**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

**Docket Number(s):** _____     _____Caption [use short title]_____

**Motion for:** _____

_____

_____

Set forth below precise, complete statement of relief sought:

_____

_____

_____

_____

_____

_____

**MOVING PARTY:**_____ **OPPOSING PARTY:**_____

___Plaintiff          ___Defendant

___Appellant/Petitioner   ___Appellee/Respondent

**MOVING ATTORNEY:**_____ **OPPOSING ATTORNEY:**_____

[name of attorney, with firm, address, phone number and e-mail]

_____   _____

_____   _____

_____   _____

Court- Judge/ Agency appealed from: _____

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
___Yes ___No (explain):_____
_____

Opposing counsel's position on motion:
___Unopposed ___Opposed ___Don't Know
Does opposing counsel intend to file a response:
___Yes ___No ___Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below?          ___Yes ___No
Has this relief been previously sought in this court?    ___Yes ___No
Requested return date and explanation of emergency:    _____
_____
_____
_____
_____

Is oral argument on motion requested?     ___Yes ___No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ___ Yes ___No If yes, enter date:_____

**Signature of Moving Attorney:**

_____**Date:**_____ Service by: ___CM/ECF   ___Other [Attach proof of service]

# No. 25-1019

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

---

**RUMEYSA OZTURK,**
**Petitioner-Appellee,**

**v.**

**PATRICIA HYDE, ET AL.,**
**Respondents-Appellants.**

---

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF VERMONT
### District Court Case No. 2:25-cv-374

---

### EMERGENCY MOTION PURSUANT TO CIRCUIT RULE 27.1(d) FOR
### STAY PENDING APPEAL WITH RELIEF REQUEST BY APRIL 29, 2025

---

**YAAKOV M. ROTH**
**Acting Assistant Attorney General**
**Civil Division**

**DREW C. ENSIGN**
**Deputy Assistant Attorney General**
**Office of Immigration Litigation**

**SARAH S. WILSON**
**Assistant Director**

**MICHAEL P. DRESCHER**
**Acting United States Attorney**
**District of Vermont**

**ALANNA T. DUONG**
**Senior Litigation Counsel**
**Office of Immigration Litigation**
**Civil Division, U.S. Dept. of Justice**
**P.O. Box 878, Ben Franklin Station**
**Washington, DC 20044**

**Attorneys for Respondents-Appellants**

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ............................................................................... 1

BACKGROUND ............................................................................... 3

   I.   Ozturk's Arrest and Transfers ................................................. 3

   II.  Proceedings in Massachusetts.................................................. 4

   III. Proceedings Below. ................................................................ 6

ARGUMENT..................................................................................... 8

   I.   This Court should stay the district court's order because the Government is likely to succeed on appeal. ....................................................... 8

       A.   The INA deprives district courts of authority to order transfers of aliens pending removal proceedings. ............................................... 9

       B.   The district court lacks jurisdiction over the petition because it was never filed in Ozturk's place of confinement and has never named her immediate custodian as a respondent as *Padilla* requires..........10

       C.   The Immigration and Nationality Act further bars the district court's review of Ozturk's claims...........................................................16

       D.   The balance of equities weighs in the government's favor..............19

   II.  Alternatively, this Court should issue a writ of mandamus and hold that the district court lacked authority to order Ozturk's transfer..........................20

CONCLUSION .................................................................................22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

## TABLE OF AUTHORITIES

Page(s)

<u>**Cases**</u>

*Ozturk v. Trump*,
No. 2:25-CV-374, 2025 WL 1145250 (D. Vt. Apr. 18, 2025).................6, passim

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .........................................................................21

*Balintulo v. Daimler AG*,
727 F.3d 174 (2d Cir. 2013) ...........................................................20

*Campbell v. Office of Personnel Management*,
694 F.2d 305 (3d Cir. 1982) ...........................................................13

*Cheney v. U.S. Dist. Ct. for D. C.*,
542 U.S. 367 (2004) .........................................................................21

*Cooper Butt ex rel Q.T.R. v. Barr*,
954 F.3d 901 (6th Cir. 2020) ...........................................................17

*Cruz v. Ridge*,
383 F.3d 62 (2d Cir. 2004) ............................................................... 9

*De Ping Wang v. Dep't of Homeland Sec.*,
484 F.3d 615 (2d Cir. 2007) ...........................................................13

*Delgado v. Quarantillo*,
643 F.3d 52 (2d Cir. 2011) .........................................................18, 19

*Demjanjuk v. Meese*,
784 F.2d 1114 (D.C. Cir. 1986) ......................................................14

*Demore v. Kim*,
538 U.S. 510 (2003) .........................................................................18

*Dep't of Educ. V. California*,
145 S. Ct. 966 (2025)....................................................................... 9

*Ex Parte Endo*,
323 U.S. 283 (1944) ......................................................................6, 14

*Gandarillas-Zambrana v. BIA*,
   44 F.3d 1251 (4th Cir. 1995) ............................................................................10

*Griffin v. United States*,
   621 F.3d 1363 (Fed. Cir. 2010).........................................................................12

*Hilton v. Braunskill*,
   481 U.S. 770 (1987) ......................................................................................... 8

*Humphries v. Various Fed. U.S. INS Emps.*,
   164 F.3d 936 (5th Cir. 1999) ............................................................................17

*International Products Corp v. Koons*,
   325 F.2d 403 (2d Cir. 1963) .............................................................................20

*Jennings v. Rodriguez*,
   583 U.S. 281 (2018) ....................................................................................7, 18

*La Buy v. Howes Leather Co.*,
   352 U.S. 249 (1957) .........................................................................................21

*Liriano v. United States*,
   95 F.3d 119 (2d Cir. 1996) .........................................................................12, 13

*Mapp v. Reno*,
   241 F.3d 221 (2d Cir. 2001) ..........................................................................7, 8

*Maryland v. King*,
   567 U.S. 1301 (2012) ...................................................................................7, 19

*Mohawk Indus., Inc. v. Carpenter*,
   558 U.S. 100 (2009) .........................................................................................21

*Nasrallah v. Barr*,
   590 U.S. 573 (2020) .........................................................................................18

*Nken v. Holder*,
   556 U.S. 418 (2009) ......................................................................................... 8

*Paul v. INS*,
   348 F.3d 43 (2d Cir. 2003) ...............................................................................13

*Ragbir v. Homan,*
    923 F.3d 53 (2d Cir. 2019) ...................................................................17

*Reno v. American-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ...............................................................2, 16, 17

*Rios-Berrios v. INS,*
    776 F.2d 859 (9th Cir. 1985) ...............................................................10

*Royal Canin U. S. A., Inc. v. Wullschleger,*
    604 U.S. 22 (2025) ...............................................................................15

*Ruiz v. Mukasey,*
    552 F.3d 269 (2d Cir. 2009) ...............................................................18

*Rumsfeld v. Padilla,*
    542 U.S. 426 (2004) ...............................................................2, passim

*Schlanger v. Seamans,*
    401 U.S. 487 (1971) ...............................................................................15

*Singh v. Napolitano,*
    500 F. App'x 50 (2d Cir. 2012) ...........................................................18

*Trump v. J. G. G.,*
    ---S. Ct.---, No. 24A931, 2025 WL 1024097 (U.S. Apr. 7, 2025) ....................11

*United States ex rel. Knauff v. Shaughnessy,*
    338 U.S. 537 (1950) ...............................................................................19

*Van Dinh v. Reno,*
    197 F.3d 427 (10th Cir. 1999) ...........................................................10

*Washer v. Bullitt County,*
    110 U.S. 558 (1884) ...............................................................................15

*Wood v. United States,*
    175 F. App'x 419 (2d Cir. 2006) .........................................................10

*Zundel v. Gonzales,*
    230 F. App'x 468 (6th Cir. 2007) .......................................................17

## **Statutes**

8 U.S.C. § 1101(a)(11)(A) .................................................................. 9

8 U.S.C. § 1101(a)(11)(B) .................................................................. 9

8 U.S.C. § 1201(i) .........................................................................3, 7

8 U.S.C. § 1226 ............................................................................20

8 U.S.C. § 1226(a) ..................................................................3, 7, 18

8 U.S.C. § 1226(e) ......................................................................... 7

8 U.S.C. § 1227(a)(1)(B) ............................................................3, 4

8 U.S.C. § 1252(a)(2)(b)(ii) ....................................................10, 22

8 U.S.C. § 1252(a)(5) ................................................................7, 18

8 U.S.C. § 1252(b)(9) ...............................................................7, 18

8 U.S.C. § 1252(g) ..........................................................2, 7, 16, 17

8 U.S.C. § 1357(a) ........................................................................18

8 U.S.C. § 1231(g) ........................................................................21

8 U.S.C. § 1231(g)(1) .................................................................... 9

28 U.S.C. § 1631..................................................................5, 6, 12, 13

28 U.S.C. § 2241..................................................................9, 13, 16

## **Regulations**

8 C.F.R. § 1003.14(a)......................................................................20

No. 25-1019

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

RUMEYSA OZTURK,
Petitioner-Appellee,

v.

PATRICIA HYDE, ET AL.,
Respondents-Appellants.

EMERGENCY MOTION PURSUANT TO CIRCUIT RULE 27.1(d) FOR
STAY PENDING APPEAL WITH RELIEF REQUEST BY APRIL 29, 2025

## INTRODUCTION

This case manifestly warrants emergency relief. The federal courts are courts of limited jurisdiction—and Congress specifically limited federal-court jurisdiction over immigration matters. Yet the district court's order—which compels the government to transfer Rumeysa Ozturk from a detention facility in Louisiana to a detention facility in Vermont by Thursday, May 1—defies those limits at every turn in a way that irreparably harms the government. To start, the district court lacked any authority to issue that extraordinary order. The Immigration and Nationality Act ("INA") strips judicial review over the discretionary determination about where an alien is held during immigration proceedings—as every circuit to address the

question has held. On top of that, the district court ordered transfer to aid its consideration of Ozturk's habeas petition—thereby contravening the Supreme Court's decision in *Padilla v. Rumsfeld*, 542 U.S. 426 (2004), which holds that petitioners can only file habeas petitions in their district of confinement—here, Louisiana, not Vermont. The district court then violated a further line of Supreme Court precedent establishing that the INA strips jurisdiction over this entire case, habeas or not. Among much else, Ozturk challenges her arrest, detention, and removal. But that is *exactly* what 8 U.S.C. § 1252(g) bars—as the Supreme Court held in *Reno v. American-Arab Anti-Discrimination Comm. ("AADC")*, 525 U.S. 471 (1999).

That order does not just contravene a multitude of precedents confirming the INA's many jurisdictional bars. That order also threatens to irreparably harm the Executive Branch by usurping prerogatives over immigration and micromanaging how, when, and where the Executive Branch holds and transfers aliens.

Because the district court's order requires action by May 1, emergency relief is imperative. The government filed its notice of appeal and a motion for continued stay on April 22, which the district court denied on April 24. A decision from this Court on this emergency motion is requested by April 29, 2025.

## BACKGROUND

### I.   Ozturk's Arrest and Transfers

Ozturk is a citizen of Turkey.  *See* Ex. A, ¶ 8.  She entered the United States pursuant to a student visa.  *Id.* ¶ 8.  After the Department of State revoked her visa under 8 U.S.C. §1201(i), U.S. Immigration and Customs Enforcement ("ICE"), a component of the Department of Homeland Security ("DHS"), arrested Ozturk at approximately 5:25 PM on March 25, 2025, pursuant to 8 U.S.C. § 1226(a).  *See* Ex. B, Wesling Decl., ¶ 5.  With her visa revoked, Ozturk is subject to removal under 8 U.S.C. § 1227(a)(1)(B) as an alien "whose nonimmigrant visa … has been revoked under section 1201(i)."  *Id.* ¶ 14.

Prior to the arrest, ICE determined that there was no available bedspace for Ozturk at a facility within the New England region where she could be detained and still appear for a hearing in Immigration Court.  *Id.* ¶ 6.  ICE therefore decided that Ozturk would be transferred to the South Louisiana Correctional Facility in Basile, Louisiana, and made necessary transfer and flight arrangements.  *Id.* ¶¶ 6, 8.  Transfers out of state, and out of the Enforcement and Removal Operations ("ERO") Boston area of responsibility, are routinely conducted after arrest, due to operational necessity.  *Id.* ¶ 7.  As a result, at 5:49 PM on March 25, ICE officials departed Somerville, Massachusetts, and transported Ozturk to Methuen, Massachusetts, arriving at 6:22 PM.  *Id.* ¶ 10.

At 6:36 PM, ICE officials departed from Methuen and transported Ozturk to Lebanon, New Hampshire. *Id.* ¶ 1. At 9:03 PM, ICE officials departed Lebanon to transport Ozturk to the ICE field office in St. Albans, Vermont, arriving at 10:28 PM. *Id.* ¶¶ 12-13. While at the facility in St. Albans, ICE issued Ozturk a Notice to Appear in the Immigration Court at Oakdale, Louisiana, on April 7, 2025, and charged her as removable under 8 U.S.C. §1227(a)(1)(B). *Id.* ¶ 14.

Ozturk spent the night at the ICE field office in St. Albans, Vermont, on March 25. *Id.* ¶ 13. On March 26 at 4:00 AM, ICE officials departed the ICE Field Office in St. Albans and transported Ozturk to the airport in Burlington, Vermont. *Id.* ¶16. At 5:31 AM, Ozturk departed Burlington. *Id.* ¶ 17. At 2:35 PM, she arrived in Louisiana and was transported to the South Louisiana Correctional Facility. *Id.* ¶¶ 18-19. At the time of Ozturk's arrest, ICE was not aware of a counsel of record. *Id.* ¶ 20. Once ICE obtained Ozturk's counsel's contact information, it was provided to Ozturk, who then spoke with her counsel. *Id.* ¶¶ 20-21.

## II.    Proceedings in Massachusetts.

Ozturk filed her original petition with the District of Massachusetts on March 25, 2025 at 10:01 PM. *Id.* Ozturk named as Respondents Patricia Hyde, the Acting Director of ICE's ERO Boston Field Office, Michael Krol, ICE's Boston Homeland Security Investigation's Special Agent in Charge, Todd Lyons, the Acting Director of ICE, and Kristi Noem, the Secretary of Homeland Security. *Id.* Ozturk

4

alleged that she was "currently in custody in the District of Massachusetts" and that "one or more of the named Respondents is her immediate custodian." *Id.* ¶ 12. But Ozturk was in fact in Vermont, set to be transferred to Louisiana—a decision made by ICE officials before any petition was filed. Ex. B, Wesling Decl., ¶¶ 6-8, 10-13.

On March 28, 2025, Ozturk filed an Amended Petition. Ex. A. Ozturk added President Donald J. Trump and Secretary of State Marco Rubio as Respondents. *Id.* She asserted that venue was proper in the District of Massachusetts under the theory that she "had been detained in the District of Massachusetts by [ICE] and under the custody and control of ICE officials in Massachusetts at the time of the filing of this petition." *Id.* ¶ 7. Ozturk added claims under the First Amendment and the Administrative Procedures Act ("APA"), amended her claim under the Due Process Clause, and sought release on bail. *Id.* Ozturk asked that the district court order that she be returned to Massachusetts and that she be released. *Id.* at Prayer for Relief.

Respondents opposed the habeas petition and moved to dismiss it, and alternatively, to transfer the matter to the Western District of Louisiana. *See* Ex. C, Memo. and Order at 6-7 (Apr. 4, 2025). On April 4, 2025, the Massachusetts district court denied Respondents' motion to dismiss and its alternative request to transfer the matter to Louisiana. *Id.* at 25. Because Ozturk was, at the time of the filing, detained in Vermont, the Massachusetts district court transferred the action to the District of Vermont under 28 U.S.C. § 1631. *Id.*

5

## III. Proceedings Below.

On April 18, 2025, after supplemental briefing, the Vermont district court denied the government's motion to dismiss. *See Ozturk v. Trump*, -- F.Supp. 3d --, No. 2:25-CV-374, 2025 WL 1145250 (D. Vt. Apr. 18, 2025). Addressing Ozturk's transfer to Vermont under 8 U.S.C. § 1631, the district court concluded that, because Ozturk's petition could have been brought in the District of Vermont at the time it was filed, the Massachusetts district court's decision to transfer the petition to Vermont complied with § 1631. *Id.* at *5-6.

Turning to its jurisdiction, the district court concluded that Ozturk's transfer to the District of Vermont cured her failure to file the habeas petition in the district of confinement, and that ICE's transfer of Ozturk to the Western District of Louisiana did not deprive the court of jurisdiction. *Id.* at *6-7. Relying on *Ex Parte Endo*, the district court concluded that, had Ozturk filed her petition in Vermont on March 25, the district court would have acquired jurisdiction on that date, and maintained jurisdiction after her transfer to Louisiana because a respondent with the power to effectuate her release remained within the reach of the District of Vermont. *Id.* at *8 (citing *Ex Parte Endo*, 323 U.S. 283 (1944); *Padilla*, 542 U.S. at 426). The district court also concluded that any failure by Ozturk to name an immediate custodian as a respondent was excused by her lack of knowledge of the custodian's

identity, invoking the "unknown custodian exception." *Ozturk*, 2025 WL 1145250, at *8-9.

Regarding the jurisdictional bars under 8 U.S.C. §§ 1201(i), 1226(e), 1252(g), 1252(a)(5), and 1252(b)(9), the district court concluded that none of these provisions barred its review of Ozturk's habeas claims. *Ozturk*, 2025 WL 1145250, at *10-15. First, § 1226(e)'s bar on judicial review of discretionary judgment did not apply because, notwithstanding Ozturk's detention under the discretionary detention provision 8 U.S.C. § 1226(a), Ozturk had raised questions that were "fairly characterized as 'constitutional claims or questions of law.'" *Id.* at *10-11. Second, §1201(i)'s bar regarding judicial review of visa revocation decisions did not apply because Ozturk was not challenging her visa being revoked. *Id.* at *12. Third, § 1252(a)(5), (b)(9), and (g)'s bars on judicial review of questions arising from removal proceedings and removal orders did not apply because Ozturk's claims for relief did not challenge her removal proceedings and thus did not "arise from" them. *Id.* at *11-15. In so ruling, the district court rejected the government's argument that, under *Jennings v. Rodriguez*, 583 U.S. 281 (2018), the habeas corpus bar in §1252(b)(9) includes challenges to a decision to detain or to seek removal. *Ozturk*, 2025 WL 1145250, at *13-15.

Addressing the merits of Ozturk's claim for purposes of immediate release under *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001), the district court concluded that

Ozturk adequately alleged her detention was retaliatory in violation of the First Amendment and had an improper purpose in violation of the Due Process Clause. *Ozturk*, 2025 WL 1145250, at *18-21. However, the district court found that it did not have sufficient information to support release under *Mapp* and deferred ruling for further factual development. *Id.* at *22.

Lastly, relying on the "equitable and flexible nature of habeas relief," the district court ordered that Ozturk be transferred to ICE custody within the District of Vermont no later than May 1, 2025. *Id.* at *23, 25. The district court stayed the effect of its order for four days. *Id.* at *25. On April 22, 2025, the government filed a notice of appeal and moved for a continued stay of its order pending appeal before this Court, which the district court denied. This motion for stay follows.

## **ARGUMENT**

I. **This Court should stay the district court's order because the Government is likely to succeed on appeal.**

An immediate stay pending appeal is warranted. Courts consider four factors in assessing a motion for stay pending appeal: (1) the movant's likelihood of prevailing on the merits of the appeal, (2) whether the movant will suffer irreparable harm absent a stay, (3) the harm that other parties will suffer if a stay is granted, and (4) the public interest. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). When the government is a party, its interests and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

8

This Court should immediately issue a stay. As the district court recognized, its transfer order here is immediately reviewable—even though it is an interlocutory order. *See Ozturk*, 2025 WL 1145250, at *25; *Dep't of Educ. V. California*, 145 S. Ct. 966, 968 (2025); *Cruz v. Ridge*, 383 F.3d 62, 64–65 (2d Cir. 2004). And the district court's order should plainly be set aside. The INA firmly commits to the Executive's discretion the decision about where to detain an alien who is undergoing removal proceedings—as multiple circuit courts have held. Further, both the INA, which governs federal courts' jurisdiction over immigration-related orders, and the federal habeas statute, 28 U.S.C. § 2241, which governs federal courts' jurisdiction over habeas petitions, bar jurisdiction here.

## A. The INA deprives district courts of authority to order transfers of aliens pending removal proceedings.

The district court relied on the "equitable and flexible nature of habeas relief" to justify its order. *Ozturk*, 2025 WL 1145250, at *23. But Congress specifically foreclosed that remedy via the INA. The district court did not grapple with these limits at all, let alone justify its decision under them.

Decisions about where to detain an alien pending removal proceedings are committed to the discretion of the Secretary of Homeland Security. *See* 8 U.S.C. § 1101(a)(11)(A)-(B), 1231(g)(1) ("The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."). The INA specifically precludes judicial review over such discretionary

9

decisions. *Id.* § 1252(a)(2)(B)(ii). Indeed, the INA identifies the habeas statute and provides that there shall be no judicial review of "any" such "discretionary" decision. *Id.* Put together, DHS "necessarily has the authority to determine the location of detention of an alien in deportation proceedings," and the federal courts lack the power to review or alter that discretionary decision. *Gandarillas-Zambrana v. BIA*, 44 F.3d 1251, 1256 (4th Cir. 1995).

