25-1019
*Öztürk v. Hyde*

# United States Court of Appeals
## for the Second Circuit

---

August Term 2024
Argued: May 6, 2025
Decided: May 7, 2025

No. 25-1019

---

RUMEYSA OZTURK,

*Petitioner–Appellee,*

*v.*

PATRICIA HYDE, in her official capacity as the New England Field Office Director, U.S. Immigration and Customs Enforcement; MICHAEL KROL, in his official capacity as HSI New England Special Agent in Charge, U.S. Immigration and Customs Enforcement; TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; MARCO RUBIO, in his official capacity as Secretary of State; and DONALD J. TRUMP, in his official capacity as President of the United States,

*Respondents–Appellants.*

---

Appeal from the United States District Court
for the District of Vermont
No. 2:25-cv-374, William K. Sessions III, *Judge*

---

Before:          PARKER, CARNEY, and NATHAN, *Circuit Judges*.

———————

ESHA BHANDARI
BRETT MAX KAUFMAN
BRIAN HAUSS
NOOR ZAFAR
SIDRA MAHFOOZ
American Civil Liberties Union
New York, NY

JESSIE J. ROSSMAN
ADRIANA LAFAILLE
RACHEL E. DAVIDSON
JULIAN BAVA
American Civil Liberties Union
Foundation of Massachusetts, Inc.
Boston, MA

MAHSA KHANBABAI
North Easton, MA

LIA ERNST
MONICA H. ALLARD
ACLU Foundation of Vermont
Montpelier, VT

RAMZI KASSEM
NAZ AHMAD
MUDASSAR TOPPA
SHEZZA ABBOUSHI DALLAL
CLEAR Project
Main Street Legal Services, Inc.

CUNY School of Law
Long Island City, NY

MATTHEW D. BRINCKERHOFF
KATHERINE ROSENFELD
VASUDHA TALLA
SONYA LEVITOVA
Emery Celli Brinckerhoff Abady
Ward & Maazel LLP
New York, NY

*Counsel for Petitioner–Appellee*

DREW C. ENSIGN
ALANNA T. DUONG
YAAKOV M. ROTH
SARAH S. WILSON
Civil Division
U.S. Dept. of Justice
Washington, D.C.

MICHAEL P. DRESCHER
Acting United States Attorney
District of Vermont

*Counsel for Respondents–Appellants*

———————

BARRINGTON D. PARKER, SUSAN L. CARNEY, and ALISON J. NATHAN, *Circuit Judges*:

Rümeysa Öztürk is a graduate student who had, until recently, been living in Massachusetts lawfully on a student visa. On March 25, 2025, six plainclothes law enforcement officers arrested Öztürk near her home without warning and drove her away in an unmarked car. Unaware of her location and unable to contact their client, Öztürk's counsel brought a habeas petition in the District of Massachusetts. The petition alleges that Öztürk was arrested and is now detained based solely on an op-ed she wrote over a year before her arrest. But, when the petition was filed, Öztürk had already been driven across state lines to Vermont. And when the government eventually disclosed Öztürk's location nearly twenty-four hours later, she had again been moved, this time to a correctional facility in Louisiana.

The habeas petition filed in Massachusetts was transferred to the District of Vermont, and the district court has set an expeditious schedule for a bail hearing and to resolve the constitutional claims made in the habeas petition. In aid of this resolution, the district court ordered the government to transport Öztürk from immigration custody in Louisiana to immigration custody in the District of Vermont. Although proceedings continue in the District of Vermont, the government now appeals the district court's order. Before this panel, the

1

government seeks an emergency stay of this transfer order pending appeal. We conclude that the government has failed to meet its burden to justify such a stay.

First, the government has failed to show that it is likely to succeed on the merits of its appeal. The District of Vermont is likely the proper venue to adjudicate Öztürk's habeas petition because, at the time she filed, she was physically in Vermont and her immediate custodian was unknown. Furthermore, we conclude that the government is unlikely to prevail on its arguments that various jurisdiction-stripping provisions of the Immigration and Nationality Act ("INA") on which the government relies deprive the district court of jurisdiction over Öztürk's challenge to her detention.

Second, the government has failed to show irreparable injury absent a stay of the transfer order. Contrary to its arguments, the transfer order does not prevent it from effectuating any duly enacted law. If the government were to prevail on this appeal, Öztürk would return to immigration custody in Louisiana. And in the interim, Öztürk's immigration removal proceedings will continue in Louisiana. Finally, the balance of the equities disfavors a stay. Öztürk's interest in participating in her scheduled habeas proceedings in person outweighs the government's purported administrative and logistical costs.

2

For these reasons, the government's motion for a stay is **DENIED**, the government's request for a writ of mandamus is also **DENIED**, and the administrative stay entered by this Court is hereby **VACATED**. The government is hereby **ORDERED** to comply with the district court's transfer order within one week of the date of this opinion. Accordingly, the district court's April 18, 2025 Order is hereby amended as follows: "To support the Court's resolution of these issues, the Court orders that Ms. Öztürk be physically transferred to ICE custody within the District of Vermont no later than May 14, 2025."

## I.    BACKGROUND

This case arises from the arrest and detention of Rümeysa Öztürk, a young Turkish student who entered the United States legally pursuant to a valid F-1 student visa. Öztürk is a third-year doctoral candidate in Child Study and Human Development at Tufts University, and has been residing in Somerville, Massachusetts. Öztürk was arrested on March 25, 2025, and has been detained at a correctional facility in Louisiana ever since.

To date, the only justification the government has provided for her arrest and detention is that the Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE") made an assessment that she "had been involved in associations that 'may undermine U.S foreign policy by creating

a hostile environment for Jewish students and indicating support for a designated terrorist organization' *including co-authoring an op-ed* that found common cause with an organization that was later temporarily banned from campus." *Ozturk v. Trump*, No. 2:25-cv-374, 2025 WL 1145250, at *17 (D. Vt. Apr. 18, 2025) (emphasis added).

The opinion editorial, which was co-authored by Öztürk and three other Tufts students, was published last year on March 26, 2024. It expressed strong views on an undisputedly controversial topic, criticizing the University's response to three resolutions passed by the Tufts Community Union Senate that would have the University "acknowledge the Palestinian genocide, apologize for University President Sunil Kumar's statements, disclose its investments and divest from companies with direct or indirect ties to Israel." Rumeysa Ozturk et al., *Op-ed: Try Again, President Kumar: Renewing Calls for Tufts to Adopt March 4 TCU Senate Resolutions,* The Tufts Daily (Mar. 26, 2024), available at https://www.tuftsdaily. com/article/2024/03/4ftk27sm6jkj [https://perma.cc/84ZQ-EVZ7].

