# No. 25-1019

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

**RUMEYSA OZTURK,**
**Petitioner-Appellee,**

**v.**

**PATRICIA HYDE, ET AL.,**
**Respondents-Appellants.**

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**
**District Court Case No. 2:25-cv-374**

---

## JOINT APPENDIX

---

**ALANNA T. DUONG**
**Senior Litigation Counsel**
**Civil Division**
**U.S. Dept. of Justice**
**P.O. Box 878**
**Ben Franklin Station**
**Washington, DC 20044**
**Tel: (202) 305-7040**
**alanna.duong@usdoj.gov**

**Attorney for**
**Respondents-Appellants**

**MONICA H. ALLARD**
**Staff Attorney**
**ACLU of Vermont**
**P.O. Box 277**
**Montpelier, VT 05601**
**Tel: (802) 251-7091**
**mallard@acluvt.org**

**Attorney for**
**Petitioner-Appellee**

## TABLE OF CONTENTS

ECF#1 Petition for Writ of Habeas Corpus ..........................................1

ECF#3 Service Order and Order Regarding Jurisdiction.....................4

ECF#7 All Writs Act Motion to Produce Petitioner ...........................8

ECF#9 Respondents' Opposition to Motion to Produce......................11

ECF#12 Amended Habeas Petition and Two Exhibits......................14

ECF#19 Response to Amended Petition and One Exhibit.................45

ECF#42 J. Casper Order Regarding Transfer to District of Vermont...78

ECF#46 April 3, 2025 Hearing Transcript....................................104

ECF#66 April 7, 2025 Hearing transcript....................................148

ECF#82 Motion and Nine Exhibits..............................................182

ECF#98 April 14, 2025 Hearing Transcript...................................294

ECF#104 April 18, 2025 Order....................................................409

ECF#105 Notice of Appeal of April 18, 2025 Order..........................483

ECF#106 Motion for Continued Stay Pending Appeal......................484

ECF#109 April 24, 2025 Continued Stay Denial Order....................490

ECF#131 May 9, 2025 Immediate Release Order............................497

ECF#140 May 16, 2025 *Mapp v. Reno* Release Order......................499

June 27, 2025 Docket..................................................................527

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RUMEYSA OZTURK, ) | Case No. __1:25-cv-10695__ |
| ) | |
| Petitioner, ) | **PETITION FOR WRIT OF** |
| ) | **HABEAS CORPUS** |
| v. ) | |
| ) | |
| PATRICIA HYDE, Field Office Director, ) | |
| MICHAEL KROL, HSI New England Special ) | |
| Agent in Charge, TODD LYONS, Acting Director ) | |
| U.S. Immigrations and Customs Enforcement, ) | |
| and KRISTI NOEM, Secretary of Homeland ) | |
| Security ) | |
| Respondents. ) | |

## INTRODUCTION

1. Rumeysa Ozturk is a Turkish national in valid F-1 student status. Her date of birth is ███████ 1994. She was unlawfully detained by DHS on March 25, 2025.

2. Accordingly, to vindicate Petitioner's constitutional rights, this Court should grant the instant petition for a writ of habeas corpus.

3. Petitioner asks this Court to find that she was unlawfully detained and order her release.

## JURISDICTION

4. This Court has subject matter jurisdiction under 28 U.S.C. § 2241 (habeas corpus) and 28 U.S.C. § 1331 (federal question).

5. Venue is proper because Petitioner resides and was detained in Sommerville, MA, and on information and belief is detained in the District of Massachusetts.

1

## PARTIES AND FACTS ALLEGED

6.  The Petitioner Rumeysa Ozturk is a PhD student at Tufts University.  She resides in Somerville, Massachusetts.

7.  Respondent Patricia Hyde is the New England Field Office Director for U.S. Immigration and Customs Enforcement.

8.  Respondent Michael Krol is the New England Special Agent in Charge for Homeland Security Investigations for U.S. Immigration and Customs Enforcement.

9.  Respondent Todd Lyons is the Acting Director for U.S. Immigration and Customs Enforcement.

10. Respondent Kristi Noem is the Secretary of Homeland Security.

11. Petitioner is a Turkish national in valid F-1 student status.  On information and belief, she was detained without cause near her residence by U.S. Immigration and Customs Enforcement agents on March 25, 2025, at about 5:30 p.m.

12. On information and belief, Petitioner is currently in custody in the District of Massachusetts, and one or more of the Respondents is her immediate custodian.

## CLAIMS FOR RELIEF

### COUNT ONE
### Violation of Fifth Amendment Right to Due Process

1.  On information and belief, Petitioner is currently being arrested and detained by federal agents without cause and in violation of her constitutional rights to due process of law.

## PRAYER FOR RELIEF

Wherefore, Petitioner respectfully requests this Court to grant the following:

(1)  Assume jurisdiction over this matter;

(2)  Order that Petitioner shall not be transferred outside the District of Massachusetts;

2

JA-000002

(3)    Issue an Order to Show Cause ordering Respondents to show cause why this Petition should not be granted within three days.

(4)    Declare that Petitioner's detention violates the Due Process Clause of the Fifth Amendment.

(5)    Issue a Writ of Habeas Corpus ordering Respondents to release Petitioner immediately.

(6)    Grant any further relief this Court deems just and proper.

Respectfully submitted,

/s/ Mahsa Khanbabai
Mahsa Khanbabai (BBO #639803)
115 Main Street, Suite 1B
North Easton, MA 02356
Mahsa@mk-immigration.com
508-297-2065

*Counsel for Petitioner*

Dated: March 25, 2025

JA-000003

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                      )
RUMEYSA OZTURK,                       )
                                      )
              Petitioner,             )
                                      )
       v.                             )
                                      )
PATRICIA HYDE, Acting Director of     )
Boston Field Office, United States    )
Immigration and Customs Enforcement,  )
TODD LYONS, Acting Director United States )
Immigration and Customs Enforcement, and )
KRISTI NOEM, Secretary of Homeland    )
Security,                             )
                                      )
              Respondents.            )
```

Civil Action No. 1:25-cv-10695- DJC

SERVICE ORDER AND ORDER CONCERNING
DETERMINATION OF JURISDICTION

Talwani, D.J.

Petitioner Rumeysa Ozturk, a Turkish national detained by DHS on March 25, 2025, has

filed a petition for a writ of habeas corpus. S h e names Patricia Hyde, Acting Director of

Boston Field Office, United States Immigration and Customs Enforcement; Todd Lyons,

Acting Director, U.S. Immigration and Customs Enforcement, and Kristi Noem, Secretary of

the United States Department of Homeland Security, as respondents.

Upon review of the petition, the Court hereby ORDERS as follows:

1.     The clerk of this court shall serve a copy of the petition upon respondents and the

United States Attorney for the District of Massachusetts.

2.     Respondents shall, no later than March 28, 2025, answer or respond to the

petition.

3.     Although a United States District Court does not generally have subject-matter

jurisdiction to review orders of removal, *see* 8 U.S.C. § 1252(a)(1), (g), it does generally have

2:25-cv-00374-wks    Document 3    Filed 03/25/25    Page 2 of 3

jurisdiction over habeas petitions. *See* 28 U.S.C. § 2241(a). Furthermore, a federal court

"always has jurisdiction to determine its own jurisdiction," including its own subject-matter

jurisdiction. *Brownback v. King*, 592 U.S. 209, 218-19 (2021) (quoting *United States v. Ruiz*,

536 U.S. 622, 628 (2002)). In order to give the court an opportunity to consider whether it has

subject-matter jurisdiction, and if so to determine the validity of the habeas petition, the court

may order respondent to preserve the status quo. *See United States v. United Mine Workers of*

*Am.*, 330 U.S. 258, 293 (1947) ("[T]he District Court ha[s] the power to preserve existing

conditions while it [is] determining its own authority to grant injunctive relief," unless the

assertion of jurisdiction is frivolous.). Such an order is valid unless and until it is overturned,

even when the issuing court lacks subject-matter jurisdiction to determine the merits of the

underlying action. *See id.* at 294-95 (upholding criminal contempt convictions for violations of a

preliminary injunction, assuming the District Court had no jurisdiction to decide the underlying

matter). This principle applies with even greater force where the action the court enjoins would

otherwise destroy its jurisdiction or moot the case. *See United States v. Shipp*, 203 U.S. 563, 573

(1906).

    4.    Accordingly, and unless otherwise ordered by the Court, petitioner shall not be

moved outside the District of Massachusetts without first providing advance notice of the

intended move. Such notice shall be filed in writing on the docket in this proceeding, and shall

state the reason why the government believes that such a movement is necessary and should not

be stayed pending further court proceedings. Once that notice has been docketed, the petitioner

shall not be moved out of the District for a period of at least 48 hours from the time of that

docketing. If the 48-hour notice period "would end on a Saturday, Sunday, or legal holiday, the

period continues to run until the same time on the next day that is not a Saturday, Sunday, or

2

legal holiday." Fed. R. Civ. P. 6(a)(2)(C). The time period may be shortened or extended as

may be appropriate by further order of the Court.

**So Ordered.**

/s/ Indira Talwani
District Judge
United States District Court

Dated: March 25, 2025

3

JA-000006

JA-000007

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

RUMEYSA OZTURK,

                    Petitioner,

      v.

                                 No. 1:25-cv-10695-DJC

PATRICIA HYDE, et al.,

                    Respondents.

## All Writs Act Motion to Produce Petitioner to Her Attorney

Last night, this Court ordered Respondents not to move Petitioner Rumeysa Ozturk outside of the District of Massachusetts without at least 48-hours' notice. ECF No. 3. Counsel has been attempting to locate and speak to her client since last night, and was informed by the U.S. Attorneys' Office that even after making inquiries, they do not know Ms. Ozturk's whereabouts. Ms. Ozturk was detained without the medication that she takes for her asthma. Petitioner respectfully requests that the Court enter an order requiring Respondents to report on Ms. Ozturk's whereabouts and permit her counsel to speak to her by 6pm today. I have further just been informed by a U.S. Senator's office that she has been transferred to Louisiana, but I have not received any confirmation from ICE or the U.S. attorney office.

Ms. Ozturk was a student in valid F1 status who was detained on March 25, 2025 at around 5:15pm when plain-clothes officers in what appear to be unmarked

1

JA-000008

vehicles approached her on the street near her home, handcuffed her, and took her away. In a now widely-circulated video of her arrest, Ms. Ozturk is seen screaming as a man in a hooded sweatshirt grabs a hold of her.

Since Ms. Ozturk's detention, numerous attempts by counsel to learn where she is and the basis for her detention, and speak to her, have been unsuccessful. This morning, a representative of the Turkish consulate went personally to the offices of Immigration and Customs Enforcement in Burlington Massachusetts and was reportedly informed that she was not in that office, but that ICE could not provide information about her whereabouts. Counsel assisting Ms. Ozturk also called all major known ICE detention facilities in New England, and were informed that she was not being held at those facilities. Counsel have also checked ICE's online detainee locator, which reveals that Ms. Ozturk is detained, but does not reveal the location of her detention. And although Representatives of the U.S. Attorneys' Office informed counsel that they would attempt to locate Ms. Ozturk's, they too have reported back that they were unable to learn her location. To counsel's knowledge, no one has heard from Ms. Ozturk since her detention.

Counsel has been informed that Ms. Ozturk takes at least two different medications for asthma and was detained without access to these medications. Because high stress situations can trigger asthma attacks, counsel has also called around to area hospitals in an attempt to locate Ms. Ozturk, but has been unable to do so.

JA-000009

The All Writs Act empowers district courts to issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The habeas statutes similarly authorize district courts to order relief "as law and justice require." In this case, concerns about Ms. Ozturk's health in light of her increasingly-prolonged incommunicado detention without her medication warrant relief. Petitioner thus respectfully asks the court to compel Respondents to disclose Ms. Ozturk's location and permit access to her by 6pm today.

Respectfully submitted,

/s/ Mahsa Khanbabai
Mahsa Khanbabai (BBO #639803
115 Main Street, Suite 1B, North Easton, MA 02356
mahsa@mk-immigration.com
508-297-2065
*Counsel for Petitioner*

Local Rule 7.1 Statement

I have contacted government counsel to attempt to resolve or narrow the issues in this motion. Counsel for the government asked me to delay the filing of this motion.  As of 2:30pm, counsel for the government still had not provided any response.

Dated: March 25, 2025                    /s/ Mahsa Khanbabai
                                         Mahsa Khanbabai

3

JA-000010

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RUMEYSA OZTURK,<br><br>      Petitioner,<br><br>  v.<br><br>PATRICIA HYDE, Field Office Director, MICHAEL KROL, HSI New England Special Agent in Charge, TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement, and KRISTI NOEM, Secretary of Homeland Security,<br><br>      Respondents. | Civil Action No. 1:25-cv-10695-DJC |

## RESPONDENTS' OPPOSITION TO PETITIONER'S
## MOTION TO PRODUCE PETITIONER TO HER ATTORNEY

Respondents, by and through their attorney, Leah B. Foley, United States Attorney for the District of Massachusetts, respectfully submits this response to Petitioner Rumeysa Ozturk's ("Petitioner") motion filed on March 26, 2025 seeking Respondents to provide her location and to permit her counsel to communicate with her.  Doc. No. 7.

The undersigned can report that Petitioner is currently detained at the South Louisiana Correctional Facility located at 3943 E. Stagg Avenue in Basile, Louisiana.[1]  *See* ICE Online Detainee Locator System, *https://locator.ice.gov/odls/#/search* which provides the following information once Petitioner's name and country of nationality, Turkey, is input.

---

[1] Respondents will set forth the timeline of Petitioner's arrest and transfer from Massachusetts in further detail via sworn declaration in its response to Petitioner's Habeas Petition.  The undersigned has been informed that Petitioner was detained outside of Massachusetts at the time the Petition was filed and the Court's Service Order was issued.

*Detention Information For:*

**RUMEYSA OZTURK**

**Country of Birth:** *Turkey*

*Current Detention Facility:*

*SOUTH LOUISIANA ICE PROCESSING CENTER*

*3843 STAGG AVENUE*

*BASILE, LA 70515*

**Visitor Information:** *(318) 668-5900*

The undersigned conveyed that Petitioner would be detained at this location to Petitioner's counsel upon learning such information from Respondents and upon viewing this information on the Online Detainee Locator System at approximately 5:30 PM on March 26, 2025.

In response to Petitioner's request for the Court to order communication be facilitated between Petitioner's counsel and Petitioner, the undersigned can also report that he worked diligently throughout the afternoon and the evening of March 26, 2025 to make Respondents aware of Petitioner's counsel's desire to speak with Petitioner and to keep Petitioner's counsel apprised that such communication would be possible after Petitioner had arrived at the South Louisiana Correctional Facility and had gone through processing at such facility.  The undersigned, based on discussions with Respondents and with Petitioner's counsel, can report that Petitioner was able to speak with Petitioner's counsel on March 26, 2025 at approximately 9:45 PM.

JA-000012

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Dated: March 27, 2025      By:     */s/ Mark Sauter*
Mark Sauter
Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Tel.: 617-748-3347
Email: mark.sauter@usdoj.gov

## CERTIFICATE OF SERVICE

I, Mark Sauter, Assistant United States Attorney, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated:  March 27, 2025      By:     */s/ Mark Sauter*
Mark Sauter
Assistant United States Attorney

3

JA-000013

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

RÜMEYSA ÖZTÜRK,

*Petitioner,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; PATRICIA HYDE, in her official capacity as the New England Field Office Director for U.S. Immigration and Customs Enforcement; MICHAEL KROL, in his official capacity as HSI New England Special Agent in Charge, U.S. Immigration and Customs Enforcement; TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; and MARCO RUBIO, in his official capacity as Secretary of State,

*Respondents.*

Case No. 1:25-cv-10695-DJC

**FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT**

## <u>INTRODUCTION</u>

1.      Rümeysa Öztürk is an international PhD student who was arrested on March 25, 2025 when six plain-clothes federal officers surrounded her on the street just outside her home in Somerville, MA. Rümeysa screamed as a man in a hooded sweatshirt grabbed her. Several other officers encircled her and soon covered their faces with masks. Rümeysa was handcuffed and escorted with an officer holding each arm into an unmarked vehicle. For more than 20 hours, her friends, family and legal counsel could not locate or contact her. After an exhaustive search, they learned that she had ultimately been removed from Massachusetts and sent more than 1,300 miles away to an ICE detention facility in Louisiana.

1

2.      Rümeysa has not been charged with any crime. Nor has there been any allegation that she is dangerous or a flight risk. Her arrest and detention appear to be based solely on her co-authorship of an op-ed in her school newspaper, *The Tufts Daily*, in March 2024. The piece criticized the University's dismissal of several resolutions that had been adopted by the undergraduate student Senate as "a sincere effort to hold Israel accountable for clear violations of international law." It articulated the goals of the resolutions and the disappointment of the authors before concluding with a request that the administration "trust in the Senate's rigorous and democratic process" and "meaningfully engage with and actualize the resolutions passed by the Senate."[1]

3.      Rümeysa's arrest and detention are designed to punish her speech and chill the speech of others. Indeed, her arrest and detention are part of a concerted and systemic effort by Trump administration officials to punish students and others identified with pro-Palestine activism. When asked about Rümeysa's case, Secretary of State Marco Rubio confirmed revoking her visa, adding, "we gave you a visa to come and study and get a degree, not to become a social activist that tears up our university campuses."[2]

4.      The Department of Homeland Security's website informs international students and the schools that host them that the termination of student status may result in a requirement to immediately depart the United States and may lead ICE agents to investigate whether a student has in fact departed. It makes no mention of arresting or detaining students based solely

---

[1] Rümeysa Öztürk, et al., *Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions*, THE TUFTS DAILY (Mar. 26, 2024), www.tuftsdaily.com/article/2024/03/4ftk27sm6jkj.
[2] *Secretary Rubio Defends Revoking Turkish Student's Visa*, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students-visa/5158479.

JA-000015

on the loss of status. In this case, however, DHS grabbed, arrested, and detained Rümeysa before she had received any notice of the revocation of her student visa or her student status.

5.     Rümeysa's arrest and detention are not a necessary or usual consequence of the revocation of a visa. But like the revocation of her visa, her arrest and detention are designed to silence her, punish her for her speech, and ensure that other students will be chilled from expressing pro-Palestinian viewpoints. Her continued detention is therefore unlawful. Because the government's arrest and detention violate the First and Fifth Amendments to the United States Constitution and the Administrative Procedure Act, Rümeysa should be released.

## JURISDICTION

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2241 (habeas corpus); Art. I, § 9, cl. 2 of the United States Constitution (Suspension Clause); and 28 U.S.C. § 2201 (declaratory judgment).

7.     Venue is proper because Petitioner had been detained in the District of Massachusetts by Immigration and Customs Enforcement (ICE) in Massachusetts and under the custody and control of ICE officials in Massachusetts at the time of the filing of this petition. Defendant Patricia Hyde is the Director of the Boston Field Office of ICE Enforcement and Removal Operations (ICE ERO), with authority over ICE ERO's operations and detainees in New England. Additionally, Defendant Michael Krol is the Special Agent in Charge for the Boston office of ICE Homeland Security Investigations (HSI), with authority over HSI operations and detainees in New England. At the time this petition was filed, and when the Court issued an order requiring notice prior to any transfer of the petitioner out of Massachusetts, ECF No. 3, Rümeysa had only recently been arrested in Massachusetts and had not left the custody

JA-000016

and control of Defendants Hyde and/or Krol in Massachusetts.[3] Sometime after receiving that order, ICE officials transferred Rümeysa to Louisiana without notifying the Court, her counsel, or Department of Justice counsel on this case. Meanwhile, Respondents withheld information about Rümeysa's location from Petitioner's counsel (and apparently, from Department of Justice attorneys on this case) until nearly 24 hours after she had been detained. On information and belief, the movement of Petitioner to other states is consistent with, and part of, ICE's pattern and practice of moving people detained for their speech to distant locations incommunicado and in secret to frustrate the ability of counsel to file habeas petitions on their behalf.

## **PARTIES**

8.      Petitioner Rümeysa Öztürk is a PhD student at Tufts University.  She resides in Somerville, Massachusetts. Rümeysa entered the United States on an F-1 nonimmigrant student visa.

9.      Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security.

10.      Respondent Patricia Hyde is named in her official capacity as the New England Field Office Director for U.S. Immigration and Customs Enforcement.

11.      Respondent Michael Krol is named in his official capacity as the New England Special Agent in Charge for Homeland Security Investigations for U.S. Immigration and Customs Enforcement.

---

[3] Counsel for the government has stated that he "has been informed that Petitioner was detained outside of Massachusetts at the time the Petition was filed," but has not provided evidence of Rümeysa's location at the time the petition was filed, or suggested that she was not in the custody and control of ICE officials in Massachusetts, ECF No. 9 at 1 n.1.

4

12.     Respondent Todd Lyons is named in his official capacity as the Acting Director for U.S. Immigration and Customs Enforcement. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States and is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner.

13.     Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a) (2007); is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner.

14.     Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i).

## FACTS

### *Rümeysa Öztürk*

15.     Rümeysa is a doctoral candidate in Child Study and Human Development at Tufts University. Rümeysa received a master's degree from Columbia University on a Fulbright scholarship.

16.     On March 26, 2024, almost exactly one year before her arrest, Rümeysa co-authored an op-ed in *The Tufts Daily*. The piece criticized Tufts University's response to several student Senate resolutions concerning human rights violations in Gaza. The authors urged

5

JA-000018

meaningful engagement by the University administration with the Senate resolutions.

17.     In February 2025, the website Canary Mission published a profile on Rümeysa, including her photograph, claiming she "engaged in anti-Israel activism in March 2024 . . . ." The profile describes Rümeysa as "a supporter of the Boycott, Divestment, Sanctions (BDS) movement." Its sole support for the contention that Rümeysa "engaged in anti-Israel activism" was a link and screenshots of the March 2024 opinion piece.

18.     Canary Mission's publication caused Rümeysa to fear for her safety.

### Rümeysa's Arrest Near Her Home and Continued Detention in Louisiana

19.     On March 25, 2025 at approximately 5:15 p.m., a hooded, plainclothes officer approached Rümeysa near her Somerville apartment.[4]

20.     The hooded officer grabbed Rümeysa by her wrists as she screamed. Additional officers surrounded Rümeysa as she pleaded with them. The officers placed Rümeysa in handcuffs and took her away in an unmarked vehicle.

21.     Rümeysa's friends frantically tried to find out more information about what had happened to her. At approximately 10:02 p.m., counsel for Rümeysa filed a petition for writ of habeas corpus in this Court.

22.      At approximately 10:55 p.m., the Court ordered that Rümeysa not be moved outside the District of Massachusetts without 48 hours' notice.

23.     For more than 24 hours after her arrest, Rümeysa's friends, family and legal counsel did not hear from her and could not speak to her.

24.     Because Rümeysa suffers from asthma, her family and friends worried that she

---

[4] WCVB Channel 5 Boston, *Surveillance shows Tufts graduate student detained*, YouTube (Mar. 26, 2025), https://www.youtube.com/watch?v=PuFIs7OkzYY.

could become ill without access to her medication.

25.    On the evening of her arrest, and on the following day, counsel made numerous attempts to locate Rümeysa.

26.    These efforts included contacting the offices of ICE ERO and ICE HSI. Counsel received no response to these inquiries. Counsel also called all major known ICE detention facilities in New England but were informed that Rümeysa was not there. Counsel attempted to locate her whereabouts through ICE's Online Detainee Locator System. Although the Detainee Locator indicated that Rümeysa was in ICE custody, the field for "Current Detention Facility" remained blank.

27.    A representative of the Turkish consulate went personally to ICE offices in Burlington, Massachusetts and was reportedly informed that Rümeysa was not in that office and that ICE could not provide further information about her whereabouts. Department of Justice counsel on this matter also informed counsel for Rümeysa that they could not locate her.

28.    Fearing Rümeysa could have had a medical episode, counsel contacted numerous area hospitals.

29.    At around 3 p.m. on March 26, counsel moved this Court for an order requiring Respondents to report on Rümeysa's whereabouts and permit her counsel to speak with her.

30.    Shortly thereafter, Department of Justice counsel informed Rümeysa's counsel that she had been moved to a staging facility in Alexandria, Louisiana to be transferred to South Louisiana.

31.    Counsel was finally able to speak to Rümeysa late in the evening of March 26. Counsel learned that she had suffered an asthma attack while en route to Louisiana.

JA-000020

*Rümeysa's Visa Revocation and Removal Proceedings*

32.     ICE uses the Student and Exchange Visitor Information System ("SEVIS") to maintain information on students who attend designated educational programs.

33.     A letter dated March 25, 2025, and addressed but not provided to Rümeysa stated that her SEVIS designation "has been terminated pursuant to 237(a)(1)(C)(i) and/or 237(a)(4)(C)(i) of the Immigration and Nationality Act."[5] *See* **Exhibit A**. On information and belief, a copy of the letter was provided to Tufts University.

34.     A Notice to Appear ("NTA") functions as a charging document for removal proceedings. *See* 8 U.S.C. § 1229(a).

35.     On March 25 ICE provided Rümeysa with an NTA. *See* **Exhibit B**. The NTA alleges, in part, that Rümeysa's visa "was revoked by the United States Department of State" on March 21, 2025. The NTA charges Rümeysa as deportable under INA § 237(a)(1)(B).[6]  The NTA provides no other basis for Rümeysa's removal.

36.     On information and belief, Rümeysa received no notice that her visa had been revoked prior to her arrest or the service of the NTA.

37.     The NTA indicates that Rümeysa is scheduled for an initial hearing on April 7, 2025 at 8:30 a.m.

---

[5] Section 237(a)(1)(C)(i) provides: "Any alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted . . . or to comply with the conditions of any such status, is deportable." 8 U.S.C. § 1227(a)(1)(C)(i). Section 237(a)(4)(C)(i) provides: "An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1227(A)(4)(c)(i).
[6] Section 237(a)(1)(B) provides: "Any alien who is present in the United States in violation of this chapter or any other law of the United States, or whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant) has been revoked under section 1201(i) of this title, is deportable." 8 U.S.C. § 1227(a)(1)(B).

JA-000021

*Rümeysa's Arrest and Detention are Part of the Trump Administration's Policy of Retaliating Against Noncitizens Who Advocate for Palestinian Rights*

38.     Rümeysa's arrest and detention reflect and are a part of the Trump administration's concerted effort to silence protected political speech.

39.     In the fall of 2023, thousands of students across the U.S. from a wide range of racial, ethnic, religious, and socioeconomic backgrounds began organizing on their campuses, many criticizing what they saw as the steadfast support of their universities and the United States government for Israel's policies. Opponents of these students' messages—including President Trump—have characterized their message in favor of Palestinian rights as inherently supportive of Hamas and antisemitic.

40.     During his campaign for re-election, President Trump repeatedly vowed to use visa revocations as a tactic to pursue his policy of silencing pro-Palestinian activities on university campuses.

41.     For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."

42.     In the spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."

43.     Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated

9

the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."

### *The Trump Administration Announces its Policy to Target Speech of Noncitizens*

44.     Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

45.     Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's overly broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including advocacy for Palestinian human rights.

46.     Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that, applied to speech, would punish constitutionally protected criticism of the Israeli government and its policies. In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas,"

JA-000023

sending a clear message to all "resident aliens [sic] who participated in pro-jihadist protests" that the federal government "will find you… and deport you."

47.    In or around February 2025, Respondents began implementing a policy by which they would retaliate against and punish noncitizens like Rümeysa for their constitutionally protected speech (the Policy). Under the Policy, Secretary of State Marco Rubio would revoke the visas or green cards of individuals who expressed support for Palestinian rights. These revocations would then permit the Department of Homeland Security to arrest, detain and deport such individuals.

48.    On March 6, 2025, Secretary Rubio posted to X: "Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law—including international students—face visa denial or revocation, and deportation."

49.    Additionally, certain groups began publicizing the names of pro-Palestinian activists they wanted the government to deport. Specifically, these groups compiled lists of students and faculty who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line, or publicly flagged names to U.S. Government official accounts.

50.    As illustrated *infra*, one way that Secretary Rubio is implementing the Policy is by wrongly invoking 8 U.S.C. § 1227(a)(4)(C)(i) (hereinafter "the Foreign Policy Ground"), which provides that "An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." This Provision expressly prohibits the Secretary of State from excluding or conditioning entry based on a noncitizen's "past, current, or

11

expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the individual would compromise a compelling U.S. foreign policy interest. *See* 8 U.S.C. § 1227(a)(4)(C)(ii) (citing 8 U.S.C. § 1182(a)(3)(C)(iii)).

51.     Legislative history makes clear that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

52.     Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

JA-000025

***The Government Begins to Implement its Policy of Intimidation and Retaliation***

53.    On March 5, 2025, the State Department revoked the student visa of Ranjani Srinivasan, an Indian national and doctoral student at Columbia, under the Foreign Policy Ground. Srinivasan had previously expressed support for the rights of Palestinians. Two days later, federal immigration agents showed up at her apartment looking for her, but she did not open the door. They showed up again the following night, but she was not home. On March 13, 2025, agents returned to her home with a judicial warrant. DHS released a statement characterizing Srinivasan as a terrorist sympathizer and accused her of advocating violence and being "involved in activities supporting Hamas," but the agency has not provided any evidence for its allegations, and Srinivasan disputes them.

54.    On March 8, 2025, ICE agents in plain clothes arrested Mahmoud Khalil, a legal permanent resident and recent Columbia University graduate, at his Columbia University student housing. Khalil had previously expressed support for the rights of Palestinians. The agents initially told Khalil that they were detaining him because his student visa had been revoked by the State Department, but when Khalil's attorney informed the agents that he was a green card holder, the agents responded that the State Department had revoked Khalil's green card, too. The Notice to Appear later issued by the government to Khalil cites the Foreign Policy Ground as the basis for his arrest and removal. The agents handcuffed Khalil and placed him in an unmarked vehicle. Over the course of that evening and into the early hours of the following morning, Khalil would first be taken to an ICE field office in Manhattan and then to a detention facility in New Jersey, returning to New York to board a flight to Texas and finally to Louisiana. To date, Khalil remains detained in Louisiana.

JA-000026

55.     On March 8, 2025, ICE signed an administrative arrest warrant for Yunseo Chung, a legal permanent resident and Columbia University student who has lived in the United States since she was seven. Chung had previously expressed support for the rights of Palestinians. On March 10, a federal law enforcement official advised Chung's attorney that her legal permanent resident status had been revoked. On March 13, federal law enforcement agents executed a judicial search warrant at Chung's dormitory. Chung filed a complaint and petition for habeas corpus in the United States District Court for the Southern District of New York, and sought, among other things, a temporary restraining order preventing immigration enforcement officials from taking her into custody or transferring her out of the district. On March 25, 2025, the court issued such an order. *Chung v. Trump et al.*, Case No. 25-cv-02412, ECF 19 (S.D.N.Y.).

56.     On March 17, 2025, ICE arrested Badar Khan Suri, an Indian national and postdoctoral fellow at Georgetown University's School of Foreign Service. Suri's student visa was revoked pursuant to the Foreign Policy Ground. In a statement given to Fox News, DHS asserted that Suri had "spread[] Hamas propaganda," "promot[ed] antisemitism on social media," and had "close connections to a known or suspected terrorist, who is a senior advisor to Hamas." Suri has no criminal record and has not been charged with a crime. DHS's allegations appear to reference the fact that Suri's father-in-law, Ahmed Yousef, is a former advisor to Ismael Haniyeh, the Hamas leader assassinated by Israel last year in Iran. But Yousef left his position in the Hamas-run government in Gaza more than a decade ago and has publicly criticized Hamas's decision to attack Israel on October 7, 2023. DHS has not alleged that Suri himself has taken any action on behalf of Hamas. To date, Suri remains in immigration detention.

14

57.     On March 21, 2025, the Justice Department wrote to counsel for Momodou Taal, a student visa holder and doctoral candidate at Cornell University, to convey ICE's intention to serve a deportation notice on Taal and request that Taal voluntarily surrender to ICE custody. Taal had previously expressed support for the rights of Palestinians. The Justice Department wrote to Taal's lawyers after Taal sought a temporary restraining order to enjoin DHS from attempting to detain, remove, or otherwise enforce the Executive Orders against him. In response to that application, the government informed the court that the State Department had revoked Taal's student visa.

### High-Level Government Officials Confirm Rümeysa Was Targeted Because of Her Speech

58.     Multiple government officials, including Secretary of State Marco Rubio, have confirmed that Rümeysa was targeted for arrest and detention solely because of her actual or perceived First Amendment activity.

59.     On March 21, 2025, the day Rümeysa's visa was revoked according to her NTA, Secretary Rubio announced on X.com: "We will continue to cancel the visas of those whose presence or activities have potentially serious adverse foreign policy consequences for our country . . . And we will continue to use every legal means available to remove alien enemies."

60.     After Rümeysa's arrest, a DHS spokesperson stated, "DHS and ICE investigations found Öztürk engaged in activities in support of Hamas, a foreign terrorist organization that relishes the killing of Americans . . . . A visa is a privilege, not a right. Glorifying and supporting terrorists who kill Americans is grounds for visa issuance to be terminated. This is commonsense security."[7]

---

[7] Mike Toole & Beth Germano, *Tufts University student taken into immigration custody by federal agents in Massachusetts* (Mar. 27, 2025), https://www.cbsnews.com/boston/news/tufts-university-graduate-student-somerville-ice/.

15

61.     In a March 27 news conference, Secretary Rubio reaffirmed that the reason for Rümeysa's arrest and detention washer actual and perceived pro-Palestinian speech and political activity.[8] At the conference, a member of the media asked Secretary Rubio to explain the specific actions that led to Rümeysa's visa being revoked. The Secretary responded "oh, we revoked her visa," and continued:

> We gave you a visa to come and study and get a degree not to become a social activist that tears up our university campuses. And if we've given you a visa and then you decide to do that we're going to take it away. [. . .] We don't want it. We don't want it in our country. Go back and do it in your country. But you're not going to do it in our country."

62.     Secretary Rubio added: "Every time I find one of these lunatics I take away their visa," suggesting that hundreds of visas have been revoked in furtherance of the administration's Policy of targeting noncitizens for their pro-Palestinian speech.[9]

### *DHS Did Not Follow Ordinary Procedure*

63.     DHS maintains a website, titled "Study in the States," which "explains the student visa process, enhances coordination among government agencies, and keeps international students and the U.S. academic community better informed about pertinent rules and regulations." *About*, Study in the States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27, 2025), https://studyinthestates.dhs.gov/footer/about.

64.     According to Study in the States, student visa holders must maintain their status, which means "Fulfilling the purpose for why the Department of State issued you your visa" and

---

[8] *Secretary Rubio Defends Revoking Turkish Student's Visa*, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students-visa/5158479.
[9] *See* Madeline Halpert, *Marco Rubio says US revoked at least 300 foreign students' visas*, BBC (Mar. 27, 2025), https://www.bbc.com/news/articles/c75720q9d7lo; *see also Secretary of State Marco Rubio Remarks to the Press*, U.S. Dep't of State (March 28, 2025), https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-3/.

JA-000029

"Following the regulations associated with that purpose." *Maintaining Status*, Study in the States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27, 2025), https://studyinthestates.dhs.gov/students/maintaining-status. For F-1 student visa holders, that purpose is "to study." *Id.*

65.     The Study in the States website lists consequences that can occur "[w]hen an F-1/M-1 SEVIS record is terminated," including, the student "loses all on-and/or off-campus employment authorization," the student "cannot re-enter the United States on the terminated SEVIS record," and ICE agents "may investigate to confirm the departure of the student." *Terminate a Student*, Study in the States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27, 2025), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student. Termination may require an F-1 visa holder to immediately depart the United States. *Id.*

66.     DHS does not indicate on its Study in the States website that loss of student status may result in immediate arrest and detention. DHS departed from these expected procedures in arresting Rümeysa without warning or notice about the change in her student status.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of the First Amendment to the United States Constitution

67.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

68.     The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First

17

Amendment protects past, present, and future speech, including speech by noncitizens.

69. The Policy, and the government's implementation of the Policy as to Rümeysa—specifically, the government's targeting, arrest, transfer, and ongoing detention of Rümeysa—violate the First Amendment because they:

    a. retaliate against and punish Rümeysa's past protected speech;

    b. prevent her from speaking now (through detention);

    c. attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) her future speech in the United States;

    d. deprive those with whom she would speak of her present and future speech on matters of public concern; and

    e. chill other individuals who express support for Palestinian rights.

70. These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the purpose of the Policy and the government's actions implementing the Policy as to Rümeysa and those similarly situated. In government officials' own telling, the Policy is intended to silence viewpoints with which the Trump administration disagrees.

### SECOND CLAIM
### Violation of Fifth Amendment Right to Due Process

71. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

72. The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

73. The government's detention of Rümeysa is unjustified. The government has not

JA-000031

demonstrated that Rümeysa—who has no criminal history, has close ties in the Tufts community, and wishes to complete her doctoral degree at Tufts—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Rümeysa cannot be safely released back to her community.

74.     Rümeysa's detention is also punitive and bears no "reasonable relation" to any legitimate purpose for detaining her. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("nature and duration" of civil confinement must "bear some reasonable relation to the purpose for which the individuals is committed"); *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). Her "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

75.     Rümeysa's arrest and detention under the Policy violate due process limitations on civil detention because they are designed to punish and silence her speech with which the government disagrees, and to chill others from expressing these viewpoints—impermissible bases for taking away individual liberty.

76.     The Policy and its implementation as to Rümeysa violate her right to due process for additional reasons as well. The government's policy of applying the Foreign Policy Ground to make such determinations concerning people like Rümeysa—who was in valid F-1 status, living peacefully in the country—is unconstitutionally vague where it is due to constitutionally protected speech.

## THIRD CLAIM
### Violation of the Administrative Procedure Act and the *Accardi* Doctrine

77.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

78.     The government has adopted a policy of targeting noncitizens for arrest, detention and removal based on First Amendment-protected speech advocating for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706 (2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

79.     In addition, Rümeysa's SEVIS termination notice invoked the Foreign Policy Ground.

80.     In order to be invoked in an instance involving a noncitizen's past statements, the Foreign Policy Ground requires the Secretary of State to determine that a person's "presence or activities would potentially have serious adverse foreign policy consequences for the United States" and "would compromise a compelling United States foreign policy interest."

81.     Here, there is no indication that the Secretary of State ever made such a determination.

82.     To the extent the Secretary of State failed to make such a determination, the invocation of the Foreign Policy Ground is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C § 706 (2)(A), (B), (C).

JA-000033

83.     To the extent the Secretary of State purported to make such a determination, it is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C § 706 (2)(A), (B), (C).

## FOURTH CLAIM
### Release on Bail Pending Adjudication

84.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

85.     Federal courts sitting in habeas possess the "inherent power to release the petitioner pending determination of the merits." *Savino v. Souza*, 453 F. Supp. 3d 441, 454 (D. Mass. 2020) (quoting *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972) (per curiam)); *see also Da Graca v. Souza*, 991 F.3d 60 (1st Cir. 2021). Federal courts "have the same inherent authority to admit habeas petitioners to bail in the immigration context as they do in the criminal habeas case." *Id.* (quoting *Mapp v. Reno*, 241 F.3d 221, 223 (2d Cir. 2001)). "A court considering bail for a habeas petitioner must inquire into whether the habeas petition raise[s] substantial claims and [whether] extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective." *Id.* (quoting *Mapp*, 241 F.3d at 230) (cleaned up).

86.     This petition raises substantial constitutional and statutory claims challenging Rümeysa's retaliatory detention. Furthermore, extraordinary circumstances exist that make Rümeysa's release essential for the remedy to be effective. Even if she is ultimately freed, as long as Rümeysa remains in ICE's physical custody, she will be prevented from speaking freely and openly and her unlawful detention will serve to chill others. In addition, Rümeysa has asthma and has already suffered an asthma attack while in ICE custody, raising concerns about future asthma attacks. Finally, Rümeysa's confinement in Louisiana prevents her from

21

JA-000034

adequately litigating her removal proceedings by impeding her access to counsel and evidence located within the District of Massachusetts.

## PRAYER FOR RELIEF

Wherefore, Petitioner respectfully requests this Court to grant the following:

1)  Assume jurisdiction over this matter;

1)  Require Respondents to return Petitioner to this District pending these proceedings;

2)  Order the immediate release of Petitioner pending these proceedings;

3)  Declare that Respondents' actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment;

4)  Vacate and set aside Respondents' unlawful Policy of targeting noncitizens for arrest, detention and removal based on First Amendment-protected speech advocating for Palestinian rights;

5)  Restore Petitioner's SEVIS record;

6)  Enjoin Respondents from taking any enforcement action against Petitioner arising directly or indirectly from an investigation into the applicability of the Foreign Policy Ground;

7)  Award reasonable attorneys' fees and costs for this action; and

8)  Grant such further relief as the Court deems just and proper.

Respectfully submitted,

[signature block on next page]

JA-000035

/s/ *Jessie J. Rossman*
Jessie J. Rossman (BBO #670685)
Adriana Lafaille (BBO #680210)
Rachel E. Davidson (BBO #707084)
Julian Bava (BBO #712829)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
alafaille@aclum.org
rdavidson@aclum.org
jbava@aclum.org

Mahsa Khanbabai (BBO #639803)
115 Main Street, Suite 1B
North Easton, MA 02356
(508) 297-2065
mahsa@mk-immigration.com

Brian Hauss*
Esha Bhandari*
Brett Max Kaufman*
Noor Zafar*
Sidra Mahfooz*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
bhauss@aclu.org
ebhandari@aclu.org
bkaufman@aclu.org
nzafar@aclu.org
smahfooz@aclu.org

*Counsel for Petitioner*

*\*Pro hac vice application forthcoming*

Dated: March 28, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2025, a true copy of the above document was filed via the Court's CM/ECF system and that a copy will be sent automatically to all counsel of record.

March 28, 2025                    */s/ Jessie J.Rossman*
                                 Jessie J.Rossman

JA-000037

# EXHIBIT A

JA-000038

March 25, 2025

Rumeysa Ozturk

██████████████

**Student and Exchange Visitor Program**
**SEVIS Designation Termination Notice**

This letter is to inform you that your Student and Exchange Visitor Information System (SEVIS) designation associated with SEVIS ID ████████ issued by Tufts University - Tufts University/Medford, school code ████████ has been Terminated pursuant to 237(a)(1)(C)(i) and/or 237(a)(4)(C)(i) of the Immigration and Nationality Act.

If you remain in the United States, you may be contacted by immigration officials or placed in removal proceedings.

Should you wish to speak to someone regarding this notice email at sevp@ice.dhs.gov

Sincerely,

Student and Exchange Visitor Program

CC ██████████████

# EXHIBIT B

JA-000040

DEPARTMENT OF HOMELAND SECURITY
**NOTICE TO APPEAR**

DOB: ▮▮▮▮▮▮

Event No: XBO2503000017

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID: ▮▮▮▮   FINS: ▮▮▮▮▮   File No: ▮▮▮▮▮▮

In the Matter of:

Respondent: RUMEYSA OZTURK _____ currently residing at:

See Continuation Page Made a Part Hereof
_____
(Number, street, city, state and ZIP code)                (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of TURKIYE and a citizen of TURKIYE;

3. You were admitted to the United States at Boston, MA on or about June 28, 2024 as a nonimmigrant Student (F-1);

4. On March 21, 2025, your nonimmigrant visa was revoked by the United States Department of State.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(B) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, your nonimmigrant visa was revoked under section 221(i) of the Act.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:   ☐ 8CFR 208.30   ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

3843 E STAGG AVE, BASILE, LOUISIANA 70515. SOUTH LOUISIANA CORR CENTER
_____
(Complete Address of Immigration Court, including Room Number, if any)

on __April 7, 2025__ at __8:30 am__ to show why you should not be removed from the United States based on the
    (Date)              (Time)

charge(s) set forth above.                D. 4448 JOHNSTON - SDDO
                                    (Signature and Title of Issuing Officer)

Date: __March 25, 2025__                St Albans, VT
                                        (City and State)

DHS Form I-862 (6/22)

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____     _____
                                            *(Signature of Respondent)*

                                            Date: _____
_____
*(Signature and Title of Immigration Officer)*

### Certificate of Service

This Notice To Appear was served on the respondent by me on **March 25, 2025**, in the following manner and in compliance with section 239(a)(1) of the Act.

[X] in person   [ ] by certified mail, returned receipt # _____ requested   [ ] by regular mail
[ ] Attached is a credible fear worksheet.
[ ] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the **ENGLISH** language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

M 11272 MUSCARELLA - Deportation Officer
_____          _____
*(Signature of Respondent if Personally Served)*      *(Signature and Title of officer)*

DHS Form I-862 (6/22)

JA-000042

## Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

JA-000043

**U.S. Department of Homeland Security**

**Continuation Page for Form I-862**

| Alien's Name | File Number | Date |
|---|---|---|
| OZTURK, RUMEYSA | Event No: XBO2503000017 | 03/25/2025 |

CURRENTLY RESIDING AT:
----------------------------------------------------------------------------

South Louisiana Imm Center 3843 W Stagg Ave Basile, LOUISIANA 70515

| Signature | Title |
|---|---|
| D. 4448 JOHNSTON | SDDO |

_____4_____ of ____4____ Pages

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

RUMEYSA OZTURK,

Petitioner,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, PATRICIA
HYDE, Field Office Director,
MICHAEL KROL, HSI New England Special
Agent in Charge, TODD LYONS, Acting
Director, U.S. Immigration and Customs
Enforcement, and KRISTI NOEM, Secretary of
Homeland Security; and MARCO RUBIO, in his
official capacity as Secretary of State

Respondents.

Civil Action No. 1:25-cv-10695-DJC

Leave to file excess pages
granted on 4/1/2025

## RESPONDENTS' OPPOSITION TO PETITIONER'S AMENDED PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C § 2241

Respondents, by and through their attorney, Leah B. Foley, United States Attorney for the

District of Massachusetts, respectfully submit this opposition to Petitioner Rumeysa Ozturk's

Amended Petition for Writ of Habeas Corpus (the "Petition"). Doc No. 12.

## INTRODUCTION

Under binding precedent from the Supreme Court and the U.S. Court of Appeals for the

First Circuit, this Court lacks habeas jurisdiction over this Petition because Petitioner was not in

the District of Massachusetts when she filed her original petition seeking release from U.S.

Immigration and Customs Enforcement ("ICE") custody. *See* Declaration of Acting Deputy Field

Office Director David T. Wesling, ¶¶ 12-13, attached as Exhibit A ("Wesling Decl.). Instead, at

the time of filing, Petitioner was in Vermont, after she had been transferred from Massachusetts

immediately after her arrest on March 25, 2025. *Id.*, ¶¶ 6-8. Petitioner also was not in this District when she filed her Amended Complaint on March 28 as she had been transferred to Louisiana two days prior. *Id.*, ¶¶ 18-19. As this Court is not in Petitioner's district of confinement, it lacks jurisdiction to entertain this action.

In *Rumsfeld v. Padilla*, 542 U.S. 426, 434-35 (2004), the Supreme Court made clear an individual challenging her detention through a habeas petition must file that petition in the district where she is detained and must name the custodian detaining her in such district as the respondent. The First Circuit, in *Vasquez v. Reno* similarly held that "an alien who seeks a writ of habeas corpus contesting the legality of his detention by [ICE] normally must name as the respondent his immediate custodian, that is, the individual having day-to-day control over the facility in which he is being detained." 233 F.3d 688, 690 (1st Cir. 2000). Because Petitioner did not do that, and still has not done that with the filing of her Amended Petition, this Court lacks habeas jurisdiction over this action. *See, e.g.*, *Tham v. Adducci*, 319 F. Supp. 3d 574, 577 (D. Mass. 2018) (Holding that "jurisdiction lies in only one district: the district of confinement."); *Rombot v. Moniz*, 299 F. Supp. 3d 215, 218 (D. Mass. 2017) ("A district court may only grant a petitioner relief when the court is located in the 'district of confinement.'") (quoting *Padilla*, 542 U.S. at 443); *Hernandez v. Lyons*, 1:19-cv-10519-DJC, ECF No. 18 (D. Mass. Oct. 11, 2019) (Allowing motion to dismiss as habeas petitioner "was not in the district when he filed or was pursuing this Petition as is required.").

Additionally, even if Petitioner had properly filed her original petition when she was detained in Massachusetts, this Court would nonetheless lack jurisdiction over this matter under the Immigration and Nationality Act ("INA"). The federal immigration laws strip district courts of jurisdiction over the sorts of governmental decisions challenged in the Petition, including the revocation of Petitioner's student visa and ICE's decision to initiate removal proceedings. The

2

Department of State revoked Petitioner's visa on March 21, 2025 pursuant to INA Section 221(i), 8 U.S.C. § 1201(i), which allows revocation of a visa at the Secretary of State's discretion. *See* Doc. No. 12-2, Form I-862, Notice to Appear ("NTA"). Per Section 1201(i), Congress barred judicial review of a visa revocation, specifically stating that "[t]here *shall be no means of judicial review* … of a revocation under this subsection," including through a habeas petition, other than in the context of removal proceedings and only if the visa revocation is the sole basis for removal. (emphasis added).

Petitioner's request for review of ICE's decision to initiate removal proceedings against her is barred by 8 U.S.C. § 1252(g) which strips district courts of jurisdiction "to hear any cause or claim by or on behalf of an alien arising from the decision or action by [ICE] to commence proceedings … against any alien," including constitutional claims. Courts also lack jurisdiction to review ICE's discretionary decisions to arrest and detain aliens under 8 U.S.C. § 1226(a). Per 8 U.S.C. § 1226(e), ICE's "discretionary judgment regarding the application of [Section 1226] shall not be subject to review [and] … [n]o court may set aside any action or decision by [ICE] under this section regarding the detention of any alien …". And finally, 8 U.S.C. §§ 1252(a)(5) and (b)(9) strip "federal courts of jurisdiction to decide legal and factual questions arising from an alien's removal" and instead channel such questions to the courts of appeal via a petition for review. *Gicharu v. Carr*, 983 F.3d 13, 16 (1st Cir. 2020).

Petitioner is not without recourse to challenge the revocation of her visa and her arrest and detention, but such challenge cannot be made before this Court. Instead, Petitioner must seek release before an immigration judge and must pursue relief from removal in Immigration Court, before the Board of Immigration Appeals ("BIA"), and eventually before a circuit court if necessary. But one way or another, this Court lacks jurisdiction over this matter. And as this

3

Court lacks jurisdiction over this Petition, Petitioner's request for release on bail pending adjudication of the matter is similarly unwarranted.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Petitioner's Arrest and Transfer from the District of Massachusetts.

Petitioner is a native and citizen of Turkey. Doc. No. 12, ¶ 8. Petitioner entered the United States pursuant to a student visa. *Id.*, ¶ 8. Pursuant to 8 U.S.C. § 1226(a), ICE arrested Petitioner at approximately 5:25 PM on March 25, 2025, after her visa had been revoked by the Department of State under 8 U.SC. § 1201(i). Wesling Decl., ¶ 5; Doc. No 12-2, NTA. With the revocation of her visa, Petitioner was subject to removal from the United States pursuant to 8 U.S.C. § 1227(a)(1)(B) as an alien "whose nonimmigrant visa … has been revoked under section 1201(i)." Doc. No. 12-2.

Prior to the arrest, ICE determined that there was no available bedspace for Petitioner at a facility within the New England region where she could be detained and still appear for a hearing in Immigration Court. *Id.*, ¶ 6. ICE therefore decided that Petitioner would be transferred to the South Louisiana Correctional Facility in Basile, Louisiana after her arrest and made necessary transfer and flight arrangements to facilitate custody at that facility. *Id.*, ¶¶ 6, 8. Transfers out of state, and out of the ERO Boston area of responsibility, are routinely conducted after arrest, due to operational necessity. *Id.*, ¶ 7. In accordance with this operational plan, at 5:49 PM on March 25, ICE officials departed Somerville, Massachusetts, and transported Petitioner to Methuen, Massachusetts arriving at 6:22 PM. *Id.*, ¶ 10. At 6:36 PM, ICE officials departed from Methuen, Massachusetts and transported Petitioner to Lebanon, New Hampshire.[1] *Id.*, ¶ 11. At

---

[1] Methuen, Massachusetts is approximately 2 miles from the New Hampshire border on Interstate I-93.

4

9:03 PM, ICE officials departed Lebanon, New Hampshire to transport Petitioner to the ICE field office in St. Albans, Vermont.[2] *Id.*, ¶ 12. At 10:28 PM, Petitioner arrived at the ICE field office in St. Albans, Vermont. *Id.*, ¶ 13. While at the facility in St. Albans, ICE issued Petitioner with a NTA in the Oakdale, Louisiana Immigration Court on April 7, 2025 and charged Petitioner as removable from the United States per 8 U.S.C. § 1227(a)(1)(B). *Id.*, ¶ 14; Doc. No. 12-2, NTA.

Petitioner spent the night at the ICE field office in St. Albans, Vermont on March 25. Wesling Decl.*, ¶ 13.* On March 26 at 4:00 AM, ICE officials departed the ICE Field Office in St. Albans and transported Petitioner to the airport in Burlington, Vermont. *Id.*, ¶ 16. At 5:31 AM, Petitioner departed the airport in Burlington. *Id.*, ¶ 17. At 2:35 PM, Petitioner arrived in Alexandria, Louisiana and was transported to the South Louisiana Correctional Facility in Basile, Louisiana. *Id.*, ¶¶ 18-19. At the time of Petitioner's arrest, ICE was not aware of a counsel of record for Petitioner. *Id.*, ¶ 20. Once ICE obtained Petitioner's counsel's contact information, it was provided to ERO New Orleans to facilitate Petitioner's communication with counsel. *Id.* Upon her arrival to the South Louisiana Correctional Facility, Petitioner spoke with counsel. *Id.* ¶ 21.

### B. Petitioner's Original Habeas Petition and her Amended Petition.

Petitioner filed her original petition with this Court on March 25, 2025 at 10:01 PM. Doc. No. 1. Petitioner named as Respondents Patricia Hyde, the Acting Director of ICE's ERO Boston Field Office, Michael Krol, ICE's Boston Homeland Security Investigation's Special Agent in Charge, Todd Lyons, the Acting Director of ICE, and Kristi Noem, the Secretary of Homeland Security. *Id.* Petitioner alleged that she was "currently in custody in the District of Massachusetts"

---

[2] Lebanon, New Hampshire is approximately 5 miles from the Vermont border on Interstate I-89.

5

and that "one or more of the Respondents is her immediate custodian." *Id.*, ¶ 12. But as just detailed, Petitioner was in fact in Vermont, set to be transferred to Louisiana—a decision, again, that was made by ICE officials before any petition was filed. Wesling Decl., ¶¶ 6-8, 10-13.

On March 28, Petitioner filed an Amended Petition. Doc. No. 12. Petitioner added President Donald J. Trump and Secretary of State Marco Rubio as Respondents. *Id.* Petitioner asserts venue is proper in this Court under the theory that she "had been detained in the District of Massachusetts by [ICE] and under the custody and control of ICE officials in Massachusetts at the time of the filing of this petition." *Id.*, ¶ 7. Petitioner added claims under the First Amendment and the Administrative Procedures Act ("APA"), amended her claim under the Fifth Amendment's Due Process Clause, and sought release on bail. *Id.* Petitioner asked the Court order that she be returned to Massachusetts, that she be released, and that the Court find that her arrest violated the First and Fifth Amendments. *Id.* at PRAYER FOR RELIEF.

## ARGUMENT

Petitioner improperly filed her original petition with this Court because Petitioner was not detained in Massachusetts when she filed her action at 10:02 PM on March 25. She also named improper supervisory officials as respondents. Petitioner's Amended Petition is similarly improperly filed in this Court because Petitioner is in custody in Louisiana and this Court lacks jurisdiction over her immediate custodian who has not been named as a respondent. Even if the original petition had been properly filed, dismissal would still be required because this Court lacks jurisdiction to review Petitioner's challenges to the Government's action and to order the requested relief. As such, this Court should dismiss this action without prejudice. If, however, the Court determines transfer of the Petition is appropriate, such transfer must be to the Western District of Louisiana where Petitioner is currently detained.

6

A. **The Immediate Custodian and District of Confinement Rules Apply to this Petition and Render this Court without Jurisdiction.**

Petitioner's original petition was improperly filed as Petitioner was not detained in Massachusetts when she filed her action at 10:02 PM on March 25 and because she did not name her immediate custodian as a respondent. Petitioner departed Massachusetts shortly after 6:30 PM when ICE officials transported her from Methuen, Massachusetts on the way to Lebanon, New Hampshire before eventually arriving in St. Albans, Vermont later that evening. Wesling Decl., ¶¶ 11-13. Because Petitioner was in Vermont when her original petition was filed, she should have filed her action with the U.S. District Court for the District of Vermont, not this Court.

The Supreme Court explained that when considering "challenges to present physical confinement … the immediate custodian, not a supervisory official who exercises legal control, is the proper respondent." *Padilla*, 542 U.S. at 439. *Padilla* involved a habeas petition filed by a U.S. citizen who was initially detained in the Southern District of New York but then transferred to South Carolina. *Id.* at 431. After Mr. Padilla was transferred, he filed a petition in SDNY, naming President Bush and Secretary Rumsfeld as respondents. *Id.* at 432. The Court confronted the "question whether the Southern District has jurisdiction over Padilla's habeas petition" which required two determinations: "First, who is the proper respondent to the petition? And second, does the Southern District have jurisdiction over him or her?" *Id.* at 434.

Answering the first question, the Supreme Court explained that the habeas statute "provides that the proper respondent to a habeas petition is 'the person who has custody over [the petitioner].'" *Id.* (quoting 22 U.S.C. § 2242). The Court stated that "there is generally only one proper respondent to a given prisoner's habeas petition," the immediate custodian who has "the ability to produce the prisoner's body before the habeas court." *Id.* The Court applied its

7

"longstanding" rules – known as the "district of confinement" and "immediate custodian" rules –
and explained that in a challenge to present physical confinement, "the proper respondent is the
warden of the facility where the prisoner is held, not the Attorney General or some other remote
supervisory official." *Id.* at 435. The Court acknowledged that while Mr. Padilla's detention
was "undeniably unique in many respects, it is at bottom a simple challenge to physical custody
imposed by the Executive…." *Id.* at 441. Without evidence that "there was any attempt to
manipulate" his transfer or that government was hiding his location, the Court explained that his
"detention is thus not unique in any way that would provide arguable basis for a departure from
the immediate custodian rule." *Id.* at 441-42.

As to the question of the proper district court to consider the petition, the Court affirmed
the applicability of the traditional rule "that for core habeas petitions challenging present
physical confinement, jurisdiction lies in only one district: the district of confinement." *Id.* at
443. Because Mr. Padilla was moved from the Southern District of New York before the petition
was filed, "the Southern District never acquired jurisdiction over Padilla's petition.". *Id.* at 441-
42.[3] In summary, the *Padilla* Court explained that whenever a "habeas petitioner seeks to
challenge his present physical custody within the United States, he should name his warden as
respondent and file the petition in the district of confinement." *Id.* at 447.

---

[3] As such, the *Padilla* Court distinguished the factual circumstances before the Court
from those at issue in *Ex parte Endo*, 323 U.S. 283 (1944) where the Supreme Court had created
an exception to its general rule for cases in which the petitioner properly filed the habeas petition
against the immediate custodian and thereafter was transferred outside the district court's
territorial jurisdiction. Here, as in *Padilla*, *Endo* is not applicable because Petitioner never
properly filed her habeas petition because she was not detained in Massachusetts when it was
filed.

8

Four years prior to the *Padilla* decision, the First Circuit in *Vasquez v. Reno* held that a habeas petitioner challenging his immigration detention must file his petition in the district of confinement and must name his immediate custodian in that district as the respondent. *Vasquez*, 233 F.3d at 696. The First Circuit rejected the argument that a supervisory official such as the Attorney General was the proper respondent, holding that "as a general rule, the Attorney General is neither the custodian of such an alien in the requisite sense nor the proper respondent to a habeas petition." [4] *Id.* at 689.

In *Vasquez*, an alien was detained in Massachusetts before transfer to Louisiana. *Id.* at 690. The petitioner filed in the District of Massachusetts, naming as respondents the Attorney General, the Commissioner of the Immigration and Nationality Service ("INS"), and the district director of the INS's Boston office. *Id.* He did not name, however, the INS official who maintained his custody in Louisiana. *Id.* The First Circuit held that the district court erred in exercising jurisdiction because the petitioner was not detained in Massachusetts when he filed and due "to the petitioner's failure to name his true custodian (the INS district director for Louisiana) as the respondent to his petition." *Id.* The Court distinguished the Supreme Court's decision in *Endo*, explaining that such petition was "properly-filed," unlike Mr. Vasquez's petition which was filed "in a jurisdiction where neither he nor his immediate custodian was physically present." *Id.* at 695.

The First Circuit explained that "Congress has stipulated that a writ of habeas corpus granted by a district court 'shall be directed to the person having custody of the person detained.'" *Id.* (quoting 28 U.S.C. § 2243). Per the Court, "[t]his means, of course, that the

---

[4] At the time of the *Vasquez* decision, immigration detainees were held by the Immigration and Naturalization Service which was part of the U.S. Department of Justice.

court issuing the writ must have personal jurisdiction over the person who holds the petitioner in custody." *Id.* at 690. As it specifically concerned aliens in immigration detention, the Court found that, as in in the prison context, the proper respondent is not a supervisory official such as the Attorney General or the head of an agency, but the immediate custodian of the alien, *i.e.* the individual "who holds the petitioner in custody." *Id*. at 691. As such, the First Circuit held that "an alien who seeks a writ of habeas corpus contesting the legality of his detention by [ICE] normally must name as the respondent his immediate custodian, that is, the individual having day-to-day control over the facility in which he is being detained." *Id.* Otherwise, "allowing alien habeas petitioners to name the Attorney General … will encourage rampant forum shopping." *Id.* at 694.

Courts within this District routinely find jurisdiction wanting over habeas petitions that are filed by ICE detainees outside of Massachusetts. *See Kantengwa v. Brackett*, No. 19-CV-12566-NMG, 2020 WL 93955, at *1 (D. Mass. Jan. 7, 2020) ("Because the District of Massachusetts is not the district of [petitioner's] confinement, jurisdiction is lacking."); *Tham*, 319 F. Supp. 3d at 577 ("jurisdiction lies in only one district: the district of confinement."); *Rombot v. Moniz*, 299 F. Supp. 3d at 218 ("A district court may only grant a petitioner relief when the court is located in the 'district of confinement.'") (quoting *Padilla*, 542 U.S. at 443).

Because Petitioner was not detained in Massachusetts when she filed her original petition and because she failed to name her immediate custodian, this Court lacks jurisdiction over this matter. Petitioner's Amended Petition is similarly improperly filed in this Court, because it fails to name her immediate custodian in Louisiana, and it is not filed in her district of confinement. Given this Court lacks habeas jurisdiction under the above rules, the proper course is for this Court to dismiss the action.

JA-000054

### 1. __Petitioner failed to name her immediate custodian.__

Petitioner named improper respondents in her original petition because she named supervisory officials, rather than her immediate custodian in Vermont when the petition was filed. Her Amended Petition suffers from the same flaws as she adds additional supervisory officials but fails to name her immediate custodian in Louisiana.

Courts within this district routinely hold that they lack jurisdiction over a habeas petition if the alien names improper respondents such as supervisory officials like the ICE Boston Field Office Director ("FOD"), even if this individual provides oversite throughout the New England region. For example, in *Duy Tho Hy v. Gillen*, 588 F. Supp. 2d 122, 124-25 (D. Mass. 2008), the Court held that the ICE FOD was not a proper party, explaining that "[b]ecause the petitioner's *immediate* custodian is the only proper respondent, a supervisory officer of any kind, … is not a proper party." *Id.* at 125 (emphasis in original). More recently, the Court rejected an argument, similarly made by Petitioner, that ICE Boston's FOD had "total control" over the petitioner and therefore was a proper respondent, finding such claim "unavailing" in *Tham,* 319 F. Supp. 3d at 576-577.

Other sessions of this Court similarly routinely hold that supervisory officials are not proper respondents to a habeas action. *See e.g., McPherson v. Holder*, No. 14-CV-30207-MGM, 2015 WL 12861171, at *2 (D. Mass. Mar. 4, 2015) (Explaining that "regardless of where petitioner was detained at the time of filing, under First Circuit jurisprudence, Attorney General Eric Holder does not have day-to-day control over the facility where the petitioner is held. Thus, petitioner has not named the proper respondent, and on this basis alone, the petition may be dismissed without prejudice to its refiling with the correct respondent."); *Pen v. Sessions*, No. CV 17-10626-NMG, 2017 WL 2312822, at *1–2 (D. Mass. May 25, 2017) (Holding that "the

11

JA-000055

proper respondent is the warden of the institution where Pen was confined when the petition was

filed. … The other persons identified as respondents are not proper parties to this action.").

As Petitioner is now detained in Louisiana, her failure to name her immediate custodian

subjects her Amended Petition to dismissal. *See Tham*, 319 F. Supp. 3d at 577 (Explaining that

for an ICE habeas petitioner detained in New Hampshire, the correct respondent is the

Superintendent of that facility); *Faulkner v. US. Immigr. & Naturalization,* No. CV 22-12122-

WGY, 2023 WL 3868437, at *2 (D. Mass. June 7, 2023) (Holding that "the proper respondent is

the warden of the institution where Faulkner was confined when the petition was filed. Because

Faulkner is [in Maryland], the proper respondent is the warden at this Maryland facility.");

*Kantengwa*, 2020 WL 93955 at *1 ("Because Kantengwa was at the Strafford County Detention

Center at the time she filed her petition (and remains there still), the proper respondent is Warden

Brackett. The other persons identified as respondents are not proper parties to this action.").

### 2. **Petitioner failed to file in the district of confinement.**

Because Petitioner was not detained in Massachusetts when she filed her original petition

or her Amended Petition, this Court lacks jurisdiction over this action. For a district court to

have jurisdiction over a habeas petition, the individual holding custody must be "within [the

court's] respective jurisdiction[]." *Padilla*, 542 U.S. at 442 (quoting 28 U.S.C. § 2241(a));

*Vasquez*, 233 F.3d at 690 (Explaining "that the court issuing the writ must have personal

jurisdiction over the person who holds the petitioner in custody."). As the Supreme Court has

made clear, that means the district of confinement. *Padilla*, 542 U.S. at 443.

Courts within this district routinely find that they do not have habeas jurisdiction when a

petition is filed by a detainee outside Massachusetts. *See Rombot*, 299 F. Supp. 3d at 218 ("A

district court may only grant a petitioner relief when the court is located in the 'district of

confinement.'") (quoting *Padilla*, 542 U.S. at 443); *Tham*, 319 F. Supp. 3d at 577 ("jurisdiction lies in only one district: the district of confinement."); *Kantengwa*, 2020 WL 93955, at *2 ("Because the District of Massachusetts is not the district of Kantengwa's confinement, jurisdiction is lacking."); *Aitcheson v. Holder*, No. CV 15-11123-NMG, 2015 WL 10434871, at *2 (D. Mass. Dec. 31, 2015) (Finding no jurisdiction over a habeas petition filed by a petitioner when in the District, but who was moved to Alabama shortly after such filing because "1) [Massachusetts] is no longer petitioner's district of confinement and 2) only a respondent at the Detention Center in Alabama could bring the petitioner before a habeas court.").

Because Petitioner was transferred from Massachusetts before she filed the original petition, this Court never acquired jurisdiction and therefore "out not to … act[] on the merits" of her Amended Petition. *Vasquez*, 233 F.3d at 697.

### 3. <u>No exceptional circumstances allow deviation from the district of confinement and immediate custodian rules.</u>

The First Circuit did acknowledge that there could be "extraordinary circumstances" in which an official with supervisory control could be named as the respondent for an ICE detainee's habeas petition. *Vasquez*, 233 F.3d at 697. The First Circuit, however, found no "hint of anything that might qualify as an extraordinary circumstance" in that Mr. Vasquez was required to file his petition in the district of his confinement (Louisiana), even if that jurisdiction was considered a less hospitable judicial district for the detainee to present his claims. *Id.*

Here too, there are no extraordinary circumstances that make appropriate the naming of supervisory officials as respondents to this action or that ground jurisdiction with this Court. Petitioner's transfer out of Massachusetts was not done to manipulate jurisdiction or to detain her in an undisclosed location, rather it was done out of operational necessity. Wesling Decl., ¶¶ 6-8. After ICE arrested Petitioner at approximately 5:25 PM on March 25, ICE transferred

13

Petitioner out of Massachusetts to the ICE Field Office in St. Albans, Vermont because ICE does not maintain detention facilities in Massachusetts for females. *Id.*, ¶¶ 6, 10-13. ICE routinely transfers individuals arrested in one state to facilities in other states because of operational considerations such as bedspace and designation of risk categories. *Id.*, 7.[5]

ICE's transfer of Petitioner to Vermont and then to Louisiana does not suggest "furtiveness" or "bad faith" as the First Circuit was concerned with in *Vasquez*. Other courts have confronted comparable circumstances in which a petition was filed outside the district of confinement during transit between locations and have rejected arguments seeking exception to the immediate custodian and district of confinement rules. For example, in *Ruvira-Garcia v. Guadian*, the court explained that there were "two big problems" with petitioner's request that the court order her return to Illinois: "Petitioner filed against the wrong people, in the wrong place." No. 1:20-CV-2179, 2020 WL 1983875, at *1 (N.D. Ill. Apr. 17, 2020). The petitioner in that case was not in Illinois when she filed her petition, "she apparently was en route between Texas and Oklahoma" and therefore the court found that this "isn't a case where the petitioner was here at the moment of filing, and then left. She hasn't been in [Illinois] at any point since this case started." *Id.*, at *3. Even if it was "unclear whether the authorities in Texas, or the authorities in Oklahoma, had custody over her at the moment of filing," "if the choice is between Texas and Oklahoma, Illinois is the wrong answer." *Id.* The court found it lacked jurisdiction

---

[5] *See Russian scientist working at Harvard detained by ICE at Boston airport*, https://www.theguardian.com/us-news/2025/mar/27/russian-scientist-harvard-medical-school-ice-detention (Explaining that a female applicant for admission had her visa revoked on February 16, 2025 by U.S. Customs and Border Protection and then was transferred by ICE to a facility in Vermont prior to transfer to a facility in Louisiana).

JA-000058

but explained that "the continued detention of [p]etitioner by the Executive Branch is not immune from challenge … [p]etitioner simply can't challenge her detention [in Illinois], as Congress made clear." *Id.*

In another case, while recognizing that transfers of an ICE detainee between states presented "unusual logistical circumstances," the court explained that "it is not this Court's duty to ascertain or identify an Arizona official who would be correctly named as a respondent in this case" and concluded that "there is no recognized exception to the immediate custodian rule for inconvenience or exigent circumstances." *Fuentes v. Choate*, No. 24-CV-01377-NYW, 2024 WL 2978285, at *9-10 (D. Colo. June 13, 2024). Similarly, in *Khalil v. Joyce*, --- F.Supp.3d ---, 2025 WL 849803, (S.D.N.Y. Mar. 19, 2025), a case that also involved an ICE arrest in New York, a transfer to a facility in New Jersey, and then an eventual transfer to Louisiana, the Southern District found it lacked jurisdiction because even though petitioner was arrested in New York, he was in New Jersey when he filed his petition. *Id.*, at *2.

These cases demonstrate that even with an arrest in one district followed by a transfer to another district, a habeas petitioner must file her petition in the district of confinement and must name her immediate custodian as respondent. Simply because a detainee is transferred to another district post-arrest does not suggest bad faith underlying the transfer. *See Khalil*, 2025 WL 849803, at *10 (The "swift nature of Khalil's transfer does not help his argument … [as] rapid transfers from one immigration detention facility to another also appear to be common"). The traditional immediate custodian and district of confinement rules apply in this case and as such, the Petition must be dismissed.

JA-000059

**B.** **Even if the Original Petition was Properly Filed, this Court Lacks Jurisdiction to Review the Challenged Executive Actions.**

Even if properly filed, this action must still be dismissed as the Court lacks jurisdiction over Petitioner's challenges to the revocation of her visa and her subsequent arrest, detention, and initiation of removal proceedings.

**1.** **District courts lack jurisdiction to review the Department of State's revocation of visas.**

Petitioner asserts that the revocation of her student visa was unlawful and therefore her arrest and detention are illegal. Doc. No. 12, ¶¶ 4-5. Her challenge to the revocation of her visa cannot be heard by this Court, however, as 8 U.S.C. § 1201(i) specifically states that there "shall be no means of judicial review" including habeas review, "except in the context of removal proceedings if such revocation provides the sole ground for removal". Here, ICE issued Petitioner with a NTA initiating removal proceedings on account of her revoked visa and she can seek judicial review before an Immigration Court, the BIA, and eventually to a court of appeals if she is ordered removed.

As explained by another district court when dismissing a petition which challenged a visa revocation on account of a political dispute: "Congress has taken it out of my hands. … I cannot address this argument because I lack subject matter jurisdiction over the case. The legality of petitioner's detention depends on the resolution of such issues as whether the government lawfully revoked his visa and whether he is removable from the United States and, as indicated above, I am precluded from reviewing those issues." *Bolante v. Achim*, 457 F. Supp. 2d 898, 902 (E.D. Wis. 2006). The court also found the Suspension Clause not implicated because "the government has initiated removal proceedings" and a circuit court could review a challenge to the visa revocation upon a petition for review. *Id.* at 902-03, n.6; 8

16

U.S.C. § 1252(a)(2)(D) (Explaining that judicial review remains available for "constitutional claims or questions of law raised upon a petition for review).

Other courts also routinely find themselves without jurisdiction to consider the merits of a visa revocation upon operation of Section 1201(i)'s language.  *See e.g.*, *Aldabbagh v. Sec'y of State*, No. 6:21-CV-532-GAP-EJK, 2021 WL 6298664, at *2 (M.D. Fla. Oct. 5, 2021) (Finding no jurisdiction over complaint that asked court to declare revocation of visa to be arbitrary and capricious, an abuse of discretion, and not in accordance of law.); *Tarlinsky v. Pompeo*, No. 3:19-CV-659 (VLB), 2019 WL 2231908, at *5 (D. Conn. May 23, 2019) ("As the basis for [the visa] revocation is expressly non-reviewable by statute, the [c]ourt lacks subject matter jurisdiction over" the complaint.).   To the extent Petitioner seeks review of the State Department's revocation of her visa, this Court lacks jurisdiction to consider her claims.

### 2. District courts lack jurisdiction over ICE's decisions to commence removal proceedings and to detain aliens for such proceedings.

Petitioner's claim that ICE's decision to initiate removal proceedings and arrest and detain her violated her constitutional rights is not subject to this Court's review under the INA.

### a. *8 U.S.C. § 1252(g) bars judicial review of ICE's decision to commence removal proceedings against Petitioner.*

Congress, through the REAL ID Act, made clear that district courts do not have jurisdiction to consider challenges to ICE's discretionary decisions concerning the commencement of removal proceedings.  Specifically, 8 U.S.C. § 1252(g) strips courts of jurisdiction to hear "any cause or claim by or on behalf of an alien arising from the decision or action by [ICE] to *commence proceedings* … against any alien under this chapter."  (emphasis added).  Section 1252(g) is "directed against a particular evil: attempts to impose judicial constraints upon [certain categories of] prosecutorial discretion."  *Reno v. Am.-Arab Anti-*

17

*Discrimination Comm.*, 525 U.S. 471, 485 n.9 (1999). Section 1252(g) plainly applies to decisions and actions to *commence* proceedings that ultimately may end in the execution of a final removal order. *See Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002) ("We construe § 1252(g) . . . to include not only a decision in an individual case *whether* to commence, but also *when* to commence, a proceeding."); *Obado v. Superior Ct. of New Jersey Middlesex Cnty.,* No. CV 21-10420 (FLW), 2022 WL 283133, at *3 (D.N.J. Jan. 31, 2022) ("Because [p]etitioner challenges the decision to commence and adjudicate removal proceedings against him, the [c]ourt lacks jurisdiction to direct [respondents] to terminate [p]etitioner's NTA and/or halt his removal proceedings.").

In addition to barring challenges to *whether* and *when* to commence proceedings, § 1252(g) bars district courts from hearing challenges to the *method* by which ICE chooses to commence removal proceedings. *See Alvarez v. U.S. Immigr. & Customs Enf't*, 818 F.3d 1194, 1203 (11th Cir. 2016) ("By its plain terms, [§ 1252(g)] bars us from questioning ICE's discretionary decisions to commence removal" and also to review "ICE's decision to take him into custody and to detain him during removal proceedings"); *Saadulloev v. Garland*, No. 3:23-CV-00106, 2024 WL 1076106, at *3 (W.D. Pa. Mar. 12, 2024) ("The Government's decision to arrest [petitioner], clearly is a decision to 'commence proceedings' that squarely falls within the jurisdictional bar of § 1252(g).").

As Section 1252(g) prohibits judicial review of "any cause or claim" that arises from the commencement of removal proceedings, this provision applies to constitutional as well as statutory claims. *Candra v. Cronen*, 361 F. Supp. 3d 148, 156 (D. Mass. 2019) (Explaining that a petitioner's "attempt to frame his claim in due process language does not change [the] result" that Section 1252(g) strips jurisdiction.); *Anderson, v. Moniz*, No. CV 21-11584-FDS, 2022 WL

18

375231, at *4 (D. Mass. Feb. 7, 2022) ("Section 1252(g) can serve as a jurisdictional bar even when a petitioner contends that his due-process rights were violated.").

That Petitioner is alleging her removal proceedings were initiated in retaliation for her exercise of the First Amendment does not remove her claim from Section 1252(g)'s reach. *See Reno*, 525 U.S. at 487-92 (holding that Section 1252(g) deprived district court of jurisdiction over claim that certain aliens were targeted for deportation in violation of the First Amendment.); *Zundel v. Gonzales*, 230 F. App'x 468, 475 (6th Cir. 2007) (Explaining that First Amendment challenge related to immigration enforcement action "is properly characterized as a challenge to a discretionary decision to 'commence proceedings' … [and] is insulated from judicial review".); *Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 945 (5th Cir. 1999) (determining that § 1252(g) prohibited review of an alien's First Amendment claim based on decision to put him into exclusion proceedings); *Vargas v. United States Dep't of Homeland Sec.*, No. 1:17-CV-00356, 2017 WL 962420, at *3 (W.D. La. Mar. 10, 2017) (Claim that ICE "violated her First Amendment right to free speech by arresting her and initiating her removal after she made statements to the media … is barred by 8 U.S.C. § 1252(g)."); *Kumar v. Holder*, No. 12-CV-5261 SJF, 2013 WL 6092707, at *6 (E.D.N.Y. Nov. 18, 2013) (Claim of initiation of proceedings in retaliatory manner "falls squarely within Section 1252(g) … [and] that [t]he pending immigration proceedings are the appropriate forum for addressing petitioner's retaliation claim in the first instance.").  As such, judicial review of Petitioner's claim that commencement of removal proceedings is unconstitutional is barred by Section 1252(g).

       b.  *8 U.S.C. § 1226(e) bars judicial review of ICE's decision to arrest and detain Petitioner.*

ICE's arrest and detention of Petitioner is authorized by 8 U.S.C. § 1226(a) which allows detention "pending a decision on whether [she] is to be removed from the United States."

19

8 U.S.C. § 1226(a). This provision "creates authority for *anyone's* arrest or release under §

1226—and it gives the Secretary broad discretion as to both actions…." *Nielsen v. Preap*, 586

U.S. 392, 409 (2019) (emphasis in the original). Petitioner's assertion that her detention is

unlawful is not properly before this Court as Congress has made clear that ICE's "discretionary

judgment regarding the application of [Section 1226] shall not be subject to review." 8 U.S.C.

§ 1226(e). Section 1226(e) further commands that "[n]o court may set aside any action or

decision by [ICE] under this section regarding the detention of any alien or the revocation or

denial of bond or parole." *Id.* As the Supreme Court explained in *Demore v. Kim*, 538 U.S.

510, 516-17 (2003), this provision blocks judicial review of ICE's discretionary judgments and

decisions to arrest and detain aliens subject to 8 U.S.C. § 1226. *See also Jennings v. Rodriguez*,

583 U.S. 281, 295-96 (2018) (Section "1226(e) precludes an alien from challenging a

discretionary judgment by the [Secretary] or a decision that the [Secretary] has made regarding

his detention or release.") (cleaned up).

Petitioner asserts her detention "is unjustified" because the Government has not

demonstrated that she "needs to be detained." Doc. No. 12, ¶ 73. This Court, however, is not the

forum for such a claim. Instead, Petitioner must request release from an immigration judge, and

if dissatisfied with the outcome, to the BIA.[6] She further asserts that her detention is punitive and

that there is no legitimate purpose for detaining her. *Id.*, ¶ 74. This argument fails, however, as

she is detained for purpose of removal proceedings and the Supreme Court has upheld the

constitutionality of detention such purpose, even when such detention is mandatory and does not

---

[6] After ICE makes the initial decision to detain an alien, the alien may request a bond
hearing in Immigration Court and can appeal to the BIA if necessary. 8 C.F.R. § 236.1(d)(1)-
(3).

JA-000064

allow access to a bond hearing, as Petitioner is entitled to in this case. *Demore,* 538 U.S. at 523 (The "Court has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process.");[7] *Wong Wing v. U.S.* 163 U.S. 288, 235 (1896) (holding deportation proceedings "would be vain if those accused could not be held in custody pending the inquiry into their true character."); *Hernandez-Lara v. Lyons*, 10 F.4th 19, 32 (1st Cir. 2021) (Recognizing that the "prompt execution of removal orders is a legitimate governmental interest which detention may facilitate.") (cleaned up).   If mandatory detention without access to a bond hearing passes constitutional muster, then Petitioner's detention, where she can seek a bond hearing, certainly does not implicate due process concerns.   To the extent that Petitioner is basing her claim on *Demore*, 538 U.S. at 532–33 (Kennedy, J., concurring) or *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), those claims are related to prolonged detention and are not available until immigration detention exceeds a minimum of six months. *See Demore*, 538 U.S. at 510 (affirming constitutionality of detention exceeding six months); *Zadvydas*, 533 U.S. at 693 (adopting six months as a presumptively reasonable period of detention following a final order of removal).   As such, this Court lacks jurisdiction over ICE's decision to arrest and detain Petitioner.

### 3.   Petitioner's challenge to removal from the United States must proceed administratively before being raised to the circuit court.

Petitioner has an opportunity to contest the initiation of her removal proceedings and to challenge her removal from the United States in Immigration Court, before the BIA, and eventually, if necessary, before a court of appeal.   District courts, however, play no role in such process as made clear by Congress and the First Circuit.   In passing the REAL ID Act, Congress

---

[7] The Supreme Court has recognized that it "has firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens."  *Id.* at 522 (citations omitted).

21

prescribed a single path for judicial review of orders of removal entered through the administrative process: "a petition for review filed with an appropriate court of appeals." 8 U.S.C. § 1252(a)(5); *Gicharu v. Carr*, 983 F.3d 13, 16 (1st Cir. 2020). A circuit court can consider "constitutional claims or questions of law" in the petition for review. 8 U.S.C. § 1252(a)(2)(D).

Congress, however, channeled to the courts of appeals, not just challenges to the removal decision, but also to challenges to the removal process. *Aguilar et al., v. USICE, et al.*, 510 F.3d 1, 9 (1st Cir. 2007) (Section 1252(b)(9) "was designed to consolidate and channel review of *all* legal and factual questions that arise from the removal of an alien into the administrative process, with judicial review of those decisions vested exclusively with the courts of appeals.") (emphasis in the original). Per Section 1252(b)(9), "judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, *arising from any action taken or proceeding brought to remove an alien from the United States* .... shall be available only in judicial review of a final order under this section." 8 U.S.C. § 1252(b)(9) (emphasis added); *Gicharu*, 983 F.3d at 16 ("Adding belt to suspenders, section 1252(b)(9) strips federal courts of jurisdiction to decide legal and factual questions arising from an alien's removal in any other context, *including on a petition for a writ of habeas corpus*.") (emphasis added). The First Circuit has described the expanse of § 1252(b)(9) as "breathtaking" and "vise-like". *Aguilar*, 510 F.3d at 9. In passing this provision, "Congress plainly intended to put an end to the scattershot and piecemeal nature of the review process that previously had held sway in regard to removal proceedings." *Id.*

Pursuant to these provisions, Petitioner must present removability issues related to the revocation of her visa administratively before any Article III review. As explained earlier, 8

JA-000066

U.S.C. § 1201(i) allows for judicial review of her visa's revocation in the context of removal proceedings if the revocation is the sole basis for removal (which it is here) and therefore Section 1252(a)(5) and (b)(9) channel any claims related to the revocation of her visa to an immigration judge, the BIA, and eventually to the circuit court.  In a recent case filed seeking a Temporary Restraining Order filed by a student whose visa had been revoked, the plaintiff, Mr. Taal, alleged that the visa revocation and ICE's initiation of removal proceedings violated his First Amendment rights.  *Taal v. Trump,* No. 3:25-CV-335 (ECC/ML), 2025 WL 926207, at *2 (N.D.N.Y. Mar. 27, 2025).  The district court, however, found that the plaintiff had not established it had jurisdiction over such claims due to Section 1252(a)(5) and 1252(b)(9).  *Id.* The court explained that Mr. Taal's "challenge to the basis for commencing his removal proceedings," "is part of the process by which … removability will be determined, and Taal's claims therefore arise from the removal proceedings."  *Id.* (cleaned up).

Because Petitioner can challenge the revocation of her visa administratively and eventually to a circuit court, this Court lacks jurisdiction over such claims.  *See Vega-Del Roquel v. Barr,* 568 F. Supp. 3d 73, 76 (D. Mass. 2021) (Explaining that "[o]nly claims that are not related in any way to the removal process are beyond the scope of [Section 1252(b)(9)] and therefore within the jurisdiction of federal courts.").

### C.  Petitioner's APA Claim Fails.

Petitioner fails to demonstrate any merit to her claims brought under the APA and *Accardi v. Shaughnessy*, 347 U.S. 260 (1954).   The APA provides a right to judicial review of "final agency action for which there is no other adequate remedy." *Bennett v. Spear*, 520 U.S. 154, 175 (1997).   However, the APA does not "afford an implied grant of subject-matter jurisdiction

permitting federal judicial review of agency action" in all circumstances. *Califano v. Sanders*, 430 U.S. 99, 107 (1977).

The APA does not apply where another statute "preclude[s] judicial review." 5 U.S.C. § 701(a)(1). Additionally, Section 701(a)(2) of the APA precludes judicial review where agency action is committed to agency discretion by law. As such, judicial review of the State Department's revocation of Petitioner's visa is precluded under the APA since 8 U.S.C. § 1201(i) vests such revocation in the Secretary of State and prohibits judicial review aside from in removal proceedings. *See Mansur v. Albright,* 130 F. Supp. 2d 59, 61 (D.D.C. 2001) ("Without such statutory or regulatory limitation, there is no law to apply to the Secretary's discretionary revocation, and this court lacks jurisdiction to review the revocation …"). Similarly, ICE's decisions to commence removal proceedings and arrest and detain Petitioner were all discretionary decisions not subject to APA review by this Court on account of 8 U.S.C. §§ 1252(g) and 1226(a), (e). *See Gicharu*, 983 F.3d at 20 ("Having concluded that Gicharu's APA claim and habeas claim both arise form his removal proceedings, we hold that the district court lacked subject matter jurisdiction over those claims under section 1252(b)(9).").

Additionally, the APA does not authorize judicial review until "an aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule." *Darby v. Cisneros,* 509 U.S. 137, 146 (1993). Even if Petitioner could identify a final agency action, that agency action would be directly tied to the State Department's decision to revoke her visa and ICE's decision to initiate removal proceedings against her, which must be brought in removal proceedings. Because Petitioner has an alternative forum for her claim, it is not cognizable under the APA before this Court. *See Bennett*, 520 U.S. at 175–77; *Pataud v. United States Citizenship & Immigr. Servs., Bos. Field Off.*, 501 F. Supp. 3d 22, 27 (D. Mass. 2020) (with removal

JA-000068

proceedings initiated, review of immigration application not available under the APA); *A.Z. v. Nielson*, No. CV 18-10511-PBS, 2018 WL 5269990, at *5 (D. Mass. Oct. 23, 2018) (agency decision denying immigration application is not a "reviewable final agency action as long as the alien was referred to immigration court for removal proceedings."); *Gao v. Napolitano*, 2009 WL 961243, at *2 (D. Mass. 2009) (same).

Petitioner also complains that the notice ICE issued regarding her terminated Student and Exchange Visitor Information System ("SEVIS") record improperly invoked a ground of removability from the United States Petitioner refers to as the "Foreign Policy Ground" which is contained at INA Section 237(a)(4)(C)(i) and that the Secretary of State failed to make the necessary determination that supports such ground of removability.  Doc. No. 12, ¶¶ 79-83.  This claim is without merit, however.  ICE did not allege on the NTA that she is subject to removal under INA Section 237(a)(4)(C)(i) and the charges referenced on the SEVIS notice are not the basis for her detention or removal.  *See* Doc. No. 12-2, NTA.  For these reasons, Petitioner's APA claims fail.

### D.  <u>Petitioner's Request for Bail should be Denied.</u>

This Court does not have jurisdiction to issue habeas relief in this matter, and therefore lacks the authority to grant bail or release.  Petitioner is correct that the First Circuit has explained "that a district court entertaining a petition for habeas corpus has inherent power to release the petitioner pending determination of the merits." *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972) (per curiam); *see also Savino v. Souza*, 453 F. Supp. 3d 441, 453 (D. Mass. 2020) (In face of COVID-19 pandemic, finding bail appropriate if a habeas petitioner can demonstrate that the petition raises substantial claims and that extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective).

JA-000069

To whatever extent this Court has the authority to grant bail pending habeas, that authority is only in aide of this Court's ultimate power to grant habeas relief. So where, as here, this Court lacks the authority to grant habeas relief in the first place (as explained above), it concomitantly loses its authority to grant bail. For the reasons argued previously, Petitioner fails to raise substantial constitutional claims upon which she has a high probability of success. Further, Petitioner fails to allege that extraordinary circumstances exist making the grant of bail necessary to render the habeas remedy effective. On this issue, the First Circuit in *Woodcock* cited "a health emergency" as exceptional circumstances. 470 F.2d at 94. The Court in *Savino* found existence of exceptional circumstances with the COVID-19 "nightmarish pandemic." 453 F. Supp. 3d at 453. Petitioner's asthmatic condition and her desire to speak freely and openly does not represent exceptional circumstances as her concerns are likely common to all detainees experiencing limits on freedom and she does not demonstrate that her circumstances make the grant of bail necessary at this time. Petitioner can also seek a bond hearing with the Immigration Judge at her first hearing in Immigration Court next week on April 7, 2025.[8] Accordingly, the Court must decline Petitioner's request for interim release during the pendency of this action.

### E. If this Court determines transfer to be in the interest of justice, this Amended Petition should be transferred to Petitioner's District of Confinement.

As explained above, this Court should dismiss the Petition rather than transfer it because any receiving court, like this Court, would lack jurisdiction to consider Petitioner's claim of

---

[8] Petitioner cites the Second Circuit's decision in *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001) in support of her request for release on bail, but this decision does not aide Petitioner's argument. In that case, the court explained the power to admit on bail "is a limited one, to be exercised in special cases only." *Mapp*, 241 F.3d at 226. Further, the court qualified this holding as subject to limits imposed by Congress. *Id.* at 223. As explained earlier, 8 U.S.C. § 1226(e) is an "express statutory constraint[]" that limits the Court's authority in this context. *Mapp*, 241 F.3d at 231

26

unlawful arrest and detention and to provide her requested relief. As such, "the interest of justice" does not compel transfer. 28 U.S.C. § 1404(a). But, if this Court determines otherwise, the Amended Petition must be transferred to Petitioner's district of confinement, the Western District of Louisiana. *See also* 28 U.S.C. § 1406(a) (recognizing that transfer can occur to "any district … in which it could have been brought.").

The Supreme Court has recognized a "limited" exception to the district-of-confinement rule, namely, only "when the Government moves a habeas petitioner after she *properly files* a petition naming her immediate custodian." *Padilla*, 542 U.S. at 441 (emphasis added) (discussing *Ex Parte Endo*, 323 U.S. 283 (1944)); *see Vasquez*, 233 F.3d at 697 (Distinguishing *Endo* from circumstances in *Vasquez* where the "petitioner filed for habeas relief in a jurisdiction where neither he nor his immediate custodian was physically present."); *Yancey v. Warden, FMC Devens*, 682 F. Supp. 3d 97, 100 (D. Mass. 2023) (collecting cases for proposition that after a petitioner properly filed a petition, such "prisoner's transfer after a district court's jurisdiction attaches does not defeat jurisdiction … as long as there remains in the district a respondent who can effectuate any court order."). Under those circumstances, the court where jurisdiction originally vested may retain the case. That limited exception does not apply in this District as Petitioner never properly filed a habeas petition in this Court.

This exception would also not apply concerning venue in the District of Vermont because Petitioner did not properly file her habeas petition with that Court during her brief detention in Vermont. Where a court never *had* habeas jurisdiction in the first place because the petitioner was not in the district when the action was filed, or because the petition was not filed with the court in the district of confinement, there is nothing to retain. It is true that at the time Petitioner's original petition was filed, it could have been properly filed in Vermont as that is

27

where she was then in custody.  But this fact is not dispositive.  While this case "could have been brought" in Vermont at the time of filing, that does not mean it can be heard in the District of Vermont here and now.  And it cannot, under *Padilla*—or the specific statutory text it interpreted.  Section 2241(a) states that writs of habeas corpus "may be granted by … the district courts … within their respective jurisdictions."  Section 1406(a) can permit transfer but only if the transferee court would also have subject matter jurisdiction over the matter.  Nothing in § 1406(a)'s general authorization for transfer displaces those specific conditions for habeas relief or purports to vest the District of Vermont with jurisdiction that would not otherwise exist.  The District Court in Vermont never had jurisdiction over this matter, and it cannot exercise jurisdiction over it now, even if this Court transferred the case to it.  *See Padilla*, 542 U.S. at 441-42.  Even if that transfer statute technically permitted transfer to Vermont as a matter of civil procedure, that does not somehow vest the District of Vermont with the statutory authority to issue a specific remedy—and do so notwithstanding the specific preconditions for such relief.  Put otherwise, for the District of Vermont to award habeas relief under 2241(a), it must have "jurisdiction" to do so—as construed by *Padilla*.  Nothing in the transfer statutes alters that limitation.

The "default rule" articulated in *Padilla* controls here: "jurisdiction lies in only one district: the district of confinement".  542 U.S. at 433.  This means Petitioner's Amended Petition should have been filed in her district of confinement, the Western District of Louisiana, and any transfer of this Petitioner must be to such district.

## CONCLUSION

For these reasons, this Court lacks jurisdiction over the Petitioner and must therefore deny the request to issue a writ of habeas corpus.  Respondents further assert that transfer of this

28

Petition, rather than dismissal, would not be "in the interest of justice" because district courts lack jurisdiction to review the issues presented in the Petition and to order relief as requested. But, if the Court determines transfer appropriate, such transfer must be to the Western District of Louisiana, the district of Petitioner's confinement.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Dated: April 1, 2025      By:      */s/ Mark Sauter*
Mark Sauter
Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Tel.: 617-748-3347
Email: mark.sauter@usdoj.gov

## CERTIFICATE OF SERVICE

I, Mark Sauter, Assistant United States Attorney, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: April 1, 2025      By:      */s/ Mark Sauter*
Mark Sauter
Assistant United States Attorney

JA-000073

DECLARATION OF ACTING DEPUTY FIELD OFFICE DIRECTOR

<u>DAVID T. WESLING</u>

Pursuant to the authority of 28 U.S.C. § 1746, I, David T. Wesling, a Supervisory Detention and Deportation Officer for U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, Burlington, Massachusetts declare as follows:

1. I am an acting Deputy Field Office Director ("(a)DFOD") for the U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO").

2. Included in my official duties as (a)DFOD in Burlington, Massachusetts is the responsibility for assisting in the managing and monitoring of scheduling and execution of removal orders for aliens in ICE custody. I am familiar with ICE policies and procedures for detaining individuals to initiate removal proceedings or to effectuate removal orders as well as releasing individuals from ICE custody.

3. I have experience utilizing ICE record systems to obtain information regarding specific aliens. ICE maintains electronic and paper records on aliens in the course of its regularly conducted business activity. These records are made in the course of regularly conducted business activity at or near the time of relevant events by a person with knowledge of these events.

4. In the course of preparing this declaration, I have examined the official records available to me regarding the immigration history and custody status of Ms. Rumeysa Ozturk ("Petitioner"). I have also discussed this case internally with officials within my office.

5.  Pursuant to its statutory authority contained at 8 U.S.C. § 1226(a), ICE arrested Petitioner on March 25, 2025, at 1725 in Somerville, Massachusetts.

6.  Prior to the arrest, ICE determined that because there was no available bedspace for Petitioner at a facility where she could appear for a hearing with the U.S. Department of Justice's Executive Office for Immigration Review in New England, that she would be transferred to the South Louisiana Correctional Facility at 3843 East Stagg Avenue in Basile, Louisiana where bedspace was determined to be available.

7.  Transfers out of state, and out of the ERO Boston area of responsibility, are routinely conducted after arrest, due to operational necessity and considerations.

8.  Once ICE secured her final bedspace location, ICE made the appropriate flight and custody arrangements to transport Petitioner to Louisiana.

9.  Upon her arrest by ICE officers on March 25, 2025, Petitioner indicated she was in moderately good health with asthma, chronic back pain, and dry eye. This information was also relayed to the ERO New Orleans Field Office in Louisiana.

10. On March 25, 2025, at 1749, ICE officials departed Somerville, Massachusetts, and transported Petitioner to Methuen, Massachusetts arriving at 1822.

11. On March 25, 2025, at 1836, ICE officials departed from Methuen, Massachusetts and transported Petitioner to Lebanon, New Hampshire.

12. On March 25, 2025, at 2103, ICE officials departed Lebanon, New Hampshire to transport Petitioner to the ICE Field Office in St. Albans, Vermont.

13. On March 25, 2025, at 2228, Petitioner, arrived at the ICE Field Office in St. Albans, Vermont for processing of Petitioner's Notice to Appear (NTA), and was in custody overnight at the ICE Field Office in Saint Albans, Vermont.

14. On March 25, 2025, ICE served Petitioner with an NTA, charging her with removability under section 237(a)(1)(B) of the Immigration and Nationality Act (INA). ICE filed that NTA at the Oakdale Immigration Court in Oakdale, Louisiana.

15. The NTA orders her to appear before an immigration judge on April 7, 2025, at 8:30am at the Oakdale Immigration Court, the immigration facility with jurisdiction over her place of detention.

16. On March 26, 2025, at 0400, ICE officials departed the ICE Field Office in St. Albans, Vermont and transported Petitioner to the airport in Burlington, Vermont.

17. On March 26, 2025, at 0531, Petitioner departed the airport in Burlington, Vermont with ICE officials.

18. On March 26, 2025, at 1435, Petitioner arrived at the airport in Alexandria, Louisianna with ICE officials, who transferred her to the custody of ERO New Orleans.

19. As of the date of this declaration, Petitioner is currently detained at in ICE custody in the South Louisiana Correctional Facility, located at 3943 East Stagg Avenue in Basile, Louisiana.

20. At the time of Petitioner's arrest, there was no known counsel of record. Once ICE official obtained Petitioner's counsel's contact information through the filing of the instant habeas petition, it was provided to ERO New Orleans to facilitate Petitioner's communication with her counsel, once she arrived at her final detention location.

21. Upon her arrival to the South Louisiana Correctional Facility, Petitioner was permitted to speak with her counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the twenty-seventh day of March 2025

_____

David T. Wesling
Acting Deputy Field Office Director
U.S. Department of Homeland Security
United States Immigration and Customs Enforcement
Burlington, Massachusetts

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **RUMEYSA OZTURK,** ) | |
| ) | |
| **Petitioner** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **DONALD J. TRUMP, in his official capacity** ) | |
| **as President of the United States; PATRICIA** ) | |
| **HYDE, in her official capacity as the New** ) | |
| **England Field Office Director for U.S.** ) | **Case No. 25-cv-10695-DJC** |
| **Immigration and Customs Enforcement;** ) | |
| **MICHAEL KROL, in his official capacity as** ) | |
| **HSI New England Special Agent in Charge,** ) | |
| **U.S. Immigration and Customs Enforcement;** ) | |
| **TODD LYONS, in his official capacity as** ) | |
| **Acting Director, U.S. Immigration and** ) | |
| **Customs Enforcement; KRISTI NOEM, in her** ) | |
| **official capacity as Secretary of the United** ) | |
| **States Department of Homeland Security; and** ) | |
| **MARCO RUBIO, in his official capacity as** ) | |
| **Secretary of State,** ) | |
| ) | |
| **Respondents.** ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                   **April 4, 2025**

### I.    Introduction

Petitioner Rumeysa Ozturk ("Ozturk") has filed this habeas petition under 28 U.S.C.

§ 2241 (the "Petition") against the Respondents, United States government officials (collectively,

the "government"). Although the government disputes Ozturk's claims for relief, the following is

undisputed: on March 25, 2025, at approximately 5:25 p.m. without prior notice of the revocation

of her student visa or the grounds asserted for same, Ozturk, a graduate student in Child Study and

1

Human Development at Tufts University, was approached and surrounded by six officers (several wearing masks and/or hoods), stripped of her cellphone and backpack, handcuffed, and taken into custody in an unmarked vehicle. Despite the best efforts of her counsel and, even the Turkish consulate to determine her whereabouts, the government did not disclose her place of confinement until approximately 3:27 p.m. the following day, March 26, 2025. Given the period following her arrest and detention in which the government did not disclose her whereabouts, counsel for Ozturk filed the Petition in this Court, the location of her arrest and detention and the only location of her last known whereabouts, on March 25, 2025 at approximately 10:02 p.m. The government asserts that this Court lacks jurisdiction over the Petition as Ozturk, unknown to anyone but the government, was in Vermont, not Massachusetts at the time the Petition was filed and, as of 2:35 p.m. on March 26, 2025, was in Louisiana, where she remains.

Ozturk alleges that she was targeted, arrested and transferred in retaliation for exercise of her First Amendment rights (Count I), D. 12 ¶ 69, detained in violation of her Fifth Amendment right to Due Process (Count II), id. ¶ 75, and detained and subject to removal in violation of the Administrative Procedure Act ("APA") (Count III), id. ¶ 78. Ozturk requests release from custody pending adjudication (Count IV). Id. ¶¶ 84-86. Although the Petition raises serious issues as to the conduct of her arrest and detention as alleged in each of these Counts, before reaching the merits of the Petition, the Court must first address the parties' dispute about its jurisdiction. For the reasons articulated below, the Court denies the government's motion to dismiss this Petition or its request to transfer this matter to the Western District of Louisiana and, relying upon the "interest of justice" under 28 U.S.C. § 1631, transfers this matter to the District of Vermont, where Ozturk was confined overnight at the time that the Petition was filed.

II.     **Factual and Procedural Background**

A.      **Ozturk's Arrest and Detention**

Ozturk, a Turkish national and doctoral candidate, entered the United States pursuant to a validly issued F-1 student visa, D. 12 ¶ 8; D. 19 at 4, on June 28, 2024, D. 12-2 at 2; see 8 C.F.R. § 214.2(f)(5) (providing that F-1 visas are issued for the duration of a full course of study).  On March 25, 2025, Ozturk's visa was revoked, subjecting her to removal from the United States pursuant to 8 U.S.C. § 1227(a)(1)(B) as an alien "whose nonimmigrant visa . . . has been revoked under section 1201(i)."  D. 19 at 3; D. 12-1 at 2; D. 12-2 at 2.

Ozturk was given no notice of the revocation of her student visa.  D. 12 ¶ 4.  On March 25, 2025, at approximately 5:25 p.m., she was arrested and taken into custody by agents of Immigration and Customs Enforcement ("ICE") near her residence in Somerville, Massachusetts. D. 19-1 ¶ 5; D. 12 ¶¶ 19-20.  A video of Ozturk's arrest shows a hooded officer in plainclothes approach Ozturk and grab her by the wrists.  D. 12 ¶ 19 n.4; (video).  Five additional officers surrounded her, took her cell phone, placed her in handcuffs and took her away in an unmarked vehicle.  Id. ¶¶ 1, 20.

At some unspecified time, but prior to her arrest, ICE determined that officers would take Ozturk to Louisiana and it made flight and custody arrangements for transport.  D. 19-1 ¶¶ 6-8. According to ICE, Ozturk was to be transferred to Louisiana because "there was no available bedspace for Petitioner at a facility where she could appear for a hearing" in New England, and such out-of-state transfers are "routinely conducted after arrest, due to operational necessity considerations."  Id. ¶¶ 6-7.  The ICE Boston Field Office, located in Burlington, Massachusetts has administrative and operational authority over ICE arrest, removal and detention operations throughout New England, including Massachusetts, Connecticut, Maine, New Hampshire, Rhode

Island and Vermont.  D. 26-3 ¶ 6.  ICE has detention facilities for female detainees in multiple locations in New England.  Id. ¶ 9.  According to affidavits from several experienced New England immigration attorneys, it is the usual practice to have detainees, arrested on civil immigration charges, booked and processed at the ICE Boston Field Office in Burlington, Massachusetts before they are sent to a detention facility.  Id. ¶¶ 10, 12; D. 26-4 ¶¶ 4-5; D. 26-6 ¶¶ 5-6.

After Ozturk's arrest, ICE took her from Somerville, Massachusetts at 5:49 p.m., to Methuen, Massachusetts, arriving there at 6:22 p.m.  D. 19-1 ¶ 10.  Shortly thereafter, at 6:36 p.m., the officers took Ozturk from Methuen, Massachusetts and transported her to Lebanon, New Hampshire.  Id. ¶ 11.  At 9:03 p.m., ICE officials departed from Lebanon, New Hampshire, which is approximately five miles from the Vermont border, D. 19 at 5 n. 2, to transport Ozturk to the ICE Field Office in St. Albans, Vermont, where she arrived at 10:28 p.m. for processing of her Notice to Appear ("NTA") and was held there in custody overnight, D. 19-1 ¶¶ 12-13.  The next morning, March 26, 2025, at 4:00 a.m., ICE officers took Ozturk to the airport in Burlington, Vermont.  D.19-1 ¶ 16.  The flight transporting Ozturk left Burlington, Vermont at 5:31 a.m., and arrived in Alexandria, Louisiana at 2:35 p.m.  Id. ¶¶ 17-18.  From there, officers transferred her to the custody of Enforcement and Removal Operation ("ERO") New Orleans.  Id. ¶ 18.  Ozturk is currently detained in ICE custody in the South Louisiana Correctional Facility in Basile, Louisiana.  Id. ¶ 19.

All of this was unknown to Ozturk's attorney, who did not know her client's whereabouts upon learning of her arrest.  D. 26-2 ¶¶ 6-7.  Close to five hours after that arrest, still having been unable to confirm her whereabouts and knowing that she had been arrested and detained in Massachusetts, Ozturk's attorney filed the Petition in this Court on her client's behalf at approximately 10:02 p.m.  D. 12 ¶ 21; D. 26-2 ¶ 2.  Shortly thereafter, at approximately 10:12

4

p.m., Ozturk's counsel sent of a copy of the Petition to the government's counsel. D. 26-2 ¶ 3. Less than an hour later, at approximately 10:55 p.m., this Court (Talwani, J.) issued an order enjoining the government from moving Ozturk outside of Massachusetts without providing 48 hours' notice to the Court. D. 3 ¶ 4; D. 12 ¶ 22. Per the Court's Order, such notice was to be filed in writing on the docket in the proceeding and was to "state the reason why the government believes that such a movement is necessary and should not be stayed pending further court proceedings." D. 3 ¶ 4. A copy of this Order was delivered to the U.S. Attorney's Office, the government's counsel, minutes later, at approximately 10:57 a.m., via e-mail. 3/25/25 docket entry; D. 26-2 ¶ 5.

Even after the Petition was filed on the evening of March 25, 2025, Ozturk's counsel was unable to determine her whereabouts even in her contact with the government throughout that evening and much of the next day. D. 26-2 ¶¶ 6-13. She contacted the ICE ERO in Burlington, Massachusetts and ICE Homeland Security Investigations in Boston, Massachusetts several times to request information, but received no response. Id. ¶ 6. Ozturk's attorney also was unable to locate her via ICE's Online Detainee Locator System, where the field for "Current Detention Facility" for Ozturk remained blank. Id. ¶ 7. She had several conversations with counsel for the government who could not confirm Ozturk's whereabouts. D. 26-2 ¶¶ 9-12; D. 12 ¶ 27. Counsel was concerned about her client as Ozturk suffers from asthma (a condition apparently disclosed to officers by Ozturk upon her arrest, D. 19-1 ¶ 9) and she did not have her medication when she was detained. D. 26-2 ¶ 9; D. 12 ¶ 24. A representative of the Turkish consulate even went to the ICE Boston Field Office in Burlington, Massachusetts, and was reportedly informed Ozturk was not in that office and ICE could not provide further information about her whereabouts. D. 26-2 ¶ 8; D. 12 ¶ 27.

5

In light of these difficulties, on the afternoon of March 26, 2025, Ozturk's attorney filed an emergency motion to compel the government to disclose Ozturk's location and permit counsel to speak with her that evening. D. 7; D. 26-2 ¶ 13. In that motion, counsel noted that a U.S. Senator's office had just informed her that Ozturk had been transferred to Louisiana, but neither the government's counsel nor ICE had confirmed same. D. 7 at 1. Shortly after Ozturk's counsel filed this motion, D. 7, at approximately 3:27 p.m. on March 26, 2025, counsel for the government informed Ozturk's attorney for the first time that Ozturk had been moved to a staging facility in Alexandria, Louisiana, to be transferred to South Louisiana. D. 9 at 2; D. 12 ¶ 30; D. 26-2 ¶ 14. Ozturk's attorney was able to speak with Ozturk for the first time since her arrest later that night at approximately 9:45 p.m., D. 9 at 2; D. 19-1 ¶ 21; D. 26-2 ¶ 21, and learned that she had suffered an asthma attack while being transported in custody to Louisiana. D. 12 ¶ 31. As directed by the Court, the government filed a response to Ozturk's motion the next morning, March 27, 2025, reporting that, as was now noted in ICE's online detainee locator, Ozturk was currently confined at the South Louisiana Correctional Facility in Basile, Louisiana. D. 9 at 1, where she remains. D. 19-1 ¶ 19.

On March 28, 2025, Ozturk filed an amended Petition, D. 12. In light of same, the Court gave the government until 5:00 p.m. on Tuesday, April 1, 2025 to respond to it. D. 16. To allow resolution of its jurisdiction to decide the Petition, the Court ordered that "Ozturk shall not be removed from the United States until [its] further Order." Id. The government timely filed its response and requested that this Court dismiss the Petition, or, if the Court determines that transfer is appropriate, transfer the case to the Western District of Louisiana, the district where Ozturk is presently confined. D. 19 at 28-29. The Court ordered Ozturk to file a response by 5:00 p.m. the

6

following day, Wednesday April 2, 2025.  D. 20.  The Court heard oral argument from the parties

on April 3, 2025 and took the matter under advisement.  D. 41.

## B.   Ozturk's Revocation and Removal Proceedings

As mentioned, Ozturk was not given notice of the revocation of her visa and had not

received a copy of the NTA before an immigration judge for removal proceedings before her arrest.

D. 12 ¶ 36.  A letter dated March 25, 2025, which was addressed to Ozturk but not provided to her

before her arrest and detention, states that Ozturk's Student and Exchange Visitor Information

System ("SEVIS") designation "has been terminated pursuant to 237(a)(1)(C)(i) and/or

237(a)(4)(C)(i) of the Immigration and Nationality Act."  D. 12 ¶ 33; D. 12-1 at 2.  Also, as the

government recounts, Ozturk was not served with the NTA until after she was in custody.  D. 19-

1 ¶¶ 13-14.  The NTA orders Ozturk to appear before an immigration judge in Louisiana on April

7, 2025 for an initial hearing.  D. 12 ¶ 37; D. 19-1 ¶ 15; D. 12-2 at 2.

Although the basis of her revocation is not cited in the letter to her regarding same, Ozturk

was one of several authors who contributed to an editorial back on March 26, 2024 in the school

newspaper, The Tufts Daily, criticizing the University's dismissal of several resolutions that had

been adopted by the undergraduate student Senate in "a sincere effort to hold Israel accountable

for clear violations of international law."  D. 12 ¶¶ 2, 16; D. 26 at 2; D. 26-1 at 67 ¶ 5.  The

President of Tufts University attests that no complaints were filed in its aftermath and there were

multiple editorials published on different sides of this issue.  D. 26-1 at 67 ¶ 5.  As alleged, Ozturk's

current visa status aligns with new policy directives from President Donald Trump who, after

assuming office, signed two Executive Orders aimed at fulfilling a campaign promise to revoke

the visas of students he characterized as "Hamas sympathizers."  D. 12 ¶¶ 40-44.  Ozturk's case is

one of several cases in which the Trump Administration has implemented these Executive Orders

by revoking the immigration status of non-citizens who expressed support for Palestine.  D. 12 ¶¶ 53-57.  In such cases, the government has invoked the same provision it cited in its letter to Ozturk, 8 U.S.C. § 1227(a)(4)(C)(i), which provides that "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable."  D. 12 ¶ 50; D. 12-1 at 2; see, e.g., Chung v. Trump, No. 25-cv-02412-NRB, D. 1 (S.D.N.Y. March 24, 2025); Khalil v. Joyce, No. 25-cv-01935-JMF, 2025 WL 849803, at *1 (S.D.N.Y. Mar. 19, 2025).

## III.     Discussion

Before a Court can turn to the merits of the Petition, including Ozturk's request for immediate release, it must determine whether it has jurisdiction over this matter.  Ozturk contends that this is the appropriate tribunal for the Petition, D. 12 ¶¶ 6-7; D. 26 at 10-16, but if the Court determines that it is not, the matter should be transferred to the District of Vermont.  D. 26 at 17-19.  The government contends that the Petition should be dismissed or, alternatively, transferred to the Western District of Louisiana.  D. 19 at 6-16; 26-28.

### A.      Jurisdiction for the Petition

Ozturk filed the Petition pursuant to 28 U.S.C. § 2241, which provides in relevant part that "[w]rits of habeas corpus may be granted by . . . the district courts within their respective jurisdictions" when a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241.  "Aliens in custody of federal immigration officials have traditionally been able to obtain review of immigration decisions by petitioning for a writ of habeas corpus under what is now § 2241."  Goncalves v. Reno, 144 F.3d 110, 120, 133 (1st Cir. 1998) (concluding that habeas jurisdiction permits a district court to review at least "pure issues of law concerning the applicability of statutory provisions" to immigration decisions); see Raspoutny v.

8

Decker, 708 F. Supp. 3d 371, 379 (S.D.N.Y. 2023) (stating that "Section 2241 permits a federal court to review 'purely legal statutory and constitutional claims' regarding immigration proceedings, but jurisdiction 'does not extend to review of discretionary determinations by the IJ and the BIA'") (quoting Sol v. I.N.S., 274 F.3d 648, 651 (2d Cir. 2001)).  Section 2241 is also the proper vehicle for petitioners challenging their detention by immigration officials pending a decision in immigration matters.  Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec., 510 F.3d 1, 11 (1st Cir. 2007) (noting that "[d]istrict courts retain jurisdiction over challenges to the legality of detention in the immigration context") (citing Hernández v. Gonzales, 424 F.3d 42, 42 (1st Cir. 2005)); Pensamiento v. McDonald, 315 F. Supp. 3d 684, 688 (D. Mass. 2018) (observing that "[d]espite . . . jurisdiction-stripping provisions, the district court may still review habeas challenges to unlawful immigration detention") (citing Aguilar, 510 F.3d at 11).  Accordingly, the Petition, filed under § 2241, is the correct vehicle for Ozturk to pursue her challenge to her arrest and detention upon the revocation of her student visa pending removal proceedings.

The government, however, contests that the District of Massachusetts is the right court to hear the Petition.[1]  As provided by statute, a habeas petition "shall allege the facts concerning the

---

[1] The government also contends that pursuant to 8 U.S.C §§ 1226(e), 1252(b)(9) and 1252(g), the Court lacks subject matter jurisdiction to review the merits of the Petition. D. 19 at 17-23.  As for §§ 1252(b)(9) and (g), the First Circuit has held that where a habeas petition raises challenges "wholly collateral" to removal, district courts are not precluded from review said petition.  See Aguilar, 510 F.3d at 10; Kong v. United States, 62 F.4th 608, 613 (1st Cir. 2023) (citing Aguilar, 510 F.3d at 11).  Likewise, the First Circuit has held that § 1226(e) does not strip district courts' ability to review habeas petitions challenging the constitutionality of a petitioner's detention.  See Hernandez-Lara v. Lyons, 10 F.4th 19, 33-34 (1st Cir. 2021) (holding that federal district courts have jurisdiction to review a habeas petition that challenges "the extent of the Government's detention authority under the 'statutory framework' as a whole") (citing Jennings v. Rodriguez, 583 U.S. 281, 295-96 (2018)); Campbell v. Chadbourne, 505 F. Supp. 2d 191, 196 (D. Mass. 2007) (stating that Congress did not express an intent in § 1226(e) to preclude judicial

9

application's commitment or detention, the name of the person who has custody over him and by virtue of what claim or authority, if known," 28 U.S.C. § 2242, and a writ of habeas corpus granted by a district court "shall be directed to the person having custody of the person detained."  28 U.S.C. § 2243.  "Jurisdiction over the custodian is paramount because '[t]he writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody.'"  Vasquez v. Reno, 233 F.3d 688, 690 (1st Cir. 2000) (alteration in original) (quoting Braden v. 30th Jud. Cir. Ct. of Ky., 410 U.S. 484, 494-95 (1973)).  Accordingly and not surprisingly, as a general rule, a petitioner must file a habeas petition in the district in which they are confined and must name as a respondent the petitioner's immediate custodian.  See Rumsfeld v. Padilla, 542 U.S. 426, 442-47 (2004).

      *1.*     *The General Rule for Challenging Physical Custody is Against the Immediate Custodian and in the Place of Confinement*

As to the general rule about naming the immediate custodian, the respondent is typically "the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official."  Padilla, 542 U.S. at 435; see Vasquez, 233 F.3d at 696 (holding that "normally" the rule is that the immediate custodian and not the Attorney General is the proper respondent in immigration habeas challenges).

Also, as a general matter, a habeas petitioner must file his or her petition in the district of confinement.  Padilla, 542 U.S. at 447 (considering the proper venue for a habeas petition brought by a United States citizen designated as an "enemy combatant" who was initially detained in the Southern District of New York ("S.D.N.Y.") and was later transferred to military custody in South

---

review of constitutional challenges to detention).  Here, because the Petition does not challenge the government's discretionary authority to remove her but the legality of her detention under the First and Fifth Amendments and the APA, D. 12 ¶¶ 69, 73-75, 78, the statutes do not strip the Court's jurisdiction to review the Petition here.

Carolina and filed a § 2241 habeas petition in S.D.N.Y.). Id. at 432. The Court concluded that S.D.N.Y. lacked jurisdiction over Padilla's claim because § 2241 permits a habeas petition only in "the district of confinement," and no one in S.D.N.Y. served as Padilla's immediate custodian. Id. at 442. In reaching this conclusion, the Court observed that "Congress added the limiting clause- 'within their respective jurisdictions'-to the habeas statute in 1867 to avert the 'inconvenient [and] potentially embarrassing' possibility that 'every judge anywhere [could] issue the Great Writ on behalf of applicants far distantly removed from the courts whereon they sat.'" Id. at 442 (alterations in original) (quoting Carbo v. United States, 364 U.S. 611, 617 (1961)). Although Ozturk's counsel observed at the motion hearing that there is some overlap in the jurisprudence about the two rules, the Padilla Court addressed them separately to say that the place of confinement rule, in conjunction with the immediate custodian rule "compose[s] a simple rule . . . [w]henever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement." Id. at 447. This rule serves the important purposes of "preventing forum shopping by habeas petitioners" and avoiding the "inconvenience, expense, and embarrassment" of district courts with overlapping jurisdiction. Id.

### 2. There are Exceptions to these General Rules

#### a) As Recognized in *Padilla*

Significantly, the Supreme Court in Padilla acknowledged that certain exceptions have historically applied to both of these general rules. The majority noted exceptions to the immediate-custodian rule exist when there is no immediate physical custodian with respect to the "custody" challenged. Padilla, 542 U.S. at 438-49, pointing to the Court's earlier ruling in Braden v. United States, 410 U.S. 484 (1973). In Braden, the Supreme Court considered a habeas petition filed by

11

an Alabama prisoner in the United States District Court for the Western District of Kentucky, which challenged a detainer lodged against him in Kentucky. Braden, 410 U.S. at 488-89. Because Braden sought to challenge "a confinement that would be imposed in the future," the Court concluded the immediate custodian rule did not apply, and Braden was instead "in custody" in Kentucky by virtue of the detainer, id. at 488-89, and while the Alabama warden was the present custodian, he was not "the person who [held Braden] in what [was] alleged to be unlawful custody." Id. at 494-95. The Padilla Court also pointed to the decision in Strait v. Laird, 406 U.S. 341 (1992), Padilla, 542 U.S. at 438-39, where it addressed an inactive reservist's § 2241 petition seeking relief from future military obligations. Id. at 344. While the petitioner was domiciled in California, the Supreme Court reasoned that because he was not challenging any present physical confinement, his "'nominal' custodian was a commanding officer in Indiana who had charge of [his] Army records." Id. In citing these precedents, the Padilla Court concluded that the "legal control" test could not be applied to physical-custody challenges to allow a convicted prisoner to name that State or the Attorney General as a respondent to its § 2241 petition, Padilla, 542 U.S. at 439-40, but acknowledged that Braden and Strait remained exceptions to the general rule.

The Supreme Court also noted an exception to this general rule regarding the immediate custody in Ex parte Endo, 323 U.S. 283 (1944), in which a Japanese-American citizen interned in California filed a § 2241 petition in the federal district court in the Northern District of California to challenge her detention, id. at 284-85; Padilla, 542 U.S. at 440. Endo had named her immediate custodian in California in her petition, but the government later transferred her to Utah. Endo, 323 at 285. The Supreme Court concluded that the subsequent transfer did not divest the Northern District of California of its jurisdiction. Id. at 304-06. Instead, "when the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District

12

Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release." Padilla, 542 U.S. at 441 (characterizing Endo's holding, and describing it as "important but limited"); see Chavez-Rivas v. Olsen, 194 F. Supp. 2d 368, 377 (D.N.J. 2002) (concluding that "where an INS-detained habeas petitioner properly files a habeas petition in the district where he is incarcerated, and the petitioner is subsequently transferred to a facility outside of that district, the Attorney General . . . may be deemed a 'custodian' to allow the original District Court to retain jurisdiction over the habeas petition"). The Supreme Court reasoned that the Endo exception did not apply to Padilla's case because Padilla had been moved from the S.D.N.Y. to South Carolina before his lawyer had filed his habeas petition, meaning jurisdiction had never vested in S.D.N.Y. Id.

In addition, the Supreme Court noted certain exceptions legislated by Congress. Id. at 443. Specifically, the Court in Padilla noted that it had "long implicitly recognized an exception to the immediate custodian rule in the military context where an American citizen is detained outside the territorial jurisdiction of any district court." Id. at 436 n.9. The majority in Padilla also acknowledged an exception relied upon by the dissent, but disagreed that it was applicable. Citing Demjanjuk v. Meese, 784 F.2d 1114 (D.C. Cir. 1986) (Bork, J.), the majority observed that "[w]hen, as in that case, a prisoner is held in an undisclosed location by an unknown custodian, it is impossible to apply the immediate custodian and district of confinement rules," but concluded that was not Padilla's case "where the identity of the immediate custodian and the location of the appropriate district court are clear." Padilla, 542 U.S. at 450 n.18.

b)    As proposed by the concurrence in *Padilla*

Although the 5-4 majority in Padilla applied the general rule requiring a habeas petition challenging physical custody to be filed in the place of confinement, two members of that majority,

13

in a concurring opinion, suggested an exception to the general rule that is implicated here.  Justice Kennedy (joined by Justice O'Connor) noted that an exception to filing a petition in the district of confinement might be warranted "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention."  Padilla, 542 U.S. at 454 (Kennedy, J., concurring).  In such a case "habeas jurisdiction would be in the district court from whose territory the petitioner had been removed."  Id. (Kennedy J., concurring).  Although this exception was not adopted by the majority, because Justice Kennedy and Justice O'Connor's votes were "necessary to the formation of a majority," Justice Kennedy's opinion is at least "given particular weight," Schmitz v. Zilveti, 20 F.3d 1043, 1045 (9th Cir. 1994) (citing Middlesex Mut. Ins. Co. v. Levine, 675 F.2d 1197, 1200 (11th Cir. 1982)); see Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 594 (1st Cir. 1980) (relying upon a concurrence after noting that the author's opinion was needed to make a majority); ANR Coal Co. v. Cogentrix of N.C., Inc., 173 F.3d 493, 499 n.3 (4th Cir. 1999) (observing that courts have given particular weight to a concurrence because the vote of each justice who joined that concurrence was "necessary to create a majority").  This is particularly appropriate where the majority in Padilla did not express disagreement with this exception proposed by the concurrence, but rather noted that the particular facts of Padilla's case did not warrant its invocation.  Padilla, 542 U.S. at 441-42 (noting, by the majority, that "[t]here is no indication that there was any attempt to manipulate Padilla's transfer" and "the Government did not attempt to hide from Padilla's lawyer where it had taken him").  The majority's observation in Padilla also foreshadowed later cautions by the Supreme Court.  For example, in Boumediene v. Bush, 553 U.S. 723, 732-33 (2008), the Supreme Court concluded that the Military Commissions

14

Act, which prohibited detainees classified as enemy combatants from petitioning for habeas corpus, was an unconstitutional suspension of the right to the writ of habeas corpus.  There, the Court described the writ as "an indispensable mechanism for monitoring the separation of powers" which it cautioned "must not be subject to manipulation by those whose power it is designed to restrain."  Id. at 765-66; see Demjanjuk, 784 F.2d at 1116 (noting that "it is essential that petitioner not be denied the right to petition for a writ of habeas corpus").

Although the government's brief does not address Justice Kennedy's proposed exception in the Padilla concurrence, see D. 19 at 13-15, courts within this Circuit and others have recognized it even as they have acknowledged that the facts in their particular case did not warrant its application.  See Khalil, 2025 WL 849803 at *6-11 (addressing Justice Kennedy's proposed exception in the Padilla concurrence); Parker v. Hazelwood, No. 17-cv-484-LM, 2019 WL 4261832, at *3-5 (D.N.H. Sept. 9, 2019) (referencing Justice Kennedy's exception, but noting that the petitioner has not "identified facts fitting this case into any of the recognized extraordinary circumstances warranting exception to the jurisdictional rules"); Xia v. King, No. 24-cv-2000-JRT-DLM, 2025 WL 240792, at *2 (D. Minn. Jan. 17, 2025) (citing Justice Kennedy's concurrence and suggesting that "[t]he Supreme Court has recognized" an exception to the district of confinement rule "where the Government was not forthcoming with respect to the identity of the custodian and the place of detention"); Gayle v. Meade, 614 F. Supp. 3d 1175, 1235 (S.D. Fla. 2020) (noting Justice Kennedy's exception and acknowledging that the Court "might entertain jurisdiction" over the claims "if there were evidence of efforts on the part of the defendants to evade jurisdiction of the Court") (quoting McKinnon v. Talladega Cnty., Ala., 745 F.2d 1360, 1363 (11th Cir. 1984)); Sow v. Whitaker, No. 18-cv-11394-GBD-RWL, 2019 WL 2023752, at *5-6 (S.D.N.Y. May 8, 2019) (noting Justice Kennedy's proposed exception but concluding that the

15

petitioner had failed to provide evidence showing that the government either made it difficult for his lawyer to know where he was or was not forthcoming about his place of detention); Salcedo v. Decker, No. 18-cv-8801-RA, 2019 WL 339642, at *2 n.3 (S.D.N.Y. Jan. 28, 2019) (citing Justice Kennedy's exception in Padilla but would continue to apply the general rule "[a]bsent contrary instruction from the Supreme Court or the Second Circuit and absent any allegation that there was an 'attempt to manipulate' [the petitioner's] transfer in bad faith"). It is also true, as the court in Khalil noted, that no court has "ever found that [Justice Kennedy's] exceptions applied" to the facts of any particular case. Khalil, 2025 WL 849803 at *2.

c)      Also as recognized in the First Circuit

Justice Kennedy's concurrence outlining an exception to the place-of-confinement also echoed a point the First Circuit had made four years before Padilla in Vasquez, 233 F.3d at 696, about an exception to the immediate-custodian rule. The case involved an ICE detainee who was transferred from Massachusetts to Louisiana for removal proceedings following his release from prison, who then filed a habeas petition in this Court naming the Attorney General as the defendant. Id. at 690. The First Circuit concluded that, as a general rule, the Attorney General is neither the custodian nor the appropriate respondent in a habeas case, noting that "allowing alien habeas petitioners to name the Attorney General (over whom all district courts presumably have personal jurisdiction) as a respondent will encourage rampant forum shopping." Id. at 693-94. The Vasquez court, however, noted the possibility for exceptions in "extraordinary circumstances." Id. at 696. Such extraordinary circumstances would exist if "INS [the precursor to ICE] spirited an alien from one site to another in an attempt to manipulate jurisdiction." Id. (concluding that no such "extraordinary circumstances" existed in the case where "the petitioner has neither marshaled facts suggesting furtiveness nor made a showing of the elements necessary to demonstrate bad faith").

16

Such concerns regarding government conduct are heightened in the case of a habeas petitioner who is an ICE detainee. Anariba v. Dir. Hudson Cnty. Corr. Ctr., 17 F.4th 434, 447 (3d Cir. 2021). Given ICE's "broad authority to move ICE detainees" without notice, "the Government could willingly transfer an ICE detainee seeking habeas from continued detention to a jurisdiction that is more amendable to the Government's position, or the Government could transfer an ICE detainee for the purpose of intentionally introducing complicated jurisdictional defects to delay the merits review of already lengthy § 2241 claims." Id. at 447-48.

Courts have noted that "extraordinary circumstances" could exist to invoke the exception articulated in Vasquez. See Tham v. Adducci, 319 F. Supp. 3d 574, 577 (D. Mass. 2018) (citing Vasquez, 233 F.3d at 696) (concluding that there were "no extraordinary facts . . . that would warrant deviating from the immediate custodian rule"); Chavez-Rivas, 194 F. Supp. 2d at 376 (discussing exception under Vasquez, but disagreeing that "a petitioner should shoulder the burden of proving the Government acted in bad faith" in invoking same and that "[w]here transfer is not the result of the petitioner's misconduct, [the court] would not impose such a burden upon him"); Gayle, 614 F. Supp. 3d at 1235 n.23 (internal citation and quotation marks omitted) (some alterations in original) (citing Vasquez and other cases to suggest that "if Petitioners could satisfactorily prove their hunch ['that the ICE-facilitated transfers may be part of a shell game designed to strip the Court of jurisdiction'], then the Court might entertain jurisdiction over [their] claim[s] if there were evidence of efforts on the part of the defendants to evade the jurisdiction of the Court").

A court has invoked Vasquez in at least two cases to allow a petitioner to name the Attorney General as the respondent where ICE moved the petitioner from the district immediately after detention. Farah v. I.N.S., No. 02-cv-4725-DSD-RLE, 2002 WL 31828309, at *2-3 (D. Minn.

17

Dec. 11, 2002); de Jesus Paiva v. Aljets, No. cv-036075-DWF-AJB, 2003 WL 22888865, at *4

(D. Minn. Dec. 1, 2003).  In those cases, the court expressed concern that such a practice by ICE

would allow it "to forum shop, intentionally or not."  Farah, 2002 WL 31828309, at *3 (citing

Alcaide–Zelaya v. McElroy, No. 99–cv-5102-DC, 2000 WL 1616981, at * 5 (S.D.N.Y. Oct. 27,

2000)); de Jesus Paiva, 2003 WL 22888865, at *4 (observing that "[t]o now hold that Petitioners

may only file their Petition in the state that the ICE determines to send them would be to allow the

ICE to forum shop") (citing Alcaide-Zelaya, 2000 WL 1616981, at *5).  That the "extraordinary

circumstances" described in Vasquez, 233 F.3d at 696, has not often been invoked reflects that

such circumstances are rare, not that rare cases never present themselves.

### 3.    Considering the Immediate-Custodian Rule in this Case[2]

The government here points to several cases to contend that the course of events

surrounding Ozturk's arrest and detention do not rise to the level of "furtiveness" or "bad faith"

that concerned the First Circuit in applying the immediate-custodian rule in certain "extraordinary

circumstances" in Vasquez.  First, it points to Ruvira-Garcia v. Guadian, No. 20-cv-2179, 2020

WL 1983875, at *2 (N.D. Ill. Apr. 17, 2020), where the district court in the Northern District of

Illinois, petitioner's place of residence, concluded that it did not have jurisdiction over the

petitioner who was initially detained in Wisconsin, transferred to Texas and ultimately detained in

Oklahoma.  Id. at *2-3.  There, although the record reflected that the petitioner was not in the

district at the time of filing, there was no suggestion that her whereabouts were unknown at the

---

[2] Petitioner suggests that the Court does not need to reach the exceptions because, at the time the Petition was filed, Ozturk was in transit in Vermont, making her immediate custodian the ICE New England Field Officer Director, who is based in Massachusetts.  D. 26 at 12-13.  Circuit law does not appear to support this position.  See Vasquez, 233 F.3d at 695 (addressing Endo and Strait and U.S. ex rel. Circella v. Sahli, 216 F.2d 33, 35 (7th Cir. 1954) and summing up that "this trilogy of cases simply does not give a legitimate judicial imprimatur to a freewheeling definition of 'custodian' such as the petitioner champions").

18

time that her Petition was filed or that the government did not disclose her whereabouts when her counsel inquired about same. The government also cites <u>Fuentes v. Choate</u>, 24-cv-01377-NYW, 2024 WL 2978285, at *9-10 (D. Colo. June 13, 2024), in which the court addressed the practical difficulties of a habeas petitioner challenging her detention by ICE where she was moved from a facility in Colorado to a staging facility in Arizona for eventual transfer to Texas. <u>Id.</u> at *2. The court concluded that it did not have jurisdiction when she was detained in Arizona and it was "not this Court's duty to ascertain or identify an Arizona official" to be named as the correct respondent. <u>Id.</u> at *9. Recognizing petitioner's argument that she was only in Arizona temporarily and that this "present[ed] unusual logistical circumstances that likely hindered counsel's ability to act swiftly and still within the bounds of permissible habeas jurisdiction," the court declined to apply the exception in Justice Kennedy's concurrence, noting an absence of "authority from the Tenth Circuit—or weight of authority from other circuit courts—that might justify the application of such exception (however logical) by this Court." <u>Id.</u> at *10. In contrast, here, in the First Circuit, this Court must consider <u>Vasquez</u>. Moreover, other than the transport of the petitioner through several states en route to another detention facility in Oklahoma, there is no suggestion in that case that the petitioner's whereabouts were unknown to her counsel at the time she filed the habeas petition. <u>Id.</u> In fact, the court in <u>Fuentes</u> noted that petitioner's counsel was at least informed of her transfer to Texas as it was occurring. <u>Id.</u>

Here, the government attests that "[t]ransfers out of state, and out of the ERO Boston area of responsibility, are routinely conducted after arrest, due to operational necessity and considerations." D. 19-1 at 7. But even accepting that it is routine to move detainees between different locations before transport to their final destination, <u>see</u> <u>Sow</u>, 2019 WL 2023752, at *1-2 (reflecting petitioner's transport between locations in New York and New Jersey before

19

Louisiana), the government here provides no information about whether it is routine to move detainees to various locations in a single day or to have a detainee on a plane heading out of the region within twelve hours of her arrest.

Moreover, unlike the circumstances in Vasquez, 233 F.3d at 696, the petitioner has "marshaled facts" at least showing "furtiveness" on the part of the government here. Id. Ironically, the government (at least in its papers) faulted Ozturk for failing to file the Petition in the district of her confinement and failing to name her immediate custodian, D. 19 at 6-13, despite the fact that Ozturk was not permitted to communicate her whereabouts as she was transported from Somerville, Massachusetts to Methuen, Massachusetts to Lebanon, New Hampshire and then to Saint Albans, Vermont, see D. 26-7 ¶ 6 (Ozturk attesting that she kept asking to call her attorney but was told that she would be allowed to do so "once [she] reached [her] final destination"). Ozturk's attorney did not and could not have known her place of confinement or her immediate custodian at the time she filed the Petition, and even in the aftermath of that filing, the government did not disclose Ozturk's whereabouts in Vermont or her planned transport to Louisiana until a day later after she arrived in Louisiana. D. 19-1 ¶ 21.[3]

Ozturk has filed multiple affidavits from experienced, immigration attorneys in the New England area that attest that the sequence of events here was far from routine, even putting aside the circumstances of her arrest. According to these sworn statements, most ICE detainees arrested on civil immigration warrants are booked and processed in the ICE ERO Field Office in Burlington, D. 26-3 ¶ 10; D. 26-4 ¶ 5; D. 26-6 ¶ 6, and then are transferred to a detention facility.

---

[3] That ICE has an internal policy that it will notify a detainee's attorney of record of a transfer "as soon as practicable on the day of the transfer, but in no circumstances later than twenty four (24) hours after the transfer occurs," U.S. ICE, Policy No. 11022.1(5.3)(2)(a)(2012), does not counter this conclusion here where the government was aware that Ozturk and her counsel affirmatively had requested such contact before the expiration of this time period.

20

D. 26-6 ¶ 6.  This was not the case with Ozturk, who was booked and processed in another city in Massachusetts, Methuen, transported to New Hampshire and then to Vermont.  Although ICE detainees might be moved during custody, D. 19-1 ¶ 7 (the Acting Deputy Field Office Director for ICE ERO attesting that "[t]ransfers out of state, and out of the ERO Boston area of responsibility, are routinely conducted after arrest, due to operational necessity and considerations"), it is unusual for that to occur within a few hours.  D. 26-3 ¶ 11; D. 26-4 ¶ 7; D. 26-5 ¶ 13; D. 26-6 ¶ 7.  Women who are detained by ICE in the region are regularly detained at facilities in New Hampshire (Strafford Jail), Rhode Island (Wyatt) and Maine (Cumberland County Jail), D. 26-4 ¶ 6, and another facility in Vermont (Chittenden Regional Correctional Facility).  D. 26-6 ¶ 9.  At least as to the facility in Maine (Cumberland County Jail), there was space for female detainees on March 25 and 26, 2025.  D. 26-5 ¶ 12.  An experienced immigration attorney working in Vermont attested that she has only experienced people being detained at the St. Albans office upon initial arrest in Vermont and has "never once encountered the case of a detained person who is being transferred into Vermont for the purposes of continued ICE detention" and that it is "even more extraordinary for a person to be transferred into the St. Albans ICE office, which is a government office and not a detention facility."  D. 26-7 ¶ 8.  The irregularity of the arrest, detention and processing here is coupled with the failure to disclose Ozturk's whereabouts even after the government was aware that she had counsel and the Petition was filed in this Court.  Moreover, contrary to counsel's arguments at the motion hearing, that the government had a pre-arranged plan for Ozturk's detention and transport before the agents effectuated her arrest does not necessarily show lack of attempt to manipulate jurisdiction where that plan continued (apparently uninterrupted) even after the government was aware of the Petition.

JA-000098

Even if <u>Vasquez</u>'s extraordinary circumstances exception to the immediate custodian rule did not apply here, there is also an exception to the immediate-custodian rule where the custodian of the petitioner is unknown at the time that the Petition is filed. As discussed above, in <u>Demjanjuk</u>, 784 F.2d at 1116, where the petitioner was being held by the U.S. Marshal in a confidential location, the court treated the Attorney General as the custodian and concluded that jurisdiction would lie in the D.C. Circuit at the time that the Petition was filed. <u>Id.</u>; <u>Khalil v. Joyce</u>, No. 25-cv-01963-MEF, 2025 WL 972959, at *28-37 (D.N.J. Apr. 1, 2025) (discussing <u>Demjankuk</u>).[4] Similarly, where ICE took Ozturk into custody in Massachusetts, but transported her to an unknown place, she cannot be faulted for filing the Petition in this Court against the Respondents with national and regional supervision over ICE. This is particularly true here where counsel for Ozturk could not have known to name her client's immediate custodian in Vermont, her location at the time the Petition was filed.

### 4. Considering Place-of-Confinement Rule in this Case

The same is true as to the general rule under <u>Padilla</u> and its progeny that a Petition should be filed in the petitioner's place of confinement, which we now know was the District of Vermont for Ozturk. <u>See</u> <u>Demjanjuk</u>, 784 F.2d at 1116. Despite her counsel's argument at the motion hearing, whatever the analytical overlap between this general rule and the immediate-custodian rule may be, the Court must address both rules in determining its jurisdiction. <u>Padilla</u>, 542 U.S. at

---

[4] At oral argument, in addressing <u>Demjanjuk</u>, counsel for the government argued that even if it were true that the immediate custodian was unknown at the time the Petition was filed on March 25, 2025, the Court should focus on the fact that this was no longer the case when the amended Petition was filed on March 28, 2025. Such an approach is contrary to "relate-back" rules that apply in a civil case such as this one, <u>Jaynes v. Grant</u>, No. 03-cv-11582-JLT, 2010 WL 4181241, at *2-3 (D. Mass. Oct. 19, 2010) (concluding that an amended habeas petition relates back to the original filing), particularly when the critical focus is at the time the Petition was filed. <u>See</u> <u>Padilla</u>, 542 U.S. at 441 (discussing <u>Endo</u>, 323 U.S. at 304-06).

JA-000099

447.  It is the irregularity of the processing and transport in a single day and failure to disclose Ozturk's whereabouts discussed above as to <u>Vasquez</u> that also implicates the <u>Padilla</u> exception to the place-of-confinement rule proffered by Justice Kennedy.  Justice Kennedy's remedy in this scenario would have been that "habeas jurisdiction would lie in the district or districts from which [the detainee] had been removed."  <u>Padilla</u>, 542 U.S. at 454.  This is the remedy that Ozturk seeks in the first instance, but argues in the alternative that transfer to the District of Vermont, D. 26 at 9, would be appropriate.  This is perhaps in Ozturk's recognition of the fact that no court has yet relied upon the <u>Padilla</u> concurrence as the basis for jurisdiction.  <u>Khalil</u>, 2025 WL 849803, at *2. Moreover, if the purpose of any exception to the place-of-confinement rule is to curb forum shopping by the government, <u>see</u> <u>Anariba</u>, 17 F.4th at 447, the transfer of this matter to the federal district court in the District of Vermont, the place that Ozturk was confined at the time that the Petition was filed, does so.  <u>See</u> <u>Boumediene</u>, 553 U.S. at 779 (observing that "common-law habeas corpus was, above all, an adaptable remedy"); <u>Khalil</u>, 2025 WL 972959, at *35 (noting that "[p]er the Supreme Court, courts must apply the habeas statute with an eye to the underlying equitable nature of the writ") (and cases cited).

      **B.**      **<u>Transfer to Vermont is Warranted Here</u>**

In the context of a habeas petition, the jurisdictional rules are "not jurisdictional in the sense of a limitation on subject-matter jurisdiction," but rather akin to "personal jurisdiction or venue."  <u>Padilla</u>, 542 U.S. at 451 (Kennedy, J., concurring); <u>Tham</u>, 319 F. Supp. 3d at 576 n. 2. There are a number of transfer statutes, 28 U.S.C. §§ 1404(a), 1406(a), 1631, but the most applicable here appear to be the latter two, §§ 1406(a) and 1631.  If a case is filed in the wrong venue, 28 U.S.C. § 1406(a) permits the district court in the district in which the case was filed to "transfer such case to any district or division in which it could have been brought" if such transfer

23

serves "the interest of justice." Id.; Tham, 319 F. Supp. 3d at 577. If "there is a want of jurisdiction," as the Court concludes here, 28 U.S.C. § 1631 permits transfer of a civil action to any court "in which the action . . . could have been brought at the time it was filed or noticed," if such transfer "is in the interest of justice." In Hoffman v. Blaski, 363 U.S. 335, 342-44 (1960), the Supreme Court considered whether the phrase "where it might have been brought" in § 1404(a) required the transferee court to have jurisdiction at the time the original action was filed, or whether it permitted transfer to a court that would have had jurisdiction at the time of the transfer only. The Court concluded that the "unambiguous, direct (and) clear" language of the transfer statute permitted transfer only in the former case. Id. Courts have concluded that Hoffman's limitation also applies to the "could have been brought" language in §§ 1406(a) and 1631. See, e.g., Gonzalez v. Grondolsky, 152 F. Supp. 3d 39, 47 (D. Mass. 2016).

"Want of jurisdiction" under § 1631 means a lack of either personal or subject matter jurisdiction. See HC&D, LLC v. Precision NDT & Consulting, LLC, 698 F. Supp. 3d 180, 197-98 (D. Mass. 2023) (internal citation omitted). Once transferred, "the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred." 28 U.S.C. § 1631; see Khalil, 2025 WL 972959, at *14-20 (discussing § 1631). Such transfer treats the transferred case as if it was filed at the time of the original filing; here, it would treat the Petition as filed in Vermont on March 25, 2025 at 10:02 p.m. Gonzalez, 152 F. Supp. 3d at 47; see Miller v. United States, 753 F.2d 270, 276 (3d Cir. 1985); Martinez-Nieto v. Att'y General, 805 F. App'x 131, 135 (3d Cir. 2020).

The First Circuit has recognized that § 1631 applies in the context of habeas petitions. See Tham, 319 F. Supp. 3d at 577-78 (transferring a habeas petition pursuant to § 1631 and noting that

24

"there is a rebuttable presumption in favor of transferring a case instead of dismissing it"); Del Carvalho v. Moniz, No. 21-cv-11946-WGY, 2021 WL 5811301, at *1 (D. Mass. Dec. 7, 2021) (transferring a habeas petition to New Hampshire pursuant to § 1631 and "in the interest of justice").

Under either statute, however, an action may only be transferred to the court where it "could have been brought." 28 U.S.C. §§ 1406(a), 1631.[5] Here, because Ozturk was confined overnight in Vermont when the Petition was filed, the District of Vermont is the proper transferee court.[6]

## IV. Conclusion

For the reasons articulated below, the Court DENIES the government's motion to dismiss this Petition and its alternative request to transfer this matter to the Western District of Louisiana. The Court ALLOWS the alternative relief sought by Ozturk and transfers this matter "in the interest of justice" pursuant 28 U.S.C. § 1631 to the U.S. District Court for the District of Vermont.

To ensure that Ozturk has an opportunity to have the Petition considered by the District of Vermont, and to preserve the status quo, this Court's March 28, 2025 Order enjoining the government from removing her from the United States, D. 16, shall remain in effect unless and until the transferee court orders otherwise. See Khalil, 2025 WL 849803, at *14 (ordering same upon transfer).

**So Ordered.**

---

[5] For at least this reason, the Court rejects the government's argument that if it did not dismiss the Petition, it should instead transfer it to the Western District of Louisiana, where Ozturk was not detained at the time of the filing of the Petition.

[6] It will be for the District of Vermont to determine if it has jurisdiction over Ozturk's Petition notwithstanding her later transfer to Louisiana after the filing of the Petition that is now transferred there. See Khalil v. Joyce, 2025 WL 972959, at *24-38 (taking transferred petition as filed in New Jersey at the time it had been filed in S.D.N.Y.).

25

/s Denise J. Casper
United States District Judge

26

1

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3   RUMEYSA OZTURK,                    )
                                        )
 4                      Plaintiff       )
                                        )  No. 1:25-cv-10695-DJC
 5   vs.                                )
                                        )
 6   PATRICIA HYDE, et al.,             )
                                        )
 7                      Defendants.     )
                                        )
 8                                      )
                                        )
 9

10

11          BEFORE THE HONORABLE DENISE J. CASPER
                  UNITED STATES DISTRICT JUDGE
12                      MOTION HEARING

13

14

15
          John Joseph Moakley United States Courthouse
16                      Courtroom No. 11
                        One Courthouse Way
17                  Boston, Massachusetts 02210

18
                         April 3, 2025
19                        2:00 p.m.

20

21
                   Kristin M. Kelley, RPR, CRR
22                    Official Court Reporter
          John Joseph Moakley United States Courthouse
23                One Courthouse Way, Room 3209
                    Boston, Massachusetts 02210
24                  E-mail: kmob929@gmail.com

25      Mechanical Steno - Computer-Aided Transcript
```

JA-000104

2

1    APPEARANCES:

2          Adriana Lafaille
          Jessie J. Rossman
3          Julian Bava
          Rachel Davidson
4          Noor Zafar
          Brian Hauss
5          ACLU of Massachusetts
          One Center Plaza
6          Suite 850
          Boston, MA 02108
7          617-482-3170
          alafaille@aclum.org
8          jrossman@aclum.org
          jbava@aclum.org
9          rdavidson@aclum.org
          for Petitioner.

10

11          Mahsa Khanbabai
          Khanbabai Immigration Law
12          115 Main Street
          Ste 1b
13          North Easton, MA 02356
          508-297-2065
14          mahsa@mk-immigration.com
          for Petitioner.

15

16          Katherine Rosenfeld
          Matthew Brinckerhoff
17          Sonya Levitova
          Vasudha Talla
18          Emery Celli Brinckerhoff Abady Ward & Maazel LLP
          One Rockefeller Plaza
19          8th Floor
          New York, NY 10020
20          212-763-5000
          krosenfeld@ecbawm.com
21          mbrinckerhoff@ecbawm.com
          slevitova@ecbawm.com
22          vtalla@ecbawm.com
          for Petitioner.

23

24

25

JA-000105

3



1    APPEARANCES CONT'D:

2

3            Mark Sauter
             DOJ-USAO
4            Moakley U.S. Courthouse
             One Courthouse Way
5            Ste 9200
             Boston, MA 02169
6            617-748-3347
             mark.sauter@usdoj.gov
7            for Respondents.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  All rise.
 3              (The Honorable Court entered.)
 4              THE CLERK:  Civil Action No. 25-10695, Ozturk vs.
02:00  5   Hyde.
 6              THE COURT:  Good afternoon, counsel.  I'll have you
 7   introduce yourselves for the record.
 8              MS. ROSSMAN:  Good afternoon, your Honor.  Jessie
 9   Rossman on behalf of petitioner.
02:00 10              THE COURT:  Good afternoon.
11              MS. LAFAILLE:  Good afternoon, your Honor.  Adriana
12   Lafaille on behalf of the petitioner.
13              THE COURT:  Good afternoon.
14              MS. DAVIDSON:  Good afternoon, your Honor.  Rachel
02:01 15   Davidson for the petitioner.
16              THE COURT:  Good afternoon.
17              MR. BAVA:  Good afternoon, your Honor.  Julian Bava
18   for the petitioner.
19              THE COURT:  Good afternoon.
02:01 20              MS. KHANBABAI:  Good afternoon, your Honor.  Mahsa
21   Khanbabai for the petitioner.
22              THE COURT:  And there are two attorneys on Zoom?
23              MS. ZAFAR:  Good afternoon.  Noor Zafar for the
24   petitioner.
02:02 25              MR. HAUSS:  Good afternoon, your Honor.  Brian Hauss
```

JA-000107

5

```
 1    for the petitioner.

 2              THE COURT:  Good afternoon to you both as well.

 3              Counsel?

 4              MR. SAUTER:  Good afternoon.  AUSA Mark Sauter on

 5    behalf of the defendant.

 6              THE COURT:  Good afternoon.

 7              Counsel, I know we're here on the petitioner's

 8    petition.  I've had a chance to read the briefs on either side

 9    and the submissions as well.  I'm prepared to hear argument.

10    As you might imagine, and certainly as your briefs anticipated,

11    I'm very focused on jurisdiction.  So I would like to start

12    there, counsel.

13              I'll hear from the petitioner first.

14              MS. ROSSMAN:  Thank you, your Honor.  Attorney

15    Lafaille will be addressing jurisdiction.

16              THE COURT:  Thank you.

17              MS. LAFAILLE:  Are you referring to the habeas?

18              THE COURT:  Yes.

19              MS. LAFAILLE:  I can start there.

20              THE COURT:  I'm focused on 2142.

21              MS. LAFAILLE:  Understood.  Your Honor, first of all,

22    we're incredibly grateful for the Court's attention to this

23    matter on such a short time frame.

24              THE COURT:  Pardon me for one second.  Can we mute

25    Zoom?
```

The line timestamps in the left margin: 02:02 (line 5), 02:02 (line 10), 02:02 (line 15), 02:02 (line 20), 02:03 (line 25).

JA-000108

6

1                   Counsel?

2             MS. LAFAILLE:  We're here, as your Honor knows, to

3       address the case of a student who was grabbed by federal agents

4       in front of her home and then taken over the course of several

02:03   5       hours, to Vermont without any ability to contact counsel,

6       without the ability for counsel to contact her, and with her

7       location for a period of about 22 hours being undisclosed, even

8       to the Department of Justice attorneys on this case.

9             We've talked in our briefs about some of the

02:03  10       exceptions to the general rule for habeas venue and

11       jurisdiction.  I do want to first make argument that this

12       rule -- this case actually falls within general venue

13       principles, and there's actually no need to invoke any

14       exception, but to the extent the Court disagrees, we also fall

02:04  15       within several of those exceptions.

16             So as the Court is aware, there's the general rule,

17       and as the government cites, is that the parties have to sue

18       the immediate custodian.  In this case, we've done exactly

19       that.  Miss Ozturk was not at any detention facility at the

02:04  20       time this petition was filed at approximately 10:02 p.m.  She

21       was, it appears to be, in a car or a vehicle of some sort being

22       transported between locations.

23             THE COURT:  And, counsel, I understood that you were

24       relying, at least in part or in alternative, to the unknown

02:05  25       custodian concept?

JA-000109

7

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | MS. LAFAILLE:  Yes.  And I can address that, your            |
|       | 2  | Honor.  I don't think we even need to go there because this is |
|       | 3  | a case where we did name the right custodian.                |
|       | 4  | Our client was, at the time she was detained, in the         |
| 02:05 | 5  | custody of ICE Boston, ICE's Boston field office, and certainly |
|       | 6  | before she left Massachusetts if a habeas petition had been  |
|       | 7  | filed, again, she was not in a detention facility, she's just |
|       | 8  | in a vehicle, certainly the government would agree we could   |
|       | 9  | have filed that petition in Massachusetts.  And I assume the  |
| 02:05 | 10 | government would agree that the custodian would be the director |
|       | 11 | of the ICE field office, which has control over ICE in New   |
|       | 12 | England, and not the individual ICE officer in whose vehicle |
|       | 13 | she is or the two or three ICE officers with her in that     |
|       | 14 | vehicle.                                                     |
| 02:05 | 15 | And that didn't change when she crossed the state            |
|       | 16 | lines.  The custodian here --                                 |
|       | 17 | THE COURT:  Even the state lines into Vermont?               |
|       | 18 | MS. LAFAILLE:  Correct, your Honor.                          |
|       | 19 | The custodian, this is not one of those cases where,         |
| 02:06 | 20 | you know, the typical case in which a petitioner is in a      |
|       | 21 | facility detained outside of a jurisdiction.  Our client was |
|       | 22 | simply in a vehicle in the custody of the ICE officers.  The |
|       | 23 | government hasn't told us who they think the appropriate      |
|       | 24 | custodian is.  They noted we haven't named the appropriate   |
| 02:06 | 25 | custodian.                                                    |

JA-000110

8

1    Unless the appropriate custodian is the ICE officers

2    in whose vehicle she is, I think it's clear that the

3    appropriate custodian would have to be the head of New

4    England's ICE office.  That's Patricia Hyde, who we've named,

02:07 5    and this is the Court with jurisdiction over Patricia Hyde.

6    So as the general rule is articulated in *Padilla*, and

7    there's a very clear articulation in the first few lines of

8    Justice Kennedy's concurrence that explains that this general

9    rule is you have to sue the immediate custodian in the place

02:07 10   where the immediate custodian is.

11   Normally, the very meaning of the immediate custodian

12   is that the immediate custodian and the petitioner are in the

13   same place, but this happens to be an odd situation where she

14   was in a vehicle that had crossed state lines, and so the

02:07 15   immediate custodian is still the head of New England's ICE

16   office who's based here in Massachusetts.

17   So we think it's clear under general principles, even

18   as articulated in the government's brief, that we sue the

19   immediate custodian, and we've done just that.  So this is

02:07 20   unlike -- I know the parties cited to the briefing in the

21   *Khalil* case down in the Southern District of New York and the

22   District of New Jersey, and this has some distinctions with

23   that case, in that Mr. Khalil had already reached a detention

24   facility in New Jersey at the time the petition was filed.

02:08 25   That's not our case here.  For that reason, we think

9

1 that we fall within general habeas jurisdiction principles even

2 without relying on the exceptions.

3   But to move on to those exceptions, as your Honor

4 mentioned, there is an exception where the custodian is unknown

02:08 5 and that exception is recognized by the *Padilla* majority in a

6 footnote.  It's also implicitly recognized in 28 U.S.C. 2242

7 which asks us, requires habeas petitioners to name the

8 custodian if known.  And, essentially, what that case law

9 establishes is, if you don't know the custodian, it's okay to

02:09 10 sue the supervisory official in the place where the supervisory

11 official is, and that's exactly what we've done here.  The

12 habeas petition was filed at the place of the local supervisor

13 in the place where the supervisor is.

14   THE COURT:  Isn't there also language in that Judge

02:09 15 Bork decision that once you know who the custodian is, to the

16 extent that that gives you jurisdiction over the custodian,

17 that disappears?

18   MS. LAFAILLE:  I don't think the jurisdiction -- I may

19 not be understanding your Honor's question.

02:09 20   THE COURT:  So meaning, at some point -- and I

21 understand the point about it not being known at the time that

22 the petition is filed given now the factual record about where

23 your client was at the time, but I do recall that there was

24 language in that decision about what happens once the custodian

02:10 25 is known.  Should it become known that the petitioner is held

JA-000112

10

|   |   |
|---|---|
| 1 | in a jurisdiction other this one, a judge of this circuit would |
| 2 | be divested of jurisdiction. |
| 3 | So what would you have the Court do with that? |
| 4 | MS. LAFAILLE:  So I think I want to understand this |
| 02:10 5 | case in light of how the Supreme Court cited it.  What the |
| 6 | Supreme Court said is that, in this circumstance where the |
| 7 | custodian and location are unknown, the regular rules, the |
| 8 | regular immediate custodian rule doesn't apply.  And so that -- |
| 9 | that's all I draw from the citation of that exception in |
| 02:11 10 | *Padilla*, is that this is a recognized exception where if there |
| 11 | isn't a known custodian, the rules bend a little bit.  And, |
| 12 | again, we don't even think we're bending the rules, but the |
| 13 | rules bend a little bit.  And here we have personal -- we've |
| 14 | sued in a place with personal jurisdiction over the custodian |
| 02:11 15 | and where the client was -- where our client was detained. |
| 16 | THE COURT:  And my memory is that when you're reciting |
| 17 | to *Padilla* in this regard, that's the majority in *Padilla*. |
| 18 | MS. LAFAILLE:  Exactly, your Honor. |
| 19 | And there are two other exceptions recognized -- well, |
| 02:12 20 | recognized in the concurrence in *Padilla*, which I think are |
| 21 | perhaps less well established than the unknown custodian |
| 22 | exception, which is when the government is not forthcoming with |
| 23 | respect to the identity of the custodian -- |
| 24 | THE COURT:  And so, counsel, before jumping to that, |
| 02:12 25 | as I understand it, there are two issues, right?  There's the |

JA-000113

11

immediate custodian and then there's a place of confinement.
So are there other exceptions as to the immediate custodian
that you would have me consider?  I think the parties on both
sides had cited to *Vasquez*.

02:12  MS. LAFAILLE:  *Vasquez* I think is just establishing,
it's a case pre-dating *Padilla*, if I recall correctly, and is
establishing the general rule that, even in immigration cases,
we typically should sue the immediate custodian.  This is a
case where, you know, we're not talking about cases where it's
02:13  unknown who the immediate custodian is.

THE COURT:  Right.

MS. LAFAILLE:  Under this circumstance, we have not
only --

THE COURT:  And, counsel, I apologize if I wasn't more
02:13  precise.  I was talking about the language in *Vasquez* that
refers to exceptional circumstances, when you would depart from
that general rule.

MS. LAFAILLE:  Exactly.  This is a case that has a
number of those exceptional circumstances.  Because of the --
02:13  we've submitted a number of declarations just attesting to,
and, again, this is where this case differs from the *Khalil*
circumstances in the Southern District of New York where Judge
Furman said he did not believe, had been shown that the
circumstances were unusual.  Here we've submitted a number of
02:13  declarations attesting to --

JA-000114

12

```
 1              THE COURT:  And I've read them.
 2              MS. LAFAILLE:  -- how unusual what happened here was.
 3      And, particularly, the efforts to withhold information about
 4      Miss Ozturk's whereabouts from her counsel and from even
02:14 5  counsel for the government make this case particularly unusual.
 6              The declarations submitted by the government's witness
 7      at paragraph 20 talks about how at the time of petitioner's
 8      request there was no known counsel of record, and once, through
 9      the filing of this habeas, there was attorney contact
02:14 10 information, it was provided to the people in Louisiana so that
11      she could call counsel from Louisiana.
12              So, in other words, it was deliberately not provided
13      to people who were with Miss Ozturk and who could have helped
14      her call counsel, which, as her declaration attests, she was
02:14 15 asking to do.  That information was withheld from those who
16      could have given it to her at a time when she could have used
17      it to call counsel before being sent to Louisiana.
18              And I want to --
19              THE COURT:  Counsel, I can't recall if it's in the
02:15 20 submission by the government here or reflected in the papers
21      that were filed in the Khalil case where I've read the papers
22      in that case as well, but I imagine one of the responses from
23      the government is going to be in regards to some internal ICE
24      rule about having detainees have contact with their attorneys
02:15 25 within 24 hours of their detention.
```

JA-000115

13

|   |   |
|---|---|
| 1 | What, if anything, would you have me make of that, of |
| 2 | that rule? |
| 3 | MS. LAFAILLE:  Well, she didn't, first of all.  She -- |
| 4 | again, despite -- I think even if your Honor saw nothing |
| 02:16  5 | unusual in the fact that she couldn't call counsel within the |
| 6 | time that she was in Massachusetts and Vermont, it's still |
| 7 | quite unusual that even the government's own lawyers were not |
| 8 | told despite their efforts to learn their whereabouts, where |
| 9 | she was. |
| 02:16  10 | There's an added feature here, which is this Court's |
| 11 | order on Tuesday night close to 11:00 p.m. which instructed the |
| 12 | government not to move Miss Ozturk out of Massachusetts except |
| 13 | after 48 hours of notice.  The government getting that order |
| 14 | and knowing she was out of Massachusetts at the time of that |
| 02:16  15 | order had a couple of choices, one of which was coming to the |
| 16 | Court to say, hey, actually, she's already out of |
| 17 | Massachusetts, and obviously that wasn't the route taken.  The |
| 18 | route taken instead was to ignore the order and not disclose |
| 19 | her location to her counsel. |
| 02:17  20 | It's particularly notable because the intention of |
| 21 | that order is stated in the order, and it's to preserve the |
| 22 | status quo.  Even if the status quo at that moment was that she |
| 23 | was in Vermont, what the government did was the opposite of |
| 24 | preserving the status quo, which was secretly whisking her away |
| 02:17  25 | and making sure no one would know where she was until she was |

14

1      in Louisiana.

2              THE COURT:  Counsel, before I interrupted you with a

3      question before, I think you were moving to the other matter of

4      place of confinement, which I'm also interested in hearing

02:17  5      about.

6              MS. LAFAILLE:  So I think these are interrelated

7      concepts, of course.  In terms of the -- the government has

8      separated them in their brief, but the general rule, sue the

9      immediate custodian, sue the immediate custodian where the

02:18 10      custodian is, and, of course, that's also generally where the

11      petitioner is.  For the idiosyncratic reasons here, the vehicle

12      the petitioner was in had already crossed state lines.

13              We think, generally, the rule about suing in the

14      location of confinement is really just an expression of the

02:18 15      ordinary principle that we sue the immediate custodian in the

16      location where the immediate custodian is.

17              The same exceptions -- the exceptions we discussed

18      with regard to the immediate custodian is also relevant here.

19      Where the custodian is unknown, it's permissible to sue someone

02:19 20      higher up in the chain in the place where that person is.  Of

21      course, that's what we've done, and then here we have all of

22      these unusual circumstances involving efforts to make it

23      difficult for anyone to learn where Miss Ozturk was.

24              THE COURT:  And so, counsel, that language from the

02:19 25      concurrence in *Padilla* if I'm following correctly.

JA-000117

15

         1          MS. LAFAILLE:  With regards to the -- yes, the purpose

         2    of removing to make it difficult, exactly.

         3          THE COURT:  So, counsel, other than the concurrence in

         4    *Padilla*, what else do I -- do you rely on in regards to the

02:19    5    place of confinement?  And I understand your point that they're

         6    interrelated, although a number of the cases seem to treat them

         7    differently.

         8          MS. LAFAILLE:  Yes.  The place of confinement, again,

         9    this is not a situation where they're talking about subject

02:20   10    matter jurisdiction.  We're talking about habeas petitions,

        11    which are meant to be equitable.

        12          And I also want to go back to the purpose of these

        13    rules, which is to prevent forum shopping.  The purpose of

        14    these rules, of course, is to make sure that a petitioner

02:20   15    cannot simply choose which level of official they're going to

        16    sue or sue a national official in any jurisdiction of their

        17    choice in the United States.

        18          Here we have the opposite situation.  We really have a

        19    situation where the government is forum shopping, that is

02:20   20    whisking away a petitioner to its forum of choice and doing

        21    everything in its power to ensure that a habeas petition cannot

        22    be filed and then seeking the dismissal of this petition or a

        23    transfer to its forum of choice.

        24          So particularly keeping in mind that we're not talking

02:21   25    here about subject matter jurisdiction, and there's no question

JA-000118

16

```
 1    that there's personal jurisdiction, this really is about

 2    implementing venue and implementing the intention of the habeas

 3    statute, which again is to -- is set up to prevent petitioners

 4    from forum shopping and having a choice of forum.

 5         Here, Attorney Khanbabai sued in the only forum she

 6    really could have sued in unless she was going to sue in

 7    multiple forums, which, as is pointed out in the recent

 8    District of New Jersey opinion, might raise ethical questions

 9    if she can't have a good faith basis to assert that her client

10    is in a particular forum.

11         THE COURT:  And so I appreciate the argument.  I think

12    that is invoking the language in Justice Kennedy's concurrence,

13    I think, as the government has pointed out in their papers.

14    Although it was the concurrence, it was joined by two justices.

15    I was unable, as I think the judge in Khalil was unable, to

16    find any case in which a court has relied on that exception for

17    the purposes of finding jurisdiction where the petitioner was

18    not in -- was not in confinement in the district of which the

19    petition was filed.

20         So what do you say to that?

21         MS. LAFAILLE:  I think in looking at all those cases

22    the thing they have in common though is that the petitioner is

23    in another facility that has another custodian.  There

24    aren't -- I don't think we've seen a case where the petitioner

25    is in transit.  I'm not aware of one where these rules about
```

02:21  5
02:21 10
02:22 15
02:22 20
02:23 25

17

```
 1   habeas jurisdiction are being applied in such an unbending way
 2   to someone who is in transit still within the custody and
 3   control of the official in the state in which she was arrested
 4   and in which the petition was filed.
 5            THE COURT:  Thank you.
 6            MS. LAFAILLE:  And then, lastly, your Honor, largely
 7   for the reasons in the Khalil opinions, if the Court determines
 8   that Massachusetts is not an appropriate forum for this case,
 9   then transfer to Vermont would be the appropriate remedy, not
10   dismissal or transfer to Louisiana.  And that's simply, I
11   think, explained quite well in the Khalil decisions but also
12   just a straightforward application of 28 U.S.C. 1631.
13            THE COURT:  Right.  And I understood from the papers
14   that you were relying on 1631, although I think the Southern
15   District had invoked 1404 or 1406, but your argument is under
16   1631.
17            MS. LAFAILLE:  Yes, your Honor, and we also have
18   specific case law in the First Circuit Federal Home Loan Bank
19   vs. Moody's Corp., 821 F.3rd 102, that speaks specifically to
20   1631.  Questions have been raised about whether that provision
21   applies when there's an issue of personal jurisdiction as
22   opposed to subject matter jurisdiction.
23            So, in the First Circuit, it is law that any kind of
24   jurisdiction if there's an issue of habeas jurisdiction,
25   personal jurisdiction, that also is cause to apply this
```

02:23  (line 5)
02:23  (line 10)
02:24  (line 15)
02:24  (line 20)
02:24  (line 25)

JA-000120

18

```
 1   provision, and that decision also makes clear that the law in
 2   the First Circuit creates a presumption of transfer in that
 3   circumstance and it's only when it has to be found that it's
 4   not in the interest of justice to transfer the case that the
 5   analysis would result in not transferring.
 6              THE COURT:  Right.
 7              MS. LAFAILLE:  And I think for all the reasons we were
 8   discussing with regards to the application of the *Padilla*
 9   exceptions, we think it's certainly in the interest of justice
10   if the Court concludes that this is not an appropriate venue to
11   transfer the case to Vermont.
12              THE COURT:  And so 1631 is invoking the want of
13   jurisdiction of the transferring court.  Okay.
14              MS. LAFAILLE:  Correct.
15              THE COURT:  So, counsel, is it as an operation of 1631
16   or as of case law that the petition filed here would be taken
17   as having been filed on the evening of March 25th in Vermont?
18              MS. LAFAILLE:  As the *Khalil* decision in New Jersey I
19   think very well analyzes this provision, I think it could be,
20   just the text of it that it would be taken, proceed as if it
21   was filed in that court at the time it was filed.
22              THE COURT:  Thank you.
23              MS. LAFAILLE:  Thank you, your Honor.
24              THE COURT:  I'll hear from the government on this
25   point about jurisdiction.
```

02:25 5
02:25 10
02:25 15
02:26 20
02:26 25

JA-000121

19

```
 1              MR. SAUTER:  Thank you, your Honor.

 2              I'll start with where counsel started with the general

 3       rules that everyone understands apply to habeas provisions,

 4       which require for a court to have habeas jurisdiction that the

02:26 5      petition needs to be filed in the district of confinement and

 6       needs to name the immediate custodian over the petitioner.

 7              In this case, neither of those two general rules that

 8       have been called longstanding rules by the Supreme Court were

 9       followed.

02:27 10             THE COURT:  And, counsel, can the petitioner really be

11       faulted for that here given the circumstances that have become

12       clear even from the government's affidavit?

13             MR. SAUTER:  At the time of the original filing, no,

14       your Honor.  I don't think petitioner can be faulted for filing

02:27 15      the petition in Massachusetts.  Certainly at the time the

16       amended petition was filed on March 28th, it was clear at that

17       point that the district of confinement was the Western District

18       of Louisiana for at least three days at that point, two and a

19       half days, and the immediate custodian of that facility was

02:27 20      also known at the time, in time of the amended filing.

21             THE COURT:  Counsel, and I know your sister is

22       pointing me to the overlap of these considerations of place of

23       confinement and immediate custodian, but I'd like to hear you

24       in regards to the argument about the Court not needing to reach

02:28 25      any exception as to the immediate custodian given the transient
```

JA-000122

20

1    nature of her location at whatever it was, 10:03 or 10:05, on

2    the evening of March 25th.

3         MR. SAUTER:  I think, based on the standard practice,

4    an exception would need to be reached here because, again,

02:28  5    district of confinement, this petition was not filed in the

6    district of confinement and an immediate custodian was not

7    named, nor sister counsel indicates that she believes that the

8    immediate proper custodian was named in that supervisory

9    officials were named to the petition, but this is from the

02:28  10   Supreme Court to the First Circuit, down to this district court

11   that supervisory officials, such as the field office director

12   of ICE, even if that field office director covers New England,

13   is not a proper respondent to a habeas petition.

14        And *Vasquez*, the First Circuit case, discussed this

02:29  15   with, in that case, the petitioner had named that when INS, the

16   district director for Boston, First Circuit said, well, did not

17   name the respondent, the proper respondent, which was the INS

18   district director in Louisiana.

19        So, in this case, the proper respondent would have

02:29  20   been an ICE field office director that had jurisdiction,

21   immediate jurisdiction over Vermont where petitioner was at the

22   time.

23        THE COURT:  But that was unknown at the time.  So,

24   counsel, you've talked about *Vasquez*.  There was language there

02:29  25   about exceptional circumstances, right, in regards to the

JA-000123

21

immediate custodian where there's either furtiveness or bad

faith by the government.  It's an "or", so I don't think the

Court has to find both.  It can find either or.  Why shouldn't

I apply -- if for some reason I wanted to apply the unknown

02:30   exception, why shouldn't I reach that exception?

MR. SAUTER:  Yes, your Honor.  So *Vasquez* dealt with

two different potential extraordinary circumstances that the

First Circuit could imagine.  First was in citation to

*Demjanjuk* from Judge Bork where it said if petitioner was being

02:30   held at an undisclosed location.  The second was when there was

the facts that indicated that movement out of the district was

done to manipulate jurisdiction.

I'll take the first extraordinary circumstance, if

that's fine with your Honor, in terms of being held in an

02:31   undisclosed location.  So, again, this citation was from the

*Demjanjuk* case.  If you look at the facts of that case, it

dealt with an individual who was subject to immediate

extradition from the United States who was being held in a

confidential location.  Judge Bork acted on the petition,

02:31   saying that it won't make sense for the public to learn of the

location of the individual.

The facts in this case are dramatically different.

Within 24 hours of the arrest, petitioner's location was known.

THE COURT:  But, counsel, isn't the period I'd be

02:31   looking at when the petition was filed and at that time it was

JA-000124

22

```
 1    unknown?  It was undisclosed.
 2              MR. SAUTER:  It was undisclosed.
 3              THE COURT:  I should take that back.  It was known to
 4    the government but not disclosed to the petitioner.
 5              MR. SAUTER:  It was not disclosed to the petitioner at
 6    that time.  That is true.  And, again, going to the Demjanjuk
 7    decision, as the Court pointed out earlier, the language from
 8    Judge Bork says, at the point when the disclosure, when we
 9    learn where the individual is, if that individual is not in the
10    D.C. circuit, then the circuit loses jurisdiction over that
11    individual.  So that would be the case here when the next day
12    this was not an unknown location anymore, not an undisclosed
13    location.
14              THE COURT:  But it certainly was at the time the
15    petition was filed, counsel, right?
16              MR. SAUTER:  Yes, your Honor.
17              The other cases cited by the petitioner when she
18    discusses the unknown custodian also show the difference from
19    this case.  Those involved enemy combatants, Al Qaeda members
20    who were being held by the military overseas.  Those were the
21    first two cases cited.  The third case was a national class
22    action about detainees.
23              THE COURT:  Are we still talking about Vasquez?
24              MR. SAUTER:  This is talking about Vasquez because
25    it's talking about the undisclosed location, which is this same
```

23

```
 1   exception that's referenced by petitioner as the unknown
 2   custodian exception, I believe.
 3           THE COURT:  But I guess, counsel, I mean, I know that
 4   Vasquez, as I think you mentioned, does mention that case, but
 5   I'm not sure that they're exactly the same, right?  One is
 6   about unknown, and the other I suppose could also be unknown,
 7   but it seems focused on government conduct.
 8           MR. SAUTER:  Yes, your Honor.  And, again, with the
 9   government conduct here, and I think this also touches the
10   second possible extraordinary circumstance set forth by the
11   Vasquez court, whether there's an attempt to manipulate
12   jurisdiction, the government would argue here that there was no
13   attempt to manipulate jurisdiction.
14           The driving force for the transfer of petitioner
15   outside of Massachusetts was the fact that there is no detainee
16   facility, no facility to detain female detainees in
17   Massachusetts.
18           THE COURT:  And, counsel, I've read all of the
19   affidavits, right, filed by the government and the multiple
20   ones filed on petitioner's side.  I see reference in the
21   government's affidavit to sort of a characterization of the
22   movement of detainees being routinely conducted after arrest
23   due to operational necessity and considerations.  It doesn't
24   say anything about the timing of any detainee moves, and I now
25   have a number of affidavits from immigration attorneys
```

02:33  5
02:33 10
02:34 15
02:34 20
02:35 25

JA-000126

24

experienced in this field and working within this region who

say that the timing of these moves is not -- is not routine and

common.

Isn't that something I can look at under the *Vasquez*

exceptions?

MR. SAUTER:  I think what your Honor can look at is

the reasons set forth by ICE as to why she was transferred out

of Massachusetts and when those decisions were made.  Those

decisions were made prior to her arrest, which means they were

made prior to the filing of this habeas petition.  Prior to her

arrest it was determined that there is no detention facility in

Massachusetts where she could be detained.

So if she was transferred -- any places she'd be

transferred to after her arrest would be outside of

Massachusetts.  It was then determined that there was detention

location space for her at a female facility in Louisiana.  As a

result, a plan was put in place, which led to her transfer out

of Massachusetts to Vermont and then to a flight the next, very

early the next morning.

THE COURT:  I'm not sure, counsel.  Which way does

that cut in regards to the issue your sister brings up about

that counsel, even after the petition was filed on her behalf,

didn't know her whereabouts?  Like, I'm not sure that -- I'm

not sure that the prior arrangements made by the government are

a fact in the government's favor in this analysis.

JA-000127

25

1    MR. SAUTER:  I think the prior arrangements made by

2  the government show that there was no attempt to manipulate

3  jurisdiction of a habeas petition when that habeas petition had

4  not yet been filed when those arrangements were made.  If a

02:37   5  habeas petition is filed and then there was a flurry of

6  activity to try to bring a person outside of the jurisdiction

7  of that court, I think that would be the attempt to manipulate

8  jurisdiction.

9    THE COURT:  But what do you say to your sister's

02:37  10  argument that the flurry of activity actually continued after

11  the petition was filed and the government was on notice that it

12  had been filed and that she was represented?

13    MR. SAUTER:  The government activity that continued

14  was activity that had already been set in place prior to the

02:37  15  petition being filed.  She was being moved to Vermont so she

16  could spend the night in Vermont and then be able early morning

17  to take a flight out of Vermont.

18    THE COURT:  And, counsel, doesn't -- shouldn't that

19  movement be effected by an order entered by this Court?

02:38  20    MR. SAUTER:  If the petitioner was inside of

21  Massachusetts and the government learned that there was an

22  order prohibiting her departure or transfer outside of

23  Massachusetts, then that movement certainly would be effected

24  by such an order, but when she was not in Massachusetts, an

02:38  25  order that says, do not move from Massachusetts does not have

JA-000128

26

```
 1    that same effect.

 2            THE COURT:  Even if the respondents have nationwide

 3    authority presumably?

 4            MR. SAUTER:  Even if the respondents have nationwide

 5    authority?  The language of the order still says do not move

 6    outside of Massachusetts, which does not affect a situation

 7    when a person is already outside of Massachusetts.

 8            THE COURT:  And, counsel, just to move on to another

 9    consideration, still focused on Vasquez, counsel, in this

10    situation under Vasquez, the exceptions, can the Court consider

11    the circumstances of the arrest itself in regards to

12    furtiveness or bad faith?

13            MR. SAUTER:  I don't believe there's language in

14    Vasquez that would allow a court to consider the circumstances

15    of the arrest, your Honor.

16            THE COURT:  Why would that be, counsel?

17            MR. SAUTER:  I think what Vasquez is concerned about

18    is a transfer from district of confinement, and the arrest

19    itself is not related to the transfer outside of the

20    jurisdiction.  Vasquez is looking at if extraordinary

21    circumstances exist in an undisclosed location or if ICE

22    spirited the individual to another jurisdiction in an attempt

23    to manipulate jurisdiction to a different district.  The

24    lawfulness of the arrest itself --

25            THE COURT:  I'm not talking about the lawfulness.  I'm
```

02:38 (line 5)
02:39 (line 10)
02:39 (line 15)
02:39 (line 20)
02:40 (line 25)

27

talking about the circumstances.

MR. SAUTER:  I'm not sure I -- I'm not sure I understand the circumstances that you are referring to in terms of how it may affect.

02:40    THE COURT:  So whether or not -- so in regards to identification or where the petitioner was going to be transferred.

MR. SAUTER:  The information that we have, your Honor, from ICE is that the decision was made before of where she was 02:40 going to be transferred because there's not a detention location in Massachusetts for female detainees.

THE COURT:  Do I know anything in the record about what the petitioner was told at the time that the agents arrested her in regards to where she was headed?

02:41    MR. SAUTER:  No, your Honor.  Your Honor did reference earlier a detainee transfer policy that Judge Furman cited to in *Khalil*, Southern District of New York.

THE COURT:  This is in regards to the contact with counsel?

02:41    MR. SAUTER:  Exactly, your Honor.  A few things that come into play with that.  At the time of petitioner's arrest, ICE did not have a counsel of record for petitioner.  For ICE to have a counsel of record, the petitioner's counsel needs to submit a form called a G-28.  No G-28 had been submitted prior 02:41 to her arrest on behalf of petitioner.  That's set forth by ICE

JA-000130

in their declaration.

But the transfer policy, the language in the transfer policy indicates that the individual is not, does not have the opportunity to contact counsel until the individual arrives at the final destination.

So here on the night of her arrest, that was not her final destination in Vermont. Her final destination was next day in Louisiana. After she arrived in Louisiana, she was able to contact her attorney.

THE COURT: And so I guess, counsel, to ask you the flip side of what I asked your sister on this particular issue, I understand that ICE might have a policy in that regard but don't I get to consider that circumstance along with the other circumstances under *Vasquez*, at least as to this issue about the immediate custodian?

As I understand the affidavits that I now have, there's an affidavit that the petitioner was not able to contact her attorney, and obviously I had previously heard from her counsel that she wasn't able to locate her client.

So, as I said, the flip side of what I asked your sister, isn't that something I can consider?

MR. SAUTER: I think certainly that can be considered in the analysis of whether the petition was filed in the proper court. If she was not able to contact her attorney to say, I am in Vermont, then, as the Court asked earlier, can

|      |    |                                                                        |
|------|----|------------------------------------------------------------------------|
|      | 1  | petitioner's counsel be faulted for not filing in Vermont, and         |
|      | 2  | the government does not fault the petitioner's counsel for             |
|      | 3  | filing in Massachusetts.                                               |
|      | 4  | Does her inability to contact her attorney on the                     |
| 02:44| 5  | night of her arrest bring this into an exception? That's been          |
|      | 6  | discussed in *Vasquez* or in a concurrence and indeed is a            |
|      | 7  | different question. I think that question cuts against                 |
|      | 8  | petitioner, that it does not bring us into an exception because        |
|      | 9  | ICE following the policy that it follows did not allow a phone         |
| 02:44| 10 | call to be made that evening is not bad faith or is not an             |
|      | 11 | attempt to keep someone in an undisclosed location or to              |
|      | 12 | prevent the awareness of where the individual is going to be.          |
|      | 13 | That awareness came the next day, midday the next day, when it         |
|      | 14 | was apparent she was in Louisiana.                                     |
| 02:44| 15 | THE COURT: I wasn't suggesting that circumstance                       |
|      | 16 | alone, but it's one of the circumstances the Court could              |
|      | 17 | consider.                                                              |
|      | 18 | MR. SAUTER: I think the Court can consider that and I                  |
|      | 19 | think the Court would also, in that consideration, look that           |
| 02:45| 20 | it -- that action follows directly in accordance with an ICE          |
|      | 21 | policy.                                                                |
|      | 22 | THE COURT: And, counsel, I focused my questions on                     |
|      | 23 | this immediate custodian issue, but in regards to the place of         |
|      | 24 | confinement, which you also mentioned, counsel, what do you say        |
| 02:45| 25 | to your sister's arguments in regards to *Padilla* and otherwise?     |

30

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
|          | 1  | MR. SAUTER:  Place of confinement can't be swept away              |
|          | 2  | as one of the longstanding rules that the Supreme Court in         |
|          | 3  | *Vasquez* has looked at as a necessary precondition for the        |
|          | 4  | district court to exercise jurisdiction over a habeas petition     |
| 02:45    | 5  | because, again, the Court's order would be directed to             |
|          | 6  | custodian of the individual in the place of confinement.  If       |
|          | 7  | the individual is not located in the district that the Court       |
|          | 8  | sits, then the Court doesn't have jurisdiction over that           |
|          | 9  | person, the custodian.                                             |
| 02:46    | 10 | So even in the *Demjanjuk* case where it was found to be           |
|          | 11 | an exception of the immediate custodian rule, the court there      |
|          | 12 | was quick to note that once we learn the district of              |
|          | 13 | confinement, if it's not District of D.C., then the Court         |
|          | 14 | doesn't have jurisdiction.                                         |
| 02:46    | 15 | And that same reasoning was used by the *Khalil* court            |
|          | 16 | in New Jersey where the court there said, even if it is an        |
|          | 17 | unknown custodian, proper district for the petition to be heard   |
|          | 18 | still has to be in the district of confinement.  That's why the   |
|          | 19 | New Jersey, the *Khalil* New Jersey court said that was in New    |
| 02:47    | 20 | Jersey where she was detained at the time that the petition was   |
|          | 21 | filed.                                                             |
|          | 22 | THE COURT:  You mean in terms of the transfer between            |
|          | 23 | the Southern District and New Jersey?                             |
|          | 24 | MR. SAUTER:  Correct, your Honor.                                |
| 02:47    | 25 | THE COURT:  And so, counsel, on this last point, and             |

JA-000133

31

some of it I think you anticipated when I was asking you about *Vasquez*, why not consider the exception suggested in the concurrence?

        MR. SAUTER:  From *Rumsfeld v. Padilla*?

02:47        THE COURT:  From *Padilla*.  From *Padilla*.

        MR. SAUTER:  The Court doesn't need to consider it because it's not binding.  It's not holding from that Supreme Court case as Judge Furman in Southern District of New York discussed, but even if court -- well, I'll add the second point

02:48 to that, and I think the Court mentioned this earlier. Petitioner, in her briefing and argument here, was not able to provide any case nationwide that has applied the concurrence from *Padilla* to obtain relief, and Judge Furman made that point also.

02:48 But even if we look at those proposed exceptions from *Padilla*, I think we've discussed parts of them.  The first talks about ICE not being forthcoming with respect to the identity of the custodian or the place of the detention.  All of that information was known less than 24 hours after the

02:49 arrest on the next day.  So we're not in a situation where someone was being held in an undisclosed location for a determinant time.

        THE COURT:  But wasn't it a period, counsel?  I guess that's -- I mean, isn't my focus on when the petition was

02:49 filed?

32

|   |   |   |
|---|---|---|
| | 1 | MR. SAUTER:  When the petition was filed, your Honor, |
| | 2 | they -- petitioner's counsel did not know where she was. |
| | 3 | That's not the same thing as ICE not being forthcoming about |
| | 4 | her location.  ICE was still in the process of transporting her |
| 02:49 | 5 | through Vermont at the time that the petition was filed.  There |
| | 6 | hadn't been -- it would be a -- perhaps it would be a different |
| | 7 | situation if there was communication prior to the petition |
| | 8 | being filed and that information was not disclosed. |
| | 9 | THE COURT:  Counsel, let me ask a better question.  I |
| 02:50 | 10 | think *Padilla* also talks about the movement of the petitioner |
| | 11 | or of a petitioner as being one of the issues that could lead |
| | 12 | to the application of this exception that Justice Kennedy |
| | 13 | discussed. |
| | 14 | MR. SAUTER:  Right, whether there was an indication |
| 02:50 | 15 | that the purpose of the transfer was to make it difficult. |
| | 16 | THE COURT:  Yes. |
| | 17 | MR. SAUTER:  ICE, through a sworn declaration, stated |
| | 18 | the purpose of the transfer was to -- was because there was not |
| | 19 | facilities within Massachusetts where she could be detained and |
| 02:50 | 20 | the purpose of the transfer was to take her to a location where |
| | 21 | she could be detained. |
| | 22 | THE COURT:  But that doesn't stand as undisputed on |
| | 23 | the record now, does it, given the affidavits that have been |
| | 24 | filed in regards to bed space and processing and the timing of |
| 02:51 | 25 | movement? |

JA-000135

33

1          MR. SAUTER:  There's no bed space within, no detention

2     space within Massachusetts where a female detainee could be

3     detained for purposes of removal proceedings, which is why she

4     was detained.  So, in Massachusetts, there's none, no space for

02:51  5     female detainees.

6          THE COURT:  Right, but I guess -- isn't the *Padilla*

7     exception a little bit broader than that in regards to not just

8     about -- not just about the whether or not she's in

9     Massachusetts but whether or not she's being moved in a manner

02:51 10     in which it would make it difficult to determine where you

11     would file the petition?

12          MR. SAUTER:  Right, and I think this was discussed

13     before the southern district with Judge Furman in the *Khalil*

14     case.  The petitioner there tried to say the swift transfer

02:52 15     across a number of states brought upon this concurrence.  Judge

16     Furman there said no.  What the concern was in *Padilla* was

17     continuous movement so he could never be in one location to

18     allow the habeas petition to catch up.

19          THE COURT:  Right.

02:52 20          MR. SAUTER:  The transfers here were made so she could

21     get to the location where the habeas petition could be filed

22     the next day when she was in Louisiana.  So the transfers here

23     were not done in a way to try to, you know, stay ahead of the

24     habeas petition.  They were done to put her in a location where

02:52 25     she could be on a flight at five in the morning to end up at

JA-000136

34

1 the location that had been determined for her prior to her

2 arrest, prior to a habeas petition.

3    THE COURT:  Counsel, obviously your sister would have

4 me take a different interpretation of the facts here, and

02:53 5 obviously the *Khalil* case, I don't know what factual

6 development was made in regards to what the regular and routine

7 practice is, but I appreciate the argument.

8    Counsel, if I -- I don't know if you have anything

9 further to say on this point, but I know the government is

02:53 10 seeking dismissal of the petition, but if I were to choose not

11 to dismiss the petition, you argue in the alternative that I

12 should send this to the Western District of Louisiana.

13    Why should I do that as opposed to Vermont where this

14 petition could have been filed at the time that it was filed?

02:53 15    MR. SAUTER:  Thank you.  I will address that one very

16 quick last point on the --

17    THE COURT:  Sure.

18    MR. SAUTER:  -- the questions have been about the

19 unusual nature of transfers.

02:54 20    THE COURT:  Yes.

21    MR. SAUTER:  There was a recent news article that was

22 cited and the government's response involving a female

23 scientist who was detained at Boston Logan Airport.  She was

24 detained by Customs and Border Protection.  She was turned over

02:54 25 to ICE.  She was transferred from Massachusetts to Vermont, on

```
 1    a flight from Vermont to Louisiana.  This happened I believe in

 2    mid February.  So this circumstance that is alleged to have

 3    been very unusual --

 4              THE COURT:  Yes.  I guess the difference is, counsel,

 5    whether recent is regular, but I understand your point.

 6              MR. SAUTER:  Thank you.

 7              THE COURT:  I'll give it consideration.

 8              MR. SAUTER:  Thank you, your Honor.

 9              In terms of a proper venue for this case to be

10    transferred, so the government argues that they should be

11    transferred to the Western District of Louisiana because it is

12    the district of confinement.  The immediate custodian is known.

13    And when the transfer statutes, three of which have been cited

14    by the Court earlier, they look at where the petitioner might

15    have been brought or could have been brought.

16              The time that the amended petition in this case was

17    filed, there's only one location and first district where the

18    amended petition could be filed, and that's the Western

19    District of Louisiana at that time as the district of

20    confinement and the immediate custodian is known.  So a

21    transfer to the District of Vermont at this point, the court

22    there does not have jurisdiction over an immediate custodian

23    and the petitioner is not in that district either.

24              THE COURT:  Counsel, isn't it sort of common in civil

25    cases that an amended pleading would relate back to the
```

36

```
 1    original pleading?
 2            MR. SAUTER:  In civil cases, yes, generally.  I think
 3    here where we're dealing with the filing of a habeas petition
 4    in a proper district when there's two longstanding rules that
 5    when an amended petition is filed that is not in a proper
 6    district, it doesn't make sense for it to be transferred to
 7    another district that is also not proper because that district
 8    doesn't satisfy the longstanding rules.
 9            THE COURT:  But you're aware of the decision I might
10    find persuasive out of the District of New Jersey?
11            MR. SAUTER:  I am, your Honor.  The only -- the thing,
12    the distinguishing factor there is there was not an amended
13    petition that was filed and it wasn't filed at a time when this
14    was clear as to district of confinement and immediate custodian
15    over the petitioner.
16            THE COURT:  Thank you.
17            MR. SAUTER:  Thank you, your Honor.
18            THE COURT:  Counsel, if you want brief rebuttal.
19            MS. LAFAILLE:  Thank you, your Honor.
20            I guess I'll start here with the point about the
21    amended petition.  I don't think the government has cited a
22    single case where that is at all relevant for the
23    jurisdictional analysis here.  And, again, this plays very much
24    the wrong way into the concern for forum shopping that's at the
25    heart of these rules.  It's not possible at the time in these
```

37

cases where a petitioner is quickly being moved and the basis

for detention, the circumstances for detention, are unknown.

It's not possible to have a fully fleshed out habeas petition.

What the government is saying is, essentially, parties

02:57 should be penalized for amending habeas pleadings and that

should leave the government to be able to choose its forum.

And that just sets a very strange and dangerous precedent here.

I also want to go back to the -- actually, just to

stay on that point for a moment, it also cuts against ex parte

02:58 *Endo* and I thought the very persuasive points --

THE COURT:  Meaning where it's filed in the proper

district initially and someone has transferred after that?

MS. LAFAILLE:  Exactly, your Honor.  And nothing about

amendment changes that.  I think your Honor has it right that

02:58 the relevant thing for habeas is the time of filing.  Your

Honor referenced the language in Judge Bork's opinion.  That's

not binding on the Court and contrary to ex parte *Endo* which

makes clear that it's the time of filing.  It's the

jurisdiction at the time of filing that matters.  We think that

02:59 was established here.

I also would point to the compelling language in the

District of New Jersey opinion in this regard about gaps in

habeas jurisdiction.  We can't interpret these rules in a way

that would create periods of time when there's effectively no

02:59 habeas jurisdiction and no habeas petition can be lodged.  That

JA-000140

38

```
1    would --
2              THE COURT:  In terms of the travel of a detainee?
3              MS. LAFAILLE:  Correct, your Honor.
4         What the government is saying essentially is there is
5    no way in those early periods that a habeas petition could be
6    filed and considered if the government is making the choice to
7    move someone to their forum of choice and, essentially,
8    petitioners won't have the ability during those periods to file
9    petitions that would be considered.  That just runs contrary to
10   the suspension clause and ex parte *Endo*.
11        I also want to talk about this prior plan thing and
12   the government's argument that the prior plan somehow helps the
13   government.  First of all, the notion that the prior plan was
14   due to bed space constraints is not something the Court has to
15   credit.  It is in a sworn declaration, but it's a sworn
16   declaration of an officer who is claiming no personal knowledge
17   over that and is claiming to write this declaration based on
18   reviews of record systems and conversations with undisclosed
19   other people.
20        So I see nothing there that needs to be credited,
21   particularly when on the other side of that ledger there is
22   credible testimony, including the declaration of Miss Walsh,
23   Attorney Walsh saying that there's reason to think that there
24   was bed space in New England and that transfer --
25             The government says, of course, in this paragraph 6 of
```

39

this declaration, the portion over which we're talking about

that there is no personal knowledge, that there was no bed

space in a facility where essentially in New England, where the

petitioner would have been able to appear for an immigration

03:01  court hearing in New England.  Attorney Sauter kept quoting no

space in Massachusetts.  Of course, that's not the same thing

as the declarations.  We know there is reason to think there

was bed space in New England.

And the Court doesn't have to ignore what was

03:01  happening.  The government was already embroiled in litigation

about Mr. Khalil and litigation of a number of other cases

similarly involving students and scholars arrested in response

to pro-Palestine protests.  It does not have to -- the Court

does not have to ignore the question of venue as being

03:02  litigated, and the government would have had every incentive to

transfer Miss Ozturk quickly and not to inform her counsel and

to make it difficult essentially for counsel to learn her

location.

The rule about calling counsel, again, even if that

03:02  wasn't violated, that says nothing about when counsel is making

affirmative attempts to reach the petitioner and, again, it

says nothing even about why even counsel for the government

were not told where Miss Ozturk was even though -- it appears

they were making, at least represented to us, that they were

03:03  making inquiries about her whereabouts, and that's particularly

JA-000142

40

```
 1    troubling in light of the supposed prior plan.
 2         If there was a prior plan all along and these
 3    movements weren't happening in the spur of a moment fashion,
 4    which I accept, then it's even more troubling that counsel for
 5    the government won't have been informed about it at a time when
 6    corrective action might have been taken.
 7         The Russian scientist case that Mr. Sauter
 8    mentioned --
 9         THE COURT:  In a footnote, yes.
10         MS. LAFAILLE:  Somebody was transferred to Vermont.  I
11    appreciate that this is not in the record but I'm happy to get
12    an affidavit from this attorney.  That attorney spoke to his
13    client while she was in Vermont because her location in Vermont
14    was disclosed to him.
15         So, again, this just highlights the unusual nature,
16    like all of the declarations highlight, of what was done here
17    and I think makes abundantly clear that these circumstances,
18    even if they don't fall within the ordinary rule, which for the
19    reasons we've said we think they do, certainly fall within
20    exceptions that are intended again to be consistent with the
21    interest to prevent forum shopping to extend the jurisdiction
22    of habeas courts in equitable ways.
23         And, finally, on this point about the immediate
24    custodian, Mr. Sauter still hasn't been clear about which
25    custodian he thinks the petitioner should have named or could
```

03:03  5
03:03 10
03:03 15
03:04 20
03:04 25

JA-000143

41

|   |   |
|---|---|
| 1 | have named.  I believe he said during his remarks that it would |
| 2 | have been the ICE field office director with control over |
| 3 | Vermont.  That is exactly who he named.  Because there's a New |
| 4 | England field office, a field office director sits in |
| 03:05  5 | Massachusetts in Burlington, and that person has control -- |
| 6 | THE COURT:  This is Miss Hyde? |
| 7 | MS. LAFAILLE:  Yes. |
| 8 | I'll end just where I started.  I'm sure we've all |
| 9 | seen the video of Miss Ozturk being grabbed by ICE officers on |
| 03:05 10 | the street in Somerville.  If we could freeze that moment in |
| 11 | time and imagine a habeas petition being filed, which surely |
| 12 | she had the right to file if there was the wherewithal to do it |
| 13 | at that moment, it's clear that the -- |
| 14 | I don't think Mr. Sauter is saying that the ICE |
| 03:05 15 | officer who was physically grabbing her would have been the |
| 16 | custodian.  The custodian had to be the person in control of |
| 17 | the New England area for ICE.  I took his remarks to be |
| 18 | essentially acknowledging that.  And that didn't change.  That |
| 19 | person in control did not change when the vehicle that |
| 03:06 20 | Miss Ozturk was in crossed state lines. |
| 21 | So we think this, although this is an unusual case |
| 22 | where the client was across state lines, she was in a vehicle, |
| 23 | her condition -- excuse me -- her custodian had not changed. |
| 24 | And for all of the reasons we've articulated, habeas |
| 03:06 25 | jurisdiction in this court is consistent with ordinary |

JA-000144

```
 1    principles of habeas jurisdiction and, if not, certainly the
 2    government's behavior, ignoring a Court's order and whisking
 3    her away, certainly give ample reason to preserve the
 4    jurisdiction of this Court in Massachusetts.
03:06  5          THE COURT:  And, if not, in the District of Vermont,
 6    counsel?
 7          MS. LAFAILLE:  Well, we think this case --
 8          THE COURT:  And if not, in the District of Vermont?
 9          MS. LAFAILLE:  Sorry, your Honor.  I hear you now.
03:07 10   Yes.  Absolutely, your Honor.  If not here, then a transfer to
11   Vermont would be the appropriate remedy.
12          THE COURT:  Meaning I took those to be alternative
13   arguments as the government has made alternative arguments.
14          MS. LAFAILLE:  Yes, your Honor.
03:07 15          THE COURT:  Counsel, I appreciate the arguments, thank
16   you, on both sides.
17          Counsel, I think there were other folks, some who are
18   on Zoom, that were queued up to address other issues.  To be
19   completely transparent, as hopefully my questions to both sides
03:07 20   suggested, I'm very focused on the jurisdictional issue, which
21   is very much a live issue here, so I'm inclined to wrestle with
22   that a little bit more and get a decision out in that regard.
23   And then if there are further proceedings, we would go from
24   there.  Okay?
03:07 25          Thank you, counsel.
```

43

1            THE CLERK:  All rise.

2            (The Honorable Court exited.)

3            (Adjourned, 3:09 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

44

```
 1                    C E R T I F I C A T E

 2

 3

 4   UNITED STATES DISTRICT COURT )

 5   DISTRICT OF MASSACHUSETTS    )

 6

 7

 8          I, Kristin M. Kelley, certify that the foregoing is a

 9   correct transcript from the record of proceedings taken

10   April 3, 2025 in the above-entitled matter to the best of my

11   skill and ability.

12

13

14      /s/ Kristin M. Kelley            April 8, 2025

15      Kristin M. Kelley, RPR, CRR            Date
        Official Court Reporter
16

17

18

19

20

21

22

23

24

25
```

1

1          UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF VERMONT
2

3   RUMEYSA OZTURK,                )
                                   )
4                                  )
          vs.                      ) CASE NO. 2:25-cv-374
5                                  )
    PATRICIA HYDE, MICHAEL KROL,   )
6   TODD LYONS, KRISTI NOEM,       )
    DONALD J. TRUMP, MARCO A.      )
7   RUBIO,                         )
                                   )
8                 Defendants.      )
    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )
9

10

11

12        Telephonic status conference held at 12:11 p.m.

13   on Monday, April 7, 2025, in Burlington, Vermont,

14   before Honorable William K. Sessions, III, District

15   Judge.

16

17

18

19

20

21   Sarah M. Bentley, CCR-B-1745
      Registered Professional Reporter and Notary Public
22

23

24

25              BENTLEY COURT REPORTING
                  sbireland7@gmail.com

2

1                          A P P E A R A N C E S

2

3      For the Plaintiff:

4              LIA N. ERNST, ESQ. (via telephone)
               ACLU Foundation of Vermont
5              P.O. Box 277
               Montpelier, Vermont  05601-0277
6              lernst@acluvt.org

7

               RAMZI KASSEM, ESQ.  (via telephone)
8              Main Street Legal Services, Inc.
               CLEAR Project
9              CUNY School of Law, 5th Floor
               2 Court Square
10             Long Island City, New York  11101
               (718) 340-4558
11

12

13

14

15     For the Defendants:

16             MICHAEL P. DRESCHER, ESQ.  (via telephone)
               Assistant United States Attorney
17             United States Attorney's Office
               3rd Floor
18             11 Elmwood Avenue
               Burlington, Vermont  05402-0570
19             (802) 951-6725
               michael.drescher@usdoj.gov
20

21

22

23

24     Also Present:

25

3

1                        I N D E X

2

3                                           PAGE

4    Statements by Mr. Kassem              6, 27, 30

5
     Statements by Mr. Drescher              19, 26
6

7    Statement by the Court              18, 23, 28

8

9                    *      *      *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
1              P R O C E E D I N G S

2

3

4           THE CLERK:  Please be seated.

12:11  5           THE COURT:  Good afternoon.

6           THE CLERK:  This is Civil Case No.

7      25-374, Rumeysa Ozturk vs. Patricia Hyde,

8      Michael Krol, Todd Lyons, Kristi Noem, Donald J.

9      Trump, and Marco Rubio.

12:11  10          Present for the plaintiffs by telephone

11     is Lia Ernst and Ramzi Kassem.

12          Present for the defendant is Assistant

13     United States Attorney Michael Drescher.

14          The matter before the Court is a status

12:11  15     conference.

16          THE COURT:  All right.  This is a status

17     conference.  Let me set, as I understand it, the

18     background to this Court's involvement.

19          First, the petition was filed in the

12:12  20     District of Massachusetts.  Soon after the

21     petition was filed the government filed a motion

22     to dismiss, essentially arguing, first, that

23     there was no jurisdiction in Massachusetts

24     because at the time of the filing of the

12:12  25     petition the petitioner was not in the district
```

5

1    of confinement and did not identify the persons

2    who were restricting her liberty.  And, as a

3    result, the matter should be dismissed for lack

4    of jurisdiction.

12:12  5    Second, the government is also arguing in

6    its motion to dismiss that under the Immigration

7    and Nationality Act essentially the Court, this

8    Court, the Article 3 court has no jurisdiction,

9    and this was exclusively delegated to the

12:13  10    immigration authorities.  And, of course, the

11    petitioner has objected to both of those

12    requests.

13    Finally, the petitioner has

14    also requested a release from confinement.

12:13  15    It seems to me that the Court needs to

16    address the question of whether it has

17    jurisdiction in this case, both in terms of

18    whether the petition that was filed in

19    Massachusetts on the 25th of March gave the

12:13  20    Court jurisdiction and, second of all, whether

21    the Court still has jurisdiction in light of the

22    application of the Immigration and Nationality

23    Act.

24    First, the Court has to decide whether it

12:13  25    has personal jurisdiction in this particular

6

1    case.  If it does, then the Court needs to

2    address the request on the part of the

3    petitioner for release from confinement.

4         So let me turn to the lawyers for the

12:14  5    case, first the lawyers for the petitioner,

6    Mr. Kassem.

7         And, also, Mr. Drescher I think is

8    representing the government; is that correct?

9         MR. DRESCHER:  It is.

12:14  10   THE COURT:  Okay.  So let me ask you

11   whether I described the background correctly and

12   tell me, I think you have requested a status

13   conference, Mr. Kassem, I believe, and so tell

14   me what your thought is about how we proceed.

12:14  15   MR. KASSEM:  Thank you, your Honor.  Good

16   morning.

17        THE COURT:  Good morning.

18        MR. KASSEM:  This is Ramzi Kassem for the

19   petitioner, Rumeysa Ozturk.  I'm from the CLEAR

12:15  20   Project at CUNY School of Law.

21        First of all, on behalf of our client and

22   the rest of the legal team, I'm like to thank

23   the Court for its attention to this pressing

24   matter.

12:15  25   And with the Court's permission I'd like

7

1    to take just a few minutes to review the case's

2    stance from our perspective, and if the Court

3    will indulge --

4            THE COURT:  Yes.

12:15  5            MR. KASSEM:  -- I have four keys points.

6            THE COURT:  Yes.

7            MR. KASSEM:  First of all, your Honor --

8            THE COURT:  I think you should identify

9    exactly what is before the Court.

12:15  10            I don't think that you have to get into

11    extended argument at this particular point.  I

12    should tell you that I have read all of the

13    pleadings that were before Judge Casper in

14    Massachusetts.  I've also read her decision and

12:15  15    begun research into the issues that are

16    presented by this really unique case.

17            So -- but you don't need to get into the

18    argument.  You're going to have plenty of

19    opportunity to do that in the very near future,

12:16  20    but go ahead.

21            MR. KASSEM:  Thank you, your Honor.

22            I mean, the top one, your Honor, is, of

23    course, that Ms. Ozturk was locked up by ICE and

24    by the government essentially for co-authoring

12:16  25    an op-ed in a Tufts campus newspaper.  So that

8

1    is retaliation for her speech, we allege, which

2    also -- which also chills not just her speech

3    but the speech of many others, offending our

4    most basic notions of freedom.

12:16    5        And in her case it's part of a larger

6    pattern, as your Honor well knows by now,

7    including such cases as Mr. Mahmoud Khalil's

8    case, Dr. Badar Khan Suri, and, also, Yunseo

9    Chung, Rajani Srinivasan and Momodou Taal, and

12:16    10   the list does not end there.

11       So from our perspective, your Honor, the

12   Court has the power to grant release right now.

13   The government has responded to the amended

14   habeas petition, as the Court well knows.

12:16    15   Petitioner has replied, so that petition is

16   fully briefed and ripe for decision,

17   particularly as to the urgent detention claims

18   raised in habeas, and so the Court could today

19   grant the writ, order the petitioner's release,

12:17    20   and then we litigate the remaining --

21       THE COURT:  One, as I say, I have read

22   the motion to dismiss.  I've read your response.

23       The problem, of course, is that when the

24   case was in Massachusetts you were in the

12:17    25   1st Circuit.  And one of the observations that I

9

1    made in regard to the memoranda that were

2    submitted is that you focused, quite naturally,

3    on 1st Circuit law.  In particular, the Vasquez

4    became very much a part of the issue.  That's a

12:17    5    1st Circuit case.

6           Well, you're now in the 2nd Circuit.

7    And, of course, the Court responds directly to

8    the expertise of the judges of the 2nd Circuit,

9    and there is no research that has been shown to

12:17    10    me about how the 2nd Circuit has applied some of

11    these concepts of law in its precedent.

12           So I appreciate the fact that you say

13    that the motion to dismiss is fully briefed but,

14    in fact, it's not because nobody has dealt with

12:18    15    2nd Circuit cases.

16           Do you disagree?

17    MR. KASSEM:  We fully appreciate that

18    point, your Honor.  And, in fact, if I may just

19    make two points in quick response.

12:18    20           First, you know, as extraordinary as this

21    case may be, your Honor has already recognized

22    the Lakhani case, L-A-K-H-A-N-I, the

23    well-established principal that habeas cases

24    should be filed in the judicial district in

12:18    25    which the petitioner is held at the time they

10

1    are filed, and so this case is no different from

2    that.  And so the issue is not entirely novel to

3    the Court.

4          The second point I'd like to make, your

12:18  5    Honor, is that should the Court understandably

6    wish to see additional briefing under 2nd

7    Circuit case law, that briefing has already

8    occurred in other cases, including one that my

9    organization and some of our co-counsel are

12:19  10    involved in and, of course, that the government

11    is involved in in the 2nd Circuit so that should

12    not delay the issue.

13          Because, of course, the cost of the delay

14    is being born by Ms. Ozturk, and for habeas

12:19  15    purposes that is a grave harm and that's why

16    habeas exists as a remedy, as the Court well

17    knows.

18          So what we would propose, your Honor, is

19    that to the extent that any additional briefing

12:19  20    is needed, whether it's on bail or venue, that

21    briefing should be expedited, ideally starting

22    with bail first or at least proceeding on

23    parallel tracks where one does not hold up the

24    other.

12:19  25          And what we would suggest is that

11

1    plaintiffs file any -- any supplement with

2    2nd Circuit case law tomorrow.  You know,

3    respondents can either file simultaneously or by

4    the following day, Wednesday.  We would be

12:19   5    willing to waive our reply and tee up the

6    issues, and we'll willing to do this, your

7    Honor, both on bail as well as venue; to tee up

8    the issues for resolution as soon as possible.

9         Petitioner's counsel would be glad to

12:20  10    appear later this week for a hearing, should the

11    Court wish to call us in, or at the earliest

12    possible time convenient to the Court.

13         THE COURT:  Well, as I assess the issues,

14    you have hit two of them.  That is, the bail

12:20  15    question, obviously, and whether there's

16    jurisdiction as a result of the filing of the

17    petition in Massachusetts at a time when the

18    petitioner was located.  That's her district of

19    confinement was in Vermont, and so the question

12:20  20    is whether that's a valid petition or whether it

21    should be dismissed.

22         But there's a third issue as well, and of

23    course the government has requested, in its

24    motion to dismiss, to dismiss the case based

12:21  25    upon the Immigration and Nationality Act.

12

1    You've responded to that in your briefing.

2        You haven't responded necessarily with

3    2nd Circuit case law, but it seems to me that

4    before the Court addresses the issue of release,

12:21  5    that the Court make a determination that it, in

6    fact, has jurisdiction, and that requires the

7    answer both to the question about whether it's a

8    proper place of filing but it also requires an

9    answer to the initial question as to whether

12:21  10    this case should be dismissed under the

11    Immigration and Nationality Act.

12        And do you agree with that?

13        MR. KASSEM:  Well, your Honor, we take a

14    slightly different perspective, both on that

12:21  15    point and, of course, on the government's

16    position as to the INA jurisdictional bars that

17    your Honor is referencing.

18        Our view, your Honor, is that,

19    respectfully, the Court can rule on the venue

12:22  20    issue should it so decide, and at that point the

21    Court would have jurisdiction to order release.

22        Of course, our client is not a flight

23    risk.  The government has not contended that

24    she's a flight risk.  All she wants to do is to

12:22  25    return to her home and to her studies at Tufts,

13

1    and at that point we could litigate the

2    jurisdictional bars.

3         And should the Court at the end of that

4    process conclude that the government has the

12:22  5    better end of the argument on the INA

6    jurisdictional bars, then all the options would

7    be left on the table for the government.

8         The government would be no worse off

9    should it seek to re-detain Ms. Ozturk following

12:22  10   a dismissal of the habeas petition and complaint

11   based on the INA jurisdictional bars.  That

12   option would be on the table.  The government

13   would be no worse off.

14        Your Honor, our concern is the delay that

12:22  15   would be occasioned by lengthy litigation over

16   these jurisdictional questions because the cost

17   of that delay would be born by Ms. Ozturk.

18        And recently, as in the Srinivasan case,

19   the Supreme Court has held that the habeas

12:23  20   corpus, the cost of the delay, should not be

21   born by the detainee.

22        So the appropriate course here would be

23   for the Court to rule on venue and bail as a

24   priority, and then we can litigate the INA

12:23  25   jurisdictional bars, which actually merge into

14

1    the merits of the blended petition and complaint
2    that we filed.
3         And so it's appropriate to litigate those
4    at that stage while Ms. Ozturk is back home at
5    Tufts completing her course of study.  Again,
6    the government would be no worse off by that
7    outcome.
8         The alternative would place the cost of
9    delay squarely and exclusively on the shoulders
10   of Ms. Ozturk, which the Supreme Court has
11   already said is inconsistent with the purpose of
12   the great writ.
13        THE COURT:  Well, you've got a filing by
14   the government under the Immigration and
15   Nationality Act which seeks dismissal.  You have
16   a whole briefing from the government.  You
17   apparently have fully briefed the response.
18        Don't you think, assuming that there's an
19   update to reflect the case law in the 2nd
20   Circuit, don't you think the Court could address
21   the motion to dismiss quickly based upon the
22   pleadings that have already been submitted and
23   the pleadings that would be submitted that are
24   updating the previous submissions by additional
25   case law?

15

1    So we're not talking about a significant

2    delay.  You know, quite frankly, I was fully

3    anticipating addressing the motion for the

4    jurisdiction, the motion to dismiss under the

12:24   5    Immigration and Nationality Act, and the

6    question of release on confinement

7    expeditiously.

8    And, in fact, you know, my thought, and I

9    will submit to you and then I'll ask

12:24   10   Mr. Drescher to respond for the government, is

11   that I would give both sides until Thursday at

12   5 o'clock for the submission of updated briefing

13   on the motion to dismiss and the motion for no

14   jurisdiction for the Court, as well as the

12:25   15   request for release from confinement, all

16   briefing for that by Thursday.

17   I'd make available the Court for argument

18   on Monday, Monday morning, and, also, submission

19   of any evidence that either side would want to

12:25   20   provide.

21   I mean, I know that you've submitted a

22   whole series of affidavits.  I don't think it's

23   necessary that it be oral testimony, but it may

24   be that one side or the other may request oral

12:25   25   testimony.

16

1    Frankly, I would make my schedule
2  available on Monday, into Tuesday and with a
3  full eye -- with a full goal of addressing all
4  of these issues expeditiously.  And so you tell
5  me if you have an objection to that process.

6    That is, opening up the Court for hearing
7  on Monday with the idea that I would address all
8  of these issues quickly.

9    MR. KASSEM:  Thank you, your Honor, and,
10  again, we truly appreciate, all of us, including
11  our client, we all appreciate the Court's prompt
12  attention to this case, including the schedule
13  that your Honor is suggesting.

14    I would just like to make two points.  As
15  your Honor appreciates, from our perspective
16  Ms. Ozturk has already spent 13 days behind bars
17  at a facility in Louisiana, a distance from her
18  community, all for writing an op-ed, which is
19  already far longer than any free society should
20  tolerate.  And that's where, you know, our
21  position -- that's what our position is rooted
22  in fundamentally.

23    The other point I'd like to make, your
24  Honor, is to share with the Court what we, those
25  of us who have represented other similarly

17

1      situated petitioners in other cases outside of

2      this district, what we've seen in those cases;

3      for example, the Mahmoud Khalil case, which has

4      dilatory tactics.

12:27   5           And, of course, I do not impute that

6      intention onto opposing counsel here, but I'm

7      just sharing sort of the larger pattern that

8      we've seen, which is re-litigation of the venue

9      issue in the transferee court, which here in the

12:27  10      District of Vermont is the transferee court

11      under 1631, following the ruling by the District

12      of Massachusetts.

13           So venue re-litigation followed by a

14      request for certification for interlocutory

12:27  15      appeal and probably a stay motion.

16           So, again, this is our concern, is that,

17      you know, getting into the jurisdictional

18      questions, including the INA bar arguments that

19      the government has made, would again shift the

12:28  20      cost of delay onto Ms. Ozturk.

21           But with that said, your Honor, I think

22      the schedule you're proposing is certainly

23      expedited.  With the Court's permission, perhaps

24      while Mr. Drescher addresses the Court, I will

12:28  25      confer with my co-counsel, and then if the Court

18

1    permits me to come back on mic I'll share our

2    position.

3         THE COURT:  Okay.  And as you share with

4    co-counsel the Court's suggestion, you know,

12:28    5    understand that the first thing the Court has to

6    do in any litigation is make a determination as

7    to whether it has jurisdiction.  And if it

8    doesn't have jurisdiction, it has no authority

9    or power to order anything.

12:28    10        So I appreciate the difficulties that

11    you're experiencing with your client being

12    incarcerated, but understand that to actually

13    address this question thoroughly and correctly I

14    first have to make a decision in regard to

12:29    15    whether, in fact, I have jurisdiction and

16    whether a motion to dismiss, it seems to me,

17    should be granted.

18        What I'm offering to both sides is an

19    expedited process by which this would be

12:29    20    resolved quite, quite quickly.

21        So with that, Mr. Drescher, you've heard

22    the issues that have been presented by the

23    petitioner and the previous pleadings by the

24    government.  What is your thought as to whether

12:29    25    or not the schedule that the Court is proposing

19

1      is acceptable?

2            MR. DRESCHER:  Thank you, your Honor.

3            We agree that jurisdiction is absolutely

4      the threshold issue that the Court needs to

12:30  5      address; that the provisions of Title 8 raise

6      serious jurisdictional questions that the Court

7      has to navigate and deal with in deciding

8      whether it has jurisdiction over this case.

9            An additional wrinkle that I'm not sure

12:30  10      may be on your Honor's radar is the question as

11      to whether the transfer under 1631 is

12      appropriate or whether 1631 on its face vests

13      this Court with jurisdiction.  That is a

14      question that the district court in New Jersey

12:30  15      in the <u>Khalil</u> case that Mr. Kassem referenced

16      has actually certified for an interlocutory

17      appeal.

18            In that case New Jersey was the

19      transferee district from the Southern District

12:31  20      of New York.  The application of 1631 needs to

21      be dealt with as well, and the government

22      intends to supplement.  Or actually in light of

23      the Court's -- in light of the Court's vision

24      for how to proceed here, we'd be arguing that

12:31  25      under 1631 -- that 1631 does not create

20

1    jurisdiction in this court, and that under 1631

2    the appropriate district for the case to be

3    transferred to is in the Western District of

4    Louisiana rather than Vermont.

5    We also agree with your Honor that the

6    briefing that occurred in Boston was, quite

7    understandably, very 1st Circuit centric and

8    that this Court should have the benefit of 2nd

9    Circuit research, specific research on this

10    case.

11    And then with regard to the schedule, of

12    course we're going to do whatever the Court

13    directs in that regard.  The one reason why a

14    slower schedule might make sense, and I'm going

15    to suggest to the Court, is that it is my

16    understanding that petitioner has the

17    opportunity to seek release on conditions before

18    the immigration judge.  I do not know --

19    THE COURT:  Well, wasn't she before the

20    immigration judge this morning?

21    MR. DRESCHER:  Perhaps her counsel can

22    address that.

23    MR. KASSEM:  Your Honor, no, she was not.

24    THE COURT:  She was not?

25    MR. KASSEM:  She was not.

21

1          THE COURT:  I thought there was a hearing

2     scheduled for the morning of the 7th, and I was

3     wondering whether there were any developments

4     about her confinement?

12:32   5          MR. KASSEM:  Your Honor, there may have

6     been some confusion.  There is an immigration

7     court hearing in another case, Mr. Khalil's case

8     in Louisiana today, so that may have been, you

9     know, the news that reached the Court.

12:33  10          But with respect to Ms. Ozturk, there is

11     no immigration court hearing today.  In fact,

12     there is none on the calendar.

13          What is immediately teed up in the

14     immigration case in Louisiana for Ms. Ozturk is

12:33  15     that the government has until April 24th to

16     respond to Ms. Ozturk's denial to immigration

17     counsel of all charges.

18          THE COURT:  Well, I --

19          MR. KASSEM:  And, your Honor, to clarify,

12:33  20     the immigration court cancelled the hearing that

21     was originally on schedule for today.

22          THE COURT:  Oh, I see, so that there was

23     a hearing.

24          Because I read your pleadings.

12:33  25          MR. KASSEM:  Correct, your Honor.

22

1    Correct.

2            THE COURT:  And I was -- it was clearly

3    indicated that she was going to be before the

4    immigration court this morning.  But what you're

12:33  5    saying is that the immigration court postponed

6    the hearing?

7            MR. KASSEM:  You were correct, your

8    Honor.  The immigration court cancelled the

9    hearing in favor of the briefing scheduled that

12:34  10    I just mentioned.

11            So Ms. Ozturk denied the immigration

12    charges in immigration court, and now the

13    government has until April 24th to respond in

14    writing.

12:34  15            THE COURT:  All right.  And as far as you

16    know there's no request for release pending

17    before the immigration court?

18            MR. KASSEM:  Not at present, your Honor.

19            THE COURT:  Okay.

12:34  20            All right.  Mr. Drescher, you've added an

21    additional issue and you've also agreed with me

22    that the pleadings have to be updated to include

23    2nd Circuit case law.

24            Well, do you have any objection to

12:34  25    ordering that all of the briefings be submitted

23

1    by 5 o'clock Thursday afternoon and that the

2    Court would be available for argument of counsel

3    on Monday and that if, for any reason, any side

4    wishes to call witnesses, that they would notify

12:35   5    the Court in advance?

6         The witnesses would be called, and the

7    Court would make available time for the hearing

8    of those witnesses if the Court felt it

9    necessary to hear from those witnesses.  And

12:35   10   that hearing would start on Monday and continue

11   until completed.

12        Is there any objection to that schedule?

13        MR. DRESCHER:  My only -- in short, your

14   Honor, yes.  My objection is that planning for

12:35   15   an evidentiary hearing before the Court has

16   addressed the question of jurisdiction seems --

17   it seems irregular under the circumstances; that

18   we need to understand the Court's authority.

19        THE COURT:  Except it's not really.  So

12:36   20   when you actually look at the question about the

21   filing in Massachusetts when, in fact, she was

22   in Vermont, the question is whether that filing

23   has to literally comply with the rules in regard

24   to habeas corpus petitions, or are there

12:36   25   exceptions in extraordinary circumstances?

24

1          And I would suspect, because I don't want

2    to get off into this litigation at this point,

3    but I would suspect that the petitioner may say

4    that she doesn't have to follow all of the

12:37  5    literal requirements like district of

6    confinement.

7          In a situation in which she has no idea

8    where her client is, the lawyer would have no

9    idea where the client is, and as a result the

12:37  10    argument may be that the filing in Massachusetts

11    for judgment here is essentially a filing for

12    habeas in any place once she finds out where the

13    client is.  That is extraordinary circumstances,

14    and the question is whether extraordinary

12:37  15    circumstances apply in this case.

16          So it may be that one side would want to

17    introduce evidence to show what the

18    extraordinary circumstances were, which

19    justified the Court accepting the submission of

12:38  20    the petition that was filed in Massachusetts as

21    one that's effective in Vermont.

22          That means that we may have evidence in

23    regard to how the process happened, and that is

24    before we make a determination as to whether the

12:38  25    Court has jurisdiction because that -- that is

25

1    related to whether the Court has jurisdiction.

2         So there could be a circumstance, I would

3    imagine, in which some party would want to call

4    evidence about what happened and why the

12:38   5    petitioner was not able to file in Vermont when

6    the petitioner was in Vermont.  And that all

7    relates to the question of extraordinary

8    circumstances justifying some variance as to the

9    legal requirements of the filing of a habeas

12:39  10    petition.

11         So I don't know.  I don't -- I don't mean

12    to speculate.  Well, I guess I do speculate.

13    That's my nature, but I just wonder whether

14    there may be evidence in regard to the

12:39  15    exceptional circumstances surrounding the filing

16    of the petition that may require evidence.  And

17    it may require evidence if the Court eventually

18    gets to the issue of release.

19         Either party may want to call witnesses

12:39  20    in regard to whether she poses a danger of

21    flight or of risk to the community.  Either side

22    might want to provide evidence in that regard.

23         So I -- what I would really want to do is

24    to make sure that this is done in an expedited

12:40  25    basis but a thorough basis.

26

1        So, you know, we'll give you until

2    Thursday to submit whatever briefing you want to

3    submit, and then we're available to open up the

4    Court's schedule so that you could have the time

5    that you need early on in the week.

6        And the expectation is that once the

7    evidence has been completed, either by way of

8    affidavit, all this could be by way of affidavit

9    or oral testimony and, also, all of the legal

10   submissions made and the argument of counsel,

11   then the Court would be in a position to address

12   the three separate questions.

13       And that's the motion to dismiss based

14   upon the filing in Massachusetts when she, in

15   fact, was in Vermont; the motion to dismiss as a

16   result of the Immigration and Nationality Act;

17   and then only if the Court finds jurisdiction,

18   doesn't dismiss the case, finds jurisdiction

19   would the Court then address whether she should

20   be released.

21       And that's -- that's my thought.  So tell

22   me if you have any strenuous objection to that

23   process.

24       MR. DRESCHER:  This is Mike Drescher for

25   the record.

27

1          My only requested addendum to your list

2     of issues, your Honor, is the propriety of the

3     1631 transfer that I referenced earlier.

4          THE COURT:  That's correct.  That's the

12:41   5     new issue that was not addressed before in the

6     Massachusetts pleadings and Judge Casper's

7     decision and, yes, that would be the fourth.

8          MR. DRESCHER:  Thank you.

9          THE COURT:  Okay.

12:41  10          All right?  Mr. Kassem.

11          MR. KASSEM:  Thank you, your Honor.

12     Ramzi Kassem for the petitioner, Rumeysa Ozturk.

13          THE COURT:  Do you pronounce your name

14     Kassem?  Is it Kassem?

12:42  15          MR. KASSEM:  Kassem, yes, your Honor.

16          THE COURT:  Mr. Kassem, what's your

17     reaction to that?

18          MR. KASSEM:  Thank you for asking, your

19     Honor.

12:42  20          Just a couple points, your Honor.  Your

21     Honor's description is essentially, to my mind,

22     a perfectly appropriate description of

23     jurisdictional discovery which would be proper

24     through an evidentiary hearing as the Court

12:42  25     describes it.  And so -- and it would be limited

28

1    to the jurisdictional points as your Honor --

2    exactly as your Honor described.

3         I will say with respect to the evidence

4    that is now on the record, because I have to say

12:42  5    this, your Honor, there has been no allegation,

6    nor could be there be any allegation that

7    Ms. Ozturk is a flight risk or public safety

8    concern of any sort.  And this is undisputed.

9         And, in fact, on the other side of that

12:42  10   you have these voluminous filings, two dozen

11   letters of support, including from the head of

12   Tufts and other administrators, faculty

13   advisors, other community members, all attesting

14   to Ms. Ozturk's community integration and, in

12:43  15   fact, to the harm that the community faces from

16   her continued detention.  So that's what's in

17   the balance right now.

18        THE COURT:  Yes.  So, Mr. Kassem, I

19   appreciate that you're really want to make that

12:43  20   point.  You made that point actually in your

21   brief.

22        And you made the argument that there's no

23   evidence to suggest that she would provide a

24   risk of flight or danger to the community and

12:43  25   that she has the support.  She's got all of the

29

1    affidavits.

2            You know, what I really want to do is

3    make sure both sides have a full opportunity to

4    introduce what they need to support their

12:43  5    argument.  It may require some evidence; it may

6    not.  It may require affidavits; it may not.

7            But, as a result, I think the Court is

8    going to have adequate opportunity to give you a

9    lot of time to be able to argue your case as to

12:44  10   what the government has shown and what it hasn't

11   shown and what the Court should conclude in

12   terms of jurisdiction.  So I think this is all

13   going to be fair game on Monday.

14           And if anyone wants to introduce oral

12:44  15   testimony on Monday or Tuesday, then you should

16   notify the Court that you are wanting to seek

17   the introduction of certain testimony, summarize

18   the testimony.

19           The Court will make a determination as to

12:44  20   whether that's appropriate or not, but I'm

21   hoping that the submissions, including the

22   briefs and the testimony and the affidavits and

23   the argument of counsel, will all be done by

24   Tuesday.

12:45  25           MR. KASSEM:  Thank you, your Honor.  This

30

1       is Ramzi Kassem for the petitioner again.

2               I've had a chance to confer with

3       co-counsel.  We agree to the Court's -- we have

4       no objection to the Court's appropriately

12:45   5       expedited schedule.  Briefs due on Thursday on

6       the INA -- the asserted INA jurisdictional bars.

7               That's the motion to dismiss element of

8       the government's response to our habeas

9       petition, plus the venue 1631 issues, plus bail,

12:45   10      so any supplemental by Thursday at 5:00 p.m.

11              And, your Honor, we welcome the

12      opportunity and we will consider the need on our

13      end to submit additional evidence or testimony

14      and seek testimony going to the jurisdictional

12:45   15      question.

16              I imagine if we were to go down that

17      path, notice to the Court with any summaries

18      necessary by Friday, would that be the Court's

19      intention?

12:45   20              THE COURT:  Any summary by Friday, yes,

21      it would be the Court's intention.

22              So by Friday at 5:00 o'clock, if you want

23      to submit any oral testimony, any witnesses,

24      then you summarize the testimony and submit it

12:46   25      to the Court with a copy obviously to the

31

1     opposing counsel, an opportunity over the

2     weekend for opposing counsel either to object or

3     consent, and then the Court would rule on Monday

4     as to whether that witness can be called.

12:46    5           MR. KASSEM:  Understood, your Honor.

6           And a point of clarification I guess for

7     both parties.  Would it be appropriate to submit

8     a consolidated brief that addresses those three

9     broad lines that we've identified instead of

12:46   10     three separate briefs?

11           And, if so, would it be -- I guess under

12     either scenario would additional pages be

13     appropriate and agreeable to the Court?

14           THE COURT:  I think that you can combine

12:46   15     them all in one memorandum.  Oh, absolutely.

16           I don't think it's necessary that you

17     have a separate memorandum on the motion to

18     dismiss and, you know, the jurisdiction arising

19     out of the filing in Massachusetts, I think that

12:47   20     would all be a part of one memorandum dealing

21     with all of these issues.

22           Well, actually, I strike that.

23           So if there is a filing that you want to

24     file in terms of argument for her release, you

12:47   25     know, that's after the Court has made a

32

1      determination as to jurisdiction.  Then assume

2      that the Court has made a determination as to

3      jurisdiction, found that there's jurisdiction,

4      has personal jurisdiction in this case, then the

5      Court addresses the issue of her release.  So I

6      think that would be in a separate filing.

7           But, again, in terms of calling

8      witnesses, that would all be combined either on

9      Monday or Tuesday of next week.

10          MR. KASSEM:  Okay.  Thank you, your

11     Honor.

12          THE COURT:  So the answer is that those

13     first three legal issues arising out of the Act

14     and, also, the placement of the filing would be

15     in one brief, and the release or detention would

16     be in a separate one.

17          MR. KASSEM:  Understood, your Honor.

18          And would it be appropriate to seek leave

19     of court right now for overlong briefs on both

20     of those filings for --

21          THE COURT:  Well, I'm not going to limit

22     the amount of pages that you want to file.  You

23     can make it as long as you want.

24          MR. KASSEM:  Thank you, your Honor.  We

25     will -- we will not burden the Court any more

12:47 (line 5)
12:47 (line 10)
12:48 (line 15)
12:48 (line 20)
12:48 (line 25)

33

1    than we have to, but we appreciate it.

2         THE COURT:  So, yeah, I think there's

3    something about briefs that are much too long

4    become much less persuasive, but that's up to

12:49    5    you.

6         MR. KASSEM:  Understood, your Honor.

7    Thank you.

8         THE COURT:  Okay.

9         All right, Mr. Drescher, your response to

12:49    10   this schedule and -- well, any response?

11        MR. DRESCHER:  I think I've said my

12   piece, your Honor.

13        I understand the Court's desire to move

14   expeditiously; that that is the schedule that

12:49    15   has been set, and we understand.

16        THE COURT:  Good.  That's good.

17        That's great.  So we'll see you here on

18   Monday, but meanwhile at 5 o'clock on Thursday

19   I'll expect the submission of the briefs.

12:49    20        MR. KASSEM:  Thank you, your Honor.

21        THE COURT:  Okay.

22        Is there anything else we need to address

23   at this point?

24        MR. KASSEM:  Nothing for the petitioner,

12:49    25   your Honor.

34

1          THE COURT:  Okay.

2          Mr. Drescher, anything else?

3          MR. DRESCHER:  I don't believe so.  Thank

4     you, your Honor.

12:49   5          THE COURT:  Okay.  All right.  Thank you.

6          THE CLERK:  All rise.

7          (End of hearing at 12:50 p.m. and end of

8     transcript of same.)

9

10

11

12

13

14

15

16          C E R T I F I C A T E

17

18    I certify that the foregoing is an accurate

19    transcript from the proceedings in the above-entitled

20    matter, dated this 8th day of April, 2025.

21

22

23                    /s/ Sarah M. Bentley, RPR

                      _____
24                    Sarah M. Bentley, RPR

25

# UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

|  |  |
|---|---|
| RUMEYSA OZTURK,<br><br>               Petitioner,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; PATRICIA HYDE, in her official capacity as the New England Field Office Director for U.S. Immigration and Customs Enforcement; MICHAEL KROL, in his official capacity as HSI New England Special Agent in Charge, U.S. Immigration and Customs Enforcement; TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; and MARCO RUBIO, in his official capacity as Secretary of State,<br><br>               Respondents. | Case No. 2:25-cv-00374 |

## MOTION FOR RELEASE UNDER *MAPP v. RENO*, OR IN THE ALTERNATIVE, FOR RETURN TO VERMONT

Petitioner Rümeysa Öztürk, through counsel, moves this Court for an order of immediate release pending the adjudication of her habeas petition under the Court's inherent authority to grant release on bail to a habeas petitioner who warrants immediate relief and release. In the alternative, Ms. Öztürk respectfully requests that the Court order her to be transferred back to this District for the pendency of this litigation. In support of this motion, Petitioner submits the accompanying memorandum of law and associated exhibits.

1

JA-000182

## REQUEST FOR ORAL ARGUMENT

Ms. Öztürk believes oral argument may assist the Court in resolving this motion and respectfully requests oral argument.

Respectfully submitted,

/s/ Lia Ernst
Monica H. Allard
ACLU Foundation of Vermont
PO Box 277
Montpelier, VT 05601
(802) 223-6304
lernst@acluvt.org
mallard@acluvt.org

*Counsel for Petitioner*
Dated: April 10, 2025

Jessie J. Rossman*
Adriana Lafaille*
Rachel E. Davidson*
Julian Bava**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
alafaille@aclum.org
rdavidson@aclum.org
jbava@aclum.org

Mahsa Khanbabai**
115 Main Street, Suite 1B
North Easton, MA 02356
(508) 297-2065
mahsa@mk-immigration.com

Brian Hauss**
Esha Bhandari**
Brett Max Kaufman**
Noor Zafar**
Sidra Mahfooz*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

2

125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
bhauss@aclu.org
ebhandari@aclu.org
bkaufman@aclu.org
nzafar@aclu.org
smahfooz@aclu.org


Ramzi Kassem**
Naz Ahmad*
Mudassar Toppa**
Shezza Abboushi Dallal*
CLEAR Project
Main Street Legal Services, Inc.
CUNY School of Law
2 Court Square
Long Island City, NY  11101
(718) 340-4558
ramzi.kassem@law.cuny.edu
naz.ahmad@law.cuny.edu
mudassar.toppa@law.cuny.edu
shezza.dallal@law.cuny.edu


Matthew D. Brinckerhoff**
Katherine Rosenfeld**
Vasudha Talla**
Sonya Levitova**
Emery Celli Brinckerhoff Abady Ward
& Maazel LLP
One Rockefeller Plaza, 8th Floor
New York, NY 10020
212-763-5000
mbrinckerhoff@ecbawm.com
krosenfeld@ecbawm.com
vtalla@ecbawm.com
slevitova@ecbawm.com


*Pro hac vice application forthcoming
**Admitted to appear pro hac vice

3

<u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7(a)(7)</u>

I hereby certify that on April 10, 2025, Petitioner's counsel conferred with Respondents' counsel in accordance with Local Rule 7(a)(7). Respondents' counsel indicated that Respondents oppose the motion.

April 10, 2025                    */s/ Lia Ernst*
                                 Lia Ernst

JA-000185

# EXHIBIT 1

JA-000186

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

RÜMEYSA ÖZTÜRK,

*Petitioner*,

v.                                                    Civil Action No. 2:25-cv-00374-wks

DONALD J. TRUMP, *et al.*,

*Respondents.*

## DECLARATION OF ATTORNEY LIA ERNST SUBMITTED IN SUPPORT OF PETITIONER'S MOTION FOR RELEASE UNDER *MAPP V. RENO*, OR IN THE ALTERNATIVE, FOR RETURN TO VERMONT; AND PETITIONER'S SUPPLEMENTAL MEMORANDUM OF LAW ON JURISDICTIONAL ISSUES

I, Lia Ernst, declare under penalty of perjury that the following is true and correct:

1.      I am an attorney for Rümeysa Öztürk.

2.      Attached as Exhibit 1-A is a true and correct copy of a declaration by Cynthia Smith dated April 1, 2025.

3.      Attached as Exhibit 1-B is a true and correct copy of a declaration by Lynn Cooper, D.Min dated March 31, 2025.

4.      Attached as Exhibit 1-C is a true and correct copy of a declaration by Professor Sara K. Johnson dated April 2, 2025.

5.      Attached as Exhibit 1-D is a true and correct copy of a declaration by Mairéad O'Grady dated April 1, 2025.

6.      Attached as Exhibit 1-E is a true and correct copy of a declaration by Professor Calvin L. Gidney dated March 30, 2025.

7.      Attached as Exhibit 1-F is a true and correct copy of a declaration by Ayse Reyyan Bilge Yildirim, PhD dated April 1, 2025.

1

JA-000187

8.      Attached as Exhibit 1-G is a true and correct copy of a declaration by Matthew N. Gee dated April 1, 2025.

9.      Attached as Exhibit 1-H is a true and correct copy of a declaration by Elisa Guzman dated April 2, 2025.

10.     Attached as Exhibit 1-I is a true and correct copy of a declaration by Professor Ellen E. Pinderhughes dated April 1, 2025.

11.     Attached as Exhibit 1-J is a true and correct copy of a declaration by Najiba Akbar dated March 30, 2025.

12.     Attached as Exhibit 1-K is a true and correct copy of a declaration by Alison Campion dated April 2, 2025.

13.     Attached as Exhibit 1-L is a true and correct copy of a declaration by Professor Christine McWayne dated March 31, 2025.

14.     Attached as Exhibit 1-M is a true and correct copy of a declaration by Dr. Julie Dobrow dated March 30, 2025.

15.     Attached as Exhibit 1-N is a true and correct copy of a declaration by Professor Jayanthi Mistry dated March 30, 2025.

16.     Attached as Exhibit 1-O is a true and correct copy of a declaration by W. George Scarlett, PhD dated April 1, 2025.

17.     Attached as Exhibit 1-P is a true and correct copy of a declaration by Sam Alterman dated April 2, 2025.

18.     Attached as Exhibit 1-Q is a true and correct copy of a declaration by SooYun Byeon dated March 31, 2025.

JA-000188

19.     Attached as Exhibit 1-R is a true and correct copy of a declaration by Lucinda Garcia dated April 2, 2025.

20.     Attached as Exhibit 1-S is a true and correct copy of a declaration by Rola Kazaer dated April 2, 2025.

21.     Attached as Exhibit 1-T is a true and correct copy of a declaration by Professor Saeed Mehraban dated April 1, 2025.

22.     Attached as Exhibit 1-U is a true and correct copy of a declaration by Professor Tama Leventhal dated March 30, 2025.

23.     Attached as Exhibit 1-V is a true and correct copy of a declaration by Tufts President Sunil Kumar dated April 1, 2025.

* * *

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 10, 2025, in Montpelier, VT.


*/s / Lia Ernst*
Lia Ernst

3

# EXHIBIT 1-A

JA-000190



SCHOOL OF ARTS AND SCIENCES

# Eliot-Pearson Department of
# Child Study and Human Development

April 1, 2025

I, Cynthia Smith, depose and state as follows:

I am an individual of sound mind and legal age.  I make this affidavit based on my personal knowledge and relationship with Rumeysa Öztürk, a doctoral student at Tufts Graduate School of Arts and Sciences where I am a faculty member in the Eliot Pearson Department of Child Study and Human Development.

As a faculty member at Tufts University in the Eliot Pearson Department of Child Study and Human Development, I have had the privilege of knowing and collaborating with Rumeysa Öztürk for three years on various projects for the community … the most memorable being a workshop on Collective Grieving for Children at the Interfaith Center at Tufts University.  Our relationship has been deeply rooted in shared values, intellectual engagement, and a mutual commitment to the well-being of children, women, and humanity as a whole. During this time, I have gotten to know Rumeysa on an academic, professional and personal level.

Throughout our friendship, Rumeysa and I have engaged in extensive discussions about the importance of family and friends … exchanging stories about her mom, her family's garden in Turkey and about her attempts to grow a small indoor garden in her apartment in Somerville. We have often reflected on the role of community in fostering emotional well-being and resilience, and we have shared personal experiences that underscore our commitment to nurturing strong social connections. We would often be the first ones arriving to campus, in the early morning, which gave us an opportunity to talk about a soup recipe we tried, how taking walks help us to destress and focus on the work we are engaged in, and how we both strive to serve children. In addition to these conversations, we collaborated on a grief workshop aimed at providing support to individuals navigating individual and collective loss.. Rumeysa's leadership, insights, empathy, and intellectual contributions significantly enriched the workshop, making it a valuable resource for all participants which included students, faculty, and staff.

Rumeysa has demonstrated unwavering dedication to the welfare of children, women, and humanity through her academic work and community involvement. Her research focuses on the positive development of adolescents in a media-embedded, digitally connected world. Her commitment to mentorship, education, and advocacy has been evident in her role as a Teaching Assistant and in her involvement in various initiatives that promote well-being and inclusivity.

JA-000191

Rumeysa and I share a profound appreciation for the creative arts as a tool for social and emotional well-being. We have discussed and explored how artistic expression can be used to foster healing, resilience, and community engagement. Her contributions and leadership on projects, such as a community expressive arts grief workshops and the mosaic project, symbolizing the values of the Eliot-Pearson Department, highlight her belief in the transformative power of art.

Beyond academic and professional collaborations, Rumeysa and I have cultivated a friendship enriched by shared culinary experiences. We have made soups for each other, exchanged our favorite recipes, and bonded over the joy of cooking. These simple yet meaningful gestures reflect her generous spirit, warmth, and dedication to building authentic relationships.

It is with deep concern that I acknowledge and bear witness to Rumeysa's current detention in a federal facility in Louisiana. Her absence has left a profound void in our community. As attested by her colleagues, students, and friends at Tufts University, Rumeysa is a dedicated scholar, mentor, and a person of immense integrity and kindness. Her contributions extend far beyond academia, touching the lives of those around her in immeasurable ways.

I attest to Rumeysa's character as a compassionate, service-minded, and principled individual. Her presence is invaluable to our academic and social community, and I urge the relevant authorities to recognize the immense positive impact she has had on those who know her.

I submit this affidavit in good faith and in support of Rumeysa Öztürk, affirming her contributions to academia, her unwavering commitment to humanity, and the profound impact she has made on my life and the lives of many others.

I affirm that the statements made in this affidavit are true and correct to the best of my knowledge and belief.

Rumeysa needs to remain in the United States and be returned to Massachusetts because she is a significant contributor to all facets of our community … making the world a better place.

**In solidarity and support,**

**Cynthia Smith**

April 1, 2025

# EXHIBIT 1-B

JA-000193



31 March 2025

I first met Rümeysa Öztürk in the fall of 2022. In my role as Catholic Chaplain at Tufts University, I direct Be-Friend, an interfaith friendship program, and that fall, Rümeysa signed up to be one of our graduate student Be-Frienders. At the beginning of this semester-long program, we ask each participant whether they prefer to be paired with a partner within their religious tradition or across tradition. Rümeysa requested to be paired with someone from another religious tradition. As I have come to know Rümeysa better in the intervening years, I have found this detail to align with her character. She is always eager to get to know people who are different from her. She values learning from them and shining a light on building meaningful connections through empathy.

In the spring of 2024, Rümeysa emailed me and our University Chaplain, Elyse Nelson Winger, inviting us to collaborate on a new project. She was in the beginning stages of planning a gathering to honor the experience of children living in conflict and war. In the months that followed, we shared resources from different religious traditions, collecting poetry and art. The title of this event was: "Collective Grieving for Children Facing War and Conflict: Sharing Poetry, Art, and Stories for Children around the World." The outline Rümeysa wrote for this program demonstrated her anguish at the suffering of others, specifically children. I knew that the wide breadth of conflicts she acknowledged (Sudan, Gaza, Yemen, Congo, Ukraine, Syria, Uyghur) would be a balm for many attendees as so many of our students come to us from parts of the world that do not receive as much media attention as others. Her goal was to create connection and togetherness with a shared value of improving childhood and using stories and artistic expression to lift up the pain and wisdom of children. Even the title says so much about Rümeysa: "Collective Grieving". She knows that we are better together. At her core, she is like connective tissue in our community. Her integration of academic study and practical application is noteworthy. She is not simply concerned about an intellectual exercise but how to utilize her expertise to affect those most in need.

Rümeysa is a deeply humble human being. She is always aware of those around her, their needs and thinks about how she may serve and support them. In September 2024, she joined our team of volunteers for a weekly dinner shift at the Harvard Square Homeless Shelter. This shelter is a hub of education around housing insecurity in Boston, and Rümeysa served as a trusted and equipped graduate student who guided undergraduates in this work. We rely on such students to help lead at the shelter, as many of our younger students are unfamiliar with navigating off-campus engagements.

In the fall of 2024, Rümeysa stepped into leadership to help restart our women's fitness class at the Interfaith Center. We were in the midst of a job search for a new Muslim Chaplain, and with the freneticism of the new academic year, this program could have easily been tabled until January. Rümeysa, however, knew how important this space was for her

JA-000194

classmates and reached out to help us reconfigure the class. I was named the point person on staff, and her contribution and support were central to this effort. She was keen to make changes from last year to ensure that the program would be more accessible – logistics-wise with more workout equipment and thinking ahead about how to use that blocked-off time during the fast in Ramadan. At the last moment, on the afternoon of the first class, Rümeysa suggested we adjust the time to accommodate others' schedules—students who had only just then expressed interest in joining. This might seem like a small gesture, but it shows how her concern for others pours through her every interaction in our community. Rümeysa Ötürk is a thoughtful and conscientious human being who has been a gift to Tufts University. Her critical contributions to her field and our community cannot be overstated. Her absence has caused deep anguish among so many whose lives she has touched. I urge the court to please release Rümeysa Östürk and return her to her home and our shared community.

I declare that the above statements are all true and correct to the best of my knowledge and ability.

Sincerely,

Lynn Cooper, D.Min
Associate Director of the University Chaplaincy and Catholic Chaplain

# EXHIBIT 1-C

JA-000196



SCHOOL OF **ARTS AND** SCIENCES

# Eliot-Pearson Department of
# Child Study and Human Development

April 1, 2025

Dear Honorable Immigration Judge:

My name is Sara K. Johnson. I am Associate Professor and Director of Graduate Studies in the Eliot-Pearson Department of Child Study and Human Development at Tufts University and a United States citizen. I am writing with the **Strongest possible support** of Rumeysa Ozturk; I urge you to allow her to return to her home in Massachusetts and her studies at Tufts in order to complete her innovative research and resume her career trajectory as an amazing young scholar.

I have been a member of Rumeysa's doctoral advising committee since she began her studies in our program in September 2020. Initially, I was her secondary advisor. Since January 2023, I have had the **immense** privilege of being her primary advisor. In that time, we have met nearly every week for at least an hour, she works as a research assistant **in** my lab, and has also been a student in several of my courses. In short, I have gotten to know Rumeysa extremely well, so I have an abundance of examples to draw from to describe the quality of her character and the thoughtfulness of her academic work, both of which are primary reasons why I believe she should be allowed to remain in the United States to finish her doctorate.

I know that many, many other people are also submitting affidavits in support of Rumeysa that will include countless examples, from virtually every corner of her life, of her many strengths and positive qualities. That is why I want to focus this letter on Rumeysa's dissertation, which I have a unique window into as her primary academic advisor and which I believe represents not only her research talent but also who she is as a person.

There is a saying among social scientists that "research is me-search": people are drawn to studying things that are important to them personally. In my more than fifteen years of supervising students as they develop their research interests, I have seen quite a bit of evidence for that. When viewed from that perspective, it makes total sense that Rumeysa has been very clear about her plan to do a dissertation on the topic of **prosocial behavior:** these are things that a person does to benefit others rather than themselves.

**Rumeysa's research on this topic is highly innovative and special** because she wants to investigate how young people's prosocial behavior can be facilitated by social media platforms, which are more typically viewed as a setting that encourages self-centeredness. Her perspective acknowledges that social media also has potential negative effects; but she wants to make sure that we really truly understand the complete picture around social media, both positive and negative, before being able to make decisions about its role in young people's lives. Her choice of this topic, and overall approach to it, reflect Rumeysa's overall level of thoughtfulness and her clear desire to understand things from multiple points of view. These qualities have played a main role in her success in our doctoral program and will facilitate her career as a productive and influential researcher. Working with Rumeysa to develop the idea for her dissertation has expanded my own thinking about prosocial behavior and how we promote it. The quality of her research ideas has also been recognized by our department, which awarded her a prestigious fellowship, and also by Tufts University itself, which awarded her a competitive Graduate

105 College Avenue, Medford, MA 02155 ⏐ TEL: 617.627.3355 ⏐ FAX: 617.627.3503 ⏐ http://ase.tufts.edu/epcshd



SCHOOL OF ARTS AND SCIENCES
# Eliot-Pearson Department of Child Study and Human Development

Student Research Award to support her dissertation. Our program, and the discipline of developmental science in general, is lucky to have a student such as Rumeysa, and she should be allowed to remain in the United States to finish her degree.

Beyond its innovative nature, **Romeysa's choice of research topic also aligns with the values that she holds most closely:** **she is prosocial to the core of her being.** I have seen her prosocial nature constantly in my work with Rumeysa over the past five years; she always does things to benefit other people, including those who may come from different backgrounds than she does.

I **see her prosocial nature in her care for me as her advisor.** She asks about how I am doing, how my family is doing, and how my cats are doing (despite her being very allergic to them!). When my mother moved from Kentucky to Boston last summer, Rumeysa gave me information about senior events in the area that she knew from her volunteer work as well as people she knew of similar age to my mother who might have shared interests. She has since spent many hours talking with my mother, when they are both at my house for dinner, about visiting Turkey (the number one country on my mom's travel bucket list!). All of my doctoral students (I currently have four working with me, including Rumeysa) care about me, of course, but Rumeysa really stands out in the level of care she shows for me as a **person,** not just an advisor, and the thoughtful ways in which she shows it.

I **see her prosocial nature in her care for the other students in my research group.** In our group meetings I hear about how Rumeysa has provided excellent feedback on their writing and other aspects of their research, and how she has learned about all of their cultural traditions and especially the food that is included in their celebrations. She takes excellent care of our shared lab space, such as creating a tea station that she stocks with her favorite teas and others from the list of favorites that she asks the other graduate students to contribute to. These are only a few such examples, and I am sure that the letters from other students contain many more. Our lab group would be significantly harmed if she were not allowed to return.

I **see Rumeysa's prosocial nature in her care for everyone else in our department.** Rumeysa is an integral member of our larger departmental community who not only organizes events on topics important to her (such as the welfare of children around the globe who are affected by war) but also shows up and thoughtfully participates in events organized by other students and the department. We can count on her active and thoughtful presence. I know that virtually every faculty member in our department, as well as other students outside of my lab, have examples to share of the ways that Rumeysa has made a positive difference in their lives. Our community would be irreparably damaged if she were not allowed to return.

I **know from others that Rumeysa's prosocial behavior extends outside of our department to the larger university community and far beyond.** I expect that many of the other affidavits you will receive will contain myriad examples from those contexts, ranging from the university Chaplaincy to other academic departments.

105 College Avenue, Medford, MA 02155 | TEL: 617.627.3355 | FAX: 617.627.3503 | http://ase.tufts.edu/epcshd

JA-000198



SCHOOL OF ARTS AND SCIENCES

# Eliot-Pearson Department of
# Child Study and Human Development

In sum, Rumeysa is an innovative researcher of prosocial behavior, and she is the very <u>epitome</u> of prosocial behavior herself. For those reasons, and many more, she should be allowed to remain in the United States to complete her doctoral degree at Tufts. During her time in our doctoral program, she has exceeded our expectations of and requirements for doctoral students, and she has done so in a timely manner. Rumeysa is nearing the end of her program and is entering the intensive dissertation phase. We require students to have a meeting at this point, called the "qualifying review" and hers is scheduled to take place in early May. Rumeysa is well prepared for the dissertation, and she is so enthusiastic about it. I am really looking forward to seeing the innovative and rigorous research she produces.

Rumeysa has done everything right in terms of being a doctoral student and should absolutely be allowed to return to her home in Massachusetts, and her place as a valued and integral member of our community at Tufts, to complete her dissertation and her degree. I urge you, as strongly as possible, to release her so that she may do so. I **miss her very much.**

**I declare that the above statements are all true and correct to the best of my ability.**

Sincerely,

Sara K. Johnson, Ph.D.
Associate Professor
Director of Graduate Studies
Eliot-Pearson Department of Child Study and Human Development
Tufts University

105 College Avenue, Medford, MA 02155 | TEL: 617.627.3355 | FAX: 617.627.3503 | http://ase.tufts.edu/epcshd

# EXHIBIT 1-D

JA-000200

April 1, 2025

To Whom It May Concern:

I am writing in support of my esteemed colleague and dear friend, Rumeysa Öztürk. I have known Rumeysa for two years. We first met when I visited the Tufts University campus as an admitted student in February 2023, and we became lab mates and colleagues when I arrived on campus to begin my doctoral program in August 2023. I urgently compel you to allow Rumeysa to return and complete her doctoral studies at Tufts University, where she is an integral part of our scholarly and social community.

Within the first few weeks of my time on campus, Rumeysa invited me to have coffee and go for a walk with her, offering me a tour of various spaces around campus and asking me about my own background and my early experiences in our doctoral program. Although I am several years her senior, I immediately felt that she was not only a peer but could also be a source of wisdom and comfort to me as I adjusted to life as a Tufts University student. It also became clear to me that her work was both interesting and essential. As a former high school teacher, I am particularly interested in her upcoming dissertation focused on how adolescents use social media in prosocial ways (e.g., to help each other, connect, and build community).

Rumeysa is, herself, incredibly prosocial in our lab, department, and campus communities. Within the lab, she is often the first to reply with helpful comments when a peer shares a piece of writing for feedback, and she also shares her own work willingly as she seeks to develop her ideas. I have agreed to be the second coder on her dissertation when data analysis begins; she also served as my second coder for my thesis this spring, and her questions and insights greatly enriched the final product. In addition to her scholarly input, each time that we host a lab event, not only does she make extraordinary homemade dishes to share, but she also ensures that she brings something special for those who have food allergies. (Her gluten-free, dairy-free almond cookies were a particular hit.) And when I was dog-sitting for my sister's small puppy and asked my lab mates if I could bring her to campus, Rumeysa agreed despite a lifelong fear of dogs – and fell in love, asking when the puppy could come back to visit again.

Beyond the lab, Rumeysa serves as both a formal teaching assistant and an informal mentor to others within the department. Last week, after hearing of her detainment, a student came to the lab and shared with me that she had provided him with the best advice he'd gotten on applying to doctoral programs. And I know that Rumeysa is a linchpin in the Muslim community on campus: she invited a group of our friends to join her for both a multifaith prayer and an *iftar* last year during Ramadan, where I witnessed how beloved she is within that affinity group. We were scheduled to have an *iftar* as a lab the same week that she was detained.

In short, Rumeysa is not only involved on campus, but she constantly seeks to bring together disparate groups of people to connect. It is not lost on me that although I am a native Bostonian and a domestic student, it is she who has played a far greater role in welcoming me to the Tufts community.

I declare that the above statements are all true and correct to the best of my knowledge and ability.

Mairéad O'Grady

# EXHIBIT 1-E

JA-000203



**March 30, 2025**

I am writing this affidavit of support on behalf of Ms. Rumeysa Ozturk, a doctoral candidate in the Eliot-Pearson Department of Child Study and Human Development at Tufts University. I am an Associate Professor in the department, where I have taught for over 30 years.

I first met Ms. Ozturk on January 24, 2020, during an interview day hosted by our department for applicants shortlisted for our doctoral program. Ms. Ozturk had applied to work with me on my research in children's media. I was immediately impressed by her background in psychology, her interest in children's media, and her commitment to supporting refugee children. After our initial interview, I wrote in my evaluation, "Rumeysa is an outstanding applicant: she is very smart, very engaged, and engaging..." I enthusiastically supported her admission to the program.

In March 2020, the COVID-19 pandemic led to a nationwide lockdown. As a result, I met Rumeysa only via Zoom during the Fall 2020 semester. She served as a teaching assistant for my introductory child development course. As a TA, Rumeysa was outstanding—kind, approachable, and deeply attentive to the psychological needs of her students as we navigated the challenges of the pandemic. Students in her section wrote glowing reviews, highlighting her empathy, dedication, and commitment to their well-being.

In the Spring 2021 semester, while still in lockdown, Rumeysa co-taught a course with me through the university's GIFT program, a teacher training initiative for doctoral students. As a GIFT fellow, she played a pivotal role in reshaping the course, integrating innovative pedagogical technologies and contemporary teaching strategies. When she assumed the primary teaching role for our course, *Understanding Child Development Through Film*, she demonstrated exceptional scholarship, organization, and instructional design. Her lessons encouraged critical self-reflection and meaningful discussion. Students deeply valued her warmth, engagement, and investment in their learning experience.

During her first two years in the doctoral program, Rumeysa worked with me and several colleagues as a research assistant on the Children's Television Project, a longitudinal content analysis of contemporary children's cartoons. As a research assistant, she brought fresh energy to the project and led successful efforts to present our work at academic conferences.

Ms. Ozturk deserves the highest accolades—both as a scholar and as a person. Academically, she is deeply engaged, hardworking, and passionate about authentic representation in children's

media. As an educator, she is engaging, informative, and fosters an inclusive, supportive learning environment. Personally, she is of the highest character—kind, open-minded, and respectful of diverse perspectives.

Over the years in our doctoral program, Rumeysa has built strong connections within multiple communities. As a core member of a close-knit social and intellectual group, she actively engages with fellow graduate students both academically and socially. Beyond the program,



Rumeysa plays a vital role in various interfaith groups on campus. Her deep ties to the Department, Tufts University, and the Somerville community underscore the necessity of her return to Massachusetts and release from detention. Given Rumeysa's character and commitment to her community, I can confidently attest that she does not pose a flight risk once reinstated in her rightful place among us.

Rumeysa Ozturk is one of the most cherished members of our Eliot-Pearson community. She is kind, curious, and genuinely invested in understanding other cultures. She has the potential to become a leader in applied developmental science. Her deportation from the United States would be a profound loss—not only to our department but to the entire Tufts community. Like many others, I am devastated by Rumeysa's detention and strongly advocate for her continued presence in this country and in our program.

I declare that the above statements are true and correct to the best of my knowledge and ability.

Sincerely,

*/s/ Calvin L. Gidney, Ph.D.*

Associate Professor

# EXHIBIT 1-F

JA-000206



**Ayse Reyyan Bilge Yildirim**

01/04/2025

**To Whom It May Concern,**

It is my great honor to write this character affidavit in support of Rümeysa Öztürk, a dear friend and former student, who is currently facing unjust detention by ICE despite being here on a valid visa and having no criminal involvement whatsoever.

I have known Rümeysa for over a decade. She was one of my top students at Istanbul Sehir University, where I taught as part of the psychology faculty. I later wrote her recommendation letters for the prestigious Fulbright Scholarship, her Master's at Columbia University, and her Ph.D. studies at Tufts University. Throughout this time, we have remained close friends and colleagues, even co-authoring a paper together on children's conceptualization of death, which was originally her undergraduate thesis.

Rümeysa is an extraordinary human being—intelligent, compassionate, dedicated, and deeply respected by all who know her. Her passion for research and education is unmatched. She excels both academically and socially, consistently impressing with her leadership, integrity, and empathy. During her undergraduate research, she led a culturally sensitive and complex study on children's understanding of death among refugee populations, coordinating a diverse team of research assistants with professionalism and kindness. The project culminated in a successful presentation at an international conference in the Netherlands and has been published.

Beyond her academic brilliance, Rümeysa is an integral member of our community. She speaks English fluently and engages meaningfully with people from all walks of life. She has worked on multiple initiatives aimed at enriching children's media literacy and development. Her warmth, inclusivity, and generosity have made her beloved by friends, colleagues, and countless members of her extended community.

Personally, Rümeysa is like family to us. My two children, now aged 12 and 16, consider her an older sister. I have met her with my family many times and always appreciated her thoughtfulness—she brings gifts, checks in regularly, and even follows up and cares how they are doing. She offered invaluable guidance to my daughter during her current college application process, helping us find resources and providing encouragement. Rümeysa is a role model for our children, and we are raising them with a strong belief in freedom, justice, and civil rights. Watching Rümeysa be treated unfairly and detained without cause has shaken those beliefs—not only for us as parents, but for our children, who are now asking if these foundational ideals of America are truly being upheld.

Since her detainment on March 26, there has been an overwhelming outpouring of love and support. I have received dozens of calls, emails, and texts from people eager to help her. Many of these individuals are also here on valid visas and are now afraid to speak out due to fear of retaliation.

JA-000207

Rümeysa's situation has sent shockwaves through a law-abiding, peaceful community. Her absence is deeply felt.

Rümeysa should return to her home in Boston, continue with her studies, have a chance to finish her Ph.D., and be allowed to stay in the United States not only because she is innocent of any wrongdoing, but because she represents the very best of what America stands for—intellect, compassion, diversity, and service. Her contributions to academia, to children's education, and to her community are irreplaceable. She is someone to be celebrated, not targeted.

**I declare that the above statements are true and correct to the best of my knowledge and ability.**

Sincerely,
Ayse Reyyan Bilge Yildirim, Ph.D.

# EXHIBIT 1-G

April 1, 2025

To whom it may concern,

My name is Matthew N. Gee, I am a U.S. citizen, and I am a friend of Rümeysa Öztürk. I am writing this affidavit to demonstrate Rümeysa's character to the courts. From my letter, I hope it is clear what a kind, caring, considerate, and hardworking person Rümeysa is. She is a cherished friend who has contributed so much to my life and the life of our department.

I have known Rümeysa for over five years. We are in the same PhD cohort, meaning that we started studying for our PhDs in Child Study and Human Development at the same time. Rümeysa and I met in January of 2020; she was actually the first prospective student I met during our Tufts University PhD interview day. During that day, I was a nervous wreck, but I was drawn to talk to Rümeysa because of her radiant kindness, positivity, and enthusiasm for research. She was so excited for the opportunity to study children's media and how it contributes to children's mental health. She was also genuinely curious about my research interests, and in our conversation, she affirmed that I deserved to be in that room and that my research interests were important, despite my insecurities. Talking to Rümeysa calmed my nerves, and as fate would have it, we would both be admitted to Tufts.

Since 2020, Rümeysa and I have studied and worked together in the Department of Child Study and Human Development. She is a disciplined researcher who is committed to representing children in their full humanity. Recently, Rümeysa and I have had weekly writing meetups where we would work on our theoretical qualifying papers together. She has read hundreds of articles to support her theoretical model regarding how social media may be a modality for developing adolescents' prosocial behaviors (i.e., voluntary acts of kindness, respect, and cooperation that benefit others). Rümeysa recently received a Graduate Student Research Competition Award to fund research that she plans to conduct this summer to test her theoretical model. In her proposed project, Rümeysa plans not only to survey adolescents but also interview them about their prosocial behaviors and social media use. To Rümeysa, research participants are not just numbers on a survey; they are humans full of love and potential, and she is interested in what they are thinking, feeling, dreaming, and navigating in their contexts.

Rümeysa's humanizing perspective on children in her research extends to all of us who have the honor of calling her a friend. Rümeysa is one of the kindest people I have ever met, and her kindness manifests in small and large ways. Every morning, Rümeysa greets us in the lab and asks us how we are, and when she asks, she truly wants to know how we are doing. Another small act of her kindness is that she always opens the door for others and motions them through with a smile. And yet another is that she always takes time to stop and catch up with people in the hallways. Examples of her larger acts of kindness include sending me job postings every time she becomes aware of opportunities that are related to my interests. One time, she informed me of a competitive fellowship that she was also applying for— she does not have a competitive bone in her body. In a very touching example, she asked me how my family celebrates Lunar New Year, and then she brought in culturally appropriate treats to celebrate. Rümeysa never wants to be an imposition to others, but she always goes above and beyond to help others and make sure they feel respected and valued.

Rümeysa is a beloved member of our department community. In our lab, there are four PhD students, and she is so supportive of us. She always offers to read our writing, and she has given me insightful feedback that has significantly improved my writing and thinking. She regularly brings teas and baked goods to the lab to bring us comfort during times of stress. Rümeysa cares so much about contributing to the community. She is a regular presence at community events, especially those with a service component. Most recently, she and I made blankets for children who are ill or otherwise seriously in need. We have also worked on a number of projects to bring the department community together and offer space for collective healing. In one of these projects, we secured funding, collaborated with a local youth arts organization, and facilitated the creation of a community mosaic that all members of the department had a hand in. In each of these events, Rümeysa has been so attentive to each person's needs. Her considerate nature is evident by her providing a variety of foods to meet various dietary restrictions, accommodations for folks with disabilities, and various activities for people who process their emotions in different ways. Again, her kindness and caring are truly extraordinary.

Rümeysa's friendship has enriched my life in countless ways. She is an invaluable member of our community, and her absence has been deeply felt. She is a dedicated scholar who truly cares about supporting the well-being of all children. To Rümeysa, each child (and each of us) is precious and deserving of respect and love, which she aims to provide in every single one of her actions. I declare that the above statements are all true and correct to the best of my ability.

Sincerely,

/s/ Matthew N. Gee

# EXHIBIT 1-H

JA-000212

Declaration of Elisa Guzman, dated April 2, 2025

JA-000213

To Whom It May Concern,

I, Elisa Guzman, of legal age and citizen of the United States, wholeheartedly support Rumeysa Ozturk's case to remain in this country. I have had the privilege of knowing her for two years after meeting her through friends in the Muslim Student Association (MSA) at Tufts University. From the moment we met, her kindness, warmth, and dedication to her community were evident. I can say with complete confidence that she is an individual with an exemplary character.

Rumeysa is the embodiment of inclusivity and compassion and is well loved in the community. I have seen her greet everyone with a warm welcome and her infectious smile. I distinctly remember one of my first MSA events – I knew only a few people and felt nervous. Being greeted by Rumeysa and her calm presence instantly calmed my nerves. She introduced me to others, making sure I felt included and comfortable, as she continued welcoming and saying hello to other friends. Her kindness is unmatched and not performative; it is ingrained in her character.

Beyond MSA gatherings, Rumeysa has invited me to tea parties, dinners, and graduation events for her roommate in their home. One telling moment was when I accidentally dropped my cookie at her house during one of the tea parties she was hosting, and without hesitation, she gave me hers before getting herself another. It may seem like a small instance, but it's the culmination of these microevents that truly define a person's character.

Outside of social gatherings, Rumeysa and I also attend a Fit and Strong workout class together. Her encouragement and positive spirit make even the toughest exercises enjoyable. On days I lacked motivation, knowing she would be there kept me accountable. Her soft-spoken demeanor invites you in, makes you feel safe, and combined with her welcoming smile instantly washes away any bad feelings of the day.

Rumeysa is not only a compassionate friend, but a dedicated scholar. She is currently pursuing her doctoral degree in Child Study and Human Development at Tufts University where she focuses on children's and adolescents' development in this media surrounded world, and the positive impact their use can have on society. Her research is deeply relevant in today's world and has the potential to greatly and positively impact future generations. Her academic excellence has earned her a Fulbright Scholarship, a prestigious award recognizing her intellectual contributions by supporting her studies. She has also received a fellowship from the department and the Graduate Institute for Teaching. She is incredibly humble about her recognized impact and achievements – I only learned about these through a mutual friend.

Despite coming from a different cultural background, Rumeysa has fully immersed herself in the American life. She speaks English fluently and actively engages with her community forming strong friendships across cultures. Through our friendship, I have increased my understanding and appreciation of different traditions, reinforcing the values of empathy and inclusion.

Rumeysa's presence in the U.S. is an asset to both her academic and social communities. Her dedication to fostering meaningful connections, her impactful research, and her commitment to spreading kindness makes her an invaluable part of this country. She values and fully believes in cultivating joy and protecting others, especially children. I feel blessed to have met her and be able to call her my friend. She fosters a positive environment that makes me want to be a better person, and especially a better friend.

I strongly urge the court to release Rumeysa Ozturk and return her back her community in Massachusetts. I also strongly encourage you to allow Rumeysa Ozturk to remain in the United States. Her contributions and character demonstrate the values of kindness, peace, and respect that we all should strive for. Her absence would not only leave a void in the lives of her friends and colleagues but also deprive the community of a brilliant mind dedicated to making a difference.

I declare that the above statements are true and correct to the best of my ability. If any further information is required, please do not hesitate to contact me.

Sincerely,



Recoverable Signature

X *Elisa Guzman*
Elisa Guzman

Signed by: 4e1d0f63-705c-4749-8fbc-40000295b732

Elisa Guzman

# EXHIBIT 1-I



**SCHOOL OF ARTS AND SCIENCES**

Eliot-Pearson Department of
Child Study and Human Development

April 1, 2025

Letter of Support for Ms. Rumeysa Öztürk

TO WHOM IT MAY CONCERN:

I write to provide this affidavit of support for **Ms. Rumeysa Öztürk**, a Turkish international student enrolled in our doctoral program here at Eliot-Pearson Department of Child Study and Human Development (Eliot-Pearson) at Tufts University. I write as a citizen of the United States, having been born here.

I write to advocate strenuously for a decision to allow Rumeysa to stay in the United States. As my letter describes, Rumeysa is an individual, who through her interactions with others, collaborations within communities, her learning as a student, and work as a scholar has made important contributions during her time in the United States. These contributions are to the functioning of communities (notably departmental academic community and peer community) and as a developing scholar, to the literature.

I have known Rumeysa since fall, 2020, when she entered the doctoral program. I first met her during our PhD admission interview day in January 2020. I have interacted with Rumeysa as an instructor of a course that she took, "Cultural Sensitivity in Child and Family Research/Practice," and as an informal mentor. In the latter role, we have had numerous conversations about her research interests in children and media, personal passion for the rights and needs of children throughout the world, her sense of commitment to the Eliot-Pearson community, and her life here in the United States. In short, I know Rumeysa well.

**Rumeysa, as a person**, is a gentle individual who carries herself with quiet passion for children and compassion for all. During her time at Eliot-Pearson, she has made an indelible mark on our community through these two qualities. I share just two examples. Two years ago, she co-led a major effort in our department to engage students at all levels, faculty and staff in the creation of a community mosaic that represented the values of our department. That mosaic hangs in our lobby for all to see as they move through our space. Just last fall, Rumeysa spearheaded another community activity dedicated to children who are caught up in traumatic situations ("Collective Grieving for Children Facing War and Conflict: A Night for Poetry and Storytelling"). When she sent me the flyer, asking me to share the news, she noted that she was co-organizing this with two other doctoral students. However, the reality is that this was Rumeysa's idea: she approached me in spring semester, 2024, with this idea. I could tell how pained she was about the experiences of children globally who face challenges and trauma in various ways. She was explicitly clear that she wanted to help the Eliot-Pearson community develop an activity that was for **all children,** not for certain children or children in certain parts of the world. We discussed her initial ideas, and I offered my thoughts about how she might proceed. True to who she is, Rumeysa brought in peer collaborators, who all worked seamlessly on this project that was so deeply thoughtfully, meticulously and sensitively planned to ensure a safe space for those who attended to experiences a shared reflective, creative, and productive space that promoted healing

JA-000217



for all who attended. Also true to who Rumeysa is, she took no credit, instead, thanking her collaborators and others who made important contributions to the activity.

**Rumeysa, as a student,** brings not only her compassion for others, but also her strong intellectual curiosity to the learning experience.  In my class, Rumeysa carefully listened to others, asking questions that enabled her to understand others' perspectives; she did so in deeply respectful ways. As a result, others typically felt heard and seen by her, which helped them feel validated as a person. Rumeysa's academic work was very strong. She always came to class well-prepared, having done the readings, crafted questions or points that she offered in class discussions. In her written work and class discussions, she demonstrated her ability to critically think and evaluate material, often elevating the conversation and contributing to other students and my own learning.

**Rumeysa, as a scholar**, is deeply committed to developing her skills in disseminating her ideas. Rumeysa took the highly unusual step of developing the final assignment for the course I taught into a manuscript that she successfully published (Ozturk, R. 2023. Representation of refugee characters and experiences in children's animated television: missed opportunities and hopes. *Journal of Children and Media*). This article reflected her ability to translate what she learned into published recommendations for ways to improve children's media. No other student has ever taken this step in my over 30 years of teaching this class.

**Rumeysa, as a peer among graduate students**, has actively encouraged her fellow students to move along in their graduate programs, celebrating their achievement of particular milestones and honoring and encouraging them when they have self-doubts. Several of my advisees have reflected on the ways in which she touched them during their time here in Eliot-Pearson. In her role as a peer student, Rumeysa has been invaluable – quietly so – to the fabric of the graduate student community. Her absence has struck a deep void in the student community.

My last point is to provide some critically important context for understanding Rumeysa. She lives with daily prejudice and bias about her faith and her faith practices (including wearing hijab), from verbal harassment to physical harassment. She rarely talks about these experiences and her deep disappointment that she has not felt supported or understood by officials whom she contacted about some of these experiences. Can you imagine the person I have described having to navigate these realities?  It is in this context that Rumeysa engages in community spaces where she can offer and find support in the pursuit of a better world.

In sum, Rumeysa Öztürk makes everyone around her a better person; she is an essential member of the Tufts community. We need her back.  I urge that the courts return Rumeysa Öztürk to our community. I declare that the above statements are all true and correct to the best of my ability.

Sincerely,

Ellen E.  Pinderhughes PhD
Professor of Child Study and Human Development

# EXHIBIT 1-J

JA-000219

Najiba Akbar

March 30, 2025

Subject: Affidavit Letter of Support for Rumeysa Ozturk

To Whom It May Concern,

I am writing this letter in strong support of Rumeysa Ozturk. I served as the Muslim Chaplain at Tufts University from 2021-2024 and first met Rumeysa during my initial academic year. From our earliest conversations, it was clear to me that she was an engaged and thoughtful member of the Tufts community. She spoke highly of her experience as a Tufts student and expressed a deep desire to foster a greater sense of belonging amongst Muslim and international graduate students on campus. This shared vision led us to begin meeting regularly, and over the next three years, we collaborated closely, organizing a variety of gatherings—dinners, social events, and community discussions—held at the Tufts Interfaith Center. These events provided a warm, welcoming space for graduate students to connect and support one another. Rumeysa was always willing to step up to help organize the event, prepare food, or co-lead a discussion.

Rumeysa has always struck me as a deeply compassionate and conscientious individual. She listens with care, considers diverse perspectives, and approaches others with kindness and humility. She was not only an active participant in our community initiatives but also one of the first to step up in service—whether by helping to prepare meals, welcoming new students, or staying late to clean up after events. Her intelligence, maturity, and generosity made her a pillar of our graduate student community. Undergraduates at Tufts describe her as having the presence of an "older sister" who took them under her wing and offered unconditional love and support.

Beyond her contributions at Tufts, I know Rumeysa has a deep passion for children's literature and aspires to become a children's book author—driven by her belief in the power of storytelling to inspire and uplift young minds. Rumeysa is precisely the kind of student we should be welcoming and supporting in the United States. As a Fulbright scholar, she has demonstrated exceptional academic merit and has been highly regarded by her professors and peers. She deserves the opportunity to complete her education at Tufts.

I know Rumeysa was excited about being at the end of her PhD journey, after all of the hard work and long hours she has put into this endeavor. She was almost at the finish line! I respectfully ask that she be allowed to return to the state of Massachusetts to complete her PhD program in Child Study and Human Development.

I declare that the above statements are all true and correct to the best of my ability.

JA-000220

Sincerely,

/s/Najiba Akbar_____
Najiba Akbar
U.S. Citizen, Born November 5, 1981 in New York, NY

# EXHIBIT 1-K

JA-000222

April 1, 2025

To Whom it May Concern,

My name is Alison Campion, I am a third year PhD student at Tufts University writing this letter in support of Rumeysa Ozturk.

I have met Rumeysa several times through the Tufts graduate student community. Most memorably, I attended an interfaith Iftar event sponsored by the Muslim Students Association and Tufts Chaplaincy with her on March 12, 2024. I had gone to the event with a mutual friend and ended up spending much of the evening with Rumeysa. Rumeysa was warm, friendly, and quick to smile. She was clearly a valued member of the Muslim student community, but also made me, a Catholic who did not know many people there, feel incredibly valued and welcomed. She patiently answered my questions about Ramadan and introduced me to each new person that came over to squeeze around our table. She showed the same genuine kindness to each person that joined our group, no matter how well she knew them.

That Iftar dinner and Rumeysa's generous spirit perfectly reflected how she invests in her religious community while also extending support, respect, and kindness to the wider community. To me, Rumeysa's ability to express her own cultural and religious views while accepting, respecting, and celebrating others' is the true embodiment of American values.

Every time I have crossed paths with Rumeysa since that Iftar dinner, she has lifted my spirits with her friendly smile and kind words.  I always knew her to be hard working and studious, and a good, dependable, caring friend. She is a valued member of the Tufts graduate student community and I look forward to seeing her back on campus where she very much belongs.

I can personally attest to the fact that Rumeysa has actively improved the experience of myself and other students at Tufts. I urge the courts to release Rumeysa and return her to her community at Tufts University, so she can continue to make a positive impact on her colleagues, students, teachers, and friends.

I declare that the above statements are all true and correct to the best of my ability.

Alison Campion

# EXHIBIT 1-L

JA-000224



SCHOOL OF ARTS AND SCIENCES
# Eliot-Pearson Department of Child Study and Human Development

March 31, 2025

To Whom it May Concern,

I am writing a letter of emphatic support for Rumeysa Öztürk to implore that she be released, returned to her community, and allowed to stay in the United States through the completion of her doctoral program at Tufts University. I am a Professor of Child Study and Human Development, Faculty Affairs Coordinator, and Director of the Ensuring eXperiences for Children's Early Learning Success (ExCELS) lab at Tufts University. I currently serve as Rumeysa's second advisor in the doctoral program and have been meeting with her formally once or twice each semester over the last couple of years to support her work. Rumeysa's research area of interest centers on children's and adolescents' positive development in a media-embedded, digitally connected global world. Her dissertation will investigate how adolescents and young adults use social media in prosocial ways. This theme of positive youth development is entirely consistent with Rumeysa's character and aligns with her personal values of care, hope, and compassion.

Since the beginning of her time in the Eliot-Pearson Department of Child Study and Human Development, Rumeysa has stood out for these qualities and has contributed greatly to the heart and soul of our department. Based on conversations with her about her work in the DICE lab, she's that wonderful combination of an independent scholar and collaborative team player! In our meetings together to discuss progress in her work, she has demonstrated a strong work ethic, great attention to detail, always asks astute questions, and immediately adjusts based on the feedback she receives. She is a strong writer and takes the initiative to learn what she needs to learn to make progress toward her goals. I have witnessed her professional growth and the increasing sophistication of the questions she is asking, especially regarding the best ways to support positive youth development through social media. Rumeysa shows her eagerness to learn by taking the initiative to find opportunities to develop professionally and intellectually, whether it be through attending and presenting at professional conferences or serving as a teaching assistant or mentor to other students in the department. She has also shown the highest level of professionalism by always maintaining clear communication and connection with her advisors and peers. Rumeysa will be an invaluable contributor to any research team or in any field setting in the future and will be a critical leader in any context she chooses for her next professional home.

Rumeysa's pleasant and collaborative demeanor, professional work ethic, intellectual curiosity, and thoughtful interactions with faculty and students all make her an important member of our department and a role model for the other graduate and undergraduate students. She is, quite simply, one of the most earnest and compassionate students I've ever known in my 22 years as a professor. Rumeysa, as you've no doubt learned from others, is a deeply valued member of other Tufts communities as well, including those formed through the Tufts University Chaplaincy. As a recent article states, "Her leadership as a graduate student with different life experiences and practical wisdom has been a profound gift for the undergraduate students on the Medford campus–for both Muslim students and students from other religious and philosophical traditions." Rumeysa is one of the most caring, humble, and inclusive people I know. We all

JA-000225



SCHOOL OF ARTS AND SCIENCES

# Eliot-Pearson Department of Child Study and Human Development

miss her so much, and just want her returned to our Tufts community, so that we can embrace her again and benefit from her sweet, sweet spirit.

Rumeysa's professional and interpersonal skills, intellectual curiosity, writing and analytic capabilities, and commitment to creating communities of care make her an essential member of our department and the larger Tufts community. Though I have known her only a short while, Rumeysa's professional dedication and intellectual ability can be seen in every course, leadership, and research task she is given. But, perhaps above all, her contribution to the soul of our community is what we miss most. I sincerely hope that those reading this letter will give her case the most positive consideration and release and return her to us as soon as possible. She is mere months from completing her PhD program and will honor that privilege by putting the best developmental science, guided by her commitments to inclusion and equity, out into the world. Please let me know if I can provide any additional information in support of Rumeysa Öztürk. I declare that the above statements are all true and correct to the best of my ability.

Sincerely,

Christine McWayne, Ph.D.
Professor

# EXHIBIT 1-M

JA-000227



**SCHOOL OF ARTS AND SCIENCES**

Eliot-Pearson Department of Child Study and Human Development

March 30, 2025

To Whom It May Concern:

Rumeysa Ozturk was a student in two of my classes, and she was the teaching assistant for three courses I taught. In the Fall of 2020 she took my graduate seminar (CSHD 267) in which she received an A. She audited my Creating Children's Media class in the spring of 2021 but attended every single class and did every single assignment although she did not take the course for credit – she was simply interested in furthering her knowledge and experience in the area of children's media.

In the fall of 2022, Rumeysa was the TA for CSHD 167, Children and Mass Media. In the spring of 2023, she was the TA for both CHD 169, Creating Children's Media, and CSHD 113, Media Literacy. In each instance Rumeysa went above and beyond anything I asked of her. She was always willing to set up separate office hours and meet with students individually outside of class to clarify any questions, help them frame assignments, or just to chat. In each of these classes, I turned part of one session over to Rumeysa to teach. She was always well-prepared and engaging. And memorable. Just yesterday I heard from a student from Creating Children's Media from 2023, who stated that Rumeysa's work about low income and refugee children in media had inspired her own senior honors thesis that she is now completing.

When Rumeysa took my graduate seminar, we were in the height of Covid and the entire semester was online. This class met once a week. There was one day early in the semester that was Rosh Hashanah, the Jewish New Year. I explained to the class that we would not meet that day since I would be celebrating with my family. Rumeysa, always curious about others and sincerely interested in learning about different faith traditions, asked me what I would be doing to celebrate. And when I explained that part of my family tradition was to bake my grandmother's honey cake, Rumeysa immediately asked for the recipe.

Rumeysa is someone who always prefaces her queries with the phrase, "May I kindly ask that…" To me, this is the essence of who she is: someone who never wishes to impose herself on others, someone who is extremely considerate, someone who cares about engaging with and learning about the world.

When my father passed away last winter, the first person I heard from was Rumeysa. This was no surprise. She is, and has always been, someone who cares deeply about those around her. Her peers and her professors know Rumeysa to be a thoughtful and compassionate person, someone who has made a difference in our lives, someone who cares profoundly about children and families. I have greatly valued having her kind, competent and interculturally aware presence as a student and as a teaching assistant. She is an integral part of the fabric that is our community in the Eliot-Pearson Department of Child Development.

JA-000228

Sincerely,

*Julie Dobrow*

Dr. Julie Dobrow
Distinguished Senior Lecturer

I declare that the above statements are all true and correct to the best of my knowledge and ability.

JA-000229

# EXHIBIT 1-N

JA-000230



**SCHOOL OF ARTS AND SCIENCES**

Eliot-Pearson Department of Child Study and
Human Development

March 30th, 2025

To Whom It May Concern

     I have known Rumeysa since started her PhD program in Applied Child Development in our department. At that time, I knew her as a member of our student community. In Spring 2021, Rumeysa took my course on "Qualitative Research Methods" and I got to know her well, both as a person and as a student. I observed her intelligence, her deep interest in learning, her commitment to conducting well-designed research, and her dedication to serving children and families. As part of the requirements of this course, Rumeysa completed a small pilot research project that involved analyzing stories written by young adults as they recalled significant events in their childhood. I remember being most impressed with Rumeysa's attention to detail and her sensitivity to the diverse backgrounds of the young adults. She is a very thoughtful and introspective person, who pays careful attention to all individuals with whom she interacts.

     Rumeysa spends much of her time in the department, working in Professor Sara Johnson's lab, which is near the main corridor of our department building. I see and interact with Rumeysa regularly, as she has a kind and pleasant demeanor and always greets everyone with a smile on her face. She is very respectful, warm, and friendly. She is also a very active member of our department community. She has served on student committees, has volunteered and helped out with event planning and engages in all department gatherings and events.

     Rumeysa has also served as a Teaching Assistant for several courses, and many of my undergraduate advisees mention that she is always willing to go out of her way to answer their questions and provide supportive and encouraging assistance. Last year, Rumeysa was an active member of a group of students who created a mosaic with an artist from the community that represents the all-encompassing spirit of community and unity that we value very deeply in our department. Rumeysa is known, not only in our department, but also within the larger Tufts community, through her involvement with graduate students in other departments, with members of the Chaplaincy at Tufts, and in community organizations in the neighboring areas. Our department and university community are eager to have Rumeysa back in Somerville, back on campus, and in our department. She is an integral and active member of our community.

I declare that the above statements are all true and correct to the best of my knowledge.

Sincerely,

Jayanthi Mistry, Ph.D.
Professor of Child Study & Human Development

# EXHIBIT 1-O

JA-000232



SCHOOL OF ARTS AND SCIENCES

# Eliot-Pearson Department of
# Child Study and Human Development

April 1, 2025

**To Whom it May Concern:**

I am a U.S. citizen and member of the faculty teaching in the Eliot-Pearson Department of Child Development at Tufts University. This letter is a letter of support for Rumeysa Ozturk, written with the hope that she will be returned very soon to continue her good work in our department and be the kind and caring person we all know and admire.

I first met Rumeysa four years ago when she joined a group of students and myself to put together an anti-racism poetry festival – an event that had students and faculty performing their poetry.  In the many meetings preparing for this event, I was struck by Rumeysa's gentle and kind nature.  It was immediately obvious that she cared about anyone's suffering and wished to do what she could to reduce that suffering – in soft and kind ways.

More recently, I joined a group that Rumeysa and other students hosted to express support for children suffering from war.  We gathered to share in different ways (through music, poetry, weaving, and more) – all expressions of how children have been suffering because of war.  Again, this was no loud and aggressive protest. Rather, it was a way the group could feel together and be empowered to do what we can to lessen the impact of war on children. In many ways, the gathering and ways of expressing encapsulated Rumeysa's ways of showing care.

Finally, though I don't work closely with Rumeysa, every time we pass in the hallway or converse at a community event, I am struck once again by her kind and gentle nature. She is the real deal when it comes to caring for others. We should all be more like Rumeysa.

I hope these comments contribute to the collective picture of Rumeysa as a person who deserves to not only remain in the U.S. and to return to campus to work on her Ph.D surrounded by the support of the Tuft's community, but also deserves our admiration for her kind and caring nature and her devotion to lessening the pain and suffering of others, especially children.

**I declare that the above statements are all true and correct to the best of my knowledge and ability.**

Sincerely,

*W. George Scarlett*

W. George Scarlett, Ph.D.

Distinguished Senior Lecturer and Tisch Sr.Fellow

Eliot-Pearson Department of Child Study and Human Development

105 College Avenue, Medford, MA 02155  |  TEL: 617.627.3355  |  FAX: 617.627.3503  |  http://ase.tufts.edu/epcshd

# EXHIBIT 1-P

JA-000234

Tuesday, April 1 2025

My name is Sam Alterman. I am a PhD student in Physics at Tufts University. I've known Rümeysa Öztürk for about two years, both in my capacity as a steward of the Tufts University Graduate Worker's Union and as a personal friend. Rümeysa is a gentle, intelligent, caring person and a valued member of our community. I believe very firmly she should be allowed to remain in the United States.

I first met Rümeysa in Summer 2023 when our graduate student union was trying to talk to graduate students in the Child Studies and Human Development department to better understand their working conditions. The first time I walked into the Child Studies and Human Development offices, it was immediately clear how central Rümeysa was and is to the culture of that department. She warmly greets everyone by name every morning, and always makes time to genuinely listen to her coworkers talking about their day. I continue to be struck by the depth and sincerity of her relationships with her coworkers. Rümeysa's involvement in our union has been vital, making connections with her coworkers and giving them space to advocate for their needs. After running into each other at several interfaith events, where she always brings her deep respect for and curiosity about other spiritual and religious traditions, I became lucky enough to call Rümeysa a friend.

I strongly believe that Rümeysa Öztürk should be allowed to remain in the United States. Rümeysa is one of the kindest, gentlest, and most compassionate people I have ever had the pleasure to meet. Her passion for teaching and natural curiosity has made her well-known at Tufts as an excellent Teaching Assistant whose courses are highly sought by students. Within the graduate student community, Rümeysa is always a quiet but persistent voice for kindness, mutual understanding, and care. Our community is not whole without her here. I urgently request that the Court allow Rümeysa to be returned to Massachusetts and released on bail so she can be with the community that cares for her and finish her doctoral studies.

I declare that the above statements are all true and correct to the best of my ability.

# EXHIBIT 1-Q

JA-000236

March 31st, 2025

To whom it may concern,

I am writing to you to describe the gentle and caring nature of Rumeysa Ozturk and to ask that she be allowed to stay in Somerville, Massachusetts.

I met Rumeysa in February 2022 when I was interviewing for my doctoral program at Tufts. The interviews that year were held on zoom and Rumeysa had the difficult job of facilitating a room full of nervous applicants, which she did with grace. Within her first few sentences on that zoom call, I was soothed by her kind greetings and smiles, then immediately impressed with her scholarship and passion for research on children's media. Even before meeting her in person, I felt Rumeysa warmth. In the three years I have been privileged to know her since, she has continued to amaze me with her integrity, care, and love for her family.

When I had to take some time off from school to care for my mom, Rumeysa was checking in on me and reminding me of how much I was missed in our lab. For each of our lab members' birthdays, she stayed up late baking a treat that reminded her of us. When I was new to Tufts, she went out of her way to have lunch and coffee with me. These are just a few of the instances that demonstrate Rumeysa's commitment to her friends and peers.

Rumeysa cares deeply about helping children. We bonded over how much we love the children's show Bluey, a show featuring a family of Australian shepherds, particularly because of the way it can help kids process big emotions such as grief or as small as cleaning up toys. Whenever Rumeysa and I talked about Bluey, her face lit up with positivity and radiance. We would giggle at the events of the newest episodes and talk about our favorite moments.

Last year, Rumeysa cared so deeply for children affected by wars all over the world, so she organized a community art night at the interfaith center at Tufts. Prior to the event, Rumeysa spent hours organizing the event, crafting a budget for a community quilt to process grief, and went from store to store to find necessary supplies. Rumeysa's organizing helped Tufts students and faculty members come together to grieve children affected by wars through poem reading, song singing, and art making. I will carry that memory of mutual care in my heart as I continue to channel Rumeysa's deep commitment to morality through both my scholarship and personal life.

To know Rumeysa is to love Rumeysa. Rumeysa is a valuable member of the community, scholar, and, most importantly, friend. I urge you to allow her to stay in the Somerville community.

Warm regards,
SooYun Byeon

# EXHIBIT 1-R

JA-000238

Garcia

April 2, 2025

I met Rumeysa three years ago when we were paired as co-teaching assistants during the first semester of my PhD program at Tufts. She was very kind to me even though I was visibly nervous about starting grad school after taking several years away from academia. Rumeysa always asked for my input on our projects and made sure I felt included. During that first semester, we took an autumnal walk around Cambridge, treating ourselves to cookies from the local bakery. Our new friendship helped me to adjust to my life here at Tufts and as a grad student. Rumeysa's warm presence makes her the type of person you want around when you feel nervous or alone.

During our time as co-teaching assistants, Rumeysa's schedule allowed her to be in the class more than me, and as a result, students often felt more comfortable emailing her over me. I noticed Rumeysa always worked diligently to keep up with their questions and requests. Her hard work and attention to our students was an amazing model for me as a new PhD student.

Last year, Rumeysa and I attended the Graduate Student Council awards in support our friend and PhD colleague Matt, who was receiving an award that year. Rumeysa always advocates to make sure everyone is recognized for their accomplishments, big and small. Her positivity has a powerful impact on our department, shining through her kindness to all and her resounding encouragement, and celebration of everyone's achievements.

During a weekend-long writing retreat organized by the PhD students, Rumeysa helped with every chore - from getting set up, to cooking, to cleaning up. She was always asking how she could be of service, and ensured we were respectful of the cleaning rules

Garcia

when we were putting everything away. In the years I have known Rumeysa, I have noticed that she is consistently thoughtful and mindful, always taking care not to disrupt the spaces she is in or disturb the people she is with. Her thoughtfulness extends beyond those in her immediate proximity - she always asks after my pets and loved ones.

During the writing retreat, we unexpectedly lost power and because we were in relatively isolated cabin, some of the students felt freaked out about the unfamiliar circumstances. We found candles and gathered around the dining room table together. Rumeysa led us through positive affirmations for PhD students, speaking aloud intentions such as, "I know what it takes to successfully complete scholarly work" and "It is okay to make mistakes because I always learn from them." After she spoke each affirmation, we all repeated it back to her. Through her guidance, she transformed the space from something uncertain and scary into a supportive and safe environment.

Rumeysa loves animals. Unaware that she had such a bad allergy to cats, I invited her over to meet my new kitten, and she came over gladly. When she started to have allergic reactions after playing with the kitten, she did not complain. Instead, I heard her in the bathroom splashing water on her face to soothe her allergy-induced irritated eyes. It was clear that she wanted to keep the visit fun and not ruin the mood with her allergic reaction. I insisted that we leave the kitten alone and hang out outside, even though she said she was enjoying herself. Rumeysa is a team player, and not a complainer, even when it comes to enjoying the company of furry creatures she is allergic to.

Rumeysa has the biggest heart of anyone I know. The last text she sent me was a book recommendation for a children's book called "Just What To Do", described as a tender

Garcia

children's book on processing grief, which I've read to process my own sense of loss in her absence. She has always been interested in helping others, but especially children, process big emotions - it's a topic we have discussed extensively, touching on subjects such as gentle parenting and positive youth development.

Rumeysa and I recently got dinner together and talked about the struggles of maintaining our health while trying to stay on top of multiple deadlines in a PhD program. I bought her a special collagen smoothie because we were joking about wanting to reduce our stress and maintain youthful skin. She told me that she would be happy to join me for a gym date in the future, but we never got around to it.

I am asking the court to please return Rumeysa to her home in Massachusetts. She is a dear friend, and has shown me support with her encouragement and gentle positivity. She has a strong community here, and many, many people who miss her.

I declare that all the above statements are all true and correct to the best of my ability.


/s/ Lucinda Garcia

Lucinda Garcia

US Citizen

# EXHIBIT 1-S

JA-000242

April 1, 2025

To whom it may concern,

I first met Rumeysa Ozturk during my freshman year at Tufts University at a Muslim Student Association (MSA) event. We were introduced by my friend, who was Rumeysa's roommate at the time. Now a junior at Tufts, I've had the privilege of knowing Rumeysa for the past three years.

In that time, I've come to know Rumeysa as one of the most compassionate, gentle, and caring individuals. Our former Muslim chaplain, Najiba Akbar, once described Rumeysa as having an "angelic presence" in our community, and I couldn't agree more. I would regularly see Rumeysa at MSA events—whether it was Friday prayers, iftars, or casual gatherings. Without fail, every time I saw her, she would greet me warmly with a hug, ask about my family, and genuinely check in on how I was doing in class. Her deep, authentic curiosity about others was extended to so many members of our community.

What stood out most was Rumeysa's unwavering kindness and desire to serve others. Despite not holding a leadership role in the MSA, she consistently volunteered to help—often serving food at our crowded iftars even though she was fasting all day herself. Her actions reflect a selfless heart and a desire to uplift others before thinking of her own needs. Her selfnesses along with her warmth made Rumeysa a pillar in our community and source of comfort for many.

Rumeysa is also an exceptionally bright and accomplished young woman. She earned a master's degree in Developmental and Child Psychology from Columbia University and is currently pursuing a PhD in Child Studies and Human Development at Tufts—two highly prestigious programs that speak to her academic excellence. Achieving this as an international student and non-native English speaker is a testament to Rumeysa's dedication, intelligence, and perseverance. Additionally, Rumeysa is a Fulbright Scholar and illustrator of the children's book *The Tale of Ibrahim Ibn Adham*, written by her friend and fellow graduate student at Columbia.

Rumeysa is not your average woman. She is talented, driven, and deeply filled with compassion. Her energy has touched many of us in the MSA and wider Tufts community. Since her absence, many of us who have known her personally have felt a deep void. It has been difficult to continue with our daily lives while our thoughts and hearts are with our dear Rumeysa.

I urge you to consider the profound positive impact Rumeysa has had on those around her, and how devastating her absence has been to our community. Rumeysa does not deserve to be detained—she deserves to be here, where she has built a home and a community that values and needs her.  She is not only a friend but a source of light, strength, and inspiration to many. I strongly urge you to allow her to remain in the United States so she can continue her studies and contribute positively to the lives of those around her, as she has always done.

*I declare the above statements are true and correct to the best of my ability.*

Sincerely,
Rola Kazaer
/s/ Rola Kazaer

# EXHIBIT 1-T

Assistant Professor of Computer Science,
Tufts University

To whom it may concern,

My name is Saeed Mehraban, and I am an Assistant Professor of Computer Science at Tufts University. I have known Rümeysa Öztürk since March 2023 through the Muslim Student Association (MSA) community Iftar. When she learned I am a faculty at the university, she respectfully approached me to invite me to participate in a special Iftar for graduate students she and her friends were participating. This made me feel specially welcomed. From our very first interaction, I found her to be kind, humble, and full of positive energy and respect. Since then, I have seen her frequently at Islamic events at Tufts University or around campus.

I cannot emphasize enough her caring and admirable character. Every time I have seen her, she has approached others with a warm smile and genuine kindness. She is a great listener who makes people feel understood and always ensures that those around her are doing well. At the Iftar events, she consistently helped with setting up, serving food, and cleaning afterward. Rümeysa communicates clearly in English and easily connects with others. I know she deeply values her education and was hoping to complete her PhD soon and take the next step in her life journey.

Her strong and compassionate presence has helped bring our community together. Everyone I know is deeply saddened by what has happened, and we all miss her dearly. Our community is not the same without her. I sincerely hope she can return to our community, finish her degree, and flourish in every step she takes afterward. I declare that the above statements are true and correct to the best of my knowledge and ability.

Sincerely

/s/ Saeed Mehraban
April 1, 2025

JA-000245

# EXHIBIT 1-U

JA-000246



**SCHOOL OF ARTS AND SCIENCES**

Eliot-Pearson Department of
Child Study and Human Development

March 30, 2025

To Whom It May Concern:

My name is Tama Leventhal, and I am Professor and Chair of the Eliot-Pearson Department of Child Study and Human Development. I am writing this highest letter of support for Rumeysa Öztürk. I have been most fortunate to know Rumeysa since September 2020, when she enrolled in our doctoral program. I was the Director of Graduate Studies at that time. Since then, I have served on committees with Rumeysa, attended events she organized, and interacted with her informally on numerous occasions. Most recently, I was asked to be on her upcoming doctoral committee. Thus, I have had extensive opportunities to interact with Rumeysa and can attest with the utmost confidence that she is someone of the **absolute highest** character.

All first- and second-year doctoral students are required to take the Doctoral Proseminar, which I taught the year Rumeysa entered our doctoral program. That year there were ten students in the course, providing ample opportunity to observe her. From the start, Rumeysa stood out as a curious and motivated student as well as a true community-builder despite her soft-spoken manner. She was highly regarded by her peers and faculty alike who joined the seminar on a regular basis. It was here that I learned about her interest in children and media and the work she hoped to accomplish over the course of her doctoral studies.

Consistent with the role she played in the Doctoral Proseminar, Rumeysa became a leader in our department's student-led Belonging Committee—a committee intended to create an inclusive community where **all members** feel valued. Through this committee, she organized many events designed to do just that. Two examples standout. Before describing these events, I will note that as Department Chair, we depend on our graduate students to play an active role in our community by organizing events, serving on committees, assisting with admissions recruitment, etc. It is only a handful of students, however, who typically take the lead in assuming these roles. Accordingly, Rumeysa is one of these students upon whom our department has come to depend.

The first event is the *Beautiful Stuff* project held during the Spring of 2023. Rumeysa played a key role in the development and creation of a mosaic representing the values of the department, including a more equitable, inclusive, and just department. That mosaic, so-created by many members of our community (e.g., undergraduate and graduate students, faculty, staff, and children from the Eliot-Pearson Children's School), now holds a prominent place in our building for all visitors to see. It is a testament to the values she brings to our community.

JA-000247

The second event this past Fall was entitled, *Collective Grieving for Children Facing War and Conflict*, and entailed poetry and quilting.  Very tellingly, it was held at the Interfaith Center and was intended to address concerns for children in conflict globally.  Here was how Rumeysa expressed her gratitude to the participants, "I am grateful for everyone who gathered to listen and offer pieces of grief and love for the children. Your presence, songs, poems, words, art, and time means a lot. It is heavy sadness that we held this event due to the loss and impact on so many children and families (since our program started, especially last year and this year).  I appreciate that we could all dedicate at least a few hours to remembering those children often overlook. I value the compassionate space we offered each other, a rare opportunity for the genuine connections we sometimes miss in academic settings."  Rumeysa's remarks capture her own compassion for children, generosity of spirit, and commitment to justice through the arts in this case.

Rumeysa's active role as a leader and community-builder meant she volunteered to serve on other committees as well. In Fall of 2022, she was the student representative on a faculty search committee.  I had the pleasure of being on her interview team.  Rumeysa acted with the highest professionalism and demonstrated respect and kindness for the numerous candidates we interviewed.  It was an absolute joy to work with her, and we established a closer relationship afterwards.  Rumeysa and I often talked about cooking, travels, exercise, etc.  It was hard to pass her in the hallways without exchanging a few pleasantries.  The department is not the same without Rumeysa's steady presence.  As someone so devoted to creating a sense of belonging, Rumeysa belongs back in Massachusetts and here at Tufts to rejoin our Eliot-Pearson community, where she is a most valued member.

One incident that I recall most poignantly is when I sought advice from her about an upcoming family vacation to Turkey in Summer 2024. Rumeysa was full of advice and offered to host me, but unfortunately our schedules did not align.  When we returned in the fall, she told me my trip had inspired her to go to Cappadocia, a part of her country to which she had never been.  Unlike me, she was too afraid to go up in a hot air ballon, which is a common activity there, because she was too scared.  I think of that now and it only reinforces my concern for her welfare.

In terms of her scholarship, Rumeysa received the prestigious Evan's Literacy Fellowship to support her research on children and media. This award is given to an outstanding doctoral student in the department.  For this reason, I was thrilled when her advisor asked me on Monday, March 24th—the day before she was detained—if I would serve on her doctoral committee.  It is a role I gladly accepted. I welcome the opportunity to interact with Rumeysa in this new capacity and to support her academic journey.

To that end, I want to highlight that Rumeysa's dissertation on social media and positive youth development will cover an understudied and critically important to the field of developmental science specifically and to public discourse around the role of social media in the lives of children and youth more generally given widespread attention to this topic. Completing her dissertation is the final step in Rumeysa's doctoral studies, and she is extremely close to this major milestone after years of intensive work.  It is essential for her professional development that she return to Tufts to complete her dissertation within the next year as planned.

Although I have not worked directly with Rumeysa in her role as a Teaching Assistant. She has made a valuable contribution to the education of undergraduates at Tufts. She even taught her own course on children and media for a pre-college program. As is clear, her contributions to our department are innumerable.

In conclusion, Rumeysa is a deeply valued member of our community and truly a remarkable person. I have tried to express her strong character, defined by her role as a uniter and community builder with a kind and gentle manner. Please do not hesitate to reach out to me for any additional information I can provide.

I declare that the above statements are true and correct to the best of my knowledge and ability.

Cordially,

Tama Leventhal, Ph.D.
Professor & Chair

# EXHIBIT 1-V

JA-000250

## DECLARATION OF TUFTS UNIVERSITY

Tufts University (an entity legally known as "The Trustees of Tufts College" and henceforth referred to as "Tufts University", the "University" or "Tufts"), declares as follows:

1.    On Tuesday, March 25, 2025, the University learned that Rümeysa Öztürk, a Tufts doctoral student from Turkey, was taken into custody by the Department of Homeland Security as she was leaving her off-campus apartment in Somerville, Massachusetts. The University understands that she was leaving her home that evening for an Iftar dinner hosted at the Tufts Interfaith Center where she would break her Ramadan fast for the day.

2.    At around 6:30 p.m. that evening, the Tufts University Police Department received courtesy notification from the Somerville Police Department that an individual had been detained by federal authorities and that the person in custody might be a Tufts student. We confirmed through our records that the person in question was Rümeysa Öztürk.

3.    At 7:32 p.m., Ms. Öztürk's record in the Student and Exchange Visitor Information System (SEVIS) was updated to note that her visa was terminated. Prior to that, and at the time of her detention, Ms. Öztürk was in "good immigration standing" according to her record in SEVIS, and both Ms. Öztürk and Tufts had followed the governing regulations for students on visas. The University then received a notice, dated March 25, 2025 and received via email on March 26, 2025 at 10:31 a.m., stating that Ms. Öztürk's SEVIS designation was terminated under the Immigration and Naturalization Act (INA) section 237(a)(1)(C)(i) (which relates to failure to maintain valid nonimmigrant status) and/or INA section 237(a)(4)(C)(i) (which addresses noncitizens "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States").

1

JA-000251

4.      With her consent, the University can confirm that Ms. Öztürk is a third-year doctoral student in good academic and administrative standing. Her research focuses on how young adults can use social media in positive, prosocial ways and she is described by her faculty as a hard-working student dedicated to her studies and the Tufts community.  The University has no information to support the allegations that she was engaged in activities at Tufts that warrant her arrest and detention.  The University has seen an outpouring of support for Ms. Öztürk over the last week from Tufts students, faculty and staff.  These individuals have described Ms. Öztürk as a valued member of the community, dedicated to her academic pursuits and committed to her colleagues.

5.      The University can confirm that Ms. Öztürk was one of several authors of an opinion piece in the student newspaper, *The Tufts Daily*, published on March 26, 2024, entitled: "Try again, President Kumar: Renewing Calls for Tufts to Adopt March 4 TCU Senate resolutions." The University declares that this opinion piece was not in violation of any Tufts policies. Further, no complaints were filed with the University or, to our knowledge, outside of the University about this op-ed. The University maintains that the op-ed was consistent with speech permitted by the Declaration on Freedom of Expression adopted by our trustees on November 7, 2009. (Attached hereto as Exhibit A.) For the record, a search of the Tufts Daily will reveal op-eds on multiple sides of the issue with opinions that were shared just as strongly as the op-ed Ms. Öztürk co-authored. The University has no further information suggesting that she has acted in a manner that would constitute a violation of the University's understanding of the Immigration and Naturalization Act.

6.      Our international students, faculty, and staff are vital to deliver on the education, teaching, research, and public service mission of Tufts University. The University sponsors 1,818

JA-000252

continuing international students on F-1 visas, alongside 569 alumni who are pursuing post-completion work authorization in the United States, and 24 degree and non-degree students on J-1 visas. This is in addition to the broader community of students, faculty, and staff that hold various immigrant and non-immigrant statuses.

7.      The free movement of our international community members is therefore essential to the functioning of the University and serving our mission. The University has heard from students, faculty and staff who are forgoing opportunities to speak at international conferences and avoiding or postponing international travel. In the worst cases, many report being fearful of leaving their homes, even to attend and teach classes on campus.

8.      The University declares that many of these students will go on to make significant economic and intellectual contributions to the United States and in countries around the world. They will do so by working in or building new companies, through teaching and research in universities and other academic and healthcare institutions, and through public service in the United States and across the globe. The University is confident in its declaration because thousands of Tufts University alumni have received their education while on F-1 visas and have gone on to make a positive impact to the economic prosperity and intellectual success of the United States and other countries.

9.      The undersigned submits this declaration, on behalf of Tufts University, in support of Ms. Öztürk and asks that she receive the due process rights to which she is entitled. Based on everything we know and have shared here, the University seeks relief so that Ms. Öztürk is released without delay so that she can return to complete her studies and finish her degree at Tufts University.

JA-000253

On behalf of the University, the undersigned declares under the penalty of perjury that the foregoing is true and correct.

Executed on April 1, 2025, at Tufts University.

_____
SUNIL KUMAR
PRESIDENT, TUFTS UNIVERSITY

4

# EXHIBIT A

JA-000255

## DECLARATION ON FREEDOM OF EXPRESSION AT TUFTS UNIVERSITY

Tufts University is an educational community that has as its paramount mission the discovery and dissemination of knowledge and the pursuit of the arts through study, teaching, and research. For this community to achieve its mission, all members must have full and equal opportunity to pursue personal and intellectual growth.

> Freedom of expression and inquiry are fundamental to the academic enterprise. Without freedom of expression, community members cannot fully share their knowledge or test ideas on the anvil of open debate and criticism. Without freedom of inquiry, community members cannot search for new knowledge or challenge conventional wisdom.

Freedom of expression and inquiry are not absolute. The law, for example, provides that freedom of expression does not include the right to slander the reputation of another, to engage in specified forms of harassment, to threaten or obstruct a speaker who advances unwelcome ideas, or to incite another person to violence. Scholarly inquiry also is limited by federal and state regulation, ethical tenets, and professional standards designed to protect human and animal subjects. In addition, the University seeks to ensure the orderly function of the educational enterprise and to ensure that all members of the community have the opportunity to participate in and benefit from the discovery and dissemination of knowledge.

Members of the Tufts community owe one another the basic respect and ethical obligations of human beings engaged in a common endeavor. While not enjoying the force of law, these obligations reflect three basic community values: 1) respect for the freedom of other community members to inquire and express themselves fully; 2) the need to exercise freedom of expression and inquiry in ways that respect the human dignity of others; and 3) the importance of a climate at Tufts that is conducive to learning and in which all community members, regardless of background, are free from behavior that interferes with their ability to study, grow, and attain their full potential.

Members of the university community, including academic and administrative leaders, must hold accountable those who do not respect these values.

When community values are not respected, every member of the Tufts community has an obligation to respond. Those who are the target of such speech should not and must not bear the burden of responding alone. An affront against any member of our community is an affront to all of us. It is only by affirming our collective values that we can build a stronger, more cohesive, and more vibrant community where differences are respected and all are made to feel welcome.

It is incumbent upon all members of the Tufts community, and especially the University leadership, to educate the community about the diverse world in which we live and to support and empower members whose rights are violated. In the end, freedom of expression and inquiry is necessary but not sufficient on its own for learning to take place. Achieving our educational mission requires an environment of respect, tolerance, and civil dialogue.

Approved by the Board of Trustees, November 7, 2009

JA-000256

# EXHIBIT 2

JA-000257

**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

**RÜMEYSA ÖZTÜRK,**
*Petitioner*,

v.                                                      No. 2:25-cv-00374

**DONALD J. TRUMP,** et al.,
*Respondents.*

**Declaration of Stefanie Fisher-Pinkert, Esq.**

I, Stefanie Fisher-Pinkert, declare the following under pain and penalty of perjury:

1.      I am an attorney licensed to practice law in the Commonwealth of Massachusetts. I am also admitted to the Federal District Court for the District of Massachusetts, the Federal District Court for the District of Nebraska, and the First Circuit Court of Appeals.

2.      Since obtaining my license in November of 2009, I have specialized in immigration law, and specifically in removal defense. I have been a member of the American Immigration Lawyers Association ("AILA") since January of 2010. As a member of AILA, I have served in various volunteer positions, including as a member of the Federal Litigation Committee, as a liaison to the Office of Chief Counsel of U.S. Immigration and Customs Enforcement ("ICE"), and as a a liaison to U.S. Customs and Border Protection. I am currently Counsel in the law firm Araujo & Fisher.

3.      Throughout my legal career, I have represented detained individuals in New England facing removal/deportation proceedings or otherwise slated for

1

JA-000258

removal/deportation.  The statements in this declaration are based on my personal knowledge accumulated during my years of immigration practice.

4.      My coworkers and I have represented women in civil immigration detention, including women detained at the Strafford County facility in Dover, NH, and ICE's Buffalo facility in Batavia, NY.

5.      In my experience, ICE regularly detains women at their faciliaties in New England, including the Strafford County facility in New Hampshire, at the Wyatt Detention facility in Rhode Island, and at the  Cumberland County facility in Maine. In my experience, female detainees from New England who are sent outside of New England have most commonly been sent to the detention facility in Batavia, NY.

6.      In my experience, ICE Enforcement and Removal Operations regularly processes individuals they detain in eastern Massachusetts at their Boston Field Office, located in Burlington, Massachusetts.  In my experience, it has been common for family members of a detainee to receive a phone call from the detainee (or possibly from an ICE officer who is with the detainee) while their family member is still in Burlington, Massachusetts. In these phone calls, the family member might learn, for example, that the detainee is in Burlington, Massachusetts and is being taken to be held in Plymouth (or another area facility). I am aware that these phone calls from the Boston Field Office in Burlington occur because I have been contacted by family members who have just received news that their loved one is in ICE custody and is in Burlington, Massachusetts.

7.      In my experience, people arrested by ICE's Homeland Security and Investigations ("HSI") are regularly booked and processed at HSI's offices in Boston, Massachusetts.

JA-000259

8.      I have reviewed the Declaration of David T. Wesling.  In my 16 years of practice, I have not seen or even heard of an ICE detainee arrested in Massachusetts being booked and repeatedly moved in the manner described in that declaration.  I have never seen or even heard of an ICE detainee arrested in Massachusetts being moved to Methuen, Massachusetts, then Lebanon, New Hampshire, then St. Albans, Vermont, within a matter of hours.  I have never heard of any ICE facility or office in Methuen, Massachusetts at all, and have never heard of someone detained by ICE being taken there. I am also unaware of any ICE facility in Lebanon, New Hampshire, and have never heard of an ICE detainee from Massachusetts being taken there. Nor have I ever heard of an ICE detainee arrested in Massachusetts being taken to St. Albans, Vermont.  The conduct described in Mr. Wesling's declaration is, in short, highly irregular.

Executed on April 9, 2025, in Boston, MA.

_____
Stefanie Fisher-Pinkert

3

JA-000260

# EXHIBIT 3

JA-000261

**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

**RÜMEYSA ÖZTÜRK,**
*Petitioner,*

v.                                                          No. 2:25-cv-00374

**DONALD J. TRUMP,** et al.,
*Respondents.*

**Declaration of Professor Anna R. Welch, Esq. submitted in support of
Petitioner's Motion for Release Under *Mapp V. Reno*, or in the Alternative,
for Return to Vermont; and Petitioner's Supplemental Memorandum of
Law on Jurisdictional Issues**

I, Anna R. Welch, declare the following under pain and penalty of perjury:

1. I am an attorney licensed to practice in the State of Maine.

2. Since 2012, I have worked as the founding director and a professor in the University of Maine School of Law's Refugee and Human Rights Clinic. I also teach Immigration Law. I previously worked as a fellow at Stanford Law School, where I taught and supervised students in Stanford's Immigrants' Rights Clinic. From 2006 to 2010, I practiced at the law firm Verrill in Portland, Maine, where I was the head of the firm's Immigration and Global Migration Group.

3. The information below is based on my years of immigration practice in Maine, including monitoring and interacting with and supervising students and colleagues interacting with dozens of civil immigration detainees at the Cumberland County Jail ("CCJ") in Portland, Maine, and including my communications with CCJ's management staff over the years.

JA-000262

4. CCJ has an agreement with U.S. Immigration and Customs Enforcement ("ICE") to house civil immigration detainees. I have been informed recently by Cumberland County's Sheriff Joyce that CCJ can house up to 88 civil immigration detainees.

5. CCJ houses both male and female civil immigration detainees. Female detainees are housed at CCJ whether or not they have a criminal record.

6. CCJ provides our clinic with daily data concerning, among other things, the number of civil immigration detainees housed in its facility. Paragraphs 7-11 below summarize voluminous writings that cannot be conveniently examined in court, in part because they contain personally identifying information concerning certain persons housed in CCJ.

7. On March 7, 2025, records indicated that approximately 27 civil immigration detainees were housed in Pod C3 at CCJ. Pod C3 is the female housing unit.

8. On March 7, 2025, records indicated that approximately 62 total female detainees, including civil immigration detainees, were housed at CCJ.

9. On March 25, 2025, records indicated that approximately 19 civil immigration detainees were housed in Pod C3 (the female housing unit) at CCJ.

10. On March 26, 2025, records indicated that approximately 18 civil immigration detainees were housed in Pod C3 (the female housing unit) at CCJ.

11. On March 26, 2025, records indicated that approximately 46 total female detainees, including civil immigration detainees, were housed at CCJ.

12. Based on my review of these records, and my extensive experience working with CCJ and detainees at CCJ over more than a decade, I conclude that there were at least 16 open beds to house additional female detainees at CCJ on March 25 & 26, 2025.

JA-000263

13. Throughout my years of experience working with the immigrant population in northern New England, I have never heard of an ICE detainee being arrested in Massachusetts and being transferred to Methuen, MA, Lebanon, NH, and then St. Albans, VT in a matter of hours. Nor have I heard of detainees from Massachusetts being taken to any of these locations at all.

Executed on April 10, 2025, in Portland, Maine.

Anna R. Welch

# EXHIBIT 4

JA-000265

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

RÜMEYSA ÖZTÜRK,
*Petitioner*,

v.                                                    No. 2:25-cv-00374

DONALD J. TRUMP, et al.,
*Respondents*.

DECLARATION OF HEATHER YOUNTZ, ESQ.
SUBMITTED IN SUPPORT OF PETITIONER'S MOTION FOR RELEASE UNDER
*MAPP v. RENO*, OR IN THE ALTERNATIVE, FOR RETURN TO VERMONT AND
PETITIONER'S SUPPLEMENTAL MEMORANDUM OF LAW ON JURISDICTIONAL
ISSUES

I, Heather Yountz, declare the following under pain and penalty of perjury:

1.      I am an attorney licensed to practice in the Commonwealth of Massachusetts.

2.      Overall, I have been practicing immigration law for 17 years.  I make this
declaration based on my personal knowledge and personal observations accumulated over that
time period.

3.      Since 2021, I have been employed as a Senior Immigration Staff Attorney at the
Massachusetts Law Reform Institute.  Immediately prior to that, I was an immigration and criminal
defense attorney at the firm Demissie & Church for about six years.

4.      I have been honored to receive awards based on my work representing detained
immigrants and related matters.  I was named one of Boston Magazine's Top Lawyers of 2022,
2023 and 2024, and 2018 Top Women of Law by Massachusetts Lawyers Weekly. I have chaired
the AILA New England Litigation committee, and given seminars, talks, and served on panels for
the American Medical Association, Massachusetts Women's Bar Association, New England

1

Muslim Bar Association, Boston University Law School, Northeastern University School of Law, Suffolk Law School, Boston College Law School, and many other organizations and groups.

5.      Since much of my work has been in deportation defense and the intersection of criminal law and immigration law, I have often spent approximately one day a week in detention facilities operated by U.S. Immigration and Customs Enforcement ("ICE"), including by ICE's Enforcement and Removal Operations ("ERO") department. ICE ERO is generally responsible for civil immigration enforcement within the United States, including the identification, arrest, detention, and removal of noncitizens who ICE alleges are subject to removal or unlawfully present in the United States.

6.      I have been to ICE Boston Field Office, which is located in Burlington, Massachusetts.  The Boston Field Office has administrative and operational authority over ICE arrest, removal, and detention operations in all of New England, including Massachusetts, Connecticut, Maine, New Hampshire, Rhode Island, and Vermont.  The scope of this authority is confirmed by ICE's website entry for the Boston Field Office: https://www.ice.gov/field-office/boston-field-office

7.      ICE has a another division, called Homeland Security Investigations ("HSI").  HSI conducts federal criminal investigations.  In my experience, HSI also gives notice of visa revocations in some cases.  HSI's mission is confirmed on its website: https://www.ice.gov/about-ice/hsi

8.      I have been to four ICE detention facilities in New England, including the Plymouth County Correctional Facility and the Wyatt Detention Facility, and I have represented clients held at other ICE detention facilities throughout the northeastern United States. I am generally familiar with the use these facilities in the immigration detention and removal process.

2

JA-000267

9.    There are multiple ICE detention facilities in New England and elsewhere in the Northeastern United States that hold women detainees.  These include the Stafford County Corrections facility in New Hampshire, Cumberland County Jail in Maine, Chittenden Regional Correctional Facility in Vermont, and the ICE's Buffalo Facility in Batavia, New York. Additionally, for short-term and overnight detention of women detainees, ICE has holding cells in Wyatt Detention Facility and its local offices, including at ICE ERO's Boston Field Office in Burlington, Massachusetts.

10.    In my experience, immigrants who are arrested on civil immigration charges in eastern Massachusetts are booked and processed at ICE ERO's Boston Field Office in Burlington, Massachusetts. In my 17 years of practicing immigration law, I cannot recall seeing an immigrant arrested on civil immigration charges in eastern Massachusetts who has not been processed at Burlington before being sent to a detention facility. I have also seen some immigrants arrested in eastern Massachusetts taken to Boston for booking and processing, but my recollection is they were people arrested by either by HSI or by U.S. Customs and Border Protection.

11.    In my 17 years of working with hundreds of immigrants in Massachusetts, I have never seen or heard of an immigrant arrested by ICE or HSI taken to Methuen, Massachusetts or to St. Albans, Vermont. I have also never seen an immigrant moved to Methuen, then moved to Lebanon, New Hampshire, and then moved to ICE's local office in St. Albans, Vermont. This is a highly unusual event, especially taking place within a matter of a few hours.  According to Google Maps, the drive from Boston to St. Albans, Vermont, is over 240 miles.  According to Google Maps, St. Albans, Vermont, is less than 15 miles from the Canadian border.

12.    The typical path for immigrants arrested on civil immigration charges in eastern Massachusetts is that they are booked and processed at the Boston Field Office in Burlington.

3

JA-000268

Typically, the booking process takes over an hour and often much longer as the ICE officer typically has multiple questions to ask the immigrant, the immigrant is fingerprinted, the immigrant is served with the NTA, the immigrant's belongings are taken and documented, the immigrant's passport and other immigration paperwork is documented and stored, and other procedures are performed. In most cases, ICE is not required by law to detain noncitizens arrested within the United States on civil immigration charges, and ICE sometimes releases people directly from Burlington. Where ICE chooses to pursue detention, the person is generally held at Burlington and transferred many hours later or the next day to a detention facility such as Plymouth, Wyatt, or Strafford. The detainee may stay at those locations long term, or may be transferred a few days later to a facility elsewhere in the United States. In all of those situations, I observed that the detainees were held in Massachusetts for at least 12 hours (and generally more like 24-48 hours).

13.    I have reviewed the Declaration of David Wesling. The procedures described therein for Ms. Ozturk are not consistent with anything I have ever observed in my 17 years of immigration practice. I have never seen or even heard of an immigrant booked in 14 minutes. I have never seen a client transferred twice in the same day. The fastest transfer I recall seeing was 24 hours after initial placement. I do not recall ever seeing a client arrested in Massachusetts be detained in St. Albans, Vermont. I have never seen an F-1 revocation where the noncitizen was arrested and detained on the street, by masked men, with no prior notice that the visa had been revoked. To the best of my memory, in each of the F-1 revocations I have seen, the noncitizens' alleged actions leading to the visa revocation would (if true) have been clearly in violation of the terms of the visa (*e.g.*, the immigrant was no longer attending the listed school, the immigrant had

4

JA-000269

overstayed the visa). I have never before seen an F-1 visa revoked, and the student arrested without

prior notice of the revocation, based on an op-ed published in a school newspaper.

* * *


Executed on April 10, 2025, in Boston, MA.

/s /
Heather Yountz

5

# EXHIBIT 5

JA-000271

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

**RÜMEYSA ÖZTÜRK,**
*Petitioner,*

v.                                                          No. 2:25-cv-00374

**DONALD J. TRUMP,** et al.,
*Respondents.*

### Declaration of Margaret Moran, Esq. submitted in support of Petitioner's Motion for Release Under *Mapp v. Reno*, or in the Alternative, for Return to Vermont; and Petitioner's Supplemental Memorandum of Law on Jurisdictional Issues

I, Margaret Moran, do hereby swear and affirm as follows:

1. I am an immigration attorney at New Hampshire Legal Assistance (NHLA) responsible for NHLA's Immigrant Justice Project. I have been practicing immigration law for 13 years and represent NHLA clients in immigration court proceedings in the Boston and Chelmsford Immigration Courts and in appeals or petitions for review therefrom.

2. NHLA is a non-profit law firm that provides free civil legal services to people with low income, including noncitizens. NHLA works on civil cases impacting low-income clients' basic needs.

3. In April 2021, NHLA began providing full representation to people in immigration proceedings, focusing on those apprehended by Immigration and Customs Enforcement (ICE) and detained at the Strafford County House of Corrections in Dover, New Hampshire (Strafford Jail). I have been representing noncitizens in ICE custody at the Strafford Jail since April 2021. Before joining NHLA in April 2021, I worked at Greater Boston Legal Services, where I also represented noncitizens in ICE detention in New England.

4. The Strafford Jail holds men and women in ICE detention. The noncitizens in ICE detention I have met at the Strafford Jail are in a variety of immigration-related postures and have been apprehended by ICE for different reasons. People in ICE detention at the Strafford Jail have included people who have entered or attempted to enter the U.S. on student or visitor visas, pursuant to a visa waiver program, as refugees, without inspection, or on parole, or who are lawful permanent residents or applicants for asylum, withholding of removal or Convention Against Torture protection, etc. The ICE detainee population at the Strafford Jail has included people who have been charged with or convicted of

non-immigration crimes as well as people who have no history with the criminal legal system in the U.S. or elsewhere.

5. During the past four years, I have continuously represented and provided legal consultations for women and men in ICE detention at the Strafford Jail. I have observed that almost all the women and men I have met in ICE detention at the Strafford Jail have been apprehended in Massachusetts and processed for detention at the ICE Enforcement and Removal Operations (ICE ERO) Boston Field Office in Burlington, MA before being transported to the Strafford Jail. Most recently, for example, of the 30 men and women I met with in March 2025 at the Strafford Jail, 29 were residing in Massachusetts before ICE apprehension and were apprehended by ICE in Massachusetts, and one came from Rhode Island.

6. Based on my experience, people apprehended by the Boston ICE ERO Field Office and its sub-offices are processed for detention by ICE at an ICE office, usually the Burlington, MA Field Office, and then transported to a detention facility. When people are brought to the Strafford Jail, for example, ICE has already prepared custody papers and sometimes has already confiscated their personal property and placed it in storage at the ICE office. If anyone is transported to the Strafford Jail who is in possession of their personal property, the Strafford Jail confiscates the property and puts it in storage at the Strafford Jail. People are then processed through the booking process at the jail, including a medical screening and an interview to determine any safety or other issues that might influence where they will be housed at the facility, and held in the Booking Area of the Strafford Jail until taken by jail personnel to the unit where they are to be housed. People are often held in an interim location at the Strafford Jail due to medical protocols or while the facility personnel are relocating people within the facility to accommodate new arrivals. Part of the booking process includes a determination about the appropriate unit to which someone will be taken. These are the typical steps I have observed while at the Strafford Jail and heard of from ICE detainees I have met with.

7. In my years of immigration practice, I have never seen a person arrested in Massachusetts moved to Methuen, Massachusetts, to Lebanon, NH, to St. Albans, VT, all within a span of hours. I have never heard at all of any ICE facility in Methuen, Massachusetts, or of ICE detainees being taken there. Similarly, I am not familiar with any ICE facility in Lebanon, NH, and have never heard of ICE detainees being taken to such a facility. Nor am I aware of detainees from Massachusetts or New Hampshire ever being transported to the ICE Field Office in St. Albans, Vermont.

8. In my work at NHLA, I routinely participate in meetings and collaborate with immigration attorneys in New England who work with other non-profit legal services providers, law school clinics, and private firms providing pro bono or low-cost removal defense. In those meetings, I discuss with other practitioners

the enforcement, detention, and removal operations of ICE and Customs and Border Protection in the region.

9. Based on my conversations and collaboration with other attorneys in New England, I am aware of at least two other facilities in New England that hold or have recently held women in ICE detention. One of these facilities is the Cumberland County Jail in Portland, Maine, and the other is the Chittenden Regional Correctional Facility in Burlington, Vermont.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

4/10/2025
Date

Margaret Moran, Esq.

# EXHIBIT 6

JA-000275

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

Case No. 2:25-cv-00374

RUMEYSA OZTURK

        Plaintiffs,

  v.

PATRICIA HYDE, *et al.*,

        Defendants.

**SUPPLEMENTAL DECLARATION OF JILL MARTIN DIAZ OF VERMONT ASYLUM ASSISTANCE PROJECT, (VAAP) IN SUPPORT OF PETITIONER'S MOTION FOR RELEASE UNDER *MAPP V. RENO*, OR, IN THE ALTERNATIVE, FOR RETURN TO VERMONT; AND PETITIONER'S SUPPLEMENTAL MEMORANDUM OF LAW ON JURISDICTIONAL ISSUES**

Pursuant to 28 U.S.C. § 1746, I, Jill Martin Diaz, Esq., Executive Director of Vermont Asylum Assistance Project and Part-Time Lecturer at the University of Vermont, declare under penalty of perjury the following:

1. I am Jill Martin Diaz, my pronouns are they/them, and I am an experienced immigration defense attorney licensed to practice in New York (2017), Vermont (2018), and the District of Vermont (2022) and living and working in Burlington, Vermont.

2. I have worked as an immigration defense attorney for about nine years since 2014, my second year of law school, and spent my other two years of legal practice in housing and benefits defense at Vermont Legal Aid. Today, I serve as Executive Director of the Vermont Asylum Assistance Project (VAAP; www.vaapvt.org), Vermont's only nonprofit law firm dedicated to direct immigration legal service delivery and technical assistance.

3. At VAAP, I lead a team of two lawyers, dozens of *pro bono* volunteers, and numerous students focused on providing humanitarian immigration legal services to noncitizens in Vermont, including individuals seeking detained and non-detained removal defense. I also teach immigration service provision as a part-time lecturer in social work at the University of Vermont; direct legal services for Connecting Cultures–New England Survivors of Torture and Trauma (NESTT); serve as an appointed member to the Vermont Judiciary's Access to Justice Coalition and the Vermont Treasurer's Federal Transition Task Force; and co-chair the Vermont Bar Association's Immigration Law Section as well as the Vermont Queer Legal Professionals affinity network.

4. My previous experience includes co-founding and directing the Center for Justice Reform Immigration Clinic; lecturing in doctrinal immigration law at Vermont Law and Graduate School; practicing as a Vermont Poverty Law Fellow at Vermont Legal Aid; practicing as an Immigrant Justice Corps Fellow at Sanctuary for Families New York; and practicing as a student attorney at Brooklyn Defender Services, Immigrant Defense Project, and Atlas:

Developing Immigrant Youth. I received my Juris Doctor degree, *cum laude* in 2016 from Brooklyn Law School and my Bachelor of Arts degree, *summa cum laude* in 2008 from the George Washington University.

5. Over my eleven years in the legal profession, my supervisees and I have defended detained and nondetailed Vermont and New York respondents in removal proceedings and custody matters in New York, New Jersey, Massachusetts, and Texas Immigration Courts.

6. The St. Albans Office serves as a subordinate office to the ICE Boston Field Office and is where ICE conducts Enforcement and Removal Operations (ERO) including supervision. The St. Albans Office is a small government office in a corporate park and not a detention facility. It lacks normal detention facility amenities like attorney-client meeting space, visitation space, or a telephone system with which detainees can communicate accessibly with loved ones or counsel.

7. Last year, ICE Boston Field Office and St. Albans Office leadership called a meeting with Vermont immigration legal services providers in Burlington, Vermont to introduce us to new management who would be permanently staffing the office. There, I had the chance to personally meet with Boston and St. Albans ICE leadership, solicit their practice preferences and prosecutorial discretion priorities, and exchange contact information to facilitate more efficient resolution of represented parties' immigration custody and removal proceedings. I understood from this engagement and have heard confirmed by numerous supervisees that the St. Albans Office is a small, simple administrative office not suitable for long-term custody and detention.

8. In my experience, noncitizens arrested by ICE in Vermont are processed at the St. Albans ICE Office and may be detained there for a short period of time—generally, hours—before being moved to another detention center in the region. I have only ever seen or heard of ICE detaining immigrants at the St. Albans Immigration and Customs Enforcement (ICE) Office upon their initial arrest in Vermont. I have never previously seen or heard of people from other states being transferred into the St. Albans Office for detention.

9. In my seven years of practicing in Vermont and serving as a local expert on immigration matters, I have seen many cases of noncitizens who are arrested by ICE in Vermont transferred to other states, such as Strafford in New Hampshire or Plymouth in Massachusetts. But I have not seen people detained in other states being transferred by ICE into Vermont, with one exception. That exception involved a recent case of an individual detained on the New York side of Lake Champlain, across from Burlington, Vermont. She was detained at the Chittenden Regional women's facility in Burlington temporarily before being transferred to Louisiana.

10. Last month was the first time I encountered a Vermont resident who had been initially detained in Vermont and then relocated to long-term custody outside of the northeast. That individual was initially moved to the Plymouth facility in Massachusetts and then to a facility in Texas. ICE told us the unusual transfer resulted from an administrative error that flagged that client's case for expeditious removal, even though the client's asylum application on Form I-589 was pending before the Chelmsford Immigration Court.

11. It is extraordinary for a Vermont detainee to be transferred from custody in the northeast to custody outside of the northeast. It is similarly extraordinary for a person to be transferred into a Vermont facility from ICE custody out of state.

12. It is even more extraordinary for a person to be transferred into the St. Albans ICE office, which is not a detention facility. It lacks normal detention facility amenities like attorney-client meeting space, visitation space, or a telephone system with which detainees can communicate accessibly with loved ones or counsel.

13. In my experience, the ICE Detainee Locator does not typically specify a Vermont detainee's location, no matter whether they are at the St. Albans office or at a Vermont Department of Corrections facility such as Chittenden pursuant to a Vermont-U.S. Marshals Service Intergovernmental Service Agreement (IGSA). Instead of a precise facility, the Detainee Locator typically suggests contacting ERO at the St. Albans Office.

14. The example of the asylum seeker who ICE relocated from Vermont to Plymouth, MA to Laredo, TX at Paragraph 10 is my only known example of a detainee whose custody at the St. Albans office was reflected on the Detainee Locator.

WHEREFORE, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed at Washington, D.C. on this 2nd day of April 2025.

Respectfully Submitted,

Jill Martin Diaz, Esq.

Executive Director

# EXHIBIT 7

JA-000279

(282 of 546), Page 282 of 546
Case: 25-1019, 06/27/2025, DktEntry: 92.1, Page 282 of 546
2:25-cv-00374-wks    Document 82-8    Filed 04/10/25    Page 2 of 3

### UNITED STATES DISTRICT COURT
### DISTRICT OF VERMONT

**RÜMEYSA ÖZTÜRK,**
*Petitioner,*

v.                                                        No. 2:25-cv-00374

**DONALD J. TRUMP,** et al.,
*Respondents.*

### Declaration of Brett Stokes, Esq.
### submitted in support of Petitioner's Motion for Release Under *Mapp V. Reno*, or in the Alternative, for Return to Vermont; and Petitioner's Supplemental Memorandum of Law on Jurisdictional Issues

I, Brett Stokes, declare the following under pain and penalty of perjury:

1. I am an attorney licensed to practice in Vermont and New Mexico.

2. I have been practicing immigration law in the area of removal defense for about 9 years. I previously worked in Colorado but have been practicing in Vermont since July 2022. I am presently the Director of the Center for Justice Reform Clinic at Vermont Law & Graduate School.

3. I am providing this declaration based on my experience as a removal defense practitioner in Vermont since 2022. My declaration is also informed by conversations with immigration practitioners in Vermont and other Northern New England states.

4. I am aware of two primary facilities that Immigration and Customs Enforcement uses to detain noncitizens overnight in Vermont, the Chittenden Regional Correctional Facility and the Northwest State Correctional Facility. Both of these facilities are run by the Vermont Department of Corrections. In my experience, ICE typically uses these facilities to detain noncitizens who are first taken into custody in Vermont or near the Vermont border. ICE detainees typically stay at these facilities for a few days before being transferred to another facility, such as the Plymouth County Correctional Facility in Massachusetts. Chittenden is used to house female ICE detainees, whereas the Northwest State Correctional Facility is used to house male ICE detainees. I have heard but cannot confirm that ICE may also use other Vermont Department of Corrections facilities sometimes.

5. ICE also has a suboffice in St. Albans, Vermont. In my experience, noncitizens who are taken into custody in Vermont are detained at that Field Office location only for the duration of their initial processing. In my experience, after being initially processed in the St. Albans Field Office, noncitizens who were not

released from custody on supervision are then promptly taken to another
detention facility, such as one of the Vermont Department of Corrections
facilities or the facility in Plymouth, Massachusetts. I have never heard of a
detainee arrested in Massachusetts, or any other location not in or very near
Vermont, being processed or held at the St. Albans Field Office. And I have never
heard of a case in which a detainee has been held overnight at the St. Albans Field
Office.

6.  The Vermont Department of Corrections facilities are all connected to an online
    portal where, in my experience, within an hour or so of booking, their location is
    publicly available at the doc.vermont.gov website. The St. Albans Field Office is
    the only ICE detention location I am aware of in Vermont where an ICE detainee
    could be held without their location becoming publicly available via that portal.

7.  On three occasions that I can recall, clients that I was already working with have
    been detained by ICE in Vermont and processed at the St. Albans Field Office.
    Two of these clients had their phones with them and were permitted to use their
    phones to call family members while held for processing at the St. Albans Field
    Office. On those occasions, I was able to learn in real time not only that the client
    was detained for processing at the St. Albans Field Office, but also the facility to
    which the client would be taken next. The third client checked into the ICE at the
    St. Albans Field Office without a phone, was detained, and as far as I am aware
    did not call anyone from the St. Albans Field Office.

8.  I have reviewed the declaration of Acting Deputy Field Office Directo David T.
    Wesling in this case. I have never encountered or heard of a detainee transferred
    into and out of Vermont in a manner resembling the transfer of Ms. Özturk. The
    distance from which Ms. Özturk was brought to Vermont, the fact that she was
    processed and held overnight at the Field Office St. Albans rather than being
    taken to Chittenden, and the speed with which she was transferred into and out
    of Vermont all make this case highly unusual, in my experience.


Executed on April 10, 2025, in Burlington, VT.



_____
Brett Stokes

# EXHIBIT 8

JA-000282

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

RÜMEYSA ÖZTÜRK,
*Petitioner*,

v.                                                           No. 2:25-cv-00374

DONALD J. TRUMP, et al.,
*Respondents*.

**DECLARATION OF ATTORNEY MAHSA KHANBABAI
SUBMITTED IN SUPPORT OF PETITIONER'S MOTION FOR RELEASE UNDER
*MAPP v. RENO*, OR IN THE ALTERNATIVE, FOR RETURN TO VERMONT AND
PETITIONER'S SUPPLEMENTAL MEMORANDUM OF LAW ON JURISDICTIONAL
ISSUES**

I, Mahsa Khanbabai, declare under penalty of perjury that the following is true and correct:

1.      I am an attorney for Petitioner Rümeysa Öztürk. I submit this declaration in support of the Petitioner's motion for release under *Mapp v. Reno*, or in the alternative, for return to Vermont and Petitioner's supplemental memorandum of law on jurisdictional issues.

2.      I filed a habeas petition on behalf of Rümeysa Öztürk on March 25, 2025 at approximately 10:01 pm in the United States District Court for the District of Massachusetts. The habeas petition appeared on the electronic docket at 10:02 pm.

3.      At approximately 10:12 pm, I sent a copy of the habeas petition to Attorney Rayford Farquhar, who is the Chief of Defensive Litigation in the Civil Division at the United States Attorney's Office in the District of Massachusetts. I also spoke with the emergency clerk for the United States District Court for the District of Massachusetts at approximately 10:30 pm. The clerk informed me that they too had let the United States Attorney's Office know about the habeas petition.

1

JA-000283

4.      At approximately 10:55 pm, the Court issued an order that Ms. Öztürk not be moved outside the District of Massachusetts without 48 hours' notice.

5.      At approximately 10:59 pm, I sent a copy of the Court's order to Attorney Farquhar. I also spoke with the emergency clerk for the United States District Court for the District of Massachusetts at approximately 10:57 pm. The clerk informed me that they too had let the United States Attorney's Office know about the habeas petition.

6.      Between the evening of March 25 and the afternoon of March 26, I contacted both the ICE ERO in Burlington, Massachusetts and ICE HSI in Boston, Massachusetts several times to ask about Ms. Öztürk's whereabouts, but I received no response to these inquiries.

7.      Between the evening of March 25 and the afternoon of March 26, I checked ICE's Online Detainee Locator System several times for Ms. Öztürk's location, but the "current detention facility" field repeatedly remained blank.

8.      A representative of the Turkish consulate personally went to ICE offices in Burlington, Massachusetts on March 26 and was reportedly informed that she was not in that office and that ICE did not have information about her whereabouts.

9.      I called Attorney Farquhar on the morning of March 26 to inquire about Ms. Öztürk's location, to ask to speak with her, and to alert him that she has asthma and her medication was not on her when she was detained. Attorney Farquhar told me he did not know where she was and that he would look into it.

10.     At approximately 9:55 am, I emailed Assistant United States Attorney Mark Sauter to inform him that I had spoken with Attorney Farquhar to inquire about Ms. Öztürk's location, to ask to speak with her, and to alert him that she has asthma and her medication was not on her when she was detained. Attorney Sauter responded that he was "trying to confirm current location still."

JA-000284

11.     At approximately 1:11 pm, I emailed Attorney Sauter and Farquhar to express my dismay that they still had not been able to locate Ms. Öztürk, and to inform them that I would be filing a motion within the hour asking the Court to order the government to disclose her location and to permit me to speak to her by 6pm.

12.     At approximately 1:43 pm, Attorney Sauter responded that he was "continuing to try to obtain information about petitioner's current lcoation" and that he had "asked ICE again for this information."

13.     At approximately 3 pm, I filed a motion asking the Court to order the government to disclose her location and to permit me to speak to her by 6pm.

14.     At approximately 3:27 pm, Attorney Sauter stated that ICE "informed" him that Ms. Öztürk was transferred to Louisiana in the morning and was en route to a detention facility. He stated "I continue to ask ICE for the detention facility that she will be placed and that she be permitted to contact you."

15.     At approximately 3:49 pm, I responded and said that I needed to speak with Ms. Öztürk as soon as possible as it had been nearly 24 hours since she had been detained and I had not had any access to her.

16.     At approximately 6:15 pm, Attorney Sauter infomed me that Ms. Öztürk was in a staging facility in Alexandra, Louisiana and would later be sent to the South Louisiana ICE processing center.

17.     At approximately 7:19 pm, I emailed Attorney Sauter and said that I was alarmed that I had not access to my client for more than 24 hours since her detention.

JA-000285

18.     At approximately 8:45 pm, Attorney Sauter informed me that he understood that Ms. Öztürk was now at the South Louisiana ICE processing center and that she could now contact me.

19.     At approximately 8:50 pm, I emailed Attorney Sauter and informed him that I still had not been able to speak with Ms. Öztürk.

20.     At approximately 9:45 pm, I was finally able to speak with Ms. Öztürk. This was the first time that I had been able to speak with her since she had been taken into custody at approximately 5:15 pm the day before.

21.     At no time following her arrest while Ms. Öztürk was in Massachusetts, New Hampshire or Vermont was I informed where my client was located.


I declare under penalty of perjury that the foregoing is true and correct copy.

Executed on April 10, 2025, in North Easton, MA.




Mahsa Khanbabai Esq.

JA-000286

# EXHIBIT 9

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

**RÜMEYSA ÖZTÜRK,**
*Petitioner,*

v.                                                              No. 2:25-cv-00374

**DONALD J. TRUMP,** et al.,
*Respondents.*

Declaration of Rümeysa Öztürk

I, Rümeysa Öztürk, under penalty of perjury declare as follows:

1. My name is Rümeysa Öztürk. I am 30 years old. I am a citizen of Turkey.
2. I previously submitted a declaration in this case before the District of Massachusetts. I now submit this updated declaration to explain some of my ongoing health and safety concerns and the circumstances of my detention in support of my request for bail and in the alternative for return to New England.
3. I have lived in the United States since 2018 and am currently a Ph.D student at Tufts University in the Child Study and Human Development program. I miss interacting with my Tufts community from working with my advisor and professors, supporting my labmates as we worked on peer reviews, my interactions with undergraduate students, and special projects like our Mosiac Art Project and the Collective Grieving Space for children.
4. My plans are to stay in academia and to undertake a post-doc in positive media for youth.
5. I was detained on March 25, 2025 in the early evening. I was speaking to my mother on the phone when several men approached me on the street and then surrounded me and I screamed.
6. Since appearing on the Canary Mission website in February, I had begun to be afraid that I could be targeted for violence. When the men approached me, my first thought was that they were not government officials but private individuals who wanted to harm me. I felt very scared and concerned as the men surrounded me and grabbed my phone from me.
7. I asked who they were, and they said they were the police. I asked them for badges and one showed me a gold badge but it happened so quickly **I couldn't** tell what it said. But I didn't think that they were the police because I had

JA-000288

never seen police approach and take someone away like this. I thought they were people who had doxxed me and I was afraid for my safety. They also **didn't respond when I asked why and if they were arresting me.** I saw a neighbor recording the scene.

8. After I was put into the car, I asked who they were, where they were taking me to, and they told me I was being arrested but they didn't say why. I began to cough as we drove. I asked for my inhaler and to open the window.

9. It was hard to see out of the window but I could see we arrived at a parking lot. There were a few cars parked. About 8-9 officers huddled together while I was waiting in the car.

10. They took me out of the car and shackled my feet and belly and then put me in the car again. I again asked to speak with my attorney, but they told me that I could not.

11. I wanted to ask questions about what was happening to me but they were scary and harsh. They asked my name but I told them I choose to remain silent. I was held in the parking lot area for about 15-20 minutes.

12. We changed cars and different officers got into the car with me. I asked for a woman officer to be with us, but they said none were around. They were all wearing civilian clothes. I thought this was a strange situation and was sure they were going to kill me.

13. We had another stop, this time in or near Lawrence, MA, in a parking lot outside of an office building. It was an isolated place which had me very concerned. I was there roughly for 15-20 minutes. We waited in the car and I asked who they are. I asked to speak with an attorney. He showed me his badge very quickly but I couldn't read it. I asked a few times if I was physically safe.  He seemed to feel guilty and said "we are not monsters", "we do what the government tells us". He also warned me that what you can say can be used against you.

14. I asked them where they were taking me and they said Vermont. When I asked why, they said there are no detention centers in MA for women.

15. I had spoken to a lawyer about a week earlier because I was afraid after having been doxxed **and had the lawyer's phone number with me. After being** detained, I asked to speak to a lawyer several times. Each time they told me I could speak to a lawyer later. I again reminded the officers that I needed my emergency asthma inhaler close by and they kept it near me.

16. We left this place and I told them that it was close to the time for me to break my fast, and that I needed a full meal. They said they can't get me a meal but can provide me snacks. We drove for about 5-7 minutes and one of the officers went inside an office building and came out with some snacks.

17. They gave me two small packages of crackers and water but I didn't drink and eat it because I was worried they could have poisoned it. I told them I wanted

to speak to my lawyer first before I eat. I was afraid that if something happened to me, no one would know where I was. A woman officer then joined us but we didn't speak. She appeared to avoid eye contact with me as did all the other officers. I was able to do my prayer in the car.

18. I was transported quickly to New Hampshire and believe we stopped in Lebanon at what appeared to be a police station. This is when I first thought it might be a US law enforcement agency detaining me rather than kidnappers related to the doxxing. Inside the police station I asked their names and to use the bathroom.

19. After a short time, the officers took me to a car and I asked where they were taking me. I again asked to speak to an attorney. They told me I could at the next stop. On the drive, I again asked where they were taking me. They told me Vermont and that when we get there I could make a call.

20. In Vermont, I asked to speak to an attorney again but was told that I could not, despite them having said before that I could call my lawyer from Vermont. They told me I would be going to another location but then I spent the night there.

21. I stayed in a cell that had no bed but a hard bench. I asked if there was a bed and they said no. I was not able to sleep. The toilet was in the same space with basically no barrier and there was no soap. There were no other detainees there, as far as I could tell.

22. I felt like I was going to faint and again asked for a full meal as I had fasted all day. I also had a lot of motion sickness from all the driving. They gave me some snacks.

23. They took my biometrics, did DNA testing and then went over the NTA with me. **I didn't understand some of the language they were using and asked for** an interpreter. They said it was late, it was midnight, and that it was hard to find an interpreter. I refused to sign the documents.

24. Inside the building I saw a book titled **"National Detainee Handbook"** written by US ICE in 2016 and asked them for the book, which they gave to me after checking if it was okay. I again told them I need my asthma and other medications.

25. I have lived with asthma for approximately 2-3 years. My asthma causes me difficulty breathing, including when I am exposed to chemical fumes, dust, damp spaces, mold, perfumes, heavy smells as well as stress.

26. I take medications for my asthma. I take one medication on a daily basis to prevent asthma attacks. I also keep an emergency inhaler for use during asthma attacks. I take these medications because asthma attacks can be dangerous.

27. I estimate that I have had about 13 asthma attacks in my life. During those attacks, I feel short of breath, afraid, anxious, and physically exhausted.

28. I asked to call my attorney **but they said I can't make any calls. I asked to call** friends to let them know what happened. They again said I could not.

29. They said I could take some phone numbers from my phone to call from my next location. Once I did that, they had access to my phone. I have private photos of me without hejab and my loved ones on there of me and am very concerned about them having access to these.

30. **They didn't let me make any calls and they asked me to put the phone into** flight mode. I was so tired and scared so I agreed. It was an isolated place with four men and it was terrifying.

31. During the night they came to my cell multiple times and asked me questions about wanting to apply for asylum and if I was a member of a terrorist organization. I tried to be helpful and answer their questions but I was so **tired and didn't understand what was happening to me.** I asked where they were going to take me and they said Louisiana. **One of them said** "I hope we treated you with respect."

32. Around 4am we left for the airport and I was handcuffed again. I gave up asking to speak to a lawyer again.

33. I experienced an asthma attack while I was waiting in the Atlanta airport with ICE. I felt like I could not breathe. I asked permission to go to the restroom to use my inhaler, which I did, but I could not get over the asthma attack. I asked for the medication I am prescribed to treat asthma attacks but I was told that there was no place to buy it and that I would get it at my final destination. My asthma attack finally passed after I used my emergency inhaler twice but it took some time and I was in pain.

34. In Louisiana, myself and a few other women were taken to a processing center. I saw many women and men handcuffed and belly chained. We were placed in a cage-like vehicle and could not communicate with the officers detaining us. We waited in this place for 3-4 hours. We had no access to food or water.

35. I eventually arrived at the Louisiana facility where I am now. During the entire first week of my stay there we were not allowed to go outside. During the first two weeks, access to food and supplies was very limited because of their systems to request these items.

36. I had a second asthma attack while at the Louisiana facility. I had difficulty breathing and used the emergency inhaler but my breathing didn't improve. I asked to go to the medical center and it took them a very long time to take me **there. While waiting, I was incredibly distressed as I couldn't breathe** well.

37. I asked them to let me outside to get some fresh air. They said no but let me wait outside of the room in the hallway. While waiting, I still couldn't breathe well and was crying. They let me stand near the door to the outdoors to get a

little fresh air. It took 10-15 minutes to take me to the medical center during which time I had a lot of difficulty breathing.

38. Once they finally took me to the medical center, the nurse took my temperature. She said **"you** need to take that thing off your head**"** and took off my hejab without asking my permission. **I told her you can't take off my hejab** and she said this is for your health. After a few minutes I put my hejab back on. But they did nothing to treat my asthma and gave me a few ibuprofen.

39. I had a third asthma attack at the Louisiana facility. Again, this happened in the cell and other woman knocked on the window to get the attention of the officers. I was told that the nurse would come to the cell to see me. She took me outside for a short bit and told me that it was all in my mind. She finally took me to the medical center but I was not treated for my difficulty breathing. **The nurse left the room and didn't answer my questions**

40. I had a fourth asthma attack on Wednesday March 9th around noon. I used my inhaler and waited for it to pass. I was in pain and very scared but I **didn't ask to go to the medical center because I don't feel** that they address my medical needs.

41. **I don't feel safe** at the medical center because of my prior experiences there. They complain when I go there and speak to me in an insulting and condescending manner. They also write information in my medical records that is not accurate. The doctor and nurses there are rude and uncaring.

42. I fear that my asthma is not being adequately treated and it will not be adequately treated while I remain in ICE custody. The air is full of fumes from **cleaning supplies and is damp which triggers my asthma. We don't get much** fresh air which also impacts my ability to breathe well.

43. The conditions in the facility are very unsanitary, unsafe, and inhumane. There is a mouse in our cell. The boxes they provide for our clothing are very dirty and the**y don't give us adequate** hygiene supplies.

44. We are in a cell that has a sign stating capacity for 14 but there are 24 of us in this small space. None of us are able to sleep through the night. They come into the cell often and walk around triggering the fluorescent lights. They shout in the cell to wake up those who work in the kitchen around 3:30am each day.

45. They wake me up for a blood sugar test at 4:15am every morning despite me asking to change the time. I have since declined to have these tests.

46. If we need hygienic supplies like toilet paper, we may not get it until 18 hours later, depending on the officer.

47. When they do the inmate count we are threatened to not leave our beds or we will lose privileges, which means that we are often stuck waiting in our beds for hours.

48. At mealtimes, there is so much anxiety because there is no schedule when it comes meals. They **threaten to close the door if we don't leave the room in time, meaning we won't get a meal.**

49. There is lack of medical care too. For example, a woman was hit on the head with a tray and fainted. It took a long time for her to be given medical attention, at least 15 minutes.

50. I still have not been provided a prayer rug or a Quran. I also requested to meet with a Muslim chaplain. I made these requests over two weeks ago. I also asked for lightweight long sleeve clothing because of the heat but have not received that.

51. I pray everyday for my release so I can go back to my home and community in Somerville. I plan to stay with a dear friend for a short while after the ordeal I have been through. I still have my apartment close to Tufts that I plan to return to.

52. I want to complete my PhD which I have been working on for the last 5 years. I only have about 9 months left to complete it and am very concerned about not being able to finish my studies.

53. I have had to delay working on my dissertation proposal because of my detention. It is very hard to access books here and it took nearly 2 weeks to get a few pieces of paper and pens.

54. I am supposed to present at a conference in Minnesota in late April/early May on character role models based on one of my PhD qualifying papers. My qualifying review is scheduled for the beginning of May which we put a lot of planning and preparation into. It will be very difficult to reschedule this process.

55. I am also concerned about my summer plans to mentor graduate and undergraduate students. I am scheduled to teach a summer class titled **Introduction to Children's Media for college level high school students.** I was also in the process of selecting students for an undergraduate research program this summer. I want to return to Tufts to resume all of my cherished work.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

4/10/25

_____

Date

SS *Rümeysa Öztürk*

RÜMEYSA ÖZTÜRK

JA-000293

1

1                UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF VERMONT
2

3   RUMEYSA OZTURK,              )
                                 )
4                 Petitioner     )
          vs.                    ) CASE NO. 2:25-cv-374
5                                )
    PATRICIA HYDE, MICHAEL KROL, )
6   TODD LYONS, KRISTI NOEM,     )
    DONALD J. TRUMP, MARCO A.    )
7   RUBIO,                       )
                                 )
8                 Respondents.   )
    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)
9

10

11

12        Motions Hearing held at 9:33 a.m. on Monday,

13   April 14, 2025, in Burlington, Vermont, before

14   Honorable William K. Sessions, III, District Judge.

15

16

17

18

19

20

21   Sarah M. Bentley, CCR-B-1745
      Registered Professional Reporter and Notary Public
22

23

24

                  BENTLEY COURT REPORTING
25                  sbireland7@gmail.com

2

1                 A P P E A R A N C E S

2


3    For the Petitioner:

4         ADRIANA LAFAILLE, ESQ.
          ACLU Foundation of Massachusetts, Inc.
5         Suite 850
          One Center Plaza
6         Boston, Massachusetts  02108
            (617) 482-3170
7           alafaille@aclum.org

8
          JESSIE J. ROSSMAN, ESQ.
9         ACLU Foundation of Massachusetts, Inc.
          Suite 850
10        One Center Plaza
          Boston, Massachusetts  02108
11          (617) 482-3170
            jrossman@aclum.org

12


13        NOOR ZAFAR, ESQ.
          American Civil Liberties Union Foundation
14        18th Floor
          125 Broad Street
15        New York, New York  10004
            (469) 301-5991
16          nzafar@aclu.org

17


18


19   For the Respondents:

20        MICHAEL P. DRESCHER, ESQ.
          Assistant United States Attorney
21        United States Attorney's Office
          3rd Floor
22        United States Federal Building and Post Office
          11 Elmwood Avenue
23        Burlington, Vermont  05402-0570
            (802) 951-6725
24          michael.drescher@usdoj.gov

25

3

1                    I N D E X

2

3                                              PAGE

4
     Statements by the Court                    4
5

6    Statements by Mr. Drescher             5, 104

7
     Statements by Ms. Zafar                    45
8

9    Statements by Ms. Lafallia           61, 103

10
     Statements by Ms. Rossman                  75
11

12

13                    *      *      *

14

15

16

17

18

19

20

21

22

23

24

25

4

```
1                  P R O C E E D I N G S

2

3

4            THE COURT:  Good morning.

5            THE CLERK:  This is Civil Case No.

6       25-374, Rumeysa Ozturk vs. Patricia Hyde, et al.

7            Present for the petitioner are Attorneys

8       Adriana Lafaille, Jessie Rossman, and Noor

9       Zafar.

10            Present for the respondent is Assistant

11       United States Attorney Michael Drescher.

12            The matter before the Court is a hearing

13       on a motion to dismiss.

14            THE COURT:  Okay.  Good morning,

15       everyone.

16            (Brief pause.)

17            THE COURT:  All right.  Good morning,

18       everyone.  This is a full house.  At least it

19       looks like a full house from this perspective.

20            I invite you to be here.  I just would

21       remind everyone that this is a courtroom.  This

22       is a respectful environment; that I've asked the

23       marshals if anyone becomes disruptive during the

24       course of the argument that they should be

25       removed, but other than that we certainly invite
```

5

1    everyone to be here.

2            So we're addressing a number of motions

3    that have been filed.

4            First, the government has filed a motion

5    to dismiss, and I think we'll address that

6    first.

7            The petitioner has also filed a request

8    for release and, alternatively, that she be

9    removed back to this jurisdiction for the course

10   of the habeas proceedings, and we'll deal with

11   that second.

12           So, first, is the government ready to

13   proceed on its motion to dismiss?

14           MR. DRESCHER:  It is.

15           THE COURT:  Technically you didn't file a

16   motion to dismiss, but I perceived that that's

17   exactly what you were requesting.  In fact,

18   that's what you requested in the course of your

19   filing so I call it a motion to dismiss, and

20   I'll hear you.

21           MR. DRESCHER:  Understood.

22           With your Honor's indulgence, as the

23   Court is aware, there are two or three separate

24   issues pertinent to whether the Court has

25   jurisdiction; the first being habeas, the second

6

1    being the transfer under 1631, and the third

2    being the effect of the INA.

3         THE COURT:  Yes.

4         MR. DRESCHER:  Do you wish -- and I

5    appreciate that counsel for petitioner,

6    different counsel will argue different issues

7    for petitioner, and so my question is how would

8    you like the government -- do you want me to

9    argue all of the issues initially?

10        THE COURT:  I think that you should argue

11   all of the issues initially.  Then if, in fact,

12   different counsel want to address those issues

13   from the petitioner, they can do that.

14        MR. DRESCHER:  Thank you.

15        At the outset I want to emphasize that we

16   do not contest that Ms. Ozturk is entitled to

17   judicial review of what has happened and what is

18   happening to her.

19        Our position is that under the system set

20   up by Congress for administering the immigration

21   laws and pursuant to decisions, pursuant to the

22   decisions of the Supreme Court in the 2nd

23   Circuit, this is neither the time nor the forum

24   for that review to occur.

25        THE COURT:  All right, so you are

7

1    essentially suggesting that she does have a

2    right to file a habeas petition addressing

3    constitutional issues, which are separate and

4    apart from the removal proceedings that she is

5    now facing; is that correct?

6         MR. DRESCHER:  We're not contesting her

7    right to file a habeas petition.

8         THE COURT:  Okay.

9         MR. DRESCHER:  She's in the executive --

10    she's in the custody of the executive.  Habeas

11    is a traditional means of challenging the

12    legality of that.

13         We do challenge whether this Court has

14    habeas -- is the appropriate venue for that

15    habeas challenge to be heard.

16         THE COURT:  All right.

17         MR. DRESCHER:  And, again, at the outset

18    I appreciate that the system that Congress has

19    set up does not provide Ms. Ozturk for the

20    relief that she wants at this time and that she

21    understandably wants to believe now.

22         I also appreciate that her detention, as

23    for anyone who is in the custody of the

24    executive branch, has a profound impact on her.

25         The Congress has made clear that claims

8

1    such as the one that are before the Court,

2    whether it's habeas or other -- or fashioned

3    otherwise, because they arise from the fact that

4    Ms. Ozturk is in immigration proceedings right

5    now and is subject to removal proceedings, her

6    claims must be presented to an appropriate court

7    of appeals at the appropriate time.

8          And in the meantime Ms. Ozturk may

9    request that she be released on bond before the

10    immigration judge, and to my knowledge she has

11    not yet done so.

12          On the question of habeas jurisdiction, I

13    think the critical case is <u>Padilla</u>.  And that

14    case makes clear that the appropriate venue for

15    considering a petitioner's habeas petition is

16    the venue in which the petitioner's immediate

17    custodian, is the venue that has jurisdiction

18    over the immediate custodian, and is the venue

19    of her detention.

20          THE COURT:  Okay.  So just before we get

21    into the discussion about venue, you've looked

22    at the complaint that has been filed by the

23    petitioner.  Tell me what you think the

24    complaint is seeking as a remedy.

25          MR. DRESCHER:  On its face it seeks an

9

1    order returning her initially to the District of

2    Massachusetts.  Now they are asking her to be

3    returned to the District of Vermont.

4         It's asking that she be released on bail.

5         It's asking that the Court declare her

6    arrest and detention are constitutionally -- are

7    unconstitutional.

8         It asks the Court to set aside a policy

9    of targeting noncitizens for removal based on

10   protected speech.

11        It's asking the Court to restore her --

12   certain entries relating to her in the system

13   set up by the Department of Homeland Security

14   relating to student visas, the SEVIS record,

15   which it's not completely clear.

16        It may also be a challenge to the actual

17   revocation of her visa.

18        She's asking the Court to enjoin any

19   enforcement action against her based on -- based

20   on foreign policy.

21        And those are the principal requests for

22   relief.

23        THE COURT:  Well, so what questions is

24   she addressing in her complaint in regard to her

25   removal proceedings?

10

1        In other words, what restriction is she

2    asking the Court to make about how immigration

3    is to proceed in the removal proceeding?

4        MR. DRESCHER:  With your Honor's

5    indulgence, I want to answer your Honor's

6    question indirectly.

7        THE COURT:  Okay.

8        MR. DRESCHER:  First, as a core habeas

9    matter, the only relief that's available for a

10    core habeas matter is the petitioner's release.

11        THE COURT:  All right.

12        MR. DRESCHER:  All of the other remedies,

13    while certainly relevant to her situation, are

14    really outside the normal scope of a habeas

15    case.

16        THE COURT:  All right, so -- and have you

17    read the complaint to be consistent with that

18    principal?

19        That is, what the petitioner is seeking

20    is a declaration that her arrest violated both

21    the First and the Fifth Amendment as well as the

22    APA, and what she is seeking essentially is

23    release?

24        That is, because the arrest was in

25    violation of the First, Fifth and APA, she's

11

1      entitled to a release, but that has no impact

2      upon the revocation or the removal proceeding?

3          MR. DRESCHER:  That's not totally clear,

4      your Honor.

5          I'll take a step back.  It does have an

6      impact on the removal proceedings insofar as she

7      is currently in custody because her visa has

8      been revoked and she's received a notice to

9      appear asserting that she is no longer -- she is

10     out of status because of the revocation of her

11     visa.  Under the discretion that is accorded to

12     the executive branch by Congress in 1226(a), she

13     is being held in custody.

14         She is in custody because she is in

15     removal proceedings.  She was taken into custody

16     because -- because of her absence of status.

17         It is conceptionally impossible to

18     separate her request to be released from custody

19     from the fact that she is in custody because the

20     Attorney General has initiated removal

21     proceedings.  She has detained her in her

22     discretion as part of those and has detained her

23     as part of those removal proceedings.

24         Under the 2nd Circuit's analysis in the

25     Delgado case and in the 2nd Circuit's analysis

12

1    in the Ragbir case, these -- the fact of her

2    detention is inextricably connected to the fact

3    that she is in removal proceedings.  And --

4         THE COURT:  Okay, so let's just assume

5    that the Court were to grant the petitioner's

6    request, declare the arrest to be in violation

7    of the First and Fifth Amendment, okay,

8    constitutional violation, which means then the

9    Court addresses whether she should be in

10   custody.

11        Are you suggesting that if the Court were

12   to determine that she was arrested in violation

13   of the First Amendment and the Fifth Amendment,

14   that the Court has no remedy or that the

15   petitioners have no remedy?

16        That is, in fact, if the Court ordered

17   her to be released, you would say that the Court

18   had no jurisdiction to order her released

19   because of its impact on the removal proceeding?

20        MR. DRESCHER:  Not because of its impact

21   on the removal proceeding, although it certainly

22   would presumably have an impact in terms of

23   venue and other aspects of the removal

24   proceedings, which I'm not completely familiar

25   with.

13

1          Our position is the Court doesn't have

2     jurisdiction to do that because it's connected

3     to the removal proceedings.  And it's not just

4     me as a lawyer saying that.  It's what Congress

5     said in 1226 and in 1252.

6          First, Congress says that in 1226 there

7     shall be no judicial review of the discretion --

8     the discretionary detention of a noncitizen who

9     is subject to removal proceedings.

10         Now, that noncitizen, like petitioner

11    here, can seek relief before the immigration

12    court if she's detained, as is the case here.

13    So Congress has made pretty crystal clear in

14    1226 that's the case.

15         The 2nd Circuit has recognized that

16    that's the case in a case, Velasco Lopez.

17         THE COURT:  Velasco Lopez, which is the

18    central case, indicating that the Court does

19    have the power to address a habeas petition

20    despite the fact that someone may be in removal

21    proceedings?

22         MR. DRESCHER:  As I understand Velasco

23    Lopez, and this is consistent with, I believe,

24    the Supreme Court decision in Jennings, a court

25    can exercise habeas jurisdiction when the

14

1    assertion is the scope of authority or a

2    challenge to the statutory scheme; that in those

3    cases that was what was at issue.

4         There was a -- it was not a challenge to

5    the discretionary decision or, I believe in

6    Jennings, in some cases a nondiscretionary

7    decision under 1226(c).

8         THE COURT:  Well, you've read the

9    proceedings of the petitioner which basically

10    suggests that they're not in any way addressing

11    the removal proceedings.  They're, in fact,

12    approaching this subject matter almost as two

13    separate areas of concern.

14         The first area of concern would be in the

15    arrest and immediate detention in violation of

16    constitutional rights.  That's a separate habeas

17    proceeding which goes before an Article III

18    judge.  That's habeas.

19         The second is the removal proceedings.

20    And what they're suggesting is they're not

21    seeking relief at all in terms of the removal

22    proceedings.  In fact, they're not trying to get

23    the immigration judge or ICE in its prosecution

24    of the removal proceedings to do anything.

25    That's not -- that's not a part of this case.

15

1       All they're saying is she was illegally

2   arrested in violation of the First and Fifth

3   Amendment in particular and, as a result, the

4   remedy would be her release from detention here,

5   not impacting her -- the removal proceedings in

6   any particular way.  And, in fact, you know,

7   suggesting that the removal proceedings continue

8   on despite the fact that her arrest was

9   determined to be illegal.

10      So do you disagree with that sort of dual

11  way of approaching this subject matter?

12      MR. DRESCHER:  I believe I understand

13  your Honor's point, but what I take issue with,

14  what we take issue with is the -- is the idea

15  that the Court can separate the fact that

16  Ms. Ozturk was arrested and is in immigration

17  custody from the fact that she's been charged

18  with a notice to -- she's been served a notice

19  to appear and is in custody because of the

20  revocation of her visa.

21      THE COURT:  Okay, so she's filed a habeas

22  petition suggesting that she was illegally

23  arrested.  The remedy that she is seeking has

24  nothing to do with damages against the

25  government, has nothing to do with stopping her

16

1    removal proceeding.  Her remedy is pretty

2    straightforward.

3         If you have a constitutional violation in

4    the arrest of a person, you are entitled to

5    release.  And, you know, I appreciate the fact

6    that you -- that it becomes a little bit fuzzy

7    when you're talking about detention and its

8    impact on the removal proceeding, but what is

9    really fundamentally a question for me is what

10   if she is right?

11        What if there was a constitutional

12   violation in her arrest?

13        The only remedy she's seeking is release,

14   and you are suggesting that the Court has no

15   power to release her because she has a removal

16   proceeding in which she has been ordered

17   detained by immigration authorities so that, as

18   a result, she has no remedy.

19        I mean, this is the fundamental question

20   because obviously if the Court -- if the Court

21   found that there was a constitutional violation,

22   I would turn to you and say, well, of course she

23   needs to be released.

24        And if the government then says, well,

25   no, she can't be released because we have a

17

1     detention order in immigration, which is in
2     violate and she's not going to be released, then
3     we're in a constitutional crisis.
4            MR. DRESCHER:  So I don't want to be
5     heard -- I don't want to be perceived in any way
6     as suggesting that we're not going to abide by
7     an order of the Court.  If I take that hint in
8     your Honor's statement, I want to make that
9     clear.
10           Our argument, Judge, is that -- and it's
11    not -- it's not the executive.  It's not me who
12    is saying this.  It's Congress who said this,
13    and it's the 2nd Circuit and the Supreme Court
14    who have said this; that because of the
15    intricacies of operating and administering the
16    immigration laws of our country, the executive
17    is vested with a wide amount of discretion.
18           And because of the intricacies of that
19    system, Congress has specified that district
20    courts should not be involved in reviewing the
21    operations of the immigration -- of the
22    immigration courts, to include reviews of the
23    Attorney General's discretion, discretionary
24    decision to detain a noncitizen who is in
25    immigration proceedings, to include -- well, to

18

1    include the question of whether somebody is

2    detained or not.

3        THE COURT:  So as a general matter I

4    don't disagree with that at all.  I mean, I

5    certainly think that Congress in the INA has, in

6    particular, a number of provisions said that

7    immigration authorities are in charge and that

8    the judicial branch should have no impact in

9    reviewing removal proceedings, removal orders,

10   et cetera.  There's no question about that.

11       There only is a question about this

12   fundamental issue about whether or not during

13   the course of an arrest or bringing the

14   petitioner before immigration authorities there

15   was a violation of fundamental liberties, in

16   which case I agree with you that this is a very

17   complex area of the law and -- and essentially

18   the Constitution rubs up against the INA perhaps

19   in some areas.  You know, but fundamentally the

20   Court's responsibility is to make an assessment

21   about the constitutional liberties.

22       And if there is a constitutional

23   violation here, I mean certainly that takes

24   precedence, it seems to me.

25       Is that -- do you disagree with that?

19

1      MR. DRESCHER:  I don't disagree at all
2   that making sure there is a system in place for
3   judicial review of the constitutionality of
4   what's going on is understandably important to
5   all of us.
6      In this context, Congress has specified
7   in Section 1252(b)(9) that judicial review of
8   all questions of law and fact, including
9   interpretation and application of constitutional
10  provisions arising from any action taken or
11  proceeding brought to remove an alien from the
12  United States, shall be available only in
13  judicial review of the final order under this
14  section.
15     THE COURT:  I don't disagree with that,
16  but to move the ball forward you have to make an
17  assessment as to whether that provision is
18  related to removal proceedings or that provision
19  suggests that an Article III judge has no power
20  to make a determination of a constitutional
21  violation earlier in the process.
22     And I don't hear you saying that an
23  Article III judge would not have the power to
24  make a determination in a habeas proceeding of
25  whether there has been a fundamental violation

20

1       of the First and Fifth Amendment.

2               Am I correct about that?

3               MR. DRESCHER:  I'm not sure.  There are

4       habeas cases in which courts exercise habeas

5       jurisdiction over challenges to a statutory

6       system, over challenges to whether the executive

7       has authority to exercise at all, but

8       Section 1226(e), I believe, specifies in

9       similarly broad language that there shall be no

10      judicial review of the -- of the decision to --

11      and, again, and this is not just the statute.

12              If you look to Jennings, the Supreme

13      Court case on point, which was a very messy set

14      of concurrences, and at some point there was an

15      opinion for the majority.  At some point there

16      was different justices saying different things.

17              In Part II of that decision three

18      justices say that 1226(e) bars judicial review

19      of discretionary -- the exercise of discretion

20      to detain an alien who is in removal

21      proceedings.  Three justices say that.

22              Two justices in a concurrence say that

23      there should be no jurisdiction at all under

24      1252.

25              So a majority of the Supreme Court has

21

1    concluded that there is no judicial review at
2    the District Court level of an arrest in this
3    context.
4         THE COURT:  Okay, so tell me, if that's
5    true, if what you're saying is under 1223 or
6    1226(e), there is no review of detention, right?
7    Tell me why there would still be habeas corpus
8    relief.
9         MR. DRESCHER:  As I indicated, there
10   are -- courts will exercise habeas jurisdiction
11   in the immigration context when the challenge is
12   not to the legality of an individual's -- when
13   the challenge is not to the executive's exercise
14   of discretion to detain a noncitizen who's in
15   removal proceedings.
16        Rather, when the challenge is to a
17   statutory scheme or the challenge is whether
18   there is authority at all to be exercised in
19   that case.  I think this is the -- these are
20   the -- these are the lines that are drawn as I
21   read them in the habeas, in the cases where
22   there is habeas jurisdiction asserted over
23   detained -- detained noncitizens under 1226.
24        THE COURT:  And there is no question that
25   if you take habeas relief as proposed by the

22

1    petitioner or, you know, I think by the Circuit

2    in Velasco, that courts address the fundamental

3    question about whether there's a constitutional

4    violation and, if so, the remedy is to release

5    that person.  The remedy is not to impact in any

6    way the removal proceedings but to release that

7    person.

8           MR. DRESCHER:  And I --

9           THE COURT:  That's the fundamental

10    distinction.

11           MR. DRESCHER:  Well, I appreciate that,

12    but I think -- I don't think that's the issue.

13           The fact that removal proceedings can

14    continue does not disconnect the detained status

15    of the petitioner from the fact that there are

16    removal proceedings, and it's that connection

17    which is what triggers these provisions in the

18    INA.

19           THE COURT:  But would you then agree that

20    your position is that because of 1226(e), that

21    the impact on detention in a removal proceeding,

22    that essentially the petitioner here has no

23    remedy under habeas?

24           MR. DRESCHER:  That's what Congress says,

25    and --

23

1          THE COURT:  Okay.

2          MR. DRESCHER:  And because of -- because

3     of the extraordinary complexity that is -- that

4     surrounds the operation of our immigration laws,

5     Congress has made that policy determination to

6     vest judicial review, including constitutional

7     review, in the petition for review at the end of

8     the proceedings.

9          THE COURT:  And that if we found some

10    law, some judicial history -- well, actually

11    legislative history, the legislative history to

12    the INA which suggests that the INA does not

13    really impact the fundamental right to bring

14    habeas, so that is somewhat distinct, if there

15    is something mentioned in legislative history to

16    suggest that the right to habeas remains,

17    despite the passage of the INA, you would find

18    that extraordinary?

19          MR. DRESCHER:  I think the INA speaks

20    clearly that habeas relief is not available in

21    contexts where the immigration laws are being

22    administered.

23          THE COURT:  All right.  So I wanted

24    really to address that fundamental question

25    because I wasn't sure exactly what the

24

1    government's position is.

2         Now it's pretty clear that basically what

3    you're suggesting is that at least in regard to

4    detention under 1226(e), you feel that the Court

5    really has no jurisdiction, just generally, as a

6    general matter, and we'll get into the more

7    specific.

8         MR. DRESCHER:  Yes.  And, your Honor, I

9    recognize that in many respects that's a

10   counterintuitive set of rules.

11        THE COURT:  Yes.

12        MR. DRESCHER:  But it's also a very

13   counterintuitive area of the law given -- given

14   the intricacies of how our immigration system

15   operates and given Congress's judgment in terms

16   of at what point is it appropriate for the

17   judicial branch to involve itself in that, in

18   the administration of that area of the law.

19        I want to, by way of example, the 2nd

20   Circuit's case in Ragbir, which I think does a

21   lot of work for both sides in this case, you

22   know, in that case the Court concluded that

23   there was -- although in the end the Supreme

24   Court vacated this part of the ruling.

25        THE COURT:  But that was on a

BENTLEY COURT REPORTING                    JA-000317

25

1      different -- that was on a totally different
2      issue, right?
3              MR. DRESCHER:  Well, it had to do with
4      the nature of the relief that was being granted
5      in habeas.
6              THE COURT:  Yes.
7              MR. DRESCHER:  But the Court concluded
8      like it would be okay for there to be habeas
9      jurisdiction in that First Amendment challenge
10     to the execution of a removal order.
11             The only reason why the 2nd Circuit
12     concluded that was because at that point in the
13     proceedings there was no prospect of a petition
14     for review at the appropriate circuit court
15     level.
16             Because by that time in the -- in the
17     immigration history of Mr. Ragbir, the final
18     order of removal had already issued.  There was
19     no way -- and the timing for her seeking
20     petition for review had expired.
21             The only reason why the 2nd Circuit said
22     there could be habeas jurisdiction in that case
23     was because the provisions of 1252 sending the
24     constitutional review to the Circuit Court of
25     Appeals couldn't apply.

26

1          THE COURT:  Right, but that's an

2     extraordinary circumstance in which there is no

3     judicial review at the circuit level after

4     there's an order of removal.

5          So this is -- this is -- Ragbir is sort

6     of, it seems to me, sort of suggests that in

7     habeas kinds of cases they're flexible.

8     Sometimes there are extraordinary circumstances.

9          In this particular case, in Ragbir, there

10    was the extraordinary circumstance of no

11    judicial review once an order of removal has

12    been approved by the IJ, the immigration judge,

13    and so as a result in this extraordinary

14    circumstance you actually can review an order of

15    removal.

16          I mean, clearly they're not seeking to be

17    able to review an order of removal.  This has

18    nothing to do with immigration, at least

19    according to what the petitioner is saying.

20    This just has to do with what happened when she

21    was arrested and was the arrest pursuant to a

22    violation of the First Amendment.

23          Anyway, so we could stand debating this

24    for I think probably -- not debating.  I'm

25    trying to learn, but --

27

1         MR. DRESCHER:  You and I both, your

2    Honor, and I appreciate -- you know, I think

3    I've said most of my piece with regard to the

4    operation of the INA in that context.

5         THE COURT:  Right.

6         MR. DRESCHER:  I don't want to lose sight

7    of the threshold habeas questions that are

8    triggered by <u>Padilla</u>, and I think they're

9    intractable, another very difficult

10   jurisdictional problem for this Court.  I think

11   they make it necessary --

12        THE COURT:  We're talking about the

13   arrest and her being brought to Metheun,

14   Massachusetts, then New Hampshire and Vermont,

15   and the filing of the petition at 10:02 in

16   Massachusetts when, in fact, the petitioner's

17   lawyers did not know where she was.

18        And what's your argument?

19        Well, tell me what your argument is.

20        MR. DRESCHER:  My argument is simply that

21   under <u>Padilla</u> in order for a court to have

22   habeas jurisdiction, meaning being the

23   appropriate venue for a habeas case to be filed,

24   that the petition has to be filed against the

25   petitioner's immediate custodian over whom the

28

1    Court would have jurisdiction, and the

2    petitioner has to be in the district of -- the

3    district where it's filed has to be the district

4    of confinement.

5          THE COURT:  And are there any

6    extraordinary circumstances in which the

7    district of confinement or the immediate

8    custodian, those are the rules in habeas; that

9    you have to file in the district of confinement

10    and that you have to actually identify the

11    immediate custodian as opposed to the Attorney

12    General, et cetera?

13          That's the rule.  Are there any

14    exceptions to that rule?

15          MR. DRESCHER:  The Supreme Court has

16    recognized what I would consider two sets of

17    exceptions.

18          One is the rule of Endo, which is when

19    the petition is initially filed in the

20    appropriate district against the immediate

21    custodian.  Habeas jurisdiction attaches at that

22    time when -- if it's filed when the petitioner

23    is there.

24          If the petitioner in the custody -- if

25    the executive branch then moves the petitioner

29

1    away, jurisdiction doesn't move.  But that

2    requires the petition to be filed in conformity

3    with the immediate custodian rule when it's

4    filed.

5         THE COURT:  Okay, so let's first address

6    the facts.

7         The facts here; she's arrested at, I

8    think 5:35, and she's taken to Methuen,

9    Massachusetts, et cetera.  The petition is filed

10   at 10:04 or, I'm sorry, 10:02.  And at 10:02 she

11   is actually in a vehicle being operated by law

12   enforcement officials on her way.  She's in

13   Vermont, but she's on her way to St. Albans; is

14   that right.

15        MR. DRESCHER:  That's my understanding;

16   that she was in transit at the time the petition

17   was filed.

18        THE COURT:  Okay.

19        MR. DRESCHER:  And in Vermont.

20        THE COURT:  So she's not in Massachusetts

21   for sure.

22        So do you agree that counsel for the

23   petitioner had no idea where she was; that

24   counsel for the petitioner had called DOJ, ICE,

25   et cetera, trying to locate her.  Nobody would

30

1    respond and, as a result, she had no idea or

2    they had no idea where she was.  And then chose

3    to file in Massachusetts because Massachusetts

4    was the last place where she was located, and

5    because she had no -- they had no idea who the

6    custodian was, they filed against the Attorney

7    General.  Is that correct?

8         MR. DRESCHER:  I don't think there's any

9    factual dispute about what happened and why

10   things happened the way they did in terms of

11   where the petition was filed.

12        THE COURT:  Okay.  So clearly there's

13   a -- clearly they filed a petition in

14   Massachusetts.  They seek -- they seek an

15   exception to be able to file in Massachusetts

16   because they had no clue where she was and --

17   but she, in fact, is in Vermont.

18        So in regard, first of all, to the

19   immediate custodian, who is the immediate

20   custodian at the time of the filing?

21        MR. DRESCHER:  It would have to be

22   somebody now who was other than a supervisory

23   official over the people in whose custody the

24   petition was.  I don't have a name for you right

25   now, but Padilla makes clear it has to be

31

1    somebody with immediate custody.

2          It's not just an official located in

3    another city or even in Washington, D.C.  That's

4    one of the clear holdings of Padilla.

5          THE COURT:  Yeah, so ordinarily in all

6    the cases I've been involved in, usually the

7    warden, the warden of the prison, that's the

8    supervisory personnel, but it's the person who

9    has the ability to release -- release her.

10          MR. DRESCHER:  Right.

11          THE COURT:  Why wouldn't that be the head

12    of the field office of ICE?

13          MR. DRESCHER:  Your Honor, I'm just

14    repeating the holding of Padilla; that it can't

15    be somebody with legal authority.  It has to be

16    the person with immediate custody.

17          If you're asking why that's the reason,

18    I'm going to circle back to it's because that's

19    what the Supreme Court says.

20          THE COURT:  Well, now you have a second

21    amended petition which identifies a number of

22    people, and one of them is the head of the field

23    office for the northeast area, which controls

24    all of New England.

25          MR. DRESCHER:  I think even Judge Casper

32

1    acknowledges in her decision that that -- that

2    that wasn't sufficient under the immediate

3    custodian rule in terms of --

4        THE COURT:  So you don't think the

5    identification of Ms. Hyde as the person who's

6    the head of the office would be similar to a

7    person who was a warden of a prison?

8        MR. DRESCHER:  Right.

9        THE COURT:  Okay.

10       MR. DRESCHER:  To your Honor's point

11   about what counsel knew or didn't know, again, I

12   think that issue is taken up in Padilla, and I

13   want to point the Court specifically to

14   Footnote 17 in Padilla where the Court

15   specifically rejects the idea that it's okay to

16   file in the Southern District of New York

17   because counsel was not -- did not know at that

18   time that the petitioner had been moved to South

19   Carolina; that what's known or not known to

20   plaintiff's counsel.

21       And I hope nobody in this room hears me

22   to be -- to be criticizing the performance of

23   counsel.  They were trying to represent their

24   client, but they didn't know where she was, just

25   like the petitioner's counsel in Padilla did not

33

1    know where he was.  They filed in the district

2    which was, you know, for lack of a better set of

3    words, their best estimate of where their client

4    was located.

5         But in this case she -- and in Padilla

6    he -- was not located there.  And the Supreme

7    Court specifically said habeas jurisdiction does

8    not attach under those circumstances.

9         And the fact that counsel didn't know

10   does not affect that analysis.  It's -- and that

11   being the case, that being the case the petition

12   and the amended petition here have never

13   conformed to the requirements of Padilla.

14        THE COURT:  But perhaps they didn't --

15   well, they clearly did not know, but one of the

16   things they would say is that they really made

17   all of these efforts to contact the Department

18   of Justice and ICE and calling numerous places

19   to try to get some information about where she

20   was.  And -- and it may be for legitimate

21   purposes.  It may be because of security

22   concerns.

23        I think part of your pleadings why, ICE

24   was very concerned about security and, as a

25   result, would not want to disclose where they

34

1    are.  But the fact is they continued to refuse

2    to tell counsel where she was, and does that

3    make a difference?

4            MR. DRESCHER:  No, I don't think it does.

5    And I don't think it does, just like in Padilla

6    it didn't make a difference.

7            And I appreciate your Honor, you know,

8    recognizing the point we made in our filing that

9    there are legitimate security reasons not to

10   disclose the location of somebody who's been

11   detained while that person is in transit.

12           And, you know, as -- and I can speak from

13   personal experience in the criminal context.

14   Sometimes somebody who has been arrested and

15   charged with a crime is, you know, held without

16   an opportunity to connect with family or a

17   lawyer for a period of, you know, a day or more.

18           If the system operated more efficiently,

19   nobody would be complaining about that, but this

20   is sort of the reality of when people get

21   arrested and get transported to a holding

22   facility.  I appreciate why that's frustrating

23   to counsel.  I appreciate why that was

24   frustrating to the petitioner in this case, but

25   it's not unusual for somebody who's being

35

1    arrested to be deprived of the ability to

2    communicate for most of a day following an

3    arrest.

4         THE COURT:  Right.  I suppose that they

5    could recognize why ICE would not necessarily

6    want to reveal the location, but then what their

7    argument would be, but we're prejudiced by the

8    fact that no one told us where she was.  Because

9    if somebody had told us that she was in Vermont,

10    they could very well have filed the same habeas

11    petition in Vermont that they filed in

12    Massachusetts.

13         MR. DRESCHER:  Well, I appreciate not

14    knowing where their client was located, they did

15    not know where to file a petition.

16         And I appreciate that one follows the

17    other, but that doesn't mean it's improper to

18    not disclose the location of their client until

19    she reached her final -- her final facility.

20         THE COURT:  All right.  There's one

21    other -- there's one other area of this

22    particular point in the story.  That is, when

23    she is filing her petition in Massachusetts,

24    10 o'clock, 10:02, the Massachusetts court

25    responded relatively quickly and, in fact, there

36

1       was a judicial order signed, I think at

2       11 o'clock, approximately 11 o'clock, certainly

3       well before her transport from Vermont to

4       Louisiana, in which they said, Don't move her.

5       They clearly expressed in a judicial order from

6       an Article III judge a desire to maintain

7       jurisdiction, keep her in Massachusetts.  At

8       that point they thought it was Massachusetts.

9       Don't move her.

10       And that was filed with the parties, so

11       the Department of Justice and ICE had notice of

12       this ruling and this order as of -- you know, on

13       the 25th, and yet that order had no impact.

14       And I'm interested to know, first of all,

15       if ICE knew about that order.  I know that

16       counsel made an effort to contact the lawyer for

17       the government so I just assume that they knew

18       of this order, and yet that seemed to have no

19       impact upon what ultimately happened to the

20       petitioner.

21       I'm wondering whether you acknowledge

22       that you, in fact, or the government, not you

23       particularly, but the government knew about the

24       order in the U. S. District Court in

25       Massachusetts and how you responded?

37

1      MR. DRESCHER:  I don't know who learned

2   about that order and when.  That's my threshold

3   answer.  I just don't know.  I'm not able to

4   speak to the factual flow of information.

5      My only observation, and I appreciate

6   this is pertinent to your Honor's point but

7   not -- it's pertinent to your Honor's point.  My

8   only observation is it's my -- it is my

9   understanding that order was to not remove the

10  petitioner from Massachusetts.

11     And at the time that order issued, she

12  was already out of the District of

13  Massachusetts, making, you know -- and so

14  it's -- it created some complications for what

15  to make of that order.

16     Now I'm speaking about that as an

17  educated observer who's aware of that aspect of

18  the record but, again, you know, without --

19  without having information about who knew what

20  and when, if there's a court order that says,

21  you know, don't leave Burlington but you're

22  already in Rutland, it's not clear if it's

23  possible to comply with that court's order.

24     And as I understand the order your Honor

25  is referring to, that's sort of -- that's sort

38

1    of the predicament that was existing then.

2          THE COURT:  Well, the spirit of the order

3    clearly was that the Massachusetts judge, the

4    U. S. judge in Massachusetts wanted to maintain

5    jurisdiction on the habeas.

6          MR. DRESCHER:  I assuming incorrectly

7    that -- that that court had jurisdiction under

8    Padilla at the time the petition was filed.

9          The other thing I'd point out, and I know

10   your Honor confronts this all the time in the

11   criminal context; that it would be extremely

12   unusual for a court to dictate to the branch of

13   the executive, the agency of the executive

14   branch specifically, where to house somebody

15   who's in custody.

16         In the criminal case the marshal service

17   makes those calls based upon all sorts of

18   reasons.

19         In this case the record is that the folks

20   at ICE had canvassed the available --

21   potentially available facilities in New England.

22   I believe this is Paragraph 6 of the Wessling

23   declaration, Docket 19-1, I believe, and ICE had

24   concluded there was no available bed space in

25   New England.

39

1        And under those circumstances, you know,

2   they -- you know, managing bed space is a

3   recurring issue, and --

4        THE COURT:  So your position is that they

5   decided to use this rather unique proceeding,

6   taking her to Metheun, Massachusetts, to just a

7   really quick stop and then -- then New Hampshire

8   and then Vermont, that was all because of lack

9   of bed space?

10        And you know that there's some affidavits

11   that were submitted by petitioner which

12   described the available bed space in all of New

13   England, which was contrary to what you just

14   said.

15        But what you're saying is that -- is that

16   the ICE agents in this particular case actually

17   looked into whether there was space.  They

18   didn't want to treat her any differently than

19   anybody else, but they saw that there was no

20   space available?

21        MR. DRESCHER:  I don't want to talk -- I

22   can't speak to what they wanted.

23        I can speak to what's in the Wessling

24   declaration.  And my recollection of that

25   declaration is that there was no available bed

40

1       space and that managing bed space was one of the

2       factors that contributed to why things played

3       out the way it did.

4              Now, I appreciate that there are -- that

5       there are -- you know, in the declarations that

6       your Honor referenced there are descriptions

7       from immigration advocates about their

8       familiarity with people who are in immigration

9       detention being housed in different facilities

10      around New England.

11             But as your Honor knows, at any given

12      time the availability of bed space is a

13      fluctuating thing; that my recollection is that

14      there was an affidavit from an advocate or a

15      declaration from an advocate in Maine who

16      explained she had sort of regular information

17      flow from one of the local jails in a county

18      jail in Maine.  I have no reason to dispute the

19      fact that she had access to those flows, but the

20      fact --

21             THE COURT:  My memory is that she said

22      there was 19 beds available, right?

23             MR. DRESCHER:  That was her assessment.

24             It's -- ICE's assessment was that there

25      was no bed space available for -- based upon the

41

1    Wessling declaration.  I appreciate that, and

2    I -- you know, ICE is going to have a

3    perspective different than an immigration

4    advocate in terms of communication with the

5    jails.  I can't speak to those, but the

6    statement of an immigration advocate about what

7    she assesses in terms of the availability of bed

8    space I don't think should be cause for, you

9    know, questioning the accuracy of the

10   declaration from the ICE official, whose job it

11   is to manage bed space and take in all sorts of,

12   you know, the day-to-day issues associated with

13   that.

14        THE COURT:  Okay, but at least in this

15   broad issue about whether there can be

16   flexibility in habeas cases, and in particular

17   in extraordinary circumstances adjustment as to

18   the rules so that in the interest of justice

19   cases can be filed and then adjusted, do you

20   have any more to say on that?

21        MR. DRESCHER:  I think -- well, if your

22   Honor is asking about 1631 --

23        THE COURT:  Right, so now we're getting

24   into 1631.  That was the bridge to 1631.

25        MR. DRESCHER:  Thank you.  I'm glad I

42

1    picked up on that.

2         1631, the 2nd Circuit has observed that

3    1631 does not cure defects that -- such as if

4    something is filed out of time.  It does cure if

5    something is filed in the wrong court but on

6    time.

7         In this case there are defects in terms

8    of filing in the wrong court, not naming the

9    right petitioner, and using 1631 to -- in the

10   words, of the district judge in New Jersey, as a

11   time machine to sort of -- to declare that the

12   case will proceed as if it was filed somewhere

13   else at a particular time is -- you know, is

14   counterintuitive and I believe is contrary to

15   the rule of Padilla.

16        You know, 1631 uses the verb "shall" in

17   the interest of justice and, you know, there's

18   no mention of 1631 in Padilla.  1631 existed at

19   that time.

20        If 1631 was supposed to apply in that

21   context, then you would have expected it to have

22   at least come up in discussions in some fashion.

23        As we note in our papers, the district

24   judge in New Jersey who accepted the transfer

25   from the SDNY under 1631 recognizes that it's a

BENTLEY COURT REPORTING                    JA-000335

43

1    potentially thorny issue that -- and has

2    certified the question of its jurisdiction as

3    the basis for an interlocutory appeal to the

4    3rd Circuit.

5         And, you know, taking another half a step

6    back, if 1631 were allowed to fix a habeas

7    petition any time it was filed in the wrong

8    district, especially during the time of transit,

9    when the petitioner is in the time of transit,

10   courts would be engaged in -- you know, for

11   example, when this case, when the petitioner was

12   flying and had a stop in Atlanta, as I

13   understand it, if the petition had been filed

14   while -- while she was in the air would it be

15   the Court's job to figure out what state she was

16   over at that point?

17        Or if she was going through, you know,

18   the Hartsfield Airport, does that mean that

19   Massachusetts could have conveyed it,

20   transferred it to -- it creates a host of

21   problems and basically, you know, undermines the

22   reason for the Supreme Court's attention to the

23   immediate custodian rule in Padilla.

24        THE COURT:  But isn't that an argument

25   for the opposite of the point that you want to

44

1    make?

2         That's an argument for flexibility.

3    That's an argument for a person, let's say who's

4    in transition.  You don't know where they are

5    and, quite frankly -- well, you know, a person

6    is in transition.  You don't know exactly what

7    jurisdiction would be the final call, but you

8    know that if a person is in a particular place,

9    at that particular place they got a right to

10   file a habeas.

11        And then it's fair to say, I mean, I can

12   think of probably many cases in which people

13   have filed habeas in Vermont and the case is

14   then transferred to the appropriate jurisdiction

15   in the interest of justice, assuming it's in the

16   interest of justice.  And, you know, that

17   happens quite regularly.

18        People file in the wrong place and, as a

19   result, it's moved over to the place in which it

20   should be filed.  And it's never been a big

21   deal, frankly.  And you're suggesting that it's

22   not appropriate here and --

23        MR. DRESCHER:  I'm suggesting that, you

24   know, that what is known to petitioner's counsel

25   at the time the original petition files and

45

1    petitioner's counsel making her best effort to

2    file it in the place of confinement, Footnote 17

3    of _Padilla_ makes clear that that doesn't matter

4    for purposes of habeas jurisdiction.

5            THE COURT:  Okay.

6            MR. DRESCHER:  If your Honor has any

7    other questions, I'll try to field them.

8    Otherwise, I'll sit down.

9            THE COURT:  Okay.  All right.

10           Who's going to argue on behalf -- well,

11   we've been going for an hour.  How about if we

12   take a fifteen-minute recess, and then you can

13   figure out who's going to argue first.

14           Okay.

15           THE CLERK:  All rise.

16           (A recess was taken from 10:31 a.m. to

17   10:49 a.m.)

18           THE COURT:  Good morning.

19           MS. ZAFAR:  Good morning, your Honor.

20   Noor Zafar for Petitioner Rumeysa Ozturk, and

21   I'll be addressing the INA judicial bars.

22           I'd like to make three points with

23   respect to the bars.

24           First is clarify the nature of the relief

25   that we're seeking today.  Second is to explain

46

1    why the petition for review process is an

2    inadequate substitute for this Court's habeas

3    review.  And then, finally, just to note for the

4    record that Ms. Ozturk did, in fact, submit a

5    bond application this morning but, regardless,

6    the Court does not need to wait for that process

7    to play out because exhaustion here would

8    largely be futile.

9         THE COURT:  She has filed a bond

10   request --

11        MS. ZAFAR:  Correct.

12        THE COURT:  -- in Louisiana?

13        MS. ZAFAR:  Correct, as of this morning.

14        So first with respect to the relief that

15   we're seeking.  What Ms. Ozturk seeks here is

16   relief from unlawful detention.  Her claim

17   arises from detention, not from her removal

18   proceedings.

19        THE COURT:  Okay, so let me ask you about

20   the remedy that you're seeking.  You're arguing

21   that based upon the constitutional violations,

22   the First and Fifth Amendment violations in

23   particular you're arguing happened, you're

24   arguing for release on this particular petition?

25        MS. ZAFAR:  Correct, your Honor.

47

1          THE COURT:  So is she being held on this
2     order, or is she being held on the order of the
3     immigration court?
4          MS. ZAFAR:  She's being held -- our
5     argument is that she's being held in retaliation
6     for her speech.  And so we're not -- we're not
7     contesting the general authority that the
8     government has to detain people pending removal.
9     We're not challenging that discretion.
10          THE COURT:  Okay, so you take a look at
11     1226(e).  The issue of detention is delegated to
12     the immigration authorities, and the argument
13     that Mr. Drescher is making is that immigration
14     has decided she should be detained for the
15     removal proceedings.
16          Now, you are arguing that her detention
17     violated the First and the Fifth Amendment?
18          MS. ZAFAR:  Correct.
19          THE COURT:  And the remedy that you're
20     seeking is release from detention.
21          And my question is if the Court released
22     her from detention on her habeas petition, does
23     that have any impact on her detention which has
24     been ordered by the Immigration and
25     Naturalization Act by ICE?

48

1          In other words, they could very well

2     say -- and obviously we were addressing that

3     question.  They could very well say you have no

4     authority to tell ICE that they can release her

5     in the removal proceedings.

6          MS. ZAFAR:  So that, your Honor, simply

7     conflicts with established Supreme Court law and

8     the law of the Circuit which makes clear that

9     when a petitioner is challenging the legal basis

10    for their detention, which is what Ms. Ozturk is

11    doing here; she's saying that the government

12    does not have any legal authority to detain

13    people in retaliation for their speech.  When

14    the question is of what is executive's legal

15    authority, that is something that this Court has

16    jurisdiction to review, and that's been made

17    clear, again through Supreme Court case law and

18    through case law in the 2nd Circuit and other

19    courts in this district.

20         THE COURT:  Okay.  So you say case law in

21    which the granting of the habeas petition

22    resulted in the release of a defendant -- I mean

23    of a petitioner who is, in fact, in removal

24    proceedings?

25         In other words, something directly on

49

1    point.  That is, if the Court finds habeas

2    violation, violation of the First and the Fifth

3    Amendment, I'm going to order her release, do

4    you have precedent to say that order ordering

5    her release would then impact the ICE

6    authorities in the removal proceedings?

7         MS. ZAFAR:  So, your Honor, the

8    government sites the Delgado case, which there

9    the Court -- so there it was not a detention

10   habeas, but basically the principal that was

11   articulated in Delgado was that the relief that

12   the petitioner was seeking there, if it were

13   granted, would directly result in the

14   nullification of removal proceedings.  That's

15   not what we have here.

16        If the Court grants release here, her

17   removal proceedings will proceed as they are and

18   there would be no impact on that.  So the

19   detention claim is really collateral to and

20   independent of the removal proceedings that are

21   happening.

22        THE COURT:  Okay, so let's assume that

23   she is released here on this habeas petition.

24   She's no longer in ICE custody.  She's released.

25        Does the proceeding continue?

50

1          MS. ZAFAR:  Yes, the proceeding continues

2     because the release order would have no bearing

3     on whether her removal proceedings are lawful.

4          THE COURT:  Okay, so the removal

5     proceedings would continue.  I assume she would

6     appear virtually?

7          MS. ZAFAR:  Yes.  She could appear

8     virtually, yes.

9          THE COURT:  Okay.  What about the impact

10    on detention?

11         When you look at the INA, which basically

12    says the Court should not -- it has no

13    jurisdiction over detention in a removal kind of

14    setting, doesn't this suggest that there is some

15    impact on detention?

16         That's the detention order made by ICE?

17         MS. ZAFAR:  There would be impact

18    generally if we're talking about the

19    discretionary decision to detain pending

20    removal.  But where -- our claim is not with

21    respect to the discretion to generally detain.

22    It's about the legal authority to detain in the

23    first place.

24         THE COURT:  Okay, but still that's going

25    to impact their discretionary decision on

51

1    detention, is it not?

2         MS. ZAFAR:  It will, but -- but the

3    courts have recognized that when it comes to

4    unlawful detention, the Court, the District

5    Court has habeas jurisdiction to review that.

6         THE COURT:  Okay, so what you're saying

7    is that when you have habeas jurisdiction and

8    you rule that there's a constitutional violation

9    in the beginning of the prosecution, the

10   beginning of the removal proceedings, that is

11   there's a violation of the constitutional right,

12   that person cannot be held so there is going to

13   be impact upon the ability of ICE agents to

14   order detention?

15        MS. ZAFAR:  There will be an impact on

16   their ability to order detention but not to

17   carry out removal.

18        THE COURT:  How about discretion?

19        How about when the INA says, oh, that

20   they have discretion or they have the ability to

21   make decisions which are discretionary and those

22   are to be upheld and not reversed by courts,

23   does that impact your argument?

24        MS. ZAFAR:  Well, your Honor, there's no

25   discretion to violate the Constitution so,

52

1    again, we're not talking about a discretionary

2    decision here.

3         THE COURT:  Well, there is a

4    discretionary decision in regard to detention.

5    And in the removal proceeding when they make the

6    discretionary decision about detention, that

7    isn't necessarily violating the Constitution.

8         The Constitution was violated well before

9    when -- at the very beginning of the process.

10         So does that constitutional violation

11    continue?

12         MS. ZAFAR:  Yes, your Honor, and I can

13    point the Court to a case that we cite from the

14    Southern District of New York, the Michalski

15    case, and there the petitioner brought a similar

16    challenge in that he was challenging the initial

17    legal authority for ICE to detain him.

18         And the government raised similar

19    jurisdictional bars about why the INA would

20    strip the District Court of habeas jurisdiction,

21    and the Court found that because the petitioner

22    was challenging not a discretion decision to

23    detain pending removal but the very legal

24    authority and basis for his detention in the

25    first place, that the INA did not strip habeas

53

1       review.

2              So really the distinction comes down to

3       whether there's a challenge to a discretionary

4       action, which is not what we have here, or if

5       there's a challenge to the executive legal

6       authority to carry out certain actions.

7              THE COURT:  But that sort of turns the

8       argument on its head because then they're likely

9       to say, the government may very well be likely

10      to say the Court made a decision about habeas,

11      about the beginning of the process but, in fact,

12      the reason that she's being held right now is

13      because of the detention order in the removal

14      proceedings that was made by the IJ or, you

15      know, by ICE.

16             There, that's the decision that is

17      holding her right now, and you are acknowledging

18      that this Court has nothing to do with that

19      decision, is not reversing that decision.

20             So does that give them the ability to say

21      you haven't overruled our decision, our

22      discretionary decision about detention and,

23      therefore, that ruling is in effect?

24             MS. ZAFAR:  Your Honor, I would just

25      again reiterate that we're not challenging a

54

1     discretionary decision here.  We're really

2     challenging ICE's authority to detain.

3          And I'll just note that in the typical

4     visa revocation, ICE does not detain.  Usually

5     those -- in those cases there's no detention,

6     and there's frequently not even a removal order.

7          What we have here is really extraordinary

8     circumstances where a decision was made by ICE,

9     not by the IJ, by ICE to detain her in

10     retaliation for her speech.

11          THE COURT:  Okay.  All right.

12          MS. ZAFAR:  And then just to move to the

13     second point about why a petition for review

14     would be inadequate substitute for -- for this

15     Court's habeas review, so in Jennings the Court

16     made clear that when the channeling provision at

17     1252(b)(9) would essentially result in a court

18     not being able to provide meaningful relief,

19     that channeling is not appropriate and the

20     District Court has habeas jurisdiction.

21          And the 3rd Circuit and the 1st Circuit

22     have sort of distilled that principal into a

23     now-or-never principal, which basically says

24     that if waiting for the PFR process to play out

25     would preclude effective relief, then District

55

1    Court review is available.

2         And here we have the sort of prototypical

3    now-or-never claim.  We have, one, the

4    irreparable harm from her detention but then, in

5    addition to that, we also have the harm to her

6    speech.  Every minute that she's detained her

7    speech is being chilled, and that's why review

8    from this Court and relief from this Court is so

9    important.

10        Secondly, there are some built-in

11   limitations to the nature of the review that

12   could take place in the immigration courts.

13        So, first of all, the immigration judge

14   and the BIA are not empowered to consider

15   constitutional claims, which is exactly what we

16   have here.  We're challenging the

17   constitutionality of her detention, but the IJ

18   and the BIA simply would not have the power to

19   consider those claims as part of her removal

20   proceedings.

21        And then, in addition to that --

22        THE COURT:  I mean, they can never

23   consider constitutional issues and at least as a

24   part of their review?

25        MS. ZAFAR:  No, your Honor, they're not

56

1    empowered to consider constitutional claims.

2    Their review is limited to whether the charge of

3    removability has been met.

4         And here the government says she's

5    removable because her visa was revoked, so

6    their -- the scope of their review would be

7    limited to that question.

8         But, of course, we say that there are

9    constitutional questions implicated in that, but

10   those constitutional questions are not something

11   that the immigration judge or the Board of

12   Appeals would be empowered to consider.

13             THE COURT:  Okay.

14             MS. ZAFAR:  And then, finally, the

15   ability of the IJ and the BIA to create a

16   factual record, an evidentiary record is also

17   very limited.  So there's limited authority to

18   call witnesses and to issue subpoenas.

19        And, again, that would really have an

20   impact on, once the ruling actually gets up to

21   the Court of Appeals which can review the

22   constitutional issues in the first instance, the

23   record developed would be largely inadequate for

24   a robust review of the constitutional issues.

25             THE COURT:  Well, what about the

57

1    requirement that they notice you, notice the

2    petitioner or notice you in a removal proceeding

3    about the nature of the charges?

4         About what evidence they have to bring

5    the petition and to seek removal.  Do you have a

6    right to a full disclosure of what they are

7    alleging?

8         MS. ZAFAR:  Yes.  I mean, they can submit

9    their evidence and the petitioner has some time

10   to review that but, you know, I would like to

11   sort of refer to a recent example of a case that

12   I think has a lot of parallels with Ms. Ozturk's

13   case, and that was the case of Mahmoud Khalil,

14   who just had his merits removability hearing on

15   Friday.

16        And there the government presented its

17   evidence, and the petitioner was given 48 hours

18   to review and respond to that evidence, which of

19   course is inadequate.

20        And there were other, you know, defects

21   with that proceeding that I can get into, but

22   just because the government presents its

23   evidence does not mean that the petitioner will

24   get an adequate time to review and respond.

25        And I'll just note in that case the

58

1    petitioner made several evidentiary requests,

2    all of which were denied.  So there really is a

3    concern that if these claims were to be raised

4    exclusively in the PFR process, that petitioner

5    would not get a robust and meaningful hearing of

6    her claims.

7         THE COURT:  All right.  So what is the

8    evidence that has been disclosed to you about

9    the basis of the government's request for

10   removal?

11        MS. ZAFAR:  Well --

12        THE COURT:  Is it just the article?

13        MS. ZAFAR:  To this point, and I am not

14   working on the immigration proceeding so I don't

15   want to speak to something I don't have direct

16   knowledge of, but at this point the only thing

17   that's happened is that Ms. Ozturk's master

18   calendar hearing has been scheduled for this

19   Wednesday.  And that's the hearing where the

20   petitioner and the government will determine a

21   schedule and sort of how to proceed with the

22   actual merits hearing.  So so far there hasn't

23   been evidence submitted by the government.

24        THE COURT:  Well, there was a submission

25   that you filed with the Court on Friday

59

1    indicating that really the basis of this claim

2    is all within the Tufts article and that there

3    was no other evidence of your client engaging in

4    anti-Semitism or advocacy for terrorists groups,

5    right?

6          There's no evidence of that?

7          MS. ZAFAR:  Correct.  Correct.

8          THE COURT:  Is that -- have you been told

9    that?

10         Is that what the government's position

11   is?

12         MS. ZAFAR:  As far as -- as far as I know

13   that is the entirety of the government's case,

14   is that she is -- her visa was revoked, and

15   she's been detained because she co-authored an

16   op-ed in her school newspaper.

17         THE COURT:  And that's it?

18         MS. ZAFAR:  As far as we know.  The

19   government has not presented any additional

20   evidence.

21         THE COURT:  And do you anticipate that

22   any additional evidence or claims to be made by

23   the government would be filed on Wednesday?

24         MS. ZAFAR:  It's possible.  I'm not sure

25   if the government would submit evidence on

60

1    Wednesday.  You know, it could introduce

2    additional charges for removability, but at

3    least -- I mean, so far we don't have any

4    evidence from the government except for that one

5    State Department memo.

6              THE COURT:  Thank you.

7              MS. ZAFAR:  And then, finally, I just

8    want to turn to the bond hearing process and why

9    this Court does not need to wait for that

10    process to play out before ordering relief here.

11         So, first of all, exhaustion here is not

12    a statutory or regulatory requirement.  It's

13    purely production, and it would be futile for a

14    couple of reasons.

15         So, first, as I mentioned, the IJ and BIA

16    is only limited to considering whether she's a

17    flight risk or danger in the context of a bond

18    hearing.  They cannot consider any of the

19    constitutional claims that we are bringing with

20    respect to her detention.

21         Secondly, even if she were released on

22    bond, that would not remedy the First Amendment

23    harms here because the government under the

24    relevant regulations has wide-ranging discretion

25    to re-detain her, including if she wrote another

61

1    op-ed that the government disagreed with.  So

2    release on bond would not be a sort of

3    meaningful remedy because she could easily be

4    re-detained.

5         And then, finally, even if bond were

6    granted, the government can appeal it to the BIA

7    but, more importantly, it can also obtain an

8    automatic stay, which would stay the decision to

9    release her on bond from at least 90 days up to

10   almost 200 days.

11        And, of course, during this whole time

12   Ms. Ozturk would be detained and the irreparable

13   harm, detention, and the chilling of her speech

14   would be accruing.

15        So, you know, for these reasons we don't

16   think it's appropriate for this Court to wait

17   for that process to play out because it doesn't

18   offer a meaningful remedy.

19             THE COURT:  Okay.  All right.

20             MS. ZAFAR:  Thank you, your Honor.

21             THE COURT:  Okay.

22             Okay, who's next?

23             (Ms. Lafaille approached the podium.)

24             THE COURT:  Good morning.

25             MS. LAFAILLE:  Good morning, your Honor,

62

1      I'm Adriana Lafaille.  I'm here to speak to the

2      venue, habeas jurisdiction issues.

3              THE COURT:  Okay.

4              MS. LAFAILLE:  As your Honor pointed out,

5      habeas is a flexible and equitable remedy.  And

6      every case that the government has cited and

7      that's in the party's papers demonstrates over

8      and over again that although there are ordinary

9      rules, the ordinary rules bend to ensure the

10     availability of The Great Writ, that sacred

11     remedy of habeas corpus.  This case falls

12     squarely within the letter of 1631.

13             The District Court determined that

14     jurisdiction was wanting, transferred it to the

15     Court in which the action could have been

16     brought, and now this action must proceed as if

17     it had been filed in this Court at 10:02 p.m. on

18     March 25th at a time when the petitioner,

19     Ms. Ozturk, was unquestionably in this district.

20             THE COURT:  And she was in a vehicle; is

21     that correct?

22             Am I right about the facts there?

23             MS. LAFAILLE:  Correct, your Honor.  Yes,

24     that's what we understand from the government's

25     declaration.

63

1    THE COURT:  And who would you think would

2    be the immediate custodian of her at that

3    moment?

4    MS. LAFAILLE:  So we think we've named

5    the immediate custodian.  We think it's Patricia

6    Hyde, the field officer/director for the New

7    England region.

8    This is a petition case where the

9    government has said over and over again "not

10    that custodian" but they refuse to say, well,

11    then who is the custodian that they will

12    acknowledge as correct.

13    It falls -- you know, if anything, if not

14    Ms. Hyde then, of course, this case has to fall

15    squarely within the unknown custodian exception,

16    because the custodian appears so unknown that it

17    cannot even be named by government counsel in

18    this proceeding.

19    THE COURT:  And what does the unknown

20    custodian exception say?

21    MS. LAFAILLE:  That exception allows a

22    case to be brought against supervisory officials

23    when the custodian is unknown.

24    THE COURT:  All right.  So if the

25    custodian is not known and it's without fault of

64

1     the petitioner, then the fallback or default

2     position would be, in fact, to sue or to name

3     the Attorney General, the head of ICE, some

4     removed official because you can't figure out

5     who is the immediate custodian, and has that

6     been established in precedent?

7          MS. LAFAILLE:  Yes, your Honor, and here

8     we've named all of those individuals of the

9     chain from the local district director, Patricia

10    Hyde, to the DHS secretary, who might be thought

11    of as the ultimate legal custodian here.

12         So the custodian has been named either

13    because the custodian -- either because Patricia

14    Hyde is the immediate custodian or because the

15    immediate custodian is someone else, and these

16    principals have to be allowed to bend to allow

17    us to amend in that person and to require the

18    government to tell us who that person even is.

19         THE COURT:  And the Court would have the

20    authority to open up the pleadings to let you

21    amend the pleadings when you, in fact, have

22    identified the immediate custodian; is that

23    right?

24         MS. LAFAILLE:  Yes, your Honor.  That

25    would be replacement of the -- adding immediate

65

1    custodian would be standard, is the kind of

2    thing that's done routinely in habeas cases.

3         THE COURT:  Okay, so I want to ask you a

4    little bit about the facts.

5         MS. LAFAILLE:  Yes, your Honor.

6         THE COURT:  So the filing was at 10:02,

7    and your pleadings have said that you didn't

8    know where she was; that what efforts were made

9    to contact the government, and can you just

10   describe what efforts were made prior to 10:02

11   to identify the district of detention and the

12   immediate custodian?

13        MS. LAFAILLE:  So, your Honor, the -- and

14   I'll refer the Court to the declaration of Mahsa

15   Khanbabai, the attorney who filed the habeas

16   case.

17        Attorney Mahsa Khanbabai was calling ICE

18   multiple times during the course of those -- of

19   those -- of that day beginning on the March 25th

20   and continuing into March 26th.

21        THE COURT:  Well, she was taken into

22   custody about 5:30.  So between 5:30 and 10:00

23   he was making constant contact with ICE?

24        MS. LAFAILLE:  Your Honor, I'm not sure

25   about that point.  I'll have to clarify that

66

1        with Attorney Khanbabai.

2               There were continuous efforts to locate

3        Ms. Ozturk, but there was no reason to think

4        that so quickly after her arrest that she might

5        be outside the jurisdiction other than the

6        practice in, your Honor, the Khalil case to

7        transfer quickly.

8               THE COURT:  Okay, but then there was a

9        judicial order, was there not?

10              MS. LAFAILLE:  Correct, your Honor.

11              THE COURT:  So tell me about that.  What

12       happened there?

13              MS. LAFAILLE:  And that is one of the

14       features of this that I find most troubling.

15              There was a judicial order close to

16       11 o'clock, which was transmitted to counsel for

17       the government, and --

18              THE COURT:  How was that done?

19              MS. LAFAILLE:  Through the emergency

20       clerk.

21              This is -- so the clerk informed Attorney

22       Khanbabai that they had let the United States

23       Office know about the petition and the -- they

24       were sent, also, the order.

25              Now, we discussed this order at length in

67

1    our proceedings in the District Court of

2    Massachusetts.  Not once has the government come

3    forward to say we didn't receive the order in

4    time; we didn't know about the order.

5         What the government has said was, well,

6    the order was issued after she was out of

7    Massachusetts.  Mr. Drescher just said, you

8    know, complications or what to make of that

9    order would arise at that point because she was

10   no longer in Massachusetts.  And, you know,

11   Mr. Drescher was being not clear if it was

12   possible to comply at that point.

13        And the government receiving an order

14   from a court to keep someone in Massachusetts

15   when that person has already crossed state lines

16   into Vermont has a couple of choices.  One might

17   be to bring petitioner back to Massachusetts to

18   be in conformity with the order.

19        Another might be to seek clarification

20   from the Court and say actually this person is

21   outside of Massachusetts.

22        But the purpose of the order was very

23   clear, and it was to preserve the status quo.

24   And that phrase is in the order itself.

25        And the government having received --

68

1      THE COURT:  It was to preserve the status

2   quo for the habeas petition --

3      MS. LAFAILLE:  Correct, your Honor.

4      THE COURT:  -- which had been filed in

5   Massachusetts?

6      MS. LAFAILLE:  Yes.

7      THE COURT:  So the judge then ordered

8   that she was not to be removed from

9   Massachusetts.

10      So how do you address the argument that

11   the government is making that she's already

12   outside the state and this is an order which is,

13   I guess, impossible to comply with?

14      MS. LAFAILLE:  General -- generally the

15   order is intended, and there's law in the 2nd

16   Circuit about violation not just of the letter

17   but of the spirit of the order.

18      THE COURT:  So where is that in case law?

19      MS. LAFAILLE:  I'd have to get your Honor

20   the cite.  I don't have it right with me.

21      THE COURT:  Okay.  So in the immigration

22   context there is case law to suggest that in

23   this kind of situation the government is on the

24   obligation to say the spirit of this order, in

25   addition to the letter of the order, requires

69

1    this person not to be moved?

2         Is that --

3         MS. LAFAILLE:  It's not so specific as

4    that, your Honor.  There's case law about

5    following the compliance with the spirit of the

6    order, not just the letter of the order, but --

7         THE COURT:  So what is the remedy that

8    you seek for a violation of that order?

9         MS. LAFAILLE:  My point here is that this

10   is one of the factors that goes to these

11   equitable considerations that we were talking

12   about when we think about the habeas

13   jurisdiction issues that have been brought up

14   here.

15        This is a case in which someone has been

16   locked up for writing an op-ed, grabbed off the

17   street in, you know, something that should

18   really shake all Americans, and we're almost

19   three weeks into her custody with every judge

20   that has touched this case moving as

21   expeditiously as possible.  And, you know, still

22   Ms. Ozturk is -- you know, still has not, until

23   today, had the opportunity to have the merits of

24   her case presented to a federal court.

25        THE COURT:  Well, I'm interested in your

70

1    request to have her transferred back to this

2    district.

3           You make this argument that -- almost a

4    totality of circumstances argument.  That is,

5    because you have such a strong case and because

6    of the circumstances of this situation where

7    there was only one article and that was an

8    article which, according to you, basically was

9    critical most of the authorities at Tufts

10   University, and those combination of factors,

11   together with the fact that you need to have her

12   here to prepare for your trial or your hearing

13   warrant her being moved.

14          I guess my question is if you argued that

15   there was a judicial order that she not be

16   removed, and at least a part of your solution

17   would be to enforce that order?

18          MS. LAFAILLE:  Yes, your Honor, and in

19   the first -- my colleague, Jessie Rossman, can

20   speak to the bail and transfer issues.  In

21   the --

22          THE COURT:  All right.

23          MS. LAFAILLE:  In the first instance we

24   asked for her to be released.  Only as an

25   alternative to that would we propose that she be

71

1      brought back to Vermont.

2            But with regards to the question of

3      habeas jurisdiction, I think the conduct of the

4      government with regards to the order as well as

5      the very peculiar manner, to put it mildly, in

6      which the government handled her movements that

7      evening certainly warrant exercise of this

8      Court's habeas jurisdiction.  It's within the

9      equitable powers of the Court, the flexible

10     nature of the habeas remedy.

11           THE COURT:  So are you relying upon the

12     Kennedy concurring opinion or --

13           MS. LAFAILLE:  I'm not relying on -- I

14     think those -- we could allow them, but that's

15     not my primary basis, your Honor.

16           THE COURT:  You don't need to rely on the

17     Kennedy --

18           MS. LAFAILLE:  We don't.  We don't, your

19     Honor.

20           THE COURT:  Kennedy requires -- and

21     Justice O'Connor was concurring as well, and

22     that requires essentially an onus on you that

23     the government did this as a, sort of an

24     intentional way of trying to subvert your

25     ability to file habeas petition, right?

72

1      That's essentially what Justice Kennedy

2  said, and that has not been adopted by other

3  courts.  It hasn't been rejected either, but

4  you're not relying upon that.  You're just

5  relying upon the exceptional circumstances of

6  this situation, right?

7      Is that right?

8      MS. LAFAILLE:  Yes, your Honor.

9  Primarily we're relying on 1631 to say that this

10  is a case that could have been brought in New

11  Hampshire -- excuse me, in Vermont at the time

12  it was filed.

13      THE COURT:  You're in Vermont now.  I

14  appreciate -- yeah, you're in Vermont.

15      MS. LAFAILLE:  Thank you, your Honor.

16      Obviously our client undertook a

17  multistate journey that night, but this was a

18  case that could have been brought in Vermont

19  and, therefore, straight under the letter of

20  1631 this case has been properly transferred

21  here and now should be treated as if filed in

22  Vermont on that night.  So that's our primary

23  basis.

24      And then Endo, the Supreme Court's

25  decision in Endo talks about the government not

73

1  being able to defeat habeas jurisdiction from

2  subsequent movements after the filing of a

3  habeas petition.

4       THE COURT:  Okay, so once habeas is

5  established in Vermont, according to your

6  argument, then the transfer to the south would

7  be irrelevant because you can't transfer

8  jurisdiction.

9       So the fact that she's in Louisiana now

10  does not defeat the jurisdiction, which is

11  already established in Vermont under the Endo

12  rule; is that right?

13       MS. LAFAILLE:  Correct, your Honor.

14  Correct, your Honor.  And that rule is one --

15       THE COURT:  That was 1934, and you know

16  that's still in -- still being credited?

17       MS. LAFAILLE:  It is, and it was

18  referenced in Padilla, of course, as one of the

19  bedrock exceptions to the ordinary rule that you

20  sue where the immediate custodian, the

21  jurisdiction of confinement.

22       Of course, if the person has been moved

23  during the pendency of the habeas then you're no

24  longer in the jurisdiction of confinement, but

25  that doesn't matter as long as the habeas was

BENTLEY COURT REPORTING            JA-000366

74

1    filed, or in this case was treated as if filed,

2    in the jurisdiction of confinement at the time

3    of the filing.

4         So that -- that's our, the primary thing

5    we're relying on.  And, you know, the only

6    defect that the government can attach here is

7    that the custodian theoretically wasn't named.

8    And that's where I'd point to the flexible

9    nature of these remedies and the fact that, you

10   know, to this day the government has not even

11   said who the appropriate custodian is that could

12   be named.

13        It's difficult to fault -- to fault

14   Ms. Ozturk for not naming someone that the

15   government themselves has not been able to name.

16   And to suggest that because of that this

17   petition should be dismissed and have to be

18   re-filed really runs counter to the weight of

19   all of this law that says the habeas remedy must

20   be preserved.

21        And even though we have these basic rules

22   for the general case, we have to bend them when

23   her unknown custodians -- when the government is

24   doing things that make it difficult for the

25   ordinary rules to be followed.

75

1          THE COURT:  Okay.

2          MS. LAFAILLE:  Thank you, your Honor.

3          THE COURT:  All right.  And you have a

4    third presenter?

5          (Ms. Rossman approached the podium.)

6          THE COURT:  Is it Ms. Rossman?

7          MS. ROSSMAN:  Yes.

8          THE COURT:  And you're going to be

9    addressing the release or transfer?

10          MS. ROSSMAN:  Yes, your Honor, both

11    release and transfer.

12          THE COURT:  Okay, so the argument in

13    regard to the motion to dismiss is then --

14          MS. ROSSMAN:  That is correct, your

15    Honor, so I didn't know --

16          THE COURT:  So now we're going to go into

17    the request that you are making for her release

18    or, alternatively, for transfer to this

19    jurisdiction?

20          MS. ROSSMAN:  That's right, your Honor,

21    and I wasn't sure if you wanted Attorney

22    Drescher to address any response to them, or I

23    can move directly into release and return.

24          THE COURT:  I think you can move directly

25    into it, and then we can give Attorney Drescher

76

1          a response to the motion to dismiss and also a
2          response to your argument.
3                   MS. ROSSMAN:  Thank you, your Honor.
4                   As numerous declarations in this record
5          make clear, this is not a case of ordinary
6          immigration enforcement.  And I know there's
7          been a lot of discussion today about the
8          discretion that the government has, in
9          particular components of immigration
10         re-enforcement, but there is not discretion,
11         even within immigration law, for the government
12         to violate the Constitution.
13                  And it's not unusual even outside of the
14         immigration context to have situations where an
15         individual has discretion; for example, at-will
16         employment, but that discretion is confined by
17         constitutional limitations.  You can't fire
18         someone for an unconstitutional reason.
19                  And the 2nd Circuit has similarly said in
20         the Velasco Lopez decision, recognizing the
21         government power, that there are important
22         constitutional limitations on that discretion.
23                  So in this instance -- and Velasco Lopez,
24         I should say, excuse me, your Honor, goes on to
25         say that the discretion to detain is confined by

77

1     the legitimate purposes which can be for flight

2     or for a finding of dangerousness.

3          And the 2nd Circuit has also said, even

4     outside of the context of the immigration, again

5     that it's almost a tautology to say that federal

6     agencies can't have the discretion to violate

7     the Constitution.  And that's both at the

8     Bates vs. Town of Cavendish case that we have

9     cited in our brief, your Honor, as well as the

10    Myers & Myers decision.

11         So here at every step along the way what

12    has been made clear is the government's actions

13    was not an appropriate exercise of discretion

14    but actually is an unlawful use of the

15    immigration law as a cudgel to punish the

16    petitioner, Ms. Ozturk, and to also send a clear

17    message to all other noncitizens in this country

18    that if you express opinions that the government

19    disagrees with, you will be punished.

20         THE COURT:  But see the problem with your

21    argument is that you fuse the -- you fuse

22    addressing the constitutional issue at the

23    beginning, that is the First and Fifth Amendment

24    claims that you have suggesting that the

25    detention is inappropriate, to then how the

78

1    removal proceeding is going along, is
2    proceeding.
3         I thought that your argument was you're
4    not dealing with that; that the question as to
5    whether the proceeding should involve various
6    aspects is within the discretion of ICE.
7         Technically there is an ability to
8    address detention or non-detention in the
9    removal proceedings.  But those are separate and
10   apart so that when you get into the arguments
11   about how she's being treated at this particular
12   point during the removal proceedings, that's not
13   relevant to your argument about the
14   constitutional violation in your habeas
15   proceeding, is it?
16        MS. ROSSMAN:  The continued detention of
17   Ms. Ozturk right now is relevant to our
18   constitutional argument that we're making within
19   habeas.
20        Your Honor is correct that that's
21   separate and apart from the removal proceedings,
22   and you had asked earlier about an indication
23   when there -- is there case law to look to where
24   there's a habeas that's been considered at the
25   same time that removal proceedings have been

79

1      ongoing.  Because I understand we've

2      already spoken about Ragbir, but that was a

3      slightly different procedural posture.

4              I would point your Honor's attention to

5      the Bello-Reyes case, your Honor.  That was out

6      of the 9th Circuit, and in that instance there

7      were ongoing removal proceedings and at the same

8      time the Court went through and addressed the

9      arguments that the continued detention during

10     those removal proceedings violated the First

11     Amendment and found that habeas could be granted

12     under those circumstances.

13             Now, in that instance the Court remanded

14     to the District Court to apply the appropriate

15     determination of retaliation, but explicitly at

16     Footnote 4 the 9th Circuit said this is not

17     about other instances where people have brought

18     cases that are getting into the removal

19     proceedings.

20             Quite to the contrary, Mr. Bello-Reyes is

21     continuing on his removal proceedings right now,

22     and his seeking of a habeas petition on the

23     constitutional matter of his continued detention

24     is separate and apart.

25             So that was an instance where the Court

80

1    has recognized when there are constitutional

2    matters at issue and specifically with respect

3    to the First Amendment like we have at issue

4    here, we can have a separate removal

5    consideration and that does not constrain the

6    Article III judge's ability to issue a habeas,

7    which is what really necessary here.

8         THE COURT:  Okay, so let's talk about the

9    process of release ever making -- for the Court

10   making a determination of release into the

11   community.

12        The standard way judges address issues of

13   release is to have a hearing, have a full bail

14   hearing, and at that full bail hearing have a

15   number of things addressed.  Where is she going

16   to live?  What's she going to do for work?  As

17   well as issues of dangerousness and risk of

18   flight.

19        And ordinarily in this bail hearing you

20   provide the ability for both sides to introduce

21   evidence about those conditions which would

22   assure her non-flight and ensure against

23   dangerousness to the community.

24        And the government would have the ability

25   to introduce evidence to reflect the fact that

81

1    she would be a danger to leave or a danger to

2    the community.

3         Ordinarily a bail -- in a bail hearing

4    probation officers have checked out where a

5    person lives, have checked out their resources,

6    have made a recommendation as to whether or not

7    this person with these conditions would create a

8    risk.  You know, I appreciate we aren't at that

9    stage yet, but ordinarily that's the way bail

10   hearings are done.

11        And, in fact, there is case law to

12   suggest that when we are addressing a habeas

13   situation and addressing the question of whether

14   she should be released, there are these -- all

15   of these factors about the person's life, and

16   the nature of the allegations from the

17   government that need to be addressed.

18        And my fear is that in argument of

19   counsel here I've not had an opportunity to

20   address those, or the government hasn't had an

21   opportunity to really address the dangerousness

22   question.  All they're saying is they're relying

23   upon, you know, this one article, at least at

24   this point.

25        There may be, at least according to your

82

1     submission just a couple of days ago that was --

2     it was among other, is among the possibility of

3     other allegations that they may have.

4           So I guess my question is, before we

5     address the question of release don't you think

6     there should be a bail hearing?

7           MS. ROSSMAN:  Your Honor, I think one

8     place to look is at the Mapp decision here in

9     the 2nd Circuit and how they proceeded to

10     analyze a bail consideration within the

11     immigration context.  And that remains good law,

12     your Honor, both the Real ID Act passage -- the

13     Real ID Act was passed after Mapp.

14           I know there was some suggestion in the

15     government's papers that perhaps that raised a

16     question about Mapp's continued viability, but

17     the 2nd Circuit already directly addressed that

18     in the Elkimya decision in 2007 and said

19     explicitly that the Real ID Act's silence

20     regarding our holding in Mapp constitutes an

21     implicit adoption of our interpretation.

22           So the Mapp framework is still good law

23     in the 2nd Circuit, and we've seen it applied

24     time and again in the District Courts as well,

25     and what that court says is within this context

83

1    you look at whether or not there are substantial

2    claims and whether or not bail is necessary in

3    order to ensure that habeas is effective relief.

4         And as a part of the extraordinary

5    circumstances one of the things the Court can

6    analyze is whether there has been any showing of

7    the government in terms of danger or risk of

8    flight.

9         And I would say here, your Honor, in

10   fact, we've had numerous submissions before both

11   this Court and also the Court in the District of

12   Massachusetts where the petitioner has raised

13   her bail request and has submitted record

14   evidence that she's not a danger and that she's

15   not a flight risk.

16        Quite to the contrary, she is desperate

17   to return to Tufts so that she can continue with

18   her education.  She has nine months left of her

19   doctoral program that she's been working towards

20   for five years.  She has several critical dates

21   that are coming up in the spring and summer.

22   She desperately wants to return, and there are

23   nearly two dozen declarations, sworn

24   declarations that attest to that fact.

25        On the other side of the aisle, the

84

1    government had opportunity to submit sworn

2    declarations if there was any evidence that they

3    wanted to put forward.  They were certainly on

4    notice that the petitioner has been requesting

5    bail now for over two weeks, and there's been no

6    such submission from the government.  And we

7    have no reason to believe at this point, your

8    Honor, that there would be able to do so.

9         There's been the single declaration from

10   Wessling, Officer Wessling, which made no

11   allegation that Ms. Ozturk was a danger or that

12   she was a flight risk.

13        And I would point, your Honor -- I know

14   you had mentioned sort of one of the reasons

15   that we've heard so far from the government

16   about the reasons for her detention, you

17   referenced, I believe, the filing from Friday

18   night, which was the March 21st memo from the

19   Department of State, which again states and only

20   identifies the op-ed as the basis for the visa

21   revocation.

22        THE COURT:  Well, if you look at the

23   language of that submission, I thought it listed

24   the op-ed obviously, and I think right before

25   that is a comment with dangerousness as

85

1       reflected in -- I thought you could read that

2       sentence as suggesting there may very well be

3       other things that they want to submit, although

4       they were not identifying them.

5               MS. ROSSMAN:  So I would submit, your

6       Honor, it's really helpful to look at this memo

7       alongside the Washington Post article that was

8       placed yesterday that we filed in court.  It

9       references two memos that the government hasn't

10      produced, so we don't have those documents to

11      give to the Court, but --

12              THE COURT:  Okay.

13              MS. ROSSMAN:  But what it references is

14      an initial memo where there was a recommendation

15      from DHS for the revocation of Ms. Ozturk's

16      visa.  And it specifically cited the provision

17      of a deportation of a foreigner if the Secretary

18      of State has reasonable grounds to believe that

19      the person's presence or activities has adverse

20      policy consequences for the United States.

21              In response to that, and that is what's

22      referenced in the Washington Post article, after

23      the State Department received that from the

24      Department of Homeland Security, the State

25      Department found that while Ozturk had protested

86

1    Tufts's relationship with Israel, neither DHS

2    nor ICE nor Homeland Security investigations

3    produced any evidence showing that Ms. Ozturk

4    had engaged in anti-Semitic activity or made

5    public statements indicating support for a

6    terrorist organization.

7        And it goes on to say that the memo said

8    that a search of U. S. government database on

9    Ms. Ozturk did not produce any terrorism-related

10   information about her.

11       And it was on the heels of both of those

12   statements, your Honor, that then this final

13   memo was produced that again only references the

14   op-ed.

15       THE COURT:  Okay, so this is an internal

16   memo, as I understand it, suggesting that as a

17   result of a full investigation there was no

18   evidence of anti-Semitic behavior, no evidence

19   of -- focusing on terrorists organizations, is

20   that what that article says?

21       MS. ROSSMAN:  According to the reporting,

22   your Honor, from Washington Post.

23       THE COURT:  So there is a memorandum

24   within the Department's possession that has not

25   been turned over to you?

87

1          MS. ROSSMAN:  There is a memorandum that

2     the government has not produced, your Honor,

3     that's correct.  And I believe, your Honor, it's

4     actually two different memorandums that have not

5     been yet produced.

6          The third memorandum, which is the

7     March 21st memo that we filed on Friday, had

8     been resubmitted in the removal proceeding so

9     that was the one of three, but there are two

10    that have not been produced by the government.

11         THE COURT:  So I asked you -- you haven't

12    been talking about the removal proceedings, but

13    apparently there is at least a hearing or

14    submission on Wednesday?

15         MS. ROSSMAN:  Yes, your Honor.

16         THE COURT:  And what does that involve?

17         MS. ROSSMAN:  Unfortunately you're going

18    to hear partially --

19         THE COURT:  Probably going to the wrong

20    person.  I'm sorry.

21         MS. ROSSMAN:  No, but the one thing I

22    will say, your Honor, is that the master

23    calendar has been reset for Wednesday.

24         I will reiterate what one of my

25    colleagues said, which is that with respect to a

88

1    bond termination, your Honor, there are several

2    reasons why that is not a barrier to this Court

3    granting bail and, in fact, it is certainly

4    important that the Court exercise its discretion

5    here to grant bail if you look at what has been

6    happening in other cases around the country.

7    THE COURT:  Right, so I'm not -- I wasn't

8    thinking about the bail situation at this point.

9    What I was thinking about is whether or

10   not those reports within the government's

11   possession are going to be disclosed to you as a

12   part of the removal proceedings?

13   MS. ROSSMAN:  That's something I wouldn't

14   be able to answer here today, your Honor.

15   THE COURT:  All right, that's fine.  Yes.

16   MS. ROSSMAN:  Of course, the government

17   could also produce them within this proceeding

18   as well and has had opportunities in the past to

19   do so with its submissions and could do so again

20   in the future.

21   THE COURT:  Okay.

22   MS. ROSSMAN:  It might -- would it help

23   your Honor for me to speak a little bit about

24   within the context of the Mapp structure for

25   that bail determination?

89

1          THE COURT:  Yes.

2          MS. ROSSMAN:  We both need to address the

3     substantial claims as well as exceptional

4     circumstances.

5          Petitioner believes that all of the

6     claims that she's raising in her petition are

7     substantial, but for the purposes of this

8     Court's analysis only one is necessary.  And

9     given the context of what we've been talking

10    about here today, I think it might be the most

11    hopeful to focus, as your Honor has done, on

12    both the First Amendment and the Fifth Amendment

13    claims in particular to the respect to the

14    arrest, transfer, and detention of Ms. Ozturk.

15         So I can start with the First Amendment,

16    your Honor.  The First Amendment really acts as

17    an element on the government's ability to

18    suppress particular viewpoints, and that's

19    exactly what is happening here.

20         About a year ago, as your Honor

21    referenced, Ms. Ozturk coauthored an op-ed in

22    her student newspaper, and it was really speech

23    that is of the highest form of protected speech.

24    It was about a matter of public concern about

25    ongoing human rights violations in Gaza, and it

90

1     was also something that was in the press.  It

2     was in the newspapers and part of the media.

3          And this is the sole basis for her

4     arrest, transportation and transfer, as we've

5     just been discussing.  The government over more

6     than 20 days of her detention has not put

7     forward any other basis for why this has

8     occurred.

9          And if you look -- we were speaking about

10    the 3/21/25 memo.  Your Honor had referenced

11    this language as well; that it included

12    coauthoring an op-ed that found common cause

13    with an organization that was later temporarily

14    banned from campus.

15         The only language --

16         THE COURT:  Is there any evidence to

17    suggest that she was a member of that eventually

18    temporarily banned organization?

19         MS. ROSSMAN:  No, your Honor, there is

20    not.

21         And the only sentence that this can be

22    referencing is within her op-ed, the sentence --

23    and this is a co-authored op-ed; Graduate

24    Students for Palestine join Tufts Students for

25    Justice in Palestine, the Tufts faculty, and

91

1          staff coalition for ceasefire and pledges

2          Students for Palestine to reject the

3          University's response.

4                That sentence is the only sentence of the

5          memo that could possibly be referencing.

6                And this guilt by association, and not

7          just guilt by association but guilt by

8          association that would have had to be prescient

9          that a group was going to be banned in the

10         future by the administration is a really

11         chilling example of a First Amendment violation,

12         and it's an eerie comparison to some of what the

13         government was attempting to do during in the

14         Red Scare in the 1950s.

15               We have cited in our papers, your Honor,

16         the Bridges case from the Supreme Court, and

17         there Congress had passed an act to enable the

18         deportations of noncitizens who were affiliating

19         with communist enterprises.

20               And under that statute the government had

21         tried to deport Mr. Bridges based on his running

22         a newspaper that sometimes was just called

23         The Waterfront Worker that worked with the union

24         that was found to both be a legitimate union but

25         also have -- also be a communist organization.

92

1          And the Court rejected the government's

2     attempt to do this.  It read the statute in a

3     way that could not be applied to Mr. Bridges's

4     behavior.  And the reason why was to do so, the

5     Court found, would have violated the First

6     Amendment.

7          They used language to say, and this is a

8     direct quote, The link by which it sought to tie

9     him to subversive activities is an exceedingly

10    tenuous one.  It relies upon inferences upon

11    inferences.

12         And he published a newspaper that engaged

13    in protected speech, and cooperation with the

14    communist group for the attainment of lawful

15    ends cannot be something for which someone is

16    punished without violating the First Amendment.

17         And, as a result, they did not allow the

18    government to use their immigration laws to

19    violation the free expression of Mr. Bridges.

20         And this Court should similarly ensure

21    that the government does not use immigration

22    laws to violate the First Amendment as part of

23    its policy to target speech.

24         There are more recent examples than the

25    1950s.  We've spoken already about Ragbir, your

93

1    Honor, as well as the Bello-Reyes case.

2         I also wanted to point your Honor to the

3    Guitierrez case, which is cited in our papers as

4    well.  All of these recognize that the Court has

5    habeas authority when there is a violation of

6    the First Amendment.

7         THE COURT:  So the Court has habeas

8    authority to address the question as to whether

9    it was a First or Fifth Amendment violation, but

10   when you start arguing about ICE using this in

11   the removal proceedings, that really creates a

12   concern.

13        You have the INA, which basically says

14   that the courts should not get involved in the

15   bringing of charges before the immigration

16   court, the prosecution, as well as the

17   enforcement.  And I think those are the three

18   things.

19        And so when you suggest that they are

20   violating the Constitution in the prosecution,

21   in the court, you raise concerns because there

22   is, in fact, the engagement of a third -- of a

23   judicial branch in that prosecution itself.

24        That is, ultimately if I -- if the IJ

25   decides for removal, the appeal goes to the

94

1    U. S. Court of Appeals or Circuit.  So there is
2    some engagement of the third -- of the third
3    branch; the judiciary.
4         And so when you make the argument about
5    you can't bring the charges or you are entitled
6    to withdraw from prison based upon a
7    constitutional violation, that clearly is
8    covered by constitutional law.
9         But when you start talking about the
10   removal proceedings and those processes, I think
11   that the INA gives you difficulty.
12        Do you understand the distinction that
13   I'm trying to make?
14        MS. ROSSMAN:  I believe so, your Honor,
15   but please tell me if I'm going off track.
16        THE COURT:  Yeah, right.  Right, so I
17   mean I think this is a really confusing area of
18   the law because you're sort of overlapping
19   issues, both from the Constitution dimension in
20   habeas, together with what's happening in a
21   removal proceedings.
22        A removal proceeding does have judges
23   involved, and they are on the appellate level.
24        MS. ROSSMAN:  That's right, your Honor.
25   I think part of the distinction, however, is, as

95

1    you had referenced earlier on -- or almost this

2    afternoon but right now it's still this morning,

3    earlier on this morning our petition, and in

4    particular what we're speaking about with

5    respect to the bail request is focusing on

6    challenging the arrest and detention.

7        Neither the arrest, nor the detention,

8    was required by the revocation of the student

9    status or the revocation of the visa.  And the

10   continued removal proceedings against Ms. Ozturk

11   does not require her continued detention.

12       And, again, the Bello-Reyes case is a

13   perfect example of this where the Court was

14   recognizing the ability of the petitioner there

15   to be out of custody under the Article III

16   jurisdiction of the habeas court while

17   continuing to participate in the removal

18   proceedings within the context of the

19   immigration court.

20       THE COURT:  There is no difficulty in

21   doing that?

22       There's no difficulty in having her

23   removed from custody of the immigration court

24   but then continuing on with the process?

25       MS. ROSSMAN:  That is correct, your

96

1    Honor.  There are -- it is not required to be in

2    detention in order to continue on removal

3    proceedings and, in fact, one of the

4    declarations by Attorney Young speaks to the

5    fact that with respect to F-1 visa revocations,

6    which is the visa revocation at issue for

7    Ms. Ozturk, in her experience in over 17 years

8    of immigration practice it is not typical for

9    someone with an F-1 visa revocation to be

10   arrested.

11        And that's what we're focusing on here;

12   is that the -- setting aside for a moment the

13   visa revocation and the student status

14   revocation, the response of the government in

15   every step along the way to that, which included

16   both not notifying Ms. Ozturk of the fact that

17   she had a visa revocation, which is not typical,

18   and led to an understandably terrified response

19   when six plainclothes officers approached her.

20   She had no reason to believe that anything had

21   been revoked and then placed her into an

22   unmarked van.

23        She said in her declaration at the time

24   she thought they were going to kill her because

25   she had no idea who these people were and having

97

1    given no reason to understand why the police

2    would be arresting her.

3         THE COURT:  Well, if -- she did say that

4    she saw a badge, although she did not know what

5    the badge was.  But she saw a badge but then

6    thought, of course, she was being killed.

7         MS. ROSSMAN:  And placed in an unmarked

8    van.  And then so that's the arrest, your Honor.

9         The second piece is everything that

10   happened over the course of the next 20 hours,

11   which I know you've already spoken with, with

12   other counsel here today, but that unusual

13   circumstance of hop-scotching across multiple

14   state lines and then getting taken to Louisiana

15   really early the next morning.

16        The declarations that we have in the

17   record, your Honor, combined more than 40 years

18   of immigration experience in the New England

19   area, and all of those practitioners say that

20   they have never seen, nor heard, of someone get

21   taken in three different states over the course

22   of just a few hours.

23        And practitioners here in Vermont, too,

24   have said both -- excuse me, Attorney Stokes and

25   Attorney Diaz, that neither of them had seen

98

1    someone taken out of state and placed in

2    St. Albans.  And that was particularly important

3    because St. Albans is the only location where

4    someone can be held in immigration detention and

5    not be on the Vermont Department of Corrections

6    public website within an hour.  So, again,

7    that's another set of circumstances which was

8    highly unusual.

9         Even taking the government at its word,

10   which there is directly contradictory evidence

11   in the record that there were bed space

12   available in New England, so that's something

13   that petitioner heavily contests.

14        But even, for the sake of argument,

15   taking of the government at its word, why did

16   Ms. Ozturk need to be taken three different

17   states away to get a plane from the Burlington

18   airport rather that being held in Burlington,

19   Massachusetts, which is the typical course of

20   practice and then get taken from Logan Airport

21   to Louisiana?

22        All across the board, your Honor, these

23   were unusual steps that were designed to punish

24   Ms. Ozturk for her protected speech, chill her

25   speech, and send a very chilling message to

99

1    everyone who was watching -- and the government

2    does know that people are watching -- that if

3    you engage in speech that the Administration

4    disagrees with, you are going to be punished.

5         And that chilling aspect was something

6    that was recognized both by the Ragbir court and

7    by the Guitierrez court as something that sends

8    a message not just to the petitioner themselves

9    but to other noncitizens.  That's an additional

10   First Amendment injury that's appropriate for

11   the Court to address in a habeas proceeding.

12        THE COURT:  Okay.  So let me just ask you

13   about your alternative proposal.

14        MS. ROSSMAN:  Yes, your Honor.

15        THE COURT:  You know, you've heard what

16   the standard procedures are here for

17   establishing bail.  I mean, to get a full

18   hearing, to have a full hearing in regard to all

19   of the conditions that have to be imposed to

20   make sure that a person does not provide a risk

21   to the community and a risk of flight ordinarily

22   requires a lot.

23        And it also gives the parties an

24   opportunity to introduce the evidence that they

25   want to introduce, including the evidence that

100

1        you want to introduce in regard to how this was

2        unusual.  That may be relevant to the issue of

3        whether she should be released.  That is, the

4        viability of her due process claim.

5            All right?

6            MS. ROSSMAN:  Uh-huh (affirmative).

7            THE COURT:  So that could happen.

8            The second proposal that you have is to

9        have her transferred back here, both for

10       assisting your representation for the hearing,

11       the ultimate hearing but, also, for a bail

12       hearing.  And that is, to have her present so

13       that you could address all these various issues

14       that the Court addresses whenever it releases a

15       person into the community.

16           So what is your -- I mean, I know that

17       this is an alternative, but what is your

18       objection to essentially an order that she be

19       transferred back here and that we have a bail

20       hearing in regard to her release on the habeas

21       case and then ultimately have her here for the

22       hearing?

23           MS. ROSSMAN:  So if I'm understanding

24       your Honor correctly, what you're suggesting as

25       an alternative is sort of what is our response

101

1    to you, rather than automatically

2    getting bail --

3         THE COURT:  And I'm going to ask the

4    other side the same.

5         What's the problem with that?

6         MS. ROSSMAN:  And as a part of that

7    suggestion, your Honor, are you suggesting that

8    Ms. Ozturk would be immediately returned to the

9    District of Vermont during the pendency of those

10   proceedings?

11        Is that what --

12        THE COURT:  Well, that's what you're

13   seeking.

14        MS. ROSSMAN:  That is our alternative,

15   that is correct, your Honor.

16        Well, of course, petitioners do believe

17   that there's already a record right now that

18   would enable a determination of bail,

19   particularly given the multiple opportunities

20   the government has had to put record evidence in

21   to oppose any seeking of bail, and they have

22   never done so.

23        We have no reason to believe, nor does

24   this Court have any basis to believe that they

25   would put forward something to counteract the

102

1    showing that Ms. Ozturk has made that she has

2    satisfied the bail requirements.  So we do think

3    that has been satisfied on the papers.

4         That being said, under our alternative of

5    having Ms. Ozturk returned here, we think it's

6    well within this Court's authority, both as an

7    equitable habeas court, which your Honor has

8    already recognized has flexibility in terms of

9    orders, and under the All Writs Act to order

10   Ms. Ozturk to be immediately returned to Vermont

11   so that she could have access to counsel.

12        And, of course, I think one additional

13   component we would say, your Honor, is if the

14   Court is inclined to set an additional

15   evidentiary hearing for a bail proceeding, which

16   our suggestion would be that our papers submit,

17   but if your Honor would want to have additional

18   hearings, that that occur, as everything already

19   has with this Court, as expeditiously as

20   possible, particularly in light of some of the

21   educational deadlines that Ms. Ozturk has.

22        There are proceedings within her -- she

23   has a conference that she's meant to be

24   attending at the end of this month, and she also

25   has specific dates with respect to her doctoral

103

1    review that is also in the upcoming month.

2           Every day that she remains in detention,

3    your Honor, is both harming her in terms of her

4    ability to continue with her education.  It's

5    also a continued First Amendment violation of

6    both her rights and sends a very dangerous

7    message to everyone else that if you do

8    something against the government in terms of

9    your speech, you're going to be punished.

10           THE COURT:  All right.  Thank you.

11           Okay, Mr. Drescher?

12           MS. LAFAILLE:  Your Honor, with

13    Mr. Drescher's indulgence, I just wanted to

14    respond to a couple of points.

15           Your Honor asked me about Attorney

16    Khanbabai's efforts to locate Ms. Ozturk prior

17    to 10:02.  The declaration at Paragraph 6 and 7

18    talks about efforts that evening, but just to

19    confirm, that prior to 10:02 Attorney Khanbabai

20    had also done those things; calling ICE

21    Enforcement and Removal Operations and calling

22    ICE Homeland Security Investigations, ICE HSI

23    and ERO to look for Ms. Ozturk and checking the

24    detaining locator.

25           And then in response to your Honor's

104

1        colloquy to Mr. Drescher about the spirit of the

2        order and the letter of the order, the case I

3        had cited to your Honor is Stetson, which is

4        cited on Page 23 of our bail and return motion.

5              THE COURT:  Okay.

6              MS. LAFAILLE:  Thank you.

7              THE COURT:  All right.  Okay.

8              MR. DRESCHER:  Before I get into the

9        question of bail, on the question of what to

10       make of the Court's order in Massachusetts, it

11       occurred to me after I sat down that the

12       District of Massachusetts has had a chance to

13       deal with its perception of what happened there

14       and could have investigated it further, could

15       have done -- could have made a finding about

16       that, and what they did was they transferred the

17       case up here.  I just wanted to sort of note

18       that as another consideration.

19             THE COURT:  Interesting.  They

20       transferred the case up here and then basically

21       made a conclusion that filing in Massachusetts

22       was really just like filing in Vermont because

23       obviously this is the district of confinement

24       and that essentially the whole record would be

25       as of the 10:02 filing date.

105

1    And essentially what they would be

2    suggesting is, I think they are suggesting that

3    it's filed in Vermont as of 10:02.  I thought

4    that was the thrust of Judge Casper's opinion.

5         MR. DRESCHER:  I agree that that was the

6    thrust of her opinion, but she also noted that

7    it was going to be for this Court to figure out

8    whether it had jurisdiction.

9         THE COURT:  Yes, absolutely, and I think

10    that that's true of 1631 always; that when you

11    transfer it, it's your assessment that that

12    jurisdiction or that court would have

13    jurisdiction, but that's up for that court to

14    make a determination and that's why we're here.

15         MR. DRESCHER:  On the question of bail,

16    our threshold position is that especially in

17    light of subsequent statements in Jennings and

18    Velasco Lopez that are more recent than both

19    Mapp and Elkimya, I think there is a legitimate

20    question as to whether the INA would permit the

21    Court to release petitioner on bail.  A lot of

22    that dovetails with the same jurisdictional

23    arguments we've made.

24         THE COURT:  Right.

25         MR. DRESCHER:  And which is our appeal,

106

1      our threshold position that the Court does not

2      have habeas jurisdiction and, therefore, does

3      not have inherent authority to release

4      petitioner on bail.

5           With regard to the questions of the Mapp

6      factors, I just have a couple of responses.

7           One of the arguments that has been made,

8      I believe, in the papers and today, is that

9      being detained stifles a person's ability to

10     speak and is inherently a violation of the First

11     Amendment.  I don't think that -- I don't think

12     that's a tenable argument.

13          If that were a tenable argument, being

14     detained, anybody who's detained is having their

15     First Amendment violated and so -- and it's

16     certainly not an extraordinary circumstance

17     among people who are detained.  They -- it's

18     part and parcel of being detained.  You know,

19     you have -- you have less of a voice.

20          THE COURT:  Well, there are a couple of

21     concerns in regard to the First Amendment, so --

22     and they're different.

23          It seems to me that what the petitioners

24     are raising here is an argument that her

25     violation -- her First Amendment rights were

107

1    violated.  It's not based upon the fact that

2    other people would be discouraged in regard to

3    whether they would make statements in the

4    community.  It is her particular rights that

5    are -- that are at risk.

6         And, you know, frankly, I would focus

7    mostly on the time of detention.  At that

8    particular time their argument is, first, that

9    her First Amendment rights are being

10   prosecuted -- are being violated, and that's

11   obviously the basis of their claim for release.

12        And then, second, is how it happened, how

13   the arrest took place, whether she was

14   permitted knowing where she was going or her

15   lawyers knowing where she was going, or the fact

16   is that she was really sort of denied the

17   ability to get to a court.  That's her second

18   Fifth Amendment claim.

19        I'm not so sure the impact in the

20   community about other people's First Amendment

21   rights being impacted is the core of their

22   argument.

23        MR. DRESCHER:  Okay.

24        So, yeah, going through the Mapp factors,

25   I appreciate that she's making an argument.  Her

108

1    habeas theory is that her detention is a
2    violation of her First and Fifth Amendment
3    rights.  I appreciate that the circuit in <u>Ragbir</u>
4    articulates that that can be a basis for habeas
5    jurisdiction but only in the absence of the
6    availability of a petition for review, which
7    we've already gone over.
8          THE COURT:  Can I ask you, throwing out
9    this possibility of having her coming back here
10   to address her constitutional claims, her habeas
11   with an order, of course, that it would have no
12   impact on the removal proceedings.  It would be
13   necessary to have her here because we would be
14   addressing issues about release, and this would
15   be for the hearing on her claims and she would
16   be able to assist counsel.
17         My question is, how are you prejudiced by
18   that proceeding?
19         MR. DRESCHER:  I believe the papers
20   make -- state our position that -- well, I'm
21   going to take a half a step back.
22         Generally speaking our papers argue that
23   the law is clear that the Court doesn't have
24   jurisdiction to like dictate place of
25   confinement.

109

1          THE COURT:  Correct.

2          MR. DRESCHER:  But I appreciate your

3     point.

4          THE COURT:  This is the hypothetical to

5     say that the Court has jurisdiction.  The Court

6     would take Velasco Lopez and Ragbir and say,

7     okay, we have jurisdiction to address the habeas

8     issue.  Why not do that at the same time that

9     the removal proceedings continue on?

10          And why are you prejudiced by that?

11          MR. DRESCHER:  I don't know -- I mean, if

12     your Honor wants to writ petitioner to Vermont

13     for purposes of being present in court for a

14     hearing, other than the extent to which that

15     interferes with ICE's ability to dictate where

16     she would be held, you know, as an advocate, I

17     don't think that would be prejudicial.

18          You know, we have defendants or

19     plaintiffs personally in court all the time.  If

20     there is a prejudice, then I'm really not

21     prepared to get into the nooks and crannies of

22     this because I didn't anticipate your Honor's

23     question.

24          It would be in the operations of, you

25     know, immigration detention whose custody would

110

1    she be in.  Where are there beds?  Those types

2    of -- those types of issues that, you know, in

3    the criminal context, as your Honor knows, she

4    could be housed in Rhode Island or upstate New

5    York or any number of other facilities.  Or down

6    the street as well, for sure, in the criminal

7    context.

8         What is available if she's in ICE custody

9    is not clear, and there could very well be

10   prejudice to ICE's operations in that regard.

11        But I also don't want to get ahead of

12   myself.  You know, the -- I don't know the

13   extent of potential prejudice is sort of the

14   threshold answer to your Honor's question.

15        THE COURT:  No, I appreciate that honest

16   response.

17        MR. DRESCHER:  And so, yeah, we don't

18   think that she's -- I appreciate, you know, in

19   the verbiage of Ragbir she makes a

20   constitutional claim and that's, of course,

21   something that -- something that the 2nd Circuit

22   has acknowledged can be concerning and can be

23   the basis of habeas in the absence of petition

24   for review.

25        The viability of success on that claim

111

1     given the jurisdictional challenges, given the

2     presence of the INA, given the actual rational

3     in Ragbir, relying on the absence of a petition

4     for review as a basis for asserting habeas

5     jurisdiction I think calls into question,

6     there's sufficient jurisdictional concerns about

7     what this -- if this Court were to assert habeas

8     jurisdiction, it certainly calls into question

9     the prospect of success were the Court to issue

10    habeas relief.

11         Even the 1631 transfer, albeit it's

12    happened before, it happened from New York to

13    New Jersey recently, you know, as the Court in

14    New Jersey certainly suggested by certifying the

15    question, it's some potentially shaky

16    jurisdictional footing, and that also undermines

17    the prospect of success in court on a habeas

18    theory.

19         And, your Honor, if your Honor has

20    additional questions --

21         THE COURT:  Okay, so I'd like to

22    change -- I appreciate that and, you know, I

23    think the argument is over.

24         I'd like to ask both counsel how long you

25    would anticipate a habeas hearing to last if I

112

1    was to assume jurisdiction?

2         And, in particular, you've noticed that

3    this Court has made a real effort to move this

4    along quickly.  And whether or not the

5    petitioner is here or not, if I assume

6    jurisdiction, the case is going for a habeas

7    hearing, and my question is how long would the

8    hearing last?

9         And I would anticipate scheduling this

10   hearing in May, and my question is whether that

11   is realistic.

12        So first from the government.

13        MR. DRESCHER:  This is another "I don't

14   know", and I would have to consult with lawyers

15   more experienced in habeas than I am.

16        You know, it may be -- I don't know what

17   the evidence would look like.  I mean, I

18   appreciate what's in the record.  It may be that

19   you don't have to take testimony if the record

20   can be made on the papers, but I don't know that

21   and I would ask for a chance to get back to the

22   Court on that.

23        THE COURT:  Okay.  Yeah, if you can

24   notify the Court.

25        So how about from the petitioner?

113

1          MS. ROSSMAN:  Thank you, your Honor.  I
2     think we, similarly, would want to, with your
3     indulgence, make sure we speak with immigration
4     counsel as well and perhaps submit a short
5     supplement to answer your question.
6          THE COURT:  Yeah, so let me ask both
7     sides just to have a short supplement.  If the
8     Court were to accept habeas jurisdiction,
9     schedule a habeas hearing, I would hope to do
10    that in May.
11         Tell me if that is viable, a viable
12    schedule in light of the complexities of this
13    case, in light of the evidence that you would
14    hope to introduce.
15         MS. ROSSMAN:  Thank you, your Honor.  I
16    will say the two things that I can say for
17    certain right now is from petitioner's side we
18    both appreciate how quickly the Court has been
19    moving on this and that we, as well, would move
20    at as quick a speed as this Court could do to
21    make it happen.
22         So in terms of timing, we would be ready
23    at the Court's earlier convenience to have a
24    hearing and would make ourselves available to do
25    so.

114

1          With respect to the amount of time that

2     the hearing itself could take, we can submit a

3     supplement.

4          THE COURT:  Okay.  Well, I really

5     appreciate the professionalism of the argument.

6     This was very well argued, and I'll take the

7     matter under advisement.

8          Are there any other issues that you want

9     to address at this point?

10          MR. DRESCHER:  Not from respondents, your

11     Honor.

12          MS. ROSSMAN:  Not at this time, your

13     Honor.  Thank you.

14          THE COURT:  Okay.  Thank you very much.

15          (End of hearing at 12:15 p.m. and end of

16     transcript of same.)

17

18

19

20

21

22

23

24

25

115

1                    C E R T I F I C A T E

2

3          I, SARAH M. BENTLEY, Certified Court

4    Reporter, Registered Professional Reporter and Notary

5    Public, do hereby certify that the said proceedings

6    were taken in machine shorthand by me at the time and

7    place aforesaid and were thereafter reduced to

8    typewritten form under my direction, Pages 1 - 115;

9    that the foregoing is a true, complete, and correct

10   transcript of said proceedings.

11          I further certify that I am not employed

12   by, related to, nor counsel for any of the parties

13   herein, nor otherwise interested in the outcome of

14   this litigation.

15          IN WITNESS WHEREOF, I have affixed my

16   signature and seal this 15th day of April, 2025.

17

18

19                    /s/ Sarah M. Bentley, RPR

20                    SARAH M. BENTLEY, CCR-B-1745

21

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

RUMEYSA OZTURK,                    )
                                  )
            Petitioner,           )
                                  )
      v.                          )    Case No. 2:25-cv-374
                                  )
DONALD J. TRUMP, in his           )
official capacity as              )
President of the United           )
States; PATRICIA HYDE, in her     )
official capacity as the New      )
England Field Director for        )
U.S. Immigration and Customs      )
Enforcement; MICHAEL KROL, in     )
his official capacity as HSI      )
New England Special Agent in      )
Charge, U.S. Immigration and      )
Customs Enforcement; TODD         )
LYONS, in his official            )
capacity as Acting Director,      )
U.S. Immigration and Customs      )
Enforcement; KRISTI NOEM, in      )
her official capacity as          )
Secretary of the United           )
States Department of              )
Homeland Security; and MARCO      )
RUBIO, in his official            )
capacity as Secretary of          )
State,                            )
                                  )
            Respondents.          )

**OPINION AND ORDER**

Petitioner Rumeysa Ozturk was arrested by United States

Immigration and Customs Enforcement ("ICE") agents in

Massachusetts on March 25, 2025 and is currently in immigration

detention at a correctional facility in Louisiana. Ms. Ozturk

filed this habeas petition under 28 U.S.C. § 2241 against

JA-000409

Respondents Donald J. Trump, Patricia Hyde, Michael Krol, Todd
Lyons, Kristi Noem, and Marco Rubio (collectively "the
government"), alleging she was arrested and detained in
violation of her First Amendment and Fifth Amendment rights and
the Administrative Procedure Act ("APA").

Ms. Ozturk's original petition (the "Petition") was filed
in the District of Massachusetts. Because Ms. Ozturk was, at the
time of the filing, detained in Vermont, the Massachusetts
district court transferred this action to the District of
Vermont pursuant to 28 U.S.C. § 1631. ECF No. 42.

The instant matter concerns the government's motion to
dismiss this case. The parties dispute whether this Court has
jurisdiction to grant Ms. Ozturk the relief she requests. The
matter also concerns Ms. Ozturk's motion for an order of
immediate release pending the adjudication of her habeas claims
or, in the alternative, an order transferring Ms. Ozturk back to
the District of Vermont.

For the reasons set forth below, the Court finds that it
has jurisdiction to consider Ms. Ozturk's habeas petition. The
Court further finds that Ms. Ozturk has raised significant
constitutional concerns with her arrest and detention which
merit full and fair consideration in this forum. Accordingly,
the Court denies the government's request to dismiss the
Petition and orders that Ms. Ozturk be transferred to ICE

2

JA-000410

custody within the District of Vermont pending further hearings
on this matter.

## Factual Background

### I.   Ms. Ozturk's Op-ed in a School Newspaper

Ms. Ozturk and three other students coauthored a March 26,
2024 editorial in the Tufts University school newspaper, *The
Tufts Daily*. The editorial, which to date still appears on the
*Tufts Daily* website, criticized the university administration's
dismissal of several resolutions passed by the student senate
that demanded the university acknowledge the existence of an
ongoing genocide in Palestine, apologize for statements made by
the university president, and disclose its investments in and
divest from companies with ties to Israel.

The editorial criticized the university for
"mischaracteriz[ing]" the student senate's stances as divisive
and stated, "[w]e, as graduate students, affirm the equal
dignity and humanity of all people[.]" Rumeysa Ozturk et al.,
*Op-ed: Try again, President Kumar: Renewing calls for Tufts to
adopt March 4 TCU Senate resolutions*, The Tufts Daily (Mar. 26,
2024), https://www.tuftsdaily.com/article/2024/03/4ftk27sm6jkj.
It urged the university administration "to meaningfully engage
with and actualize the resolutions passed by the Senate." *Id.*
The op-ed expresses agreement between Graduate Students for
Palestine and three other campus groups, including Tufts

JA-000411

Students for Justice in Palestine, about the university's
response to the Senate resolutions. In the fall of 2024, Tufts
University temporarily suspended Tufts Students for Justice in
Palestine. Estelle Anderson, *Tufts SJP disaffiliates from Tufts
after university suspends group until Jan. 2027*, The Tufts Daily
(Nov. 21, 2024), https://www.tuftsdaily.com/article/
2024/11/tufts-sjp-disaffiliates-from-tufts-after-university-
suspends-group-until-jan-2027. Ms. Ozturk has not been alleged
to be a member of that group, and the suspension occurred
several months after the op-ed was published.

In an April 1, 2025, declaration, Sunil Kumar, the Tufts
University president, attested that the opinion piece co-
authored by Ms. Ozturk "was not in violation of any Tufts
policies" and that "no complaints were filed with the University
or, to our knowledge, outside of the University about this op-
ed." ECF No. 26-1 at 67. The declaration noted that the
newspaper also published other "op-eds on multiple sides of the
issue with opinions that were shared just as strongly as the op-
ed Ms. Ozturk co-authored." *Id.*

## II.  Ms. Ozturk's Arrest and Detention

Ms. Ozturk is a Turkish national and doctoral candidate in
Child Study and Human Development at Tufts University. ECF No.
42 at 1-3. On June 28, 2024, she entered the United States
pursuant to a validly issued F-1 student visa. *Id.* at 3. On

4

JA-000412

March 21, 2025, the government revoked Ms. Ozturk's visa,
potentially subjecting her to removal from the United States.
ECF No. 91-1 at 6. Pursuant to 8 U.S.C. § 1227(a)(1)(B), "[a]ny
alien who is present in the United States . . . whose
nonimmigrant visa (or other documentation authorizing admission
into the United States as a nonimmigrant) has been revoked under
section 1201(i) of this title, is deportable."

Prior to her arrest, ICE determined that it would take Ms.
Ozturk to a detention facility in Louisiana. According to ICE,
"there was no available bedspace for [her] at a facility where
she could appear for a hearing" in New England and "[t]ransfers
out of state . . . are routinely conducted after arrest, due to
operational necessity and considerations." ECF No. 19-1. Ms.
Ozturk has submitted affidavits from several experienced New
England immigration attorneys stating that immigration detainees
are typically booked and processed at the ICE Boston Field
Office in Burlington, Massachusetts before being sent to a
detention facility. ECF Nos. 26-3, 26-4, 26-6. She also
submitted an affidavit from an experienced Maine immigration
attorney stating that based on the attorney's review of records
from the Cumberland County Jail, the facility had at least
sixteen open beds to house female detainees on March 25 and 26,
2025. ECF No. 26-5 at 3

JA-000413

Ms. Ozturk was not notified promptly of her student visa's revocation. On March 25, 2025, at approximately 5:25 p.m., Ms. Ozturk was near her residence in Somerville, Massachusetts when a hooded and masked officer in plainclothes approached her and grabbed her wrists. ECF No. 42 at 3. Five additional officers then surrounded her, took her cell phone, and handcuffed her. Ms. Ozturk was driven away in an unmarked vehicle. *Id.*

ICE agents took Ms. Ozturk to Methuen, Massachusetts, arriving at 6:22 p.m. that day. ECF No. 19-1 at 2. Shortly thereafter, the agents and Ms. Ozturk departed for Lebanon, New Hampshire. *Id.* At approximately 9:03 p.m., ICE agents began transporting Ms. Ozturk to the ICE Field Office in St. Albans, Vermont. *Id.* At approximately 10:02 p.m. on March 25, 2025, having been unable to speak to Ms. Ozturk or otherwise ascertain her location after attempting to do so, Ms. Ozturk's counsel filed a habeas petition in the District of Massachusetts. ECF No. 42 at 4. At that time, Ms. Ozturk was in Vermont en route to the St. Albans Field Office.

At approximately 10:55 p.m. that night, the District of Massachusetts court ordered that Ms. Ozturk "shall not be moved outside the District of Massachusetts without first providing advance notice of the intended move." ECF No. 3 at 2; ECF No. 42 at 5. The order stated that "[s]uch notice shall be filed in writing on the docket in this proceeding, and shall state the

6

reason why the government believes that such a movement is necessary and should not be stayed pending further court proceedings." ECF No. 3 at 2. The order noted that "[i]n order to give the court an opportunity to consider whether it has subject-matter jurisdiction, and if so to determine the validity of the habeas petition, the court may order [the] respondent to preserve the status quo." *Id.*

Both the Petition and the order were transmitted to the United States Attorney's Office on the night of March 25, 2025. ECF No. 26-2 at 2-3. When asked at oral argument about the government's knowledge of the order when it was issued, its counsel stated, "I don't know who learned about that order and when. . . . I'm not able to speak to the factual flow of information." ECF No. 98 at 37.

Ms. Ozturk arrived at the St. Albans Field Office at 10:28 p.m. on March 25, 2025 and was kept in custody there overnight. ECF No. 19-1 at 2. On the morning of March 26, 2025, at approximately 4:00 a.m., ICE agents transported Ms. Ozturk to the Burlington, Vermont airport and placed her on a plane to Louisiana. *Id.* at 3. Ms. Ozturk arrived in Alexandria, Louisiana at 2:35 p.m. and was taken to the South Louisiana Correctional Facility, where she is presently detained. *Id.*

Between the evening of March 25, 2025 and the afternoon of March 26, 2025, Ms. Ozturk's counsel repeatedly attempted to

7

ascertain her location, to no avail. ECF No. 26-2 at 3. Although
Ms. Ozturk's attorney checked ICE's Detainee Locator System
online several times, the "current detention facility" section
was blank. *Id.* Counsel's inquiries about Ms. Ozturk's location
to ICE's Enforcement and Removal Operations ("ERO") division in
Burlington, Massachusetts and Homeland Security Investigations
("HSI") in Boston, Massachusetts went unanswered. *Id.*

When a representative of the Turkish consulate went in
person to ICE offices in Burlington, Massachusetts on March 26
to inquire about Ms. Ozturk's whereabouts, the representative
was told that ICE did not have information about where she was.
*Id.* Ms. Ozturk's counsel also called Rayford Farquhar, the Chief
of Defensive Litigation in the Civil Division at the United
States Attorney's Office in the District of Massachusetts and
emailed Assistant United States Attorney Mark Sauter on the
morning of March 26 to ask about Ms. Ozturk's location and
notify them that her asthma medication was not with her when she
was detained. Mr. Farquahar and Mr. Sauter both responded that
they did not know Ms. Ozturk's location. *Id.* Ms. Ozturk's
counsel emailed them again in the early afternoon of May 26, and
Mr. Sauter responded that he was still attempting to obtain
information about Ms. Ozturk's whereabouts. *Id.* at 3-4.

That afternoon, Ms. Ozturk's counsel filed an emergency
motion asking the District of Massachusetts court to order the

8

government to disclose Ms. Ozturk's location and permit her to
speak to her attorney. ECF No. 42 at 6. The motion noted that
counsel had just been informed by a U.S. Senator's office that
Ms. Ozturk was in Louisiana but had not received confirmation of
her location from ICE or the government's counsel. *Id.* At
approximately 3:27 p.m., Mr. Sauter told Ms. Ozturk's counsel
that ICE had informed him that she was transferred to Louisiana
that morning and was en route to a detention facility. ECF No.
26-2 at 4. Mr. Sauter's email stated, "I continue to ask ICE for
the detention facility that she will be placed and that she be
permitted to contact you." *Id.* (internal quotation marks
omitted). After Mr. Sauter and Ms. Ozturk's counsel exchanged
several more emails, Ms. Ozturk spoke to her attorney at 9:45
p.m. on March 26, more than 24 hours after her arrest. *Id.* at 5.

## III. Ms. Ozturk's Revocation and Removal Proceedings

According to a memorandum by John L. Armstrong (hereinafter
"Armstrong Memorandum"), a senior bureau official of the Bureau
of Consular Affairs, the Bureau of Consular Affairs had approved
revocation of Ms. Ozturk's F-1 visa pursuant to a request from
ICE and the Department of Homeland Security ("DHS") on March 21,
2025. ECF No. 91-1 at 6. According to the memo, ICE and DHS had
made an assessment that Ms. Ozturk "had been involved in
associations that 'may undermine U.S. foreign policy by creating
a hostile environment for Jewish students and indicating support

JA-000417

for a designated terrorist organization' including co-authorizing an op-ed that found common cause with an organization that was later temporarily banned from campus. . . ." *Id.* The memo also noted, "[d]ue to ongoing ICE operational security, this revocation will be silent; the Department of State will not notify the subject of the revocation." *Id.*

Ms. Ozturk was served with a Notice to Appear ("NTA") on March 25, 2025, while in custody. ECF No. 19-1 at 3. The NTA cites Section 237(a)(1)(B) of the Immigration and Nationality Act ("INA"), which applies to individuals whose nonimmigrant visas have been revoked, as the basis for her removal. ECF No. 12-2; 8 U.S.C. § 1227(a)(1)(B). A March 25, 2025 letter, which was addressed to Ms. Ozturk but not provided to her prior to her arrest, also cites the INA provision codified at 8 U.S.C. § 1227(a)(4)(C)(i) as a possible basis for termination of her Student Exchange Visitor Information System ("SEVIS") designation. ECF No. 42 at 7. This provision states that "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1227(a)(4)(C)(i).

The government has not represented that revocation of Ms. Ozturk's visa was based on 8 U.S.C. § 1227(a)(4)(C)(i). In its briefing, the government acknowledges that the "statute is

10

mentioned [in the March 25, 2025 letter] as one of two possible reasons why Petitioner's SEVIS record was terminated" but states "that data entry into a DHS information system is not a State Department record, and does not speak for the State Department." ECF No. 83 at 21 n.5.

The NTA ordered Ms. Ozturk to appear before an immigration judge in Louisiana on April 7, 2025, although that hearing was later canceled. ECF No. 66 at 22. On April 14, 2025, Ms. Ozturk submitted a request for a bond hearing in immigration court. On April 16, 2025, an immigration judge denied her request for a change in custody status and provided "Danger and Flight Risk" as the rationale. ECF No. 101-1 at 4.

## IV. The Pending Proceedings

Ms. Ozturk filed an amended petition and complaint on March 28, 2025. ECF No. 12. The same day, the Massachusetts district court ordered Ms. Ozturk not to be removed from the United States until further order of the court and ordered the government to file a response by April 1, 2025. ECF No. 16. The government timely filed a response, and Ms. Ozturk filed her reply on April 2, 2025. ECF Nos. 19, 26. On April 3, 2025, the District of Massachusetts held a hearing on the amended petition. ECF No. 41.

On April 4, 2025, the Massachusetts district court denied the government's motion to dismiss the petition and its

11

alternative request to transfer the matter to the Western
District of Louisiana. The court instead transferred the case to
the District of Vermont "in the interest of justice" pursuant to
28 U.S.C. § 1631.

At a status conference on April 7, 2025, this Court ordered
the parties to submit supplemental briefing citing Second
Circuit law on their jurisdictional arguments. ECF No. 60. On
April 10, 2025, Ms. Ozturk filed a supplemental memorandum on
the jurisdictional issues as well as a motion for her release,
or in the alternative, a motion to return her to the District of
Vermont. ECF Nos. 81, 82. The government filed its supplemental
briefing in opposition on these issues. ECF Nos. 83, 84. The
Court heard oral argument from the parties on April 14, 2025 and
took the matter under advisement.

## Discussion

Pending before the Court is Ms. Ozturk's habeas corpus
petition and the government's request for the petition to be
dismissed. As a threshold matter, Ms. Ozturk argues that the
District of Vermont has jurisdiction and is the proper court
after the District of Massachusetts' transfer pursuant to 28
U.S.C. § 1631. The government argues that § 1631 cannot supply
this Court with jurisdiction and that the petition should be
dismissed because the proper forum is the Western District of
Louisiana, where Ms. Ozturk is currently confined. The parties

12

also dispute whether certain provisions of the INA bar review of
Ms. Ozturk's habeas claims.

Ms. Ozturk's substantive constitutional claims center on
alleged violations of her First and Fifth Amendment rights. In
support of her First Amendment claim, she has submitted evidence
to show that the actions against her were retaliatory, as the
only identifiable conduct supporting her detention is her co-
authoring of a Tufts University op-ed. The government has
submitted no evidence to counter her First Amendment claim. Ms.
Ozturk's Fifth Amendment claim asserts due process violations.
Finally, Ms. Ozturk requests immediate release on bail pending
the outcome of the habeas review, while the government argues
that bail or bond can only be sought from an immigration judge.
In the alternative, Ms. Ozturk requests she be returned to
custody in Vermont where she can work with counsel to prepare
her legal claims. The Court will first address the
jurisdictional questions.

## I.   Habeas Corpus Jurisdiction

### A. Legal Standards

Ms. Ozturk filed her habeas petition pursuant to 28 U.S.C.
§ 2241. Generally, "[w]henever a § 2241 habeas petitioner seeks
to challenge his present physical custody within the United
States, he should name his warden as respondent and file the
petition in the district of confinement." *Rumsfeld v. Padilla*,

13

542 U.S. 426, 447 (2004). This rule is "derived from the terms
of the habeas statute," *id.*, which only permits district courts
to grant habeas relief "within their respective jurisdictions,"
28 U.S.C. § 2241(a).

The federal habeas statute further states that a petition
must allege "the name of the person who has custody over him."
28 U.S.C. § 2242; *see* 28 U.S.C. § 2243 ("The writ, or order to
show cause shall be directed to the person having custody of the
person detained."). The Supreme Court has interpreted this
statutory language as requiring the petitioner to name as the
respondent her "immediate custodian[,]" who, "[b]y
definition . . . reside[s] in the same district" as the
petitioner. *Padilla*, 542 U.S. at 444. "[T]he default rule is
that the proper respondent is the warden of the facility where
the prisoner is being held, not the Attorney General or some
other remote supervisory official." *Id.* at 435. These
jurisdictional rules for habeas petitions do not implicate the
Court's subject-matter jurisdiction and are treated functionally
as matters of personal jurisdiction or venue. *See id.* at 434 n.7
(explaining that the Court uses the word "'jurisdiction . . . in
the sense that it is used in the habeas statute, 28 U.S.C. §
2241(a), and not in the sense of subject-matter jurisdiction of
the District Court"); *id.* at 451 (Kennedy, J., concurring) ("In
my view, the question of the proper location for a habeas

14

petition is best understood as a question of personal
jurisdiction or venue.").

Because Ms. Ozturk was in Vermont when her counsel filed
the pending habeas petition in the District of Massachusetts,
the petition was not filed in her district of confinement. Nor
did it name her immediate custodian (who presumptively would
have been in the District of Vermont). The government argues
that the § 1631 transfer by the District of Massachusetts is
insufficient to cure these jurisdictional defects, and that the
only forum where Ms. Ozturk's petition may properly be brought
is the Western District of Louisiana. The Court therefore
addresses, in turn, (1) whether the District of Massachusetts §
1631 transfer was proper, (2) whether the § 1631 transfer cures
the original petition's failure to comply with the district of
confinement rule, and (3) whether this Court has jurisdiction
despite the petition's alleged failure to identify any immediate
custodian.

**B. The Section 1631 Transfer**

Under 28 U.S.C. § 1631:

[w]henever a civil action is filed in a court as
defined in section 610 of this title or an appeal,
including a petition for review of administrative
action, is noticed for or filed with such a court and
that court finds that there is a want of jurisdiction,
the court shall, if it is in the interest of justice,
transfer such action or appeal to any other such court
(or, for cases within the jurisdiction of the United
States Tax Court, to that court) in which the action

15

or appeal could have been brought at the time it was
filed or noticed, and the action or appeal shall
proceed as if it had been filed in or noticed for the
court to which it is transferred on the date upon
which it was actually filed in or noticed for the
court from which it is transferred.

It is well-established in the Second Circuit that habeas
petitions may be transferred under § 1631. *See, e.g., Liriano v.
United States*, 95 F.3d 119, 123 (2d Cir. 1996) (holding that
when a second or successive petition for habeas corpus is filed
in district court without the requisite authorization of the
Second Circuit, "the district court should transfer the petition
or motion to this Court in the interest of justice pursuant to §
1631"); *Zhen Yi Guo v. Napolitano*, 2009 WL 2840400, at *6
(S.D.N.Y. Sept. 2, 2009) ("Courts have consistently found it in
the interest of justice to transfer habeas petitions when
jurisdiction is lacking." (quoting *Shehnaz v. Ashcroft*, 2004 WL
2378371, at *4 (S.D.N.Y. Oct. 25, 2004))). "When considering
whether a transfer would serve the interest of justice, [the
Court] must weigh 'the equities of dismissing a claim when it
could be transferred.'" *Ruiz v. Mukasey*, 552 F.3d 269, 276 (2d
Cir. 2009) (quoting *Liriano,* 95 F.3d at 122). Relevant equities
include whether the petitioner acted in good faith and whether a
transfer would "expedite [] review, thereby furthering the
interest of justice." *Id.*

In this case, the government does not dispute that this
petition "could have been brought" in the District of Vermont

16

"at the time it was filed[.]" 28 U.S.C. § 1631; *see* ECF No. 19 at 27 ("It is true that at the time Petitioner's original petition was filed, it could have been properly filed in Vermont as that is where she was then in custody."). Ms. Ozturk acted in good faith when she originally filed the petition in Massachusetts, and transfer expedited review because Ms. Ozturk would otherwise have needed to spend time refiling the petition. Because Ms. Ozturk's petition could have been brought in this Court at the time it was filed and the record supports that the equities weighed in favor of transfer, the Massachusetts district court's decision to transfer the petition to this Court complied with the requirements for transfer under § 1631. *Cf. U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 152 (2d Cir. 2019) (noting the Supreme Court's "sagacious warning" that "'[t]ransferee courts that feel entirely free to revisit transfer decisions of a coordinate court threaten to send litigants into a vicious circle of litigation,' culminating in a 'perpetual game of jurisdictional ping-pong.'" (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816, 818 (1988))).

## C. The District of Confinement Rule

Ms. Ozturk argues that because a case transferred under § 1631 "shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it

17

was actually filed in[,]" the Court should treat her petition as
if it had been filed in the District of Vermont at approximately
10:02 p.m. on March 25, 2025, in which case it would have been
filed in her district of confinement. 28 U.S.C. § 1631. The
government contends that Ms. Ozturk cannot "use § 1631 to vest
this Court with authority that it otherwise would lack by way of
statute" and that "[n]othing in § 1631 allows a district court
to somehow blow past" § 2241's statutory requirements "based on
the fiction that the suit was properly before it." ECF No. 83 at
14-15.

The government does not cite any authority holding that §
1631 cannot cure a habeas petitioner's failure to file a
petition in the correct district. Other courts have found
transfer under § 1631 to be proper where a habeas petition was
not originally filed in the district of confinement. *See, e.g.,*
*Abraham v. Decker*, 2018 WL 3387695, at *3 (E.D.N.Y. July 12,
2018) (transferring habeas petition under § 1631 because
petitioner's immediate custodian was in New Jersey, not New
York); *Golding v. Sessions*, 2018 WL 6444400, at *3 (S.D.N.Y.
Dec. 6, 2018) (same). Additionally, "[t]he legislative history
of § 1631 indicates that 'Congress contemplated that the
provision would aid litigants who were confused about the proper
forum for review.'" *Liriano*, 95 F.3d at 122. Ms. Ozturk's filing
of her habeas petition in the District of Massachusetts because

18

her counsel did not know her location — in other words, her confusion about the proper forum for review — is thus exactly the kind of jurisdictional defect § 1631 was designed to cure.

The government cites *De Ping Wang v. Department of Homeland Security*, 484 F.3d 615 (2d Cir. 2007) for the proposition that "[t]he Second Circuit has held that, while § 1631 allows a transferee court to proceed as if the case had been filed on a certain date, § 1631 does not allow courts to ignore other facts and substantive limits on jurisdiction." ECF No. 83 at 15. That case, however, is readily distinguishable. In *De Ping Wang,* the Second Circuit found that transfer under 28 U.S.C. § 1631 was improper because, even if the action in that case were correctly filed in the transferee court on the same date it was mistakenly filed in transferor, it would still have been untimely. 484 F.3d at 617-18. In contrast, filing Ms. Ozturk's petition in the District of Vermont on the same date it was filed in the District of Massachusetts would have satisfied the jurisdictional requirement that she file in her district of confinement.

A New Jersey federal court recently found transfer under § 1631 to support habeas jurisdiction under similar circumstances. *Khalil v. Joyce*, 2025 WL 972959, at *15 (D.N.J. Apr. 1, 2025). In *Khalil*, the habeas petitioner was arrested by federal officials in Manhattan but was being held in a New Jersey

19

facility when he filed his petition. *Id.* at *1. Finding that it lacked jurisdiction, the Manhattan district court transferred the petition to the District of New Jersey. In finding that it had habeas jurisdiction to proceed upon the case's transfer, the District of New Jersey court reasoned that according to the clear language of § 1631, it must treat the case as if it had been filed in New Jersey on the same date it was filed in New York. The court concluded that because "[a]t that moment, the Petitioner was in New Jersey . . . there is no missing piece of the jurisdictional puzzle[,]" and thus "the Petition counts as having been in New Jersey at the same moment the Petitioner was here." *Id.* at *15.

This Court comes to the same conclusion here. At approximately 10:02 p.m. on March 25, 2025, the moment Ms. Ozturk filed her habeas petition, she was detained in Vermont. Accordingly, for this action to "proceed as if it had been filed in or noticed for the court to which it [was] transferred on the date upon which it was actually filed[,]" the case must proceed as if it were filed in the District of Vermont while Ms. Ozturk was detained here, in which case the district of confinement rule would have been satisfied. 28 U.S.C. § 1631.

The government further argues that Ms. Ozturk's present detention in Louisiana prevents the District of Vermont from exercising habeas jurisdiction. Section § 2241(a) provides that

20

district courts may only grant a writ of habeas corpus "within
their respective jurisdictions[,]" and although Ms. Ozturk was
in this jurisdiction at the time her petition was filed, she is
no longer in the District of Vermont. Ms. Ozturk asserts that
the District of Vermont has jurisdiction notwithstanding her
transfer to Louisiana based on *Ex parte Endo*, 323 U.S. 283
(1944).

In *Ex parte Endo*, the Supreme Court recognized an exception
to the general rule that a district court only has power to
grant habeas relief when the petitioner is being held within its
jurisdiction. The *Endo* petitioner was a Japanese-American
citizen who was interned by the government during World War II.
323 U.S. at 284-85. The petitioner filed a habeas petition in a
California district court while detained in that district and,
while appealing the petition's denial, was transferred to a
detention center in Utah. *Id.* The Supreme Court held that the
petitioner's transfer to Utah after the California district
court "acquired jurisdiction in this case" did not "cause it to
lose jurisdiction where a person in whose custody [the
petitioner] is remains within the district." *Id.* at 306. In
*Padilla*, the Supreme Court recognized that,

> *Endo* stands for the important but limited proposition
> that when the Government moves a habeas petitioner
> after she properly files a petition naming her
> immediate custodian, the District Court retains
> jurisdiction and may direct the writ to any respondent

21

JA-000429

within its jurisdiction who has legal authority to
effectuate the prisoner's release.

542 U.S. at 441.

The government argues that *Ex parte Endo* does not apply
because, in this case, Ms. Ozturk "never properly filed her
habeas petition" in the District of Vermont and thus this Court
had not acquired jurisdiction prior to her transfer to a
different district. ECF No. 83 at 9 n.2. The plain language of
the transfer statute, however, states that the transferred
action "shall proceed *as if it had been filed*" in the transferee
court on the same date it was filed in the transferor court. 28
U.S.C. § 1631 (emphasis added); *see Jimenez v. Quarterman*, 555
U.S. 113, 118 (2009) ("[W]hen the statutory language is plain,
we must enforce it according to its terms.").

Had Ms. Ozturk filed her habeas petition in the District of
Vermont on March 25, 2025, the holding of *Ex parte Endo* would
squarely apply. The District of Vermont would have acquired
jurisdiction on that date, and Ms. Ozturk's transfer to
Louisiana would not have stripped the Court of its jurisdiction
because a respondent with the power to effectuate Ms. Ozturk's
release remains within the reach of the District of Vermont. *See*
*Henderson v. I.N.S.*, 157 F.3d 106, 125 (2d Cir. 1998) (noting
that there is "no question that the Attorney General has the
power to produce the petitioners" in case brought by legal
permanent residents who were ordered deported).

22

### D. The Immediate Custodian Rule

Even if this Court allows Ms. Ozturk's petition to proceed as if it had been filed on March 25, 2025, in the District of Vermont, the question remains of whether the Court could not have properly acquired jurisdiction on that date because the petition may have failed to name Ms. Ozturk's immediate custodian as a respondent.

The government contends that "Petitioner named improper respondents in her original petition because she named supervisory officials, rather than her immediate custodian in Vermont when the petition was filed." ECF No. 83 at 10. Of the supervisory officials named in the Petition, the one closest to Vermont was Ms. Hyde, the acting ICE Field Office director for New England. When presented with the question of whether an ICE Field Office director was the correct respondent in a habeas petition, other district courts in the Second Circuit have held that the correct custodian was instead the warden of the local facility where the petitioner was being held. *See Sanchez v. Decker*, 2019 WL 6311955, at *4 (S.D.N.Y. Nov. 25, 2019) (finding that the warden of the county correctional facility where petitioner was held, rather than the director of ICE's New York City Field Office, was the immediate custodian); *see also Lemus-Pineda v. Whittaker*, 354 F. Supp. 3d 473, 475 (S.D.N.Y. 2018)

23

(holding that county jail warden, rather than ICE field office director, was proper respondent).

In this case, however, Ms. Ozturk was not at a prison or jail when the Petition was filed – she was in a vehicle being transported to an ICE Field Office. There is no "warden" that Ms. Ozturk could have named. It is also not apparent to the Court that Ms. Hyde was not functionally the immediate custodian in that moment. Presumably a call from Ms. Hyde to a subordinate may have actually freed Ms. Ozturk, just as a call from a warden to a correctional officer may actually free a prisoner. At oral argument, government's counsel could not identify who that immediate custodian would have been if not Ms. Hyde. ECF No. 98 at 30. Because the government has provided insufficient facts to determine that Ms. Hyde was not Ms. Ozturk's immediate custodian, the Court will not dismiss her petition on that basis.

Regardless of whether Ms. Hyde was the immediate custodian, Ms. Ozturk argues that this case falls within an exception to the immediate custodian rule because her custodian was unknown at the time of the Petition's filing. The unknown custodian exception arises from *Demjanjuk v. Meese*, 784 F.2d 1114 (D.C. Cir. 1986), in which a habeas petitioner was held by the United States in a confidential location at the time he filed his petition. The D.C. Circuit thus ruled that "in these very

24

JA-000432

limited and special circumstances," it would consider the
Attorney General of the United States the appropriate custodian.
784 F.2d at 1116. In *Padilla*, the Supreme Court recognized this
exception by noting that although "[w]hen, as in [*Demjanjuk*], a
prisoner is held in an undisclosed location by an unknown
custodian, it is impossible to apply the immediate custodian and
district of confinement rules[,]" that was not the case in
*Padilla*. 542 U.S. at 450 n.18.

In *Khalil*, the New Jersey district court found that this
exception applied where, at the time of filing the petition,
nothing in the record showed that the petitioner's counsel could
"have determined in real time that the Petitioner had been moved
to New Jersey[.]" 2025 WL 972959, at *27. Although Mr. Khalil's
counsel attempted to locate the petitioner, the ICE Online
Detainee Locator System incorrectly indicated that he was still
being held in New York, and Mr. Khalil was not allowed to call
his attorney. Accordingly, the District of New Jersey court
concluded the unknown custodian exception applied because "the
identity of the immediate custodian [was] virtually unknowable"
when Mr. Khalil filed his habeas petition. *Id.* at *30.

The District of New Jersey court acknowledged that Mr.
Khalil's custodian subsequently became known such that the case
could "simply be dismissed and refiled in Louisiana[,]" where he
was currently being held. *Id.* at 36. It nonetheless concluded

JA-000433

that equitable concerns weighed in favor of applying the unknown

custodian exception, explaining that:

> if the exception does not apply, and the case is
> dismissed on that basis, then the implication would be
> that there can be a period of time during which a
> person can be arrested in the United States and then
> moved by federal officials, during which period no
> habeas court would have the power to hear him out ---
> even though, as here, his lawyers and family cannot
> determine where he is only because they have been
> given inaccurate information about his whereabouts,
> and because he has not been allowed to correct that
> information by making a phone call.

*Id.*

For similar reasons, this Court agrees with Ms. Ozturk that

the unknown custodian exception applies in this case. As in

*Demjanjuk*, Ms. Ozturk was being held in "an undisclosed location

by an unknown custodian" on the date her habeas petition was

filed. 542 U.S. at 450 n.18. The government does not dispute

that her counsel could not have known her location; in fact, the

government states in its briefing that it does not permit

immigration detainees "to communicate about their location while

enroute between detention facilities" because doing so "would

raise serious security concerns." ECF No. 83 at 13. The

government thus admits that from the time ICE agents arrested

Ms. Ozturk to the time she arrived at the Louisiana detention

facility, it was keeping her location a secret. And the identity

of Ms. Ozturk's actual custodian at the time of filing, if it is

not one of the Respondents, appears to still be unknown to the

government.

26

Ms. Ozturk was arrested at 5:25 pm on March 25, 2025, and
ICE did not provide her location to her counsel until the
afternoon of March 26, 2025. This made it "impossible to apply
the immediate custodian" rule for a period of nearly 24 hours
after Ms. Ozturk's initial detention. *Padilla*, 542 U.S. at 450
n.18; *see United States v. Paracha*, 2006 WL 12768, at *6
(S.D.N.Y. Jan. 3, 2006) ("Ordinarily, a habeas writ must be
served on a prisoner's immediate custodian. However, where, as
here, the immediate custodian is unknown, a writ may properly be
served on the prisoner's ultimate custodian.").

The government asserted at oral argument that under
*Padilla*, it is irrelevant whether Ms. Ozturk's counsel made
diligent efforts to ascertain her location — that does not
excuse a petitioner from the immediate custodian requirement.
The *Padilla* majority, however, had no occasion to apply the
unknown custodian exception because the facts there indicated
that the petitioner's counsel may have been "well aware" of Mr.
Padilla's presence in South Carolina before filing a habeas
petition in New York. 542 U.S. at 449 n.17. The majority
rejected the dissent's characterization of the petitioner's
location as secret, finding that "neither Padilla nor the
District court" had "ever suggested that the Government
concealed Padilla's whereabouts from counsel[.]" *Id.* In this
case, Ms. Ozturk argues, and the government does not dispute,

27

that ICE officials were intentionally concealing Ms. Ozturk's whereabouts on the day her petition was filed.

Additionally, application of the unknown custodian exception in this case would not implicate the forum-shopping concerns that underlie the immediate custodian rule. As the Supreme Court explained in *Padilla*, this rule "serves the important purpose of preventing forum shopping by habeas petitioners" because "[w]ithout it, a prisoner could name a high-level supervisory official as respondent and then sue that person wherever he is amenable to long-arm jurisdiction." 542 U.S. at 447. Here, the Court finds that Ms. Ozturk could only have filed her petition in one location: the District of Vermont.

Even if the unknown custodian rule exception did not apply here, had Ms. Ozturk correctly filed the Petition in the District of Vermont but named the incorrect custodian, this Court could have simply allowed her to amend the Petition to include the proper respondent. *See* Fed. R. Civ. P. 15(a)(1)(A) ("A party may amend its pleading once as a matter of course no later than . . . 21 days after serving it); *see also Destyl v. Garland*, 2023 WL 3603666, at *4 (W.D.N.Y. May 23, 2023) (finding "purely as a procedural matter" that the proper respondent was the officer-in-charge of the Buffalo Federal Detention Facility

JA-000436

rather than the United States Attorney General and substituting in the correct respondent).

Accordingly, the Court finds it has habeas corpus jurisdiction to consider Ms. Ozturk's petition.

## II.  Habeas Review Limitations in the Immigration and Nationality Act

Having found that habeas corpus jurisdiction is proper, the Court turns to the government's argument that the INA nonetheless bars district court review of Ms. Ozturk's habeas claims related to her detention. The government cites five provisions of the INA which they argue constrain or prohibit the Court's review: 8 U.S.C. § 1201(i); 8 U.S.C. § 1226(e); 8 U.S.C. § 1252(g); 8 U.S.C. § 1252(a)(5); and 8 U.S.C. 1252 (b)(9). For reasons set forth below, the Court finds that none of these provisions limit the Court's review where Ms. Ozturk has raised constitutional and legal challenges to her detention that are separate from removal proceedings.

### A. The Court's Review is Not Barred by § 1226(e)

Ms. Ozturk has been detained under the discretionary detention provision of the INA, codified at 8 U.S.C. § 1226(a). Section 1226 created two mutually exclusive avenues for government detention of individuals who may be subject to removal. One avenue, under the subsection titled "Detention of Criminal Aliens," requires ("shall") the government to "take

29

JA-000437

into custody" individuals who fit certain heightened criteria.
§1226(c). The other avenue – at issue in this case – entitled
"Arrest, Detention, and Release," grants the government
discretion to arrest and detain individuals: "an alien may be
arrested and detained pending a decision on whether the alien is
to be removed from the United States." 8 U.S.C. § 1226(a). The
statute also includes a subsection on judicial review. This
subsection reads in its entirety, "The Attorney General's
discretionary judgment regarding the application of this section
shall not be subject to review. No court may set aside any
action or decision by the Attorney General under this section
regarding the detention of any alien or the revocation or denial
of bond or parole." § 1226(e).[1]

The government argues that § 1226(e) precludes the Court's
review of Ms. Ozturk's detention, notwithstanding the United
States Constitution's Suspension Clause. The Suspension Clause
provides that "[t]he Privilege of the Writ of Habeas Corpus
shall not be suspended, unless when in Cases of Rebellion or
Invasion the public Safety may require it." Because of the
history and importance of the habeas corpus writ, along with a
desire to read statutes to comport with the Constitution, the

---

[1] Note that since the enactment of the INA, Congress created the
Department of Homeland Security and charged the Secretary with
enforcing the INA, 8 U.S.C. § 1103.

30

JA-000438

Supreme Court has held that "where a provision precluding review
is claimed to bar habeas review, the Court requires a
particularly clear statement that such is Congress' intent."
*Demore v. Kim*, 538 U.S. 510, 511 (2003); *id.* at 517 (finding
that the "clear text" of § 1226(e) does not bar a habeas
challenge to detention). This mandate for statutory construction
is so strict that it has been criticized for establishing a
"magic words" requirement for Congress to preclude habeas
review. *INS v. St. Cyr*, 533 U.S. 289, 327 (2001) (Scalia, J.,
dissenting). Here, the Court does not find such a clear
statement of Congressional intent, let alone any magic words,
that would support a categorical bar to habeas review of
detention under § 1226.

Binding precedent in this Circuit also counters the
government's argument. In *Velasco Lopez v. Decker*, the Second
Circuit squarely considered the availability of habeas review
for the petitioner who was detained under § 1226(a). 978 F.3d
842 (2d Cir. 2020). The Circuit court reviewed a grant of habeas
relief under 28 U.S.C. § 2241 and held that § 1226(e) does not
limit habeas jurisdiction over constitutional claims or
questions of law. *Id.* at 850. Further, habeas review in federal
court can consider claims that the discretionary process itself
was constitutionally flawed. *Id.* In sum, whether a habeas

31

petitioner received due process is not a matter of discretion and is subject to judicial review. *Id.*

As discussed below, Ms. Ozturk has raised questions that are fairly characterized as "constitutional claims or questions of law." *Id.* Ms. Ozturk has also argued that while the government does have discretion in § 1226(a) detention, that discretionary process may be unconstitutional if it allows for the deprivation of constitutional rights. For jurisdictional purposes, the Court need not analyze the merits of these claims at this point. It is enough to acknowledge that because Ms. Ozturk has appropriately raised constitutional claims for this Court to consider in habeas, the nature of those claims defeats any jurisdictional bar set forth in § 1226(e).[2]

The legislative history of the REAL ID Act of 2005 confirms that Congress understood § 1226(e) does not operate as a categorical bar to habeas review of detention. Regarding provisions of the REAL ID Act which purport to deprive the districts courts of habeas jurisdiction of removal proceedings, Congress noted that those provisions "will not preclude habeas review over challenges to detention that are independent of

---

[2] The Court acknowledges case law limiting, but not eliminating, habeas review for "Criminal Aliens" mandatorily detained under § 1226(c). *See e.g., Jennings v. Rodriguez*, 583 U.S. 281 (2018). However, Ms. Ozturk is held in discretionary detention under § 1226(a), not mandatory detention under § 1226(c).

JA-000440

challenges to removal orders." H.R. Cong. Rep. No. 109-72, at
2873 (May 3, 2005). Almost immediately after the Real ID Act was
enacted, the First Circuit confronted the question of continued
district court jurisdiction for habeas challenges to detention
and determined that the REAL ID Act provided no bar in such
cases. *Hernandez v. Gonzales*, 424 F.3d 42, 42 (1st Cir. 2005).
And courts in this Circuit have continued to consider habeas
challenges to detention under § 1226(a) since then. *See, e.g.*,
*Velasco Lopez,* 978 F.3d 842. The Court adheres to that precedent
in this case.

## B. Sections § 1201(i), § 1252(g), § 1252(a)(5), and § 1252(b)(9)

The government argues that, regardless of this Court's
interpretation of 8 U.S.C. § 1226(e), four additional statutory
provisions prevent it from considering Ms. Ozturk's claim for
relief from present detention. Those four provisions – 8 U.S.C.
§ 1201(i), 8 U.S.C. § 1252(g), 8 U.S.C. § 1252(a)(5), and 8
U.S.C. § 1252(b)(9) – each directly relate to removal
proceedings.

At the outset, the Court acknowledges that the Suspension
Clause does not establish an absolute right to seek the writ of
habeas corpus. The Supreme Court has held that Congress may
modify or eliminate the right to seek the writ if Congress
provides "a collateral remedy which is neither inadequate nor

33

JA-000441

ineffective to test the legality of a person's detention." *Swain v. Pressley*, 430 U.S. 372, 381 (1977). For example, as the Court found in *INS v. St. Cyr*, "Congress could, without raising any constitutional questions, provide an adequate substitute through the courts of appeals." 533 U.S. at 314 n.38. If such a substitute is crafted by Congress, courts must then determine "whether the statute stripping jurisdiction to issue the writ avoids the Suspension Clause mandate because Congress has provided adequate substitute procedures for habeas corpus." *Luna v. Holder*, 637 F.3d 85, 93 (2d Cir. 2011) (quoting *Boumediene v. Bush*, 553 U.S. 723, 771 (2008)).

Section 1201 governs the issuance of visas. The jurisdictional bar in § 1201(i) explicitly prohibits judicial review under "section 2241 of title 28 or any other habeas corpus provision, and sections 1361 and 1651 of such title . . . except in the context of a removal proceeding" for individuals challenging the revocation of visas or documents. The government urges the Court to follow the guidance of courts in other jurisdictions who have found "themselves without jurisdiction to consider the merits of a visa revocation upon operation of Section 1201(i)'s language." ECF No. 83 at 24. Here, however, the merits of a visa revocation are not before the Court. While Ms. Ozturk may plan to challenge the revocation of her visa in another forum, she does not do so in the instant Petition.

34

Section 1252 provides a collateral remedy in the context of removal proceedings. The government details its understanding of that procedure succinctly: "Petitioner must seek release before an immigration judge and must pursue relief from removal in Immigration Court, whose decision would be reviewable before the Board of Immigration Appeals ("BIA"), and (if necessary) a federal circuit court." ECF No. 83 at 4. Courts across the country, including the Second Circuit, have functionally endorsed this procedure as a substitute for the writ of habeas corpus in instances where would-be habeas petitioners seek judicial review of removal proceedings. *See, e.g., Ruiz-Martinez v. Mukasey*, 516 F.3d 102, 114 (2d Cir. 2008). Thus, if Ms. Ozturk sought relief from removal proceedings, this Court would be obligated to follow Circuit precedent and conclude its review of that claim.

The government argues that whatever Ms. Ozturk's claims may be about the constitutionality of her detention, any "challenges inextricably intertwined with the final order of removal that precede issuance of any order of removal . . . and decisions to detain for the purposes of removal" should all be considered subject to the same jurisdictional bar. ECF No. 83 at 23. The Second Circuit has held, however, that "a suit brought against immigration authorities is not *per* se a challenge to a removal order; whether the district court has jurisdiction will turn on

35

the substance of the relief that a plaintiff is seeking."
*Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011) (citing
*Kellici v. Gonzales*, 472 F.3d 416, 420 (6th Cir. 2006) (finding
that a "district court, not court of appeals, had jurisdiction
where plaintiffs' habeas petitions challenged only the
constitutionality of the arrest and detention, not the
underlying administrative order of removal.")).

The claims for relief before this Court do not challenge
Ms. Ozturk's removal proceedings. Ms. Ozturk's attorneys
acknowledge that claims related to removal are not appropriate
in this action: "While the government's Policy also lay behind
the revocation of her visa and placement in removal proceedings,
she does not, in this Court, challenge those actions. Instead,
she seeks relief on her claims challenging her apprehension,
detention, and the termination of her SEVIS, release from
detention, reinstatement of her SEVIS, and corresponding
declaratory and injunctive relief that the Policy that resulted
in her apprehension, detention, and SEVIS termination are
illegal."[3] ECF. No. 81 at 21. None of these claims raise
challenges to the removal process.

The limitations on habeas review set forth in Section 1252
thus do not apply in this case. Subsection (a)(5) provides for

---

[3] The government notes that Ms. Ozturk's SEVIS record is not the basis
for her detention or removability. ECF No. 83 at 21.

JA-000444

the "Exclusive Means of Review" for habeas petitions challenging
"an order of removal" through the established scheme. Subsection
(b)(9) limits habeas review, except through the established
scheme requiring a final order before appeal to the circuit
court, for "all questions of law and fact, including
interpretation and application of constitutional and statutory
provisions, arising from any action taken or proceeding brought
to remove an alien from the United States under this
subchapter." And subsection (g) limits jurisdiction of courts
outside the established scheme to "hear any cause or claim by or
on behalf of any alien arising from the decision or action by
the Attorney General to commence proceedings, adjudicate cases,
or execute removal orders against any alien under this chapter."

    Subsection (a)(5) can be dispensed of quickly, as no
"removal order" has been issued here and Ms. Ozturk does not
challenge one. Similarly, she has not raised in this Court any
constitutional or legal concerns "arising from" "any action" or
"proceeding" brought to remove her, per subsection (b)(9).
Moreover, the plain text of subsection (g) does not support a
reading that Ms. Ozturk's detention and resulting constitutional
claims arise from the government's "decision or action" to
"commence proceedings, adjudicate cases, or execute removal
orders." Whether removal proceedings have proceeded according to

37

law and in comport with the Constitution is not a question
before this Court.

The government's argument that Ms. Ozturk's detention
"arises from" her removal proceedings stretches the bounds of
the text and the facts of this case. While Ms. Ozturk's
detention may be related to her immigration status following the
revocation of her visa, it does not "arise from" her removal
proceedings. Indeed, there is no causal relationship between the
removal proceedings and her detention. As the government has
confirmed, ICE's decision to arrest and detain her was
*discretionary* under § 1226(e). Her detention did not flow
naturally as a consequence of her removal proceedings. Indeed,
Ms. Ozturk was detained before the commencement of her removal
proceedings. *See* 8 C.F.R. § 1003.14. Whether her detention
comports with the law and the Constitution is the subject of
this Court's habeas review.

The government cites *Jennings v. Rodriguez*, 138 S. Ct. 830,
841 (2018) for the proposition that the habeas corpus bar in §
1252(b)(9) includes challenges to a decision to detain or to
seek removal. *Jennings* does not provide guidance on the question
of reviewability of detention decisions under § 1252(b)(9),
however, in part because that issue was not briefed or argued
before the court. 138 S. Ct. at 841 ("The parties in this case
have not addressed the scope of § 1252(b)(9), and it is not

38

JA-000446

necessary for us to attempt to provide a comprehensive interpretation. For present purposes, it is enough to note that respondents are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not even challenging any part of the process by which their removability will be determined. Under these circumstances, § 1252(b)(9) does not present a jurisdictional bar."). In fact, *Jennings* explicitly rejected the formulation, proposed in a concurrence, that the government seeks here. "The concurrence contends that 'detention *is* an "action taken ... to remove" an alien' and that therefore 'even the narrowest reading of "arising from" must cover' the claims raised by respondents. *Post* at 855. (*Thomas, J.,* concurring in part and concurring in judgment). We do not follow this logic." *Id.* at 841 n.3. Accordingly, this Court also does not read "arising from" to encompass any activity that has occurred since the revocation of Ms. Ozturk's visa.[4]

---

[4] In Court proceedings on April 14, 2025, the government reasserted the argument that the confluence of the opinions of five Justices in *Jennings* should be read to bar review of Ms. Ozturk's claims in this Court and instead channel them eventually to a court of appeals, no matter the nature of the challenged action. But Justice Alito's opinion for the Court, while not controlling on the matter of §1252(b)(9), rejects the "staggering results" that would follow Respondents' interpretation. "Suppose, for example, that a detained alien wishes to assert a claim under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), based on allegedly inhumane conditions of confinement. . . . [C]ramming judicial review of those questions into the review of final removal orders would be absurd." *Jennings* 138 S.Ct. at 293.

39

JA-000447

Similarly, the government's reliance on *Delgado v. Quarantillo* is misplaced. 643 F.3d 52 (2d Cir. 2011). The *Delgado* case did not concern detention. The plaintiff in that case brought a mandamus action to raise an adjustment-of-status challenge, which the Second Circuit determined was "inextricably linked" to a reinstatement of removal order and thus barred by § 1252(a)(5) because "the adjustment of status to that of a lawful permanent resident would render the reinstatement order invalid." 643 F.3d at 55 (cleaned up). Implicit in the *Delgado* court's reasoning is a causal relationship between the relief sought and the removal process. As noted above, the *Delgado* court made clear that district courts must determine jurisdiction by considering the substance of the asked-for relief because suits brought against immigration authorities are not *per se* challenges to removal orders. *Id.* In this case, there is no causal relationship between discretionary detention and removal proceedings. Relief from alleged improper detention would not render any removal proceedings invalid.

Finally, *Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019) does not address an analogous situation for the purpose of § 1252(g) interpretation. The government contends that *Ragbir* counsels that "1252(g) strips the district court of jurisdiction to hear a retaliatory First Amendment challenge in a removal case." ECF No. 83 at 26. But, again, the Court is not considering a removal

40

case. The Court is considering a habeas challenge to
discretionary detention.

In summary, the government urges the court to interpret
challenges to § 1226(a) detention as *per se* challenges to
removal proceedings and barred by several provisions in § 1252.
The Court declines to adopt that approach, as it has no
precedent in this Circuit or at the Supreme Court. Indeed, cases
like *Velasco Lopez* suggest that district courts in this Circuit
should continue to consider habeas challenges to detention post-
REAL ID Act, where otherwise appropriate. Article III courts
have an important role to play in evaluating constitutional and
legal claims related to detention brought in habeas, and this
Court has jurisdiction over this case.

The Court offers one final observation about the
government's argument that constitutional challenges to
detention must be brought first to an Immigration Judge, then to
the Board of Immigration Appeals, and finally via a petition for
review to the court of appeals. There are serious questions
about whether that process would be an adequate substitute for
the writ of habeas corpus in district court, given the limited
scope of administrative review.[5] In a similar case proceeding in

---

[5] Respondents' reliance on *Reno v. American-Arab Anti-Discrimination
Committee* ("*AADC*"), 525 U.S. 471 (1999), to "settle" these questions
elides the fact that *AADC* was exclusively about removal, not
detention.

41

the District of New Jersey, the government has acknowledged that, "[i]f the alleged claim is a fundamental constitutional claim the BIA (or the immigration judge) is powerless to address, the court of appeals can address that issue in the first instance." *Khalil*, 2:25-cv-01963-MEF-MAH, ECF No. 185 at 2 (cleaned up). Attorneys for the detainee in that case put it more bluntly, "both the IJ and the Board of Immigration Appeals ('BIA') lack jurisdiction over constitutional challenges." *Id.* at ECF No. 189 at 1; *see also Severino v. Mukasey*, 549 F.3d 79, 83 (2d Cir. 2008).

While timelines may vary on the speed with which detainees may have their constitutional arguments heard by a court of appeals in the first instance after the IJ and the BIA processes, it is evident that it will necessarily be slower than a petition to a district court, likely by a factor of months, leading to a gap in their habeas rights. The District Court of New Jersey held in *Khalil* that to deny jurisdiction would be to say that for a single day in March, the detainee in that case "would not have been able to call on any habeas court." 2025 WL 972959, at *37. The Court found that to be "too far" because "[o]ur tradition is that there is no gap in the fabric of habeas --- no place, no moment, where a person held in custody in the United States cannot call on a court to hear his case and decide it." *Id.*

42

Consider that the government's argument on this issue boils
down to a bold statement that no matter how egregious the type
or quantity of First Amendment or due process violations
committed by the government in detaining an individual, an
Article III court *cannot* consider any alleged constitutional
violations until after Article II employees, with no power to
consider or address those violations, have moved the case
through their lengthy process. Put another way, the government
argues that § 1226(a) grants practically limitless, unreviewable
power to detain individuals for weeks or months, even if the
detention is patently unconstitutional. Fortunately, this Court
need not rule on the merits of that argument today, given the
Court's rejection of the jurisdictional bar on other grounds.
Thus, having found that 8 U.S.C. § 1201(i), § 1226(e), §
1252(g), § 1252(a)(5), and § 1252(b)(9) do not bar the Court's
consideration of Ms. Ozturk's constitutional and legal claims,
the Court turns to those claims now.

## III. Petitioner's Request for Immediate Release

Ms. Ozturk seeks habeas corpus relief based on alleged
violations of her constitutional rights. Her ultimate goal in
these proceedings is release from detention, but the Court
presently considers her request for immediate release pending
the resolution of her habeas petition.

43

Both parties analyze Ms. Ozturk's claim for immediate release pending the adjudication of her petition in reference to *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001). Such release is authorized by *Mapp* provided the Court finds the habeas petition raises "substantial claims" and that "extraordinary circumstances" exist "that make the grant of bail necessary to make the habeas remedy effective." *Id.* at 230 (cleaned up).

In this section, the Court first considers its power to conduct a habeas review and the proper nature of that review at this point in the case. The Court turns next to a short summary of evidence related to Ms. Ozturk's constitutional claims. The Court then considers Ms. Ozturk's First Amendment and Due Process claims. The Court finds that while Ms. Ozturk has raised serious claims and provided evidence that merit further review, the Court does not yet have enough evidence to make a determination on pre-disposition release under *Mapp*, particularly given the government's limited representations on that question.

## A. Habeas Corpus Review

District Courts have "inherent power" to consider habeas petitions and grant relief. *Mapp*, 241 F.3d at 226 (citing *Ostrer v. United States*, 584 F.2d 594, 596 n.1 (2d Cir. 1978)). The power is also statutory, as Section 2241 states that "[w]rits of habeas corpus may be granted by the Supreme Court, any justice

44

thereof, the district courts and any circuit judge within their respective jurisdictions." 28 U.S.C. § 2241. "Congress has authorized federal district courts to grant a writ of habeas corpus whenever a petitioner is in custody in violation of the Constitution or laws or treaties of the United States." *Black v. Decker*, 2020 WL 4260994, at *5 (S.D.N.Y. July 23, 2020), *aff'd*, 103 F.4th 133 (2d Cir. 2024) (cleaned up).

Historically, "common-law habeas corpus was, above all, an adaptable remedy. Its precise application and scope changed upon the circumstances." *Boumediene*, 553 U.S. at 779. The "equitable and flexible nature of habeas relief" continues in our system today. *Velasco Lopez*, 978 F.3d at 855. Where appropriate, courts must use their authority to consider not only the present circumstances of confinement, but the actions that led to it. "The intended duration of the detention and the reasons for it bear upon the precise scope of the inquiry. . . . The habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain." *Boumediene*, 553 U.S. at 783. As the *Velasco Lopez* court stated, "[t]he purpose of habeas corpus is to impose limitations on the Government's ability to do these things." 978 F.3d at 855.

The nature of the detention, and any other proceedings that have occurred, will impact the rigor of review. "Where a person

45

is detained by executive order, rather than, say, after being
tried and convicted in a court, the need for collateral review
is most pressing. . . . In this context the need for habeas
corpus is more urgent." *Boumediene*, 553 U.S. at 783.
Accordingly, this Court must conduct an "urgent" investigation
of Ms. Ozturk's detention and consider "both the cause for
detention and the Executive's power to detain." *Id*.

The current questions before this Court are how to evaluate
Ms. Ozturk's claims at this stage of the proceedings and what,
if any, relief is appropriate. Ms. Ozturk argues that her
detention pursuant to the government's authority under 8 U.S.C.
§ 1226(a) is unconstitutional because it is motivated by an
impermissible purpose. She acknowledges that § 1226(a) grants
the government discretion generally as it relates to decisions
to detain individuals who may be subject to removal, but, as her
counsel argued in court, "there's no discretion to violate the
Constitution." ECF No. 98 at 51; *see also id.* at 77 (citing
*Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252, 1261
(2d Cir. 1975) and *Bates v. Town of Cavendish, Vermont*, 735 F.
Supp. 3d 479, 506 (D. Vt. 2024) for the proposition that
government officials cannot violate the Constitution despite
grants of discretion). If her detention is unconstitutional, the
likely remedy is release.

46

In addition to habeas corpus relief, Ms. Ozturk has asked
the Court to grant her immediate release pending the
adjudication of her Petition. Such release is governed by the
*Mapp* factors which, as noted above, require the Court to find
that the habeas petition raises "substantial claims" and that
"extraordinary circumstances" exist "that make the grant of bail
necessary to make the habeas remedy effective." *Id*. at 230
(cleaned up).

The Court must also consider the government's request for
dismissal. In *Ashcroft v. Iqbal.* 556 U.S. 662 (2009), the
Supreme Court considered claims of unconstitutional conduct
relating to immigration detention. *Iqbal* requires the complaint
to state "a plausible claim for relief" and "requires the
reviewing court to draw on its judicial experience and common
sense." *Id.* at 679. However, if "well-pleaded facts do not
permit the court to infer more than the mere possibility of
misconduct," the Court cannot sustain a claim. *Id.* In short,
"while legal conclusions can provide the framework of a
complaint, they must be supported by factual allegations." *Id.*

For the reasons set forth below, the Court finds that Ms.
Ozturk has presented significant evidence supporting her
constitutional claims, and that those claims easily meet the
*Iqbal* standard. Ms. Ozturk argues that her detention is in
retaliation for her political speech, thus violating her rights

47

under the First and Fifth Amendments. Her evidence supports her argument that the government's motivation or purpose for her detention is to punish her for co-authoring an op-ed in a campus newspaper which criticized the Tufts University administration, and to chill the political speech of others. The government has so far offered no evidence to support an alternative, lawful motivation or purpose for Ms. Ozturk's detention.

**B.  Summary of Facts Supporting Constitutional Claims**

Over a year ago, on March 26, 2024, Ms. Ozturk was one of four co-authors of an op-ed published in a student newspaper. *The Tufts Daily* "is the entirely student-run newspaper of record at Tufts University" which regularly publishes "op-eds submitted by readers and members of the Tufts community." *About Us*, The Tufts Daily, https://www.tuftsdaily.com/page/about. The op-ed was titled "Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions." Ms. Ozturk describes the op-ed as "criticiz[ing] the University's dismissal of several resolutions that had been adopted by the undergraduate student Senate as 'a sincere effort to hold Israel accountable for clear violations of international law.' The op-ed urged Tufts to "trust in the Senate's rigorous and democratic process' and 'meaningfully engage with and actualize the resolutions passed by the Senate.'" ECF No. 12 at 2.

48

Tufts University "declares that this opinion piece was not in violation of any Tufts policies" and "[t]he University maintains that the op-ed was consistent with speech permitted by the Declaration on Freedom of Expression adopted by [University] trustees on November 7, 2009." ECF No. 26 at 67. This declaration from Tufts University was signed by President Kumar, the addressee of Ms. Ozturk's co-authored op-ed. *Id.* at 69.

Ms. Ozturk supports her claim that her adverse treatment from the government is improperly motivated by pointing to several statements made by high-level government officials.[6] On May 14, 2024, then-candidate Donald Trump reportedly said, "any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[7] On March 28, 2025, Secretary of State Marco Rubio delivered remarks to the press regarding Ms. Ozturk's detention. U.S. Department of State, *Secretary of State*

---

[6] Though Ms. Ozturk offers these statements to support her argument that her detention is related to her speech, these statements do not always neatly differentiate between the issues of visa revocation, legal status in the country, detention, and removal. *See, e.g.,* Secretary Rubio's statement on March 27, 2025, "We'll revoke your visa, and once your visa is revoked, you're illegally in the country and you have to leave." *Secretary Rubio Defends Revoking Turkish Student's Visa*, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students-visa/5158479.

[7] Josh Dawsey, et al., *Trump told donors he will crush pro-Palestinian protests, deport demonstrators*, Washington Post (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

JA-000457

*Marco Rubio Remarks to the Press* (Mar. 28, 2025),
https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-
the-press-3/. Secretary Rubio stated in response to a question
about Ms. Ozturk, "The activities presented to me meet the
standard of what I've just described to you: people that are
supportive of movements that run counter to the foreign policy
of the United States." Secretary Rubio further indicated that
Ms. Ozturk's detention was the government "basically asking them
to leave the country." He explicitly noted that "that's why
they've been detained."

Secretary Rubio, however, alluded that the government had
more evidence than the op-ed to support Ms. Ozturk's detention,
stating: "I would caution you against solely going off of what
the media has been able to identify, and those presentations, if
necessary, will be made in court." A March 21, 2025 memo from a
Senior Bureau Official in the Bureau of Consular Affairs with
the Department of State states that, "in response to a request
from DHS/ICE and the assessment from DHS/ICE that Rumeysa OZTURK
had been involved in associations that 'may undermine U.S.
foreign policy by creating a hostile environment for Jewish
students and indicating support for a designated terrorist
organization' *including* co-authoring an op-ed that found common
cause with an organization that was later temporarily banned

50

JA-000458

from campus, the Bureau of Consular Affairs" revoked Ms. Ozturk's visa. ECF No. 91 at 6 (emphasis added).

Ms. Ozturk has also provided declarations to this Court supporting her claim that the manner of her arrest and detention are irregular. Declarations from five immigration attorneys in New England provide evidence that her movements through at least five states and several different government facilities within 24 hours of arrest may be atypical for an individual in her situation. ECF No. 82 at 17-18. In particular, Ms. Ozturk has offered evidence to dispute the government's claims that she has been detained in Louisiana because there were no appropriate beds available in New England at the time of her detention. *Id.* at 20.

The government has presented little evidence to rebut Ms. Ozturk's constitutional violation claims. As noted above, the government has offered a declaration from the Acting Deputy Field Office Director for ICE in Burlington, Massachusetts regarding ICE detention procedures and available bedspace. ECF No. 19-1. The government has not offered any evidence specifically regarding its motivation or rationale for Ms. Ozturk's detention.

### C. First Amendment Claim

The First Amendment's protection of the right to free speech is often considered the cornerstone of our vibrant

51

American democracy. As Benjamin Franklin famously wrote in 1737,
"Freedom of speech is a principal pillar of a free government;
when this support is taken away, the constitution of a free
society is dissolved." The Supreme Court has confronted
restrictions on the right to free speech countless times since
our founding, and it recently summarized the history, scope, and
importance of the right to freedom of speech:

> The framers designed the Free Speech Clause of the
> First Amendment to protect the freedom to think as you
> will and to speak as you think. They did so because
> they saw the freedom of speech both as an end and as a
> means. An end because the freedom to think and speak
> is among our inalienable human rights. A means because
> the freedom of thought and speech is indispensable to
> the discovery and spread of political truth. By
> allowing all views to flourish, the framers
> understood, we may test and improve our own thinking
> both as individuals and as a Nation. For all these
> reasons, if there is any fixed star in our
> constitutional constellation, it is the principle that
> the government may not interfere with an uninhibited
> marketplace of ideas. . . . [t]he First Amendment
> protects an individual's right to speak his mind
> regardless of whether the government considers his
> speech sensible and well intentioned or deeply
> misguided and likely to cause anguish and incalculable
> grief. Equally, the First Amendment protects acts of
> expressive association.

*303 Creative LLC v. Elenis*, 600 U.S. 570, 584-86 (2023)
(internal citations and quotations omitted).

    It is against this backdrop that Ms. Ozturk alleges that
her detention is retaliation for political speech which is core
First Amendment protected conduct. The only specific act cited
by the government so far as justification for any of their

adverse actions towards Ms. Ozturk is her co-authored op-ed. ECF
No. 91-1. The Supreme Court has repeatedly "reaffirmed that
speech on public issues occupies the highest rung of the
hierarchy of First Amendment values, and is entitled to special
protection," *Connick v. Myers*, 461 U.S. 138, 145 (1983)
(internal quotation omitted), because "political speech [is] at
the core of what the First Amendment is designed to protect,"
*Virginia v. Black*, 538 U.S. 343, 365 (2003). As a general rule,
"the First Amendment means that government has no power to
restrict expression because of its message, its ideas, its
subject matter, or its content." *Ashcroft v. Am. Civil Liberties
Union*, 535 U.S. 564, 573 (2002). Furthermore, First Amendment
protections have long extended to noncitizens residing within
the country. *Bridges v. Wixon*, 326 U.S. 135 (1945).

The Court hesitates to characterize the content of Ms.
Ozturk's speech, which is obviously about public issues, but it
is necessary to clarify that Ms. Ozturk's op-ed does not readily
fall into one of the established exemptions to the First
Amendment's protection from government speech regulation. The
op-ed focuses largely on the authors' belief that the Tufts
University administration erred by not affording sufficient
deference to resolutions adopted by the Tufts undergraduate
student senate. The op-ed quotes school documents to argue that
the school administrators are not upholding their stated values

of supporting critical thinking and debate in the community. The authors express their belief regarding violations of international law that have motivated the student senate's resolutions. And as the Armstrong Memorandum cites, the authors note alignment in rejecting the university administration's response to the student senate recommendations with another organization later temporarily barred from the Tufts campus for actions the organization took well after the publication of this op-ed. The op-ed culminates with the co-authors "urg[ing] President Kumar and the Tufts administration to meaningfully engage with and actualize the resolutions by the Senate." Taken together, the op-ed is self-evidently speech regarding public issues, albeit largely focused on the parochial politics of university governance.

The Supreme Court has recognized only "a few limited areas" where the First Amendment permits restrictions based on the content of speech. *See United States v. Stevens*, 559 U.S. 460, 468 (2010) (citation omitted). The Supreme Court summarized these areas in the recent *Counterman v. Colorado* case: "incitement—statements directed at producing imminent lawless action, and likely to do so," "defamation—false statements of fact harming another's reputation," "obscenity—valueless material appealing to the prurient interest," and "true threats of violence." 600 U.S. 66, 73-74 (2023) (cleaned up). This Court

54

does not believe that a reasonable reader of the op-ed would find a true threat or incitement of lawless action, let alone obscenity or defamation. Tufts University has confirmed that the op-ed did not violate any Tufts policy, that no complaints were filed about the op-ed, that the speech in the op-ed was consistent with University guidelines, and indeed that it was just one of many op-eds discussing the issue published in the school newspaper. ECF No. 26-1 at 67.

The First Amendment protects individuals from government action that is based on improper motives, namely silencing disfavored speech. The Second Circuit has long recognized retaliation in violation of the First Amendment as a defense from government enforcement. In recently affirming this Court, the Circuit identified the appropriate standard: "A plaintiff must allege (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Demarest v. Town of Underhill*, 2025 WL 88417, at *2 (2d Cir. Jan. 14, 2025) (summary order) (quoting *Gonzalez v. Hasty*, 802 F.3d 212, 222 (2d Cir. 2015)) (cleaned up). In the criminal context, the Supreme Court has expanded on the standard for the third element: "With respect to the third requirement, '[i]t is not enough to show that an official acted with a retaliatory motive

55

and that the plaintiff was injured – the motive must cause the injury.'" *Id.* (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)). "Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* (quoting *Nieves* 587 U.S. at 399). However, given the different nature of criminal detention and immigration detention, as discussed above, it is not altogether clear that this interpretation controls the habeas inquiry. *See Gonzalez v. Trevino* 602 U.S. 653, 658 (2024) (rejecting an "overly cramped" reading of the *Nieves* standard). Regardless of whether it binds the Court here, *Nieves* serves to highlight the importance of identifying the motive for detention.

The Second Circuit has specifically recognized potential retaliation for protected political speech as a cognizable ground for habeas relief in the immigration context, noting that "to allow this retaliatory conduct to proceed would broadly chill protected speech, among not only activists subject to final orders of deportation but also those citizens and other residents who would fear retaliation against others." *Ragbir*, 923 F.3d at 71.

Ms. Ozturk has presented evidence to support her argument that she may qualify for a retaliation claim. Administration officials have identified her speech as the reason her visa was

revoked. If this Court were evaluating the question of
motivation for Ms. Ozturk's visa revocation, this inquiry could
likely conclude now. It may well be that the Ms. Ozturk's
detention shares common motivation with her visa revocation. But
as this Court has found that visa revocation and detention
proceedings are not inextricably linked, the Court seeks
additional evidence of the connection between Ms. Ozturk's
speech and her detention.

The court in *Ragbir*, decided before *Nieves*, found that a
retaliation claim was satisfied by "plausible — indeed, strong —
evidence that officials responsible for the decision to deport
him did so based on their disfavor of Ragbir's speech." 923 F.3d
at 73. Regardless of whether the standard for establishing a
connection is "plausible," "strong," or "causation," the Court's
inquiry would benefit from the ability to consider additional
evidence. For present purposes it is sufficient to find that Ms.
Ozturk's First Amendment claims are serious and worthy of
further exploration in this Court.

Secretary Rubio has argued publicly that there are
additional justifications for the government's actions adverse
to Ms. Ozturk and that these justifications may be filed in
court if necessary. The Court invites an immediate submission
any such evidence in this case. In the absence of additional
information from the government, the Court's habeas review is

57

likely to conclude that Ms. Ozturk has presented a substantial claim.

### D. Due Process Claim

The Due Process Clause of the Fifth Amendment protects the right of "any person" from "be[ing] deprived of life, liberty, or property, without due process of law." "Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

Ms. Ozturk alleges that her detention violates the Due Process Clause because it serves no legitimate purpose, or in the alternative because it is motivated by improper purposes. Her due process claims are grounded in a "line of cases which interprets the Fifth and Fourteenth Amendments' guarantee of 'due process of law' to include a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301–02 (1993). Substantive due process claims are available in the context of immigration detention. *Zadvydas*, 533 U.S. at 694 (citing *Wong Wing v. U.S.*, 163 U.S. 228 (1896)). And "the Due Process Clause covers noncitizens, whether their presence here is lawful,

JA-000466

unlawful, temporary, or permanent." *Velasco Lopez*, 978 F.3d at 850 (citing *Zadvydas*, 533 U.S. at 693).

In the civil immigration context, potential requirements of the Due Process Clause frequently conflict with the prerogatives of Congress and the Executive to manage immigration and foreign affairs. As discussed above, Congress has granted the Executive the authority to detain individuals such as Ms. Ozturk pending a removal decision under 8 U.S.C. § 1226(a). Though detentions under § 1226(a) do not follow any judicial process, let alone a criminal conviction, the Supreme Court has found that such deprivation of liberty is not *per se* unconstitutional. The Supreme Court "has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process," *Demore*, 538 U.S. at 523, and determined that "the Due Process Clause does not require [the government] to employ the least burdensome means to accomplish its goal," *id.* at 528.

Civil detention may be permissible with lower procedural requirements than criminal detention, but it is not permissible for the same purposes. Specifically, the Supreme Court has long recognized that the key rationale for allowing less process in immigration cases than in criminal cases is that the immigration system, including detention, is not punitive. *See, e.g., Fong Yue Ting v. United States*, 149 U.S. 698, 730 (1893); *AADC*, 525

59

U.S. at 491. ICE acknowledges this principle with respect to immigration detention, *Detention Management*, U.S. Immigrations and Custom Enforcement, https://www.ice.gov/detain/detention-management (updated Apr. 16, 2025)("Detention is non-punitive."), and for good reason. The Supreme Court has reiterated that immigration detention is "civil, not criminal, and we assume that they are nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690. Justice Kennedy confirmed the majority's understanding in that case that "both removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious. Where detention is incident to removal, the detention cannot be justified as punishment nor can the confinement or its conditions be designed in order to punish." *Id.* at 721 (Kennedy, J., dissenting). Rather than punishment, immigration detention must be motivated by the two valid regulatory goals that the government has previously argued motivate the statute: "ensuring the appearance of aliens at future immigration proceedings and preventing danger to the community." *Id.* at 690 (cleaned up). So long as detention is motivated by those goals, and not a desire for punishment, the Court is generally required to defer to the political branches on the administration of the immigration system.

Ms. Ozturk argues that her detention is punitive, in addition to the First Amendment retaliation claims discussed

JA-000468

above. The Secretary of State's recent comments imply that her detention is motivated by a desire to compel her to voluntarily depart the country. U.S. Department of State, *Secretary of State Marco Rubio Remarks to the Press* (Mar. 28, 2025),https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-3/. The Secretary also suggests that her detention advances a message to others in similar situations that they should choose to leave the country rather than face detention. "They can do so tomorrow. Buy an airplane ticket and leave." However, courts have not sanctioned the use of the immigration detention system to strike fear in or punish individuals who may seek to contest their removal through lawful administrative and judicial channels designed for that purpose. This is an important distinction between civil detention and criminal incarceration, which allows for punishment and deterrence. Courts' less exacting due process scrutiny has thus far been premised on the assumption that the system is operating for permitted purposes.

Ordinarily, the government may not need to justify its discretionary decision to detain an individual pursuant to 8 U.S.C. § 1226(e), and it has presented no evidence here as to its motivations for Ms. Ozturk's detention. Ms. Ozturk's counsel has informed the Court that DHS contended in immigration court that "Ms. Ozturk poses a flight risk," though Ms. Ozturk's

JA-000469

attorneys have characterized that claim as "unsupported." ECF
No. 99 at 1. An immigration judge found "Danger and Flight
Risk," but the Court has not seen the evidence that supported
that determination, and Ms. Ozturk has submitted evidence to
support the opposite conclusion. ECF 101-1 at 4. Where a
detainee presents evidence that her detention, though
discretionary, is motivated by unconstitutional purposes in
violation of the Due Process Clause, the Court may reasonably
conclude the same in the absence of countervailing evidence. As
the Court continues consideration of Ms. Ozturk's habeas
petition, it will allow the government to present evidence to
rebut claims that her detention is improperly motivated.

### E. Ms. Ozturk Has Plausibly Alleged Constitutional Violations, But the Record Is Not Sufficiently Developed to Support Immediate Release

The record before the Court demonstrates that Ms. Ozturk
has plausibly pled constitutional violations related to her
detention. Ms. Ozturk's Free Speech and Due Process claims are
serious, and the Court intends to continue to develop the facts
on these issues. However, the Court does not find at this time
that such pleadings are sufficient to satisfy the standard for
immediate release, given the overarching deference towards the
executive branch's authority in the area of immigration
enforcement.

JA-000470

Both Ms. Ozturk and the government suggest that it is
appropriate for the Court to consider Ms. Ozturk's claim for
release pending the resolution of her habeas petition under the
Second Circuit's standard in *Mapp*. As noted previously, the *Mapp*
standard requires a court contemplating bail to "inquire into
whether the habeas petition raises substantial claims and
whether extraordinary circumstances exist that make the grant of
bail necessary to make the habeas remedy effective." 241 F.3d at
230 (cleaned up).

The Court does not find that it has sufficient information
to support release under *Mapp*, nor does it determine that Ms.
Ozturk is unlikely to be able to meet that standard with
additional evidence. The Court notes at the outset that this
case has been proceeding rapidly, and new evidence has been
emerging regularly. For example, on Friday, April 11, 2025, Ms.
Ozturk's counsel transmitted to the Court the Armstrong
Memorandum, which contains probative evidence regarding the
government's motivations but was received by Ms. Ozturk's
counsel after the April 10 filing deadline on these issues. *See*
ECF No. 91. Similarly, on Sunday, April 13, less than twenty-
four hours before this Court held a hearing on these issues, Ms.
Ozturk's counsel submitted as an exhibit an April 13, 2025
Washington Post article reporting on the existence of an
additional State Department memorandum, though that memorandum

63

has not yet been provided to this Court. See ECF No. 95. These
memoranda, along with any other evidence held by either party
but not yet disclosed to the Court, are important to the
resolution of both a request for release on bail and a final
determination. The Court plans to move expeditiously towards the
resolution of these factual questions.

### F. Scope of Federal Judicial Power

Rather than contest the merits of Ms. Ozturk's detention,
the government has primarily argued that decisions regarding
immigration detention fall squarely under the control of the
political branches and should not be second guessed by the
courts. This Court follows clear instruction of the Supreme
Court on this matter and has "due regard for the deference owed
to the Executive Branch in the conduct of foreign affairs." *Noem
v. Abrego Garcia*, 2025 WL 1077101, at *1 (U.S. Apr. 10, 2025).
This Court has not considered questions of foreign policy or
immigration policy in the course of these proceedings. The Court
concerns itself only with review of Ms. Ozturk's discretionary
domestic detention, within the contours of established
precedent.

To be clear, precedent in this Circuit has confirmed that
Congress may restrict some judicial review of immigration cases.
The *Mapp* decision found that "[t]here can be no doubt that, with
respect to immigration and deportation, federal judicial power

is singularly constrained," 241 F.3d at 227, and that Congress

may have "plenary power over immigration matters [that] renders

this [habeas] authority readily subject to congressional

limitation," *id.* at 231. However, the *Mapp* Court also held that,

"[a]bsent a clear direction from Congress, federal judicial

power is unaltered, and the authority of the federal courts to

admit to bail parties properly within their jurisdiction remains

unqualified." *Id.* at 227. As discussed above, no such clear

direction applies here.[8]

Nonetheless, this backdrop will inform the scope and depth

of the Court's review into the merits of Ms. Ozturk's habeas

claims to ensure that the Court does not improperly intrude upon

the prerogatives of the other co-equal branches. *See AADC*, 525

U.S. at 491 (holding that in general courts should not assess

the legitimacy of the Executive's foreign policy objectives or

law enforcement priorities when considering deportation cases

though there may be "a rare case in which the alleged basis of

discrimination is so outrageous" as to warrant judicial review).

Where the executive branch has exercised powers assigned to it

by the legislative branch in compliance with the laws and

---

[8] Further it is not evident that the power of the political branches to
"constrain" or "limit" habeas review is the same as the power to
eliminate it in the district courts, particularly in the context of
detention. Consider the *Jennings* Court's hypothetical regarding
judicial review of inhumane conditions of confinement, which the
Supreme Court found "absurd" to channel to the circuit courts via a
petition for review. *Supra* note 4.

65

Constitution, this Court will not second guess the government's
choices.

## IV.  Petitioner's Request for Return to Vermont

Ms. Ozturk has proposed that, if her request for immediate
release is not granted, the Court order her returned to the
District of Vermont. The Court finds that Ms. Ozturk's physical
return to ICE custody within the District of Vermont is in the
interest of justice because transfer would assist the Court's
exploration of the important constitutional questions in this
case, would allow the Court to conduct appropriate fact-finding
including to support a potential bail hearing, and would
otherwise have no impact on removal proceedings. Her physical
return to Vermont would also give closely proximate effect to
the order issued by the District of Massachusetts court at 10:55
p.m. on Tuesday, March 25, 2025, which was not heeded by the
government.

### A. Ms. Ozturk's Presence in Vermont Will Facilitate the Fair and Expeditious Resolution of this Matter

The Court finds that Ms. Ozturk's presence in Vermont will
facilitate her ability to work with her attorneys, coordinate
the appearance of witnesses, and generally present her habeas
claims, many of which are based on events that occurred in New
England. A transfer to Vermont will also facilitate Ms. Ozturk's
ability to receive a neutral medical evaluation, as her medical

66

condition will be a factor for the Court to consider when addressing the question of release. More generally, her presence in the courtroom will assist the Court in determining potential bail conditions and whether release is appropriate.

Ms. Ozturk has informed the Court that her treatment in the Louisiana facility is inadequate. She is suffering from severe asthma attacks and is not provided appropriate medication. Her place of detention is reportedly overcrowded and unsanitary. Her religious needs are not being addressed. The Court takes these issues into consideration when determining the necessity and equities of a transfer.

As discussed previously, the Second Circuit has recognized the "equitable and flexible nature of habeas relief." *Velasco Lopez*, 978 F.3d at 855. The Supreme Court has held that the "exercise of a court's equity powers . . . must be made on a case-by-case basis." *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964). The "flexibility" inherent in "equitable procedure" enables courts "to meet new situations [that] demand equitable intervention, and to accord all the relief necessary to correct . . . particular injustices." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248 (1944). The Court also has the inherent authority and responsibility to protect the integrity of its proceedings which were undoubtedly impacted when Ms. Ozturk was transferred to Louisiana. *See Degen v. United States*,

JA-000475

517 U.S. 820, 823 (1996) ("Courts invested with the judicial power of the United States have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities.").

Here, the Court finds that the equities strongly favor Ms. Ozturk's transfer to Vermont. Such transfer will expedite resolution of this matter, provide Ms. Ozturk ready access to legal and medical services, and address concerns about the conditions of her confinement. The Court further finds that a transfer to Vermont will not prejudice the government's removal proceedings, as she may participate in those remotely. The Court plans to proceed to resolution of the habeas petition quickly, and it is essential that Ms. Ozturk be a full participant in the process. Should her petition be denied, the government will have discretion over her place of confinement. Accordingly, pursuant to its inherent equitable power, as well its power under the All Writs Act, the Court orders Ms. Ozturk's transfer as set forth below. *See* 28 U.S.C. § 1651(a) (empowering courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law").

**B. Ms. Ozturk's Return to Vermont Will Give Effect to the District of Massachusetts Court's Order Preserving the Status Quo**

JA-000476

The United States District Court for the District of
Massachusetts issued a valid order in this case at approximately
10:55 p.m. on March 25, 2025. The order was transmitted to the
government immediately, both formally by the court and by Ms.
Ozturk's attorney. ECF No. 26-2 at 3. The order had been issued
by the court within an hour of Ms. Ozturk's attorney filing the
initial habeas petition.

The purpose of the District of Massachusetts' order was to
"order respondent to preserve the status quo." ECF No. 3 at 2.
The order had immediate effect and required that "petitioner
shall not be moved outside the District of Massachusetts without
first providing advance notice of the intended move." Moreover,
the court clearly understood that Ms. Ozturk's physical location
was critical to the court's jurisdiction. The court noted that
the order was intended to preserve its ability "to consider
whether it has subject-matter jurisdiction," and would be "valid
unless and until it is overturned." *Id.* The court further
clarified that the motivation for the order was the court's
recognition that "the action the court enjoins," i.e., Ms.
Ozturk's movement out of the state by the government, "would
otherwise destroy its jurisdiction or moot the case." *Id.*

The government apparently did not take any immediate steps
to comply with the order or to communicate with the court to
ascertain the court's intent. At oral argument, the government

69

was not able to say who learned about the order or when. The
government's only argument to date has been that the order may
have been impossible to comply with if construed literally,
because by 10:55 p.m., the government had already moved Ms.
Ozturk to Vermont. There is no evidence that officials in the
U.S. Attorney's Office in Massachusetts who were in contact with
Ms. Ozturk's attorney at the time and received the order, or
indeed any other government representatives, made contact with
the court to convey this perceived predicament.

Ms. Ozturk cites Second Circuit precedent stating that it
is the obligation of parties receiving orders from Article III
courts "to observe the objects for which the relief was granted
and to find a breach of the decree in a violation of the spirit
of the injunction, even though its strict letter may not have
been disregarded." *John B. Stetson Co. v. Stephen L. Stetson
Co.*, 128 F.2d 981, 983 (2d Cir. 1942). *Stetson* remains good law
in this Circuit, standing for the proposition that "'it is the
spirit of the order, not the letter, that must be obeyed.'"
*Aquavit Pharms., Inc. v. U-Bio Med, Inc.*, 2020 WL 1900502, at *6
(S.D.N.Y. Apr. 17, 2020) (quoting *Titra California, Inc. v.
Titra Film*, 2001 WL 1382587, at *5 (S.D.N.Y. Nov. 6, 2001)); *see
also Salazar v. Buono*, 559 U.S. 700, 762 (2010) (Breyer, J.
dissenting) (citing *Stetson* for proposition that courts have
long looked to the intent of granted injunctive relief when

70

JA-000478

assessing compliance). The Court agrees that it is appropriate to consider whether parties have complied with the spirit of an injunction, where that spirit is readily discernible from an order.

There is no question here that the District of Massachusetts intended to preserve the status quo of Ms. Ozturk's whereabouts while it assessed its jurisdiction to consider the case. The government of course had already moved Ms. Ozturk out of state, so that jurisdictional analysis may have still resulted in the case being heard before this Court. Nevertheless, the Court holds that after receipt of the order, the government had an obligation to consider the intent of the order, even if literal compliance with the order was impossible. Ms. Ozturk has offered alternative potential actions that the government could have taken upon receipt of the order, in lieu of ignoring it entirely. ECF No. 82-1 at 22-23. At minimum, the government should have informed the issuing court in a timely fashion that compliance with the order was not literally possible and sought out clarification. Informing the District of Massachusetts would have allowed for that court to make any necessary modifications to either its order or its determination of its jurisdiction. Ignoring an order, particularly one issued on an emergency basis in response to events that are currently

unfolding, is not the approach the Court expects from the government.

The remedy for the government ignoring the March 25, 2025, order is simple. Ms. Ozturk should be returned to the status quo at the time of issuance when she was in custody in the District of Vermont. This equitable relief, ordered under this Court's inherent habeas power, will give proximate effect to the District of Massachusetts's order without disadvantaging the government. Giving effect to the spirit of the District of Massachusetts' order is also necessary to ensure continued respect for orders issued by Article III courts. "If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911). The Court declines to abet a slide into mockery in this case.

## Conclusion

For the foregoing reasons, the Court concludes that this case will continue in this Court with Ms. Ozturk physically present for the remainder of the proceedings.

The Court has determined that it retains jurisdiction over Ms. Ozturk's habeas petition which shall proceed in the District

JA-000480

of Vermont. The petition, filed in federal district court in Massachusetts, was properly transferred to this Court. There are no technical deficiencies that prevent this Court's consideration of this petition as if it were originally filed here. Furthermore, there is nothing in the INA that categorically prevents a federal district court from reviewing a habeas petition challenging discretionary detention. Therefore, there are no jurisdictional limitations on this Court's consideration of Ms. Ozturk's habeas claims related to her detention.

Upon review of the First Amendment and Due Process claims and the evidence presented by both parties, the Court concludes that Ms. Ozturk has presented viable and serious habeas claims which warrant urgent review on the merits. The Court plans to move expeditiously to a bail hearing and final disposition of the habeas petition, as Ms. Ozturk's claims require no less.

To support the Court's resolution of these issues, the Court orders that Ms. Ozturk be physically transferred to ICE custody within the District of Vermont no later than May 1, 2025. The Court orders that a bail hearing be scheduled in this Court for May 9, 2025, with Ms. Ozturk appearing in person. Parties are ordered to brief the Court and present all evidence related to the issue of bail by May 2, 2025. A hearing on the merits of the habeas petition will be held on May 22, 2025. The

73

Court stays the effect of this order for four days to allow either party to appeal this order.

DATED at Burlington, in the District of Vermont, this 18th day of April 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge

JA-000482

# UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

RUMEYSA OZTURK,

                    Petitioner,

      v.                                              No. 2:25-cv-374

DONALD J. TRUMP, in his official capacity as
President of the United States, PATRICIA
HYDE, Field Office Director,
MICHAEL KROL, HSI New England Special
Agent in Charge, TODD LYONS, Acting
Director, U.S. Immigration and Customs
Enforcement, and KRISTI NOEM, Secretary of
Homeland Security; and MARCO RUBIO, in his
official capacity as Secretary of State

                   Respondents.

## RESPONDENTS' NOTICE OF APPEAL

PLEASE TAKE NOTICE that all named Respondents hereby appeal to the United

States Court of Appeals for the Second Circuit from the Court's April 18, 2025 Order (ECF No.

104) accepting jurisdiction and ordering Petitioner be physically transferred to ICE custody

within the District of Vermont no later than May 1, 2025.

                   Respectfully submitted,

Dated: April 22, 2025       By:    */s/ Michael P. Drescher*
                         Michael P. Drescher
                         Assistant United States Attorney
                         District of Vermont

# UNITED STATES DISTRICT COURT
# DISTRICT OF VERMONT

| | |
|---|---|
| RUMEYSA OZTURK,<br><br>             Petitioner,<br><br>      v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, PATRICIA HYDE, Field Office Director, MICHAEL KROL, HSI New England Special Agent in Charge, TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement, and KRISTI NOEM, Secretary of Homeland Security; and MARCO RUBIO, in his official capacity as Secretary of State<br><br>             Respondents. | No. 2:25-cv-374 |

## RESPONDENTS' MOTION FOR CONTINUED STAY PENDING APPEAL

### INTRODUCTION

The Court stayed its April 18, 2025 Order "for four days to allow either party to appeal . . . ." ECF No. 104, at 74. Respondents have filed a Notice of Appeal (ECF No. 105), which "confers jurisdiction on the court of appeals and divests [this Court] of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). But to the extent it is necessary, Respondents move this Court, under Federal Rule of Civil Procedure 62, to continue its stay pending disposition of the appeal by the United States Court of Appeals for the Second Circuit. Respondents respectfully request that this Court rule on this motion no later than 3:00 p.m. EDT on April 24, 2025; after that time,

1

Respondents intend to seek emergency relief from the Second Circuit. Fed. R. App. P. 8(a)(2); Fed. R. Civ. P. 62(g)(1).

## **LEGAL STANDARD**

To evaluate whether to issue a stay pending appeal, courts consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quotation omitted). The first two factors "are the most critical[,]" and the final factors merge where, as here, the government is a party. *Id*. at 434-35.

## **ARGUMENT**

The Court has already stayed its Order to allow either party to appeal. ECF No. 104, at 74. Respondents are taking advantage of the opportunity afforded by the Court and pursuing expeditious review by the Court of Appeals of the complex, important legal issues presented in this case. To effectuate that review, Respondents ask the Court to continue the stay currently in place pending final disposition of the appeal.

### I.     **Respondents are likely to succeed on the merits.**

A continued stay pending appeal is warranted because Respondents raise important potentially dispositive challenges to the Court's authority to exercise habeas jurisdiction under *Rumsfeld v. Padilla*, 542 U.S. 426 (2004) and the Immigration and Nationality Act. Further, Respondents are likely to succeed on the merits that the Court lacks authority to order Petitioner's transfer to the District of Vermont.

JA-000485

### A. The Court lacks jurisdiction.

#### a. The Court lacks jurisdiction under *Padilla*.

As previously argued, "[w]henever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement." *Padilla*, 542 U.S. at 447. That rule derives from the habeas statutes themselves, which require a petition to allege "the name of the person who has custody over" a petitioner. 28 U.S.C. § 2242; *see also* 28 U.S.C. § 2243 ("The writ, or order to show cause shall be directed to the person having custody of the person detained."). Indeed, "jurisdiction lies in only one district: the district of confinement." *Trump v. J.G.G.*, 2025 WL 1024097, at *1 (U.S. Apr. 7, 2025). Here, Petitioner's district of confinement is the Western District of Louisiana, and that is where jurisdiction lies. *See id.*

*Padilla* stands as a reproach of the Second Circuit's historically relaxed approach to the "immediate custodian rule." *Padilla*, 542 U.S. at 437-38. Because the petition did not name Petitioner's immediate custodian when it was originally filed in the District of Massachusetts (and because Petitioner's current immediate custodian is not located in the District of Vermont), this Court lacks jurisdiction. For the reasons articulated in Respondents' Supplemental Opposition, neither the transfer statute nor the Supreme Court's decision in *Ex parte Endo*, 323 U.S. 283 (1944), cure that defect. *See* ECF No. 83, at 7-14.

Also as previously argued, 28 U.S.C. § 1631 should not retroactively cure the original Petition's non-compliance with *Padilla.* Indeed if § 1631 can so cure, the Supreme Court's analysis in *Padilla* is potentially nullified.

JA-000486

### b. The Court lacks jurisdiction under the INA.

Aside from *Padilla*, this Court also lacks jurisdiction under the Immigration and Nationality Act. Under section 1252(g), "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings . . . against any alien under this chapter." 8 U.S.C. § 1252(g). The "decision to commence proceedings," which is the genesis of Petitioner's detention, "falls squarely within § 1252(g)." *Reno v. American-Arab Anti-Discrimination Committee ("AADC")*, 525 U.S. 471, 487 (1999) (cleaned up).

Petitioner's claims regarding detention stem from the method by which the removal proceedings against her were commenced; they are not "unrelated to any removal action or proceeding." *Cf. Ruiz v. Mukasey*, 552 F.3d 269, 274 n.3 (2d Cir. 2009). And the decision as to the method by which removal proceedings are commenced is a discretionary one that is not reviewable by a district court under section 1252(g). *See* ECF No. 83, at 19-20.

Instead, the INA makes "the court of appeals for the judicial circuit in which the immigration judge completed the proceedings" "the sole and exclusive means for judicial review of an order of removal." 8 U.S.C. §§ 1252(a)(5), (b)(2). Thus, this Court lacks jurisdiction to review "all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter . . . ." 8 U.S.C. § 1252(b)(9). In short, Petitioner's claims regarding her arrest and detention, including her constitutional claims, must be heard by the court of appeals sitting "in judicial review of a final order under this section." *Id.*

The merits of these arguments weigh in favor of granting the requested stay.

**B. The Court lacks authority to order Petitioner's transfer.**

"A principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012). That broad discretion extends to the "authority to determine the location of detention of an alien in deportation proceedings," including whether to change that location during the pendency of proceedings. *Gandarillas-Zambrana v. Bd. of Immigration Appeals*, 44 F.3d 1251, 1256 (4th Cir. 1995). Congress vested the Executive Branch with that substantial discretion in the INA itself. *See* 8 U.S.C. § 1231(g)(1) ("The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."). And Congress stripped the courts of jurisdiction to review such exercises of discretion. *See* 8 U.S.C. § 1251(a)(2)(B)(ii) (barring district courts form exercising subject matter jurisdiction of "any . . . decision or action of the Attorney General . . . the authority for which is specified under this subchapter [8 U.S.C. § 1151-1381] to be in the discretion of the Attorney General . . . .").

Courts across the country, including the Second Circuit, have recognized as much. *See, e.g.*, *Wood v. United States*, 175 F. App'x 419, 420 (2d Cir. 2006) (holding that the Secretary "was not required to detain [Plaintiff] in a particular state" given the Secretary's "statutory discretion" under § 1231(g)); ECF No. 83, at 17-18 (collecting cases). Respondents are thus likely to succeed on the merits of an appeal challenging this Court's transfer order.

**II.    The balance of harm favors a stay.**

The Government "suffers a form of irreparable injury" "[a]ny time [it] is enjoined by a court form effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). That is particularly true here because rules governing immigration "implement[ ] an inherent executive power." *United*

5

*States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien").

Moreover, Petitioner does not challenge the revocation of her visa. *See* ECF No. 26, at 25 ("Ms. Ozturk does not challenge the revocation of her visa."). And with her visa revoked, Petitioner lacks status and is subject to detention under 8 U.S.C. § 1226 for the duration of removal proceedings. Even under the terms of the Court's April 18 Order, Petitioner would remain in custody, *see* ECF No. 104, at 66, so she would not be substantially harmed by continuing the stay pending resolution of Respondents' appeal.

Respectfully submitted,

Dated: April 22, 2025           By:      */s/ Michael P. Drescher*
                                         Michael P. Drescher
                                         Assistant United States Attorney
                                         District of Vermont

JA-000489

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

RUMEYSA OZTURK,                    )
                                  )
            Petitioner,           )
                                  )
      v.                          )    Case No. 2:25-cv-374
                                  )
DONALD J. TRUMP, in his           )
official capacity as              )
President of the United           )
States; PATRICIA HYDE, in her     )
official capacity as the New      )
England Field Director for        )
U.S. Immigration and Customs      )
Enforcement; MICHAEL KROL, in     )
his official capacity as HSI      )
New England Special Agent in      )
Charge, U.S. Immigration and      )
Customs Enforcement; TODD         )
LYONS, in his official            )
capacity as Acting Director,      )
U.S. Immigration and Customs      )
Enforcement; KRISTI NOEM, in      )
her official capacity as          )
Secretary of the United           )
States Department of              )
Homeland Security; and MARCO      )
RUBIO, in his official            )
capacity as Secretary of          )
State,                            )
                                  )
            Respondents.          )

## OPINION AND ORDER

Respondents (hereinafter "government") have submitted a

Motion for Continued Stay Pending Appeal. ECF No. 106. The Court

previously issued a stay of its April 18, 2025, Opinion and

Order (hereinafter "Opinion") for four days "to allow either

party to appeal this order." ECF No. 104 at 74. On April 22, the

JA-000490

government availed itself of the opportunity to appeal to the
U.S. Court of Appeals for the Second Circuit. ECF No. 105. This
Court's stay expired on April 22. The government is now
obligated to ensure that Ms. Ozturk is transferred to ICE
custody within the District of Vermont no later than May 1,
2025. ECF No. 104 at 73.

At the outset, the Court notes that the government's motion
largely recycles the same arguments that the Court has
previously considered and rejected. The Court briefly summarizes
its rationale for rejecting some of these arguments here again,
but the Court refers the government to its Opinion for a fuller
explanation if necessary. The Court considers the four factors
from *Nken v. Holder* that the government has identified for
evaluating a motion to stay and finds that they weigh against
the government. 556 U.S. 418, 434 (2009). For the following
reasons, the government's motion to stay Ms. Ozturk's return to
Vermont is denied.

## I.    Respondents Raise Jurisdictional Arguments that This Court has Duly Considered and Rejected.

The government's motion devotes two pages to its argument
that this Court lacks jurisdiction to consider Ms. Ozturk's
habeas petition. The Court has previously considered these same
arguments in these proceedings. Both the government and Ms.
Ozturk filed lengthy briefs on these jurisdictional questions,

2

JA-000491

and the Court devoted significant attention to the parties'
filings and oral arguments. The April 18 Opinion discussed these
very questions, and the Court found that its jurisdiction is
proper under 28 U.S.C. § 2241, that this Court is the
appropriate place for the habeas petition to be heard following
the petition's transfer to this Court under 28 U.S.C. § 1631,
and that the INA does not bar this Court's review of claims
regarding the legality of Ms. Ozturk's detention. ECF No. 104 at
12-66. The government's request that this Court now find that
the government "has made a strong showing that [it] is likely to
succeed on the merits," ECF. No. 106 (quoting *Nken v. Holder*,
556 U.S. at 434), is patently at odds with this Court's Opinion.
The Court will not relitigate those issues here, and it finds
that the government has not made a strong showing that it is
likely to succeed on the merits of its jurisdictional arguments.

II. **The Balance of Harms and Potential Disruption of the
    Court's Proceedings Favors Rejecting a Stay**

As the Court explained in its Opinion, habeas proceedings
are by their nature equitable and flexible, and the Court has
the authority and the mandate to ensure the integrity of its
proceedings. ECF No. 104 at 67. The Court considered the
government's clear opposition to transfer before issuing the
Opinion, but the Court found "that the equities strongly favor
Ms. Ozturk's transfer to Vermont." *Id.* at 67.

3

To briefly reiterate, Ms. Ozturk's physical transfer to ICE custody in Vermont will have no impact on the government's separate removal proceedings against her in immigration court. However, her return to Vermont will facilitate speedy resolution of her petition in this Court. At oral argument, the Court directly asked the government's counsel how the government would be prejudiced if Ms. Ozturk were returned to Vermont. ECF No. 98 at 109. Government's counsel did not then, and the government does not now, offer any concrete injury that the government would suffer. *Id.* at 109-110.

The government now argues that it, and by extension the public, would suffer an injury if Ms. Ozturk's detention were subject to judicial review. ECF No. 106 at 5-6. While the executive branch assuredly has an interest in effectuating statutes enacted by the legislative branch, the judicial branch is charged with ensuring that the other branches do so in comport with the laws and the Constitution. *Powell v. McCormack*, 395 U.S. 486, 506 (1969) ("'[I]t is the province and duty of the judicial department to determine in cases regularly brought before them, whether the powers of any branch of the government, and even those of the legislature in the enactment of laws, have been exercised in conformity to the Constitution; and if they have not, to treat their acts as null and void.'") (quoting *Kilbourn v. Thompson,* 103 U.S. 168, 199 (1880)); *see also W.*

4

*Virginia v. Env't Prot. Agency*, 597 U.S. 697, 736 (2022) ("One of the Judiciary's most solemn duties is to ensure that acts of Congress are applied in accordance with the Constitution in the cases that come before us.") (Gorsuch, J., concurring); *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 327 (2013) ("But there is another concern at play, no less firmly rooted in our constitutional structure. That is the obligation of the Judiciary not only to confine itself to its proper role, but to ensure that the other branches do so as well.") (Roberts, C.J., dissenting); *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 76 (2015) ("The 'check' the judiciary provides to maintain our separation of powers is enforcement of the rule of law through judicial review.") (Thomas, J., concurring). Furthermore, the public interest does not lie only on the government's side in this case. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("[S]ecuring First Amendment rights is in the public interest.").

As the Court noted in the Opinion, the Court intends to resolve Ms. Ozturk's habeas petition expeditiously, and Ms. Ozturk's presence in Vermont is necessary to assist the Court with its consideration of her request for release on bail as well as the underlying merits of her petition. ECF No. 104 at 66-68. The Court notes that Ms. Ozturk's return to Vermont might not even be an issue in this case had the government not ignored

JA-000494

the order issued from the District Court in Massachusetts on
March 25, 2025. ECF No. 104 at 68-72. As the Court held in its
Opinion, the remedy here is simple, a return to the status quo.
*Id.* at 72. Instead, Ms. Ozturk is in detention in Louisiana,
where she reports that she is enduring overcrowding, unsanitary
conditions, a worsening medical condition, insufficient medical
care, and difficulties practicing her religion. *Id.* at 67.
Furthermore, should the Court's schedule for resolution of Ms.
Ozturk's habeas petition, *id.* at 73, be delayed in any way, the
government will not have suffered any concrete injury through
Ms. Ozturk's return to Vermont, while Ms. Ozturk will be well-
positioned to present her case as soon as possible. Accordingly,
the Court finds that the balance of harms of a stay of transfer
would fall most heavily on Ms. Ozturk and would not be in the
public interest.

## Conclusion

For the foregoing reasons, the government's motion for a
stay of Ms. Ozturk's transfer to ICE custody within the District
of Vermont is denied. As the Court established in its April 18
Opinion, "Ms. Ozturk has presented viable and serious habeas
claims which warrant urgent review on the merits." *Id.* at 73.
Any unnecessary delay of Ms. Ozturk's transfer to this District
would likely disrupt or delay the Court's proceedings,
potentially prolonging the very detention that is at the heart

JA-000495

of this case. Meanwhile, Ms. Ozturk's return to Vermont would not unduly burden the government and would restore the status quo at the time of the order from the District Court in Massachusetts. The Court ordered that Ms. Ozturk be returned to Vermont precisely so that the Court could resolve the habeas petition as expeditiously as possible, and the Court intends to do so.

DATED at Burlington, in the District of Vermont, this 24th day of April 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

RUMEYSA OZTURK,                    )
                                   )
          Petitioner,              )
                                   )
     v.                            )   Case No. 2:25-cv-374
                                   )
DONALD J. TRUMP, in his            )
official capacity as               )
President of the United            )
States; PATRICIA HYDE, in her )
official capacity as the New )
England Field Director for         )
U.S. Immigration and Customs )
Enforcement; MICHAEL KROL, in )
his official capacity as HSI )
New England Special Agent in )
Charge, U.S. Immigration and )
Customs Enforcement; TODD          )
LYONS, in his official             )
capacity as Acting Director, )
U.S. Immigration and Customs )
Enforcement; KRISTI NOEM, in )
her official capacity as           )
Secretary of the United            )
States Department of               )
Homeland Security; and MARCO )
RUBIO, in his official             )
capacity as Secretary of           )
State,                             )
                                   )
          Respondents.             )

**ORDER**

The Court held a telephonic conference with counsel for

Petitioner and counsel for Respondent at 4:50pm. The Court

reaffirmed its ruling made at the bail hearing earlier on

5/9/25. In light of the Court's finding of no risk of flight and

no danger to the community, Petitioner is to be released from

JA-000497

ICE custody immediately on her own recognizance, without any form of Body-Worn GPS or other ICE monitoring at this time. Petitioner is not subject to any travel restrictions. Respondent's counsel shall submit proposed conditions of release after conferring with ICE no later than 5/12/2025.

DATED at Burlington, in the District of Vermont, this 9th day of May 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge

JA-000498

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

RUMEYSA OZTURK,                          )
                                         )
          Petitioner,                    )
                                         )
     v.                                  )    Case No. 2:25-cv-374
                                         )
DONALD J. TRUMP, in his                  )
official capacity as                     )
President of the United                  )
States; PATRICIA HYDE, in her            )
official capacity as the New             )
England Field Director for               )
U.S. Immigration and Customs             )
Enforcement; MICHAEL KROL, in            )
his official capacity as HSI             )
New England Special Agent in             )
Charge, U.S. Immigration and             )
Customs Enforcement; TODD                )
LYONS, in his official                   )
capacity as Acting Director,             )
U.S. Immigration and Customs             )
Enforcement; KRISTI NOEM, in             )
her official capacity as                 )
Secretary of the United                  )
States Department of                     )
Homeland Security; and MARCO             )
RUBIO, in his official                   )
capacity as Secretary of                 )
State,                                   )
                                         )
          Respondents.                   )

**OPINION AND ORDER**

On April 10, 2025, Petitioner Rumeysa Ozturk filed a Motion

for Release pending the adjudication of her habeas corpus

petition, as governed by *Mapp v. Reno,* 241 F.3d 221 (2d Cir.

2001). ECF No. 82. Respondents opposed the motion, raising

arguments about this Court's jurisdiction to consider the

underlying habeas petition and about Ms. Ozturk's ability to
meet the *Mapp* standard for release on bail. ECF Nos. 83, 84, and
103. On April 18, 2025, the Court issued an Opinion and Order
holding, *inter alia*, that this Court had jurisdiction to
consider Ms. Ozturk's habeas petition and planned to move
expeditiously to consideration of both Ms. Ozturk's motion for
release and the petition itself. ECF No. 104.

On May 9, 2025, following a full bail hearing on
Petitioner's motion for release under *Mapp*, the Court ruled from
the bench, granting Ms. Ozturk's motion and ordering that she be
released immediately from U.S. Immigration and Customs
Enforcement ("ICE") custody. ECF No. 130. That Order was
reiterated in part later the same day in a text Order. ECF No.
131. This Opinion supplements the May 9 Order from the bench and
subsequent text Order.

## Procedural Background

On April 18, 2025, this Court issued an Opinion and Order
in this case. ECF No. 104. The Court "determined that it retains
jurisdiction over Ms. Ozturk's habeas petition" and found that
"there are no jurisdictional limitations on this Court's habeas
claims related to her detention." *Id.* at 72-73. The Court
further concluded that "Ms. Ozturk has presented viable and
serious habeas claims which warrant urgent review on the
merits." *Id.* at 73. On April 22, 2025, the government appealed

2

the Court's Order to the United States Court of Appeals for the Second Circuit. ECF No. 105. That appeal on the merits remains pending.

The Court's April 18 Order also required the government to transfer Ms. Ozturk to ICE custody within the District of Vermont no later than May 1, 2025. On April 22, the government filed a motion to stay Ms. Ozturk's transfer to ICE custody in Vermont. ECF No. 106. On April 24, the Court denied that motion, rejecting the government's jurisdictional arguments again and finding that "the four factors from *Nken v. Holder* that the government has identified for evaluating a motion to stay . . . weigh against the government." ECF No. 109 at 2.

Later that day, the government filed an Emergency Motion with the circuit court, seeking a stay of this Court's order to return Ms. Ozturk to Vermont. Emergency Motion Pursuant to Circuit Rule 27.1(d) for Stay Pending Appeal with Relief Request by April 29, 2025, Docket No. 25-1019, ECF. No. 19. The government's argument predominately focused on the question of this Court's jurisdiction to consider Ms. Ozturk's habeas petition. Given the procedural posture of the case, the circuit court evaluated the government's jurisdictional arguments to determine whether the government was likely to succeed on the merits. On May 7, 2025, the circuit court issued an Order denying the government's motion for a stay "because the

3

JA-000501

government has not met its burden on any of the factors." *Ozturk v. Hyde*, 2025 WL 1318154, at *3 (2d Cir. May 7, 2025). Significantly, the circuit court found that the government was not likely to prevail on its arguments that this Court lacks jurisdiction over Ms. Ozturk's habeas petition. *Id.* at *4-13.

The Court has reviewed the circuit court's ruling and notes that nothing therein can be construed as denying this Court's continued jurisdiction over Ms. Ozturk's habeas petition, including the instant motion for immediate release. Indeed the circuit court acknowledged this Court's ongoing hearing schedule which included a planned bail hearing and instructed that the Court may amend its hearing schedule if necessary. *Id.* at *14. Therefore, the Court will not again consider the government's jurisdictional objections which have already been rejected by this Court and the circuit court.

On May 8, the Court held a status conference with counsel. Petitioner's counsel requested that the Court proceed with the scheduled May 9 bail hearing, with Ms. Ozturk appearing remotely if she has not yet been returned to Vermont. Government's counsel indicated that the only prejudice they may experience as a result of such hearing was "tension" between the Court's April 18 Order requiring Ms. Ozturk's return to Vermont and the circuit court's May 7 Order requiring the same by a later date. The circuit court, after requiring Ms. Ozturk's physical

4

transfer to Vermont "no later than May 14, 2025" stated that
"the district court may amend its hearing schedule as it deems
necessary in light of this order." *Ozturk,* 2025 WL 1318154, at
*14.

In granting Ms. Ozturk's motion for return to Vermont, the
Court's April 18 Order stated that "[Ms. Ozturk's] presence in
the courtroom will assist the Court in determining potential
bail conditions and whether release is appropriate." ECF No. 104
at 67. The circuit court similarly noted on May 7 that this
Court's order was intended in part to allow Ms. Ozturk "to
prepare for and attend her bail and habeas petition." *Ozturk,*
2025 WL 1318154, at *13. However, on May 8, Ms. Ozturk waived
her request for in-person appearance at her bail hearing to
avoid further delay, particularly in light of her ongoing and
worsening medical conditions, discussed below. The government
meanwhile did not argue any other prejudice from a remote
appearance by Ms. Ozturk. The circuit court required the
government to return Ms. Ozturk "by" May 14, but the government
was of course free to transport Ms. Ozturk back to Vermont
sooner. In light of Ms. Ozturk's waiver of her in-person
appearance at her bail hearing, and no concrete prejudice to the
government from Ms. Ozturk's remote appearance, the Court
determined it was appropriate to proceed with a bail hearing on
May 9, 2025.

5

Before this Court was consideration of the merits of Ms.
Ozturk's petition for release under *Mapp*.

### Factual Background

The facts of this case were largely set forth in the
Court's prior Opinion and Order issued April 18, 2025 and again
by the circuit court in its ruling issued May 7, 2025. This
Court assumes familiarity with those facts.

Briefly stated, the case arises from the arrest and
detention of Ms. Ozturk, a Turkish student who entered the
United States lawfully pursuant to a valid F-1 student visa and
has been engaged in doctoral studies in Child Study and Human
Development at Tufts University. At approximately 5:25 p.m. on
March 25, 2025, while walking near her residence in Somerville,
Massachusetts, Ms. Ozturk was arrested without warning by a
group of armed, plainclothes law enforcement officers, some of
whom were masked. The officers immediately handcuffed her and
led to her to an unmarked vehicle. Ms. Ozturk had not been
notified of her visa revocation or imminent arrest.

Over the course of the next few hours, she was transported
to an office in Methuen, Massachusetts, then to Lebanon, New
Hampshire, and ultimately to an ICE Field Office in St. Albans,
Vermont. Early the following morning, ICE transported Ms. Ozturk
from Vermont to a detention facility in Basile, Louisiana, where
she remained in ICE custody for over six weeks.

6

JA-000504

To date, the only basis offered by the government to
justify Ms. Ozturk's arrest is an assessment by the Department
of Homeland Security ("DHS") and ICE that she "had been involved
in associations that 'may undermine U.S. foreign policy by
creating a hostile environment for Jewish students and
indicating support for a designated terrorist organization'
including co-authoring an op-ed that found common cause with an
organization that was later temporarily banned from campus." ECF
No. 91 at 6. The "op-ed" in question, co-authored by Ms. Ozturk
and three other Tufts students, criticized the University's
response to three resolutions passed by the Tufts Community
Union Senate and asked the University to "acknowledge the
Palestinian genocide, apologize for University President Sunil
Kumar's statements, disclose its investments and divest from
companies with direct or indirect ties to Israel." ECF No. 123
at 6. In an April 1, 2025, declaration, Tufts University
President Kumar attested that Ms. Ozturk's co-authored op-ed
"was not in violation of any Tufts policies" and that "no
complaints were filed with the University or, to our knowledge,
outside of the University about this op-ed." ECF No. 26-1 at 67.
President Kumar further noted that the same newspaper also
published other "op-eds on multiple sides of the issue with
opinions that were shared just as strongly as the op-ed Ms.
Ozturk co-authored." *Id.*

7

Ms. Ozturk was not informed, prior to her arrest, that DHS and ICE were pursuing visa revocation or that the revocation had occurred. In fact, a memo from the Bureau of Consular Affairs required that the revocation "be silent; the Department of State will not notify the subject of the revocation." ECF No. 91-1 at 6. With respect to Ms. Ozturk's movements immediately post-arrest, her counsel has submitted affidavits from experienced immigration attorneys stating that such successive transfers, particularly to those locations, were highly unusual. *See, e.g.,* ECF No. 82-3 at 4 ("In my 16 years of practice, I have not seen or even heard of an ICE detainee arrested in Massachusetts being booked and repeatedly moved in the manner described in that declaration."). And as to her detention generally, other immigration practitioners have opined that detention in a case such as this – involving revocation of an F-1 visa and termination of a SEVIS record – is equally unusual. *See, e.g.,* ECF Nos. 122-4 at 5; 122-5 at 4.

Ms. Ozturk reported poor treatment and unsanitary conditions during her detention in Louisiana. Several of her concerns pertained to her health. Ms. Ozturk suffers from asthma, which requires daily medication. ECF No. 82-10 at 4. Prior to her arrest, she had suffered approximately 13 asthma attacks in her life, commonly lasting between 5 and 15 minutes. *Id.* She informed the Court on May 2 that since her arrest, she

8

had suffered at least 8 additional attacks lasting anywhere from 5-45 minutes. ECF No. 122-9 at 3. She is concerned about the severity of the attacks and her ability to manage them. *Id.* When not incarcerated, Ms. Ozturk is more able to control her environment and avoid exposure to triggers. *Id.* at 4.

Ms. Ozturk also reported poor medical care at the facility. For example, she was allegedly told that an asthma attack was "all in her head," and her questions to a doctor were belittled. *Id.* at 7. She witnessed other women experience significant delays in receiving care. A physician who reviewed Ms. Ozturk's medical history and spoke to her recently believes, in her professional opinion, that if not released Ms. Ozturk would be at risk for progressive symptoms, worsening disease control, and perhaps even "potentially fatal asthma exacerbation." ECF No. 122-10 at 8.

Stress is one of Ms. Ozturk's asthma triggers, and she attested that her time in detention has been stressful. Officers at the facility were allegedly not responsive to detainee concerns and were verbally abusive. *Id.* at 10. Ms. Ozturk had difficulty sleeping due to loud noises and constant lighting throughout the night. *Id.* at 10-11. Poor food quality was also an issue. *Id.* at 11. From the outset, Ms. Ozturk reported that cells were overcrowded, hygiene supplies were inadequate, and

9

that she was not provided certain religious materials. ECF No. 82-10 at 6-7.

Ms. Ozturk's counsel has provided the Court with numerous letters of support which attest to Ms. Ozturk's qualities as a person. Representative examples describe her as "compassionate," "service-minded," "conscientious," "gentle" and "caring." *See* ECF No. 90 at 6, 9, 14, 52. Nothing in the record suggests otherwise.

Going forward, the Dean of the Graduate School of Arts and Sciences at Tufts informs the Court that Ms. Ozturk will have several sources of income this coming summer as a result of her teaching and research and that the University will be able to provide her with housing. ECF No. 122-7 at 3. The Court also received a Declaration from personnel at the Burlington Community Justice Center, which was ready and willing to provide pre-trial services to Ms. Ozturk upon her release. ECF No. 122-8 at 3. Ms. Ozturk reported that within the Tufts community she has a core group of close friends, as well as a larger group of friends and colleagues to which she will be returning.

On May 9, 2025, the Court heard testimony from Ms. Ozturk. The testimony from Ms. Ozturk confirmed the nature of her academic work, her ties to her community in Massachusetts, her desire to return to her academic studies, and the continued decline of her health. Ms. Ozturk reported that since the

10

submission of her last court filing on May 2, she had
experienced 4 additional asthma attacks. And as a witness
testified at the bail hearing, Ms. Ozturk appeared to suffer
another asthma attack and was temporarily excused from the
hearing to obtain her inhaler.

The Court also heard testimony from three witnesses who had
previously submitted sworn affidavits. Testimony from the
physician who had consulted with Ms. Ozturk remotely and
reviewed her medical records expanded on the serious risk of Ms.
Ozturk's worsening asthma without proper management and
treatment. Testimony from Ms. Ozturk's primary academic advisor
reiterated Ms. Ozturk's strong ties to her community and her
generous and compassionate character, as well as the potential
negative academic and professional consequences of continued
detention. Finally, testimony from an official with the
Burlington Community Justice Center reiterated that
organization's ability to provide supervision and support
services for Ms. Ozturk if she were released.

## Discussion

Ms. Ozturk requested release from custody pending
resolution of her habeas petition. Ms. Ozturk argued that the
Court has the inherent authority to order such a release,
subject to the analysis in *Mapp v. Reno*. 241 F.3d 221 (2d Cir.
2001). The government countered that the Court lacks authority

11

to consider release because of various jurisdictional bars, ECF
No. 84 at 1-6, but the government otherwise acknowledged that if
the Court did have such authority, *Mapp* is likely the
controlling standard. *Id.* at 1-2. As previously discussed,
following the circuit court's May 7 Opinion the Court will not
reconsider its April 18 jurisdictional determinations at this
time. The Court has the authority to grant release pending the
adjudication of Ms. Ozturk's habeas petition. Therefore, the
only question before the Court was whether Ms. Ozturk's release
is appropriate under a *Mapp* analysis.

*Mapp v. Reno* established the controlling bail standard: "a
court considering a habeas petitioner's fitness for bail must
inquire into whether the habeas petition raises substantial
claims and whether extraordinary circumstances exist that make
the grant of bail necessary to make the habeas remedy
effective." 241 F.3d at 230 (cleaned up). Sibling courts have
typically interpreted this standard to require three findings.
*See, e.g., Mahdawi v. Trump*, 2025 WL 1243135, at *8-14 (D. Vt.
Apr. 30, 2025). The Court must find (1) substantial claims, (2)
extraordinary circumstances, and (3) grant of bail is necessary
to make the habeas remedy effective. *Id.* (applying *Mapp*). The
*Mapp* court noted that this standard is "difficult," and the
burden falls on the petitioner to make the necessary
demonstrations. 241 F.3d at 226.

12

Though not explicitly a part of the *Mapp* standard, it is also appropriate for the Court to consider whether the petitioner is a risk of flight or a danger to the community. *Id* at 244 (noting that the district court had ordered release after finding that petitioner was not a serious flight risk or threat to the community.); *see also Black v. Decker*, 103 F.4th 133, 157 (2d Cir. 2024) ("Both sections 1226(a) and (c) aim to prevent flight and danger to the community."); *Velasco Lopez v. Decker*, 978 F.3d 842, 857 (2d Cir. 2020) ("The Government . . . has no interest in the continued incarceration of an individual who it cannot show to be either a flight risk or a danger to his community.")

In the April 18 Opinion, the Court instructed the parties to submit briefing and evidence related to bail by May 2, 2025. On May 2, Ms. Ozturk filed a supplemental memorandum and evidence with the Court. ECF No. 122. The government did not file additional briefing or evidence. At the May 9 bail hearing, the government maintained that its objections to Ms. Ozturk's release were primarily related to the Court's jurisdiction, and the government wished to preserve those arguments for any potential appeal. The government did raise arguments related to conditions of release, on which the Court subsequently ordered further briefing. *See* ECF Nos. 130, 131. But the government did not make substantive arguments in relation to the *Mapp* factors.

13

The Court therefore considered the government's substantive opposition to Ms. Ozturk's bail from its April 10, 2025, briefing. ECF No. 84.

For the reasons below, the Court found that Ms. Ozturk has made the necessary demonstrations under *Mapp*, and the Court further found that she does not pose a risk of flight or danger to the community. Therefore, release was appropriate.

## I.   Substantial Claims

Ms. Ozturk has raised two primary constitutional claims related to her arrest and detention.[1] Ms. Ozturk argued that the government's actions have violated her First Amendment right to free speech and association. She further argued that her arrest and detention were intended to be, and actually are, punitive in violation of her Fifth Amendment due process rights. A detailed summary of these claims and the Court's analytic framework was outlined in the April 18 Opinion. On May 9, the Court found that Ms. Ozturk's habeas petition raised substantial claims of both violations.

### a. First Amendment

As a threshold matter, the Court's April 18 Opinion stated that "in the absence of additional information from the

---

[1] Ms. Ozturk also raised claims based on the Administrative Procedure Act and the *Accardi* doctrine. ECF No. 82-1 at 14. Thus far it has not been necessary for the Court to evaluate those claims as litigation has proceeded on other grounds.

14

government, the Court's habeas review is likely to conclude that
Ms. Ozturk has presented a substantial claim." ECF No. 104 at
57-58. Specifically, the Court took note of Secretary Rubio's
public statements seemingly offering to make presentations in
court to justify Ms. Ozturk's detention, *id.* at 50, and the
Court invited an immediate submission of any relevant evidence.
*Id.* at 57. No such submission has been received by this Court.
In its absence, the Court concluded that Ms. Ozturk has
presented a substantial First Amendment claim.

To briefly summarize, Ms. Ozturk has argued that her arrest
and detention are retaliation for her co-authorship of an op-ed
in a student newspaper. The government has identified her op-ed,
and potentially related associations, as the precipitating
factor for her visa revocation. *Id.* at 9 (quoting a State
Department memorandum revoking her visa). As the Court cited in
its April 18, 2025, Opinion and Order, then-candidate Trump
reportedly threatened to deport foreign students involved in
campus protests. *Id.* at 49. And Secretary of State Marco Rubio,
in response to press inquiries about Ms. Ozturk's arrest, opined
that Ms. Ozturk's activities "meet the standard of what I've
just described to you: people that are supportive of movements
that run counter to the foreign policy of the United States" and
that detention was "basically asking them to leave the country."
*Id.*

15

JA-000513

Arrest and detention, let alone termination of status, are not a natural consequence of visa revocation. Ms. Ozturk has presented credible evidence to show that similarly situated individuals historically have not been detained following visa revocation or termination of status. ECF No. 122 at 8 (summarizing submitted declarations from attorneys with considerable experience with student visas).

To date, the government has neither rebutted the argument that retaliation for Ms. Ozturk's op-ed was the motivation for her detention nor identified another specific reason for Ms. Ozturk's detention, arguing instead that such decisions are committed to the discretion of the executive branch. ECF No. 84 at 5. While it is uncontested that the government has discretion in this area, that discretion is not accompanied by the authority to violate the Constitution.

The Court need not decide at this stage whether Ms. Ozturk's detention actually constitutes a First Amendment violation. As the April 18 opinion established, Ms. Ozturk's op-ed carries all the hallmarks of protected speech on public issues, and it does not fall into any recognized exception. ECF No. 104 at 52-55. A First Amendment retaliation claim requires showing a causal connection between protected speech by Ms. Ozturk and adverse action by the government. *Id*. at 55 (quoting *Demarest v. Town of Underhill*, 2025 WL 88417, at *2 (2d Cir.

16

2025). The record before this Court shows that the only speech at issue is Ms. Ozturk's op-ed, and her arrest and detention clearly constitute adverse action. On April 18, the Court offered the government the opportunity to rebut Ms. Ozturk's evidence showing that her op-ed is the but-for cause of her detention. ECF No. 104 at 56-58. The government has not done so. Meanwhile, Ms. Ozturk has introduced significant evidence demonstrating the irregular nature of the government's actions. ECF No. 122 at 8. The Court therefore concluded that Ms. Ozturk has presented, at the very least, a substantial claim of a First Amendment violation.[2]

---

[2] The Court previously posited that the test for First Amendment retaliation claims may be open to debate after *Nieves v. Bartlett*, 587 U.S. 391 (2019). ECF No. 104 at 55-56. Petitioner subsequently argued that *Nieves* was inapposite in the habeas context and *Mt. Healthy Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274 (1977) should govern the Court's inquiry, while Respondents provided no argument. The Court finds that Ms. Ozturk has presented a substantial claim at this stage no matter the applicable test. The Court invites further briefing on the appropriate standard for First Amendment retaliation claims in civil immigration habeas proceedings prior to final disposition. In addition, the Court notes that a court in the District of Massachusetts recently found that plaintiffs in that case "plausibly alleged the existence of both an ideological-deportation policy targeting protected political speech and a more informal campaign of censorship through threats." *Am. Ass'n of Univ. Professors v. Rubio*, 2025 WL 1235084, at *20 (D. Mass. Apr. 29, 2025). The Court invites briefing on whether the potential existence of such a policy would instead implicate the First Amendment retaliation test in *Lozman v. Riviera Beach*, 585 U.S. 87 (2018). Finally, the Court notes that, in similar litigation proceeding in other courts, the government has argued that non-citizens may not share the First Amendment protections of citizens, *Bridges v. Wixon* notwithstanding. *See, e.g.*,

JA-000515

### b. Due Process

In its April 18 Opinion, the Court stated, "Where a detainee presents evidence that her detention, though discretionary, is motivated by unconstitutional purposes in violation of the Due Process Clause, the Court may reasonably conclude the same in the absence of countervailing evidence." ECF No. 104 at 62. The Court invited the government to rebut Ms. Ozturk's claims of an improper, punitive motivation for her detention, but the Court has received no such evidence. Therefore, on May 9 the Court concluded that Ms. Ozturk has presented a substantial claim of a due process violation by the government.

Civil detention by the government of individuals like Ms. Ozturk who are undergoing removal proceedings is authorized by Congress in 8 U.S.C. § 1226(a). The government has argued that such detention is completely at the discretion of the government. ECF No. 84 at 3. However, that discretion may not be deployed for any purpose of the government's choosing. Detention is primarily permitted for two purposes: preventing danger to the community and ensuring an individual in proceedings does not abscond. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). In

---

Opposition to Motion for Release Under *Mapp v. Reno*, *Mahdawi v. Trump*, Docket No. 2:25-cv-00389, ECF No. 42 at 5. The Court invites briefing on the nature and extent of this distinction, if any, in this case's context.

JA-000516

contrast with criminal incarceration, civil immigration
detention is not permissible for a punitive purpose. *Id.*

The government could have demonstrated that Ms. Ozturk's
detention was motivated by a desire to prevent a danger to the
community or a flight risk.[3] However, Ms. Ozturk has instead
shown that her detention is likely motivated by improper
purposes.

Ms. Ozturk argued that her detention is punishment for her
op-ed, and that her punishment is intended to serve as a warning
to other non-citizens who are contemplating public speech on
issues of the day. The Court found that Ms. Ozturk has presented
credible evidence to support her argument, including her own
testimony describing her terror during her irregular arrest,
statements by the Secretary of State describing the purpose of
the government's actions, sworn declarations from immigration
attorneys attesting to the unusual nature of Ms. Ozturk's case,
and a sworn declaration from the Tufts University president
describing the resulting climate of fear among the international
members of the school community. The Court need not conclude at
this stage that Ms. Ozturk's arrest and detention are actually
punitive in violation of her due process rights. However, for

---

[3] An immigration judge's finding at a bond hearing are discussed
below. For this analysis, the Court notes only that the
immigration judge's determination did not precede detention.

JA-000517

the purpose of *Mapp,* the Court found that Ms. Ozturk has demonstrated a substantial claim of a violation of due process.

## II.  Extraordinary Circumstances

*Mapp* requires that the court find "extraordinary circumstances" before granting bail. Extraordinary circumstances are evident across multiple dimensions of this case.

First, the Court considered the unusual sequence of events that led to Ms. Ozturk's present detention in Louisiana. Not only was Ms. Ozturk arrested and transported out of Massachusetts in a striking manner, but she was further flown to Louisiana despite a court order issued on an emergency basis by a federal court in Massachusetts which was intended to preserve the status quo. ECF No. 104 at 68-72. This Court previously criticized the government's response to the order issued on the evening of Ms. Ozturk's arrest, *id.*, and ordered Ms. Ozturk's return to Vermont "in part to effectuate the district court in Massachusetts's order, returning Ozturk to the status quo at the time of issuance and in part to ensure continued respect for orders issued by Article III courts." *Ozturk v. Hyde*, 2025 WL 1318154, at *14 (2d Cir. May 7, 2025) (cleaned up). The reviewing circuit court determined that "equity favors such a determination." *Id.* Needless to say, it is an extraordinary circumstance when an individual is transported across the country despite a court order.

20

Second, the facts underlying Ms. Ozturk's substantial claims present an extraordinary circumstance. The government has not claimed that Ms. Ozturk violated any civil or criminal laws requiring her removal from the country. Instead, a year after Ms. Ozturk co-authored an op-ed in a campus newspaper, the government seemingly discovered the op-ed and exercised its discretion to revoke Ms. Ozturk's student visa, and then took further steps to terminate her status, arrest, and detain her. ECF No. 83 at 21, n. 5. In defense of these actions, the government has not provided anything beyond Ms. Ozturk's political speech. As Judge Crawford recently explained in a similar case, these are not unprecedented actions by the government, but they are nonetheless extraordinary. *Mahdawi*, 2025 WL 1243135, at *12-13.

Finally, Ms. Ozturk's declining health in custody provides another basis for finding extraordinary circumstances. The Court received testimony and affidavits expressing concern about Ms. Ozturk's conditions of confinement which appeared to be exacerbating her underlying medical conditions. The Court takes seriously the testifying physician's warning that Ms. Ozturk's asthma could be life-threatening if not properly managed. Therefore, Ms. Ozturk's health now constitutes an additional extraordinary circumstance which warranted immediate release.

21

### III. Necessary to Make the Habeas Remedy Effective

Ms. Ozturk has spent over six weeks in detention, and she has established substantial claims that her detention is unconstitutional. Her release is now necessary as the Court continues to consider the merits of her habeas petition.

The evidence before the Court showed that Ms. Ozturk's health has declined precipitously over the last six weeks, and she is at risk for needing emergency medical care, which may be difficult to obtain in detention. Her detention also had a negative impact on her academic, professional, and personal life, as has been established by voluminous affidavits and testimony. "When the Government incarcerates individuals it cannot show to be a poor bail risk . . . it separates families and removes from the community breadwinners, caregivers, parents, siblings and employees. The Government articulates no public interest that any of this serves and we see none." *Velasco Lopez,* 978 F.3d at 855.

Ms. Ozturk's detention necessarily constitutes an infringement of her First Amendment rights and her right to liberty. While such an infringement may be justified if the government presented a legitimate purpose for it, *see Jones v. N. Carolina Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 125 (1977), the government has not done so in this case. If the Court later finds that Ms. Ozturk's substantial claims are in

22

fact proven claims, her detention will have been an
unconstitutional deprivation with no public purpose or benefit.
Meanwhile, Ms. Ozturk's continued detention restricts her
ability to speak freely and potentially chills the speech of
other non-citizens. For all these reasons, the Court found that
bail was necessary to make the habeas remedy effective.

## IV.  Risk of Flight and Danger to the Community

The Court found that Ms. Ozturk has presented substantial
claims and that extraordinary circumstances make the grant of
bail necessary for the habeas remedy to be effective. As is
customary in bail considerations, the Court continued on to
consider whether the detainee presents a risk of flight or
danger to the community which may make release inappropriate.
The Court considered the totality of evidence presented and
found that Ms. Ozturk does not pose a risk of flight or a danger
to the community.

The Court is aware that on April 16, 2025, an immigration
judge in Louisiana denied Ms. Ozturk's request for a change in
custody status and provided "Danger and Flight Risk" as the
rationale. ECF No. 101-1 at 4. The Court does not here, as the
government has argued, conduct "improper judicial review of a
bail determination" of the immigration judge. ECF No. 84 at 3.
The Court instead considers the immigration judge's finding as
potential evidence in the government's favor. In the April 18

23

Opinion, the Court took notice of that finding, which was
supplied to the Court by Ms. Ozturk, as well as DHS's reported
contention at immigration judge's bond hearing that Ms. Ozturk
posed a flight risk. ECF 104 at 61-62. The Court further invited
the government to submit evidence supporting that determination
to the record in this case. *Id.* The government did not present
any such evidence.

This is an Article III court. It is obligated to conduct an
independent and rigorous review of the evidence that is a part
of the record in this case. Immigration judges, by contrast, are
executive branch employees subject to executive branch orders.
The Court does not seek to disturb or set aside the immigration
judge's finding—indeed if Ms. Ozturk's habeas petition is
unsuccessful, she may presumably be again subject to potential
discretionary detention—but neither is this Court bound by an
executive branch employee's finding apparently unsupported by
evidence. Such deference would obviate the purpose of habeas
corpus as enshrined in the Constitution:

> In our own system the Suspension Clause is designed to
> protect against these cyclical abuses. The Clause
> protects the rights of the detained by a means
> consistent with the essential design of the
> Constitution. It ensures that, except during periods
> of formal suspension, the Judiciary will have a time-
> tested device, the writ, to maintain the delicate
> balance of governance that is itself the surest
> safeguard of liberty. The Clause protects the rights
> of the detained by affirming the duty and authority of
> the Judiciary to call the jailer to account.

*Boumediene v. Bush*, 553 U.S. 723, 745 (2008) (cleaned up).

The Court is not bound by the immigration judge's analysis for an additional reason. This Court has inherent authority to grant bail in immigration habeas cases after making the necessary findings. *Mapp,* 241 F.3d at 222. In this case, those findings include substantial claims of constitutional violations, as discussed above. As the circuit court has recognized, "neither the IJ nor the BIA has jurisdiction to decide constitutional issues." *Ozturk*, 2025 WL 1318154, at *12 (2d Cir. May 7, 2025) (internal quotation omitted). In part for that reason, the circuit court was "not persuaded that an IJ or the BIA would have developed a sufficient factual record, or any record at all, with respect to the challenged *detention*[.]" *Id.* (emphasis in original). As discussed above, constitutional issues permeate this case and necessitate the grant of bail.

Both preceding and following the April 18 Opinion, the Court received significant credible evidence attesting to Ms. Ozturk's peaceful and compassionate character as well as to her ties to her university and her community. This evidence includes numerous sworn affidavits as well as testimony from Ms. Ozturk's academic advisor and Ms. Ozturk herself. This demonstration contrasts with the complete lack of evidence from the government suggesting Ms. Ozturk is a danger or at risk of flight. There is

JA-000523

no evidence that Ms. Ozturk has engaged in violence or advocated violence, and she has no criminal record. Nor does any of her conduct suggest a risk of flight. Instead the evidence before the court showed that Ms. Ozturk is committed to her academic career and her community. Therefore, the Court found that Ms. Ozturk does not pose a danger to the community, nor does she present a risk of flight.

Ms. Ozturk's motion for immediate release was granted at the May 9 hearing, subject to the following conditions.[4]

## V. Conditions of Release

Ms. Ozturk was ordered to be immediately released on her own recognizance, without Body-Worn GPS. Ms. Ozturk is free to travel as she sees fit, as the Court has not found any risk of flight and Ms. Ozturk's academic career necessitates travel. Ms. Ozturk was ordered to have at least monthly contact with the Burlington Community Justice Center to monitor and support her reintegration into her community following these traumatic events. The Burlington Community Justice Center was ordered to submit a monthly report to the Court detailing Ms. Ozturk's status, activities over the previous month, and future plans.

---

[4] The government did not move for a stay of release pending appeal; however, petitioner's counsel raised the possibility in her argument. The Court found that a stay would not be appropriate under *Nken v. Holder*, 556 U.S. 418 (2009), because all four factors weigh in favor of Ms. Ozturk.

JA-000524

Government's counsel requested additional conditions of release that are common for immigration detainees who have been granted bail. The Court instructed both parties to confer and attempt to find consensus on modest additional conditions and submit a proposal to the Court.

## Conclusion

For the reasons above, Ms. Ozturk was ordered immediately released at her bail hearing on May 9, 2025, pending the resolution of her habeas petition.

The Court found that Ms. Ozturk demonstrated substantial claims of First Amendment and Due Process Clause violations related to her detention. At this stage in the proceedings, there is no evidence to support Ms. Ozturk's continued detention absent consideration of her op-ed. Her substantial claims, which have been largely unrebutted by the government, are that her detention is retaliation for her op-ed in a school newspaper and that her detention is punitive, in part to serve as a message to others contemplating similar speech.

The Court found that extraordinary conditions exist in this case. In particular, the government's actions in ignoring a court order while arresting and transporting her to Louisiana constitute extraordinary circumstances. Further, extraordinary circumstances exist given the nature and strength of Ms.

JA-000525

Ozturk's constitutional claims and her demonstration that her detention exacerbated an underlying medical condition.

The Court found that immediate release was necessary to make the habeas remedy effective. As demonstrated by testimony and affidavits, continued detention may have potentially severe consequences for Ms. Ozturk's health. Immediate release was also necessary to ameliorate the chilling effect that Ms. Ozturk's arguably unconstitutional detention may have on non-citizens present in the country.

Finally, the Court found that Ms. Ozturk does not present a danger to the community or a risk of flight. This Article III Court was obligated to conduct an independent, rigorous review of all evidence presented, and the Court concluded that Ms. Ozturk is a cherished member of her community who exhibits a caring and compassionate character. On those bases, Ms. Ozturk's immediate release was warranted, and Ms. Ozturk's motion for release, ECF No. 82, was granted.

DATED at Burlington, in the District of Vermont, this 16th day of May 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge

JA-000526

  CourtLink® (Dockets)  Client: -None-∨ History Help More

**Document:**          2:25cv374, Ozturk V. Hyde Et Al          Actions∨

🖨 ✉ ⬇ 📄 | Go to ∨ | 🔔          ‹ **12** of 19 | Results list ›

# 2:25cv374, Ozturk V. Hyde Et Al

US District Court Docket

United States District Court, Vermont

(Burlington)

This case was retrieved on **06/27/2025**

▼Header

| | |
|---|---|
| **Case Number:** 2:25cv374 | **Class Code:** Open |
| **Date Filed:** 04/04/2025 | **Statute:** 8:1182 |
| **Assigned To:** Judge William K. Sessions III | **Jury Demand:** None |
| **Nature of Suit:** Prisoner - General (530) | **Demand Amount:** $0 |
| **Cause:** Defend. Denial of Pla. Appl. for Alien Employment Cer | **NOS Description:** Prisoner - General |
| **Lead Docket:** None | |
| **Other Docket:** Massachusetts, 1:25-cv-10695 | |
| **Jurisdiction:** U.S. Government Defendant | |

▼Participants

| Litigants | Attorneys |
|---|---|
| Rumeysa Ozturk<br>**Petitioner** | Adriana Lafaille , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>ACLU Foundation of Massachusetts, Inc.<br>One Center Plaza, Suite 850<br>Boston, MA 02108<br>USA<br>617-482-3170 Email:Alafaille@aclum.Org<br><br>Brett M. Kaufman , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street, 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2603 Fax: 212-995-4031 Email:Bkaufman@aclu.Org<br><br>Brian Matthew Hauss , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street, 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Bhauss@aclu.Org<br><br>Esha Bhandari , Esq. |

JA-000527

| Litigants | Attorneys |
|---|---|
| | PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street, 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Ebhandari@aclu.Org<br><br>Hillary A. Rich , Esq.<br>ATTORNEY TO BE NOTICED<br>ACLU Foundation of Vermont<br>P.O. Box 277<br>Montpelier, VT 05601-0277<br>USA<br>315-521-9231 Email:Hrich@acluvt.Org<br><br>Jessie Rossman , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>ACLU Foundation of Massachusetts, Inc.<br>One Center Plaza, Suite 850<br>Boston, MA 02108<br>USA<br>617-482-3170 Fax: 617-451-0009 Email:Jrossman@aclum.Org<br><br>Julian Bava , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>ACLU Foundation of Massachusetts, Inc.<br>One Center Plaza, Suite 850<br>Boston, MA 02108<br>USA<br>617-482-3170 Email:Jbava@aclum.Org<br><br>Katherine Rosenfeld , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>1 Rockefeller Plaza, 8th Floor<br>New York, NY 10020<br>USA<br>212-763-5000 Email:Krosenfeld@ecbawm.Com<br><br>Lia N. Ernst , Esq.<br>ATTORNEY TO BE NOTICED<br>ACLU Foundation of Vermont<br>P.O. Box 277<br>Montpelier, VT 05601-0277<br>USA<br>(802) 223-6304 Fax: (802) 223-6304 Email:Lernst@acluvt.Org<br><br>Mahsa Khanbabai , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Khanbabai Immigration Law<br>115 Main Street, Ste 1b<br>North Easton, MA 02356<br>USA<br>508-297-2065<br><br>Matthew D. Brinckerhoff , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>1 Rockefeller Plaza, 8th Floor<br>New York, NY 10020<br>USA<br>212-763-5000 Fax: 212-763-5001 |

JA-000528

| Litigants | Attorneys |
|-----------|-----------|
|  | Email:Mbrinckerhoff@ecbawm.Com |

Michael K.T. Tan , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
USA
212-549-2500 Fax: 332-221-1702

Monica H. Allard , Esq.
ATTORNEY TO BE NOTICED
ACLU Foundation of Vermont
P.O. Box 277
Montpelier, VT 05601-0277
USA
802-251-7091 Email:Mallard@acluvt.Org

Mudassar H. Toppa , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
Main Street Legal Services Inc.
Clear Project Cuny School Of Law 2 Court Square, Ste 5th Floor
Long Island City, NY 11101
USA
718-340-4021 Email:Mudassar.Toppa@law.Cuny.Edu

Naz Ahmad , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
Main Street Legal Services Inc.
Clear Project Cuny School Of Law 2 Court Square, Ste 5th Floor
Long Island City, NY 11101
USA
718-340-4630 Email:Naz.Ahmad@law.Cuny.Edu

Noor Zafar , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
USA
212-549-2500 Email:Nzafar@aclu.Org

Rachel E. Davidson , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
ACLU Foundation of Massachusetts, Inc.
One Center Plaza, Suite 850
Boston, MA 02108
USA
617-482-3170 Email:Rdavidson@aclum.Org

Ramzi Kassem , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
Main Street Legal Services Inc.
Clear Project Cuny School Of Law 2 Court Square, Ste 5th Floor
Long Island City, NY 11101
USA
718-340-4558 Fax: 718-340-4478
Email:Ramzi.Kassem@law.Cuny.Edu

Sidra Mahfooz , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation

JA-000529

| Litigants | Attorneys |
|---|---|
| | 125 Broad Street, 18th Floor<br>New York, NY 10004<br>USA<br>631-741-3383 Email:Smahfooz@aclu.Org<br><br>Sonya Levitova , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>1 Rockefeller Plaza, 8th Floor<br>New York, NY 10020<br>USA<br>212-763-5000 Fax: 212-763-5001 Email:Slevitova@ecbawm.Com<br><br>Vasudha Talla , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>1 Rockefeller Plaza, 8th Floor<br>New York, NY 10020<br>USA<br>212-763-5000 Fax: 212-763-5001 Email:Vtalla@ecbawm.Com |
| Patricia Hyde<br>Field Office Director \|<br>**Respondent** | Mark Sauter , AUSA<br><br>[Terminated: 05/06/2025]<br>U.S. Department of Justice<br>Suite 9200 One Courthouse Way<br>Boston, MA 02169<br>USA<br>617-748-3347<br><br>Michael P. Drescher , AUSA<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>11 Elmwood Avenue, 3rd Floor P.O. Box 570<br>Burlington, VT 05402-0570<br>USA<br>(802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Michael Krol<br>HSI New England Special Agent in Charge \|<br>**Respondent** | Mark Sauter , AUSA<br><br>[Terminated: 05/06/2025]<br>U.S. Department of Justice<br>Suite 9200 One Courthouse Way<br>Boston, MA 02169<br>USA<br>617-748-3347<br><br>Michael P. Drescher , AUSA<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>11 Elmwood Avenue, 3rd Floor P.O. Box 570<br>Burlington, VT 05402-0570<br>USA<br>(802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Todd Lyons<br>Acting Director U.S. Immigration and Customs Enforcement \|<br>**Respondent** | Mark Sauter , AUSA<br><br>[Terminated: 05/06/2025]<br>U.S. Department of Justice<br>Suite 9200 One Courthouse Way<br>Boston, MA 02169<br>USA<br>617-748-3347<br><br>Michael P. Drescher , AUSA |

JA-000530

| Litigants | Attorneys |
|---|---|
| | ATTORNEY TO BE NOTICED |
| | United States Attorney's Office |
| | 11 Elmwood Avenue, 3rd Floor P.O. Box 570 |
| | Burlington, VT 05402-0570 |
| | USA |
| | (802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Kristi Noem | Mark Sauter , AUSA |
| Secretary of Homeland Security \| | |
| **Respondent** | [Terminated: 05/06/2025] |
| | U.S. Department of Justice |
| | Suite 9200 One Courthouse Way |
| | Boston, MA 02169 |
| | USA |
| | 617-748-3347 |
| | |
| | Michael P. Drescher , AUSA |
| | ATTORNEY TO BE NOTICED |
| | United States Attorney's Office |
| | 11 Elmwood Avenue, 3rd Floor P.O. Box 570 |
| | Burlington, VT 05402-0570 |
| | USA |
| | (802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Donald J Trump | Mark Sauter , AUSA |
| **Respondent** | |
| | [Terminated: 05/06/2025] |
| | U.S. Department of Justice |
| | Suite 9200 One Courthouse Way |
| | Boston, MA 02169 |
| | USA |
| | 617-748-3347 |
| | |
| | Michael P. Drescher , AUSA |
| | ATTORNEY TO BE NOTICED |
| | United States Attorney's Office |
| | 11 Elmwood Avenue, 3rd Floor P.O. Box 570 |
| | Burlington, VT 05402-0570 |
| | USA |
| | (802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Marco A. Rubio | Mark Sauter , AUSA |
| **Respondent** | |
| | [Terminated: 05/06/2025] |
| | U.S. Department of Justice |
| | Suite 9200 One Courthouse Way |
| | Boston, MA 02169 |
| | USA |
| | 617-748-3347 |
| | |
| | Michael P. Drescher , AUSA |
| | ATTORNEY TO BE NOTICED |
| | United States Attorney's Office |
| | 11 Elmwood Avenue, 3rd Floor P.O. Box 570 |
| | Burlington, VT 05402-0570 |
| | USA |
| | (802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Brett F Stokes | Brett F. Stokes , Esq. |
| International Law Professors, Experts, Practitioners and Scholars | ATTORNEY TO BE NOTICED |
| \| | Vermont Law School |
| **Amicus** | P.O. Box 1404 |
| | Burlington, VT 05402 |
| | USA |
| | 802-558-7732 Email:Bstokes@vermontlaw.Edu |

JA-000531

| Litigants | Attorneys |
|---|---|
| The Cato Institute<br>**Amicus** | James M. Diaz , Esq.<br>ATTORNEY TO BE NOTICED<br>Darby Kolter & Roberts, LLP<br>89 South Main Street<br>Waterbury, VT 05676<br>USA<br>802-253-7165 Fax: 802-244-5954<br>Email:Jay@waterburystowelaw.Con |
| Becky Penberthy<br>**Material Witness** | |

## ▼Proceedings

> **Retrieve Document(s)**

| | Availability ⬍ | # ⬍ | Date ⬆ | Proceeding Text ⬍ | Source ⬍ |
|---|---|---|---|---|---|
| ☐ | Online | 1 | 03/25/2025 | PETITION for Writ of Habeas Corpus (2241) Filing fee: $ 5, receipt number BMADC-10912735 Fee status: Filing Fee paid., filed by Rumeysa Ozturk. (Khanbabai, Mahsa) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/25/2025) | |
| ☐ | | 2 | 03/25/2025 | ELECTRONIC NOTICE of Case Assignment. Judge Denise J. Casper assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Donald L. Cabell. (JPM) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/25/2025) | |
| ☐ | Online | 3 | 03/25/2025 | Judge Indira Talwani: ORDER entered. Service Order and Order Concerning Determination of Jurisdiction. (JPM) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/25/2025) | |
| ☐ | Online | 4 | 03/26/2025 | General Order 19-02, dated June 1, 2019 regarding Public Access to Immigration Cases Restricted by Federal Rule of Civil Procedure 5.2(c). (NMC) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/26/2025) | |
| ☐ | | 5 | 03/26/2025 | Online access to documents in this case is limited to counsel of record only. All documents are available for review in the Office of the Clerk. Counsel of record: please note that you will need to log into CM/ECF to access any documents in this case. (SEC) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/26/2025) | |
| ☐ | Free | 6 | 03/26/2025 | NOTICE of Appearance by Mark Sauter on behalf of Patricia Hyde, Michael Krol, Todd Lyons, Kristi Noem (Sauter, Mark) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/26/2025) | |
| ☐ | Free | 7 | 03/26/2025 | Withdrawn MOTION for Writ EMERGENCY Motion To Produce Petitioner by Rumeysa Ozturk.(Khanbabai, Mahsa) Modified on 3/27/2025 in accordance with D. 10 (SEC). [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/26/2025) | |
| ☐ | | 8 | 03/26/2025 | Judge Denise J. Casper: ELECTRONIC ORDER entered. The Court orders the government to respond to the motion, D. 7 , by 9:00am on 3/27/25. (SEC) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/26/2025) | |
| ☐ | Free | 9 | 03/27/2025 | Opposition re 7 MOTION for Writ EMERGENCY Motion To Produce Petitioner filed by Rumeysa Ozturk, Patricia Hyde, Michael Krol, Todd Lyons, Kristi Noem. (Sauter, Mark) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/27/2025) | |
| ☐ | Online | 10 | 03/27/2025 | NOTICE of Withdrawal by Rumeysa Ozturk to W/D Motion at ECF7 (Khanbabai, Mahsa) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/27/2025) | |
| ☐ | Online | 11 | 03/28/2025 | NOTICE of Appearance by Jessie J. Rossman on behalf of Rumeysa Ozturk (Rossman, Jessie) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/28/2025) | |
| ☐ | Online | 12 | 03/28/2025 | AMENDED COMPLAINT AND PETITION FOR WRIT OF HABEAS CORPUS against Patricia Hyde, Michael Krol, Todd Lyons, Kristi Noem, Donald J Trump, Marco Rubio, filed by Rumeysa Ozturk. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Rossman, Jessie) . (Additional attachment(s) added on 3/28/2025: # 3 *SEALED* Exhibit A and B) (SEC). [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/28/2025) | |

JA-000532

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | Online | 13 | 03/28/2025 | NOTICE of Appearance by Rachel Elizabeth Davidson on behalf of Rumeysa Ozturk (Davidson, Rachel) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/28/2025) | |
| ☐ | Online | 14 | 03/28/2025 | NOTICE of Appearance by Julian Bava on behalf of Rumeysa Ozturk (Bava, Julian) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/28/2025) | |
| ☐ | Online | 15 | 03/28/2025 | NOTICE of Appearance by Adriana Lafaille on behalf of Rumeysa Ozturk (Lafaille, Adriana) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/28/2025) | |
| ☐ | Free | 16 | 03/28/2025 | Judge Denise J. Casper: ORDER entered. MEMORANDUM AND ORDER - the Court ORDERS as follows: 1. To allow the Court's resolution of its jurisdiction to decide the Petition, Ozturk shall not be removed from the United States until further Order of this Court. See Mahmoud Khalil v. Joyce, No. 25-cv-01935-JMF at ECF No. 9, 2025 WL 750599 (S.D.N.Y. Mar. 10, 2025) (ruling that "[t]o preserve the Courts jurisdiction pending a ruling on the petition, Petitioner shall not be removed from the United States unless and until the Court orders otherwise"); and 2. The Respondents have until 5:00 p.m. on Tuesday, April 1, 2025, to respond to the Amended Petition and Complaint, D. 12 . (SEC) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/28/2025) | |
| ☐ | Online | 17 | 04/01/2025 | MOTION for Leave to File Excess Pages by Patricia Hyde, Michael Krol, Donald J Trump, Marco Rubio, Todd Lyons, Kristi Noem.(Sauter, Mark) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/01/2025) | |
| | | 18 | 04/01/2025 | Judge Denise J. Casper: ELECTRONIC ORDER entered allowing 17 Motion for Leave to File Excess Pages; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (SEC) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/01/2025) | |
| ☐ | Free | 19 | 04/01/2025 | RESPONSE/ANSWER to 12 Amended Complaint, by Patricia Hyde, Michael Krol, Donald J Trump, Marco Rubio, Todd Lyons, Kristi Noem. (Attachments: # 1 Exhibit A)(Sauter, Mark) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/01/2025) | |
| | | 20 | 04/01/2025 | Judge Denise J. Casper: ELECTRONIC ORDER entered re 19 Response to Petition for Writ of Habeas Corpus - 2241. Petitioner may file a response to Respondents' filing, D. 19 , by April 2, 2025 at 5 p.m. Such filing shall not exceed thirty (30) pages. (SEC) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/01/2025) | |
| | | 21 | 04/02/2025 | ELECTRONIC NOTICE of Hearing. Oral argument on the Amended Petition, D. 12. Hearing set for 4/3/2025 02:00 PM in Courtroom 11 (In person with remote access provided) before Judge Denise J. Casper. Overflow will be available in Jury Assembly Hall. This hearing will be available to the public and media by audio only. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.(LMH) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| ☐ | Online | 22 | 04/02/2025 | MOTION to Seal Declaration of Rumeysa Ozturk re: Reply to 1 PETITION for Writ of Habeas Corpus (2241) by Rumeysa Ozturk.(Lafaille, Adriana) [Transferred from Massachusetts on 4/4/2025.] Link added on 4/6/2025 (law). (Entered: 04/02/2025) | |
| | | 23 | 04/02/2025 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 22 Motion to Seal Declaration of Rumeysa Ozturk by Rumeysa Ozturk. Counsel will receive an email within twenty-four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (LMH) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| ☐ | Online | 24 | 04/02/2025 | MOTION for Leave to File Excess Pages for Reply re: 1 PETITION for Writ of Habeas Corpus (2241) by Rumeysa Ozturk.(Lafaille, Adriana) [Transferred from Massachusetts on 4/4/2025.] Link added on 4/6/2025 (law). (Entered: 04/02/2025) | |
| | | 25 | 04/02/2025 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 24 MOTION for Leave to File Excess Pages by Rumeysa Ozturk noting there | |

JA-000533

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | will be no opposition filed.Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (SEC) [Transferred from Massachusetts 4/4/2025]. (Entered: 04/02/2025) | |
| ☐ | Online | 26 | 04/02/2025 | REPLY to Response to 1 Petition for Writ of Habeas Corpus - 2241 by Rumeysa Ozturk. (Attachments: # 1 Exhibit 1 (unredacted, sealed), # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 8)(Lafaille, Adriana) (Additional attachment(s) added on 4/3/2025: # 8 *SEALED* Exhibit 7) (SEC). [Transferred from Massachusetts on 4/4/2025.] Text and link clarified on 4/6/2025 (law). (Additional attachment(s) added on 4/16/2025: # 9 Exhibit 1 (redacted) ) (law). (Entered: 04/02/2025) | |
| ☐ | Online | 27 | 04/02/2025 | ASSENTED-TO MOTION for Leave to Appear Pro Hac Vice for admission of Noor Zafar Filing fee: $ 125, receipt number AMADC-10929762 by Rumeysa Ozturk. (Attachments: # 1 Exhibit A)(Rossman, Jessie) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| ☐ | Online | 28 | 04/02/2025 | ASSENTED-TO MOTION for Leave to Appear Pro Hac Vice for admission of Brian Hauss Filing fee: $ 125, receipt number AMADC-10929769 by Rumeysa Ozturk. (Attachments: # 1 Exhibit A)(Rossman, Jessie) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| ☐ | Online | 29 | 04/02/2025 | ASSENTED-TO MOTION for Leave to Appear Pro Hac Vice for admission of Esha Bhandari Filing fee: $ 125, receipt number AMADC-10929772 by Rumeysa Ozturk. (Attachments: # 1 Exhibit A)(Rossman, Jessie) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| ☐ | Online | 30 | 04/02/2025 | ASSENTED-TO MOTION for Leave to Appear Pro Hac Vice for admission of Katherine Rosenfeld Filing fee: $ 125, receipt number AMADC-10929774 by Rumeysa Ozturk. (Attachments: # 1 Exhibit A)(Rossman, Jessie) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| ☐ | Online | 31 | 04/02/2025 | ASSENTED-TO MOTION for Leave to Appear Pro Hac Vice for admission of Sonya Levitova Filing fee: $ 125, receipt number AMADC-10929777 by Rumeysa Ozturk. (Attachments: # 1 Exhibit A)(Rossman, Jessie) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| ☐ | Online | 32 | 04/02/2025 | ASSENTED-TO MOTION for Leave to Appear Pro Hac Vice for admission of Matthew D. Brinckerhoff Filing fee: $ 125, receipt number AMADC-10929780 by Rumeysa Ozturk. (Attachments: # 1 Exhibit A)(Rossman, Jessie)[Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| ☐ | Online | 33 | 04/02/2025 | ASSENTED-TO MOTION for Leave to Appear Pro Hac Vice for admission of Vasudha Talla Filing fee: $ 125, receipt number AMADC-10929785 by Rumeysa Ozturk. (Attachments: # 1 Exhibit A)(Rossman, Jessie) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| | | 34 | 04/03/2025 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 27 Motion for Leave to Appear Pro Hac Vice Added Noor Zafar; 28 Motion for Leave to Appear Pro Hac Vice Added Brian Hauss; 29 Motion for Leave to Appear Pro Hac Vice Added Esha Bhandari; 30 Motion for Leave to Appear Pro Hac Vice Added Katherine Rosenfeld; 31 Motion for Leave to Appear Pro Hac Vice Added Sonya Levitova; 32 Motion for Leave to Appear Pro Hac Vice Added Matthew D. Brinckerhoff; 33 Motion for Leave to Appear Pro Hac Vice Added Vasudha Talla. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorneys. (SEC) [Transferred from Massachusetts 4/4/2025.] (Entered: 04/03/2025) | |
| ☐ | Online | 35 | 04/03/2025 | Assented to MOTION Remote Participation by Some of Petitioner's Counsel at Argument re 21 Notice of Hearing,,, by Rumeysa Ozturk.(Bava, Julian) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/03/2025) | |
| ☐ | Online | 36 | 04/03/2025 | NOTICE of Appearance by Matthew Brinckerhoff on behalf of Rumeysa Ozturk (Brinckerhoff, Matthew) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/03/2025) | |

JA-000534

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | Online | 37 | 04/03/2025 | NOTICE of Appearance of Katherine Rosenfeld on behalf of Rumeysa Ozturk (Rosenfeld, Katherine) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/03/2025) | |
| ☐ | Online | 38 | 04/03/2025 | NOTICE of Appearance by Sonya Levitova on behalf of Rumeysa Ozturk (Levitova, Sonya) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/03/2025) | |
| ☐ | Online | 39 | 04/03/2025 | NOTICE of Appearance by Vasudha Talla on behalf of Rumeysa Ozturk (Talla, Vasudha) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/03/2025) | |
| | | 40 | 04/03/2025 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 35 Motion for Remote Participation by Some of Petitioner's Counsel at Argument re 21 Notice of Hearing by Rumeysa Ozturk. (LMH) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/03/2025) | |
| | | 41 | 04/03/2025 | Electronic Clerk's Notes for proceedings held before Judge Denise J. Casper: Hearing on Amended Petition held on 4/3/2025. Court hears from counsel and takes matter under advisement. (Court Reporter: Kristin Kelley at kmob929@gmail.com.)(Attorneys present: Jessie Rossman, Adriana Lafaille, Mahsa Khanbabai, Rachel Davidson, Julian Bava, Noor Zafar and Brian Hauss for the petitioner. Mark Sauter for respondent.) (LMH) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/03/2025) | |
| ☐ | Free | 42 | 04/04/2025 | Judge Denise J. Casper: ORDER entered. MEMORANDUM AND ORDER - The Court DENIES the government's motion to dismiss this Petition and its alternative request to transfer this matter to the Western District of Louisiana. The Court ALLOWS the alternative relief sought by Ozturk and transfers this matter "in the interest of justice" pursuant 28 U.S.C. § 1631 to the U.S. District Court for the District of Vermont.To ensure that Ozturk has an opportunity to have the Petition considered by the District of Vermont, and to preserve the status quo, this Court's March 28, 2025 Order enjoining the government from removing her from the United States, D. 16, shall remain in effect unless and until the transferee court orders otherwise. See Khalil, 2025 WL 849803, at *14 (ordering same upon transfer).(LMH) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/04/2025) | |
| ☐ | Free | 43 | 04/04/2025 | Judge Denise J. Casper: Order Transferring Case to US District Court, District of Vermont.(LMH) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/04/2025) | |
| | | 44 | 04/04/2025 | Case transferred to to District of Vermont. Original file certified copy of transfer order and docket sheet sent to Clerk in that district. (SEC) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/04/2025) | |
| ☐ | Online | 45 | 04/04/2025 | CASE TRANSFERRED IN electronically from District of Massachusetts; Case Number 1:25-cv-10695. (Entered: 04/04/2025) | |
| ☐ | Online | 46 | 04/04/2025 | NOTICE OF APPEARANCE by Lia N. Ernst, Esq on behalf of Rumeysa Ozturk.(Ernst, Lia) (Entered: 04/04/2025) | |
| ☐ | Online | 47 | 04/04/2025 | UNOPPOSED MOTION for Telephonic Status Conference filed by Rumeysa Ozturk. (Ernst, Lia) (Entered: 04/04/2025) | |
| | | 48 | 04/05/2025 | ORDER granting 47 Unopposed Motion for Telephonic Status Conference. A telephonic status conference is now scheduled on Monday, April 7, 2025 at 12:00 p.m. EST. Signed by Judge William K. Sessions III on 4/5/2025. (This is a text-only Order.) (eae) (Entered: 04/05/2025) | |
| ☐ | Online | 49 | 04/05/2025 | NOTICE OF APPEARANCE by Monica H. Allard, Esq on behalf of Rumeysa Ozturk.(Allard, Monica) (Entered: 04/05/2025) | |
| ☐ | Online | 50 | 04/06/2025 | NOTICE of Hearing: Status Conference set for 4/7/2025 12:00 PM by telephone before Judge William K. Sessions III.(law) (Entered: 04/06/2025) | |
| ☐ | Online | 51 | 04/06/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Ramzi Kassem (Filing fee $ 150 receipt number AVTDC-2055485) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Ramzi Kassem, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/7/2025 to clarify text/attachments and Attachment 1 replaced on 4/7/2025) (sjl). (Entered: 04/06/2025) | |
| ☐ | Online | 52 | 04/06/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Mudassar Hayat Toppa (Filing fee $ 150 receipt number AVTDC-2055486) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Mudassar Hayat Toppa, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/7/2025 to clarify text/attachments (sjl). (Entered: 04/06/2025) | |
| ☐ | Online | 53 | 04/06/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Mahsa Khanbabai (Filing fee $ 150 receipt number AVTDC-2055495) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Mahsa Khanbabai, # 2 Certificate of Good Standing). (Ernst, Lia) Modified on 4/7/2025 to clarify text/attachments and Attachment 1 replaced on 4/7/2025) (sjl). (Entered: 04/06/2025) | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | 54 | 04/07/2025 | ORDER granting 52 Motion for Admission Pro Hac Vice of Mudassar Hayat Toppa. Signed by Judge William K. Sessions III on 4/7/2025. (This is a text-only Order.) (eae) (Entered: 04/07/2025) | |
| ☐ | Online | 55 | 04/07/2025 | NOTICE OF APPEARANCE by Michael P. Drescher, AUSA on behalf of Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd Lyons, Kristi Noem.(Drescher, Michael) (Entered: 04/07/2025) | |
| ☐ | Online | 56 | 04/07/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 53 UNOPPOSED MOTION for Appearance Pro Hac Vice of Mahsa Khanbabai. The Affidavit has been replaced to include the signature which was omitted at the time of filing. The corrected document is now attached to 53 and this entry. (sjl) (Entered: 04/07/2025) | |
| | | 57 | 04/07/2025 | ORDER granting 53 Unopposed Motion for Admission Pro Hac Vice of Mahsa Khanbabai. Signed by Judge William K. Sessions III on 4/7/2025. (This is a text-only Order.) (eae) (Entered: 04/07/2025) | |
| ☐ | Online | 58 | 04/07/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 51 UNOPPOSED MOTION for Appearance Pro Hac Vice of Ramzi Kassem. The Affidavit has been replaced with a corrected version. The corrected document is now attached to 51 and this entry. (sjl) (Entered: 04/07/2025) | |
| | | 59 | 04/07/2025 | ORDER granting 51 Unopposed Motion for Admission Pro Hac Vice of Ramzi Kassem. Signed by Judge William K. Sessions III on 4/7/2025. (This is a text-only Order.) (eae) (Entered: 04/07/2025) | |
| | | 60 | 04/07/2025 | MINUTE ENTRY for proceedings held before Judge William K. Sessions III: Status Conference held on 4/7/2025. Present by telephone Ramzi Kassem, Esq. for petitioner and Michael Drescher, AUSA for respondent. Court inquires. Statements by counsel. ORDERED: supplemental briefs due by 4/10/2025 at 5pm and summary of testimony, if needed, due by 4/11/2025 at 5pm; further hearing may be set for Monday and/or Tuesday if necessary; page limitations are waived on additional briefing. (Court Reporter: Sarah M. Bentley) (law) (Entered: 04/07/2025) | |
| ☐ | Online | 61 | 04/08/2025 | MOTION for Appearance Pro Hac Vice of Matthew Brinckerhoff (Filing fee $ 150 receipt number AVTDC-2056634) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Matthew Brinckerhoff, # 2 Certificate of Good Standing (Ernst, Lia) Modified on 4/9/2025 to clarify attachments (sjl). (Entered: 04/08/2025) | |
| ☐ | Online | 62 | 04/08/2025 | MOTION for Appearance Pro Hac Vice of Sonya Levitova (Filing fee $ 150 receipt number AVTDC-2056635) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Sonya Levitova, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/9/2025 to clarify attachments (sjl). (Entered: 04/08/2025) | |
| ☐ | Online | 63 | 04/08/2025 | MOTION for Appearance Pro Hac Vice of Katherine Rosenfeld (Filing fee $ 150 receipt number AVTDC-2056636) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Katherine Rosenfeld, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/9/2025 to clarify attachments (sjl). (Entered: 04/08/2025) | |
| ☐ | Online | 64 | 04/08/2025 | MOTION for Appearance Pro Hac Vice of Vasudha Talla (Filing fee $ 150 receipt number AVTDC-2056637) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Vasudha Talla, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/9/2025 to clarify attachments (sjl). (Entered: 04/08/2025) | |
| ☐ | Online | 65 | 04/08/2025 | MOTION for Appearance Pro Hac Vice of Brett Kaufman (Filing fee $ 150 receipt number AVTDC-2056644) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Brett Kaufman, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/9/2025 to clarify attachments (sjl). (Entered: 04/08/2025) | |
| ☐ | Online | 66 | 04/09/2025 | TRANSCRIPT of Telephonic Status Conference hearing held on April 7, 2025, before Judge William K. Sessions III. Court Reporter/Transcriber Sarah M. Bentley, contact information: sbireland7@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/5/2025. Redacted Transcript Deadline set for 5/15/2025. Release of Transcript Restriction set for 7/11/2025. (law) (Entered: 04/09/2025) | |
| | | 67 | 04/09/2025 | ORDER granting 61 Motion for Admission Pro Hac Vice of Matthew Brinckerhoff; granting 62 Motion for Admission Pro Hac Vice of Sonya Levitova ; granting 63 Motion for Admission Pro Hac Vice of Katherine Rosenfeld; granting 64 Motion for Admission Pro Hac Vice of Vasudha Talla; granting 65 Motion for Admission Pro Hac Vice of Brett Kaufman. Signed by Judge William K. Sessions III on 4/9/2025. (This is a text-only Order.) (eae) (Entered: 04/09/2025) | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | Online | 68 | 04/09/2025 | NOTICE OF APPEARANCE by Matthew D. Brinckerhoff, Esq on behalf of Rumeysa Ozturk.(Brinckerhoff, Matthew) (Entered: 04/09/2025) | |
| ☐ | Online | 69 | 04/09/2025 | NOTICE OF APPEARANCE by Katherine Rosenfeld, Esq on behalf of Rumeysa Ozturk.(Rosenfeld, Katherine) (Entered: 04/09/2025) | |
| ☐ | Online | 70 | 04/09/2025 | NOTICE OF APPEARANCE by Vasudha Talla, Esq on behalf of Rumeysa Ozturk.(Talla, Vasudha) (Entered: 04/09/2025) | |
| ☐ | Online | 71 | 04/09/2025 | NOTICE OF APPEARANCE by Sonya Levitova, Esq on behalf of Rumeysa Ozturk.(Levitova, Sonya) (Entered: 04/09/2025) | |
| ☐ | Online | 72 | 04/09/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Julian Bava (Filing fee $ 150 receipt number AVTDC-2057391) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Julian Bava, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/10/2025 to clarify text/attachments (sjl) (Entered: 04/09/2025) | |
| ☐ | Online | 73 | 04/09/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Esha Bhandari (Filing fee $ 150 receipt number AVTDC-2057394) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Esha Bhandari, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/10/2025 to clarify text/attachments (sjl) Modified on 4/10/2025 (sjl). (Entered: 04/09/2025) | |
| ☐ | Online | 74 | 04/09/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Brian Hauss (Filing fee $ 150 receipt number AVTDC-2057395) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Brian Hauss, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/10/2025 to clarify text/attachments (sjl). (Entered: 04/09/2025) | |
| ☐ | Online | 75 | 04/09/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Noor Zafar (Filing fee $ 150 receipt number AVTDC-2057396) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Noor Zafar, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/10/2025 to clarify text/attachments (sjl). (Entered: 04/09/2025) | |
| | | 76 | 04/10/2025 | ORDER granting 72 Motion for Admission Pro Hac Vice of Julian Bava; granting 73 Motion for Admission Pro Hac Vice of Esha Bhandari; granting 74 Motion for Admission Pro Hac Vice of Brian Hauss; granting 75 Motion for Admission Pro Hac Vice of Noor Zafar. Signed by Judge William K. Sessions III on 4/10/2025. (This is a text-only Order.) (eae) (Entered: 04/10/2025) | |
| ☐ | Online | 77 | 04/10/2025 | NOTICE OF APPEARANCE by Gary L. Franklin, Esq on behalf of Anshe Chesed, Bend the Arc: A Jewish Partnership for Justice, B'nai Jeshurun, Congregation Beth Elohim, Congregation Dorshei Tzedek, West Newton, Habonim Dror, Harvard Jewish Progressive Alumni, IKAR, J Street, Jewish Center for Justice, Jewish Labor Committee, Keshet, Leo Baeck Temple, Ma'yan Tikvah, New England Jewish Labor Committee, New Israel Fund, New Jewish Narrative, Nexus Project, T'ruah: The Rabbinic Call for Human Rights, Massachusetts, The Boston Workers Circle, The Reconstructionist Rabbinical Assoc, The Workers Circle, Worcester Havurah, Jewish Alliance for Law and Social Action, New York Jewish Agenda, Temple Emanu-El, Temple Micah.(Franklin, Gary) Filers added on 4/10/2025 (law). (Entered: 04/10/2025) | |
| ☐ | Free | 78 | 04/10/2025 | NOTICE OF Hearing re: Motion to Dismiss: Motion Hearing set for 4/14/2025 at 09:30 AM in Burlington Courtroom 110 before Judge William K. Sessions III. (law) (see page 2 of notice for Zoom information) Please be reminded that Judicial Conference policy prohibits the broadcasting of proceedings in federal courts. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, or rebroadcasting of court proceedings pursuant to Judicial Conference policy. This prohibition applies to counsel, the parties, the media and any member of the public. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. (Entered: 04/10/2025) | |
| ☐ | Online | 79 | 04/10/2025 | MOTION for Appearance Pro Hac Vice of Robert Balin, Jeremy Chase, Linda Steinman, Victor Kovner, Abigail Everdell, Rachel Strom, James Rosenfeld, Jesse Feitel, Adam Sieff, Rachel Goldberg, Nathan Siegel, Alison Schary (Filing fee $ 1,800 receipt number 5670) filed by Anshe Chesed, Bend the Arc: A Jewish Partnership for Justice, B'nai Jeshurun, Congregation Beth Elohim, Congregation Dorshei Tzedek, Habonim Dror, Harvard Jewish Progressive Alumni, IKAR, J Street, Jewish Center for Justice, Jewish Labor Committee, Keshet, Leo Baeck Temple, Ma'yan Tikvah, New England Jewish Labor Committee, New Israel Fund, New Jewish Narrative, Nexus Project, T'ruah: The Rabbinic Call for Human | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | Rights, Massachusetts, The Boston Workers Circle, The Reconstructionist Rabbinical Assoc, The Workers Circle, Worcester Havurah, Jewish Alliance for Law and Social Action (JALSA), New York Jewish Agenda, Temple Emanu-El, Temple Micah (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X )(Franklin, Gary) Modified on 4/11/2025 to clarify attachments and include receipt number (sjl). (Entered: 04/10/2025) | |
| ☐ | Online | 80 | 04/10/2025 | MOTION for Leave to File an Amicus Curiae Brief filed by Brett F Stokes, International Law Professors, Experts, Practitioners and Scholars. (Attachments: # 1 Proposed Order, # 2 Proposed Brief)(Stokes, Brett) (Entered: 04/10/2025) | |
| ☐ | Online | 81 | 04/10/2025 | SUPPLEMENTAL MEMORANDUM by Rumeysa Ozturk on Jurisdictional Issues. (Allard, Monica) (Entered: 04/10/2025) | |
| ☐ | Online | 82 | 04/10/2025 | MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont with Request for Oral Argument/Hearing filed by Rumeysa Ozturk (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9)(Ernst, Lia) Text clarified and Added MOTION for Return to Vermont on 4/10/2025 (law). (Additional attachment(s) added on 4/11/2025: # 11 Exhibit 1(redacted), # 12 Index of Exhibits) (law). (Entered: 04/10/2025) | |
| ☐ | Online | 83 | 04/10/2025 | SUPPLEMENTAL MEMORANDUM in Opposition re: 12 Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 by Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd Lyons, Kristi Noem. (Drescher, Michael) Text clarified on 4/10/2025 (law). (Entered: 04/10/2025) | |
| ☐ | Online | 84 | 04/10/2025 | SUPPLEMENTAL BRIEFING in Opposition to 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont filed by Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd Lyons, Kristi Noem. (Drescher, Michael) Text clarified on 4/10/2025 (law). (Entered: 04/10/2025) | |
| ☐ | Online | 85 | 04/10/2025 | MOTION for Leave to File Amici Curiae Brief filed by Ansche Chesed, Bend the Arc: A Jewish Partnership for Justice, B'nai Jeshurun, Congregation Beth Elohim, Congregation Dorshei Tzedek, Habonim Dror, Harvard Jewish Progressive Alumni, IKAR, J Street, Jewish Center for Justice, Jewish Labor Committee, Keshet, Leo Baeck Temple, Ma'yan Tikvah, New England Jewish Labor Committee, New Israel Fund, New Jewish Narrative, Nexus Project, T'ruah: The Rabbinic Call for Human Rights, Massachusetts, The Boston Workers Circle, The Reconstructionist Rabbinical Assoc, The Workers Circle, Worcester Havurah, Jewish Alliance for Law and Social Action, New York Jewish Agenda, Temple Emanu-El, Temple Micah. (Attachments: # 1 Proposed Brief)(Franklin, Gary) Text clarified on 4/10/2025 (law). (Entered: 04/10/2025) | |
| ☐ | Online | 86 | 04/10/2025 | MOTION for Appearance Pro Hac Vice of Sidra Mahfooz (Filing fee $ 150 receipt number AVTDC-2058449) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Sidra Mahfooz, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/11/2025 to clarify attachments and Attachment 1 replaced on 4/11/2025) (sjl). (Entered: 04/10/2025) | |
| ☐ | Online | 87 | 04/11/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 86 MOTION for Appearance Pro Hac Vice of Sidra Mahfooz. Attachment 1 has been replaced to correct the PDF size and remove illegible PDF headers. The corrected document is now attached to 86 and this entry. (sjl) (Entered: 04/11/2025) | |
| | | 88 | 04/11/2025 | ORDER granting 86 Motion for Admission Pro Hac Vice of Sidra Mahfooz. Signed by Judge William K. Sessions III on 4/11/2025. (This is a text-only Order.) (eae) (Entered: 04/11/2025) | |
| | | 89 | 04/11/2025 | ORDER granting 79 Motion for Admission Pro Hac Vice of Robert Balin, Jeremy Chase, Linda Steinman, Victor Kovner, Abigail Everdell, Rachel Strom, James Rosenfeld, Jesse Feitel, Adam Sieff, Rachel Goldberg, Nathan Siegel, and Alison Schary. Signed by Judge William K. Sessions III on 4/11/2025. (This is a text-only Order.) (eae) (Entered: 04/11/2025) | |
| ☐ | Online | 90 | 04/11/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont filed by Rumeysa Ozturk. Exhibit 1 has been sealed in accordance with F.R.Civ.P. 5.2. Also, the required Index of Exhibits was not included at the | |

JA-000538

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | | | | time of filing. The redacted exhibit and index are now attached to 82 and this entry. (Attachments: # 1 Index of Exhibits) (law) (Entered: 04/11/2025) | |
| ☐ | Online | 91 | 04/11/2025 | SUPPLEMENTAL DOCUMENT(S) re: Jurisdictional Issues and 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont by Rumeysa Ozturk. (Attachments: # 1 Exhibit 12)(Ernst, Lia) Text clarified on 4/13/2025 (law) (Entered: 04/11/2025) | |
| ☐ | Online | 92 | 04/11/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Rachel Davidson (Filing fee $ 150 receipt number AVTDC-2059258) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Rachel Davidson, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/14/2025 to clarify text/attachments (sjl). (Entered: 04/11/2025) | |
| ☐ | Online | 93 | 04/11/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Adriana Lafaille (Filing fee $ 150 receipt number AVTDC-2059259) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Adriana Lafaille, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/14/2025 to clarify text/attachments (sjl). (Entered: 04/11/2025) | |
| ☐ | Online | 94 | 04/11/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Jessie J. Rossman (Filing fee $ 150 receipt number AVTDC-2059260) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Jessie Rossman, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/14/2025 to clarify text/attachments (sjl) (Entered: 04/11/2025) | |
| ☐ | Online | 95 | 04/13/2025 | SUPPLEMENTAL DOCUMENT(S) re: 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont by Rumeysa Ozturk. (Attachments: # 1 Exhibit 13)(Levitova, Sonya) (Entered: 04/13/2025) | |
| | | 96 | 04/14/2025 | ORDER granting 92 Motion for Admission Pro Hac Vice of Rachel Davidson; granting 93 Motion for Admission Pro Hac Vice of Adriana Lafaille; granting 94 Motion for Admission Pro Hac Vice of Jessie J. Rossman. Signed by Judge William K. Sessions III on 4/14/2025. (This is a text-only Order.) (eae) (Entered: 04/14/2025) | |
| | | 97 | 04/14/2025 | MINUTE ENTRY for proceedings held before Judge William K. Sessions III: Motion Hearing held on 4/14/2025 re: Motion to Dismiss and 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont. Adriana Lafaille, Jessie Rossman, Lisa Ernst, Monica Allard and Noor Zafar, Esqs. present for petitioner. Michael Drescher, AUSA present for respondents. Statements by counsel. ORDERED: motions taken under advisement. (Court Reporter: Sarah Bentley) (law) (Entered: 04/14/2025) | |
| ☐ | Online | 98 | 04/16/2025 | TRANSCRIPT of Motion hearing held on April 14, 2025, before Judge William K. Sessions III. Court Reporter/Transcriber Sarah M. Bentley, telephone number sbireland7@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2025. Redacted Transcript Deadline set for 5/22/2025. Release of Transcript Restriction set for 7/18/2025. (law) (Entered: 04/16/2025) | |
| ☐ | Online | 99 | 04/16/2025 | SUPPLEMENTAL DOCUMENT(s) re: 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return by Rumeysa Ozturk. (Ernst, Lia) Link added on 4/17/2025 (law). (Entered: 04/16/2025) | |
| ☐ | Online | 100 | 04/17/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 26 REPLY to Response to 1 Petition for Writ of Habeas Corpus - 2241 filed by Rumeysa Ozturk. Exhibit 1 has been sealed in accordance with F.R.Civ.P. 5.2. A redacted version is now attached to 26 and this entry. (law) (Entered: 04/17/2025) | |
| ☐ | Online | 101 | 04/17/2025 | SUPPLEMENTAL DOCUMENT(S) re: 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont by Rumeysa Ozturk. (Ernst, Lia) (Text and link clarified, Main Document 101 replaced and Attachment(s) added on 4/17/2025: # 1 Exhibit A) (law). (Entered: 04/17/2025) | |
| ☐ | Online | 102 | 04/17/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 101 Supplemental Document to 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont filed by Rumeysa Ozturk. The document and its exhibit was uploaded as a singular PDF. The documents have been broken apart and are now separately attached to 101 and this entry. (Attachments: # 1 Exhibit A) (law) (Entered: 04/17/2025) | |
| ☐ | Online | 103 | 04/18/2025 | RESPONSE to 99 Supplemental Document re: 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont by Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd | |

JA-000539

| | Availability ↕ | # ↕ | Date ↑ | Proceeding Text ↕ | Source ↕ |
|---|---|---|---|---|---|
| | | | | Lyons, Kristi Noem. (Drescher, Michael) Text clarified, link added on 4/20/2025 (law). (Entered: 04/18/2025) | |
| ☐ | Free | 104 | 04/18/2025 | OPINION AND ORDER re: court to retain jurisdiction; petitioner is to be transferred to ICE custody within the District of Vermont no later than 5/1/2025; a bail hearing is to be scheduled for 5/9/2025; parties are ordered to submit briefs and present all evidence related to issue of bail by 5/2/2025; a hearing on the merits of the habeas petition will be held 5/22/2025 and the court stays the effect of this order for 4 days to allow either party to appeal this order. Signed by Judge William K. Sessions III on 4/18/2025. (law) (Entered: 04/18/2025) | |
| ☐ | Online | 105 | 04/22/2025 | NOTICE OF APPEAL as to 104 Opinion and by Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd Lyons, Kristi Noem. (Drescher, Michael) (Entered: 04/22/2025) | |
| ☐ | Online | 106 | 04/22/2025 | MOTION to Continue Stay Pending Appeal re 104 Opinion and Order filed by Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd Lyons, Kristi Noem. (Drescher, Michael) Text clarified on 4/23/2025 (law). (Entered: 04/22/2025) | |
| ☐ | Online | 107 | 04/23/2025 | RESPONSE in Opposition re 106 MOTION to Continue Stay Pending Appeal re 104 Opinion and Order filed by Rumeysa Ozturk. (Ernst, Lia) (Entered: 04/23/2025) | |
| ☐ | Online | 108 | 04/23/2025 | REPLY to 99 Supplemental Document re: 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont regarding request for production of memoranda by Rumeysa Ozturk. (Ernst, Lia) Text clarified and link added on 4/24/2025 (law). (Entered: 04/23/2025) | |
| ☐ | Free | 109 | 04/24/2025 | OPINION AND ORDER denying 106 Motion to Continue Stay Pending Appeal re 104 Opinion and Order. Signed by Judge William K. Sessions III on 4/24/2025. (law) (Entered: 04/24/2025) | |
| ☐ | Online | 110 | 04/24/2025 | NOTICE of Hearing: Bail Hearing set for 5/9/2025 09:30 AM in Burlington Courtroom 110 before Judge William K. Sessions III.(law) (Entered: 04/24/2025) | |
| ☐ | Online | 111 | 04/25/2025 | NOTICE OF APPEARANCE by Hillary A. Rich, Esq on behalf of Rumeysa Ozturk.(Rich, Hillary) (Entered: 04/25/2025) | |
| ☐ | Online | 112 | 04/25/2025 | MOTION for Leave to File Amicus Brief and MOTION to Expedite filed by E.S. (Attachments: # 1 Proposed Amicus Brief)(law) (Entered: 04/25/2025) | |
| ☐ | Online | 113 | 04/28/2025 | TRANSMITTED Index on Appeal, Circuit No. 25-1019, re: 105 Notice of Appeal (Attachments: # 1 Docket Sheet (public), # 2 Docket Sheet (sealed), # 3 Clerk's Certification)(kac) (Entered: 04/28/2025) | |
| ☐ | Online | 114 | 04/28/2025 | NOTICE of Hearing re: 1 Petition for Writ of Habeas Corpus (2241). Hearing set for 5/22/2025 at 09:00 AM in Burlington Courtroom 110 before Judge William K. Sessions III.(law) (Entered: 04/28/2025) | |
| ☐ | Online | 115 | 04/28/2025 | UNOPPOSED MOTION for Leave to File Brief as Amicus Curiae in Support of Petitioner filed by Foundation for Individual Rights and Expression, National Coalition Against Censorship, The Rutherford Institute, PEN America, The Cato Institute, First Amendment Lawyers Association. (Attachments: # 1 Proposed Brief)(Diaz, James) Text clarified on 4/29/2025 (law). (Entered: 04/28/2025) | |
| ☐ | Online | 116 | 04/28/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Naz Ahmad (Filing fee $ 150 receipt number AVTDC-2066895) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Naz Ahmad, # 2 Certificate of Good Standing (Ernst, Lia) Modified on 4/29/2025 to clarify text/attachment (sjl). (Entered: 04/28/2025) | |
| ☐ | Online | 118 | 04/28/2025 | ORDER of USCA, Circuit No. 25-1019, as to 104 Order: motion for a stay pending appeal is referred to the three-judge motions panel sitting on May 6, 2025. An administrative stay of the district court's order to transfer is granted pending decision by the panel. (kac) (Entered: 04/29/2025) | |
| | | 117 | 04/29/2025 | ORDER granting 116 Unopposed Motion for Admission Pro Hac Vice of Naz Ahmad. Signed by Judge William K. Sessions III on 4/29/2025. (This is a text-only Order.) (eae) (Entered: 04/29/2025) | |
| ☐ | Online | 119 | 04/29/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Conor Fitzpatrick (Filing fee $ 150 receipt number AVTDC-2067806) filed by Foundation for Individual Rights and Expression (Attachments: # 1 Declaration of Conor Fitzpatrick, # 2 Certificate of Good Standing)(Diaz, James) Modified on 4/30/2025 to clarify text/attachment (sjl). (Entered: 04/29/2025) | |
| | | 120 | 04/30/2025 | ORDER granting 119 Unopposed Motion for Admission Pro Hac Vice of Conor Fitzpatrick. Signed by Judge William K. Sessions III on 4/30/2025. (This is a text-only Order.) (eae) (Entered: 04/30/2025) | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | Online | 121 | 05/02/2025 | MOTION to Withdraw as Attorney filed by Ansche Chesed, Bend the Arc: A Jewish Partnership for Justice, B'nai Jeshurun, Congregation Beth Elohim, Congregation Dorshei Tzedek, Habonim Dror, Harvard Jewish Progressive Alumni, IKAR, J Street, Jewish Center for Justice, Jewish Labor Committee, Keshet, Leo Baeck Temple, Ma'yan Tikvah, New England Jewish Labor Committee, New Israel Fund, New Jewish Narrative, Nexus Project, T'ruah: The Rabbinic Call for Human Rights, Massachusetts, The Boston Workers Circle, The Reconstructionist Rabbinical Assoc, The Workers Circle, Worcester Havurah, Jewish Alliance for Law and Social Action, New York Jewish Agenda, Temple Emanu-El, Temple Micah. (Feitel, Jesse) (Entered: 05/02/2025) | |
| ☐ | Online | 122 | 05/02/2025 | SUPPLEMENTAL MEMORANDUM re: 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont filed by Rumeysa Ozturk. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1, # 3 Exhibit 1-A, # 4 Exhibit 1-B, # 5 Exhibit 1-C, # 6 Exhibit 1-D, # 7 Exhibit 1-E, # 8 Exhibit 1-F, # 9 Exhibit 1-G, # 10 Exhibit 1-H, # 11 Exhibit 1-I)(Bava, Julian) Text clarified on 5/4/2025 (law) (Entered: 05/02/2025) | |
| ☐ | Online | 123 | 05/07/2025 | ORDER of USCA, Circuit No. 25-1019, as to 105 Notice of Appeal; govt's motion for a stay of transfer is DENIED. Govt's request for a writ of mandamus is DENIED. Administrative stay entered by Circuit Court is VACATED. Govt is ORDERED to comply with district court's transfer order within one week of date of this opinion. Circuit Court orders that Ms. Ozturk be physically transferred to ICE custody within the District of Vermont no later than May 14, 2025. The district court may amend its hearing schedule as it deems necessary in light of this order. (kac) (Entered: 05/07/2025) | |
| ☐ | Online | 124 | 05/08/2025 | REVISED NOTICE of Hearing (same date/time): Status Conference set for 5/9/2025 at 09:30 AM in Burlington Courtroom 110 before Judge William K. Sessions III.(law) (Entered: 05/08/2025) | |
| ☐ | Online | 125 | 05/08/2025 | NOTICE of Hearing: Telephone Conference set for 5/8/2025 at 10:00 AM before Judge Kevin J. Doyle. (law) (see page 2 of the notice for Zoom information - audio only)Please be reminded that Judicial Conference policy prohibits the broadcasting of proceedings in federal courts. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, or rebroadcasting of court proceedings pursuant to Judicial Conference policy. This prohibition applies to counsel, the parties, the media and any member of the public. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. Join ZoomGov Meeting https://vt-uscourts.zoomgov.com/j/1617910049?pwd=AEoTnuXeRzTw4fTU7ocLTDL1yEF5YI.1 One tap mobile: +16468287666, 1617910049 US (New York) Meeting ID: 161 791 0049 Passcode: 951302 (law) (Entered: 05/08/2025) | |
| | | 126 | 05/08/2025 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Telephone Conference held on 5/8/2025. Monica Allard, Esq. present for petitioner. Michael Drescher, AUSA present for respondent. Statements by counsel re: bail hearing. (Court Reporter: Johanna Masse) (law) (Entered: 05/08/2025) | |
| | | 127 | 05/08/2025 | ORDER granting 121 Motion to Withdraw as Attorney. Signed by Judge William K. Sessions III on 5/8/2025. (This is a text-only Order.) (eae) (Entered: 05/08/2025) | |
| ☐ | Online | 128 | 05/08/2025 | SECOND REVISED NOTICE of Hearing: Bail Hearing reset for 5/9/2025 10:00 AM in Burlington Courtroom 110 before Judge William K. Sessions III. (Note: petitioner to participate remotely) (law) Text clarified and Main Document 128 replaced on 5/8/2025 (law) (Entered: 05/08/2025) | |
| | | 129 | 05/08/2025 | ZOOM LINK for 5/9/2025 - ZoomGov Meeting https://vt-uscourts.zoomgov.com/j/1616772338?pwd=MHR2awlyeIgo0KHqU7VbgUx53LmzJe.1 or One tap mobile: +16468287666, 1617910049 US (New York); Meeting ID: 161 677 2338 Passcode: 238539. (law) Please be reminded that Judicial Conference policy prohibits the broadcasting of proceedings in federal courts. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, or rebroadcasting of court proceedings pursuant to Judicial Conference policy. This prohibition applies to counsel, the parties, the media and any member of the public. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. (Entered: 05/08/2025) | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | 130 | 05/09/2025 | MINUTE ENTRY for proceedings held before Judge William K. Sessions III: Bail Hearing held on 5/9/2025. Adriana Lafaille, Jessie Rossman, Julian Bava, Lia Ernst, Monica Allard, Mudassar Toppa, Noor Zafar and Rachael Davidson, Esqs. present for petitioner. Mahsa Khanbabai, Esq. present with petitioner remotely. Michael Drescher, AUSA present for respondents. Court inquires petitioner's waiver of personal appearance. The following witnesses examined for petitioner: Rumeysa Ozturk, Dr. McCannon, S. Johnson, and B. Penberthy. Statements by counsel. Court makes findings. ORDERED: petitioner to be released immediately on PR w/conditions; gov't is to notify the court when she is released; gov't to submit proposed order as to conditions of release after conferring with ICE. (Court Reporter: Johanna Masse) (law) (Entered: 05/09/2025) | |
| ☐ | Free | 131 | 05/09/2025 | ORDER: Petitioner is to be released from ICE custody immediately on her own recognizance, without any form of Body-Worn GPS or other ICE monitoring at this time. Petitioner is not subject to any travel restrictions. Respondents counsel shall submit proposed conditions of release after conferring with ICE no later than 5/12/2025. Signed by Judge William K. Sessions III on 5/9/2025. (hbc) (Entered: 05/09/2025) | |
| ☐ | Online | 132 | 05/12/2025 | TRANSCRIPT of Bail hearing held on May 9, 2025, before Judge William K. Sessions III. Court Reporter/Transcriber Johanna Masse, telephone number (802) 951-8102. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/5/2025. Redacted Transcript Deadline set for 6/16/2025. Release of Transcript Restriction set for 8/14/2025. (law) (Entered: 05/12/2025) | |
| ☐ | Online | 133 | 05/12/2025 | REQUEST for Conditions of Release filed by Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd Lyons, Kristi Noem. (Attachments: # 1 Exhibit 1, # 2 Proposed Order)(Drescher, Michael) Text clarified on 5/12/2025 (law). (Entered: 05/12/2025) | |
| ☐ | Online | 134 | 05/12/2025 | STIPULATED MOTION for Status Conference filed by Rumeysa Ozturk. (Allard, Monica) (Entered: 05/12/2025) | |
| ☐ | Online | 135 | 05/13/2025 | UNOPPOSED MOTION to Redesignate Case filed by Rumeysa Ozturk. (Allard, Monica) Text clarified on 5/13/2025 (law). (Entered: 05/13/2025) | |
| ☐ | Online | 136 | 05/13/2025 | DECLARATION of Becky Penberthy by Becky Penberthy. (Allard, Monica) (Entered: 05/13/2025) | |
| ☐ | Online | 137 | 05/14/2025 | NOTICE of Hearing: Telephone Conference set for 5/15/2025 01:30 PM before Judge William K. Sessions III.(law) (Entered: 05/14/2025) | |
| | | | 05/14/2025 | **ZOOM LINK for 5/15/2025 (audio only, no video) - ZoomGov Meeting https://vt-uscourts.zoomgov.com/j/1602099446?pwd=7HX3WOEJE8d9InCqEnj8BYvj2Impjt.1 or One tap mobile +16692545252, 1602099446 US (San Jose) or +16468287666, 1602099446 US (New York); Meeting ID: 160 209 9446 and Passcode: 712578. Please be reminded that Judicial Conference policy prohibits the broadcasting of proceedings in federal courts. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, or rebroadcasting of court proceedings pursuant to Judicial Conference policy. This prohibition applies to counsel, the parties, the media and any member of the public. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. (law) (Entered: 05/14/2025) | |
| ☐ | Online | 138 | 05/14/2025 | RESPONSE in Opposition re 133 REQUEST for Conditions of Release filed by Rumeysa Ozturk. (Allard, Monica) (Entered: 05/14/2025) | |
| | | 139 | 05/15/2025 | MINUTE ENTRY for proceedings held before Judge William K. Sessions III: Telephone Conference held on 5/15/2025. Adriana Lafaille, Esq. present for petitioner and Michael Drescher, AUSA present for respondents. Court reviews proposed release conditions. Statements by counsel re: briefing schedule. ORDERED: petitioner to file briefing on discovery within 30 days and gov't to respond within 10 days; hearing on 5/22/2025 is cancelled; and granting 135 Unopposed Motion to Redesignate Case. (Court Reporter: Johanna Masse) (law) (Entered: 05/15/2025) | |
| ☐ | Free | 140 | 05/16/2025 | OPINION AND ORDER granting 82 Motion for Release Under MAPP v. RENO. Signed by Judge William K. Sessions III on 5/16/2025. (law) (Entered: 05/16/2025) | |
| ☐ | Free | 141 | 05/16/2025 | ORDER granting in part and denying in part 133 Request for Conditions of Release. Signed by Judge William K. Sessions III on 5/16/2025. (law) | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | (Entered: 05/16/2025) | |
| ☐ | Online | 142 | 05/22/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Michael Tan (Filing fee $ 150 receipt number AVTDC-2079505) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Michael Tan, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 5/22/2025 to clarify text/attachment (sjl). (Entered: 05/22/2025) | |
| | | 143 | 05/23/2025 | ORDER granting 142 Motion for Admission Pro Hac Vice of Michael K.T. Tan. Signed by Judge William K. Sessions III on 5/23/2025. (This is a text-only Order.) (eae) (Entered: 05/23/2025) | |
| ☐ | Online | 144 | 05/23/2025 | TRANSCRIPT filed for date(s) of 5/15/2025 before Judge William K. Sessions III as to 105 Notice of Appeal. Court Reporter/Transcriber Johanna Masse, telephone number (802) 951-8102. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 6/16/2025. Redacted Transcript Deadline set for 6/26/2025. Release of Transcript Restriction set for 8/25/2025. (hbc) (Entered: 05/23/2025) | |
| ☐ | Free | 145 | 05/23/2025 | MOTION for Preliminary Injunction Requiring Restoring SEVIS Record with Request for Oral Argument/Hearing filed by Rumeysa Ozturk (Attachments: # 1 Declaration of Anna Garson, # 2 Declaration of Dahlia M. French) (Lafaille, Adriana) (Attachment 1 replaced and Additional attachment(s) added on 5/27/2025: # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5) (law). (Entered: 05/23/2025) | |
| ☐ | Online | 146 | 05/27/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 145 MOTION for Preliminary Injunction Requiring Restoring SEVIS Record filed by Rumeysa Ozturk. The Declaration of Anna Garson was uploaded with its exhibits as a singular PDF. The documents have been broken apart and reattached on the docket. They are now separately attached to 145 and this entry. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (law) (Entered: 05/27/2025) | |
| ☐ | Online | 147 | 05/28/2025 | TRANSMITTED Supplemental Index on Appeal, Circuit No. 25-1019, re: 105 Notice of Appeal (Attachments: # 1 Partial Docket Sheet, # 2 Partial Docket Sheet (sealed), # 3 Clerk's Certification)(kac) (Entered: 05/28/2025) | |
| ☐ | Free | 148 | 06/02/2025 | RESPONSE in Opposition re 145 MOTION for Preliminary Injunction Requiring Restoring SEVIS Record filed by Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd Lyons, Kristi Noem. (Attachments: # 1 Exhibit A) (same document as 149 (Drescher, Michael) Text clarified on 6/3/2025 (law). (Entered: 06/02/2025) | |
| ☐ | Free | 149 | 06/02/2025 | MOTION to Dismiss Case for Lack of Jurisdiction and Improper Venue filed by Patricia Hyde, Michael Krol, Todd Lyons, Kristi Noem, Marco A. Rubio, Donald J Trump. (Attachments: # 1 Exhibit A) (same document as 148 ) (law) (Entered: 06/03/2025) | |
| ☐ | Free | 150 | 06/16/2025 | MOTION for Discovery in Advance of Habeas Hearing with Request for Oral Argument/Hearing filed by Rumeysa Ozturk (Attachments: # 1 Proposed Requests for Production, # 2 Proposed Interrogatories, # 3 Proposed Requests for Admission)(Levitova, Sonya) (Entered: 06/16/2025) | |
| ☐ | Free | 151 | 06/16/2025 | REPLY to Response to 145 MOTION for Preliminary Injunction Requiring Restoring SEVIS Record filed by Rumeysa Ozturk. (same document as 152 ) (Lafaille, Adriana) (Entered: 06/16/2025) | |
| ☐ | Free | 152 | 06/16/2025 | RESPONSE in Opposition re 149 MOTION to Dismiss Case for Lack of Jurisdiction and Improper Venue filed by Rumeysa Ozturk. (same document as 151 ) (Lafaille, Adriana) (Entered: 06/16/2025) | |
| ☐ | Free | 153 | 06/24/2025 | STIPULATED MOTION for Extension of Time to File Response/Reply as to 150 MOTION for Discovery in Advance of Habeas Hearing filed by Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd Lyons, Kristi Noem(Drescher, Michael) (Entered: 06/24/2025) | |
| | | 154 | 06/24/2025 | ORDER granting 153 STIPULATED MOTION for Extension of Time to File Response/Reply as to 150 MOTION for Discovery in Advance of Habeas Hearing. Signed by Judge William K. Sessions III on 6/24/2025. (This is a text-only Order.) (eae) (Entered: 06/24/2025) | |

**Retrieve Document(s)**

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX ™

Copyright © 2025 LexisNexis.