# No. 25-1019

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

**RUMEYSA OZTURK,**
**Petitioner-Appellee,**

v.

**PATRICIA HYDE, in her official capacity as the New England Field Director for U.S. Immigration and Customs Enforcement; MICHAEL KROL, in his capacity as HSI New England Special Agent in Charge, U.S. Immigration and Customs Enforcement; TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; MARCO A. RUBIO, in his official capacity as Secretary of State; DONALD J. TRUMP, in his official capacity as President of the United States, Respondents-Appellants.**

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF VERMONT**
District Court Case No. 2:25-cv-374

## JOINT APPENDIX

**Vols. I of II**
**Pages 1-293**

ALANNA T. DUONG
Senior Litigation Counsel
Civil Division
U.S. Dept. of Justice
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-7040
alanna.duong@usdoj.gov

Attorney for
Respondents-Appellants

MONICA H. ALLARD
Staff Attorney
ACLU of Vermont
P.O. Box 277
Montpelier, VT 05601
Tel: (802) 251-7091
mallard@acluvt.org

Attorney for
Petitioner-Appellee

# <u>TABLE OF CONTENTS</u>

**Volume I**

ECF#1 Petition for Writ of Habeas Corpus …………………………………1

ECF#3 Service Order and Order Regarding Jurisdiction…………………4

ECF#7 All Writs Act Motion to Produce Petitioner ………………………8

ECF#9 Respondents' Opposition to Motion to Produce…………………11

ECF#12 Amended Habeas Petition and Two Exhibits…………………14

ECF#19 Response to Amended Petition and One Exhibit……………45

ECF#42 J. Casper Order Regarding Transfer to District of Vermont…78

ECF#46 April 3, 2025 Hearing Transcript………………………………104

ECF#66 April 7, 2025 Hearing transcript………………………………148

ECF#82 Motion and Nine Exhibits………………………………………182

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

RUMEYSA OZTURK,                                    )
                                                   )     Case No. __1:25-cv-10695__
                         Petitioner,               )
                                                   )     **PETITION FOR WRIT OF**
v.                                                 )     **HABEAS CORPUS**
                                                   )
PATRICIA HYDE, Field Office Director,              )
MICHAEL KROL, HSI New England Special              )
Agent in Charge, TODD LYONS, Acting Director       )
U.S. Immigrations and Customs Enforcement,         )
and KRISTI NOEM, Secretary of Homeland             )
Security                                           )
                         Respondents.              )
_____     )

## INTRODUCTION

1.  Rumeysa Ozturk is a Turkish national in valid F-1 student status. Her date of birth is

    ███████ 1994. She was unlawfully detained by DHS on March 25, 2025.

2.  Accordingly, to vindicate Petitioner's constitutional rights, this Court should grant

    the instant petition for a writ of habeas corpus.

3.  Petitioner asks this Court to find that she was unlawfully detained and order her

    release.

## JURISDICTION

4.  This Court has subject matter jurisdiction under 28 U.S.C. § 2241 (habeas corpus) and 28

    U.S.C. § 1331 (federal question).

5.  Venue is proper because Petitioner resides and was detained in Sommerville, MA, and on

    information and belief is detained in the District of Massachusetts.

## PARTIES AND FACTS ALLEGED

6. The Petitioner Rumeysa Ozturk is a PhD student at Tufts University.  She resides in Somerville, Massachusetts.

7. Respondent Patricia Hyde is the New England Field Office Director for U.S. Immigration and Customs Enforcement.

8. Respondent Michael Krol is the New England Special Agent in Charge for Homeland Security Investigations for U.S. Immigration and Customs Enforcement.

9. Respondent Todd Lyons is the Acting Director for U.S. Immigration and Customs Enforcement.

10. Respondent Kristi Noem is the Secretary of Homeland Security.

11. Petitioner is a Turkish national in valid F-1 student status.  On information and belief, she was detained without cause near her residence by U.S. Immigration and Customs Enforcement agents on March 25, 2025, at about 5:30 p.m.

12. On information and belief, Petitioner is currently in custody in the District of Massachusetts, and one or more of the Respondents is her immediate custodian.

## CLAIMS FOR RELIEF

### COUNT ONE
### Violation of Fifth Amendment Right to Due Process

1. On information and belief, Petitioner is currently being arrested and detained by federal agents without cause and in violation of her constitutional rights to due process of law.

## PRAYER FOR RELIEF

Wherefore, Petitioner respectfully requests this Court to grant the following:

(1) Assume jurisdiction over this matter;

(2) Order that Petitioner shall not be transferred outside the District of Massachusetts;

JA-000002

(3)   Issue an Order to Show Cause ordering Respondents to show cause why this Petition should not be granted within three days.

(4)   Declare that Petitioner's detention violates the Due Process Clause of the Fifth Amendment.

(5)   Issue a Writ of Habeas Corpus ordering Respondents to release Petitioner immediately.

(6)   Grant any further relief this Court deems just and proper.

Respectfully submitted,

/s/ Mahsa Khanbabai
Mahsa Khanbabai (BBO #639803)
115 Main Street, Suite 1B
North Easton, MA 02356
Mahsa@mk-immigration.com
508-297-2065

*Counsel for Petitioner*

Dated: March 25, 2025

JA-000003

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RUMEYSA OZTURK, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 1:25-cv-10695- DJC |
| PATRICIA HYDE, Acting Director of | ) | |
| Boston Field Office, United States | ) | |
| Immigration and Customs Enforcement, | ) | |
| TODD LYONS, Acting Director United States | ) | |
| Immigration and Customs Enforcement, and | ) | |
| KRISTI NOEM, Secretary of Homeland | ) | |
| Security, | ) | |
| | ) | |
| Respondents. | ) | |

### SERVICE ORDER AND ORDER CONCERNING
### DETERMINATION OF JURISDICTION

**Talwani, D.J.**

Petitioner Rumeysa Ozturk, a Turkish national detained by DHS on March 25, 2025, has

filed a petition for a writ of habeas corpus. S h e names Patricia Hyde, Acting Director of

Boston Field Office, United States Immigration and Customs Enforcement; Todd Lyons,

Acting Director, U.S. Immigration and Customs Enforcement, and Kristi Noem, Secretary of

the United States Department of Homeland Security, as respondents.

Upon review of the petition, the Court hereby ORDERS as follows:

1.       The clerk of this court shall serve a copy of the petition upon respondents and the

United States Attorney for the District of Massachusetts.

2.       Respondents shall, no later than March 28, 2025, answer or respond to the

petition.

3.       Although a United States District Court does not generally have subject-matter

jurisdiction to review orders of removal, *see* 8 U.S.C. § 1252(a)(1), (g), it does generally have

JA-000004

jurisdiction over habeas petitions. *See* 28 U.S.C. § 2241(a). Furthermore, a federal court

"always has jurisdiction to determine its own jurisdiction," including its own subject-matter

jurisdiction. *Brownback v. King*, 592 U.S. 209, 218-19 (2021) (quoting *United States v. Ruiz*,

536 U.S. 622, 628 (2002)). In order to give the court an opportunity to consider whether it has

subject-matter jurisdiction, and if so to determine the validity of the habeas petition, the court

may order respondent to preserve the status quo. *See United States v. United Mine Workers of

Am.*, 330 U.S. 258, 293 (1947) ("[T]he District Court ha[s] the power to preserve existing

conditions while it [is] determining its own authority to grant injunctive relief," unless the

assertion of jurisdiction is frivolous.). Such an order is valid unless and until it is overturned,

even when the issuing court lacks subject-matter jurisdiction to determine the merits of the

underlying action. *See id.* at 294-95 (upholding criminal contempt convictions for violations of a

preliminary injunction, assuming the District Court had no jurisdiction to decide the underlying

matter). This principle applies with even greater force where the action the court enjoins would

otherwise destroy its jurisdiction or moot the case. *See United States v. Shipp*, 203 U.S. 563, 573

(1906).

     4.    Accordingly, and unless otherwise ordered by the Court, petitioner shall not be

moved outside the District of Massachusetts without first providing advance notice of the

intended move. Such notice shall be filed in writing on the docket in this proceeding, and shall

state the reason why the government believes that such a movement is necessary and should not

be stayed pending further court proceedings. Once that notice has been docketed, the petitioner

shall not be moved out of the District for a period of at least 48 hours from the time of that

docketing. If the 48-hour notice period "would end on a Saturday, Sunday, or legal holiday, the

period continues to run until the same time on the next day that is not a Saturday, Sunday, or

2

legal holiday." Fed. R. Civ. P. 6(a)(2)(C). The time period may be shortened or extended as

may be appropriate by further order of the Court.

**So Ordered.**

<div align="center" style="float:right">

/s/ Indira Talwani
District Judge
United States District Court

</div>

Dated: March 25, 2025

3

JA-000007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RUMEYSA OZTURK,<br><br>        Petitioner,<br><br>v.<br><br>PATRICIA HYDE, et al.,<br><br>        Respondents. | No. 1:25-cv-10695-DJC |

## All Writs Act Motion to Produce Petitioner to Her Attorney

Last night, this Court ordered Respondents not to move Petitioner Rumeysa Ozturk outside of the District of Massachusetts without at least 48-hours' notice. ECF No. 3. Counsel has been attempting to locate and speak to her client since last night, and was informed by the U.S. Attorneys' Office that even after making inquiries, they do not know Ms. Ozturk's whereabouts. Ms. Ozturk was detained without the medication that she takes for her asthma. Petitioner respectfully requests that the Court enter an order requiring Respondents to report on Ms. Ozturk's whereabouts and permit her counsel to speak to her by 6pm today. I have further just been informed by a U.S. Senator's office that she has been transferred to Louisiana, but I have not received any confirmation from ICE or the U.S. attorney office.

Ms. Ozturk was a student in valid F1 status who was detained on March 25, 2025 at around 5:15pm when plain-clothes officers in what appear to be unmarked

JA-000008

vehicles approached her on the street near her home, handcuffed her, and took her away. In a now widely-circulated video of her arrest, Ms. Ozturk is seen screaming as a man in a hooded sweatshirt grabs a hold of her.

Since Ms. Ozturk's detention, numerous attempts by counsel to learn where she is and the basis for her detention, and speak to her, have been unsuccessful. This morning, a representative of the Turkish consulate went personally to the offices of Immigration and Customs Enforcement in Burlington Massachusetts and was reportedly informed that she was not in that office, but that ICE could not provide information about her whereabouts. Counsel assisting Ms. Ozturk also called all major known ICE detention facilities in New England, and were informed that she was not being held at those facilities. Counsel have also checked ICE's online detainee locator, which reveals that Ms. Ozturk is detained, but does not reveal the location of her detention. And although Representatives of the U.S. Attorneys' Office informed counsel that they would attempt to locate Ms. Ozturk's, they too have reported back that they were unable to learn her location. To counsel's knowledge, no one has heard from Ms. Ozturk since her detention.

Counsel has been informed that Ms. Ozturk takes at least two different medications for asthma and was detained without access to these medications. Because high stress situations can trigger asthma attacks, counsel has also called around to area hospitals in an attempt to locate Ms. Ozturk, but has been unable to do so.

JA-000009

The All Writs Act empowers district courts to issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The habeas statutes similarly authorize district courts to order relief "as law and justice require." In this case, concerns about Ms. Ozturk's health in light of her increasingly-prolonged incommunicado detention without her medication warrant relief. Petitioner thus respectfully asks the court to compel Respondents to disclose Ms. Ozturk's location and permit access to her by 6pm today.

Respectfully submitted,

/s/ Mahsa Khanbabai
Mahsa Khanbabai (BBO #639803
115 Main Street, Suite 1B,
North Easton, MA 02356
mahsa@mk-immigration.com
508-297-2065
*Counsel for Petitioner*

Local Rule 7.1 Statement

I have contacted government counsel to attempt to resolve or narrow the issues in this motion. Counsel for the government asked me to delay the filing of this motion.  As of 2:30pm, counsel for the government still had not provided any response.

Dated: March 25, 2025                    /s/ Mahsa Khanbabai
                                         Mahsa Khanbabai

JA-000010

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RUMEYSA OZTURK,<br><br>               Petitioner,<br><br>      v.<br><br>PATRICIA HYDE, Field Office Director,<br>MICHAEL KROL, HSI New England Special<br>Agent in Charge, TODD LYONS, Acting<br>Director, U.S. Immigration and Customs<br>Enforcement, and KRISTI NOEM, Secretary of<br>Homeland Security,<br><br>               Respondents. | Civil Action No. 1:25-cv-10695-DJC |

## RESPONDENTS' OPPOSITION TO PETITIONER'S
## MOTION TO PRODUCE PETITIONER TO HER ATTORNEY

Respondents, by and through their attorney, Leah B. Foley, United States Attorney for

the District of Massachusetts, respectfully submits this response to Petitioner Rumeysa Ozturk's

("Petitioner") motion filed on March 26, 2025 seeking Respondents to provide her location and

to permit her counsel to communicate with her.  Doc. No. 7.

The undersigned can report that Petitioner is currently detained at the South Louisiana

Correctional Facility located at 3943 E. Stagg Avenue in Basile, Louisiana.[1]  *See* ICE Online

Detainee Locator System, *https://locator.ice.gov/odls/#/search* which provides the following

information once Petitioner's name and country of nationality, Turkey, is input.

---

[1] Respondents will set forth the timeline of Petitioner's arrest and transfer from Massachusetts in further detail via sworn declaration in its response to Petitioner's Habeas Petition.  The undersigned has been informed that Petitioner was detained outside of Massachusetts at the time the Petition was filed and the Court's Service Order was issued.

*Detention Information For:*

**RUMEYSA OZTURK**

**Country of Birth:** *Turkey*

*Current Detention Facility:*

*SOUTH LOUISIANA ICE PROCESSING CENTER*

*3843 STAGG AVENUE*

*BASILE, LA 70515*

**Visitor Information:** *(318) 668-5900*

The undersigned conveyed that Petitioner would be detained at this location to Petitioner's counsel upon learning such information from Respondents and upon viewing this information on the Online Detainee Locator System at approximately 5:30 PM on March 26, 2025.

In response to Petitioner's request for the Court to order communication be facilitated between Petitioner's counsel and Petitioner, the undersigned can also report that he worked diligently throughout the afternoon and the evening of March 26, 2025 to make Respondents aware of Petitioner's counsel's desire to speak with Petitioner and to keep Petitioner's counsel apprised that such communication would be possible after Petitioner had arrived at the South Louisiana Correctional Facility and had gone through processing at such facility.  The undersigned, based on discussions with Respondents and with Petitioner's counsel, can report that Petitioner was able to speak with Petitioner's counsel on March 26, 2025 at approximately 9:45 PM.

JA-000012

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Dated: March 27, 2025          By:     */s/ Mark Sauter*
                                       Mark Sauter
                                       Assistant United States Attorney
                                       United States Attorney's Office
                                       1 Courthouse Way, Suite 9200
                                       Boston, MA 02210
                                       Tel.: 617-748-3347
                                       Email: mark.sauter@usdoj.gov

## **CERTIFICATE OF SERVICE**

I, Mark Sauter, Assistant United States Attorney, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated:  March 27, 2025          By:     */s/ Mark Sauter*
                                        Mark Sauter
                                        Assistant United States Attorney

JA-000013

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

RÜMEYSA ÖZTÜRK,

*Petitioner*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States; PATRICIA HYDE,
in her official capacity as the New England Field
Office Director for U.S. Immigration and
Customs Enforcement; MICHAEL KROL, in his
official capacity as HSI New England Special
Agent in Charge, U.S. Immigration and Customs
Enforcement; TODD LYONS, in his official
capacity as Acting Director, U.S. Immigration and
Customs Enforcement; KRISTI NOEM, in her
official capacity as Secretary of the United States
Department of Homeland Security; and MARCO
RUBIO, in his official capacity as Secretary of
State,

*Respondents*.

Case No. 1:25-cv-10695-DJC

**FIRST AMENDED PETITION FOR
WRIT OF HABEAS CORPUS
AND COMPLAINT**

## <u>INTRODUCTION</u>

1.      Rümeysa Öztürk is an international PhD student who was arrested on March 25,

2025 when six plain-clothes federal officers surrounded her on the street just outside her home in

Somerville, MA. Rümeysa screamed as a man in a hooded sweatshirt grabbed her. Several other

officers encircled her and soon covered their faces with masks. Rümeysa was handcuffed and

escorted with an officer holding each arm into an unmarked vehicle. For more than 20 hours, her

friends, family and legal counsel could not locate or contact her. After an exhaustive search, they

learned that she had ultimately been removed from Massachusetts and sent more than 1,300

miles away to an ICE detention facility in Louisiana.

JA-000014

2.      Rümeysa has not been charged with any crime. Nor has there been any allegation that she is dangerous or a flight risk. Her arrest and detention appear to be based solely on her co-authorship of an op-ed in her school newspaper, *The Tufts Daily*, in March 2024. The piece criticized the University's dismissal of several resolutions that had been adopted by the undergraduate student Senate as "a sincere effort to hold Israel accountable for clear violations of international law." It articulated the goals of the resolutions and the disappointment of the authors before concluding with a request that the administration "trust in the Senate's rigorous and democratic process" and "meaningfully engage with and actualize the resolutions passed by the Senate."[1]

3.      Rümeysa's arrest and detention are designed to punish her speech and chill the speech of others. Indeed, her arrest and detention are part of a concerted and systemic effort by Trump administration officials to punish students and others identified with pro-Palestine activism. When asked about Rümeysa's case, Secretary of State Marco Rubio confirmed revoking her visa, adding, "we gave you a visa to come and study and get a degree, not to become a social activist that tears up our university campuses."[2]

4.      The Department of Homeland Security's website informs international students and the schools that host them that the termination of student status may result in a requirement to immediately depart the United States and may lead ICE agents to investigate whether a student has in fact departed. It makes no mention of arresting or detaining students based solely

---

[1] Rümeysa Öztürk, et al., *Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions*, THE TUFTS DAILY (Mar. 26, 2024), www.tuftsdaily.com/ article/2024/03/4ftk27sm6jkj.
[2] *Secretary Rubio Defends Revoking Turkish Student's Visa*, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students- visa/5158479.

JA-000015

on the loss of status.  In this case, however, DHS grabbed, arrested, and detained Rümeysa before she had received any notice of the revocation of her student visa or her student status.

5.      Rümeysa's arrest and detention are not a necessary or usual consequence of the revocation of a visa. But like the revocation of her visa, her arrest and detention are designed to silence her, punish her for her speech, and ensure that other students will be chilled from expressing pro-Palestinian viewpoints. Her continued detention is therefore unlawful. Because the government's arrest and detention violate the First and Fifth Amendments to the United States Constitution and the Administrative Procedure Act, Rümeysa should be released.

## **JURISDICTION**

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2241 (habeas corpus); Art. I, § 9, cl. 2 of the United States Constitution (Suspension Clause); and 28 U.S.C. § 2201 (declaratory judgment).

7.      Venue is proper because Petitioner had been detained in the District of Massachusetts by Immigration and Customs Enforcement (ICE) in Massachusetts and under the custody and control of ICE officials in Massachusetts at the time of the filing of this petition. Defendant Patricia Hyde is the Director of the Boston Field Office of ICE Enforcement and Removal Operations (ICE ERO), with authority over ICE ERO's operations and detainees in New England. Additionally, Defendant Michael Krol is the Special Agent in Charge for the Boston office of ICE Homeland Security Investigations (HSI), with authority over HSI operations and detainees in New England. At the time this petition was filed, and when the Court issued an order requiring notice prior to any transfer of the petitioner out of Massachusetts, ECF No. 3, Rümeysa had only recently been arrested in Massachusetts and had not left the custody

JA-000016

and control of Defendants Hyde and/or Krol in Massachusetts.[3] Sometime after receiving that

order, ICE officials transferred Rümeysa to Louisiana without notifying the Court, her counsel,

or Department of Justice counsel on this case. Meanwhile, Respondents withheld information

about Rümeysa's location from Petitioner's counsel (and apparently, from Department of Justice

attorneys on this case) until nearly 24 hours after she had been detained. On information and

belief, the movement of Petitioner to other states is consistent with, and part of, ICE's pattern

and practice of moving people detained for their speech to distant locations incommunicado and

in secret to frustrate the ability of counsel to file habeas petitions on their behalf.

## **PARTIES**

8.      Petitioner Rümeysa Öztürk is a PhD student at Tufts University.  She resides in

Somerville, Massachusetts. Rümeysa entered the United States on an F-1 nonimmigrant student

visa.

9.      Respondent Donald J. Trump is named in his official capacity as the President of

the United States. In this capacity, he is responsible for the policies and actions of the executive

branch, including the Department of State and Department of Homeland Security.

10.      Respondent Patricia Hyde is named in her official capacity as the New England

Field Office Director for U.S. Immigration and Customs Enforcement.

11.      Respondent Michael Krol is named in his official capacity as the New England

Special Agent in Charge for Homeland Security Investigations for U.S. Immigration and

Customs Enforcement.

---

[3] Counsel for the government has stated that he "has been informed that Petitioner was detained outside of Massachusetts at the time the Petition was filed," but has not provided evidence of Rümeysa's location at the time the petition was filed, or suggested that she was not in the custody and control of ICE officials in Massachusetts, ECF No. 9 at 1 n.1.

4

12.     Respondent Todd Lyons is named in his official capacity as the Acting Director for U.S. Immigration and Customs Enforcement. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States and is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner.

13.     Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a) (2007); is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner.

14.     Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i).

## **FACTS**

### *Rümeysa Öztürk*

15.     Rümeysa is a doctoral candidate in Child Study and Human Development at Tufts University. Rümeysa received a master's degree from Columbia University on a Fulbright scholarship.

16.     On March 26, 2024, almost exactly one year before her arrest, Rümeysa co-authored an op-ed in *The Tufts Daily*. The piece criticized Tufts University's response to several student Senate resolutions concerning human rights violations in Gaza. The authors urged

JA-000018

meaningful engagement by the University administration with the Senate resolutions.

17.    In February 2025, the website Canary Mission published a profile on Rümeysa, including her photograph, claiming she "engaged in anti-Israel activism in March 2024 . . . ." The profile describes Rümeysa as "a supporter of the Boycott, Divestment, Sanctions (BDS) movement." Its sole support for the contention that Rümeysa "engaged in anti-Israel activism" was a link and screenshots of the March 2024 opinion piece.

18.    Canary Mission's publication caused Rümeysa to fear for her safety.

### *Rümeysa's Arrest Near Her Home and Continued Detention in Louisiana*

19.    On March 25, 2025 at approximately 5:15 p.m., a hooded, plainclothes officer approached Rümeysa near her Somerville apartment.[4]

20.    The hooded officer grabbed Rümeysa by her wrists as she screamed. Additional officers surrounded Rümeysa as she pleaded with them. The officers placed Rümeysa in handcuffs and took her away in an unmarked vehicle.

21.    Rümeysa's friends frantically tried to find out more information about what had happened to her. At approximately 10:02 p.m., counsel for Rümeysa filed a petition for writ of habeas corpus in this Court.

22.     At approximately 10:55 p.m., the Court ordered that Rümeysa not be moved outside the District of Massachusetts without 48 hours' notice.

23.    For more than 24 hours after her arrest, Rümeysa's friends, family and legal counsel did not hear from her and could not speak to her.

24.    Because Rümeysa suffers from asthma, her family and friends worried that she

---

[4] WCVB Channel 5 Boston, *Surveillance shows Tufts graduate student detained*, YouTube (Mar. 26, 2025), https://www.youtube.com/watch?v=PuFIs7OkzYY.

JA-000019

could become ill without access to her medication.

25.    On the evening of her arrest, and on the following day, counsel made numerous attempts to locate Rümeysa.

26.    These efforts included contacting the offices of ICE ERO and ICE HSI. Counsel received no response to these inquiries. Counsel also called all major known ICE detention facilities in New England but were informed that Rümeysa was not there. Counsel attempted to locate her whereabouts through ICE's Online Detainee Locator System. Although the Detainee Locator indicated that Rümeysa was in ICE custody, the field for "Current Detention Facility" remained blank.

27.    A representative of the Turkish consulate went personally to ICE offices in Burlington, Massachusetts and was reportedly informed that Rümeysa was not in that office and that ICE could not provide further information about her whereabouts. Department of Justice counsel on this matter also informed counsel for Rümeysa that they could not locate her.

28.    Fearing Rümeysa could have had a medical episode, counsel contacted numerous area hospitals.

29.    At around 3 p.m. on March 26, counsel moved this Court for an order requiring Respondents to report on Rümeysa's whereabouts and permit her counsel to speak with her.

30.    Shortly thereafter, Department of Justice counsel informed Rümeysa's counsel that she had been moved to a staging facility in Alexandria, Louisiana to be transferred to South Louisiana.

31.    Counsel was finally able to speak to Rümeysa late in the evening of March 26. Counsel learned that she had suffered an asthma attack while en route to Louisiana.

*Rümeysa's Visa Revocation and Removal Proceedings*

32.      ICE uses the Student and Exchange Visitor Information System ("SEVIS") to maintain information on students who attend designated educational programs.

33.      A letter dated March 25, 2025, and addressed but not provided to Rümeysa stated that her SEVIS designation "has been terminated pursuant to 237(a)(1)(C)(i) and/or 237(a)(4)(C)(i) of the Immigration and Nationality Act."[5] *See* **Exhibit A**. On information and belief, a copy of the letter was provided to Tufts University.

34.      A Notice to Appear ("NTA") functions as a charging document for removal proceedings. *See* 8 U.S.C. § 1229(a).

35.      On March 25 ICE provided Rümeysa with an NTA. *See* **Exhibit B**. The NTA alleges, in part, that Rümeysa's visa "was revoked by the United States Department of State" on March 21, 2025. The NTA charges Rümeysa as deportable under INA § 237(a)(1)(B).[6]  The NTA provides no other basis for Rümeysa's removal.

36.      On information and belief, Rümeysa received no notice that her visa had been revoked prior to her arrest or the service of the NTA.

37.      The NTA indicates that Rümeysa is scheduled for an initial hearing on April 7, 2025 at 8:30 a.m.

---

[5] Section 237(a)(1)(C)(i) provides: "Any alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted . . . or to comply with the conditions of any such status, is deportable." 8 U.S.C. § 1227(a)(1)(C)(i). Section 237(a)(4)(C)(i) provides: "An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1227(A)(4)(c)(i).
[6] Section 237(a)(1)(B) provides: "Any alien who is present in the United States in violation of this chapter or any other law of the United States, or whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant) has been revoked under section 1201(i) of this title, is deportable." 8 U.S.C. § 1227(a)(1)(B).

JA-000021

***Rümeysa's Arrest and Detention are Part of the Trump Administration's Policy of Retaliating Against Noncitizens Who Advocate for Palestinian Rights***

38.     Rümeysa's arrest and detention reflect and are a part of the Trump administration's concerted effort to silence protected political speech.

39.     In the fall of 2023, thousands of students across the U.S. from a wide range of racial, ethnic, religious, and socioeconomic backgrounds began organizing on their campuses, many criticizing what they saw as the steadfast support of their universities and the United States government for Israel's policies. Opponents of these students' messages—including President Trump—have characterized their message in favor of Palestinian rights as inherently supportive of Hamas and antisemitic.

40.     During his campaign for re-election, President Trump repeatedly vowed to use visa revocations as a tactic to pursue his policy of silencing pro-Palestinian activities on university campuses.

41.     For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."

42.     In the spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."

43.     Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated

JA-000022

the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."

### *The Trump Administration Announces its Policy to Target Speech of Noncitizens*

44.     Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

45.     Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's overly broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including advocacy for Palestinian human rights.

46.     Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that, applied to speech, would punish constitutionally protected criticism of the Israeli government and its policies. In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas,"

10

sending a clear message to all "resident aliens [sic] who participated in pro-jihadist protests" that the federal government "will find you... and deport you."

47.     In or around February 2025, Respondents began implementing a policy by which they would retaliate against and punish noncitizens like Rümeysa for their constitutionally protected speech (the Policy). Under the Policy, Secretary of State Marco Rubio would revoke the visas or green cards of individuals who expressed support for Palestinian rights. These revocations would then permit the Department of Homeland Security to arrest, detain and deport such individuals.

48.     On March 6, 2025, Secretary Rubio posted to X: "Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law—including international students—face visa denial or revocation, and deportation."

49.     Additionally, certain groups began publicizing the names of pro-Palestinian activists they wanted the government to deport. Specifically, these groups compiled lists of students and faculty who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line, or publicly flagged names to U.S. Government official accounts.

50.     As illustrated *infra*, one way that Secretary Rubio is implementing the Policy is by wrongly invoking 8 U.S.C. § 1227(a)(4)(C)(i) (hereinafter "the Foreign Policy Ground"), which provides that "An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." This Provision expressly prohibits the Secretary of State from excluding or conditioning entry based on a noncitizen's "past, current, or

JA-000024

expected beliefs, statements, or associations, if such beliefs, statements, or associations would be

lawful within the United States," unless the Secretary personally certifies to Congress that

admitting the individual would compromise a compelling U.S. foreign policy interest. *See* 8

U.S.C. § 1227(a)(4)(C)(ii) (citing 8 U.S.C. § 1182(a)(3)(C)(iii)).

51.    Legislative history makes clear that Congress intended to limit the Executive's

authority to exclude noncitizens based on their speech or beliefs. When the Moynihan

Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the

United States has embarrassed itself by excluding prominent foreigners from visiting the United

States solely because of their political beliefs." The amendment was intended "to take away the

executive branch's authority to deny visas to foreigners solely because of the foreigner's political

beliefs or because of his anticipated speech in the United States," while affirming "the principles

of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in

133 Cong. Rec. S2326 (1987)).

52.    Congress further evinced its intent to restrict the Executive's ability to exclude

foreign speakers by asserting that such exclusions should not be based solely on "the possible

content of an alien's speech in this country," that the Secretary's authority to determine that entry

would compromise foreign policy interests should be used "sparingly and not merely because

there is a likelihood that an alien will make critical remarks about the United States or its

policies," and that the "compelling foreign policy interest" standard should be applied strictly.

(H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N.

6784, 6794).

JA-000025

*The Government Begins to Implement its Policy of Intimidation and Retaliation*

53.     On March 5, 2025, the State Department revoked the student visa of Ranjani
Srinivasan, an Indian national and doctoral student at Columbia, under the Foreign Policy
Ground. Srinivasan had previously expressed support for the rights of Palestinians. Two days
later, federal immigration agents showed up at her apartment looking for her, but she did not
open the door. They showed up again the following night, but she was not home. On March 13,
2025, agents returned to her home with a judicial warrant. DHS released a statement
characterizing Srinivasan as a terrorist sympathizer and accused her of advocating violence and
being "involved in activities supporting Hamas," but the agency has not provided any evidence
for its allegations, and Srinivasan disputes them.

54.     On March 8, 2025, ICE agents in plain clothes arrested Mahmoud Khalil, a legal
permanent resident and recent Columbia University graduate, at his Columbia University student
housing. Khalil had previously expressed support for the rights of Palestinians. The agents
initially told Khalil that they were detaining him because his student visa had been revoked by
the State Department, but when Khalil's attorney informed the agents that he was a green card
holder, the agents responded that the State Department had revoked Khalil's green card, too. The
Notice to Appear later issued by the government to Khalil cites the Foreign Policy Ground as the
basis for his arrest and removal. The agents handcuffed Khalil and placed him in an unmarked
vehicle. Over the course of that evening and into the early hours of the following morning, Khalil
would first be taken to an ICE field office in Manhattan and then to a detention facility in New
Jersey, returning to New York to board a flight to Texas and finally to Louisiana. To date, Khalil
remains detained in Louisiana.

JA-000026

55.     On March 8, 2025, ICE signed an administrative arrest warrant for Yunseo

Chung, a legal permanent resident and Columbia University student who has lived in the United

States since she was seven. Chung had previously expressed support for the rights of

Palestinians. On March 10, a federal law enforcement official advised Chung's attorney that her

legal permanent resident status had been revoked. On March 13, federal law enforcement agents

executed a judicial search warrant at Chung's dormitory. Chung filed a complaint and petition

for habeas corpus in the United States District Court for the Southern District of New York, and

sought, among other things, a temporary restraining order preventing immigration enforcement

officials from taking her into custody or transferring her out of the district. On March 25, 2025,

the court issued such an order. *Chung v. Trump et al.*, Case No. 25-cv-02412, ECF 19

(S.D.N.Y.).

56.     On March 17, 2025, ICE arrested Badar Khan Suri, an Indian national and

postdoctoral fellow at Georgetown University's School of Foreign Service. Suri's student visa

was revoked pursuant to the Foreign Policy Ground. In a statement given to Fox News, DHS

asserted that Suri had "spread[] Hamas propaganda," "promot[ed] antisemitism on social media,"

and had "close connections to a known or suspected terrorist, who is a senior advisor to Hamas."

Suri has no criminal record and has not been charged with a crime. DHS's allegations appear to

reference the fact that Suri's father-in-law, Ahmed Yousef, is a former advisor to Ismael

Haniyeh, the Hamas leader assassinated by Israel last year in Iran. But Yousef left his position in

the Hamas-run government in Gaza more than a decade ago and has publicly criticized Hamas's

decision to attack Israel on October 7, 2023. DHS has not alleged that Suri himself has taken any

action on behalf of Hamas. To date, Suri remains in immigration detention.

JA-000027

57.    On March 21, 2025, the Justice Department wrote to counsel for Momodou Taal, a student visa holder and doctoral candidate at Cornell University, to convey ICE's intention to serve a deportation notice on Taal and request that Taal voluntarily surrender to ICE custody. Taal had previously expressed support for the rights of Palestinians. The Justice Department wrote to Taal's lawyers after Taal sought a temporary restraining order to enjoin DHS from attempting to detain, remove, or otherwise enforce the Executive Orders against him. In response to that application, the government informed the court that the State Department had revoked Taal's student visa.

### *High-Level Government Officials Confirm Rümeysa Was Targeted Because of Her Speech*

58.    Multiple government officials, including Secretary of State Marco Rubio, have confirmed that Rümeysa was targeted for arrest and detention solely because of her actual or perceived First Amendment activity.

59.    On March 21, 2025, the day Rümeysa's visa was revoked according to her NTA, Secretary Rubio announced on X.com: "We will continue to cancel the visas of those whose presence or activities have potentially serious adverse foreign policy consequences for our country . . . And we will continue to use every legal means available to remove alien enemies."

60.    After Rümeysa's arrest, a DHS spokesperson stated, "DHS and ICE investigations found Öztürk engaged in activities in support of Hamas, a foreign terrorist organization that relishes the killing of Americans . . . . A visa is a privilege, not a right. Glorifying and supporting terrorists who kill Americans is grounds for visa issuance to be terminated. This is commonsense security."[7]

---

[7] Mike Toole & Beth Germano, *Tufts University student taken into immigration custody by federal agents in Massachusetts* (Mar. 27, 2025), https://www.cbsnews.com/boston/news/tufts-university-graduate-student-somerville-ice/.

JA-000028

61.  In a March 27 news conference, Secretary Rubio reaffirmed that the reason for Rümeysa's arrest and detention washer actual and perceived pro-Palestinian speech and political activity.[8] At the conference, a member of the media asked Secretary Rubio to explain the specific actions that led to Rümeysa's visa being revoked. The Secretary responded "oh, we revoked her visa," and continued:

> We gave you a visa to come and study and get a degree not to become a social activist that tears up our university campuses. And if we've given you a visa and then you decide to do that we're going to take it away. [. . .] We don't want it. We don't want it in our country. Go back and do it in your country. But you're not going to do it in our country."

62.  Secretary Rubio added: "Every time I find one of these lunatics I take away their visa," suggesting that hundreds of visas have been revoked in furtherance of the administration's Policy of targeting noncitizens for their pro-Palestinian speech.[9]

### DHS Did Not Follow Ordinary Procedure

63.  DHS maintains a website, titled "Study in the States," which "explains the student visa process, enhances coordination among government agencies, and keeps international students and the U.S. academic community better informed about pertinent rules and regulations." *About*, Study in the States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27, 2025), https://studyinthestates.dhs.gov/footer/about.

64.  According to Study in the States, student visa holders must maintain their status, which means "Fulfilling the purpose for why the Department of State issued you your visa" and

---

[8] *Secretary Rubio Defends Revoking Turkish Student's Visa*, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students-visa/5158479.

[9] *See* Madeline Halpert, *Marco Rubio says US revoked at least 300 foreign students' visas*, BBC (Mar. 27, 2025), https://www.bbc.com/news/articles/c75720q9d7lo; *see also Secretary of State Marco Rubio Remarks to the Press*, U.S. Dep't of State (March 28, 2025), https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-3/.

16

"Following the regulations associated with that purpose." *Maintaining Status*, Study in the

States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27, 2025),

https://studyinthestates.dhs.gov/students/maintaining-status. For F-1 student visa holders, that

purpose is "to study." *Id.*

65.     The Study in the States website lists consequences that can occur "[w]hen an F-

1/M-1 SEVIS record is terminated," including, the student "loses all on-and/or off-campus

employment authorization," the student "cannot re-enter the United States on the terminated

SEVIS record," and ICE agents "may investigate to confirm the departure of the student."

*Terminate a Student*, Study in the States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27,

2025), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-

terminations/terminate-a-student. Termination may require an F-1 visa holder to immediately

depart the United States. *Id.*

66.     DHS does not indicate on its Study in the States website that loss of student status

may result in immediate arrest and detention. DHS departed from these expected procedures in

arresting Rümeysa without warning or notice about the change in her student status.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of the First Amendment to the United States Constitution

67.     Petitioner repeats and re-alleges the allegations contained in the preceding

paragraphs of this Complaint-Petition as if fully set forth herein.

68.     The First Amendment to the United States Constitution provides in part that

"Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people .

. . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First

JA-000030

Amendment protects past, present, and future speech, including speech by noncitizens.

69.     The Policy, and the government's implementation of the Policy as to Rümeysa—specifically, the government's targeting, arrest, transfer, and ongoing detention of Rümeysa—violate the First Amendment because they:

      a.  retaliate against and punish Rümeysa's past protected speech;

      b.  prevent her from speaking now (through detention);

      c.  attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) her future speech in the United States;

      d.  deprive those with whom she would speak of her present and future speech on matters of public concern; and

      e.  chill other individuals who express support for Palestinian rights.

70.     These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the purpose of the Policy and the government's actions implementing the Policy as to Rümeysa and those similarly situated. In government officials' own telling, the Policy is intended to silence viewpoints with which the Trump administration disagrees.

## SECOND CLAIM
### Violation of Fifth Amendment Right to Due Process

71.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

72.     The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

73.     The government's detention of Rümeysa is unjustified. The government has not

18

demonstrated that Rümeysa—who has no criminal history, has close ties in the Tufts community, and wishes to complete her doctoral degree at Tufts—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Rümeysa cannot be safely released back to her community.

74.     Rümeysa's detention is also punitive and bears no "reasonable relation" to any legitimate purpose for detaining her. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("nature and duration" of civil confinement must "bear some reasonable relation to the purpose for which the individuals is committed"); *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). Her "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

75.     Rümeysa's arrest and detention under the Policy violate due process limitations on civil detention because they are designed to punish and silence her speech with which the government disagrees, and to chill others from expressing these viewpoints—impermissible bases for taking away individual liberty.

76.     The Policy and its implementation as to Rümeysa violate her right to due process for additional reasons as well. The government's policy of applying the Foreign Policy Ground to make such determinations concerning people like Rümeysa—who was in valid F-1 status, living peacefully in the country—is unconstitutionally vague where it is due to constitutionally protected speech.

**THIRD CLAIM**
**Violation of the Administrative Procedure Act and the *Accardi* Doctrine**

77.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

78.    The government has adopted a policy of targeting noncitizens for arrest, detention and removal based on First Amendment-protected speech advocating for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706 (2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

79.    In addition, Rümeysa's SEVIS termination notice invoked the Foreign Policy Ground.

80.    In order to be invoked in an instance involving a noncitizen's past statements, the Foreign Policy Ground requires the Secretary of State to determine that a person's "presence or activities would potentially have serious adverse foreign policy consequences for the United States" and "would compromise a compelling United States foreign policy interest."

81.    Here, there is no indication that the Secretary of State ever made such a determination.

82.    To the extent the Secretary of State failed to make such a determination, the invocation of the Foreign Policy Ground is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C § 706 (2)(A), (B), (C).

JA-000033

83.    To the extent the Secretary of State purported to make such a determination, it is

arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law,

and in excess of statutory jurisdiction. 5 U.S.C § 706 (2)(A), (B), (C).

<div align="center">

**FOURTH CLAIM**
**Release on Bail Pending Adjudication**

</div>

84.    Petitioner repeats and re-alleges the allegations contained in the preceding

paragraphs of this Complaint-Petition as if fully set forth herein.

85.    Federal courts sitting in habeas possess the "inherent power to release the

petitioner pending determination of the merits." *Savino v. Souza*, 453 F. Supp. 3d 441, 454 (D.

Mass. 2020) (quoting *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972) (per curiam)); *see

also Da Graca v. Souza*, 991 F.3d 60 (1st Cir. 2021). Federal courts "have the same inherent

authority to admit habeas petitioners to bail in the immigration context as they do in the criminal

habeas case." *Id.* (quoting *Mapp v. Reno*, 241 F.3d 221, 223 (2d Cir. 2001)). "A court

considering bail for a habeas petitioner must inquire into whether the habeas petition raise[s]

substantial claims and [whether] extraordinary circumstances exist[ ] that make the grant of bail

necessary to make the habeas remedy effective." *Id.* (quoting *Mapp*, 241 F.3d at 230) (cleaned

up).

86.    This petition raises substantial constitutional and statutory claims challenging

Rümeysa's retaliatory detention. Furthermore, extraordinary circumstances exist that make

Rümeysa's release essential for the remedy to be effective. Even if she is ultimately freed, as

long as Rümeysa remains in ICE's physical custody, she will be prevented from speaking freely

and openly and her unlawful detention will serve to chill others. In addition, Rümeysa has

asthma and has already suffered an asthma attack while in ICE custody, raising concerns about

future asthma attacks. Finally, Rümeysa's confinement in Louisiana prevents her from

<div align="center">21</div>

adequately litigating her removal proceedings by impeding her access to counsel and evidence located within the District of Massachusetts.

## PRAYER FOR RELIEF

Wherefore, Petitioner respectfully requests this Court to grant the following:

1) Assume jurisdiction over this matter;

1) Require Respondents to return Petitioner to this District pending these proceedings;

2) Order the immediate release of Petitioner pending these proceedings;

3) Declare that Respondents' actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment;

4) Vacate and set aside Respondents' unlawful Policy of targeting noncitizens for arrest, detention and removal based on First Amendment-protected speech advocating for Palestinian rights;

5) Restore Petitioner's SEVIS record;

6) Enjoin Respondents from taking any enforcement action against Petitioner arising directly or indirectly from an investigation into the applicability of the Foreign Policy Ground;

7) Award reasonable attorneys' fees and costs for this action; and

8) Grant such further relief as the Court deems just and proper.

Respectfully submitted,

[signature block on next page]

JA-000035

/s/ *Jessie J. Rossman*
Jessie J. Rossman (BBO #670685)
Adriana Lafaille (BBO #680210)
Rachel E. Davidson (BBO #707084)
Julian Bava (BBO #712829)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
alafaille@aclum.org
rdavidson@aclum.org
jbava@aclum.org

Mahsa Khanbabai (BBO #639803)
115 Main Street, Suite 1B
North Easton, MA 02356
(508) 297-2065
mahsa@mk-immigration.com

Brian Hauss*
Esha Bhandari*
Brett Max Kaufman*
Noor Zafar*
Sidra Mahfooz*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
bhauss@aclu.org
ebhandari@aclu.org
bkaufman@aclu.org
nzafar@aclu.org
smahfooz@aclu.org

*Counsel for Petitioner*

**Pro hac vice application forthcoming*

Dated: March 28, 2025

23

JA-000036

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2025, a true copy of the above document was filed via

the Court's CM/ECF system and that a copy will be sent automatically to all counsel of record.

March 28, 2025                    */s/ Jessie J.Rossman*
                                 Jessie J.Rossman

JA-000037

# EXHIBIT A

JA-000038

March 25, 2025

Rumeysa Ozturk
███████████████████

**Student and Exchange Visitor Program**
**SEVIS Designation Termination Notice**

This letter is to inform you that your Student and Exchange Visitor Information System (SEVIS) designation associated with SEVIS ID ███████ issued by Tufts University - Tufts University/Medford, school code ██████████ has been Terminated pursuant to 237(a)(1)(C)(i) and/or 237(a)(4)(C)(i) of the Immigration and Nationality Act.

If you remain in the United States, you may be contacted by immigration officials or placed in removal proceedings.

Should you wish to speak to someone regarding this notice email at sevp@ice.dhs.gov

Sincerely,


Student and Exchange Visitor Program

CC ████████████████

# EXHIBIT B

JA-000040

DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

DOB: [redacted]

Event No: XBO2503000017

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: [redacted]     FINS: [redacted]     File No: [redacted]

In the Matter of:

Respondent: RUMEYSA OZTURK _____ currently residing at:

See Continuation Page Made a Part Hereof
_____
(Number, street, city, state and ZIP code)          (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of TURKIYE and a citizen of TURKIYE;

3. You were admitted to the United States at Boston, MA on or about June 28, 2024 as a nonimmigrant Student (F-1);

4. On March 21, 2025, your nonimmigrant visa was revoked by the United States Department of State.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(B) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, your nonimmigrant visa was revoked under section 221(i) of the Act.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:     ☐ 8CFR 208.30     ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

3843 E STAGG AVE, BASILE, LOUISIANA 70515. SOUTH LOUISIANA CORR CENTER
_____
(Complete Address of Immigration Court, including Room Number, if any)

on __April 7, 2025__ at __8:30 am__ to show why you should not be removed from the United States based on the
    (Date)         (Time)

charge(s) set forth above.             D. 4448 JOHNSTON - SDDO
_____
                        (Signature and Title of Issuing Officer)

Date: __March 25, 2025__             St Albans, VT
_____
                              (City and State)

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

_____
*(Signature of Respondent)*

Date: _____

_____
*(Signature and Title of Immigration Officer)*

### Certificate of Service

This Notice To Appear was served on the respondent by me on **March 25, 2025**, in the following manner and in compliance with section 239(a)(1) of the Act.

☒ in person   ☐ by certified mail, returned receipt # _____ requested   ☐ by regular mail
☐ Attached is a credible fear worksheet.
☐ Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the **ENGLISH** language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

M 11272 MUSCARELLA - Deportation Officer

_____        _____
*(Signature of Respondent if Personally Served)*        *(Signature and Title of officer)*

## Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

DHS Form I-862 (6/22)

**U.S. Department of Homeland Security**                                    **Continuation Page for Form** I-862

| Alien's Name | File Number | Date |
|---|---|---|
| OZTURK, RUMEYSA | ███████ Event No: XBO2503000017 | 03/25/2025 |

CURRENTLY RESIDING AT:
-----------------------------------------------------------------------------

South Louisiana Imm Center 3843 W Stagg Ave Basile, LOUISIANA 70515

| Signature | Title |
|---|---|
| D. 4448 JOHNSTON | SDDO |

                                                        4 of 4 Pages

Form I-831 Continuation Page (Rev. 08/01/07)

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RUMEYSA OZTURK, | |
|                  Petitioner, | |
|        v. | Civil Action No. 1:25-cv-10695-DJC |
| DONALD J. TRUMP, in his official capacity as President of the United States, PATRICIA HYDE, Field Office Director, MICHAEL KROL, HSI New England Special Agent in Charge, TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement, and KRISTI NOEM, Secretary of Homeland Security; and MARCO RUBIO, in his official capacity as Secretary of State | Leave to file excess pages granted on 4/1/2025 |
|                  Respondents. | |

## RESPONDENTS' OPPOSITION TO PETITIONER'S AMENDED PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C § 2241

Respondents, by and through their attorney, Leah B. Foley, United States Attorney for the District of Massachusetts, respectfully submit this opposition to Petitioner Rumeysa Ozturk's Amended Petition for Writ of Habeas Corpus (the "Petition").  Doc No. 12.

## INTRODUCTION

Under binding precedent from the Supreme Court and the U.S. Court of Appeals for the First Circuit, this Court lacks habeas jurisdiction over this Petition because Petitioner was not in the District of Massachusetts when she filed her original petition seeking release from U.S. Immigration and Customs Enforcement ("ICE") custody.  *See* Declaration of Acting Deputy Field Office Director David T. Wesling, ¶¶ 12-13, attached as Exhibit A ("Wesling Decl.).  Instead, at the time of filing, Petitioner was in Vermont, after she had been transferred from Massachusetts

immediately after her arrest on March 25, 2025. *Id.*, ¶¶ 6-8. Petitioner also was not in this District when she filed her Amended Complaint on March 28 as she had been transferred to Louisiana two days prior. *Id.*, ¶¶ 18-19. As this Court is not in Petitioner's district of confinement, it lacks jurisdiction to entertain this action.

In *Rumsfeld v. Padilla*, 542 U.S. 426, 434-35 (2004), the Supreme Court made clear an individual challenging her detention through a habeas petition must file that petition in the district where she is detained and must name the custodian detaining her in such district as the respondent. The First Circuit, in *Vasquez v. Reno* similarly held that "an alien who seeks a writ of habeas corpus contesting the legality of his detention by [ICE] normally must name as the respondent his immediate custodian, that is, the individual having day-to-day control over the facility in which he is being detained." 233 F.3d 688, 690 (1st Cir. 2000). Because Petitioner did not do that, and still has not done that with the filing of her Amended Petition, this Court lacks habeas jurisdiction over this action. *See, e.g.*, *Tham v. Adducci*, 319 F. Supp. 3d 574, 577 (D. Mass. 2018) (Holding that "jurisdiction lies in only one district: the district of confinement."); *Rombot v. Moniz*, 299 F. Supp. 3d 215, 218 (D. Mass. 2017) ("A district court may only grant a petitioner relief when the court is located in the 'district of confinement.'") (quoting *Padilla*, 542 U.S. at 443); *Hernandez v. Lyons*, 1:19-cv-10519-DJC, ECF No. 18 (D. Mass. Oct. 11. 2019) (Allowing motion to dismiss as habeas petitioner "was not in the district when he filed or was pursuing this Petition as is required.").

Additionally, even if Petitioner had properly filed her original petition when she was detained in Massachusetts, this Court would nonetheless lack jurisdiction over this matter under the Immigration and Nationality Act ("INA"). The federal immigration laws strip district courts of jurisdiction over the sorts of governmental decisions challenged in the Petition, including the revocation of Petitioner's student visa and ICE's decision to initiate removal proceedings. The

2

Department of State revoked Petitioner's visa on March 21, 2025 pursuant to INA Section 221(i), 8 U.S.C. § 1201(i), which allows revocation of a visa at the Secretary of State's discretion. *See* Doc. No. 12-2, Form I-862, Notice to Appear ("NTA"). Per Section 1201(i), Congress barred judicial review of a visa revocation, specifically stating that "[t]here *shall be no means of judicial review* … of a revocation under this subsection," including through a habeas petition, other than in the context of removal proceedings and only if the visa revocation is the sole basis for removal. (emphasis added).

Petitioner's request for review of ICE's decision to initiate removal proceedings against her is barred by 8 U.S.C. § 1252(g) which strips district courts of jurisdiction "to hear any cause or claim by or on behalf of an alien arising from the decision or action by [ICE] to commence proceedings … against any alien," including constitutional claims. Courts also lack jurisdiction to review ICE's discretionary decisions to arrest and detain aliens under 8 U.S.C. § 1226(a). Per 8 U.S.C. § 1226(e), ICE's "discretionary judgment regarding the application of [Section 1226] shall not be subject to review [and] … [n]o court may set aside any action or decision by [ICE] under this section regarding the detention of any alien …". And finally, 8 U.S.C. §§ 1252(a)(5) and (b)(9) strip "federal courts of jurisdiction to decide legal and factual questions arising from an alien's removal" and instead channel such questions to the courts of appeal via a petition for review. *Gicharu v. Carr*, 983 F.3d 13, 16 (1st Cir. 2020).

Petitioner is not without recourse to challenge the revocation of her visa and her arrest and detention, but such challenge cannot be made before this Court. Instead, Petitioner must seek release before an immigration judge and must pursue relief from removal in Immigration Court, before the Board of Immigration Appeals ("BIA"), and eventually before a circuit court if necessary. But one way or another, this Court lacks jurisdiction over this matter. And as this

JA-000047

Court lacks jurisdiction over this Petition, Petitioner's request for release on bail pending adjudication of the matter is similarly unwarranted.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Petitioner's Arrest and Transfer from the District of Massachusetts.

Petitioner is a native and citizen of Turkey.  Doc. No. 12, ¶ 8.  Petitioner entered the United States pursuant to a student visa.  *Id.*, ¶ 8.  Pursuant to 8 U.S.C. § 1226(a), ICE arrested Petitioner at approximately 5:25 PM on March 25, 2025, after her visa had been revoked by the Department of State under 8 U.SC. § 1201(i).  Wesling Decl., ¶ 5; Doc. No 12-2, NTA. With the revocation of her visa, Petitioner was subject to removal from the United States pursuant to 8 U.S.C. § 1227(a)(1)(B) as an alien "whose nonimmigrant visa … has been revoked under section 1201(i)."  Doc. No. 12-2.

Prior to the arrest, ICE determined that there was no available bedspace for Petitioner at a facility within the New England region where she could be detained and still appear for a hearing in Immigration Court.  *Id.*, ¶ 6.  ICE therefore decided that Petitioner would be transferred to the South Louisiana Correctional Facility in Basile, Louisiana after her arrest and made necessary transfer and flight arrangements to facilitate custody at that facility.  *Id.*, ¶¶ 6, 8.  Transfers out of state, and out of the ERO Boston area of responsibility, are routinely conducted after arrest, due to operational necessity.  *Id.*, ¶ 7.  In accordance with this operational plan, at 5:49 PM on March 25, ICE officials departed Somerville, Massachusetts, and transported Petitioner to Methuen, Massachusetts arriving at 6:22 PM.  *Id.*, ¶ 10.  At 6:36 PM, ICE officials departed from Methuen, Massachusetts and transported Petitioner to Lebanon, New Hampshire.[1]  *Id.*, ¶ 11.  At

---

[1] Methuen, Massachusetts is approximately 2 miles from the New Hampshire border on Interstate I-93.

JA-000048

9:03 PM, ICE officials departed Lebanon, New Hampshire to transport Petitioner to the ICE field office in St. Albans, Vermont.[2] *Id.*, ¶ 12. At 10:28 PM, Petitioner arrived at the ICE field office in St. Albans, Vermont. *Id.*, ¶ 13. While at the facility in St. Albans, ICE issued Petitioner with a NTA in the Oakdale, Louisiana Immigration Court on April 7, 2025 and charged Petitioner as removable from the United States per 8 U.S.C. § 1227(a)(1)(B). *Id.*, ¶ 14; Doc. No. 12-2, NTA.

Petitioner spent the night at the ICE field office in St. Albans, Vermont on March 25. Wesling Decl.*,* ¶ 13. On March 26 at 4:00 AM, ICE officials departed the ICE Field Office in St. Albans and transported Petitioner to the airport in Burlington, Vermont. *Id.*, ¶ 16. At 5:31 AM, Petitioner departed the airport in Burlington. *Id.*, ¶ 17. At 2:35 PM, Petitioner arrived in Alexandria, Louisiana and was transported to the South Louisiana Correctional Facility in Basile, Louisiana. *Id.*, ¶¶ 18-19. At the time of Petitioner's arrest, ICE was not aware of a counsel of record for Petitioner. *Id.*, ¶ 20. Once ICE obtained Petitioner's counsel's contact information, it was provided to ERO New Orleans to facilitate Petitioner's communication with counsel. *Id.* Upon her arrival to the South Louisiana Correctional Facility, Petitioner spoke with counsel. *Id.* ¶ 21.

## B. Petitioner's Original Habeas Petition and her Amended Petition.

Petitioner filed her original petition with this Court on March 25, 2025 at 10:01 PM. Doc. No. 1. Petitioner named as Respondents Patricia Hyde, the Acting Director of ICE's ERO Boston Field Office, Michael Krol, ICE's Boston Homeland Security Investigation's Special Agent in Charge, Todd Lyons, the Acting Director of ICE, and Kristi Noem, the Secretary of Homeland Security. *Id.* Petitioner alleged that she was "currently in custody in the District of Massachusetts"

---

[2] Lebanon, New Hampshire is approximately 5 miles from the Vermont border on Interstate I-89.

JA-000049

and that "one or more of the Respondents is her immediate custodian." *Id.*, ¶ 12. But as just detailed, Petitioner was in fact in Vermont, set to be transferred to Louisiana—a decision, again, that was made by ICE officials before any petition was filed. Wesling Decl., ¶¶ 6-8, 10-13.

On March 28, Petitioner filed an Amended Petition. Doc. No. 12. Petitioner added President Donald J. Trump and Secretary of State Marco Rubio as Respondents. *Id.* Petitioner asserts venue is proper in this Court under the theory that she "had been detained in the District of Massachusetts by [ICE] and under the custody and control of ICE officials in Massachusetts at the time of the filing of this petition." *Id.*, ¶ 7. Petitioner added claims under the First Amendment and the Administrative Procedures Act ("APA"), amended her claim under the Fifth Amendment's Due Process Clause, and sought release on bail. *Id.* Petitioner asked the Court order that she be returned to Massachusetts, that she be released, and that the Court find that her arrest violated the First and Fifth Amendments. *Id.* at PRAYER FOR RELIEF.

## ARGUMENT

Petitioner improperly filed her original petition with this Court because Petitioner was not detained in Massachusetts when she filed her action at 10:02 PM on March 25. She also named improper supervisory officials as respondents. Petitioner's Amended Petition is similarly improperly filed in this Court because Petitioner is in custody in Louisiana and this Court lacks jurisdiction over her immediate custodian who has not been named as a respondent. Even if the original petition had been properly filed, dismissal would still be required because this Court lacks jurisdiction to review Petitioner's challenges to the Government's action and to order the requested relief. As such, this Court should dismiss this action without prejudice. If, however, the Court determines transfer of the Petition is appropriate, such transfer must be to the Western District of Louisiana where Petitioner is currently detained.

A. **The Immediate Custodian and District of Confinement Rules Apply to this Petition and Render this Court without Jurisdiction.**

Petitioner's original petition was improperly filed as Petitioner was not detained in Massachusetts when she filed her action at 10:02 PM on March 25 and because she did not name her immediate custodian as a respondent. Petitioner departed Massachusetts shortly after 6:30 PM when ICE officials transported her from Methuen, Massachusetts on the way to Lebanon, New Hampshire before eventually arriving in St. Albans, Vermont later that evening. Wesling Decl., ¶¶ 11-13. Because Petitioner was in Vermont when her original petition was filed, she should have filed her action with the U.S. District Court for the District of Vermont, not this Court.

The Supreme Court explained that when considering "challenges to present physical confinement … the immediate custodian, not a supervisory official who exercises legal control, is the proper respondent." *Padilla*, 542 U.S. at 439. *Padilla* involved a habeas petition filed by a U.S. citizen who was initially detained in the Southern District of New York but then transferred to South Carolina. *Id.* at 431. After Mr. Padilla was transferred, he filed a petition in SDNY, naming President Bush and Secretary Rumsfeld as respondents. *Id.* at 432. The Court confronted the "question whether the Southern District has jurisdiction over Padilla's habeas petition" which required two determinations: "First, who is the proper respondent to the petition? And second, does the Southern District have jurisdiction over him or her?" *Id.* at 434.

Answering the first question, the Supreme Court explained that the habeas statute "provides that the proper respondent to a habeas petition is 'the person who has custody over [the petitioner].'" *Id.* (quoting 22 U.S.C. § 2242). The Court stated that "there is generally only one proper respondent to a given prisoner's habeas petition," the immediate custodian who has "the ability to produce the prisoner's body before the habeas court." *Id.* The Court applied its

7

"longstanding" rules – known as the "district of confinement" and "immediate custodian" rules –

and explained that in a challenge to present physical confinement, "the proper respondent is the

warden of the facility where the prisoner is held, not the Attorney General or some other remote

supervisory official." *Id.* at 435. The Court acknowledged that while Mr. Padilla's detention

was "undeniably unique in many respects, it is at bottom a simple challenge to physical custody

imposed by the Executive…." *Id.* at 441. Without evidence that "there was any attempt to

manipulate" his transfer or that government was hiding his location, the Court explained that his

"detention is thus not unique in any way that would provide arguable basis for a departure from

the immediate custodian rule." *Id.* at 441-42.

As to the question of the proper district court to consider the petition, the Court affirmed

the applicability of the traditional rule "that for core habeas petitions challenging present

physical confinement, jurisdiction lies in only one district: the district of confinement." *Id.* at

443. Because Mr. Padilla was moved from the Southern District of New York before the petition

was filed, "the Southern District never acquired jurisdiction over Padilla's petition.". *Id.* at 441-

42.[3] In summary, the *Padilla* Court explained that whenever a "habeas petitioner seeks to

challenge his present physical custody within the United States, he should name his warden as

respondent and file the petition in the district of confinement." *Id.* at 447.

---

[3] As such, the *Padilla* Court distinguished the factual circumstances before the Court from those at issue in *Ex parte Endo,* 323 U.S. 283 (1944) where the Supreme Court had created an exception to its general rule for cases in which the petitioner properly filed the habeas petition against the immediate custodian and thereafter was transferred outside the district court's territorial jurisdiction. Here, as in *Padilla*, *Endo* is not applicable because Petitioner never properly filed her habeas petition because she was not detained in Massachusetts when it was filed.

Four years prior to the *Padilla* decision, the First Circuit in *Vasquez v. Reno* held that a habeas petitioner challenging his immigration detention must file his petition in the district of confinement and must name his immediate custodian in that district as the respondent. *Vasquez*, 233 F.3d at 696. The First Circuit rejected the argument that a supervisory official such as the Attorney General was the proper respondent, holding that "as a general rule, the Attorney General is neither the custodian of such an alien in the requisite sense nor the proper respondent to a habeas petition." [4] *Id.* at 689.

In *Vasquez*, an alien was detained in Massachusetts before transfer to Louisiana. *Id.* at 690. The petitioner filed in the District of Massachusetts, naming as respondents the Attorney General, the Commissioner of the Immigration and Nationality Service ("INS"), and the district director of the INS's Boston office. *Id.* He did not name, however, the INS official who maintained his custody in Louisiana. *Id.* The First Circuit held that the district court erred in exercising jurisdiction because the petitioner was not detained in Massachusetts when he filed and due "to the petitioner's failure to name his true custodian (the INS district director for Louisiana) as the respondent to his petition." *Id.* The Court distinguished the Supreme Court's decision in *Endo*, explaining that such petition was "properly-filed," unlike Mr. Vasquez's petition which was filed "in a jurisdiction where neither he nor his immediate custodian was physically present." *Id.* at 695.

The First Circuit explained that "Congress has stipulated that a writ of habeas corpus granted by a district court 'shall be directed to the person having custody of the person detained.'" *Id.* (quoting 28 U.S.C. § 2243). Per the Court, "[t]his means, of course, that the

---

[4] At the time of the *Vasquez* decision, immigration detainees were held by the Immigration and Naturalization Service which was part of the U.S. Department of Justice.

JA-000053

court issuing the writ must have personal jurisdiction over the person who holds the petitioner in custody." *Id.* at 690. As it specifically concerned aliens in immigration detention, the Court found that, as in in the prison context, the proper respondent is not a supervisory official such as the Attorney General or the head of an agency, but the immediate custodian of the alien, *i.e.* the individual "who holds the petitioner in custody." *Id.* at 691. As such, the First Circuit held that "an alien who seeks a writ of habeas corpus contesting the legality of his detention by [ICE] normally must name as the respondent his immediate custodian, that is, the individual having day-to-day control over the facility in which he is being detained." *Id.* Otherwise, "allowing alien habeas petitioners to name the Attorney General … will encourage rampant forum shopping." *Id.* at 694.

Courts within this District routinely find jurisdiction wanting over habeas petitions that are filed by ICE detainees outside of Massachusetts. *See Kantengwa v. Brackett*, No. 19-CV-12566-NMG, 2020 WL 93955, at *1 (D. Mass. Jan. 7, 2020) ("Because the District of Massachusetts is not the district of [petitioner's] confinement, jurisdiction is lacking."); *Tham*, 319 F. Supp. 3d at 577 ("jurisdiction lies in only one district: the district of confinement."); *Rombot v. Moniz*, 299 F. Supp. 3d at 218 ("A district court may only grant a petitioner relief when the court is located in the 'district of confinement.'") (quoting *Padilla*, 542 U.S. at 443).

Because Petitioner was not detained in Massachusetts when she filed her original petition and because she failed to name her immediate custodian, this Court lacks jurisdiction over this matter. Petitioner's Amended Petition is similarly improperly filed in this Court, because it fails to name her immediate custodian in Louisiana, and it is not filed in her district of confinement. Given this Court lacks habeas jurisdiction under the above rules, the proper course is for this Court to dismiss the action.

JA-000054

### 1.  __Petitioner failed to name her immediate custodian.__

Petitioner named improper respondents in her original petition because she named supervisory officials, rather than her immediate custodian in Vermont when the petition was filed.  Her Amended Petition suffers from the same flaws as she adds additional supervisory officials but fails to name her immediate custodian in Louisiana.

Courts within this district routinely hold that they lack jurisdiction over a habeas petition if the alien names improper respondents such as supervisory officials like the ICE Boston Field Office Director ("FOD"), even if this individual provides oversite throughout the New England region.  For example, in *Duy Tho Hy v. Gillen*, 588 F. Supp. 2d 122, 124-25 (D. Mass. 2008), the Court held that the ICE FOD was not a proper party, explaining that "[b]ecause the petitioner's *immediate* custodian is the only proper respondent, a supervisory officer of any kind, … is not a proper party." *Id.* at 125 (emphasis in original).  More recently, the Court rejected an argument, similarly made by Petitioner, that ICE Boston's FOD had "total control" over the petitioner and therefore was a proper respondent, finding such claim "unavailing" in *Tham,* 319 F. Supp. 3d at 576-577.

Other sessions of this Court similarly routinely hold that supervisory officials are not proper respondents to a habeas action.  *See e.g., McPherson v. Holder*, No. 14-CV-30207-MGM, 2015 WL 12861171, at *2 (D. Mass. Mar. 4, 2015) (Explaining that "regardless of where petitioner was detained at the time of filing, under First Circuit jurisprudence, Attorney General Eric Holder does not have day-to-day control over the facility where the petitioner is held. Thus, petitioner has not named the proper respondent, and on this basis alone, the petition may be dismissed without prejudice to its refiling with the correct respondent."); *Pen v. Sessions*, No. CV 17-10626-NMG, 2017 WL 2312822, at *1–2 (D. Mass. May 25, 2017) (Holding that "the

JA-000055

proper respondent is the warden of the institution where Pen was confined when the petition was

filed. … The other persons identified as respondents are not proper parties to this action.").

As Petitioner is now detained in Louisiana, her failure to name her immediate custodian

subjects her Amended Petition to dismissal.  *See Tham*, 319 F. Supp. 3d at 577 (Explaining that

for an ICE habeas petitioner detained in New Hampshire, the correct respondent is the

Superintendent of that facility); *Faulkner v. US. Immigr. & Naturalization,* No. CV 22-12122-

WGY, 2023 WL 3868437, at *2 (D. Mass. June 7, 2023) (Holding that "the proper respondent is

the warden of the institution where Faulkner was confined when the petition was filed. Because

Faulkner is [in Maryland], the proper respondent is the warden at this Maryland facility.");

*Kantengwa*, 2020 WL 93955 at *1 ("Because Kantengwa was at the Strafford County Detention

Center at the time she filed her petition (and remains there still), the proper respondent is Warden

Brackett. The other persons identified as respondents are not proper parties to this action.").

### 2. <u>Petitioner failed to file in the district of confinement.</u>

Because Petitioner was not detained in Massachusetts when she filed her original petition

or her Amended Petition, this Court lacks jurisdiction over this action.  For a district court to

have jurisdiction over a habeas petition, the individual holding custody must be "within [the

court's] respective jurisdiction[]."  *Padilla*, 542 U.S. at 442 (quoting 28 U.S.C. § 2241(a));

*Vasquez*, 233 F.3d at 690 (Explaining "that the court issuing the writ must have personal

jurisdiction over the person who holds the petitioner in custody.").   As the Supreme Court has

made clear, that means the district of confinement.  *Padilla*, 542 U.S. at 443.

Courts within this district routinely find that they do not have habeas jurisdiction when a

petition is filed by a detainee outside Massachusetts.  *See Rombot*, 299 F. Supp. 3d at 218 ("A

district court may only grant a petitioner relief when the court is located in the 'district of

confinement.'") (quoting *Padilla*, 542 U.S. at 443); *Tham*, 319 F. Supp. 3d at 577 ("jurisdiction

lies in only one district: the district of confinement."); *Kantengwa*, 2020 WL 93955, at *2

("Because the District of Massachusetts is not the district of Kantengwa's confinement,

jurisdiction is lacking."); *Aitcheson v. Holder*, No. CV 15-11123-NMG, 2015 WL 10434871, at

*2 (D. Mass. Dec. 31, 2015) (Finding no jurisdiction over a habeas petition filed by a petitioner

when in the District, but who was moved to Alabama shortly after such filing because "1)

[Massachusetts] is no longer petitioner's district of confinement and 2) only a respondent at the

Detention Center in Alabama could bring the petitioner before a habeas court.").

Because Petitioner was transferred from Massachusetts before she filed the original

petition, this Court never acquired jurisdiction and therefore "out not to … act[] on the merits" of

her Amended Petition. *Vasquez*, 233 F.3d at 697.

### 3. No exceptional circumstances allow deviation from the district of confinement and immediate custodian rules.

The First Circuit did acknowledge that there could be "extraordinary circumstances" in

which an official with supervisory control could be named as the respondent for an ICE

detainee's habeas petition. *Vasquez*, 233 F.3d at 697. The First Circuit, however, found no "hint

of anything that might qualify as an extraordinary circumstance" in that Mr. Vasquez was

required to file his petition in the district of his confinement (Louisiana), even if that jurisdiction

was considered a less hospitable judicial district for the detainee to present his claims. *Id.*

Here too, there are no extraordinary circumstances that make appropriate the naming of

supervisory officials as respondents to this action or that ground jurisdiction with this Court.

Petitioner's transfer out of Massachusetts was not done to manipulate jurisdiction or to detain her

in an undisclosed location, rather it was done out of operational necessity. Wesling Decl., ¶¶ 6-

8. After ICE arrested Petitioner at approximately 5:25 PM on March 25, ICE transferred

JA-000057

Petitioner out of Massachusetts to the ICE Field Office in St. Albans, Vermont because ICE does not maintain detention facilities in Massachusetts for females. *Id.*, ¶¶ 6, 10-13. ICE routinely transfers individuals arrested in one state to facilities in other states because of operational considerations such as bedspace and designation of risk categories. *Id.*, 7.[5]

ICE's transfer of Petitioner to Vermont and then to Louisiana does not suggest "furtiveness" or "bad faith" as the First Circuit was concerned with in *Vasquez*. Other courts have confronted comparable circumstances in which a petition was filed outside the district of confinement during transit between locations and have rejected arguments seeking exception to the immediate custodian and district of confinement rules. For example, in *Ruvira-Garcia v. Guadian*, the court explained that there were "two big problems" with petitioner's request that the court order her return to Illinois: "Petitioner filed against the wrong people, in the wrong place." No. 1:20-CV-2179, 2020 WL 1983875, at *1 (N.D. Ill. Apr. 17, 2020). The petitioner in that case was not in Illinois when she filed her petition, "she apparently was en route between Texas and Oklahoma" and therefore the court found that this "isn't a case where the petitioner was here at the moment of filing, and then left. She hasn't been in [Illinois] at any point since this case started." *Id.*, at *3. Even if it was "unclear whether the authorities in Texas, or the authorities in Oklahoma, had custody over her at the moment of filing," "if the choice is between Texas and Oklahoma, Illinois is the wrong answer." *Id.* The court found it lacked jurisdiction

---

[5] *See Russian scientist working at Harvard detained by ICE at Boston airport*, https://www.theguardian.com/us-news/2025/mar/27/russian-scientist-harvard-medical-school-ice-detention (Explaining that a female applicant for admission had her visa revoked on February 16, 2025 by U.S. Customs and Border Protection and then was transferred by ICE to a facility in Vermont prior to transfer to a facility in Louisiana).

JA-000058

but explained that "the continued detention of [p]etitioner by the Executive Branch is not immune from challenge ... [p]etitioner simply can't challenge her detention [in Illinois], as Congress made clear." *Id.*

In another case, while recognizing that transfers of an ICE detainee between states presented "unusual logistical circumstances," the court explained that "it is not this Court's duty to ascertain or identify an Arizona official who would be correctly named as a respondent in this case" and concluded that "there is no recognized exception to the immediate custodian rule for inconvenience or exigent circumstances." *Fuentes v. Choate*, No. 24-CV-01377-NYW, 2024 WL 2978285, at \*9-10 (D. Colo. June 13, 2024).  Similarly, in *Khalil v. Joyce*, --- F.Supp.3d ---, 2025 WL 849803, (S.D.N.Y. Mar. 19, 2025), a case that also involved an ICE arrest in New York, a transfer to a facility in New Jersey, and then an eventual transfer to Louisiana, the Southern District found it lacked jurisdiction because even though petitioner was arrested in New York, he was in New Jersey when he filed his petition.  *Id.*, at \*2.

These cases demonstrate that even with an arrest in one district followed by a transfer to another district, a habeas petitioner must file her petition in the district of confinement and must name her immediate custodian as respondent.  Simply because a detainee is transferred to another district post-arrest does not suggest bad faith underlying the transfer.  *See Khalil*, 2025 WL 849803, at \*10 (The "swift nature of Khalil's transfer does not help his argument ... [as] rapid transfers from one immigration detention facility to another also appear to be common").  The traditional immediate custodian and district of confinement rules apply in this case and as such, the Petition must be dismissed.

15

**B.** **Even if the Original Petition was Properly Filed, this Court Lacks Jurisdiction to Review the Challenged Executive Actions.**

Even if properly filed, this action must still be dismissed as the Court lacks jurisdiction over Petitioner's challenges to the revocation of her visa and her subsequent arrest, detention, and initiation of removal proceedings.

**1.** **District courts lack jurisdiction to review the Department of State's revocation of visas.**

Petitioner asserts that the revocation of her student visa was unlawful and therefore her arrest and detention are illegal. Doc. No. 12, ¶¶ 4-5. Her challenge to the revocation of her visa cannot be heard by this Court, however, as 8 U.S.C. § 1201(i) specifically states that there "shall be no means of judicial review" including habeas review, "except in the context of removal proceedings if such revocation provides the sole ground for removal". Here, ICE issued Petitioner with a NTA initiating removal proceedings on account of her revoked visa and she can seek judicial review before an Immigration Court, the BIA, and eventually to a court of appeals if she is ordered removed.

As explained by another district court when dismissing a petition which challenged a visa revocation on account of a political dispute: "Congress has taken it out of my hands. … I cannot address this argument because I lack subject matter jurisdiction over the case. The legality of petitioner's detention depends on the resolution of such issues as whether the government lawfully revoked his visa and whether he is removable from the United States and, as indicated above, I am precluded from reviewing those issues." *Bolante v. Achim*, 457 F. Supp. 2d 898, 902 (E.D. Wis. 2006). The court also found the Suspension Clause not implicated because "the government has initiated removal proceedings" and a circuit court could review a challenge to the visa revocation upon a petition for review. *Id.* at 902-03, n.6; 8

JA-000060

U.S.C. § 1252(a)(2)(D) (Explaining that judicial review remains available for "constitutional claims or questions of law raised upon a petition for review).

Other courts also routinely find themselves without jurisdiction to consider the merits of a visa revocation upon operation of Section 1201(i)'s language.  *See e.g.*, *Aldabbagh v. Sec'y of State*, No. 6:21-CV-532-GAP-EJK, 2021 WL 6298664, at *2 (M.D. Fla. Oct. 5, 2021) (Finding no jurisdiction over complaint that asked court to declare revocation of visa to be arbitrary and capricious, an abuse of discretion, and not in accordance of law.); *Tarlinsky v. Pompeo*, No. 3:19-CV-659 (VLB), 2019 WL 2231908, at *5 (D. Conn. May 23, 2019) ("As the basis for [the visa] revocation is expressly non-reviewable by statute, the [c]ourt lacks subject matter jurisdiction over" the complaint.).   To the extent Petitioner seeks review of the State Department's revocation of her visa, this Court lacks jurisdiction to consider her claims.

### 2.   District courts lack jurisdiction over ICE's decisions to commence removal proceedings and to detain aliens for such proceedings.

Petitioner's claim that ICE's decision to initiate removal proceedings and arrest and detain her violated her constitutional rights is not subject to this Court's review under the INA.

a.   *8 U.S.C. § 1252(g) bars judicial review of ICE's decision to commence removal proceedings against Petitioner.*

Congress, through the REAL ID Act, made clear that district courts do not have jurisdiction to consider challenges to ICE's discretionary decisions concerning the commencement of removal proceedings.  Specifically, 8 U.S.C. § 1252(g) strips courts of jurisdiction to hear "any cause or claim by or on behalf of an alien arising from the decision or action by [ICE] to *commence proceedings* … against any alien under this chapter."  (emphasis added).  Section 1252(g) is "directed against a particular evil: attempts to impose judicial constraints upon [certain categories of] prosecutorial discretion."  *Reno v. Am.-Arab Anti-*

17

JA-000061

*Discrimination Comm.*, 525 U.S. 471, 485 n.9 (1999). Section 1252(g) plainly applies to

decisions and actions to *commence* proceedings that ultimately may end in the execution of a

final removal order. *See Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002) ("We

construe § 1252(g) . . . to include not only a decision in an individual case *whether* to commence,

but also *when* to commence, a proceeding."); *Obado v. Superior Ct. of New Jersey Middlesex

Cnty.,* No. CV 21-10420 (FLW), 2022 WL 283133, at *3 (D.N.J. Jan. 31, 2022) ("Because

[p]etitioner challenges the decision to commence and adjudicate removal proceedings against

him, the [c]ourt lacks jurisdiction to direct [respondents] to terminate [p]etitioner's NTA and/or

halt his removal proceedings.").

In addition to barring challenges to *whether* and *when* to commence proceedings, §

1252(g) bars district courts from hearing challenges to the *method* by which ICE chooses to

commence removal proceedings. *See Alvarez v. U.S. Immigr. & Customs Enf't*, 818 F.3d 1194,

1203 (11th Cir. 2016) ("By its plain terms, [§ 1252(g)] bars us from questioning ICE's

discretionary decisions to commence removal" and also to review "ICE's decision to take him

into custody and to detain him during removal proceedings"); *Saadulloev v. Garland*, No. 3:23-

CV-00106, 2024 WL 1076106, at *3 (W.D. Pa. Mar. 12, 2024) ("The Government's decision to

arrest [petitioner], clearly is a decision to 'commence proceedings' that squarely falls within the

jurisdictional bar of § 1252(g).").

As Section 1252(g) prohibits judicial review of "any cause or claim" that arises from the

commencement of removal proceedings, this provision applies to constitutional as well as

statutory claims. *Candra v. Cronen*, 361 F. Supp. 3d 148, 156 (D. Mass. 2019) (Explaining that

a petitioner's "attempt to frame his claim in due process language does not change [the] result"

that Section 1252(g) strips jurisdiction.); *Anderson, v. Moniz*, No. CV 21-11584-FDS, 2022 WL

18

JA-000062

375231, at *4 (D. Mass. Feb. 7, 2022) ("Section 1252(g) can serve as a jurisdictional bar even when a petitioner contends that his due-process rights were violated.").

That Petitioner is alleging her removal proceedings were initiated in retaliation for her exercise of the First Amendment does not remove her claim from Section 1252(g)'s reach. *See Reno,* 525 U.S. at 487-92 (holding that Section 1252(g) deprived district court of jurisdiction over claim that certain aliens were targeted for deportation in violation of the First Amendment.); *Zundel v. Gonzales*, 230 F. App'x 468, 475 (6th Cir. 2007) (Explaining that First Amendment challenge related to immigration enforcement action "is properly characterized as a challenge to a discretionary decision to 'commence proceedings' … [and] is insulated from judicial review".); *Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 945 (5th Cir. 1999) (determining that § 1252(g) prohibited review of an alien's First Amendment claim based on decision to put him into exclusion proceedings); *Vargas v. United States Dep't of Homeland Sec.*, No. 1:17-CV-00356, 2017 WL 962420, at *3 (W.D. La. Mar. 10, 2017) (Claim that ICE "violated her First Amendment right to free speech by arresting her and initiating her removal after she made statements to the media … is barred by 8 U.S.C. § 1252(g)."); *Kumar v. Holder*, No. 12-CV-5261 SJF, 2013 WL 6092707, at *6 (E.D.N.Y. Nov. 18, 2013) (Claim of initiation of proceedings in retaliatory manner "falls squarely within Section 1252(g) … [and] that [t]he pending immigration proceedings are the appropriate forum for addressing petitioner's retaliation claim in the first instance.").  As such, judicial review of Petitioner's claim that commencement of removal proceedings is unconstitutional is barred by Section 1252(g).

      b.  *8 U.S.C. § 1226(e) bars judicial review of ICE's decision to arrest and detain Petitioner.*

ICE's arrest and detention of Petitioner is authorized by 8 U.S.C. § 1226(a) which allows detention "pending a decision on whether [she] is to be removed from the United States."

19

8 U.S.C. § 1226(a).  This provision "creates authority for *anyone's* arrest or release under § 1226—and it gives the Secretary broad discretion as to both actions…." *Nielsen v. Preap*, 586 U.S. 392, 409 (2019) (emphasis in the original).  Petitioner's assertion that her detention is unlawful is not properly before this Court as Congress has made clear that ICE's "discretionary judgment regarding the application of [Section 1226] shall not be subject to review."  8 U.S.C. § 1226(e).  Section 1226(e) further commands that "[n]o court may set aside any action or decision by [ICE] under this section regarding the detention of any alien or the revocation or denial of bond or parole."  *Id.*  As the Supreme Court explained in *Demore v. Kim*, 538 U.S. 510, 516-17 (2003), this provision blocks judicial review of ICE's discretionary judgments and decisions to arrest and detain aliens subject to 8 U.S.C. § 1226.  *See also Jennings v. Rodriguez*, 583 U.S. 281, 295-96 (2018) (Section "1226(e) precludes an alien from challenging a discretionary judgment by the [Secretary] or a decision that the [Secretary] has made regarding his detention or release.") (cleaned up).

Petitioner asserts her detention "is unjustified" because the Government has not demonstrated that she "needs to be detained."  Doc. No. 12, ¶ 73.  This Court, however, is not the forum for such a claim.  Instead, Petitioner must request release from an immigration judge, and if dissatisfied with the outcome, to the BIA.[6]  She further asserts that her detention is punitive and that there is no legitimate purpose for detaining her.  *Id.*, ¶ 74.  This argument fails, however, as she is detained for purpose of removal proceedings and the Supreme Court has upheld the constitutionality of detention such purpose, even when such detention is mandatory and does not

---

[6] After ICE makes the initial decision to detain an alien, the alien may request a bond hearing in Immigration Court and can appeal to the BIA if necessary.  8 C.F.R. § 236.1(d)(1)-(3).

JA-000064

allow access to a bond hearing, as Petitioner is entitled to in this case. *Demore,* 538 U.S. at 523 (The "Court has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process.");[7] *Wong Wing v. U.S.* 163 U.S. 288, 235 (1896) (holding deportation proceedings "would be vain if those accused could not be held in custody pending the inquiry into their true character."); *Hernandez-Lara v. Lyons,* 10 F.4th 19, 32 (1st Cir. 2021) (Recognizing that the "prompt execution of removal orders is a legitimate governmental interest which detention may facilitate.") (cleaned up). If mandatory detention without access to a bond hearing passes constitutional muster, then Petitioner's detention, where she can seek a bond hearing, certainly does not implicate due process concerns. To the extent that Petitioner is basing her claim on *Demore,* 538 U.S. at 532–33 (Kennedy, J., concurring) or *Zadvydas v. Davis,* 533 U.S. 678, 693 (2001), those claims are related to prolonged detention and are not available until immigration detention exceeds a minimum of six months. *See Demore,* 538 U.S. at 510 (affirming constitutionality of detention exceeding six months); *Zadvydas,* 533 U.S. at 693 (adopting six months as a presumptively reasonable period of detention following a final order of removal). As such, this Court lacks jurisdiction over ICE's decision to arrest and detain Petitioner.

   3.   **Petitioner's challenge to removal from the United States must proceed administratively before being raised to the circuit court.**

Petitioner has an opportunity to contest the initiation of her removal proceedings and to challenge her removal from the United States in Immigration Court, before the BIA, and eventually, if necessary, before a court of appeal. District courts, however, play no role in such process as made clear by Congress and the First Circuit. In passing the REAL ID Act, Congress

---

[7] The Supreme Court has recognized that it "has firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." *Id.* at 522 (citations omitted).

JA-000065

prescribed a single path for judicial review of orders of removal entered through the administrative process: "a petition for review filed with an appropriate court of appeals." 8 U.S.C. § 1252(a)(5); *Gicharu v. Carr*, 983 F.3d 13, 16 (1st Cir. 2020). A circuit court can consider "constitutional claims or questions of law" in the petition for review. 8 U.S.C. § 1252(a)(2)(D).

Congress, however, channeled to the courts of appeals, not just challenges to the removal decision, but also to challenges to the removal process. *Aguilar et al., v. USICE, et al.*, 510 F.3d 1, 9 (1st Cir. 2007) (Section 1252(b)(9) "was designed to consolidate and channel review of *all* legal and factual questions that arise from the removal of an alien into the administrative process, with judicial review of those decisions vested exclusively with the courts of appeals.") (emphasis in the original). Per Section 1252(b)(9), "judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, *arising from any action taken or proceeding brought to remove an alien from the United States* …. shall be available only in judicial review of a final order under this section." 8 U.S.C. § 1252(b)(9) (emphasis added); *Gicharu*, 983 F.3d at 16 ("Adding belt to suspenders, section 1252(b)(9) strips federal courts of jurisdiction to decide legal and factual questions arising from an alien's removal in any other context, *including on a petition for a writ of habeas corpus*.") (emphasis added). The First Circuit has described the expanse of § 1252(b)(9) as "breathtaking" and "vise-like". *Aguilar*, 510 F.3d at 9. In passing this provision, "Congress plainly intended to put an end to the scattershot and piecemeal nature of the review process that previously had held sway in regard to removal proceedings." *Id.*

Pursuant to these provisions, Petitioner must present removability issues related to the revocation of her visa administratively before any Article III review. As explained earlier, 8

JA-000066

U.S.C. § 1201(i) allows for judicial review of her visa's revocation in the context of removal proceedings if the revocation is the sole basis for removal (which it is here) and therefore Section 1252(a)(5) and (b)(9) channel any claims related to the revocation of her visa to an immigration judge, the BIA, and eventually to the circuit court. In a recent case filed seeking a Temporary Restraining Order filed by a student whose visa had been revoked, the plaintiff, Mr. Taal, alleged that the visa revocation and ICE's initiation of removal proceedings violated his First Amendment rights. *Taal v. Trump,* No. 3:25-CV-335 (ECC/ML), 2025 WL 926207, at *2 (N.D.N.Y. Mar. 27, 2025). The district court, however, found that the plaintiff had not established it had jurisdiction over such claims due to Section 1252(a)(5) and 1252(b)(9). *Id.* The court explained that Mr. Taal's "challenge to the basis for commencing his removal proceedings," "is part of the process by which … removability will be determined, and Taal's claims therefore arise from the removal proceedings." *Id.* (cleaned up).

Because Petitioner can challenge the revocation of her visa administratively and eventually to a circuit court, this Court lacks jurisdiction over such claims. *See Vega-Del Roquel v. Barr,* 568 F. Supp. 3d 73, 76 (D. Mass. 2021) (Explaining that "[o]nly claims that are not related in any way to the removal process are beyond the scope of [Section 1252(b)(9)] and therefore within the jurisdiction of federal courts.").

### C. Petitioner's APA Claim Fails.

Petitioner fails to demonstrate any merit to her claims brought under the APA and *Accardi v. Shaughnessy*, 347 U.S. 260 (1954). The APA provides a right to judicial review of "final agency action for which there is no other adequate remedy." *Bennett v. Spear*, 520 U.S. 154, 175 (1997). However, the APA does not "afford an implied grant of subject-matter jurisdiction

JA-000067

permitting federal judicial review of agency action" in all circumstances. *Califano v. Sanders*, 430 U.S. 99, 107 (1977).

The APA does not apply where another statute "preclude[s] judicial review." 5 U.S.C. § 701(a)(1). Additionally, Section 701(a)(2) of the APA precludes judicial review where agency action is committed to agency discretion by law. As such, judicial review of the State Department's revocation of Petitioner's visa is precluded under the APA since 8 U.S.C. § 1201(i) vests such revocation in the Secretary of State and prohibits judicial review aside from in removal proceedings. *See Mansur v. Albright,* 130 F. Supp. 2d 59, 61 (D.D.C. 2001) ("Without such statutory or regulatory limitation, there is no law to apply to the Secretary's discretionary revocation, and this court lacks jurisdiction to review the revocation …"). Similarly, ICE's decisions to commence removal proceedings and arrest and detain Petitioner were all discretionary decisions not subject to APA review by this Court on account of 8 U.S.C. §§ 1252(g) and 1226(a), (e). *See Gicharu*, 983 F.3d at 20 ("Having concluded that Gicharu's APA claim and habeas claim both arise form his removal proceedings, we hold that the district court lacked subject matter jurisdiction over those claims under section 1252(b)(9).").

Additionally, the APA does not authorize judicial review until "an aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule." *Darby v. Cisneros,* 509 U.S. 137, 146 (1993). Even if Petitioner could identify a final agency action, that agency action would be directly tied to the State Department's decision to revoke her visa and ICE's decision to initiate removal proceedings against her, which must be brought in removal proceedings. Because Petitioner has an alternative forum for her claim, it is not cognizable under the APA before this Court. *See Bennett*, 520 U.S. at 175–77; *Pataud v. United States Citizenship & Immigr. Servs., Bos. Field Off.*, 501 F. Supp. 3d 22, 27 (D. Mass. 2020) (with removal

24

proceedings initiated, review of immigration application not available under the APA); *A.Z. v. Nielson*, No. CV 18-10511-PBS, 2018 WL 5269990, at *5 (D. Mass. Oct. 23, 2018) (agency decision denying immigration application is not a "reviewable final agency action as long as the alien was referred to immigration court for removal proceedings."); *Gao v. Napolitano*, 2009 WL 961243, at *2 (D. Mass. 2009) (same).

Petitioner also complains that the notice ICE issued regarding her terminated Student and Exchange Visitor Information System ("SEVIS") record improperly invoked a ground of removability from the United States Petitioner refers to as the "Foreign Policy Ground" which is contained at INA Section 237(a)(4)(C)(i) and that the Secretary of State failed to make the necessary determination that supports such ground of removability. Doc. No. 12, ¶¶ 79-83. This claim is without merit, however. ICE did not allege on the NTA that she is subject to removal under INA Section 237(a)(4)(C)(i) and the charges referenced on the SEVIS notice are not the basis for her detention or removal. *See* Doc. No. 12-2, NTA. For these reasons, Petitioner's APA claims fail.

### D. Petitioner's Request for Bail should be Denied.

This Court does not have jurisdiction to issue habeas relief in this matter, and therefore lacks the authority to grant bail or release. Petitioner is correct that the First Circuit has explained "that a district court entertaining a petition for habeas corpus has inherent power to release the petitioner pending determination of the merits." *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972) (per curiam); *see also Savino v. Souza*, 453 F. Supp. 3d 441, 453 (D. Mass. 2020) (In face of COVID-19 pandemic, finding bail appropriate if a habeas petitioner can demonstrate that the petition raises substantial claims and that extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective).

JA-000069

To whatever extent this Court has the authority to grant bail pending habeas, that authority is only in aide of this Court's ultimate power to grant habeas relief. So where, as here, this Court lacks the authority to grant habeas relief in the first place (as explained above), it concomitantly loses its authority to grant bail. For the reasons argued previously, Petitioner fails to raise substantial constitutional claims upon which she has a high probability of success. Further, Petitioner fails to allege that extraordinary circumstances exist making the grant of bail necessary to render the habeas remedy effective. On this issue, the First Circuit in *Woodcock* cited "a health emergency" as exceptional circumstances. 470 F.2d at 94. The Court in *Savino* found existence of exceptional circumstances with the COVID-19 "nightmarish pandemic." 453 F. Supp. 3d at 453. Petitioner's asthmatic condition and her desire to speak freely and openly does not represent exceptional circumstances as her concerns are likely common to all detainees experiencing limits on freedom and she does not demonstrate that her circumstances make the grant of bail necessary at this time. Petitioner can also seek a bond hearing with the Immigration Judge at her first hearing in Immigration Court next week on April 7, 2025.[8] Accordingly, the Court must decline Petitioner's request for interim release during the pendency of this action.

**E. If this Court determines transfer to be in the interest of justice, this Amended Petition should be transferred to Petitioner's District of Confinement.**

As explained above, this Court should dismiss the Petition rather than transfer it because any receiving court, like this Court, would lack jurisdiction to consider Petitioner's claim of

---

[8] Petitioner cites the Second Circuit's decision in *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001) in support of her request for release on bail, but this decision does not aide Petitioner's argument. In that case, the court explained the power to admit on bail "is a limited one, to be exercised in special cases only." *Mapp*, 241 F.3d at 226. Further, the court qualified this holding as subject to limits imposed by Congress. *Id.* at 223. As explained earlier, 8 U.S.C. § 1226(e) is an "express statutory constraint[]" that limits the Court's authority in this context. *Mapp*, 241 F.3d at 231

26

unlawful arrest and detention and to provide her requested relief. As such, "the interest of justice" does not compel transfer. 28 U.S.C. § 1404(a). But, if this Court determines otherwise, the Amended Petition must be transferred to Petitioner's district of confinement, the Western District of Louisiana. *See also* 28 U.S.C. § 1406(a) (recognizing that transfer can occur to "any district … in which it could have been brought.").

The Supreme Court has recognized a "limited" exception to the district-of-confinement rule, namely, only "when the Government moves a habeas petitioner after she *properly files* a petition naming her immediate custodian." *Padilla*, 542 U.S. at 441 (emphasis added) (discussing *Ex Parte Endo*, 323 U.S. 283 (1944)); *see Vasquez*, 233 F.3d at 697 (Distinguishing *Endo* from circumstances in *Vasquez* where the "petitioner filed for habeas relief in a jurisdiction where neither he nor his immediate custodian was physically present."); *Yancey v. Warden, FMC Devens*, 682 F. Supp. 3d 97, 100 (D. Mass. 2023) (collecting cases for proposition that after a petitioner properly filed a petition, such "prisoner's transfer after a district court's jurisdiction attaches does not defeat jurisdiction … as long as there remains in the district a respondent who can effectuate any court order."). Under those circumstances, the court where jurisdiction originally vested may retain the case. That limited exception does not apply in this District as Petitioner never properly filed a habeas petition in this Court.

This exception would also not apply concerning venue in the District of Vermont because Petitioner did not properly file her habeas petition with that Court during her brief detention in Vermont. Where a court never *had* habeas jurisdiction in the first place because the petitioner was not in the district when the action was filed, or because the petition was not filed with the court in the district of confinement, there is nothing to retain. It is true that at the time Petitioner's original petition was filed, it could have been properly filed in Vermont as that is

27

where she was then in custody.  But this fact is not dispositive.  While this case "could have been brought" in Vermont at the time of filing, that does not mean it can be heard in the District of Vermont here and now.  And it cannot, under *Padilla*—or the specific statutory text it interpreted.  Section 2241(a) states that writs of habeas corpus "may be granted by … the district courts … within their respective jurisdictions."  Section 1406(a) can permit transfer but only if the transferee court would also have subject matter jurisdiction over the matter.  Nothing in § 1406(a)'s general authorization for transfer displaces those specific conditions for habeas relief or purports to vest the District of Vermont with jurisdiction that would not otherwise exist.  The District Court in Vermont never had jurisdiction over this matter, and it cannot exercise jurisdiction over it now, even if this Court transferred the case to it.  *See Padilla*, 542 U.S. at 441-42.  Even if that transfer statute technically permitted transfer to Vermont as a matter of civil procedure, that does not somehow vest the District of Vermont with the statutory authority to issue a specific remedy—and do so notwithstanding the specific preconditions for such relief.  Put otherwise, for the District of Vermont to award habeas relief under 2241(a), it must have "jurisdiction" to do so—as construed by *Padilla*.  Nothing in the transfer statutes alters that limitation.

The "default rule" articulated in *Padilla* controls here: "jurisdiction lies in only one district: the district of confinement".  542 U.S. at 433.  This means Petitioner's Amended Petition should have been filed in her district of confinement, the Western District of Louisiana, and any transfer of this Petitioner must be to such district.

## CONCLUSION

For these reasons, this Court lacks jurisdiction over the Petitioner and must therefore deny the request to issue a writ of habeas corpus.  Respondents further assert that transfer of this

28

Petition, rather than dismissal, would not be "in the interest of justice" because district courts

lack jurisdiction to review the issues presented in the Petition and to order relief as requested.

But, if the Court determines transfer appropriate, such transfer must be to the Western District of

Louisiana, the district of Petitioner's confinement.

<div style="margin-left: 50%;">

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

</div>

Dated: April 1, 2025                    By:    */s/ Mark Sauter*
                                               Mark Sauter
                                               Assistant United States Attorney
                                               United States Attorney's Office
                                               1 Courthouse Way, Suite 9200
                                               Boston, MA 02210
                                               Tel.: 617-748-3347
                                               Email: mark.sauter@usdoj.gov

## CERTIFICATE OF SERVICE

I, Mark Sauter, Assistant United States Attorney, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated:  April 1, 2025                   By:    */s/ Mark Sauter*
                                               Mark Sauter
                                               Assistant United States Attorney

JA-000073

DECLARATION OF ACTING DEPUTY FIELD OFFICE DIRECTOR

<u>DAVID T. WESLING</u>

Pursuant to the authority of 28 U.S.C. § 1746, I, David T. Wesling, a Supervisory Detention and Deportation Officer for U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, Burlington, Massachusetts declare as follows:

1. I am an acting Deputy Field Office Director ("(a)DFOD") for the U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO").

2. Included in my official duties as (a)DFOD in Burlington, Massachusetts is the responsibility for assisting in the managing and monitoring of scheduling and execution of removal orders for aliens in ICE custody. I am familiar with ICE policies and procedures for detaining individuals to initiate removal proceedings or to effectuate removal orders as well as releasing individuals from ICE custody.

3. I have experience utilizing ICE record systems to obtain information regarding specific aliens. ICE maintains electronic and paper records on aliens in the course of its regularly conducted business activity. These records are made in the course of regularly conducted business activity at or near the time of relevant events by a person with knowledge of these events.

4. In the course of preparing this declaration, I have examined the official records available to me regarding the immigration history and custody status of Ms. Rumeysa Ozturk ("Petitioner"). I have also discussed this case internally with officials within my office.

JA-000074

5. Pursuant to its statutory authority contained at 8 U.S.C. § 1226(a), ICE arrested Petitioner on March 25, 2025, at 1725 in Somerville, Massachusetts.

6. Prior to the arrest, ICE determined that because there was no available bedspace for Petitioner at a facility where she could appear for a hearing with the U.S. Department of Justice's Executive Office for Immigration Review in New England, that she would be transferred to the South Louisiana Correctional Facility at 3843 East Stagg Avenue in Basile, Louisiana where bedspace was determined to be available.

7. Transfers out of state, and out of the ERO Boston area of responsibility, are routinely conducted after arrest, due to operational necessity and considerations.

8. Once ICE secured her final bedspace location, ICE made the appropriate flight and custody arrangements to transport Petitioner to Louisiana.

9. Upon her arrest by ICE officers on March 25, 2025, Petitioner indicated she was in moderately good health with asthma, chronic back pain, and dry eye. This information was also relayed to the ERO New Orleans Field Office in Louisiana.

10. On March 25, 2025, at 1749, ICE officials departed Somerville, Massachusetts, and transported Petitioner to Methuen, Massachusetts arriving at 1822.

11. On March 25, 2025, at 1836, ICE officials departed from Methuen, Massachusetts and transported Petitioner to Lebanon, New Hampshire.

12. On March 25, 2025, at 2103, ICE officials departed Lebanon, New Hampshire to transport Petitioner to the ICE Field Office in St. Albans, Vermont.

13. On March 25, 2025, at 2228, Petitioner, arrived at the ICE Field Office in St. Albans, Vermont for processing of Petitioner's Notice to Appear (NTA), and was in custody overnight at the ICE Field Office in Saint Albans, Vermont.

JA-000075

14. On March 25, 2025, ICE served Petitioner with an NTA, charging her with removability under section 237(a)(1)(B) of the Immigration and Nationality Act (INA). ICE filed that NTA at the Oakdale Immigration Court in Oakdale, Louisiana.

15. The NTA orders her to appear before an immigration judge on April 7, 2025, at 8:30am at the Oakdale Immigration Court, the immigration facility with jurisdiction over her place of detention.

16. On March 26, 2025, at 0400, ICE officials departed the ICE Field Office in St. Albans, Vermont and transported Petitioner to the airport in Burlington, Vermont.

17. On March 26, 2025, at 0531, Petitioner departed the airport in Burlington, Vermont with ICE officials.

18. On March 26, 2025, at 1435, Petitioner arrived at the airport in Alexandria, Louisianna with ICE officials, who transferred her to the custody of ERO New Orleans.

19. As of the date of this declaration, Petitioner is currently detained at in ICE custody in the South Louisiana Correctional Facility, located at 3943 East Stagg Avenue in Basile, Louisiana.

20. At the time of Petitioner's arrest, there was no known counsel of record. Once ICE official obtained Petitioner's counsel's contact information through the filing of the instant habeas petition, it was provided to ERO New Orleans to facilitate Petitioner's communication with her counsel, once she arrived at her final detention location.

21. Upon her arrival to the South Louisiana Correctional Facility, Petitioner was permitted to speak with her counsel.

JA-000076

I declare under penalty of perjury that the foregoing is true and correct.


Signed on the twenty-seventh day of March 2025


_____

David T. Wesling
Acting Deputy Field Office Director
U.S. Department of Homeland Security
United States Immigration and Customs Enforcement
Burlington, Massachusetts

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **RUMEYSA OZTURK,** | ) |
| | ) |
| **Petitioner** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **DONALD J. TRUMP, in his official capacity** | ) |
| **as President of the United States; PATRICIA** | ) |
| **HYDE, in her official capacity as the New** | ) |
| **England Field Office Director for U.S.** | )  **Case No. 25-cv-10695-DJC** |
| **Immigration and Customs Enforcement;** | ) |
| **MICHAEL KROL, in his official capacity as** | ) |
| **HSI New England Special Agent in Charge,** | ) |
| **U.S. Immigration and Customs Enforcement;** | ) |
| **TODD LYONS, in his official capacity as** | ) |
| **Acting Director, U.S. Immigration and** | ) |
| **Customs Enforcement; KRISTI NOEM, in her** | ) |
| **official capacity as Secretary of the United** | ) |
| **States Department of Homeland Security; and** | ) |
| **MARCO RUBIO, in his official capacity as** | ) |
| **Secretary of State,** | ) |
| | ) |
| **Respondents.** | ) |

## <u>MEMORANDUM AND ORDER</u>

**CASPER, J.**                                                             **April 4, 2025**

## I.    Introduction

Petitioner Rumeysa Ozturk ("Ozturk") has filed this habeas petition under 28 U.S.C.

§ 2241 (the "Petition") against the Respondents, United States government officials (collectively,

the "government"). Although the government disputes Ozturk's claims for relief, the following is

undisputed: on March 25, 2025, at approximately 5:25 p.m. without prior notice of the revocation

of her student visa or the grounds asserted for same, Ozturk, a graduate student in Child Study and

1

JA-000078

Human Development at Tufts University, was approached and surrounded by six officers (several wearing masks and/or hoods), stripped of her cellphone and backpack, handcuffed, and taken into custody in an unmarked vehicle. Despite the best efforts of her counsel and, even the Turkish consulate to determine her whereabouts, the government did not disclose her place of confinement until approximately 3:27 p.m. the following day, March 26, 2025. Given the period following her arrest and detention in which the government did not disclose her whereabouts, counsel for Ozturk filed the Petition in this Court, the location of her arrest and detention and the only location of her last known whereabouts, on March 25, 2025 at approximately 10:02 p.m. The government asserts that this Court lacks jurisdiction over the Petition as Ozturk, unknown to anyone but the government, was in Vermont, not Massachusetts at the time the Petition was filed and, as of 2:35 p.m. on March 26, 2025, was in Louisiana, where she remains.

Ozturk alleges that she was targeted, arrested and transferred in retaliation for exercise of her First Amendment rights (Count I), D. 12 ¶ 69, detained in violation of her Fifth Amendment right to Due Process (Count II), id. ¶ 75, and detained and subject to removal in violation of the Administrative Procedure Act ("APA") (Count III), id. ¶ 78. Ozturk requests release from custody pending adjudication (Count IV). Id. ¶¶ 84-86. Although the Petition raises serious issues as to the conduct of her arrest and detention as alleged in each of these Counts, before reaching the merits of the Petition, the Court must first address the parties' dispute about its jurisdiction. For the reasons articulated below, the Court denies the government's motion to dismiss this Petition or its request to transfer this matter to the Western District of Louisiana and, relying upon the "interest of justice" under 28 U.S.C. § 1631, transfers this matter to the District of Vermont, where Ozturk was confined overnight at the time that the Petition was filed.

2

II.     **Factual and Procedural Background**

A.      **Ozturk's Arrest and Detention**

Ozturk, a Turkish national and doctoral candidate, entered the United States pursuant to a validly issued F-1 student visa, D. 12 ¶ 8; D. 19 at 4, on June 28, 2024, D. 12-2 at 2; <u>see</u> 8 C.F.R. § 214.2(f)(5) (providing that F-1 visas are issued for the duration of a full course of study).  On March 25, 2025, Ozturk's visa was revoked, subjecting her to removal from the United States pursuant to 8 U.S.C. § 1227(a)(1)(B) as an alien "whose nonimmigrant visa . . . has been revoked under section 1201(i)."  D. 19 at 3; D. 12-1 at 2; D. 12-2 at 2.

Ozturk was given no notice of the revocation of her student visa.  D. 12 ¶ 4.  On March 25, 2025, at approximately 5:25 p.m., she was arrested and taken into custody by agents of Immigration and Customs Enforcement ("ICE") near her residence in Somerville, Massachusetts. D. 19-1 ¶ 5; D. 12 ¶¶ 19-20.  A video of Ozturk's arrest shows a hooded officer in plainclothes approach Ozturk and grab her by the wrists.  D. 12 ¶ 19 n.4; (video).  Five additional officers surrounded her, took her cell phone, placed her in handcuffs and took her away in an unmarked vehicle.  <u>Id.</u> ¶¶ 1, 20.

At some unspecified time, but prior to her arrest, ICE determined that officers would take Ozturk to Louisiana and it made flight and custody arrangements for transport.  D. 19-1 ¶¶ 6-8. According to ICE, Ozturk was to be transferred to Louisiana because "there was no available bedspace for Petitioner at a facility where she could appear for a hearing" in New England, and such out-of-state transfers are "routinely conducted after arrest, due to operational necessity considerations."  <u>Id.</u> ¶¶ 6-7.  The ICE Boston Field Office, located in Burlington, Massachusetts has administrative and operational authority over ICE arrest, removal and detention operations throughout New England, including Massachusetts, Connecticut, Maine, New Hampshire, Rhode

3

Island and Vermont.  D. 26-3 ¶ 6.  ICE has detention facilities for female detainees in multiple locations in New England.  Id. ¶ 9.  According to affidavits from several experienced New England immigration attorneys, it is the usual practice to have detainees, arrested on civil immigration charges, booked and processed at the ICE Boston Field Office in Burlington, Massachusetts before they are sent to a detention facility.  Id. ¶¶ 10, 12; D. 26-4 ¶¶ 4-5; D. 26-6 ¶¶ 5-6.

After Ozturk's arrest, ICE took her from Somerville, Massachusetts at 5:49 p.m., to Methuen, Massachusetts, arriving there at 6:22 p.m.  D. 19-1 ¶ 10.  Shortly thereafter, at 6:36 p.m., the officers took Ozturk from Methuen, Massachusetts and transported her to Lebanon, New Hampshire.  Id. ¶ 11.  At 9:03 p.m., ICE officials departed from Lebanon, New Hampshire, which is approximately five miles from the Vermont border, D. 19 at 5 n. 2, to transport Ozturk to the ICE Field Office in St. Albans, Vermont, where she arrived at 10:28 p.m. for processing of her Notice to Appear ("NTA") and was held there in custody overnight, D. 19-1 ¶¶ 12-13.  The next morning, March 26, 2025, at 4:00 a.m., ICE officers took Ozturk to the airport in Burlington, Vermont.  D.19-1 ¶ 16.  The flight transporting Ozturk left Burlington, Vermont at 5:31 a.m., and arrived in Alexandria, Louisiana at 2:35 p.m.  Id. ¶¶ 17-18.  From there, officers transferred her to the custody of Enforcement and Removal Operation ("ERO") New Orleans.  Id. ¶ 18.  Ozturk is currently detained in ICE custody in the South Louisiana Correctional Facility in Basile, Louisiana.  Id. ¶ 19.

All of this was unknown to Ozturk's attorney, who did not know her client's whereabouts upon learning of her arrest.  D. 26-2 ¶¶ 6-7.  Close to five hours after that arrest, still having been unable to confirm her whereabouts and knowing that she had been arrested and detained in Massachusetts, Ozturk's attorney filed the Petition in this Court on her client's behalf at approximately 10:02 p.m.  D. 12 ¶ 21; D. 26-2 ¶ 2.  Shortly thereafter, at approximately 10:12

4

p.m., Ozturk's counsel sent of a copy of the Petition to the government's counsel. D. 26-2 ¶ 3. Less than an hour later, at approximately 10:55 p.m., this Court (Talwani, J.) issued an order enjoining the government from moving Ozturk outside of Massachusetts without providing 48 hours' notice to the Court. D. 3 ¶ 4; D. 12 ¶ 22. Per the Court's Order, such notice was to be filed in writing on the docket in the proceeding and was to "state the reason why the government believes that such a movement is necessary and should not be stayed pending further court proceedings." D. 3 ¶ 4. A copy of this Order was delivered to the U.S. Attorney's Office, the government's counsel, minutes later, at approximately 10:57 a.m., via e-mail. 3/25/25 docket entry; D. 26-2 ¶ 5.

Even after the Petition was filed on the evening of March 25, 2025, Ozturk's counsel was unable to determine her whereabouts even in her contact with the government throughout that evening and much of the next day. D. 26-2 ¶¶ 6-13. She contacted the ICE ERO in Burlington, Massachusetts and ICE Homeland Security Investigations in Boston, Massachusetts several times to request information, but received no response. Id. ¶ 6. Ozturk's attorney also was unable to locate her via ICE's Online Detainee Locator System, where the field for "Current Detention Facility" for Ozturk remained blank. Id. ¶ 7. She had several conversations with counsel for the government who could not confirm Ozturk's whereabouts. D. 26-2 ¶¶ 9-12; D. 12 ¶ 27. Counsel was concerned about her client as Ozturk suffers from asthma (a condition apparently disclosed to officers by Ozturk upon her arrest, D. 19-1 ¶ 9) and she did not have her medication when she was detained. D. 26-2 ¶ 9; D. 12 ¶ 24. A representative of the Turkish consulate even went to the ICE Boston Field Office in Burlington, Massachusetts, and was reportedly informed Ozturk was not in that office and ICE could not provide further information about her whereabouts. D. 26-2 ¶ 8; D. 12 ¶ 27.

5

In light of these difficulties, on the afternoon of March 26, 2025, Ozturk's attorney filed an emergency motion to compel the government to disclose Ozturk's location and permit counsel to speak with her that evening. D. 7; D. 26-2 ¶ 13. In that motion, counsel noted that a U.S. Senator's office had just informed her that Ozturk had been transferred to Louisiana, but neither the government's counsel nor ICE had confirmed same. D. 7 at 1. Shortly after Ozturk's counsel filed this motion, D. 7, at approximately 3:27 p.m. on March 26, 2025, counsel for the government informed Ozturk's attorney for the first time that Ozturk had been moved to a staging facility in Alexandria, Louisiana, to be transferred to South Louisiana. D. 9 at 2; D. 12 ¶ 30; D. 26-2 ¶ 14. Ozturk's attorney was able to speak with Ozturk for the first time since her arrest later that night at approximately 9:45 p.m., D. 9 at 2; D. 19-1 ¶ 21; D. 26-2 ¶ 21, and learned that she had suffered an asthma attack while being transported in custody to Louisiana. D. 12 ¶ 31. As directed by the Court, the government filed a response to Ozturk's motion the next morning, March 27, 2025, reporting that, as was now noted in ICE's online detainee locator, Ozturk was currently confined at the South Louisiana Correctional Facility in Basile, Louisiana. D. 9 at 1, where she remains. D. 19-1 ¶ 19.

On March 28, 2025, Ozturk filed an amended Petition, D. 12. In light of same, the Court gave the government until 5:00 p.m. on Tuesday, April 1, 2025 to respond to it. D. 16. To allow resolution of its jurisdiction to decide the Petition, the Court ordered that "Ozturk shall not be removed from the United States until [its] further Order." Id. The government timely filed its response and requested that this Court dismiss the Petition, or, if the Court determines that transfer is appropriate, transfer the case to the Western District of Louisiana, the district where Ozturk is presently confined. D. 19 at 28-29. The Court ordered Ozturk to file a response by 5:00 p.m. the

JA-000083

following day, Wednesday April 2, 2025. D. 20. The Court heard oral argument from the parties

on April 3, 2025 and took the matter under advisement. D. 41.

### B. Ozturk's Revocation and Removal Proceedings

As mentioned, Ozturk was not given notice of the revocation of her visa and had not

received a copy of the NTA before an immigration judge for removal proceedings before her arrest.

D. 12 ¶ 36. A letter dated March 25, 2025, which was addressed to Ozturk but not provided to her

before her arrest and detention, states that Ozturk's Student and Exchange Visitor Information

System ("SEVIS") designation "has been terminated pursuant to 237(a)(1)(C)(i) and/or

237(a)(4)(C)(i) of the Immigration and Nationality Act." D. 12 ¶ 33; D. 12-1 at 2. Also, as the

government recounts, Ozturk was not served with the NTA until after she was in custody. D. 19-

1 ¶¶ 13-14. The NTA orders Ozturk to appear before an immigration judge in Louisiana on April

7, 2025 for an initial hearing. D. 12 ¶ 37; D. 19-1 ¶ 15; D. 12-2 at 2.

Although the basis of her revocation is not cited in the letter to her regarding same, Ozturk

was one of several authors who contributed to an editorial back on March 26, 2024 in the school

newspaper, The Tufts Daily, criticizing the University's dismissal of several resolutions that had

been adopted by the undergraduate student Senate in "a sincere effort to hold Israel accountable

for clear violations of international law." D. 12 ¶¶ 2, 16; D. 26 at 2; D. 26-1 at 67 ¶ 5. The

President of Tufts University attests that no complaints were filed in its aftermath and there were

multiple editorials published on different sides of this issue. D. 26-1 at 67 ¶ 5. As alleged, Ozturk's

current visa status aligns with new policy directives from President Donald Trump who, after

assuming office, signed two Executive Orders aimed at fulfilling a campaign promise to revoke

the visas of students he characterized as "Hamas sympathizers." D. 12 ¶¶ 40-44. Ozturk's case is

one of several cases in which the Trump Administration has implemented these Executive Orders

by revoking the immigration status of non-citizens who expressed support for Palestine. D. 12 ¶¶ 53-57. In such cases, the government has invoked the same provision it cited in its letter to Ozturk, 8 U.S.C. § 1227(a)(4)(C)(i), which provides that "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." D. 12 ¶ 50; D. 12-1 at 2; see, e.g., Chung v. Trump, No. 25-cv-02412-NRB, D. 1 (S.D.N.Y. March 24, 2025); Khalil v. Joyce, No. 25-cv-01935-JMF, 2025 WL 849803, at *1 (S.D.N.Y. Mar. 19, 2025).

## III. Discussion

Before a Court can turn to the merits of the Petition, including Ozturk's request for immediate release, it must determine whether it has jurisdiction over this matter. Ozturk contends that this is the appropriate tribunal for the Petition, D. 12 ¶¶ 6-7; D. 26 at 10-16, but if the Court determines that it is not, the matter should be transferred to the District of Vermont. D. 26 at 17-19. The government contends that the Petition should be dismissed or, alternatively, transferred to the Western District of Louisiana. D. 19 at 6-16; 26-28.

### A. Jurisdiction for the Petition

Ozturk filed the Petition pursuant to 28 U.S.C. § 2241, which provides in relevant part that "[w]rits of habeas corpus may be granted by . . . the district courts within their respective jurisdictions" when a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241. "Aliens in custody of federal immigration officials have traditionally been able to obtain review of immigration decisions by petitioning for a writ of habeas corpus under what is now § 2241." Goncalves v. Reno, 144 F.3d 110, 120, 133 (1st Cir. 1998) (concluding that habeas jurisdiction permits a district court to review at least "pure issues of law concerning the applicability of statutory provisions" to immigration decisions); see Raspoutny v.

8

<u>Decker</u>, 708 F. Supp. 3d 371, 379 (S.D.N.Y. 2023) (stating that "Section 2241 permits a federal court to review 'purely legal statutory and constitutional claims' regarding immigration proceedings, but jurisdiction 'does not extend to review of discretionary determinations by the IJ and the BIA'") (quoting <u>Sol v. I.N.S.</u>, 274 F.3d 648, 651 (2d Cir. 2001)).  Section 2241 is also the proper vehicle for petitioners challenging their detention by immigration officials pending a decision in immigration matters.  <u>Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.</u>, 510 F.3d 1, 11 (1st Cir. 2007) (noting that "[d]istrict courts retain jurisdiction over challenges to the legality of detention in the immigration context") (citing <u>Hernández v. Gonzales</u>, 424 F.3d 42, 42 (1st Cir. 2005)); <u>Pensamiento v. McDonald</u>, 315 F. Supp. 3d 684, 688 (D. Mass. 2018) (observing that "[d]espite . . . jurisdiction-stripping provisions, the district court may still review habeas challenges to unlawful immigration detention") (citing <u>Aguilar</u>, 510 F.3d at 11).  Accordingly, the Petition, filed under § 2241, is the correct vehicle for Ozturk to pursue her challenge to her arrest and detention upon the revocation of her student visa pending removal proceedings.

The government, however, contests that the District of Massachusetts is the right court to hear the Petition.[1]  As provided by statute, a habeas petition "shall allege the facts concerning the

_____

[1] The government also contends that pursuant to 8 U.S.C §§ 1226(e), 1252(b)(9) and 1252(g), the Court lacks subject matter jurisdiction to review the merits of the Petition. D. 19 at 17-23.  As for §§ 1252(b)(9) and (g), the First Circuit has held that where a habeas petition raises challenges "wholly collateral" to removal, district courts are not precluded from review said petition.  See <u>Aguilar</u>, 510 F.3d at 10; <u>Kong v. United States</u>, 62 F.4th 608, 613 (1st Cir. 2023) (citing <u>Aguilar</u>, 510 F.3d at 11).  Likewise, the First Circuit has held that § 1226(e) does not strip district courts' ability to review habeas petitions challenging the constitutionality of a petitioner's detention.  See <u>Hernandez-Lara v. Lyons</u>, 10 F.4th 19, 33-34 (1st Cir. 2021) (holding that federal district courts have jurisdiction to review a habeas petition that challenges "the extent of the Government's detention authority under the 'statutory framework' as a whole") (citing <u>Jennings v. Rodriguez</u>, 583 U.S. 281, 295-96 (2018)); <u>Campbell v. Chadbourne</u>, 505 F. Supp. 2d 191, 196 (D. Mass. 2007) (stating that Congress did not express an intent in § 1226(e) to preclude judicial

application's commitment or detention, the name of the person who has custody over him and by virtue of what claim or authority, if known," 28 U.S.C. § 2242, and a writ of habeas corpus granted by a district court "shall be directed to the person having custody of the person detained." 28 U.S.C. § 2243. "Jurisdiction over the custodian is paramount because '[t]he writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody.'" Vasquez v. Reno, 233 F.3d 688, 690 (1st Cir. 2000) (alteration in original) (quoting Braden v. 30th Jud. Cir. Ct. of Ky., 410 U.S. 484, 494-95 (1973)). Accordingly and not surprisingly, as a general rule, a petitioner must file a habeas petition in the district in which they are confined and must name as a respondent the petitioner's immediate custodian. See Rumsfeld v. Padilla, 542 U.S. 426, 442-47 (2004).

    *1.    The General Rule for Challenging Physical Custody is Against the Immediate Custodian and in the Place of Confinement*

As to the general rule about naming the immediate custodian, the respondent is typically "the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." Padilla, 542 U.S. at 435; see Vasquez, 233 F.3d at 696 (holding that "normally" the rule is that the immediate custodian and not the Attorney General is the proper respondent in immigration habeas challenges).

Also, as a general matter, a habeas petitioner must file his or her petition in the district of confinement. Padilla, 542 U.S. at 447 (considering the proper venue for a habeas petition brought by a United States citizen designated as an "enemy combatant" who was initially detained in the Southern District of New York ("S.D.N.Y.") and was later transferred to military custody in South

---

review of constitutional challenges to detention). Here, because the Petition does not challenge the government's discretionary authority to remove her but the legality of her detention under the First and Fifth Amendments and the APA, D. 12 ¶¶ 69, 73-75, 78, the statutes do not strip the Court's jurisdiction to review the Petition here.

Carolina and filed a § 2241 habeas petition in S.D.N.Y.). Id. at 432. The Court concluded that S.D.N.Y. lacked jurisdiction over Padilla's claim because § 2241 permits a habeas petition only in "the district of confinement," and no one in S.D.N.Y. served as Padilla's immediate custodian. Id. at 442. In reaching this conclusion, the Court observed that "Congress added the limiting clause-'within their respective jurisdictions'-to the habeas statute in 1867 to avert the 'inconvenient [and] potentially embarrassing' possibility that 'every judge anywhere [could] issue the Great Writ on behalf of applicants far distantly removed from the courts whereon they sat.'" Id. at 442 (alterations in original) (quoting Carbo v. United States, 364 U.S. 611, 617 (1961)). Although Ozturk's counsel observed at the motion hearing that there is some overlap in the jurisprudence about the two rules, the Padilla Court addressed them separately to say that the place of confinement rule, in conjunction with the immediate custodian rule "compose[s] a simple rule . . . [w]henever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement." Id. at 447. This rule serves the important purposes of "preventing forum shopping by habeas petitioners" and avoiding the "inconvenience, expense, and embarrassment" of district courts with overlapping jurisdiction. Id.

### 2. There are Exceptions to these General Rules

#### a) As Recognized in *Padilla*

Significantly, the Supreme Court in Padilla acknowledged that certain exceptions have historically applied to both of these general rules. The majority noted exceptions to the immediate-custodian rule exist when there is no immediate physical custodian with respect to the "custody" challenged. Padilla, 542 U.S. at 438-49, pointing to the Court's earlier ruling in Braden v. United States, 410 U.S. 484 (1973). In Braden, the Supreme Court considered a habeas petition filed by

11

an Alabama prisoner in the United States District Court for the Western District of Kentucky, which challenged a detainer lodged against him in Kentucky. Braden, 410 U.S. at 488-89. Because Braden sought to challenge "a confinement that would be imposed in the future," the Court concluded the immediate custodian rule did not apply, and Braden was instead "in custody" in Kentucky by virtue of the detainer, id. at 488-89, and while the Alabama warden was the present custodian, he was not "the person who [held Braden] in what [was] alleged to be unlawful custody." Id. at 494-95. The Padilla Court also pointed to the decision in Strait v. Laird, 406 U.S. 341 (1992), Padilla, 542 U.S. at 438-39, where it addressed an inactive reservist's § 2241 petition seeking relief from future military obligations. Id. at 344. While the petitioner was domiciled in California, the Supreme Court reasoned that because he was not challenging any present physical confinement, his "'nominal' custodian was a commanding officer in Indiana who had charge of [his] Army records." Id. In citing these precedents, the Padilla Court concluded that the "legal control" test could not be applied to physical-custody challenges to allow a convicted prisoner to name that State or the Attorney General as a respondent to its § 2241 petition, Padilla, 542 U.S. at 439-40, but acknowledged that Braden and Strait remained exceptions to the general rule.

The Supreme Court also noted an exception to this general rule regarding the immediate custody in Ex parte Endo, 323 U.S. 283 (1944), in which a Japanese-American citizen interned in California filed a § 2241 petition in the federal district court in the Northern District of California to challenge her detention, id. at 284-85; Padilla, 542 U.S. at 440. Endo had named her immediate custodian in California in her petition, but the government later transferred her to Utah. Endo, 323 at 285. The Supreme Court concluded that the subsequent transfer did not divest the Northern District of California of its jurisdiction. Id. at 304-06. Instead, "when the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District

12

Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release." Padilla, 542 U.S. at 441 (characterizing Endo's holding, and describing it as "important but limited"); see Chavez-Rivas v. Olsen, 194 F. Supp. 2d 368, 377 (D.N.J. 2002) (concluding that "where an INS-detained habeas petitioner properly files a habeas petition in the district where he is incarcerated, and the petitioner is subsequently transferred to a facility outside of that district, the Attorney General . . . may be deemed a 'custodian' to allow the original District Court to retain jurisdiction over the habeas petition"). The Supreme Court reasoned that the Endo exception did not apply to Padilla's case because Padilla had been moved from the S.D.N.Y. to South Carolina before his lawyer had filed his habeas petition, meaning jurisdiction had never vested in S.D.N.Y. Id.

In addition, the Supreme Court noted certain exceptions legislated by Congress. Id. at 443. Specifically, the Court in Padilla noted that it had "long implicitly recognized an exception to the immediate custodian rule in the military context where an American citizen is detained outside the territorial jurisdiction of any district court." Id. at 436 n.9. The majority in Padilla also acknowledged an exception relied upon by the dissent, but disagreed that it was applicable. Citing Demjanjuk v. Meese, 784 F.2d 1114 (D.C. Cir. 1986) (Bork, J.), the majority observed that "[w]hen, as in that case, a prisoner is held in an undisclosed location by an unknown custodian, it is impossible to apply the immediate custodian and district of confinement rules," but concluded that was not Padilla's case "where the identity of the immediate custodian and the location of the appropriate district court are clear." Padilla, 542 U.S. at 450 n.18.

b)      As proposed by the concurrence in *Padilla*

Although the 5-4 majority in Padilla applied the general rule requiring a habeas petition challenging physical custody to be filed in the place of confinement, two members of that majority,

13

JA-000090

in a concurring opinion, suggested an exception to the general rule that is implicated here. Justice Kennedy (joined by Justice O'Connor) noted that an exception to filing a petition in the district of confinement might be warranted "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention." Padilla, 542 U.S. at 454 (Kennedy, J., concurring). In such a case "habeas jurisdiction would be in the district court from whose territory the petitioner had been removed." Id. (Kennedy J., concurring). Although this exception was not adopted by the majority, because Justice Kennedy and Justice O'Connor's votes were "necessary to the formation of a majority," Justice Kennedy's opinion is at least "given particular weight," Schmitz v. Zilveti, 20 F.3d 1043, 1045 (9th Cir. 1994) (citing Middlesex Mut. Ins. Co. v. Levine, 675 F.2d 1197, 1200 (11th Cir. 1982)); see Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 594 (1st Cir. 1980) (relying upon a concurrence after noting that the author's opinion was needed to make a majority); ANR Coal Co. v. Cogentrix of N.C., Inc., 173 F.3d 493, 499 n.3 (4th Cir. 1999) (observing that courts have given particular weight to a concurrence because the vote of each justice who joined that concurrence was "necessary to create a majority"). This is particularly appropriate where the majority in Padilla did not express disagreement with this exception proposed by the concurrence, but rather noted that the particular facts of Padilla's case did not warrant its invocation. Padilla, 542 U.S. at 441-42 (noting, by the majority, that "[t]here is no indication that there was any attempt to manipulate Padilla's transfer" and "the Government did not attempt to hide from Padilla's lawyer where it had taken him"). The majority's observation in Padilla also foreshadowed later cautions by the Supreme Court. For example, in Boumediene v. Bush, 553 U.S. 723, 732-33 (2008), the Supreme Court concluded that the Military Commissions

14

Act, which prohibited detainees classified as enemy combatants from petitioning for habeas corpus, was an unconstitutional suspension of the right to the writ of habeas corpus. There, the Court described the writ as "an indispensable mechanism for monitoring the separation of powers" which it cautioned "must not be subject to manipulation by those whose power it is designed to restrain." Id. at 765-66; see Demjanjuk, 784 F.2d at 1116 (noting that "it is essential that petitioner not be denied the right to petition for a writ of habeas corpus").

Although the government's brief does not address Justice Kennedy's proposed exception in the Padilla concurrence, see D. 19 at 13-15, courts within this Circuit and others have recognized it even as they have acknowledged that the facts in their particular case did not warrant its application. See Khalil, 2025 WL 849803 at *6-11 (addressing Justice Kennedy's proposed exception in the Padilla concurrence); Parker v. Hazelwood, No. 17-cv-484-LM, 2019 WL 4261832, at *3-5 (D.N.H. Sept. 9, 2019) (referencing Justice Kennedy's exception, but noting that the petitioner has not "identified facts fitting this case into any of the recognized extraordinary circumstances warranting exception to the jurisdictional rules"); Xia v. King, No. 24-cv-2000-JRT-DLM, 2025 WL 240792, at *2 (D. Minn. Jan. 17, 2025) (citing Justice Kennedy's concurrence and suggesting that "[t]he Supreme Court has recognized" an exception to the district of confinement rule "where the Government was not forthcoming with respect to the identity of the custodian and the place of detention"); Gayle v. Meade, 614 F. Supp. 3d 1175, 1235 (S.D. Fla. 2020) (noting Justice Kennedy's exception and acknowledging that the Court "might entertain jurisdiction" over the claims "if there were evidence of efforts on the part of the defendants to evade jurisdiction of the Court") (quoting McKinnon v. Talladega Cnty., Ala., 745 F.2d 1360, 1363 (11th Cir. 1984)); Sow v. Whitaker, No. 18-cv-11394-GBD-RWL, 2019 WL 2023752, at *5-6 (S.D.N.Y. May 8, 2019) (noting Justice Kennedy's proposed exception but concluding that the

15

petitioner had failed to provide evidence showing that the government either made it difficult for his lawyer to know where he was or was not forthcoming about his place of detention); Salcedo v. Decker, No. 18-cv-8801-RA, 2019 WL 339642, at *2 n.3 (S.D.N.Y. Jan. 28, 2019) (citing Justice Kennedy's exception in Padilla but would continue to apply the general rule "[a]bsent contrary instruction from the Supreme Court or the Second Circuit and absent any allegation that there was an 'attempt to manipulate' [the petitioner's] transfer in bad faith"). It is also true, as the court in Khalil noted, that no court has "ever found that [Justice Kennedy's] exceptions applied" to the facts of any particular case. Khalil, 2025 WL 849803 at *2.

<div align="center">

c)    Also as recognized in the First Circuit

</div>

Justice Kennedy's concurrence outlining an exception to the place-of-confinement also echoed a point the First Circuit had made four years before Padilla in Vasquez, 233 F.3d at 696, about an exception to the immediate-custodian rule. The case involved an ICE detainee who was transferred from Massachusetts to Louisiana for removal proceedings following his release from prison, who then filed a habeas petition in this Court naming the Attorney General as the defendant. Id. at 690. The First Circuit concluded that, as a general rule, the Attorney General is neither the custodian nor the appropriate respondent in a habeas case, noting that "allowing alien habeas petitioners to name the Attorney General (over whom all district courts presumably have personal jurisdiction) as a respondent will encourage rampant forum shopping." Id. at 693-94. The Vasquez court, however, noted the possibility for exceptions in "extraordinary circumstances." Id. at 696. Such extraordinary circumstances would exist if "INS [the precursor to ICE] spirited an alien from one site to another in an attempt to manipulate jurisdiction." Id. (concluding that no such "extraordinary circumstances" existed in the case where "the petitioner has neither marshaled facts suggesting furtiveness nor made a showing of the elements necessary to demonstrate bad faith").

<div align="center">16</div>

Such concerns regarding government conduct are heightened in the case of a habeas petitioner who is an ICE detainee. Anariba v. Dir. Hudson Cnty. Corr. Ctr., 17 F.4th 434, 447 (3d Cir. 2021). Given ICE's "broad authority to move ICE detainees" without notice, "the Government could willingly transfer an ICE detainee seeking habeas from continued detention to a jurisdiction that is more amendable to the Government's position, or the Government could transfer an ICE detainee for the purpose of intentionally introducing complicated jurisdictional defects to delay the merits review of already lengthy § 2241 claims." Id. at 447-48.

Courts have noted that "extraordinary circumstances" could exist to invoke the exception articulated in Vasquez. See Tham v. Adducci, 319 F. Supp. 3d 574, 577 (D. Mass. 2018) (citing Vasquez, 233 F.3d at 696) (concluding that there were "no extraordinary facts . . . that would warrant deviating from the immediate custodian rule"); Chavez-Rivas, 194 F. Supp. 2d at 376 (discussing exception under Vasquez, but disagreeing that "a petitioner should shoulder the burden of proving the Government acted in bad faith" in invoking same and that "[w]here transfer is not the result of the petitioner's misconduct, [the court] would not impose such a burden upon him"); Gayle, 614 F. Supp. 3d at 1235 n.23 (internal citation and quotation marks omitted) (some alterations in original) (citing Vasquez and other cases to suggest that "if Petitioners could satisfactorily prove their hunch ['that the ICE-facilitated transfers may be part of a shell game designed to strip the Court of jurisdiction'], then the Court might entertain jurisdiction over [their] claim[s] if there were evidence of efforts on the part of the defendants to evade the jurisdiction of the Court").

A court has invoked Vasquez in at least two cases to allow a petitioner to name the Attorney General as the respondent where ICE moved the petitioner from the district immediately after detention. Farah v. I.N.S., No. 02-cv-4725-DSD-RLE, 2002 WL 31828309, at *2-3 (D. Minn.

17

JA-000094

Dec. 11, 2002); de Jesus Paiva v. Aljets, No. cv-036075-DWF-AJB, 2003 WL 22888865, at *4

(D. Minn. Dec. 1, 2003).  In those cases, the court expressed concern that such a practice by ICE

would allow it "to forum shop, intentionally or not."  Farah, 2002 WL 31828309, at *3 (citing

Alcaide–Zelaya v. McElroy, No. 99–cv-5102-DC, 2000 WL 1616981, at * 5 (S.D.N.Y. Oct. 27,

2000)); de Jesus Paiva, 2003 WL 22888865, at *4 (observing that "[t]o now hold that Petitioners

may only file their Petition in the state that the ICE determines to send them would be to allow the

ICE to forum shop") (citing Alcaide-Zelaya, 2000 WL 1616981, at *5).  That the "extraordinary

circumstances" described in Vasquez, 233 F.3d at 696, has not often been invoked reflects that

such circumstances are rare, not that rare cases never present themselves.

> 3.  *Considering the Immediate-Custodian Rule in this Case*[2]

The government here points to several cases to contend that the course of events

surrounding Ozturk's arrest and detention do not rise to the level of "furtiveness" or "bad faith"

that concerned the First Circuit in applying the immediate-custodian rule in certain "extraordinary

circumstances" in Vasquez.  First, it points to Ruvira-Garcia v. Guadian, No. 20-cv-2179, 2020

WL 1983875, at *2 (N.D. Ill. Apr. 17, 2020), where the district court in the Northern District of

Illinois, petitioner's place of residence, concluded that it did not have jurisdiction over the

petitioner who was initially detained in Wisconsin, transferred to Texas and ultimately detained in

Oklahoma.  Id. at *2-3.  There, although the record reflected that the petitioner was not in the

district at the time of filing, there was no suggestion that her whereabouts were unknown at the

---

[2] Petitioner suggests that the Court does not need to reach the exceptions because, at the time the Petition was filed, Ozturk was in transit in Vermont, making her immediate custodian the ICE New England Field Officer Director, who is based in Massachusetts.  D. 26 at 12-13.  Circuit law does not appear to support this position.  See Vasquez, 233 F.3d at 695 (addressing Endo and Strait and U.S. ex rel. Circella v. Sahli, 216 F.2d 33, 35 (7th Cir. 1954) and summing up that "this trilogy of cases simply does not give a legitimate judicial imprimatur to a freewheeling definition of 'custodian' such as the petitioner champions").

18

time that her Petition was filed or that the government did not disclose her whereabouts when her counsel inquired about same. The government also cites <u>Fuentes v. Choate</u>, 24-cv-01377-NYW, 2024 WL 2978285, at *9-10 (D. Colo. June 13, 2024), in which the court addressed the practical difficulties of a habeas petitioner challenging her detention by ICE where she was moved from a facility in Colorado to a staging facility in Arizona for eventual transfer to Texas. <u>Id.</u> at *2. The court concluded that it did not have jurisdiction when she was detained in Arizona and it was "not this Court's duty to ascertain or identify an Arizona official" to be named as the correct respondent. <u>Id.</u> at *9. Recognizing petitioner's argument that she was only in Arizona temporarily and that this "present[ed] unusual logistical circumstances that likely hindered counsel's ability to act swiftly and still within the bounds of permissible habeas jurisdiction," the court declined to apply the exception in Justice Kennedy's concurrence, noting an absence of "authority from the Tenth Circuit—or weight of authority from other circuit courts—that might justify the application of such exception (however logical) by this Court." <u>Id.</u> at *10. In contrast, here, in the First Circuit, this Court must consider <u>Vasquez</u>. Moreover, other than the transport of the petitioner through several states en route to another detention facility in Oklahoma, there is no suggestion in that case that the petitioner's whereabouts were unknown to her counsel at the time she filed the habeas petition. <u>Id.</u> In fact, the court in <u>Fuentes</u> noted that petitioner's counsel was at least informed of her transfer to Texas as it was occurring. <u>Id.</u>

Here, the government attests that "[t]ransfers out of state, and out of the ERO Boston area of responsibility, are routinely conducted after arrest, due to operational necessity and considerations." D. 19-1 at 7. But even accepting that it is routine to move detainees between different locations before transport to their final destination, <u>see</u> <u>Sow</u>, 2019 WL 2023752, at *1-2 (reflecting petitioner's transport between locations in New York and New Jersey before

19

Louisiana), the government here provides no information about whether it is routine to move detainees to various locations in a single day or to have a detainee on a plane heading out of the region within twelve hours of her arrest.

Moreover, unlike the circumstances in <u>Vasquez</u>, 233 F.3d at 696, the petitioner has "marshaled facts" at least showing "furtiveness" on the part of the government here. <u>Id.</u> Ironically, the government (at least in its papers) faulted Ozturk for failing to file the Petition in the district of her confinement and failing to name her immediate custodian, D. 19 at 6-13, despite the fact that Ozturk was not permitted to communicate her whereabouts as she was transported from Somerville, Massachusetts to Methuen, Massachusetts to Lebanon, New Hampshire and then to Saint Albans, Vermont, <u>see</u> D. 26-7 ¶ 6 (Ozturk attesting that she kept asking to call her attorney but was told that she would be allowed to do so "once [she] reached [her] final destination"). Ozturk's attorney did not and could not have known her place of confinement or her immediate custodian at the time she filed the Petition, and even in the aftermath of that filing, the government did not disclose Ozturk's whereabouts in Vermont or her planned transport to Louisiana until a day later after she arrived in Louisiana. D. 19-1 ¶ 21.[3]

Ozturk has filed multiple affidavits from experienced, immigration attorneys in the New England area that attest that the sequence of events here was far from routine, even putting aside the circumstances of her arrest. According to these sworn statements, most ICE detainees arrested on civil immigration warrants are booked and processed in the ICE ERO Field Office in Burlington, D. 26-3 ¶ 10; D. 26-4 ¶ 5; D. 26-6 ¶ 6, and then are transferred to a detention facility.

---

[3] That ICE has an internal policy that it will notify a detainee's attorney of record of a transfer "as soon as practicable on the day of the transfer, but in no circumstances later than twenty four (24) hours after the transfer occurs," U.S. ICE, Policy No. 11022.1(5.3)(2)(a)(2012), does not counter this conclusion here where the government was aware that Ozturk and her counsel affirmatively had requested such contact before the expiration of this time period.

20

D. 26-6 ¶ 6.  This was not the case with Ozturk, who was booked and processed in another city in Massachusetts, Methuen, transported to New Hampshire and then to Vermont.  Although ICE detainees might be moved during custody, D. 19-1 ¶ 7 (the Acting Deputy Field Office Director for ICE ERO attesting that "[t]ransfers out of state, and out of the ERO Boston area of responsibility, are routinely conducted after arrest, due to operational necessity and considerations"), it is unusual for that to occur within a few hours.  D. 26-3 ¶ 11; D. 26-4 ¶ 7; D. 26-5 ¶ 13; D. 26-6 ¶ 7.  Women who are detained by ICE in the region are regularly detained at facilities in New Hampshire (Strafford Jail), Rhode Island (Wyatt) and Maine (Cumberland County Jail), D. 26-4 ¶ 6, and another facility in Vermont (Chittenden Regional Correctional Facility).  D. 26-6 ¶ 9.  At least as to the facility in Maine (Cumberland County Jail), there was space for female detainees on March 25 and 26, 2025.  D. 26-5 ¶ 12.  An experienced immigration attorney working in Vermont attested that she has only experienced people being detained at the St. Albans office upon initial arrest in Vermont and has "never once encountered the case of a detained person who is being transferred into Vermont for the purposes of continued ICE detention" and that it is "even more extraordinary for a person to be transferred into the St. Albans ICE office, which is a government office and not a detention facility."  D. 26-7 ¶ 8.  The irregularity of the arrest, detention and processing here is coupled with the failure to disclose Ozturk's whereabouts even after the government was aware that she had counsel and the Petition was filed in this Court.  Moreover, contrary to counsel's arguments at the motion hearing, that the government had a pre-arranged plan for Ozturk's detention and transport before the agents effectuated her arrest does not necessarily show lack of attempt to manipulate jurisdiction where that plan continued (apparently uninterrupted) even after the government was aware of the Petition.

JA-000098

Even if <u>Vasquez</u>'s extraordinary circumstances exception to the immediate custodian rule did not apply here, there is also an exception to the immediate-custodian rule where the custodian of the petitioner is unknown at the time that the Petition is filed. As discussed above, in <u>Demjanjuk</u>, 784 F.2d at 1116, where the petitioner was being held by the U.S. Marshal in a confidential location, the court treated the Attorney General as the custodian and concluded that jurisdiction would lie in the D.C. Circuit at the time that the Petition was filed. <u>Id.</u>; <u>Khalil v. Joyce</u>, No. 25-cv-01963-MEF, 2025 WL 972959, at *28-37 (D.N.J. Apr. 1, 2025) (discussing <u>Demjankuk</u>).[4] Similarly, where ICE took Ozturk into custody in Massachusetts, but transported her to an unknown place, she cannot be faulted for filing the Petition in this Court against the Respondents with national and regional supervision over ICE. This is particularly true here where counsel for Ozturk could not have known to name her client's immediate custodian in Vermont, her location at the time the Petition was filed.

### 4.   Considering Place-of-Confinement Rule in this Case

The same is true as to the general rule under <u>Padilla</u> and its progeny that a Petition should be filed in the petitioner's place of confinement, which we now know was the District of Vermont for Ozturk. <u>See</u> <u>Demjanjuk</u>, 784 F.2d at 1116. Despite her counsel's argument at the motion hearing, whatever the analytical overlap between this general rule and the immediate-custodian rule may be, the Court must address both rules in determining its jurisdiction. <u>Padilla</u>, 542 U.S. at

---

[4] At oral argument, in addressing <u>Demjanjuk</u>, counsel for the government argued that even if it were true that the immediate custodian was unknown at the time the Petition was filed on March 25, 2025, the Court should focus on the fact that this was no longer the case when the amended Petition was filed on March 28, 2025. Such an approach is contrary to "relate-back" rules that apply in a civil case such as this one, <u>Jaynes v. Grant</u>, No. 03-cv-11582-JLT, 2010 WL 4181241, at *2-3 (D. Mass. Oct. 19, 2010) (concluding that an amended habeas petition relates back to the original filing), particularly when the critical focus is at the time the Petition was filed. <u>See</u> <u>Padilla</u>, 542 U.S. at 441 (discussing <u>Endo</u>, 323 U.S. at 304-06).

22

JA-000099

447. It is the irregularity of the processing and transport in a single day and failure to disclose Ozturk's whereabouts discussed above as to <u>Vasquez</u> that also implicates the <u>Padilla</u> exception to the place-of-confinement rule proffered by Justice Kennedy. Justice Kennedy's remedy in this scenario would have been that "habeas jurisdiction would lie in the district or districts from which [the detainee] had been removed." <u>Padilla</u>, 542 U.S. at 454. This is the remedy that Ozturk seeks in the first instance, but argues in the alternative that transfer to the District of Vermont, D. 26 at 9, would be appropriate. This is perhaps in Ozturk's recognition of the fact that no court has yet relied upon the <u>Padilla</u> concurrence as the basis for jurisdiction. <u>Khalil</u>, 2025 WL 849803, at *2. Moreover, if the purpose of any exception to the place-of-confinement rule is to curb forum shopping by the government, <u>see</u> <u>Anariba</u>, 17 F.4th at 447, the transfer of this matter to the federal district court in the District of Vermont, the place that Ozturk was confined at the time that the Petition was filed, does so. <u>See</u> <u>Boumediene</u>, 553 U.S. at 779 (observing that "common-law habeas corpus was, above all, an adaptable remedy"); <u>Khalil</u>, 2025 WL 972959, at *35 (noting that "[p]er the Supreme Court, courts must apply the habeas statute with an eye to the underlying equitable nature of the writ") (and cases cited).

### B.   Transfer to Vermont is Warranted Here

In the context of a habeas petition, the jurisdictional rules are "not jurisdictional in the sense of a limitation on subject-matter jurisdiction," but rather akin to "personal jurisdiction or venue." <u>Padilla</u>, 542 U.S. at 451 (Kennedy, J., concurring); <u>Tham</u>, 319 F. Supp. 3d at 576 n. 2. There are a number of transfer statutes, 28 U.S.C. §§ 1404(a), 1406(a), 1631, but the most applicable here appear to be the latter two, §§ 1406(a) and 1631. If a case is filed in the wrong venue, 28 U.S.C. § 1406(a) permits the district court in the district in which the case was filed to "transfer such case to any district or division in which it could have been brought" if such transfer

serves "the interest of justice." Id.; Tham, 319 F. Supp. 3d at 577. If "there is a want of jurisdiction," as the Court concludes here, 28 U.S.C. § 1631 permits transfer of a civil action to any court "in which the action . . . could have been brought at the time it was filed or noticed," if such transfer "is in the interest of justice." In Hoffman v. Blaski, 363 U.S. 335, 342-44 (1960), the Supreme Court considered whether the phrase "where it might have been brought" in § 1404(a) required the transferee court to have jurisdiction at the time the original action was filed, or whether it permitted transfer to a court that would have had jurisdiction at the time of the transfer only. The Court concluded that the "unambiguous, direct (and) clear" language of the transfer statute permitted transfer only in the former case. Id. Courts have concluded that Hoffman's limitation also applies to the "could have been brought" language in §§ 1406(a) and 1631. See, e.g., Gonzalez v. Grondolsky, 152 F. Supp. 3d 39, 47 (D. Mass. 2016).

"Want of jurisdiction" under § 1631 means a lack of either personal or subject matter jurisdiction. See HC&D, LLC v. Precision NDT & Consulting, LLC, 698 F. Supp. 3d 180, 197-98 (D. Mass. 2023) (internal citation omitted). Once transferred, "the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred." 28 U.S.C. § 1631; see Khalil, 2025 WL 972959, at *14-20 (discussing § 1631). Such transfer treats the transferred case as if it was filed at the time of the original filing; here, it would treat the Petition as filed in Vermont on March 25, 2025 at 10:02 p.m. Gonzalez, 152 F. Supp. 3d at 47; see Miller v. United States, 753 F.2d 270, 276 (3d Cir. 1985); Martinez-Nieto v. Att'y General, 805 F. App'x 131, 135 (3d Cir. 2020).

The First Circuit has recognized that § 1631 applies in the context of habeas petitions. See Tham, 319 F. Supp. 3d at 577-78 (transferring a habeas petition pursuant to § 1631 and noting that

"there is a rebuttable presumption in favor of transferring a case instead of dismissing it"); Del Carvalho v. Moniz, No. 21-cv-11946-WGY, 2021 WL 5811301, at *1 (D. Mass. Dec. 7, 2021) (transferring a habeas petition to New Hampshire pursuant to § 1631 and "in the interest of justice").

Under either statute, however, an action may only be transferred to the court where it "could have been brought." 28 U.S.C. §§ 1406(a), 1631.[5] Here, because Ozturk was confined overnight in Vermont when the Petition was filed, the District of Vermont is the proper transferee court.[6]

## IV. Conclusion

For the reasons articulated below, the Court DENIES the government's motion to dismiss this Petition and its alternative request to transfer this matter to the Western District of Louisiana. The Court ALLOWS the alternative relief sought by Ozturk and transfers this matter "in the interest of justice" pursuant 28 U.S.C. § 1631 to the U.S. District Court for the District of Vermont.

To ensure that Ozturk has an opportunity to have the Petition considered by the District of Vermont, and to preserve the status quo, this Court's March 28, 2025 Order enjoining the government from removing her from the United States, D. 16, shall remain in effect unless and until the transferee court orders otherwise. See Khalil, 2025 WL 849803, at *14 (ordering same upon transfer).

**So Ordered.**

---

[5] For at least this reason, the Court rejects the government's argument that if it did not dismiss the Petition, it should instead transfer it to the Western District of Louisiana, where Ozturk was not detained at the time of the filing of the Petition.

[6] It will be for the District of Vermont to determine if it has jurisdiction over Ozturk's Petition notwithstanding her later transfer to Louisiana after the filing of the Petition that is now transferred there. See Khalil v. Joyce, 2025 WL 972959, at *24-38 (taking transferred petition as filed in New Jersey at the time it had been filed in S.D.N.Y.).

25

/s Denise J. Casper
United States District Judge

26

1

```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3    RUMEYSA OZTURK,                    )
                                         )
 4                        Plaintiff      )
                                         )  No. 1:25-cv-10695-DJC
 5    vs.                                )
                                         )
 6    PATRICIA HYDE, et al.,             )
                                         )
 7                        Defendants.    )
                                         )
 8                                       )
                                         )
 9

10

11              BEFORE THE HONORABLE DENISE J. CASPER
                    UNITED STATES DISTRICT JUDGE
12                         MOTION HEARING

13

14

15
                John Joseph Moakley United States Courthouse
16                         Courtroom No. 11
                            One Courthouse Way
17                     Boston, Massachusetts 02210

18
                              April 3, 2025
19                             2:00 p.m.

20

21
                     Kristin M. Kelley, RPR, CRR
22                       Official Court Reporter
                John Joseph Moakley United States Courthouse
23                   One Courthouse Way, Room 3209
                       Boston, Massachusetts 02210
24                     E-mail: kmob929@gmail.com

25         Mechanical Steno - Computer-Aided Transcript
```

2

```
 1    APPEARANCES:

 2            Adriana Lafaille
                Jessie J. Rossman
 3            Julian Bava
                Rachel Davidson
 4            Noor Zafar
                Brian Hauss
 5            ACLU of Massachusetts
                One Center Plaza
 6            Suite 850
                Boston, MA 02108
 7            617-482-3170
                alafaille@aclum.org
 8            jrossman@aclum.org
                jbava@aclum.org
 9            rdavidson@aclum.org
                for Petitioner.
10

11            Mahsa Khanbabai
                Khanbabai Immigration Law
12            115 Main Street
                Ste 1b
13            North Easton, MA 02356
                508-297-2065
14            mahsa@mk-immigration.com
                for Petitioner.
15

16            Katherine Rosenfeld
                Matthew Brinckerhoff
17            Sonya Levitova
                Vasudha Talla
18            Emery Celli Brinckerhoff Abady Ward & Maazel LLP
                One Rockefeller Plaza
19            8th Floor
                New York, NY 10020
20            212-763-5000
                krosenfeld@ecbawm.com
21            mbrinckerhoff@ecbawm.com
                slevitova@ecbawm.com
22            vtalla@ecbawm.com
                for Petitioner.
23

24

25
```

JA-000105



1    APPEARANCES CONT'D:

2

3            Mark Sauter
             DOJ-USAO
4            Moakley U.S. Courthouse
             One Courthouse Way
5            Ste 9200
             Boston, MA 02169
6            617-748-3347
             mark.sauter@usdoj.gov
7            for Respondents.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  All rise.
 3              (The Honorable Court entered.)
 4              THE CLERK:  Civil Action No. 25-10695, Ozturk vs.
02:00  5   Hyde.
 6              THE COURT:  Good afternoon, counsel.  I'll have you
 7   introduce yourselves for the record.
 8              MS. ROSSMAN:  Good afternoon, your Honor.  Jessie
 9   Rossman on behalf of petitioner.
02:00 10              THE COURT:  Good afternoon.
11              MS. LAFAILLE:  Good afternoon, your Honor.  Adriana
12   Lafaille on behalf of the petitioner.
13              THE COURT:  Good afternoon.
14              MS. DAVIDSON:  Good afternoon, your Honor.  Rachel
02:01 15   Davidson for the petitioner.
16              THE COURT:  Good afternoon.
17              MR. BAVA:  Good afternoon, your Honor.  Julian Bava
18   for the petitioner.
19              THE COURT:  Good afternoon.
02:01 20              MS. KHANBABAI:  Good afternoon, your Honor.  Mahsa
21   Khanbabai for the petitioner.
22              THE COURT:  And there are two attorneys on Zoom?
23              MS. ZAFAR:  Good afternoon.  Noor Zafar for the
24   petitioner.
02:02 25              MR. HAUSS:  Good afternoon, your Honor.  Brian Hauss
```

JA-000107

```
 1    for the petitioner.
 2              THE COURT:  Good afternoon to you both as well.
 3              Counsel?
 4              MR. SAUTER:  Good afternoon.  AUSA Mark Sauter on
02:02 5    behalf of the defendant.
 6              THE COURT:  Good afternoon.
 7              Counsel, I know we're here on the petitioner's
 8    petition.  I've had a chance to read the briefs on either side
 9    and the submissions as well.  I'm prepared to hear argument.
02:02 10   As you might imagine, and certainly as your briefs anticipated,
11    I'm very focused on jurisdiction.  So I would like to start
12    there, counsel.
13              I'll hear from the petitioner first.
14              MS. ROSSMAN:  Thank you, your Honor.  Attorney
02:02 15   Lafaille will be addressing jurisdiction.
16              THE COURT:  Thank you.
17              MS. LAFAILLE:  Are you referring to the habeas?
18              THE COURT:  Yes.
19              MS. LAFAILLE:  I can start there.
02:02 20         THE COURT:  I'm focused on 2142.
21              MS. LAFAILLE:  Understood.  Your Honor, first of all,
22    we're incredibly grateful for the Court's attention to this
23    matter on such a short time frame.
24              THE COURT:  Pardon me for one second.  Can we mute
02:03 25   Zoom?
```

6

1        Counsel?

2        MS. LAFAILLE:  We're here, as your Honor knows, to

3   address the case of a student who was grabbed by federal agents

4   in front of her home and then taken over the course of several

02:03  5   hours, to Vermont without any ability to contact counsel,

6   without the ability for counsel to contact her, and with her

7   location for a period of about 22 hours being undisclosed, even

8   to the Department of Justice attorneys on this case.

9        We've talked in our briefs about some of the

02:03 10   exceptions to the general rule for habeas venue and

11   jurisdiction.  I do want to first make argument that this

12   rule -- this case actually falls within general venue

13   principles, and there's actually no need to invoke any

14   exception, but to the extent the Court disagrees, we also fall

02:04 15   within several of those exceptions.

16        So as the Court is aware, there's the general rule,

17   and as the government cites, is that the parties have to sue

18   the immediate custodian.  In this case, we've done exactly

19   that.  Miss Ozturk was not at any detention facility at the

02:04 20   time this petition was filed at approximately 10:02 p.m.  She

21   was, it appears to be, in a car or a vehicle of some sort being

22   transported between locations.

23        THE COURT:  And, counsel, I understood that you were

24   relying, at least in part or in alternative, to the unknown

02:05 25   custodian concept?

7

1          MS. LAFAILLE:  Yes.  And I can address that, your

2    Honor.  I don't think we even need to go there because this is

3    a case where we did name the right custodian.

4          Our client was, at the time she was detained, in the

02:05  5    custody of ICE Boston, ICE's Boston field office, and certainly

6    before she left Massachusetts if a habeas petition had been

7    filed, again, she was not in a detention facility, she's just

8    in a vehicle, certainly the government would agree we could

9    have filed that petition in Massachusetts.  And I assume the

02:05 10   government would agree that the custodian would be the director

11   of the ICE field office, which has control over ICE in New

12   England, and not the individual ICE officer in whose vehicle

13   she is or the two or three ICE officers with her in that

14   vehicle.

02:05 15         And that didn't change when she crossed the state

16   lines.  The custodian here --

17         THE COURT:  Even the state lines into Vermont?

18         MS. LAFAILLE:  Correct, your Honor.

19         The custodian, this is not one of those cases where,

02:06 20   you know, the typical case in which a petitioner is in a

21   facility detained outside of a jurisdiction.  Our client was

22   simply in a vehicle in the custody of the ICE officers.  The

23   government hasn't told us who they think the appropriate

24   custodian is.  They noted we haven't named the appropriate

02:06 25   custodian.

1    Unless the appropriate custodian is the ICE officers

2    in whose vehicle she is, I think it's clear that the

3    appropriate custodian would have to be the head of New

4    England's ICE office.  That's Patricia Hyde, who we've named,

02:07  5    and this is the Court with jurisdiction over Patricia Hyde.

6    So as the general rule is articulated in *Padilla*, and

7    there's a very clear articulation in the first few lines of

8    Justice Kennedy's concurrence that explains that this general

9    rule is you have to sue the immediate custodian in the place

02:07  10    where the immediate custodian is.

11    Normally, the very meaning of the immediate custodian

12    is that the immediate custodian and the petitioner are in the

13    same place, but this happens to be an odd situation where she

14    was in a vehicle that had crossed state lines, and so the

02:07  15    immediate custodian is still the head of New England's ICE

16    office who's based here in Massachusetts.

17    So we think it's clear under general principles, even

18    as articulated in the government's brief, that we sue the

19    immediate custodian, and we've done just that.  So this is

02:07  20    unlike -- I know the parties cited to the briefing in the

21    *Khalil* case down in the Southern District of New York and the

22    District of New Jersey, and this has some distinctions with

23    that case, in that Mr. Khalil had already reached a detention

24    facility in New Jersey at the time the petition was filed.

02:08  25    That's not our case here.  For that reason, we think

9

that we fall within general habeas jurisdiction principles even
without relying on the exceptions.

But to move on to those exceptions, as your Honor
mentioned, there is an exception where the custodian is unknown
02:08 and that exception is recognized by the *Padilla* majority in a
footnote.  It's also implicitly recognized in 28 U.S.C. 2242
which asks us, requires habeas petitioners to name the
custodian if known.  And, essentially, what that case law
establishes is, if you don't know the custodian, it's okay to
02:09 sue the supervisory official in the place where the supervisory
official is, and that's exactly what we've done here.  The
habeas petition was filed at the place of the local supervisor
in the place where the supervisor is.

THE COURT:  Isn't there also language in that Judge
02:09 Bork decision that once you know who the custodian is, to the
extent that that gives you jurisdiction over the custodian,
that disappears?

MS. LAFAILLE:  I don't think the jurisdiction -- I may
not be understanding your Honor's question.

02:09 THE COURT:  So meaning, at some point -- and I
understand the point about it not being known at the time that
the petition is filed given now the factual record about where
your client was at the time, but I do recall that there was
language in that decision about what happens once the custodian
02:10 is known.  Should it become known that the petitioner is held

JA-000112

1 in a jurisdiction other this one, a judge of this circuit would

2 be divested of jurisdiction.

3          So what would you have the Court do with that?

4          MS. LAFAILLE:  So I think I want to understand this

02:10  5 case in light of how the Supreme Court cited it.  What the

6 Supreme Court said is that, in this circumstance where the

7 custodian and location are unknown, the regular rules, the

8 regular immediate custodian rule doesn't apply.  And so that --

9 that's all I draw from the citation of that exception in

02:11 10 *Padilla*, is that this is a recognized exception where if there

11 isn't a known custodian, the rules bend a little bit.  And,

12 again, we don't even think we're bending the rules, but the

13 rules bend a little bit.  And here we have personal -- we've

14 sued in a place with personal jurisdiction over the custodian

02:11 15 and where the client was -- where our client was detained.

16          THE COURT:  And my memory is that when you're reciting

17 to *Padilla* in this regard, that's the majority in *Padilla*.

18          MS. LAFAILLE:  Exactly, your Honor.

19          And there are two other exceptions recognized -- well,

02:12 20 recognized in the concurrence in *Padilla*, which I think are

21 perhaps less well established than the unknown custodian

22 exception, which is when the government is not forthcoming with

23 respect to the identity of the custodian --

24          THE COURT:  And so, counsel, before jumping to that,

02:12 25 as I understand it, there are two issues, right?  There's the

1    immediate custodian and then there's a place of confinement.

2    So are there other exceptions as to the immediate custodian

3    that you would have me consider?  I think the parties on both

4    sides had cited to *Vasquez*.

02:12  5         MS. LAFAILLE:  *Vasquez* I think is just establishing,

6    it's a case pre-dating *Padilla*, if I recall correctly, and is

7    establishing the general rule that, even in immigration cases,

8    we typically should sue the immediate custodian.  This is a

9    case where, you know, we're not talking about cases where it's

02:13  10   unknown who the immediate custodian is.

11         THE COURT:  Right.

12         MS. LAFAILLE:  Under this circumstance, we have not

13   only --

14         THE COURT:  And, counsel, I apologize if I wasn't more

02:13  15   precise.  I was talking about the language in *Vasquez* that

16   refers to exceptional circumstances, when you would depart from

17   that general rule.

18         MS. LAFAILLE:  Exactly.  This is a case that has a

19   number of those exceptional circumstances.  Because of the --

02:13  20   we've submitted a number of declarations just attesting to,

21   and, again, this is where this case differs from the *Khalil*

22   circumstances in the Southern District of New York where Judge

23   Furman said he did not believe, had been shown that the

24   circumstances were unusual.  Here we've submitted a number of

02:13  25   declarations attesting to --

```
 1          THE COURT:  And I've read them.
 2          MS. LAFAILLE:  -- how unusual what happened here was.
 3    And, particularly, the efforts to withhold information about
 4    Miss Ozturk's whereabouts from her counsel and from even
02:14 5    counsel for the government make this case particularly unusual.
 6          The declarations submitted by the government's witness
 7    at paragraph 20 talks about how at the time of petitioner's
 8    request there was no known counsel of record, and once, through
 9    the filing of this habeas, there was attorney contact
02:14 10   information, it was provided to the people in Louisiana so that
11    she could call counsel from Louisiana.
12          So, in other words, it was deliberately not provided
13    to people who were with Miss Ozturk and who could have helped
14    her call counsel, which, as her declaration attests, she was
02:14 15   asking to do.  That information was withheld from those who
16    could have given it to her at a time when she could have used
17    it to call counsel before being sent to Louisiana.
18          And I want to --
19          THE COURT:  Counsel, I can't recall if it's in the
02:15 20   submission by the government here or reflected in the papers
21    that were filed in the Khalil case where I've read the papers
22    in that case as well, but I imagine one of the responses from
23    the government is going to be in regards to some internal ICE
24    rule about having detainees have contact with their attorneys
02:15 25   within 24 hours of their detention.
```

1    What, if anything, would you have me make of that, of

2  that rule?

3    MS. LAFAILLE:  Well, she didn't, first of all.  She --

4  again, despite -- I think even if your Honor saw nothing

02:16  5  unusual in the fact that she couldn't call counsel within the

6  time that she was in Massachusetts and Vermont, it's still

7  quite unusual that even the government's own lawyers were not

8  told despite their efforts to learn their whereabouts, where

9  she was.

02:16  10    There's an added feature here, which is this Court's

11  order on Tuesday night close to 11:00 p.m. which instructed the

12  government not to move Miss Ozturk out of Massachusetts except

13  after 48 hours of notice.  The government getting that order

14  and knowing she was out of Massachusetts at the time of that

02:16  15  order had a couple of choices, one of which was coming to the

16  Court to say, hey, actually, she's already out of

17  Massachusetts, and obviously that wasn't the route taken.  The

18  route taken instead was to ignore the order and not disclose

19  her location to her counsel.

02:17  20    It's particularly notable because the intention of

21  that order is stated in the order, and it's to preserve the

22  status quo.  Even if the status quo at that moment was that she

23  was in Vermont, what the government did was the opposite of

24  preserving the status quo, which was secretly whisking her away

02:17  25  and making sure no one would know where she was until she was

14

in Louisiana.

THE COURT:  Counsel, before I interrupted you with a question before, I think you were moving to the other matter of place of confinement, which I'm also interested in hearing about.

MS. LAFAILLE:  So I think these are interrelated concepts, of course.  In terms of the -- the government has separated them in their brief, but the general rule, sue the immediate custodian, sue the immediate custodian where the custodian is, and, of course, that's also generally where the petitioner is.  For the idiosyncratic reasons here, the vehicle the petitioner was in had already crossed state lines.

We think, generally, the rule about suing in the location of confinement is really just an expression of the ordinary principle that we sue the immediate custodian in the location where the immediate custodian is.

The same exceptions -- the exceptions we discussed with regard to the immediate custodian is also relevant here. Where the custodian is unknown, it's permissible to sue someone higher up in the chain in the place where that person is.  Of course, that's what we've done, and then here we have all of these unusual circumstances involving efforts to make it difficult for anyone to learn where Miss Ozturk was.

THE COURT:  And so, counsel, that language from the concurrence in *Padilla* if I'm following correctly.

JA-000117

1        MS. LAFAILLE:  With regards to the -- yes, the purpose

2   of removing to make it difficult, exactly.

3        THE COURT:  So, counsel, other than the concurrence in

4   *Padilla*, what else do I -- do you rely on in regards to the

02:19  5   place of confinement?  And I understand your point that they're

6   interrelated, although a number of the cases seem to treat them

7   differently.

8        MS. LAFAILLE:  Yes.  The place of confinement, again,

9   this is not a situation where they're talking about subject

02:20 10   matter jurisdiction.  We're talking about habeas petitions,

11   which are meant to be equitable.

12        And I also want to go back to the purpose of these

13   rules, which is to prevent forum shopping.  The purpose of

14   these rules, of course, is to make sure that a petitioner

02:20 15   cannot simply choose which level of official they're going to

16   sue or sue a national official in any jurisdiction of their

17   choice in the United States.

18        Here we have the opposite situation.  We really have a

19   situation where the government is forum shopping, that is

02:20 20   whisking away a petitioner to its forum of choice and doing

21   everything in its power to ensure that a habeas petition cannot

22   be filed and then seeking the dismissal of this petition or a

23   transfer to its forum of choice.

24        So particularly keeping in mind that we're not talking

02:21 25   here about subject matter jurisdiction, and there's no question

1    that there's personal jurisdiction, this really is about

2    implementing venue and implementing the intention of the habeas

3    statute, which again is to -- is set up to prevent petitioners

4    from forum shopping and having a choice of forum.

02:21   5    Here, Attorney Khanbabai sued in the only forum she

6    really could have sued in unless she was going to sue in

7    multiple forums, which, as is pointed out in the recent

8    District of New Jersey opinion, might raise ethical questions

9    if she can't have a good faith basis to assert that her client

02:21   10   is in a particular forum.

11   THE COURT:  And so I appreciate the argument.  I think

12   that is invoking the language in Justice Kennedy's concurrence,

13   I think, as the government has pointed out in their papers.

14   Although it was the concurrence, it was joined by two justices.

02:22   15   I was unable, as I think the judge in *Khalil* was unable, to

16   find any case in which a court has relied on that exception for

17   the purposes of finding jurisdiction where the petitioner was

18   not in -- was not in confinement in the district of which the

19   petition was filed.

02:22   20   So what do you say to that?

21   MS. LAFAILLE:  I think in looking at all those cases

22   the thing they have in common though is that the petitioner is

23   in another facility that has another custodian.  There

24   aren't -- I don't think we've seen a case where the petitioner

02:23   25   is in transit.  I'm not aware of one where these rules about

1  habeas jurisdiction are being applied in such an unbending way

2  to someone who is in transit still within the custody and

3  control of the official in the state in which she was arrested

4  and in which the petition was filed.

02:23  5      THE COURT:  Thank you.

6      MS. LAFAILLE:  And then, lastly, your Honor, largely

7  for the reasons in the *Khalil* opinions, if the Court determines

8  that Massachusetts is not an appropriate forum for this case,

9  then transfer to Vermont would be the appropriate remedy, not

02:23 10  dismissal or transfer to Louisiana.  And that's simply, I

11  think, explained quite well in the *Khalil* decisions but also

12  just a straightforward application of 28 U.S.C. 1631.

13      THE COURT:  Right.  And I understood from the papers

14  that you were relying on 1631, although I think the Southern

02:24 15  District had invoked 1404 or 1406, but your argument is under

16  1631.

17      MS. LAFAILLE:  Yes, your Honor, and we also have

18  specific case law in the First Circuit *Federal Home Loan Bank*

19  *vs. Moody's Corp.*, 821 F.3rd 102, that speaks specifically to

02:24 20  1631.  Questions have been raised about whether that provision

21  applies when there's an issue of personal jurisdiction as

22  opposed to subject matter jurisdiction.

23      So, in the First Circuit, it is law that any kind of

24  jurisdiction if there's an issue of habeas jurisdiction,

02:24 25  personal jurisdiction, that also is cause to apply this

provision, and that decision also makes clear that the law in

the First Circuit creates a presumption of transfer in that

circumstance and it's only when it has to be found that it's

not in the interest of justice to transfer the case that the

02:25 5   analysis would result in not transferring.

6          THE COURT:  Right.

7          MS. LAFAILLE:  And I think for all the reasons we were

8   discussing with regards to the application of the *Padilla*

9   exceptions, we think it's certainly in the interest of justice

02:25 10  if the Court concludes that this is not an appropriate venue to

11  transfer the case to Vermont.

12         THE COURT:  And so 1631 is invoking the want of

13  jurisdiction of the transferring court.  Okay.

14         MS. LAFAILLE:  Correct.

02:25 15        THE COURT:  So, counsel, is it as an operation of 1631

16  or as of case law that the petition filed here would be taken

17  as having been filed on the evening of March 25th in Vermont?

18         MS. LAFAILLE:  As the *Khalil* decision in New Jersey I

19  think very well analyzes this provision, I think it could be,

02:26 20  just the text of it that it would be taken, proceed as if it

21  was filed in that court at the time it was filed.

22         THE COURT:  Thank you.

23         MS. LAFAILLE:  Thank you, your Honor.

24         THE COURT:  I'll hear from the government on this

02:26 25  point about jurisdiction.

1           MR. SAUTER:  Thank you, your Honor.

2           I'll start with where counsel started with the general

3  rules that everyone understands apply to habeas provisions,

4  which require for a court to have habeas jurisdiction that the

02:26  5  petition needs to be filed in the district of confinement and

6  needs to name the immediate custodian over the petitioner.

7           In this case, neither of those two general rules that

8  have been called longstanding rules by the Supreme Court were

9  followed.

02:27 10         THE COURT:  And, counsel, can the petitioner really be

11  faulted for that here given the circumstances that have become

12  clear even from the government's affidavit?

13          MR. SAUTER:  At the time of the original filing, no,

14  your Honor.  I don't think petitioner can be faulted for filing

02:27 15  the petition in Massachusetts.  Certainly at the time the

16  amended petition was filed on March 28th, it was clear at that

17  point that the district of confinement was the Western District

18  of Louisiana for at least three days at that point, two and a

19  half days, and the immediate custodian of that facility was

02:27 20  also known at the time, in time of the amended filing.

21          THE COURT:  Counsel, and I know your sister is

22  pointing me to the overlap of these considerations of place of

23  confinement and immediate custodian, but I'd like to hear you

24  in regards to the argument about the Court not needing to reach

02:28 25  any exception as to the immediate custodian given the transient

1    nature of her location at whatever it was, 10:03 or 10:05, on

2    the evening of March 25th.

3         MR. SAUTER:  I think, based on the standard practice,

4    an exception would need to be reached here because, again,

02:28  5    district of confinement, this petition was not filed in the

6    district of confinement and an immediate custodian was not

7    named, nor sister counsel indicates that she believes that the

8    immediate proper custodian was named in that supervisory

9    officials were named to the petition, but this is from the

02:28 10   Supreme Court to the First Circuit, down to this district court

11   that supervisory officials, such as the field office director

12   of ICE, even if that field office director covers New England,

13   is not a proper respondent to a habeas petition.

14        And *Vasquez*, the First Circuit case, discussed this

02:29 15   with, in that case, the petitioner had named that when INS, the

16   district director for Boston, First Circuit said, well, did not

17   name the respondent, the proper respondent, which was the INS

18   district director in Louisiana.

19        So, in this case, the proper respondent would have

02:29 20   been an ICE field office director that had jurisdiction,

21   immediate jurisdiction over Vermont where petitioner was at the

22   time.

23        THE COURT:  But that was unknown at the time.  So,

24   counsel, you've talked about *Vasquez*.  There was language there

02:29 25   about exceptional circumstances, right, in regards to the

immediate custodian where there's either furtiveness or bad

faith by the government.  It's an "or", so I don't think the

Court has to find both.  It can find either or.  Why shouldn't

I apply -- if for some reason I wanted to apply the unknown

02:30 exception, why shouldn't I reach that exception?

MR. SAUTER:  Yes, your Honor.  So *Vasquez* dealt with

two different potential extraordinary circumstances that the

First Circuit could imagine.  First was in citation to

*Demjanjuk* from Judge Bork where it said if petitioner was being

02:30 held at an undisclosed location.  The second was when there was

the facts that indicated that movement out of the district was

done to manipulate jurisdiction.

I'll take the first extraordinary circumstance, if

that's fine with your Honor, in terms of being held in an

02:31 undisclosed location.  So, again, this citation was from the

*Demjanjuk* case.  If you look at the facts of that case, it

dealt with an individual who was subject to immediate

extradition from the United States who was being held in a

confidential location.  Judge Bork acted on the petition,

02:31 saying that it won't make sense for the public to learn of the

location of the individual.

The facts in this case are dramatically different.

Within 24 hours of the arrest, petitioner's location was known.

THE COURT:  But, counsel, isn't the period I'd be

02:31 looking at when the petition was filed and at that time it was

1      unknown?  It was undisclosed.

2              MR. SAUTER:  It was undisclosed.

3              THE COURT:  I should take that back.  It was known to

4      the government but not disclosed to the petitioner.

02:31  5              MR. SAUTER:  It was not disclosed to the petitioner at

6      that time.  That is true.  And, again, going to the *Demjanjuk*

7      decision, as the Court pointed out earlier, the language from

8      Judge Bork says, at the point when the disclosure, when we

9      learn where the individual is, if that individual is not in the

02:32 10      D.C. circuit, then the circuit loses jurisdiction over that

11      individual.  So that would be the case here when the next day

12      this was not an unknown location anymore, not an undisclosed

13      location.

14              THE COURT:  But it certainly was at the time the

02:32 15      petition was filed, counsel, right?

16              MR. SAUTER:  Yes, your Honor.

17              The other cases cited by the petitioner when she

18      discusses the unknown custodian also show the difference from

19      this case.  Those involved enemy combatants, Al Qaeda members

02:32 20      who were being held by the military overseas.  Those were the

21      first two cases cited.  The third case was a national class

22      action about detainees.

23              THE COURT:  Are we still talking about *Vasquez*?

24              MR. SAUTER:  This is talking about *Vasquez* because

02:33 25      it's talking about the undisclosed location, which is this same

 1   exception that's referenced by petitioner as the unknown

 2   custodian exception, I believe.

 3          THE COURT:  But I guess, counsel, I mean, I know that

 4   *Vasquez*, as I think you mentioned, does mention that case, but

02:33  5   I'm not sure that they're exactly the same, right?  One is

 6   about unknown, and the other I suppose could also be unknown,

 7   but it seems focused on government conduct.

 8          MR. SAUTER:  Yes, your Honor.  And, again, with the

 9   government conduct here, and I think this also touches the

02:33 10   second possible extraordinary circumstance set forth by the

11   *Vasquez* court, whether there's an attempt to manipulate

12   jurisdiction, the government would argue here that there was no

13   attempt to manipulate jurisdiction.

14          The driving force for the transfer of petitioner

02:34 15   outside of Massachusetts was the fact that there is no detainee

16   facility, no facility to detain female detainees in

17   Massachusetts.

18          THE COURT:  And, counsel, I've read all of the

19   affidavits, right, filed by the government and the multiple

02:34 20   ones filed on petitioner's side.  I see reference in the

21   government's affidavit to sort of a characterization of the

22   movement of detainees being routinely conducted after arrest

23   due to operational necessity and considerations.  It doesn't

24   say anything about the timing of any detainee moves, and I now

02:35 25   have a number of affidavits from immigration attorneys

JA-000126

24

experienced in this field and working within this region who
say that the timing of these moves is not -- is not routine and
common.

Isn't that something I can look at under the *Vasquez*
exceptions?

MR. SAUTER:  I think what your Honor can look at is
the reasons set forth by ICE as to why she was transferred out
of Massachusetts and when those decisions were made.  Those
decisions were made prior to her arrest, which means they were
made prior to the filing of this habeas petition.  Prior to her
arrest it was determined that there is no detention facility in
Massachusetts where she could be detained.

So if she was transferred -- any places she'd be
transferred to after her arrest would be outside of
Massachusetts.  It was then determined that there was detention
location space for her at a female facility in Louisiana.  As a
result, a plan was put in place, which led to her transfer out
of Massachusetts to Vermont and then to a flight the next, very
early the next morning.

THE COURT:  I'm not sure, counsel.  Which way does
that cut in regards to the issue your sister brings up about
that counsel, even after the petition was filed on her behalf,
didn't know her whereabouts?  Like, I'm not sure that -- I'm
not sure that the prior arrangements made by the government are
a fact in the government's favor in this analysis.

1        MR. SAUTER:  I think the prior arrangements made by

2   the government show that there was no attempt to manipulate

3   jurisdiction of a habeas petition when that habeas petition had

4   not yet been filed when those arrangements were made.  If a

02:37 5   habeas petition is filed and then there was a flurry of

6   activity to try to bring a person outside of the jurisdiction

7   of that court, I think that would be the attempt to manipulate

8   jurisdiction.

9        THE COURT:  But what do you say to your sister's

02:37 10  argument that the flurry of activity actually continued after

11  the petition was filed and the government was on notice that it

12  had been filed and that she was represented?

13       MR. SAUTER:  The government activity that continued

14  was activity that had already been set in place prior to the

02:37 15  petition being filed.  She was being moved to Vermont so she

16  could spend the night in Vermont and then be able early morning

17  to take a flight out of Vermont.

18       THE COURT:  And, counsel, doesn't -- shouldn't that

19  movement be effected by an order entered by this Court?

02:38 20       MR. SAUTER:  If the petitioner was inside of

21  Massachusetts and the government learned that there was an

22  order prohibiting her departure or transfer outside of

23  Massachusetts, then that movement certainly would be effected

24  by such an order, but when she was not in Massachusetts, an

02:38 25  order that says, do not move from Massachusetts does not have

1  that same effect.

2       THE COURT:  Even if the respondents have nationwide

3  authority presumably?

4       MR. SAUTER:  Even if the respondents have nationwide

02:38  5  authority?  The language of the order still says do not move

6  outside of Massachusetts, which does not affect a situation

7  when a person is already outside of Massachusetts.

8       THE COURT:  And, counsel, just to move on to another

9  consideration, still focused on *Vasquez*, counsel, in this

02:39  10  situation under *Vasquez*, the exceptions, can the Court consider

11  the circumstances of the arrest itself in regards to

12  furtiveness or bad faith?

13       MR. SAUTER:  I don't believe there's language in

14  *Vasquez* that would allow a court to consider the circumstances

02:39  15  of the arrest, your Honor.

16       THE COURT:  Why would that be, counsel?

17       MR. SAUTER:  I think what *Vasquez* is concerned about

18  is a transfer from district of confinement, and the arrest

19  itself is not related to the transfer outside of the

02:39  20  jurisdiction.  *Vasquez* is looking at if extraordinary

21  circumstances exist in an undisclosed location or if ICE

22  spirited the individual to another jurisdiction in an attempt

23  to manipulate jurisdiction to a different district.  The

24  lawfulness of the arrest itself --

02:40  25       THE COURT:  I'm not talking about the lawfulness.  I'm

1    talking about the circumstances.

2         MR. SAUTER:  I'm not sure I -- I'm not sure I

3    understand the circumstances that you are referring to in terms

4    of how it may affect.

02:40  5         THE COURT:  So whether or not -- so in regards to

6    identification or where the petitioner was going to be

7    transferred.

8         MR. SAUTER:  The information that we have, your Honor,

9    from ICE is that the decision was made before of where she was

02:40 10    going to be transferred because there's not a detention

11    location in Massachusetts for female detainees.

12         THE COURT:  Do I know anything in the record about

13    what the petitioner was told at the time that the agents

14    arrested her in regards to where she was headed?

02:41 15         MR. SAUTER:  No, your Honor.  Your Honor did reference

16    earlier a detainee transfer policy that Judge Furman cited to

17    in *Khalil*, Southern District of New York.

18         THE COURT:  This is in regards to the contact with

19    counsel?

02:41 20         MR. SAUTER:  Exactly, your Honor.  A few things that

21    come into play with that.  At the time of petitioner's arrest,

22    ICE did not have a counsel of record for petitioner.  For ICE

23    to have a counsel of record, the petitioner's counsel needs to

24    submit a form called a G-28.  No G-28 had been submitted prior

02:41 25    to her arrest on behalf of petitioner.  That's set forth by ICE

1       in their declaration.

2              But the transfer policy, the language in the transfer

3       policy indicates that the individual is not, does not have the

4       opportunity to contact counsel until the individual arrives at

02:42 5       the final destination.

6              So here on the night of her arrest, that was not her

7       final destination in Vermont.  Her final destination was next

8       day in Louisiana.  After she arrived in Louisiana, she was able

9       to contact her attorney.

02:42 10             THE COURT:  And so I guess, counsel, to ask you the

11      flip side of what I asked your sister on this particular issue,

12      I understand that ICE might have a policy in that regard but

13      don't I get to consider that circumstance along with the other

14      circumstances under *Vasquez*, at least as to this issue about

02:43 15      the immediate custodian?

16             As I understand the affidavits that I now have,

17      there's an affidavit that the petitioner was not able to

18      contact her attorney, and obviously I had previously heard from

19      her counsel that she wasn't able to locate her client.

02:43 20             So, as I said, the flip side of what I asked your

21      sister, isn't that something I can consider?

22             MR. SAUTER:  I think certainly that can be considered

23      in the analysis of whether the petition was filed in the proper

24      court.  If she was not able to contact her attorney to say, I

02:43 25      am in Vermont, then, as the Court asked earlier, can

JA-000131

1    petitioner's counsel be faulted for not filing in Vermont, and

2    the government does not fault the petitioner's counsel for

3    filing in Massachusetts.

4         Does her inability to contact her attorney on the

02:44  5    night of her arrest bring this into an exception?  That's been

6    discussed in *Vasquez* or in a concurrence and indeed is a

7    different question.  I think that question cuts against

8    petitioner, that it does not bring us into an exception because

9    ICE following the policy that it follows did not allow a phone

02:44 10    call to be made that evening is not bad faith or is not an

11    attempt to keep someone in an undisclosed location or to

12    prevent the awareness of where the individual is going to be.

13    That awareness came the next day, midday the next day, when it

14    was apparent she was in Louisiana.

02:44 15         THE COURT:  I wasn't suggesting that circumstance

16    alone, but it's one of the circumstances the Court could

17    consider.

18         MR. SAUTER:  I think the Court can consider that and I

19    think the Court would also, in that consideration, look that

02:45 20    it -- that action follows directly in accordance with an ICE

21    policy.

22         THE COURT:  And, counsel, I focused my questions on

23    this immediate custodian issue, but in regards to the place of

24    confinement, which you also mentioned, counsel, what do you say

02:45 25    to your sister's arguments in regards to *Padilla* and otherwise?

1        MR. SAUTER:  Place of confinement can't be swept away

2   as one of the longstanding rules that the Supreme Court in

3   *Vasquez* has looked at as a necessary precondition for the

4   district court to exercise jurisdiction over a habeas petition

02:45   5   because, again, the Court's order would be directed to

6   custodian of the individual in the place of confinement.  If

7   the individual is not located in the district that the Court

8   sits, then the Court doesn't have jurisdiction over that

9   person, the custodian.

02:46  10        So even in the *Demjanjuk* case where it was found to be

11  an exception of the immediate custodian rule, the court there

12  was quick to note that once we learn the district of

13  confinement, if it's not District of D.C., then the Court

14  doesn't have jurisdiction.

02:46  15        And that same reasoning was used by the *Khalil* court

16  in New Jersey where the court there said, even if it is an

17  unknown custodian, proper district for the petition to be heard

18  still has to be in the district of confinement.  That's why the

19  New Jersey, the *Khalil* New Jersey court said that was in New

02:47  20  Jersey where she was detained at the time that the petition was

21  filed.

22        THE COURT:  You mean in terms of the transfer between

23  the Southern District and New Jersey?

24        MR. SAUTER:  Correct, your Honor.

02:47  25        THE COURT:  And so, counsel, on this last point, and

31

1    some of it I think you anticipated when I was asking you about

2    *Vasquez*, why not consider the exception suggested in the

3    concurrence?

4            MR. SAUTER:  From *Rumsfeld v. Padilla*?

02:47  5         THE COURT:  From *Padilla*.  From *Padilla*.

6            MR. SAUTER:  The Court doesn't need to consider it

7    because it's not binding.  It's not holding from that Supreme

8    Court case as Judge Furman in Southern District of New York

9    discussed, but even if court -- well, I'll add the second point

02:48 10  to that, and I think the Court mentioned this earlier.

11   Petitioner, in her briefing and argument here, was not able to

12   provide any case nationwide that has applied the concurrence

13   from *Padilla* to obtain relief, and Judge Furman made that point

14   also.

02:48 15       But even if we look at those proposed exceptions from

16   *Padilla*, I think we've discussed parts of them.  The first

17   talks about ICE not being forthcoming with respect to the

18   identity of the custodian or the place of the detention.  All

19   of that information was known less than 24 hours after the

02:49 20  arrest on the next day.  So we're not in a situation where

21   someone was being held in an undisclosed location for a

22   determinant time.

23           THE COURT:  But wasn't it a period, counsel?  I guess

24   that's -- I mean, isn't my focus on when the petition was

02:49 25  filed?

JA-000134

32

1            MR. SAUTER:  When the petition was filed, your Honor,

2       they -- petitioner's counsel did not know where she was.

3       That's not the same thing as ICE not being forthcoming about

4       her location.  ICE was still in the process of transporting her

02:49  5       through Vermont at the time that the petition was filed.  There

6       hadn't been -- it would be a -- perhaps it would be a different

7       situation if there was communication prior to the petition

8       being filed and that information was not disclosed.

9            THE COURT:  Counsel, let me ask a better question.  I

02:50 10       think *Padilla* also talks about the movement of the petitioner

11       or of a petitioner as being one of the issues that could lead

12       to the application of this exception that Justice Kennedy

13       discussed.

14            MR. SAUTER:  Right, whether there was an indication

02:50 15       that the purpose of the transfer was to make it difficult.

16            THE COURT:  Yes.

17            MR. SAUTER:  ICE, through a sworn declaration, stated

18       the purpose of the transfer was to -- was because there was not

19       facilities within Massachusetts where she could be detained and

02:50 20       the purpose of the transfer was to take her to a location where

21       she could be detained.

22            THE COURT:  But that doesn't stand as undisputed on

23       the record now, does it, given the affidavits that have been

24       filed in regards to bed space and processing and the timing of

02:51 25       movement?

JA-000135

1          MR. SAUTER:  There's no bed space within, no detention

2    space within Massachusetts where a female detainee could be

3    detained for purposes of removal proceedings, which is why she

4    was detained.  So, in Massachusetts, there's none, no space for

02:51  5    female detainees.

6          THE COURT:  Right, but I guess -- isn't the *Padilla*

7    exception a little bit broader than that in regards to not just

8    about -- not just about the whether or not she's in

9    Massachusetts but whether or not she's being moved in a manner

02:51 10    in which it would make it difficult to determine where you

11    would file the petition?

12          MR. SAUTER:  Right, and I think this was discussed

13    before the southern district with Judge Furman in the *Khalil*

14    case.  The petitioner there tried to say the swift transfer

02:52 15    across a number of states brought upon this concurrence.  Judge

16    Furman there said no.  What the concern was in *Padilla* was

17    continuous movement so he could never be in one location to

18    allow the habeas petition to catch up.

19          THE COURT:  Right.

02:52 20          MR. SAUTER:  The transfers here were made so she could

21    get to the location where the habeas petition could be filed

22    the next day when she was in Louisiana.  So the transfers here

23    were not done in a way to try to, you know, stay ahead of the

24    habeas petition.  They were done to put her in a location where

02:52 25    she could be on a flight at five in the morning to end up at

1 the location that had been determined for her prior to her

2 arrest, prior to a habeas petition.

3   THE COURT:  Counsel, obviously your sister would have

4 me take a different interpretation of the facts here, and

02:53 5 obviously the *Khalil* case, I don't know what factual

6 development was made in regards to what the regular and routine

7 practice is, but I appreciate the argument.

8   Counsel, if I -- I don't know if you have anything

9 further to say on this point, but I know the government is

02:53 10 seeking dismissal of the petition, but if I were to choose not

11 to dismiss the petition, you argue in the alternative that I

12 should send this to the Western District of Louisiana.

13   Why should I do that as opposed to Vermont where this

14 petition could have been filed at the time that it was filed?

02:53 15   MR. SAUTER:  Thank you.  I will address that one very

16 quick last point on the --

17   THE COURT:  Sure.

18   MR. SAUTER:  -- the questions have been about the

19 unusual nature of transfers.

02:54 20   THE COURT:  Yes.

21   MR. SAUTER:  There was a recent news article that was

22 cited and the government's response involving a female

23 scientist who was detained at Boston Logan Airport.  She was

24 detained by Customs and Border Protection.  She was turned over

02:54 25 to ICE.  She was transferred from Massachusetts to Vermont, on

1  a flight from Vermont to Louisiana.  This happened I believe in

2  mid February.  So this circumstance that is alleged to have

3  been very unusual --

4  THE COURT:  Yes.  I guess the difference is, counsel,

02:54  5  whether recent is regular, but I understand your point.

6  MR. SAUTER:  Thank you.

7  THE COURT:  I'll give it consideration.

8  MR. SAUTER:  Thank you, your Honor.

9  In terms of a proper venue for this case to be

02:54 10  transferred, so the government argues that they should be

11  transferred to the Western District of Louisiana because it is

12  the district of confinement.  The immediate custodian is known.

13  And when the transfer statutes, three of which have been cited

14  by the Court earlier, they look at where the petitioner might

02:55 15  have been brought or could have been brought.

16  The time that the amended petition in this case was

17  filed, there's only one location and first district where the

18  amended petition could be filed, and that's the Western

19  District of Louisiana at that time as the district of

02:55 20  confinement and the immediate custodian is known.  So a

21  transfer to the District of Vermont at this point, the court

22  there does not have jurisdiction over an immediate custodian

23  and the petitioner is not in that district either.

24  THE COURT:  Counsel, isn't it sort of common in civil

02:55 25  cases that an amended pleading would relate back to the

1  original pleading?

2       MR. SAUTER:  In civil cases, yes, generally.  I think

3  here where we're dealing with the filing of a habeas petition

4  in a proper district when there's two longstanding rules that

02:56  5  when an amended petition is filed that is not in a proper

6  district, it doesn't make sense for it to be transferred to

7  another district that is also not proper because that district

8  doesn't satisfy the longstanding rules.

9       THE COURT:  But you're aware of the decision I might

02:56 10  find persuasive out of the District of New Jersey?

11       MR. SAUTER:  I am, your Honor.  The only -- the thing,

12  the distinguishing factor there is there was not an amended

13  petition that was filed and it wasn't filed at a time when this

14  was clear as to district of confinement and immediate custodian

02:56 15  over the petitioner.

16       THE COURT:  Thank you.

17       MR. SAUTER:  Thank you, your Honor.

18       THE COURT:  Counsel, if you want brief rebuttal.

19       MS. LAFAILLE:  Thank you, your Honor.

02:57 20       I guess I'll start here with the point about the

21  amended petition.  I don't think the government has cited a

22  single case where that is at all relevant for the

23  jurisdictional analysis here.  And, again, this plays very much

24  the wrong way into the concern for forum shopping that's at the

02:57 25  heart of these rules.  It's not possible at the time in these

1   cases where a petitioner is quickly being moved and the basis

2   for detention, the circumstances for detention, are unknown.

3   It's not possible to have a fully fleshed out habeas petition.

4        What the government is saying is, essentially, parties

02:57  5   should be penalized for amending habeas pleadings and that

6   should leave the government to be able to choose its forum.

7   And that just sets a very strange and dangerous precedent here.

8        I also want to go back to the -- actually, just to

9   stay on that point for a moment, it also cuts against ex parte

02:58 10   *Endo* and I thought the very persuasive points --

11        THE COURT:  Meaning where it's filed in the proper

12   district initially and someone has transferred after that?

13        MS. LAFAILLE:  Exactly, your Honor.  And nothing about

14   amendment changes that.  I think your Honor has it right that

02:58 15   the relevant thing for habeas is the time of filing.  Your

16   Honor referenced the language in Judge Bork's opinion.  That's

17   not binding on the Court and contrary to ex parte *Endo* which

18   makes clear that it's the time of filing.  It's the

19   jurisdiction at the time of filing that matters.  We think that

02:59 20   was established here.

21        I also would point to the compelling language in the

22   District of New Jersey opinion in this regard about gaps in

23   habeas jurisdiction.  We can't interpret these rules in a way

24   that would create periods of time when there's effectively no

02:59 25   habeas jurisdiction and no habeas petition can be lodged.  That

```
     1    would --
     2              THE COURT:  In terms of the travel of a detainee?
     3              MS. LAFAILLE:  Correct, your Honor.
     4              What the government is saying essentially is there is
02:59 5    no way in those early periods that a habeas petition could be
     6    filed and considered if the government is making the choice to
     7    move someone to their forum of choice and, essentially,
     8    petitioners won't have the ability during those periods to file
     9    petitions that would be considered.  That just runs contrary to
03:00 10   the suspension clause and ex parte *Endo*.
    11              I also want to talk about this prior plan thing and
    12    the government's argument that the prior plan somehow helps the
    13    government.  First of all, the notion that the prior plan was
    14    due to bed space constraints is not something the Court has to
03:00 15   credit.  It is in a sworn declaration, but it's a sworn
    16    declaration of an officer who is claiming no personal knowledge
    17    over that and is claiming to write this declaration based on
    18    reviews of record systems and conversations with undisclosed
    19    other people.
03:00 20             So I see nothing there that needs to be credited,
    21    particularly when on the other side of that ledger there is
    22    credible testimony, including the declaration of Miss Walsh,
    23    Attorney Walsh saying that there's reason to think that there
    24    was bed space in New England and that transfer --
03:01 25             The government says, of course, in this paragraph 6 of
```

1  this declaration, the portion over which we're talking about

2  that there is no personal knowledge, that there was no bed

3  space in a facility where essentially in New England, where the

4  petitioner would have been able to appear for an immigration

03:01 5  court hearing in New England.  Attorney Sauter kept quoting no

6  space in Massachusetts.  Of course, that's not the same thing

7  as the declarations.  We know there is reason to think there

8  was bed space in New England.

9  And the Court doesn't have to ignore what was

03:01 10  happening.  The government was already embroiled in litigation

11  about Mr. Khalil and litigation of a number of other cases

12  similarly involving students and scholars arrested in response

13  to pro-Palestine protests.  It does not have to -- the Court

14  does not have to ignore the question of venue as being

03:02 15  litigated, and the government would have had every incentive to

16  transfer Miss Ozturk quickly and not to inform her counsel and

17  to make it difficult essentially for counsel to learn her

18  location.

19  The rule about calling counsel, again, even if that

03:02 20  wasn't violated, that says nothing about when counsel is making

21  affirmative attempts to reach the petitioner and, again, it

22  says nothing even about why even counsel for the government

23  were not told where Miss Ozturk was even though -- it appears

24  they were making, at least represented to us, that they were

03:03 25  making inquiries about her whereabouts, and that's particularly

1    troubling in light of the supposed prior plan.

2         If there was a prior plan all along and these

3    movements weren't happening in the spur of a moment fashion,

4    which I accept, then it's even more troubling that counsel for

03:03  5    the government won't have been informed about it at a time when

6    corrective action might have been taken.

7         The Russian scientist case that Mr. Sauter

8    mentioned --

9         THE COURT:  In a footnote, yes.

03:03  10         MS. LAFAILLE:  Somebody was transferred to Vermont.  I

11    appreciate that this is not in the record but I'm happy to get

12    an affidavit from this attorney.  That attorney spoke to his

13    client while she was in Vermont because her location in Vermont

14    was disclosed to him.

03:03  15         So, again, this just highlights the unusual nature,

16    like all of the declarations highlight, of what was done here

17    and I think makes abundantly clear that these circumstances,

18    even if they don't fall within the ordinary rule, which for the

19    reasons we've said we think they do, certainly fall within

03:04  20    exceptions that are intended again to be consistent with the

21    interest to prevent forum shopping to extend the jurisdiction

22    of habeas courts in equitable ways.

23         And, finally, on this point about the immediate

24    custodian, Mr. Sauter still hasn't been clear about which

03:04  25    custodian he thinks the petitioner should have named or could

have named.  I believe he said during his remarks that it would

have been the ICE field office director with control over

Vermont.  That is exactly who he named.  Because there's a New

England field office, a field office director sits in

03:05  Massachusetts in Burlington, and that person has control --

THE COURT:  This is Miss Hyde?

MS. LAFAILLE:  Yes.

I'll end just where I started.  I'm sure we've all

seen the video of Miss Ozturk being grabbed by ICE officers on

03:05  the street in Somerville.  If we could freeze that moment in

time and imagine a habeas petition being filed, which surely

she had the right to file if there was the wherewithal to do it

at that moment, it's clear that the --

I don't think Mr. Sauter is saying that the ICE

03:05  officer who was physically grabbing her would have been the

custodian.  The custodian had to be the person in control of

the New England area for ICE.  I took his remarks to be

essentially acknowledging that.  And that didn't change.  That

person in control did not change when the vehicle that

03:06  Miss Ozturk was in crossed state lines.

So we think this, although this is an unusual case

where the client was across state lines, she was in a vehicle,

her condition -- excuse me -- her custodian had not changed.

And for all of the reasons we've articulated, habeas

03:06  jurisdiction in this court is consistent with ordinary

1   principles of habeas jurisdiction and, if not, certainly the

2   government's behavior, ignoring a Court's order and whisking

3   her away, certainly give ample reason to preserve the

4   jurisdiction of this Court in Massachusetts.

03:06   5        THE COURT:  And, if not, in the District of Vermont,

6   counsel?

7        MS. LAFAILLE:  Well, we think this case --

8        THE COURT:  And if not, in the District of Vermont?

9        MS. LAFAILLE:  Sorry, your Honor.  I hear you now.

03:07  10   Yes.  Absolutely, your Honor.  If not here, then a transfer to

11   Vermont would be the appropriate remedy.

12        THE COURT:  Meaning I took those to be alternative

13   arguments as the government has made alternative arguments.

14        MS. LAFAILLE:  Yes, your Honor.

03:07  15        THE COURT:  Counsel, I appreciate the arguments, thank

16   you, on both sides.

17        Counsel, I think there were other folks, some who are

18   on Zoom, that were queued up to address other issues.  To be

19   completely transparent, as hopefully my questions to both sides

03:07  20   suggested, I'm very focused on the jurisdictional issue, which

21   is very much a live issue here, so I'm inclined to wrestle with

22   that a little bit more and get a decision out in that regard.

23   And then if there are further proceedings, we would go from

24   there.  Okay?

03:07  25        Thank you, counsel.

1          THE CLERK:  All rise.

2          (The Honorable Court exited.)

3          (Adjourned, 3:09 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS     )

6

7

8           I, Kristin M. Kelley, certify that the foregoing is a

9    correct transcript from the record of proceedings taken

10   April 3, 2025 in the above-entitled matter to the best of my

11   skill and ability.

12

13

14       /s/ Kristin M. Kelley                April 8, 2025

15       Kristin M. Kelley, RPR, CRR               Date
         Official Court Reporter
16

17

18

19

20

21

22

23

24

25

1

```
                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF VERMONT


RUMEYSA OZTURK,                 )
                                )
                                )
         vs.                    ) CASE NO. 2:25-cv-374
                                )
PATRICIA HYDE, MICHAEL KROL,    )
TODD LYONS, KRISTI NOEM,        )
DONALD J. TRUMP, MARCO A.       )
RUBIO,                          )
                                )
                Defendants.     )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)
```

        Telephonic status conference held at 12:11 p.m.

on Monday, April 7, 2025, in Burlington, Vermont,

before Honorable William K. Sessions, III, District

Judge.

Sarah M. Bentley, CCR-B-1745
 Registered Professional Reporter and Notary Public

BENTLEY COURT REPORTING
sbireland7@gmail.com

2

1                    A P P E A R A N C E S

2

3     For the Plaintiff:

4             LIA N. ERNST, ESQ. (via telephone)
              ACLU Foundation of Vermont
5             P.O. Box 277
              Montpelier, Vermont  05601-0277
6             lernst@acluvt.org

7

              RAMZI KASSEM, ESQ.  (via telephone)
8             Main Street Legal Services, Inc.
              CLEAR Project
9             CUNY School of Law, 5th Floor
              2 Court Square
10            Long Island City, New York  11101
              (718) 340-4558
11

12

13

14

15    For the Defendants:

16            MICHAEL P. DRESCHER, ESQ.  (via telephone)
              Assistant United States Attorney
17            United States Attorney's Office
              3rd Floor
18            11 Elmwood Avenue
              Burlington, Vermont  05402-0570
19            (802) 951-6725
              michael.drescher@usdoj.gov
20

21

22

23

24    Also Present:

25

3

1                           I N D E X

2

3                                                        PAGE

4       Statements by Mr. Kassem                    6, 27, 30

5
        Statements by Mr. Drescher                      19, 26
6

7       Statement by the Court                      18, 23, 28

8

9                           *       *       *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

P R O C E E D I N G S

1
2
3

4        THE CLERK:  Please be seated.

12:11   5        THE COURT:  Good afternoon.

6        THE CLERK:  This is Civil Case No.

7   25-374, Rumeysa Ozturk vs. Patricia Hyde,

8   Michael Krol, Todd Lyons, Kristi Noem, Donald J.

9   Trump, and Marco Rubio.

12:11   10        Present for the plaintiffs by telephone

11   is Lia Ernst and Ramzi Kassem.

12        Present for the defendant is Assistant

13   United States Attorney Michael Drescher.

14        The matter before the Court is a status

12:11   15   conference.

16        THE COURT:  All right.  This is a status

17   conference.  Let me set, as I understand it, the

18   background to this Court's involvement.

19        First, the petition was filed in the

12:12   20   District of Massachusetts.  Soon after the

21   petition was filed the government filed a motion

22   to dismiss, essentially arguing, first, that

23   there was no jurisdiction in Massachusetts

24   because at the time of the filing of the

12:12   25   petition the petitioner was not in the district

5

1    of confinement and did not identify the persons

2    who were restricting her liberty.  And, as a

3    result, the matter should be dismissed for lack

4    of jurisdiction.

12:12    5         Second, the government is also arguing in

6    its motion to dismiss that under the Immigration

7    and Nationality Act essentially the Court, this

8    Court, the Article 3 court has no jurisdiction,

9    and this was exclusively delegated to the

12:13    10   immigration authorities.  And, of course, the

11   petitioner has objected to both of those

12   requests.

13        Finally, the petitioner has

14   also requested a release from confinement.

12:13    15       It seems to me that the Court needs to

16   address the question of whether it has

17   jurisdiction in this case, both in terms of

18   whether the petition that was filed in

19   Massachusetts on the 25th of March gave the

12:13    20   Court jurisdiction and, second of all, whether

21   the Court still has jurisdiction in light of the

22   application of the Immigration and Nationality

23   Act.

24        First, the Court has to decide whether it

12:13    25   has personal jurisdiction in this particular

6

1     case.  If it does, then the Court needs to

2     address the request on the part of the

3     petitioner for release from confinement.

4              So let me turn to the lawyers for the

12:14  5     case, first the lawyers for the petitioner,

6     Mr. Kassem.

7              And, also, Mr. Drescher I think is

8     representing the government; is that correct?

9              MR. DRESCHER:  It is.

12:14  10     THE COURT:  Okay.  So let me ask you

11     whether I described the background correctly and

12     tell me, I think you have requested a status

13     conference, Mr. Kassem, I believe, and so tell

14     me what your thought is about how we proceed.

12:14  15     MR. KASSEM:  Thank you, your Honor.  Good

16     morning.

17              THE COURT:  Good morning.

18              MR. KASSEM:  This is Ramzi Kassem for the

19     petitioner, Rumeysa Ozturk.  I'm from the CLEAR

12:15  20     Project at CUNY School of Law.

21              First of all, on behalf of our client and

22     the rest of the legal team, I'm like to thank

23     the Court for its attention to this pressing

24     matter.

12:15  25              And with the Court's permission I'd like

                                                              7

1       to take just a few minutes to review the case's

2       stance from our perspective, and if the Court

3       will indulge --

4               THE COURT:  Yes.

12:15   5               MR. KASSEM:  -- I have four keys points.

6               THE COURT:  Yes.

7               MR. KASSEM:  First of all, your Honor --

8               THE COURT:  I think you should identify

9       exactly what is before the Court.

12:15   10              I don't think that you have to get into

11      extended argument at this particular point.  I

12      should tell you that I have read all of the

13      pleadings that were before Judge Casper in

14      Massachusetts.  I've also read her decision and

12:15   15      begun research into the issues that are

16      presented by this really unique case.

17              So -- but you don't need to get into the

18      argument.  You're going to have plenty of

19      opportunity to do that in the very near future,

12:16   20      but go ahead.

21              MR. KASSEM:  Thank you, your Honor.

22              I mean, the top one, your Honor, is, of

23      course, that Ms. Ozturk was locked up by ICE and

24      by the government essentially for co-authoring

12:16   25      an op-ed in a Tufts campus newspaper.  So that

8

1    is retaliation for her speech, we allege, which

2    also -- which also chills not just her speech

3    but the speech of many others, offending our

4    most basic notions of freedom.

12:16    5         And in her case it's part of a larger

6    pattern, as your Honor well knows by now,

7    including such cases as Mr. Mahmoud Khalil's

8    case, Dr. Badar Khan Suri, and, also, Yunseo

9    Chung, Rajani Srinivasan and Momodou Taal, and

12:16   10    the list does not end there.

11         So from our perspective, your Honor, the

12    Court has the power to grant release right now.

13    The government has responded to the amended

14    habeas petition, as the Court well knows.

12:16   15    Petitioner has replied, so that petition is

16    fully briefed and ripe for decision,

17    particularly as to the urgent detention claims

18    raised in habeas, and so the Court could today

19    grant the writ, order the petitioner's release,

12:17   20    and then we litigate the remaining --

21         THE COURT:  One, as I say, I have read

22    the motion to dismiss.  I've read your response.

23         The problem, of course, is that when the

24    case was in Massachusetts you were in the

12:17   25    1st Circuit.  And one of the observations that I

9

1 made in regard to the memoranda that were

2 submitted is that you focused, quite naturally,

3 on 1st Circuit law.  In particular, the Vasquez

4 became very much a part of the issue.  That's a

12:17 5 1st Circuit case.

6   Well, you're now in the 2nd Circuit.

7 And, of course, the Court responds directly to

8 the expertise of the judges of the 2nd Circuit,

9 and there is no research that has been shown to

12:17 10 me about how the 2nd Circuit has applied some of

11 these concepts of law in its precedent.

12   So I appreciate the fact that you say

13 that the motion to dismiss is fully briefed but,

14 in fact, it's not because nobody has dealt with

12:18 15 2nd Circuit cases.

16   Do you disagree?

17   MR. KASSEM:  We fully appreciate that

18 point, your Honor.  And, in fact, if I may just

19 make two points in quick response.

12:18 20   First, you know, as extraordinary as this

21 case may be, your Honor has already recognized

22 the Lakhani case, L-A-K-H-A-N-I, the

23 well-established principal that habeas cases

24 should be filed in the judicial district in

12:18 25 which the petitioner is held at the time they

10

1    are filed, and so this case is no different from

2    that.  And so the issue is not entirely novel to

3    the Court.

4          The second point I'd like to make, your

5    Honor, is that should the Court understandably

6    wish to see additional briefing under 2nd

7    Circuit case law, that briefing has already

8    occurred in other cases, including one that my

9    organization and some of our co-counsel are

10    involved in and, of course, that the government

11    is involved in in the 2nd Circuit so that should

12    not delay the issue.

13          Because, of course, the cost of the delay

14    is being born by Ms. Ozturk, and for habeas

15    purposes that is a grave harm and that's why

16    habeas exists as a remedy, as the Court well

17    knows.

18          So what we would propose, your Honor, is

19    that to the extent that any additional briefing

20    is needed, whether it's on bail or venue, that

21    briefing should be expedited, ideally starting

22    with bail first or at least proceeding on

23    parallel tracks where one does not hold up the

24    other.

25          And what we would suggest is that

12:18
12:19
12:19
12:19
12:19

11

1    plaintiffs file any -- any supplement with

2    2nd Circuit case law tomorrow.  You know,

3    respondents can either file simultaneously or by

4    the following day, Wednesday.  We would be

12:19  5    willing to waive our reply and tee up the

6    issues, and we'll willing to do this, your

7    Honor, both on bail as well as venue; to tee up

8    the issues for resolution as soon as possible.

9         Petitioner's counsel would be glad to

12:20  10    appear later this week for a hearing, should the

11    Court wish to call us in, or at the earliest

12    possible time convenient to the Court.

13         THE COURT:  Well, as I assess the issues,

14    you have hit two of them.  That is, the bail

12:20  15    question, obviously, and whether there's

16    jurisdiction as a result of the filing of the

17    petition in Massachusetts at a time when the

18    petitioner was located.  That's her district of

19    confinement was in Vermont, and so the question

12:20  20    is whether that's a valid petition or whether it

21    should be dismissed.

22         But there's a third issue as well, and of

23    course the government has requested, in its

24    motion to dismiss, to dismiss the case based

12:21  25    upon the Immigration and Nationality Act.

12

1   You've responded to that in your briefing.

2          You haven't responded necessarily with

3   2nd Circuit case law, but it seems to me that

4   before the Court addresses the issue of release,

12:21  5   that the Court make a determination that it, in

6   fact, has jurisdiction, and that requires the

7   answer both to the question about whether it's a

8   proper place of filing but it also requires an

9   answer to the initial question as to whether

12:21  10  this case should be dismissed under the

11  Immigration and Nationality Act.

12         And do you agree with that?

13         MR. KASSEM:  Well, your Honor, we take a

14  slightly different perspective, both on that

12:21  15  point and, of course, on the government's

16  position as to the INA jurisdictional bars that

17  your Honor is referencing.

18         Our view, your Honor, is that,

19  respectfully, the Court can rule on the venue

12:22  20  issue should it so decide, and at that point the

21  Court would have jurisdiction to order release.

22         Of course, our client is not a flight

23  risk.  The government has not contended that

24  she's a flight risk.  All she wants to do is to

12:22  25  return to her home and to her studies at Tufts,

13

1    and at that point we could litigate the

2    jurisdictional bars.

3         And should the Court at the end of that

4    process conclude that the government has the

12:22  5    better end of the argument on the INA

6    jurisdictional bars, then all the options would

7    be left on the table for the government.

8         The government would be no worse off

9    should it seek to re-detain Ms. Ozturk following

12:22  10   a dismissal of the habeas petition and complaint

11   based on the INA jurisdictional bars.  That

12   option would be on the table.  The government

13   would be no worse off.

14        Your Honor, our concern is the delay that

12:22  15   would be occasioned by lengthy litigation over

16   these jurisdictional questions because the cost

17   of that delay would be born by Ms. Ozturk.

18        And recently, as in the Srinivasan case,

19   the Supreme Court has held that the habeas

12:23  20   corpus, the cost of the delay, should not be

21   born by the detainee.

22        So the appropriate course here would be

23   for the Court to rule on venue and bail as a

24   priority, and then we can litigate the INA

12:23  25   jurisdictional bars, which actually merge into

14

1   the merits of the blended petition and complaint

2   that we filed.

3        And so it's appropriate to litigate those

4   at that stage while Ms. Ozturk is back home at

5   Tufts completing her course of study.  Again,

6   the government would be no worse off by that

7   outcome.

8        The alternative would place the cost of

9   delay squarely and exclusively on the shoulders

10  of Ms. Ozturk, which the Supreme Court has

11  already said is inconsistent with the purpose of

12  the great writ.

13       THE COURT:  Well, you've got a filing by

14  the government under the Immigration and

15  Nationality Act which seeks dismissal.  You have

16  a whole briefing from the government.  You

17  apparently have fully briefed the response.

18       Don't you think, assuming that there's an

19  update to reflect the case law in the 2nd

20  Circuit, don't you think the Court could address

21  the motion to dismiss quickly based upon the

22  pleadings that have already been submitted and

23  the pleadings that would be submitted that are

24  updating the previous submissions by additional

25  case law?

15

1          So we're not talking about a significant

2     delay.  You know, quite frankly, I was fully

3     anticipating addressing the motion for the

4     jurisdiction, the motion to dismiss under the

12:24    5     Immigration and Nationality Act, and the

6     question of release on confinement

7     expeditiously.

8          And, in fact, you know, my thought, and I

9     will submit to you and then I'll ask

12:24    10    Mr. Drescher to respond for the government, is

11    that I would give both sides until Thursday at

12    5 o'clock for the submission of updated briefing

13    on the motion to dismiss and the motion for no

14    jurisdiction for the Court, as well as the

12:25    15    request for release from confinement, all

16    briefing for that by Thursday.

17         I'd make available the Court for argument

18    on Monday, Monday morning, and, also, submission

19    of any evidence that either side would want to

12:25    20    provide.

21         I mean, I know that you've submitted a

22    whole series of affidavits.  I don't think it's

23    necessary that it be oral testimony, but it may

24    be that one side or the other may request oral

12:25    25    testimony.

16

1      Frankly, I would make my schedule
2   available on Monday, into Tuesday and with a
3   full eye -- with a full goal of addressing all
4   of these issues expeditiously.  And so you tell
5   me if you have an objection to that process.
6          That is, opening up the Court for hearing
7   on Monday with the idea that I would address all
8   of these issues quickly.
9          MR. KASSEM:  Thank you, your Honor, and,
10  again, we truly appreciate, all of us, including
11  our client, we all appreciate the Court's prompt
12  attention to this case, including the schedule
13  that your Honor is suggesting.
14         I would just like to make two points.  As
15  your Honor appreciates, from our perspective
16  Ms. Ozturk has already spent 13 days behind bars
17  at a facility in Louisiana, a distance from her
18  community, all for writing an op-ed, which is
19  already far longer than any free society should
20  tolerate.  And that's where, you know, our
21  position -- that's what our position is rooted
22  in fundamentally.
23         The other point I'd like to make, your
24  Honor, is to share with the Court what we, those
25  of us who have represented other similarly

17

1    situated petitioners in other cases outside of

2    this district, what we've seen in those cases;

3    for example, the Mahmoud Khalil case, which has

4    dilatory tactics.

12:27    5         And, of course, I do not impute that

6    intention onto opposing counsel here, but I'm

7    just sharing sort of the larger pattern that

8    we've seen, which is re-litigation of the venue

9    issue in the transferee court, which here in the

12:27    10   District of Vermont is the transferee court

11   under 1631, following the ruling by the District

12   of Massachusetts.

13        So venue re-litigation followed by a

14   request for certification for interlocutory

12:27    15   appeal and probably a stay motion.

16        So, again, this is our concern, is that,

17   you know, getting into the jurisdictional

18   questions, including the INA bar arguments that

19   the government has made, would again shift the

12:28    20   cost of delay onto Ms. Ozturk.

21        But with that said, your Honor, I think

22   the schedule you're proposing is certainly

23   expedited.  With the Court's permission, perhaps

24   while Mr. Drescher addresses the Court, I will

12:28    25   confer with my co-counsel, and then if the Court

18

1       permits me to come back on mic I'll share our

2       position.

3           THE COURT:  Okay.  And as you share with

4       co-counsel the Court's suggestion, you know,

12:28  5   understand that the first thing the Court has to

6       do in any litigation is make a determination as

7       to whether it has jurisdiction.  And if it

8       doesn't have jurisdiction, it has no authority

9       or power to order anything.

12:28  10      So I appreciate the difficulties that

11      you're experiencing with your client being

12      incarcerated, but understand that to actually

13      address this question thoroughly and correctly I

14      first have to make a decision in regard to

12:29  15   whether, in fact, I have jurisdiction and

16      whether a motion to dismiss, it seems to me,

17      should be granted.

18          What I'm offering to both sides is an

19      expedited process by which this would be

12:29  20   resolved quite, quite quickly.

21          So with that, Mr. Drescher, you've heard

22      the issues that have been presented by the

23      petitioner and the previous pleadings by the

24      government.  What is your thought as to whether

12:29  25   or not the schedule that the Court is proposing

19

1    is acceptable?

2              MR. DRESCHER:  Thank you, your Honor.

3              We agree that jurisdiction is absolutely

4    the threshold issue that the Court needs to

12:30   5    address; that the provisions of Title 8 raise

6    serious jurisdictional questions that the Court

7    has to navigate and deal with in deciding

8    whether it has jurisdiction over this case.

9              An additional wrinkle that I'm not sure

12:30  10    may be on your Honor's radar is the question as

11    to whether the transfer under 1631 is

12    appropriate or whether 1631 on its face vests

13    this Court with jurisdiction.  That is a

14    question that the district court in New Jersey

12:30  15    in the Khalil case that Mr. Kassem referenced

16    has actually certified for an interlocutory

17    appeal.

18              In that case New Jersey was the

19    transferee district from the Southern District

12:31  20    of New York.  The application of 1631 needs to

21    be dealt with as well, and the government

22    intends to supplement.  Or actually in light of

23    the Court's -- in light of the Court's vision

24    for how to proceed here, we'd be arguing that

12:31  25    under 1631 -- that 1631 does not create

20

1    jurisdiction in this court, and that under 1631

2    the appropriate district for the case to be

3    transferred to is in the Western District of

4    Louisiana rather than Vermont.

12:31  5          We also agree with your Honor that the

6    briefing that occurred in Boston was, quite

7    understandably, very 1st Circuit centric and

8    that this Court should have the benefit of 2nd

9    Circuit research, specific research on this

12:31  10   case.

11          And then with regard to the schedule, of

12   course we're going to do whatever the Court

13   directs in that regard.  The one reason why a

14   slower schedule might make sense, and I'm going

12:32  15   to suggest to the Court, is that it is my

16   understanding that petitioner has the

17   opportunity to seek release on conditions before

18   the immigration judge.  I do not know --

19          THE COURT:  Well, wasn't she before the

12:32  20   immigration judge this morning?

21          MR. DRESCHER:  Perhaps her counsel can

22   address that.

23          MR. KASSEM:  Your Honor, no, she was not.

24          THE COURT:  She was not?

12:32  25          MR. KASSEM:  She was not.

21

1       THE COURT:  I thought there was a hearing

2   scheduled for the morning of the 7th, and I was

3   wondering whether there were any developments

4   about her confinement?

12:32   5       MR. KASSEM:  Your Honor, there may have

6   been some confusion.  There is an immigration

7   court hearing in another case, Mr. Khalil's case

8   in Louisiana today, so that may have been, you

9   know, the news that reached the Court.

12:33  10       But with respect to Ms. Ozturk, there is

11   no immigration court hearing today.  In fact,

12   there is none on the calendar.

13       What is immediately teed up in the

14   immigration case in Louisiana for Ms. Ozturk is

12:33  15   that the government has until April 24th to

16   respond to Ms. Ozturk's denial to immigration

17   counsel of all charges.

18       THE COURT:  Well, I --

19       MR. KASSEM:  And, your Honor, to clarify,

12:33  20   the immigration court cancelled the hearing that

21   was originally on schedule for today.

22       THE COURT:  Oh, I see, so that there was

23   a hearing.

24       Because I read your pleadings.

12:33  25       MR. KASSEM:  Correct, your Honor.

22

1    Correct.

2              THE COURT:  And I was -- it was clearly

3    indicated that she was going to be before the

4    immigration court this morning.  But what you're

12:33    5    saying is that the immigration court postponed

6    the hearing?

7              MR. KASSEM:  You were correct, your

8    Honor.  The immigration court cancelled the

9    hearing in favor of the briefing scheduled that

12:34    10    I just mentioned.

11              So Ms. Ozturk denied the immigration

12    charges in immigration court, and now the

13    government has until April 24th to respond in

14    writing.

12:34    15              THE COURT:  All right.  And as far as you

16    know there's no request for release pending

17    before the immigration court?

18              MR. KASSEM:  Not at present, your Honor.

19              THE COURT:  Okay.

12:34    20              All right.  Mr. Drescher, you've added an

21    additional issue and you've also agreed with me

22    that the pleadings have to be updated to include

23    2nd Circuit case law.

24              Well, do you have any objection to

12:34    25    ordering that all of the briefings be submitted

23

1    by 5 o'clock Thursday afternoon and that the

2    Court would be available for argument of counsel

3    on Monday and that if, for any reason, any side

4    wishes to call witnesses, that they would notify

12:35   5    the Court in advance?

6          The witnesses would be called, and the

7    Court would make available time for the hearing

8    of those witnesses if the Court felt it

9    necessary to hear from those witnesses.  And

12:35  10    that hearing would start on Monday and continue

11    until completed.

12          Is there any objection to that schedule?

13          MR. DRESCHER:  My only -- in short, your

14    Honor, yes.  My objection is that planning for

12:35  15    an evidentiary hearing before the Court has

16    addressed the question of jurisdiction seems --

17    it seems irregular under the circumstances; that

18    we need to understand the Court's authority.

19          THE COURT:  Except it's not really.  So

12:36  20    when you actually look at the question about the

21    filing in Massachusetts when, in fact, she was

22    in Vermont, the question is whether that filing

23    has to literally comply with the rules in regard

24    to habeas corpus petitions, or are there

12:36  25    exceptions in extraordinary circumstances?

24

1      And I would suspect, because I don't want

2   to get off into this litigation at this point,

3   but I would suspect that the petitioner may say

4   that she doesn't have to follow all of the

12:37   5   literal requirements like district of

6   confinement.

7      In a situation in which she has no idea

8   where her client is, the lawyer would have no

9   idea where the client is, and as a result the

12:37   10   argument may be that the filing in Massachusetts

11   for judgment here is essentially a filing for

12   habeas in any place once she finds out where the

13   client is.  That is extraordinary circumstances,

14   and the question is whether extraordinary

12:37   15   circumstances apply in this case.

16      So it may be that one side would want to

17   introduce evidence to show what the

18   extraordinary circumstances were, which

19   justified the Court accepting the submission of

12:38   20   the petition that was filed in Massachusetts as

21   one that's effective in Vermont.

22      That means that we may have evidence in

23   regard to how the process happened, and that is

24   before we make a determination as to whether the

12:38   25   Court has jurisdiction because that -- that is

25

1    related to whether the Court has jurisdiction.

2         So there could be a circumstance, I would

3    imagine, in which some party would want to call

4    evidence about what happened and why the

12:38    5    petitioner was not able to file in Vermont when

6    the petitioner was in Vermont.  And that all

7    relates to the question of extraordinary

8    circumstances justifying some variance as to the

9    legal requirements of the filing of a habeas

12:39    10    petition.

11         So I don't know.  I don't -- I don't mean

12    to speculate.  Well, I guess I do speculate.

13    That's my nature, but I just wonder whether

14    there may be evidence in regard to the

12:39    15    exceptional circumstances surrounding the filing

16    of the petition that may require evidence.  And

17    it may require evidence if the Court eventually

18    gets to the issue of release.

19         Either party may want to call witnesses

12:39    20    in regard to whether she poses a danger of

21    flight or of risk to the community.  Either side

22    might want to provide evidence in that regard.

23         So I -- what I would really want to do is

24    to make sure that this is done in an expedited

12:40    25    basis but a thorough basis.

26

1       So, you know, we'll give you until

2    Thursday to submit whatever briefing you want to

3    submit, and then we're available to open up the

4    Court's schedule so that you could have the time

12:40  5    that you need early on in the week.

6       And the expectation is that once the

7    evidence has been completed, either by way of

8    affidavit, all this could be by way of affidavit

9    or oral testimony and, also, all of the legal

12:40  10   submissions made and the argument of counsel,

11   then the Court would be in a position to address

12   the three separate questions.

13       And that's the motion to dismiss based

14   upon the filing in Massachusetts when she, in

12:40  15   fact, was in Vermont; the motion to dismiss as a

16   result of the Immigration and Nationality Act;

17   and then only if the Court finds jurisdiction,

18   doesn't dismiss the case, finds jurisdiction

19   would the Court then address whether she should

12:41  20   be released.

21       And that's -- that's my thought.  So tell

22   me if you have any strenuous objection to that

23   process.

24       MR. DRESCHER:  This is Mike Drescher for

12:41  25   the record.

27

1    My only requested addendum to your list

2  of issues, your Honor, is the propriety of the

3  1631 transfer that I referenced earlier.

4    THE COURT:  That's correct.  That's the

12:41 5  new issue that was not addressed before in the

6  Massachusetts pleadings and Judge Casper's

7  decision and, yes, that would be the fourth.

8    MR. DRESCHER:  Thank you.

9    THE COURT:  Okay.

12:41 10    All right?  Mr. Kassem.

11    MR. KASSEM:  Thank you, your Honor.

12  Ramzi Kassem for the petitioner, Rumeysa Ozturk.

13    THE COURT:  Do you pronounce your name

14  Kassem?  Is it Kassem?

12:42 15    MR. KASSEM:  Kassem, yes, your Honor.

16    THE COURT:  Mr. Kassem, what's your

17  reaction to that?

18    MR. KASSEM:  Thank you for asking, your

19  Honor.

12:42 20    Just a couple points, your Honor.  Your

21  Honor's description is essentially, to my mind,

22  a perfectly appropriate description of

23  jurisdictional discovery which would be proper

24  through an evidentiary hearing as the Court

12:42 25  describes it.  And so -- and it would be limited

28

1       to the jurisdictional points as your Honor --

2       exactly as your Honor described.

3           I will say with respect to the evidence

4       that is now on the record, because I have to say

12:42   5       this, your Honor, there has been no allegation,

6       nor could be there be any allegation that

7       Ms. Ozturk is a flight risk or public safety

8       concern of any sort.  And this is undisputed.

9           And, in fact, on the other side of that

12:42  10      you have these voluminous filings, two dozen

11      letters of support, including from the head of

12      Tufts and other administrators, faculty

13      advisors, other community members, all attesting

14      to Ms. Ozturk's community integration and, in

12:43  15      fact, to the harm that the community faces from

16      her continued detention.  So that's what's in

17      the balance right now.

18           THE COURT:  Yes.  So, Mr. Kassem, I

19      appreciate that you're really want to make that

12:43  20      point.  You made that point actually in your

21      brief.

22           And you made the argument that there's no

23      evidence to suggest that she would provide a

24      risk of flight or danger to the community and

12:43  25      that she has the support.  She's got all of the

29

1    affidavits.

2         You know, what I really want to do is

3    make sure both sides have a full opportunity to

4    introduce what they need to support their

12:43   5    argument.  It may require some evidence; it may

6    not.  It may require affidavits; it may not.

7         But, as a result, I think the Court is

8    going to have adequate opportunity to give you a

9    lot of time to be able to argue your case as to

12:44  10    what the government has shown and what it hasn't

11    shown and what the Court should conclude in

12    terms of jurisdiction.  So I think this is all

13    going to be fair game on Monday.

14         And if anyone wants to introduce oral

12:44  15    testimony on Monday or Tuesday, then you should

16    notify the Court that you are wanting to seek

17    the introduction of certain testimony, summarize

18    the testimony.

19         The Court will make a determination as to

12:44  20    whether that's appropriate or not, but I'm

21    hoping that the submissions, including the

22    briefs and the testimony and the affidavits and

23    the argument of counsel, will all be done by

24    Tuesday.

12:45  25         MR. KASSEM:  Thank you, your Honor.  This

30

1     is Ramzi Kassem for the petitioner again.

2          I've had a chance to confer with

3     co-counsel.  We agree to the Court's -- we have

4     no objection to the Court's appropriately

12:45  5     expedited schedule.  Briefs due on Thursday on

6     the INA -- the asserted INA jurisdictional bars.

7          That's the motion to dismiss element of

8     the government's response to our habeas

9     petition, plus the venue 1631 issues, plus bail,

12:45  10    so any supplemental by Thursday at 5:00 p.m.

11         And, your Honor, we welcome the

12    opportunity and we will consider the need on our

13    end to submit additional evidence or testimony

14    and seek testimony going to the jurisdictional

12:45  15    question.

16         I imagine if we were to go down that

17    path, notice to the Court with any summaries

18    necessary by Friday, would that be the Court's

19    intention?

12:45  20         THE COURT:  Any summary by Friday, yes,

21    it would be the Court's intention.

22         So by Friday at 5:00 o'clock, if you want

23    to submit any oral testimony, any witnesses,

24    then you summarize the testimony and submit it

12:46  25    to the Court with a copy obviously to the

31

1    opposing counsel, an opportunity over the

2    weekend for opposing counsel either to object or

3    consent, and then the Court would rule on Monday

4    as to whether that witness can be called.

12:46    5    MR. KASSEM:  Understood, your Honor.

6    And a point of clarification I guess for

7    both parties.  Would it be appropriate to submit

8    a consolidated brief that addresses those three

9    broad lines that we've identified instead of

12:46    10    three separate briefs?

11    And, if so, would it be -- I guess under

12    either scenario would additional pages be

13    appropriate and agreeable to the Court?

14    THE COURT:  I think that you can combine

12:46    15    them all in one memorandum.  Oh, absolutely.

16    I don't think it's necessary that you

17    have a separate memorandum on the motion to

18    dismiss and, you know, the jurisdiction arising

19    out of the filing in Massachusetts, I think that

12:47    20    would all be a part of one memorandum dealing

21    with all of these issues.

22    Well, actually, I strike that.

23    So if there is a filing that you want to

24    file in terms of argument for her release, you

12:47    25    know, that's after the Court has made a

32

1   determination as to jurisdiction.  Then assume

2   that the Court has made a determination as to

3   jurisdiction, found that there's jurisdiction,

4   has personal jurisdiction in this case, then the

5   Court addresses the issue of her release.  So I

6   think that would be in a separate filing.

7          But, again, in terms of calling

8   witnesses, that would all be combined either on

9   Monday or Tuesday of next week.

10          MR. KASSEM:  Okay.  Thank you, your

11   Honor.

12          THE COURT:  So the answer is that those

13   first three legal issues arising out of the Act

14   and, also, the placement of the filing would be

15   in one brief, and the release or detention would

16   be in a separate one.

17          MR. KASSEM:  Understood, your Honor.

18          And would it be appropriate to seek leave

19   of court right now for overlong briefs on both

20   of those filings for --

21          THE COURT:  Well, I'm not going to limit

22   the amount of pages that you want to file.  You

23   can make it as long as you want.

24          MR. KASSEM:  Thank you, your Honor.  We

25   will -- we will not burden the Court any more

33

1    than we have to, but we appreciate it.

2              THE COURT:  So, yeah, I think there's

3    something about briefs that are much too long

4    become much less persuasive, but that's up to

12:49    5    you.

6              MR. KASSEM:  Understood, your Honor.

7    Thank you.

8              THE COURT:  Okay.

9              All right, Mr. Drescher, your response to

12:49   10    this schedule and -- well, any response?

11             MR. DRESCHER:  I think I've said my

12    piece, your Honor.

13             I understand the Court's desire to move

14    expeditiously; that that is the schedule that

12:49   15    has been set, and we understand.

16             THE COURT:  Good.  That's good.

17             That's great.  So we'll see you here on

18    Monday, but meanwhile at 5 o'clock on Thursday

19    I'll expect the submission of the briefs.

12:49   20             MR. KASSEM:  Thank you, your Honor.

21             THE COURT:  Okay.

22             Is there anything else we need to address

23    at this point?

24             MR. KASSEM:  Nothing for the petitioner,

12:49   25    your Honor.

34

1        THE COURT:  Okay.

2        Mr. Drescher, anything else?

3        MR. DRESCHER:  I don't believe so.  Thank

4    you, your Honor.

12:49  5        THE COURT:  Okay.  All right.  Thank you.

6        THE CLERK:  All rise.

7        (End of hearing at 12:50 p.m. and end of

8    transcript of same.)

9

10

11

12

13

14

15

16            C E R T I F I C A T E

17

18    I certify that the foregoing is an accurate

19    transcript from the proceedings in the above-entitled

20    matter, dated this 8th day of April, 2025.

21

22

23                    /s/ Sarah M. Bentley, RPR

                       _____

24                    Sarah M. Bentley, RPR

25

# UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

|  |  |
|---|---|
| RUMEYSA OZTURK, | |
|        Petitioner, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; PATRICIA HYDE, in her official capacity as the New England Field Office Director for U.S. Immigration and Customs Enforcement; MICHAEL KROL, in his official capacity as HSI New England Special Agent in Charge, U.S. Immigration and Customs Enforcement; TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; and MARCO RUBIO, in his official capacity as Secretary of State, | Case No. 2:25-cv-00374 |
|        Respondents. | |

## MOTION FOR RELEASE UNDER *MAPP v. RENO*, OR IN THE ALTERNATIVE, FOR RETURN TO VERMONT

Petitioner Rümeysa Öztürk, through counsel, moves this Court for an order of immediate release pending the adjudication of her habeas petition under the Court's inherent authority to grant release on bail to a habeas petitioner who warrants immediate relief and release. In the alternative, Ms. Öztürk respectfully requests that the Court order her to be transferred back to this District for the pendency of this litigation. In support of this motion, Petitioner submits the accompanying memorandum of law and associated exhibits.

1

JA-000182

**REQUEST FOR ORAL ARGUMENT**

Ms. Öztürk believes oral argument may assist the Court in resolving this motion and respectfully requests oral argument.

Respectfully submitted,

/s/ Lia Ernst
Monica H. Allard
ACLU Foundation of Vermont
PO Box 277
Montpelier, VT 05601
(802) 223-6304
lernst@acluvt.org
mallard@acluvt.org

Jessie J. Rossman*
Adriana Lafaille*
Rachel E. Davidson*
Julian Bava**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
alafaille@aclum.org
rdavidson@aclum.org
jbava@aclum.org

Mahsa Khanbabai**
115 Main Street, Suite 1B
North Easton, MA 02356
(508) 297-2065
mahsa@mk-immigration.com

Brian Hauss**
Esha Bhandari**
Brett Max Kaufman**
Noor Zafar**
Sidra Mahfooz*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

*Counsel for Petitioner*
Dated: April 10, 2025

2

JA-000183

125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
bhauss@aclu.org
ebhandari@aclu.org
bkaufman@aclu.org
nzafar@aclu.org
smahfooz@aclu.org

Ramzi Kassem**
Naz Ahmad*
Mudassar Toppa**
Shezza Abboushi Dallal*
CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
CUNY School of Law
2 Court Square
Long Island City, NY  11101
(718) 340-4558
ramzi.kassem@law.cuny.edu
naz.ahmad@law.cuny.edu
mudassar.toppa@law.cuny.edu
shezza.dallal@law.cuny.edu

Matthew D. Brinckerhoff**
Katherine Rosenfeld**
Vasudha Talla**
Sonya Levitova**
EMERY CELLI BRINCKERHOFF ABADY WARD
& MAAZEL LLP
One Rockefeller Plaza, 8th Floor
New York, NY 10020
212-763-5000
mbrinckerhoff@ecbawm.com
krosenfeld@ecbawm.com
vtalla@ecbawm.com
slevitova@ecbawm.com

*Pro hac vice application forthcoming
**Admitted to appear pro hac vice

JA-000184

<u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7(a)(7)</u>

I hereby certify that on April 10, 2025, Petitioner's counsel conferred with Respondents' counsel in accordance with Local Rule 7(a)(7). Respondents' counsel indicated that Respondents oppose the motion.

April 10, 2025                    */s/ Lia Ernst*
                                 Lia Ernst

4

JA-000185

# EXHIBIT 1

JA-000186

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

RÜMEYSA ÖZTÜRK,

*Petitioner*,

v.

DONALD J. TRUMP, *et al.*,

*Respondents.*

Civil Action No. 2:25-cv-00374-wks

## DECLARATION OF ATTORNEY LIA ERNST SUBMITTED IN SUPPORT OF PETITIONER'S MOTION FOR RELEASE UNDER *MAPP V. RENO*, OR IN THE ALTERNATIVE, FOR RETURN TO VERMONT; AND PETITIONER'S SUPPLEMENTAL MEMORANDUM OF LAW ON JURISDICTIONAL ISSUES

I, Lia Ernst, declare under penalty of perjury that the following is true and correct:

1. I am an attorney for Rümeysa Öztürk.

2. Attached as Exhibit 1-A is a true and correct copy of a declaration by Cynthia Smith dated April 1, 2025.

3. Attached as Exhibit 1-B is a true and correct copy of a declaration by Lynn Cooper, D.Min dated March 31, 2025.

4. Attached as Exhibit 1-C is a true and correct copy of a declaration by Professor Sara K. Johnson dated April 2, 2025.

5. Attached as Exhibit 1-D is a true and correct copy of a declaration by Mairéad O'Grady dated April 1, 2025.

6. Attached as Exhibit 1-E is a true and correct copy of a declaration by Professor Calvin L. Gidney dated March 30, 2025.

7. Attached as Exhibit 1-F is a true and correct copy of a declaration by Ayse Reyyan Bilge Yildirim, PhD dated April 1, 2025.

1

JA-000187

8.      Attached as Exhibit 1-G is a true and correct copy of a declaration by Matthew N. Gee dated April 1, 2025.

9.      Attached as Exhibit 1-H is a true and correct copy of a declaration by Elisa Guzman dated April 2, 2025.

10.     Attached as Exhibit 1-I is a true and correct copy of a declaration by Professor Ellen E. Pinderhughes dated April 1, 2025.

11.     Attached as Exhibit 1-J is a true and correct copy of a declaration by Najiba Akbar dated March 30, 2025.

12.     Attached as Exhibit 1-K is a true and correct copy of a declaration by Alison Campion dated April 2, 2025.

13.     Attached as Exhibit 1-L is a true and correct copy of a declaration by Professor Christine McWayne dated March 31, 2025.

14.     Attached as Exhibit 1-M is a true and correct copy of a declaration by Dr. Julie Dobrow dated March 30, 2025.

15.     Attached as Exhibit 1-N is a true and correct copy of a declaration by Professor Jayanthi Mistry dated March 30, 2025.

16.     Attached as Exhibit 1-O is a true and correct copy of a declaration by W. George Scarlett, PhD dated April 1, 2025.

17.     Attached as Exhibit 1-P is a true and correct copy of a declaration by Sam Alterman dated April 2, 2025.

18.     Attached as Exhibit 1-Q is a true and correct copy of a declaration by SooYun Byeon dated March 31, 2025.

JA-000188

19.     Attached as Exhibit 1-R is a true and correct copy of a declaration by Lucinda Garcia dated April 2, 2025.

20.     Attached as Exhibit 1-S is a true and correct copy of a declaration by Rola Kazaer dated April 2, 2025.

21.     Attached as Exhibit 1-T is a true and correct copy of a declaration by Professor Saeed Mehraban dated April 1, 2025.

22.     Attached as Exhibit 1-U is a true and correct copy of a declaration by Professor Tama Leventhal dated March 30, 2025.

23.     Attached as Exhibit 1-V is a true and correct copy of a declaration by Tufts President Sunil Kumar dated April 1, 2025.

* * *

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 10, 2025, in Montpelier, VT.


*/s / Lia Ernst*
Lia Ernst

JA-000189

# EXHIBIT 1-A

JA-000190



SCHOOL OF ARTS AND SCIENCES
# Eliot-Pearson Department of Child Study and Human Development

April 1, 2025

I, Cynthia Smith, depose and state as follows:

I am an individual of sound mind and legal age. I make this affidavit based on my personal knowledge and relationship with Rumeysa Öztürk, a doctoral student at Tufts Graduate School of Arts and Sciences where I am a faculty member in the Eliot Pearson Department of Child Study and Human Development.

As a faculty member at Tufts University in the Eliot Pearson Department of Child Study and Human Development, I have had the privilege of knowing and collaborating with Rumeysa Öztürk for three years on various projects for the community … the most memorable being a workshop on Collective Grieving for Children at the Interfaith Center at Tufts University. Our relationship has been deeply rooted in shared values, intellectual engagement, and a mutual commitment to the well-being of children, women, and humanity as a whole. During this time, I have gotten to know Rumeysa on an academic, professional and personal level.

Throughout our friendship, Rumeysa and I have engaged in extensive discussions about the importance of family and friends … exchanging stories about her mom, her family's garden in Turkey and about her attempts to grow a small indoor garden in her apartment in Somerville. We have often reflected on the role of community in fostering emotional well-being and resilience, and we have shared personal experiences that underscore our commitment to nurturing strong social connections. We would often be the first ones arriving to campus, in the early morning, which gave us an opportunity to talk about a soup recipe we tried, how taking walks help us to destress and focus on the work we are engaged in, and how we both strive to serve children. In addition to these conversations, we collaborated on a grief workshop aimed at providing support to individuals navigating individual and collective loss.. Rumeysa's leadership, insights, empathy, and intellectual contributions significantly enriched the workshop, making it a valuable resource for all participants which included students, faculty, and staff.

Rumeysa has demonstrated unwavering dedication to the welfare of children, women, and humanity through her academic work and community involvement. Her research focuses on the positive development of adolescents in a media-embedded, digitally connected world. Her commitment to mentorship, education, and advocacy has been evident in her role as a Teaching Assistant and in her involvement in various initiatives that promote well-being and inclusivity.

JA-000191

Rumeysa and I share a profound appreciation for the creative arts as a tool for social and emotional well-being. We have discussed and explored how artistic expression can be used to foster healing, resilience, and community engagement. Her contributions and leadership on projects, such as a community expressive arts grief workshops and the mosaic project, symbolizing the values of the Eliot-Pearson Department, highlight her belief in the transformative power of art.

Beyond academic and professional collaborations, Rumeysa and I have cultivated a friendship enriched by shared culinary experiences. We have made soups for each other, exchanged our favorite recipes, and bonded over the joy of cooking. These simple yet meaningful gestures reflect her generous spirit, warmth, and dedication to building authentic relationships.

It is with deep concern that I acknowledge and bear witness to Rumeysa's current detention in a federal facility in Louisiana. Her absence has left a profound void in our community. As attested by her colleagues, students, and friends at Tufts University, Rumeysa is a dedicated scholar, mentor, and a person of immense integrity and kindness. Her contributions extend far beyond academia, touching the lives of those around her in immeasurable ways.

I attest to Rumeysa's character as a compassionate, service-minded, and principled individual. Her presence is invaluable to our academic and social community, and I urge the relevant authorities to recognize the immense positive impact she has had on those who know her.

I submit this affidavit in good faith and in support of Rumeysa Öztürk, affirming her contributions to academia, her unwavering commitment to humanity, and the profound impact she has made on my life and the lives of many others.

I affirm that the statements made in this affidavit are true and correct to the best of my knowledge and belief.

Rumeysa needs to remain in the United States and be returned to Massachusetts because she is a significant contributor to all facets of our community … making the world a better place.

**In solidarity and support,**

**Cynthia Smith**

April 1, 2025

# EXHIBIT 1-B

JA-000193



University
Chaplaincy

31 March 2025

I first met Rümeysa Öztürk in the fall of 2022. In my role as Catholic Chaplain at Tufts University, I direct Be-Friend, an interfaith friendship program, and that fall, Rümeysa signed up to be one of our graduate student Be-Frienders. At the beginning of this semester-long program, we ask each participant whether they prefer to be paired with a partner within their religious tradition or across tradition. Rümeysa requested to be paired with someone from another religious tradition. As I have come to know Rümeysa better in the intervening years, I have found this detail to align with her character. She is always eager to get to know people who are different from her. She values learning from them and shining a light on building meaningful connections through empathy.

In the spring of 2024, Rümeysa emailed me and our University Chaplain, Elyse Nelson Winger, inviting us to collaborate on a new project. She was in the beginning stages of planning a gathering to honor the experience of children living in conflict and war. In the months that followed, we shared resources from different religious traditions, collecting poetry and art. The title of this event was: "Collective Grieving for Children Facing War and Conflict: Sharing Poetry, Art, and Stories for Children around the World." The outline Rümeysa wrote for this program demonstrated her anguish at the suffering of others, specifically children. I knew that the wide breadth of conflicts she acknowledged (Sudan, Gaza, Yemen, Congo, Ukraine, Syria, Uyghur) would be a balm for many attendees as so many of our students come to us from parts of the world that do not receive as much media attention as others. Her goal was to create connection and togetherness with a shared value of improving childhood and using stories and artistic expression to lift up the pain and wisdom of children. Even the title says so much about Rümeysa: "Collective Grieving". She knows that we are better together. At her core, she is like connective tissue in our community. Her integration of academic study and practical application is noteworthy. She is not simply concerned about an intellectual exercise but how to utilize her expertise to affect those most in need.

Rümeysa is a deeply humble human being. She is always aware of those around her, their needs and thinks about how she may serve and support them. In September 2024, she joined our team of volunteers for a weekly dinner shift at the Harvard Square Homeless Shelter. This shelter is a hub of education around housing insecurity in Boston, and Rümeysa served as a trusted and equipped graduate student who guided undergraduates in this work. We rely on such students to help lead at the shelter, as many of our younger students are unfamiliar with navigating off-campus engagements.

In the fall of 2024, Rümeysa stepped into leadership to help restart our women's fitness class at the Interfaith Center. We were in the midst of a job search for a new Muslim Chaplain, and with the freneticism of the new academic year, this program could have easily been tabled until January. Rümeysa, however, knew how important this space was for her

JA-000194

classmates and reached out to help us reconfigure the class. I was named the point person on staff, and her contribution and support were central to this effort. She was keen to make changes from last year to ensure that the program would be more accessible – logistics-wise with more workout equipment and thinking ahead about how to use that blocked-off time during the fast in Ramadan. At the last moment, on the afternoon of the first class, Rümeysa suggested we adjust the time to accommodate others' schedules—students who had only just then expressed interest in joining. This might seem like a small gesture, but it shows how her concern for others pours through her every interaction in our community. Rümeysa Ötürk is a thoughtful and conscientious human being who has been a gift to Tufts University. Her critical contributions to her field and our community cannot be overstated. Her absence has caused deep anguish among so many whose lives she has touched. I urge the court to please release Rümeysa Östürk and return her to her home and our shared community.

I declare that the above statements are all true and correct to the best of my knowledge and ability.

Sincerely,

Lynn Cooper, D.Min
Associate Director of the University Chaplaincy and Catholic Chaplain

JA-000195

# EXHIBIT 1-C

JA-000196



SCHOOL OF **ARTS AND** SCIENCES

# Eliot-Pearson Department of
# Child Study and Human Development

April 1, 2025

Dear Honorable Immigration Judge:

My name is Sara K. Johnson. I am Associate Professor and Director of Graduate Studies in the Eliot-Pearson Department of Child Study and Human Development at Tufts University and a United States citizen. I am writing with the **Strongest possible support** of Rumeysa Ozturk; I urge you to allow her to return to her home in Massachusetts and her studies at Tufts in order to complete her innovative research and resume her career trajectory as an amazing young scholar.

I have been a member of Rumeysa's doctoral advising committee since she began her studies in our program in September 2020. Initially, I was her secondary advisor. Since January 2023, I have had the **immense** privilege of being her primary advisor. In that time, we have met nearly every week for at least an hour, she works as a research assistant **in** my lab, and has also been a student in several of my courses. In short, I have gotten to know Rumeysa extremely well, so I have an abundance of examples to draw from to describe the quality of her character and the thoughtfulness of her academic work, both of which are primary reasons why I believe she should be allowed to remain in the United States to finish her doctorate.

I know that many, many other people are also submitting affidavits in support of Rumeysa that will include countless examples, from virtually every corner of her life, of her many strengths and positive qualities. That is why I want to focus this letter on Rumeysa's dissertation, which I have a unique window into as her primary academic advisor and which I believe represents not only her research talent but also who she is as a person.

There is a saying among social scientists that "research is me-search": people are drawn to studying things that are important to them personally. In my more than fifteen years of supervising students as they develop their research interests, I have seen quite a bit of evidence for that. When viewed from that perspective, it makes total sense that Rumeysa has been very clear about her plan to do a dissertation on the topic of **prosocial behavior:** these are things that a person does to benefit others rather than themselves.

**Rumeysa's research on this topic is highly innovative and special** because she wants to investigate how young people's prosocial behavior can be facilitated by social media platforms, which are more typically viewed as a setting that encourages self-centeredness. Her perspective acknowledges that social media also has potential negative effects; but she wants to make sure that we really truly understand the complete picture around social media, both positive and negative, before being able to make decisions about its role in young people's lives. Her choice of this topic, and overall approach to it, reflect Rumeysa's overall level of thoughtfulness and her clear desire to understand things from multiple points of view. These qualities have played a main role in her success in her doctoral program and will facilitate her career as a productive and influential researcher. Working with Rumeysa to develop the idea for her dissertation has expanded my own thinking about prosocial behavior and how we promote it. The quality of her research ideas has also been recognized by our department, which awarded her a prestigious fellowship, and also by Tufts University itself, which awarded her a competitive Graduate



SCHOOL OF ARTS AND SCIENCES
# Eliot-Pearson Department of Child Study and Human Development

Student Research Award to support her dissertation. Our program, and the discipline of developmental science in general, is lucky to have a student such as Rumeysa, and she should be allowed to remain in the United States to finish her degree.

Beyond its innovative nature, **Romeysa's choice of research topic also aligns with the values that she holds most closely:** **she is prosocial to the core of her being.** I have seen her prosocial nature constantly in my work with Rumeysa over the past five years; she always does things to benefit other people, including those who may come from different backgrounds than she does.

I **see her prosocial nature in her care for me as her advisor.** She asks about how I am doing, how my family is doing, and how my cats are doing (despite her being very allergic to them!). When my mother moved from Kentucky to Boston last summer, Rumeysa gave me information about senior events in the area that she knew from her volunteer work as well as people she knew of similar age to my mother who might have shared interests. She has since spent many hours talking with my mother, when they are both at my house for dinner, about visiting Turkey (the number one country on my mom's travel bucket list!). All of my doctoral students (I currently have four working with me, including Rumeysa) care about me, of course, but Rumeysa really stands out in the level of care she shows for me as a **person,** not just an advisor, and the thoughtful ways in which she shows it.

I **see her prosocial nature in her care for the other students in my research group.** In our group meetings I hear about how Rumeysa has provided excellent feedback on their writing and other aspects of their research, and how she has learned about all of their cultural traditions and especially the food that is included in their celebrations. She takes excellent care of our shared lab space, such as creating a tea station that she stocks with her favorite teas and others from the list of favorites that she asks the other graduate students to contribute to. These are only a few such examples, and I am sure that the letters from other students contain many more. Our lab group would be significantly harmed if she were not allowed to return.

I **see Rumeysa's prosocial nature in her care for everyone else in our department.** Rumeysa is an integral member of our larger departmental community who not only organizes events on topics important to her (such as the welfare of children around the globe who are affected by war) but also shows up and thoughtfully participates in events organized by other students and the department. We can count on her active and thoughtful presence. I know that virtually every faculty member in our department, as well as other students outside of my lab, have examples to share of the ways that Rumeysa has made a positive difference in their lives. Our community would be irreparably damaged if she were not allowed to return.

I **know** from others that Rumeysa's prosocial behavior extends outside of our department to the larger university community and far beyond. I expect that many of the other affidavits you will receive will contain myriad examples from those contexts, ranging from the university Chaplaincy to other academic departments.

105 College Avenue, Medford, MA 02155 | TEL: 617.627.3355 | FAX: 617.627.3503 | http://ase.tufts.edu/epcshd

JA-000198



SCHOOL OF ARTS AND SCIENCES

# Eliot-Pearson Department of
# Child Study and Human Development

In sum, Rumeysa is an innovative researcher of prosocial behavior, and she is the very <u>epitome</u> of prosocial behavior herself. For those reasons, and many more, she should be allowed to remain in the United States to complete her doctoral degree at Tufts. During her time in our doctoral program, she has exceeded our expectations of and requirements for doctoral students, and she has done so in a timely manner. Rumeysa is nearing the end of her program and is entering the intensive dissertation phase. We require students to have a meeting at this point, called the "qualifying review" and hers is scheduled to take place in early May. Rumeysa is well prepared for the dissertation, and she is so enthusiastic about it. I am really looking forward to seeing the innovative and rigorous research she produces.

Rumeysa has done everything right in terms of being a doctoral student and should absolutely be allowed to return to her home in Massachusetts, and her place as a valued and integral member of our community at Tufts, to complete her dissertation and her degree. I urge you, as strongly as possible, to release her so that she may do so. I **miss her very much.**

**I declare that the above statements are all true and correct to the best of my ability.**

Sincerely,

Sara K. Johnson, Ph.D.
Associate Professor
Director of Graduate Studies
Eliot-Pearson Department of Child Study and Human Development
Tufts University

JA-000199

# EXHIBIT 1-D

JA-000200

April 1, 2025

To Whom It May Concern:

I am writing in support of my esteemed colleague and dear friend, Rumeysa Öztürk. I have known
Rumeysa for two years. We first met when I visited the Tufts University campus as an admitted
student in February 2023, and we became lab mates and colleagues when I arrived on campus to
begin my doctoral program in August 2023. I urgently compel you to allow Rumeysa to return and
complete her doctoral studies at Tufts University, where she is an integral part of our scholarly and
social community.

Within the first few weeks of my time on campus, Rumeysa invited me to have coffee and go for a
walk with her, offering me a tour of various spaces around campus and asking me about my own
background and my early experiences in our doctoral program. Although I am several years her
senior, I immediately felt that she was not only a peer but could also be a source of wisdom and
comfort to me as I adjusted to life as a Tufts University student. It also became clear to me that her
work was both interesting and essential. As a former high school teacher, I am particularly interested
in her upcoming dissertation focused on how adolescents use social media in prosocial ways (e.g., to
help each other, connect, and build community).

Rumeysa is, herself, incredibly prosocial in our lab, department, and campus communities. Within
the lab, she is often the first to reply with helpful comments when a peer shares a piece of writing for
feedback, and she also shares her own work willingly as she seeks to develop her ideas. I have agreed
to be the second coder on her dissertation when data analysis begins; she also served as my second
coder for my thesis this spring, and her questions and insights greatly enriched the final product. In
addition to her scholarly input, each time that we host a lab event, not only does she make
extraordinary homemade dishes to share, but she also ensures that she brings something special for
those who have food allergies. (Her gluten-free, dairy-free almond cookies were a particular hit.)
And when I was dog-sitting for my sister's small puppy and asked my lab mates if I could bring her
to campus, Rumeysa agreed despite a lifelong fear of dogs – and fell in love, asking when the puppy
could come back to visit again.

Beyond the lab, Rumeysa serves as both a formal teaching assistant and an informal mentor to others
within the department. Last week, after hearing of her detainment, a student came to the lab and
shared with me that she had provided him with the best advice he'd gotten on applying to doctoral
programs. And I know that Rumeysa is a linchpin in the Muslim community on campus: she invited
a group of our friends to join her for both a multifaith prayer and an *iftar* last year during Ramadan,
where I witnessed how beloved she is within that affinity group. We were scheduled to have an *iftar*
as a lab the same week that she was detained.

In short, Rumeysa is not only involved on campus, but she constantly seeks to bring together
disparate groups of people to connect. It is not lost on me that although I am a native Bostonian and a
domestic student, it is she who has played a far greater role in welcoming me to the Tufts
community.

I declare that the above statements are all true and correct to the best of my knowledge and ability.

JA-000201

Mairéad O'Grady

# EXHIBIT 1-E

JA-000203



**March 30, 2025**

I am writing this affidavit of support on behalf of Ms. Rumeysa Ozturk, a doctoral candidate in the Eliot-Pearson Department of Child Study and Human Development at Tufts University. I am an Associate Professor in the department, where I have taught for over 30 years.

I first met Ms. Ozturk on January 24, 2020, during an interview day hosted by our department for applicants shortlisted for our doctoral program. Ms. Ozturk had applied to work with me on my research in children's media. I was immediately impressed by her background in psychology, her interest in children's media, and her commitment to supporting refugee children. After our initial interview, I wrote in my evaluation, "Rumeysa is an outstanding applicant: she is very smart, very engaged, and engaging..." I enthusiastically supported her admission to the program.

In March 2020, the COVID-19 pandemic led to a nationwide lockdown. As a result, I met Rumeysa only via Zoom during the Fall 2020 semester. She served as a teaching assistant for my introductory child development course. As a TA, Rumeysa was outstanding—kind, approachable, and deeply attentive to the psychological needs of her students as we navigated the challenges of the pandemic. Students in her section wrote glowing reviews, highlighting her empathy, dedication, and commitment to their well-being.

In the Spring 2021 semester, while still in lockdown, Rumeysa co-taught a course with me through the university's GIFT program, a teacher training initiative for doctoral students. As a GIFT fellow, she played a pivotal role in reshaping the course, integrating innovative pedagogical technologies and contemporary teaching strategies. When she assumed the primary teaching role for our course, *Understanding Child Development Through Film*, she demonstrated exceptional scholarship, organization, and instructional design. Her lessons encouraged critical self-reflection and meaningful discussion. Students deeply valued her warmth, engagement, and investment in their learning experience.

During her first two years in the doctoral program, Rumeysa worked with me and several colleagues as a research assistant on the Children's Television Project, a longitudinal content analysis of contemporary children's cartoons. As a research assistant, she brought fresh energy to the project and led successful efforts to present our work at academic conferences.

Ms. Ozturk deserves the highest accolades—both as a scholar and as a person. Academically, she is deeply engaged, hardworking, and passionate about authentic representation in children's

media. As an educator, she is engaging, informative, and fosters an inclusive, supportive learning environment. Personally, she is of the highest character—kind, open-minded, and respectful of diverse perspectives.

Over the years in our doctoral program, Rumeysa has built strong connections within multiple communities. As a core member of a close-knit social and intellectual group, she actively engages with fellow graduate students both academically and socially. Beyond the program,



Rumeysa plays a vital role in various interfaith groups on campus. Her deep ties to the Department, Tufts University, and the Somerville community underscore the necessity of her return to Massachusetts and release from detention. Given Rumeysa's character and commitment to her community, I can confidently attest that she does not pose a flight risk once reinstated in her rightful place among us.

Rumeysa Ozturk is one of the most cherished members of our Eliot-Pearson community. She is kind, curious, and genuinely invested in understanding other cultures. She has the potential to become a leader in applied developmental science. Her deportation from the United States would be a profound loss—not only to our department but to the entire Tufts community. Like many others, I am devastated by Rumeysa's detention and strongly advocate for her continued presence in this country and in our program.

I declare that the above statements are true and correct to the best of my knowledge and ability.

Sincerely,

*/s/ Calvin L. Gidney, Ph.D.*

Associate Professor

# EXHIBIT 1-F

JA-000206



**Ayse Reyyan Bilge Yildirim**

01/04/2025

**To Whom It May Concern,**

It is my great honor to write this character affidavit in support of Rümeysa Öztürk, a dear friend and former student, who is currently facing unjust detention by ICE despite being here on a valid visa and having no criminal involvement whatsoever.

I have known Rümeysa for over a decade. She was one of my top students at Istanbul Sehir University, where I taught as part of the psychology faculty. I later wrote her recommendation letters for the prestigious Fulbright Scholarship, her Master's at Columbia University, and her Ph.D. studies at Tufts University. Throughout this time, we have remained close friends and colleagues, even co-authoring a paper together on children's conceptualization of death, which was originally her undergraduate thesis.

Rümeysa is an extraordinary human being—intelligent, compassionate, dedicated, and deeply respected by all who know her. Her passion for research and education is unmatched. She excels both academically and socially, consistently impressing with her leadership, integrity, and empathy. During her undergraduate research, she led a culturally sensitive and complex study on children's understanding of death among refugee populations, coordinating a diverse team of research assistants with professionalism and kindness. The project culminated in a successful presentation at an international conference in the Netherlands and has been published.

Beyond her academic brilliance, Rümeysa is an integral member of our community. She speaks English fluently and engages meaningfully with people from all walks of life. She has worked on multiple initiatives aimed at enriching children's media literacy and development. Her warmth, inclusivity, and generosity have made her beloved by friends, colleagues, and countless members of her extended community.

Personally, Rümeysa is like family to us. My two children, now aged 12 and 16, consider her an older sister. I have met her with my family many times and always appreciated her thoughtfulness—she brings gifts, checks in regularly, and even follows up and cares how they are doing. She offered invaluable guidance to my daughter during her current college application process, helping us find resources and providing encouragement. Rümeysa is a role model for our children, and we are raising them with a strong belief in freedom, justice, and civil rights. Watching Rümeysa be treated unfairly and detained without cause has shaken those beliefs—not only for us as parents, but for our children, who are now asking if these foundational ideals of America are truly being upheld.

Since her detainment on March 26, there has been an overwhelming outpouring of love and support. I have received dozens of calls, emails, and texts from people eager to help her. Many of these individuals are also here on valid visas and are now afraid to speak out due to fear of retaliation.

JA-000207

Rümeysa's situation has sent shockwaves through a law-abiding, peaceful community. Her absence is deeply felt.

Rümeysa should return to her home in Boston, continue with her studies, have a chance to finish her Ph.D., and be allowed to stay in the United States not only because she is innocent of any wrongdoing, but because she represents the very best of what America stands for—intellect, compassion, diversity, and service. Her contributions to academia, to children's education, and to her community are irreplaceable. She is someone to be celebrated, not targeted.

**I declare that the above statements are true and correct to the best of my knowledge and ability.**

Sincerely,
Ayse Reyyan Bilge Yildirim, Ph.D.

# EXHIBIT 1-G

JA-000209

April 1, 2025

To whom it may concern,

My name is Matthew N. Gee, I am a U.S. citizen, and I am a friend of Rümeysa Öztürk. I am writing this affidavit to demonstrate Rümeysa's character to the courts. From my letter, I hope it is clear what a kind, caring, considerate, and hardworking person Rümeysa is. She is a cherished friend who has contributed so much to my life and the life of our department.

I have known Rümeysa for over five years. We are in the same PhD cohort, meaning that we started studying for our PhDs in Child Study and Human Development at the same time. Rümeysa and I met in January of 2020; she was actually the first prospective student I met during our Tufts University PhD interview day. During that day, I was a nervous wreck, but I was drawn to talk to Rümeysa because of her radiant kindness, positivity, and enthusiasm for research. She was so excited for the opportunity to study children's media and how it contributes to children's mental health. She was also genuinely curious about my research interests, and in our conversation, she affirmed that I deserved to be in that room and that my research interests were important, despite my insecurities. Talking to Rümeysa calmed my nerves, and as fate would have it, we would both be admitted to Tufts.

Since 2020, Rümeysa and I have studied and worked together in the Department of Child Study and Human Development. She is a disciplined researcher who is committed to representing children in their full humanity. Recently, Rümeysa and I have had weekly writing meetups where we would work on our theoretical qualifying papers together. She has read hundreds of articles to support her theoretical model regarding how social media may be a modality for developing adolescents' prosocial behaviors (i.e., voluntary acts of kindness, respect, and cooperation that benefit others). Rümeysa recently received a Graduate Student Research Competition Award to fund research that she plans to conduct this summer to test her theoretical model. In her proposed project, Rümeysa plans not only to survey adolescents but also interview them about their prosocial behaviors and social media use. To Rümeysa, research participants are not just numbers on a survey; they are humans full of love and potential, and she is interested in what they are thinking, feeling, dreaming, and navigating in their contexts.

Rümeysa's humanizing perspective on children in her research extends to all of us who have the honor of calling her a friend. Rümeysa is one of the kindest people I have ever met, and her kindness manifests in small and large ways. Every morning, Rümeysa greets us in the lab and asks us how we are, and when she asks, she truly wants to know how we are doing. Another small act of her kindness is that she always opens the door for others and motions them through with a smile. And yet another is that she always takes time to stop and catch up with people in the hallways. Examples of her larger acts of kindness include sending me job postings every time she becomes aware of opportunities that are related to my interests. One time, she informed me of a competitive fellowship that she was also applying for— she does not have a competitive bone in her body. In a very touching example, she asked me how my family celebrates Lunar New Year, and then she brought in culturally appropriate treats to celebrate. Rümeysa never wants to be an imposition to others, but she always goes above and beyond to help others and make sure they feel respected and valued.

Rümeysa is a beloved member of our department community. In our lab, there are four PhD students, and she is so supportive of us. She always offers to read our writing, and she has given me insightful feedback that has significantly improved my writing and thinking. She regularly brings teas and baked goods to the lab to bring us comfort during times of stress. Rümeysa cares so much about contributing to the community. She is a regular presence at community events, especially those with a service component. Most recently, she and I made blankets for children who are ill or otherwise seriously in need. We have also worked on a number of projects to bring the department community together and offer space for collective healing. In one of these projects, we secured funding, collaborated with a local youth arts organization, and facilitated the creation of a community mosaic that all members of the department had a hand in. In each of these events, Rümeysa has been so attentive to each person's needs. Her considerate nature is evident by her providing a variety of foods to meet various dietary restrictions, accommodations for folks with disabilities, and various activities for people who process their emotions in different ways. Again, her kindness and caring are truly extraordinary.

Rümeysa's friendship has enriched my life in countless ways. She is an invaluable member of our community, and her absence has been deeply felt. She is a dedicated scholar who truly cares about supporting the well-being of all children. To Rümeysa, each child (and each of us) is precious and deserving of respect and love, which she aims to provide in every single one of her actions. I declare that the above statements are all true and correct to the best of my ability.

Sincerely,

/s/ Matthew N. Gee

# EXHIBIT 1-H

JA-000212

Declaration of Elisa Guzman, dated April 2, 2025

JA-000213

To Whom It May Concern,

I, Elisa Guzman, of legal age and citizen of the United States, wholeheartedly support Rumeysa Ozturk's case to remain in this country. I have had the privilege of knowing her for two years after meeting her through friends in the Muslim Student Association (MSA) at Tufts University. From the moment we met, her kindness, warmth, and dedication to her community were evident. I can say with complete confidence that she is an individual with an exemplary character.

Rumeysa is the embodiment of inclusivity and compassion and is well loved in the community. I have seen her greet everyone with a warm welcome and her infectious smile. I distinctly remember one of my first MSA events – I knew only a few people and felt nervous. Being greeted by Rumeysa and her calm presence instantly calmed my nerves. She introduced me to others, making sure I felt included and comfortable, as she continued welcoming and saying hello to other friends. Her kindness is unmatched and not performative; it is ingrained in her character.

Beyond MSA gatherings, Rumeysa has invited me to tea parties, dinners, and graduation events for her roommate in their home. One telling moment was when I accidentally dropped my cookie at her house during one of the tea parties she was hosting, and without hesitation, she gave me hers before getting herself another. It may seem like a small instance, but it's the culmination of these microevents that truly define a person's character.

Outside of social gatherings, Rumeysa and I also attend a Fit and Strong workout class together. Her encouragement and positive spirit make even the toughest exercises enjoyable. On days I lacked motivation, knowing she would be there kept me accountable. Her soft-spoken demeanor invites you in, makes you feel safe, and combined with her welcoming smile instantly washes away any bad feelings of the day.

Rumeysa is not only a compassionate friend, but a dedicated scholar. She is currently pursuing her doctoral degree in Child Study and Human Development at Tufts University where she focuses on children's and adolescents' development in this media surrounded world, and the positive impact their use can have on society. Her research is deeply relevant in today's world and has the potential to greatly and positively impact future generations. Her academic excellence has earned her a Fulbright Scholarship, a prestigious award recognizing her intellectual contributions by supporting her studies. She has also received a fellowship from the department and the Graduate Institute for Teaching. She is incredibly humble about her recognized impact and achievements – I only learned about these through a mutual friend.

Despite coming from a different cultural background, Rumeysa has fully immersed herself in the American life. She speaks English fluently and actively engages with her community forming strong friendships across cultures. Through our friendship, I have increased my understanding and appreciation of different traditions, reinforcing the values of empathy and inclusion.

Rumeysa's presence in the U.S. is an asset to both her academic and social communities. Her dedication to fostering meaningful connections, her impactful research, and her commitment to spreading kindness makes her an invaluable part of this country. She values and fully believes in cultivating joy and protecting others, especially children. I feel blessed to have met her and be able to call her my friend. She fosters a positive environment that makes me want to be a better person, and especially a better friend.

I strongly urge the court to release Rumeysa Ozturk and return her back her community in Massachusetts. I also strongly encourage you to allow Rumeysa Ozturk to remain in the United States. Her contributions and character demonstrate the values of kindness, peace, and respect that we all should strive for. Her absence would not only leave a void in the lives of her friends and colleagues but also deprive the community of a brilliant mind dedicated to making a difference.

I declare that the above statements are true and correct to the best of my ability. If any further information is required, please do not hesitate to contact me.

Sincerely,



Recoverable Signature

X *Elisa Guzman*

Elisa Guzman

Signed by: 4e1d0f63-705c-4749-8fbc-40000295b732

Elisa Guzman

# EXHIBIT 1-I

JA-000216



SCHOOL OF ARTS AND SCIENCES

Eliot-Pearson Department of
Child Study and Human Development

April 1, 2025

Letter of Support for Ms. Rumeysa Öztürk

TO WHOM IT MAY CONCERN:

I write to provide this affidavit of support for **Ms. Rumeysa Öztürk**, a Turkish international student enrolled in our doctoral program here at Eliot-Pearson Department of Child Study and Human Development (Eliot-Pearson) at Tufts University.  I write as a citizen of the United States, having been born here.

<u>I write to advocate strenuously for a decision to allow Rumeysa to stay in the United States</u>. As my letter describes, Rumeysa is an individual, who through her interactions with others, collaborations within communities, her learning as a student, and work as a scholar has made important contributions during her time in the United States. These contributions are to the functioning of communities (notably departmental academic community and peer community) and as a developing scholar, to the literature.

I have known Rumeysa since fall, 2020, when she entered the doctoral program. I first met her during our PhD admission interview day in January 2020.  I have interacted with Rumeysa as an instructor of a course that she took, "Cultural Sensitivity in Child and Family Research/Practice," and as an informal mentor.  In the latter role, we have had numerous conversations about her research interests in children and media, personal passion for the rights and needs of children throughout the world, her sense of commitment to the Eliot-Pearson community, and her life here in the United States.  In short, I know Rumeysa well.

**Rumeysa, as a person**, is a gentle individual who carries herself with quiet passion for children and compassion for all. During her time at Eliot-Pearson, she has made an indelible mark on our community through these two qualities. I share just two examples. Two years ago, she co-led a major effort in our department to engage students at all levels, faculty and staff in the creation of a community mosaic that represented the values of our department. That mosaic hangs in our lobby for all to see as they move through our space. Just last fall, Rumeysa spearheaded another community activity dedicated to children who are caught up in traumatic situations ("Collective Grieving for Children Facing War and Conflict: A Night for Poetry and Storytelling"). When she sent me the flyer, asking me to share the news, she noted that she was co-organizing this with two other doctoral students.  However, the reality is that this was Rumeysa's idea: she approached me in spring semester, 2024, with this idea.  I could tell how pained she was about the experiences of children globally who face challenges and trauma in various ways. She was explicitly clear that she wanted to help the Eliot-Pearson community develop an activity that was for **all children,** not for certain children or children in certain parts of the world.  We discussed her initial ideas, and I offered my thoughts about how she might proceed. True to who she is, Rumeysa brought in peer collaborators, who all worked seamlessly on this project that was so deeply thoughtfully, meticulously and sensitively planned to ensure a safe space for those who attended to experiences a shared reflective, creative, and productive space that promoted healing



for all who attended. Also true to who Rumeysa is, she took no credit, instead, thanking her collaborators and others who made important contributions to the activity.

**Rumeysa, as a student,** brings not only her compassion for others, but also her strong intellectual curiosity to the learning experience.  In my class, Rumeysa carefully listened to others, asking questions that enabled her to understand others' perspectives; she did so in deeply respectful ways. As a result, others typically felt heard and seen by her, which helped them feel validated as a person. Rumeysa's academic work was very strong. She always came to class well-prepared, having done the readings, crafted questions or points that she offered in class discussions. In her written work and class discussions, she demonstrated her ability to critically think and evaluate material, often elevating the conversation and contributing to other students and my own learning.

**Rumeysa, as a scholar**, is deeply committed to developing her skills in disseminating her ideas. Rumeysa took the highly unusual step of developing the final assignment for the course I taught into a manuscript that she successfully published (Ozturk, R. 2023. Representation of refugee characters and experiences in children's animated television: missed opportunities and hopes. *Journal of Children and Media*). This article reflected her ability to translate what she learned into published recommendations for ways to improve children's media. No other student has ever taken this step in my over 30 years of teaching this class.

**Rumeysa, as a peer among graduate students**, has actively encouraged her fellow students to move along in their graduate programs, celebrating their achievement of particular milestones and honoring and encouraging them when they have self-doubts. Several of my advisees have reflected on the ways in which she touched them during their time here in Eliot-Pearson. In her role as a peer student, Rumeysa has been invaluable – quietly so – to the fabric of the graduate student community. Her absence has struck a deep void in the student community.

My last point is to provide some critically important context for understanding Rumeysa. She lives with daily prejudice and bias about her faith and her faith practices (including wearing hijab), from verbal harassment to physical harassment. She rarely talks about these experiences and her deep disappointment that she has not felt supported or understood by officials whom she contacted about some of these experiences. Can you imagine the person I have described having to navigate these realities?  It is in this context that Rumeysa engages in community spaces where she can offer and find support in the pursuit of a better world.

In sum, Rumeysa Öztürk makes everyone around her a better person; she is an essential member of the Tufts community. We need her back.  I urge that the courts return Rumeysa Öztürk to our community. I declare that the above statements are all true and correct to the best of my ability.

Sincerely,

Ellen E.  Pinderhughes PhD
Professor of Child Study and Human Development

# EXHIBIT 1-J

JA-000219

Najiba Akbar

March 30, 2025

Subject: Affidavit Letter of Support for Rumeysa Ozturk

To Whom It May Concern,

I am writing this letter in strong support of Rumeysa Ozturk. I served as the Muslim Chaplain at Tufts University from 2021-2024 and first met Rumeysa during my initial academic year. From our earliest conversations, it was clear to me that she was an engaged and thoughtful member of the Tufts community. She spoke highly of her experience as a Tufts student and expressed a deep desire to foster a greater sense of belonging amongst Muslim and international graduate students on campus. This shared vision led us to begin meeting regularly, and over the next three years, we collaborated closely, organizing a variety of gatherings—dinners, social events, and community discussions—held at the Tufts Interfaith Center. These events provided a warm, welcoming space for graduate students to connect and support one another. Rumeysa was always willing to step up to help organize the event, prepare food, or co-lead a discussion.

Rumeysa has always struck me as a deeply compassionate and conscientious individual. She listens with care, considers diverse perspectives, and approaches others with kindness and humility. She was not only an active participant in our community initiatives but also one of the first to step up in service—whether by helping to prepare meals, welcoming new students, or staying late to clean up after events. Her intelligence, maturity, and generosity made her a pillar of our graduate student community. Undergraduates at Tufts describe her as having the presence of an "older sister" who took them under her wing and offered unconditional love and support.

Beyond her contributions at Tufts, I know Rumeysa has a deep passion for children's literature and aspires to become a children's book author—driven by her belief in the power of storytelling to inspire and uplift young minds. Rumeysa is precisely the kind of student we should be welcoming and supporting in the United States. As a Fulbright scholar, she has demonstrated exceptional academic merit and has been highly regarded by her professors and peers. She deserves the opportunity to complete her education at Tufts.

I know Rumeysa was excited about being at the end of her PhD journey, after all of the hard work and long hours she has put into this endeavor. She was almost at the finish line! I respectfully ask that she be allowed to return to the state of Massachusetts to complete her PhD program in Child Study and Human Development.

I declare that the above statements are all true and correct to the best of my ability.

JA-000220

Sincerely,

/s/Najiba Akbar_____
Najiba Akbar
U.S. Citizen, Born November 5, 1981 in New York, NY

# EXHIBIT 1-K

April 1, 2025

To Whom it May Concern,

My name is Alison Campion, I am a third year PhD student at Tufts University writing this letter in support of Rumeysa Ozturk.

I have met Rumeysa several times through the Tufts graduate student community. Most memorably, I attended an interfaith Iftar event sponsored by the Muslim Students Association and Tufts Chaplaincy with her on March 12, 2024. I had gone to the event with a mutual friend and ended up spending much of the evening with Rumeysa. Rumeysa was warm, friendly, and quick to smile. She was clearly a valued member of the Muslim student community, but also made me, a Catholic who did not know many people there, feel incredibly valued and welcomed. She patiently answered my questions about Ramadan and introduced me to each new person that came over to squeeze around our table. She showed the same genuine kindness to each person that joined our group, no matter how well she knew them.

That Iftar dinner and Rumeysa's generous spirit perfectly reflected how she invests in her religious community while also extending support, respect, and kindness to the wider community. To me, Rumeysa's ability to express her own cultural and religious views while accepting, respecting, and celebrating others' is the true embodiment of American values.

Every time I have crossed paths with Rumeysa since that Iftar dinner, she has lifted my spirits with her friendly smile and kind words. I always knew her to be hard working and studious, and a good, dependable, caring friend. She is a valued member of the Tufts graduate student community and I look forward to seeing her back on campus where she very much belongs.

I can personally attest to the fact that Rumeysa has actively improved the experience of myself and other students at Tufts. I urge the courts to release Rumeysa and return her to her community at Tufts University, so she can continue to make a positive impact on her colleagues, students, teachers, and friends.

I declare that the above statements are all true and correct to the best of my ability.

Alison Campion

# EXHIBIT 1-L

JA-000224



SCHOOL OF ARTS AND SCIENCES
# Eliot-Pearson Department of Child Study and Human Development

March 31, 2025

To Whom it May Concern,

I am writing a letter of emphatic support for Rumeysa Öztürk to implore that she be released, returned to her community, and allowed to stay in the United States through the completion of her doctoral program at Tufts University. I am a Professor of Child Study and Human Development, Faculty Affairs Coordinator, and Director of the Ensuring eXperiences for Children's Early Learning Success (ExCELS) lab at Tufts University. I currently serve as Rumeysa's second advisor in the doctoral program and have been meeting with her formally once or twice each semester over the last couple of years to support her work. Rumeysa's research area of interest centers on children's and adolescents' positive development in a media-embedded, digitally connected global world. Her dissertation will investigate how adolescents and young adults use social media in prosocial ways. This theme of positive youth development is entirely consistent with Rumeysa's character and aligns with her personal values of care, hope, and compassion.

Since the beginning of her time in the Eliot-Pearson Department of Child Study and Human Development, Rumeysa has stood out for these qualities and has contributed greatly to the heart and soul of our department. Based on conversations with her about her work in the DICE lab, she's that wonderful combination of an independent scholar and collaborative team player! In our meetings together to discuss progress in her work, she has demonstrated a strong work ethic, great attention to detail, always asks astute questions, and immediately adjusts based on the feedback she receives. She is a strong writer and takes the initiative to learn what she needs to learn to make progress toward her goals. I have witnessed her professional growth and the increasing sophistication of the questions she is asking, especially regarding the best ways to support positive youth development through social media. Rumeysa shows her eagerness to learn by taking the initiative to find opportunities to develop professionally and intellectually, whether it be through attending and presenting at professional conferences or serving as a teaching assistant or mentor to other students in the department. She has also shown the highest level of professionalism by always maintaining clear communication and connection with her advisors and peers. Rumeysa will be an invaluable contributor to any research team or in any field setting in the future and will be a critical leader in any context she chooses for her next professional home.

Rumeysa's pleasant and collaborative demeanor, professional work ethic, intellectual curiosity, and thoughtful interactions with faculty and students all make her an important member of our department and a role model for the other graduate and undergraduate students. She is, quite simply, one of the most earnest and compassionate students I've ever known in my 22 years as a professor. Rumeysa, as you've no doubt learned from others, is a deeply valued member of other Tufts communities as well, including those formed through the Tufts University Chaplaincy. As a recent article states, "Her leadership as a graduate student with different life experiences and practical wisdom has been a profound gift for the undergraduate students on the Medford campus–for both Muslim students and students from other religious and philosophical traditions." Rumeysa is one of the most caring, humble, and inclusive people I know. We all

JA-000225



SCHOOL OF ARTS AND SCIENCES

# Eliot-Pearson Department of
# Child Study and Human Development

miss her so much, and just want her returned to our Tufts community, so that we can embrace her again and benefit from her sweet, sweet spirit.

Rumeysa's professional and interpersonal skills, intellectual curiosity, writing and analytic capabilities, and commitment to creating communities of care make her an essential member of our department and the larger Tufts community. Though I have known her only a short while, Rumeysa's professional dedication and intellectual ability can be seen in every course, leadership, and research task she is given. But, perhaps above all, her contribution to the soul of our community is what we miss most. I sincerely hope that those reading this letter will give her case the most positive consideration and release and return her to us as soon as possible. She is mere months from completing her PhD program and will honor that privilege by putting the best developmental science, guided by her commitments to inclusion and equity, out into the world. Please let me know if I can provide any additional information in support of Rumeysa Öztürk. I declare that the above statements are all true and correct to the best of my ability.


Sincerely,

Christine McWayne, Ph.D.
Professor

# EXHIBIT 1-M

JA-000227



**SCHOOL OF ARTS AND SCIENCES**

Eliot-Pearson Department of Child Study and Human Development

March 30, 2025

To Whom It May Concern:

Rumeysa Ozturk was a student in two of my classes, and she was the teaching assistant for three courses I taught. In the Fall of 2020 she took my graduate seminar (CSHD 267) in which she received an A. She audited my Creating Children's Media class in the spring of 2021 but attended every single class and did every single assignment although she did not take the course for credit – she was simply interested in furthering her knowledge and experience in the area of children's media.

In the fall of 2022, Rumeysa was the TA for CSHD 167, Children and Mass Media. In the spring of 2023, she was the TA for both CHD 169, Creating Children's Media, and CSHD 113, Media Literacy. In each instance Rumeysa went above and beyond anything I asked of her. She was always willing to set up separate office hours and meet with students individually outside of class to clarify any questions, help them frame assignments, or just to chat. In each of these classes, I turned part of one session over to Rumeysa to teach. She was always well-prepared and engaging. And memorable. Just yesterday I heard from a student from Creating Children's Media from 2023, who stated that Rumeysa's work about low income and refugee children in media had inspired her own senior honors thesis that she is now completing.

When Rumeysa took my graduate seminar, we were in the height of Covid and the entire semester was online. This class met once a week. There was one day early in the semester that was Rosh Hashanah, the Jewish New Year. I explained to the class that we would not meet that day since I would be celebrating with my family. Rumeysa, always curious about others and sincerely interested in learning about different faith traditions, asked me what I would be doing to celebrate. And when I explained that part of my family tradition was to bake my grandmother's honey cake, Rumeysa immediately asked for the recipe.

Rumeysa is someone who always prefaces her queries with the phrase, "May I kindly ask that…" To me, this is the essence of who she is: someone who never wishes to impose herself on others, someone who is extremely considerate, someone who cares about engaging with and learning about the world.

When my father passed away last winter, the first person I heard from was Rumeysa. This was no surprise. She is, and has always been, someone who cares deeply about those around her. Her peers and her professors know Rumeysa to be a thoughtful and compassionate person, someone who has made a difference in our lives, someone who cares profoundly about children and families. I have greatly valued having her kind, competent and interculturally aware presence as a student and as a teaching assistant. She is an integral part of the fabric that is our community in the Eliot-Pearson Department of Child Development.

Sincerely,

*Julie Dobrow*

Dr. Julie Dobrow
Distinguished Senior Lecturer

I declare that the above statements are all true and correct to the best of my knowledge and
ability.

# EXHIBIT 1-N

JA-000230



**SCHOOL OF ARTS AND SCIENCES**

Eliot-Pearson Department of Child Study and
Human Development

March 30th, 2025

To Whom It May Concern

     I have known Rumeysa since started her PhD program in Applied Child Development in our department. At that time, I knew her as a member of our student community. In Spring 2021, Rumeysa took my course on "Qualitative Research Methods" and I got to know her well, both as a person and as a student. I observed her intelligence, her deep interest in learning, her commitment to conducting well-designed research, and her dedication to serving children and families. As part of the requirements of this course, Rumeysa completed a small pilot research project that involved analyzing stories written by young adults as they recalled significant events in their childhood. I remember being most impressed with Rumeysa's attention to detail and her sensitivity to the diverse backgrounds of the young adults. She is a very thoughtful and introspective person, who pays careful attention to all individuals with whom she interacts.

     Rumeysa spends much of her time in the department, working in Professor Sara Johnson's lab, which is near the main corridor of our department building. I see and interact with Rumeysa regularly, as she has a kind and pleasant demeanor and always greets everyone with a smile on her face. She is very respectful, warm, and friendly. She is also a very active member of our department community. She has served on student committees, has volunteered and helped out with event planning and engages in all department gatherings and events.

     Rumeysa has also served as a Teaching Assistant for several courses, and many of my undergraduate advisees mention that she is always willing to go out of her way to answer their questions and provide supportive and encouraging assistance. Last year, Rumeysa was an active member of a group of students who created a mosaic with an artist from the community that represents the all-encompassing spirit of community and unity that we value very deeply in our department. Rumeysa is known, not only in our department, but also within the larger Tufts community, through her involvement with graduate students in other departments, with members of the Chaplaincy at Tufts, and in community organizations in the neighboring areas. Our department and university community are eager to have Rumeysa back in Somerville, back on campus, and in our department. She is an integral and active member of our community.

I declare that the above statements are all true and correct to the best of my knowledge.

Sincerely,

*Jayanthi Mistry*

Jayanthi Mistry, Ph.D.
Professor of Child Study & Human Development

# EXHIBIT 1-O

JA-000232



SCHOOL OF ARTS AND SCIENCES
# Eliot-Pearson Department of
# Child Study and Human Development

April 1, 2025

**To Whom it May Concern:**

I am a U.S. citizen and member of the faculty teaching in the Eliot-Pearson Department of Child Development at Tufts University. This letter is a letter of support for Rumeysa Ozturk, written with the hope that she will be returned very soon to continue her good work in our department and be the kind and caring person we all know and admire.

I first met Rumeysa four years ago when she joined a group of students and myself to put together an anti-racism poetry festival – an event that had students and faculty performing their poetry.  In the many meetings preparing for this event, I was struck by Rumeysa's gentle and kind nature.  It was immediately obvious that she cared about anyone's suffering and wished to do what she could to reduce that suffering – in soft and kind ways.

More recently, I joined a group that Rumeysa and other students hosted to express support for children suffering from war.  We gathered to share in different ways (through music, poetry, weaving, and more) – all expressions of how children have been suffering because of war.  Again, this was no loud and aggressive protest. Rather, it was a way the group could feel together and be empowered to do what we can to lessen the impact of war on children. In many ways, the gathering and ways of expressing encapsulated Rumeysa's ways of showing care.

Finally, though I don't work closely with Rumeysa, every time we pass in the hallway or converse at a community event, I am struck once again by her kind and gentle nature. She is the real deal when it comes to caring for others. We should all be more like Rumeysa.

I hope these comments contribute to the collective picture of Rumeysa as a person who deserves to not only remain in the U.S. and to return to campus to work on her Ph.D surrounded by the support of the Tuft's community, but also deserves our admiration for her kind and caring nature and her devotion to lessening the pain and suffering of others, especially children.

**I declare that the above statements are all true and correct to the best of my knowledge and ability.**

Sincerely,

W. George Scarlett, Ph.D.

Distinguished Senior Lecturer and Tisch Sr.Fellow

Eliot-Pearson Department of Child Study and Human Development

105 College Avenue, Medford, MA 02155  |  TEL: 617.627.3355  |  FAX: 617.627.3503  |  http://ase.tufts.edu/epcshd

JA-000233

# EXHIBIT 1-P

JA-000234

Tuesday, April 1 2025

My name is Sam Alterman. I am a PhD student in Physics at Tufts University. I've known Rümeysa Öztürk for about two years, both in my capacity as a steward of the Tufts University Graduate Worker's Union and as a personal friend. Rümeysa is a gentle, intelligent, caring person and a valued member of our community. I believe very firmly she should be allowed to remain in the United States.

I first met Rümeysa in Summer 2023 when our graduate student union was trying to talk to graduate students in the Child Studies and Human Development department to better understand their working conditions.  The first time I walked into the Child Studies and Human Development offices, it was immediately clear how central Rümeysa was and is to the culture of that department. She warmly greets everyone by name every morning, and always makes time to genuinely listen to her coworkers talking about their day. I continue to be struck by the depth and sincerity of her relationships with her coworkers.  Rümeysa's involvement in our union has been vital, making connections with her coworkers and giving them space to advocate for their needs. After running into each other at several interfaith events,  where she always brings her deep respect for and curiosity about other spiritual and religious traditions, I became lucky enough to call Rümeysa a friend.

I strongly believe that Rümeysa Öztürk should be allowed to remain in the United States. Rümeysa is one of the kindest, gentlest, and most compassionate people I have ever had the pleasure to meet. Her passion for teaching and natural curiosity has made her well-known at Tufts as an excellent Teaching Assistant whose courses are highly sought by students. Within the graduate student community, Rümeysa is always a quiet but persistent voice for kindness, mutual understanding, and care. Our community is not whole without her here.  I urgently request that the Court allow Rümeysa to be returned to Massachusetts and released on bail so she can be with the community that cares for her and finish her doctoral studies.

I declare that the above statements are all true and correct to the best of my ability.

# EXHIBIT 1-Q

JA-000236

March 31st, 2025

To whom it may concern,

I am writing to you to describe the gentle and caring nature of Rumeysa Ozturk and to ask that she be allowed to stay in Somerville, Massachusetts.

I met Rumeysa in February 2022 when I was interviewing for my doctoral program at Tufts. The interviews that year were held on zoom and Rumeysa had the difficult job of facilitating a room full of nervous applicants, which she did with grace. Within her first few sentences on that zoom call, I was soothed by her kind greetings and smiles, then immediately impressed with her scholarship and passion for research on children's media. Even before meeting her in person, I felt Rumeysa warmth. In the three years I have been privileged to know her since, she has continued to amaze me with her integrity, care, and love for her family.

When I had to take some time off from school to care for my mom, Rumeysa was checking in on me and reminding me of how much I was missed in our lab. For each of our lab members' birthdays, she stayed up late baking a treat that reminded her of us. When I was new to Tufts, she went out of her way to have lunch and coffee with me. These are just a few of the instances that demonstrate Rumeysa's commitment to her friends and peers.

Rumeysa cares deeply about helping children. We bonded over how much we love the children's show Bluey, a show featuring a family of Australian shepherds, particularly because of the way it can help kids process big emotions such as grief or as small as cleaning up toys. Whenever Rumeysa and I talked about Bluey, her face lit up with positivity and radiance. We would giggle at the events of the newest episodes and talk about our favorite moments.

Last year, Rumeysa cared so deeply for children affected by wars all over the world, so she organized a community art night at the interfaith center at Tufts. Prior to the event, Rumeysa spent hours organizing the event, crafting a budget for a community quilt to process grief, and went from store to store to find necessary supplies. Rumeysa's organizing helped Tufts students and faculty members come together to grieve children affected by wars through poem reading, song singing, and art making. I will carry that memory of mutual care in my heart as I continue to channel Rumeysa's deep commitment to morality through both my scholarship and personal life.

To know Rumeysa is to love Rumeysa. Rumeysa is a valuable member of the community, scholar, and, most importantly, friend. I urge you to allow her to stay in the Somerville community.

Warm regards,
SooYun Byeon

JA-000237

# EXHIBIT 1-R

JA-000238

Garcia

April 2, 2025

I met Rumeysa three years ago when we were paired as co-teaching assistants during the first semester of my PhD program at Tufts. She was very kind to me even though I was visibly nervous about starting grad school after taking several years away from academia. Rumeysa always asked for my input on our projects and made sure I felt included. During that first semester, we took an autumnal walk around Cambridge, treating ourselves to cookies from the local bakery. Our new friendship helped me to adjust to my life here at Tufts and as a grad student. Rumeysa's warm presence makes her the type of person you want around when you feel nervous or alone.

During our time as co-teaching assistants, Rumeysa's schedule allowed her to be in the class more than me, and as a result, students often felt more comfortable emailing her over me. I noticed Rumeysa always worked diligently to keep up with their questions and requests. Her hard work and attention to our students was an amazing model for me as a new PhD student.

Last year, Rumeysa and I attended the Graduate Student Council awards in support our friend and PhD colleague Matt, who was receiving an award that year. Rumeysa always advocates to make sure everyone is recognized for their accomplishments, big and small. Her positivity has a powerful impact on our department, shining through her kindness to all and her resounding encouragement, and celebration of everyone's achievements.

During a weekend-long writing retreat organized by the PhD students, Rumeysa helped with every chore - from getting set up, to cooking, to cleaning up. She was always asking how she could be of service, and ensured we were respectful of the cleaning rules

Garcia

when we were putting everything away. In the years I have known Rumeysa, I have noticed

that she is consistently thoughtful and mindful, always taking care not to disrupt the

spaces she is in or disturb the people she is with. Her thoughtfulness extends beyond

those in her immediate proximity - she always asks after my pets and loved ones.

During the writing retreat, we unexpectedly lost power and because we were in

relatively isolated cabin, some of the students felt freaked out about the unfamiliar

circumstances. We found candles and gathered around the dining room table together.

Rumeysa led us through positive affirmations for PhD students, speaking aloud intentions

such as, "I know what it takes to successfully complete scholarly work" and "It is okay to

make mistakes because I always learn from them." After she spoke each affirmation, we all

repeated it back to her. Through her guidance, she transformed the space from something

uncertain and scary into a supportive and safe environment.

Rumeysa loves animals. Unaware that she had such a bad allergy to cats, I invited

her over to meet my new kitten, and she came over gladly. When she started to have

allergic reactions after playing with the kitten, she did not complain. Instead, I heard her in

the bathroom splashing water on her face to soothe her allergy-induced irritated eyes. It

was clear that she wanted to keep the visit fun and not ruin the mood with her allergic

reaction. I insisted that we leave the kitten alone and hang out outside, even though she

said she was enjoying herself. Rumeysa is a team player, and not a complainer, even when

it comes to enjoying the company of furry creatures she is allergic to.

Rumeysa has the biggest heart of anyone I know. The last text she sent me was a

book recommendation for a children's book called "Just What To Do", described as a tender

Garcia

children's book on processing grief, which I've read to process my own sense of loss in her

absence. She has always been interested in helping others, but especially children,

process big emotions - it's a topic we have discussed extensively, touching on subjects

such as gentle parenting and positive youth development.

Rumeysa and I recently got dinner together and talked about the struggles of

maintaining our health while trying to stay on top of multiple deadlines in a PhD program. I

bought her a special collagen smoothie because we were joking about wanting to reduce

our stress and maintain youthful skin. She told me that she would be happy to join me for a

gym date in the future, but we never got around to it.

I am asking the court to please return Rumeysa to her home in Massachusetts. She

is a dear friend, and has shown me support with her encouragement and gentle positivity.

She has a strong community here, and many, many people who miss her.

I declare that all the above statements are all true and correct to the best of my

ability.


/s/ Lucinda Garcia

Lucinda Garcia

US Citizen

# EXHIBIT 1-S

JA-000242

April 1, 2025

To whom it may concern,

I first met Rumeysa Ozturk during my freshman year at Tufts University at a Muslim Student Association (MSA) event. We were introduced by my friend, who was Rumeysa's roommate at the time. Now a junior at Tufts, I've had the privilege of knowing Rumeysa for the past three years.

In that time, I've come to know Rumeysa as one of the most compassionate, gentle, and caring individuals. Our former Muslim chaplain, Najiba Akbar, once described Rumeysa as having an "angelic presence" in our community, and I couldn't agree more. I would regularly see Rumeysa at MSA events—whether it was Friday prayers, iftars, or casual gatherings. Without fail, every time I saw her, she would greet me warmly with a hug, ask about my family, and genuinely check in on how I was doing in class. Her deep, authentic curiosity about others was extended to so many members of our community.

What stood out most was Rumeysa's unwavering kindness and desire to serve others. Despite not holding a leadership role in the MSA, she consistently volunteered to help—often serving food at our crowded iftars even though she was fasting all day herself. Her actions reflect a selfless heart and a desire to uplift others before thinking of her own needs. Her selfnesses along with her warmth made Rumeysa a pillar in our community and source of comfort for many.

Rumeysa is also an exceptionally bright and accomplished young woman. She earned a master's degree in Developmental and Child Psychology from Columbia University and is currently pursuing a PhD in Child Studies and Human Development at Tufts—two highly prestigious programs that speak to her academic excellence. Achieving this as an international student and non-native English speaker is a testament to Rumeysa's dedication, intelligence, and perseverance. Additionally, Rumeysa is a Fulbright Scholar and illustrator of the children's book *The Tale of Ibrahim Ibn Adham*, written by her friend and fellow graduate student at Columbia.

Rumeysa is not your average woman. She is talented, driven, and deeply filled with compassion. Her energy has touched many of us in the MSA and wider Tufts community. Since her absence, many of us who have known her personally have felt a deep void. It has been difficult to continue with our daily lives while our thoughts and hearts are with our dear Rumeysa.

I urge you to consider the profound positive impact Rumeysa has had on those around her, and how devastating her absence has been to our community. Rumeysa does not deserve to be detained—she deserves to be here, where she has built a home and a community that values and needs her.  She is not only a friend but a source of light, strength, and inspiration to many. I strongly urge you to allow her to remain in the United States so she can continue her studies and contribute positively to the lives of those around her, as she has always done.

*I declare the above statements are true and correct to the best of my ability.*

Sincerely,
Rola Kazaer
/s/ Rola Kazaer

JA-000243

# EXHIBIT 1-T

JA-000244

Assistant Professor of Computer Science,
Tufts University

To whom it may concern,

My name is Saeed Mehraban, and I am an Assistant Professor of Computer Science at
Tufts University. I have known Rümeysa Öztürk since March 2023 through the Muslim
Student Association (MSA) community Iftar. When she learned I am a faculty at the
university, she respectfully approached me to invite me to participate in a special Iftar
for graduate students she and her friends were participating. This made me feel
specially welcomed. From our very first interaction, I found her to be kind, humble, and
full of positive energy and respect. Since then, I have seen her frequently at Islamic
events at Tufts University or around
campus.

I cannot emphasize enough her caring and admirable character. Every time I have seen
her, she has approached others with a warm smile and genuine kindness. She is a great
listener who makes people feel understood and always ensures that those around her
are doing well. At the Iftar events, she consistently helped with setting up, serving food,
and cleaning afterward. Rümeysa communicates clearly in English and easily connects
with others. I know she deeply values her education and was hoping to complete her
PhD soon and take the next step in her life journey.

Her strong and compassionate presence has helped bring our community together.
Everyone I know is deeply saddened by what has happened, and we all miss her dearly.
Our community is not the same without her. I sincerely hope she can return to our
community, finish her degree, and flourish in every step she takes afterward. I declare
that the above statements are true and correct to the best of my knowledge and ability.

Sincerely

/s/ Saeed Mehraban
April 1, 2025

JA-000245

# EXHIBIT 1-U

JA-000246



**SCHOOL OF ARTS AND SCIENCES**

_____
Eliot-Pearson Department of
Child Study and Human Development

March 30, 2025

To Whom It May Concern:

My name is Tama Leventhal, and I am Professor and Chair of the Eliot-Pearson Department of Child Study and Human Development. I am writing this highest letter of support for Rumeysa Öztürk.  I have been most fortunate to know Rumeysa since September 2020, when she enrolled in our doctoral program.  I was the Director of Graduate Studies at that time. Since then, I have served on committees with Rumeysa, attended events she organized, and interacted with her informally on numerous occasions. Most recently, I was asked to be on her upcoming doctoral committee.  Thus, I have had extensive opportunities to interact with Rumeysa and can attest with the utmost confidence that she is someone of the **absolute highest** character.

All first- and second-year doctoral students are required to take the Doctoral Proseminar, which I taught the year Rumeysa entered our doctoral program.  That year there were ten students in the course, providing ample opportunity to observe her.  From the start, Rumeysa stood out as a curious and motivated student as well as a true community-builder despite her soft-spoken manner.  She was highly regarded by her peers and faculty alike who joined the seminar on a regular basis.  It was here that I learned about her interest in children and media and the work she hoped to accomplish over the course of her doctoral studies.

Consistent with the role she played in the Doctoral Proseminar, Rumeysa became a leader in our department's student-led Belonging Committee—a committee intended to create an inclusive community where **all members** feel valued.  Through this committee, she organized many events designed to do just that.  Two examples standout.  Before describing these events, I will note that as Department Chair, we depend on our graduate students to play an active role in our community by organizing events, serving on committees, assisting with admissions recruitment, etc.  It is only a handful of students, however, who typically take the lead in assuming these roles.  Accordingly, Rumeysa is one of these students upon whom our department has come to depend.

The first event is the _Beautiful Stuff_ project held during the Spring of 2023.  Rumeysa played a key role in the development and creation of a mosaic representing the values of the department, including a more equitable, inclusive, and just department. That mosaic, so-created by many members of our community (e.g., undergraduate and graduate students, faculty, staff, and children from the Eliot-Pearson Children's School), now holds a prominent place in our building for all visitors to see.  It is a testament to the values she brings to our community.

JA-000247

The second event this past Fall was entitled, *Collective Grieving for Children Facing War and Conflict*, and entailed poetry and quilting. Very tellingly, it was held at the Interfaith Center and was intended to address concerns for children in conflict globally. Here was how Rumeysa expressed her gratitude to the participants, "I am grateful for everyone who gathered to listen and offer pieces of grief and love for the children. Your presence, songs, poems, words, art, and time means a lot. It is heavy sadness that we held this event due to the loss and impact on so many children and families (since our program started, especially last year and this year). I appreciate that we could all dedicate at least a few hours to remembering those children often overlook. I value the compassionate space we offered each other, a rare opportunity for the genuine connections we sometimes miss in academic settings." Rumeysa's remarks capture her own compassion for children, generosity of spirit, and commitment to justice through the arts in this case.

Rumeysa's active role as a leader and community-builder meant she volunteered to serve on other committees as well. In Fall of 2022, she was the student representative on a faculty search committee. I had the pleasure of being on her interview team. Rumeysa acted with the highest professionalism and demonstrated respect and kindness for the numerous candidates we interviewed. It was an absolute joy to work with her, and we established a closer relationship afterwards. Rumeysa and I often talked about cooking, travels, exercise, etc. It was hard to pass her in the hallways without exchanging a few pleasantries. The department is not the same without Rumeysa's steady presence. As someone so devoted to creating a sense of belonging, Rumeysa belongs back in Massachusetts and here at Tufts to rejoin our Eliot-Pearson community, where she is a most valued member.

One incident that I recall most poignantly is when I sought advice from her about an upcoming family vacation to Turkey in Summer 2024. Rumeysa was full of advice and offered to host me, but unfortunately our schedules did not align. When we returned in the fall, she told me my trip had inspired her to go to Cappadocia, a part of her country to which she had never been. Unlike me, she was too afraid to go up in a hot air ballon, which is a common activity there, because she was too scared. I think of that now and it only reinforces my concern for her welfare.

In terms of her scholarship, Rumeysa received the prestigious Evan's Literacy Fellowship to support her research on children and media. This award is given to an outstanding doctoral student in the department. For this reason, I was thrilled when her advisor asked me on Monday, March 24th—the day before she was detained—if I would serve on her doctoral committee. It is a role I gladly accepted. I welcome the opportunity to interact with Rumeysa in this new capacity and to support her academic journey.

To that end, I want to highlight that Rumeysa's dissertation on social media and positive youth development will cover an understudied and critically important to the field of developmental science specifically and to public discourse around the role of social media in the lives of children and youth more generally given widespread attention to this topic. Completing her dissertation is the final step in Rumeysa's doctoral studies, and she is extremely close to this major milestone after years of intensive work. It is essential for her professional development that she return to Tufts to complete her dissertation within the next year as planned.

Although I have not worked directly with Rumeysa in her role as a Teaching Assistant. She has made a valuable contribution to the education of undergraduates at Tufts. She even taught her own course on children and media for a pre-college program. As is clear, her contributions to our department are innumerable.

In conclusion, Rumeysa is a deeply valued member of our community and truly a remarkable person. I have tried to express her strong character, defined by her role as a uniter and community builder with a kind and gentle manner. Please do not hesitate to reach out to me for any additional information I can provide.

I declare that the above statements are true and correct to the best of my knowledge and ability.

Cordially,

*Tama Leventha*

Tama Leventhal, Ph.D.
Professor & Chair

# EXHIBIT 1-V

JA-000250

## DECLARATION OF TUFTS UNIVERSITY

Tufts University (an entity legally known as "The Trustees of Tufts College" and henceforth referred to as "Tufts University", the "University" or "Tufts"), declares as follows:

1.      On Tuesday, March 25, 2025, the University learned that Rümeysa Öztürk, a Tufts doctoral student from Turkey, was taken into custody by the Department of Homeland Security as she was leaving her off-campus apartment in Somerville, Massachusetts. The University understands that she was leaving her home that evening for an Iftar dinner hosted at the Tufts Interfaith Center where she would break her Ramadan fast for the day.

2.      At around 6:30 p.m. that evening, the Tufts University Police Department received courtesy notification from the Somerville Police Department that an individual had been detained by federal authorities and that the person in custody might be a Tufts student. We confirmed through our records that the person in question was Rümeysa Öztürk.

3.      At 7:32 p.m., Ms. Öztürk's record in the Student and Exchange Visitor Information System (SEVIS) was updated to note that her visa was terminated. Prior to that, and at the time of her detention, Ms. Öztürk was in "good immigration standing" according to her record in SEVIS, and both Ms. Öztürk and Tufts had followed the governing regulations for students on visas. The University then received a notice, dated March 25, 2025 and received via email on March 26, 2025 at 10:31 a.m., stating that Ms. Öztürk's SEVIS designation was terminated under the Immigration and Naturalization Act (INA) section 237(a)(1)(C)(i) (which relates to failure to maintain valid nonimmigrant status) and/or INA section 237(a)(4)(C)(i) (which addresses noncitizens "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States").

1

4.      With her consent, the University can confirm that Ms. Öztürk is a third-year doctoral student in good academic and administrative standing. Her research focuses on how young adults can use social media in positive, prosocial ways and she is described by her faculty as a hard-working student dedicated to her studies and the Tufts community. The University has no information to support the allegations that she was engaged in activities at Tufts that warrant her arrest and detention. The University has seen an outpouring of support for Ms. Öztürk over the last week from Tufts students, faculty and staff. These individuals have described Ms. Öztürk as a valued member of the community, dedicated to her academic pursuits and committed to her colleagues.

5.      The University can confirm that Ms. Öztürk was one of several authors of an opinion piece in the student newspaper, *The Tufts Daily*, published on March 26, 2024, entitled: "Try again, President Kumar: Renewing Calls for Tufts to Adopt March 4 TCU Senate resolutions." The University declares that this opinion piece was not in violation of any Tufts policies. Further, no complaints were filed with the University or, to our knowledge, outside of the University about this op-ed. The University maintains that the op-ed was consistent with speech permitted by the Declaration on Freedom of Expression adopted by our trustees on November 7, 2009. (Attached hereto as <u>Exhibit A</u>.) For the record, a search of the Tufts Daily will reveal op-eds on multiple sides of the issue with opinions that were shared just as strongly as the op-ed Ms. Öztürk co-authored. The University has no further information suggesting that she has acted in a manner that would constitute a violation of the University's understanding of the Immigration and Naturalization Act.

6.      Our international students, faculty, and staff are vital to deliver on the education, teaching, research, and public service mission of Tufts University. The University sponsors 1,818

JA-000252

continuing international students on F-1 visas, alongside 569 alumni who are pursuing post-completion work authorization in the United States, and 24 degree and non-degree students on J-1 visas. This is in addition to the broader community of students, faculty, and staff that hold various immigrant and non-immigrant statuses.

7.     The free movement of our international community members is therefore essential to the functioning of the University and serving our mission. The University has heard from students, faculty and staff who are forgoing opportunities to speak at international conferences and avoiding or postponing international travel. In the worst cases, many report being fearful of leaving their homes, even to attend and teach classes on campus.

8.     The University declares that many of these students will go on to make significant economic and intellectual contributions to the United States and in countries around the world. They will do so by working in or building new companies, through teaching and research in universities and other academic and healthcare institutions, and through public service in the United States and across the globe. The University is confident in its declaration because thousands of Tufts University alumni have received their education while on F-1 visas and have gone on to make a positive impact to the economic prosperity and intellectual success of the United States and other countries.

9.     The undersigned submits this declaration, on behalf of Tufts University, in support of Ms. Öztürk and asks that she receive the due process rights to which she is entitled. Based on everything we know and have shared here, the University seeks relief so that Ms. Öztürk is released without delay so that she can return to complete her studies and finish her degree at Tufts University.

JA-000253

On behalf of the University, the undersigned declares under the penalty of perjury that the foregoing is true and correct.

Executed on April 1, 2025, at Tufts University.

_____
SUNIL KUMAR
PRESIDENT, TUFTS UNIVERSITY

JA-000254

# EXHIBIT A

JA-000255

## DECLARATION ON FREEDOM OF EXPRESSION AT TUFTS UNIVERSITY

Tufts University is an educational community that has as its paramount mission the discovery and dissemination of knowledge and the pursuit of the arts through study, teaching, and research. For this community to achieve its mission, all members must have full and equal opportunity to pursue personal and intellectual growth.

Freedom of expression and inquiry are fundamental to the academic enterprise. Without freedom of expression, community members cannot fully share their knowledge or test ideas on the anvil of open debate and criticism. Without freedom of inquiry, community members cannot search for new knowledge or challenge conventional wisdom.

Freedom of expression and inquiry are not absolute. The law, for example, provides that freedom of expression does not include the right to slander the reputation of another, to engage in specified forms of harassment, to threaten or obstruct a speaker who advances unwelcome ideas, or to incite another person to violence. Scholarly inquiry also is limited by federal and state regulation, ethical tenets, and professional standards designed to protect human and animal subjects. In addition, the University seeks to ensure the orderly function of the educational enterprise and to ensure that all members of the community have the opportunity to participate in and benefit from the discovery and dissemination of knowledge.

Members of the Tufts community owe one another the basic respect and ethical obligations of human beings engaged in a common endeavor. While not enjoying the force of law, these obligations reflect three basic community values: 1) respect for the freedom of other community members to inquire and express themselves fully; 2) the need to exercise freedom of expression and inquiry in ways that respect the human dignity of others; and 3) the importance of a climate at Tufts that is conducive to learning and in which all community members, regardless of background, are free from behavior that interferes with their ability to study, grow, and attain their full potential.

Members of the university community, including academic and administrative leaders, must hold accountable those who do not respect these values.

When community values are not respected, every member of the Tufts community has an obligation to respond. Those who are the target of such speech should not and must not bear the burden of responding alone. An affront against any member of our community is an affront to all of us. It is only by affirming our collective values that we can build a stronger, more cohesive, and more vibrant community where differences are respected and all are made to feel welcome.

It is incumbent upon all members of the Tufts community, and especially the University leadership, to educate the community about the diverse world in which we live and to support and empower members whose rights are violated. In the end, freedom of expression and inquiry is necessary but not sufficient on its own for learning to take place. Achieving our educational mission requires an environment of respect, tolerance, and civil dialogue.

Approved by the Board of Trustees, November 7, 2009

JA-000256

# EXHIBIT 2

JA-000257

**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

**RÜMEYSA ÖZTÜRK,**
*Petitioner*,

v.                                             No. 2:25-cv-00374

**DONALD J. TRUMP,** et al.,
*Respondents.*

**Declaration of Stefanie Fisher-Pinkert, Esq.**

I, Stefanie Fisher-Pinkert, declare the following under pain and penalty of perjury:

1.      I am an attorney licensed to practice law in the Commonwealth of Massachusetts. I am also admitted to the Federal District Court for the District of Massachusetts, the Federal District Court for the District of Nebraska, and the First Circuit Court of Appeals.

2.      Since obtaining my license in November of 2009, I have specialized in immigration law, and specifically in removal defense. I have been a member of the American Immigration Lawyers Association ("AILA") since January of 2010. As a member of AILA, I have served in various volunteer positions, including as a member of the Federal Litigation Committee, as a liaison to the Office of Chief Counsel of U.S. Immigration and Customs Enforcement ("ICE"), and as a a liaison to U.S. Customs and Border Protection. I am currently Counsel in the law firm Araujo & Fisher.

3.      Throughout my legal career, I have represented detained individuals in New England facing removal/deportation proceedings or otherwise slated for

JA-000258

removal/deportation. The statements in this declaration are based on my personal knowledge accumulated during my years of immigration practice.

4. My coworkers and I have represented women in civil immigration detention, including women detained at the Strafford County facility in Dover, NH, and ICE's Buffalo facility in Batavia, NY.

5. In my experience, ICE regularly detains women at their faciliaties in New England, including the Strafford County facility in New Hampshire, at the Wyatt Detention facility in Rhode Island, and at the Cumberland County facility in Maine. In my experience, female detainees from New England who are sent outside of New England have most commonly been sent to the detention facility in Batavia, NY.

6. In my experience, ICE Enforcement and Removal Operations regularly processes individuals they detain in eastern Massachusetts at their Boston Field Office, located in Burlington, Massachusetts. In my experience, it has been common for family members of a detainee to receive a phone call from the detainee (or possibly from an ICE officer who is with the detainee) while their family member is still in Burlington, Massachusetts. In these phone calls, the family member might learn, for example, that the detainee is in Burlington, Massachusetts and is being taken to be held in Plymouth (or another area facility). I am aware that these phone calls from the Boston Field Office in Burlington occur because I have been contacted by family members who have just received news that their loved one is in ICE custody and is in Burlington, Massachusetts.

7. In my experience, people arrested by ICE's Homeland Security and Investigations ("HSI") are regularly booked and processed at HSI's offices in Boston, Massachusetts.

JA-000259

8.      I have reviewed the Declaration of David T. Wesling.  In my 16 years of practice, I have not seen or even heard of an ICE detainee arrested in Massachusetts being booked and repeatedly moved in the manner described in that declaration.  I have never seen or even heard of an ICE detainee arrested in Massachusetts being moved to Methuen, Massachusetts, then Lebanon, New Hampshire, then St. Albans, Vermont, within a matter of hours.  I have never heard of any ICE facility or office in Methuen, Massachusetts at all, and have never heard of someone detained by ICE being taken there. I am also unaware of any ICE facility in Lebanon, New Hampshire, and have never heard of an ICE detainee from Massachusetts being taken there. Nor have I ever heard of an ICE detainee arrested in Massachusetts being taken to St. Albans, Vermont.  The conduct described in Mr. Wesling's declaration is, in short, highly irregular.

Executed on April 9, 2025, in Boston, MA.

_____
Stefanie Fisher-Pinkert

JA-000260

# EXHIBIT 3

JA-000261

## UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

**RÜMEYSA ÖZTÜRK,**
*Petitioner*,

v.                                                              No. 2:25-cv-00374

**DONALD J. TRUMP,** et al.,
*Respondents.*

**Declaration of Professor Anna R. Welch, Esq. submitted in support of Petitioner's Motion for Release Under *Mapp V. Reno*, or in the Alternative, for Return to Vermont; and Petitioner's Supplemental Memorandum of Law on Jurisdictional Issues**

I, Anna R. Welch, declare the following under pain and penalty of perjury:

1. I am an attorney licensed to practice in the State of Maine.

2. Since 2012, I have worked as the founding director and a professor in the University of Maine School of Law's Refugee and Human Rights Clinic. I also teach Immigration Law. I previously worked as a fellow at Stanford Law School, where I taught and supervised students in Stanford's Immigrants' Rights Clinic. From 2006 to 2010, I practiced at the law firm Verrill in Portland, Maine, where I was the head of the firm's Immigration and Global Migration Group.

3. The information below is based on my years of immigration practice in Maine, including monitoring and interacting with and supervising students and colleagues interacting with dozens of civil immigration detainees at the Cumberland County Jail ("CCJ") in Portland, Maine, and including my communications with CCJ's management staff over the years.

JA-000262

4. CCJ has an agreement with U.S. Immigration and Customs Enforcement ("ICE") to house civil immigration detainees. I have been informed recently by Cumberland County's Sheriff Joyce that CCJ can house up to 88 civil immigration detainees.

5. CCJ houses both male and female civil immigration detainees. Female detainees are housed at CCJ whether or not they have a criminal record.

6. CCJ provides our clinic with daily data concerning, among other things, the number of civil immigration detainees housed in its facility. Paragraphs 7-11 below summarize voluminous writings that cannot be conveniently examined in court, in part because they contain personally identifying information concerning certain persons housed in CCJ.

7. On March 7, 2025, records indicated that approximately 27 civil immigration detainees were housed in Pod C3 at CCJ. Pod C3 is the female housing unit.

8. On March 7, 2025, records indicated that approximately 62 total female detainees, including civil immigration detainees, were housed at CCJ.

9. On March 25, 2025, records indicated that approximately 19 civil immigration detainees were housed in Pod C3 (the female housing unit) at CCJ.

10. On March 26, 2025, records indicated that approximately 18 civil immigration detainees were housed in Pod C3 (the female housing unit) at CCJ.

11. On March 26, 2025, records indicated that approximately 46 total female detainees, including civil immigration detainees, were housed at CCJ.

12. Based on my review of these records, and my extensive experience working with CCJ and detainees at CCJ over more than a decade, I conclude that there were at least 16 open beds to house additional female detainees at CCJ on March 25 & 26, 2025.

13. Throughout my years of experience working with the immigrant population in northern New England, I have never heard of an ICE detainee being arrested in Massachusetts and being transferred to Methuen, MA, Lebanon, NH, and then St. Albans, VT in a matter of hours. Nor have I heard of detainees from Massachusetts being taken to any of these locations at all.

Executed on April 10, 2025, in Portland, Maine.

Anna R. Welch

# EXHIBIT 4

JA-000265

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

**RÜMEYSA ÖZTÜRK,**
*Petitioner,*

v.                                    No. 2:25-cv-00374

**DONALD J. TRUMP,** et al.,
*Respondents.*

## DECLARATION OF HEATHER YOUNTZ, ESQ. SUBMITTED IN SUPPORT OF PETITIONER'S MOTION FOR RELEASE UNDER *MAPP v. RENO*, OR IN THE ALTERNATIVE, FOR RETURN TO VERMONT AND PETITIONER'S SUPPLEMENTAL MEMORANDUM OF LAW ON JURISDICTIONAL ISSUES

I, Heather Yountz, declare the following under pain and penalty of perjury:

1.     I am an attorney licensed to practice in the Commonwealth of Massachusetts.

2.     Overall, I have been practicing immigration law for 17 years. I make this declaration based on my personal knowledge and personal observations accumulated over that time period.

3.     Since 2021, I have been employed as a Senior Immigration Staff Attorney at the Massachusetts Law Reform Institute. Immediately prior to that, I was an immigration and criminal defense attorney at the firm Demissie & Church for about six years.

4.     I have been honored to receive awards based on my work representing detained immigrants and related matters. I was named one of Boston Magazine's Top Lawyers of 2022, 2023 and 2024, and 2018 Top Women of Law by Massachusetts Lawyers Weekly. I have chaired the AILA New England Litigation committee, and given seminars, talks, and served on panels for the American Medical Association, Massachusetts Women's Bar Association, New England

1

JA-000266

Muslim Bar Association, Boston University Law School, Northeastern University School of Law, Suffolk Law School, Boston College Law School, and many other organizations and groups.

5.    Since much of my work has been in deportation defense and the intersection of criminal law and immigration law, I have often spent approximately one day a week in detention facilities operated by U.S. Immigration and Customs Enforcement ("ICE"), including by ICE's Enforcement and Removal Operations ("ERO") department. ICE ERO is generally responsible for civil immigration enforcement within the United States, including the identification, arrest, detention, and removal of noncitizens who ICE alleges are subject to removal or unlawfully present in the United States.

6.    I have been to ICE Boston Field Office, which is located in Burlington, Massachusetts. The Boston Field Office has administrative and operational authority over ICE arrest, removal, and detention operations in all of New England, including Massachusetts, Connecticut, Maine, New Hampshire, Rhode Island, and Vermont. The scope of this authority is confirmed by ICE's website entry for the Boston Field Office: https://www.ice.gov/field-office/boston-field-office

7.    ICE has a another division, called Homeland Security Investigations ("HSI"). HSI conducts federal criminal investigations. In my experience, HSI also gives notice of visa revocations in some cases. HSI's mission is confirmed on its website: https://www.ice.gov/about-ice/hsi

8.    I have been to four ICE detention facilities in New England, including the Plymouth County Correctional Facility and the Wyatt Detention Facility, and I have represented clients held at other ICE detention facilities throughout the northeastern United States. I am generally familiar with the use these facilities in the immigration detention and removal process.

2

JA-000267

9.      There are multiple ICE detention facilities in New England and elsewhere in the Northeastern United States that hold women detainees. These include the Stafford County Corrections facility in New Hampshire, Cumberland County Jail in Maine, Chittenden Regional Correctional Facility in Vermont, and the ICE's Buffalo Facility in Batavia, New York. Additionally, for short-term and overnight detention of women detainees, ICE has holding cells in Wyatt Detention Facility and its local offices, including at ICE ERO's Boston Field Office in Burlington, Massachusetts.

10.      In my experience, immigrants who are arrested on civil immigration charges in eastern Massachusetts are booked and processed at ICE ERO's Boston Field Office in Burlington, Massachusetts. In my 17 years of practicing immigration law, I cannot recall seeing an immigrant arrested on civil immigration charges in eastern Massachusetts who has not been processed at Burlington before being sent to a detention facility. I have also seen some immigrants arrested in eastern Massachusetts taken to Boston for booking and processing, but my recollection is they were people arrested by either by HSI or by U.S. Customs and Border Protection.

11.      In my 17 years of working with hundreds of immigrants in Massachusetts, I have never seen or heard of an immigrant arrested by ICE or HSI taken to Methuen, Massachusetts or to St. Albans, Vermont. I have also never seen an immigrant moved to Methuen, then moved to Lebanon, New Hampshire, and then moved to ICE's local office in St. Albans, Vermont. This is a highly unusual event, especially taking place within a matter of a few hours. According to Google Maps, the drive from Boston to St. Albans, Vermont, is over 240 miles. According to Google Maps, St. Albans, Vermont, is less than 15 miles from the Canadian border.

12.      The typical path for immigrants arrested on civil immigration charges in eastern Massachusetts is that they are booked and processed at the Boston Field Office in Burlington.

JA-000268

Typically, the booking process takes over an hour and often much longer as the ICE officer typically has multiple questions to ask the immigrant, the immigrant is fingerprinted, the immigrant is served with the NTA, the immigrant's belongings are taken and documented, the immigrant's passport and other immigration paperwork is documented and stored, and other procedures are performed. In most cases, ICE is not required by law to detain noncitizens arrested within the United States on civil immigration charges, and ICE sometimes releases people directly from Burlington. Where ICE chooses to pursue detention, the person is generally held at Burlington and transferred many hours later or the next day to a detention facility such as Plymouth, Wyatt, or Strafford. The detainee may stay at those locations long term, or may be transferred a few days later to a facility elsewhere in the United States. In all of those situations, I observed that the detainees were held in Massachusetts for at least 12 hours (and generally more like 24-48 hours).

13.     I have reviewed the Declaration of David Wesling. The procedures described therein for Ms. Ozturk are not consistent with anything I have ever observed in my 17 years of immigration practice. I have never seen or even heard of an immigrant booked in 14 minutes. I have never seen a client transferred twice in the same day. The fastest transfer I recall seeing was 24 hours after initial placement. I do not recall ever seeing a client arrested in Massachusetts be detained in St. Albans, Vermont. I have never seen an F-1 revocation where the noncitizen was arrested and detained on the street, by masked men, with no prior notice that the visa had been revoked. To the best of my memory, in each of the F-1 revocations I have seen, the noncitizens' alleged actions leading to the visa revocation would (if true) have been clearly in violation of the terms of the visa (*e.g.*, the immigrant was no longer attending the listed school, the immigrant had

4

JA-000269

overstayed the visa). I have never before seen an F-1 visa revoked, and the student arrested without

prior notice of the revocation, based on an op-ed published in a school newspaper.

* * *

Executed on April 10, 2025, in Boston, MA.

/s /
Heather Yountz

JA-000270

# EXHIBIT 5

JA-000271

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

**RÜMEYSA ÖZTÜRK,**
*Petitioner,*

v.                                                    No. 2:25-cv-00374

**DONALD J. TRUMP,** et al.,
*Respondents.*

**Declaration of Margaret Moran, Esq. submitted in support of Petitioner's
Motion for Release Under *Mapp v. Reno*, or in the Alternative, for Return to
Vermont; and Petitioner's Supplemental Memorandum of Law on
Jurisdictional Issues**

I, Margaret Moran, do hereby swear and affirm as follows:

1. I am an immigration attorney at New Hampshire Legal Assistance (NHLA) responsible for NHLA's Immigrant Justice Project. I have been practicing immigration law for 13 years and represent NHLA clients in immigration court proceedings in the Boston and Chelmsford Immigration Courts and in appeals or petitions for review therefrom.

2. NHLA is a non-profit law firm that provides free civil legal services to people with low income, including noncitizens. NHLA works on civil cases impacting low-income clients' basic needs.

3. In April 2021, NHLA began providing full representation to people in immigration proceedings, focusing on those apprehended by Immigration and Customs Enforcement (ICE) and detained at the Strafford County House of Corrections in Dover, New Hampshire (Strafford Jail). I have been representing noncitizens in ICE custody at the Strafford Jail since April 2021. Before joining NHLA in April 2021, I worked at Greater Boston Legal Services, where I also represented noncitizens in ICE detention in New England.

4. The Strafford Jail holds men and women in ICE detention. The noncitizens in ICE detention I have met at the Strafford Jail are in a variety of immigration-related postures and have been apprehended by ICE for different reasons. People in ICE detention at the Strafford Jail have included people who have entered or attempted to enter the U.S. on student or visitor visas, pursuant to a visa waiver program, as refugees, without inspection, or on parole, or who are lawful permanent residents or applicants for asylum, withholding of removal or Convention Against Torture protection, etc. The ICE detainee population at the Strafford Jail has included people who have been charged with or convicted of

non-immigration crimes as well as people who have no history with the criminal legal system in the U.S. or elsewhere.

5. During the past four years, I have continuously represented and provided legal consultations for women and men in ICE detention at the Strafford Jail. I have observed that almost all the women and men I have met in ICE detention at the Strafford Jail have been apprehended in Massachusetts and processed for detention at the ICE Enforcement and Removal Operations (ICE ERO) Boston Field Office in Burlington, MA before being transported to the Strafford Jail. Most recently, for example, of the 30 men and women I met with in March 2025 at the Strafford Jail, 29 were residing in Massachusetts before ICE apprehension and were apprehended by ICE in Massachusetts, and one came from Rhode Island.

6. Based on my experience, people apprehended by the Boston ICE ERO Field Office and its sub-offices are processed for detention by ICE at an ICE office, usually the Burlington, MA Field Office, and then transported to a detention facility. When people are brought to the Strafford Jail, for example, ICE has already prepared custody papers and sometimes has already confiscated their personal property and placed it in storage at the ICE office. If anyone is transported to the Strafford Jail who is in possession of their personal property, the Strafford Jail confiscates the property and puts it in storage at the Strafford Jail. People are then processed through the booking process at the jail, including a medical screening and an interview to determine any safety or other issues that might influence where they will be housed at the facility, and held in the Booking Area of the Strafford Jail until taken by jail personnel to the unit where they are to be housed. People are often held in an interim location at the Strafford Jail due to medical protocols or while the facility personnel are relocating people within the facility to accommodate new arrivals. Part of the booking process includes a determination about the appropriate unit to which someone will be taken. These are the typical steps I have observed while at the Strafford Jail and heard of from ICE detainees I have met with.

7. In my years of immigration practice, I have never seen a person arrested in Massachusetts moved to Methuen, Massachusetts, to Lebanon, NH, to St. Albans, VT, all within a span of hours. I have never heard at all of any ICE facility in Methuen, Massachusetts, or of ICE detainees being taken there. Similarly, I am not familiar with any ICE facility in Lebanon, NH, and have never heard of ICE detainees being taken to such a facility. Nor am I aware of detainees from Massachusetts or New Hampshire ever being transported to the ICE Field Office in St. Albans, Vermont.

8. In my work at NHLA, I routinely participate in meetings and collaborate with immigration attorneys in New England who work with other non-profit legal services providers, law school clinics, and private firms providing pro bono or low-cost removal defense. In those meetings, I discuss with other practitioners

the enforcement, detention, and removal operations of ICE and Customs and Border Protection in the region.

9. Based on my conversations and collaboration with other attorneys in New England, I am aware of at least two other facilities in New England that hold or have recently held women in ICE detention. One of these facilities is the Cumberland County Jail in Portland, Maine, and the other is the Chittenden Regional Correctional Facility in Burlington, Vermont.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_4/10/2025_
Date

_Margaret Moran_
Margaret Moran, Esq.

JA-000274

# EXHIBIT 6

JA-000275

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

|  |  |
|---|---|
| | Case No. 2:25-cv-00374 |
| RUMEYSA OZTURK | **SUPPLEMENTAL DECLARATION OF** |
| Plaintiffs, | **JILL MARTIN DIAZ OF VERMONT** |
| | **ASYLUM ASSISTANCE PROJECT, (VAAP)** |
| v. | **IN SUPPORT OF PETITIONER'S MOTION** |
| | **FOR RELEASE UNDER *MAPP V. RENO*,** |
| PATRICIA HYDE, *et al.*, | **OR, IN THE ALTERNATIVE, FOR** |
| | **RETURN TO VERMONT; AND** |
| Defendants. | **PETITIONER'S SUPPLEMENTAL** |
| | **MEMORANDUM OF LAW ON** |
| | **JURISDICTIONAL ISSUES** |

Pursuant to 28 U.S.C. § 1746, I, Jill Martin Diaz, Esq., Executive Director of Vermont Asylum Assistance Project and Part-Time Lecturer at the University of Vermont, declare under penalty of perjury the following:

1. I am Jill Martin Diaz, my pronouns are they/them, and I am an experienced immigration defense attorney licensed to practice in New York (2017), Vermont (2018), and the District of Vermont (2022) and living and working in Burlington, Vermont.

2. I have worked as an immigration defense attorney for about nine years since 2014, my second year of law school, and spent my other two years of legal practice in housing and benefits defense at Vermont Legal Aid. Today, I serve as Executive Director of the Vermont Asylum Assistance Project (VAAP; www.vaapvt.org), Vermont's only nonprofit law firm dedicated to direct immigration legal service delivery and technical assistance.

3. At VAAP, I lead a team of two lawyers, dozens of *pro bono* volunteers, and numerous students focused on providing humanitarian immigration legal services to noncitizens in Vermont, including individuals seeking detained and non-detained removal defense. I also teach immigration service provision as a part-time lecturer in social work at the University of Vermont; direct legal services for Connecting Cultures–New England Survivors of Torture and Trauma (NESTT); serve as an appointed member to the Vermont Judiciary's Access to Justice Coalition and the Vermont Treasurer's Federal Transition Task Force; and co-chair the Vermont Bar Association's Immigration Law Section as well as the Vermont Queer Legal Professionals affinity network.

4. My previous experience includes co-founding and directing the Center for Justice Reform Immigration Clinic; lecturing in doctrinal immigration law at Vermont Law and Graduate School; practicing as a Vermont Poverty Law Fellow at Vermont Legal Aid; practicing as an Immigrant Justice Corps Fellow at Sanctuary for Families New York; and practicing as a student attorney at Brooklyn Defender Services, Immigrant Defense Project, and Atlas:

Developing Immigrant Youth. I received my Juris Doctor degree, *cum laude* in 2016 from Brooklyn Law School and my Bachelor of Arts degree, *summa cum laude* in 2008 from the George Washington University.

5. Over my eleven years in the legal profession, my supervisees and I have defended detained and nondetailed Vermont and New York respondents in removal proceedings and custody matters in New York, New Jersey, Massachusetts, and Texas Immigration Courts.

6. The St. Albans Office serves as a subordinate office to the ICE Boston Field Office and is where ICE conducts Enforcement and Removal Operations (ERO) including supervision. The St. Albans Office is a small government office in a corporate park and not a detention facility. It lacks normal detention facility amenities like attorney-client meeting space, visitation space, or a telephone system with which detainees can communicate accessibly with loved ones or counsel.

7. Last year, ICE Boston Field Office and St. Albans Office leadership called a meeting with Vermont immigration legal services providers in Burlington, Vermont to introduce us to new management who would be permanently staffing the office. There, I had the chance to personally meet with Boston and St. Albans ICE leadership, solicit their practice preferences and prosecutorial discretion priorities, and exchange contact information to facilitate more efficient resolution of represented parties' immigration custody and removal proceedings. I understood from this engagement and have heard confirmed by numerous supervisees that the St. Albans Office is a small, simple administrative office not suitable for long-term custody and detention.

8. In my experience, noncitizens arrested by ICE in Vermont are processed at the St. Albans ICE Office and may be detained there for a short period of time—generally, hours—before being moved to another detention center in the region. I have only ever seen or heard of ICE detaining immigrants at the St. Albans Immigration and Customs Enforcement (ICE) Office upon their initial arrest in Vermont. I have never previously seen or heard of people from other states being transferred into the St. Albans Office for detention.

9. In my seven years of practicing in Vermont and serving as a local expert on immigration matters, I have seen many cases of noncitizens who are arrested by ICE in Vermont transferred to other states, such as Strafford in New Hampshire or Plymouth in Massachusetts. But I have not seen people detained in other states being transferred by ICE into Vermont, with one exception. That exception involved a recent case of an individual detained on the New York side of Lake Champlain, across from Burlington, Vermont. She was detained at the Chittenden Regional women's facility in Burlington temporarily before being transferred to Louisiana.

10. Last month was the first time I encountered a Vermont resident who had been initially detained in Vermont and then relocated to long-term custody outside of the northeast. That individual was initially moved to the Plymouth facility in Massachusetts and then to a facility in Texas. ICE told us the unusual transfer resulted from an administrative error that flagged that client's case for expeditious removal, even though the client's asylum application on Form I-589 was pending before the Chelmsford Immigration Court.

JA-000277

11. It is extraordinary for a Vermont detainee to be transferred from custody in the northeast to custody outside of the northeast. It is similarly extraordinary for a person to be transferred into a Vermont facility from ICE custody out of state.

12. It is even more extraordinary for a person to be transferred into the St. Albans ICE office, which is not a detention facility. It lacks normal detention facility amenities like attorney-client meeting space, visitation space, or a telephone system with which detainees can communicate accessibly with loved ones or counsel.

13. In my experience, the ICE Detainee Locator does not typically specify a Vermont detainee's location, no matter whether they are at the St. Albans office or at a Vermont Department of Corrections facility such as Chittenden pursuant to a Vermont-U.S. Marshals Service Intergovernmental Service Agreement (IGSA). Instead of a precise facility, the Detainee Locator typically suggests contacting ERO at the St. Albans Office.

14. The example of the asylum seeker who ICE relocated from Vermont to Plymouth, MA to Laredo, TX at Paragraph 10 is my only known example of a detainee whose custody at the St. Albans office was reflected on the Detainee Locator.

WHEREFORE, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed at Washington, D.C. on this 2nd day of April 2025.

Respectfully Submitted,

Jill Martin Diaz, Esq.

Executive Director

# EXHIBIT 7

JA-000279

# UNITED STATES DISTRICT COURT
# DISTRICT OF VERMONT

**RÜMEYSA ÖZTÜRK,**
*Petitioner*,

v.

No. 2:25-cv-00374

**DONALD J. TRUMP,** et al.,
*Respondents*.

### Declaration of Brett Stokes, Esq.
### submitted in support of Petitioner's Motion for Release Under *Mapp V. Reno*, or in the Alternative, for Return to Vermont; and Petitioner's Supplemental Memorandum of Law on Jurisdictional Issues

I, Brett Stokes, declare the following under pain and penalty of perjury:

1. I am an attorney licensed to practice in Vermont and New Mexico.

2. I have been practicing immigration law in the area of removal defense for about 9 years. I previously worked in Colorado but have been practicing in Vermont since July 2022. I am presently the Director of the Center for Justice Reform Clinic at Vermont Law & Graduate School.

3. I am providing this declaration based on my experience as a removal defense practitioner in Vermont since 2022. My declaration is also informed by conversations with immigration practitioners in Vermont and other Northern New England states.

4. I am aware of two primary facilities that Immigration and Customs Enforcement uses to detain noncitizens overnight in Vermont, the Chittenden Regional Correctional Facility and the Northwest State Correctional Facility. Both of these facilities are run by the Vermont Department of Corrections. In my experience, ICE typically uses these facilities to detain noncitizens who are first taken into custody in Vermont or near the Vermont border. ICE detainees typically stay at these facilities for a few days before being transferred to another facility, such as the Plymouth County Correctional Facility in Massachusetts. Chittenden is used to house female ICE detainees, whereas the Northwest State Correctional Facility is used to house male ICE detainees. I have heard but cannot confirm that ICE may also use other Vermont Department of Corrections facilities sometimes.

5. ICE also has a suboffice in St. Albans, Vermont. In my experience, noncitizens who are taken into custody in Vermont are detained at that Field Office location only for the duration of their initial processing. In my experience, after being initially processed in the St. Albans Field Office, noncitizens who were not

JA-000280

released from custody on supervision are then promptly taken to another detention facility, such as one of the Vermont Department of Corrections facilities or the facility in Plymouth, Massachusetts. I have never heard of a detainee arrested in Massachusetts, or any other location not in or very near Vermont, being processed or held at the St. Albans Field Office. And I have never heard of a case in which a detainee has been held overnight at the St. Albans Field Office.

6. The Vermont Department of Corrections facilities are all connected to an online portal where, in my experience, within an hour or so of booking, their location is publicly available at the doc.vermont.gov website. The St. Albans Field Office is the only ICE detention location I am aware of in Vermont where an ICE detainee could be held without their location becoming publicly available via that portal.

7. On three occasions that I can recall, clients that I was already working with have been detained by ICE in Vermont and processed at the St. Albans Field Office. Two of these clients had their phones with them and were permitted to use their phones to call family members while held for processing at the St. Albans Field Office. On those occasions, I was able to learn in real time not only that the client was detained for processing at the St. Albans Field Office, but also the facility to which the client would be taken next. The third client checked into the ICE at the St. Albans Field Office without a phone, was detained, and as far as I am aware did not call anyone from the St. Albans Field Office.

8. I have reviewed the declaration of Acting Deputy Field Office Directo David T. Wesling in this case. I have never encountered or heard of a detainee transferred into and out of Vermont in a manner resembling the transfer of Ms. Özturk. The distance from which Ms. Özturk was brought to Vermont, the fact that she was processed and held overnight at the Field Office St. Albans rather than being taken to Chittenden, and the speed with which she was transferred into and out of Vermont all make this case highly unusual, in my experience.

Executed on April 10, 2025, in Burlington, VT.

Brett Stokes

# EXHIBIT 8

JA-000282

<div align="center">

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

</div>

RÜMEYSA ÖZTÜRK,
*Petitioner*,

v.                                                    No. 2:25-cv-00374

DONALD J. TRUMP, et al.,
*Respondents.*

<div align="center">

**DECLARATION OF ATTORNEY MAHSA KHANBABAI
SUBMITTED IN SUPPORT OF PETITIONER'S MOTION FOR RELEASE UNDER
*MAPP v. RENO*, OR IN THE ALTERNATIVE, FOR RETURN TO VERMONT AND
PETITIONER'S SUPPLEMENTAL MEMORANDUM OF LAW ON JURISDICTIONAL
ISSUES**

</div>

I, Mahsa Khanbabai, declare under penalty of perjury that the following is true and correct:

1.      I am an attorney for Petitioner Rümeysa Öztürk. I submit this declaration in support of the Petitioner's motion for release under *Mapp v. Reno*, or in the alternative, for return to Vermont and Petitioner's supplemental memorandum of law on jurisdictional issues.

2.      I filed a habeas petition on behalf of Rümeysa Öztürk on March 25, 2025 at approximately 10:01 pm in the United States District Court for the District of Massachusetts. The habeas petition appeared on the electronic docket at 10:02 pm.

3.      At approximately 10:12 pm, I sent a copy of the habeas petition to Attorney Rayford Farquhar, who is the Chief of Defensive Litigation in the Civil Division at the United States Attorney's Office in the District of Massachusetts. I also spoke with the emergency clerk for the United States District Court for the District of Massachusetts at approximately 10:30 pm. The clerk informed me that they too had let the United States Attorney's Office know about the habeas petition.

<div align="center">1</div>

JA-000283

4.      At approximately 10:55 pm, the Court issued an order that Ms. Öztürk not be moved outside the District of Massachusetts without 48 hours' notice.

5.      At approximately 10:59 pm, I sent a copy of the Court's order to Attorney Farquhar. I also spoke with the emergency clerk for the United States District Court for the District of Massachusetts at approximately 10:57 pm. The clerk informed me that they too had let the United States Attorney's Office know about the habeas petition.

6.      Between the evening of March 25 and the afternoon of March 26, I contacted both the ICE ERO in Burlington, Massachusetts and ICE HSI in Boston, Massachusetts several times to ask about Ms. Öztürk's whereabouts, but I received no response to these inquiries.

7.      Between the evening of March 25 and the afternoon of March 26, I checked ICE's Online Detainee Locator System several times for Ms. Öztürk's location, but the "current detention facility" field repeatedly remained blank.

8.      A representative of the Turkish consulate personally went to ICE offices in Burlington, Massachusetts on March 26 and was reportedly informed that she was not in that office and that ICE did not have information about her whereabouts.

9.      I called Attorney Farquhar on the morning of March 26 to inquire about Ms. Öztürk's location, to ask to speak with her, and to alert him that she has asthma and her medication was not on her when she was detained. Attorney Farquhar told me he did not know where she was and that he would look into it.

10.     At approximately 9:55 am, I emailed Assistant United States Attorney Mark Sauter to inform him that I had spoken with Attorney Farquhar to inquire about Ms. Öztürk's location, to ask to speak with her, and to alert him that she has asthma and her medication was not on her when she was detained. Attorney Sauter responded that he was "trying to confirm current location still."

JA-000284

11.     At approximately 1:11 pm, I emailed Attorney Sauter and Farquhar to express my dismay that they still had not been able to locate Ms. Öztürk, and to inform them that I would be filing a motion within the hour asking the Court to order the government to disclose her location and to permit me to speak to her by 6pm.

12.     At approximately 1:43 pm, Attorney Sauter responded that he was "continuing to try to obtain information about petitioner's current lcoation" and that he had "asked ICE again for this information."

13.     At approximately 3 pm, I filed a motion asking the Court to order the government to disclose her location and to permit me to speak to her by 6pm.

14.     At approximately 3:27 pm, Attorney Sauter stated that ICE "informed" him that Ms. Öztürk was transferred to Louisiana in the morning and was en route to a detention facility. He stated "I continue to ask ICE for the detention facility that she will be placed and that she be permitted to contact you."

15.     At approximately 3:49 pm, I responded and said that I needed to speak with Ms. Öztürk as soon as possible as it had been nearly 24 hours since she had been detained and I had not had any access to her.

16.     At approximately 6:15 pm, Attorney Sauter infomed me that Ms. Öztürk was in a staging facility in Alexandra, Louisiana and would later be sent to the South Louisiana ICE processing center.

17.     At approximately 7:19 pm, I emailed Attorney Sauter and said that I was alarmed that I had not access to my client for more than 24 hours since her detention.

JA-000285

18.     At approximately 8:45 pm, Attorney Sauter informed me that he understood that Ms. Öztürk was now at the South Louisiana ICE processing center and that she could now contact me.

19.     At approximately 8:50 pm, I emailed Attorney Sauter and informed him that I still had not been able to speak with Ms. Öztürk.

20.     At approximately 9:45 pm, I was finally able to speak with Ms. Öztürk. This was the first time that I had been able to speak with her since she had been taken into custody at approximately 5:15 pm the day before.

21.     At no time following her arrest while Ms. Öztürk was in Massachusetts, New Hampshire or Vermont was I informed where my client was located.

I declare under penalty of perjury that the foregoing is true and correct copy.

Executed on April 10, 2025, in North Easton, MA.

Mahsa Khanbabai Esq.

4

JA-000286

# EXHIBIT 9

JA-000287

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

**RÜMEYSA ÖZTÜRK,**
*Petitioner,*

v.                                                    No. 2:25-cv-00374

**DONALD J. TRUMP,** et al.,
*Respondents.*

Declaration of Rümeysa Öztürk

I, Rümeysa Öztürk, under penalty of perjury declare as follows:

1. My name is Rümeysa Öztürk. I am 30 years old. I am a citizen of Turkey.
2. I previously submitted a declaration in this case before the District of Massachusetts. I now submit this updated declaration to explain some of my ongoing health and safety concerns and the circumstances of my detention in support of my request for bail and in the alternative for return to New England.
3. I have lived in the United States since 2018 and am currently a Ph.D student at Tufts University in the Child Study and Human Development program. I miss interacting with my Tufts community from working with my advisor and professors, supporting my labmates as we worked on peer reviews, my interactions with undergraduate students, and special projects like our Mosiac Art Project and the Collective Grieving Space for children.
4. My plans are to stay in academia and to undertake a post-doc in positive media for youth.
5. I was detained on March 25, 2025 in the early evening. I was speaking to my mother on the phone when several men approached me on the street and then surrounded me and I screamed.
6. Since appearing on the Canary Mission website in February, I had begun to be afraid that I could be targeted for violence. When the men approached me, my first thought was that they were not government officials but private individuals who wanted to harm me. I felt very scared and concerned as the men surrounded me and grabbed my phone from me.
7. I asked who they were, and they said they were the police. I asked them for badges and one showed me a gold badge but it happened so quickly **I couldn't** tell what it said. But I didn't think that they were the police because I had

never seen police approach and take someone away like this. I thought they were people who had doxxed me and I was afraid for my safety. They also **didn't respond when I asked why and if they were arresting me.** I saw a neighbor recording the scene.

8.  After I was put into the car, I asked who they were, where they were taking me to, and they told me I was being arrested but they didn't say why. I began to cough as we drove. I asked for my inhaler and to open the window.

9.  It was hard to see out of the window but I could see we arrived at a parking lot. There were a few cars parked. About 8-9 officers huddled together while I was waiting in the car.

10. They took me out of the car and shackled my feet and belly and then put me in the car again. I again asked to speak with my attorney, but they told me that I could not.

11. I wanted to ask questions about what was happening to me but they were scary and harsh. They asked my name but I told them I choose to remain silent. I was held in the parking lot area for about 15-20 minutes.

12. We changed cars and different officers got into the car with me. I asked for a woman officer to be with us, but they said none were around. They were all wearing civilian clothes. I thought this was a strange situation and was sure they were going to kill me.

13. We had another stop, this time in or near Lawrence, MA, in a parking lot outside of an office building. It was an isolated place which had me very concerned. I was there roughly for 15-20 minutes. We waited in the car and I asked who they are. I asked to speak with an attorney. He showed me his badge very quickly but I couldn't read it. I asked a few times if I was physically safe. He seemed to feel guilty and said "we are not monsters", "we do what the government tells us". He also warned me that what you can say can be used against you.

14. I asked them where they were taking me and they said Vermont. When I asked why, they said there are no detention centers in MA for women.

15. I had spoken to a lawyer about a week earlier because I was afraid after having been doxxed **and had the lawyer's phone number with me. After being** detained, I asked to speak to a lawyer several times. Each time they told me I could speak to a lawyer later. I again reminded the officers that I needed my emergency asthma inhaler close by and they kept it near me.

16. We left this place and I told them that it was close to the time for me to break my fast, and that I needed a full meal. They said they can't get me a meal but can provide me snacks. We drove for about 5-7 minutes and one of the officers went inside an office building and came out with some snacks.

17. They gave me two small packages of crackers and water but I didn't drink and eat it because I was worried they could have poisoned it. I told them I wanted

to speak to my lawyer first before I eat. I was afraid that if something happened to me, no one would know where I was. A woman officer then joined us but we didn't speak. She appeared to avoid eye contact with me as did all the other officers. I was able to do my prayer in the car.

18. I was transported quickly to New Hampshire and believe we stopped in Lebanon at what appeared to be a police station. This is when I first thought it might be a US law enforcement agency detaining me rather than kidnappers related to the doxxing. Inside the police station I asked their names and to use the bathroom.

19. After a short time, the officers took me to a car and I asked where they were taking me. I again asked to speak to an attorney. They told me I could at the next stop. On the drive, I again asked where they were taking me. They told me Vermont and that when we get there I could make a call.

20. In Vermont, I asked to speak to an attorney again but was told that I could not, despite them having said before that I could call my lawyer from Vermont. They told me I would be going to another location but then I spent the night there.

21. I stayed in a cell that had no bed but a hard bench. I asked if there was a bed and they said no. I was not able to sleep. The toilet was in the same space with basically no barrier and there was no soap. There were no other detainees there, as far as I could tell.

22. I felt like I was going to faint and again asked for a full meal as I had fasted all day. I also had a lot of motion sickness from all the driving. They gave me some snacks.

23. They took my biometrics, did DNA testing and then went over the NTA with me. **I didn't understand some of the language they were using and asked for** an interpreter. They said it was late, it was midnight, and that it was hard to find an interpreter. I refused to sign the documents.

24. Inside the building I saw a book titled **"National Detainee Handbook"** written by US ICE in 2016 and asked them for the book, which they gave to me after checking if it was okay. I again told them I need my asthma and other medications.

25. I have lived with asthma for approximately 2-3 years. My asthma causes me difficulty breathing, including when I am exposed to chemical fumes, dust, damp spaces, mold, perfumes, heavy smells as well as stress.

26. I take medications for my asthma. I take one medication on a daily basis to prevent asthma attacks. I also keep an emergency inhaler for use during asthma attacks. I take these medications because asthma attacks can be dangerous.

27. I estimate that I have had about 13 asthma attacks in my life. During those attacks, I feel short of breath, afraid, anxious, and physically exhausted.

28. I asked to call my attorney **but they said I can't make any calls. I asked to call** friends to let them know what happened. They again said I could not.

29. They said I could take some phone numbers from my phone to call from my next location. Once I did that, they had access to my phone. I have private photos of me without hejab and my loved ones on there of me and am very concerned about them having access to these.

30. **They didn't let me make any calls and they asked me to put the phone into** flight mode. I was so tired and scared so I agreed. It was an isolated place with four men and it was terrifying.

31. During the night they came to my cell multiple times and asked me questions about wanting to apply for asylum and if I was a member of a terrorist organization. I tried to be helpful and answer their questions but I was so **tired and didn't understand what was happening to me.** I asked where they were going to take me and they said Louisiana. **One of them said "**I hope we treated you with respect.**"**

32. Around 4am we left for the airport and I was handcuffed again. I gave up asking to speak to a lawyer again.

33. I experienced an asthma attack while I was waiting in the Atlanta airport with ICE. I felt like I could not breathe. I asked permission to go to the restroom to use my inhaler, which I did, but I could not get over the asthma attack. I asked for the medication I am prescribed to treat asthma attacks but I was told that there was no place to buy it and that I would get it at my final destination. My asthma attack finally passed after I used my emergency inhaler twice but it took some time and I was in pain.

34. In Louisiana, myself and a few other women were taken to a processing center. I saw many women and men handcuffed and belly chained. We were placed in a cage-like vehicle and could not communicate with the officers detaining us. We waited in this place for 3-4 hours. We had no access to food or water.

35. I eventually arrived at the Louisiana facility where I am now. During the entire first week of my stay there we were not allowed to go outside. During the first two weeks, access to food and supplies was very limited because of their systems to request these items.

36. I had a second asthma attack while at the Louisiana facility. I had difficulty breathing and used the emergency inhaler but my breathing didn't improve. I asked to go to the medical center and it took them a very long time to take me **there. While waiting, I was incredibly distressed as I couldn't breathe** well.

37. I asked them to let me outside to get some fresh air. They said no but let me wait outside of the room in the hallway. While waiting, I still couldn't breathe well and was crying. They let me stand near the door to the outdoors to get a

little fresh air. It took 10-15 minutes to take me to the medical center during which time I had a lot of difficulty breathing.

38. Once they finally took me to the medical center, the nurse took my temperature. She said **"you** need to take that thing off your head**"** and took off my hejab without asking my permission. **I told her you can't take off my hejab** and she said this is for your health. After a few minutes I put my hejab back on. But they did nothing to treat my asthma and gave me a few ibuprofen.

39. I had a third asthma attack at the Louisiana facility. Again, this happened in the cell and other woman knocked on the window to get the attention of the officers. I was told that the nurse would come to the cell to see me. She took me outside for a short bit and told me that it was all in my mind. She finally took me to the medical center but I was not treated for my difficulty breathing. **The nurse left the room and didn't answer my questions**

40. I had a fourth asthma attack on Wednesday March 9th around noon. I used my inhaler and waited for it to pass. I was in pain and very scared but I **didn't ask to go to the medical center because I don't feel** that they address my medical needs.

41. **I don't feel safe** at the medical center because of my prior experiences there. They complain when I go there and speak to me in an insulting and condescending manner. They also write information in my medical records that is not accurate. The doctor and nurses there are rude and uncaring.

42. I fear that my asthma is not being adequately treated and it will not be adequately treated while I remain in ICE custody. The air is full of fumes from **cleaning supplies and is damp which triggers my asthma. We don't get much** fresh air which also impacts my ability to breathe well.

43. The conditions in the facility are very unsanitary, unsafe, and inhumane. There is a mouse in our cell. The boxes they provide for our clothing are very dirty and th**ey don't give us adequate** hygiene supplies.

44. We are in a cell that has a sign stating capacity for 14 but there are 24 of us in this small space. None of us are able to sleep through the night. They come into the cell often and walk around triggering the fluorescent lights. They shout in the cell to wake up those who work in the kitchen around 3:30am each day.

45. They wake me up for a blood sugar test at 4:15am every morning despite me asking to change the time. I have since declined to have these tests.

46. If we need hygienic supplies like toilet paper, we may not get it until 18 hours later, depending on the officer.

47. When they do the inmate count we are threatened to not leave our beds or we will lose privileges, which means that we are often stuck waiting in our beds for hours.

48. At mealtimes, there is so much anxiety because there is no schedule when it comes meals. They **threaten to close the door if we don't leave the room in time, meaning we won't get a meal.**

49. There is lack of medical care too. For example, a woman was hit on the head with a tray and fainted. It took a long time for her to be given medical attention, at least 15 minutes.

50. I still have not been provided a prayer rug or a Quran. I also requested to meet with a Muslim chaplain. I made these requests over two weeks ago. I also asked for lightweight long sleeve clothing because of the heat but have not received that.

51. I pray everyday for my release so I can go back to my home and community in Somerville. I plan to stay with a dear friend for a short while after the ordeal I have been through. I still have my apartment close to Tufts that I plan to return to.

52. I want to complete my PhD which I have been working on for the last 5 years. I only have about 9 months left to complete it and am very concerned about not being able to finish my studies.

53. I have had to delay working on my dissertation proposal because of my detention. It is very hard to access books here and it took nearly 2 weeks to get a few pieces of paper and pens.

54. I am supposed to present at a conference in Minnesota in late April/early May on character role models based on one of my PhD qualifying papers. My qualifying review is scheduled for the beginning of May which we put a lot of planning and preparation into. It will be very difficult to reschedule this process.

55. I am also concerned about my summer plans to mentor graduate and undergraduate students. I am scheduled to teach a summer class titled **Introduction to Children's Media for college level high school students.** I was also in the process of selecting students for an undergraduate research program this summer. I want to return to Tufts to resume all of my cherished work.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

4/10/25

_____

Date

SS *Rümeysa Öztürk*

RÜMEYSA ÖZTÜRK