# No. 25-1019

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

### RUMEYSA OZTURK,
**Petitioner-Appellee,**

**v.**

**PATRICIA HYDE, in her official capacity as the New England
Field Director for U.S. Immigration and Customs Enforcement;
MICHAEL KROL, in his capacity as HSI New England Special
Agent in Charge, U.S. Immigration and Customs Enforcement;
TODD LYONS, in his official capacity as Acting Director, U.S.
Immigration and Customs Enforcement; KRISTI NOEM, in her
official capacity as Secretary of the United States Department
of Homeland Security; MARCO A. RUBIO, in his official
capacity as Secretary of State; DONALD J. TRUMP, in his
official capacity as President of the United States,
Respondents-Appellants.**

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**
District Court Case No. 2:25-cv-374

---

### JOINT APPENDIX

**Vols. II of II
Pages 294-544**

---

ALANNA T. DUONG
Senior Litigation Counsel
Civil Division
U.S. Dept. of Justice
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-7040
alanna.duong@usdoj.gov

Attorney for
Respondents-Appellants

MONICA H. ALLARD
Staff Attorney
ACLU of Vermont
P.O. Box 277
Montpelier, VT 05601
Tel: (802) 251-7091
mallard@acluvt.org

Attorney for
Petitioner-Appellee

# TABLE OF CONTENTS

**Volume II**

ECF#98 April 14, 2025 Hearing Transcript…………………………………..294

ECF#104 April 18, 2025 Order……………………………………………..409

ECF#105 Notice of Appeal of April 18, 2025 Order……………………..483

ECF#106 Motion for Continued Stay Pending Appeal…………………484

ECF#109 April 24, 2025 Continued Stay Denial Order………………..490

ECF#131 May 9, 2025 Immediate Release Order………………………..497

ECF#140 May 16, 2025 *Mapp v. Reno* Release Order…………………..499

June 27, 2025 Docket……………………………………………………..527

1

1          UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF VERMONT

2

3   RUMEYSA OZTURK,                )
                                   )
4                    Petitioner    )
            vs.                    ) CASE NO. 2:25-cv-374
5                                  )
    PATRICIA HYDE, MICHAEL KROL,   )
6   TODD LYONS, KRISTI NOEM,       )
    DONALD J. TRUMP, MARCO A.      )
7   RUBIO,                         )
                                   )
8                    Respondents.  )
    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)

9

10

11

12        Motions Hearing held at 9:33 a.m. on Monday,

13   April 14, 2025, in Burlington, Vermont, before

14   Honorable William K. Sessions, III, District Judge.

15

16

17

18

19

20

21   Sarah M. Bentley, CCR-B-1745
      Registered Professional Reporter and Notary Public

22

23

24
                    BENTLEY COURT REPORTING
25                     sbireland7@gmail.com

2

1                    A P P E A R A N C E S

2

3     For the Petitioner:

4          ADRIANA LAFAILLE, ESQ.
           ACLU Foundation of Massachusetts, Inc.
5          Suite 850
           One Center Plaza
6          Boston, Massachusetts  02108
             (617) 482-3170
7            alafaille@aclum.org

8
           JESSIE J. ROSSMAN, ESQ.
9          ACLU Foundation of Massachusetts, Inc.
           Suite 850
10         One Center Plaza
           Boston, Massachusetts  02108
11           (617) 482-3170
             jrossman@aclum.org

12

13         NOOR ZAFAR, ESQ.
           American Civil Liberties Union Foundation
14         18th Floor
           125 Broad Street
15         New York, New York  10004
             (469) 301-5991
16           nzafar@aclu.org

17

18

19    For the Respondents:

20         MICHAEL P. DRESCHER, ESQ.
           Assistant United States Attorney
21         United States Attorney's Office
           3rd Floor
22         United States Federal Building and Post Office
           11 Elmwood Avenue
23         Burlington, Vermont  05402-0570
             (802) 951-6725
24           michael.drescher@usdoj.gov

25

3

1                        I N D E X

2

3                                              PAGE

4

5   Statements by the Court                      4

6   Statements by Mr. Drescher               5, 104

7   Statements by Ms. Zafar                     45

8

9   Statements by Ms. Lafallia              61, 103

10  Statements by Ms. Rossman                   75

11

12

13                     *      *      *

14

15

16

17

18

19

20

21

22

23

24

25

4

1          P R O C E E D I N G S

2

3

4               THE COURT:  Good morning.

5               THE CLERK:  This is Civil Case No.

6       25-374, Rumeysa Ozturk vs. Patricia Hyde, et al.

7               Present for the petitioner are Attorneys

8       Adriana Lafaille, Jessie Rossman, and Noor

9       Zafar.

10              Present for the respondent is Assistant

11       United States Attorney Michael Drescher.

12              The matter before the Court is a hearing

13       on a motion to dismiss.

14              THE COURT:  Okay.  Good morning,

15       everyone.

16              (Brief pause.)

17              THE COURT:  All right.  Good morning,

18       everyone.  This is a full house.  At least it

19       looks like a full house from this perspective.

20              I invite you to be here.  I just would

21       remind everyone that this is a courtroom.  This

22       is a respectful environment; that I've asked the

23       marshals if anyone becomes disruptive during the

24       course of the argument that they should be

25       removed, but other than that we certainly invite

5

1     everyone to be here.

2            So we're addressing a number of motions

3     that have been filed.

4            First, the government has filed a motion

5     to dismiss, and I think we'll address that

6     first.

7            The petitioner has also filed a request

8     for release and, alternatively, that she be

9     removed back to this jurisdiction for the course

10    of the habeas proceedings, and we'll deal with

11    that second.

12           So, first, is the government ready to

13    proceed on its motion to dismiss?

14           MR. DRESCHER:  It is.

15           THE COURT:  Technically you didn't file a

16    motion to dismiss, but I perceived that that's

17    exactly what you were requesting.  In fact,

18    that's what you requested in the course of your

19    filing so I call it a motion to dismiss, and

20    I'll hear you.

21           MR. DRESCHER:  Understood.

22           With your Honor's indulgence, as the

23    Court is aware, there are two or three separate

24    issues pertinent to whether the Court has

25    jurisdiction; the first being habeas, the second

6

1    being the transfer under 1631, and the third

2    being the effect of the INA.

3        THE COURT:  Yes.

4        MR. DRESCHER:  Do you wish -- and I

5    appreciate that counsel for petitioner,

6    different counsel will argue different issues

7    for petitioner, and so my question is how would

8    you like the government -- do you want me to

9    argue all of the issues initially?

10       THE COURT:  I think that you should argue

11   all of the issues initially.  Then if, in fact,

12   different counsel want to address those issues

13   from the petitioner, they can do that.

14       MR. DRESCHER:  Thank you.

15       At the outset I want to emphasize that we

16   do not contest that Ms. Ozturk is entitled to

17   judicial review of what has happened and what is

18   happening to her.

19       Our position is that under the system set

20   up by Congress for administering the immigration

21   laws and pursuant to decisions, pursuant to the

22   decisions of the Supreme Court in the 2nd

23   Circuit, this is neither the time nor the forum

24   for that review to occur.

25       THE COURT:  All right, so you are

7

1    essentially suggesting that she does have a
2    right to file a habeas petition addressing
3    constitutional issues, which are separate and
4    apart from the removal proceedings that she is
5    now facing; is that correct?
6         MR. DRESCHER:  We're not contesting her
7    right to file a habeas petition.
8         THE COURT:  Okay.
9         MR. DRESCHER:  She's in the executive --
10   she's in the custody of the executive.  Habeas
11   is a traditional means of challenging the
12   legality of that.
13        We do challenge whether this Court has
14   habeas -- is the appropriate venue for that
15   habeas challenge to be heard.
16        THE COURT:  All right.
17        MR. DRESCHER:  And, again, at the outset
18   I appreciate that the system that Congress has
19   set up does not provide Ms. Ozturk for the
20   relief that she wants at this time and that she
21   understandably wants to believe now.
22        I also appreciate that her detention, as
23   for anyone who is in the custody of the
24   executive branch, has a profound impact on her.
25        The Congress has made clear that claims

8

1     such as the one that are before the Court,

2     whether it's habeas or other -- or fashioned

3     otherwise, because they arise from the fact that

4     Ms. Ozturk is in immigration proceedings right

5     now and is subject to removal proceedings, her

6     claims must be presented to an appropriate court

7     of appeals at the appropriate time.

8          And in the meantime Ms. Ozturk may

9     request that she be released on bond before the

10    immigration judge, and to my knowledge she has

11    not yet done so.

12         On the question of habeas jurisdiction, I

13    think the critical case is <u>Padilla</u>.  And that

14    case makes clear that the appropriate venue for

15    considering a petitioner's habeas petition is

16    the venue in which the petitioner's immediate

17    custodian, is the venue that has jurisdiction

18    over the immediate custodian, and is the venue

19    of her detention.

20         THE COURT:  Okay.  So just before we get

21    into the discussion about venue, you've looked

22    at the complaint that has been filed by the

23    petitioner.  Tell me what you think the

24    complaint is seeking as a remedy.

25         MR. DRESCHER:  On its face it seeks an

9

1    order returning her initially to the District of

2    Massachusetts.  Now they are asking her to be

3    returned to the District of Vermont.

4         It's asking that she be released on bail.

5         It's asking that the Court declare her

6    arrest and detention are constitutionally -- are

7    unconstitutional.

8         It asks the Court to set aside a policy

9    of targeting noncitizens for removal based on

10   protected speech.

11        It's asking the Court to restore her --

12   certain entries relating to her in the system

13   set up by the Department of Homeland Security

14   relating to student visas, the SEVIS record,

15   which it's not completely clear.

16        It may also be a challenge to the actual

17   revocation of her visa.

18        She's asking the Court to enjoin any

19   enforcement action against her based on -- based

20   on foreign policy.

21        And those are the principal requests for

22   relief.

23        THE COURT:  Well, so what questions is

24   she addressing in her complaint in regard to her

25   removal proceedings?

10

1        In other words, what restriction is she

2   asking the Court to make about how immigration

3   is to proceed in the removal proceeding?

4        MR. DRESCHER:  With your Honor's

5   indulgence, I want to answer your Honor's

6   question indirectly.

7        THE COURT:  Okay.

8        MR. DRESCHER:  First, as a core habeas

9   matter, the only relief that's available for a

10  core habeas matter is the petitioner's release.

11       THE COURT:  All right.

12       MR. DRESCHER:  All of the other remedies,

13  while certainly relevant to her situation, are

14  really outside the normal scope of a habeas

15  case.

16       THE COURT:  All right, so -- and have you

17  read the complaint to be consistent with that

18  principal?

19       That is, what the petitioner is seeking

20  is a declaration that her arrest violated both

21  the First and the Fifth Amendment as well as the

22  APA, and what she is seeking essentially is

23  release?

24       That is, because the arrest was in

25  violation of the First, Fifth and APA, she's

11

1    entitled to a release, but that has no impact

2    upon the revocation or the removal proceeding?

3              MR. DRESCHER:  That's not totally clear,

4    your Honor.

5              I'll take a step back.  It does have an

6    impact on the removal proceedings insofar as she

7    is currently in custody because her visa has

8    been revoked and she's received a notice to

9    appear asserting that she is no longer -- she is

10   out of status because of the revocation of her

11   visa.  Under the discretion that is accorded to

12   the executive branch by Congress in 1226(a), she

13   is being held in custody.

14             She is in custody because she is in

15   removal proceedings.  She was taken into custody

16   because -- because of her absence of status.

17             It is conceptionally impossible to

18   separate her request to be released from custody

19   from the fact that she is in custody because the

20   Attorney General has initiated removal

21   proceedings.  She has detained her in her

22   discretion as part of those and has detained her

23   as part of those removal proceedings.

24             Under the 2nd Circuit's analysis in the

25   Delgado case and in the 2nd Circuit's analysis

12

1    in the Ragbir case, these -- the fact of her

2    detention is inextricably connected to the fact

3    that she is in removal proceedings.  And --

4         THE COURT:  Okay, so let's just assume

5    that the Court were to grant the petitioner's

6    request, declare the arrest to be in violation

7    of the First and Fifth Amendment, okay,

8    constitutional violation, which means then the

9    Court addresses whether she should be in

10   custody.

11        Are you suggesting that if the Court were

12   to determine that she was arrested in violation

13   of the First Amendment and the Fifth Amendment,

14   that the Court has no remedy or that the

15   petitioners have no remedy?

16        That is, in fact, if the Court ordered

17   her to be released, you would say that the Court

18   had no jurisdiction to order her released

19   because of its impact on the removal proceeding?

20        MR. DRESCHER:  Not because of its impact

21   on the removal proceeding, although it certainly

22   would presumably have an impact in terms of

23   venue and other aspects of the removal

24   proceedings, which I'm not completely familiar

25   with.

13

1      Our position is the Court doesn't have
2  jurisdiction to do that because it's connected
3  to the removal proceedings.  And it's not just
4  me as a lawyer saying that.  It's what Congress
5  said in 1226 and in 1252.
6      First, Congress says that in 1226 there
7  shall be no judicial review of the discretion --
8  the discretionary detention of a noncitizen who
9  is subject to removal proceedings.
10     Now, that noncitizen, like petitioner
11  here, can seek relief before the immigration
12  court if she's detained, as is the case here.
13  So Congress has made pretty crystal clear in
14  1226 that's the case.
15     The 2nd Circuit has recognized that
16  that's the case in a case, Velasco Lopez.
17     THE COURT:  Velasco Lopez, which is the
18  central case, indicating that the Court does
19  have the power to address a habeas petition
20  despite the fact that someone may be in removal
21  proceedings?
22     MR. DRESCHER:  As I understand Velasco
23  Lopez, and this is consistent with, I believe,
24  the Supreme Court decision in Jennings, a court
25  can exercise habeas jurisdiction when the

14

1    assertion is the scope of authority or a
2    challenge to the statutory scheme; that in those
3    cases that was what was at issue.
4         There was a -- it was not a challenge to
5    the discretionary decision or, I believe in
6    Jennings, in some cases a nondiscretionary
7    decision under 1226(c).
8         THE COURT:  Well, you've read the
9    proceedings of the petitioner which basically
10   suggests that they're not in any way addressing
11   the removal proceedings.  They're, in fact,
12   approaching this subject matter almost as two
13   separate areas of concern.
14        The first area of concern would be in the
15   arrest and immediate detention in violation of
16   constitutional rights.  That's a separate habeas
17   proceeding which goes before an Article III
18   judge.  That's habeas.
19        The second is the removal proceedings.
20   And what they're suggesting is they're not
21   seeking relief at all in terms of the removal
22   proceedings.  In fact, they're not trying to get
23   the immigration judge or ICE in its prosecution
24   of the removal proceedings to do anything.
25   That's not -- that's not a part of this case.

15

1      All they're saying is she was illegally

2  arrested in violation of the First and Fifth

3  Amendment in particular and, as a result, the

4  remedy would be her release from detention here,

5  not impacting her -- the removal proceedings in

6  any particular way.  And, in fact, you know,

7  suggesting that the removal proceedings continue

8  on despite the fact that her arrest was

9  determined to be illegal.

10      So do you disagree with that sort of dual

11  way of approaching this subject matter?

12      MR. DRESCHER:  I believe I understand

13  your Honor's point, but what I take issue with,

14  what we take issue with is the -- is the idea

15  that the Court can separate the fact that

16  Ms. Ozturk was arrested and is in immigration

17  custody from the fact that she's been charged

18  with a notice to -- she's been served a notice

19  to appear and is in custody because of the

20  revocation of her visa.

21      THE COURT:  Okay, so she's filed a habeas

22  petition suggesting that she was illegally

23  arrested.  The remedy that she is seeking has

24  nothing to do with damages against the

25  government, has nothing to do with stopping her

16

1    removal proceeding.  Her remedy is pretty

2    straightforward.

3         If you have a constitutional violation in

4    the arrest of a person, you are entitled to

5    release.  And, you know, I appreciate the fact

6    that you -- that it becomes a little bit fuzzy

7    when you're talking about detention and its

8    impact on the removal proceeding, but what is

9    really fundamentally a question for me is what

10   if she is right?

11        What if there was a constitutional

12   violation in her arrest?

13        The only remedy she's seeking is release,

14   and you are suggesting that the Court has no

15   power to release her because she has a removal

16   proceeding in which she has been ordered

17   detained by immigration authorities so that, as

18   a result, she has no remedy.

19        I mean, this is the fundamental question

20   because obviously if the Court -- if the Court

21   found that there was a constitutional violation,

22   I would turn to you and say, well, of course she

23   needs to be released.

24        And if the government then says, well,

25   no, she can't be released because we have a

17

1    detention order in immigration, which is in

2    violate and she's not going to be released, then

3    we're in a constitutional crisis.

4         MR. DRESCHER:  So I don't want to be

5    heard -- I don't want to be perceived in any way

6    as suggesting that we're not going to abide by

7    an order of the Court.  If I take that hint in

8    your Honor's statement, I want to make that

9    clear.

10        Our argument, Judge, is that -- and it's

11   not -- it's not the executive.  It's not me who

12   is saying this.  It's Congress who said this,

13   and it's the 2nd Circuit and the Supreme Court

14   who have said this; that because of the

15   intricacies of operating and administering the

16   immigration laws of our country, the executive

17   is vested with a wide amount of discretion.

18        And because of the intricacies of that

19   system, Congress has specified that district

20   courts should not be involved in reviewing the

21   operations of the immigration -- of the

22   immigration courts, to include reviews of the

23   Attorney General's discretion, discretionary

24   decision to detain a noncitizen who is in

25   immigration proceedings, to include -- well, to

18

1    include the question of whether somebody is

2    detained or not.

3         THE COURT:  So as a general matter I

4    don't disagree with that at all.  I mean, I

5    certainly think that Congress in the INA has, in

6    particular, a number of provisions said that

7    immigration authorities are in charge and that

8    the judicial branch should have no impact in

9    reviewing removal proceedings, removal orders,

10   et cetera.  There's no question about that.

11        There only is a question about this

12   fundamental issue about whether or not during

13   the course of an arrest or bringing the

14   petitioner before immigration authorities there

15   was a violation of fundamental liberties, in

16   which case I agree with you that this is a very

17   complex area of the law and -- and essentially

18   the Constitution rubs up against the INA perhaps

19   in some areas.  You know, but fundamentally the

20   Court's responsibility is to make an assessment

21   about the constitutional liberties.

22        And if there is a constitutional

23   violation here, I mean certainly that takes

24   precedence, it seems to me.

25        Is that -- do you disagree with that?

19

1          MR. DRESCHER:  I don't disagree at all

2     that making sure there is a system in place for

3     judicial review of the constitutionality of

4     what's going on is understandably important to

5     all of us.

6          In this context, Congress has specified

7     in Section 1252(b)(9) that judicial review of

8     all questions of law and fact, including

9     interpretation and application of constitutional

10    provisions arising from any action taken or

11    proceeding brought to remove an alien from the

12    United States, shall be available only in

13    judicial review of the final order under this

14    section.

15         THE COURT:  I don't disagree with that,

16    but to move the ball forward you have to make an

17    assessment as to whether that provision is

18    related to removal proceedings or that provision

19    suggests that an Article III judge has no power

20    to make a determination of a constitutional

21    violation earlier in the process.

22         And I don't hear you saying that an

23    Article III judge would not have the power to

24    make a determination in a habeas proceeding of

25    whether there has been a fundamental violation

20

1        of the First and Fifth Amendment.

2                Am I correct about that?

3                MR. DRESCHER:  I'm not sure.  There are

4        habeas cases in which courts exercise habeas

5        jurisdiction over challenges to a statutory

6        system, over challenges to whether the executive

7        has authority to exercise at all, but

8        Section 1226(e), I believe, specifies in

9        similarly broad language that there shall be no

10       judicial review of the -- of the decision to --

11       and, again, and this is not just the statute.

12               If you look to Jennings, the Supreme

13       Court case on point, which was a very messy set

14       of concurrences, and at some point there was an

15       opinion for the majority.  At some point there

16       was different justices saying different things.

17               In Part II of that decision three

18       justices say that 1226(e) bars judicial review

19       of discretionary -- the exercise of discretion

20       to detain an alien who is in removal

21       proceedings.  Three justices say that.

22               Two justices in a concurrence say that

23       there should be no jurisdiction at all under

24       1252.

25               So a majority of the Supreme Court has

21

1    concluded that there is no judicial review at

2    the District Court level of an arrest in this

3    context.

4              THE COURT:  Okay, so tell me, if that's

5    true, if what you're saying is under 1223 or

6    1226(e), there is no review of detention, right?

7    Tell me why there would still be habeas corpus

8    relief.

9              MR. DRESCHER:  As I indicated, there

10   are -- courts will exercise habeas jurisdiction

11   in the immigration context when the challenge is

12   not to the legality of an individual's -- when

13   the challenge is not to the executive's exercise

14   of discretion to detain a noncitizen who's in

15   removal proceedings.

16             Rather, when the challenge is to a

17   statutory scheme or the challenge is whether

18   there is authority at all to be exercised in

19   that case.  I think this is the -- these are

20   the -- these are the lines that are drawn as I

21   read them in the habeas, in the cases where

22   there is habeas jurisdiction asserted over

23   detained -- detained noncitizens under 1226.

24             THE COURT:  And there is no question that

25   if you take habeas relief as proposed by the

22

1     petitioner or, you know, I think by the Circuit

2     in Velasco, that courts address the fundamental

3     question about whether there's a constitutional

4     violation and, if so, the remedy is to release

5     that person.  The remedy is not to impact in any

6     way the removal proceedings but to release that

7     person.

8           MR. DRESCHER:  And I --

9           THE COURT:  That's the fundamental

10    distinction.

11          MR. DRESCHER:  Well, I appreciate that,

12    but I think -- I don't think that's the issue.

13         The fact that removal proceedings can

14    continue does not disconnect the detained status

15    of the petitioner from the fact that there are

16    removal proceedings, and it's that connection

17    which is what triggers these provisions in the

18    INA.

19          THE COURT:  But would you then agree that

20    your position is that because of 1226(e), that

21    the impact on detention in a removal proceeding,

22    that essentially the petitioner here has no

23    remedy under habeas?

24          MR. DRESCHER:  That's what Congress says,

25    and --

23

1           THE COURT:  Okay.

2           MR. DRESCHER:  And because of -- because

3     of the extraordinary complexity that is -- that

4     surrounds the operation of our immigration laws,

5     Congress has made that policy determination to

6     vest judicial review, including constitutional

7     review, in the petition for review at the end of

8     the proceedings.

9           THE COURT:  And that if we found some

10    law, some judicial history -- well, actually

11    legislative history, the legislative history to

12    the INA which suggests that the INA does not

13    really impact the fundamental right to bring

14    habeas, so that is somewhat distinct, if there

15    is something mentioned in legislative history to

16    suggest that the right to habeas remains,

17    despite the passage of the INA, you would find

18    that extraordinary?

19          MR. DRESCHER:  I think the INA speaks

20    clearly that habeas relief is not available in

21    contexts where the immigration laws are being

22    administered.

23          THE COURT:  All right.  So I wanted

24    really to address that fundamental question

25    because I wasn't sure exactly what the

24

1    government's position is.

2          Now it's pretty clear that basically what

3    you're suggesting is that at least in regard to

4    detention under 1226(e), you feel that the Court

5    really has no jurisdiction, just generally, as a

6    general matter, and we'll get into the more

7    specific.

8          MR. DRESCHER:  Yes.  And, your Honor, I

9    recognize that in many respects that's a

10   counterintuitive set of rules.

11         THE COURT:  Yes.

12         MR. DRESCHER:  But it's also a very

13   counterintuitive area of the law given -- given

14   the intricacies of how our immigration system

15   operates and given Congress's judgment in terms

16   of at what point is it appropriate for the

17   judicial branch to involve itself in that, in

18   the administration of that area of the law.

19         I want to, by way of example, the 2nd

20   Circuit's case in Ragbir, which I think does a

21   lot of work for both sides in this case, you

22   know, in that case the Court concluded that

23   there was -- although in the end the Supreme

24   Court vacated this part of the ruling.

25         THE COURT:  But that was on a

25

1    different -- that was on a totally different

2    issue, right?

3          MR. DRESCHER:  Well, it had to do with

4    the nature of the relief that was being granted

5    in habeas.

6          THE COURT:  Yes.

7          MR. DRESCHER:  But the Court concluded

8    like it would be okay for there to be habeas

9    jurisdiction in that First Amendment challenge

10   to the execution of a removal order.

11         The only reason why the 2nd Circuit

12   concluded that was because at that point in the

13   proceedings there was no prospect of a petition

14   for review at the appropriate circuit court

15   level.

16         Because by that time in the -- in the

17   immigration history of Mr. Ragbir, the final

18   order of removal had already issued.  There was

19   no way -- and the timing for her seeking

20   petition for review had expired.

21         The only reason why the 2nd Circuit said

22   there could be habeas jurisdiction in that case

23   was because the provisions of 1252 sending the

24   constitutional review to the Circuit Court of

25   Appeals couldn't apply.

26

1          THE COURT:  Right, but that's an

2     extraordinary circumstance in which there is no

3     judicial review at the circuit level after

4     there's an order of removal.

5          So this is -- this is -- Ragbir is sort

6     of, it seems to me, sort of suggests that in

7     habeas kinds of cases they're flexible.

8     Sometimes there are extraordinary circumstances.

9          In this particular case, in Ragbir, there

10     was the extraordinary circumstance of no

11     judicial review once an order of removal has

12     been approved by the IJ, the immigration judge,

13     and so as a result in this extraordinary

14     circumstance you actually can review an order of

15     removal.

16          I mean, clearly they're not seeking to be

17     able to review an order of removal.  This has

18     nothing to do with immigration, at least

19     according to what the petitioner is saying.

20     This just has to do with what happened when she

21     was arrested and was the arrest pursuant to a

22     violation of the First Amendment.

23          Anyway, so we could stand debating this

24     for I think probably -- not debating.  I'm

25     trying to learn, but --

27

1    MR. DRESCHER:  You and I both, your

2    Honor, and I appreciate -- you know, I think

3    I've said most of my piece with regard to the

4    operation of the INA in that context.

5    THE COURT:  Right.

6    MR. DRESCHER:  I don't want to lose sight

7    of the threshold habeas questions that are

8    triggered by Padilla, and I think they're

9    intractable, another very difficult

10   jurisdictional problem for this Court.  I think

11   they make it necessary --

12   THE COURT:  We're talking about the

13   arrest and her being brought to Metheun,

14   Massachusetts, then New Hampshire and Vermont,

15   and the filing of the petition at 10:02 in

16   Massachusetts when, in fact, the petitioner's

17   lawyers did not know where she was.

18   And what's your argument?

19   Well, tell me what your argument is.

20   MR. DRESCHER:  My argument is simply that

21   under Padilla in order for a court to have

22   habeas jurisdiction, meaning being the

23   appropriate venue for a habeas case to be filed,

24   that the petition has to be filed against the

25   petitioner's immediate custodian over whom the

28

1    Court would have jurisdiction, and the

2    petitioner has to be in the district of -- the

3    district where it's filed has to be the district

4    of confinement.

5         THE COURT:  And are there any

6    extraordinary circumstances in which the

7    district of confinement or the immediate

8    custodian, those are the rules in habeas; that

9    you have to file in the district of confinement

10   and that you have to actually identify the

11   immediate custodian as opposed to the Attorney

12   General, et cetera?

13        That's the rule.  Are there any

14   exceptions to that rule?

15        MR. DRESCHER:  The Supreme Court has

16   recognized what I would consider two sets of

17   exceptions.

18        One is the rule of Endo, which is when

19   the petition is initially filed in the

20   appropriate district against the immediate

21   custodian.  Habeas jurisdiction attaches at that

22   time when -- if it's filed when the petitioner

23   is there.

24        If the petitioner in the custody -- if

25   the executive branch then moves the petitioner

29

1    away, jurisdiction doesn't move.  But that

2    requires the petition to be filed in conformity

3    with the immediate custodian rule when it's

4    filed.

5         THE COURT:  Okay, so let's first address

6    the facts.

7         The facts here; she's arrested at, I

8    think 5:35, and she's taken to Methuen,

9    Massachusetts, et cetera.  The petition is filed

10   at 10:04 or, I'm sorry, 10:02.  And at 10:02 she

11   is actually in a vehicle being operated by law

12   enforcement officials on her way.  She's in

13   Vermont, but she's on her way to St. Albans; is

14   that right.

15        MR. DRESCHER:  That's my understanding;

16   that she was in transit at the time the petition

17   was filed.

18        THE COURT:  Okay.

19        MR. DRESCHER:  And in Vermont.

20        THE COURT:  So she's not in Massachusetts

21   for sure.

22        So do you agree that counsel for the

23   petitioner had no idea where she was; that

24   counsel for the petitioner had called DOJ, ICE,

25   et cetera, trying to locate her.  Nobody would

1      respond and, as a result, she had no idea or

2      they had no idea where she was.  And then chose

3      to file in Massachusetts because Massachusetts

4      was the last place where she was located, and

5      because she had no -- they had no idea who the

6      custodian was, they filed against the Attorney

7      General.  Is that correct?

8              MR. DRESCHER:  I don't think there's any

9      factual dispute about what happened and why

10     things happened the way they did in terms of

11     where the petition was filed.

12             THE COURT:  Okay.  So clearly there's

13     a -- clearly they filed a petition in

14     Massachusetts.  They seek -- they seek an

15     exception to be able to file in Massachusetts

16     because they had no clue where she was and --

17     but she, in fact, is in Vermont.

18             So in regard, first of all, to the

19     immediate custodian, who is the immediate

20     custodian at the time of the filing?

21             MR. DRESCHER:  It would have to be

22     somebody now who was other than a supervisory

23     official over the people in whose custody the

24     petition was.  I don't have a name for you right

25     now, but Padilla makes clear it has to be

31

1    somebody with immediate custody.

2         It's not just an official located in

3    another city or even in Washington, D.C.  That's

4    one of the clear holdings of <u>Padilla</u>.

5         THE COURT:  Yeah, so ordinarily in all

6    the cases I've been involved in, usually the

7    warden, the warden of the prison, that's the

8    supervisory personnel, but it's the person who

9    has the ability to release -- release her.

10        MR. DRESCHER:  Right.

11        THE COURT:  Why wouldn't that be the head

12   of the field office of ICE?

13        MR. DRESCHER:  Your Honor, I'm just

14   repeating the holding of <u>Padilla</u>; that it can't

15   be somebody with legal authority.  It has to be

16   the person with immediate custody.

17        If you're asking why that's the reason,

18   I'm going to circle back to it's because that's

19   what the Supreme Court says.

20        THE COURT:  Well, now you have a second

21   amended petition which identifies a number of

22   people, and one of them is the head of the field

23   office for the northeast area, which controls

24   all of New England.

25        MR. DRESCHER:  I think even Judge Casper

32

1    acknowledges in her decision that that -- that

2    that wasn't sufficient under the immediate

3    custodian rule in terms of --

4         THE COURT:  So you don't think the

5    identification of Ms. Hyde as the person who's

6    the head of the office would be similar to a

7    person who was a warden of a prison?

8         MR. DRESCHER:  Right.

9         THE COURT:  Okay.

10        MR. DRESCHER:  To your Honor's point

11   about what counsel knew or didn't know, again, I

12   think that issue is taken up in Padilla, and I

13   want to point the Court specifically to

14   Footnote 17 in Padilla where the Court

15   specifically rejects the idea that it's okay to

16   file in the Southern District of New York

17   because counsel was not -- did not know at that

18   time that the petitioner had been moved to South

19   Carolina; that what's known or not known to

20   plaintiff's counsel.

21        And I hope nobody in this room hears me

22   to be -- to be criticizing the performance of

23   counsel.  They were trying to represent their

24   client, but they didn't know where she was, just

25   like the petitioner's counsel in Padilla did not

33

1    know where he was.  They filed in the district

2    which was, you know, for lack of a better set of

3    words, their best estimate of where their client

4    was located.

5           But in this case she -- and in <u>Padilla</u>

6    he -- was not located there.  And the Supreme

7    Court specifically said habeas jurisdiction does

8    not attach under those circumstances.

9           And the fact that counsel didn't know

10    does not affect that analysis.  It's -- and that

11    being the case, that being the case the petition

12    and the amended petition here have never

13    conformed to the requirements of <u>Padilla</u>.

14         THE COURT:  But perhaps they didn't --

15    well, they clearly did not know, but one of the

16    things they would say is that they really made

17    all of these efforts to contact the Department

18    of Justice and ICE and calling numerous places

19    to try to get some information about where she

20    was.  And -- and it may be for legitimate

21    purposes.  It may be because of security

22    concerns.

23           I think part of your pleadings why, ICE

24    was very concerned about security and, as a

25    result, would not want to disclose where they

34

1    are.  But the fact is they continued to refuse

2    to tell counsel where she was, and does that

3    make a difference?

4            MR. DRESCHER:  No, I don't think it does.

5    And I don't think it does, just like in Padilla

6    it didn't make a difference.

7            And I appreciate your Honor, you know,

8    recognizing the point we made in our filing that

9    there are legitimate security reasons not to

10   disclose the location of somebody who's been

11   detained while that person is in transit.

12           And, you know, as -- and I can speak from

13   personal experience in the criminal context.

14   Sometimes somebody who has been arrested and

15   charged with a crime is, you know, held without

16   an opportunity to connect with family or a

17   lawyer for a period of, you know, a day or more.

18           If the system operated more efficiently,

19   nobody would be complaining about that, but this

20   is sort of the reality of when people get

21   arrested and get transported to a holding

22   facility.  I appreciate why that's frustrating

23   to counsel.  I appreciate why that was

24   frustrating to the petitioner in this case, but

25   it's not unusual for somebody who's being

35

1    arrested to be deprived of the ability to
2    communicate for most of a day following an
3    arrest.

4           THE COURT:  Right.  I suppose that they
5    could recognize why ICE would not necessarily
6    want to reveal the location, but then what their
7    argument would be, but we're prejudiced by the
8    fact that no one told us where she was.  Because
9    if somebody had told us that she was in Vermont,
10   they could very well have filed the same habeas
11   petition in Vermont that they filed in
12   Massachusetts.

13          MR. DRESCHER:  Well, I appreciate not
14   knowing where their client was located, they did
15   not know where to file a petition.

16          And I appreciate that one follows the
17   other, but that doesn't mean it's improper to
18   not disclose the location of their client until
19   she reached her final -- her final facility.

20          THE COURT:  All right.  There's one
21   other -- there's one other area of this
22   particular point in the story.  That is, when
23   she is filing her petition in Massachusetts,
24   10 o'clock, 10:02, the Massachusetts court
25   responded relatively quickly and, in fact, there

36

1    was a judicial order signed, I think at

2    11 o'clock, approximately 11 o'clock, certainly

3    well before her transport from Vermont to

4    Louisiana, in which they said, Don't move her.

5    They clearly expressed in a judicial order from

6    an Article III judge a desire to maintain

7    jurisdiction, keep her in Massachusetts.  At

8    that point they thought it was Massachusetts.

9    Don't move her.

10          And that was filed with the parties, so

11   the Department of Justice and ICE had notice of

12   this ruling and this order as of -- you know, on

13   the 25th, and yet that order had no impact.

14          And I'm interested to know, first of all,

15   if ICE knew about that order.  I know that

16   counsel made an effort to contact the lawyer for

17   the government so I just assume that they knew

18   of this order, and yet that seemed to have no

19   impact upon what ultimately happened to the

20   petitioner.

21          I'm wondering whether you acknowledge

22   that you, in fact, or the government, not you

23   particularly, but the government knew about the

24   order in the U. S. District Court in

25   Massachusetts and how you responded?

37

1      MR. DRESCHER:  I don't know who learned
2  about that order and when.  That's my threshold
3  answer.  I just don't know.  I'm not able to
4  speak to the factual flow of information.
5      My only observation, and I appreciate
6  this is pertinent to your Honor's point but
7  not -- it's pertinent to your Honor's point.  My
8  only observation is it's my -- it is my
9  understanding that order was to not remove the
10 petitioner from Massachusetts.
11     And at the time that order issued, she
12 was already out of the District of
13 Massachusetts, making, you know -- and so
14 it's -- it created some complications for what
15 to make of that order.
16     Now I'm speaking about that as an
17 educated observer who's aware of that aspect of
18 the record but, again, you know, without --
19 without having information about who knew what
20 and when, if there's a court order that says,
21 you know, don't leave Burlington but you're
22 already in Rutland, it's not clear if it's
23 possible to comply with that court's order.
24     And as I understand the order your Honor
25 is referring to, that's sort of -- that's sort

38

1    of the predicament that was existing then.

2         THE COURT:  Well, the spirit of the order

3    clearly was that the Massachusetts judge, the

4    U. S. judge in Massachusetts wanted to maintain

5    jurisdiction on the habeas.

6         MR. DRESCHER:  I assuming incorrectly

7    that -- that that court had jurisdiction under

8    Padilla at the time the petition was filed.

9         The other thing I'd point out, and I know

10   your Honor confronts this all the time in the

11   criminal context; that it would be extremely

12   unusual for a court to dictate to the branch of

13   the executive, the agency of the executive

14   branch specifically, where to house somebody

15   who's in custody.

16        In the criminal case the marshal service

17   makes those calls based upon all sorts of

18   reasons.

19        In this case the record is that the folks

20   at ICE had canvassed the available --

21   potentially available facilities in New England.

22   I believe this is Paragraph 6 of the Wessling

23   declaration, Docket 19-1, I believe, and ICE had

24   concluded there was no available bed space in

25   New England.

39

1          And under those circumstances, you know,

2     they -- you know, managing bed space is a

3     recurring issue, and --

4          THE COURT:  So your position is that they

5     decided to use this rather unique proceeding,

6     taking her to Metheun, Massachusetts, to just a

7     really quick stop and then -- then New Hampshire

8     and then Vermont, that was all because of lack

9     of bed space?

10         And you know that there's some affidavits

11    that were submitted by petitioner which

12    described the available bed space in all of New

13    England, which was contrary to what you just

14    said.

15         But what you're saying is that -- is that

16    the ICE agents in this particular case actually

17    looked into whether there was space.  They

18    didn't want to treat her any differently than

19    anybody else, but they saw that there was no

20    space available?

21         MR. DRESCHER:  I don't want to talk -- I

22    can't speak to what they wanted.

23         I can speak to what's in the Wessling

24    declaration.  And my recollection of that

25    declaration is that there was no available bed

40

1    space and that managing bed space was one of the

2    factors that contributed to why things played

3    out the way it did.

4         Now, I appreciate that there are -- that

5    there are -- you know, in the declarations that

6    your Honor referenced there are descriptions

7    from immigration advocates about their

8    familiarity with people who are in immigration

9    detention being housed in different facilities

10   around New England.

11        But as your Honor knows, at any given

12   time the availability of bed space is a

13   fluctuating thing; that my recollection is that

14   there was an affidavit from an advocate or a

15   declaration from an advocate in Maine who

16   explained she had sort of regular information

17   flow from one of the local jails in a county

18   jail in Maine.  I have no reason to dispute the

19   fact that she had access to those flows, but the

20   fact --

21        THE COURT:  My memory is that she said

22   there was 19 beds available, right?

