# No. 25-1019

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

RÜMEYSA ÖZTÜRK,

*Petitioner-Appellee*

v.

PATRICIA HYDE, in her official capacity as the New England Field Director for U.S. Immigration and Customs Enforcement; MICHAEL KROL, in his official capacity as HSI New England Special Agent in Charge, U.S. Immigration and Customs Enforcement; TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; MARCO RUBIO, in his official capacity as Secretary of State; DONALD J. TRUMP, in his official capacity as President of the United States,

*Respondents-Appellants.*

On Appeal from the United States District Court for the District of Vermont, Case No. 2:25-cv-374 (Hon. William K. Sessions, III)

## CONSENT BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, COMMITTEE TO PROTECT JOURNALISTS, PEN AMERICA, REPORTERS WITHOUT BORDERS, AND STUDENT PRESS LAW CENTER IN SUPPORT OF PETITIONER-APPELLEE

*Continued on the next page*

Gabriel Rottman
   *Counsel of record*
Lisa Zycherman
Mara Gassmann*
Allyson Veile*
Ellen Goodrich*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300

## CORPORATE DISCLOSURE STATEMENTS

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

The Committee to Protect Journalists is a nonprofit organization no parent corporation and no stock.

PEN American Center, Inc. ("PEN America") has no parent or affiliate corporation.

Reporters Without Borders, or Reporters sans frontières (RSF), is a nonprofit association with no parent corporation and no subsidiaries.

Student Press Law Center is a 501(c)(3) not-for-profit corporation that has no parent and issues no stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................iii

SOURCE OF AUTHORITY TO FILE ................................................viii

FED. R. APP. P. 29(a)(4)(E) STATEMENT.........................................viii

IDENTITY AND INTEREST OF AMICI CURIAE ..............................1

INTRODUCTION ..................................................................................5

ARGUMENT..........................................................................................9

   I.   Non-citizen journalists perform important public interest newsgathering and reporting every day. .........................................9

   II.   Crediting the government's jurisdiction-stripping arguments will chill newsgathering and reporting in the public interest...........................15

   III.   The availability of habeas relief for retaliatory detention is especially important because the statutes cited here nominally permit the government to seek removal based on protected speech. ..........................18

CONCLUSION ....................................................................................25

CERTIFICATE OF COMPLIANCE ..................................................26

CERTIFICATE OF SERVICE ...........................................................27

ii

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ................................................................16

*Bridges v. Wixon*,
  326 U.S. 135 (1945) .......................................................... 9, 12

*Demore v. Kim*,
  538 U.S. 510 (2003) ................................................................22

*Dep't of Homeland Sec. v. Thuraissigiam*,
  591 U.S. 103 (2020) ........................................................ 21, 24

*Elrod v. Burns*,
  427 U.S. 347 (1976) ................................................................16

*Husain v. Springer*,
  494 F.3d 108 (2d Cir. 2007) .......................................... 13, 14

*Iancu v. Brunetti*,
  588 U.S. 388 (2019) ................................................................13

*Khalil v. Trump*,
  No. 25-CV-01963, 2025 WL 1514713 (D.N.J. May 28, 2025) ........................20

*Lovell v. City of Griffin*,
  303 U.S. 444 (1938) ................................................................14

*Lozman v. City of Riviera Beach*,
  585 U.S. 87 (2019) ................................................................16

*Marbury v. Madison,*
    5 U.S. 137 (1803)..................................................................................20

*Massieu v. Reno,*
    91 F.3d 416 (3d Cir. 1996) ................................................................20

*Massieu v. Reno,*
    915 F. Supp. 681 (D.N.J. 1996)........................................................19

*Matal v. Tam,*
    582 U.S. 218 (2017)............................................................................13

*Miami Herald Pub. Co. v. Tornillo,*
    418 U.S. 241 (1974)............................................................................14

*Mills v. State of Ala.,*
    384 U.S. 214 (1966)............................................................................14

*Neb. Press Ass'n v. Stuart,*
    427 U.S. 539 (1976)..................................................................... 15, 21

*Öztürk v. Trump,*
    779 F. Supp. 3d 462 (D. Vt. 2025)....................................... 6, 8, 13, 24

