# 25-1019

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

RÜMEYSA ÖZTÜRK,

*Petitioner-Appellee,*

v.

PATRICIA HYDE, in her official capacity as the New England Field Director for U.S. Immigration and Customs Enforcement; MICHAEL KROL, in his official capacity as HSI New England Special Agent in Charge, U.S. Immigration and Customs Enforcement; TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; MARCO RUBIO, in his official capacity as Secretary of State; and DONALD J. TRUMP, in his official capacity as President of the United States,

*Respondents-Appellants.*

On Appeal from the United States District Court
for the District of Vermont, No. 2:25-cv-374
Hon. William K. Sessions III

## BRIEF OF *AMICI CURIAE*
## FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, NATIONAL COALITION AGAINST CENSORSHIP, THE RUTHERFORD INSTITUTE, THE CATO INSTITUTE, AND

**FIRST AMENDMENT LAWYERS ASSOCIATION IN SUPPORT OF PETITIONER–APPELLEE**

Ronald G. London
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ronnie.london@thefire.org

Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici curiae* certifies that none of the *amici* has any parent corporation, and no publicly held corporation owns 10% or more of the stock of any of the *amici*.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ...................................................... iii

INTEREST OF AMICI CURIAE ................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 6

ARGUMENT ...................................................................... 10

    I.    Ms. Öztürk's Op-Ed Is Core Protected Political Speech. ...... 10

        A.    Ms. Öztürk has full First Amendment rights. ............. 10

        B.    The First Amendment protects all viewpoints. ........... 12

        C.    Detaining Ms. Öztürk for her pro-Palestine op-ed is unconstitutional viewpoint discrimination. ............. 15

        D.    The administration's detention of Ms. Öztürk amounts to unconstitutional retaliation. ..................... 18

    II.    Arrests Targeting Protected Advocacy Contradict America's Free-Speech Rights and Values. ........................... 20

        A.    Allowing arrest and detention for speech the government disfavors will chill expression at America's universities and beyond. ............................. 20

        B.    Allowing the Secretary of State to order the arrest and detention of speakers deemed contrary to the national interest is an un-American approach to speech. ....................................................................... 22

CONCLUSION ..................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Am.-Arab Anti-Discrimination Comm. v. Reno,*
70 F.3d 1045 (9th Cir. 1995)....................................................10, 11

*Bridges v. California,*
314 U.S. 252 (1941)................................................................9, 10

*Bridges v. Wixon,*
326 U.S. 135 (1945)....................................................6, 10, 12, 24

*Brooks v. Auburn Univ.,*
296 F. Supp. 188 (M.D. Ala. 1969) ................................................16

*Connick v. Myers,*
461 U.S. 138 (1983)....................................................................13

*Cox v. Louisiana,*
379 U.S. 536 (1965)......................................................................6

*Davis v. Goord,*
320 F.3d 346 (2d Cir. 2003) ..........................................................19

*Garrison v. Louisiana,*
379 U.S. 64 (1964)......................................................................12

*Gay & Lesbian Students Ass'n v. Gohn,*
850 F.2d 361 (8th Cir. 1988)..........................................................16

*Hartman v. Moore,*
547 U.S. 250 (2006)....................................................................19

*Healy v. James,*
408 U.S. 169 (1971)................................................................16, 20

*Holder v. Humanitarian L. Project,*
561 U.S. 1 (2010)....................................................................15, 18

*Hous. Cmty. Coll. Sys. v. Wilson,*
595 U.S. 468 (2022)....................................................................19

*Iancu v. Brunetti*,
    588 U.S. 388 (2019)................................................................17

*Int'l Soc'y for Krisha Consciousness, Inc. v. Barber*,
    650 F.2d 430 (2d Cir. 1981) ..............................................22

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967)......................................................16, 20

*Kwong Hai Chew v. Colding*,
    344 U.S. 590 (1953)................................................................10

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
    594 U.S. 180 (2021)................................................................21

*Matal v. Tam*,
    582 U.S. 218 (2017)................................................................17

*Matthews v. City of New York*,
    779 F.3d 167 (2d Cir. 2015) ..............................................19

*Mills v. Alabama*,
    384 U.S. 214 (1966)......................................................13, 19

*Molpus v. Fortune*,
    432 F.2d 916 (5th Cir. 1970)..............................................16

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)................................................................12

*Pahls v. Thomas*,
    718 F.3d 1210 (10th Cir. 2013)..........................................11