Under a straightforward application of these statutory provisions, federal courts have held time and again that they lack authority over the Executive's decision about *where* to detain aliens during immigration proceedings. *See, e.g.*, *Wood v. United States*, 175 F. App'x 419, 420 (2d Cir. 2006) (holding that the Secretary "was not required to detain [Plaintiff] in a particular state"); *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999) (holding that "a district court has no jurisdiction to restrain the Attorney General's power to transfer aliens to appropriate facilities"); *Rios-Berrios v. INS*, 776 F.2d 859, 863 (9th Cir. 1985). The government is not aware of a single example to the contrary. Simply put, the federal courts have no authority to order that an alien be held in one ICE facility over another.

**B.** **The district court lacks jurisdiction over the petition because it was never filed in Ozturk's place of confinement and has never named her immediate custodian as a respondent as *Padilla* requires.**

Further, the order below was unlawful because the district court does not have habeas jurisdiction over this case in the first place. The Supreme Court has made

clear that for claims that "fall within the 'core' of the writ of habeas corpus," "jurisdiction lies in only one district: the district of confinement." *Trump v. J. G. G.*, ---S. Ct.---, No. 24A931, 2025 WL 1024097, at *1 (U.S. Apr. 7, 2025); *see also Padilla*, 542 U.S. at 434-35. For Ozturk, that is the Western District of Louisiana. That district is the sole district where a habeas petition may be filed. The District of Vermont, by contrast, has no claim to this case.

**1.** In *Padilla*, the Supreme Court established two rules for habeas jurisdiction: A habeas petition must file that petition in the district where she is detained, and the petition must name the custodian detaining her in that district. 542 U.S. at 434-35. Indeed, *Padilla* rebuked this Court's relaxed approach to the immediate custodian rule. *See* 542 U.S. at 437-38 (rejecting the Second Circuit's "view that we have relaxed the immediate custodian rule in cases involving prisoners detained for 'other than federal criminal violations,' and that in such cases the proper respondent is the person exercising 'the reality of control over the petitioner.'").

*Padilla* controls here. When Ozturk filed her original habeas petition in Massachusetts—naming supervisory officials, rather than her immediate custodian—she was in fact in Vermont. And when Ozturk filed her amended habeas petition in the District of Massachusetts—again naming supervisory officials, rather than her immediate custodian—she was in Louisiana. Thus, the Vermont district court does not have jurisdiction over this matter because: (1) Ozturk filed her

petition in Massachusetts, although she was detained in Vermont; (2) no petition was filed in Vermont during Ozturk's time there; (3) Ozturk has been detained in Louisiana since March 26, where no petition has been filed; and (4) she failed to name her immediate custodian in her petition (or in her amended petition) when it was originally filed in Massachusetts, and her current immediate custodian is not located within Vermont. Under a straightforward application of *Padilla*, that was improper. And here, as there, the proper course is "dismissal without prejudice," so that Ozturk can properly file in her district of confinement. 542 U.S. at 451.

**2.** The district court held otherwise, but its reasoning was flawed.

*First*, the district court held that it had jurisdiction under the transfer statute— 28 U.S.C. § 1631—on the ground that when Ozturk filed her original habeas petition, it "could have been brought" in Vermont. *Ozturk*, 2025 WL 1145250, at *6. But a general transfer statute cannot be used to override the specific statutory perquisites for any particular remedy. Section 1631 serves a narrow function: to "aid litigants who were confused about the proper forum for review." *Liriano v. United States*, 95 F.3d 119, 122 (2d Cir. 1996). Specifically, the statute allows transferee courts to excuse "technical obstacles" that would otherwise prevent it from exercising its *existing authority* over a case. *Griffin v. United States*, 621 F.3d 1363, 1365 (Fed. Cir. 2010). The statute thus provides that a court may transfer a case to another court "in which the action or appeal could have been brought at the time it was filed or

noticed," and that case "shall proceed as if it had been filed in [that court] to which it is transferred on the date upon which it was actually filed."

There is a fundamental difference, however, between using § 1631 to excuse a threshold technical or procedural defect and using it to try to acquire *substantive authority* that the court would otherwise lack. The former is using the statute as intended; the latter is stretching it beyond its bounds. *See, e.g.*, *Paul v. INS*, 348 F.3d 43, 46 (2d Cir. 2003); *Liriano*, 95 F.3d at 122-23.

The district court's order falls on the wrong side of that line. Section 2241, at bottom, is a specific federal statute that authorizes the federal courts to issue a specific sort of remedy (habeas), if and only if certain preconditions are satisfied. *See Padilla*, 542 U.S. at 434-35. Nothing in § 1631 allows a district court to cast aside those statutory requirements, based on the fiction that the suit was properly before it. Notably, this Court has held that § 1631 does not allow courts to ignore substantive limits on jurisdiction. *See De Ping Wang v. Dep't of Homeland Sec.*, 484 F.3d 615, 617-18 (2d Cir. 2007) ("Because we would have lacked jurisdiction over Wang's petition for review had it been filed in this Court 'at the time it was filed or noticed' in the District Court, transfer under § 1631 was not permitted."); *accord Campbell v. Office of Personnel Management*, 694 F.2d 305, 309 n.6 (3d Cir. 1982). So much so here: Nothing in § 1631 vests the district court to issue habeas

relief, when that court has not—and cannot—satisfied the specific statutory prerequisites that Congress set for doing so.

*Second*, the district relied on *Ex Parte Endo* as an exception to the above rules. 323 U.S. at 283. But the Supreme Court has explained that *Endo* is a "limited" exception that applies *only* when a petitioner "properly files" a habeas petition in the original court. *Padilla*, 542 U.S. at 441. In those circumstances, the original court can "retain[]" jurisdiction, notwithstanding the government's subsequent decision to transfer. *Id.* But where, as here, habeas jurisdiction did not originally vest, there is nothing to retain; the court never had jurisdiction in the first place. Here, Ozturk never filed a proper petition in the District of Vermont when she was detained there. That is dispositive under *Padilla*. And nothing in *Endo* justifies a departure.

*Third*, the district court relied on the judge-made "unknown custodian exception" to excuse Ozturk's failure to name a proper respondent. But that exception only applies in extraordinary circumstances where the custodian is *unknowable*, that is, where one's detention is a prolonged secret. Thus, courts have reasoned that the exception effectively allows a district court to relax the immediate-custodian rule (and the district-of-confinement rule) if the identity of the custodian is something the government will not reveal, and that the petitioner's counsel cannot feasibly obtain. *See Demjanjuk v. Meese*, 784 F.2d 1114, 1116 (D.C. Cir. 1986). In other words, it applies when "a prisoner is held in an undisclosed location by an

14

unknown custodian" because "it is impossible to apply the immediate custodian and district of confinement rules." *Padilla*, 542 U.S. at 450 n.18. That exception does not apply where, as here, counsel is unable to track down the proper custodian for a brief period. Thus, here, failure to name the proper respondent subject to a district court's jurisdiction is "fatal." *Schlanger v. Seamans*, 401 U.S. 487, 489-91 (1971).

**3.** Further, the district court lacked habeas jurisdiction for an additional, independent reason: Ozturk amended her petition. "The plaintiff is the master of the complaint, and therefore controls much about her suit." *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025) (cleaned up). "If a plaintiff amends her complaint, the new pleading 'supersedes' the old one: The original pleading no longer performs any function in the case." *Id.*

Those same principles control here. "When a petition is amended," the "cause proceeds on the amended petition." *Washer v. Bullitt County*, 110 U.S. 558, 562 (1884). As relevant, that means the amended petition must justify jurisdiction on its own. *Cf. Royal Canin*, 604 U.S. at 39 (holding when plaintiffs amends complaint to remove federal claims, then federal court lacks supplemental jurisdiction and must remand). Yet here, when Ozturk chose to amend her petition, she was in the Western District of Louisiana, and knew that her immediate custodian was there too. *See* Ex. A ¶¶1, 30-31. Whatever can be said of the District of Vermont's claim over Ozturk's *original* petition, there is no available basis for it to claim jurisdiction over

the *amended* one.  By that time, habeas jurisdiction was only proper in the Western District of Louisiana.

## C. The Immigration and Nationality Act further bars the district court's review of Ozturk's claims.

Finally, the district court's order was also improper because the INA stripped district courts of jurisdiction over cases like this one.  Specifically, Ozturk's preemptive challenge to her arrest, detention, and removal is squarely barred by 8 U.S.C. § 1252(g)—as the Supreme Court squarely held in a remarkably similar case.  In § 1252(g), Congress clearly provided that "no court" has jurisdiction over any cause or claim "arising from the decision or action ... to commence proceedings, "notwithstanding any other provision of law," whether "statutory or nonstatutory," including habeas, mandamus, or the All Writs Act.  By its terms, this jurisdiction-stripping provision precludes habeas review under 28 U.S.C. § 2241 (as well as review pursuant to the All Writs Act and APA) of claims arising from a decision or action to commence removal proceedings.  *See AADC*, 525 U.S. at 482.  In short, the decision as to the method by which removal proceedings are commenced, which is the genesis of Ozturk's detention, is a discretionary one that is not reviewable by a district court under §1252(g).  *See id.* at 487.

Crucially, the Supreme Court has held that a prior version of § 1252(g) barred claims similar to those brought here.  *See AADC*, 525 U.S. at 487-92.  In a case in which aliens alleged that the "INS was selectively enforcing the immigration laws

against them in violation of their First and Fifth Amendment rights," *id.* at 473-74, and the government admitted "that the alleged First Amendment activity was the basis for selecting the individuals for adverse action," *id.* at 488 n.10, the Supreme Court nonetheless held that the "challenge to the Attorney General's decision to 'commence proceedings' against them falls squarely within § 1252(g)," *id.* at 487; *see Cooper Butt ex rel Q.T.R. v. Barr*, 954 F.3d 901, 908-09 (6th Cir. 2020). *AADC* confirms that an alien cannot avoid the reach of §1252(g) by alleging his arrest and the commencement of removal proceedings against him are in retaliation for her exercise of the First Amendment. *See, e.g.*, *AADC*, 525 U.S. at 487-92; *Ragbir v. Homan*, 923 F.3d 53, 73 (2d Cir. 2019); *Zundel v. Gonzales*, 230 F. App'x 468, 475 (6th Cir. 2007); *Humphries v. Various Fed. U.S. INS Emps.*, 164 F.3d 936, 945 (5th Cir. 1999).

Moreover, the district court does not obtain jurisdiction simply because Ozturk asserts constitutional arguments under the First and Fifth Amendments. Instead, the INA provides that "[j]udicial review of *all* questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action" to remove an alien are "available only in judicial review of a final order [of removal]." 8 U.S.C. § 1252(b)(9) (emphasis added). Thus, "the sole and exclusive means for judicial review of an order of removal" is a "petition for review filed with an appropriate court of appeals." 8 U.S.C. §1252(a)(5), (b)(2).

That includes challenges inextricably intertwined with the final order of removal that precede issuance of any order of removal and both direct and indirect challenges to removal order. *See, e.g.*, *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011), *Ruiz v. Mukasey*, 552 F.3d 269, 274 n.3 (2d Cir. 2009); *Singh v. Napolitano*, 500 F. App'x 50, 52 (2d Cir. 2012). It also includes decisions to detain for purposes of removal. *See Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (§1252(b)(9) bar challenges to "decision to detain [alien] in the first place or to seek removal," which precedes any issuance of a Notice to Appear); *Nasrallah v. Barr*, 590 U.S. 573, 580 (2020) (recognizing that the REAL ID Act clarified that removal orders may not be reviewed in district courts, "even via habeas corpus".).

The district court's finding of "no causal relationship between the removal proceedings and [Ozturk's] detention" because her detention was discretionary and thus "did not flow naturally as a consequence of her removal proceedings" misunderstands the immigration process. *Ozturk*, 2025 WL 1145250, at *23. First, detention is constitutionally authorized "for the brief period necessary for ... removal proceedings." *Demore v. Kim*, 538 U.S. 510, 513 (2003); *see* 8 U.S.C. § 1357(a); *Jennings*, 583 U.S. at 303 ("Section 1226(a) creates a default rule for those aliens by permitting—but not requiring—the Attorney to issue warrants for their arrest and detention pending removal proceedings."). Second, aside from citing the regulation addressing commencement of proceedings, the district court provides no authority

establishing that proceedings must commence before an alien is detained. *See id.* No such authority exists. Instead, by Ozturk's own words, her challenges are inextricably intertwined with her removal proceedings, and the district court erred by failing to dismiss them. *Delgado*, 643 F.3d at 55. Indeed, as the district court stated, Ozturk "seeks relief on her claims "challenging her apprehension, detention," "release from detention," and sought "corresponding declaratory and injunctive relief that the Policy that resulted in her apprehension, detention" are illegal. *Ozturk*, 2025 WL 1145250, at *12.

### D. The balance of equities weighs in the government's favor.

The government "suffers a form of irreparable injury" "[a]ny time [it] is enjoined by a court form effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). That is particularly true here because rules governing immigration "implement[ ] an inherent executive power." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (recognizing that "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien"). Critically, the district court ordered that Ozturk appear remotely for her removal proceedings in Louisiana, although the immigration court in Louisiana has jurisdiction over her removal proceedings. *See* Ex. B, Wesling Decl., ¶14; 8 C.F.R.

19

§ 1003.14(a). Notwithstanding the logical difficulty, the district court's order essentially prioritizes the (improper) proceedings in Vermont over the (proper) proceedings in Louisiana, and allowing district courts to micromanage how the Executive Branch operates and transfers aliens—often for space-related reasons or other operational needs—would severely undermine the workability of this system.

Moreover, Ozturk does not challenge the revocation of her visa. With her visa revoked, she lacks lawful status in the United States and is subject to detention under 8 U.S.C. § 1226 for the duration of removal proceedings. Even under the terms of the district court's order, Ozturk would remain in custody; accordingly, she would not be substantially harmed by a stay of the district court's order.

## II. Alternatively, this Court should issue a writ of mandamus and hold that the district court lacked authority to order Ozturk's transfer.

Should this Court not stay the district court's order, it should exercise jurisdiction under the All Writs Act to issue a writ of mandamus. A writ of mandamus is "a drastic and extraordinary remedy reserved for really extraordinary cases."[1] *Balintulo v. Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013). Mandamus relief is appropriate "in extraordinary circumstances," when, for example, a district court's order "amounts to a judicial usurpation of power or a clear abuse of

---

[1] A notice of appeal can be construed as a petition for a writ of mandamus. *See, e.g.*, *International Products Corp v. Koons*, 325 F.2d 403, 407 (2d Cir. 1963).

discretion, or otherwise works a manifest injustice." *Id.* (citing *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009)).

Mandamus is warranted in the event this Court does not stay the district court's transfer order, because the transfer order functions as an injunction upon the government, and the district court lacks jurisdiction under multiple theories, *see supra* pp. 10-19. The district court could not "disregard statutory and constitutional requirements and provisions" and exercise equitable relief that has been limited by the INA. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–28 (2015). But even if it could, mandamus relief would warranted for three reasons. First, the government has no other adequate means to attain the requested relief. *See Cheney v. U.S. Dist. Ct. for D. C.*, 542 U.S. 367, 380 (2004). Crucially, the district court ordered ICE to transfer Ozturk to a facility in Vermont by May 1, 2025. Second, considering the jurisdictional bars in 8 U.S.C. §§1231(g) and 1252(a)(2)(b)(ii), and the district court's reliance only on the "equitable and flexile nature of habeas relief," *Ozturk*, 2025 WL 1145250, at *23, the government has satisfied its burden of showing that its right to issuance of the writ is clear and indisputable. *See Chenery*, 542 U.S. at 380. Finally, issuance of the writ is appropriate under these circumstances because the district court's order amounts to a judicial usurpation of the Executive's exclusive statutory powers and preeminent constitutional powers over immigration. *See La Buy v. Howes Leather Co.*, 352 U.S. 249, 259-60 (1957).

21

## **CONCLUSION**

The Court should grant the government's emergency motion and stay the district court's order pending appeal on or by April 29, 2025.

Respectfully submitted,

/s/Alanna T. Duong

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General
Office of Immigration Litigation

SARAH S. WILSON
Assistant Director

Michael P. Drescher
Acting United States Attorney
District of Vermont

ALANNA T. DUONG
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-7040
alanna.duong@usdoj.gov

April 24, 2025

Attorneys for Respondents-Appellant

22

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 27(d)(2)(A), I certify that the foregoing was prepared using 14-point Times New Roman type, is proportionally spaced and contains less than 5,200 words, exclusive of the tables of contents and citations, and certificates of counsel.

<div align="right">

*/s/ Alanna T. Duong*
ALANNA T. DUONG
Senior Litigation Counsel
U.S. Department of Justice

</div>

April 24, 2025                        Attorney for Respondents-Appellants

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 24, 2025, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate ACMS system. I further certify that all participants in the case are registered ACMS users and that service will be accomplished through that system.

<div align="right">

*/s/ Alanna T. Duong*
ALANNA T. DUONG
Senior Litigation Counsel
U.S. Department of Justice

</div>

Exhibit A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

RÜMEYSA ÖZTÜRK,

      *Petitioner*,

 v.

DONALD J. TRUMP, in his official capacity as President of the United States; PATRICIA HYDE, in her official capacity as the New England Field Office Director for U.S. Immigration and Customs Enforcement; MICHAEL KROL, in his official capacity as HSI New England Special Agent in Charge, U.S. Immigration and Customs Enforcement; TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; and MARCO RUBIO, in his official capacity as Secretary of State,

      *Respondents.*

</td><td>

Case No. 1:25-cv-10695-DJC

**FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT**

</td></tr>
</table>

## <u>INTRODUCTION</u>

1. Rümeysa Öztürk is an international PhD student who was arrested on March 25, 2025 when six plain-clothes federal officers surrounded her on the street just outside her home in Somerville, MA. Rümeysa screamed as a man in a hooded sweatshirt grabbed her. Several other officers encircled her and soon covered their faces with masks. Rümeysa was handcuffed and escorted with an officer holding each arm into an unmarked vehicle. For more than 20 hours, her friends, family and legal counsel could not locate or contact her. After an exhaustive search, they learned that she had ultimately been removed from Massachusetts and sent more than 1,300 miles away to an ICE detention facility in Louisiana.

1

2.      Rümeysa has not been charged with any crime. Nor has there been any allegation that she is dangerous or a flight risk. Her arrest and detention appear to be based solely on her co-authorship of an op-ed in her school newspaper, *The Tufts Daily*, in March 2024. The piece criticized the University's dismissal of several resolutions that had been adopted by the undergraduate student Senate as "a sincere effort to hold Israel accountable for clear violations of international law." It articulated the goals of the resolutions and the disappointment of the authors before concluding with a request that the administration "trust in the Senate's rigorous and democratic process" and "meaningfully engage with and actualize the resolutions passed by the Senate."[1]

3.      Rümeysa's arrest and detention are designed to punish her speech and chill the speech of others. Indeed, her arrest and detention are part of a concerted and systemic effort by Trump administration officials to punish students and others identified with pro-Palestine activism. When asked about Rümeysa's case, Secretary of State Marco Rubio confirmed revoking her visa, adding, "we gave you a visa to come and study and get a degree, not to become a social activist that tears up our university campuses."[2]

4.      The Department of Homeland Security's website informs international students and the schools that host them that the termination of student status may result in a requirement to immediately depart the United States and may lead ICE agents to investigate whether a student has in fact departed. It makes no mention of arresting or detaining students based solely

---

[1] Rümeysa Öztürk, et al., *Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions*, THE TUFTS DAILY (Mar. 26, 2024), www.tuftsdaily.com/ article/2024/03/4ftk27sm6jkj.

[2] *Secretary Rubio Defends Revoking Turkish Student's Visa*, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students-visa/5158479.

on the loss of status. In this case, however, DHS grabbed, arrested, and detained Rümeysa before she had received any notice of the revocation of her student visa or her student status.

5.       Rümeysa's arrest and detention are not a necessary or usual consequence of the revocation of a visa. But like the revocation of her visa, her arrest and detention are designed to silence her, punish her for her speech, and ensure that other students will be chilled from expressing pro-Palestinian viewpoints. Her continued detention is therefore unlawful. Because the government's arrest and detention violate the First and Fifth Amendments to the United States Constitution and the Administrative Procedure Act, Rümeysa should be released.

## JURISDICTION

6.       This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2241 (habeas corpus); Art. I, § 9, cl. 2 of the United States Constitution (Suspension Clause); and 28 U.S.C. § 2201 (declaratory judgment).

7.       Venue is proper because Petitioner had been detained in the District of Massachusetts by Immigration and Customs Enforcement (ICE) in Massachusetts and under the custody and control of ICE officials in Massachusetts at the time of the filing of this petition. Defendant Patricia Hyde is the Director of the Boston Field Office of ICE Enforcement and Removal Operations (ICE ERO), with authority over ICE ERO's operations and detainees in New England. Additionally, Defendant Michael Krol is the Special Agent in Charge for the Boston office of ICE Homeland Security Investigations (HSI), with authority over HSI operations and detainees in New England. At the time this petition was filed, and when the Court issued an order requiring notice prior to any transfer of the petitioner out of Massachusetts, ECF No. 3, Rümeysa had only recently been arrested in Massachusetts and had not left the custody

and control of Defendants Hyde and/or Krol in Massachusetts.[3] Sometime after receiving that order, ICE officials transferred Rümeysa to Louisiana without notifying the Court, her counsel, or Department of Justice counsel on this case. Meanwhile, Respondents withheld information about Rümeysa's location from Petitioner's counsel (and apparently, from Department of Justice attorneys on this case) until nearly 24 hours after she had been detained. On information and belief, the movement of Petitioner to other states is consistent with, and part of, ICE's pattern and practice of moving people detained for their speech to distant locations incommunicado and in secret to frustrate the ability of counsel to file habeas petitions on their behalf.