On March 21, 2025, the U.S. Department of State, Bureau of Consular Affairs approved revocation of Öztürk's F-1 visa. *Ozturk*, 2025 WL 1145250, at *2. The approval was, apparently, based solely on the assessment by DHS and ICE that

Öztürk's co-authorship of the op-ed a year earlier demonstrated her involvement in organizations that "may undermine U.S. foreign policy." *Id.* at *17. Öztürk was not informed that DHS and ICE were considering seeking her visa revocation, nor that such a determination was made. The Armstrong Memo stated that "[d]ue to ongoing ICE operational security, this revocation will be silent; ***the Department of State will not notify the subject of the revocation***." *Id.* at *3 (emphasis added).

Four days later, six heavily armed, plainclothes officers, some masked, arrested Öztürk without warning on the street near her residence and drove her away in an unmarked vehicle, crossing state lines and transporting her first to New Hampshire, then to Vermont, and the next day, flying her to a correctional facility in Basile, Louisiana, where she remains in custody.

Öztürk was not afforded an opportunity to speak with counsel or to tell anyone where she was until after her arrival in Louisiana, almost twenty-four hours after her arrest in Massachusetts. Counsel's efforts to determine where she was detained in the hours after her arrest were unsuccessful. Thus, that evening, her counsel filed a habeas petition in the District of Massachusetts—her last known location—seeking her release. The Massachusetts district court then ordered that

she not be transferred out of Massachusetts. But at this point Öztürk was already in Vermont. ICE agents proceeded to transport her to Louisiana.

Because Öztürk was detained in Vermont at the time her habeas petition was filed, Judge Denise L. Casper of the District of Massachusetts soon transferred this case to the District of Vermont, where the case was assigned to Judge William K. Sessions III. *Ozturk v. Trump*, 25-cv-10695, 2025 WL 1009445, at \*11 (D. Mass. Apr. 4, 2025); *see also* 28 U.S.C. § 1631.

In her amended habeas petition, Öztürk alleges that her arrest and detention were unlawfully "designed to punish her speech and chill the speech of others." Mot. Ex. A (Amended Habeas Petition, hereinafter "Pet.") at 2 ¶ 3. She does not challenge the revocation of her visa, and she is not subject to an order of removal. The government moved to dismiss the petition. In a careful and thoughtful opinion, Judge Sessions denied the government's motion and scheduled a bail hearing (for May 9) and a hearing on the habeas petition (for May 22). The district court also ordered that Öztürk be transferred to immigration custody in the District of Vermont in order to facilitate those proceedings.

Before us is the government's emergency motion seeking a stay pending appeal of the district court's order dated April 18, 2025, which directs the

government to return Öztürk from Louisiana to the District of Vermont. Öztürk argues that we lack appellate jurisdiction over an appeal from Judge Sessions' order, and she otherwise opposes the motion.

## II.    APPELLATE JURISDICTION

As a threshold matter, Öztürk argues that we lack jurisdiction over the government's interlocutory appeal from the district court's order that she "be physically transferred to ICE custody within the District of Vermont no later than May 1, 2025." *Ozturk*, 2025 WL 1145250, at *25. Specifically, she contends that we cannot review this interlocutory order because it is not an injunction, was not certified by the district court to this Court, and is not appealable under the collateral order doctrine. We disagree.

In *Shoop v. Twyford*, the Supreme Court held that, pursuant to the collateral order doctrine, federal courts of appeal have appellate jurisdiction to review a transportation order under the All Writs Act, 28 U.S.C. § 1651. 596 U.S. 811, 817 n.1 (2022). We are bound by that conclusion. Accordingly, we conclude that this Court has jurisdiction over the stay motion.

## III.    STAY PENDING APPEAL

A stay is "an exercise of judicial discretion and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S.

7

418, 433 (2009) (alterations adopted) (quotation marks omitted). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of [the Court's] discretion." *Id.* at 433–34. The four stay factors are "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434 (quotation marks omitted). "The first two factors . . . are the most critical." *Id.* And where "the government is a party to the suit, the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020). We deny the stay because the government has not met its burden on any of the factors.

## A. Likelihood of Success on the Merits

### 1. *District of Confinement and Immediate Custodian*

We begin with two traditional requirements for a federal court to entertain a habeas petition: that the petition be filed in the district of confinement and that it name the petitioner's immediate custodian. *See Rumsfeld v. Padilla*, 542 U.S. 426, 438 (2004); *see also* 28 U.S.C. § 2242. Generally, "[w]henever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States," he must file the petition in the district of confinement and name his

immediate custodian as the respondent. *Padilla*, 542 U.S. at 447. Öztürk filed her original habeas petition in the District of Massachusetts on March 25, 2025 at approximately 10pm, naming as respondents Patricia Hyde, the New England Field Office Director of ICE; Michael Krol, ICE's Homeland Security Investigation's New England Special Agent in Charge; Todd Lyons, the Acting Director of ICE; and Kristi Noem, the Secretary of Homeland Security. The government argues that, because the petition was not filed in Öztürk's district of confinement and did not name Öztürk's immediate custodian, "the order below was unlawful because the district court does not have habeas jurisdiction over this case in the first place." Mot. at 10.

Any confusion about where habeas jurisdiction resides arises from the government's conduct during the twenty-four hours following Öztürk's arrest. Öztürk was arrested near her residence in Somerville, Massachusetts, at about 5:25pm on March 25, 2025. *Ozturk*, 2025 WL 1009445, at *2 . ICE officers departed Somerville with Öztürk at 5:49pm. *Id.* At 10:28pm, after being transferred to Methuen, Massachusetts, and then to Lebanon, New Hampshire, Öztürk arrived at an ICE field office in St. Albans, Vermont, where she spent the next six hours.

*Id*. At 4:00am on March 26, 2025, Öztürk was transported to the airport in Burlington, Vermont and then to Louisiana, where she arrived at 2:35pm. *Id.*

Öztürk's counsel "repeatedly attempted to ascertain her location" in the hours following her arrest. *Ozturk*, 2025 WL 1145250, at *3; *see also* Opp. at 4–5. After their initial efforts failed, counsel filed Öztürk's original habeas petition in the District of Massachusetts—her last known location—at approximately 10:01pm. *See* Mot. at 5; *Ozturk*, 2025 WL 1145250, at *2; *Ozturk*, 2025 WL 1009445, at *1. It is now undisputed that at that time, Öztürk was not in the District of Massachusetts—she was already in Vermont. Accordingly, the Massachusetts district court found it lacked habeas jurisdiction and transferred the petition to Vermont under 28 U.S.C. § 1631. *Ozturk*, 2025 WL 1009445, at *11.