23        MR. DRESCHER:  That was her assessment.

24        It's -- ICE's assessment was that there

25   was no bed space available for -- based upon the

41

1    Wessling declaration.  I appreciate that, and

2    I -- you know, ICE is going to have a

3    perspective different than an immigration

4    advocate in terms of communication with the

5    jails.  I can't speak to those, but the

6    statement of an immigration advocate about what

7    she assesses in terms of the availability of bed

8    space I don't think should be cause for, you

9    know, questioning the accuracy of the

10    declaration from the ICE official, whose job it

11    is to manage bed space and take in all sorts of,

12    you know, the day-to-day issues associated with

13    that.

14         THE COURT:  Okay, but at least in this

15    broad issue about whether there can be

16    flexibility in habeas cases, and in particular

17    in extraordinary circumstances adjustment as to

18    the rules so that in the interest of justice

19    cases can be filed and then adjusted, do you

20    have any more to say on that?

21         MR. DRESCHER:  I think -- well, if your

22    Honor is asking about 1631 --

23         THE COURT:  Right, so now we're getting

24    into 1631.  That was the bridge to 1631.

25         MR. DRESCHER:  Thank you.  I'm glad I

42

1    picked up on that.

2          1631, the 2nd Circuit has observed that

3    1631 does not cure defects that -- such as if

4    something is filed out of time.  It does cure if

5    something is filed in the wrong court but on

6    time.

7          In this case there are defects in terms

8    of filing in the wrong court, not naming the

9    right petitioner, and using 1631 to -- in the

10   words, of the district judge in New Jersey, as a

11   time machine to sort of -- to declare that the

12   case will proceed as if it was filed somewhere

13   else at a particular time is -- you know, is

14   counterintuitive and I believe is contrary to

15   the rule of Padilla.

16         You know, 1631 uses the verb "shall" in

17   the interest of justice and, you know, there's

18   no mention of 1631 in Padilla.  1631 existed at

19   that time.

20         If 1631 was supposed to apply in that

21   context, then you would have expected it to have

22   at least come up in discussions in some fashion.

23         As we note in our papers, the district

24   judge in New Jersey who accepted the transfer

25   from the SDNY under 1631 recognizes that it's a

43

1    potentially thorny issue that -- and has

2    certified the question of its jurisdiction as

3    the basis for an interlocutory appeal to the

4    3rd Circuit.

5         And, you know, taking another half a step

6    back, if 1631 were allowed to fix a habeas

7    petition any time it was filed in the wrong

8    district, especially during the time of transit,

9    when the petitioner is in the time of transit,

10   courts would be engaged in -- you know, for

11   example, when this case, when the petitioner was

12   flying and had a stop in Atlanta, as I

13   understand it, if the petition had been filed

14   while -- while she was in the air would it be

15   the Court's job to figure out what state she was

16   over at that point?

17        Or if she was going through, you know,

18   the Hartsfield Airport, does that mean that

19   Massachusetts could have conveyed it,

20   transferred it to -- it creates a host of

21   problems and basically, you know, undermines the

22   reason for the Supreme Court's attention to the

23   immediate custodian rule in <u>Padilla</u>.

24        THE COURT:  But isn't that an argument

25   for the opposite of the point that you want to

44

1    make?

2         That's an argument for flexibility.

3    That's an argument for a person, let's say who's

4    in transition.  You don't know where they are

5    and, quite frankly -- well, you know, a person

6    is in transition.  You don't know exactly what

7    jurisdiction would be the final call, but you

8    know that if a person is in a particular place,

9    at that particular place they got a right to

10   file a habeas.

11        And then it's fair to say, I mean, I can

12   think of probably many cases in which people

13   have filed habeas in Vermont and the case is

14   then transferred to the appropriate jurisdiction

15   in the interest of justice, assuming it's in the

16   interest of justice.  And, you know, that

17   happens quite regularly.

18        People file in the wrong place and, as a

19   result, it's moved over to the place in which it

20   should be filed.  And it's never been a big

21   deal, frankly.  And you're suggesting that it's

22   not appropriate here and --

23        MR. DRESCHER:  I'm suggesting that, you

24   know, that what is known to petitioner's counsel

25   at the time the original petition files and

45

1    petitioner's counsel making her best effort to

2    file it in the place of confinement, Footnote 17

3    of <u>Padilla</u> makes clear that that doesn't matter

4    for purposes of habeas jurisdiction.

5              THE COURT:  Okay.

6              MR. DRESCHER:  If your Honor has any

7    other questions, I'll try to field them.

8    Otherwise, I'll sit down.

9              THE COURT:  Okay.  All right.

10             Who's going to argue on behalf -- well,

11   we've been going for an hour.  How about if we

12   take a fifteen-minute recess, and then you can

13   figure out who's going to argue first.

14             Okay.

15             THE CLERK:  All rise.

16             (A recess was taken from 10:31 a.m. to

17   10:49 a.m.)

18             THE COURT:  Good morning.

19             MS. ZAFAR:  Good morning, your Honor.

20   Noor Zafar for Petitioner Rumeysa Ozturk, and

21   I'll be addressing the INA judicial bars.

22             I'd like to make three points with

23   respect to the bars.

24             First is clarify the nature of the relief

25   that we're seeking today.  Second is to explain

46

1    why the petition for review process is an

2    inadequate substitute for this Court's habeas

3    review.  And then, finally, just to note for the

4    record that Ms. Ozturk did, in fact, submit a

5    bond application this morning but, regardless,

6    the Court does not need to wait for that process

7    to play out because exhaustion here would

8    largely be futile.

9         THE COURT:  She has filed a bond

10   request --

11        MS. ZAFAR:  Correct.

12        THE COURT:  -- in Louisiana?

13        MS. ZAFAR:  Correct, as of this morning.

14        So first with respect to the relief that

15   we're seeking.  What Ms. Ozturk seeks here is

16   relief from unlawful detention.  Her claim

17   arises from detention, not from her removal

18   proceedings.

19        THE COURT:  Okay, so let me ask you about

20   the remedy that you're seeking.  You're arguing

21   that based upon the constitutional violations,

22   the First and Fifth Amendment violations in

23   particular you're arguing happened, you're

24   arguing for release on this particular petition?

25        MS. ZAFAR:  Correct, your Honor.

47

1    THE COURT:  So is she being held on this
2    order, or is she being held on the order of the
3    immigration court?
4        MS. ZAFAR:  She's being held -- our
5    argument is that she's being held in retaliation
6    for her speech.  And so we're not -- we're not
7    contesting the general authority that the
8    government has to detain people pending removal.
9    We're not challenging that discretion.
10        THE COURT:  Okay, so you take a look at
11    1226(e).  The issue of detention is delegated to
12    the immigration authorities, and the argument
13    that Mr. Drescher is making is that immigration
14    has decided she should be detained for the
15    removal proceedings.
16        Now, you are arguing that her detention
17    violated the First and the Fifth Amendment?
18        MS. ZAFAR:  Correct.
19        THE COURT:  And the remedy that you're
20    seeking is release from detention.
21        And my question is if the Court released
22    her from detention on her habeas petition, does
23    that have any impact on her detention which has
24    been ordered by the Immigration and
25    Naturalization Act by ICE?

48

1        In other words, they could very well

2   say -- and obviously we were addressing that

3   question.  They could very well say you have no

4   authority to tell ICE that they can release her

5   in the removal proceedings.

6        MS. ZAFAR:  So that, your Honor, simply

7   conflicts with established Supreme Court law and

8   the law of the Circuit which makes clear that

9   when a petitioner is challenging the legal basis

10  for their detention, which is what Ms. Ozturk is

11  doing here; she's saying that the government

12  does not have any legal authority to detain

13  people in retaliation for their speech.  When

14  the question is of what is executive's legal

15  authority, that is something that this Court has

16  jurisdiction to review, and that's been made

17  clear, again through Supreme Court case law and

18  through case law in the 2nd Circuit and other

19  courts in this district.

20       THE COURT:  Okay.  So you say case law in

21  which the granting of the habeas petition

22  resulted in the release of a defendant -- I mean

23  of a petitioner who is, in fact, in removal

24  proceedings?

25       In other words, something directly on

49

1    point.  That is, if the Court finds habeas

2    violation, violation of the First and the Fifth

3    Amendment, I'm going to order her release, do

4    you have precedent to say that order ordering

5    her release would then impact the ICE

6    authorities in the removal proceedings?

7         MS. ZAFAR:  So, your Honor, the

8    government sites the Delgado case, which there

9    the Court -- so there it was not a detention

10   habeas, but basically the principal that was

11   articulated in Delgado was that the relief that

12   the petitioner was seeking there, if it were

13   granted, would directly result in the

14   nullification of removal proceedings.  That's

15   not what we have here.

16        If the Court grants release here, her

17   removal proceedings will proceed as they are and

18   there would be no impact on that.  So the

19   detention claim is really collateral to and

20   independent of the removal proceedings that are

21   happening.

22        THE COURT:  Okay, so let's assume that

23   she is released here on this habeas petition.

24   She's no longer in ICE custody.  She's released.

25        Does the proceeding continue?

50

1      MS. ZAFAR:  Yes, the proceeding continues
2  because the release order would have no bearing
3  on whether her removal proceedings are lawful.
4      THE COURT:  Okay, so the removal
5  proceedings would continue.  I assume she would
6  appear virtually?
7      MS. ZAFAR:  Yes.  She could appear
8  virtually, yes.
9      THE COURT:  Okay.  What about the impact
10  on detention?
11      When you look at the INA, which basically
12  says the Court should not -- it has no
13  jurisdiction over detention in a removal kind of
14  setting, doesn't this suggest that there is some
15  impact on detention?
16      That's the detention order made by ICE?
17      MS. ZAFAR:  There would be impact
18  generally if we're talking about the
19  discretionary decision to detain pending
20  removal.  But where -- our claim is not with
21  respect to the discretion to generally detain.
22  It's about the legal authority to detain in the
23  first place.
24      THE COURT:  Okay, but still that's going
25  to impact their discretionary decision on

51

1    detention, is it not?

2         MS. ZAFAR:  It will, but -- but the

3    courts have recognized that when it comes to

4    unlawful detention, the Court, the District

5    Court has habeas jurisdiction to review that.

6         THE COURT:  Okay, so what you're saying

7    is that when you have habeas jurisdiction and

8    you rule that there's a constitutional violation

9    in the beginning of the prosecution, the

10   beginning of the removal proceedings, that is

11   there's a violation of the constitutional right,

12   that person cannot be held so there is going to

13   be impact upon the ability of ICE agents to

14   order detention?

15        MS. ZAFAR:  There will be an impact on

16   their ability to order detention but not to

17   carry out removal.

18        THE COURT:  How about discretion?

19        How about when the INA says, oh, that

20   they have discretion or they have the ability to

21   make decisions which are discretionary and those

22   are to be upheld and not reversed by courts,

23   does that impact your argument?

24        MS. ZAFAR:  Well, your Honor, there's no

25   discretion to violate the Constitution so,

1    again, we're not talking about a discretionary

2    decision here.

3        THE COURT:  Well, there is a

4    discretionary decision in regard to detention.

5    And in the removal proceeding when they make the

6    discretionary decision about detention, that

7    isn't necessarily violating the Constitution.

8        The Constitution was violated well before

9    when -- at the very beginning of the process.

10        So does that constitutional violation

11    continue?

12        MS. ZAFAR:  Yes, your Honor, and I can

13    point the Court to a case that we cite from the

14    Southern District of New York, the <u>Michalski</u>

15    case, and there the petitioner brought a similar

16    challenge in that he was challenging the initial

17    legal authority for ICE to detain him.

18        And the government raised similar

19    jurisdictional bars about why the INA would

20    strip the District Court of habeas jurisdiction,

21    and the Court found that because the petitioner

22    was challenging not a discretion decision to

23    detain pending removal but the very legal

24    authority and basis for his detention in the

25    first place, that the INA did not strip habeas

53

1    review.

2            So really the distinction comes down to

3    whether there's a challenge to a discretionary

4    action, which is not what we have here, or if

5    there's a challenge to the executive legal

6    authority to carry out certain actions.

7            THE COURT:  But that sort of turns the

8    argument on its head because then they're likely

9    to say, the government may very well be likely

10   to say the Court made a decision about habeas,

11   about the beginning of the process but, in fact,

12   the reason that she's being held right now is

13   because of the detention order in the removal

14   proceedings that was made by the IJ or, you

15   know, by ICE.

16           There, that's the decision that is

17   holding her right now, and you are acknowledging

18   that this Court has nothing to do with that

19   decision, is not reversing that decision.

20           So does that give them the ability to say

21   you haven't overruled our decision, our

22   discretionary decision about detention and,

23   therefore, that ruling is in effect?

24           MS. ZAFAR:  Your Honor, I would just

25   again reiterate that we're not challenging a

54

1    discretionary decision here.  We're really

2    challenging ICE's authority to detain.

3         And I'll just note that in the typical

4    visa revocation, ICE does not detain.  Usually

5    those -- in those cases there's no detention,

6    and there's frequently not even a removal order.

7         What we have here is really extraordinary

8    circumstances where a decision was made by ICE,

9    not by the IJ, by ICE to detain her in

10   retaliation for her speech.

11        THE COURT:  Okay.  All right.

12        MS. ZAFAR:  And then just to move to the

13   second point about why a petition for review

14   would be inadequate substitute for -- for this

15   Court's habeas review, so in Jennings the Court

16   made clear that when the channeling provision at

17   1252(b)(9) would essentially result in a court

18   not being able to provide meaningful relief,

19   that channeling is not appropriate and the

20   District Court has habeas jurisdiction.

21        And the 3rd Circuit and the 1st Circuit

22   have sort of distilled that principal into a

23   now-or-never principal, which basically says

24   that if waiting for the PFR process to play out

25   would preclude effective relief, then District

55

1    Court review is available.

2         And here we have the sort of prototypical

3    now-or-never claim.  We have, one, the

4    irreparable harm from her detention but then, in

5    addition to that, we also have the harm to her

6    speech.  Every minute that she's detained her

7    speech is being chilled, and that's why review

8    from this Court and relief from this Court is so

9    important.

10        Secondly, there are some built-in

11   limitations to the nature of the review that

12   could take place in the immigration courts.

13        So, first of all, the immigration judge

14   and the BIA are not empowered to consider

15   constitutional claims, which is exactly what we

16   have here.  We're challenging the

17   constitutionality of her detention, but the IJ

18   and the BIA simply would not have the power to

19   consider those claims as part of her removal

20   proceedings.

21        And then, in addition to that --

22        THE COURT:  I mean, they can never

23   consider constitutional issues and at least as a

24   part of their review?

25        MS. ZAFAR:  No, your Honor, they're not

56

1      empowered to consider constitutional claims.

2      Their review is limited to whether the charge of

3      removability has been met.

4              And here the government says she's

5      removable because her visa was revoked, so

6      their -- the scope of their review would be

7      limited to that question.

8              But, of course, we say that there are

9      constitutional questions implicated in that, but

10     those constitutional questions are not something

11     that the immigration judge or the Board of

12     Appeals would be empowered to consider.

13             THE COURT:  Okay.

14             MS. ZAFAR:  And then, finally, the

15     ability of the IJ and the BIA to create a

16     factual record, an evidentiary record is also

17     very limited.  So there's limited authority to

18     call witnesses and to issue subpoenas.

19             And, again, that would really have an

20     impact on, once the ruling actually gets up to

21     the Court of Appeals which can review the

22     constitutional issues in the first instance, the

23     record developed would be largely inadequate for

24     a robust review of the constitutional issues.

25             THE COURT:  Well, what about the

57

1    requirement that they notice you, notice the

2    petitioner or notice you in a removal proceeding

3    about the nature of the charges?

4         About what evidence they have to bring

5    the petition and to seek removal.  Do you have a

6    right to a full disclosure of what they are

7    alleging?

8         MS. ZAFAR:  Yes.  I mean, they can submit

9    their evidence and the petitioner has some time

10   to review that but, you know, I would like to

11   sort of refer to a recent example of a case that

12   I think has a lot of parallels with Ms. Ozturk's

13   case, and that was the case of Mahmoud Khalil,

14   who just had his merits removability hearing on

15   Friday.

16        And there the government presented its

17   evidence, and the petitioner was given 48 hours

18   to review and respond to that evidence, which of

19   course is inadequate.

20        And there were other, you know, defects

21   with that proceeding that I can get into, but

22   just because the government presents its

23   evidence does not mean that the petitioner will

24   get an adequate time to review and respond.

25        And I'll just note in that case the

58

1    petitioner made several evidentiary requests,

2    all of which were denied.  So there really is a

3    concern that if these claims were to be raised

4    exclusively in the PFR process, that petitioner

5    would not get a robust and meaningful hearing of

6    her claims.

7         THE COURT:  All right.  So what is the

8    evidence that has been disclosed to you about

9    the basis of the government's request for

10   removal?

11        MS. ZAFAR:  Well --

12        THE COURT:  Is it just the article?

13        MS. ZAFAR:  To this point, and I am not

14   working on the immigration proceeding so I don't

15   want to speak to something I don't have direct

16   knowledge of, but at this point the only thing

17   that's happened is that Ms. Ozturk's master

18   calendar hearing has been scheduled for this

19   Wednesday.  And that's the hearing where the

20   petitioner and the government will determine a

21   schedule and sort of how to proceed with the

22   actual merits hearing.  So so far there hasn't

23   been evidence submitted by the government.

24        THE COURT:  Well, there was a submission

25   that you filed with the Court on Friday

59

1    indicating that really the basis of this claim

2    is all within the Tufts article and that there

3    was no other evidence of your client engaging in

4    anti-Semitism or advocacy for terrorists groups,

5    right?

6           There's no evidence of that?

7           MS. ZAFAR:  Correct.  Correct.

8           THE COURT:  Is that -- have you been told

9    that?

10          Is that what the government's position

11   is?

12          MS. ZAFAR:  As far as -- as far as I know

13   that is the entirety of the government's case,

14   is that she is -- her visa was revoked, and

15   she's been detained because she co-authored an

16   op-ed in her school newspaper.

17          THE COURT:  And that's it?

18          MS. ZAFAR:  As far as we know.  The

19   government has not presented any additional

20   evidence.

21          THE COURT:  And do you anticipate that

22   any additional evidence or claims to be made by

23   the government would be filed on Wednesday?

24          MS. ZAFAR:  It's possible.  I'm not sure

25   if the government would submit evidence on

60

1      Wednesday.  You know, it could introduce
2      additional charges for removability, but at
3      least -- I mean, so far we don't have any
4      evidence from the government except for that one
5      State Department memo.
6              THE COURT:  Thank you.
7              MS. ZAFAR:  And then, finally, I just
8      want to turn to the bond hearing process and why
9      this Court does not need to wait for that
10     process to play out before ordering relief here.
11             So, first of all, exhaustion here is not
12     a statutory or regulatory requirement.  It's
13     purely production, and it would be futile for a
14     couple of reasons.
15             So, first, as I mentioned, the IJ and BIA
16     is only limited to considering whether she's a
17     flight risk or danger in the context of a bond
18     hearing.  They cannot consider any of the
19     constitutional claims that we are bringing with
20     respect to her detention.
21             Secondly, even if she were released on
22     bond, that would not remedy the First Amendment
23     harms here because the government under the
24     relevant regulations has wide-ranging discretion
25     to re-detain her, including if she wrote another

61

1      op-ed that the government disagreed with.  So

2      release on bond would not be a sort of

3      meaningful remedy because she could easily be

4      re-detained.

5           And then, finally, even if bond were

6      granted, the government can appeal it to the BIA

7      but, more importantly, it can also obtain an

8      automatic stay, which would stay the decision to

9      release her on bond from at least 90 days up to

10     almost 200 days.

11          And, of course, during this whole time

12     Ms. Ozturk would be detained and the irreparable

13     harm, detention, and the chilling of her speech

14     would be accruing.

15          So, you know, for these reasons we don't

16     think it's appropriate for this Court to wait

17     for that process to play out because it doesn't

18     offer a meaningful remedy.

19               THE COURT:  Okay.  All right.

20               MS. ZAFAR:  Thank you, your Honor.

21               THE COURT:  Okay.

22          Okay, who's next?

23          (Ms. Lafaille approached the podium.)

24               THE COURT:  Good morning.

25               MS. LAFAILLE:  Good morning, your Honor,

62

1    I'm Adriana Lafaille.  I'm here to speak to the

2    venue, habeas jurisdiction issues.

3              THE COURT:  Okay.

4              MS. LAFAILLE:  As your Honor pointed out,

5    habeas is a flexible and equitable remedy.  And

6    every case that the government has cited and

7    that's in the party's papers demonstrates over

8    and over again that although there are ordinary

9    rules, the ordinary rules bend to ensure the

10   availability of The Great Writ, that sacred

11   remedy of habeas corpus.  This case falls

12   squarely within the letter of 1631.

13             The District Court determined that

14   jurisdiction was wanting, transferred it to the

15   Court in which the action could have been

16   brought, and now this action must proceed as if

17   it had been filed in this Court at 10:02 p.m. on

18   March 25th at a time when the petitioner,

19   Ms. Ozturk, was unquestionably in this district.

20             THE COURT:  And she was in a vehicle; is

21   that correct?

22             Am I right about the facts there?

23             MS. LAFAILLE:  Correct, your Honor.  Yes,

24   that's what we understand from the government's

25   declaration.

63

1    THE COURT:  And who would you think would

2    be the immediate custodian of her at that

3    moment?

4    MS. LAFAILLE:  So we think we've named

5    the immediate custodian.  We think it's Patricia

6    Hyde, the field officer/director for the New

7    England region.

8    This is a petition case where the

9    government has said over and over again "not

10   that custodian" but they refuse to say, well,

11   then who is the custodian that they will

12   acknowledge as correct.

13   It falls -- you know, if anything, if not

14   Ms. Hyde then, of course, this case has to fall

15   squarely within the unknown custodian exception,

16   because the custodian appears so unknown that it

17   cannot even be named by government counsel in

18   this proceeding.

19   THE COURT:  And what does the unknown

20   custodian exception say?

21   MS. LAFAILLE:  That exception allows a

22   case to be brought against supervisory officials

23   when the custodian is unknown.

24   THE COURT:  All right.  So if the

25   custodian is not known and it's without fault of

64

1    the petitioner, then the fallback or default

2    position would be, in fact, to sue or to name

3    the Attorney General, the head of ICE, some

4    removed official because you can't figure out

5    who is the immediate custodian, and has that

6    been established in precedent?

7         MS. LAFAILLE:  Yes, your Honor, and here

8    we've named all of those individuals of the

9    chain from the local district director, Patricia

10   Hyde, to the DHS secretary, who might be thought

11   of as the ultimate legal custodian here.

12        So the custodian has been named either

13   because the custodian -- either because Patricia

14   Hyde is the immediate custodian or because the

15   immediate custodian is someone else, and these

16   principals have to be allowed to bend to allow

17   us to amend in that person and to require the

18   government to tell us who that person even is.

19        THE COURT:  And the Court would have the

20   authority to open up the pleadings to let you

21   amend the pleadings when you, in fact, have

22   identified the immediate custodian; is that

23   right?

24        MS. LAFAILLE:  Yes, your Honor.  That

25   would be replacement of the -- adding immediate

65

1   custodian would be standard, is the kind of

2   thing that's done routinely in habeas cases.

3           THE COURT:  Okay, so I want to ask you a

4   little bit about the facts.

5           MS. LAFAILLE:  Yes, your Honor.

6           THE COURT:  So the filing was at 10:02,

7   and your pleadings have said that you didn't

8   know where she was; that what efforts were made

9   to contact the government, and can you just

10  describe what efforts were made prior to 10:02

11  to identify the district of detention and the

12  immediate custodian?

13          MS. LAFAILLE:  So, your Honor, the -- and

14  I'll refer the Court to the declaration of Mahsa

15  Khanbabai, the attorney who filed the habeas

16  case.

17          Attorney Mahsa Khanbabai was calling ICE

18  multiple times during the course of those -- of

19  those -- of that day beginning on the March 25th

20  and continuing into March 26th.

21          THE COURT:  Well, she was taken into

22  custody about 5:30.  So between 5:30 and 10:00

23  he was making constant contact with ICE?

24          MS. LAFAILLE:  Your Honor, I'm not sure

25  about that point.  I'll have to clarify that

66

1    with Attorney Khanbabai.

2          There were continuous efforts to locate

3    Ms. Ozturk, but there was no reason to think

4    that so quickly after her arrest that she might

5    be outside the jurisdiction other than the

6    practice in, your Honor, the Khalil case to

7    transfer quickly.

8          THE COURT:  Okay, but then there was a

9    judicial order, was there not?

10          MS. LAFAILLE:  Correct, your Honor.

11          THE COURT:  So tell me about that.  What

12    happened there?

13          MS. LAFAILLE:  And that is one of the

14    features of this that I find most troubling.

15          There was a judicial order close to

16    11 o'clock, which was transmitted to counsel for

17    the government, and --

18          THE COURT:  How was that done?

19          MS. LAFAILLE:  Through the emergency

20    clerk.

21          This is -- so the clerk informed Attorney

22    Khanbabai that they had let the United States

23    Office know about the petition and the -- they

24    were sent, also, the order.

25          Now, we discussed this order at length in

67

1    our proceedings in the District Court of

2    Massachusetts.  Not once has the government come

3    forward to say we didn't receive the order in

4    time; we didn't know about the order.

5         What the government has said was, well,

6    the order was issued after she was out of

7    Massachusetts.  Mr. Drescher just said, you

8    know, complications or what to make of that

9    order would arise at that point because she was

10   no longer in Massachusetts.  And, you know,

11   Mr. Drescher was being not clear if it was

12   possible to comply at that point.

13        And the government receiving an order

14   from a court to keep someone in Massachusetts

15   when that person has already crossed state lines

16   into Vermont has a couple of choices.  One might

17   be to bring petitioner back to Massachusetts to

18   be in conformity with the order.

19        Another might be to seek clarification

20   from the Court and say actually this person is

21   outside of Massachusetts.

22        But the purpose of the order was very

23   clear, and it was to preserve the status quo.

24   And that phrase is in the order itself.

25        And the government having received --

68

1       THE COURT:  It was to preserve the status

2   quo for the habeas petition --

3       MS. LAFAILLE:  Correct, your Honor.

4       THE COURT:  -- which had been filed in

5   Massachusetts?

6       MS. LAFAILLE:  Yes.

7       THE COURT:  So the judge then ordered

8   that she was not to be removed from

9   Massachusetts.

10      So how do you address the argument that

11  the government is making that she's already

12  outside the state and this is an order which is,

13  I guess, impossible to comply with?

14      MS. LAFAILLE:  General -- generally the

15  order is intended, and there's law in the 2nd

16  Circuit about violation not just of the letter

17  but of the spirit of the order.

18      THE COURT:  So where is that in case law?

19      MS. LAFAILLE:  I'd have to get your Honor

20  the cite.  I don't have it right with me.

21      THE COURT:  Okay.  So in the immigration

22  context there is case law to suggest that in

23  this kind of situation the government is on the

24  obligation to say the spirit of this order, in

25  addition to the letter of the order, requires

69

1   this person not to be moved?

2           Is that --

3           MS. LAFAILLE:  It's not so specific as

4   that, your Honor.  There's case law about

5   following the compliance with the spirit of the

6   order, not just the letter of the order, but --

7           THE COURT:  So what is the remedy that

8   you seek for a violation of that order?

9           MS. LAFAILLE:  My point here is that this

10  is one of the factors that goes to these

11  equitable considerations that we were talking

12  about when we think about the habeas

13  jurisdiction issues that have been brought up

14  here.

15          This is a case in which someone has been

16  locked up for writing an op-ed, grabbed off the

17  street in, you know, something that should

18  really shake all Americans, and we're almost

19  three weeks into her custody with every judge

20  that has touched this case moving as

21  expeditiously as possible.  And, you know, still

22  Ms. Ozturk is -- you know, still has not, until

23  today, had the opportunity to have the merits of

24  her case presented to a federal court.

25          THE COURT:  Well, I'm interested in your

70

1    request to have her transferred back to this
2    district.
3          You make this argument that -- almost a
4    totality of circumstances argument.  That is,
5    because you have such a strong case and because
6    of the circumstances of this situation where
7    there was only one article and that was an
8    article which, according to you, basically was
9    critical most of the authorities at Tufts
10   University, and those combination of factors,
11   together with the fact that you need to have her
12   here to prepare for your trial or your hearing
13   warrant her being moved.
14         I guess my question is if you argued that
15   there was a judicial order that she not be
16   removed, and at least a part of your solution
17   would be to enforce that order?
18         MS. LAFAILLE:  Yes, your Honor, and in
19   the first -- my colleague, Jessie Rossman, can
20   speak to the bail and transfer issues.  In
21   the --
22         THE COURT:  All right.
23         MS. LAFAILLE:  In the first instance we
24   asked for her to be released.  Only as an
25   alternative to that would we propose that she be

71

1    brought back to Vermont.

2            But with regards to the question of

3    habeas jurisdiction, I think the conduct of the

4    government with regards to the order as well as

5    the very peculiar manner, to put it mildly, in

6    which the government handled her movements that

7    evening certainly warrant exercise of this

8    Court's habeas jurisdiction.  It's within the

9    equitable powers of the Court, the flexible

10   nature of the habeas remedy.

11           THE COURT:  So are you relying upon the

12   Kennedy concurring opinion or --

13           MS. LAFAILLE:  I'm not relying on -- I

14   think those -- we could allow them, but that's

15   not my primary basis, your Honor.

16           THE COURT:  You don't need to rely on the

17   Kennedy --

18           MS. LAFAILLE:  We don't.  We don't, your

19   Honor.

20           THE COURT:  Kennedy requires -- and

21   Justice O'Connor was concurring as well, and

22   that requires essentially an onus on you that

23   the government did this as a, sort of an

24   intentional way of trying to subvert your

25   ability to file habeas petition, right?

72

1        That's essentially what Justice Kennedy

2   said, and that has not been adopted by other

3   courts.  It hasn't been rejected either, but

4   you're not relying upon that.  You're just

5   relying upon the exceptional circumstances of

6   this situation, right?

7        Is that right?

8        MS. LAFAILLE:  Yes, your Honor.

9   Primarily we're relying on 1631 to say that this

10  is a case that could have been brought in New

11  Hampshire -- excuse me, in Vermont at the time

12  it was filed.

13       THE COURT:  You're in Vermont now.  I

14  appreciate -- yeah, you're in Vermont.

15       MS. LAFAILLE:  Thank you, your Honor.

16       Obviously our client undertook a

17  multistate journey that night, but this was a

18  case that could have been brought in Vermont

19  and, therefore, straight under the letter of

20  1631 this case has been properly transferred

21  here and now should be treated as if filed in

22  Vermont on that night.  So that's our primary

23  basis.

24       And then Endo, the Supreme Court's

25  decision in Endo talks about the government not

73

1       being able to defeat habeas jurisdiction from

2       subsequent movements after the filing of a

3       habeas petition.

4               THE COURT:  Okay, so once habeas is

5       established in Vermont, according to your

6       argument, then the transfer to the south would

7       be irrelevant because you can't transfer

8       jurisdiction.

9               So the fact that she's in Louisiana now

10      does not defeat the jurisdiction, which is

11      already established in Vermont under the Endo

12      rule; is that right?

13              MS. LAFAILLE:  Correct, your Honor.

14      Correct, your Honor.  And that rule is one --

15              THE COURT:  That was 1934, and you know

16      that's still in -- still being credited?

17              MS. LAFAILLE:  It is, and it was

18      referenced in Padilla, of course, as one of the

19      bedrock exceptions to the ordinary rule that you

20      sue where the immediate custodian, the

21      jurisdiction of confinement.

22              Of course, if the person has been moved

23      during the pendency of the habeas then you're no

24      longer in the jurisdiction of confinement, but

25      that doesn't matter as long as the habeas was

74

1    filed, or in this case was treated as if filed,

2    in the jurisdiction of confinement at the time

3    of the filing.

4         So that -- that's our, the primary thing

5    we're relying on.  And, you know, the only

6    defect that the government can attach here is

7    that the custodian theoretically wasn't named.

8    And that's where I'd point to the flexible

9    nature of these remedies and the fact that, you

10   know, to this day the government has not even

11   said who the appropriate custodian is that could

12   be named.

13        It's difficult to fault -- to fault

14   Ms. Ozturk for not naming someone that the

15   government themselves has not been able to name.

16   And to suggest that because of that this

17   petition should be dismissed and have to be

18   re-filed really runs counter to the weight of

19   all of this law that says the habeas remedy must

20   be preserved.

21        And even though we have these basic rules

22   for the general case, we have to bend them when

23   her unknown custodians -- when the government is

24   doing things that make it difficult for the

25   ordinary rules to be followed.

75

1          THE COURT:  Okay.

2          MS. LAFAILLE:  Thank you, your Honor.

3          THE COURT:  All right.  And you have a

4     third presenter?

5          (Ms. Rossman approached the podium.)

6          THE COURT:  Is it Ms. Rossman?

7          MS. ROSSMAN:  Yes.

8          THE COURT:  And you're going to be

9     addressing the release or transfer?

10          MS. ROSSMAN:  Yes, your Honor, both

11     release and transfer.

12          THE COURT:  Okay, so the argument in

13     regard to the motion to dismiss is then --

14          MS. ROSSMAN:  That is correct, your

15     Honor, so I didn't know --

16          THE COURT:  So now we're going to go into

17     the request that you are making for her release

18     or, alternatively, for transfer to this

19     jurisdiction?

20          MS. ROSSMAN:  That's right, your Honor,

21     and I wasn't sure if you wanted Attorney

22     Drescher to address any response to them, or I

23     can move directly into release and return.

24          THE COURT:  I think you can move directly

25     into it, and then we can give Attorney Drescher

76

1       a response to the motion to dismiss and also a

2       response to your argument.

3               MS. ROSSMAN:  Thank you, your Honor.

4               As numerous declarations in this record

5       make clear, this is not a case of ordinary

6       immigration enforcement.  And I know there's

7       been a lot of discussion today about the

8       discretion that the government has, in

9       particular components of immigration

10      re-enforcement, but there is not discretion,

11      even within immigration law, for the government

12      to violate the Constitution.

13              And it's not unusual even outside of the

14      immigration context to have situations where an

15      individual has discretion; for example, at-will

16      employment, but that discretion is confined by

17      constitutional limitations.  You can't fire

18      someone for an unconstitutional reason.

19              And the 2nd Circuit has similarly said in

20      the Velasco Lopez decision, recognizing the

21      government power, that there are important

22      constitutional limitations on that discretion.

23              So in this instance -- and Velasco Lopez,

24      I should say, excuse me, your Honor, goes on to

25      say that the discretion to detain is confined by

77

1    the legitimate purposes which can be for flight

2    or for a finding of dangerousness.

3         And the 2nd Circuit has also said, even

4    outside of the context of the immigration, again

5    that it's almost a tautology to say that federal

6    agencies can't have the discretion to violate

7    the Constitution.  And that's both at the

8    Bates vs. Town of Cavendish case that we have

9    cited in our brief, your Honor, as well as the

10   Myers & Myers decision.

11        So here at every step along the way what

12   has been made clear is the government's actions

13   was not an appropriate exercise of discretion

14   but actually is an unlawful use of the

15   immigration law as a cudgel to punish the

16   petitioner, Ms. Ozturk, and to also send a clear

17   message to all other noncitizens in this country

18   that if you express opinions that the government

19   disagrees with, you will be punished.

20        THE COURT:  But see the problem with your

21   argument is that you fuse the -- you fuse

22   addressing the constitutional issue at the

23   beginning, that is the First and Fifth Amendment

24   claims that you have suggesting that the

25   detention is inappropriate, to then how the

78

1     removal proceeding is going along, is

2     proceeding.

3          I thought that your argument was you're

4     not dealing with that; that the question as to

5     whether the proceeding should involve various

6     aspects is within the discretion of ICE.

7          Technically there is an ability to

8     address detention or non-detention in the

9     removal proceedings.  But those are separate and

10    apart so that when you get into the arguments

11    about how she's being treated at this particular

12    point during the removal proceedings, that's not

13    relevant to your argument about the

14    constitutional violation in your habeas

15    proceeding, is it?

16         MS. ROSSMAN:  The continued detention of

17    Ms. Ozturk right now is relevant to our

18    constitutional argument that we're making within

19    habeas.

20         Your Honor is correct that that's

21    separate and apart from the removal proceedings,

22    and you had asked earlier about an indication

23    when there -- is there case law to look to where

24    there's a habeas that's been considered at the

25    same time that removal proceedings have been

79

1    ongoing.  Because I understand we've

2    already spoken about Ragbir, but that was a

3    slightly different procedural posture.

4          I would point your Honor's attention to

5    the Bello-Reyes case, your Honor.  That was out

6    of the 9th Circuit, and in that instance there

7    were ongoing removal proceedings and at the same

8    time the Court went through and addressed the

9    arguments that the continued detention during

10   those removal proceedings violated the First

11   Amendment and found that habeas could be granted

12   under those circumstances.

13         Now, in that instance the Court remanded

14   to the District Court to apply the appropriate

15   determination of retaliation, but explicitly at

16   Footnote 4 the 9th Circuit said this is not

17   about other instances where people have brought

18   cases that are getting into the removal

19   proceedings.

20         Quite to the contrary, Mr. Bello-Reyes is

21   continuing on his removal proceedings right now,

22   and his seeking of a habeas petition on the

23   constitutional matter of his continued detention

24   is separate and apart.

25         So that was an instance where the Court

80

1    has recognized when there are constitutional

2    matters at issue and specifically with respect

3    to the First Amendment like we have at issue

4    here, we can have a separate removal

5    consideration and that does not constrain the

6    Article III judge's ability to issue a habeas,

7    which is what really necessary here.

8              THE COURT:  Okay, so let's talk about the

9    process of release ever making -- for the Court

10   making a determination of release into the

11   community.

12             The standard way judges address issues of

13   release is to have a hearing, have a full bail

14   hearing, and at that full bail hearing have a

15   number of things addressed.  Where is she going

16   to live?  What's she going to do for work?  As

17   well as issues of dangerousness and risk of

18   flight.

19             And ordinarily in this bail hearing you

20   provide the ability for both sides to introduce

21   evidence about those conditions which would

22   assure her non-flight and ensure against

23   dangerousness to the community.

24             And the government would have the ability

25   to introduce evidence to reflect the fact that

81

1    she would be a danger to leave or a danger to

2    the community.

3        Ordinarily a bail -- in a bail hearing

4    probation officers have checked out where a

5    person lives, have checked out their resources,

6    have made a recommendation as to whether or not

7    this person with these conditions would create a

8    risk.  You know, I appreciate we aren't at that

9    stage yet, but ordinarily that's the way bail

10   hearings are done.

11       And, in fact, there is case law to

12   suggest that when we are addressing a habeas

13   situation and addressing the question of whether

14   she should be released, there are these -- all

15   of these factors about the person's life, and

16   the nature of the allegations from the

17   government that need to be addressed.

18       And my fear is that in argument of

19   counsel here I've not had an opportunity to

20   address those, or the government hasn't had an

21   opportunity to really address the dangerousness

22   question.  All they're saying is they're relying

23   upon, you know, this one article, at least at

24   this point.