*Öztürk v. Trump,*
    No. 2:25-CV-374, 2025 WL 1420540 (D. Vt. May 16, 2025). ............6

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999)..................................................................... 22, 23

*Rosenberger v. Rector & Visitors of Univ. of Virginia,*
    515 U.S. 819 (1995)............................................................................13

*Velasco Lopez v. Decker*,
  978 F.3d 842 (2d Cir. 2020) .................................................................21

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ...........................................................................23

**Statutes**

28 U.S.C. § 2241(c)(3) .........................................................................21

8 U.S.C. § 1182(a)(3)(C)(iv) ................................................................19

8 U.S.C. § 1201(i) ........................................................................... 19, 22

8 U.S.C. § 1226(e) .......................................................................... 21, 22

8 U.S.C. § 1227(a)(4)(C)(i) ..................................................................19

8 U.S.C. § 1252(g) .......................................................................... 22, 23

8 U.S.C. § 1252(a)(5) ............................................................................22

8 U.S.C. § 1252(b)(9) ............................................................................22

**Other Authorities**

Aneer Rukh-Kamaa, *U.S. Nonimmigrant Admissions: 2023*,
  U.S. Dep't of Homeland Sec., Office of Statistics (Aug. 2024),
  https://perma.cc/4L3U-UC6V ...........................................................9

Angela Fu, *Foreign Journalists in the U.S. are Self-Censoring to Protect
  Themselves from the Trump Administration*, Poynter (July 14, 2025),
  https://perma.cc/CY3Z-ZYG6 ...........................................................17

*Editorial Writing*, The Pulitzer Prizes,
   https://www.pulitzer.org/prize-winners-by-category/214 (last visited Aug.
   15, 2025)................................................................................................7

*Finalist: Staff of The Wall Street Journal*, The Pulitzer Prizes,
   http://bit.ly/4fcczDv (last visited June 13, 2025). ...........................................10

Jesus Jiménez, *Jorge Ramos to Leave Univision After 40 Years at the Network*,
   N.Y. Times (Sept. 9, 2024),
   https://perma.cc/WQ53-QTTD. ........................................................................11

John S. Clayton, Note, *Policing the Press: Retaliatory Arrests of Newsgatherers
   After* Nieves v. Bartlett, 120 Colum. L. Rev. 2275, 2289 (2020). ...................15

*Lingling Wei*, Wall St. J.,
   https://perma.cc/9434-86H3 (last visited July 30, 2025)...............................10

Lingling Wei et al., *China Puts Six-Month Limit on Its Ease of Rare-Earth Export
   Licenses*, Wall St. J. (June 11, 2025),
   https://perma.cc/U55V-8J99 ..........................................................................10

Lingling Wei et al., *China Tries to Play the Role of Peacemaker in Ukraine*,
   Wall St. J. (Feb. 13, 2025),
   https://perma.cc/X8JM-7UVG .......................................................................11

Lingling Wei, *Behind Xi Jinping's Pivot on Broad China Stimulus*,
   Wall St. J. (Oct. 15, 2024),
   https://perma.cc/6DZY-SQXC. .......................................................................11

Lingling Wei, *Forced to Leave China—and My Family*,
   Wall St. J. (June 6, 2020),
   https://perma.cc/PRE2-RFUA.........................................................................10

Peter Schurmann, *Amid Deportations, Immigrant Journalists Face Heightened Risks for Their Reporting*, American Community Media (Apr. 24, 2025), https://perma.cc/X4HD-5RMA..........................................................................17

Rigoberto Hernandez, *Journalist Jorge Ramos Takes on Obama, Republicans*, NPR (Feb. 2, 2015), https://perma.cc/E6M2-L8VK..........................................................................11

Stephania Taladrid, *Jorge Ramos, the Voice of Latino America*, The New Yorker (Aug. 17, 2024), https://perma.cc/YQZ5-ELW3................................................................. 11, 12

**Treatises**

3 William Blackstone, Commentaries on the Laws of England at 23............21

## SOURCE OF AUTHORITY TO FILE

Petitioner-Appellee and Respondents-Appellants have consented to the filing of this brief, and it is thus filed pursuant to Federal Rule of Appellate Procedure 29(a)(2).