*Papish v. Bd. of Curators of Univ. of Mo.*,
    410 U.S. 667 (1973)................................................................13

*Rafeedie v. INS*,
    795 F. Supp. 13 (D.D.C. 1992)....................................10, 12

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)......................................................16, 20

*Sessions v. Dimaya,*
    584 U.S. 148 (2018) ...................................................................9

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ....................................................8, 13, 15

*Sweezy v. New Hampshire,*
    354 U.S. 234 (1957) ...................................................................8

*Terminiello v. City of Chicago,*
    337 U.S. 1 (1949) .......................................................................6

*Texas v. Johnson,*
    491 U.S. 397 (1989) ...................................................................8

*United States v. Alvarez,*
    567 U.S. 709 (2012) .................................................................13

*United States v. Robel,*
    389 U.S. 258 (1967) ...................................................................7

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) .................................................................16

**Statutes**

8 U.S.C.
    § 1182(a)(3)(B)(i)(VII) ............................................................17
    § 1227(a)(1) ...............................................................................17
    § 1227(a)(4)(B) .........................................................................17

18 U.S.C.
    § 2339A(b)(1) ...........................................................................15

An Act Concerning Aliens,
    ch. 58, § 2, 1 Stat. 570 (1798) ...............................................8

**Constitutional Provisions**

U.S. Const. amend. I ...............................................................10

**Foreign Laws**

Federal Law of the Russian Federation on Information,
    Informational Technologies and the Protection of
    Information [Russian Federation Collection of Legislation]
    2006, No. 31, Item 3448.................................................................23

Law of Printing and Publication (Royal Decree No. M/32, 3/9/1424
    H), art. 9 (2003) (Saudi Arabia) .......................................................23

Xianfa art. 51 (1982) (China).................................................................23

**Other Authorities**

*Enrollment Trends*, Open Doors.............................................................20

James Madison,
    The Report of 1800 (Jan. 7, 1800) ..................................................11

John Hudson,
    *No Evidence Linking Tufts Student to Antisemitism or
    Terrorism, State Dept. Office Found*, Wash. Post (Apr. 13,
    2025) ..............................................................................................14

Josh Dawsey, Karen DeYoung & Marianne LeVine,
    *Trump Told Donors He Will Crush Pro-Palestinian Protests,
    Deport Demonstrators*, Wash. Post (May 27, 2024) .......................21

Thomas Jefferson,
    First Inaugural Address (Mar. 4, 1801)..........................................24

## INTEREST OF AMICI CURIAE[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights on college campuses nationwide through public advocacy, targeted litigation, and *amicus curiae* filings in cases that implicate expressive rights. In June 2022, FIRE expanded its advocacy beyond the university setting and now defends First Amendment rights both on campus and in society at large. In lawsuits across the United States, FIRE works to vindicate First Amendment rights without regard to the speakers' views. *See, e.g.*, *Trump v. Selzer*, No. 4:24-cv-449 (S.D. Iowa filed Dec. 17, 2024); *Volokh v. James*, No. 23-356, 2025 WL 2177513 (2d Cir. Aug. 1, 2025); *Novoa v. Diaz*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022), *appeal docketed*, No. 22-13994 (11th Cir. argued June 14, 2024); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025), *appeal docketed*, No. 25-2366 (9th Cir.

---

[1] All parties consent to the filing of this brief. No counsel for a party authored this brief in whole or in part. Further, no person, other than *amici*, their members, or their counsel contributed money intended to fund this brief's preparation or submission.

Apr. 14, 2025); *Villarreal v. Alaniz*, 145 S. Ct. 368 (2024). As such, FIRE is deeply concerned by the government's claim of authority to subject resident aliens to adverse action for their expressed viewpoints.

The National Coalition Against Censorship (NCAC) is an alliance of more than 60 national non-profit literary, artistic, religious, educational, professional, labor, and civil liberties groups. NCAC was founded in 1974 in response to the United States Supreme Court's landmark decision in *Miller v. California*, 413 U.S. 15 (1973), which narrowed First Amendment protections for sexual expression and opened the door to obscenity prosecutions. The organization's purpose is to promote freedom of thought, inquiry, and expression, and to oppose censorship in all its forms. NCAC engages in direct advocacy and education to support free expression rights of students, teachers, librarians, artists, and others. NCAC has long opposed attempts to censor or limit youth free expression on college campuses and tracks efforts to suppress artistic and cultural expression related to political conflict in Israel and Palestine. *See, e.g.*, Art Censorship Index: Israel and Palestine 2023-Onwards, NAT'L COAL. AGAINST CENSORSHIP, https://ncac.org/art-censorship-index-israel-palestine-2023-onwards. It

therefore has a longstanding interest in assuring the continuance of robust First Amendment protections for all, including students and noncitizens. The positions advocated in this brief do not necessarily reflect the views of NCAC's member organizations.