## **PARTIES**

8.      Petitioner Rümeysa Öztürk is a PhD student at Tufts University.  She resides in Somerville, Massachusetts. Rümeysa entered the United States on an F-1 nonimmigrant student visa.

9.      Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security.

10.      Respondent Patricia Hyde is named in her official capacity as the New England Field Office Director for U.S. Immigration and Customs Enforcement.

11.      Respondent Michael Krol is named in his official capacity as the New England Special Agent in Charge for Homeland Security Investigations for U.S. Immigration and Customs Enforcement.

---

[3] Counsel for the government has stated that he "has been informed that Petitioner was detained outside of Massachusetts at the time the Petition was filed," but has not provided evidence of Rümeysa's location at the time the petition was filed, or suggested that she was not in the custody and control of ICE officials in Massachusetts, ECF No. 9 at 1 n.1.

4

12.     Respondent Todd Lyons is named in his official capacity as the Acting Director for U.S. Immigration and Customs Enforcement. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States and is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner.

13.     Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a) (2007); is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner.

14.     Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i).

## FACTS

### *Rümeysa Öztürk*

15.     Rümeysa is a doctoral candidate in Child Study and Human Development at Tufts University. Rümeysa received a master's degree from Columbia University on a Fulbright scholarship.

16.     On March 26, 2024, almost exactly one year before her arrest, Rümeysa co-authored an op-ed in *The Tufts Daily*. The piece criticized Tufts University's response to several student Senate resolutions concerning human rights violations in Gaza. The authors urged

meaningful engagement by the University administration with the Senate resolutions.

17.     In February 2025, the website Canary Mission published a profile on Rümeysa,
including her photograph, claiming she "engaged in anti-Israel activism in March 2024 . . . ."
The profile describes Rümeysa as "a supporter of the Boycott, Divestment, Sanctions (BDS)
movement." Its sole support for the contention that Rümeysa "engaged in anti-Israel activism"
was a link and screenshots of the March 2024 opinion piece.

18.     Canary Mission's publication caused Rümeysa to fear for her safety.

### Rümeysa's Arrest Near Her Home and Continued Detention in Louisiana

19.     On March 25, 2025 at approximately 5:15 p.m., a hooded, plainclothes officer
approached Rümeysa near her Somerville apartment.[4]

20.     The hooded officer grabbed Rümeysa by her wrists as she screamed. Additional
officers surrounded Rümeysa as she pleaded with them. The officers placed Rümeysa in
handcuffs and took her away in an unmarked vehicle.

21.     Rümeysa's friends frantically tried to find out more information about what had
happened to her. At approximately 10:02 p.m., counsel for Rümeysa filed a petition for writ of
habeas corpus in this Court.

22.      At approximately 10:55 p.m., the Court ordered that Rümeysa not be moved
outside the District of Massachusetts without 48 hours' notice.

23.     For more than 24 hours after her arrest, Rümeysa's friends, family and legal
counsel did not hear from her and could not speak to her.

24.     Because Rümeysa suffers from asthma, her family and friends worried that she

---

[4] WCVB Channel 5 Boston, *Surveillance shows Tufts graduate student detained*, YouTube (Mar.
26, 2025), https://www.youtube.com/watch?v=PuFIs7OkzYY.

could become ill without access to her medication.

25.    On the evening of her arrest, and on the following day, counsel made numerous attempts to locate Rümeysa.

26.    These efforts included contacting the offices of ICE ERO and ICE HSI. Counsel received no response to these inquiries. Counsel also called all major known ICE detention facilities in New England but were informed that Rümeysa was not there. Counsel attempted to locate her whereabouts through ICE's Online Detainee Locator System. Although the Detainee Locator indicated that Rümeysa was in ICE custody, the field for "Current Detention Facility" remained blank.

27.    A representative of the Turkish consulate went personally to ICE offices in Burlington, Massachusetts and was reportedly informed that Rümeysa was not in that office and that ICE could not provide further information about her whereabouts. Department of Justice counsel on this matter also informed counsel for Rümeysa that they could not locate her.

28.    Fearing Rümeysa could have had a medical episode, counsel contacted numerous area hospitals.

29.    At around 3 p.m. on March 26, counsel moved this Court for an order requiring Respondents to report on Rümeysa's whereabouts and permit her counsel to speak with her.

30.    Shortly thereafter, Department of Justice counsel informed Rümeysa's counsel that she had been moved to a staging facility in Alexandria, Louisiana to be transferred to South Louisiana.

31.    Counsel was finally able to speak to Rümeysa late in the evening of March 26. Counsel learned that she had suffered an asthma attack while en route to Louisiana.

*Rümeysa's Visa Revocation and Removal Proceedings*

32.     ICE uses the Student and Exchange Visitor Information System ("SEVIS") to maintain information on students who attend designated educational programs.

33.     A letter dated March 25, 2025, and addressed but not provided to Rümeysa stated that her SEVIS designation "has been terminated pursuant to 237(a)(1)(C)(i) and/or 237(a)(4)(C)(i) of the Immigration and Nationality Act."[5] *See* **Exhibit A**. On information and belief, a copy of the letter was provided to Tufts University.

34.     A Notice to Appear ("NTA") functions as a charging document for removal proceedings. *See* 8 U.S.C. § 1229(a).

35.     On March 25 ICE provided Rümeysa with an NTA. *See* **Exhibit B**. The NTA alleges, in part, that Rümeysa's visa "was revoked by the United States Department of State" on March 21, 2025. The NTA charges Rümeysa as deportable under INA § 237(a)(1)(B).[6]  The NTA provides no other basis for Rümeysa's removal.

36.     On information and belief, Rümeysa received no notice that her visa had been revoked prior to her arrest or the service of the NTA.

37.     The NTA indicates that Rümeysa is scheduled for an initial hearing on April 7, 2025 at 8:30 a.m.

---

[5] Section 237(a)(1)(C)(i) provides: "Any alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted . . . or to comply with the conditions of any such status, is deportable." 8 U.S.C. § 1227(a)(1)(C)(i). Section 237(a)(4)(C)(i) provides: "An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1227(A)(4)(c)(i).
[6] Section 237(a)(1)(B) provides: "Any alien who is present in the United States in violation of this chapter or any other law of the United States, or whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant) has been revoked under section 1201(i) of this title, is deportable." 8 U.S.C. § 1227(a)(1)(B).

*Rümeysa's Arrest and Detention are Part of the Trump Administration's Policy of Retaliating Against Noncitizens Who Advocate for Palestinian Rights*

38.    Rümeysa's arrest and detention reflect and are a part of the Trump administration's concerted effort to silence protected political speech.

39.    In the fall of 2023, thousands of students across the U.S. from a wide range of racial, ethnic, religious, and socioeconomic backgrounds began organizing on their campuses, many criticizing what they saw as the steadfast support of their universities and the United States government for Israel's policies. Opponents of these students' messages—including President Trump—have characterized their message in favor of Palestinian rights as inherently supportive of Hamas and antisemitic.

40.    During his campaign for re-election, President Trump repeatedly vowed to use visa revocations as a tactic to pursue his policy of silencing pro-Palestinian activities on university campuses.

41.    For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."

42.    In the spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."

43.    Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated

the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."

### *The Trump Administration Announces its Policy to Target Speech of Noncitizens*

44.     Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

45.     Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's overly broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including advocacy for Palestinian human rights.

46.     Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that, applied to speech, would punish constitutionally protected criticism of the Israeli government and its policies. In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas,"

10

sending a clear message to all "resident aliens [sic] who participated in pro-jihadist protests" that the federal government "will find you… and deport you."

47.     In or around February 2025, Respondents began implementing a policy by which they would retaliate against and punish noncitizens like Rümeysa for their constitutionally protected speech (the Policy). Under the Policy, Secretary of State Marco Rubio would revoke the visas or green cards of individuals who expressed support for Palestinian rights. These revocations would then permit the Department of Homeland Security to arrest, detain and deport such individuals.

48.     On March 6, 2025, Secretary Rubio posted to X: "Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law—including international students—face visa denial or revocation, and deportation."

49.     Additionally, certain groups began publicizing the names of pro-Palestinian activists they wanted the government to deport. Specifically, these groups compiled lists of students and faculty who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line, or publicly flagged names to U.S. Government official accounts.

50.     As illustrated *infra*, one way that Secretary Rubio is implementing the Policy is by wrongly invoking 8 U.S.C. § 1227(a)(4)(C)(i) (hereinafter "the Foreign Policy Ground"), which provides that "An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." This Provision expressly prohibits the Secretary of State from excluding or conditioning entry based on a noncitizen's "past, current, or

11

expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the individual would compromise a compelling U.S. foreign policy interest. *See* 8 U.S.C. § 1227(a)(4)(C)(ii) (citing 8 U.S.C. § 1182(a)(3)(C)(iii)).

51.    Legislative history makes clear that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

52.    Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

*The Government Begins to Implement its Policy of Intimidation and Retaliation*

53.    On March 5, 2025, the State Department revoked the student visa of Ranjani Srinivasan, an Indian national and doctoral student at Columbia, under the Foreign Policy Ground. Srinivasan had previously expressed support for the rights of Palestinians. Two days later, federal immigration agents showed up at her apartment looking for her, but she did not open the door. They showed up again the following night, but she was not home. On March 13, 2025, agents returned to her home with a judicial warrant. DHS released a statement characterizing Srinivasan as a terrorist sympathizer and accused her of advocating violence and being "involved in activities supporting Hamas," but the agency has not provided any evidence for its allegations, and Srinivasan disputes them.

54.    On March 8, 2025, ICE agents in plain clothes arrested Mahmoud Khalil, a legal permanent resident and recent Columbia University graduate, at his Columbia University student housing. Khalil had previously expressed support for the rights of Palestinians. The agents initially told Khalil that they were detaining him because his student visa had been revoked by the State Department, but when Khalil's attorney informed the agents that he was a green card holder, the agents responded that the State Department had revoked Khalil's green card, too. The Notice to Appear later issued by the government to Khalil cites the Foreign Policy Ground as the basis for his arrest and removal. The agents handcuffed Khalil and placed him in an unmarked vehicle. Over the course of that evening and into the early hours of the following morning, Khalil would first be taken to an ICE field office in Manhattan and then to a detention facility in New Jersey, returning to New York to board a flight to Texas and finally to Louisiana. To date, Khalil remains detained in Louisiana.

55.     On March 8, 2025, ICE signed an administrative arrest warrant for Yunseo

Chung, a legal permanent resident and Columbia University student who has lived in the United

States since she was seven. Chung had previously expressed support for the rights of

Palestinians. On March 10, a federal law enforcement official advised Chung's attorney that her

legal permanent resident status had been revoked. On March 13, federal law enforcement agents

executed a judicial search warrant at Chung's dormitory. Chung filed a complaint and petition

for habeas corpus in the United States District Court for the Southern District of New York, and

sought, among other things, a temporary restraining order preventing immigration enforcement

officials from taking her into custody or transferring her out of the district. On March 25, 2025,

the court issued such an order. *Chung v. Trump et al.*, Case No. 25-cv-02412, ECF 19

(S.D.N.Y.).

56.     On March 17, 2025, ICE arrested Badar Khan Suri, an Indian national and

postdoctoral fellow at Georgetown University's School of Foreign Service. Suri's student visa

was revoked pursuant to the Foreign Policy Ground. In a statement given to Fox News, DHS

asserted that Suri had "spread[] Hamas propaganda," "promot[ed] antisemitism on social media,"

and had "close connections to a known or suspected terrorist, who is a senior advisor to Hamas."

Suri has no criminal record and has not been charged with a crime. DHS's allegations appear to

reference the fact that Suri's father-in-law, Ahmed Yousef, is a former advisor to Ismael

Haniyeh, the Hamas leader assassinated by Israel last year in Iran. But Yousef left his position in

the Hamas-run government in Gaza more than a decade ago and has publicly criticized Hamas's

decision to attack Israel on October 7, 2023. DHS has not alleged that Suri himself has taken any

action on behalf of Hamas. To date, Suri remains in immigration detention.

57.     On March 21, 2025, the Justice Department wrote to counsel for Momodou Taal, a student visa holder and doctoral candidate at Cornell University, to convey ICE's intention to serve a deportation notice on Taal and request that Taal voluntarily surrender to ICE custody. Taal had previously expressed support for the rights of Palestinians. The Justice Department wrote to Taal's lawyers after Taal sought a temporary restraining order to enjoin DHS from attempting to detain, remove, or otherwise enforce the Executive Orders against him. In response to that application, the government informed the court that the State Department had revoked Taal's student visa.

### High-Level Government Officials Confirm Rümeysa Was Targeted Because of Her Speech

58.     Multiple government officials, including Secretary of State Marco Rubio, have confirmed that Rümeysa was targeted for arrest and detention solely because of her actual or perceived First Amendment activity.

59.     On March 21, 2025, the day Rümeysa's visa was revoked according to her NTA, Secretary Rubio announced on X.com: "We will continue to cancel the visas of those whose presence or activities have potentially serious adverse foreign policy consequences for our country . . . And we will continue to use every legal means available to remove alien enemies."

60.     After Rümeysa's arrest, a DHS spokesperson stated, "DHS and ICE investigations found Öztürk engaged in activities in support of Hamas, a foreign terrorist organization that relishes the killing of Americans . . . . A visa is a privilege, not a right. Glorifying and supporting terrorists who kill Americans is grounds for visa issuance to be terminated. This is commonsense security."[7]

---

[7] Mike Toole & Beth Germano, *Tufts University student taken into immigration custody by federal agents in Massachusetts* (Mar. 27, 2025), https://www.cbsnews.com/boston/news/tufts-university-graduate-student-somerville-ice/.

61.    In a March 27 news conference, Secretary Rubio reaffirmed that the reason for Rümeysa's arrest and detention washer actual and perceived pro-Palestinian speech and political activity.[8] At the conference, a member of the media asked Secretary Rubio to explain the specific actions that led to Rümeysa's visa being revoked. The Secretary responded "oh, we revoked her visa," and continued:

> We gave you a visa to come and study and get a degree not to become a social activist that tears up our university campuses. And if we've given you a visa and then you decide to do that we're going to take it away. [. . .] We don't want it. We don't want it in our country. Go back and do it in your country. But you're not going to do it in our country."

62.    Secretary Rubio added: "Every time I find one of these lunatics I take away their visa," suggesting that hundreds of visas have been revoked in furtherance of the administration's Policy of targeting noncitizens for their pro-Palestinian speech.[9]

### DHS Did Not Follow Ordinary Procedure

63.    DHS maintains a website, titled "Study in the States," which "explains the student visa process, enhances coordination among government agencies, and keeps international students and the U.S. academic community better informed about pertinent rules and regulations." *About*, Study in the States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27, 2025), https://studyinthestates.dhs.gov/footer/about.

64.    According to Study in the States, student visa holders must maintain their status, which means "Fulfilling the purpose for why the Department of State issued you your visa" and

---

[8] *Secretary Rubio Defends Revoking Turkish Student's Visa*, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students-visa/5158479.

[9] *See* Madeline Halpert, *Marco Rubio says US revoked at least 300 foreign students' visas*, BBC (Mar. 27, 2025), https://www.bbc.com/news/articles/c75720q9d7lo; *see also Secretary of State Marco Rubio Remarks to the Press*, U.S. Dep't of State (March 28, 2025), https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-3/.

"Following the regulations associated with that purpose." *Maintaining Status*, Study in the

States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27, 2025),

https://studyinthestates.dhs.gov/students/maintaining-status. For F-1 student visa holders, that

purpose is "to study." *Id.*

65.     The Study in the States website lists consequences that can occur "[w]hen an F-

1/M-1 SEVIS record is terminated," including, the student "loses all on-and/or off-campus

employment authorization," the student "cannot re-enter the United States on the terminated

SEVIS record," and ICE agents "may investigate to confirm the departure of the student."

*Terminate a Student*, Study in the States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27,

2025), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-

terminations/terminate-a-student. Termination may require an F-1 visa holder to immediately

depart the United States. *Id.*

66.     DHS does not indicate on its Study in the States website that loss of student status

may result in immediate arrest and detention. DHS departed from these expected procedures in

arresting Rümeysa without warning or notice about the change in her student status.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of the First Amendment to the United States Constitution

67.     Petitioner repeats and re-alleges the allegations contained in the preceding

paragraphs of this Complaint-Petition as if fully set forth herein.

68.     The First Amendment to the United States Constitution provides in part that

"Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people .

. . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First

Amendment protects past, present, and future speech, including speech by noncitizens.

69.    The Policy, and the government's implementation of the Policy as to Rümeysa—specifically, the government's targeting, arrest, transfer, and ongoing detention of Rümeysa—violate the First Amendment because they:

      a.   retaliate against and punish Rümeysa's past protected speech;

      b.   prevent her from speaking now (through detention);

      c.   attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) her future speech in the United States;

      d.   deprive those with whom she would speak of her present and future speech on matters of public concern; and

      e.   chill other individuals who express support for Palestinian rights.

70.    These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the purpose of the Policy and the government's actions implementing the Policy as to Rümeysa and those similarly situated. In government officials' own telling, the Policy is intended to silence viewpoints with which the Trump administration disagrees.

## SECOND CLAIM
### Violation of Fifth Amendment Right to Due Process

71.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

72.    The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

73.    The government's detention of Rümeysa is unjustified. The government has not

demonstrated that Rümeysa—who has no criminal history, has close ties in the Tufts community, and wishes to complete her doctoral degree at Tufts—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Rümeysa cannot be safely released back to her community.

74.     Rümeysa's detention is also punitive and bears no "reasonable relation" to any legitimate purpose for detaining her. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("nature and duration" of civil confinement must "bear some reasonable relation to the purpose for which the individuals is committed"); *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). Her "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

75.     Rümeysa's arrest and detention under the Policy violate due process limitations on civil detention because they are designed to punish and silence her speech with which the government disagrees, and to chill others from expressing these viewpoints—impermissible bases for taking away individual liberty.

76.     The Policy and its implementation as to Rümeysa violate her right to due process for additional reasons as well. The government's policy of applying the Foreign Policy Ground to make such determinations concerning people like Rümeysa—who was in valid F-1 status, living peacefully in the country—is unconstitutionally vague where it is due to constitutionally protected speech.

19

**THIRD CLAIM**
**Violation of the Administrative Procedure Act and the *Accardi* Doctrine**

77.     Petitioner repeats and re-alleges the allegations contained in the preceding

paragraphs of this Complaint-Petition as if fully set forth herein.

78.     The government has adopted a policy of targeting noncitizens for arrest, detention

and removal based on First Amendment-protected speech advocating for Palestinian rights. This

policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary

to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706 (2)(A), (B), (C), and violates the

*Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260

(1954).

79.     In addition, Rümeysa's SEVIS termination notice invoked the Foreign Policy

Ground.

80.     In order to be invoked in an instance involving a noncitizen's past statements, the

Foreign Policy Ground requires the Secretary of State to determine that a person's "presence or

activities would potentially have serious adverse foreign policy consequences for the United

States" and "would compromise a compelling United States foreign policy interest."

81.     Here, there is no indication that the Secretary of State ever made such a

determination.

82.     To the extent the Secretary of State failed to make such a determination, the

invocation of the Foreign Policy Ground is arbitrary and capricious, an abuse of discretion,

contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C §

706 (2)(A), (B), (C).

83.     To the extent the Secretary of State purported to make such a determination, it is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C § 706 (2)(A), (B), (C).

## FOURTH CLAIM
### Release on Bail Pending Adjudication

84.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

85.     Federal courts sitting in habeas possess the "inherent power to release the petitioner pending determination of the merits." *Savino v. Souza*, 453 F. Supp. 3d 441, 454 (D. Mass. 2020) (quoting *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972) (per curiam)); *see also Da Graca v. Souza*, 991 F.3d 60 (1st Cir. 2021). Federal courts "have the same inherent authority to admit habeas petitioners to bail in the immigration context as they do in the criminal habeas case." *Id.* (quoting *Mapp v. Reno*, 241 F.3d 221, 223 (2d Cir. 2001)). "A court considering bail for a habeas petitioner must inquire into whether the habeas petition raise[s] substantial claims and [whether] extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective." *Id.* (quoting *Mapp*, 241 F.3d at 230) (cleaned up).

86.     This petition raises substantial constitutional and statutory claims challenging Rümeysa's retaliatory detention. Furthermore, extraordinary circumstances exist that make Rümeysa's release essential for the remedy to be effective. Even if she is ultimately freed, as long as Rümeysa remains in ICE's physical custody, she will be prevented from speaking freely and openly and her unlawful detention will serve to chill others. In addition, Rümeysa has asthma and has already suffered an asthma attack while in ICE custody, raising concerns about future asthma attacks. Finally, Rümeysa's confinement in Louisiana prevents her from

21

adequately litigating her removal proceedings by impeding her access to counsel and evidence located within the District of Massachusetts.

## **PRAYER FOR RELIEF**

Wherefore, Petitioner respectfully requests this Court to grant the following:

1)     Assume jurisdiction over this matter;

1)     Require Respondents to return Petitioner to this District pending these proceedings;

2)     Order the immediate release of Petitioner pending these proceedings;

3)     Declare that Respondents' actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment;

4)     Vacate and set aside Respondents' unlawful Policy of targeting noncitizens for arrest, detention and removal based on First Amendment-protected speech advocating for Palestinian rights;

5)     Restore Petitioner's SEVIS record;

6)     Enjoin Respondents from taking any enforcement action against Petitioner arising directly or indirectly from an investigation into the applicability of the Foreign Policy Ground;

7)     Award reasonable attorneys' fees and costs for this action; and

8)     Grant such further relief as the Court deems just and proper.