The government now argues that this transfer was improper. The government is wrong. 28 U.S.C. § 1631 provides "[w]henever a civil action . . . is noticed for or filed with . . . a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court . . . in which the action or appeal could have been brought at the time it was filed or noticed." The Supreme Court has made clear "the general rule that for core habeas petitions challenging present physical

confinement, jurisdiction lies in only one district: the district of confinement."
*Padilla*, 542 U.S. at 443. At the time the petition was filed, that "one district" was
the District of Vermont, where Öztürk was in transit to an ICE facility for the night.
Vermont is therefore the ***only*** district in which the petition could have been
brought at the time it was filed, and thus the ***only*** district to which it could be
transferred under § 1631. True, if the district court found that transfer was not in
the interest of justice, it could have dismissed the petition without prejudice, as
the Supreme Court did in *Padilla*—but the government presents no reason to call
into doubt the district court's conclusion that transfer was "in the interest of
justice."[1]

The government argues that § 1631 cannot convey "substantive authority"
the court would otherwise lack. Mot. at 13. That is true. The only effect of the
transfer statute is that "the action or appeal shall proceed as if it had been filed in

---

[1] And there are many reasons supporting its conclusion, not least that dismissing
the petition would have the effect of vacating the order entered in the District of
Massachusetts prohibiting the government from removing Öztürk from the
country until further court order. Dismissing the petition would also
unnecessarily delay the resolution of Öztürk's claims. Further, we have held that
"a finding that the original action was filed in good faith" weighs in favor of
transfer rather than dismissal. *Liriano v. United States*, 95 F.3d 119, 122 (2d Cir.
1996), *as amended* (Oct. 7, 1996). The government has presented no basis to believe
that the original petition was not filed in good faith.

or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred." 28 U.S.C. § 1631. If the transferee court would have lacked jurisdiction had the action been filed there, transfer does not cure that error. Thus, in *De Ping Wang v. Dep't of Homeland Sec.*, where a petition was both untimely filed and filed in the wrong court, transferring it to the proper court could not change the fact that it was untimely. 484 F.3d 615, 617–18 (2d Cir. 2007). Not so here. Had the petition been filed in the District of Vermont at 10:01pm on March 25, the case would have properly been before that court. The action's transfer merely remedies the procedural defect—it conveys no substantive authority the court would otherwise lack.[2]

Nor does Öztürk's own subsequent transfer to Louisiana strip the District of Vermont of habeas jurisdiction. The Supreme Court's decision in *Ex parte Endo*, 323 U.S. 283 (1944), "stands for the important but limited proposition that when the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction and may

---

[2] Since neither the parties nor the district court relied on 28 US.C. §§1404(a) or 1406(a) in transferring Öztürk's habeas petition, we express no view as to whether transferring a petition pursuant to these provisions would similarly cure this defect.

direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release." *Padilla*, 542 U.S. at 441. The government argues that the petition was not "properly filed" in Vermont, and so the district court never obtained any jurisdiction that it could then "retain." Mot. at 8 n.3, 14. But the effect of a transfer under § 1631 is that we must treat the petition as if it were, in fact, filed in Vermont at 10:01pm, when Öztürk was present in the district. The government concedes that had the petition been filed in Vermont at that time, habeas jurisdiction would be proper there. Under § 1631, the transferee court inherits the filing time of the transferor court: in effect, the petition was filed in Vermont at approximately 10:01pm, and consequently the Vermont district court obtained jurisdiction at that time and retains it even in light of Öztürk's subsequent transfer to Louisiana. For these reasons, the government is not likely to prevail on the theory that the district-of-confinement rule bars habeas jurisdiction in the District of Vermont.

Next, the government argues Öztürk's failure to name her "immediate custodian" is fatal to her petition. Mot. at 14–15. 28 U.S.C. § 2242 provides that an application for habeas relief should allege "the name of the person who has custody over him and by virtue of what claim or authority, *if known*." 28 U.S.C.

§ 2242 (emphasis added). Generally, this requires the petitioner to name their "immediate" custodian. *Wales v. Whitney*, 114 U.S. 564, 574 (1885). More specifically, "the default rule is that the proper respondent is the warden of the facility where the prisoner is being held." *Padilla*, 542 U.S. at 435. However, in cases where the petitioner "is held in an undisclosed location by an unknown custodian, it is impossible to apply" this rule. *Id*. at 450 n.18. In "these very limited and special circumstances," the naming of a more remote custodian—here, the Secretary of Homeland Security—satisfies the statutory requirements. *Demjanjuk v. Meese*, 784 F.2d 1114, 1116 (D.C. Cir. 1986).

Here, the government did not disclose to Öztürk's counsel where, or by whom, she was being detained and did not allow Öztürk to contact counsel or convey her whereabouts to anyone until almost twenty-four hours after her arrest. Indeed, the government concedes that it withheld this information ***intentionally***. It stated below that it "does not permit immigration detainees 'to communicate about their location while enroute between detention facilities,' because doing so 'would raise serious security concerns.'" *Ozturk*, 2025 WL 1145250, at *9 (quoting Dist. Ct. Dkt. ECF No. 83 at 13). The government contends that, even though it is undisputed that Öztürk's counsel did not know and could not find out who her

14

immediate custodian was when her petition was filed (and the government still has not identified who that was), the "unknown custodian exception" does not apply here.  Rather, the government argues that this exception applies only where the custodian's identity is a "prolonged secret."  Mot. at 14.

The government cites no statute or case law for this extraordinary proposition, the practical effect of which would be that for some unspecified period of time after detention—seemingly however long the government chooses to take in transporting a detainee between states or between facilities—a detainee would be unable to file a habeas petition at all, anywhere.  Such a rule finds no support in the law and is contrary to longstanding tradition.  *See* 3 William Blackstone, Commentaries *131; Paul D. Halliday, Habeas Corpus: From England to Empire 161 (2012 edition) ("By exploring hundreds of cases across many decades, we can gain a sense of practices and principles, if not rules, that constituted a jurisprudence of normalcy. At the center of this jurisprudence stood the idea that the court might inspect imprisonment orders made at any time, anywhere, by any authority."); *see also Boumediene v. Bush*, 553 U.S. 723, 739–46 (2008).  In any event, the plain text of 28 U.S.C. § 2242, requiring the petitioner to

identify the immediate custodian "if known," likely precludes the government's proposed rule.