25       There may be, at least according to your

82

1    submission just a couple of days ago that was --
2    it was among other, is among the possibility of
3    other allegations that they may have.
4         So I guess my question is, before we
5    address the question of release don't you think
6    there should be a bail hearing?
7         MS. ROSSMAN:  Your Honor, I think one
8    place to look is at the Mapp decision here in
9    the 2nd Circuit and how they proceeded to
10   analyze a bail consideration within the
11   immigration context.  And that remains good law,
12   your Honor, both the Real ID Act passage -- the
13   Real ID Act was passed after Mapp.
14        I know there was some suggestion in the
15   government's papers that perhaps that raised a
16   question about Mapp's continued viability, but
17   the 2nd Circuit already directly addressed that
18   in the Elkimya decision in 2007 and said
19   explicitly that the Real ID Act's silence
20   regarding our holding in Mapp constitutes an
21   implicit adoption of our interpretation.
22        So the Mapp framework is still good law
23   in the 2nd Circuit, and we've seen it applied
24   time and again in the District Courts as well,
25   and what that court says is within this context

83

1     you look at whether or not there are substantial

2     claims and whether or not bail is necessary in

3     order to ensure that habeas is effective relief.

4           And as a part of the extraordinary

5     circumstances one of the things the Court can

6     analyze is whether there has been any showing of

7     the government in terms of danger or risk of

8     flight.

9           And I would say here, your Honor, in

10    fact, we've had numerous submissions before both

11    this Court and also the Court in the District of

12    Massachusetts where the petitioner has raised

13    her bail request and has submitted record

14    evidence that she's not a danger and that she's

15    not a flight risk.

16          Quite to the contrary, she is desperate

17    to return to Tufts so that she can continue with

18    her education.  She has nine months left of her

19    doctoral program that she's been working towards

20    for five years.  She has several critical dates

21    that are coming up in the spring and summer.

22    She desperately wants to return, and there are

23    nearly two dozen declarations, sworn

24    declarations that attest to that fact.

25          On the other side of the aisle, the

84

1    government had opportunity to submit sworn

2    declarations if there was any evidence that they

3    wanted to put forward.  They were certainly on

4    notice that the petitioner has been requesting

5    bail now for over two weeks, and there's been no

6    such submission from the government.  And we

7    have no reason to believe at this point, your

8    Honor, that there would be able to do so.

9         There's been the single declaration from

10   Wessling, Officer Wessling, which made no

11   allegation that Ms. Ozturk was a danger or that

12   she was a flight risk.

13        And I would point, your Honor -- I know

14   you had mentioned sort of one of the reasons

15   that we've heard so far from the government

16   about the reasons for her detention, you

17   referenced, I believe, the filing from Friday

18   night, which was the March 21st memo from the

19   Department of State, which again states and only

20   identifies the op-ed as the basis for the visa

21   revocation.

22        THE COURT:  Well, if you look at the

23   language of that submission, I thought it listed

24   the op-ed obviously, and I think right before

25   that is a comment with dangerousness as

85

1    reflected in -- I thought you could read that

2    sentence as suggesting there may very well be

3    other things that they want to submit, although

4    they were not identifying them.

5          MS. ROSSMAN:  So I would submit, your

6    Honor, it's really helpful to look at this memo

7    alongside the Washington Post article that was

8    placed yesterday that we filed in court.  It

9    references two memos that the government hasn't

10    produced, so we don't have those documents to

11    give to the Court, but --

12          THE COURT:  Okay.

13          MS. ROSSMAN:  But what it references is

14    an initial memo where there was a recommendation

15    from DHS for the revocation of Ms. Ozturk's

16    visa.  And it specifically cited the provision

17    of a deportation of a foreigner if the Secretary

18    of State has reasonable grounds to believe that

19    the person's presence or activities has adverse

20    policy consequences for the United States.

21          In response to that, and that is what's

22    referenced in the Washington Post article, after

23    the State Department received that from the

24    Department of Homeland Security, the State

25    Department found that while Ozturk had protested

86

1    Tufts's relationship with Israel, neither DHS

2    nor ICE nor Homeland Security investigations

3    produced any evidence showing that Ms. Ozturk

4    had engaged in anti-Semitic activity or made

5    public statements indicating support for a

6    terrorist organization.

7         And it goes on to say that the memo said

8    that a search of U. S. government database on

9    Ms. Ozturk did not produce any terrorism-related

10   information about her.

11        And it was on the heels of both of those

12   statements, your Honor, that then this final

13   memo was produced that again only references the

14   op-ed.

15        THE COURT:  Okay, so this is an internal

16   memo, as I understand it, suggesting that as a

17   result of a full investigation there was no

18   evidence of anti-Semitic behavior, no evidence

19   of -- focusing on terrorists organizations, is

20   that what that article says?

21        MS. ROSSMAN:  According to the reporting,

22   your Honor, from Washington Post.

23        THE COURT:  So there is a memorandum

24   within the Department's possession that has not

25   been turned over to you?

87

1    MS. ROSSMAN:  There is a memorandum that

2    the government has not produced, your Honor,

3    that's correct.  And I believe, your Honor, it's

4    actually two different memorandums that have not

5    been yet produced.

6        The third memorandum, which is the

7    March 21st memo that we filed on Friday, had

8    been resubmitted in the removal proceeding so

9    that was the one of three, but there are two

10   that have not been produced by the government.

11   THE COURT:  So I asked you -- you haven't

12   been talking about the removal proceedings, but

13   apparently there is at least a hearing or

14   submission on Wednesday?

15   MS. ROSSMAN:  Yes, your Honor.

16   THE COURT:  And what does that involve?

17   MS. ROSSMAN:  Unfortunately you're going

18   to hear partially --

19   THE COURT:  Probably going to the wrong

20   person.  I'm sorry.

21   MS. ROSSMAN:  No, but the one thing I

22   will say, your Honor, is that the master

23   calendar has been reset for Wednesday.

24       I will reiterate what one of my

25   colleagues said, which is that with respect to a

88

1    bond termination, your Honor, there are several
2    reasons why that is not a barrier to this Court
3    granting bail and, in fact, it is certainly
4    important that the Court exercise its discretion
5    here to grant bail if you look at what has been
6    happening in other cases around the country.
7            THE COURT:  Right, so I'm not -- I wasn't
8    thinking about the bail situation at this point.
9            What I was thinking about is whether or
10   not those reports within the government's
11   possession are going to be disclosed to you as a
12   part of the removal proceedings?
13           MS. ROSSMAN:  That's something I wouldn't
14   be able to answer here today, your Honor.
15           THE COURT:  All right, that's fine.  Yes.
16           MS. ROSSMAN:  Of course, the government
17   could also produce them within this proceeding
18   as well and has had opportunities in the past to
19   do so with its submissions and could do so again
20   in the future.
21           THE COURT:  Okay.
22           MS. ROSSMAN:  It might -- would it help
23   your Honor for me to speak a little bit about
24   within the context of the Mapp structure for
25   that bail determination?

89

1          THE COURT:  Yes.

2          MS. ROSSMAN:  We both need to address the

3    substantial claims as well as exceptional

4    circumstances.

5          Petitioner believes that all of the

6    claims that she's raising in her petition are

7    substantial, but for the purposes of this

8    Court's analysis only one is necessary.  And

9    given the context of what we've been talking

10   about here today, I think it might be the most

11   hopeful to focus, as your Honor has done, on

12   both the First Amendment and the Fifth Amendment

13   claims in particular to the respect to the

14   arrest, transfer, and detention of Ms. Ozturk.

15         So I can start with the First Amendment,

16   your Honor.  The First Amendment really acts as

17   an element on the government's ability to

18   suppress particular viewpoints, and that's

19   exactly what is happening here.

20         About a year ago, as your Honor

21   referenced, Ms. Ozturk coauthored an op-ed in

22   her student newspaper, and it was really speech

23   that is of the highest form of protected speech.

24   It was about a matter of public concern about

25   ongoing human rights violations in Gaza, and it

90

1    was also something that was in the press.  It

2    was in the newspapers and part of the media.

3        And this is the sole basis for her

4    arrest, transportation and transfer, as we've

5    just been discussing.  The government over more

6    than 20 days of her detention has not put

7    forward any other basis for why this has

8    occurred.

9        And if you look -- we were speaking about

10    the 3/21/25 memo.  Your Honor had referenced

11    this language as well; that it included

12    coauthoring an op-ed that found common cause

13    with an organization that was later temporarily

14    banned from campus.

15        The only language --

16        THE COURT:  Is there any evidence to

17    suggest that she was a member of that eventually

18    temporarily banned organization?

19        MS. ROSSMAN:  No, your Honor, there is

20    not.

21        And the only sentence that this can be

22    referencing is within her op-ed, the sentence --

23    and this is a co-authored op-ed; Graduate

24    Students for Palestine join Tufts Students for

25    Justice in Palestine, the Tufts faculty, and

91

1      staff coalition for ceasefire and pledges

2      Students for Palestine to reject the

3      University's response.

4              That sentence is the only sentence of the

5      memo that could possibly be referencing.

6              And this guilt by association, and not

7      just guilt by association but guilt by

8      association that would have had to be prescient

9      that a group was going to be banned in the

10     future by the administration is a really

11     chilling example of a First Amendment violation,

12     and it's an eerie comparison to some of what the

13     government was attempting to do during in the

14     Red Scare in the 1950s.

15             We have cited in our papers, your Honor,

16     the Bridges case from the Supreme Court, and

17     there Congress had passed an act to enable the

18     deportations of noncitizens who were affiliating

19     with communist enterprises.

20             And under that statute the government had

21     tried to deport Mr. Bridges based on his running

22     a newspaper that sometimes was just called

23     The Waterfront Worker that worked with the union

24     that was found to both be a legitimate union but

25     also have -- also be a communist organization.

92

1       And the Court rejected the government's

2    attempt to do this.  It read the statute in a

3    way that could not be applied to Mr. Bridges's

4    behavior.  And the reason why was to do so, the

5    Court found, would have violated the First

6    Amendment.

7       They used language to say, and this is a

8    direct quote, The link by which it sought to tie

9    him to subversive activities is an exceedingly

10   tenuous one.  It relies upon inferences upon

11   inferences.

12      And he published a newspaper that engaged

13   in protected speech, and cooperation with the

14   communist group for the attainment of lawful

15   ends cannot be something for which someone is

16   punished without violating the First Amendment.

17      And, as a result, they did not allow the

18   government to use their immigration laws to

19   violation the free expression of Mr. Bridges.

20      And this Court should similarly ensure

21   that the government does not use immigration

22   laws to violate the First Amendment as part of

23   its policy to target speech.

24      There are more recent examples than the

25   1950s.  We've spoken already about Ragbir, your

93

1    Honor, as well as the <u>Bello-Reyes</u> case.

2         I also wanted to point your Honor to the

3    <u>Guitierrez</u> case, which is cited in our papers as

4    well.  All of these recognize that the Court has

5    habeas authority when there is a violation of

6    the First Amendment.

7         THE COURT:  So the Court has habeas

8    authority to address the question as to whether

9    it was a First or Fifth Amendment violation, but

10   when you start arguing about ICE using this in

11   the removal proceedings, that really creates a

12   concern.

13        You have the INA, which basically says

14   that the courts should not get involved in the

15   bringing of charges before the immigration

16   court, the prosecution, as well as the

17   enforcement.  And I think those are the three

18   things.

19        And so when you suggest that they are

20   violating the Constitution in the prosecution,

21   in the court, you raise concerns because there

22   is, in fact, the engagement of a third -- of a

23   judicial branch in that prosecution itself.

24        That is, ultimately if I -- if the IJ

25   decides for removal, the appeal goes to the

94

1    U. S. Court of Appeals or Circuit.  So there is

2    some engagement of the third -- of the third

3    branch; the judiciary.

4         And so when you make the argument about

5    you can't bring the charges or you are entitled

6    to withdraw from prison based upon a

7    constitutional violation, that clearly is

8    covered by constitutional law.

9         But when you start talking about the

10   removal proceedings and those processes, I think

11   that the INA gives you difficulty.

12        Do you understand the distinction that

13   I'm trying to make?

14        MS. ROSSMAN:  I believe so, your Honor,

15   but please tell me if I'm going off track.

16        THE COURT:  Yeah, right.  Right, so I

17   mean I think this is a really confusing area of

18   the law because you're sort of overlapping

19   issues, both from the Constitution dimension in

20   habeas, together with what's happening in a

21   removal proceedings.

22        A removal proceeding does have judges

23   involved, and they are on the appellate level.

24        MS. ROSSMAN:  That's right, your Honor.

25   I think part of the distinction, however, is, as

95

1    you had referenced earlier on -- or almost this

2    afternoon but right now it's still this morning,

3    earlier on this morning our petition, and in

4    particular what we're speaking about with

5    respect to the bail request is focusing on

6    challenging the arrest and detention.

7         Neither the arrest, nor the detention,

8    was required by the revocation of the student

9    status or the revocation of the visa.  And the

10   continued removal proceedings against Ms. Ozturk

11   does not require her continued detention.

12        And, again, the Bello-Reyes case is a

13   perfect example of this where the Court was

14   recognizing the ability of the petitioner there

15   to be out of custody under the Article III

16   jurisdiction of the habeas court while

17   continuing to participate in the removal

18   proceedings within the context of the

19   immigration court.

20        THE COURT:  There is no difficulty in

21   doing that?

22        There's no difficulty in having her

23   removed from custody of the immigration court

24   but then continuing on with the process?

25        MS. ROSSMAN:  That is correct, your

96

1    Honor.  There are -- it is not required to be in

2    detention in order to continue on removal

3    proceedings and, in fact, one of the

4    declarations by Attorney Young speaks to the

5    fact that with respect to F-1 visa revocations,

6    which is the visa revocation at issue for

7    Ms. Ozturk, in her experience in over 17 years

8    of immigration practice it is not typical for

9    someone with an F-1 visa revocation to be

10   arrested.

11        And that's what we're focusing on here;

12   is that the -- setting aside for a moment the

13   visa revocation and the student status

14   revocation, the response of the government in

15   every step along the way to that, which included

16   both not notifying Ms. Ozturk of the fact that

17   she had a visa revocation, which is not typical,

18   and led to an understandably terrified response

19   when six plainclothes officers approached her.

20   She had no reason to believe that anything had

21   been revoked and then placed her into an

22   unmarked van.

23        She said in her declaration at the time

24   she thought they were going to kill her because

25   she had no idea who these people were and having

97

1       given no reason to understand why the police

2       would be arresting her.

3               THE COURT:  Well, if -- she did say that

4       she saw a badge, although she did not know what

5       the badge was.  But she saw a badge but then

6       thought, of course, she was being killed.

7               MS. ROSSMAN:  And placed in an unmarked

8       van.  And then so that's the arrest, your Honor.

9               The second piece is everything that

10      happened over the course of the next 20 hours,

11      which I know you've already spoken with, with

12      other counsel here today, but that unusual

13      circumstance of hop-scotching across multiple

14      state lines and then getting taken to Louisiana

15      really early the next morning.

16              The declarations that we have in the

17      record, your Honor, combined more than 40 years

18      of immigration experience in the New England

19      area, and all of those practitioners say that

20      they have never seen, nor heard, of someone get

21      taken in three different states over the course

22      of just a few hours.

23              And practitioners here in Vermont, too,

24      have said both -- excuse me, Attorney Stokes and

25      Attorney Diaz, that neither of them had seen

98

1    someone taken out of state and placed in

2    St. Albans.  And that was particularly important

3    because St. Albans is the only location where

4    someone can be held in immigration detention and

5    not be on the Vermont Department of Corrections

6    public website within an hour.  So, again,

7    that's another set of circumstances which was

8    highly unusual.

9         Even taking the government at its word,

10   which there is directly contradictory evidence

11   in the record that there were bed space

12   available in New England, so that's something

13   that petitioner heavily contests.

14        But even, for the sake of argument,

15   taking of the government at its word, why did

16   Ms. Ozturk need to be taken three different

17   states away to get a plane from the Burlington

18   airport rather that being held in Burlington,

19   Massachusetts, which is the typical course of

20   practice and then get taken from Logan Airport

21   to Louisiana?

22        All across the board, your Honor, these

23   were unusual steps that were designed to punish

24   Ms. Ozturk for her protected speech, chill her

25   speech, and send a very chilling message to

99

1    everyone who was watching -- and the government

2    does know that people are watching -- that if

3    you engage in speech that the Administration

4    disagrees with, you are going to be punished.

5         And that chilling aspect was something

6    that was recognized both by the Ragbir court and

7    by the Guitierrez court as something that sends

8    a message not just to the petitioner themselves

9    but to other noncitizens.  That's an additional

10   First Amendment injury that's appropriate for

11   the Court to address in a habeas proceeding.

12        THE COURT:  Okay.  So let me just ask you

13   about your alternative proposal.

14        MS. ROSSMAN:  Yes, your Honor.

15        THE COURT:  You know, you've heard what

16   the standard procedures are here for

17   establishing bail.  I mean, to get a full

18   hearing, to have a full hearing in regard to all

19   of the conditions that have to be imposed to

20   make sure that a person does not provide a risk

21   to the community and a risk of flight ordinarily

22   requires a lot.

23        And it also gives the parties an

24   opportunity to introduce the evidence that they

25   want to introduce, including the evidence that

1   you want to introduce in regard to how this was

2   unusual.  That may be relevant to the issue of

3   whether she should be released.  That is, the

4   viability of her due process claim.

5          All right?

6          MS. ROSSMAN:  Uh-huh (affirmative).

7          THE COURT:  So that could happen.

8          The second proposal that you have is to

9   have her transferred back here, both for

10  assisting your representation for the hearing,

11  the ultimate hearing but, also, for a bail

12  hearing.  And that is, to have her present so

13  that you could address all these various issues

14  that the Court addresses whenever it releases a

15  person into the community.

16         So what is your -- I mean, I know that

17  this is an alternative, but what is your

18  objection to essentially an order that she be

19  transferred back here and that we have a bail

20  hearing in regard to her release on the habeas

21  case and then ultimately have her here for the

22  hearing?

23         MS. ROSSMAN:  So if I'm understanding

24  your Honor correctly, what you're suggesting as

25  an alternative is sort of what is our response

101

1    to you, rather than automatically

2    getting bail --

3            THE COURT:  And I'm going to ask the

4    other side the same.

5            What's the problem with that?

6            MS. ROSSMAN:  And as a part of that

7    suggestion, your Honor, are you suggesting that

8    Ms. Ozturk would be immediately returned to the

9    District of Vermont during the pendency of those

10   proceedings?

11           Is that what --

12           THE COURT:  Well, that's what you're

13   seeking.

14           MS. ROSSMAN:  That is our alternative,

15   that is correct, your Honor.

16           Well, of course, petitioners do believe

17   that there's already a record right now that

18   would enable a determination of bail,

19   particularly given the multiple opportunities

20   the government has had to put record evidence in

21   to oppose any seeking of bail, and they have

22   never done so.

23           We have no reason to believe, nor does

24   this Court have any basis to believe that they

25   would put forward something to counteract the

102

1    showing that Ms. Ozturk has made that she has

2    satisfied the bail requirements.  So we do think

3    that has been satisfied on the papers.

4         That being said, under our alternative of

5    having Ms. Ozturk returned here, we think it's

6    well within this Court's authority, both as an

7    equitable habeas court, which your Honor has

8    already recognized has flexibility in terms of

9    orders, and under the All Writs Act to order

10   Ms. Ozturk to be immediately returned to Vermont

11   so that she could have access to counsel.

12        And, of course, I think one additional

13   component we would say, your Honor, is if the

14   Court is inclined to set an additional

15   evidentiary hearing for a bail proceeding, which

16   our suggestion would be that our papers submit,

17   but if your Honor would want to have additional

18   hearings, that that occur, as everything already

19   has with this Court, as expeditiously as

20   possible, particularly in light of some of the

21   educational deadlines that Ms. Ozturk has.

22        There are proceedings within her -- she

23   has a conference that she's meant to be

24   attending at the end of this month, and she also

25   has specific dates with respect to her doctoral

103

1   review that is also in the upcoming month.

2          Every day that she remains in detention,

3   your Honor, is both harming her in terms of her

4   ability to continue with her education.  It's

5   also a continued First Amendment violation of

6   both her rights and sends a very dangerous

7   message to everyone else that if you do

8   something against the government in terms of

9   your speech, you're going to be punished.

10          THE COURT:  All right.  Thank you.

11          Okay, Mr. Drescher?

12          MS. LAFAILLE:  Your Honor, with

13   Mr. Drescher's indulgence, I just wanted to

14   respond to a couple of points.

15          Your Honor asked me about Attorney

16   Khanbabai's efforts to locate Ms. Ozturk prior

17   to 10:02.  The declaration at Paragraph 6 and 7

18   talks about efforts that evening, but just to

19   confirm, that prior to 10:02 Attorney Khanbabai

20   had also done those things; calling ICE

21   Enforcement and Removal Operations and calling

22   ICE Homeland Security Investigations, ICE HSI

23   and ERO to look for Ms. Ozturk and checking the

24   detaining locator.

25          And then in response to your Honor's

104

1    colloquy to Mr. Drescher about the spirit of the

2    order and the letter of the order, the case I

3    had cited to your Honor is <u>Stetson</u>, which is

4    cited on Page 23 of our bail and return motion.

5            THE COURT:  Okay.

6            MS. LAFAILLE:  Thank you.

7            THE COURT:  All right.  Okay.

8            MR. DRESCHER:  Before I get into the

9    question of bail, on the question of what to

10   make of the Court's order in Massachusetts, it

11   occurred to me after I sat down that the

12   District of Massachusetts has had a chance to

13   deal with its perception of what happened there

14   and could have investigated it further, could

15   have done -- could have made a finding about

16   that, and what they did was they transferred the

17   case up here.  I just wanted to sort of note

18   that as another consideration.

19           THE COURT:  Interesting.  They

20   transferred the case up here and then basically

21   made a conclusion that filing in Massachusetts

22   was really just like filing in Vermont because

23   obviously this is the district of confinement

24   and that essentially the whole record would be

25   as of the 10:02 filing date.

1          And essentially what they would be

2     suggesting is, I think they are suggesting that

3     it's filed in Vermont as of 10:02.  I thought

4     that was the thrust of Judge Casper's opinion.

5          MR. DRESCHER:  I agree that that was the

6     thrust of her opinion, but she also noted that

7     it was going to be for this Court to figure out

8     whether it had jurisdiction.

9          THE COURT:  Yes, absolutely, and I think

10    that that's true of 1631 always; that when you

11    transfer it, it's your assessment that that

12    jurisdiction or that court would have

13    jurisdiction, but that's up for that court to

14    make a determination and that's why we're here.

15         MR. DRESCHER:  On the question of bail,

16    our threshold position is that especially in

17    light of subsequent statements in Jennings and

18    Velasco Lopez that are more recent than both

19    Mapp and Elkimya, I think there is a legitimate

20    question as to whether the INA would permit the

21    Court to release petitioner on bail.  A lot of

22    that dovetails with the same jurisdictional

23    arguments we've made.

24         THE COURT:  Right.

25         MR. DRESCHER:  And which is our appeal,

106

1    our threshold position that the Court does not

2    have habeas jurisdiction and, therefore, does

3    not have inherent authority to release

4    petitioner on bail.

5         With regard to the questions of the Mapp

6    factors, I just have a couple of responses.

7         One of the arguments that has been made,

8    I believe, in the papers and today, is that

9    being detained stifles a person's ability to

10   speak and is inherently a violation of the First

11   Amendment.  I don't think that -- I don't think

12   that's a tenable argument.

13        If that were a tenable argument, being

14   detained, anybody who's detained is having their

15   First Amendment violated and so -- and it's

16   certainly not an extraordinary circumstance

17   among people who are detained.  They -- it's

18   part and parcel of being detained.  You know,

19   you have -- you have less of a voice.

20        THE COURT:  Well, there are a couple of

21   concerns in regard to the First Amendment, so --

22   and they're different.

23        It seems to me that what the petitioners

24   are raising here is an argument that her

25   violation -- her First Amendment rights were

107

1    violated.  It's not based upon the fact that

2    other people would be discouraged in regard to

3    whether they would make statements in the

4    community.  It is her particular rights that

5    are -- that are at risk.

6          And, you know, frankly, I would focus

7    mostly on the time of detention.  At that

8    particular time their argument is, first, that

9    her First Amendment rights are being

10   prosecuted -- are being violated, and that's

11   obviously the basis of their claim for release.

12         And then, second, is how it happened, how

13   the arrest took place, whether she was

14   permitted knowing where she was going or her

15   lawyers knowing where she was going, or the fact

16   is that she was really sort of denied the

17   ability to get to a court.  That's her second

18   Fifth Amendment claim.

19         I'm not so sure the impact in the

20   community about other people's First Amendment

21   rights being impacted is the core of their

22   argument.

23         MR. DRESCHER:  Okay.

24         So, yeah, going through the Mapp factors,

25   I appreciate that she's making an argument.  Her

108

1    habeas theory is that her detention is a
2    violation of her First and Fifth Amendment
3    rights.  I appreciate that the circuit in Ragbir
4    articulates that that can be a basis for habeas
5    jurisdiction but only in the absence of the
6    availability of a petition for review, which
7    we've already gone over.
8         THE COURT:  Can I ask you, throwing out
9    this possibility of having her coming back here
10   to address her constitutional claims, her habeas
11   with an order, of course, that it would have no
12   impact on the removal proceedings.  It would be
13   necessary to have her here because we would be
14   addressing issues about release, and this would
15   be for the hearing on her claims and she would
16   be able to assist counsel.
17        My question is, how are you prejudiced by
18   that proceeding?
19        MR. DRESCHER:  I believe the papers
20   make -- state our position that -- well, I'm
21   going to take a half a step back.
22        Generally speaking our papers argue that
23   the law is clear that the Court doesn't have
24   jurisdiction to like dictate place of
25   confinement.

109

1          THE COURT:  Correct.

2          MR. DRESCHER:  But I appreciate your

3     point.

4          THE COURT:  This is the hypothetical to

5     say that the Court has jurisdiction.  The Court

6     would take Velasco Lopez and Ragbir and say,

7     okay, we have jurisdiction to address the habeas

8     issue.  Why not do that at the same time that

9     the removal proceedings continue on?

10          And why are you prejudiced by that?

11          MR. DRESCHER:  I don't know -- I mean, if

12     your Honor wants to writ petitioner to Vermont

13     for purposes of being present in court for a

14     hearing, other than the extent to which that

15     interferes with ICE's ability to dictate where

16     she would be held, you know, as an advocate, I

17     don't think that would be prejudicial.

18          You know, we have defendants or

19     plaintiffs personally in court all the time.  If

20     there is a prejudice, then I'm really not

21     prepared to get into the nooks and crannies of

22     this because I didn't anticipate your Honor's

23     question.

24          It would be in the operations of, you

25     know, immigration detention whose custody would

110

1    she be in.  Where are there beds?  Those types

2    of -- those types of issues that, you know, in

3    the criminal context, as your Honor knows, she

4    could be housed in Rhode Island or upstate New

5    York or any number of other facilities.  Or down

6    the street as well, for sure, in the criminal

7    context.

8         What is available if she's in ICE custody

9    is not clear, and there could very well be

10   prejudice to ICE's operations in that regard.

11        But I also don't want to get ahead of

12   myself.  You know, the -- I don't know the

13   extent of potential prejudice is sort of the

14   threshold answer to your Honor's question.

15        THE COURT:  No, I appreciate that honest

16   response.

17        MR. DRESCHER:  And so, yeah, we don't

18   think that she's -- I appreciate, you know, in

19   the verbiage of Ragbir she makes a

20   constitutional claim and that's, of course,

21   something that -- something that the 2nd Circuit

22   has acknowledged can be concerning and can be

23   the basis of habeas in the absence of petition

24   for review.

25        The viability of success on that claim

111

1    given the jurisdictional challenges, given the

2    presence of the INA, given the actual rational

3    in Ragbir, relying on the absence of a petition

4    for review as a basis for asserting habeas

5    jurisdiction I think calls into question,

6    there's sufficient jurisdictional concerns about

7    what this -- if this Court were to assert habeas

8    jurisdiction, it certainly calls into question

9    the prospect of success were the Court to issue

10   habeas relief.

11        Even the 1631 transfer, albeit it's

12   happened before, it happened from New York to

13   New Jersey recently, you know, as the Court in

14   New Jersey certainly suggested by certifying the

15   question, it's some potentially shaky

16   jurisdictional footing, and that also undermines

17   the prospect of success in court on a habeas

18   theory.

19        And, your Honor, if your Honor has

20   additional questions --

21        THE COURT:  Okay, so I'd like to

22   change -- I appreciate that and, you know, I

23   think the argument is over.

24        I'd like to ask both counsel how long you

25   would anticipate a habeas hearing to last if I

112

1   was to assume jurisdiction?

2          And, in particular, you've noticed that

3   this Court has made a real effort to move this

4   along quickly.  And whether or not the

5   petitioner is here or not, if I assume

6   jurisdiction, the case is going for a habeas

7   hearing, and my question is how long would the

8   hearing last?

9          And I would anticipate scheduling this

10  hearing in May, and my question is whether that

11  is realistic.

12         So first from the government.

13         MR. DRESCHER:  This is another "I don't

14  know", and I would have to consult with lawyers

15  more experienced in habeas than I am.

16         You know, it may be -- I don't know what

17  the evidence would look like.  I mean, I

18  appreciate what's in the record.  It may be that

19  you don't have to take testimony if the record

20  can be made on the papers, but I don't know that

21  and I would ask for a chance to get back to the

22  Court on that.

23         THE COURT:  Okay.  Yeah, if you can

24  notify the Court.

25         So how about from the petitioner?

113

1    MS. ROSSMAN:  Thank you, your Honor.  I
2    think we, similarly, would want to, with your
3    indulgence, make sure we speak with immigration
4    counsel as well and perhaps submit a short
5    supplement to answer your question.
6        THE COURT:  Yeah, so let me ask both
7    sides just to have a short supplement.  If the
8    Court were to accept habeas jurisdiction,
9    schedule a habeas hearing, I would hope to do
10    that in May.
11        Tell me if that is viable, a viable
12    schedule in light of the complexities of this
13    case, in light of the evidence that you would
14    hope to introduce.
15        MS. ROSSMAN:  Thank you, your Honor.  I
16    will say the two things that I can say for
17    certain right now is from petitioner's side we
18    both appreciate how quickly the Court has been
19    moving on this and that we, as well, would move
20    at as quick a speed as this Court could do to
21    make it happen.
22        So in terms of timing, we would be ready
23    at the Court's earlier convenience to have a
24    hearing and would make ourselves available to do
25    so.

114

1      With respect to the amount of time that

2   the hearing itself could take, we can submit a

3   supplement.

4      THE COURT:  Okay.  Well, I really

5   appreciate the professionalism of the argument.

6   This was very well argued, and I'll take the

7   matter under advisement.

8      Are there any other issues that you want

9   to address at this point?

10      MR. DRESCHER:  Not from respondents, your

11   Honor.

12      MS. ROSSMAN:  Not at this time, your

13   Honor.  Thank you.

14      THE COURT:  Okay.  Thank you very much.

15      (End of hearing at 12:15 p.m. and end of

16   transcript of same.)