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

The Reporters Committee for Freedom of the Press declares that:

1. no party's counsel authored the brief in whole or in part;

2. no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and

3. no person, other than amici, their members or their counsel, contributed money intended to fund the preparation or submission of this brief.

## IDENTITY AND INTEREST OF AMICI CURIAE

Proposed amici curiae are the Reporters Committee for Freedom of the Press ("Reporters Committee"), the Committee to Protect Journalists ("CPJ"), PEN America, Reporters Without Borders, and the Student Press Law Center ("SPLC"), (together, "amici"), organizations that work to defend the First Amendment and newsgathering rights of journalists. Amici have an interest in ensuring that the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*, is not interpreted and enforced in a manner that hinders or dissuades the press from gathering and reporting the news.

The government's proposed interpretation of the jurisdiction-stripping provisions of the INA, 8 U.S.C. §§ 1201(i), 1226(e), 1252(a)(5), 1252(b)(9), and 1252(g), would grant the executive effectively unreviewable discretion to detain non-citizen journalists, based on reporting perceived as unfavorable or critical, until an order of removal is entered and a petition for review can be filed. Amici write to underscore the extraordinary

1

chilling effect on newsgathering and reporting in the public interest that would result from this interpretation were it accepted by the courts.

Lead amicus, the Reporters Committee, is an unincorporated nonprofit association founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide *pro bono* legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists. The Reporters Committee regularly files in this Court on issues of First Amendment significance. *See, e.g.*, Br. of Amici Curiae Reporters Comm. for Freedom of the Press & Other Orgs., *Courthouse News Serv. v. Gabel*, No. 21-3098 (2d Cir. Jul. 12, 2022; Br. of Amici Curiae Reporters Comm. for Freedom of the Press & Wall St. J., *Massimino v. Benoit*, No. 25-1104 (2d Cir. Aug. 18, 2025); Br. of Amici Curiae Reporters Comm. for Freedom of the Press & Other Orgs., *Giuffre v. Maxwell*, No. 18-2868 (2d Cir. Dec. 17, 2018).

CPJ is an independent, nonprofit organization that was founded in 1981 to promote press freedom worldwide. It defends the right of journalists to report the news without fear of reprisal. CPJ is a global organization headquartered in New York City. CPJ's board of directors is composed of prominent journalists, media executives, and leaders from related professions.

PEN America is a non-partisan, not-for-profit organization dedicated to creative expression and the liberties that make it possible. Founded in 1922, PEN America engages in advocacy, research, and public programming related to free expression in the United States and around the world. PEN America stands for the unhampered transmission of thought within each nation and between all nations, working to ensure that people everywhere have the freedom to create literature, to convey information and ideas, express their views, and access the views, ideas, and literatures of others. PEN America has engaged in research and advocacy related to protest rights and the free speech rights of immigrants.

Reporters Without Borders, also known under its French name Reporters sans frontières (RSF), is an international non-governmental organization defending freedom, independence, and pluralism of journalism. RSF has a significant interest in protecting freedom of expression and the ability of journalists to gather and report news.

SPLC is a nonprofit, nonpartisan organization which, since 1974, has been the nation's only legal assistance agency devoted exclusively to educating high school and college journalists about the rights and responsibilities embodied in the First Amendment to the Constitution of the United States. SPLC provides free legal assistance, information and educational materials for student journalists on a variety of legal topics.

## INTRODUCTION

Were they credited, the government's jurisdiction-stripping arguments in this case would create a potent means of suppressing public interest newsgathering and reporting that officials perceive as critical or unfavorable.  The government is claiming unfettered power to detain non-citizens, expressly based on First Amendment-protected speech, including reportage, without any immediate judicial recourse.  That is not the law, and it is essential that federal district courts be able to entertain quickly a habeas petition alleging the retaliatory detention of a non-citizen journalist.  Anything less would allow the executive branch to silence disfavored non-citizen journalists through an unconstitutional detention, without any review of its constitutionality until a final removal order is entered and a petition for review can be filed.