The Rutherford Institute is a nonprofit civil liberties organization headquartered in Charlottesville, Virginia. Founded in 1982 by its president, John W. Whitehead, the Institute provides legal assistance at no charge to individuals whose constitutional rights have been threatened or violated and educates the public about constitutional and human rights issues affecting their freedoms. The Rutherford Institute works tirelessly to resist tyranny and threats to freedom by seeking to ensure that the government abides by the rule of law and is held accountable when it infringes on the rights guaranteed by the Constitution and laws of the United States.

The Cato Institute is a nonpartisan public-policy research foundation established in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that

are the foundation of liberty. Toward those ends, Cato files *amicus* briefs, publishes books and studies, conducts conferences, and produces the annual *Cato Supreme Court Review*.

The First Amendment Lawyers Association (FALA) is a nonpartisan, nonprofit bar association comprised of attorneys throughout the United States and elsewhere whose practices emphasize defense of Freedom of Speech and of the Press, and which advocates against all forms of government censorship. Formed in the mid-1960s, FALA's members practice throughout the U.S. in defense of the free speech. Since its founding, its members have been involved in many of the nation's landmark free expression cases, including cases before the Supreme Court. *See*, *e.g.*, *Ashcroft v. Free Speech Coalition, Inc.*, 535 U.S. 234 (2002) (successful challenge to Child Pornography Prevention Act argued by FALA member and former president H. Louis Sirkin); *United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803 (2000) (successful challenge to "signal bleed" portion of Telecommunications Act argued by FALA member and former president Robert Corn-Revere). In addition, FALA has a tradition of submitting *amicus* briefs to the Supreme Court on issues pertaining to the First Amendment. *See*, *e.g.*, *City of Littleton*

4

*v. Z.J. Gifts D-4, LLC,* 2004 WL 199239 (Jan. 26, 2004) (*amicus* brief submitted by FALA); *United States v. 12,200-ft Reels of Super 8mm Film*, 409 U.S. 909 (1972) (order granting FALA's motion to submit *amicus* brief).

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness."

## INTRODUCTION AND SUMMARY OF ARGUMENT

It is unthinkable that a person in a free society could be snatched from the street, imprisoned, and threatened with deportation for expressing an opinion the government dislikes. Certainly not in the country envisioned by our nation's Framers. America's founding principle, core to who and what we are as a Nation, is that liberty comes not from the benevolent hand of a king, but is an inherent right of every man, woman, and child. That includes "the opportunity for free political discussion" as "a basic tenet of our constitutional democracy." *Cox v. Louisiana*, 379 U.S. 536, 552 (1965). And "a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). For these reasons, along with all citizens, "freedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945).

Secretary of State Marco Rubio, however, facilitated the arrest and detention of a PhD student, Rümeysa Öztürk, not because the government claims she committed a crime or other deportable offense, but for the seemingly sole reason that her expression—an op-ed in a student newspaper—stirred the Trump administration to anger. ICE made a discretionary decision to detain Ms. Öztürk under 8 U.S.C. § 1226(e). *See* Op. and Order 38, Dkt. No. 104. The district court explained that "[h]er detention did not flow naturally as a consequence of her removal proceedings." *Id.* The Secretary argues his discretionary power over lawfully present international students includes the authority to subject them to arrest, detention, and deportation for even *protected* speech. It does not.

The First Amendment's protection for free speech trumps a federal statute. *United States v. Robel*, 389 U.S. 258, 268 n.20 (1967). Accepting Secretary Rubio's position would irreparably damage free expression in the United States, particularly on college campuses. Foreign students would (with good reason) fear criticizing the current American government during classroom debates, in term papers, and on social media, lest they risk arrest, detention, and eventually deportation. That

7

result is utterly incompatible with the longstanding recognition that "[t]he essentiality of freedom in the community of American universities is almost self-evident," and that "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

Secretary Rubio claims (as do all censors) that this time is different, that university students' pro-Palestinian (and, as administration officials allege, anti-Israel) views cannot be tolerated. But "if there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive." *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (holding the First Amendment protects burning the American flag in protest); *see also Snyder v. Phelps*, 562 U.S. 443, 454 (2011) (holding the First Amendment protects displaying "God Hates Fags" and "Thank God for Dead Soldiers" posters outside a military funeral).