                                        Respectfully submitted,

                                        [signature block on next page]

/s/ *Jessie J. Rossman*
Jessie J. Rossman (BBO #670685)
Adriana Lafaille (BBO #680210)
Rachel E. Davidson (BBO #707084)
Julian Bava (BBO #712829)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
alafaille@aclum.org
rdavidson@aclum.org
jbava@aclum.org

Mahsa Khanbabai (BBO #639803)
115 Main Street, Suite 1B
North Easton, MA 02356
(508) 297-2065
mahsa@mk-immigration.com

Brian Hauss*
Esha Bhandari*
Brett Max Kaufman*
Noor Zafar*
Sidra Mahfooz*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
bhauss@aclu.org
ebhandari@aclu.org
bkaufman@aclu.org
nzafar@aclu.org
smahfooz@aclu.org

*Counsel for Petitioner*

**Pro hac vice application forthcoming*

Dated: March 28, 2025

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2025, a true copy of the above document was filed via

the Court's CM/ECF system and that a copy will be sent automatically to all counsel of record.


March 28, 2025                              */s/ Jessie J.Rossman*
                                           Jessie J.Rossman

# EXHIBIT A

March 25, 2025

Rumeysa Ozturk



**Student and Exchange Visitor Program**
**SEVIS Designation Termination Notice**

This letter is to inform you that your Student and Exchange Visitor Information System (SEVIS) designation associated with SEVIS ID ▇▇▇▇▇ issued by Tufts University - Tufts University/Medford, school code ▇▇▇▇▇ has been Terminated pursuant to 237(a)(1)(C)(i) and/or 237(a)(4)(C)(i) of the Immigration and Nationality Act.

If you remain in the United States, you may be contacted by immigration officials or placed in removal proceedings.

Should you wish to speak to someone regarding this notice email at sevp@ice.dhs.gov

Sincerely,

Student and Exchange Visitor Program

CC ▇▇▇▇▇▇

# EXHIBIT B

DEPARTMENT OF HOMELAND SECURITY

**NOTICE TO APPEAR**

DOB: ▮▮▮▮

Event No: XBO2503000017

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: ▮▮▮▮          FINS: ▮▮▮▮          File No: ▮▮▮▮

In the Matter of:

Respondent: RUMEYSA OZTURK _____ currently residing at:

See Continuation Page Made a Part Hereof

| (Number, street, city, state and ZIP code) | (Area code and phone number) |

[ ] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[X] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of TURKIYE and a citizen of TURKIYE;

3. You were admitted to the United States at Boston, MA on or about June 28, 2024 as a nonimmigrant Student (F-1);

4. On March 21, 2025, your nonimmigrant visa was revoked by the United States Department of State.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(B) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, your nonimmigrant visa was revoked under section 221(i) of the Act.

[ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:       [ ] 8CFR 208.30       [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

3843 E STAGG AVE,  BASILE, LOUISIANA 70515. SOUTH LOUISIANA CORR CENTER
*(Complete Address of Immigration Court, including Room Number, if any)*

on __April 7, 2025__ at __8:30 am__ to show why you should not be removed from the United States based on the
   *(Date)*            *(Time)*

charge(s) set forth above.          D. 4448 JOHNSTON - SDDO
                         *(Signature and Title of Issuing Officer)*

Date: __March 25, 2025__          St Albans, VT
                         *(City and State)*

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

_____
*(Signature of Respondent)*

Date: _____

_____
*(Signature and Title of Immigration Officer)*

## Certificate of Service

This Notice To Appear was served on the respondent by me on <u>**March 25, 2025**</u>, in the following manner and in compliance with section 239(a)(1) of the Act.

☒ in person ☐ by certified mail, returned receipt # _____ requested ☐ by regular mail
☐ Attached is a credible fear worksheet.
☐ Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the **ENGLISH** language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

M 11272 MUSCARELLA - Deportation Officer

_____
*(Signature of Respondent if Personally Served)*

_____
*(Signature and Title of officer)*

DHS Form I-862 (6/22)

Page 2 of 4

## Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

**U.S. Department of Homeland Security**                   Continuation Page for Form I-862

| Alien's Name | File Number | Date |
|---|---|---|
| OZTURK, RUMEYSA | ▮▮▮▮▮▮ Event No: XBO2503000017 | 03/25/2025 |

CURRENTLY RESIDING AT:
-----------------------------------------------------------------------------

South Louisiana Imm Center 3843 W Stagg Ave Basile, LOUISIANA 70515

| Signature | Title |
|---|---|
| D. 4448 JOHNSTON | SDDO |

_____ 4 _____ of _____ 4 _____ Pages

Form I-831 Continuation Page (Rev. 08/01/07)

# Exhibit B

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

RUMEYSA OZTURK,

               Petitioner,

      v.

DONALD J. TRUMP, in his official capacity as
President of the United States, PATRICIA
HYDE, Field Office Director,
MICHAEL KROL, HSI New England Special
Agent in Charge, TODD LYONS, Acting
Director, U.S. Immigration and Customs
Enforcement, and KRISTI NOEM, Secretary of
Homeland Security; and MARCO RUBIO, in his
official capacity as Secretary of State

               Respondents.

Civil Action No. 1:25-cv-10695-DJC

Leave to file excess pages
granted on 4/1/2025

## RESPONDENTS' OPPOSITION TO PETITIONER'S
## AMENDED PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO
## 28 U.S.C § 2241

Respondents, by and through their attorney, Leah B. Foley, United States Attorney for the

District of Massachusetts, respectfully submit this opposition to Petitioner Rumeysa Ozturk's

Amended Petition for Writ of Habeas Corpus (the "Petition").  Doc No. 12.

## INTRODUCTION

Under binding precedent from the Supreme Court and the U.S. Court of Appeals for the

First Circuit, this Court lacks habeas jurisdiction over this Petition because Petitioner was not in

the District of Massachusetts when she filed her original petition seeking release from U.S.

Immigration and Customs Enforcement ("ICE") custody.  *See* Declaration of Acting Deputy Field

Office Director David T. Wesling, ¶¶ 12-13, attached as Exhibit A ("Wesling Decl.).  Instead, at

the time of filing, Petitioner was in Vermont, after she had been transferred from Massachusetts

immediately after her arrest on March 25, 2025. *Id.*, ¶¶ 6-8. Petitioner also was not in this District when she filed her Amended Complaint on March 28 as she had been transferred to Louisiana two days prior. *Id.*, ¶¶ 18-19. As this Court is not in Petitioner's district of confinement, it lacks jurisdiction to entertain this action.

In *Rumsfeld v. Padilla*, 542 U.S. 426, 434-35 (2004), the Supreme Court made clear an individual challenging her detention through a habeas petition must file that petition in the district where she is detained and must name the custodian detaining her in such district as the respondent. The First Circuit, in *Vasquez v. Reno* similarly held that "an alien who seeks a writ of habeas corpus contesting the legality of his detention by [ICE] normally must name as the respondent his immediate custodian, that is, the individual having day-to-day control over the facility in which he is being detained." 233 F.3d 688, 690 (1st Cir. 2000). Because Petitioner did not do that, and still has not done that with the filing of her Amended Petition, this Court lacks habeas jurisdiction over this action. *See, e.g.*, *Tham v. Adducci*, 319 F. Supp. 3d 574, 577 (D. Mass. 2018) (Holding that "jurisdiction lies in only one district: the district of confinement."); *Rombot v. Moniz*, 299 F. Supp. 3d 215, 218 (D. Mass. 2017) ("A district court may only grant a petitioner relief when the court is located in the 'district of confinement.'") (quoting *Padilla*, 542 U.S. at 443); *Hernandez v. Lyons*, 1:19-cv-10519-DJC, ECF No. 18 (D. Mass. Oct. 11. 2019) (Allowing motion to dismiss as habeas petitioner "was not in the district when he filed or was pursuing this Petition as is required.").

Additionally, even if Petitioner had properly filed her original petition when she was detained in Massachusetts, this Court would nonetheless lack jurisdiction over this matter under the Immigration and Nationality Act ("INA"). The federal immigration laws strip district courts of jurisdiction over the sorts of governmental decisions challenged in the Petition, including the revocation of Petitioner's student visa and ICE's decision to initiate removal proceedings. The

Department of State revoked Petitioner's visa on March 21, 2025 pursuant to INA Section 221(i), 8 U.S.C. § 1201(i), which allows revocation of a visa at the Secretary of State's discretion. *See* Doc. No. 12-2, Form I-862, Notice to Appear ("NTA"). Per Section 1201(i), Congress barred judicial review of a visa revocation, specifically stating that "[t]here *shall be no means of judicial review* … of a revocation under this subsection," including through a habeas petition, other than in the context of removal proceedings and only if the visa revocation is the sole basis for removal. (emphasis added).

Petitioner's request for review of ICE's decision to initiate removal proceedings against her is barred by 8 U.S.C. § 1252(g) which strips district courts of jurisdiction "to hear any cause or claim by or on behalf of an alien arising from the decision or action by [ICE] to commence proceedings … against any alien," including constitutional claims. Courts also lack jurisdiction to review ICE's discretionary decisions to arrest and detain aliens under 8 U.S.C. § 1226(a). Per 8 U.S.C. § 1226(e), ICE's "discretionary judgment regarding the application of [Section 1226] shall not be subject to review [and] … [n]o court may set aside any action or decision by [ICE] under this section regarding the detention of any alien …". And finally, 8 U.S.C. §§ 1252(a)(5) and (b)(9) strip "federal courts of jurisdiction to decide legal and factual questions arising from an alien's removal" and instead channel such questions to the courts of appeal via a petition for review. *Gicharu v. Carr*, 983 F.3d 13, 16 (1st Cir. 2020).

Petitioner is not without recourse to challenge the revocation of her visa and her arrest and detention, but such challenge cannot be made before this Court. Instead, Petitioner must seek release before an immigration judge and must pursue relief from removal in Immigration Court, before the Board of Immigration Appeals ("BIA"), and eventually before a circuit court if necessary. But one way or another, this Court lacks jurisdiction over this matter. And as this

Court lacks jurisdiction over this Petition, Petitioner's request for release on bail pending adjudication of the matter is similarly unwarranted.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Petitioner's Arrest and Transfer from the District of Massachusetts.

Petitioner is a native and citizen of Turkey. Doc. No. 12, ¶ 8. Petitioner entered the United States pursuant to a student visa. *Id.*, ¶ 8. Pursuant to 8 U.S.C. § 1226(a), ICE arrested Petitioner at approximately 5:25 PM on March 25, 2025, after her visa had been revoked by the Department of State under 8 U.SC. § 1201(i). Wesling Decl., ¶ 5; Doc. No 12-2, NTA. With the revocation of her visa, Petitioner was subject to removal from the United States pursuant to 8 U.S.C. § 1227(a)(1)(B) as an alien "whose nonimmigrant visa … has been revoked under section 1201(i)." Doc. No. 12-2.

Prior to the arrest, ICE determined that there was no available bedspace for Petitioner at a facility within the New England region where she could be detained and still appear for a hearing in Immigration Court. *Id.*, ¶ 6. ICE therefore decided that Petitioner would be transferred to the South Louisiana Correctional Facility in Basile, Louisiana after her arrest and made necessary transfer and flight arrangements to facilitate custody at that facility. *Id.*, ¶¶ 6, 8. Transfers out of state, and out of the ERO Boston area of responsibility, are routinely conducted after arrest, due to operational necessity. *Id.*, ¶ 7. In accordance with this operational plan, at 5:49 PM on March 25, ICE officials departed Somerville, Massachusetts, and transported Petitioner to Methuen, Massachusetts arriving at 6:22 PM. *Id.*, ¶ 10. At 6:36 PM, ICE officials departed from Methuen, Massachusetts and transported Petitioner to Lebanon, New Hampshire.[1] *Id.*, ¶ 11. At

---

[1] Methuen, Massachusetts is approximately 2 miles from the New Hampshire border on Interstate I-93.

9:03 PM, ICE officials departed Lebanon, New Hampshire to transport Petitioner to the ICE field office in St. Albans, Vermont.[2]  *Id.*, ¶ 12. At 10:28 PM, Petitioner arrived at the ICE field office in St. Albans, Vermont.  *Id.*, ¶ 13.  While at the facility in St. Albans, ICE issued Petitioner with a NTA in the Oakdale, Louisiana Immigration Court on April 7, 2025 and charged Petitioner as removable from the United States per 8 U.S.C. § 1227(a)(1)(B).  *Id.*, ¶ 14; Doc. No. 12-2, NTA.

Petitioner spent the night at the ICE field office in St. Albans, Vermont on March 25. Wesling Decl.*, ¶* 13.  On March 26 at 4:00 AM, ICE officials departed the ICE Field Office in St. Albans and transported Petitioner to the airport in Burlington, Vermont.  *Id.*, ¶ 16.  At 5:31 AM, Petitioner departed the airport in Burlington.  *Id.*, ¶ 17.  At 2:35 PM, Petitioner arrived in Alexandria, Louisiana and was transported to the South Louisiana Correctional Facility in Basile, Louisiana.  *Id.*, ¶¶ 18-19.  At the time of Petitioner's arrest, ICE was not aware of a counsel of record for Petitioner.  *Id.*, ¶ 20.  Once ICE obtained Petitioner's counsel's contact information, it was provided to ERO New Orleans to facilitate Petitioner's communication with counsel.  *Id.* Upon her arrival to the South Louisiana Correctional Facility, Petitioner spoke with counsel.  *Id.* ¶ 21.

### B.  Petitioner's Original Habeas Petition and her Amended Petition.

Petitioner filed her original petition with this Court on March 25, 2025 at 10:01 PM.  Doc. No. 1. Petitioner named as Respondents Patricia Hyde, the Acting Director of ICE's ERO Boston Field Office, Michael Krol, ICE's Boston Homeland Security Investigation's Special Agent in Charge, Todd Lyons, the Acting Director of ICE, and Kristi Noem, the Secretary of Homeland Security.  *Id.*  Petitioner alleged that she was "currently in custody in the District of Massachusetts"

---

[2] Lebanon, New Hampshire is approximately 5 miles from the Vermont border on Interstate I-89.

and that "one or more of the Respondents is her immediate custodian." *Id.*, ¶ 12. But as just detailed, Petitioner was in fact in Vermont, set to be transferred to Louisiana—a decision, again, that was made by ICE officials before any petition was filed. Wesling Decl., ¶¶ 6-8, 10-13.

On March 28, Petitioner filed an Amended Petition. Doc. No. 12. Petitioner added President Donald J. Trump and Secretary of State Marco Rubio as Respondents. *Id.* Petitioner asserts venue is proper in this Court under the theory that she "had been detained in the District of Massachusetts by [ICE] and under the custody and control of ICE officials in Massachusetts at the time of the filing of this petition." *Id.*, ¶ 7. Petitioner added claims under the First Amendment and the Administrative Procedures Act ("APA"), amended her claim under the Fifth Amendment's Due Process Clause, and sought release on bail. *Id.* Petitioner asked the Court order that she be returned to Massachusetts, that she be released, and that the Court find that her arrest violated the First and Fifth Amendments. *Id.* at PRAYER FOR RELIEF.

## ARGUMENT

Petitioner improperly filed her original petition with this Court because Petitioner was not detained in Massachusetts when she filed her action at 10:02 PM on March 25. She also named improper supervisory officials as respondents. Petitioner's Amended Petition is similarly improperly filed in this Court because Petitioner is in custody in Louisiana and this Court lacks jurisdiction over her immediate custodian who has not been named as a respondent. Even if the original petition had been properly filed, dismissal would still be required because this Court lacks jurisdiction to review Petitioner's challenges to the Government's action and to order the requested relief. As such, this Court should dismiss this action without prejudice. If, however, the Court determines transfer of the Petition is appropriate, such transfer must be to the Western District of Louisiana where Petitioner is currently detained.

A. **The Immediate Custodian and District of Confinement Rules Apply to this Petition and Render this Court without Jurisdiction.**

Petitioner's original petition was improperly filed as Petitioner was not detained in Massachusetts when she filed her action at 10:02 PM on March 25 and because she did not name her immediate custodian as a respondent. Petitioner departed Massachusetts shortly after 6:30 PM when ICE officials transported her from Methuen, Massachusetts on the way to Lebanon, New Hampshire before eventually arriving in St. Albans, Vermont later that evening. Wesling Decl., ¶¶ 11-13. Because Petitioner was in Vermont when her original petition was filed, she should have filed her action with the U.S. District Court for the District of Vermont, not this Court.

The Supreme Court explained that when considering "challenges to present physical confinement … the immediate custodian, not a supervisory official who exercises legal control, is the proper respondent." *Padilla*, 542 U.S. at 439. *Padilla* involved a habeas petition filed by a U.S. citizen who was initially detained in the Southern District of New York but then transferred to South Carolina. *Id.* at 431. After Mr. Padilla was transferred, he filed a petition in SDNY, naming President Bush and Secretary Rumsfeld as respondents. *Id.* at 432. The Court confronted the "question whether the Southern District has jurisdiction over Padilla's habeas petition" which required two determinations: "First, who is the proper respondent to the petition? And second, does the Southern District have jurisdiction over him or her?" *Id.* at 434.

Answering the first question, the Supreme Court explained that the habeas statute "provides that the proper respondent to a habeas petition is 'the person who has custody over [the petitioner].'" *Id.* (quoting 22 U.S.C. § 2242). The Court stated that "there is generally only one proper respondent to a given prisoner's habeas petition," the immediate custodian who has "the ability to produce the prisoner's body before the habeas court." *Id.* The Court applied its

"longstanding" rules – known as the "district of confinement" and "immediate custodian" rules –
and explained that in a challenge to present physical confinement, "the proper respondent is the
warden of the facility where the prisoner is held, not the Attorney General or some other remote
supervisory official." *Id.* at 435. The Court acknowledged that while Mr. Padilla's detention
was "undeniably unique in many respects, it is at bottom a simple challenge to physical custody
imposed by the Executive…." *Id.* at 441. Without evidence that "there was any attempt to
manipulate" his transfer or that government was hiding his location, the Court explained that his
"detention is thus not unique in any way that would provide arguable basis for a departure from
the immediate custodian rule." *Id.* at 441-42.

　　As to the question of the proper district court to consider the petition, the Court affirmed
the applicability of the traditional rule "that for core habeas petitions challenging present
physical confinement, jurisdiction lies in only one district: the district of confinement." *Id.* at
443. Because Mr. Padilla was moved from the Southern District of New York before the petition
was filed, "the Southern District never acquired jurisdiction over Padilla's petition.". *Id.* at 441-
42.[3]   In summary, the *Padilla* Court explained that whenever a "habeas petitioner seeks to
challenge his present physical custody within the United States, he should name his warden as
respondent and file the petition in the district of confinement." *Id.* at 447.

---

[3] As such, the *Padilla* Court distinguished the factual circumstances before the Court
from those at issue in *Ex parte Endo*, 323 U.S. 283 (1944) where the Supreme Court had created
an exception to its general rule for cases in which the petitioner properly filed the habeas petition
against the immediate custodian and thereafter was transferred outside the district court's
territorial jurisdiction. Here, as in *Padilla*, *Endo* is not applicable because Petitioner never
properly filed her habeas petition because she was not detained in Massachusetts when it was
filed.

Four years prior to the *Padilla* decision, the First Circuit in *Vasquez v. Reno* held that a habeas petitioner challenging his immigration detention must file his petition in the district of confinement and must name his immediate custodian in that district as the respondent. *Vasquez*, 233 F.3d at 696. The First Circuit rejected the argument that a supervisory official such as the Attorney General was the proper respondent, holding that "as a general rule, the Attorney General is neither the custodian of such an alien in the requisite sense nor the proper respondent to a habeas petition."[4] *Id.* at 689.

In *Vasquez*, an alien was detained in Massachusetts before transfer to Louisiana. *Id.* at 690. The petitioner filed in the District of Massachusetts, naming as respondents the Attorney General, the Commissioner of the Immigration and Nationality Service ("INS"), and the district director of the INS's Boston office. *Id.* He did not name, however, the INS official who maintained his custody in Louisiana. *Id.* The First Circuit held that the district court erred in exercising jurisdiction because the petitioner was not detained in Massachusetts when he filed and due "to the petitioner's failure to name his true custodian (the INS district director for Louisiana) as the respondent to his petition." *Id.* The Court distinguished the Supreme Court's decision in *Endo*, explaining that such petition was "properly-filed," unlike Mr. Vasquez's petition which was filed "in a jurisdiction where neither he nor his immediate custodian was physically present." *Id.* at 695.

The First Circuit explained that "Congress has stipulated that a writ of habeas corpus granted by a district court 'shall be directed to the person having custody of the person detained.'" *Id.* (quoting 28 U.S.C. § 2243). Per the Court, "[t]his means, of course, that the

---

[4] At the time of the *Vasquez* decision, immigration detainees were held by the Immigration and Naturalization Service which was part of the U.S. Department of Justice.

court issuing the writ must have personal jurisdiction over the person who holds the petitioner in custody." *Id.* at 690. As it specifically concerned aliens in immigration detention, the Court found that, as in in the prison context, the proper respondent is not a supervisory official such as the Attorney General or the head of an agency, but the immediate custodian of the alien, *i.e.* the individual "who holds the petitioner in custody." *Id.* at 691. As such, the First Circuit held that "an alien who seeks a writ of habeas corpus contesting the legality of his detention by [ICE] normally must name as the respondent his immediate custodian, that is, the individual having day-to-day control over the facility in which he is being detained." *Id.* Otherwise, "allowing alien habeas petitioners to name the Attorney General … will encourage rampant forum shopping." *Id.* at 694.