Even if the unknown custodian exception does not apply, Öztürk's original petition named Patricia Hyde, who it identified as ICE's New England Field Office Director. Dist. Ct. Dkt. ECF No. 1 at 1–2. Because Öztürk was in transit when her petition was filed, Öztürk contends that Hyde was in fact her immediate custodian during that period. *See* Opp. at 12. The government has never clarified who, if it was not Hyde, had immediate custody of Öztürk in transit, declining to answer direct questions from the district court and from this Court when asked.[3] *See Ozturk*, 2025 WL 114525024, at *8 (citing Dist. Ct. Dkt. ECF No. 98 at 30–31). Thus, either the custodian was Hyde, whom the petition named, or it was not Hyde and

---

[3] At oral argument before this Court, the government first stated that it does not know who Öztürk's immediate custodian was while she was in transit at approximately 10:01pm and then took the novel position that Öztürk's immediate custodian at that time was the warden of the Vermont facility to which she had not yet arrived. The government cited no authority for this contention, and it is at odds with the straightforward rule set out in *Padilla* that the proper respondent to a habeas petition is "'the person with the ability to produce the prisoner's body before the habeas court." 542 U.S. at 435 (quotation marks omitted). As the Supreme Court instructed in *Padilla*, "the default rule is that the proper respondent is the warden of the facility where the prisoner *is being held*," *id.* (emphasis added), not the person who will at some unspecified future time have the ability to produce the prisoner's body or the warden of a facility where the prisoner is not yet being held.

the custodian remains unknown.  On this record, the government has not shown a likelihood of success on its claim that Öztürk's original habeas petition was deficient for any failure to name her immediate custodian at the time of filing.

Finally, the government argues that even if the Vermont district court had habeas jurisdiction over the original petition, filed while Öztürk was physically present in Vermont, it lacks jurisdiction over Öztürk's amended petition, filed on March 28, when Öztürk was physically present in Louisiana.  Mot. at 15–16.  The government refers us to *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22 (2025), in support.  *Royal Canin* stands for the proposition that where a plaintiff files a complaint in federal court raising both federal and state law claims and later amends the complaint to remove the federal claims, the court lacks subject matter jurisdiction over the amended complaint.  *Id.* at 33–34.  *Royal Canin* is plainly inapposite.  As the Supreme Court has held, questions of habeas jurisdiction use the word jurisdiction "in the sense that it is used in the habeas statute, 28 U.S.C. § 2241(a), and not in the sense of subject-matter jurisdiction of the District Court." *Padilla*, 542 U.S. at 434 n.7.  In fact, the Federal Rules of Civil Procedure provide that an "amendment to a pleading relates back to the date of the original pleading when . . . the amendment changes the party or the naming of the party against

17

whom a claim is asserted." Fed. R. Civ. P. 15(c)(1)(C). The government cites no authority for its contention that jurisdiction within the meaning of the habeas statute is evaluated anew when the petition is amended and may not relate back to the date of the original pleading pursuant to the Federal Rules of Civil Procedure.

### 2. *Jurisdiction-Stripping Provisions of the INA*

The remainder of the government's arguments for why it is likely to succeed on the merits are primarily jurisdictional in nature. It contends first that jurisdiction-stripping provisions of the INA deprived the district court of authority to order the government to transfer Öztürk to Vermont. Then it argues that various other provisions of the INA stripped the district court of jurisdiction over Öztürk's petition as a whole. These arguments are unlikely to succeed in no small part because our analysis is guided by longstanding principles of statutory interpretation requiring Congress to speak clearly and specifically when it wishes to deprive the federal courts of jurisdiction. Repeatedly, including in the INA context, the Supreme Court has declared that we should "take account . . . of the presumption favoring interpretations of statutes [to] allow judicial review . . . absent clear statement." *Kucana v. Holder*, 558 U.S. 233, 237 (2010) (quotation marks and citation omitted); *see also McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 483–

84 (1991) ("We hold that given the absence of clear congressional language mandating preclusion of federal jurisdiction and the nature of respondents' requested relief, the District Court had jurisdiction . . . ."); *Bowen v. Michigan Acad. of Fam. Physicians*, 476 U.S. 667, 671 (1986) ("[O]nly upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review." (quotation marks omitted)). Because Öztürk challenges her arrest and detention, and not her removal, we find that the government is unlikely to make such a showing.

### a. 8 U.S.C. § 1252(a)(2)(B)(ii)

We begin with the argument that the district court lacked authority to order the government to transfer Öztürk to immigration custody in Vermont. The district court premised its power to order Öztürk's transfer to Vermont on both the "equitable and flexible nature of habeas relief" and its authority under the All Writs Act. *Ozturk*, 2025 WL 1145250, at *23 (quotation marks omitted). The district court undeniably has an "inherent authority to protect [its] proceedings," *Degen v. United States*, 517 U.S. 820, 823 (1996), and to "meet new situations which demand equitable intervention, and to accord all the relief necessary to correct the particular injustices involved in these situations," *Hazel-Atlas Glass Co. v. Hartford-*

*Empire Co.*, 322 U.S. 238, 248 (1944).  The district court concluded that the equities strongly favored Öztürk's transfer to ICE custody in Vermont.

The government argues that the decision where to detain a noncitizen pending removal proceedings is committed to the discretion of the Secretary of Homeland Security and that the INA precludes judicial review over such discretionary decisions.  In support, the government cites 8 U.S.C. § 1252(a)(2)(B)(ii), which precludes the exercise of federal court jurisdiction "to review . . . any . . . decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is ***specified*** under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security."  8 U.S.C. § 1252(a)(2)(B)(ii) (emphasis added).  The government argues that a different statute, 8 U.S.C. § 1231(g), "specifie[s]" that the decision to detain immigrants in, and transfer immigrants to, the custodial location of the government's choice is within the executive branch's discretion, barring judicial review.  The government is unlikely to succeed on that argument.

To begin with, § 1252(a)(2)(B)(ii)'s bar on jurisdiction applies only to those decisions where Congress has expressly "set out the Attorney General's

discretionary authority in the statute." [4] *Kucana*, 558 U.S. at 247. Crucially, the question is not whether § 1231(g) "require[s] an exercise of discretion" because even if it "probably do[es]," the crux is "whether the text . . . specifies that the decision is in the discretion of the Attorney General." *Nethagani v. Mukasey*, 532 F.3d 150, 154 (2d Cir. 2008) (cleaned up). We have held that "when a statute authorizes the Attorney General to make a determination, but lacks additional language specifically rendering that determination to be within his discretion (*e.g.*, 'in the discretion of the Attorney General,' 'to the satisfaction of the Attorney General,' etc.), the decision is not one that is 'specified . . . to be in the discretion of the Attorney General' for purposes of § 1252(a)(2)(B)(ii)." *Id.* at 154–55.