17

18

19

20

21

22

23

24

25

115

```
1              C E R T I F I C A T E

2

3         I, SARAH M. BENTLEY, Certified Court

4    Reporter, Registered Professional Reporter and Notary

5    Public, do hereby certify that the said proceedings

6    were taken in machine shorthand by me at the time and

7    place aforesaid and were thereafter reduced to

8    typewritten form under my direction, Pages 1 - 115;

9    that the foregoing is a true, complete, and correct

10   transcript of said proceedings.

11         I further certify that I am not employed

12   by, related to, nor counsel for any of the parties

13   herein, nor otherwise interested in the outcome of

14   this litigation.

15         IN WITNESS WHEREOF, I have affixed my

16   signature and seal this 15th day of April, 2025.

17

18

19              /s/ Sarah M. Bentley, RPR

20              SARAH M. BENTLEY, CCR-B-1745

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

RUMEYSA OZTURK,                    )
                                   )
          Petitioner,              )
                                   )
     v.                            )    Case No. 2:25-cv-374
                                   )
DONALD J. TRUMP, in his            )
official capacity as               )
President of the United            )
States; PATRICIA HYDE, in her      )
official capacity as the New       )
England Field Director for         )
U.S. Immigration and Customs       )
Enforcement; MICHAEL KROL, in      )
his official capacity as HSI       )
New England Special Agent in       )
Charge, U.S. Immigration and       )
Customs Enforcement; TODD          )
LYONS, in his official             )
capacity as Acting Director,       )
U.S. Immigration and Customs       )
Enforcement; KRISTI NOEM, in       )
her official capacity as           )
Secretary of the United            )
States Department of               )
Homeland Security; and MARCO       )
RUBIO, in his official             )
capacity as Secretary of           )
State,                             )
                                   )
          Respondents.             )

**OPINION AND ORDER**

Petitioner Rumeysa Ozturk was arrested by United States

Immigration and Customs Enforcement ("ICE") agents in

Massachusetts on March 25, 2025 and is currently in immigration

detention at a correctional facility in Louisiana. Ms. Ozturk

filed this habeas petition under 28 U.S.C. § 2241 against

Respondents Donald J. Trump, Patricia Hyde, Michael Krol, Todd
Lyons, Kristi Noem, and Marco Rubio (collectively "the
government"), alleging she was arrested and detained in
violation of her First Amendment and Fifth Amendment rights and
the Administrative Procedure Act ("APA").

Ms. Ozturk's original petition (the "Petition") was filed
in the District of Massachusetts. Because Ms. Ozturk was, at the
time of the filing, detained in Vermont, the Massachusetts
district court transferred this action to the District of
Vermont pursuant to 28 U.S.C. § 1631. ECF No. 42.

The instant matter concerns the government's motion to
dismiss this case. The parties dispute whether this Court has
jurisdiction to grant Ms. Ozturk the relief she requests. The
matter also concerns Ms. Ozturk's motion for an order of
immediate release pending the adjudication of her habeas claims
or, in the alternative, an order transferring Ms. Ozturk back to
the District of Vermont.

For the reasons set forth below, the Court finds that it
has jurisdiction to consider Ms. Ozturk's habeas petition. The
Court further finds that Ms. Ozturk has raised significant
constitutional concerns with her arrest and detention which
merit full and fair consideration in this forum. Accordingly,
the Court denies the government's request to dismiss the
Petition and orders that Ms. Ozturk be transferred to ICE

JA-000410

custody within the District of Vermont pending further hearings
on this matter.

**Factual Background**

**I.   Ms. Ozturk's Op-ed in a School Newspaper**

Ms. Ozturk and three other students coauthored a March 26,
2024 editorial in the Tufts University school newspaper, *The
Tufts Daily*. The editorial, which to date still appears on the
*Tufts Daily* website, criticized the university administration's
dismissal of several resolutions passed by the student senate
that demanded the university acknowledge the existence of an
ongoing genocide in Palestine, apologize for statements made by
the university president, and disclose its investments in and
divest from companies with ties to Israel.

The editorial criticized the university for
"mischaracteriz[ing]" the student senate's stances as divisive
and stated, "[w]e, as graduate students, affirm the equal
dignity and humanity of all people[.]" Rumeysa Ozturk et al.,
*Op-ed: Try again, President Kumar: Renewing calls for Tufts to
adopt March 4 TCU Senate resolutions*, The Tufts Daily (Mar. 26,
2024), https://www.tuftsdaily.com/article/2024/03/4ftk27sm6jkj.
It urged the university administration "to meaningfully engage
with and actualize the resolutions passed by the Senate." *Id.*
The op-ed expresses agreement between Graduate Students for
Palestine and three other campus groups, including Tufts

3

Students for Justice in Palestine, about the university's response to the Senate resolutions. In the fall of 2024, Tufts University temporarily suspended Tufts Students for Justice in Palestine. Estelle Anderson, *Tufts SJP disaffiliates from Tufts after university suspends group until Jan. 2027*, The Tufts Daily (Nov. 21, 2024), https://www.tuftsdaily.com/article/2024/11/tufts-sjp-disaffiliates-from-tufts-after-university-suspends-group-until-jan-2027. Ms. Ozturk has not been alleged to be a member of that group, and the suspension occurred several months after the op-ed was published.

In an April 1, 2025, declaration, Sunil Kumar, the Tufts University president, attested that the opinion piece co-authored by Ms. Ozturk "was not in violation of any Tufts policies" and that "no complaints were filed with the University or, to our knowledge, outside of the University about this op-ed." ECF No. 26-1 at 67. The declaration noted that the newspaper also published other "op-eds on multiple sides of the issue with opinions that were shared just as strongly as the op-ed Ms. Ozturk co-authored." *Id.*

## II. Ms. Ozturk's Arrest and Detention

Ms. Ozturk is a Turkish national and doctoral candidate in Child Study and Human Development at Tufts University. ECF No. 42 at 1-3. On June 28, 2024, she entered the United States pursuant to a validly issued F-1 student visa. *Id.* at 3. On

4

March 21, 2025, the government revoked Ms. Ozturk's visa,
potentially subjecting her to removal from the United States.
ECF No. 91-1 at 6. Pursuant to 8 U.S.C. § 1227(a)(1)(B), "[a]ny
alien who is present in the United States . . . whose
nonimmigrant visa (or other documentation authorizing admission
into the United States as a nonimmigrant) has been revoked under
section 1201(i) of this title, is deportable."

Prior to her arrest, ICE determined that it would take Ms.
Ozturk to a detention facility in Louisiana. According to ICE,
"there was no available bedspace for [her] at a facility where
she could appear for a hearing" in New England and "[t]ransfers
out of state . . . are routinely conducted after arrest, due to
operational necessity and considerations." ECF No. 19-1. Ms.
Ozturk has submitted affidavits from several experienced New
England immigration attorneys stating that immigration detainees
are typically booked and processed at the ICE Boston Field
Office in Burlington, Massachusetts before being sent to a
detention facility. ECF Nos. 26-3, 26-4, 26-6. She also
submitted an affidavit from an experienced Maine immigration
attorney stating that based on the attorney's review of records
from the Cumberland County Jail, the facility had at least
sixteen open beds to house female detainees on March 25 and 26,
2025. ECF No. 26-5 at 3

Ms. Ozturk was not notified promptly of her student visa's revocation. On March 25, 2025, at approximately 5:25 p.m., Ms. Ozturk was near her residence in Somerville, Massachusetts when a hooded and masked officer in plainclothes approached her and grabbed her wrists. ECF No. 42 at 3. Five additional officers then surrounded her, took her cell phone, and handcuffed her. Ms. Ozturk was driven away in an unmarked vehicle. *Id.*

ICE agents took Ms. Ozturk to Methuen, Massachusetts, arriving at 6:22 p.m. that day. ECF No. 19-1 at 2. Shortly thereafter, the agents and Ms. Ozturk departed for Lebanon, New Hampshire. *Id.* At approximately 9:03 p.m., ICE agents began transporting Ms. Ozturk to the ICE Field Office in St. Albans, Vermont. *Id.* At approximately 10:02 p.m. on March 25, 2025, having been unable to speak to Ms. Ozturk or otherwise ascertain her location after attempting to do so, Ms. Ozturk's counsel filed a habeas petition in the District of Massachusetts. ECF No. 42 at 4. At that time, Ms. Ozturk was in Vermont en route to the St. Albans Field Office.

At approximately 10:55 p.m. that night, the District of Massachusetts court ordered that Ms. Ozturk "shall not be moved outside the District of Massachusetts without first providing advance notice of the intended move." ECF No. 3 at 2; ECF No. 42 at 5. The order stated that "[s]uch notice shall be filed in writing on the docket in this proceeding, and shall state the

6

reason why the government believes that such a movement is necessary and should not be stayed pending further court proceedings." ECF No. 3 at 2. The order noted that "[i]n order to give the court an opportunity to consider whether it has subject-matter jurisdiction, and if so to determine the validity of the habeas petition, the court may order [the] respondent to preserve the status quo." *Id.*

Both the Petition and the order were transmitted to the United States Attorney's Office on the night of March 25, 2025. ECF No. 26-2 at 2-3. When asked at oral argument about the government's knowledge of the order when it was issued, its counsel stated, "I don't know who learned about that order and when. . . . I'm not able to speak to the factual flow of information." ECF No. 98 at 37.

Ms. Ozturk arrived at the St. Albans Field Office at 10:28 p.m. on March 25, 2025 and was kept in custody there overnight. ECF No. 19-1 at 2. On the morning of March 26, 2025, at approximately 4:00 a.m., ICE agents transported Ms. Ozturk to the Burlington, Vermont airport and placed her on a plane to Louisiana. *Id.* at 3. Ms. Ozturk arrived in Alexandria, Louisiana at 2:35 p.m. and was taken to the South Louisiana Correctional Facility, where she is presently detained. *Id.*

Between the evening of March 25, 2025 and the afternoon of March 26, 2025, Ms. Ozturk's counsel repeatedly attempted to

7

ascertain her location, to no avail. ECF No. 26-2 at 3. Although

Ms. Ozturk's attorney checked ICE's Detainee Locator System

online several times, the "current detention facility" section

was blank. *Id.* Counsel's inquiries about Ms. Ozturk's location

to ICE's Enforcement and Removal Operations ("ERO") division in

Burlington, Massachusetts and Homeland Security Investigations

("HSI") in Boston, Massachusetts went unanswered. *Id.*

When a representative of the Turkish consulate went in

person to ICE offices in Burlington, Massachusetts on March 26

to inquire about Ms. Ozturk's whereabouts, the representative

was told that ICE did not have information about where she was.

*Id.* Ms. Ozturk's counsel also called Rayford Farquhar, the Chief

of Defensive Litigation in the Civil Division at the United

States Attorney's Office in the District of Massachusetts and

emailed Assistant United States Attorney Mark Sauter on the

morning of March 26 to ask about Ms. Ozturk's location and

notify them that her asthma medication was not with her when she

was detained. Mr. Farquahar and Mr. Sauter both responded that

they did not know Ms. Ozturk's location. *Id.* Ms. Ozturk's

counsel emailed them again in the early afternoon of May 26, and

Mr. Sauter responded that he was still attempting to obtain

information about Ms. Ozturk's whereabouts. *Id.* at 3-4.

That afternoon, Ms. Ozturk's counsel filed an emergency

motion asking the District of Massachusetts court to order the

government to disclose Ms. Ozturk's location and permit her to
speak to her attorney. ECF No. 42 at 6. The motion noted that
counsel had just been informed by a U.S. Senator's office that
Ms. Ozturk was in Louisiana but had not received confirmation of
her location from ICE or the government's counsel. *Id.* At
approximately 3:27 p.m., Mr. Sauter told Ms. Ozturk's counsel
that ICE had informed him that she was transferred to Louisiana
that morning and was en route to a detention facility. ECF No.
26-2 at 4. Mr. Sauter's email stated, "I continue to ask ICE for
the detention facility that she will be placed and that she be
permitted to contact you." *Id.* (internal quotation marks
omitted). After Mr. Sauter and Ms. Ozturk's counsel exchanged
several more emails, Ms. Ozturk spoke to her attorney at 9:45
p.m. on March 26, more than 24 hours after her arrest. *Id.* at 5.

### III. Ms. Ozturk's Revocation and Removal Proceedings

According to a memorandum by John L. Armstrong (hereinafter
"Armstrong Memorandum"), a senior bureau official of the Bureau
of Consular Affairs, the Bureau of Consular Affairs had approved
revocation of Ms. Ozturk's F-1 visa pursuant to a request from
ICE and the Department of Homeland Security ("DHS") on March 21,
2025. ECF No. 91-1 at 6. According to the memo, ICE and DHS had
made an assessment that Ms. Ozturk "had been involved in
associations that 'may undermine U.S. foreign policy by creating
a hostile environment for Jewish students and indicating support

9

for a designated terrorist organization' including co-authorizing an op-ed that found common cause with an organization that was later temporarily banned from campus. . . ." *Id.* The memo also noted, "[d]ue to ongoing ICE operational security, this revocation will be silent; the Department of State will not notify the subject of the revocation." *Id.*

Ms. Ozturk was served with a Notice to Appear ("NTA") on March 25, 2025, while in custody. ECF No. 19-1 at 3. The NTA cites Section 237(a)(1)(B) of the Immigration and Nationality Act ("INA"), which applies to individuals whose nonimmigrant visas have been revoked, as the basis for her removal. ECF No. 12-2; 8 U.S.C. § 1227(a)(1)(B). A March 25, 2025 letter, which was addressed to Ms. Ozturk but not provided to her prior to her arrest, also cites the INA provision codified at 8 U.S.C. § 1227(a)(4)(C)(i) as a possible basis for termination of her Student Exchange Visitor Information System ("SEVIS") designation. ECF No. 42 at 7. This provision states that "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1227(a)(4)(C)(i).

The government has not represented that revocation of Ms. Ozturk's visa was based on 8 U.S.C. § 1227(a)(4)(C)(i). In its briefing, the government acknowledges that the "statute is

10

mentioned [in the March 25, 2025 letter] as one of two possible
reasons why Petitioner's SEVIS record was terminated" but states
"that data entry into a DHS information system is not a State
Department record, and does not speak for the State Department."
ECF No. 83 at 21 n.5.

The NTA ordered Ms. Ozturk to appear before an immigration
judge in Louisiana on April 7, 2025, although that hearing was
later canceled. ECF No. 66 at 22. On April 14, 2025, Ms. Ozturk
submitted a request for a bond hearing in immigration court. On
April 16, 2025, an immigration judge denied her request for a
change in custody status and provided "Danger and Flight Risk"
as the rationale. ECF No. 101-1 at 4.

**IV. The Pending Proceedings**

Ms. Ozturk filed an amended petition and complaint on March
28, 2025. ECF No. 12. The same day, the Massachusetts district
court ordered Ms. Ozturk not to be removed from the United
States until further order of the court and ordered the
government to file a response by April 1, 2025. ECF No. 16. The
government timely filed a response, and Ms. Ozturk filed her
reply on April 2, 2025. ECF Nos. 19, 26. On April 3, 2025, the
District of Massachusetts held a hearing on the amended
petition. ECF No. 41.

On April 4, 2025, the Massachusetts district court denied
the government's motion to dismiss the petition and its

11

alternative request to transfer the matter to the Western
District of Louisiana. The court instead transferred the case to
the District of Vermont "in the interest of justice" pursuant to
28 U.S.C. § 1631.

At a status conference on April 7, 2025, this Court ordered
the parties to submit supplemental briefing citing Second
Circuit law on their jurisdictional arguments. ECF No. 60. On
April 10, 2025, Ms. Ozturk filed a supplemental memorandum on
the jurisdictional issues as well as a motion for her release,
or in the alternative, a motion to return her to the District of
Vermont. ECF Nos. 81, 82. The government filed its supplemental
briefing in opposition on these issues. ECF Nos. 83, 84. The
Court heard oral argument from the parties on April 14, 2025 and
took the matter under advisement.

## Discussion

Pending before the Court is Ms. Ozturk's habeas corpus
petition and the government's request for the petition to be
dismissed. As a threshold matter, Ms. Ozturk argues that the
District of Vermont has jurisdiction and is the proper court
after the District of Massachusetts' transfer pursuant to 28
U.S.C. § 1631. The government argues that § 1631 cannot supply
this Court with jurisdiction and that the petition should be
dismissed because the proper forum is the Western District of
Louisiana, where Ms. Ozturk is currently confined. The parties

12

JA-000420

also dispute whether certain provisions of the INA bar review of Ms. Ozturk's habeas claims.

Ms. Ozturk's substantive constitutional claims center on alleged violations of her First and Fifth Amendment rights. In support of her First Amendment claim, she has submitted evidence to show that the actions against her were retaliatory, as the only identifiable conduct supporting her detention is her co-authoring of a Tufts University op-ed. The government has submitted no evidence to counter her First Amendment claim. Ms. Ozturk's Fifth Amendment claim asserts due process violations. Finally, Ms. Ozturk requests immediate release on bail pending the outcome of the habeas review, while the government argues that bail or bond can only be sought from an immigration judge. In the alternative, Ms. Ozturk requests she be returned to custody in Vermont where she can work with counsel to prepare her legal claims. The Court will first address the jurisdictional questions.

## I.    Habeas Corpus Jurisdiction

### A. Legal Standards

Ms. Ozturk filed her habeas petition pursuant to 28 U.S.C. § 2241. Generally, "[w]henever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement." *Rumsfeld v. Padilla*,

JA-000421

542 U.S. 426, 447 (2004). This rule is "derived from the terms
of the habeas statute," *id.*, which only permits district courts
to grant habeas relief "within their respective jurisdictions,"
28 U.S.C. § 2241(a).

The federal habeas statute further states that a petition
must allege "the name of the person who has custody over him."
28 U.S.C. § 2242; *see* 28 U.S.C. § 2243 ("The writ, or order to
show cause shall be directed to the person having custody of the
person detained."). The Supreme Court has interpreted this
statutory language as requiring the petitioner to name as the
respondent her "immediate custodian[,]" who, "[b]y
definition . . . reside[s] in the same district" as the
petitioner. *Padilla*, 542 U.S. at 444. "[T]he default rule is
that the proper respondent is the warden of the facility where
the prisoner is being held, not the Attorney General or some
other remote supervisory official." *Id.* at 435. These
jurisdictional rules for habeas petitions do not implicate the
Court's subject-matter jurisdiction and are treated functionally
as matters of personal jurisdiction or venue. *See id.* at 434 n.7
(explaining that the Court uses the word "'jurisdiction . . . in
the sense that it is used in the habeas statute, 28 U.S.C. §
2241(a), and not in the sense of subject-matter jurisdiction of
the District Court"); *id.* at 451 (Kennedy, J., concurring) ("In
my view, the question of the proper location for a habeas

14

JA-000422

petition is best understood as a question of personal
jurisdiction or venue.").

Because Ms. Ozturk was in Vermont when her counsel filed
the pending habeas petition in the District of Massachusetts,
the petition was not filed in her district of confinement. Nor
did it name her immediate custodian (who presumptively would
have been in the District of Vermont). The government argues
that the § 1631 transfer by the District of Massachusetts is
insufficient to cure these jurisdictional defects, and that the
only forum where Ms. Ozturk's petition may properly be brought
is the Western District of Louisiana. The Court therefore
addresses, in turn, (1) whether the District of Massachusetts §
1631 transfer was proper, (2) whether the § 1631 transfer cures
the original petition's failure to comply with the district of
confinement rule, and (3) whether this Court has jurisdiction
despite the petition's alleged failure to identify any immediate
custodian.

**B. The Section 1631 Transfer**

Under 28 U.S.C. § 1631:

[w]henever a civil action is filed in a court as
defined in section 610 of this title or an appeal,
including a petition for review of administrative
action, is noticed for or filed with such a court and
that court finds that there is a want of jurisdiction,
the court shall, if it is in the interest of justice,
transfer such action or appeal to any other such court
(or, for cases within the jurisdiction of the United
States Tax Court, to that court) in which the action

15

JA-000423

or appeal could have been brought at the time it was
filed or noticed, and the action or appeal shall
proceed as if it had been filed in or noticed for the
court to which it is transferred on the date upon
which it was actually filed in or noticed for the
court from which it is transferred.

It is well-established in the Second Circuit that habeas
petitions may be transferred under § 1631. *See, e.g., Liriano v.
United States*, 95 F.3d 119, 123 (2d Cir. 1996) (holding that
when a second or successive petition for habeas corpus is filed
in district court without the requisite authorization of the
Second Circuit, "the district court should transfer the petition
or motion to this Court in the interest of justice pursuant to §
1631"); *Zhen Yi Guo v. Napolitano*, 2009 WL 2840400, at *6
(S.D.N.Y. Sept. 2, 2009) ("Courts have consistently found it in
the interest of justice to transfer habeas petitions when
jurisdiction is lacking." (quoting *Shehnaz v. Ashcroft*, 2004 WL
2378371, at *4 (S.D.N.Y. Oct. 25, 2004))). "When considering
whether a transfer would serve the interest of justice, [the
Court] must weigh 'the equities of dismissing a claim when it
could be transferred.'" *Ruiz v. Mukasey*, 552 F.3d 269, 276 (2d
Cir. 2009) (quoting *Liriano,* 95 F.3d at 122). Relevant equities
include whether the petitioner acted in good faith and whether a
transfer would "expedite [] review, thereby furthering the
interest of justice." *Id.*

In this case, the government does not dispute that this
petition "could have been brought" in the District of Vermont

16

JA-000424

"at the time it was filed[.]" 28 U.S.C. § 1631; *see* ECF No. 19
at 27 ("It is true that at the time Petitioner's original
petition was filed, it could have been properly filed in Vermont
as that is where she was then in custody."). Ms. Ozturk acted in
good faith when she originally filed the petition in
Massachusetts, and transfer expedited review because Ms. Ozturk
would otherwise have needed to spend time refiling the petition.
Because Ms. Ozturk's petition could have been brought in this
Court at the time it was filed and the record supports that the
equities weighed in favor of transfer, the Massachusetts
district court's decision to transfer the petition to this Court
complied with the requirements for transfer under § 1631. *Cf.*
*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 152 (2d
Cir. 2019) (noting the Supreme Court's "sagacious warning" that
"'[t]ransferee courts that feel entirely free to revisit
transfer decisions of a coordinate court threaten to send
litigants into a vicious circle of litigation,' culminating in a
'perpetual game of jurisdictional ping-pong.'" (quoting
*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816,
818 (1988))).

**C. The District of Confinement Rule**

Ms. Ozturk argues that because a case transferred under §
1631 "shall proceed as if it had been filed in or noticed for
the court to which it is transferred on the date upon which it

17

JA-000425

was actually filed in[,]" the Court should treat her petition as
if it had been filed in the District of Vermont at approximately
10:02 p.m. on March 25, 2025, in which case it would have been
filed in her district of confinement. 28 U.S.C. § 1631. The
government contends that Ms. Ozturk cannot "use § 1631 to vest
this Court with authority that it otherwise would lack by way of
statute" and that "[n]othing in § 1631 allows a district court
to somehow blow past" § 2241's statutory requirements "based on
the fiction that the suit was properly before it." ECF No. 83 at
14-15.

    The government does not cite any authority holding that §
1631 cannot cure a habeas petitioner's failure to file a
petition in the correct district. Other courts have found
transfer under § 1631 to be proper where a habeas petition was
not originally filed in the district of confinement. *See, e.g.,*
*Abraham v. Decker*, 2018 WL 3387695, at *3 (E.D.N.Y. July 12,
2018) (transferring habeas petition under § 1631 because
petitioner's immediate custodian was in New Jersey, not New
York); *Golding v. Sessions*, 2018 WL 6444400, at *3 (S.D.N.Y.
Dec. 6, 2018) (same). Additionally, "[t]he legislative history
of § 1631 indicates that 'Congress contemplated that the
provision would aid litigants who were confused about the proper
forum for review.'" *Liriano*, 95 F.3d at 122. Ms. Ozturk's filing
of her habeas petition in the District of Massachusetts because

JA-000426

her counsel did not know her location — in other words, her
confusion about the proper forum for review — is thus exactly
the kind of jurisdictional defect § 1631 was designed to cure.

The government cites *De Ping Wang v. Department of Homeland*
*Security*, 484 F.3d 615 (2d Cir. 2007) for the proposition that
"[t]he Second Circuit has held that, while § 1631 allows a
transferee court to proceed as if the case had been filed on a
certain date, § 1631 does not allow courts to ignore other facts
and substantive limits on jurisdiction." ECF No. 83 at 15. That
case, however, is readily distinguishable. In *De Ping Wang,* the
Second Circuit found that transfer under 28 U.S.C. § 1631 was
improper because, even if the action in that case were correctly
filed in the transferee court on the same date it was mistakenly
filed in transferor, it would still have been untimely. 484 F.3d
at 617-18. In contrast, filing Ms. Ozturk's petition in the
District of Vermont on the same date it was filed in the
District of Massachusetts would have satisfied the
jurisdictional requirement that she file in her district of
confinement.

A New Jersey federal court recently found transfer under §
1631 to support habeas jurisdiction under similar circumstances.
*Khalil v. Joyce*, 2025 WL 972959, at *15 (D.N.J. Apr. 1, 2025).
In *Khalil*, the habeas petitioner was arrested by federal
officials in Manhattan but was being held in a New Jersey

19

JA-000427

facility when he filed his petition. *Id.* at *1. Finding that it
lacked jurisdiction, the Manhattan district court transferred
the petition to the District of New Jersey. In finding that it
had habeas jurisdiction to proceed upon the case's transfer, the
District of New Jersey court reasoned that according to the
clear language of § 1631, it must treat the case as if it had
been filed in New Jersey on the same date it was filed in New
York. The court concluded that because "[a]t that moment, the
Petitioner was in New Jersey . . . there is no missing piece of
the jurisdictional puzzle[,]" and thus "the Petition counts as
having been in New Jersey at the same moment the Petitioner was
here." *Id.* at *15.

This Court comes to the same conclusion here. At
approximately 10:02 p.m. on March 25, 2025, the moment Ms.
Ozturk filed her habeas petition, she was detained in Vermont.
Accordingly, for this action to "proceed as if it had been filed
in or noticed for the court to which it [was] transferred on the
date upon which it was actually filed[,]" the case must proceed
as if it were filed in the District of Vermont while Ms. Ozturk
was detained here, in which case the district of confinement
rule would have been satisfied. 28 U.S.C. § 1631.

The government further argues that Ms. Ozturk's present
detention in Louisiana prevents the District of Vermont from
exercising habeas jurisdiction. Section § 2241(a) provides that

20

district courts may only grant a writ of habeas corpus "within
their respective jurisdictions[,]" and although Ms. Ozturk was
in this jurisdiction at the time her petition was filed, she is
no longer in the District of Vermont. Ms. Ozturk asserts that
the District of Vermont has jurisdiction notwithstanding her
transfer to Louisiana based on *Ex parte Endo*, 323 U.S. 283
(1944).

In *Ex parte Endo*, the Supreme Court recognized an exception
to the general rule that a district court only has power to
grant habeas relief when the petitioner is being held within its
jurisdiction. The *Endo* petitioner was a Japanese-American
citizen who was interned by the government during World War II.
323 U.S. at 284-85. The petitioner filed a habeas petition in a
California district court while detained in that district and,
while appealing the petition's denial, was transferred to a
detention center in Utah. *Id.* The Supreme Court held that the
petitioner's transfer to Utah after the California district
court "acquired jurisdiction in this case" did not "cause it to
lose jurisdiction where a person in whose custody [the
petitioner] is remains within the district." *Id.* at 306. In
*Padilla*, the Supreme Court recognized that,

> *Endo* stands for the important but limited proposition
> that when the Government moves a habeas petitioner
> after she properly files a petition naming her
> immediate custodian, the District Court retains
> jurisdiction and may direct the writ to any respondent

JA-000429

within its jurisdiction who has legal authority to
effectuate the prisoner's release.

542 U.S. at 441.

The government argues that *Ex parte Endo* does not apply
because, in this case, Ms. Ozturk "never properly filed her
habeas petition" in the District of Vermont and thus this Court
had not acquired jurisdiction prior to her transfer to a
different district. ECF No. 83 at 9 n.2. The plain language of
the transfer statute, however, states that the transferred
action "shall proceed *as if it had been filed*" in the transferee
court on the same date it was filed in the transferor court. 28
U.S.C. § 1631 (emphasis added); *see Jimenez v. Quarterman*, 555
U.S. 113, 118 (2009) ("[W]hen the statutory language is plain,
we must enforce it according to its terms.").

Had Ms. Ozturk filed her habeas petition in the District of
Vermont on March 25, 2025, the holding of *Ex parte Endo* would
squarely apply. The District of Vermont would have acquired
jurisdiction on that date, and Ms. Ozturk's transfer to
Louisiana would not have stripped the Court of its jurisdiction
because a respondent with the power to effectuate Ms. Ozturk's
release remains within the reach of the District of Vermont. *See*
*Henderson v. I.N.S.*, 157 F.3d 106, 125 (2d Cir. 1998) (noting
that there is "no question that the Attorney General has the
power to produce the petitioners" in case brought by legal
permanent residents who were ordered deported).

22

JA-000430

**D. The Immediate Custodian Rule**

Even if this Court allows Ms. Ozturk's petition to proceed
as if it had been filed on March 25, 2025, in the District of
Vermont, the question remains of whether the Court could not
have properly acquired jurisdiction on that date because the
petition may have failed to name Ms. Ozturk's immediate
custodian as a respondent.

The government contends that "Petitioner named improper
respondents in her original petition because she named
supervisory officials, rather than her immediate custodian in
Vermont when the petition was filed." ECF No. 83 at 10. Of the
supervisory officials named in the Petition, the one closest to
Vermont was Ms. Hyde, the acting ICE Field Office director for
New England. When presented with the question of whether an ICE
Field Office director was the correct respondent in a habeas
petition, other district courts in the Second Circuit have held
that the correct custodian was instead the warden of the local
facility where the petitioner was being held. *See Sanchez v.
Decker*, 2019 WL 6311955, at *4 (S.D.N.Y. Nov. 25, 2019) (finding
that the warden of the county correctional facility where
petitioner was held, rather than the director of ICE's New York
City Field Office, was the immediate custodian); *see also Lemus-
Pineda v. Whittaker*, 354 F. Supp. 3d 473, 475 (S.D.N.Y. 2018)

23

(holding that county jail warden, rather than ICE field office
director, was proper respondent).

In this case, however, Ms. Ozturk was not at a prison or
jail when the Petition was filed – she was in a vehicle being
transported to an ICE Field Office. There is no "warden" that
Ms. Ozturk could have named. It is also not apparent to the
Court that Ms. Hyde was not functionally the immediate custodian
in that moment. Presumably a call from Ms. Hyde to a subordinate
may have actually freed Ms. Ozturk, just as a call from a warden
to a correctional officer may actually free a prisoner. At oral
argument, government's counsel could not identify who that
immediate custodian would have been if not Ms. Hyde. ECF No. 98
at 30. Because the government has provided insufficient facts to
determine that Ms. Hyde was not Ms. Ozturk's immediate
custodian, the Court will not dismiss her petition on that
basis.

Regardless of whether Ms. Hyde was the immediate custodian,
Ms. Ozturk argues that this case falls within an exception to
the immediate custodian rule because her custodian was unknown
at the time of the Petition's filing. The unknown custodian
exception arises from *Demjanjuk v. Meese*, 784 F.2d 1114 (D.C.
Cir. 1986), in which a habeas petitioner was held by the United
States in a confidential location at the time he filed his
petition. The D.C. Circuit thus ruled that "in these very

24

limited and special circumstances," it would consider the
Attorney General of the United States the appropriate custodian.
784 F.2d at 1116. In *Padilla*, the Supreme Court recognized this
exception by noting that although "[w]hen, as in [*Demjanjuk*], a
prisoner is held in an undisclosed location by an unknown
custodian, it is impossible to apply the immediate custodian and
district of confinement rules[,]" that was not the case in
*Padilla*. 542 U.S. at 450 n.18.

    In *Khalil*, the New Jersey district court found that this
exception applied where, at the time of filing the petition,
nothing in the record showed that the petitioner's counsel could
"have determined in real time that the Petitioner had been moved
to New Jersey[.]" 2025 WL 972959, at *27. Although Mr. Khalil's
counsel attempted to locate the petitioner, the ICE Online
Detainee Locator System incorrectly indicated that he was still
being held in New York, and Mr. Khalil was not allowed to call
his attorney. Accordingly, the District of New Jersey court
concluded the unknown custodian exception applied because "the
identity of the immediate custodian [was] virtually unknowable"
when Mr. Khalil filed his habeas petition. *Id.* at *30.

    The District of New Jersey court acknowledged that Mr.
Khalil's custodian subsequently became known such that the case
could "simply be dismissed and refiled in Louisiana[,]" where he
was currently being held. *Id.* at 36. It nonetheless concluded

25

that equitable concerns weighed in favor of applying the unknown

custodian exception, explaining that:

> if the exception does not apply, and the case is
> dismissed on that basis, then the implication would be
> that there can be a period of time during which a
> person can be arrested in the United States and then
> moved by federal officials, during which period no
> habeas court would have the power to hear him out ---
> even though, as here, his lawyers and family cannot
> determine where he is only because they have been
> given inaccurate information about his whereabouts,
> and because he has not been allowed to correct that
> information by making a phone call.

*Id.*

For similar reasons, this Court agrees with Ms. Ozturk that

the unknown custodian exception applies in this case. As in

*Demjanjuk*, Ms. Ozturk was being held in "an undisclosed location

by an unknown custodian" on the date her habeas petition was

filed. 542 U.S. at 450 n.18. The government does not dispute

that her counsel could not have known her location; in fact, the

government states in its briefing that it does not permit

immigration detainees "to communicate about their location while

enroute between detention facilities" because doing so "would

raise serious security concerns." ECF No. 83 at 13. The

government thus admits that from the time ICE agents arrested

Ms. Ozturk to the time she arrived at the Louisiana detention

facility, it was keeping her location a secret. And the identity

of Ms. Ozturk's actual custodian at the time of filing, if it is

not one of the Respondents, appears to still be unknown to the

government.

Ms. Ozturk was arrested at 5:25 pm on March 25, 2025, and ICE did not provide her location to her counsel until the afternoon of March 26, 2025. This made it "impossible to apply the immediate custodian" rule for a period of nearly 24 hours after Ms. Ozturk's initial detention. *Padilla*, 542 U.S. at 450 n.18; *see United States v. Paracha*, 2006 WL 12768, at *6 (S.D.N.Y. Jan. 3, 2006) ("Ordinarily, a habeas writ must be served on a prisoner's immediate custodian. However, where, as here, the immediate custodian is unknown, a writ may properly be served on the prisoner's ultimate custodian.").

The government asserted at oral argument that under *Padilla*, it is irrelevant whether Ms. Ozturk's counsel made diligent efforts to ascertain her location — that does not excuse a petitioner from the immediate custodian requirement. The *Padilla* majority, however, had no occasion to apply the unknown custodian exception because the facts there indicated that the petitioner's counsel may have been "well aware" of Mr. Padilla's presence in South Carolina before filing a habeas petition in New York. 542 U.S. at 449 n.17. The majority rejected the dissent's characterization of the petitioner's location as secret, finding that "neither Padilla nor the District court" had "ever suggested that the Government concealed Padilla's whereabouts from counsel[.]" *Id.* In this case, Ms. Ozturk argues, and the government does not dispute,

27

that ICE officials were intentionally concealing Ms. Ozturk's whereabouts on the day her petition was filed.

Additionally, application of the unknown custodian exception in this case would not implicate the forum-shopping concerns that underlie the immediate custodian rule. As the Supreme Court explained in *Padilla*, this rule "serves the important purpose of preventing forum shopping by habeas petitioners" because "[w]ithout it, a prisoner could name a high-level supervisory official as respondent and then sue that person wherever he is amenable to long-arm jurisdiction." 542 U.S. at 447. Here, the Court finds that Ms. Ozturk could only have filed her petition in one location: the District of Vermont.

Even if the unknown custodian rule exception did not apply here, had Ms. Ozturk correctly filed the Petition in the District of Vermont but named the incorrect custodian, this Court could have simply allowed her to amend the Petition to include the proper respondent. *See* Fed. R. Civ. P. 15(a)(1)(A) ("A party may amend its pleading once as a matter of course no later than . . . 21 days after serving it); *see also Destyl v. Garland*, 2023 WL 3603666, at *4 (W.D.N.Y. May 23, 2023) (finding "purely as a procedural matter" that the proper respondent was the officer-in-charge of the Buffalo Federal Detention Facility

28

JA-000436

rather than the United States Attorney General and substituting in the correct respondent).

Accordingly, the Court finds it has habeas corpus jurisdiction to consider Ms. Ozturk's petition.

## II.  Habeas Review Limitations in the Immigration and Nationality Act

Having found that habeas corpus jurisdiction is proper, the Court turns to the government's argument that the INA nonetheless bars district court review of Ms. Ozturk's habeas claims related to her detention. The government cites five provisions of the INA which they argue constrain or prohibit the Court's review: 8 U.S.C. § 1201(i); 8 U.S.C. § 1226(e); 8 U.S.C. § 1252(g); 8 U.S.C. § 1252(a)(5); and 8 U.S.C. 1252 (b)(9). For reasons set forth below, the Court finds that none of these provisions limit the Court's review where Ms. Ozturk has raised constitutional and legal challenges to her detention that are separate from removal proceedings.

### A. The Court's Review is Not Barred by § 1226(e)

Ms. Ozturk has been detained under the discretionary detention provision of the INA, codified at 8 U.S.C. § 1226(a). Section 1226 created two mutually exclusive avenues for government detention of individuals who may be subject to removal. One avenue, under the subsection titled "Detention of Criminal Aliens," requires ("shall") the government to "take

29

JA-000437

into custody" individuals who fit certain heightened criteria. §1226(c). The other avenue – at issue in this case – entitled "Arrest, Detention, and Release," grants the government discretion to arrest and detain individuals: "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). The statute also includes a subsection on judicial review. This subsection reads in its entirety, "The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole." § 1226(e).[1]

The government argues that § 1226(e) precludes the Court's review of Ms. Ozturk's detention, notwithstanding the United States Constitution's Suspension Clause. The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Because of the history and importance of the habeas corpus writ, along with a desire to read statutes to comport with the Constitution, the

---

[1] Note that since the enactment of the INA, Congress created the Department of Homeland Security and charged the Secretary with enforcing the INA, 8 U.S.C. § 1103.

30

Supreme Court has held that "where a provision precluding review
is claimed to bar habeas review, the Court requires a
particularly clear statement that such is Congress' intent."
*Demore v. Kim*, 538 U.S. 510, 511 (2003); *id.* at 517 (finding
that the "clear text" of § 1226(e) does not bar a habeas
challenge to detention). This mandate for statutory construction
is so strict that it has been criticized for establishing a
"magic words" requirement for Congress to preclude habeas
review. *INS v. St. Cyr*, 533 U.S. 289, 327 (2001) (Scalia, J.,
dissenting). Here, the Court does not find such a clear
statement of Congressional intent, let alone any magic words,
that would support a categorical bar to habeas review of
detention under § 1226.

Binding precedent in this Circuit also counters the
government's argument. In *Velasco Lopez v. Decker*, the Second
Circuit squarely considered the availability of habeas review
for the petitioner who was detained under § 1226(a). 978 F.3d
842 (2d Cir. 2020). The Circuit court reviewed a grant of habeas
relief under 28 U.S.C. § 2241 and held that § 1226(e) does not
limit habeas jurisdiction over constitutional claims or
questions of law. *Id.* at 850. Further, habeas review in federal
court can consider claims that the discretionary process itself
was constitutionally flawed. *Id.* In sum, whether a habeas

31

petitioner received due process is not a matter of discretion and is subject to judicial review. *Id.*

As discussed below, Ms. Ozturk has raised questions that are fairly characterized as "constitutional claims or questions of law." *Id.* Ms. Ozturk has also argued that while the government does have discretion in § 1226(a) detention, that discretionary process may be unconstitutional if it allows for the deprivation of constitutional rights. For jurisdictional purposes, the Court need not analyze the merits of these claims at this point. It is enough to acknowledge that because Ms. Ozturk has appropriately raised constitutional claims for this Court to consider in habeas, the nature of those claims defeats any jurisdictional bar set forth in § 1226(e).[2]