Indeed, in this case, Petitioner-Appellee Rümeysa Öztürk spent over a month in an immigration detention facility following the revocation of her student visa a year after she co-bylined an op-ed in her university's newspaper.  Government officials have thus far cited only the op-ed as a

reason for her visa revocation and detention. *Öztürk v. Trump*, 779 F. Supp. 3d 462, 489 (D. Vt. 2025) (describing memorandum by senior official of the Bureau of Consular Affairs as reflecting that "ICE and DHS had made an assessment that Ms. Öztürk had been involved in associations that may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization including co-authoring an op-ed that found common cause with an organization that was later temporarily banned from campus." (internal quotations omitted)); *see also id*. at 490 ("The only specific act cited by the government so far as justification for any of their adverse actions towards Ms. Öztürk is her co-authored op-ed.").

In these proceedings, the government has not taken "the opportunity to rebut Ms. Öztürk's evidence showing that her op-ed is the but-for cause of her detention." *Öztürk v. Trump*, No. 2:25-CV-374, 2025 WL 1420540, at *6 (D. Vt. May 16, 2025). Irrespective of the topic of the op-ed, or the fact that Ms. Öztürk is a graduate student and not a professional journalist, all indications are that this detention was based—at least in part and possibly

6

entirely—on what is indisputably journalistic activity. *See, e.g.*, *Editorial Writing*, The Pulitzer Prizes, https://www.pulitzer.org/prize-winners-by-category/214 (last visited Aug. 15, 2025).

Amici offer three arguments in support of Ms. Öztürk.

First, the impact of the government's use of detention for non-citizens under these circumstances, particularly if Ms. Öztürk were deprived of the right to seek habeas relief, will have consequences that extend beyond this case. There are many non-citizen journalists in the United States, and they perform public interest newsgathering and reporting every day. Indeed, they are often uniquely situated to report on certain topics and communities. They have special linguistic, cultural, geographic, and other knowledge that makes their reporting particularly valuable. To the extent they can be detained at will, based expressly on their reporting, the absence of speedy judicial review would mean that specific news beats— immigration enforcement, for instance—could be chilled more than others. That presents a particularly insidious form of viewpoint discrimination.

Second, the district court's decision to find jurisdiction to consider Ms. Öztürk's habeas petition should be affirmed. Any other result would give the government "practically limitless, unreviewable power to detain individuals for weeks or months, even if the detention is patently unconstitutional." *Öztürk*, 779 F. Supp. 3d at 486. The predictable consequence of such a ruling would be to chill a vast amount of speech, especially by non-citizen journalists fearful that aggressive reporting on sensitive topics could lead to their detention.

Third, the underlying provisions in the INA cited by the government, read literally and in isolation, could permit officials to seek the removal of non-citizen journalists based on reporting that the government says could harm "foreign policy" or that the Secretary of State otherwise perceives as critical or unfavorable. Because those provisions are almost certainly unconstitutional, it is especially imperative that individuals detained under these provisions be able to bring a habeas claim to challenge the constitutionality of their detentions.

For all of these reasons, amici urge this court to reject the

government's jurisdiction-stripping arguments.

## ARGUMENT

## I. Non-citizen journalists perform important public interest newsgathering and reporting every day.

There are many thousands of non-citizen journalists working in the

United States whose speech is entitled to full First Amendment protection.

*See, e.g.*, *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and

of press is accorded aliens residing in this country.").  For instance, the

primary non-immigrant visa for foreign journalists working for foreign

publications is the I-Visa.  There were 12,150 journalists admitted on that

visa in 2021, 25,270 admitted in 2022, and 32,470 admitted in 2023.  *See*

Aneer Rukh-Kamaa, *U.S. Nonimmigrant Admissions: 2023*, U.S. Dep't of

Homeland Sec., Office of Statistics, at 2 (Aug. 2024), https://perma.cc/4L3U-

UC6V.  There are many more non-citizen journalists working under

different visas or who are permanent residents.