The government's actions against Ms. Öztürk harken back to the infamous Alien Friends Act of 1798, which allowed President John Adams to deport any alien deemed a danger to "public safety." An Act Concerning Aliens, ch. 58, § 2, 1 Stat. 570, 571 (1798). It was "one of the

most notorious laws in our country's history," "widely condemned as unconstitutional," and "may have cost the Federalist Party its existence." *Sessions v. Dimaya*, 584 U.S. 148, 185 (2018) (Gorsuch, J., concurring). Yet today, Secretary Rubio allows this stain of history to repeat itself.

The "First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the press.' It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow." *Bridges v. California*, 314 U.S. 252, 263 (1941) (footnote omitted) (invalidating criminal convictions, including of a noncitizen, based on protected speech). Our "liberty-loving society" does not permit arrest, detention, and deportation as a punishment solely based on an opinion voiced in a newspaper. And dismissal of Ms. Öztürk's habeas petition, as the government seeks, would prolong the very unconstitutional harms her lawsuit seeks to prevent. The Court should dismiss the government's appeal or affirm the district court's order denying the government's motion to dismiss Ms. Öztürk's petition.

## ARGUMENT

### I.    Ms. Öztürk's Op-Ed Is Core Protected Political Speech.

### A.    Ms. Öztürk has full First Amendment rights.

The First Amendment provides "Congress shall make no law … abridging the freedom of speech, or of the press." U.S. Const. amend. I. And the Supreme Court has made clear the Constitution's "freedom of speech and of press is accorded aliens residing in this country." *Wixon*, 326 U.S. at 148 (citing *Bridges*, 314 U.S. 252). Our First Amendment does not "acknowledge[] any distinction between citizens and resident aliens." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (citation omitted); *see also Wixon,* 326 U.S. at 161 (Murphy, J., concurring) ("Once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders … including those protected by the First Amendment." (cleaned up)).

This has stood as established law for more than 70 years. *See, e.g.*, *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1065 (9th Cir. 1995); *Rafeedie v. INS*, 795 F. Supp. 13, 22 (D.D.C. 1992) ("It has long been settled that aliens within the United States enjoy the protection of the First Amendment …."). That is because the First

10

Amendment operates as a restraint on government subjecting those under its power to disfavored treatment based on their opinions. *See Pahls v. Thomas*, 718 F.3d 1210, 1239 (10th Cir. 2013).

Administration officials' statements about Ms. Öztürk and her arrest have confused fundamental distinctions between government powers to permit or deny an individual's request to enter the United States versus the rights of an individual who has lawfully entered and resides here on a visa. *See, e.g.*, Am. Pet. and Compl. ¶¶ 59–62, Dkt. No. 12. To be sure, Congress has broad powers to set rules for allowing or excluding aliens from entry. But "[t]he Framers explicitly recognized that aliens within this country participate in a reciprocal relationship of societal obligations and correlative protection." *Am.-Arab Anti-Discrimination Comm.*, 70 F.3d at 1065. As James Madison explained, "As [aliens] owe, on one hand, a temporary obedience, they are entitled, in return, to their protection and advantage." James Madison, The Report of 1800 (Jan. 7, 1800), *reprinted by* Nat'l Archives: Founders Online, https://perma.cc/BF76-6LCD. And it is especially so when the government seeks to arrest, detain, and eventually deport a lawfully present visa-holder for engaging in protected speech.

11

There is no merit to a government argument that, because the political branches have broad authority over immigration matters, the government can cast aside the constitutional rights of legal residents like Ms. Öztürk. Because "resident aliens have constitutional rights it follows that Congress may not ignore them in the exercise of its 'plenary' power of deportation." *Wixon*, 326 U.S. at 161 (Murphy, J., concurring). Like all noncitizens in the United States, Ms. Öztürk "is entitled to the same First Amendment protections as United States citizens." *Rafeedie*, 795 F. Supp. at 22.