Courts within this District routinely find jurisdiction wanting over habeas petitions that are filed by ICE detainees outside of Massachusetts. *See Kantengwa v. Brackett*, No. 19-CV-12566-NMG, 2020 WL 93955, at *1 (D. Mass. Jan. 7, 2020) ("Because the District of Massachusetts is not the district of [petitioner's] confinement, jurisdiction is lacking."); *Tham*, 319 F. Supp. 3d at 577 ("jurisdiction lies in only one district: the district of confinement."); *Rombot v. Moniz*, 299 F. Supp. 3d at 218 ("A district court may only grant a petitioner relief when the court is located in the 'district of confinement.'") (quoting *Padilla*, 542 U.S. at 443).

Because Petitioner was not detained in Massachusetts when she filed her original petition and because she failed to name her immediate custodian, this Court lacks jurisdiction over this matter. Petitioner's Amended Petition is similarly improperly filed in this Court, because it fails to name her immediate custodian in Louisiana, and it is not filed in her district of confinement. Given this Court lacks habeas jurisdiction under the above rules, the proper course is for this Court to dismiss the action.

10

1. __Petitioner failed to name her immediate custodian.__

Petitioner named improper respondents in her original petition because she named supervisory officials, rather than her immediate custodian in Vermont when the petition was filed. Her Amended Petition suffers from the same flaws as she adds additional supervisory officials but fails to name her immediate custodian in Louisiana.

Courts within this district routinely hold that they lack jurisdiction over a habeas petition if the alien names improper respondents such as supervisory officials like the ICE Boston Field Office Director ("FOD"), even if this individual provides oversite throughout the New England region. For example, in *Duy Tho Hy v. Gillen*, 588 F. Supp. 2d 122, 124-25 (D. Mass. 2008), the Court held that the ICE FOD was not a proper party, explaining that "[b]ecause the petitioner's *immediate* custodian is the only proper respondent, a supervisory officer of any kind, … is not a proper party." *Id.* at 125 (emphasis in original). More recently, the Court rejected an argument, similarly made by Petitioner, that ICE Boston's FOD had "total control" over the petitioner and therefore was a proper respondent, finding such claim "unavailing" in *Tham,* 319 F. Supp. 3d at 576-577.

Other sessions of this Court similarly routinely hold that supervisory officials are not proper respondents to a habeas action. *See e.g., McPherson v. Holder*, No. 14-CV-30207-MGM, 2015 WL 12861171, at *2 (D. Mass. Mar. 4, 2015) (Explaining that "regardless of where petitioner was detained at the time of filing, under First Circuit jurisprudence, Attorney General Eric Holder does not have day-to-day control over the facility where the petitioner is held. Thus, petitioner has not named the proper respondent, and on this basis alone, the petition may be dismissed without prejudice to its refiling with the correct respondent."); *Pen v. Sessions*, No. CV 17-10626-NMG, 2017 WL 2312822, at *1–2 (D. Mass. May 25, 2017) (Holding that "the

proper respondent is the warden of the institution where Pen was confined when the petition was filed. … The other persons identified as respondents are not proper parties to this action.").

As Petitioner is now detained in Louisiana, her failure to name her immediate custodian subjects her Amended Petition to dismissal.  *See Tham*, 319 F. Supp. 3d at 577 (Explaining that for an ICE habeas petitioner detained in New Hampshire, the correct respondent is the Superintendent of that facility); *Faulkner v. US. Immigr. & Naturalization,* No. CV 22-12122-WGY, 2023 WL 3868437, at *2 (D. Mass. June 7, 2023) (Holding that "the proper respondent is the warden of the institution where Faulkner was confined when the petition was filed. Because Faulkner is [in Maryland], the proper respondent is the warden at this Maryland facility."); *Kantengwa*, 2020 WL 93955 at *1 ("Because Kantengwa was at the Strafford County Detention Center at the time she filed her petition (and remains there still), the proper respondent is Warden Brackett. The other persons identified as respondents are not proper parties to this action.").

### 2. Petitioner failed to file in the district of confinement.

Because Petitioner was not detained in Massachusetts when she filed her original petition or her Amended Petition, this Court lacks jurisdiction over this action.  For a district court to have jurisdiction over a habeas petition, the individual holding custody must be "within [the court's] respective jurisdiction[]."  *Padilla*, 542 U.S. at 442 (quoting 28 U.S.C. § 2241(a)); *Vasquez*, 233 F.3d at 690 (Explaining "that the court issuing the writ must have personal jurisdiction over the person who holds the petitioner in custody.").   As the Supreme Court has made clear, that means the district of confinement.  *Padilla*, 542 U.S. at 443.

Courts within this district routinely find that they do not have habeas jurisdiction when a petition is filed by a detainee outside Massachusetts.  *See Rombot*, 299 F. Supp. 3d at 218 ("A district court may only grant a petitioner relief when the court is located in the 'district of

confinement.'") (quoting *Padilla*, 542 U.S. at 443); *Tham*, 319 F. Supp. 3d at 577 ("jurisdiction lies in only one district: the district of confinement."); *Kantengwa*, 2020 WL 93955, at *2 ("Because the District of Massachusetts is not the district of Kantengwa's confinement, jurisdiction is lacking."); *Aitcheson v. Holder*, No. CV 15-11123-NMG, 2015 WL 10434871, at *2 (D. Mass. Dec. 31, 2015) (Finding no jurisdiction over a habeas petition filed by a petitioner when in the District, but who was moved to Alabama shortly after such filing because "1) [Massachusetts] is no longer petitioner's district of confinement and 2) only a respondent at the Detention Center in Alabama could bring the petitioner before a habeas court.").

Because Petitioner was transferred from Massachusetts before she filed the original petition, this Court never acquired jurisdiction and therefore "out not to … act[] on the merits" of her Amended Petition. *Vasquez*, 233 F.3d at 697.

### 3. No exceptional circumstances allow deviation from the district of confinement and immediate custodian rules.

The First Circuit did acknowledge that there could be "extraordinary circumstances" in which an official with supervisory control could be named as the respondent for an ICE detainee's habeas petition. *Vasquez*, 233 F.3d at 697. The First Circuit, however, found no "hint of anything that might qualify as an extraordinary circumstance" in that Mr. Vasquez was required to file his petition in the district of his confinement (Louisiana), even if that jurisdiction was considered a less hospitable judicial district for the detainee to present his claims. *Id.*

Here too, there are no extraordinary circumstances that make appropriate the naming of supervisory officials as respondents to this action or that ground jurisdiction with this Court. Petitioner's transfer out of Massachusetts was not done to manipulate jurisdiction or to detain her in an undisclosed location, rather it was done out of operational necessity. Wesling Decl., ¶¶ 6-8. After ICE arrested Petitioner at approximately 5:25 PM on March 25, ICE transferred

Petitioner out of Massachusetts to the ICE Field Office in St. Albans, Vermont because ICE does not maintain detention facilities in Massachusetts for females. *Id.*, ¶¶ 6, 10-13. ICE routinely transfers individuals arrested in one state to facilities in other states because of operational considerations such as bedspace and designation of risk categories. *Id.*, 7.[5]

ICE's transfer of Petitioner to Vermont and then to Louisiana does not suggest "furtiveness" or "bad faith" as the First Circuit was concerned with in *Vasquez.* Other courts have confronted comparable circumstances in which a petition was filed outside the district of confinement during transit between locations and have rejected arguments seeking exception to the immediate custodian and district of confinement rules. For example, in *Ruvira-Garcia v. Guadian*, the court explained that there were "two big problems" with petitioner's request that the court order her return to Illinois: "Petitioner filed against the wrong people, in the wrong place." No. 1:20-CV-2179, 2020 WL 1983875, at *1 (N.D. Ill. Apr. 17, 2020). The petitioner in that case was not in Illinois when she filed her petition, "she apparently was en route between Texas and Oklahoma" and therefore the court found that this "isn't a case where the petitioner was here at the moment of filing, and then left. She hasn't been in [Illinois] at any point since this case started." *Id.*, at *3. Even if it was "unclear whether the authorities in Texas, or the authorities in Oklahoma, had custody over her at the moment of filing," "if the choice is between Texas and Oklahoma, Illinois is the wrong answer." *Id.* The court found it lacked jurisdiction

---

[5] *See Russian scientist working at Harvard detained by ICE at Boston airport*, https://www.theguardian.com/us-news/2025/mar/27/russian-scientist-harvard-medical-school-ice-detention (Explaining that a female applicant for admission had her visa revoked on February 16, 2025 by U.S. Customs and Border Protection and then was transferred by ICE to a facility in Vermont prior to transfer to a facility in Louisiana).

but explained that "the continued detention of [p]etitioner by the Executive Branch is not immune from challenge … [p]etitioner simply can't challenge her detention [in Illinois], as Congress made clear." *Id.*

In another case, while recognizing that transfers of an ICE detainee between states presented "unusual logistical circumstances," the court explained that "it is not this Court's duty to ascertain or identify an Arizona official who would be correctly named as a respondent in this case" and concluded that "there is no recognized exception to the immediate custodian rule for inconvenience or exigent circumstances." *Fuentes v. Choate*, No. 24-CV-01377-NYW, 2024 WL 2978285, at *9-10 (D. Colo. June 13, 2024). Similarly, in *Khalil v. Joyce*, --- F.Supp.3d ---, 2025 WL 849803, (S.D.N.Y. Mar. 19, 2025), a case that also involved an ICE arrest in New York, a transfer to a facility in New Jersey, and then an eventual transfer to Louisiana, the Southern District found it lacked jurisdiction because even though petitioner was arrested in New York, he was in New Jersey when he filed his petition. *Id.*, at *2.

These cases demonstrate that even with an arrest in one district followed by a transfer to another district, a habeas petitioner must file her petition in the district of confinement and must name her immediate custodian as respondent. Simply because a detainee is transferred to another district post-arrest does not suggest bad faith underlying the transfer. *See Khalil*, 2025 WL 849803, at *10 (The "swift nature of Khalil's transfer does not help his argument … [as] rapid transfers from one immigration detention facility to another also appear to be common"). The traditional immediate custodian and district of confinement rules apply in this case and as such, the Petition must be dismissed.

**B. Even if the Original Petition was Properly Filed, this Court Lacks Jurisdiction to Review the Challenged Executive Actions.**

Even if properly filed, this action must still be dismissed as the Court lacks jurisdiction over Petitioner's challenges to the revocation of her visa and her subsequent arrest, detention, and initiation of removal proceedings.

**1. District courts lack jurisdiction to review the Department of State's revocation of visas.**

Petitioner asserts that the revocation of her student visa was unlawful and therefore her arrest and detention are illegal. Doc. No. 12, ¶¶ 4-5. Her challenge to the revocation of her visa cannot be heard by this Court, however, as 8 U.S.C. § 1201(i) specifically states that there "shall be no means of judicial review" including habeas review, "except in the context of removal proceedings if such revocation provides the sole ground for removal". Here, ICE issued Petitioner with a NTA initiating removal proceedings on account of her revoked visa and she can seek judicial review before an Immigration Court, the BIA, and eventually to a court of appeals if she is ordered removed.

As explained by another district court when dismissing a petition which challenged a visa revocation on account of a political dispute: "Congress has taken it out of my hands. … I cannot address this argument because I lack subject matter jurisdiction over the case. The legality of petitioner's detention depends on the resolution of such issues as whether the government lawfully revoked his visa and whether he is removable from the United States and, as indicated above, I am precluded from reviewing those issues." *Bolante v. Achim*, 457 F. Supp. 2d 898, 902 (E.D. Wis. 2006). The court also found the Suspension Clause not implicated because "the government has initiated removal proceedings" and a circuit court could review a challenge to the visa revocation upon a petition for review. *Id.* at 902-03, n.6; 8

16

U.S.C. § 1252(a)(2)(D) (Explaining that judicial review remains available for "constitutional claims or questions of law raised upon a petition for review).

Other courts also routinely find themselves without jurisdiction to consider the merits of a visa revocation upon operation of Section 1201(i)'s language. *See e.g.*, *Aldabbagh v. Sec'y of State*, No. 6:21-CV-532-GAP-EJK, 2021 WL 6298664, at *2 (M.D. Fla. Oct. 5, 2021) (Finding no jurisdiction over complaint that asked court to declare revocation of visa to be arbitrary and capricious, an abuse of discretion, and not in accordance of law.); *Tarlinsky v. Pompeo*, No. 3:19-CV-659 (VLB), 2019 WL 2231908, at *5 (D. Conn. May 23, 2019) ("As the basis for [the visa] revocation is expressly non-reviewable by statute, the [c]ourt lacks subject matter jurisdiction over" the complaint.).   To the extent Petitioner seeks review of the State Department's revocation of her visa, this Court lacks jurisdiction to consider her claims.

## 2. District courts lack jurisdiction over ICE's decisions to commence removal proceedings and to detain aliens for such proceedings.

Petitioner's claim that ICE's decision to initiate removal proceedings and arrest and detain her violated her constitutional rights is not subject to this Court's review under the INA.

### a. *8 U.S.C. § 1252(g) bars judicial review of ICE's decision to commence removal proceedings against Petitioner.*

Congress, through the REAL ID Act, made clear that district courts do not have jurisdiction to consider challenges to ICE's discretionary decisions concerning the commencement of removal proceedings.  Specifically, 8 U.S.C. § 1252(g) strips courts of jurisdiction to hear "any cause or claim by or on behalf of an alien arising from the decision or action by [ICE] to *commence proceedings* … against any alien under this chapter."  (emphasis added).  Section 1252(g) is "directed against a particular evil: attempts to impose judicial constraints upon [certain categories of] prosecutorial discretion."  *Reno v. Am.-Arab Anti-*

*Discrimination Comm.*, 525 U.S. 471, 485 n.9 (1999). Section 1252(g) plainly applies to

decisions and actions to *commence* proceedings that ultimately may end in the execution of a

final removal order. *See Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002) ("We

construe § 1252(g) . . . to include not only a decision in an individual case *whether* to commence,

but also *when* to commence, a proceeding."); *Obado v. Superior Ct. of New Jersey Middlesex

Cnty.*, No. CV 21-10420 (FLW), 2022 WL 283133, at *3 (D.N.J. Jan. 31, 2022) ("Because

[p]etitioner challenges the decision to commence and adjudicate removal proceedings against

him, the [c]ourt lacks jurisdiction to direct [respondents] to terminate [p]etitioner's NTA and/or

halt his removal proceedings.").

    In addition to barring challenges to *whether* and *when* to commence proceedings, §

1252(g) bars district courts from hearing challenges to the *method* by which ICE chooses to

commence removal proceedings. *See Alvarez v. U.S. Immigr. & Customs Enf't*, 818 F.3d 1194,

1203 (11th Cir. 2016) ("By its plain terms, [§ 1252(g)] bars us from questioning ICE's

discretionary decisions to commence removal" and also to review "ICE's decision to take him

into custody and to detain him during removal proceedings"); *Saadulloev v. Garland*, No. 3:23-

CV-00106, 2024 WL 1076106, at *3 (W.D. Pa. Mar. 12, 2024) ("The Government's decision to

arrest [petitioner], clearly is a decision to 'commence proceedings' that squarely falls within the

jurisdictional bar of § 1252(g).").

    As Section 1252(g) prohibits judicial review of "any cause or claim" that arises from the

commencement of removal proceedings, this provision applies to constitutional as well as

statutory claims. *Candra v. Cronen*, 361 F. Supp. 3d 148, 156 (D. Mass. 2019) (Explaining that

a petitioner's "attempt to frame his claim in due process language does not change [the] result"

that Section 1252(g) strips jurisdiction.); *Anderson, v. Moniz*, No. CV 21-11584-FDS, 2022 WL

375231, at *4 (D. Mass. Feb. 7, 2022) ("Section 1252(g) can serve as a jurisdictional bar even when a petitioner contends that his due-process rights were violated.").

That Petitioner is alleging her removal proceedings were initiated in retaliation for her exercise of the First Amendment does not remove her claim from Section 1252(g)'s reach. *See Reno,* 525 U.S. at 487-92 (holding that Section 1252(g) deprived district court of jurisdiction over claim that certain aliens were targeted for deportation in violation of the First Amendment.); *Zundel v. Gonzales*, 230 F. App'x 468, 475 (6th Cir. 2007) (Explaining that First Amendment challenge related to immigration enforcement action "is properly characterized as a challenge to a discretionary decision to 'commence proceedings' … [and] is insulated from judicial review".); *Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 945 (5th Cir. 1999) (determining that § 1252(g) prohibited review of an alien's First Amendment claim based on decision to put him into exclusion proceedings); *Vargas v. United States Dep't of Homeland Sec*., No. 1:17-CV-00356, 2017 WL 962420, at *3 (W.D. La. Mar. 10, 2017) (Claim that ICE "violated her First Amendment right to free speech by arresting her and initiating her removal after she made statements to the media … is barred by 8 U.S.C. § 1252(g)."); *Kumar v. Holder*, No. 12-CV-5261 SJF, 2013 WL 6092707, at *6 (E.D.N.Y. Nov. 18, 2013) (Claim of initiation of proceedings in retaliatory manner "falls squarely within Section 1252(g) … [and] that [t]he pending immigration proceedings are the appropriate forum for addressing petitioner's retaliation claim in the first instance.").  As such, judicial review of Petitioner's claim that commencement of removal proceedings is unconstitutional is barred by Section 1252(g).

b. *8 U.S.C. § 1226(e) bars judicial review of ICE's decision to arrest and detain Petitioner.*

ICE's arrest and detention of Petitioner is authorized by 8 U.S.C. § 1226(a) which allows detention "pending a decision on whether [she] is to be removed from the United States."

8 U.S.C. § 1226(a).  This provision "creates authority for *anyone's* arrest or release under §

1226—and it gives the Secretary broad discretion as to both actions…."  *Nielsen v. Preap*, 586

U.S. 392, 409 (2019) (emphasis in the original).  Petitioner's assertion that her detention is

unlawful is not properly before this Court as Congress has made clear that ICE's "discretionary

judgment regarding the application of [Section 1226] shall not be subject to review."  8 U.S.C.

§ 1226(e).  Section 1226(e) further commands that "[n]o court may set aside any action or

decision by [ICE] under this section regarding the detention of any alien or the revocation or

denial of bond or parole."  *Id.*  As the Supreme Court explained in *Demore v. Kim*, 538 U.S.

510, 516-17 (2003), this provision blocks judicial review of ICE's discretionary judgments and

decisions to arrest and detain aliens subject to 8 U.S.C. § 1226.  *See also Jennings v. Rodriguez*,

583 U.S. 281, 295-96 (2018) (Section "1226(e) precludes an alien from challenging a

discretionary judgment by the [Secretary] or a decision that the [Secretary] has made regarding

his detention or release.") (cleaned up).

Petitioner asserts her detention "is unjustified" because the Government has not

demonstrated that she "needs to be detained."  Doc. No. 12, ¶ 73.  This Court, however, is not the

forum for such a claim.  Instead, Petitioner must request release from an immigration judge, and

if dissatisfied with the outcome, to the BIA.[6]  She further asserts that her detention is punitive and

that there is no legitimate purpose for detaining her.  *Id.*, ¶ 74.  This argument fails, however, as

she is detained for purpose of removal proceedings and the Supreme Court has upheld the

constitutionality of detention such purpose, even when such detention is mandatory and does not

---

[6] After ICE makes the initial decision to detain an alien, the alien may request a bond
hearing in Immigration Court and can appeal to the BIA if necessary.  8 C.F.R. § 236.1(d)(1)-
(3).

allow access to a bond hearing, as Petitioner is entitled to in this case. *Demore,* 538 U.S. at 523 (The "Court has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process.");[7] *Wong Wing v. U.S.* 163 U.S. 288, 235 (1896) (holding deportation proceedings "would be vain if those accused could not be held in custody pending the inquiry into their true character."); *Hernandez-Lara v. Lyons*, 10 F.4th 19, 32 (1st Cir. 2021) (Recognizing that the "prompt execution of removal orders is a legitimate governmental interest which detention may facilitate.") (cleaned up).  If mandatory detention without access to a bond hearing passes constitutional muster, then Petitioner's detention, where she can seek a bond hearing, certainly does not implicate due process concerns.  To the extent that Petitioner is basing her claim on *Demore*, 538 U.S. at 532–33 (Kennedy, J., concurring) or *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), those claims are related to prolonged detention and are not available until immigration detention exceeds a minimum of six months. *See Demore*, 538 U.S. at 510 (affirming constitutionality of detention exceeding six months); *Zadvydas*, 533 U.S. at 693 (adopting six months as a presumptively reasonable period of detention following a final order of removal).  As such, this Court lacks jurisdiction over ICE's decision to arrest and detain Petitioner.

**3.  Petitioner's challenge to removal from the United States must proceed administratively before being raised to the circuit court.**

Petitioner has an opportunity to contest the initiation of her removal proceedings and to challenge her removal from the United States in Immigration Court, before the BIA, and eventually, if necessary, before a court of appeal.  District courts, however, play no role in such process as made clear by Congress and the First Circuit.  In passing the REAL ID Act, Congress

---

[7] The Supreme Court has recognized that it "has firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens."  *Id.* at 522 (citations omitted).

prescribed a single path for judicial review of orders of removal entered through the administrative process: "a petition for review filed with an appropriate court of appeals." 8 U.S.C. § 1252(a)(5); *Gicharu v. Carr*, 983 F.3d 13, 16 (1st Cir. 2020). A circuit court can consider "constitutional claims or questions of law" in the petition for review. 8 U.S.C. § 1252(a)(2)(D).