Section 1231(g) has no such additional language. It merely states that "[t]he Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). Far from specifying discretion, § 1231(g) uses the obligatory "shall" rather than a permissive "may." This stands "in stark contrast to other sections of the INA,"

---

[4] As part of transferring many immigration-related responsibilities from the Attorney General to the Secretary of the Department of Homeland Security, "the Homeland Security Act of 2002 mandates that references to the Attorney General are deemed to include DHS where, as here, the relevant agency functions have been transferred from the Department of Justice to DHS." *Shabaj v. Holder*, 718 F.3d 48, 51 n.3 (2d Cir. 2013) (citing 6 U.S.C. § 557); *see also* 6 U.S.C. § 202.

which both use permissive verbs and include additional language specifying that those decisions that are within the Attorney General or DHS Secretary's discretion. *Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 20 (1st Cir. 2007)*; cf., e.g.*, 8 U.S.C. § 1157(c)(1) ("[T]he Attorney General **may, in the Attorney General's discretion** . . . ." (emphasis added)). When "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken*, 556 U.S. at 430 (quotation marks omitted).[5] Furthermore, as explained above, with respect to § 1252(a)(2)(B)(ii) exactly, the Supreme Court has applied the "presumption favoring interpretations of statutes [to] allow judicial review . . . absent clear statement." *Kucana*, 558 U.S.

---

[5] In fact, the very next sentence of § 1231(g)(1) uses the permissive "may," and the subsection appears to relate "more centrally to the government's brick and mortar obligations for obtaining facilities in which to detain aliens." *Reyna as next friend of J.F.G. v. Hott*, 921 F.3d 204, 209 (4th Cir. 2019). Section 1231(g) first provides that the Attorney General "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). If such facilities "are unavailable," the statute then provides that "the Attorney General **may** expend" from specified appropriations "amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention." *Id.* (emphasis added).

at 237 (quotation marks omitted).  Under these circumstances, we do not believe that § 1252(a)(2)(B)(ii), by operation of § 1231(g), forecloses judicial review.

With respect to transfer in particular, "§ 1231(g) does not address transfers [of noncitizen detainees] *at all*," and it surely does not "*explicitly* grant the Attorney General or the Secretary of Homeland Security discretion with respect to transfers."  *Reyna as next friend of J.F.G. v. Hott*, 921 F.3d 204, 209 (4th Cir. 2019) (emphases added).  Accordingly, *even if* the discretionary authority to transfer a detainee between facilities is contemplated under § 1231(g), such authority is merely implied.  *See id.* at 210 (though discretion to transfer detainees "might rightfully [be] locate[d]" under § 1231(g), "the authority is implied," and "§ 1252(a)(2)(B)(ii) . . . requires that discretionary authority be *specified*, *i.e.*, made explicit, in order to be unreviewable"); *Aguilar*, 510 F.3d at 20 ("[S]ection 1231(g) fails to 'specify' that individualized transfer decisions are in the Attorney General's discretion.").

For these reasons, we conclude the government has failed to demonstrate that it is likely to succeed on its contention that § 1252(a)(2)(B)(ii) strips the district court of authority to order Öztürk's custodial transfer.

b.  8 U.S.C. § 1252(g)

23

The government also asserts that § 1252(g) strips the district court of jurisdiction to hear Öztürk's habeas claims, thus warranting a stay of the district court's transfer order.  Section 1252(g) prohibits courts from "hear[ing] any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General [or Secretary of Homeland Security] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g).  That language supposedly includes Öztürk's claims.

The government dramatically overstates the reach of § 1252(g).  As both the Supreme Court and our Court have explained, § 1252(g)'s bar on jurisdiction is "narrow[]." *Reno v. Am.-Arab Anti-Discrimination Comm. ("AADC")*, 525 U.S. 471, 482 (1999); *see also Fulton v. Noem*, No. 25-194, at 2 (2d Cir. Apr. 30, 2025) (order granting stay of removal pending appeal and rejecting the proposition that § 1252(g) bars review of challenges to the manner of removal).  Section 1252(g) is directed "against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion."  *AADC*, 525 U.S. at 485 n.9.  This bar on judicial review is thus cabined "to three discrete actions": a decision "to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'"  *Id*. at 482 (quoting 8 U.S.C. § 1252(g)) (emphases adopted).  There are "many other decisions or actions that

24

may be part of the deportation process" but that do not fall within the three

discrete exercises of "prosecutorial discretion" covered by § 1252(g).  *Id.* at 482,

489.

Most, if not all, of Öztürk's habeas claims seem to fall outside of § 1252(g)'s

narrow jurisdictional bar.  She does not challenge the government's decision to

commence proceedings, adjudicate her case, or execute a removal order.  Instead,

her petition challenges her unlawful ***detention***, pending those proceedings, and

she seeks her release from detention in the interim based on the violations of her

First and Fifth Amendment rights that she has identified.  Pet. at 22.[6]  Section

1252(g) "does not preclude jurisdiction over the challenges to the legality of [a

noncitizen's] detention."  *Kong v. United States*, 62 F.4th 608, 609 (1st Cir. 2023); *see*

*also Parra v. Perryman*, 172 F.3d 954, 957 (7th Cir. 1999) (similar).

---

[6] Among other things, the petition's Prayer for Relief requests "Respondents to
return Petitioner to [the] District [of Vermont] pending these proceedings," "Order
the immediate release of Petitioner pending these proceedings," and "Declare that
Respondents' actions to arrest and detain Petitioner violate the First Amendment
and the Due Process Clause of the Fifth Amendment."  Pet. at 22.  At this time, the
Court need not decide whether every Prayer for Relief survives § 1252(g).  So long
as part of her challenge to her detention falls outside § 1252(g), her petition
survives.  The district court would on that basis alone retain the authority to order
her transfer to aid its resolution of this case.

Nevertheless, the government contends that Öztürk's detention "aris[es] from" the commencement, adjudication, or execution of removal proceedings. This contention is likely mistaken. The Supreme Court has already "rejected as 'implausible' the Government's suggestion that § 1252(g) covers 'all claims arising from deportation proceedings' or imposes 'a general jurisdictional limitation.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 19 (2020) (quoting *AADC*, 525 U.S. at 482); *accord Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (opinion of Alito, J., joined by Roberts, C.J., and Kennedy, J.) (observing that the Court "did not interpret [the phrase "arising from" in § 1252(g)] to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General"). Because "the phrase 'arising from' is not 'infinitely elastic,'" it "does not reach 'claims that are independent of, or wholly collateral to, the removal process.'" *Kong*, 62 F.4th at 614 (quoting *Aguilar*, 510 F.3d at 10–11); *see also Parra*, 172 F.3d at 957 (similar).