The legislative history of the REAL ID Act of 2005 confirms that Congress understood § 1226(e) does not operate as a categorical bar to habeas review of detention. Regarding provisions of the REAL ID Act which purport to deprive the districts courts of habeas jurisdiction of removal proceedings, Congress noted that those provisions "will not preclude habeas review over challenges to detention that are independent of

---

[2] The Court acknowledges case law limiting, but not eliminating, habeas review for "Criminal Aliens" mandatorily detained under § 1226(c). *See e.g., Jennings v. Rodriguez*, 583 U.S. 281 (2018). However, Ms. Ozturk is held in discretionary detention under § 1226(a), not mandatory detention under § 1226(c).

challenges to removal orders." H.R. Cong. Rep. No. 109-72, at
2873 (May 3, 2005). Almost immediately after the Real ID Act was
enacted, the First Circuit confronted the question of continued
district court jurisdiction for habeas challenges to detention
and determined that the REAL ID Act provided no bar in such
cases. *Hernandez v. Gonzales*, 424 F.3d 42, 42 (1st Cir. 2005).
And courts in this Circuit have continued to consider habeas
challenges to detention under § 1226(a) since then. *See, e.g.*,
*Velasco Lopez,* 978 F.3d 842. The Court adheres to that precedent
in this case.

## B. Sections § 1201(i), § 1252(g), § 1252(a)(5), and § 1252(b)(9)

The government argues that, regardless of this Court's
interpretation of 8 U.S.C. § 1226(e), four additional statutory
provisions prevent it from considering Ms. Ozturk's claim for
relief from present detention. Those four provisions – 8 U.S.C.
§ 1201(i), 8 U.S.C. § 1252(g), 8 U.S.C. § 1252(a)(5), and 8
U.S.C. § 1252(b)(9) – each directly relate to removal
proceedings.

At the outset, the Court acknowledges that the Suspension
Clause does not establish an absolute right to seek the writ of
habeas corpus. The Supreme Court has held that Congress may
modify or eliminate the right to seek the writ if Congress
provides "a collateral remedy which is neither inadequate nor

33

JA-000441

ineffective to test the legality of a person's detention." *Swain v. Pressley*, 430 U.S. 372, 381 (1977). For example, as the Court found in *INS v. St. Cyr*, "Congress could, without raising any constitutional questions, provide an adequate substitute through the courts of appeals." 533 U.S. at 314 n.38. If such a substitute is crafted by Congress, courts must then determine "whether the statute stripping jurisdiction to issue the writ avoids the Suspension Clause mandate because Congress has provided adequate substitute procedures for habeas corpus." *Luna v. Holder*, 637 F.3d 85, 93 (2d Cir. 2011) (quoting *Boumediene v. Bush*, 553 U.S. 723, 771 (2008)).

Section 1201 governs the issuance of visas. The jurisdictional bar in § 1201(i) explicitly prohibits judicial review under "section 2241 of title 28 or any other habeas corpus provision, and sections 1361 and 1651 of such title . . . except in the context of a removal proceeding" for individuals challenging the revocation of visas or documents. The government urges the Court to follow the guidance of courts in other jurisdictions who have found "themselves without jurisdiction to consider the merits of a visa revocation upon operation of Section 1201(i)'s language." ECF No. 83 at 24. Here, however, the merits of a visa revocation are not before the Court. While Ms. Ozturk may plan to challenge the revocation of her visa in another forum, she does not do so in the instant Petition.

34

Section 1252 provides a collateral remedy in the context of removal proceedings. The government details its understanding of that procedure succinctly: "Petitioner must seek release before an immigration judge and must pursue relief from removal in Immigration Court, whose decision would be reviewable before the Board of Immigration Appeals ("BIA"), and (if necessary) a federal circuit court." ECF No. 83 at 4. Courts across the country, including the Second Circuit, have functionally endorsed this procedure as a substitute for the writ of habeas corpus in instances where would-be habeas petitioners seek judicial review of removal proceedings. *See, e.g., Ruiz-Martinez v. Mukasey*, 516 F.3d 102, 114 (2d Cir. 2008). Thus, if Ms. Ozturk sought relief from removal proceedings, this Court would be obligated to follow Circuit precedent and conclude its review of that claim.

The government argues that whatever Ms. Ozturk's claims may be about the constitutionality of her detention, any "challenges inextricably intertwined with the final order of removal that precede issuance of any order of removal . . . and decisions to detain for the purposes of removal" should all be considered subject to the same jurisdictional bar. ECF No. 83 at 23. The Second Circuit has held, however, that "a suit brought against immigration authorities is not *per* se a challenge to a removal order; whether the district court has jurisdiction will turn on

35

JA-000443

the substance of the relief that a plaintiff is seeking."
*Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011) (citing
*Kellici v. Gonzales*, 472 F.3d 416, 420 (6th Cir. 2006) (finding
that a "district court, not court of appeals, had jurisdiction
where plaintiffs' habeas petitions challenged only the
constitutionality of the arrest and detention, not the
underlying administrative order of removal.")).

The claims for relief before this Court do not challenge
Ms. Ozturk's removal proceedings. Ms. Ozturk's attorneys
acknowledge that claims related to removal are not appropriate
in this action: "While the government's Policy also lay behind
the revocation of her visa and placement in removal proceedings,
she does not, in this Court, challenge those actions. Instead,
she seeks relief on her claims challenging her apprehension,
detention, and the termination of her SEVIS, release from
detention, reinstatement of her SEVIS, and corresponding
declaratory and injunctive relief that the Policy that resulted
in her apprehension, detention, and SEVIS termination are
illegal."[3] ECF. No. 81 at 21. None of these claims raise
challenges to the removal process.

The limitations on habeas review set forth in Section 1252
thus do not apply in this case. Subsection (a)(5) provides for

_____

[3] The government notes that Ms. Ozturk's SEVIS record is not the basis
for her detention or removability. ECF No. 83 at 21.

JA-000444

the "Exclusive Means of Review" for habeas petitions challenging

"an order of removal" through the established scheme. Subsection

(b)(9) limits habeas review, except through the established

scheme requiring a final order before appeal to the circuit

court, for "all questions of law and fact, including

interpretation and application of constitutional and statutory

provisions, arising from any action taken or proceeding brought

to remove an alien from the United States under this

subchapter." And subsection (g) limits jurisdiction of courts

outside the established scheme to "hear any cause or claim by or

on behalf of any alien arising from the decision or action by

the Attorney General to commence proceedings, adjudicate cases,

or execute removal orders against any alien under this chapter."

Subsection (a)(5) can be dispensed of quickly, as no

"removal order" has been issued here and Ms. Ozturk does not

challenge one. Similarly, she has not raised in this Court any

constitutional or legal concerns "arising from" "any action" or

"proceeding" brought to remove her, per subsection (b)(9).

Moreover, the plain text of subsection (g) does not support a

reading that Ms. Ozturk's detention and resulting constitutional

claims arise from the government's "decision or action" to

"commence proceedings, adjudicate cases, or execute removal

orders." Whether removal proceedings have proceeded according to

JA-000445

law and in comport with the Constitution is not a question
before this Court.

The government's argument that Ms. Ozturk's detention
"arises from" her removal proceedings stretches the bounds of
the text and the facts of this case. While Ms. Ozturk's
detention may be related to her immigration status following the
revocation of her visa, it does not "arise from" her removal
proceedings. Indeed, there is no causal relationship between the
removal proceedings and her detention. As the government has
confirmed, ICE's decision to arrest and detain her was
*discretionary* under § 1226(e). Her detention did not flow
naturally as a consequence of her removal proceedings. Indeed,
Ms. Ozturk was detained before the commencement of her removal
proceedings. *See* 8 C.F.R. § 1003.14. Whether her detention
comports with the law and the Constitution is the subject of
this Court's habeas review.

The government cites *Jennings v. Rodriguez*, 138 S. Ct. 830,
841 (2018) for the proposition that the habeas corpus bar in §
1252(b)(9) includes challenges to a decision to detain or to
seek removal. *Jennings* does not provide guidance on the question
of reviewability of detention decisions under § 1252(b)(9),
however, in part because that issue was not briefed or argued
before the court. 138 S. Ct. at 841 ("The parties in this case
have not addressed the scope of § 1252(b)(9), and it is not

38

JA-000446

necessary for us to attempt to provide a comprehensive
interpretation. For present purposes, it is enough to note that
respondents are not asking for review of an order of removal;
they are not challenging the decision to detain them in the
first place or to seek removal; and they are not even
challenging any part of the process by which their removability
will be determined. Under these circumstances, § 1252(b)(9) does
not present a jurisdictional bar."). In fact, *Jennings*
explicitly rejected the formulation, proposed in a concurrence,
that the government seeks here. "The concurrence contends that
'detention *is* an "action taken ... to remove" an alien' and that
therefore 'even the narrowest reading of "arising from" must
cover' the claims raised by respondents. *Post* at 855. (*Thomas,
J.*, concurring in part and concurring in judgment). We do not
follow this logic." *Id.* at 841 n.3. Accordingly, this Court also
does not read "arising from" to encompass any activity that has
occurred since the revocation of Ms. Ozturk's visa.[4]

---

[4] In Court proceedings on April 14, 2025, the government reasserted the
argument that the confluence of the opinions of five Justices in
*Jennings* should be read to bar review of Ms. Ozturk's claims in this
Court and instead channel them eventually to a court of appeals, no
matter the nature of the challenged action. But Justice Alito's
opinion for the Court, while not controlling on the matter of
§1252(b)(9), rejects the "staggering results" that would follow
Respondents' interpretation. "Suppose, for example, that a detained
alien wishes to assert a claim under *Bivens v. Six Unknown Fed.
Narcotics Agents*, 403 U.S. 388 (1971), based on allegedly inhumane
conditions of confinement. . . . [C]ramming judicial review of those
questions into the review of final removal orders would be absurd."
*Jennings* 138 S.Ct. at 293.

Similarly, the government's reliance on *Delgado v. Quarantillo* is misplaced. 643 F.3d 52 (2d Cir. 2011). The *Delgado* case did not concern detention. The plaintiff in that case brought a mandamus action to raise an adjustment-of-status challenge, which the Second Circuit determined was "inextricably linked" to a reinstatement of removal order and thus barred by § 1252(a)(5) because "the adjustment of status to that of a lawful permanent resident would render the reinstatement order invalid." 643 F.3d at 55 (cleaned up). Implicit in the *Delgado* court's reasoning is a causal relationship between the relief sought and the removal process. As noted above, the *Delgado* court made clear that district courts must determine jurisdiction by considering the substance of the asked-for relief because suits brought against immigration authorities are not *per se* challenges to removal orders. *Id.* In this case, there is no causal relationship between discretionary detention and removal proceedings. Relief from alleged improper detention would not render any removal proceedings invalid.

Finally, *Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019) does not address an analogous situation for the purpose of § 1252(g) interpretation. The government contends that *Ragbir* counsels that "1252(g) strips the district court of jurisdiction to hear a retaliatory First Amendment challenge in a removal case." ECF No. 83 at 26. But, again, the Court is not considering a removal

case. The Court is considering a habeas challenge to
discretionary detention.

In summary, the government urges the court to interpret
challenges to § 1226(a) detention as *per se* challenges to
removal proceedings and barred by several provisions in § 1252.
The Court declines to adopt that approach, as it has no
precedent in this Circuit or at the Supreme Court. Indeed, cases
like *Velasco Lopez* suggest that district courts in this Circuit
should continue to consider habeas challenges to detention post-
REAL ID Act, where otherwise appropriate. Article III courts
have an important role to play in evaluating constitutional and
legal claims related to detention brought in habeas, and this
Court has jurisdiction over this case.

The Court offers one final observation about the
government's argument that constitutional challenges to
detention must be brought first to an Immigration Judge, then to
the Board of Immigration Appeals, and finally via a petition for
review to the court of appeals. There are serious questions
about whether that process would be an adequate substitute for
the writ of habeas corpus in district court, given the limited
scope of administrative review.[5] In a similar case proceeding in

---

[5] Respondents' reliance on *Reno v. American-Arab Anti-Discrimination
Committee ("AADC")*, 525 U.S. 471 (1999), to "settle" these questions
elides the fact that *AADC* was exclusively about removal, not
detention.

the District of New Jersey, the government has acknowledged
that, "[i]f the alleged claim is a fundamental constitutional
claim the BIA (or the immigration judge) is powerless to
address, the court of appeals can address that issue in the
first instance." *Khalil*, 2:25-cv-01963-MEF-MAH, ECF No. 185 at 2
(cleaned up). Attorneys for the detainee in that case put it
more bluntly, "both the IJ and the Board of Immigration Appeals
('BIA') lack jurisdiction over constitutional challenges." *Id.*
at ECF No. 189 at 1; *see also Severino v. Mukasey*, 549 F.3d 79,
83 (2d Cir. 2008).

While timelines may vary on the speed with which detainees
may have their constitutional arguments heard by a court of
appeals in the first instance after the IJ and the BIA
processes, it is evident that it will necessarily be slower than
a petition to a district court, likely by a factor of months,
leading to a gap in their habeas rights. The District Court of
New Jersey held in *Khalil* that to deny jurisdiction would be to
say that for a single day in March, the detainee in that case
"would not have been able to call on any habeas court." 2025 WL
972959, at *37. The Court found that to be "too far" because
"[o]ur tradition is that there is no gap in the fabric of habeas
--- no place, no moment, where a person held in custody in the
United States cannot call on a court to hear his case and decide
it." *Id.*

42

Consider that the government's argument on this issue boils down to a bold statement that no matter how egregious the type or quantity of First Amendment or due process violations committed by the government in detaining an individual, an Article III court *cannot* consider any alleged constitutional violations until after Article II employees, with no power to consider or address those violations, have moved the case through their lengthy process. Put another way, the government argues that § 1226(a) grants practically limitless, unreviewable power to detain individuals for weeks or months, even if the detention is patently unconstitutional. Fortunately, this Court need not rule on the merits of that argument today, given the Court's rejection of the jurisdictional bar on other grounds. Thus, having found that 8 U.S.C. § 1201(i), § 1226(e), § 1252(g), § 1252(a)(5), and § 1252(b)(9) do not bar the Court's consideration of Ms. Ozturk's constitutional and legal claims, the Court turns to those claims now.

## III. Petitioner's Request for Immediate Release

Ms. Ozturk seeks habeas corpus relief based on alleged violations of her constitutional rights. Her ultimate goal in these proceedings is release from detention, but the Court presently considers her request for immediate release pending the resolution of her habeas petition.

JA-000451

Both parties analyze Ms. Ozturk's claim for immediate release pending the adjudication of her petition in reference to *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001). Such release is authorized by *Mapp* provided the Court finds the habeas petition raises "substantial claims" and that "extraordinary circumstances" exist "that make the grant of bail necessary to make the habeas remedy effective." *Id.* at 230 (cleaned up).

In this section, the Court first considers its power to conduct a habeas review and the proper nature of that review at this point in the case. The Court turns next to a short summary of evidence related to Ms. Ozturk's constitutional claims. The Court then considers Ms. Ozturk's First Amendment and Due Process claims. The Court finds that while Ms. Ozturk has raised serious claims and provided evidence that merit further review, the Court does not yet have enough evidence to make a determination on pre-disposition release under *Mapp*, particularly given the government's limited representations on that question.

**A. Habeas Corpus Review**

District Courts have "inherent power" to consider habeas petitions and grant relief. *Mapp*, 241 F.3d at 226 (citing *Ostrer v. United States*, 584 F.2d 594, 596 n.1 (2d Cir. 1978)). The power is also statutory, as Section 2241 states that "[w]rits of habeas corpus may be granted by the Supreme Court, any justice

44

JA-000452

thereof, the district courts and any circuit judge within their
respective jurisdictions." 28 U.S.C. § 2241. "Congress has
authorized federal district courts to grant a writ of habeas
corpus whenever a petitioner is in custody in violation of the
Constitution or laws or treaties of the United States." *Black v.*
*Decker*, 2020 WL 4260994, at *5 (S.D.N.Y. July 23, 2020), *aff'd*,
103 F.4th 133 (2d Cir. 2024) (cleaned up).

Historically, "common-law habeas corpus was, above all, an
adaptable remedy. Its precise application and scope changed upon
the circumstances." *Boumediene*, 553 U.S. at 779. The "equitable
and flexible nature of habeas relief" continues in our system
today. *Velasco Lopez*, 978 F.3d at 855. Where appropriate, courts
must use their authority to consider not only the present
circumstances of confinement, but the actions that led to it.
"The intended duration of the detention and the reasons for it
bear upon the precise scope of the inquiry. . . . The habeas
court must have sufficient authority to conduct a meaningful
review of both the cause for detention and the Executive's power
to detain." *Boumediene*, 553 U.S. at 783. As the *Velasco Lopez*
court stated, "[t]he purpose of habeas corpus is to impose
limitations on the Government's ability to do these things." 978
F.3d at 855.

The nature of the detention, and any other proceedings that
have occurred, will impact the rigor of review. "Where a person

45

is detained by executive order, rather than, say, after being
tried and convicted in a court, the need for collateral review
is most pressing. . . . In this context the need for habeas
corpus is more urgent." *Boumediene*, 553 U.S. at 783.
Accordingly, this Court must conduct an "urgent" investigation
of Ms. Ozturk's detention and consider "both the cause for
detention and the Executive's power to detain." *Id.*

   The current questions before this Court are how to evaluate
Ms. Ozturk's claims at this stage of the proceedings and what,
if any, relief is appropriate. Ms. Ozturk argues that her
detention pursuant to the government's authority under 8 U.S.C.
§ 1226(a) is unconstitutional because it is motivated by an
impermissible purpose. She acknowledges that § 1226(a) grants
the government discretion generally as it relates to decisions
to detain individuals who may be subject to removal, but, as her
counsel argued in court, "there's no discretion to violate the
Constitution." ECF No. 98 at 51; *see also id.* at 77 (citing
*Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252, 1261
(2d Cir. 1975) and *Bates v. Town of Cavendish, Vermont*, 735 F.
Supp. 3d 479, 506 (D. Vt. 2024) for the proposition that
government officials cannot violate the Constitution despite
grants of discretion). If her detention is unconstitutional, the
likely remedy is release.

JA-000454

In addition to habeas corpus relief, Ms. Ozturk has asked the Court to grant her immediate release pending the adjudication of her Petition. Such release is governed by the *Mapp* factors which, as noted above, require the Court to find that the habeas petition raises "substantial claims" and that "extraordinary circumstances" exist "that make the grant of bail necessary to make the habeas remedy effective." *Id.* at 230 (cleaned up).

The Court must also consider the government's request for dismissal. In *Ashcroft v. Iqbal.* 556 U.S. 662 (2009), the Supreme Court considered claims of unconstitutional conduct relating to immigration detention. *Iqbal* requires the complaint to state "a plausible claim for relief" and "requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. However, if "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the Court cannot sustain a claim. *Id.* In short, "while legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.*

For the reasons set forth below, the Court finds that Ms. Ozturk has presented significant evidence supporting her constitutional claims, and that those claims easily meet the *Iqbal* standard. Ms. Ozturk argues that her detention is in retaliation for her political speech, thus violating her rights

47

under the First and Fifth Amendments. Her evidence supports her
argument that the government's motivation or purpose for her
detention is to punish her for co-authoring an op-ed in a campus
newspaper which criticized the Tufts University administration,
and to chill the political speech of others. The government has
so far offered no evidence to support an alternative, lawful
motivation or purpose for Ms. Ozturk's detention.

**B. Summary of Facts Supporting Constitutional Claims**

Over a year ago, on March 26, 2024, Ms. Ozturk was one of
four co-authors of an op-ed published in a student newspaper.
*The Tufts Daily* "is the entirely student-run newspaper of record
at Tufts University" which regularly publishes "op-eds submitted
by readers and members of the Tufts community." *About Us*, The
Tufts Daily, https://www.tuftsdaily.com/page/about. The op-ed
was titled "Try again, President Kumar: Renewing calls for Tufts
to adopt March 4 TCU Senate resolutions." Ms. Ozturk describes
the op-ed as "criticiz[ing] the University's dismissal of
several resolutions that had been adopted by the undergraduate
student Senate as 'a sincere effort to hold Israel accountable
for clear violations of international law.' The op-ed urged
Tufts to "trust in the Senate's rigorous and democratic process'
and 'meaningfully engage with and actualize the resolutions
passed by the Senate.'" ECF No. 12 at 2.

JA-000456

Tufts University "declares that this opinion piece was not in violation of any Tufts policies" and "[t]he University maintains that the op-ed was consistent with speech permitted by the Declaration on Freedom of Expression adopted by [University] trustees on November 7, 2009." ECF No. 26 at 67. This declaration from Tufts University was signed by President Kumar, the addressee of Ms. Ozturk's co-authored op-ed. *Id*. at 69.

Ms. Ozturk supports her claim that her adverse treatment from the government is improperly motivated by pointing to several statements made by high-level government officials.[6] On May 14, 2024, then-candidate Donald Trump reportedly said, "any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[7] On March 28, 2025, Secretary of State Marco Rubio delivered remarks to the press regarding Ms. Ozturk's detention. U.S. Department of State, *Secretary of State*

---

[6] Though Ms. Ozturk offers these statements to support her argument that her detention is related to her speech, these statements do not always neatly differentiate between the issues of visa revocation, legal status in the country, detention, and removal. *See, e.g.*, Secretary Rubio's statement on March 27, 2025, "We'll revoke your visa, and once your visa is revoked, you're illegally in the country and you have to leave." *Secretary Rubio Defends Revoking Turkish Student's Visa*, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students-visa/5158479.

[7] Josh Dawsey, et al., *Trump told donors he will crush pro-Palestinian protests, deport demonstrators*, Washington Post (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

JA-000457

*Marco Rubio Remarks to the Press* (Mar. 28, 2025),
https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-
the-press-3/. Secretary Rubio stated in response to a question
about Ms. Ozturk, "The activities presented to me meet the
standard of what I've just described to you: people that are
supportive of movements that run counter to the foreign policy
of the United States." Secretary Rubio further indicated that
Ms. Ozturk's detention was the government "basically asking them
to leave the country." He explicitly noted that "that's why
they've been detained."

Secretary Rubio, however, alluded that the government had
more evidence than the op-ed to support Ms. Ozturk's detention,
stating: "I would caution you against solely going off of what
the media has been able to identify, and those presentations, if
necessary, will be made in court." A March 21, 2025 memo from a
Senior Bureau Official in the Bureau of Consular Affairs with
the Department of State states that, "in response to a request
from DHS/ICE and the assessment from DHS/ICE that Rumeysa OZTURK
had been involved in associations that 'may undermine U.S.
foreign policy by creating a hostile environment for Jewish
students and indicating support for a designated terrorist
organization' *including* co-authoring an op-ed that found common
cause with an organization that was later temporarily banned

JA-000458

from campus, the Bureau of Consular Affairs" revoked Ms.
Ozturk's visa. ECF No. 91 at 6 (emphasis added).

Ms. Ozturk has also provided declarations to this Court
supporting her claim that the manner of her arrest and detention
are irregular. Declarations from five immigration attorneys in
New England provide evidence that her movements through at least
five states and several different government facilities within
24 hours of arrest may be atypical for an individual in her
situation. ECF No. 82 at 17-18. In particular, Ms. Ozturk has
offered evidence to dispute the government's claims that she has
been detained in Louisiana because there were no appropriate
beds available in New England at the time of her detention. *Id.*
at 20.

The government has presented little evidence to rebut Ms.
Ozturk's constitutional violation claims. As noted above, the
government has offered a declaration from the Acting Deputy
Field Office Director for ICE in Burlington, Massachusetts
regarding ICE detention procedures and available bedspace. ECF
No. 19-1. The government has not offered any evidence
specifically regarding its motivation or rationale for Ms.
Ozturk's detention.

### C. First Amendment Claim

The First Amendment's protection of the right to free
speech is often considered the cornerstone of our vibrant

51

American democracy. As Benjamin Franklin famously wrote in 1737,
"Freedom of speech is a principal pillar of a free government;
when this support is taken away, the constitution of a free
society is dissolved." The Supreme Court has confronted
restrictions on the right to free speech countless times since
our founding, and it recently summarized the history, scope, and
importance of the right to freedom of speech:

> The framers designed the Free Speech Clause of the
> First Amendment to protect the freedom to think as you
> will and to speak as you think. They did so because
> they saw the freedom of speech both as an end and as a
> means. An end because the freedom to think and speak
> is among our inalienable human rights. A means because
> the freedom of thought and speech is indispensable to
> the discovery and spread of political truth. By
> allowing all views to flourish, the framers
> understood, we may test and improve our own thinking
> both as individuals and as a Nation. For all these
> reasons, if there is any fixed star in our
> constitutional constellation, it is the principle that
> the government may not interfere with an uninhibited
> marketplace of ideas. . . . [t]he First Amendment
> protects an individual's right to speak his mind
> regardless of whether the government considers his
> speech sensible and well intentioned or deeply
> misguided and likely to cause anguish and incalculable
> grief. Equally, the First Amendment protects acts of
> expressive association.

*303 Creative LLC v. Elenis*, 600 U.S. 570, 584-86 (2023)
(internal citations and quotations omitted).

It is against this backdrop that Ms. Ozturk alleges that
her detention is retaliation for political speech which is core
First Amendment protected conduct. The only specific act cited
by the government so far as justification for any of their

52

JA-000460

adverse actions towards Ms. Ozturk is her co-authored op-ed. ECF No. 91-1. The Supreme Court has repeatedly "reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection," *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation omitted), because "political speech [is] at the core of what the First Amendment is designed to protect," *Virginia v. Black*, 538 U.S. 343, 365 (2003). As a general rule, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002). Furthermore, First Amendment protections have long extended to noncitizens residing within the country. *Bridges v. Wixon*, 326 U.S. 135 (1945).

The Court hesitates to characterize the content of Ms. Ozturk's speech, which is obviously about public issues, but it is necessary to clarify that Ms. Ozturk's op-ed does not readily fall into one of the established exemptions to the First Amendment's protection from government speech regulation. The op-ed focuses largely on the authors' belief that the Tufts University administration erred by not affording sufficient deference to resolutions adopted by the Tufts undergraduate student senate. The op-ed quotes school documents to argue that the school administrators are not upholding their stated values

53

JA-000461

of supporting critical thinking and debate in the community. The authors express their belief regarding violations of international law that have motivated the student senate's resolutions. And as the Armstrong Memorandum cites, the authors note alignment in rejecting the university administration's response to the student senate recommendations with another organization later temporarily barred from the Tufts campus for actions the organization took well after the publication of this op-ed. The op-ed culminates with the co-authors "urg[ing] President Kumar and the Tufts administration to meaningfully engage with and actualize the resolutions by the Senate." Taken together, the op-ed is self-evidently speech regarding public issues, albeit largely focused on the parochial politics of university governance.

The Supreme Court has recognized only "a few limited areas" where the First Amendment permits restrictions based on the content of speech. *See United States v. Stevens*, 559 U.S. 460, 468 (2010) (citation omitted). The Supreme Court summarized these areas in the recent *Counterman v. Colorado* case: "incitement—statements directed at producing imminent lawless action, and likely to do so," "defamation—false statements of fact harming another's reputation," "obscenity—valueless material appealing to the prurient interest," and "true threats of violence." 600 U.S. 66, 73-74 (2023) (cleaned up). This Court

JA-000462

does not believe that a reasonable reader of the op-ed would find a true threat or incitement of lawless action, let alone obscenity or defamation. Tufts University has confirmed that the op-ed did not violate any Tufts policy, that no complaints were filed about the op-ed, that the speech in the op-ed was consistent with University guidelines, and indeed that it was just one of many op-eds discussing the issue published in the school newspaper. ECF No. 26-1 at 67.

The First Amendment protects individuals from government action that is based on improper motives, namely silencing disfavored speech. The Second Circuit has long recognized retaliation in violation of the First Amendment as a defense from government enforcement. In recently affirming this Court, the Circuit identified the appropriate standard: "A plaintiff must allege (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Demarest v. Town of Underhill*, 2025 WL 88417, at *2 (2d Cir. Jan. 14, 2025) (summary order) (quoting *Gonzalez v. Hasty*, 802 F.3d 212, 222 (2d Cir. 2015)) (cleaned up). In the criminal context, the Supreme Court has expanded on the standard for the third element: "With respect to the third requirement, '[i]t is not enough to show that an official acted with a retaliatory motive

JA-000463

and that the plaintiff was injured – the motive must cause the injury.'" *Id.* (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)). "Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* (quoting *Nieves* 587 U.S. at 399). However, given the different nature of criminal detention and immigration detention, as discussed above, it is not altogether clear that this interpretation controls the habeas inquiry. *See Gonzalez v. Trevino* 602 U.S. 653, 658 (2024) (rejecting an "overly cramped" reading of the *Nieves* standard). Regardless of whether it binds the Court here, *Nieves* serves to highlight the importance of identifying the motive for detention.

The Second Circuit has specifically recognized potential retaliation for protected political speech as a cognizable ground for habeas relief in the immigration context, noting that "to allow this retaliatory conduct to proceed would broadly chill protected speech, among not only activists subject to final orders of deportation but also those citizens and other residents who would fear retaliation against others." *Ragbir*, 923 F.3d at 71.

Ms. Ozturk has presented evidence to support her argument that she may qualify for a retaliation claim. Administration officials have identified her speech as the reason her visa was

JA-000464

revoked. If this Court were evaluating the question of
motivation for Ms. Ozturk's visa revocation, this inquiry could
likely conclude now. It may well be that the Ms. Ozturk's
detention shares common motivation with her visa revocation. But
as this Court has found that visa revocation and detention
proceedings are not inextricably linked, the Court seeks
additional evidence of the connection between Ms. Ozturk's
speech and her detention.

The court in *Ragbir*, decided before *Nieves*, found that a
retaliation claim was satisfied by "plausible — indeed, strong —
evidence that officials responsible for the decision to deport
him did so based on their disfavor of Ragbir's speech." 923 F.3d
at 73. Regardless of whether the standard for establishing a
connection is "plausible," "strong," or "causation," the Court's
inquiry would benefit from the ability to consider additional
evidence. For present purposes it is sufficient to find that Ms.
Ozturk's First Amendment claims are serious and worthy of
further exploration in this Court.

Secretary Rubio has argued publicly that there are
additional justifications for the government's actions adverse
to Ms. Ozturk and that these justifications may be filed in
court if necessary. The Court invites an immediate submission
any such evidence in this case. In the absence of additional
information from the government, the Court's habeas review is

57

JA-000465

likely to conclude that Ms. Ozturk has presented a substantial claim.

### D. Due Process Claim

The Due Process Clause of the Fifth Amendment protects the right of "any person" from "be[ing] deprived of life, liberty, or property, without due process of law." "Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

Ms. Ozturk alleges that her detention violates the Due Process Clause because it serves no legitimate purpose, or in the alternative because it is motivated by improper purposes. Her due process claims are grounded in a "line of cases which interprets the Fifth and Fourteenth Amendments' guarantee of 'due process of law' to include a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301–02 (1993). Substantive due process claims are available in the context of immigration detention. *Zadvydas*, 533 U.S. at 694 (citing *Wong Wing v. U.S.*, 163 U.S. 228 (1896)). And "the Due Process Clause covers noncitizens, whether their presence here is lawful,

58

JA-000466

unlawful, temporary, or permanent." *Velasco Lopez*, 978 F.3d at
850 (citing *Zadvydas*, 533 U.S. at 693).

In the civil immigration context, potential requirements of
the Due Process Clause frequently conflict with the prerogatives
of Congress and the Executive to manage immigration and foreign
affairs. As discussed above, Congress has granted the Executive
the authority to detain individuals such as Ms. Ozturk pending a
removal decision under 8 U.S.C. § 1226(a). Though detentions
under § 1226(a) do not follow any judicial process, let alone a
criminal conviction, the Supreme Court has found that such
deprivation of liberty is not *per se* unconstitutional. The
Supreme Court "has recognized detention during deportation
proceedings as a constitutionally valid aspect of the
deportation process," *Demore*, 538 U.S. at 523, and determined
that "the Due Process Clause does not require [the government]
to employ the least burdensome means to accomplish its goal,"
*id.* at 528.

Civil detention may be permissible with lower procedural
requirements than criminal detention, but it is not permissible
for the same purposes. Specifically, the Supreme Court has long
recognized that the key rationale for allowing less process in
immigration cases than in criminal cases is that the immigration
system, including detention, is not punitive. *See, e.g., Fong
Yue Ting v. United States*, 149 U.S. 698, 730 (1893); *AADC*, 525

JA-000467

U.S. at 491. ICE acknowledges this principle with respect to
immigration detention, *Detention Management*, U.S. Immigrations
and Custom Enforcement, https://www.ice.gov/detain/detention-
management (updated Apr. 16, 2025)("Detention is non-
punitive."), and for good reason. The Supreme Court has
reiterated that immigration detention is "civil, not criminal,
and we assume that they are nonpunitive in purpose and effect."
*Zadvydas*, 533 U.S. at 690. Justice Kennedy confirmed the
majority's understanding in that case that "both removable and
inadmissible aliens are entitled to be free from detention that
is arbitrary or capricious. Where detention is incident to
removal, the detention cannot be justified as punishment nor can
the confinement or its conditions be designed in order to
punish." *Id.* at 721 (Kennedy, J., dissenting). Rather than
punishment, immigration detention must be motivated by the two
valid regulatory goals that the government has previously argued
motivate the statute: "ensuring the appearance of aliens at
future immigration proceedings and preventing danger to the
community." *Id.* at 690 (cleaned up). So long as detention is
motivated by those goals, and not a desire for punishment, the
Court is generally required to defer to the political branches
on the administration of the immigration system.

Ms. Ozturk argues that her detention is punitive, in
addition to the First Amendment retaliation claims discussed

above. The Secretary of State's recent comments imply that her

detention is motivated by a desire to compel her to voluntarily

depart the country. U.S. Department of State, *Secretary of State*

*Marco Rubio Remarks to the Press* (Mar. 28,

2025),https://www.state.gov/secretary-of-state-marco-rubio-

remarks-to-the-press-3/. The Secretary also suggests that her

detention advances a message to others in similar situations

that they should choose to leave the country rather than face

detention. "They can do so tomorrow. Buy an airplane ticket and

leave." However, courts have not sanctioned the use of the

immigration detention system to strike fear in or punish

individuals who may seek to contest their removal through lawful

administrative and judicial channels designed for that purpose.

This is an important distinction between civil detention and

criminal incarceration, which allows for punishment and

deterrence. Courts' less exacting due process scrutiny has thus

far been premised on the assumption that the system is operating

for permitted purposes.

Ordinarily, the government may not need to justify its

discretionary decision to detain an individual pursuant to 8

U.S.C. § 1226(e), and it has presented no evidence here as to

its motivations for Ms. Ozturk's detention. Ms. Ozturk's counsel

has informed the Court that DHS contended in immigration court

that "Ms. Ozturk poses a flight risk," though Ms. Ozturk's

JA-000469

attorneys have characterized that claim as "unsupported." ECF
No. 99 at 1. An immigration judge found "Danger and Flight
Risk," but the Court has not seen the evidence that supported
that determination, and Ms. Ozturk has submitted evidence to
support the opposite conclusion. ECF 101-1 at 4. Where a
detainee presents evidence that her detention, though
discretionary, is motivated by unconstitutional purposes in
violation of the Due Process Clause, the Court may reasonably
conclude the same in the absence of countervailing evidence. As
the Court continues consideration of Ms. Ozturk's habeas
petition, it will allow the government to present evidence to
rebut claims that her detention is improperly motivated.

### E. Ms. Ozturk Has Plausibly Alleged Constitutional Violations, But the Record Is Not Sufficiently Developed to Support Immediate Release

The record before the Court demonstrates that Ms. Ozturk
has plausibly pled constitutional violations related to her
detention. Ms. Ozturk's Free Speech and Due Process claims are
serious, and the Court intends to continue to develop the facts
on these issues. However, the Court does not find at this time
that such pleadings are sufficient to satisfy the standard for
immediate release, given the overarching deference towards the
executive branch's authority in the area of immigration
enforcement.

JA-000470

Both Ms. Ozturk and the government suggest that it is appropriate for the Court to consider Ms. Ozturk's claim for release pending the resolution of her habeas petition under the Second Circuit's standard in *Mapp*. As noted previously, the *Mapp* standard requires a court contemplating bail to "inquire into whether the habeas petition raises substantial claims and whether extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective." 241 F.3d at 230 (cleaned up).

The Court does not find that it has sufficient information to support release under *Mapp*, nor does it determine that Ms. Ozturk is unlikely to be able to meet that standard with additional evidence. The Court notes at the outset that this case has been proceeding rapidly, and new evidence has been emerging regularly. For example, on Friday, April 11, 2025, Ms. Ozturk's counsel transmitted to the Court the Armstrong Memorandum, which contains probative evidence regarding the government's motivations but was received by Ms. Ozturk's counsel after the April 10 filing deadline on these issues. *See* ECF No. 91. Similarly, on Sunday, April 13, less than twenty-four hours before this Court held a hearing on these issues, Ms. Ozturk's counsel submitted as an exhibit an April 13, 2025 Washington Post article reporting on the existence of an additional State Department memorandum, though that memorandum

63

JA-000471

has not yet been provided to this Court. See ECF No. 95. These
memoranda, along with any other evidence held by either party
but not yet disclosed to the Court, are important to the
resolution of both a request for release on bail and a final
determination. The Court plans to move expeditiously towards the
resolution of these factual questions.