Foreign-born and non-citizen journalists are often uniquely situated

to report or write on topics of importance based on particular personal

experiences and cultural understandings. For example, Lingling Wei is the chief China correspondent for *The Wall Street Journal*, based in New York. *Lingling Wei,* Wall St. J., https://perma.cc/9434-86H3 (last visited July 30, 2025). Wei is a Chinese-born reporter who became a naturalized U.S. citizen in 2010, after she had spent eleven years studying and then working as a journalist in New York. Lingling Wei, *Forced to Leave China—and My Family*, Wall St. J. (June 6, 2020), https://perma.cc/PRE2-RFUA. After becoming a naturalized citizen, Wei worked for a decade in the *Journal*'s China Bureau, but she was expelled from China in 2020 along with several other American journalists, at which point she returned to the U.S. *Id.* She and several other members of the staff of the *Journal's* Beijing Bureau were finalists for a Pulitzer Prize in 2021 for their in-depth series on China's leader, Xi Jinping. *See Finalist: Staff of The Wall Street Journal*, The Pulitzer Prizes, http://bit.ly/4fcczDv (last visited June 13, 2025). Wei's recent work has included coverage of U.S.-China trade negotiations, Lingling Wei et al., *China Puts Six-Month Limit on Its Ease of Rare-Earth Export Licenses*, Wall St. J. (June 11, 2025), https://perma.cc/U55V-8J99; China's involvement in

negotiations to end the war in Ukraine, Lingling Wei et al., *China Tries to Play the Role of Peacemaker in Ukraine*, Wall St. J. (Feb. 13, 2025), https://perma.cc/X8JM-7UVG; as well as Chinese domestic affairs,  Lingling Wei, *Behind Xi Jinping's Pivot on Broad China Stimulus*, Wall St. J. (Oct. 15, 2024), https://perma.cc/6DZY-SQXC.

Similarly, Jorge Ramos worked for forty years as a news anchor based in Miami for Univision, providing news coverage to the Spanish-speaking community in the United States.  Jesus Jiménez, *Jorge Ramos to Leave Univision After 40 Years at the Network*, N.Y. Times, (Sept. 9, 2024), https://perma.cc/WQ53-QTTD.  Ramos immigrated to the United States from Mexico on a student visa in 1983 and did not become a U.S. citizen until 2008.  Rigoberto Hernandez, *Journalist Jorge Ramos Takes on Obama, Republicans*, NPR (Feb. 2, 2015), https://perma.cc/E6M2-L8VK.  He has been called the "Walter Cronkite of Latino America" and his nightly news show averaged over a million viewers.  *Id.*  As an immigrant himself, he is well-positioned to serve the informational needs of his audience.  Stephania Taladrid, *Jorge Ramos, the Voice of Latino America*, The New Yorker (Aug. 17,

2024), https://perma.cc/YQZ5-ELW3.  His background and skills have allowed to him to interview not only sitting U.S. Presidents, such as Barack Obama and George W. Bush, but also Spanish-speaking leaders of many Latin American countries, including Fidel Castro and Hugo Chávez.  *Id.* As such, his reporting offers unique insights into his subjects.  *Id.*

As these examples illustrate, foreign-born journalists who come to the United States and work as non-citizens—whether they ultimately seek naturalization or not—often possess specialized linguistic and cultural knowledge that makes them particularly skilled at covering certain topics or subjects, irrespective of citizenship status.  And the editorial content they produce, including their viewpoints, are unquestionably First Amendment-protected speech.  *See Bridges*, 326 U.S. at 148. In that way, the chilling effect from detentions like Ms. Öztürk's operate like a content- or viewpoint-based restriction on speech, suppressing, for example, hard-hitting coverage of increased immigration enforcement or other politically sensitive topics.  *See, e.g.*, Part II, *infra* at 17–18.  Courts have rejected viewpoint discrimination as antithetical to our nation's First Amendment,

and it is virtually never permitted. *See, e.g., Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is thus an egregious form of content discrimination."); *Matal v. Tam*, 582 U.S. 218, 234 (2017) ("The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring) (calling viewpoint discrimination "poison to a free society"); *Husain v. Springer*, 494 F.3d 108, 124 (2d Cir. 2007) (universities "may not censor, retaliate, or otherwise chill [student media] outlet's speech, or the speech of the student journalists who produce it, on the basis of content or viewpoints expressed through that outlet"). Yet that is what the government does when it uses its immigration enforcement authorities to thumb the scale of public discourse in its own favor.