## B. The First Amendment protects all viewpoints.

America's First Amendment and commitment to freedom of speech reflect "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). "Speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder*,

562 U.S. at 452 (cleaned up) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)).

Ms. Öztürk's pro-Palestinian op-ed is core protected political speech. Newspaper editorials expressing opinions "play an important role in the discussion of public affairs" at the heart of the First Amendment's protections. *Mills v. Alabama*, 384 U.S. 214, 219 (1966). And the First Amendment protects the "mere dissemination of ideas" regardless of "how offensive to good taste" some may find them. *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973) (protecting political cartoon and article in campus newspaper). There is no serious argument that Ms. Öztürk's op-ed contains any unprotected speech, and the government does not assert any such claim could be made.[2]

Nor can the administration justify Ms. Öztürk's detention by vaguely alleging Ms. Öztürk's speech supported terrorism. First of all, it

---

[2] *See United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality opinion) (holding categories of speech unprotected by the First Amendment are carefully cabined and limited to: incitement, obscenity, defamation, speech integral to criminal conduct, fighting words, child pornography, fraud, true threats, and speech presenting a "grave and imminent threat the government has the power to prevent, although a restriction under [this] last category is most difficult to sustain" (citation omitted)).

didn't. Öztürk's op-ed criticized her university's administration for dismissing student government resolutions concerning asserted violations of international law in Palestine. Am. Pet. ¶¶ 2 & n.1, 16. And according to press reports, a State Department memo indicates the State Department found no evidence linking Öztürk to antisemitism or Hamas.[3]

Even then, advocacy far more aggressive than Öztürk's would still retain full First Amendment protection. The Antiterrorism and Effective Death Penalty Act of 1996 criminalizes providing specified foreign terrorist organizations like Hamas, ISIS, and Al-Qaeda "material support or resources," defined as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials[.]

---

[3] John Hudson, *No Evidence Linking Tufts Student to Antisemitism or Terrorism, State Dept. Office Found*, Wash. Post (Apr. 13, 2025), https://www.washingtonpost.com/national-security/2025/04/13/tufts-student-rumeysa-ozturk-rubio-trump/.

18 U.S.C. § 2339A(b)(1). Mere statements of opinion in student newspapers arguing for a university to weigh in on a foreign conflict are conspicuously absent from that list. *See id.*

In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the Supreme Court held that under this definition, even expressing support *for a terrorist organization* or its goals, without more, does not qualify as providing material support. As the Court explained, Congress had not "sought to suppress ideas or opinions," but rather prohibited "material support," which "most often does not take the form of speech at all." *Id.* at 26. Protests and independent advocacy are not "material support" for terrorism. They are protected speech.

Some nations react to disfavored speech by "punishing the speaker." *Snyder*, 562 U.S. at 461. But as a "Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Id.* That is the path this Court should, and must, follow here.

### C.  Detaining Ms. Öztürk for her pro-Palestinian op-ed is unconstitutional viewpoint discrimination.

American free speech jurisprudence dictates that the government may not punish people based on their opinions. "If there is any fixed star

15

in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion ...." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). That means "the government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Courts have rejected viewpoint discrimination for decades, particularly at universities. Courts at all levels have rebuffed efforts at public universities to restrict ideas by limiting who may teach,[4] who may be invited to speak,[5] which publications to fund,[6] and what organizations to recognize or fund.[7]

---

[4] *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 602–603 (1967) (loyalty oaths for university faculty).

[5] *Molpus v. Fortune*, 432 F.2d 916, 917 (5th Cir. 1970) (university speaker bans); *Brooks v. Auburn Univ.*, 296 F. Supp. 188, 196 (M.D. Ala. 1969) ("Alabama cannot ... regulate the content of the ideas students may hear" because that is "unconstitutional censorship in its rawest form").

[6] *Rosenberger*, 515 U.S. at 825–29 (denial of funding to Christian student newspaper).

[7] *Healy v. James*, 408 U.S. 169 (1971) (denial of recognition to student political group); *Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 363–67 (8th Cir. 1988) (refusal of funding to student gay rights group following state legislature's resolution).