Congress, however, channeled to the courts of appeals, not just challenges to the removal decision, but also to challenges to the removal process. *Aguilar et al., v. USICE, et al.*, 510 F.3d 1, 9 (1st Cir. 2007) (Section 1252(b)(9) "was designed to consolidate and channel review of *all* legal and factual questions that arise from the removal of an alien into the administrative process, with judicial review of those decisions vested exclusively with the courts of appeals.") (emphasis in the original). Per Section 1252(b)(9), "judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, *arising from any action taken or proceeding brought to remove an alien from the United States* …. shall be available only in judicial review of a final order under this section." 8 U.S.C. § 1252(b)(9) (emphasis added); *Gicharu*, 983 F.3d at 16 ("Adding belt to suspenders, section 1252(b)(9) strips federal courts of jurisdiction to decide legal and factual questions arising from an alien's removal in any other context, *including on a petition for a writ of habeas corpus*.") (emphasis added). The First Circuit has described the expanse of § 1252(b)(9) as "breathtaking" and "vise-like". *Aguilar*, 510 F.3d at 9. In passing this provision, "Congress plainly intended to put an end to the scattershot and piecemeal nature of the review process that previously had held sway in regard to removal proceedings." *Id.*

Pursuant to these provisions, Petitioner must present removability issues related to the revocation of her visa administratively before any Article III review. As explained earlier, 8

22

U.S.C. § 1201(i) allows for judicial review of her visa's revocation in the context of removal proceedings if the revocation is the sole basis for removal (which it is here) and therefore Section 1252(a)(5) and (b)(9) channel any claims related to the revocation of her visa to an immigration judge, the BIA, and eventually to the circuit court.  In a recent case filed seeking a Temporary Restraining Order filed by a student whose visa had been revoked, the plaintiff, Mr. Taal, alleged that the visa revocation and ICE's initiation of removal proceedings violated his First Amendment rights.  *Taal v. Trump,* No. 3:25-CV-335 (ECC/ML), 2025 WL 926207, at *2 (N.D.N.Y. Mar. 27, 2025).  The district court, however, found that the plaintiff had not established it had jurisdiction over such claims due to Section 1252(a)(5) and 1252(b)(9).  *Id.* The court explained that Mr. Taal's "challenge to the basis for commencing his removal proceedings," "is part of the process by which … removability will be determined, and Taal's claims therefore arise from the removal proceedings."  *Id.* (cleaned up).

Because Petitioner can challenge the revocation of her visa administratively and eventually to a circuit court, this Court lacks jurisdiction over such claims.  *See Vega-Del Roquel v. Barr,* 568 F. Supp. 3d 73, 76 (D. Mass. 2021) (Explaining that "[o]nly claims that are not related in any way to the removal process are beyond the scope of [Section 1252(b)(9)] and therefore within the jurisdiction of federal courts.").

### C.  Petitioner's APA Claim Fails.

Petitioner fails to demonstrate any merit to her claims brought under the APA and *Accardi v. Shaughnessy*, 347 U.S. 260 (1954).   The APA provides a right to judicial review of "final agency action for which there is no other adequate remedy." *Bennett v. Spear*, 520 U.S. 154, 175 (1997).  However, the APA does not "afford an implied grant of subject-matter jurisdiction

permitting federal judicial review of agency action" in all circumstances. *Califano v. Sanders*, 430 U.S. 99, 107 (1977).

The APA does not apply where another statute "preclude[s] judicial review." 5 U.S.C. § 701(a)(1). Additionally, Section 701(a)(2) of the APA precludes judicial review where agency action is committed to agency discretion by law. As such, judicial review of the State Department's revocation of Petitioner's visa is precluded under the APA since 8 U.S.C. § 1201(i) vests such revocation in the Secretary of State and prohibits judicial review aside from in removal proceedings. *See Mansur v. Albright,* 130 F. Supp. 2d 59, 61 (D.D.C. 2001) ("Without such statutory or regulatory limitation, there is no law to apply to the Secretary's discretionary revocation, and this court lacks jurisdiction to review the revocation …"). Similarly, ICE's decisions to commence removal proceedings and arrest and detain Petitioner were all discretionary decisions not subject to APA review by this Court on account of 8 U.S.C. §§ 1252(g) and 1226(a), (e). *See Gicharu*, 983 F.3d at 20 ("Having concluded that Gicharu's APA claim and habeas claim both arise form his removal proceedings, we hold that the district court lacked subject matter jurisdiction over those claims under section 1252(b)(9).").

Additionally, the APA does not authorize judicial review until "an aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule." *Darby v. Cisneros,* 509 U.S. 137, 146 (1993). Even if Petitioner could identify a final agency action, that agency action would be directly tied to the State Department's decision to revoke her visa and ICE's decision to initiate removal proceedings against her, which must be brought in removal proceedings. Because Petitioner has an alternative forum for her claim, it is not cognizable under the APA before this Court. *See Bennett*, 520 U.S. at 175–77; *Pataud v. United States Citizenship & Immigr. Servs., Bos. Field Off.*, 501 F. Supp. 3d 22, 27 (D. Mass. 2020) (with removal

proceedings initiated, review of immigration application not available under the APA); *A.Z. v. Nielson*, No. CV 18-10511-PBS, 2018 WL 5269990, at *5 (D. Mass. Oct. 23, 2018) (agency decision denying immigration application is not a "reviewable final agency action as long as the alien was referred to immigration court for removal proceedings."); *Gao v. Napolitano*, 2009 WL 961243, at *2 (D. Mass. 2009) (same).

Petitioner also complains that the notice ICE issued regarding her terminated Student and Exchange Visitor Information System ("SEVIS") record improperly invoked a ground of removability from the United States Petitioner refers to as the "Foreign Policy Ground" which is contained at INA Section 237(a)(4)(C)(i) and that the Secretary of State failed to make the necessary determination that supports such ground of removability.  Doc. No. 12, ¶¶ 79-83.  This claim is without merit, however.  ICE did not allege on the NTA that she is subject to removal under INA Section 237(a)(4)(C)(i) and the charges referenced on the SEVIS notice are not the basis for her detention or removal.  *See* Doc. No. 12-2, NTA.  For these reasons, Petitioner's APA claims fail.

### D.  Petitioner's Request for Bail should be Denied.

This Court does not have jurisdiction to issue habeas relief in this matter, and therefore lacks the authority to grant bail or release.  Petitioner is correct that the First Circuit has explained "that a district court entertaining a petition for habeas corpus has inherent power to release the petitioner pending determination of the merits." *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972) (per curiam); *see also Savino v. Souza*, 453 F. Supp. 3d 441, 453 (D. Mass. 2020) (In face of COVID-19 pandemic, finding bail appropriate if a habeas petitioner can demonstrate that the petition raises substantial claims and that extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective).

To whatever extent this Court has the authority to grant bail pending habeas, that authority is only in aide of this Court's ultimate power to grant habeas relief.  So where, as here, this Court lacks the authority to grant habeas relief in the first place (as explained above), it concomitantly loses its authority to grant bail.  For the reasons argued previously, Petitioner fails to raise substantial constitutional claims upon which she has a high probability of success. Further, Petitioner fails to allege that extraordinary circumstances exist making the grant of bail necessary to render the habeas remedy effective.  On this issue, the First Circuit in *Woodcock* cited "a health emergency" as exceptional circumstances.  470 F.2d at 94.  The Court in *Savino* found existence of exceptional circumstances with the COVID-19 "nightmarish pandemic." 453 F. Supp. 3d at 453.  Petitioner's asthmatic condition and her desire to speak freely and openly does not represent exceptional circumstances as her concerns are likely common to all detainees experiencing limits on freedom and she does not demonstrate that her circumstances make the grant of bail necessary at this time.  Petitioner can also seek a bond hearing with the Immigration Judge at her first hearing in Immigration Court next week on April 7, 2025.[8]  Accordingly, the Court must decline Petitioner's request for interim release during the pendency of this action.

### E.  **If this Court determines transfer to be in the interest of justice, this Amended Petition should be transferred to Petitioner's District of Confinement.**

As explained above, this Court should dismiss the Petition rather than transfer it because any receiving court, like this Court, would lack jurisdiction to consider Petitioner's claim of

---

[8] Petitioner cites the Second Circuit's decision in *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001) in support of her request for release on bail, but this decision does not aide Petitioner's argument.  In that case, the court explained the power to admit on bail "is a limited one, to be exercised in special cases only." *Mapp*, 241 F.3d at 226.  Further, the court qualified this holding as subject to limits imposed by Congress. *Id.* at 223.  As explained earlier, 8 U.S.C. § 1226(e) is an "express statutory constraint[]" that limits the Court's authority in this context.  *Mapp*, 241 F.3d at 231

unlawful arrest and detention and to provide her requested relief. As such, "the interest of justice" does not compel transfer. 28 U.S.C. § 1404(a). But, if this Court determines otherwise, the Amended Petition must be transferred to Petitioner's district of confinement, the Western District of Louisiana. *See also* 28 U.S.C. § 1406(a) (recognizing that transfer can occur to "any district … in which it could have been brought.").

The Supreme Court has recognized a "limited" exception to the district-of-confinement rule, namely, only "when the Government moves a habeas petitioner after she *properly files* a petition naming her immediate custodian." *Padilla*, 542 U.S. at 441 (emphasis added) (discussing *Ex Parte Endo*, 323 U.S. 283 (1944)); *see Vasquez*, 233 F.3d at 697 (Distinguishing *Endo* from circumstances in *Vasquez* where the "petitioner filed for habeas relief in a jurisdiction where neither he nor his immediate custodian was physically present."); *Yancey v. Warden, FMC Devens*, 682 F. Supp. 3d 97, 100 (D. Mass. 2023) (collecting cases for proposition that after a petitioner properly filed a petition, such "prisoner's transfer after a district court's jurisdiction attaches does not defeat jurisdiction … as long as there remains in the district a respondent who can effectuate any court order."). Under those circumstances, the court where jurisdiction originally vested may retain the case. That limited exception does not apply in this District as Petitioner never properly filed a habeas petition in this Court.

This exception would also not apply concerning venue in the District of Vermont because Petitioner did not properly file her habeas petition with that Court during her brief detention in Vermont. Where a court never *had* habeas jurisdiction in the first place because the petitioner was not in the district when the action was filed, or because the petition was not filed with the court in the district of confinement, there is nothing to retain. It is true that at the time Petitioner's original petition was filed, it could have been properly filed in Vermont as that is

where she was then in custody.  But this fact is not dispositive.  While this case "could have been brought" in Vermont at the time of filing, that does not mean it can be heard in the District of Vermont here and now.  And it cannot, under *Padilla*—or the specific statutory text it interpreted.  Section 2241(a) states that writs of habeas corpus "may be granted by … the district courts … within their respective jurisdictions."  Section 1406(a) can permit transfer but only if the transferee court would also have subject matter jurisdiction over the matter.  Nothing in § 1406(a)'s general authorization for transfer displaces those specific conditions for habeas relief or purports to vest the District of Vermont with jurisdiction that would not otherwise exist.  The District Court in Vermont never had jurisdiction over this matter, and it cannot exercise jurisdiction over it now, even if this Court transferred the case to it.  *See Padilla*, 542 U.S. at 441-42.  Even if that transfer statute technically permitted transfer to Vermont as a matter of civil procedure, that does not somehow vest the District of Vermont with the statutory authority to issue a specific remedy—and do so notwithstanding the specific preconditions for such relief.  Put otherwise, for the District of Vermont to award habeas relief under 2241(a), it must have "jurisdiction" to do so—as construed by *Padilla*.  Nothing in the transfer statutes alters that limitation.

The "default rule" articulated in *Padilla* controls here: "jurisdiction lies in only one district: the district of confinement".  542 U.S. at 433.  This means Petitioner's Amended Petition should have been filed in her district of confinement, the Western District of Louisiana, and any transfer of this Petitioner must be to such district.

## CONCLUSION

For these reasons, this Court lacks jurisdiction over the Petitioner and must therefore deny the request to issue a writ of habeas corpus.  Respondents further assert that transfer of this

Petition, rather than dismissal, would not be "in the interest of justice" because district courts

lack jurisdiction to review the issues presented in the Petition and to order relief as requested.

But, if the Court determines transfer appropriate, such transfer must be to the Western District of

Louisiana, the district of Petitioner's confinement.

<div style="margin-left:40%">

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

</div>

Dated: April 1, 2025          By:    */s/ Mark Sauter*
                                     Mark Sauter
                                     Assistant United States Attorney
                                     United States Attorney's Office
                                     1 Courthouse Way, Suite 9200
                                     Boston, MA 02210
                                     Tel.: 617-748-3347
                                     Email: mark.sauter@usdoj.gov

## CERTIFICATE OF SERVICE

I, Mark Sauter, Assistant United States Attorney, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated:  April 1, 2025          By:    */s/ Mark Sauter*
                                      Mark Sauter
                                      Assistant United States Attorney

DECLARATION OF ACTING DEPUTY FIELD OFFICE DIRECTOR

<u>DAVID T. WESLING</u>

Pursuant to the authority of 28 U.S.C. § 1746, I, David T. Wesling, a Supervisory Detention and Deportation Officer for U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, Burlington, Massachusetts declare as follows:

1. I am an acting Deputy Field Office Director ("(a)DFOD") for the U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO").

2. Included in my official duties as (a)DFOD in Burlington, Massachusetts is the responsibility for assisting in the managing and monitoring of scheduling and execution of removal orders for aliens in ICE custody. I am familiar with ICE policies and procedures for detaining individuals to initiate removal proceedings or to effectuate removal orders as well as releasing individuals from ICE custody.

3. I have experience utilizing ICE record systems to obtain information regarding specific aliens. ICE maintains electronic and paper records on aliens in the course of its regularly conducted business activity. These records are made in the course of regularly conducted business activity at or near the time of relevant events by a person with knowledge of these events.

4. In the course of preparing this declaration, I have examined the official records available to me regarding the immigration history and custody status of Ms. Rumeysa Ozturk ("Petitioner"). I have also discussed this case internally with officials within my office.

5. Pursuant to its statutory authority contained at 8 U.S.C. § 1226(a), ICE arrested Petitioner on March 25, 2025, at 1725 in Somerville, Massachusetts.

6. Prior to the arrest, ICE determined that because there was no available bedspace for Petitioner at a facility where she could appear for a hearing with the U.S. Department of Justice's Executive Office for Immigration Review in New England, that she would be transferred to the South Louisiana Correctional Facility at 3843 East Stagg Avenue in Basile, Louisiana where bedspace was determined to be available.

7. Transfers out of state, and out of the ERO Boston area of responsibility, are routinely conducted after arrest, due to operational necessity and considerations.

8. Once ICE secured her final bedspace location, ICE made the appropriate flight and custody arrangements to transport Petitioner to Louisiana.

9. Upon her arrest by ICE officers on March 25, 2025, Petitioner indicated she was in moderately good health with asthma, chronic back pain, and dry eye. This information was also relayed to the ERO New Orleans Field Office in Louisiana.

10. On March 25, 2025, at 1749, ICE officials departed Somerville, Massachusetts, and transported Petitioner to Methuen, Massachusetts arriving at 1822.

11. On March 25, 2025, at 1836, ICE officials departed from Methuen, Massachusetts and transported Petitioner to Lebanon, New Hampshire.

12. On March 25, 2025, at 2103, ICE officials departed Lebanon, New Hampshire to transport Petitioner to the ICE Field Office in St. Albans, Vermont.

13. On March 25, 2025, at 2228, Petitioner, arrived at the ICE Field Office in St. Albans, Vermont for processing of Petitioner's Notice to Appear (NTA), and was in custody overnight at the ICE Field Office in Saint Albans, Vermont.

14. On March 25, 2025, ICE served Petitioner with an NTA, charging her with removability under section 237(a)(1)(B) of the Immigration and Nationality Act (INA). ICE filed that NTA at the Oakdale Immigration Court in Oakdale, Louisiana.

15. The NTA orders her to appear before an immigration judge on April 7, 2025, at 8:30am at the Oakdale Immigration Court, the immigration facility with jurisdiction over her place of detention.

16. On March 26, 2025, at 0400, ICE officials departed the ICE Field Office in St. Albans, Vermont and transported Petitioner to the airport in Burlington, Vermont.

17. On March 26, 2025, at 0531, Petitioner departed the airport in Burlington, Vermont with ICE officials.

18. On March 26, 2025, at 1435, Petitioner arrived at the airport in Alexandria, Louisianna with ICE officials, who transferred her to the custody of ERO New Orleans.

19. As of the date of this declaration, Petitioner is currently detained at in ICE custody in the South Louisiana Correctional Facility, located at 3943 East Stagg Avenue in Basile, Louisiana.

20. At the time of Petitioner's arrest, there was no known counsel of record. Once ICE official obtained Petitioner's counsel's contact information through the filing of the instant habeas petition, it was provided to ERO New Orleans to facilitate Petitioner's communication with her counsel, once she arrived at her final detention location.

21. Upon her arrival to the South Louisiana Correctional Facility, Petitioner was permitted to speak with her counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the twenty-seventh day of March 2025

_____

David T. Wesling
Acting Deputy Field Office Director
U.S. Department of Homeland Security
United States Immigration and Customs Enforcement
Burlington, Massachusetts

# Exhibit C

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RUMEYSA OZTURK, <br><br> Petitioner <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; PATRICIA HYDE, in her official capacity as the New England Field Office Director for U.S. Immigration and Customs Enforcement; MICHAEL KROL, in his official capacity as HSI New England Special Agent in Charge, U.S. Immigration and Customs Enforcement; TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; and MARCO RUBIO, in his official capacity as Secretary of State, <br><br> Respondents. | Case No. 25-cv-10695-DJC |

## MEMORANDUM AND ORDER

CASPER, J.                                                            April 4, 2025

## I.     Introduction

Petitioner Rumeysa Ozturk ("Ozturk") has filed this habeas petition under 28 U.S.C.

§ 2241 (the "Petition") against the Respondents, United States government officials (collectively,

the "government").  Although the government disputes Ozturk's claims for relief, the following is

undisputed:  on March 25, 2025, at approximately 5:25 p.m. without prior notice of the revocation

of her student visa or the grounds asserted for same, Ozturk, a graduate student in Child Study and

1

Human Development at Tufts University, was approached and surrounded by six officers (several wearing masks and/or hoods), stripped of her cellphone and backpack, handcuffed, and taken into custody in an unmarked vehicle. Despite the best efforts of her counsel and, even the Turkish consulate to determine her whereabouts, the government did not disclose her place of confinement until approximately 3:27 p.m. the following day, March 26, 2025. Given the period following her arrest and detention in which the government did not disclose her whereabouts, counsel for Ozturk filed the Petition in this Court, the location of her arrest and detention and the only location of her last known whereabouts, on March 25, 2025 at approximately 10:02 p.m. The government asserts that this Court lacks jurisdiction over the Petition as Ozturk, unknown to anyone but the government, was in Vermont, not Massachusetts at the time the Petition was filed and, as of 2:35 p.m. on March 26, 2025, was in Louisiana, where she remains.

Ozturk alleges that she was targeted, arrested and transferred in retaliation for exercise of her First Amendment rights (Count I), D. 12 ¶ 69, detained in violation of her Fifth Amendment right to Due Process (Count II), id. ¶ 75, and detained and subject to removal in violation of the Administrative Procedure Act ("APA") (Count III), id. ¶ 78. Ozturk requests release from custody pending adjudication (Count IV). Id. ¶¶ 84-86. Although the Petition raises serious issues as to the conduct of her arrest and detention as alleged in each of these Counts, before reaching the merits of the Petition, the Court must first address the parties' dispute about its jurisdiction. For the reasons articulated below, the Court denies the government's motion to dismiss this Petition or its request to transfer this matter to the Western District of Louisiana and, relying upon the "interest of justice" under 28 U.S.C. § 1631, transfers this matter to the District of Vermont, where Ozturk was confined overnight at the time that the Petition was filed.

## II.    Factual and Procedural Background

### A.    Ozturk's Arrest and Detention

Ozturk, a Turkish national and doctoral candidate, entered the United States pursuant to a validly issued F-1 student visa, D. 12 ¶ 8; D. 19 at 4, on June 28, 2024, D. 12-2 at 2; see 8 C.F.R. § 214.2(f)(5) (providing that F-1 visas are issued for the duration of a full course of study).  On March 25, 2025, Ozturk's visa was revoked, subjecting her to removal from the United States pursuant to 8 U.S.C. § 1227(a)(1)(B) as an alien "whose nonimmigrant visa . . . has been revoked under section 1201(i)."  D. 19 at 3; D. 12-1 at 2; D. 12-2 at 2.

Ozturk was given no notice of the revocation of her student visa.  D. 12 ¶ 4.  On March 25, 2025, at approximately 5:25 p.m., she was arrested and taken into custody by agents of Immigration and Customs Enforcement ("ICE") near her residence in Somerville, Massachusetts. D. 19-1 ¶ 5; D. 12 ¶¶ 19-20.  A video of Ozturk's arrest shows a hooded officer in plainclothes approach Ozturk and grab her by the wrists.  D. 12 ¶ 19 n.4; (video).  Five additional officers surrounded her, took her cell phone, placed her in handcuffs and took her away in an unmarked vehicle.  Id. ¶¶ 1, 20.

At some unspecified time, but prior to her arrest, ICE determined that officers would take Ozturk to Louisiana and it made flight and custody arrangements for transport.  D. 19-1 ¶¶ 6-8. According to ICE, Ozturk was to be transferred to Louisiana because "there was no available bedspace for Petitioner at a facility where she could appear for a hearing" in New England, and such out-of-state transfers are "routinely conducted after arrest, due to operational necessity considerations."  Id. ¶¶ 6-7.  The ICE Boston Field Office, located in Burlington, Massachusetts has administrative and operational authority over ICE arrest, removal and detention operations throughout New England, including Massachusetts, Connecticut, Maine, New Hampshire, Rhode

3

Island and Vermont. D. 26-3 ¶ 6. ICE has detention facilities for female detainees in multiple locations in New England. Id. ¶ 9. According to affidavits from several experienced New England immigration attorneys, it is the usual practice to have detainees, arrested on civil immigration charges, booked and processed at the ICE Boston Field Office in Burlington, Massachusetts before they are sent to a detention facility. Id. ¶¶ 10, 12; D. 26-4 ¶¶ 4-5; D. 26-6 ¶¶ 5-6.