"Among such 'collateral' claims" not subject to the § 1252(g) bar on judicial review are "claims seeking review of the legality of a petitioner's detention." *Kong*, 62 F.4th at 614. Even though, "[i]n a but-for sense," a claim of unlawful detention might arise from the government's decision to commence proceedings, adjudicate

26

a case, or execute a removal, challenges to unlawful detention "do not 'arise from' the government's decision to 'execute removal orders' within the meaning of § 1252(g) simply because the claims relate to that discretionary, prosecutorial decision." *Id.* at 613; *see also Parra*, 172 F.3d at 957 ("[A petitioner's] claim concern[ing] detention . . . may be resolved without affecting pending [removal] proceedings.").

Öztürk's claims of unlawful and retaliatory detention are independent of, and collateral to, the removal process. Her detention does not arise from the government's "commence[ment of] proceedings." *AADC*, 525 U.S. at 482 (quotation marks omitted). Filing a Notice to Appear ("NTA") in an immigration court is the action that commences removal proceedings. *See* 8 U.S.C. § 1229(a); 8 C.F.R. § 1239.1. But ICE detained Öztürk **before** an NTA was filed with the immigration court.

Nor does her detention-related claim seem to arise from the decision to adjudicate her removal case, since her challenge to her detention has nothing to do with whether a "removal action should be abandoned . . . or whether the formal adjudicatory process should proceed." *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1120 (9th Cir. 2001) (quotation marks omitted); *see also Michalski v. Decker*, 279 F.

27

Supp. 3d 487, 495 (S.D.N.Y. 2018) (reasoning that "the decision or action to arrest or detain an alien [cannot] be fairly construed as a decision or action to 'adjudicate cases'" because "the decision to detain an individual . . . does not implicate the Executive's discretion in continuing or withdrawing such a proceeding").

Further, the government confirmed that ICE's decision to arrest and detain Öztürk was not directed by § 1226(a). *Ozturk*, 2025 WL 1145250, at *10. In other words, her detention was not ***mandated*** by the mere fact that her case was under adjudication. Nor could her detention possibly "arise from" the execution of a removal order, because no such order has been entered. Because Öztürk's unlawful detention claims "may be resolved without affecting pending [removal] proceedings," they do not arise from the three discrete exercises of prosecutorial discretion that are shielded by § 1252(g). *Parra*, 172 F.3d at 957; *see also Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1368 (11th Cir. 2006) (challenge to unlawful detention not barred by § 1252(g) because it was distinct from a challenge to the government's decision to execute a removal order).

The government nevertheless insists that the Supreme Court's decision in *AADC* bars this claim under § 1252(g). Again, it is unlikely to succeed on this argument. It is true that the petitioners in *AADC* claimed that "INS was selectively

28

enforcing immigration laws against them in violation of their First and Fifth Amendment Rights."  525 U.S. at 474.  And the Supreme Court indeed concluded that the "challenge to the Attorney General's decision to 'commence proceedings' against them [fell] squarely within § 1252(g)."  *Id.* at 487.  But the petitioners' claims in that case fell within that jurisdictional bar because they sought "to prevent the initiation of deportation proceedings," *id.* at 474—i.e., the "commence[ment of] proceedings," *id.* at 482.  The habeas claims in that case did not sound in unlawful ***detention*** at all, and it is therefore of no help to the government.[7]

Accordingly, the government failed to satisfy its burden of demonstrating that § 1252(g) likely strips the district court of jurisdiction to hear Öztürk's petition. The district court retains jurisdiction over at least some of Öztürk's claims, vesting it with the transfer authority it exercised.

   c. 8 U.S.C. §§ 1252(a)(5), 1252(b)(9), and 1226(e)

---

[7] In a string-cite, the government also references this Circuit's decision in *Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019), *vacated sub nom. Pham v. Ragbir*, 141 S. Ct. 227 (2020), to bolster its argument.  But similar to *AADC*, the petitioners in that case "sought to prevent the Government from executing [a] final order of removal against him."  *Id.* at 61.  That is squarely the third of the exercises of prosecutorial discretion protected by § 1252(g).  The habeas petition in that case says nothing of unlawful detention.

For similar reasons, the government's argument that 8 U.S.C. §§ 1252(a)(5), 1252(b)(9), and 1226(e) bar district court review of Öztürk's detention-related claims is unlikely to succeed. Section 1252(b)(9) bars district court review of claims "arising from . . . action[s]" or "proceeding[s] brought to remove an alien." 8 U.S.C. § 1252(b)(9). The government urges the conclusion that, because Öztürk's constitutional arguments under the First and Fifth Amendments relate to her detention, and because detention itself is "necessary for . . . removal proceedings," § 1252(b)(9) strips district courts of jurisdiction. Mot. at 18 (quotation marks omitted) (quoting *Demore v. Kim*, 538 U.S. 510, 513 (2003)). In other words, the government contends that the mere fact of Öztürk's detention funnels all her unlawful detention claims into § 1252(b)(9), irrespective of how tangentially related the claims may be to removal proceedings.

As a threshold matter, the very text of § 1252(b) sets out requirements only "[w]ith respect to review of an order of removal under subsection (a)(1)." 8 U.S.C. § 1252(b). No such order of removal is at issue here. In any event, the Supreme Court has rejected the proposed approach, holding that "§ 1252(b)(9) does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision to seek removal, or the process by which

removability will be determined." *Regents*, 591 U.S. at 19 (cleaned up) (quoting *Jennings*, 583 U.S. at 294).

*Jennings* does not require a different outcome, despite the government's insistence. As a threshold matter, the discussion of § 1252(b)(9) in *Jennings* is not part of the plurality opinion of the Court. *See* 583 U.S. at 292–96 (opinion of Alito, J., joined by Roberts, C.J., and Kennedy, J.). And in any event, the relevant part of *Jennings* does not support the conclusion that § 1252(b)(9) bars jurisdiction over habeas challenges to detention. That section in fact rejected the government's "expansive interpretation of § 1252(b)(9)." *Id.* at 293; *see also id.* at 295 n.3. Contrary to the government's position, the mere fact that a noncitizen is detained does not deprive district courts of jurisdiction under § 1252(b)(9): "The question is not whether ***detention*** is an action taken to remove an alien but whether ***the legal questions*** in this case arise from such an action." *Id.* at 295 n.3 (emphasis in original).