### F. Scope of Federal Judicial Power

Rather than contest the merits of Ms. Ozturk's detention,
the government has primarily argued that decisions regarding
immigration detention fall squarely under the control of the
political branches and should not be second guessed by the
courts. This Court follows clear instruction of the Supreme
Court on this matter and has "due regard for the deference owed
to the Executive Branch in the conduct of foreign affairs." *Noem
v. Abrego Garcia*, 2025 WL 1077101, at *1 (U.S. Apr. 10, 2025).
This Court has not considered questions of foreign policy or
immigration policy in the course of these proceedings. The Court
concerns itself only with review of Ms. Ozturk's discretionary
domestic detention, within the contours of established
precedent.

To be clear, precedent in this Circuit has confirmed that
Congress may restrict some judicial review of immigration cases.
The *Mapp* decision found that "[t]here can be no doubt that, with
respect to immigration and deportation, federal judicial power

64

JA-000472

is singularly constrained," 241 F.3d at 227, and that Congress

may have "plenary power over immigration matters [that] renders

this [habeas] authority readily subject to congressional

limitation," *id.* at 231. However, the *Mapp* Court also held that,

"[a]bsent a clear direction from Congress, federal judicial

power is unaltered, and the authority of the federal courts to

admit to bail parties properly within their jurisdiction remains

unqualified." *Id.* at 227. As discussed above, no such clear

direction applies here.[8]

Nonetheless, this backdrop will inform the scope and depth

of the Court's review into the merits of Ms. Ozturk's habeas

claims to ensure that the Court does not improperly intrude upon

the prerogatives of the other co-equal branches. *See AADC*, 525

U.S. at 491 (holding that in general courts should not assess

the legitimacy of the Executive's foreign policy objectives or

law enforcement priorities when considering deportation cases

though there may be "a rare case in which the alleged basis of

discrimination is so outrageous" as to warrant judicial review).

Where the executive branch has exercised powers assigned to it

by the legislative branch in compliance with the laws and

---

[8] Further it is not evident that the power of the political branches to
"constrain" or "limit" habeas review is the same as the power to
eliminate it in the district courts, particularly in the context of
detention. Consider the *Jennings* Court's hypothetical regarding
judicial review of inhumane conditions of confinement, which the
Supreme Court found "absurd" to channel to the circuit courts via a
petition for review. *Supra* note 4.

Constitution, this Court will not second guess the government's choices.

## IV.  Petitioner's Request for Return to Vermont

Ms. Ozturk has proposed that, if her request for immediate release is not granted, the Court order her returned to the District of Vermont. The Court finds that Ms. Ozturk's physical return to ICE custody within the District of Vermont is in the interest of justice because transfer would assist the Court's exploration of the important constitutional questions in this case, would allow the Court to conduct appropriate fact-finding including to support a potential bail hearing, and would otherwise have no impact on removal proceedings. Her physical return to Vermont would also give closely proximate effect to the order issued by the District of Massachusetts court at 10:55 p.m. on Tuesday, March 25, 2025, which was not heeded by the government.

### A. Ms. Ozturk's Presence in Vermont Will Facilitate the Fair and Expeditious Resolution of this Matter

The Court finds that Ms. Ozturk's presence in Vermont will facilitate her ability to work with her attorneys, coordinate the appearance of witnesses, and generally present her habeas claims, many of which are based on events that occurred in New England. A transfer to Vermont will also facilitate Ms. Ozturk's ability to receive a neutral medical evaluation, as her medical

66

JA-000474

condition will be a factor for the Court to consider when addressing the question of release. More generally, her presence in the courtroom will assist the Court in determining potential bail conditions and whether release is appropriate.

Ms. Ozturk has informed the Court that her treatment in the Louisiana facility is inadequate. She is suffering from severe asthma attacks and is not provided appropriate medication. Her place of detention is reportedly overcrowded and unsanitary. Her religious needs are not being addressed. The Court takes these issues into consideration when determining the necessity and equities of a transfer.

As discussed previously, the Second Circuit has recognized the "equitable and flexible nature of habeas relief." *Velasco Lopez*, 978 F.3d at 855. The Supreme Court has held that the "exercise of a court's equity powers . . . must be made on a case-by-case basis." *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964). The "flexibility" inherent in "equitable procedure" enables courts "to meet new situations [that] demand equitable intervention, and to accord all the relief necessary to correct . . . particular injustices." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248 (1944). The Court also has the inherent authority and responsibility to protect the integrity of its proceedings which were undoubtedly impacted when Ms. Ozturk was transferred to Louisiana. *See Degen v. United States*,

JA-000475

517 U.S. 820, 823 (1996) ("Courts invested with the judicial power of the United States have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities.").

Here, the Court finds that the equities strongly favor Ms. Ozturk's transfer to Vermont. Such transfer will expedite resolution of this matter, provide Ms. Ozturk ready access to legal and medical services, and address concerns about the conditions of her confinement. The Court further finds that a transfer to Vermont will not prejudice the government's removal proceedings, as she may participate in those remotely. The Court plans to proceed to resolution of the habeas petition quickly, and it is essential that Ms. Ozturk be a full participant in the process. Should her petition be denied, the government will have discretion over her place of confinement. Accordingly, pursuant to its inherent equitable power, as well its power under the All Writs Act, the Court orders Ms. Ozturk's transfer as set forth below. *See* 28 U.S.C. § 1651(a) (empowering courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law").

   **B. Ms. Ozturk's Return to Vermont Will Give Effect to the District of Massachusetts Court's Order Preserving the Status Quo**

JA-000476

The United States District Court for the District of
Massachusetts issued a valid order in this case at approximately
10:55 p.m. on March 25, 2025. The order was transmitted to the
government immediately, both formally by the court and by Ms.
Ozturk's attorney. ECF No. 26-2 at 3. The order had been issued
by the court within an hour of Ms. Ozturk's attorney filing the
initial habeas petition.

The purpose of the District of Massachusetts' order was to
"order respondent to preserve the status quo." ECF No. 3 at 2.
The order had immediate effect and required that "petitioner
shall not be moved outside the District of Massachusetts without
first providing advance notice of the intended move." Moreover,
the court clearly understood that Ms. Ozturk's physical location
was critical to the court's jurisdiction. The court noted that
the order was intended to preserve its ability "to consider
whether it has subject-matter jurisdiction," and would be "valid
unless and until it is overturned." *Id.* The court further
clarified that the motivation for the order was the court's
recognition that "the action the court enjoins," i.e., Ms.
Ozturk's movement out of the state by the government, "would
otherwise destroy its jurisdiction or moot the case." *Id.*

The government apparently did not take any immediate steps
to comply with the order or to communicate with the court to
ascertain the court's intent. At oral argument, the government

JA-000477

was not able to say who learned about the order or when. The
government's only argument to date has been that the order may
have been impossible to comply with if construed literally,
because by 10:55 p.m., the government had already moved Ms.
Ozturk to Vermont. There is no evidence that officials in the
U.S. Attorney's Office in Massachusetts who were in contact with
Ms. Ozturk's attorney at the time and received the order, or
indeed any other government representatives, made contact with
the court to convey this perceived predicament.

Ms. Ozturk cites Second Circuit precedent stating that it
is the obligation of parties receiving orders from Article III
courts "to observe the objects for which the relief was granted
and to find a breach of the decree in a violation of the spirit
of the injunction, even though its strict letter may not have
been disregarded." *John B. Stetson Co. v. Stephen L. Stetson
Co.*, 128 F.2d 981, 983 (2d Cir. 1942). *Stetson* remains good law
in this Circuit, standing for the proposition that "'it is the
spirit of the order, not the letter, that must be obeyed.'"
*Aquavit Pharms., Inc. v. U-Bio Med, Inc.*, 2020 WL 1900502, at *6
(S.D.N.Y. Apr. 17, 2020) (quoting *Titra California, Inc. v.
Titra Film*, 2001 WL 1382587, at *5 (S.D.N.Y. Nov. 6, 2001)); *see
also Salazar v. Buono*, 559 U.S. 700, 762 (2010) (Breyer, J.
dissenting) (citing *Stetson* for proposition that courts have
long looked to the intent of granted injunctive relief when

70

JA-000478

assessing compliance). The Court agrees that it is appropriate to consider whether parties have complied with the spirit of an injunction, where that spirit is readily discernible from an order.

There is no question here that the District of Massachusetts intended to preserve the status quo of Ms. Ozturk's whereabouts while it assessed its jurisdiction to consider the case. The government of course had already moved Ms. Ozturk out of state, so that jurisdictional analysis may have still resulted in the case being heard before this Court. Nevertheless, the Court holds that after receipt of the order, the government had an obligation to consider the intent of the order, even if literal compliance with the order was impossible. Ms. Ozturk has offered alternative potential actions that the government could have taken upon receipt of the order, in lieu of ignoring it entirely. ECF No. 82-1 at 22-23. At minimum, the government should have informed the issuing court in a timely fashion that compliance with the order was not literally possible and sought out clarification. Informing the District of Massachusetts would have allowed for that court to make any necessary modifications to either its order or its determination of its jurisdiction. Ignoring an order, particularly one issued on an emergency basis in response to events that are currently

JA-000479

unfolding, is not the approach the Court expects from the
government.

The remedy for the government ignoring the March 25, 2025,
order is simple. Ms. Ozturk should be returned to the status quo
at the time of issuance when she was in custody in the District
of Vermont. This equitable relief, ordered under this Court's
inherent habeas power, will give proximate effect to the
District of Massachusetts's order without disadvantaging the
government. Giving effect to the spirit of the District of
Massachusetts' order is also necessary to ensure continued
respect for orders issued by Article III courts. "If a party can
make himself a judge of the validity of orders which have been
issued, and by his own act of disobedience set them aside, then
are the courts impotent, and what the Constitution now fittingly
calls the 'judicial power of the United States' would be a mere
mockery." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450
(1911). The Court declines to abet a slide into mockery in this
case.

## Conclusion

For the foregoing reasons, the Court concludes that this
case will continue in this Court with Ms. Ozturk physically
present for the remainder of the proceedings.

The Court has determined that it retains jurisdiction over
Ms. Ozturk's habeas petition which shall proceed in the District

72

JA-000480

of Vermont. The petition, filed in federal district court in
Massachusetts, was properly transferred to this Court. There are
no technical deficiencies that prevent this Court's
consideration of this petition as if it were originally filed
here. Furthermore, there is nothing in the INA that
categorically prevents a federal district court from reviewing a
habeas petition challenging discretionary detention. Therefore,
there are no jurisdictional limitations on this Court's
consideration of Ms. Ozturk's habeas claims related to her
detention.

Upon review of the First Amendment and Due Process claims
and the evidence presented by both parties, the Court concludes
that Ms. Ozturk has presented viable and serious habeas claims
which warrant urgent review on the merits. The Court plans to
move expeditiously to a bail hearing and final disposition of
the habeas petition, as Ms. Ozturk's claims require no less.

To support the Court's resolution of these issues, the
Court orders that Ms. Ozturk be physically transferred to ICE
custody within the District of Vermont no later than May 1,
2025. The Court orders that a bail hearing be scheduled in this
Court for May 9, 2025, with Ms. Ozturk appearing in person.
Parties are ordered to brief the Court and present all evidence
related to the issue of bail by May 2, 2025. A hearing on the
merits of the habeas petition will be held on May 22, 2025. The

JA-000481

Court stays the effect of this order for four days to allow
either party to appeal this order.


        DATED at Burlington, in the District of Vermont, this 18th
day of April 2025.

                                   /s/ William K. Sessions III
                                   Hon. William K. Sessions III
                                   U.S. District Court Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF VERMONT

RUMEYSA OZTURK,

                    Petitioner,

          v.                                          No. 2:25-cv-374

DONALD J. TRUMP, in his official capacity as
President of the United States, PATRICIA
HYDE, Field Office Director,
MICHAEL KROL, HSI New England Special
Agent in Charge, TODD LYONS, Acting
Director, U.S. Immigration and Customs
Enforcement, and KRISTI NOEM, Secretary of
Homeland Security; and MARCO RUBIO, in his
official capacity as Secretary of State

                    Respondents.

## RESPONDENTS' NOTICE OF APPEAL

PLEASE TAKE NOTICE that all named Respondents hereby appeal to the United

States Court of Appeals for the Second Circuit from the Court's April 18, 2025 Order (ECF No.

104) accepting jurisdiction and ordering Petitioner be physically transferred to ICE custody

within the District of Vermont no later than May 1, 2025.

                              Respectfully submitted,


Dated: April 22, 2025         By:    */s/ Michael P. Drescher*
                                     Michael P. Drescher
                                     Assistant United States Attorney
                                     District of Vermont


JA-000483

# UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

RUMEYSA OZTURK,

                    Petitioner,

          v.                                              No. 2:25-cv-374

DONALD J. TRUMP, in his official capacity as
President of the United States, PATRICIA
HYDE, Field Office Director,
MICHAEL KROL, HSI New England Special
Agent in Charge, TODD LYONS, Acting
Director, U.S. Immigration and Customs
Enforcement, and KRISTI NOEM, Secretary of
Homeland Security; and MARCO RUBIO, in his
official capacity as Secretary of State

                    Respondents.

## RESPONDENTS' MOTION FOR CONTINUED STAY PENDING APPEAL

## **INTRODUCTION**

The Court stayed its April 18, 2025 Order "for four days to allow either party to appeal . . . ." ECF No. 104, at 74. Respondents have filed a Notice of Appeal (ECF No. 105), which "confers jurisdiction on the court of appeals and divests [this Court] of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). But to the extent it is necessary, Respondents move this Court, under Federal Rule of Civil Procedure 62, to continue its stay pending disposition of the appeal by the United States Court of Appeals for the Second Circuit. Respondents respectfully request that this Court rule on this motion no later than 3:00 p.m. EDT on April 24, 2025; after that time,

1

Respondents intend to seek emergency relief from the Second Circuit. Fed. R. App. P. 8(a)(2);

Fed. R. Civ. P. 62(g)(1).

## LEGAL STANDARD

To evaluate whether to issue a stay pending appeal, courts consider four factors: "(1)

whether the stay applicant has made a strong showing that he is likely to succeed on the merits;

(2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the

stay will substantially injure the other parties interested in the proceeding; and (4) where the

public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quotation omitted). The first two

factors "are the most critical[,]" and the final factors merge where, as here, the government is a

party. *Id*. at 434-35.

## ARGUMENT

The Court has already stayed its Order to allow either party to appeal. ECF No. 104, at

74. Respondents are taking advantage of the opportunity afforded by the Court and pursuing

expeditious review by the Court of Appeals of the complex, important legal issues presented in

this case. To effectuate that review, Respondents ask the Court to continue the stay currently in

place pending final disposition of the appeal.

### I.      Respondents are likely to succeed on the merits.

A continued stay pending appeal is warranted because Respondents raise important

potentially dispositive challenges to the Court's authority to exercise habeas jurisdiction under

*Rumsfeld v. Padilla*, 542 U.S. 426 (2004) and the Immigration and Nationality Act. Further,

Respondents are likely to succeed on the merits that the Court lacks authority to order

Petitioner's transfer to the District of Vermont.

JA-000485

### A. The Court lacks jurisdiction.

#### a. The Court lacks jurisdiction under *Padilla*.

As previously argued, "[w]henever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement." *Padilla*, 542 U.S. at 447. That rule derives from the habeas statutes themselves, which require a petition to allege "the name of the person who has custody over" a petitioner. 28 U.S.C. § 2242; *see also* 28 U.S.C. § 2243 ("The writ, or order to show cause shall be directed to the person having custody of the person detained."). Indeed, "jurisdiction lies in only one district: the district of confinement." *Trump v. J.G.G.*, 2025 WL 1024097, at *1 (U.S. Apr. 7, 2025). Here, Petitioner's district of confinement is the Western District of Louisiana, and that is where jurisdiction lies. *See id.*

*Padilla* stands as a reproach of the Second Circuit's historically relaxed approach to the "immediate custodian rule." *Padilla*, 542 U.S. at 437-38. Because the petition did not name Petitioner's immediate custodian when it was originally filed in the District of Massachusetts (and because Petitioner's current immediate custodian is not located in the District of Vermont), this Court lacks jurisdiction. For the reasons articulated in Respondents' Supplemental Opposition, neither the transfer statute nor the Supreme Court's decision in *Ex parte Endo*, 323 U.S. 283 (1944), cure that defect. *See* ECF No. 83, at 7-14.

Also as previously argued, 28 U.S.C. § 1631 should not retroactively cure the original Petition's non-compliance with *Padilla.* Indeed if § 1631 can so cure, the Supreme Court's analysis in *Padilla* is potentially nullified.

3

JA-000486

**b. The Court lacks jurisdiction under the INA.**

Aside from *Padilla*, this Court also lacks jurisdiction under the Immigration and Nationality Act. Under section 1252(g), "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings . . . against any alien under this chapter." 8 U.S.C. § 1252(g). The "decision to commence proceedings," which is the genesis of Petitioner's detention, "falls squarely within § 1252(g)." *Reno v. American-Arab Anti-Discrimination Committee ("AADC")*, 525 U.S. 471, 487 (1999) (cleaned up).

Petitioner's claims regarding detention stem from the method by which the removal proceedings against her were commenced; they are not "unrelated to any removal action or proceeding." *Cf. Ruiz v. Mukasey*, 552 F.3d 269, 274 n.3 (2d Cir. 2009). And the decision as to the method by which removal proceedings are commenced is a discretionary one that is not reviewable by a district court under section 1252(g). *See* ECF No. 83, at 19-20.

Instead, the INA makes "the court of appeals for the judicial circuit in which the immigration judge completed the proceedings" "the sole and exclusive means for judicial review of an order of removal." 8 U.S.C. §§ 1252(a)(5), (b)(2). Thus, this Court lacks jurisdiction to review "all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter . . . ." 8 U.S.C. § 1252(b)(9). In short, Petitioner's claims regarding her arrest and detention, including her constitutional claims, must be heard by the court of appeals sitting "in judicial review of a final order under this section." *Id.*

The merits of these arguments weigh in favor of granting the requested stay.

JA-000487

**B.  The Court lacks authority to order Petitioner's transfer.**

"A principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012). That broad discretion extends to the "authority to determine the location of detention of an alien in deportation proceedings," including whether to change that location during the pendency of proceedings. *Gandarillas-Zambrana v. Bd. of Immigration Appeals*, 44 F.3d 1251, 1256 (4th Cir. 1995). Congress vested the Executive Branch with that substantial discretion in the INA itself. *See* 8 U.S.C. § 1231(g)(1) ("The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."). And Congress stripped the courts of jurisdiction to review such exercises of discretion. *See* 8 U.S.C. § 1251(a)(2)(B)(ii) (barring district courts form exercising subject matter jurisdiction of "any . . . decision or action of the Attorney General . . . the authority for which is specified under this subchapter [8 U.S.C. § 1151-1381] to be in the discretion of the Attorney General . . . .").

Courts across the country, including the Second Circuit, have recognized as much. *See, e.g.*, *Wood v. United States*, 175 F. App'x 419, 420 (2d Cir. 2006) (holding that the Secretary "was not required to detain [Plaintiff] in a particular state" given the Secretary's "statutory discretion" under § 1231(g)); ECF No. 83, at 17-18 (collecting cases). Respondents are thus likely to succeed on the merits of an appeal challenging this Court's transfer order.

**II.    The balance of harm favors a stay.**

The Government "suffers a form of irreparable injury" "[a]ny time [it] is enjoined by a court form effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). That is particularly true here because rules governing immigration "implement[ ] an inherent executive power." *United*

JA-000488

*States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien").

Moreover, Petitioner does not challenge the revocation of her visa. *See* ECF No. 26, at 25 ("Ms. Ozturk does not challenge the revocation of her visa."). And with her visa revoked, Petitioner lacks status and is subject to detention under 8 U.S.C. § 1226 for the duration of removal proceedings. Even under the terms of the Court's April 18 Order, Petitioner would remain in custody, *see* ECF No. 104, at 66, so she would not be substantially harmed by continuing the stay pending resolution of Respondents' appeal.

Respectfully submitted,


Dated: April 22, 2025          By:    */s/ Michael P. Drescher*
                                      Michael P. Drescher
                                      Assistant United States Attorney
                                      District of Vermont

JA-000489

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

RUMEYSA OZTURK,                          )
                                         )
            Petitioner,                  )
                                         )
       v.                                )    Case No. 2:25-cv-374
                                         )
DONALD J. TRUMP, in his                  )
official capacity as                     )
President of the United                  )
States; PATRICIA HYDE, in her            )
official capacity as the New             )
England Field Director for               )
U.S. Immigration and Customs             )
Enforcement; MICHAEL KROL, in            )
his official capacity as HSI             )
New England Special Agent in             )
Charge, U.S. Immigration and             )
Customs Enforcement; TODD                )
LYONS, in his official                   )
capacity as Acting Director,             )
U.S. Immigration and Customs             )
Enforcement; KRISTI NOEM, in             )
her official capacity as                 )
Secretary of the United                  )
States Department of                     )
Homeland Security; and MARCO             )
RUBIO, in his official                   )
capacity as Secretary of                 )
State,                                   )
                                         )
            Respondents.                 )

**OPINION AND ORDER**

Respondents (hereinafter "government") have submitted a

Motion for Continued Stay Pending Appeal. ECF No. 106. The Court

previously issued a stay of its April 18, 2025, Opinion and

Order (hereinafter "Opinion") for four days "to allow either

party to appeal this order." ECF No. 104 at 74. On April 22, the

government availed itself of the opportunity to appeal to the
U.S. Court of Appeals for the Second Circuit. ECF No. 105. This
Court's stay expired on April 22. The government is now
obligated to ensure that Ms. Ozturk is transferred to ICE
custody within the District of Vermont no later than May 1,
2025. ECF No. 104 at 73.

At the outset, the Court notes that the government's motion
largely recycles the same arguments that the Court has
previously considered and rejected. The Court briefly summarizes
its rationale for rejecting some of these arguments here again,
but the Court refers the government to its Opinion for a fuller
explanation if necessary. The Court considers the four factors
from *Nken v. Holder* that the government has identified for
evaluating a motion to stay and finds that they weigh against
the government. 556 U.S. 418, 434 (2009). For the following
reasons, the government's motion to stay Ms. Ozturk's return to
Vermont is denied.

## I.   Respondents Raise Jurisdictional Arguments that This Court has Duly Considered and Rejected.

The government's motion devotes two pages to its argument
that this Court lacks jurisdiction to consider Ms. Ozturk's
habeas petition. The Court has previously considered these same
arguments in these proceedings. Both the government and Ms.
Ozturk filed lengthy briefs on these jurisdictional questions,

2

and the Court devoted significant attention to the parties'
filings and oral arguments. The April 18 Opinion discussed these
very questions, and the Court found that its jurisdiction is
proper under 28 U.S.C. § 2241, that this Court is the
appropriate place for the habeas petition to be heard following
the petition's transfer to this Court under 28 U.S.C. § 1631,
and that the INA does not bar this Court's review of claims
regarding the legality of Ms. Ozturk's detention. ECF No. 104 at
12-66. The government's request that this Court now find that
the government "has made a strong showing that [it] is likely to
succeed on the merits," ECF. No. 106 (quoting *Nken v. Holder*,
556 U.S. at 434), is patently at odds with this Court's Opinion.
The Court will not relitigate those issues here, and it finds
that the government has not made a strong showing that it is
likely to succeed on the merits of its jurisdictional arguments.

## II.    The Balance of Harms and Potential Disruption of the Court's Proceedings Favors Rejecting a Stay

As the Court explained in its Opinion, habeas proceedings
are by their nature equitable and flexible, and the Court has
the authority and the mandate to ensure the integrity of its
proceedings. ECF No. 104 at 67. The Court considered the
government's clear opposition to transfer before issuing the
Opinion, but the Court found "that the equities strongly favor
Ms. Ozturk's transfer to Vermont." *Id.* at 67.

JA-000492

To briefly reiterate, Ms. Ozturk's physical transfer to ICE custody in Vermont will have no impact on the government's separate removal proceedings against her in immigration court. However, her return to Vermont will facilitate speedy resolution of her petition in this Court. At oral argument, the Court directly asked the government's counsel how the government would be prejudiced if Ms. Ozturk were returned to Vermont. ECF No. 98 at 109. Government's counsel did not then, and the government does not now, offer any concrete injury that the government would suffer. *Id.* at 109-110.

The government now argues that it, and by extension the public, would suffer an injury if Ms. Ozturk's detention were subject to judicial review. ECF No. 106 at 5-6. While the executive branch assuredly has an interest in effectuating statutes enacted by the legislative branch, the judicial branch is charged with ensuring that the other branches do so in comport with the laws and the Constitution. *Powell v. McCormack*, 395 U.S. 486, 506 (1969) ("'[I]t is the province and duty of the judicial department to determine in cases regularly brought before them, whether the powers of any branch of the government, and even those of the legislature in the enactment of laws, have been exercised in conformity to the Constitution; and if they have not, to treat their acts as null and void.'") (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 199 (1880)); *see also W.*

4

*Virginia v. Env't Prot. Agency*, 597 U.S. 697, 736 (2022) ("One of the Judiciary's most solemn duties is to ensure that acts of Congress are applied in accordance with the Constitution in the cases that come before us.") (Gorsuch, J., concurring); *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 327 (2013) ("But there is another concern at play, no less firmly rooted in our constitutional structure. That is the obligation of the Judiciary not only to confine itself to its proper role, but to ensure that the other branches do so as well.") (Roberts, C.J., dissenting); *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 76 (2015) ("The 'check' the judiciary provides to maintain our separation of powers is enforcement of the rule of law through judicial review.") (Thomas, J., concurring). Furthermore, the public interest does not lie only on the government's side in this case. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("[S]ecuring First Amendment rights is in the public interest.").

As the Court noted in the Opinion, the Court intends to resolve Ms. Ozturk's habeas petition expeditiously, and Ms. Ozturk's presence in Vermont is necessary to assist the Court with its consideration of her request for release on bail as well as the underlying merits of her petition. ECF No. 104 at 66-68. The Court notes that Ms. Ozturk's return to Vermont might not even be an issue in this case had the government not ignored

5

the order issued from the District Court in Massachusetts on
March 25, 2025. ECF No. 104 at 68-72. As the Court held in its
Opinion, the remedy here is simple, a return to the status quo.
*Id.* at 72. Instead, Ms. Ozturk is in detention in Louisiana,
where she reports that she is enduring overcrowding, unsanitary
conditions, a worsening medical condition, insufficient medical
care, and difficulties practicing her religion. *Id.* at 67.
Furthermore, should the Court's schedule for resolution of Ms.
Ozturk's habeas petition, *id.* at 73, be delayed in any way, the
government will not have suffered any concrete injury through
Ms. Ozturk's return to Vermont, while Ms. Ozturk will be well-
positioned to present her case as soon as possible. Accordingly,
the Court finds that the balance of harms of a stay of transfer
would fall most heavily on Ms. Ozturk and would not be in the
public interest.

## Conclusion

For the foregoing reasons, the government's motion for a
stay of Ms. Ozturk's transfer to ICE custody within the District
of Vermont is denied. As the Court established in its April 18
Opinion, "Ms. Ozturk has presented viable and serious habeas
claims which warrant urgent review on the merits." *Id.* at 73.
Any unnecessary delay of Ms. Ozturk's transfer to this District
would likely disrupt or delay the Court's proceedings,
potentially prolonging the very detention that is at the heart

6

JA-000495

of this case. Meanwhile, Ms. Ozturk's return to Vermont would

not unduly burden the government and would restore the status

quo at the time of the order from the District Court in

Massachusetts. The Court ordered that Ms. Ozturk be returned to

Vermont precisely so that the Court could resolve the habeas

petition as expeditiously as possible, and the Court intends to

do so.

DATED at Burlington, in the District of Vermont, this 24th

day of April 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

RUMEYSA OZTURK,                    )
                                   )
          Petitioner,              )
                                   )
     v.                            )    Case No. 2:25-cv-374
                                   )
DONALD J. TRUMP, in his            )
official capacity as               )
President of the United            )
States; PATRICIA HYDE, in her      )
official capacity as the New       )
England Field Director for         )
U.S. Immigration and Customs       )
Enforcement; MICHAEL KROL, in      )
his official capacity as HSI       )
New England Special Agent in       )
Charge, U.S. Immigration and       )
Customs Enforcement; TODD          )
LYONS, in his official             )
capacity as Acting Director,       )
U.S. Immigration and Customs       )
Enforcement; KRISTI NOEM, in       )
her official capacity as           )
Secretary of the United            )
States Department of               )
Homeland Security; and MARCO       )
RUBIO, in his official             )
capacity as Secretary of           )
State,                             )
                                   )
          Respondents.             )

**ORDER**

The Court held a telephonic conference with counsel for

Petitioner and counsel for Respondent at 4:50pm. The Court

reaffirmed its ruling made at the bail hearing earlier on

5/9/25. In light of the Court's finding of no risk of flight and

no danger to the community, Petitioner is to be released from

ICE custody immediately on her own recognizance, without any
form of Body-Worn GPS or other ICE monitoring at this time.
Petitioner is not subject to any travel restrictions.
Respondent's counsel shall submit proposed conditions of release
after conferring with ICE no later than 5/12/2025.

DATED at Burlington, in the District of Vermont, this 9th
day of May 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge

JA-000498

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

RUMEYSA OZTURK,                     )
                                    )
          Petitioner,               )
                                    )
     v.                             )    Case No. 2:25-cv-374
                                    )
DONALD J. TRUMP, in his             )
official capacity as                )
President of the United             )
States; PATRICIA HYDE, in her       )
official capacity as the New        )
England Field Director for          )
U.S. Immigration and Customs        )
Enforcement; MICHAEL KROL, in       )
his official capacity as HSI        )
New England Special Agent in        )
Charge, U.S. Immigration and        )
Customs Enforcement; TODD           )
LYONS, in his official              )
capacity as Acting Director,        )
U.S. Immigration and Customs        )
Enforcement; KRISTI NOEM, in        )
her official capacity as            )
Secretary of the United             )
States Department of                )
Homeland Security; and MARCO        )
RUBIO, in his official              )
capacity as Secretary of            )
State,                              )
                                    )
          Respondents.              )

**OPINION AND ORDER**

On April 10, 2025, Petitioner Rumeysa Ozturk filed a Motion
for Release pending the adjudication of her habeas corpus
petition, as governed by *Mapp v. Reno*, 241 F.3d 221 (2d Cir.
2001). ECF No. 82. Respondents opposed the motion, raising
arguments about this Court's jurisdiction to consider the

JA-000499

underlying habeas petition and about Ms. Ozturk's ability to
meet the *Mapp* standard for release on bail. ECF Nos. 83, 84, and
103. On April 18, 2025, the Court issued an Opinion and Order
holding, *inter alia*, that this Court had jurisdiction to
consider Ms. Ozturk's habeas petition and planned to move
expeditiously to consideration of both Ms. Ozturk's motion for
release and the petition itself. ECF No. 104.

On May 9, 2025, following a full bail hearing on
Petitioner's motion for release under *Mapp*, the Court ruled from
the bench, granting Ms. Ozturk's motion and ordering that she be
released immediately from U.S. Immigration and Customs
Enforcement ("ICE") custody. ECF No. 130. That Order was
reiterated in part later the same day in a text Order. ECF No.
131. This Opinion supplements the May 9 Order from the bench and
subsequent text Order.

## Procedural Background

On April 18, 2025, this Court issued an Opinion and Order
in this case. ECF No. 104. The Court "determined that it retains
jurisdiction over Ms. Ozturk's habeas petition" and found that
"there are no jurisdictional limitations on this Court's habeas
claims related to her detention." *Id.* at 72-73. The Court
further concluded that "Ms. Ozturk has presented viable and
serious habeas claims which warrant urgent review on the
merits." *Id.* at 73. On April 22, 2025, the government appealed

2

JA-000500

the Court's Order to the United States Court of Appeals for the

Second Circuit. ECF No. 105. That appeal on the merits remains

pending.

The Court's April 18 Order also required the government to

transfer Ms. Ozturk to ICE custody within the District of

Vermont no later than May 1, 2025. On April 22, the government

filed a motion to stay Ms. Ozturk's transfer to ICE custody in

Vermont. ECF No. 106. On April 24, the Court denied that motion,

rejecting the government's jurisdictional arguments again and

finding that "the four factors from *Nken v. Holder* that the

government has identified for evaluating a motion to stay . . .

weigh against the government." ECF No. 109 at 2.

Later that day, the government filed an Emergency Motion

with the circuit court, seeking a stay of this Court's order to

return Ms. Ozturk to Vermont. Emergency Motion Pursuant to

Circuit Rule 27.1(d) for Stay Pending Appeal with Relief Request

by April 29, 2025, Docket No. 25-1019, ECF. No. 19. The

government's argument predominately focused on the question of

this Court's jurisdiction to consider Ms. Ozturk's habeas

petition. Given the procedural posture of the case, the circuit

court evaluated the government's jurisdictional arguments to

determine whether the government was likely to succeed on the

merits. On May 7, 2025, the circuit court issued an Order

denying the government's motion for a stay "because the

3

government has not met its burden on any of the factors." *Ozturk v. Hyde*, 2025 WL 1318154, at *3 (2d Cir. May 7, 2025). Significantly, the circuit court found that the government was not likely to prevail on its arguments that this Court lacks jurisdiction over Ms. Ozturk's habeas petition. *Id.* at *4-13.

The Court has reviewed the circuit court's ruling and notes that nothing therein can be construed as denying this Court's continued jurisdiction over Ms. Ozturk's habeas petition, including the instant motion for immediate release. Indeed the circuit court acknowledged this Court's ongoing hearing schedule which included a planned bail hearing and instructed that the Court may amend its hearing schedule if necessary. *Id.* at *14. Therefore, the Court will not again consider the government's jurisdictional objections which have already been rejected by this Court and the circuit court.

On May 8, the Court held a status conference with counsel. Petitioner's counsel requested that the Court proceed with the scheduled May 9 bail hearing, with Ms. Ozturk appearing remotely if she has not yet been returned to Vermont. Government's counsel indicated that the only prejudice they may experience as a result of such hearing was "tension" between the Court's April 18 Order requiring Ms. Ozturk's return to Vermont and the circuit court's May 7 Order requiring the same by a later date. The circuit court, after requiring Ms. Ozturk's physical

4

transfer to Vermont "no later than May 14, 2025" stated that
"the district court may amend its hearing schedule as it deems
necessary in light of this order." *Ozturk,* 2025 WL 1318154, at
*14.

In granting Ms. Ozturk's motion for return to Vermont, the
Court's April 18 Order stated that "[Ms. Ozturk's] presence in
the courtroom will assist the Court in determining potential
bail conditions and whether release is appropriate." ECF No. 104
at 67. The circuit court similarly noted on May 7 that this
Court's order was intended in part to allow Ms. Ozturk "to
prepare for and attend her bail and habeas petition." *Ozturk,*
2025 WL 1318154, at *13. However, on May 8, Ms. Ozturk waived
her request for in-person appearance at her bail hearing to
avoid further delay, particularly in light of her ongoing and
worsening medical conditions, discussed below. The government
meanwhile did not argue any other prejudice from a remote
appearance by Ms. Ozturk. The circuit court required the
government to return Ms. Ozturk "by" May 14, but the government
was of course free to transport Ms. Ozturk back to Vermont
sooner. In light of Ms. Ozturk's waiver of her in-person
appearance at her bail hearing, and no concrete prejudice to the
government from Ms. Ozturk's remote appearance, the Court
determined it was appropriate to proceed with a bail hearing on
May 9, 2025.

5

JA-000503

Before this Court was consideration of the merits of Ms. Ozturk's petition for release under *Mapp*.

## Factual Background

The facts of this case were largely set forth in the Court's prior Opinion and Order issued April 18, 2025 and again by the circuit court in its ruling issued May 7, 2025. This Court assumes familiarity with those facts.

Briefly stated, the case arises from the arrest and detention of Ms. Ozturk, a Turkish student who entered the United States lawfully pursuant to a valid F-1 student visa and has been engaged in doctoral studies in Child Study and Human Development at Tufts University. At approximately 5:25 p.m. on March 25, 2025, while walking near her residence in Somerville, Massachusetts, Ms. Ozturk was arrested without warning by a group of armed, plainclothes law enforcement officers, some of whom were masked. The officers immediately handcuffed her and led to her to an unmarked vehicle. Ms. Ozturk had not been notified of her visa revocation or imminent arrest.

Over the course of the next few hours, she was transported to an office in Methuen, Massachusetts, then to Lebanon, New Hampshire, and ultimately to an ICE Field Office in St. Albans, Vermont. Early the following morning, ICE transported Ms. Ozturk from Vermont to a detention facility in Basile, Louisiana, where she remained in ICE custody for over six weeks.

6

JA-000504

To date, the only basis offered by the government to
justify Ms. Ozturk's arrest is an assessment by the Department
of Homeland Security ("DHS") and ICE that she "had been involved
in associations that 'may undermine U.S. foreign policy by
creating a hostile environment for Jewish students and
indicating support for a designated terrorist organization'
including co-authoring an op-ed that found common cause with an
organization that was later temporarily banned from campus." ECF
No. 91 at 6. The "op-ed" in question, co-authored by Ms. Ozturk
and three other Tufts students, criticized the University's
response to three resolutions passed by the Tufts Community
Union Senate and asked the University to "acknowledge the
Palestinian genocide, apologize for University President Sunil
Kumar's statements, disclose its investments and divest from
companies with direct or indirect ties to Israel." ECF No. 123
at 6. In an April 1, 2025, declaration, Tufts University