And it bears further emphasis that the government has claimed the authority to detain someone based, at least in part if not entirely, on an *op-ed* expressing a viewpoint that the government says is contrary to U.S. foreign policy. *See Öztürk*, 779 F. Supp. 3d at 473. But from the beginning,

13

"a major purpose of" the First Amendment was "to protect the free discussion of governmental affairs" in editorials such as these, from newspapers and magazines to "humble leaflets and circulars." *Mills v. State of Ala.*, 384 U.S. 214, 218–19 (1966) (citing *Lovell v. City of Griffin*, 303 U.S. 444 (1938)) ("Suppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change, which is all that this editorial did, muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free."); *see also Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 255 (1974) (emphasizing importance of editorial independence of press); *Husain*, 494 F.3d at 131 (2d Cir. 2007) (concluding that retaliation against student newspaper's publication of editorials violated First Amendment).  The viewpoint-discrimination facilitated by the government's interpretation of the INA applied to Ms. Öztürk's op-ed is precisely the kind of "poison" the Constitution forbids.

**II.     Crediting the government's jurisdiction-stripping arguments will chill newsgathering and reporting in the public interest.**

The government's jurisdiction-stripping arguments in this case can be distilled into one circular sentence:  Because officials chose to detain Ms. Öztürk following her visa revocation and before seeking a removal order, her detention arises from the removal proceeding and therefore the constitutionality of her detention is unreviewable under a district court habeas petition.  *See, e.g.*, Appellants' Br. at 32 (arguing "detention and removal proceedings go hand-in-hand").  That is a staggering claim of authority, and one that poses particular dangers for non-citizen journalists.

A retaliatory detention has an "immediate and irreversible" impact on the right to gather and report the news, as much so as any classic prior restraint.  *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).  For instance, in the context of on-the-scene newsgathering, the arrest of a journalist prevents the capture of "a unique set of images that might otherwise hold officials accountable."  John S. Clayton, Note, *Policing the Press: Retaliatory Arrests of Newsgatherers After* Nieves v. Bartlett, 120 Colum. L. Rev. 2275, 2289 (2020).  Addressing detentions and arrests generally, the Supreme

Court has recognized that "some police officers may exploit the arrest power as a means of suppressing speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 99 (2019). As such, the danger of the government imposing retaliatory detentions on disfavored journalists would be an extreme form of First Amendment injury. Indeed, the "loss of First Amendment freedoms, *for even minimal amounts of time*, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (emphasis added).

In addition to the immediate freeze on newsgathering and reporting by the detained journalist, the threat of indefinite detention could also unquestionably chill *other* non-citizen journalists from reporting on matters that may prove politically controversial. "[E]ven minor punishments can chill protected speech," *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002), and immigration detention pending adjudication can last for months or years. Non-citizen journalists faced with the risk of months-long detention may be discouraged from reporting or publishing on matters that could

draw the attention of immigration authorities—further suppressing First
Amendment-protected activity.

There are indications this is already happening.  Some non-citizen
journalists based in the United States are taking steps to self-censor in
response to the Trump administration's stepped-up immigration
enforcement.  *See, e.g.*, Angela Fu, *Foreign Journalists in the U.S. are Self-
Censoring to Protect Themselves from the Trump Administration*, Poynter (July
14, 2025), https://perma.cc/CY3Z-ZYG6.

Estefania Bermudez, for example, is a reporter based in Detroit who
is also a DACA recipient.  She told American Community Media she is
often asked to cover ICE raids in Michigan because of her "rooted
perspective" and expertise with the immigration system.  Peter
Schurmann, *Amid Deportations, Immigrant Journalists Face Heightened Risks
for Their Reporting*, American Community Media (Apr. 24, 2025),
https://perma.cc/X4HD-5RMA.  Bermudez has personally reported the
chilling effect of the government's immigration enforcement tactics, stating

that she is now more likely to turn down certain stories because she fears her reporting could make her a target. *Id.*

Were the government's jurisdiction-stripping arguments credited, the threat of detention based expressly on protected speech, including news reporting, would significantly amplify this chilling effect.