The government's detention of Ms. Öztürk for the reasons given to date amounts to confessed viewpoint discrimination. The Department of Homeland Security's spokesperson said the government targeted Öztürk for purportedly "[g]lorifying and supporting terrorists." Am. Pet. ¶ 60. Rubio, referring to pro-Palestinian advocacy, said he would go after any foreign national he believed was "supporting Hamas." *Id.* ¶ 43. But the government has not claimed Ms. Öztürk ever engaged in terrorist activity or provided material support to a terrorist organization, and it does not rely on immigration statutes concerning terrorism. *E.g.*, 8 U.S.C. §§ 1227(a)(1), (4)(B), 1182(a)(3)(B)(i)(VII).

Instead, the government has targeted Ms. Öztürk because of her advocacy for Palestinians in a student newspaper. That constitutes blatant viewpoint discrimination, which remains unlawful even when others find the speaker's message offensive. The "proudest boast of our free speech jurisprudence is that we protect the freedom to express the thought that we hate." *Matal v. Tam*, 582 U.S. 218, 246 (2017) (plurality opinion) (cleaned up); *see also Iancu v. Brunetti*, 588 U.S. 388, 396 (2019) (protecting speech "offensive to many Americans," including on the subject of "terrorism," because "a law disfavoring 'ideas that offend'

17

discriminates based on viewpoint, in violation of the First Amendment" (citation omitted)).

The government has not claimed Ms. Öztürk engaged in terrorist activity. It instead characterizes her political opinion as "glorifying" terrorists. Am. Pet. ¶¶ 60–61. Even were that a remotely plausible characterization of an op-ed criticizing the university for refusing to adopt resolutions passed by the Tufts undergraduate student senate urging the university to financially divest from Israel, independent advocacy of views or causes remains fully within the First Amendment's protection. *Holder*, 561 U.S. at 39.

The government's justification for detaining Ms. Öztürk has not included *any* allegations that she engaged in any speech or conduct not protected by the First Amendment. Instead, the government relies solely on Ms. Öztürk's protected expression. That is unacceptable under our Constitution and under bedrock American principles of free speech.

### D. The administration's detention of Ms. Öztürk amounts to unconstitutional retaliation.

Arresting and detaining Ms. Öztürk because of her political opinions is textbook unlawful retaliation. "The law is settled that as a general matter the First Amendment prohibits government officials from

subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Unlawful retaliation occurs when, after an individual engages in protected conduct, the government takes "adverse action" against them, and there is a "causal connection between this adverse action and the protected speech." *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015). Action is adverse if it "would deter a similarly situated individual of ordinary firmness from exercising" their freedom of speech. *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003).

The administration's arrest and detention of Ms. Öztürk ticks each unconstitutional box. As explained above, writing an op-ed on a matter of public concern is quintessential protected speech. *Mills*, 384 U.S. at 219.  There can be no doubt arrest and detention would deter a person of ordinary firmness from writing an op-ed. *See Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) (categorizing "an arrest" as an "easy to identify" adverse action). And the Trump administration has repeatedly confirmed its actions against Ms. Öztürk are predicated on her protected speech. *See, e.g.*, Am. Pet. ¶¶ 59–62. The administration's arrest and

detention of Ms. Öztürk is quintessential retaliation and barred by the Constitution.

## II. Arrests Targeting Protected Advocacy Contradict America's Free-Speech Rights and Values.

### A. Allowing arrest and detention for speech the government disfavors will chill expression at America's universities and beyond.

Arresting and detaining Ms. Öztürk for engaging in protected expression on a university campus is irreconcilable with the Supreme Court's admonition that colleges and their "surrounding environs" are "peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180–81 (quoting *Keyishian*, 385 U.S. at 603). We count on universities to act as the historic "center of our intellectual and philosophic tradition" of open debate and inquiry. *Rosenberger*, 515 U.S. at 835.

There are more than a million international students studying at America's universities.[8] None of them will feel safe criticizing the American government of the day—in class, in scholarship, or on their own time—if a current or future secretary of state may, whenever he

---

[8] *Enrollment Trends*, Open Doors, https://opendoorsdata.org/data/international-students/enrollment-trends [https://perma.cc/5UQU-X3SQ] (last visited Mar. 18, 2025).

chooses and at his unreviewable discretion, facilitate their arrest and detention based on their spoken or written advocacy.

That is not the American free speech tradition. Our schools "have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 190 (2021). Secretary Rubio may disapprove of what Ms. Öztürk has to say, but it is his constitutional duty to defend her right to say it, whether on or off campus.