After Ozturk's arrest, ICE took her from Somerville, Massachusetts at 5:49 p.m., to Methuen, Massachusetts, arriving there at 6:22 p.m. D. 19-1 ¶ 10. Shortly thereafter, at 6:36 p.m., the officers took Ozturk from Methuen, Massachusetts and transported her to Lebanon, New Hampshire. Id. ¶ 11. At 9:03 p.m., ICE officials departed from Lebanon, New Hampshire, which is approximately five miles from the Vermont border, D. 19 at 5 n. 2, to transport Ozturk to the ICE Field Office in St. Albans, Vermont, where she arrived at 10:28 p.m. for processing of her Notice to Appear ("NTA") and was held there in custody overnight, D. 19-1 ¶¶ 12-13. The next morning, March 26, 2025, at 4:00 a.m., ICE officers took Ozturk to the airport in Burlington, Vermont. D.19-1 ¶ 16. The flight transporting Ozturk left Burlington, Vermont at 5:31 a.m., and arrived in Alexandria, Louisiana at 2:35 p.m. Id. ¶¶ 17-18. From there, officers transferred her to the custody of Enforcement and Removal Operation ("ERO") New Orleans. Id. ¶ 18. Ozturk is currently detained in ICE custody in the South Louisiana Correctional Facility in Basile, Louisiana. Id. ¶ 19.

All of this was unknown to Ozturk's attorney, who did not know her client's whereabouts upon learning of her arrest. D. 26-2 ¶¶ 6-7. Close to five hours after that arrest, still having been unable to confirm her whereabouts and knowing that she had been arrested and detained in Massachusetts, Ozturk's attorney filed the Petition in this Court on her client's behalf at approximately 10:02 p.m. D. 12 ¶ 21; D. 26-2 ¶ 2. Shortly thereafter, at approximately 10:12

p.m., Ozturk's counsel sent of a copy of the Petition to the government's counsel. D. 26-2 ¶ 3. Less than an hour later, at approximately 10:55 p.m., this Court (Talwani, J.) issued an order enjoining the government from moving Ozturk outside of Massachusetts without providing 48 hours' notice to the Court. D. 3 ¶ 4; D. 12 ¶ 22. Per the Court's Order, such notice was to be filed in writing on the docket in the proceeding and was to "state the reason why the government believes that such a movement is necessary and should not be stayed pending further court proceedings." D. 3 ¶ 4. A copy of this Order was delivered to the U.S. Attorney's Office, the government's counsel, minutes later, at approximately 10:57 a.m., via e-mail. 3/25/25 docket entry; D. 26-2 ¶ 5.

Even after the Petition was filed on the evening of March 25, 2025, Ozturk's counsel was unable to determine her whereabouts even in her contact with the government throughout that evening and much of the next day. D. 26-2 ¶¶ 6-13. She contacted the ICE ERO in Burlington, Massachusetts and ICE Homeland Security Investigations in Boston, Massachusetts several times to request information, but received no response. Id. ¶ 6. Ozturk's attorney also was unable to locate her via ICE's Online Detainee Locator System, where the field for "Current Detention Facility" for Ozturk remained blank. Id. ¶ 7. She had several conversations with counsel for the government who could not confirm Ozturk's whereabouts. D. 26-2 ¶¶ 9-12; D. 12 ¶ 27. Counsel was concerned about her client as Ozturk suffers from asthma (a condition apparently disclosed to officers by Ozturk upon her arrest, D. 19-1 ¶ 9) and she did not have her medication when she was detained. D. 26-2 ¶ 9; D. 12 ¶ 24. A representative of the Turkish consulate even went to the ICE Boston Field Office in Burlington, Massachusetts, and was reportedly informed Ozturk was not in that office and ICE could not provide further information about her whereabouts. D. 26-2 ¶ 8; D. 12 ¶ 27.

5

In light of these difficulties, on the afternoon of March 26, 2025, Ozturk's attorney filed an emergency motion to compel the government to disclose Ozturk's location and permit counsel to speak with her that evening. D. 7; D. 26-2 ¶ 13. In that motion, counsel noted that a U.S. Senator's office had just informed her that Ozturk had been transferred to Louisiana, but neither the government's counsel nor ICE had confirmed same. D. 7 at 1. Shortly after Ozturk's counsel filed this motion, D. 7, at approximately 3:27 p.m. on March 26, 2025, counsel for the government informed Ozturk's attorney for the first time that Ozturk had been moved to a staging facility in Alexandria, Louisiana, to be transferred to South Louisiana. D. 9 at 2; D. 12 ¶ 30; D. 26-2 ¶ 14. Ozturk's attorney was able to speak with Ozturk for the first time since her arrest later that night at approximately 9:45 p.m., D. 9 at 2; D. 19-1 ¶ 21; D. 26-2 ¶ 21, and learned that she had suffered an asthma attack while being transported in custody to Louisiana. D. 12 ¶ 31. As directed by the Court, the government filed a response to Ozturk's motion the next morning, March 27, 2025, reporting that, as was now noted in ICE's online detainee locator, Ozturk was currently confined at the South Louisiana Correctional Facility in Basile, Louisiana. D. 9 at 1, where she remains. D. 19-1 ¶ 19.

On March 28, 2025, Ozturk filed an amended Petition, D. 12. In light of same, the Court gave the government until 5:00 p.m. on Tuesday, April 1, 2025 to respond to it. D. 16. To allow resolution of its jurisdiction to decide the Petition, the Court ordered that "Ozturk shall not be removed from the United States until [its] further Order." Id. The government timely filed its response and requested that this Court dismiss the Petition, or, if the Court determines that transfer is appropriate, transfer the case to the Western District of Louisiana, the district where Ozturk is presently confined. D. 19 at 28-29. The Court ordered Ozturk to file a response by 5:00 p.m. the

6

following day, Wednesday April 2, 2025. D. 20. The Court heard oral argument from the parties on April 3, 2025 and took the matter under advisement. D. 41.

### B. Ozturk's Revocation and Removal Proceedings

As mentioned, Ozturk was not given notice of the revocation of her visa and had not received a copy of the NTA before an immigration judge for removal proceedings before her arrest. D. 12 ¶ 36. A letter dated March 25, 2025, which was addressed to Ozturk but not provided to her before her arrest and detention, states that Ozturk's Student and Exchange Visitor Information System ("SEVIS") designation "has been terminated pursuant to 237(a)(1)(C)(i) and/or 237(a)(4)(C)(i) of the Immigration and Nationality Act." D. 12 ¶ 33; D. 12-1 at 2. Also, as the government recounts, Ozturk was not served with the NTA until after she was in custody. D. 19-1 ¶¶ 13-14. The NTA orders Ozturk to appear before an immigration judge in Louisiana on April 7, 2025 for an initial hearing. D. 12 ¶ 37; D. 19-1 ¶ 15; D. 12-2 at 2.

Although the basis of her revocation is not cited in the letter to her regarding same, Ozturk was one of several authors who contributed to an editorial back on March 26, 2024 in the school newspaper, The Tufts Daily, criticizing the University's dismissal of several resolutions that had been adopted by the undergraduate student Senate in "a sincere effort to hold Israel accountable for clear violations of international law." D. 12 ¶¶ 2, 16; D. 26 at 2; D. 26-1 at 67 ¶ 5. The President of Tufts University attests that no complaints were filed in its aftermath and there were multiple editorials published on different sides of this issue. D. 26-1 at 67 ¶ 5. As alleged, Ozturk's current visa status aligns with new policy directives from President Donald Trump who, after assuming office, signed two Executive Orders aimed at fulfilling a campaign promise to revoke the visas of students he characterized as "Hamas sympathizers." D. 12 ¶¶ 40-44. Ozturk's case is one of several cases in which the Trump Administration has implemented these Executive Orders

7

by revoking the immigration status of non-citizens who expressed support for Palestine.  D. 12 ¶¶ 53-57.  In such cases, the government has invoked the same provision it cited in its letter to Ozturk, 8 U.S.C. § 1227(a)(4)(C)(i), which provides that "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable."  D. 12 ¶ 50; D. 12-1 at 2; see, e.g., Chung v. Trump, No. 25-cv-02412-NRB, D. 1 (S.D.N.Y. March 24, 2025); Khalil v. Joyce, No. 25-cv-01935-JMF, 2025 WL 849803, at *1 (S.D.N.Y. Mar. 19, 2025).

**III.    Discussion**

Before a Court can turn to the merits of the Petition, including Ozturk's request for immediate release, it must determine whether it has jurisdiction over this matter.  Ozturk contends that this is the appropriate tribunal for the Petition, D. 12 ¶¶ 6-7; D. 26 at 10-16, but if the Court determines that it is not, the matter should be transferred to the District of Vermont.  D. 26 at 17-19.  The government contends that the Petition should be dismissed or, alternatively, transferred to the Western District of Louisiana.  D. 19 at 6-16; 26-28.

**A.    Jurisdiction for the Petition**

Ozturk filed the Petition pursuant to 28 U.S.C. § 2241, which provides in relevant part that "[w]rits of habeas corpus may be granted by . . . the district courts within their respective jurisdictions" when a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241.  "Aliens in custody of federal immigration officials have traditionally been able to obtain review of immigration decisions by petitioning for a writ of habeas corpus under what is now § 2241."  Goncalves v. Reno, 144 F.3d 110, 120, 133 (1st Cir. 1998) (concluding that habeas jurisdiction permits a district court to review at least "pure issues of law concerning the applicability of statutory provisions" to immigration decisions); see Raspoutny v.

Decker, 708 F. Supp. 3d 371, 379 (S.D.N.Y. 2023) (stating that "Section 2241 permits a federal court to review 'purely legal statutory and constitutional claims' regarding immigration proceedings, but jurisdiction 'does not extend to review of discretionary determinations by the IJ and the BIA'") (quoting Sol v. I.N.S., 274 F.3d 648, 651 (2d Cir. 2001)).  Section 2241 is also the proper vehicle for petitioners challenging their detention by immigration officials pending a decision in immigration matters.  Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec., 510 F.3d 1, 11 (1st Cir. 2007) (noting that "[d]istrict courts retain jurisdiction over challenges to the legality of detention in the immigration context") (citing Hernández v. Gonzales, 424 F.3d 42, 42 (1st Cir. 2005)); Pensamiento v. McDonald, 315 F. Supp. 3d 684, 688 (D. Mass. 2018) (observing that "[d]espite . . . jurisdiction-stripping provisions, the district court may still review habeas challenges to unlawful immigration detention") (citing Aguilar, 510 F.3d at 11).  Accordingly, the Petition, filed under § 2241, is the correct vehicle for Ozturk to pursue her challenge to her arrest and detention upon the revocation of her student visa pending removal proceedings.

The government, however, contests that the District of Massachusetts is the right court to hear the Petition.[1]  As provided by statute, a habeas petition "shall allege the facts concerning the

---

[1] The government also contends that pursuant to 8 U.S.C §§ 1226(e), 1252(b)(9) and 1252(g), the Court lacks subject matter jurisdiction to review the merits of the Petition. D. 19 at 17-23.  As for §§ 1252(b)(9) and (g), the First Circuit has held that where a habeas petition raises challenges "wholly collateral" to removal, district courts are not precluded from review said petition.  See Aguilar, 510 F.3d at 10; Kong v. United States, 62 F.4th 608, 613 (1st Cir. 2023) (citing Aguilar, 510 F.3d at 11).  Likewise, the First Circuit has held that § 1226(e) does not strip district courts' ability to review habeas petitions challenging the constitutionality of a petitioner's detention.  See Hernandez-Lara v. Lyons, 10 F.4th 19, 33-34 (1st Cir. 2021) (holding that federal district courts have jurisdiction to review a habeas petition that challenges "the extent of the Government's detention authority under the 'statutory framework' as a whole") (citing Jennings v. Rodriguez, 583 U.S. 281, 295-96 (2018)); Campbell v. Chadbourne, 505 F. Supp. 2d 191, 196 (D. Mass. 2007) (stating that Congress did not express an intent in § 1226(e) to preclude judicial

application's commitment or detention, the name of the person who has custody over him and by virtue of what claim or authority, if known," 28 U.S.C. § 2242, and a writ of habeas corpus granted by a district court "shall be directed to the person having custody of the person detained." 28 U.S.C. § 2243. "Jurisdiction over the custodian is paramount because '[t]he writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody.'" Vasquez v. Reno, 233 F.3d 688, 690 (1st Cir. 2000) (alteration in original) (quoting Braden v. 30th Jud. Cir. Ct. of Ky., 410 U.S. 484, 494-95 (1973)). Accordingly and not surprisingly, as a general rule, a petitioner must file a habeas petition in the district in which they are confined and must name as a respondent the petitioner's immediate custodian. See Rumsfeld v. Padilla, 542 U.S. 426, 442-47 (2004).

> 1. *The General Rule for Challenging Physical Custody is Against the Immediate Custodian and in the Place of Confinement*

As to the general rule about naming the immediate custodian, the respondent is typically "the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." Padilla, 542 U.S. at 435; see Vasquez, 233 F.3d at 696 (holding that "normally" the rule is that the immediate custodian and not the Attorney General is the proper respondent in immigration habeas challenges).

Also, as a general matter, a habeas petitioner must file his or her petition in the district of confinement. Padilla, 542 U.S. at 447 (considering the proper venue for a habeas petition brought by a United States citizen designated as an "enemy combatant" who was initially detained in the Southern District of New York ("S.D.N.Y.") and was later transferred to military custody in South

---

review of constitutional challenges to detention). Here, because the Petition does not challenge the government's discretionary authority to remove her but the legality of her detention under the First and Fifth Amendments and the APA, D. 12 ¶¶ 69, 73-75, 78, the statutes do not strip the Court's jurisdiction to review the Petition here.

Carolina and filed a § 2241 habeas petition in S.D.N.Y.).  Id. at 432.  The Court concluded that S.D.N.Y. lacked jurisdiction over Padilla's claim because § 2241 permits a habeas petition only in "the district of confinement," and no one in S.D.N.Y. served as Padilla's immediate custodian.  Id. at 442.  In reaching this conclusion, the Court observed that "Congress added the limiting clause-'within their respective jurisdictions'-to the habeas statute in 1867 to avert the 'inconvenient [and] potentially embarrassing' possibility that 'every judge anywhere [could] issue the Great Writ on behalf of applicants far distantly removed from the courts whereon they sat.'"  Id. at 442 (alterations in original) (quoting Carbo v. United States, 364 U.S. 611, 617 (1961)).  Although Ozturk's counsel observed at the motion hearing that there is some overlap in the jurisprudence about the two rules, the Padilla Court addressed them separately to say that the place of confinement rule, in conjunction with the immediate custodian rule "compose[s] a simple rule . . . [w]henever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement."  Id. at 447.  This rule serves the important purposes of "preventing forum shopping by habeas petitioners" and avoiding the "inconvenience, expense, and embarrassment" of district courts with overlapping jurisdiction.  Id.

2.     *There are Exceptions to these General Rules*

a)     As Recognized in *Padilla*

Significantly, the Supreme Court in Padilla acknowledged that certain exceptions have historically applied to both of these general rules.  The majority noted exceptions to the immediate-custodian rule exist when there is no immediate physical custodian with respect to the "custody" challenged.  Padilla, 542 U.S. at 438-49, pointing to the Court's earlier ruling in Braden v. United States, 410 U.S. 484 (1973).  In Braden, the Supreme Court considered a habeas petition filed by

11

an Alabama prisoner in the United States District Court for the Western District of Kentucky, which challenged a detainer lodged against him in Kentucky. Braden, 410 U.S. at 488-89. Because Braden sought to challenge "a confinement that would be imposed in the future," the Court concluded the immediate custodian rule did not apply, and Braden was instead "in custody" in Kentucky by virtue of the detainer, id. at 488-89, and while the Alabama warden was the present custodian, he was not "the person who [held Braden] in what [was] alleged to be unlawful custody." Id. at 494-95. The Padilla Court also pointed to the decision in Strait v. Laird, 406 U.S. 341 (1992), Padilla, 542 U.S. at 438-39, where it addressed an inactive reservist's § 2241 petition seeking relief from future military obligations. Id. at 344. While the petitioner was domiciled in California, the Supreme Court reasoned that because he was not challenging any present physical confinement, his "'nominal' custodian was a commanding officer in Indiana who had charge of [his] Army records." Id. In citing these precedents, the Padilla Court concluded that the "legal control" test could not be applied to physical-custody challenges to allow a convicted prisoner to name that State or the Attorney General as a respondent to its § 2241 petition, Padilla, 542 U.S. at 439-40, but acknowledged that Braden and Strait remained exceptions to the general rule.

The Supreme Court also noted an exception to this general rule regarding the immediate custody in Ex parte Endo, 323 U.S. 283 (1944), in which a Japanese-American citizen interned in California filed a § 2241 petition in the federal district court in the Northern District of California to challenge her detention, id. at 284-85; Padilla, 542 U.S. at 440. Endo had named her immediate custodian in California in her petition, but the government later transferred her to Utah. Endo, 323 at 285. The Supreme Court concluded that the subsequent transfer did not divest the Northern District of California of its jurisdiction. Id. at 304-06. Instead, "when the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District

12

Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release." Padilla, 542 U.S. at 441 (characterizing Endo's holding, and describing it as "important but limited"); see Chavez-Rivas v. Olsen, 194 F. Supp. 2d 368, 377 (D.N.J. 2002) (concluding that "where an INS-detained habeas petitioner properly files a habeas petition in the district where he is incarcerated, and the petitioner is subsequently transferred to a facility outside of that district, the Attorney General . . . may be deemed a 'custodian' to allow the original District Court to retain jurisdiction over the habeas petition"). The Supreme Court reasoned that the Endo exception did not apply to Padilla's case because Padilla had been moved from the S.D.N.Y. to South Carolina before his lawyer had filed his habeas petition, meaning jurisdiction had never vested in S.D.N.Y. Id.

In addition, the Supreme Court noted certain exceptions legislated by Congress. Id. at 443. Specifically, the Court in Padilla noted that it had "long implicitly recognized an exception to the immediate custodian rule in the military context where an American citizen is detained outside the territorial jurisdiction of any district court." Id. at 436 n.9. The majority in Padilla also acknowledged an exception relied upon by the dissent, but disagreed that it was applicable. Citing Demjanjuk v. Meese, 784 F.2d 1114 (D.C. Cir. 1986) (Bork, J.), the majority observed that "[w]hen, as in that case, a prisoner is held in an undisclosed location by an unknown custodian, it is impossible to apply the immediate custodian and district of confinement rules," but concluded that was not Padilla's case "where the identity of the immediate custodian and the location of the appropriate district court are clear." Padilla, 542 U.S. at 450 n.18.

      b)      As proposed by the concurrence in *Padilla*

Although the 5-4 majority in Padilla applied the general rule requiring a habeas petition challenging physical custody to be filed in the place of confinement, two members of that majority,

13

in a concurring opinion, suggested an exception to the general rule that is implicated here. Justice Kennedy (joined by Justice O'Connor) noted that an exception to filing a petition in the district of confinement might be warranted "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention." Padilla, 542 U.S. at 454 (Kennedy, J., concurring). In such a case "habeas jurisdiction would be in the district court from whose territory the petitioner had been removed." Id. (Kennedy J., concurring). Although this exception was not adopted by the majority, because Justice Kennedy and Justice O'Connor's votes were "necessary to the formation of a majority," Justice Kennedy's opinion is at least "given particular weight," Schmitz v. Zilveti, 20 F.3d 1043, 1045 (9th Cir. 1994) (citing Middlesex Mut. Ins. Co. v. Levine, 675 F.2d 1197, 1200 (11th Cir. 1982)); see Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 594 (1st Cir. 1980) (relying upon a concurrence after noting that the author's opinion was needed to make a majority); ANR Coal Co. v. Cogentrix of N.C., Inc., 173 F.3d 493, 499 n.3 (4th Cir. 1999) (observing that courts have given particular weight to a concurrence because the vote of each justice who joined that concurrence was "necessary to create a majority"). This is particularly appropriate where the majority in Padilla did not express disagreement with this exception proposed by the concurrence, but rather noted that the particular facts of Padilla's case did not warrant its invocation. Padilla, 542 U.S. at 441-42 (noting, by the majority, that "[t]here is no indication that there was any attempt to manipulate Padilla's transfer" and "the Government did not attempt to hide from Padilla's lawyer where it had taken him"). The majority's observation in Padilla also foreshadowed later cautions by the Supreme Court. For example, in Boumediene v. Bush, 553 U.S. 723, 732-33 (2008), the Supreme Court concluded that the Military Commissions

14

Act, which prohibited detainees classified as enemy combatants from petitioning for habeas corpus, was an unconstitutional suspension of the right to the writ of habeas corpus. There, the Court described the writ as "an indispensable mechanism for monitoring the separation of powers" which it cautioned "must not be subject to manipulation by those whose power it is designed to restrain." Id. at 765-66; see Demjanjuk, 784 F.2d at 1116 (noting that "it is essential that petitioner not be denied the right to petition for a writ of habeas corpus").