As explained above, Öztürk's unlawful detention claims may be resolved without affecting pending removal proceedings. She asserts that the government arrested and detained her to prevent speech with which it disagrees. Such an act would be a violation of the Constitution—quite separate from the removal

procedures followed by the immigration courts.  Consequently, even if her claims have a relationship to "pending removal proceedings," her claims do not themselves challenge "removal proceedings" and thus § 1252(b)(9)'s "channeling function has no role to play."  *Canal A Media Holding, LLC v. United States Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1257 (11th Cir. 2020); *see also Mukantagara v. U.S. Dep't of Homeland Sec.*, 67 F.4th 1113, 1116 (10th Cir. 2023) ("A claim only arises from a removal proceeding when the parties in fact are challenging removal proceedings."); *Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 810 (9th Cir. 2020) ("[C]laims challenging the legality of detention pursuant to an immigration detainer are independent of the removal process."); *Kellici v. Gonzales*, 472 F.3d 416, 420 (6th Cir. 2006) (holding that district court had jurisdiction where "habeas petitions challenged only the constitutionality of the [petitioners'] arrest and detention, not the underlying administrative order of removal").[8]  Legislative history from the REAL ID Act further supports this conclusion.  H.R. Rep. No. 109–72, at 175 (2005) (Conf. Rep.),

---

[8] *See also Elgharib v. Napolitano*, 600 F.3d 597, 605 (6th Cir. 2010) (explaining that "a challenge that did not require the district court to address the merits of [an] order of removal" would not be barred by § 1252); *Duarte v. Mayorkas*, 27 F.4th 1044, 1057 (5th Cir. 2022) (same); *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 697 (4th Cir. 2019) (same); *E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.*, 950 F.3d 177, 186–88 (3d Cir. 2020) (same); *Aguilar*, 510 F.3d at 10–11 (same).

*as reprinted in* 2005 U.S.C.C.A.N. 240, 300 (explaining that jurisdiction-stripping provisions "would not preclude habeas review over challenges to detention that are independent of challenges to removal orders").

The government's arguments to the contrary rely on the mistaken belief that substantive overlap between a challenge to detention and a challenge to removal is reason enough to conclude that the detention challenge arises from removal. But overlap, even substantial substantive overlap, does not make one claim arise out of the other, or necessitate that one claim controls the outcome of the other. After all, it would seem a "staggering result[]" if a person who brought a First Amendment retaliation challenge to her removal would be barred from bringing a separate First Amendment retaliation challenge to conditions of her confinement, or her prolonged detention, merely because there is substantive overlap between the claims. *Jennings*, 583 U.S. at 293 (opinion of Alito, J., joined by Roberts, C.J., and Kennedy, J.). Rather, we have explained that "whether the district court has jurisdiction will turn on the substance of the relief that a plaintiff is seeking." *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011) (discussing 8 U.S.C. § 1252(a)(5)); *see also Ruiz v. Mukasey*, 552 F.3d 269, 274 n.3 (2d Cir. 2009) (noting that neither § 1252(a)(5) nor § 1252(b)(9) "preclude a district court from

exercising jurisdiction over an action seeking review of the denial of an I–130 petition [for classification of a noncitizen as an immediate relative of a U.S. citizen] because such a denial is unrelated to any removal action or proceeding"). Here, Öztürk seeks release from detention.

This distinction makes practical sense. While challenges to *removal* can be heard in a petition for review after an order of removal has been entered by an immigration judge and affirmed by the Board of Immigration Appeals, the same is not true of constitutional challenges to *detention* like the ones raised by Öztürk. For one, neither the IJ nor the BIA has "jurisdiction to decide constitutional issues." *Rabiu v. Immigr. & Naturalization Serv.*, 41 F.3d 879, 882 (2d Cir. 1994); *see also Hinds v. Lynch*, 790 F.3d 259, 262 (1st Cir. 2015) (citing *Matter of C-*, 20 I. & N. Dec. 529, 532 (BIA 1992)); *Arriaga v. Mukasey*, 521 F.3d 219, 222 (2d Cir. 2008) (same). And while the court of appeals considering the petition for review may consider constitutional claims, that court is obliged to "decide the petition *only* on the administrative record on which the order of removal is based." 8 U.S.C. § 1252(b)(4)(A) (emphasis added). However, we are not persuaded that an IJ or the BIA would have developed a sufficient factual record, or any record at all, with respect to the challenged *detention*, especially seeing as bond hearings are decided

separately, appealed separately, and contain separate records than the removal proceedings. *See* 8 U.S.C. § 1226(a); 8 C.F.R. §§ 236.1(d), 1003.19(d); U.S. Dep't Just., Exec. Off. for Immigr. Rev., Immigration Court Practice Manual, § 9.3(e), (f) (last visited May 6, 2025), available at https://www.justice.gov/eoir/reference-materials/ic/chapter-9/3 [https://perma.cc/9A6W-AG9U]. This means that in many, if not most, instances, courts of appeal would not have a sufficient record to assess the government's conduct in cases such as this.

Construing an independent constitutional challenge to detention as necessarily implying a challenge to removal would lead to what *Jennings* called an "absurd" result. 583 U.S. at 293 (opinion of Alito, J., joined by Roberts, C.J., and Kennedy, J.). Öztürk's core argument is that her free speech and due process rights are being violated, ***now***. Pet. ¶¶ 67–76. To require her to sit on her challenge until she receives a final order of removal would create the situation warned of in *Jennings*: Öztürk's detention claim would be "effectively unreviewable" because, "[b]y the time a final order of removal [is] eventually entered, the allegedly excessive detention would have already taken place." 583 U.S. at 293 (opinion of Alito, J., joined by Roberts, C.J., and Kennedy, J.). "And of course, it is possible that no such order would ever be entered in a particular case, depriving that

35

detainee of any meaningful chance for judicial review." *Id.*; *see also Khalil v. Joyce*, No. 25-CV-01963, 2025 WL 1232369, at *30 (D.N.J. Apr. 29, 2025) (concluding that § 1252(b)(9) does not bar the petitioner's constitutional claims because "a period of delay while this case is pending before the immigration courts" is inconsistent with Supreme Court precedent "that meaningful review of First Amendment claims generally means *rapid, prioritized review*" (emphasis added)); *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 55 (1989) (determining that "refusal to grant *immediate review* of petitioner's [First Amendment] claims 'might seriously erode federal policy'" (emphasis added)).

Accordingly, the government has not established that § 1252(b)(9) likely strips the district court of jurisdiction to hear Öztürk's petition. For the same reasons, we are unpersuaded by the government's argument that § 1252(a)(5) forecloses review of Öztürk's petition. Section 1252(a)(5) bars district court review "of an order of removal," but no order of removal is at issue here. 8 U.S.C. § 1252(a)(5).

To the extent the government maintains, as it did before the district court, that 8 U.S.C. § 1226(e) bars jurisdiction over Öztürk's detention, this argument is also unlikely to succeed. Section 1226(e) provides that the Secretary of Homeland

Security's "discretionary judgment" regarding, among other things, the decision to arrest and detain a noncitizen pending a decision on removal, "shall not be subject to review." 8 U.S.C. § 1226(e). But because § 1226(e) " contains no explicit provision barring habeas review," the Supreme Court has held that its "clear text" does not bar jurisdiction over a constitutional challenge to detention under § 1226. *Demore*, 538 U.S. at 517. Likewise, this Court has held that § 1226(e) does not foreclose jurisdiction over habeas petitions challenging detention pursuant to § 1226(a). *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) (holding that § 1226(e) does not "limit habeas jurisdiction over constitutional claims or questions of law" (quotation marks omitted)).