President Kumar attested that Ms. Ozturk's co-authored op-ed
"was not in violation of any Tufts policies" and that "no
complaints were filed with the University or, to our knowledge,
outside of the University about this op-ed." ECF No. 26-1 at 67.
President Kumar further noted that the same newspaper also
published other "op-eds on multiple sides of the issue with
opinions that were shared just as strongly as the op-ed Ms.
Ozturk co-authored." *Id.*

7

Ms. Ozturk was not informed, prior to her arrest, that DHS
and ICE were pursuing visa revocation or that the revocation had
occurred. In fact, a memo from the Bureau of Consular Affairs
required that the revocation "be silent; the Department of State
will not notify the subject of the revocation." ECF No. 91-1 at
6. With respect to Ms. Ozturk's movements immediately post-
arrest, her counsel has submitted affidavits from experienced
immigration attorneys stating that such successive transfers,
particularly to those locations, were highly unusual. *See, e.g.,*
ECF No. 82-3 at 4 ("In my 16 years of practice, I have not seen
or even heard of an ICE detainee arrested in Massachusetts being
booked and repeatedly moved in the manner described in that
declaration."). And as to her detention generally, other
immigration practitioners have opined that detention in a case
such as this – involving revocation of an F-1 visa and
termination of a SEVIS record – is equally unusual. *See, e.g.,*
ECF Nos. 122-4 at 5; 122-5 at 4.

Ms. Ozturk reported poor treatment and unsanitary
conditions during her detention in Louisiana. Several of her
concerns pertained to her health. Ms. Ozturk suffers from
asthma, which requires daily medication. ECF No. 82-10 at 4.
Prior to her arrest, she had suffered approximately 13 asthma
attacks in her life, commonly lasting between 5 and 15 minutes.
*Id.* She informed the Court on May 2 that since her arrest, she

8

had suffered at least 8 additional attacks lasting anywhere from
5-45 minutes. ECF No. 122-9 at 3. She is concerned about the
severity of the attacks and her ability to manage them. *Id.* When
not incarcerated, Ms. Ozturk is more able to control her
environment and avoid exposure to triggers. *Id.* at 4.

Ms. Ozturk also reported poor medical care at the facility.
For example, she was allegedly told that an asthma attack was
"all in her head," and her questions to a doctor were belittled.
*Id.* at 7. She witnessed other women experience significant
delays in receiving care. A physician who reviewed Ms. Ozturk's
medical history and spoke to her recently believes, in her
professional opinion, that if not released Ms. Ozturk would be
at risk for progressive symptoms, worsening disease control, and
perhaps even "potentially fatal asthma exacerbation." ECF No.
122-10 at 8.

Stress is one of Ms. Ozturk's asthma triggers, and she
attested that her time in detention has been stressful. Officers
at the facility were allegedly not responsive to detainee
concerns and were verbally abusive. *Id.* at 10. Ms. Ozturk had
difficulty sleeping due to loud noises and constant lighting
throughout the night. *Id.* at 10-11. Poor food quality was also
an issue. *Id.* at 11. From the outset, Ms. Ozturk reported that
cells were overcrowded, hygiene supplies were inadequate, and

9

that she was not provided certain religious materials. ECF No.
82-10 at 6-7.

Ms. Ozturk's counsel has provided the Court with numerous
letters of support which attest to Ms. Ozturk's qualities as a
person. Representative examples describe her as "compassionate,"
"service-minded," "conscientious," "gentle" and "caring." *See*
ECF No. 90 at 6, 9, 14, 52. Nothing in the record suggests
otherwise.

Going forward, the Dean of the Graduate School of Arts and
Sciences at Tufts informs the Court that Ms. Ozturk will have
several sources of income this coming summer as a result of her
teaching and research and that the University will be able to
provide her with housing. ECF No. 122-7 at 3. The Court also
received a Declaration from personnel at the Burlington
Community Justice Center, which was ready and willing to provide
pre-trial services to Ms. Ozturk upon her release. ECF No. 122-8
at 3. Ms. Ozturk reported that within the Tufts community she
has a core group of close friends, as well as a larger group of
friends and colleagues to which she will be returning.

On May 9, 2025, the Court heard testimony from Ms. Ozturk.
The testimony from Ms. Ozturk confirmed the nature of her
academic work, her ties to her community in Massachusetts, her
desire to return to her academic studies, and the continued
decline of her health. Ms. Ozturk reported that since the

10

submission of her last court filing on May 2, she had
experienced 4 additional asthma attacks. And as a witness
testified at the bail hearing, Ms. Ozturk appeared to suffer
another asthma attack and was temporarily excused from the
hearing to obtain her inhaler.

The Court also heard testimony from three witnesses who had
previously submitted sworn affidavits. Testimony from the
physician who had consulted with Ms. Ozturk remotely and
reviewed her medical records expanded on the serious risk of Ms.
Ozturk's worsening asthma without proper management and
treatment. Testimony from Ms. Ozturk's primary academic advisor
reiterated Ms. Ozturk's strong ties to her community and her
generous and compassionate character, as well as the potential
negative academic and professional consequences of continued
detention. Finally, testimony from an official with the
Burlington Community Justice Center reiterated that
organization's ability to provide supervision and support
services for Ms. Ozturk if she were released.

## Discussion

Ms. Ozturk requested release from custody pending
resolution of her habeas petition. Ms. Ozturk argued that the
Court has the inherent authority to order such a release,
subject to the analysis in *Mapp v. Reno*. 241 F.3d 221 (2d Cir.
2001). The government countered that the Court lacks authority

11

JA-000509

to consider release because of various jurisdictional bars, ECF
No. 84 at 1-6, but the government otherwise acknowledged that if
the Court did have such authority, *Mapp* is likely the
controlling standard. *Id.* at 1-2. As previously discussed,
following the circuit court's May 7 Opinion the Court will not
reconsider its April 18 jurisdictional determinations at this
time. The Court has the authority to grant release pending the
adjudication of Ms. Ozturk's habeas petition. Therefore, the
only question before the Court was whether Ms. Ozturk's release
is appropriate under a *Mapp* analysis.

   *Mapp v. Reno* established the controlling bail standard: "a
court considering a habeas petitioner's fitness for bail must
inquire into whether the habeas petition raises substantial
claims and whether extraordinary circumstances exist that make
the grant of bail necessary to make the habeas remedy
effective." 241 F.3d at 230 (cleaned up). Sibling courts have
typically interpreted this standard to require three findings.
*See, e.g., Mahdawi v. Trump*, 2025 WL 1243135, at *8-14 (D. Vt.
Apr. 30, 2025). The Court must find (1) substantial claims, (2)
extraordinary circumstances, and (3) grant of bail is necessary
to make the habeas remedy effective. *Id.* (applying *Mapp*). The
*Mapp* court noted that this standard is "difficult," and the
burden falls on the petitioner to make the necessary
demonstrations. 241 F.3d at 226.

12

JA-000510

Though not explicitly a part of the *Mapp* standard, it is
also appropriate for the Court to consider whether the
petitioner is a risk of flight or a danger to the community. *Id*
at 244 (noting that the district court had ordered release after
finding that petitioner was not a serious flight risk or threat
to the community.); *see also Black v. Decker*, 103 F.4th 133, 157
(2d Cir. 2024) ("Both sections 1226(a) and (c) aim to prevent
flight and danger to the community."); *Velasco Lopez v. Decker*,
978 F.3d 842, 857 (2d Cir. 2020) ("The Government . . . has no
interest in the continued incarceration of an individual who it
cannot show to be either a flight risk or a danger to his
community.")

In the April 18 Opinion, the Court instructed the parties
to submit briefing and evidence related to bail by May 2, 2025.
On May 2, Ms. Ozturk filed a supplemental memorandum and
evidence with the Court. ECF No. 122. The government did not
file additional briefing or evidence. At the May 9 bail hearing,
the government maintained that its objections to Ms. Ozturk's
release were primarily related to the Court's jurisdiction, and
the government wished to preserve those arguments for any
potential appeal. The government did raise arguments related to
conditions of release, on which the Court subsequently ordered
further briefing. *See* ECF Nos. 130, 131. But the government did
not make substantive arguments in relation to the *Mapp* factors.

13

JA-000511

The Court therefore considered the government's substantive
opposition to Ms. Ozturk's bail from its April 10, 2025,
briefing. ECF No. 84.

For the reasons below, the Court found that Ms. Ozturk has
made the necessary demonstrations under *Mapp*, and the Court
further found that she does not pose a risk of flight or danger
to the community. Therefore, release was appropriate.

## I.  Substantial Claims

Ms. Ozturk has raised two primary constitutional claims
related to her arrest and detention.[1] Ms. Ozturk argued that the
government's actions have violated her First Amendment right to
free speech and association. She further argued that her arrest
and detention were intended to be, and actually are, punitive in
violation of her Fifth Amendment due process rights. A detailed
summary of these claims and the Court's analytic framework was
outlined in the April 18 Opinion. On May 9, the Court found that
Ms. Ozturk's habeas petition raised substantial claims of both
violations.

### a. First Amendment

As a threshold matter, the Court's April 18 Opinion stated
that "in the absence of additional information from the

---

[1] Ms. Ozturk also raised claims based on the Administrative
Procedure Act and the *Accardi* doctrine. ECF No. 82-1 at 14. Thus
far it has not been necessary for the Court to evaluate those
claims as litigation has proceeded on other grounds.

JA-000512

government, the Court's habeas review is likely to conclude that Ms. Ozturk has presented a substantial claim." ECF No. 104 at 57-58. Specifically, the Court took note of Secretary Rubio's public statements seemingly offering to make presentations in court to justify Ms. Ozturk's detention, *id.* at 50, and the Court invited an immediate submission of any relevant evidence. *Id.* at 57. No such submission has been received by this Court. In its absence, the Court concluded that Ms. Ozturk has presented a substantial First Amendment claim.

To briefly summarize, Ms. Ozturk has argued that her arrest and detention are retaliation for her co-authorship of an op-ed in a student newspaper. The government has identified her op-ed, and potentially related associations, as the precipitating factor for her visa revocation. *Id.* at 9 (quoting a State Department memorandum revoking her visa). As the Court cited in its April 18, 2025, Opinion and Order, then-candidate Trump reportedly threatened to deport foreign students involved in campus protests. *Id.* at 49. And Secretary of State Marco Rubio, in response to press inquiries about Ms. Ozturk's arrest, opined that Ms. Ozturk's activities "meet the standard of what I've just described to you: people that are supportive of movements that run counter to the foreign policy of the United States" and that detention was "basically asking them to leave the country." *Id.*

15

JA-000513

Arrest and detention, let alone termination of status, are not a natural consequence of visa revocation. Ms. Ozturk has presented credible evidence to show that similarly situated individuals historically have not been detained following visa revocation or termination of status. ECF No. 122 at 8 (summarizing submitted declarations from attorneys with considerable experience with student visas).

To date, the government has neither rebutted the argument that retaliation for Ms. Ozturk's op-ed was the motivation for her detention nor identified another specific reason for Ms. Ozturk's detention, arguing instead that such decisions are committed to the discretion of the executive branch. ECF No. 84 at 5. While it is uncontested that the government has discretion in this area, that discretion is not accompanied by the authority to violate the Constitution.

The Court need not decide at this stage whether Ms. Ozturk's detention actually constitutes a First Amendment violation. As the April 18 opinion established, Ms. Ozturk's op-ed carries all the hallmarks of protected speech on public issues, and it does not fall into any recognized exception. ECF No. 104 at 52-55. A First Amendment retaliation claim requires showing a causal connection between protected speech by Ms. Ozturk and adverse action by the government. *Id*. at 55 (quoting *Demarest v. Town of Underhill*, 2025 WL 88417, at *2 (2d Cir.

16

JA-000514

2025). The record before this Court shows that the only speech at issue is Ms. Ozturk's op-ed, and her arrest and detention clearly constitute adverse action. On April 18, the Court offered the government the opportunity to rebut Ms. Ozturk's evidence showing that her op-ed is the but-for cause of her detention. ECF No. 104 at 56-58. The government has not done so. Meanwhile, Ms. Ozturk has introduced significant evidence demonstrating the irregular nature of the government's actions. ECF No. 122 at 8. The Court therefore concluded that Ms. Ozturk has presented, at the very least, a substantial claim of a First Amendment violation.[2]

---

[2] The Court previously posited that the test for First Amendment retaliation claims may be open to debate after *Nieves v. Bartlett*, 587 U.S. 391 (2019). ECF No. 104 at 55-56. Petitioner subsequently argued that *Nieves* was inapposite in the habeas context and *Mt. Healthy Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274 (1977) should govern the Court's inquiry, while Respondents provided no argument. The Court finds that Ms. Ozturk has presented a substantial claim at this stage no matter the applicable test. The Court invites further briefing on the appropriate standard for First Amendment retaliation claims in civil immigration habeas proceedings prior to final disposition. In addition, the Court notes that a court in the District of Massachusetts recently found that plaintiffs in that case "plausibly alleged the existence of both an ideological-deportation policy targeting protected political speech and a more informal campaign of censorship through threats." *Am. Ass'n of Univ. Professors v. Rubio*, 2025 WL 1235084, at *20 (D. Mass. Apr. 29, 2025). The Court invites briefing on whether the potential existence of such a policy would instead implicate the First Amendment retaliation test in *Lozman v. Riviera Beach*, 585 U.S. 87 (2018). Finally, the Court notes that, in similar litigation proceeding in other courts, the government has argued that non-citizens may not share the First Amendment protections of citizens, *Bridges v. Wixon* notwithstanding. *See, e.g.,*

JA-000515

**b. Due Process**

In its April 18 Opinion, the Court stated, "Where a
detainee presents evidence that her detention, though
discretionary, is motivated by unconstitutional purposes in
violation of the Due Process Clause, the Court may reasonably
conclude the same in the absence of countervailing evidence."
ECF No. 104 at 62. The Court invited the government to rebut Ms.
Ozturk's claims of an improper, punitive motivation for her
detention, but the Court has received no such evidence.
Therefore, on May 9 the Court concluded that Ms. Ozturk has
presented a substantial claim of a due process violation by the
government.

Civil detention by the government of individuals like Ms.
Ozturk who are undergoing removal proceedings is authorized by
Congress in 8 U.S.C. § 1226(a). The government has argued that
such detention is completely at the discretion of the
government. ECF No. 84 at 3. However, that discretion may not be
deployed for any purpose of the government's choosing. Detention
is primarily permitted for two purposes: preventing danger to
the community and ensuring an individual in proceedings does not
abscond. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). In

---

Opposition to Motion for Release Under *Mapp v. Reno*, *Mahdawi v.
Trump*, Docket No. 2:25-cv-00389, ECF No. 42 at 5. The Court
invites briefing on the nature and extent of this distinction,
if any, in this case's context.

JA-000516

contrast with criminal incarceration, civil immigration detention is not permissible for a punitive purpose. *Id.*

The government could have demonstrated that Ms. Ozturk's detention was motivated by a desire to prevent a danger to the community or a flight risk.[3] However, Ms. Ozturk has instead shown that her detention is likely motivated by improper purposes.

Ms. Ozturk argued that her detention is punishment for her op-ed, and that her punishment is intended to serve as a warning to other non-citizens who are contemplating public speech on issues of the day. The Court found that Ms. Ozturk has presented credible evidence to support her argument, including her own testimony describing her terror during her irregular arrest, statements by the Secretary of State describing the purpose of the government's actions, sworn declarations from immigration attorneys attesting to the unusual nature of Ms. Ozturk's case, and a sworn declaration from the Tufts University president describing the resulting climate of fear among the international members of the school community. The Court need not conclude at this stage that Ms. Ozturk's arrest and detention are actually punitive in violation of her due process rights. However, for

---

[3] An immigration judge's finding at a bond hearing are discussed below. For this analysis, the Court notes only that the immigration judge's determination did not precede detention.

JA-000517

the purpose of *Mapp,* the Court found that Ms. Ozturk has
demonstrated a substantial claim of a violation of due process.

## II. Extraordinary Circumstances

*Mapp* requires that the court find "extraordinary
circumstances" before granting bail. Extraordinary circumstances
are evident across multiple dimensions of this case.

First, the Court considered the unusual sequence of events
that led to Ms. Ozturk's present detention in Louisiana. Not
only was Ms. Ozturk arrested and transported out of
Massachusetts in a striking manner, but she was further flown to
Louisiana despite a court order issued on an emergency basis by
a federal court in Massachusetts which was intended to preserve
the status quo. ECF No. 104 at 68-72. This Court previously
criticized the government's response to the order issued on the
evening of Ms. Ozturk's arrest, *id.*, and ordered Ms. Ozturk's
return to Vermont "in part to effectuate the district court in
Massachusetts's order, returning Ozturk to the status quo at the
time of issuance and in part to ensure continued respect for
orders issued by Article III courts." *Ozturk v. Hyde*, 2025 WL
1318154, at *14 (2d Cir. May 7, 2025) (cleaned up). The
reviewing circuit court determined that "equity favors such a
determination." *Id.* Needless to say, it is an extraordinary
circumstance when an individual is transported across the
country despite a court order.

20

Second, the facts underlying Ms. Ozturk's substantial claims present an extraordinary circumstance. The government has not claimed that Ms. Ozturk violated any civil or criminal laws requiring her removal from the country. Instead, a year after Ms. Ozturk co-authored an op-ed in a campus newspaper, the government seemingly discovered the op-ed and exercised its discretion to revoke Ms. Ozturk's student visa, and then took further steps to terminate her status, arrest, and detain her. ECF No. 83 at 21, n. 5. In defense of these actions, the government has not provided anything beyond Ms. Ozturk's political speech. As Judge Crawford recently explained in a similar case, these are not unprecedented actions by the government, but they are nonetheless extraordinary. *Mahdawi*, 2025 WL 1243135, at *12-13.

Finally, Ms. Ozturk's declining health in custody provides another basis for finding extraordinary circumstances. The Court received testimony and affidavits expressing concern about Ms. Ozturk's conditions of confinement which appeared to be exacerbating her underlying medical conditions. The Court takes seriously the testifying physician's warning that Ms. Ozturk's asthma could be life-threatening if not properly managed. Therefore, Ms. Ozturk's health now constitutes an additional extraordinary circumstance which warranted immediate release.

21

### III. Necessary to Make the Habeas Remedy Effective

Ms. Ozturk has spent over six weeks in detention, and she has established substantial claims that her detention is unconstitutional. Her release is now necessary as the Court continues to consider the merits of her habeas petition.

The evidence before the Court showed that Ms. Ozturk's health has declined precipitously over the last six weeks, and she is at risk for needing emergency medical care, which may be difficult to obtain in detention. Her detention also had a negative impact on her academic, professional, and personal life, as has been established by voluminous affidavits and testimony. "When the Government incarcerates individuals it cannot show to be a poor bail risk . . . it separates families and removes from the community breadwinners, caregivers, parents, siblings and employees. The Government articulates no public interest that any of this serves and we see none." *Velasco Lopez,* 978 F.3d at 855.

Ms. Ozturk's detention necessarily constitutes an infringement of her First Amendment rights and her right to liberty. While such an infringement may be justified if the government presented a legitimate purpose for it, *see Jones v. N. Carolina Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 125 (1977), the government has not done so in this case. If the Court later finds that Ms. Ozturk's substantial claims are in

22

JA-000520

fact proven claims, her detention will have been an
unconstitutional deprivation with no public purpose or benefit.
Meanwhile, Ms. Ozturk's continued detention restricts her
ability to speak freely and potentially chills the speech of
other non-citizens. For all these reasons, the Court found that
bail was necessary to make the habeas remedy effective.

**IV.  Risk of Flight and Danger to the Community**

The Court found that Ms. Ozturk has presented substantial
claims and that extraordinary circumstances make the grant of
bail necessary for the habeas remedy to be effective. As is
customary in bail considerations, the Court continued on to
consider whether the detainee presents a risk of flight or
danger to the community which may make release inappropriate.
The Court considered the totality of evidence presented and
found that Ms. Ozturk does not pose a risk of flight or a danger
to the community.

The Court is aware that on April 16, 2025, an immigration
judge in Louisiana denied Ms. Ozturk's request for a change in
custody status and provided "Danger and Flight Risk" as the
rationale. ECF No. 101-1 at 4. The Court does not here, as the
government has argued, conduct "improper judicial review of a
bail determination" of the immigration judge. ECF No. 84 at 3.
The Court instead considers the immigration judge's finding as
potential evidence in the government's favor. In the April 18

23

Opinion, the Court took notice of that finding, which was
supplied to the Court by Ms. Ozturk, as well as DHS's reported
contention at immigration judge's bond hearing that Ms. Ozturk
posed a flight risk. ECF 104 at 61-62. The Court further invited
the government to submit evidence supporting that determination
to the record in this case. *Id.* The government did not present
any such evidence.

This is an Article III court. It is obligated to conduct an
independent and rigorous review of the evidence that is a part
of the record in this case. Immigration judges, by contrast, are
executive branch employees subject to executive branch orders.
The Court does not seek to disturb or set aside the immigration
judge's finding—indeed if Ms. Ozturk's habeas petition is
unsuccessful, she may presumably be again subject to potential
discretionary detention—but neither is this Court bound by an
executive branch employee's finding apparently unsupported by
evidence. Such deference would obviate the purpose of habeas
corpus as enshrined in the Constitution:

> In our own system the Suspension Clause is designed to
> protect against these cyclical abuses. The Clause
> protects the rights of the detained by a means
> consistent with the essential design of the
> Constitution. It ensures that, except during periods
> of formal suspension, the Judiciary will have a time-
> tested device, the writ, to maintain the delicate
> balance of governance that is itself the surest
> safeguard of liberty. The Clause protects the rights
> of the detained by affirming the duty and authority of
> the Judiciary to call the jailer to account.

24

*Boumediene v. Bush*, 553 U.S. 723, 745 (2008) (cleaned up).

The Court is not bound by the immigration judge's analysis for an additional reason. This Court has inherent authority to grant bail in immigration habeas cases after making the necessary findings. *Mapp,* 241 F.3d at 222. In this case, those findings include substantial claims of constitutional violations, as discussed above. As the circuit court has recognized, "neither the IJ nor the BIA has jurisdiction to decide constitutional issues." *Ozturk*, 2025 WL 1318154, at *12 (2d Cir. May 7, 2025) (internal quotation omitted). In part for that reason, the circuit court was "not persuaded that an IJ or the BIA would have developed a sufficient factual record, or any record at all, with respect to the challenged *detention*[.]" *Id.* (emphasis in original). As discussed above, constitutional issues permeate this case and necessitate the grant of bail.

Both preceding and following the April 18 Opinion, the Court received significant credible evidence attesting to Ms. Ozturk's peaceful and compassionate character as well as to her ties to her university and her community. This evidence includes numerous sworn affidavits as well as testimony from Ms. Ozturk's academic advisor and Ms. Ozturk herself. This demonstration contrasts with the complete lack of evidence from the government suggesting Ms. Ozturk is a danger or at risk of flight. There is

JA-000523

no evidence that Ms. Ozturk has engaged in violence or advocated violence, and she has no criminal record. Nor does any of her conduct suggest a risk of flight. Instead the evidence before the court showed that Ms. Ozturk is committed to her academic career and her community. Therefore, the Court found that Ms. Ozturk does not pose a danger to the community, nor does she present a risk of flight.

Ms. Ozturk's motion for immediate release was granted at the May 9 hearing, subject to the following conditions.[4]

## V.    Conditions of Release

Ms. Ozturk was ordered to be immediately released on her own recognizance, without Body-Worn GPS. Ms. Ozturk is free to travel as she sees fit, as the Court has not found any risk of flight and Ms. Ozturk's academic career necessitates travel. Ms. Ozturk was ordered to have at least monthly contact with the Burlington Community Justice Center to monitor and support her reintegration into her community following these traumatic events. The Burlington Community Justice Center was ordered to submit a monthly report to the Court detailing Ms. Ozturk's status, activities over the previous month, and future plans.

---

[4] The government did not move for a stay of release pending appeal; however, petitioner's counsel raised the possibility in her argument. The Court found that a stay would not be appropriate under *Nken v. Holder*, 556 U.S. 418 (2009), because all four factors weigh in favor of Ms. Ozturk.

JA-000524

Government's counsel requested additional conditions of release that are common for immigration detainees who have been granted bail. The Court instructed both parties to confer and attempt to find consensus on modest additional conditions and submit a proposal to the Court.

## Conclusion

For the reasons above, Ms. Ozturk was ordered immediately released at her bail hearing on May 9, 2025, pending the resolution of her habeas petition.

The Court found that Ms. Ozturk demonstrated substantial claims of First Amendment and Due Process Clause violations related to her detention. At this stage in the proceedings, there is no evidence to support Ms. Ozturk's continued detention absent consideration of her op-ed. Her substantial claims, which have been largely unrebutted by the government, are that her detention is retaliation for her op-ed in a school newspaper and that her detention is punitive, in part to serve as a message to others contemplating similar speech.

The Court found that extraordinary conditions exist in this case. In particular, the government's actions in ignoring a court order while arresting and transporting her to Louisiana constitute extraordinary circumstances. Further, extraordinary circumstances exist given the nature and strength of Ms.

27

Ozturk's constitutional claims and her demonstration that her detention exacerbated an underlying medical condition.

The Court found that immediate release was necessary to make the habeas remedy effective. As demonstrated by testimony and affidavits, continued detention may have potentially severe consequences for Ms. Ozturk's health. Immediate release was also necessary to ameliorate the chilling effect that Ms. Ozturk's arguably unconstitutional detention may have on non-citizens present in the country.

Finally, the Court found that Ms. Ozturk does not present a danger to the community or a risk of flight. This Article III Court was obligated to conduct an independent, rigorous review of all evidence presented, and the Court concluded that Ms. Ozturk is a cherished member of her community who exhibits a caring and compassionate character. On those bases, Ms. Ozturk's immediate release was warranted, and Ms. Ozturk's motion for release, ECF No. 82, was granted.

DATED at Burlington, in the District of Vermont, this 16th day of May 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge

JA-000526

  CourtLink® (Dockets)   Client: -None- ⌄  History  Help  More

**Document:**  2:25cv374, Ozturk V. Hyde Et Al  Actions ⌄

🖨  ✉  ⬇  ⬒  [ Go to ⌄ ]  🔔  ⟨ **12** of 19 | Results list ⟩

## 2:25cv374, Ozturk V. Hyde Et Al

US District Court Docket

United States District Court, Vermont

(Burlington)

**This case was retrieved on 06/27/2025**

### ▼Header

**Case Number:** 2:25cv374  
**Date Filed:** 04/04/2025  
**Assigned To:** Judge William K. Sessions III  
**Nature of Suit:** Prisoner - General (530)  
**Cause:** Defend. Denial of Pla. Appl. for Alien Employment Cer  
**Lead Docket:** None  
**Other Docket:** Massachusetts, 1:25-cv-10695  
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Open  
**Statute:** 8:1182  
**Jury Demand:** None  
**Demand Amount:** $0  
**NOS Description:** Prisoner - General

### ▼Participants

| Litigants | Attorneys |
|---|---|
| Rumeysa Ozturk<br>**Petitioner** | Adriana Lafaille , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>ACLU Foundation of Massachusetts, Inc.<br>One Center Plaza, Suite 850<br>Boston, MA 02108<br>USA<br>617-482-3170 Email:Alafaille@aclum.Org<br><br>Brett M. Kaufman , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street, 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2603 Fax: 212-995-4031 Email:Bkaufman@aclu.Org<br><br>Brian Matthew Hauss , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street, 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Bhauss@aclu.Org<br><br>Esha Bhandari , Esq. |

JA-000527

| Litigants | Attorneys |
|---|---|

PRO HAC VICE;ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
USA
212-549-2500 Email:Ebhandari@aclu.Org

Hillary A. Rich , Esq.
ATTORNEY TO BE NOTICED
ACLU Foundation of Vermont
P.O. Box 277
Montpelier, VT 05601-0277
USA
315-521-9231 Email:Hrich@acluvt.Org

Jessie Rossman , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
ACLU Foundation of Massachusetts, Inc.
One Center Plaza, Suite 850
Boston, MA 02108
USA
617-482-3170 Fax: 617-451-0009 Email:Jrossman@aclum.Org

Julian Bava , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
ACLU Foundation of Massachusetts, Inc.
One Center Plaza, Suite 850
Boston, MA 02108
USA
617-482-3170 Email:Jbava@aclum.Org

Katherine Rosenfeld , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza, 8th Floor
New York, NY 10020
USA
212-763-5000 Email:Krosenfeld@ecbawm.Com

Lia N. Ernst , Esq.
ATTORNEY TO BE NOTICED
ACLU Foundation of Vermont
P.O. Box 277
Montpelier, VT 05601-0277
USA
(802) 223-6304 Fax: (802) 223-6304 Email:Lernst@acluvt.Org

Mahsa Khanbabai , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
Khanbabai Immigration Law
115 Main Street, Ste 1b
North Easton, MA 02356
USA
508-297-2065

Matthew D. Brinckerhoff , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza, 8th Floor
New York, NY 10020
USA
212-763-5000 Fax: 212-763-5001

JA-000528

| Litigants | Attorneys |
|---|---|

Email:Mbrinckerhoff@ecbawm.Com

Michael K.T. Tan , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
USA
212-549-2500 Fax: 332-221-1702

Monica H. Allard , Esq.
ATTORNEY TO BE NOTICED
ACLU Foundation of Vermont
P.O. Box 277
Montpelier, VT 05601-0277
USA
802-251-7091 Email:Mallard@acluvt.Org

Mudassar H. Toppa , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
Main Street Legal Services Inc.
Clear Project Cuny School Of Law 2 Court Square, Ste 5th Floor
Long Island City, NY 11101
USA
718-340-4021 Email:Mudassar.Toppa@law.Cuny.Edu

Naz Ahmad , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
Main Street Legal Services Inc.
Clear Project Cuny School Of Law 2 Court Square, Ste 5th Floor
Long Island City, NY 11101
USA
718-340-4630 Email:Naz.Ahmad@law.Cuny.Edu

Noor Zafar , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
USA
212-549-2500 Email:Nzafar@aclu.Org

Rachel E. Davidson , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
ACLU Foundation of Massachusetts, Inc.
One Center Plaza, Suite 850
Boston, MA 02108
USA
617-482-3170 Email:Rdavidson@aclum.Org

Ramzi Kassem , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
Main Street Legal Services Inc.
Clear Project Cuny School Of Law 2 Court Square, Ste 5th Floor
Long Island City, NY 11101
USA
718-340-4558 Fax: 718-340-4478
Email:Ramzi.Kassem@law.Cuny.Edu

Sidra Mahfooz , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation

| Litigants | Attorneys |
|---|---|
| | 125 Broad Street, 18th Floor<br>New York, NY 10004<br>USA<br>631-741-3383 Email:Smahfooz@aclu.Org<br><br>Sonya Levitova , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>1 Rockefeller Plaza, 8th Floor<br>New York, NY 10020<br>USA<br>212-763-5000 Fax: 212-763-5001 Email:Slevitova@ecbawm.Com<br><br>Vasudha Talla , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>1 Rockefeller Plaza, 8th Floor<br>New York, NY 10020<br>USA<br>212-763-5000 Fax: 212-763-5001 Email:Vtalla@ecbawm.Com |
| Patricia Hyde<br>Field Office Director |<br>**Respondent** | Mark Sauter , AUSA<br><br>[Terminated: 05/06/2025]<br>U.S. Department of Justice<br>Suite 9200 One Courthouse Way<br>Boston, MA 02169<br>USA<br>617-748-3347<br><br>Michael P. Drescher , AUSA<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>11 Elmwood Avenue, 3rd Floor P.O. Box 570<br>Burlington, VT 05402-0570<br>USA<br>(802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Michael Krol<br>HSI New England Special Agent in Charge |<br>**Respondent** | Mark Sauter , AUSA<br><br>[Terminated: 05/06/2025]<br>U.S. Department of Justice<br>Suite 9200 One Courthouse Way<br>Boston, MA 02169<br>USA<br>617-748-3347<br><br>Michael P. Drescher , AUSA<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>11 Elmwood Avenue, 3rd Floor P.O. Box 570<br>Burlington, VT 05402-0570<br>USA<br>(802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Todd Lyons<br>Acting Director U.S. Immigration and Customs Enforcement |<br>**Respondent** | Mark Sauter , AUSA<br><br>[Terminated: 05/06/2025]<br>U.S. Department of Justice<br>Suite 9200 One Courthouse Way<br>Boston, MA 02169<br>USA<br>617-748-3347<br><br>Michael P. Drescher , AUSA |

| Litigants | Attorneys |
|---|---|
| | ATTORNEY TO BE NOTICED |
| | United States Attorney's Office |
| | 11 Elmwood Avenue, 3rd Floor P.O. Box 570 |
| | Burlington, VT 05402-0570 |
| | USA |
| | (802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Kristi Noem | Mark Sauter , AUSA |
| Secretary of Homeland Security \| | |
| **Respondent** | [Terminated: 05/06/2025] |
| | U.S. Department of Justice |
| | Suite 9200 One Courthouse Way |
| | Boston, MA 02169 |
| | USA |
| | 617-748-3347 |
| | |
| | Michael P. Drescher , AUSA |
| | ATTORNEY TO BE NOTICED |
| | United States Attorney's Office |
| | 11 Elmwood Avenue, 3rd Floor P.O. Box 570 |
| | Burlington, VT 05402-0570 |
| | USA |
| | (802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Donald J Trump | Mark Sauter , AUSA |
| **Respondent** | |
| | [Terminated: 05/06/2025] |
| | U.S. Department of Justice |
| | Suite 9200 One Courthouse Way |
| | Boston, MA 02169 |
| | USA |
| | 617-748-3347 |
| | |
| | Michael P. Drescher , AUSA |
| | ATTORNEY TO BE NOTICED |
| | United States Attorney's Office |
| | 11 Elmwood Avenue, 3rd Floor P.O. Box 570 |
| | Burlington, VT 05402-0570 |
| | USA |
| | (802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Marco A. Rubio | Mark Sauter , AUSA |
| **Respondent** | |
| | [Terminated: 05/06/2025] |
| | U.S. Department of Justice |
| | Suite 9200 One Courthouse Way |
| | Boston, MA 02169 |
| | USA |
| | 617-748-3347 |
| | |
| | Michael P. Drescher , AUSA |
| | ATTORNEY TO BE NOTICED |
| | United States Attorney's Office |
| | 11 Elmwood Avenue, 3rd Floor P.O. Box 570 |
| | Burlington, VT 05402-0570 |
| | USA |
| | (802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Brett F Stokes | Brett F. Stokes , Esq. |
| International Law Professors, Experts, Practitioners and Scholars | ATTORNEY TO BE NOTICED |
| \| | Vermont Law School |
| **Amicus** | P.O. Box 1404 |
| | Burlington, VT 05402 |
| | USA |
| | 802-558-7732 Email:Bstokes@vermontlaw.Edu |

JA-000531

## Litigants

The Cato Institute
**Amicus**

Becky Penberthy
**Material Witness**

## Attorneys

James M. Diaz , Esq.
ATTORNEY TO BE NOTICED
Darby Kolter & Roberts, LLP
89 South Main Street
Waterbury, VT 05676
USA
802-253-7165 Fax: 802-244-5954
Email:Jay@waterburystowelaw.Com

## ▼Proceedings

**Retrieve Document(s)**

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | Online | 1 | 03/25/2025 | PETITION for Writ of Habeas Corpus (2241) Filing fee: $ 5, receipt number BMADC-10912735 Fee status: Filing Fee paid., filed by Rumeysa Ozturk. (Khanbabai, Mahsa) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/25/2025) | |
| | | 2 | 03/25/2025 | ELECTRONIC NOTICE of Case Assignment. Judge Denise J. Casper assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Donald L. Cabell. (JPM) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/25/2025) | |
| ☐ | Online | 3 | 03/25/2025 | Judge Indira Talwani: ORDER entered. Service Order and Order Concerning Determination of Jurisdiction. (JPM) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/25/2025) | |
| ☐ | Online | 4 | 03/26/2025 | General Order 19-02, dated June 1, 2019 regarding Public Access to Immigration Cases Restricted to Federal Rule of Civil Procedure 5.2(c). (NMC) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/26/2025) | |
| | | 5 | 03/26/2025 | Online access to documents in this case is limited to counsel of record only. All documents are available for review in the Office of the Clerk. Counsel of record: please note that you will need to log into CM/ECF to access any documents in this case. (SEC) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/26/2025) | |
| ☐ | Free | 6 | 03/26/2025 | NOTICE of Appearance by Mark Sauter on behalf of Patricia Hyde, Michael Krol, Todd Lyons, Kristi Noem (Sauter, Mark) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/26/2025) | |
| ☐ | Free | 7 | 03/26/2025 | Withdrawn MOTION for Writ EMERGENCY Motion To Produce Petitioner by Rumeysa Ozturk.(Khanbabai, Mahsa) Modified on 3/27/2025 in accordance with D. 10 (SEC). [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/26/2025) | |
| | | 8 | 03/26/2025 | Judge Denise J. Casper: ELECTRONIC ORDER entered. The Court orders the government to respond to the motion, D. 7 , by 9:00am on 3/27/25. (SEC) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/26/2025) | |
| ☐ | Free | 9 | 03/27/2025 | Opposition re 7 MOTION for Writ EMERGENCY Motion To Produce Petitioner filed by Rumeysa Ozturk, Patricia Hyde, Michael Krol, Todd Lyons, Kristi Noem. (Sauter, Mark) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/27/2025) | |
| ☐ | Online | 10 | 03/27/2025 | NOTICE of Withdrawal by Rumeysa Ozturk to W/D Motion at ECF7 (Khanbabai, Mahsa) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/27/2025) | |
| ☐ | Online | 11 | 03/28/2025 | NOTICE of Appearance by Jessie J. Rossman on behalf of Rumeysa Ozturk (Rossman, Jessie) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/28/2025) | |
| ☐ | Online | 12 | 03/28/2025 | AMENDED COMPLAINT AND PETITION FOR WRIT OF HABEAS CORPUS against Patricia Hyde, Michael Krol, Todd Lyons, Kristi Noem, Donald J Trump, Marco Rubio, filed by Rumeysa Ozturk. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Rossman, Jessie) . (Additional attachment(s) added on 3/28/2025: # 3 *SEALED* Exhibit A and B) (SEC). [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/28/2025) | |

JA-000532

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | Online | 13 | 03/28/2025 | NOTICE of Appearance by Rachel Elizabeth Davidson on behalf of Rumeysa Ozturk (Davidson, Rachel) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/28/2025) | |
| ☐ | Online | 14 | 03/28/2025 | NOTICE of Appearance by Julian Bava on behalf of Rumeysa Ozturk (Bava, Julian) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/28/2025) | |
| ☐ | Online | 15 | 03/28/2025 | NOTICE of Appearance by Adriana Lafaille on behalf of Rumeysa Ozturk (Lafaille, Adriana) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/28/2025) | |
| ☐ | Free | 16 | 03/28/2025 | Judge Denise J. Casper: ORDER entered. MEMORANDUM AND ORDER - the Court ORDERS as follows: 1. To allow the Court's resolution of its jurisdiction to decide the Petition, Ozturk shall not be removed from the United States until further Order of this Court. See Mahmoud Khalil v. Joyce, No. 25-cv-01935-JMF at ECF No. 9, 2025 WL 750599 (S.D.N.Y. Mar. 10, 2025) (ruling that "[t]o preserve the Courts jurisdiction pending a ruling on the petition, Petitioner shall not be removed from the United States unless and until the Court orders otherwise"); and 2. The Respondents have until 5:00 p.m. on Tuesday, April 1, 2025, to respond to the Amended Petition and Complaint, D. 12 . (SEC) [Transferred from Massachusetts on 4/4/2025.] (Entered: 03/28/2025) | |
| ☐ | Online | 17 | 04/01/2025 | MOTION for Leave to File Excess Pages by Patricia Hyde, Michael Krol, Donald J Trump, Marco Rubio, Todd Lyons, Kristi Noem.(Sauter, Mark) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/01/2025) | |
| | | 18 | 04/01/2025 | Judge Denise J. Casper: ELECTRONIC ORDER entered allowing 17 Motion for Leave to File Excess Pages; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (SEC) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/01/2025) | |
| ☐ | Free | 19 | 04/01/2025 | RESPONSE/ANSWER to 12 Amended Complaint, by Patricia Hyde, Michael Krol, Donald J Trump, Marco Rubio, Todd Lyons, Kristi Noem. (Attachments: # 1 Exhibit A)(Sauter, Mark) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/01/2025) | |
| | | 20 | 04/01/2025 | Judge Denise J. Casper: ELECTRONIC ORDER entered re 19 Response to Petition for Writ of Habeas Corpus - 2241. Petitioner may file a response to Respondents' filing, D. 19 , by April 2, 2025 at 5 p.m. Such filing shall not exceed thirty (30) pages. (SEC) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/01/2025) | |
| | | 21 | 04/02/2025 | ELECTRONIC NOTICE of Hearing. Oral argument on the Amended Petition, D. 12. Hearing set for 4/3/2025 02:00 PM in Courtroom 11 (In person with remote access provided) before Judge Denise J. Casper. Overflow will be available in Jury Assembly Hall. This hearing will be available to the public and media by audio only. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.(LMH) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| ☐ | Online | 22 | 04/02/2025 | MOTION to Seal Declaration of Rumeysa Ozturk re: Reply to 1 PETITION for Writ of Habeas Corpus (2241) by Rumeysa Ozturk.(Lafaille, Adriana) [Transferred from Massachusetts on 4/4/2025.] Link added on 4/6/2025 (law). (Entered: 04/02/2025) | |