## III. The availability of habeas relief for retaliatory detention is especially important because the statutes cited here nominally permit the government to seek removal based on protected speech.

The government's statutory basis for detaining Ms. Öztürk and seeking her removal has shifted between its SEVIS termination notification, which cited in substantive part 8 U.S.C. § 1227(a)(4)(C)(i), *see* Am. Pet. ¶ 33 (ECF 12), and the Notice to Appear served on Ms. Öztürk, which charged her as removable under 8 U.S.C. § 1227(a)(1)(B), *see id*. ¶ 35. Both of those statutory grounds nominally provide the Secretary of State extraordinary discretion to deem a non-citizen removable based on protected speech.

The former statute permits the Secretary of State to seek removal based on the Secretary's belief that the non-citizen's "presence or activities in the United States . . . would have potentially serious adverse foreign

policy consequences." 8 U.S.C. § 1227(a)(4)(C)(i). That provision—through § 1227(a)(4)(C)(ii)'s incorporation of the exceptions of 8 U.S.C. § 1182(a)(3)(C)—also nominally permits the Secretary to explicitly base a deportation decision on a non-citizen's "past, current, or expected beliefs, statements, or associations" when "such beliefs, statements, or associations would be lawful within the United States," so long as the Secretary "personally determines that the alien's admission would compromise a compelling United States foreign policy interest," *id.* § 1182(a)(3)(C)(iii), and certifies as much to Congress. *Id.* 8 U.S.C. § 1182(a)(3)(C)(iv). And the latter statute, 8 U.S.C. § 1227(a)(1)(B), referring to discretionary visa revocation under 8 U.S.C. § 1201(i), provides that the Secretary "may at any time, in his discretion, revoke such visa or other documentation."

Indeed, the "foreign policy grounds" in § 1227(a)(4)(C)(i) have been found by multiple courts as likely unconstitutional because of that unbounded discretion. In *Massieu v. Reno*, the district court found it unconstitutionally vague because "there is no conceivable way that an alien could know, *ex-ante*, how to conform his or her activities to the

19

requirements of the law" when foreign policy is "unpublished, ever-changing, and often highly confidential." 915 F. Supp. 681, 700 (D.N.J. 1996), *overruled on other grounds*, 91 F.3d 416, 426 (3d Cir. 1996). And in a recent case, another district court found it likely unconstitutional when invoked based on protected expression. *See Khalil v. Trump*, No. 25-CV-01963, 2025 WL 1514713, at *50–52 (D.N.J. May 28, 2025) (finding a lawful permanent resident likely to succeed on merits of as-applied vagueness challenge to "foreign policy grounds" in § 1227 and § 1182, collectively). And even if the government's basis for the detention in this case is § 1201(i)— the Secretary's freestanding authority to revoke visas "in his discretion"—constitutional issues clearly remain were the government to detain anyone based explicitly on First Amendment-protected speech.

Permitting the government to detain a non-citizen without any judicial recourse as it seeks removal would violate a first principle of our constitutional order—that where there is a constitutional wrong, there must be a remedy. *Marbury v. Madison*, 5 U.S. 137, 163 (1803) ("[W]here there is a legal right, there is also a legal remedy by suit or action at law,

whenever that right is invaded" (quoting 3 William Blackstone, Commentaries on the Laws of England at 23)); *see also* 28 U.S.C. § 2241(c)(3) (providing jurisdiction to extend writ of habeas corpus to those "in custody in violation of the Constitution"). After all, the constitutional core of habeas is to preserve a "means to secure *release* from unlawful detention," *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107 (2020), including unconstitutional detention.

The government nevertheless urges this Court to decline to find jurisdiction, which would functionally prolong Ms. Öztürk's detention until her removal proceedings have concluded. Because "each passing day" speech is burdened is a new infringement on the public's and the press's right to speak, that result would be intolerable under the First Amendment. *Neb. Press Ass'n*, 427 U.S. at 580. As the district court rightly held, such a result is clearly not required by the jurisdiction-stripping provisions of the INA on which the government relies. Namely, 8 U.S.C. § 1226(e) does not "limit habeas jurisdiction over constitutional claims," *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020), and the other

provisions on which the government relies—8 U.S.C. § 1201(i), 8 U.S.C. §

1252(g), 8 U.S.C. § 1252(a)(5), and 8 U.S.C. § 1252(b)(9)—do not strip courts

of jurisdiction to review claims for relief arising from detention.