The point of the administration's action against Ms. Öztürk *is* the chill—to scare the Nation's million-plus foreign students and tens of millions of lawful resident noncitizens from engaging in pro-Palestinian advocacy (even though millions of citizens freely engage in the very same advocacy). That is what candidate Trump promised on the campaign trail. In 2024, he vowed, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[9] Then, after

---

[9] Josh Dawsey, Karen DeYoung & Marianne LeVine, *Trump Told Donors He Will Crush Pro-Palestinian Protests, Deport Demonstrators*, Wash. Post (May 27, 2024),

Ms. Öztürk's arrest, Secretary Rubio justified detaining her and other student protestors by claiming they are "supportive of movements that run counter to the foreign policy of the United States." Op. and Order 50 (quoting Secretary Rubio's remarks to the press). The equation for foreign students is simple: Support the administration's view of the war in Gaza, or else.

This must not stand. "Our commitment to precious First Amendment freedoms is tested when unpopular" speakers and groups "seek refuge within its scope." *Int'l Soc'y for Krisha Consciousness, Inc. v. Barber*, 650 F.2d 430, 447 (2d Cir. 1981). In America, some advocate ideas that are "discomforting, unsettling, and obnoxious." *Id.* But they "are entitled to the First Amendment freedoms we all enjoy, and considerations of comfort or convenience cannot prevail." *Id.*

## B. Allowing the Secretary of State to order the arrest and detention of speakers deemed contrary to the national interest is an un-American approach to speech.

Allowing the Secretary of State to retaliate against speakers if he deems it in the national interest would place the United States among

---

https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors [https://perma.cc/2EU2-GNG9].

strange bedfellows when it comes to freedom of speech. For example, Article 51 of China's Constitution provides that individual liberty gives way if the government decides the expression "undermine[s] the interests of the state." Xianfa art. 51 (1982).[10] Russia's laws, too, permit the "[r]estriction of access to information" in the name of protecting "morality," its system of government, and the "security of the state." Federal Law of the Russian Federation on Information, Informational Technologies and the Protection of Information [Russian Federation Collection of Legislation] 2006, No. 31, Item 3448.[11] And Saudi Arabia prohibits expression that serves any "foreign interest" conflicting with the "national interest" or that "stir[s] up discord among citizens." Law of Printing and Publication (Royal Decree No. M/32, 3/9/1424 H), art. 9 (2003).[12]

---

[10] Available at: https://english.www.gov.cn/archive/lawsregulations/201911/20/content_WS5ed8856ec6d0b3f0e9499913.html [https://perma.cc/D8DG-5RSH].

[11] Available at: https://www.wto.org/english/thewto_e/acc_e/rus_e/wtaccrus58_leg_369.pdf [https://perma.cc/GW9F-C78F].

[12] Available at: https://www.saudiembassy.net/law-printing-and-publication [https://perma.cc/PG92-U2F4].

America, however, has charted a different course than the world's censorial kings and regimes. In 1801, President Thomas Jefferson used his first inaugural address to defend the free speech rights of those who called for dissolution of the Union. He proclaimed, "If there be any among us who would wish to dissolve this Union or to change its republican form, let them stand undisturbed as monuments of safety with which error of opinion may be tolerated and where reason is left free to combat it."[13] Little could be more dangerous to the interests of a fledgling nation than calling for its extinction, yet our commitment to free speech remained. So it should today, 224 years later.

## CONCLUSION

The freedom of foreign nationals lawfully residing in the United States is not "dependent upon their conformity to the popular notions of the moment," because the First Amendment "belongs to them as well as to all citizens." *Wixon,* 326 U.S. at 166 (Murphy, J., concurring). The arrest and detention of Ms. Öztürk violate the First Amendment and betray more than two centuries of American commitment to free and

---

[13] Thomas Jefferson, First Inaugural Address (Mar. 4, 1801), *reprinted by* Nat'l Archives: Founders Online, https://perma.cc/647Z-7LP9.

open expression. The Court should dismiss the government's appeal or affirm the district court's order denying the government's motion to dismiss Ms. Öztürk's petition.

Dated: August 25, 2025             Respectfully Submitted,

/s/ *Ronald G. London*
Ronald G. London
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ronnie.london@thefire.org

Counsel for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,511 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: August 25, 2025                    /s/ *Ronald G. London*
                                                              Ronald G. London

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 25, 2025, an electronic copy of the foregoing was filed with the Clerk of this Court using the CM/ECF system, and that all parties will be served through that system.

/s/ *Ronald G. London*
Ronald G. London