Although the government's brief does not address Justice Kennedy's proposed exception in the Padilla concurrence, see D. 19 at 13-15, courts within this Circuit and others have recognized it even as they have acknowledged that the facts in their particular case did not warrant its application. See Khalil, 2025 WL 849803 at *6-11 (addressing Justice Kennedy's proposed exception in the Padilla concurrence); Parker v. Hazelwood, No. 17-cv-484-LM, 2019 WL 4261832, at *3-5 (D.N.H. Sept. 9, 2019) (referencing Justice Kennedy's exception, but noting that the petitioner has not "identified facts fitting this case into any of the recognized extraordinary circumstances warranting exception to the jurisdictional rules"); Xia v. King, No. 24-cv-2000-JRT-DLM, 2025 WL 240792, at *2 (D. Minn. Jan. 17, 2025) (citing Justice Kennedy's concurrence and suggesting that "[t]he Supreme Court has recognized" an exception to the district of confinement rule "where the Government was not forthcoming with respect to the identity of the custodian and the place of detention"); Gayle v. Meade, 614 F. Supp. 3d 1175, 1235 (S.D. Fla. 2020) (noting Justice Kennedy's exception and acknowledging that the Court "might entertain jurisdiction" over the claims "if there were evidence of efforts on the part of the defendants to evade jurisdiction of the Court") (quoting McKinnon v. Talladega Cnty., Ala., 745 F.2d 1360, 1363 (11th Cir. 1984)); Sow v. Whitaker, No. 18-cv-11394-GBD-RWL, 2019 WL 2023752, at *5-6 (S.D.N.Y. May 8, 2019) (noting Justice Kennedy's proposed exception but concluding that the

petitioner had failed to provide evidence showing that the government either made it difficult for his lawyer to know where he was or was not forthcoming about his place of detention); <u>Salcedo v. Decker</u>, No. 18-cv-8801-RA, 2019 WL 339642, at *2 n.3 (S.D.N.Y. Jan. 28, 2019) (citing Justice Kennedy's exception in <u>Padilla</u> but would continue to apply the general rule "[a]bsent contrary instruction from the Supreme Court or the Second Circuit and absent any allegation that there was an 'attempt to manipulate' [the petitioner's] transfer in bad faith"). It is also true, as the court in <u>Khalil</u> noted, that no court has "ever found that [Justice Kennedy's] exceptions applied" to the facts of any particular case. <u>Khalil</u>, 2025 WL 849803 at *2.

<div align="center">

c)    <u>Also as recognized in the First Circuit</u>

</div>

Justice Kennedy's concurrence outlining an exception to the place-of-confinement also echoed a point the First Circuit had made four years before <u>Padilla</u> in <u>Vasquez</u>, 233 F.3d at 696, about an exception to the immediate-custodian rule. The case involved an ICE detainee who was transferred from Massachusetts to Louisiana for removal proceedings following his release from prison, who then filed a habeas petition in this Court naming the Attorney General as the defendant. <u>Id.</u> at 690. The First Circuit concluded that, as a general rule, the Attorney General is neither the custodian nor the appropriate respondent in a habeas case, noting that "allowing alien habeas petitioners to name the Attorney General (over whom all district courts presumably have personal jurisdiction) as a respondent will encourage rampant forum shopping." <u>Id.</u> at 693-94. The <u>Vasquez</u> court, however, noted the possibility for exceptions in "extraordinary circumstances." <u>Id.</u> at 696. Such extraordinary circumstances would exist if "INS [the precursor to ICE] spirited an alien from one site to another in an attempt to manipulate jurisdiction." <u>Id.</u> (concluding that no such "extraordinary circumstances" existed in the case where "the petitioner has neither marshaled facts suggesting furtiveness nor made a showing of the elements necessary to demonstrate bad faith").

<div align="center">

16

</div>

Such concerns regarding government conduct are heightened in the case of a habeas petitioner who is an ICE detainee. Anariba v. Dir. Hudson Cnty. Corr. Ctr., 17 F.4th 434, 447 (3d Cir. 2021). Given ICE's "broad authority to move ICE detainees" without notice, "the Government could willingly transfer an ICE detainee seeking habeas from continued detention to a jurisdiction that is more amendable to the Government's position, or the Government could transfer an ICE detainee for the purpose of intentionally introducing complicated jurisdictional defects to delay the merits review of already lengthy § 2241 claims." Id. at 447-48.

Courts have noted that "extraordinary circumstances" could exist to invoke the exception articulated in Vasquez. See Tham v. Adducci, 319 F. Supp. 3d 574, 577 (D. Mass. 2018) (citing Vasquez, 233 F.3d at 696) (concluding that there were "no extraordinary facts . . . that would warrant deviating from the immediate custodian rule"); Chavez-Rivas, 194 F. Supp. 2d at 376 (discussing exception under Vasquez, but disagreeing that "a petitioner should shoulder the burden of proving the Government acted in bad faith" in invoking same and that "[w]here transfer is not the result of the petitioner's misconduct, [the court] would not impose such a burden upon him"); Gayle, 614 F. Supp. 3d at 1235 n.23 (internal citation and quotation marks omitted) (some alterations in original) (citing Vasquez and other cases to suggest that "if Petitioners could satisfactorily prove their hunch ['that the ICE-facilitated transfers may be part of a shell game designed to strip the Court of jurisdiction'], then the Court might entertain jurisdiction over [their] claim[s] if there were evidence of efforts on the part of the defendants to evade the jurisdiction of the Court").

A court has invoked Vasquez in at least two cases to allow a petitioner to name the Attorney General as the respondent where ICE moved the petitioner from the district immediately after detention. Farah v. I.N.S., No. 02-cv-4725-DSD-RLE, 2002 WL 31828309, at *2-3 (D. Minn.

17

Dec. 11, 2002); de Jesus Paiva v. Aljets, No. cv-036075-DWF-AJB, 2003 WL 22888865, at *4

(D. Minn. Dec. 1, 2003). In those cases, the court expressed concern that such a practice by ICE

would allow it "to forum shop, intentionally or not." Farah, 2002 WL 31828309, at *3 (citing

Alcaide–Zelaya v. McElroy, No. 99–cv-5102-DC, 2000 WL 1616981, at * 5 (S.D.N.Y. Oct. 27,

2000)); de Jesus Paiva, 2003 WL 22888865, at *4 (observing that "[t]o now hold that Petitioners

may only file their Petition in the state that the ICE determines to send them would be to allow the

ICE to forum shop") (citing Alcaide-Zelaya, 2000 WL 1616981, at *5). That the "extraordinary

circumstances" described in Vasquez, 233 F.3d at 696, has not often been invoked reflects that

such circumstances are rare, not that rare cases never present themselves.

> 3.    *Considering the Immediate-Custodian Rule in this Case*[2]

The government here points to several cases to contend that the course of events

surrounding Ozturk's arrest and detention do not rise to the level of "furtiveness" or "bad faith"

that concerned the First Circuit in applying the immediate-custodian rule in certain "extraordinary

circumstances" in Vasquez. First, it points to Ruvira-Garcia v. Guadian, No. 20-cv-2179, 2020

WL 1983875, at *2 (N.D. Ill. Apr. 17, 2020), where the district court in the Northern District of

Illinois, petitioner's place of residence, concluded that it did not have jurisdiction over the

petitioner who was initially detained in Wisconsin, transferred to Texas and ultimately detained in

Oklahoma. Id. at *2-3. There, although the record reflected that the petitioner was not in the

district at the time of filing, there was no suggestion that her whereabouts were unknown at the

---

[2] Petitioner suggests that the Court does not need to reach the exceptions because, at the time the Petition was filed, Ozturk was in transit in Vermont, making her immediate custodian the ICE New England Field Officer Director, who is based in Massachusetts. D. 26 at 12-13. Circuit law does not appear to support this position. See Vasquez, 233 F.3d at 695 (addressing Endo and Strait and U.S. ex rel. Circella v. Sahli, 216 F.2d 33, 35 (7th Cir. 1954) and summing up that "this trilogy of cases simply does not give a legitimate judicial imprimatur to a freewheeling definition of 'custodian' such as the petitioner champions").

time that her Petition was filed or that the government did not disclose her whereabouts when her counsel inquired about same. The government also cites <u>Fuentes v. Choate</u>, 24-cv-01377-NYW, 2024 WL 2978285, at *9-10 (D. Colo. June 13, 2024), in which the court addressed the practical difficulties of a habeas petitioner challenging her detention by ICE where she was moved from a facility in Colorado to a staging facility in Arizona for eventual transfer to Texas. <u>Id.</u> at *2. The court concluded that it did not have jurisdiction when she was detained in Arizona and it was "not this Court's duty to ascertain or identify an Arizona official" to be named as the correct respondent. <u>Id.</u> at *9. Recognizing petitioner's argument that she was only in Arizona temporarily and that this "present[ed] unusual logistical circumstances that likely hindered counsel's ability to act swiftly and still within the bounds of permissible habeas jurisdiction," the court declined to apply the exception in Justice Kennedy's concurrence, noting an absence of "authority from the Tenth Circuit—or weight of authority from other circuit courts—that might justify the application of such exception (however logical) by this Court." <u>Id.</u> at *10. In contrast, here, in the First Circuit, this Court must consider <u>Vasquez</u>. Moreover, other than the transport of the petitioner through several states en route to another detention facility in Oklahoma, there is no suggestion in that case that the petitioner's whereabouts were unknown to her counsel at the time she filed the habeas petition. <u>Id.</u> In fact, the court in <u>Fuentes</u> noted that petitioner's counsel was at least informed of her transfer to Texas as it was occurring. <u>Id.</u>

Here, the government attests that "[t]ransfers out of state, and out of the ERO Boston area of responsibility, are routinely conducted after arrest, due to operational necessity and considerations." D. 19-1 at 7. But even accepting that it is routine to move detainees between different locations before transport to their final destination, <u>see Sow</u>, 2019 WL 2023752, at *1-2 (reflecting petitioner's transport between locations in New York and New Jersey before

Louisiana), the government here provides no information about whether it is routine to move detainees to various locations in a single day or to have a detainee on a plane heading out of the region within twelve hours of her arrest.

Moreover, unlike the circumstances in <u>Vasquez</u>, 233 F.3d at 696, the petitioner has "marshaled facts" at least showing "furtiveness" on the part of the government here. <u>Id.</u> Ironically, the government (at least in its papers) faulted Ozturk for failing to file the Petition in the district of her confinement and failing to name her immediate custodian, D. 19 at 6-13, despite the fact that Ozturk was not permitted to communicate her whereabouts as she was transported from Somerville, Massachusetts to Methuen, Massachusetts to Lebanon, New Hampshire and then to Saint Albans, Vermont, <u>see</u> D. 26-7 ¶ 6 (Ozturk attesting that she kept asking to call her attorney but was told that she would be allowed to do so "once [she] reached [her] final destination"). Ozturk's attorney did not and could not have known her place of confinement or her immediate custodian at the time she filed the Petition, and even in the aftermath of that filing, the government did not disclose Ozturk's whereabouts in Vermont or her planned transport to Louisiana until a day later after she arrived in Louisiana.  D. 19-1 ¶ 21.[3]

Ozturk has filed multiple affidavits from experienced, immigration attorneys in the New England area that attest that the sequence of events here was far from routine, even putting aside the circumstances of her arrest.  According to these sworn statements, most ICE detainees arrested on civil immigration warrants are booked and processed in the ICE ERO Field Office in Burlington, D. 26-3 ¶ 10; D. 26-4 ¶ 5; D. 26-6 ¶ 6, and then are transferred to a detention facility.

---

[3] That ICE has an internal policy that it will notify a detainee's attorney of record of a transfer "as soon as practicable on the day of the transfer, but in no circumstances later than twenty four (24) hours after the transfer occurs," U.S. ICE, Policy No. 11022.1(5.3)(2)(a)(2012), does not counter this conclusion here where the government was aware that Ozturk and her counsel affirmatively had requested such contact before the expiration of this time period.

D. 26-6 ¶ 6.  This was not the case with Ozturk, who was booked and processed in another city in Massachusetts, Methuen, transported to New Hampshire and then to Vermont.  Although ICE detainees might be moved during custody, D. 19-1 ¶ 7 (the Acting Deputy Field Office Director for ICE ERO attesting that "[t]ransfers out of state, and out of the ERO Boston area of responsibility, are routinely conducted after arrest, due to operational necessity and considerations"), it is unusual for that to occur within a few hours.  D. 26-3 ¶ 11; D. 26-4 ¶ 7; D. 26-5 ¶ 13; D. 26-6 ¶ 7.  Women who are detained by ICE in the region are regularly detained at facilities in New Hampshire (Strafford Jail), Rhode Island (Wyatt) and Maine (Cumberland County Jail), D. 26-4 ¶ 6, and another facility in Vermont (Chittenden Regional Correctional Facility).  D. 26-6 ¶ 9.  At least as to the facility in Maine (Cumberland County Jail), there was space for female detainees on March 25 and 26, 2025.  D. 26-5 ¶ 12.  An experienced immigration attorney working in Vermont attested that she has only experienced people being detained at the St. Albans office upon initial arrest in Vermont and has "never once encountered the case of a detained person who is being transferred into Vermont for the purposes of continued ICE detention" and that it is "even more extraordinary for a person to be transferred into the St. Albans ICE office, which is a government office and not a detention facility."  D. 26-7 ¶ 8.  The irregularity of the arrest, detention and processing here is coupled with the failure to disclose Ozturk's whereabouts even after the government was aware that she had counsel and the Petition was filed in this Court.  Moreover, contrary to counsel's arguments at the motion hearing, that the government had a pre-arranged plan for Ozturk's detention and transport before the agents effectuated her arrest does not necessarily show lack of attempt to manipulate jurisdiction where that plan continued (apparently uninterrupted) even after the government was aware of the Petition.

Even if <u>Vasquez</u>'s extraordinary circumstances exception to the immediate custodian rule did not apply here, there is also an exception to the immediate-custodian rule where the custodian of the petitioner is unknown at the time that the Petition is filed. As discussed above, in <u>Demjanjuk</u>, 784 F.2d at 1116, where the petitioner was being held by the U.S. Marshal in a confidential location, the court treated the Attorney General as the custodian and concluded that jurisdiction would lie in the D.C. Circuit at the time that the Petition was filed. <u>Id.</u>; <u>Khalil v. Joyce</u>, No. 25-cv-01963-MEF, 2025 WL 972959, at *28-37 (D.N.J. Apr. 1, 2025) (discussing <u>Demjankuk</u>).[4] Similarly, where ICE took Ozturk into custody in Massachusetts, but transported her to an unknown place, she cannot be faulted for filing the Petition in this Court against the Respondents with national and regional supervision over ICE. This is particularly true here where counsel for Ozturk could not have known to name her client's immediate custodian in Vermont, her location at the time the Petition was filed.

### 4.    *Considering Place-of-Confinement Rule in this Case*

The same is true as to the general rule under <u>Padilla</u> and its progeny that a Petition should be filed in the petitioner's place of confinement, which we now know was the District of Vermont for Ozturk. <u>See</u> <u>Demjanjuk</u>, 784 F.2d at 1116. Despite her counsel's argument at the motion hearing, whatever the analytical overlap between this general rule and the immediate-custodian rule may be, the Court must address both rules in determining its jurisdiction. <u>Padilla</u>, 542 U.S. at

---

[4] At oral argument, in addressing <u>Demjanjuk</u>, counsel for the government argued that even if it were true that the immediate custodian was unknown at the time the Petition was filed on March 25, 2025, the Court should focus on the fact that this was no longer the case when the amended Petition was filed on March 28, 2025. Such an approach is contrary to "relate-back" rules that apply in a civil case such as this one, <u>Jaynes v. Grant</u>, No. 03-cv-11582-JLT, 2010 WL 4181241, at *2-3 (D. Mass. Oct. 19, 2010) (concluding that an amended habeas petition relates back to the original filing), particularly when the critical focus is at the time the Petition was filed. <u>See</u> <u>Padilla</u>, 542 U.S. at 441 (discussing <u>Endo</u>, 323 U.S. at 304-06).

447.  It is the irregulary of the processing and transport in a single day and failure to disclose Ozturk's whereabouts discussed above as to <u>Vasquez</u> that also implicates the <u>Padilla</u> exception to the place-of-confinement rule proffered by Justice Kennedy.  Justice Kennedy's remedy in this scenario would have been that "habeas jurisdiction would lie in the district or districts from which [the detainee] had been removed."  <u>Padilla</u>, 542 U.S. at 454.  This is the remedy that Ozturk seeks in the first instance, but argues in the alternative that transfer to the District of Vermont, D. 26 at 9, would be appropriate.  This is perhaps in Ozturk's recognition of the fact that no court has yet relied upon the <u>Padilla</u> concurrence as the basis for jurisdiction.  <u>Khalil</u>, 2025 WL 849803, at *2.  Moreover, if the purpose of any exception to the place-of-confinement rule is to curb forum shopping by the government, <u>see</u> <u>Anariba</u>, 17 F.4th at 447, the transfer of this matter to the federal district court in the District of Vermont, the place that Ozturk was confined at the time that the Petition was filed, does so.  <u>See</u> <u>Boumediene</u>, 553 U.S. at 779 (observing that "common-law habeas corpus was, above all, an adaptable remedy"); <u>Khalil</u>, 2025 WL 972959, at *35 (noting that "[p]er the Supreme Court, courts must apply the habeas statute with an eye to the underlying equitable nature of the writ") (and cases cited).

### B.  Transfer to Vermont is Warranted Here

In the context of a habeas petition, the jurisdictional rules are "not jurisdictional in the sense of a limitation on subject-matter jurisdiction," but rather akin to "personal jurisdiction or venue."  <u>Padilla</u>, 542 U.S. at 451 (Kennedy, J., concurring); <u>Tham</u>, 319 F. Supp. 3d at 576 n. 2.  There are a number of transfer statutes, 28 U.S.C. §§ 1404(a), 1406(a), 1631, but the most applicable here appear to be the latter two, §§ 1406(a) and 1631.  If a case is filed in the wrong venue, 28 U.S.C. § 1406(a) permits the district court in the district in which the case was filed to "transfer such case to any district or division in which it could have been brought" if such transfer

serves "the interest of justice." Id.; Tham, 319 F. Supp. 3d at 577. If "there is a want of jurisdiction," as the Court concludes here, 28 U.S.C. § 1631 permits transfer of a civil action to any court "in which the action . . . could have been brought at the time it was filed or noticed," if such transfer "is in the interest of justice." In Hoffman v. Blaski, 363 U.S. 335, 342-44 (1960), the Supreme Court considered whether the phrase "where it might have been brought" in § 1404(a) required the transferee court to have jurisdiction at the time the original action was filed, or whether it permitted transfer to a court that would have had jurisdiction at the time of the transfer only. The Court concluded that the "unambiguous, direct (and) clear" language of the transfer statute permitted transfer only in the former case. Id. Courts have concluded that Hoffman's limitation also applies to the "could have been brought" language in §§ 1406(a) and 1631. See, e.g., Gonzalez v. Grondolsky, 152 F. Supp. 3d 39, 47 (D. Mass. 2016).

"Want of jurisdiction" under § 1631 means a lack of either personal or subject matter jurisdiction. See HC&D, LLC v. Precision NDT & Consulting, LLC, 698 F. Supp. 3d 180, 197-98 (D. Mass. 2023) (internal citation omitted). Once transferred, "the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred." 28 U.S.C. § 1631; see Khalil, 2025 WL 972959, at *14-20 (discussing § 1631). Such transfer treats the transferred case as if it was filed at the time of the original filing; here, it would treat the Petition as filed in Vermont on March 25, 2025 at 10:02 p.m. Gonzalez, 152 F. Supp. 3d at 47; see Miller v. United States, 753 F.2d 270, 276 (3d Cir. 1985); Martinez-Nieto v. Att'y General, 805 F. App'x 131, 135 (3d Cir. 2020).

The First Circuit has recognized that § 1631 applies in the context of habeas petitions. See Tham, 319 F. Supp. 3d at 577-78 (transferring a habeas petition pursuant to § 1631 and noting that

"there is a rebuttable presumption in favor of transferring a case instead of dismissing it"); Del Carvalho v. Moniz, No. 21-cv-11946-WGY, 2021 WL 5811301, at *1 (D. Mass. Dec. 7, 2021) (transferring a habeas petition to New Hampshire pursuant to § 1631 and "in the interest of justice").

Under either statute, however, an action may only be transferred to the court where it "could have been brought." 28 U.S.C. §§ 1406(a), 1631.[5] Here, because Ozturk was confined overnight in Vermont when the Petition was filed, the District of Vermont is the proper transferee court.[6]

## IV. Conclusion

For the reasons articulated below, the Court DENIES the government's motion to dismiss this Petition and its alternative request to transfer this matter to the Western District of Louisiana. The Court ALLOWS the alternative relief sought by Ozturk and transfers this matter "in the interest of justice" pursuant 28 U.S.C. § 1631 to the U.S. District Court for the District of Vermont.

To ensure that Ozturk has an opportunity to have the Petition considered by the District of Vermont, and to preserve the status quo, this Court's March 28, 2025 Order enjoining the government from removing her from the United States, D. 16, shall remain in effect unless and until the transferee court orders otherwise. See Khalil, 2025 WL 849803, at *14 (ordering same upon transfer).

**So Ordered.**

---

[5] For at least this reason, the Court rejects the government's argument that if it did not dismiss the Petition, it should instead transfer it to the Western District of Louisiana, where Ozturk was not detained at the time of the filing of the Petition.

[6] It will be for the District of Vermont to determine if it has jurisdiction over Ozturk's Petition notwithstanding her later transfer to Louisiana after the filing of the Petition that is now transferred there. See Khalil v. Joyce, 2025 WL 972959, at *24-38 (taking transferred petition as filed in New Jersey at the time it had been filed in S.D.N.Y.).

/s Denise J. Casper
United States District Judge