## B. Irreparable Injury

The government argues that it suffers an irreparable injury "[a]ny time" it is "enjoined by a court [from] effectuating statutes enacted by representatives of its people." Mot. at 19 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). We are not persuaded by this overbroad argument. First, the district court's order to transfer Öztürk from immigration custody in Louisiana to immigration custody in Vermont in order to prepare for and attend her bail and habeas petition hearing does not enjoin the government from enforcing or "effectuating" any duly enacted law. In particular, Öztürk does not

37

seek to disrupt—and nothing prevents the government from continuing with—the removal proceedings it has commenced. The government asserts that it would face difficulties in arranging for Öztürk to appear for her immigration proceedings in Louisiana remotely. Reply at 2. But the government has not disputed that it is legally and practically possible for Öztürk to attend removal proceedings remotely. 8 U.S.C. § 1229a(b)(2)(A)(iv) (providing that removal proceedings may, in some circumstances, take place "through telephone conference").In addition, much of the government's irreparable harm argument seems to rely upon its less-than-convincing merits arguments. "[S]imply showing some possibility of irreparable injury" is insufficient. *Nken*, 556 U.S. at 434 (quotation marks omitted). Instead, the government must "demonstrate that irreparable injury is ***likely*** in the absence of" its requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Lastly, of course, if the government were to prevail on this appeal, Öztürk would return to immigration custody in Louisiana. For this and the above reasons, we hold that the government has failed to show an irreparable injury.

### C. Balance of Equities

Finally, the balance of the equities decisively disfavors a stay. Permitting Öztürk's transfer will provide her ready access to legal and medical services,

address concerns about the conditions of her confinement, and expedite resolution of this matter—all of which are required, as the court below noted, to proceed expeditiously. *See* 28 U.S.C. § 2243; *Ozturk*, 2025 WL 1145250, at *25. At stake, too, is Öztürk's ability to participate meaningfully in her habeas proceedings. Inherent in the term "habeas corpus" is the notion that the government is required to produce the detainee in order to allow the court to examine the legality of her detention. *See* 28 U.S.C. § 2243 ("[T]he person to whom the writ is directed shall be required to produce at the hearing the body of the person detained."); *Johnson v. Eisentrager*, 339 U.S. 763, 778 (1950) ("A basic consideration in habeas corpus practice is that the prisoner will be produced before the court. This is the crux of the statutory scheme established by the Congress; indeed, it is inherent in the very term 'habeas corpus.'"); *see also Ozturk*, 2025 WL 1145250, at *22 (finding Öztürk's transfer to Vermont "would allow the Court to conduct appropriate fact-finding," and would "facilitate her ability to work with her attorneys, coordinate the appearance of witnesses, and generally present her habeas claims"). The government's contention that allowing Öztürk to participate meaningfully in these proceedings "prioritizes the (improper) proceedings in Vermont over the (proper) proceedings in Louisiana" is a particularly weak argument. Mot. at 20.

39

In addition, as the district court noted, the United States District Court for the District of Massachusetts enjoined the government from moving Öztürk "outside the District of Massachusetts without first providing advance notice of the intended move." *Ozturk*, 2025 WL 1145250, at *23 (quoting Dist. Ct. Dkt. ECF. No. 3 at 2). The court in Massachusetts did so within an hour of Öztürk's petition being filed in order "to preserve the status quo." *Id.* Although not technically non-compliant, despite this order, the government moved Öztürk from Vermont to Louisiana the next morning. The district court in Vermont ordered Öztürk's transfer in part to effectuate the district court in Massachusetts's order, returning Öztürk "to the status quo at the time of issuance" and in part "to ensure continued respect for orders issued by Article III courts." *Id.* at *24. Equity favors such a determination.

While the government raises the specter of "irreparable injury" from the transfer order because it would—evidently—suffer "logi[sti]cal difficulty," and because "micromanag[ing] how the Executive Branch . . . transfers aliens . . . would severely undermine the workability of [the immigration] system," Mot. at 20, we are unpersuaded. Faced with such a conflict between the government's unspecific financial and administrative concerns on the one hand,

and the risk of substantial constitutional harm to Öztürk on the other, we have little difficulty concluding "that the balance of hardships tips decidedly" in her favor. *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984).

## IV.    MANDAMUS RELIEF

The government asks this Court, in the alternative, to issue a writ of mandamus and hold that the district court lacked authority to order Öztürk's transfer.   "The remedy of mandamus is a drastic one, to be invoked only in extraordinary situations."  *Kerr v. U. S. Dist. Ct. for N. Dist. of California*, 426 U.S. 394, 402 (1976).  "We issue the writ only in exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion."  *In re Roman Cath. Diocese of Albany, New York, Inc.*, 745 F.3d 30, 35 (2d Cir. 2014) (quotation marks omitted); *see also Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004).

Here, the government has shown no such exceptional circumstances.  The heart of the government's argument is that the district court lacked jurisdiction.  The argument runs the government head into the "general rule that appellate courts should avoid determining jurisdictional issues on a petition for mandamus."  *In re Ivy*, 901 F.2d 7, 10 (2d Cir. 1990); *see also Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943) (holding that, when considering a petition for

mandamus, "appellate courts are reluctant to interfere with the decision of a lower court on jurisdictional questions which it was competent to decide and which are reviewable in the regular course of appeal").  We therefore decline to issue a writ of mandamus.

*     *     *

For the reasons stated above, the government's motion for a stay of the transfer order requiring Öztürk's transportation from immigration custody in Louisiana to immigration custody in the District of Vermont is **DENIED**.  The government's request for a writ of mandamus is also **DENIED**.  The administrative stay entered by this Court is hereby **VACATED**.  Recognizing both that the district court's original transfer deadline has passed, along with the practical and legal consequences of our decision for the parties, the government is hereby **ORDERED** to comply with the district court's transfer order within one week of the date of this opinion.  Accordingly, the district court's April 18, 2025 Order is hereby amended as follows: "To support the Court's resolution of these issues, the Court orders that Ms. Öztürk be physically transferred to ICE custody within the District of Vermont no later than May 14, 2025."  The district court may amend its hearing schedule as it deems necessary in light of this order.

The parties are directed to confer with the Clerk of Court to set a briefing schedule for the merits of the appeal.