| | | 23 | 04/02/2025 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 22 Motion to Seal Declaration of Rumeysa Ozturk by Rumeysa Ozturk. Counsel will receive an email within twenty-four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (LMH) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| ☐ | Online | 24 | 04/02/2025 | MOTION for Leave to File Excess Pages for Reply re: 1 PETITION for Writ of Habeas Corpus (2241) by Rumeysa Ozturk.(Lafaille, Adriana) [Transferred from Massachusetts on 4/4/2025.] Link added on 4/6/2025 (law). (Entered: 04/02/2025) | |
| | | 25 | 04/02/2025 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 24 MOTION for Leave to File Excess Pages by Rumeysa Ozturk noting there | |

JA-000533

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | will be no opposition filed.Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (SEC) [Transferred from Massachusetts on 4/4/2025] (Entered: 04/02/2025) | |
| ☐ | Online | 26 | 04/02/2025 | REPLY to Response to 1 Petition for Writ of Habeas Corpus - 2241 by Rumeysa Ozturk. (Attachments: # 1 Exhibit 1 (unredacted, sealed), # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 8)(Lafaille, Adriana) (Additional attachment(s) added on 4/3/2025: # 8 *SEALED* Exhibit 7) (SEC). (Transferred from Massachusetts on 4/4/2025.) Text and link clarified on 4/6/2025 (law). (Additional attachment(s) added on 4/16/2025: # 9 Exhibit 1 (redacted) (law). (Entered: 04/02/2025) | |
| ☐ | Online | 27 | 04/02/2025 | ASSENTED-TO MOTION for Leave to Appear Pro Hac Vice for admission of Noor Zafar Filing fee: $ 125, receipt number AMADC-10929762 by Rumeysa Ozturk. (Attachments: # 1 Exhibit A)(Rossman, Jessie) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| ☐ | Online | 28 | 04/02/2025 | ASSENTED-TO MOTION for Leave to Appear Pro Hac Vice for admission of Brian Hauss Filing fee: $ 125, receipt number AMADC-10929769 by Rumeysa Ozturk. (Attachments: # 1 Exhibit A)(Rossman, Jessie) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| ☐ | Online | 29 | 04/02/2025 | ASSENTED-TO MOTION for Leave to Appear Pro Hac Vice for admission of Esha Bhandari Filing fee: $ 125, receipt number AMADC-10929772 by Rumeysa Ozturk. (Attachments: # 1 Exhibit A)(Rossman, Jessie) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| ☐ | Online | 30 | 04/02/2025 | ASSENTED-TO MOTION for Leave to Appear Pro Hac Vice for admission of Katherine Rosenfeld Filing fee: $ 125, receipt number AMADC-10929774 by Rumeysa Ozturk. (Attachments: # 1 Exhibit A)(Rossman, Jessie) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| ☐ | Online | 31 | 04/02/2025 | ASSENTED-TO MOTION for Leave to Appear Pro Hac Vice for admission of Sonya Levitova Filing fee: $ 125, receipt number AMADC-10929777 by Rumeysa Ozturk. (Attachments: # 1 Exhibit A)(Rossman, Jessie) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| ☐ | Online | 32 | 04/02/2025 | ASSENTED-TO MOTION for Leave to Appear Pro Hac Vice for admission of Matthew D. Brinckerhoff Filing fee: $ 125, receipt number AMADC-10929780 by Rumeysa Ozturk. (Attachments: # 1 Exhibit A)(Rossman, Jessie)[Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| ☐ | Online | 33 | 04/02/2025 | ASSENTED-TO MOTION for Leave to Appear Pro Hac Vice for admission of Vasudha Talla Filing fee: $ 125, receipt number AMADC-10929785 by Rumeysa Ozturk. (Attachments: # 1 Exhibit A)(Rossman, Jessie) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/02/2025) | |
| | | 34 | 04/03/2025 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 27 Motion for Leave to Appear Pro Hac Vice Added Noor Zafar; 28 Motion for Leave to Appear Pro Hac Vice Added Brian Hauss; 29 Motion for Leave to Appear Pro Hac Vice Added Esha Bhandari; 30 Motion for Leave to Appear Pro Hac Vice Added Katherine Rosenfeld; 31 Motion for Leave to Appear Pro Hac Vice Added Sonya Levitova; 32 Motion for Leave to Appear Pro Hac Vice Added Matthew D. Brinckerhoff; 33 Motion for Leave to Appear Pro Hac Vice Added Vasudha Talla. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorneys. (SEC) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/03/2025) | |
| ☐ | Online | 35 | 04/03/2025 | Assented to MOTION Remote Participation by Some of Petitioner's Counsel at Argument re 21 Notice of Hearing,,, by Rumeysa Ozturk.(Bava, Julian) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/03/2025) | |
| ☐ | Online | 36 | 04/03/2025 | NOTICE of Appearance by Matthew Brinckerhoff on behalf of Rumeysa Ozturk (Brinckerhoff, Matthew) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/03/2025) | |

JA-000534

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | Online | 37 | 04/03/2025 | NOTICE of Appearance of Katherine Rosenfeld on behalf of Rumeysa Ozturk (Rosenfeld, Katherine) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/03/2025) | |
| ☐ | Online | 38 | 04/03/2025 | NOTICE of Appearance by Sonya Levitova on behalf of Rumeysa Ozturk (Levitova, Sonya) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/03/2025) | |
| ☐ | Online | 39 | 04/03/2025 | NOTICE of Appearance by Vasudha Talla on behalf of Rumeysa Ozturk (Talla, Vasudha) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/03/2025) | |
| | | 40 | 04/03/2025 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 35 Motion for Remote Participation by Some of Petitioner's Counsel at Argument re 21 Notice of Hearing by Rumeysa Ozturk. (LMH) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/03/2025) | |
| | | 41 | 04/03/2025 | Electronic Clerk's Notes for proceedings held before Judge Denise J. Casper: Hearing on Amended Petition held on 4/3/2025. Court hears from counsel and takes matter under advisement. (Court Reporter: Kristin Kelley at kmob929@gmail.com.)(Attorneys present: Jessie Rossman, Adriana Lafaille, Mahsa Khanbabai, Rachel Davidson, Julian Bava, Noor Zafar and Brian Hauss for the petitioner. Mark Sauter for respondent.) (LMH) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/03/2025) | |
| ☐ | Free | 42 | 04/04/2025 | Judge Denise J. Casper: ORDER entered. MEMORANDUM AND ORDER - The Court DENIES the government's motion to dismiss this Petition and its alternative request to transfer this matter to the Western District of Louisiana. The Court ALLOWS the alternative relief sought by Ozturk and transfers this matter "in the interest of justice" pursuant 28 U.S.C. § 1631 to the U.S. District Court for the District of Vermont.To ensure that Ozturk has an opportunity to have the Petition considered by the District of Vermont, and to preserve the status quo, this Court's March 28, 2025 Order enjoining the government from removing her from the United States, D. 16, shall remain in effect unless and until the transferee court orders otherwise. See Khalil, 2025 WL 849803, at *14 (ordering same upon transfer).(LMH) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/04/2025) | |
| ☐ | Free | 43 | 04/04/2025 | Judge Denise J. Casper: Order Transferring Case to US District Court, District of Vermont.(LMH) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/04/2025) | |
| | | 44 | 04/04/2025 | Case transferred to to District of Vermont. Original file certified copy of transfer order and docket sheet sent to Clerk in that district. (SEC) [Transferred from Massachusetts on 4/4/2025.] (Entered: 04/04/2025) | |
| ☐ | Online | 45 | 04/04/2025 | CASE TRANSFERRED IN electronically from District of Massachusetts; Case Number 1:25-cv-10695. (Entered: 04/04/2025) | |
| ☐ | Online | 46 | 04/04/2025 | NOTICE OF APPEARANCE by Lia N. Ernst, Esq on behalf of Rumeysa Ozturk.(Ernst, Lia) (Entered: 04/04/2025) | |
| ☐ | Online | 47 | 04/04/2025 | UNOPPOSED MOTION for Telephonic Status Conference filed by Rumeysa Ozturk. (Ernst, Lia) (Entered: 04/04/2025) | |
| | | 48 | 04/05/2025 | ORDER granting 47 Unopposed Motion for Telephonic Status Conference. A telephonic status conference is now scheduled on Monday, April 7, 2025 at 12:00 p.m. EST. Signed by Judge William K. Sessions III on 4/5/2025. (This is a text-only Order.) (eae) (Entered: 04/05/2025) | |
| ☐ | Online | 49 | 04/05/2025 | NOTICE OF APPEARANCE by Monica H. Allard, Esq on behalf of Rumeysa Ozturk.(Allard, Monica) (Entered: 04/05/2025) | |
| ☐ | Online | 50 | 04/06/2025 | NOTICE of Hearing: Status Conference set for 4/7/2025 12:00 PM by telephone before Judge William K. Sessions III.(law) (Entered: 04/06/2025) | |
| ☐ | Online | 51 | 04/06/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Ramzi Kassem (Filing fee $ 150 receipt number AVTDC-2055485) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Ramzi Kassem, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/7/2025 to clarify text/attachments and Attachment 1 replaced on 4/7/2025) (sjl). (Entered: 04/06/2025) | |
| ☐ | Online | 52 | 04/06/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Mudassar Hayat Toppa (Filing fee $ 150 receipt number AVTDC-2055486) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Mudassar Hayat Toppa, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/7/2025 to clarify text/attachments (sjl). (Entered: 04/06/2025) | |
| ☐ | Online | 53 | 04/06/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Mahsa Khanbabai (Filing fee $ 150 receipt number AVTDC-2055495) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Mahsa Khanbabai, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/7/2025 to clarify text/attachments and Attachment 1 replaced on 4/7/2025) (sjl). (Entered: 04/06/2025) | |

JA-000535

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | 54 | 04/07/2025 | ORDER granting 52 Motion for Admission Pro Hac Vice of Mudassar Hayat Toppa. Signed by Judge William K. Sessions III on 4/7/2025. (This is a text-only Order.) (eae) (Entered: 04/07/2025) | |
| ☐ | Online | 55 | 04/07/2025 | NOTICE OF APPEARANCE by Michael P. Drescher, AUSA on behalf of Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd Lyons, Kristi Noem.(Drescher, Michael) (Entered: 04/07/2025) | |
| ☐ | Online | 56 | 04/07/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 53 UNOPPOSED MOTION for Appearance Pro Hac Vice of Mahsa Khanbabai. The Affidavit has been replaced to include the signature which was omitted at the time of filing. The corrected document is now attached to 53 and this entry. (sjl) (Entered: 04/07/2025) | |
| | | 57 | 04/07/2025 | ORDER granting 53 Unopposed Motion for Admission Pro Hac Vice of Mahsa Khanbabai. Signed by Judge William K. Sessions III on 4/7/2025. (This is a text-only Order.) (eae) (Entered: 04/07/2025) | |
| ☐ | Online | 58 | 04/07/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 51 UNOPPOSED MOTION for Appearance Pro Hac Vice of Ramzi Kassem. The Affidavit has been replaced with a corrected version. The corrected document is now attached to 51 and this entry. (sjl) (Entered: 04/07/2025) | |
| | | 59 | 04/07/2025 | ORDER granting 51 Unopposed Motion for Admission Pro Hac Vice of Ramzi Kassem. Signed by Judge William K. Sessions III on 4/7/2025. (This is a text-only Order.) (eae) (Entered: 04/07/2025) | |
| | | 60 | 04/07/2025 | MINUTE ENTRY for proceedings held before Judge William K. Sessions III: Status Conference held on 4/7/2025. Present by telephone Ramzi Kassem, Esq. for petitioner and Michael Drescher, AUSA for respondent. Court inquires. Statements by counsel. ORDERED: supplemental briefs due by 4/10/2025 at 5pm and summary of testimony, if needed, due by 4/11/2025 at 5pm; further hearing may be set for Monday and/or Tuesday if necessary; page limitations are waived on additional briefing. (Court Reporter: Sarah M. Bentley) (law) (Entered: 04/07/2025) | |
| ☐ | Online | 61 | 04/08/2025 | MOTION for Appearance Pro Hac Vice of Matthew Brinckerhoff (Filing fee $ 150 receipt number AVTDC-2056634) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Matthew Brinckerhoff, # 2 Certificate of Good Standing (Ernst, Lia) Modified on 4/9/2025 to clarify attachments (sjl). (Entered: 04/08/2025) | |
| ☐ | Online | 62 | 04/08/2025 | MOTION for Appearance Pro Hac Vice of Sonya Levitova (Filing fee 150 receipt number AVTDC-2056635) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Sonya Levitova, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/9/2025 to clarify attachments (sjl). (Entered: 04/08/2025) | |
| ☐ | Online | 63 | 04/08/2025 | MOTION for Appearance Pro Hac Vice of Katherine Rosenfeld (Filing fee $ 150 receipt number AVTDC-2056636) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Katherine Rosenfeld, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/9/2025 to clarify attachments (sjl). (Entered: 04/08/2025) | |
| ☐ | Online | 64 | 04/08/2025 | MOTION for Appearance Pro Hac Vice of Vasudha Talla (Filing fee $ 150 receipt number AVTDC-2056637) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Vasudha Talla, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/9/2025 to clarify attachments (sjl). (Entered: 04/08/2025) | |
| ☐ | Online | 65 | 04/08/2025 | MOTION for Appearance Pro Hac Vice of Brett Kaufman (Filing fee $ 150 receipt number AVTDC-2056644) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Brett Kaufman, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/9/2025 to clarify attachments (sjl). (Entered: 04/08/2025) | |
| ☐ | Online | 66 | 04/09/2025 | TRANSCRIPT of Telephonic Status Conference hearing held on April 7, 2025, before Judge William K. Sessions III. Court Reporter/Transcriber Sarah M. Bentley, contact information: sbireland7@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/5/2025. Redacted Transcript Deadline set for 5/15/2025. Release of Transcript Restriction set for 7/11/2025. (law) (Entered: 04/09/2025) | |
| | | 67 | 04/09/2025 | ORDER granting 61 Motion for Admission Pro Hac Vice of Matthew Brinckerhoff; granting 62 Motion for Admission Pro Hac Vice of Sonya Levitova ; granting 63 Motion for Admission Pro Hac Vice of Katherine Rosenfeld; granting 64 Motion for Admission Pro Hac Vice of Vasudha Talla; granting 65 Motion for Admission Pro Hac Vice of Brett Kaufman. Signed by Judge William K. Sessions III on 4/9/2025. (This is a text-only Order.) (eae) (Entered: 04/09/2025) | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | Online | 68 | 04/09/2025 | NOTICE OF APPEARANCE by Matthew D. Brinckerhoff, Esq on behalf of Rumeysa Ozturk.(Brinckerhoff, Matthew) (Entered: 04/09/2025) | |
| ☐ | Online | 69 | 04/09/2025 | NOTICE OF APPEARANCE by Katherine Rosenfeld, Esq on behalf of Rumeysa Ozturk.(Rosenfeld, Katherine) (Entered: 04/09/2025) | |
| ☐ | Online | 70 | 04/09/2025 | NOTICE OF APPEARANCE by Vasudha Talla, Esq on behalf of Rumeysa Ozturk.(Talla, Vasudha) (Entered: 04/09/2025) | |
| ☐ | Online | 71 | 04/09/2025 | NOTICE OF APPEARANCE by Sonya Levitova, Esq on behalf of Rumeysa Ozturk.(Levitova, Sonya) (Entered: 04/09/2025) | |
| ☐ | Online | 72 | 04/09/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Julian Bava (Filing fee $ 150 receipt number AVTDC-2057391) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Julian Bava, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/10/2025 to clarify text/attachments (sjl). (Entered: 04/09/2025) | |
| ☐ | Online | 73 | 04/09/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Esha Bhandari (Filing fee $ 150 receipt number AVTDC-2057394) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Esha Bhandari, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/10/2025 to clarify text/attachments (sjl) Modified on 4/10/2025 (sjl). (Entered: 04/09/2025) | |
| ☐ | Online | 74 | 04/09/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Brian Hauss (Filing fee $ 150 receipt number AVTDC-2057395) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Brian Hauss, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/10/2025 to clarify text/attachments (sjl). (Entered: 04/09/2025) | |
| ☐ | Online | 75 | 04/09/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Noor Zafar (Filing fee $ 150 receipt number AVTDC-2057396) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Noor Zafar, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/10/2025 to clarify text/attachments (sjl). (Entered: 04/09/2025) | |
| | | 76 | 04/10/2025 | ORDER granting 72 Motion for Admission Pro Hac Vice of Julian Bava; granting 73 Motion for Admission Pro Hac Vice of Esha Bhandari; granting 74 Motion for Admission Pro Hac Vice of Brian Hauss; granting 75 Motion for Admission Pro Hac Vice of Noor Zafar. Signed by Judge William K. Sessions III on 4/10/2025. (This is a text-only Order.) (eae) (Entered: 04/10/2025) | |
| ☐ | Online | 77 | 04/10/2025 | NOTICE OF APPEARANCE by Gary L. Franklin, Esq on behalf of Ansche Chesed, Bend the Arc: A Jewish Partnership for Justice, B'nai Jeshurun, Congregation Beth Elohim, Congregation Dorshei Tzedek, West Newton, Habonim Dror, Harvard Jewish Progressive Alumni, IKAR, J Street, Jewish Center for Justice, Jewish Labor Committee, Keshet, Leo Baeck Temple, Ma'yan Tikvah, New England Jewish Labor Committee, New Israel Fund, New Jewish Narrative, Nexus Project, T'ruah: The Rabbinic Call for Human Rights, Massachusetts, The Boston Workers Circle, The Reconstructionist Rabbinical Assoc, The Workers Circle, Worcester Havurah, Jewish Alliance for Law and Social Action, New York Jewish Agenda, Temple Emanu-El, Temple Micah.(Franklin, Gary) Filers added on 4/10/2025 (law). (Entered: 04/10/2025) | |
| ☐ | Free | 78 | 04/10/2025 | NOTICE OF Hearing re: Motion to Dismiss: Motion Hearing set for 4/14/2025 at 09:30 AM in Burlington Courtroom 110 before Judge William K. Sessions III. (law) (see page 2 of notice for Zoom information) Please be reminded that Judicial Conference policy prohibits the broadcasting of proceedings in federal courts. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, or rebroadcasting of court proceedings pursuant to Judicial Conference policy. This prohibition applies to counsel, the parties, the media and any member of the public. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. (Entered: 04/10/2025) | |
| ☐ | Online | 79 | 04/10/2025 | MOTION for Appearance Pro Hac Vice of Robert Balin, Jeremy Chase, Linda Steinman, Victor Kovner, Abigail Everdell, Rachel Strom, James Rosenfeld, Jesse Feitel, Adam Sieff, Rachel Goldberg, Nathan Siegel, Alison Schary (Filing fee $ 1,800 receipt number 5670) filed by Ansche Chesed, Bend the Arc: A Jewish Partnership for Justice, B'nai Jeshurun, Congregation Beth Elohim, Congregation Dorshei Tzedek, Habonim Dror, Harvard Jewish Progressive Alumni, IKAR, J Street, Jewish Center for Justice, Jewish Labor Committee, Keshet, Leo Baeck Temple, Ma'yan Tikvah, New England Jewish Labor Committee, New Israel Fund, New Jewish Narrative, Nexus Project, T'ruah: The Rabbinic Call for Human | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | Rights, Massachusetts, The Boston Workers Circle, The Reconstructionist Rabbinical Assoc, The Workers Circle, Worcester Havurah, Jewish Alliance for Law and Social Action (JALSA), New York Jewish Agenda, Temple Emanu-El, Temple Micah (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X )(Franklin, Gary) Modified on 4/11/2025 to clarify attachments and include receipt number (sjl). (Entered: 04/10/2025) | |
| ☐ | Online | 80 | 04/10/2025 | MOTION for Leave to File an Amicus Curiae Brief filed by Brett F Stokes, International Law Professors, Experts, Practitioners and Scholars. (Attachments: # 1 Proposed Order, # 2 Proposed Brief)(Stokes, Brett) (Entered: 04/10/2025) | |
| ☐ | Online | 81 | 04/10/2025 | SUPPLEMENTAL MEMORANDUM by Rumeysa Ozturk on Jurisdictional Issues. (Allard, Monica) (Entered: 04/10/2025) | |
| ☐ | Online | 82 | 04/10/2025 | MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont with Request for Oral Argument/Hearing filed by Rumeysa Ozturk (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9)(Ernst, Lia) Text clarified and Added MOTION for Return to Vermont on 4/10/2025 (law). (Additional attachment(s) added on 4/11/2025: # 11 Exhibit 1(redacted), # 12 Index of Exhibits) (law). (Entered: 04/10/2025) | |
| ☐ | Online | 83 | 04/10/2025 | SUPPLEMENTAL MEMORANDUM in Opposition re: 12 Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 by Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd Lyons, Kristi Noem. (Drescher, Michael) Text clarified on 4/10/2025 (law). (Entered: 04/10/2025) | |
| ☐ | Online | 84 | 04/10/2025 | SUPPLEMENTAL BRIEFING in Opposition to 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont filed by Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd Lyons, Kristi Noem. (Drescher, Michael) Text clarified on 4/10/2025 (law). (Entered: 04/10/2025) | |
| ☐ | Online | 85 | 04/10/2025 | MOTION for Leave to File Amici Curiae Brief filed by Ansche Chesed, Bend the Arc: A Jewish Partnership for Justice, B'nai Jeshurun, Congregation Beth Elohim, Congregation Dorshei Tzedek, Habonim Dror, Harvard Jewish Progressive Alumni, IKAR, J Street, Jewish Center for Justice, Jewish Labor Committee, Keshet, Leo Baeck Temple, Ma'yan Tikvah, New England Jewish Labor Committee, New Israel Fund, New Jewish Narrative, Nexus Project, T'ruah: The Rabbinic Call for Human Rights, Massachusetts, The Boston Workers Circle, The Reconstructionist Rabbinical Assoc, The Workers Circle, Worcester Havurah, Jewish Alliance for Law and Social Action, New York Jewish Agenda, Temple Emanu-El, Temple Micah. (Attachments: # 1 Proposed Brief)(Franklin, Gary) Text clarified on 4/10/2025 (law). (Entered: 04/10/2025) | |
| ☐ | Online | 86 | 04/10/2025 | MOTION for Appearance Pro Hac Vice of Sidra Mahfooz (Filing fee $ 150 receipt number AVTDC-2058449) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Sidra Mahfooz, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/11/2025 to clarify attachments and Attachment 1 replaced on 4/11/2025) (sjl). (Entered: 04/10/2025) | |
| ☐ | Online | 87 | 04/11/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 86 MOTION for Appearance Pro Hac Vice of Sidra Mahfooz. Attachment 1 has been replaced to correct the PDF size and remove illegible PDF headers. The corrected document is now attached to 86 and this entry. (sjl) (Entered: 04/11/2025) | |
| | | 88 | 04/11/2025 | ORDER granting 86 Motion for Admission Pro Hac Vice of Sidra Mahfooz. Signed by Judge William K. Sessions III on 4/11/2025. (This is a text-only Order.) (eae) (Entered: 04/11/2025) | |
| | | 89 | 04/11/2025 | ORDER granting 79 Motion for Admission Pro Hac Vice of Robert Balin, Jeremy Chase, Linda Steinman, Victor Kovner, Abigail Everdell, Rachel Strom, James Rosenfeld, Jesse Feitel, Adam Sieff, Rachel Goldberg, Nathan Siegel, and Alison Schary. Signed by Judge William K. Sessions III on 4/11/2025. (This is a text-only Order.) (eae) (Entered: 04/11/2025) | |
| ☐ | Online | 90 | 04/11/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont filed by Rumeysa Ozturk. Exhibit 1 has been sealed in accordance with F.R.Civ.P. 5.2. Also, the required Index of Exhibits was not included at the | |

JA-000538

| Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|
| | | | time of filing. The redacted exhibit and index are now attached to 82 and this entry. (Attachments: # 1 Index of Exhibits) (law) (Entered: 04/11/2025) | |
| ☐ Online | 91 | 04/11/2025 | SUPPLEMENTAL DOCUMENT(S) re: Jurisdictional Issues and 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont by Rumeysa Ozturk. (Attachments: # 1 Exhibit 12)(Ernst, Lia) Text clarified on 4/13/2025 (law). (Entered: 04/11/2025) | |
| ☐ Online | 92 | 04/11/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Rachel Davidson (Filing fee $ 150 receipt number AVTDC-2059258) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Rachel Davidson, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/14/2025 to clarify text/attachments (sjl). (Entered: 04/11/2025) | |
| ☐ Online | 93 | 04/11/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Adriana Lafaille (Filing fee $ 150 receipt number AVTDC-2059259) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Adriana Lafaille, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/14/2025 to clarify text/attachments (sjl). (Entered: 04/11/2025) | |
| ☐ Online | 94 | 04/11/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Jessie J. Rossman (Filing fee $ 150 receipt number AVTDC-2059260) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Jessie Rossman, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/14/2025 to clarify text/attachments (sjl). (Entered: 04/11/2025) | |
| ☐ Online | 95 | 04/13/2025 | SUPPLEMENTAL DOCUMENT(S) re: 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont by Rumeysa Ozturk. (Attachments: # 1 Exhibit 13)(Levitova, Sonya) (Entered: 04/13/2025) | |
| | 96 | 04/14/2025 | ORDER granting 92 Motion for Admission Pro Hac Vice of Rachel Davidson; granting 93 Motion for Admission Pro Hac Vice of Adriana Lafaille; granting 94 Motion for Admission Pro Hac Vice of Jessie J. Rossman. Signed by Judge William K. Sessions III on 4/14/2025. (This is a text-only Order.) (eae) (Entered: 04/14/2025) | |
| | 97 | 04/14/2025 | MINUTE ENTRY for proceedings held before Judge William K. Sessions III: Motion Hearing held on 4/14/2025 re: Motion to Dismiss and 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont. Adriana Lafaille, Jessie Rossman, Lisa Ernst, Monica Allard and Noor Zafar, Esqs. present for petitioner. Michael Drescher, AUSA present for respondents. Statements by counsel. ORDERED: motions taken under advisement. (Court Reporter: Sarah Bentley) (law) (Entered: 04/14/2025) | |
| ☐ Online | 98 | 04/16/2025 | TRANSCRIPT of Motion hearing held on April 14, 2025, before Judge William K. Sessions III. Court Reporter/Transcriber Sarah M. Bentley, telephone number sbireland7@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2025. Redacted Transcript Deadline set for 5/22/2025. Release of Transcript Restriction set for 7/18/2025. (law) (Entered: 04/16/2025) | |
| ☐ Online | 99 | 04/16/2025 | SUPPLEMENTAL DOCUMENT(s) re: 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont by Rumeysa Ozturk. (Ernst, Lia) Link added on 4/17/2025 (law). (Entered: 04/16/2025) | |
| ☐ Online | 100 | 04/17/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 26 REPLY to Response to 1 Petition for Writ of Habeas Corpus - 2241 filed by Rumeysa Ozturk. Exhibit 1 has been sealed in accordance with F.R.Civ.P. 5.2. A redacted version is now attached to 26 and this entry. (law) (Entered: 04/17/2025) | |
| ☐ Online | 101 | 04/17/2025 | SUPPLEMENTAL DOCUMENT(S) re: 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont by Rumeysa Ozturk. (Ernst, Lia) (Text and link clarified, Main Document 101 replaced and Attachment(s) added on 4/17/2025: # 1 Exhibit A) (law). (Entered: 04/17/2025) | |
| ☐ Online | 102 | 04/17/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 101 Supplemental Document to 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont filed by Rumeysa Ozturk. The document and its exhibit was uploaded as a singular PDF. The documents have been broken apart and are now separately attached to 101 and this entry. (Attachments: # 1 Exhibit A) (law) (Entered: 04/17/2025) | |
| ☐ Online | 103 | 04/18/2025 | RESPONSE to 99 Supplemental Document re: 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont by Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd | |

JA-000539

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | Lyons, Kristi Noem. (Drescher, Michael) Text clarified, link added on 4/20/2025 (law). (Entered: 04/18/2025) | |
| ☐ | Free | 104 | 04/18/2025 | OPINION AND ORDER re: court to retain jurisdiction; petitioner is to be transferred to ICE custody within the District of Vermont no later than 5/1/2025; a bail hearing will be scheduled for 5/9/2025; parties are ordered to submit briefs and present all evidence related to issue of bail by 5/2/2025; a hearing on the merits of the habeas petition will be held 5/22/2025 and the court stays the effect of this order for 4 days to allow either party to appeal this order. Signed by Judge William K. Sessions III on 4/18/2025. (law) (Entered: 04/18/2025) | |
| ☐ | Online | 105 | 04/22/2025 | NOTICE OF APPEAL as to 104 Opinion and by Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd Lyons, Kristi Noem. (Drescher, Michael) (Entered: 04/22/2025) | |
| ☐ | Online | 106 | 04/22/2025 | MOTION to Continue Stay Pending Appeal re 104 Opinion and Order filed by Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd Lyons, Kristi Noem. (Drescher, Michael) Text clarified on 4/23/2025 (law). (Entered: 04/22/2025) | |
| ☐ | Online | 107 | 04/23/2025 | RESPONSE in Opposition re 106 MOTION to Continue Stay Pending Appeal re 104 Opinion and Order filed by Rumeysa Ozturk. (Ernst, Lia) (Entered: 04/23/2025) | |
| ☐ | Online | 108 | 04/23/2025 | REPLY to 99 Supplemental Document re: 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont regarding request for production of memoranda by Rumeysa Ozturk. (Ernst, Lia) Text clarified and link added on 4/24/2025 (law). (Entered: 04/23/2025) | |
| ☐ | Free | 109 | 04/24/2025 | OPINION AND ORDER denying 106 Motion to Continue Stay Pending Appeal re 104 Opinion and Order. Signed by Judge William K. Sessions III on 4/24/2025. (law) (Entered: 04/24/2025) | |
| ☐ | Online | 110 | 04/24/2025 | NOTICE of Hearing: Bail Hearing set for 5/9/2025 09:30 AM in Burlington Courtroom 110 before Judge William K. Sessions III.(law) (Entered: 04/24/2025) | |
| ☐ | Online | 111 | 04/25/2025 | NOTICE OF APPEARANCE by Hillary A. Rich, Esq on behalf of Rumeysa Ozturk.(Rich, Hillary) (Entered: 04/25/2025) | |
| ☐ | Online | 112 | 04/25/2025 | MOTION for Leave to File Amicus Brief and MOTION to Expedite filed by E.S. (Attachments: # 1 Proposed Amicus Brief)(law) (Entered: 04/25/2025) | |
| ☐ | Online | 113 | 04/28/2025 | TRANSMITTED Index on Appeal, Circuit No. 25-1019, re: 105 Notice of Appeal (Attachments: # 1 Docket Sheet (public), # 2 Docket Sheet (sealed), # 3 Clerk's Certification)(kac) (Entered: 04/28/2025) | |
| ☐ | Online | 114 | 04/28/2025 | NOTICE of Hearing re: 1 Petition for Writ of Habeas Corpus (2241). Hearing set for 5/22/2025 at 09:00 AM in Burlington Courtroom 110 before Judge William K. Sessions III.(law) (Entered: 04/28/2025) | |
| ☐ | Online | 115 | 04/28/2025 | UNOPPOSED MOTION for Leave to File Brief as Amicus Curiae in Support of Petitioner filed by Foundation for Individual Rights and Expression, National Coalition Against Censorship, The Rutherford Institute, PEN America, The Cato Institute, First Amendment Lawyers Association. (Attachments: # 1 Proposed Brief)(Diaz, James) Text clarified on 4/29/2025 (law). (Entered: 04/28/2025) | |
| ☐ | Online | 116 | 04/28/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Naz Ahmad (Filing fee $ 150 receipt number AVTDC-2066895) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Naz Ahmad, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/29/2025 to clarify text/attachment (sil). (Entered: 04/28/2025) | |
| ☐ | Online | 118 | 04/28/2025 | ORDER of USCA, Circuit No. 25-1019, as to 104 Order: motion for a stay pending appeal is referred to the three-judge motions panel sitting on May 6, 2025. An administrative stay of the district court's order to transfer is granted pending decision by the panel. (kac) (Entered: 04/29/2025) | |
| | | 117 | 04/29/2025 | ORDER granting 116 Unopposed Motion for Admission Pro Hac Vice of Naz Ahmad. Signed by Judge William K. Sessions III on 4/29/2025. (This is a text-only Order.) (eae) (Entered: 04/29/2025) | |
| ☐ | Online | 119 | 04/29/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Conor Fitzpatrick (Filing fee $ 150 receipt number AVTDC-2067806) filed by Foundation for Individual Rights and Expression (Attachments: # 1 Declaration of Conor Fitzpatrick, # 2 Certificate of Good Standing) (Diaz, James) Modified on 4/30/2025 to clarify text/attachment (sil). (Entered: 04/29/2025) | |
| | | 120 | 04/30/2025 | ORDER granting 119 Unopposed Motion for Admission Pro Hac Vice of Conor Fitzpatrick. Signed by Judge William K. Sessions III on 4/30/2025. (This is a text-only Order.) (eae) (Entered: 04/30/2025) | |

JA-000540

| | Availability ⌃⌄ | # ⌃⌄ | Date ⌃ | Proceeding Text ⌃⌄ | Source ⌃⌄ |
|---|---|---|---|---|---|
| ☐ | Online | 121 | 05/02/2025 | MOTION to Withdraw as Attorney filed by Ansche Chesed, Bend the Arc: A Jewish Partnership for Justice, B'nai Jeshurun, Congregation Beth Elohim, Congregation Dorshei Tzedek, Habonim Dror, Harvard Jewish Progressive Alumni, IKAR, J Street, Jewish Center for Justice, Jewish Labor Committee, Keshet, Leo Baeck Temple, Ma'yan Tikvah, New England Jewish Labor Committee, New Israel Fund, New Jewish Narrative, Nexus Project, T'ruah: The Rabbinic Call for Human Rights, Massachusetts, The Boston Workers Circle, The Reconstructionist Rabbinical Assoc, The Workers Circle, Worcester Havurah, Jewish Alliance for Law and Social Action, New York Jewish Agenda, Temple Emanu-El, Temple Micah. (Feitel, Jesse) (Entered: 05/02/2025) | |
| ☐ | Online | 122 | 05/02/2025 | SUPPLEMENTAL MEMORANDUM re: 82 MOTION for Release Under MAPP v. RENO or in the Alternative MOTION for Return to Vermont filed by Rumeysa Ozturk. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1, # 3 Exhibit 1-A, # 4 Exhibit 1-B, # 5 Exhibit 1-C, # 6 Exhibit 1-D, # 7 Exhibit 1-E, # 8 Exhibit 1-F, # 9 Exhibit 1-G, # 10 Exhibit 1-H, # 11 Exhibit 1-I)(Bava, Julian) Text clarified on 5/4/2025 (law) (Entered: 05/02/2025) | |
| ☐ | Online | 123 | 05/07/2025 | ORDER of USCA, Circuit No. 25-1019, as to 105 Notice of Appeal; govt's motion for a stay of transfer is DENIED. Govt's request for a writ of mandamus is DENIED. Administrative stay entered by Circuit Court is VACATED. Govt is ORDERED to comply with district court's transfer order within one week of date of this opinion. Circuit Court orders that Ms. Ozturk be physically transferred to ICE custody within the District of Vermont no later than May 14, 2025. The district court may amend its hearing schedule as it deems necessary in light of this order. (kac) (Entered: 05/07/2025) | |
| ☐ | Online | 124 | 05/08/2025 | REVISED NOTICE of Hearing (same date/time): Status Conference set for 5/9/2025 at 09:30 AM in Burlington Courtroom 110 before Judge William K. Sessions III.(law) (Entered: 05/08/2025) | |
| ☐ | Online | 125 | 05/08/2025 | NOTICE of Hearing: Telephone Conference set for 5/8/2025 at 10:00 AM before Judge Kevin J. Doyle. (law) (see page 2 of the notice for Zoom information - audio only)Please be reminded that Judicial Conference policy prohibits the broadcasting of proceedings in federal courts. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, or rebroadcasting of court proceedings pursuant to Judicial Conference policy. This prohibition applies to counsel, the parties, the media and any member of the public. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. Join ZoomGov Meeting https://vt-uscourts.zoomgov.com/j/1617910049?pwd=AEoTnuXeRzTw4fTU7ocLTDL1yEF5Yl.1 One tap mobile: +16468287666, 1617910049 US (New York) Meeting ID: 161 791 0049 Passcode: 951302 (Entered: 05/08/2025) | |
| | | 126 | 05/08/2025 | MINUTE ENTRY for proceedings held before Judge Kevin J. Doyle: Telephone Conference held on 5/8/2025. Monica Allard, Esq. present for petitioner. Michael Drescher, AUSA present for respondent. Statements by counsel re: bail hearing. (Court Reporter: Johanna Masse) (law) (Entered: 05/08/2025) | |
| | | 127 | 05/08/2025 | ORDER granting 121 Motion to Withdraw as Attorney. Signed by Judge William K. Sessions III on 5/8/2025. (This is a text-only Order.) (eae) (Entered: 05/08/2025) | |
| ☐ | Online | 128 | 05/08/2025 | SECOND REVISED NOTICE of Hearing: Bail Hearing reset for 5/9/2025 10:00 AM in Burlington Courtroom 110 before Judge William K. Sessions III. (Note: petitioner to participate remotely) (law) Text clarified and Main Document 128 replaced on 5/8/2025 (law) (Entered: 05/08/2025) | |
| | | 129 | 05/08/2025 | ZOOM LINK for 5/9/2025 - ZoomGov Meeting https://vt-uscourts.zoomgov.com/j/1616772338? pwd=MHR2awlyeIgo0KHqU7VbgUx53LmzJe.1 or One tap mobile: +16468287666, 1617910049 US (New York); Meeting ID: 161 677 2338 Passcode: 238539. (law) Please be reminded that Judicial Conference policy prohibits the broadcasting of proceedings in federal courts. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, or rebroadcasting of court proceedings pursuant to Judicial Conference policy. This prohibition applies to counsel, the parties, the media and any member of the public. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. (Entered: 05/08/2025) | |

JA-000541

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | 130 | 05/09/2025 | MINUTE ENTRY for proceedings held before Judge William K. Sessions III: Bail Hearing held on 5/9/2025. Adriana Lafaille, Jessie Rossman, Julian Bava, Lia Ernst, Monica Allard, Mudassar Toppa, Noor Zafar and Richael Davidson, Esqs. present for petitioner. Mahsa Khanbabai, Esq. present with petitioner remotely. Michael Drescher, AUSA present for respondents. Court inquires petitioner's waiver of personal appearance. The following witnesses examined for petitioner: Rumeysa Ozturk, Dr. McCannon, S. Johnson, and B. Penberthy. Statements by counsel. Court makes findings. ORDERED: petitioner to be released immediately on PR w/conditions; gov't is to notify the court when she is released; gov't to submit proposed order as to conditions of release after conferring with ICE. (Court Reporter: Johanna Masse) (law) (Entered: 05/09/2025) | |
| ☐ | Free | 131 | 05/09/2025 | ORDER: Petitioner is to be released from ICE custody immediately on her own recognizance, without any form of Body-Worn GPS or other ICE monitoring at this time. Petitioner is not subject to any travel restrictions. Respondents counsel shall submit proposed conditions of release after conferring with ICE no later than 5/12/2025. Signed by Judge William K. Sessions III on 5/9/2025. (hbc) (Entered: 05/09/2025) | |
| ☐ | Online | 132 | 05/12/2025 | TRANSCRIPT of Bail hearing held on May 9, 2025, before Judge William K. Sessions III. Court Reporter/Transcriber Johanna Masse, telephone number (802) 951-8102. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/5/2025. Redacted Transcript Deadline set for 6/16/2025. Release of Transcript Restriction set for 8/14/2025. (law) (Entered: 05/12/2025) | |
| ☐ | Online | 133 | 05/12/2025 | REQUEST for Conditions of Release filed by Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd Lyons, Kristi Noem. (Attachments: # 1 Exhibit 1, # 2 Proposed Order)(Drescher, Michael) Text clarified on 5/12/2025 (law). (Entered: 05/12/2025) | |
| ☐ | Online | 134 | 05/12/2025 | STIPULATED MOTION for Status Conference filed by Rumeysa Ozturk. (Allard, Monica) (Entered: 05/12/2025) | |
| ☐ | Online | 135 | 05/13/2025 | UNOPPOSED MOTION to Redesignate Case filed by Rumeysa Ozturk. (Allard, Monica) Text clarified on 5/13/2025 (law). (Entered: 05/13/2025) | |
| ☐ | Online | 136 | 05/13/2025 | DECLARATION of Becky Penberthy by Becky Penberthy. (Allard, Monica) (Entered: 05/13/2025) | |
| ☐ | Online | 137 | 05/14/2025 | NOTICE of Hearing: Telephone Conference set for 5/15/2025 01:30 PM before Judge William K. Sessions III.(law) (Entered: 05/14/2025) | |
| | | | 05/14/2025 | **ZOOM LINK for 5/15/2025 (audio only, no video) - ZoomGov Meeting https://vt-uscourts.zoomgov.com/j/1602099446? pwd=7HX3WOEJE8d9InCqEnj8BYvj2Impjt.1 or One tap mobile +16692545252, 1602099446 US (San Jose) or +16468287666, 1602099446 US (New York); Meeting ID: 160 209 9446 and Passcode: 712578. Please be reminded that Judicial Conference policy prohibits the broadcasting of proceedings in federal courts. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, or rebroadcasting of court proceedings pursuant to Judicial Conference policy. This prohibition applies to counsel, the parties, the media and any member of the public. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. (law) (Entered: 05/14/2025) | |
| ☐ | Online | 138 | 05/14/2025 | RESPONSE in Opposition re 133 REQUEST for Conditions of Release filed by Rumeysa Ozturk. (Allard, Monica) (Entered: 05/14/2025) | |
| | | 139 | 05/15/2025 | MINUTE ENTRY for proceedings held before Judge William K. Sessions III: Telephone Conference held on 5/15/2025. Adriana Lafaille, Esq. present for petitioner and Michael Drescher, AUSA present for respondents. Court reviews proposed release conditions. Statements by counsel re: briefing schedule. ORDERED: petitioner to file briefing on discovery within 30 days and gov't to respond within 10 days; hearing on 5/22/2025 is cancelled; and granting 135 Unopposed Motion to Redesignate Case. (Court Reporter: Johanna Masse) (law) (Entered: 05/15/2025) | |
| ☐ | Free | 140 | 05/16/2025 | OPINION AND ORDER granting 82 Motion for Release Under MAPP v. RENO. Signed by Judge William K. Sessions III on 5/16/2025. (law) (Entered: 05/16/2025) | |
| ☐ | Free | 141 | 05/16/2025 | ORDER granting in part and denying in part 133 Request for Conditions of Release. Signed by Judge William K. Sessions III on 5/16/2025. (law) | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | (Entered: 05/16/2025) | |
| ☐ | Online | 142 | 05/22/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Michael Tan (Filing fee $ 150 receipt number AVTDC-2079505) filed by Rumeysa Ozturk (Attachments: # 1 Affidavit of Michael Tan, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 5/22/2025 to clarify text/attachment (sjl). (Entered: 05/22/2025) | |
| | | 143 | 05/23/2025 | ORDER granting 142 Motion for Admission Pro Hac Vice of Michael K.T. Tan. Signed by Judge William K. Sessions III on 5/23/2025. (This is a text-only Order.) (eae) (Entered: 05/23/2025) | |
| ☐ | Online | 144 | 05/23/2025 | TRANSCRIPT filed for date(s) of 5/15/2025 before Judge William K. Sessions III as to 105 Notice of Appeal. Court Reporter/Transcriber Johanna Masse, telephone number (802) 951-8102. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 6/16/2025. Redacted Transcript Deadline set for 6/26/2025. Release of Transcript Restriction set for 8/25/2025. (hbc) (Entered: 05/23/2025) | |
| ☐ | Free | 145 | 05/23/2025 | MOTION for Preliminary Injunction Requiring Restoring SEVIS Record with Request for Oral Argument/Hearing filed by Rumeysa Ozturk (Attachments: # 1 Declaration of Anna Garson, # 2 Declaration of Dahlia M. French) (Lafaille, Adriana) (Attachment 1 replaced and Additional attachment(s) added on 5/27/2025: # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5) (law). (Entered: 05/23/2025) | |
| ☐ | Online | 146 | 05/27/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 145 MOTION for Preliminary Injunction Requiring Restoring SEVIS Record filed by Rumeysa Ozturk. The Declaration of Anna Garson was uploaded with its exhibits as a singular PDF. The documents have been broken apart and reattached on the docket. They are now separately attached to 145 and this entry. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (law) (Entered: 05/27/2025) | |
| ☐ | Online | 147 | 05/28/2025 | TRANSMITTED Supplemental Index on Appeal, Circuit No. 25-1019, re: 105 Notice of Appeal (Attachments: # 1 Partial Docket Sheet, # 2 Partial Docket Sheet (sealed), # 3 Clerk's Certification)(kac) (Entered: 05/28/2025) | |
| ☐ | Free | 148 | 06/02/2025 | RESPONSE in Opposition re 145 MOTION for Preliminary Injunction Requiring Restoring SEVIS Record filed by Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd Lyons, Kristi Noem. (Attachments: # 1 Exhibit A) (same document as 149 (Drescher, Michael) Text clarified on 6/3/2025 (law). (Entered: 06/02/2025) | |
| ☐ | Free | 149 | 06/02/2025 | MOTION to Dismiss Case for Lack of Jurisdiction and Improper Venue filed by Patricia Hyde, Michael Krol, Todd Lyons, Kristi Noem, Marco A. Rubio, Donald J Trump. (Attachments: # 1 Exhibit A) (same document as 148 ) (law) (Entered: 06/03/2025) | |
| ☐ | Free | 150 | 06/16/2025 | MOTION for Discovery in Advance of Habeas Hearing with Request for Oral Argument/Hearing filed by Rumeysa Ozturk (Attachments: # 1 Proposed Requests for Production, # 2 Proposed Interrogatories, # 3 Proposed Requests for Admission)(Levitova, Sonya) (Entered: 06/16/2025) | |
| ☐ | Free | 151 | 06/16/2025 | REPLY to Response to 145 MOTION for Preliminary Injunction Requiring Restoring SEVIS Record filed by Rumeysa Ozturk. (same document as 152 ) (Lafaille, Adriana) (Entered: 06/16/2025) | |
| ☐ | Free | 152 | 06/16/2025 | RESPONSE in Opposition re 149 MOTION to Dismiss Case for Lack of Jurisdiction and Improper Venue filed by Rumeysa Ozturk. (same document as 151 ) (Lafaille, Adriana) (Entered: 06/16/2025) | |
| ☐ | Free | 153 | 06/24/2025 | STIPULATED MOTION for Extension of Time to File Response/Reply as to 150 MOTION for Discovery in Advance of Habeas Hearing filed by Patricia Hyde, Michael Krol, Donald J Trump, Marco A. Rubio, Todd Lyons, Kristi Noem(Drescher, Michael) (Entered: 06/24/2025) | |
| | | 154 | 06/24/2025 | ORDER granting 153 STIPULATED MOTION for Extension of Time to File Response/Reply as to 150 MOTION for Discovery in Advance of Habeas Hearing. Signed by Judge William K. Sessions III on 6/24/2025. (This is a text-only Order.) (eae) (Entered: 06/24/2025) | |

Retrieve Document(s)

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

JA-000543



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX ™

Copyright © 2025 LexisNexis.