Any other conclusion would bring the INA into direct conflict with

both the First Amendment and the Suspension Clause. The Supreme Court

has cautioned that where "Congress intends to preclude judicial review of

constitutional claims, its intent to do so must be clear," and has accordingly

been hesitant to read the INA's jurisdiction-stripping provisions as

precluding review of constitutional challenges to the INA itself. *See Demore*

*v. Kim*, 538 U.S. 510, 517 (2003) (finding 8 U.S.C. § 1226(e) did not preclude

jurisdiction where habeas petitioner brought constitutional challenge to

statute authorizing his detention without bail).

The government's reliance on *Reno v. American-Arab Anti-*

*Discrimination Commission*, 525 U.S. 471 (1999), in fact serves to underscore

the danger in the authority it claims here. That case stands for the narrow

proposition that "[w]hen an alien's continuing presence in this country is in

violation of the immigration laws, the Government does not offend the

22

Constitution by deporting him for the additional reason that it believes him to be a member of an organization that supports terrorist activity." *Id.* at 491–92. Thus, "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his *deportation*," *id.* at 488 (emphasis added), and 8 U.S.C. § 1252(g) correspondingly barred review of a claim to enjoin deportation proceedings where the claimants were also charged with technical violations of the INA as the grounds for their removal.

In so holding the Court emphasized the non-punitive nature of *removal*: "While the consequences of deportation may assuredly be grave, they are not imposed as a punishment." *Id.* at 491. *Detention* based on one's First Amendment-protected speech is, however, decidedly punitive. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (explaining detention is punitive when it is not justified by "preventing flight" or demonstrated "dangerousness"). And any reading of the INA that prevented constitutional claims seeking relief from detention would, unlike the claims

23

at issue in *AADC*, strike squarely at the constitutional core of habeas. *Thuraissigiam*, 591 U.S. at 107.

That result is not required by the INA. As the district court rightly found, none of the INA's jurisdictional bars on which the government relies operate to strip a court's jurisdiction to review a habeas claim seeking relief from unconstitutional detention. *Öztürk*, 779 F. Supp. 3d at 480–86. Any other conclusion would allow the government to wield detention as a tool to smother disfavored speech and reporting for months or years, so long as it is also pursuing removal proceedings against the person it wishes to silence. It would require non-citizen journalists to wait to seek relief from their detention until a final order of removal is entered and a petition for review can be filed, all the while muzzling their speech, depriving their audience of their reporting on matters of public concern, and chilling the reporting of other non-citizen journalists who wish not to run afoul of the government's favor. Requiring Article III courts to sit idly by in this way while the government openly and continuously inflicts the extraordinary penalty of indefinite detention in retaliation for speech represents a

substantial threat to the freedoms of speech and of the press and would have the predictable result of chilling an enormous amount of public interest reporting.

## CONCLUSION

For the foregoing reasons, amici respectfully urge this Court to affirm the district court's order assuming jurisdiction.

Dated: August 25, 2025                    Respectfully submitted,

*/s/ Gabriel Rottman*
Gabriel Rottman
   *Counsel of record*
Lisa Zycherman
Mara Gassmann*
Allyson Veile*
Ellen Goodrich*
REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
grottman@rcfp.org

*Of Counsel*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5), and Local Rule 29.1(c) because it contains 4,304 words, excluding the parts of this brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Palatino Linotype font.

Dated: August 25, 2025            */s/ Gabriel Rottman*_____
                                              Gabriel Rottman
                                              Counsel of Record for Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2025, I caused the foregoing Brief of Amici Curiae the Reporters Committee for Freedom of the Press, the Committee to Protect Journalists, PEN America, Reporters Without Borders, and Student Press Law Center, to be electronically filed with the Clerk of Court using CM/ECF, which will automatically send notice of such filing to all counsel of record.

Dated: August 25, 2025          */s/ Gabriel Rottman*
                                Gabriel Rottman
                                Counsel of Record for Amici Curiae