# No. 25-1019

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

RÜMEYSA ÖZTÜRK,

*Petitioner-Appellee,*

v.

PATRICIA HYDE, in her official capacity as the New England Field Director for U.S. Immigration and Customs Enforcement; MICHAEL KROL, in his capacity as HSI New England Special Agent in Charge, U.S. Immigration and Customs Enforcement; TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; MARCO A. RUBIO, in his official capacity as Secretary of State; DONALD J. TRUMP, in his official capacity as President of the United States,

*Respondents-Appellants.*

**On Appeal from the U.S. District Court for the District of Vermont
District Court Case No. 2:25-cv-374**

**BRIEF OF SERVICE EMPLOYEES INTERNATIONAL UNION;
AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO; COMMUNICATIONS WORKERS OF
AMERICA; NATIONAL EDUCATION ASSOCIATION; INTERNATIONAL
UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA; UNITED ELECTRICAL,
RADIO & MACHINE WORKERS OF AMERICA; AND UNITE HERE
AS *AMICI CURIAE* IN SUPPORT OF PETITIONER-APPELLEE**

*(Counsel listed on next page)*

Steven K. Ury
Service Employees International Union
1800 Massachusetts Avenue, N.W.
Washington, D.C. 20036
202-730-7466

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* Service Employees International Union; American Federation of State, County and Municipal Employees, AFL-CIO; Communications Workers of America; National Education Association; The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America; United Electrical, Radio & Machine Workers of America; and UNITE HERE have no parent corporations. They have no stock, and, therefore, no publicly held company owns 10% or more of their stock.

Dated: August 22, 2025                     Respectfully submitted,


                                           /s/ Steven K. Ury
                                           Steven K. Ury

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................... iii

STATEMENT OF INTEREST ....................................................................1

INTRODUCTION ......................................................................................4

ARGUMENT .............................................................................................5

I.    THE GOVERNMENT'S ACTIONS IN THIS CASE VIOLATE THE FIRST AMENDMENT ................................................................5

II.   THE GOVERNMENT'S ACTIONS IN THIS CASE HAVE RESULTED IN SIGNIFICANT AND FORESEEABLE HARMS TO THE CONSTITUIONALLY PROTECTED RIGHTS OF *AMICI* AND THEIR MEMBERS ................................15

    A.   B.'s Story ......................................................................15

    B.   S.'s Story .......................................................................16

    C.   L.'s Story .......................................................................18

    D.   R.C.'s Story ..................................................................19

    E.   S.L.'s Story ...................................................................20

CONCLUSION .......................................................................................22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Allende v Schultz*,
605 F. Supp. 1220 (D. Mass. 1985), *aff'd* 845 F.2d 1111
(1st Cir. 1988) ...................................................................................14

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
70 F.3d 1045 (9th Cir. 1995) .................................................................9

*Bantam Books v. Sullivan*,
372 U.S. 58 (1963).................................................................................13

*Bridges v. Wixon*,
326 U.S. 135 (1945)................................................................................8

*Crawford-El v. Britton*,
523 U.S. 574, 588 n.10 (1998)...............................................................10

*Grayned v. Rockford*,
408 U.S. 104 (1972)................................................................................11

*Hartman v. Moore*,
547 U.S. 250 (2006)................................................................................10

*Keyishian v. Bd. of Regents*,
385 U.S. 589 (1967)................................................................................13

*Lamont v. Postmaster Gen.*,
381 U.S. 301 (1965)................................................................................14

*NAACP v. Button*,
371 U.S. 415 (1963)................................................................................11

*Nat'l Rifle Ass'n. of Am. v. Vullo*,
602 U.S. 175 (2024)................................................................................13

*Nieves v. Bartlett*,
587 U.S. 391 (2019)................................................................................9

*Ozturk v. Trump*,
779 F. Supp. 3d 462 (D. Vt. 2025) .....................................................6, 9

*Police Dep't of Chicago v. Mosley*,
    408 U.S. 92 (1972).............................................................................10

*R.A.V. v. St. Paul*,
    505 U.S. 377 (1992)...........................................................................10

*Rosenberger v. Rectors & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995)...........................................................................10

*Smith v. Goguen*,
    415 U.S. 566 (1974)...........................................................................11

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)...........................................................................13

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957)...........................................................................14

*Terminiello v. Chicago*,
    337 U.S. 1 (1949).................................................................................8

*Texas v. Johnson*,
    491 U.S. 397 (1989).............................................................................8

*Thomas v. Collins*,
    323 U.S. 516 (1945)...........................................................................15

*Thornhill v. Alabama*,
    310 U.S. 88 (1940).............................................................................15

*West Virginia State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943).............................................................................8

## <u>Other Authorities</u>

Ali Bianco, *Rubio Says State Department Has Revoked 300 Student
    Visas*, POLITICO (Mar. 27, 2025)........................................................7

John Hudson, *No Evidence Linking Tufts Student to Antisemitism or
    Terrorism*, WASH. POST (Apr. 13, 2025) .........................................12

Nik DeCosta-Klipa, *Why was Tufts Student Rumeysa Ozturk Detained
    by ICE? Here's What We Know*, WBUR (Mar. 28, 2025)....................6

Rümeysa Öztürk et al., *Try Again President Kumar: Renewing Calls for Tufts to Adopt March 4 TCU Senate Resolutions*, THE TUFTS DAILY (Mar. 26, 2024)............................................................................7

Senate, TUFTS COMMUNITY UNION ..........................................................7

Zach Montague, *Trump's Student Arrests, and the Lawsuit Fighting Them, Tread New Ground,* N.Y. TIMES (July 22, 2025) ...................................11

## STATEMENT OF INTEREST[1]

The **Service Employees International Union ("SEIU")** is a labor organization of approximately two million working people with members in the United States and Canada. SEIU's members include foreign-born U.S. citizens, lawful permanent residents, and immigrants authorized to work in the United States. Many of SEIU's members have mixed-status families. In Massachusetts, SEIU Local 509 represents nearly 20,000 human services workers and educators throughout the state, including graduate student workers at Tufts University. Rümeysa Öztürk is a member of SEIU Local 509.

The **American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME")** is a union of 1.4 million public service workers throughout the United States, Puerto Rico, and the District of Columbia. AFSCME represents a wide variety of public and private sector employees including individuals working in higher education. AFSCME members share a commitment to public service and advocate for fairness and security in their workplaces and communities. AFSCME is participating in this case to advance its mission of helping all working people achieve the American dream, regardless of their or their

---

[1] No party opposes the filing of this brief. No counsel of any party to this proceeding authored any part of this brief. No party or party's counsel, or person other than *amici* and their members, contributed money to the preparation or submission of this brief.

parent's national origin, and to uphold the First Amendment's guarantee of freedom of expression. AFSCME members, which include immigrants and the children of immigrants, contribute to our localities, states, and country every day, and they deserve the opportunities, security, and rights provided under the U.S. Constitution.

**The Communications Workers of America ("CWA")** is the largest communications and media labor union in the United States. Its membership consists of workers in the communications and information industries, as well as the news media, the airlines, broadcast and cable television, public service, higher education, health care, manufacturing, video games, and high tech. CWA takes an active role advocating for its members on workplace issues, which includes participating in litigation as a party or amicus.

The **National Education Association ("NEA")** is the nation's largest professional association and union, representing approximately three million members – the vast majority of whom serve as educators, counselors, and education support professionals in our nation's public schools and higher education institutions.

The **International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW")** is one of the largest and most diverse unions in North America, with members in the United States, Canada,

and Puerto Rico and in virtually every sector of the economy. From its earliest days, the UAW has been a leader in the struggle to secure economic and social justice for all people. It has a rich history of supporting inclusion, equity, and diversity in the higher education sector and in all workplaces. The UAW has nearly 1,000,000 active and retired members and represents approximately 120,000 workers in higher education – graduate students, postdoctoral scientists, researchers, university staff, and faculty – at institutions across the country including Northeastern University, Wellesley College, University of Southern California, Columbia University, Harvard University, University of Pennsylvania, Princeton University, and Worcester Polytechnic Institute, among many others. Since its founding in 1935, the UAW's membership has included immigrants from around the globe. UAW strongly supports these members' ability to study, work, and live in the United States without fear that their First Amendment-protected speech or expression will result in deportation or other adverse immigration action.

The **United Electrical, Radio and Machine Workers of America ("UE")** is a democratic, independent national union representing tens of thousands of workers in a wide variety of manufacturing, public sector and private service-sector jobs. While many UE members still work in factories related to the union's traditional jurisdictions in electrical manufacturing and metalworking, UE members are also rail crew drivers, hospital workers, co-op workers, federal

contract workers, teachers, paraeducators, clerical workers, graduate workers, scientists and librarians.

**UNITE HERE** is an international labor union that primarily represents workers in the hotels, casino gaming and food service industries, and has approximately 270,000 members in the United States. Service jobs in the hospitality industry attract new immigrants as they arrive and seek work opportunities in United States, and as a result, UNITE HERE's membership includes many immigrants who are temporarily authorized to work in the United States. In addition to service industry workers, UNITE HERE also represents a bargaining unit of graduate student workers at Yale University, many of whom are foreign nationals who, like Rümeysa Öztürk, are in the United States for graduate study and work in connection with their studies.

## INTRODUCTION

*Amici* submit this brief in support of Ms. Öztürk's petition for habeas relief. Absent such relief, Ms. Öztürk will suffer the loss of her home, her education, her job, and the support that comes from membership in a union. This brief highlights the chilling effect that the government's *in terrorem* actions have had, not only on Ms. Öztürk, but also on her co-unionists (both citizen and non-citizen) and the students they teach at Tufts and other institutions of higher learning.

# ARGUMENT

## I. THE GOVERNMENT'S ACTIONS IN THIS CASE VIOLATE THE FIRST AMENDMENT

Petitioner Rümeysa Öztürk is a Ph.D. candidate in Child Study and Human Development at Tufts University. She is also a member of SEIU Local 509, which is the certified bargaining representative for graduate student workers at Tufts. On March 25, 2025, Ms. Öztürk was arrested and handcuffed outside her apartment in Somerville, Massachusetts, by a group of six armed U.S. Immigration and Customs Enforcement ("ICE") agents in plainclothes, some wearing masks and hoods. Taken to an unmarked vehicle, she was transported to Methuen, Massachusetts, then to Lebanon, New Hampshire, and ultimately to an ICE Field Office in St. Albans, Vermont. Early the following morning, ICE moved Ms. Öztürk from Vermont to a detention facility in Basile, Louisiana. These transfers occurred without notice to Ms. Öztürk's lawyers. Despite repeated efforts of her counsel and the Turkish consulate to learn her whereabouts, the government did not disclose her place of confinement until late on the day she was transported to Louisiana.

In response to a habeas petition challenging Ms. Öztürk's detention, the district court entered an order on April 18 requiring the government to return Ms. Öztürk to the District of Vermont no later than May 1, 2025. The government appealed and sought a stay. Following this Court's denial of the motion for a stay on May 7, the district court ordered Ms. Öztürk's release from detention pending

5

the adjudication of her habeas petition. Ms. Öztürk was released on May 9 having

been in ICE custody for over six weeks.

Ms. Öztürk's apprehension was captured on a video that quickly went viral,

and her story was extensively covered by the national and international press. Her

counsel submitted evidence in district court from five experienced immigration

attorneys that the manner of her arrest and detention – including her transfer

through five states and several detention facilities in a 24-hour period – was highly

unusual. *See Ozturk v. Trump*, 779 F. Supp. 3d 462, 489 (D. Vt. 2025).

Ms. Öztürk was not initially informed that the Department of Homeland

Security ("DHS") and ICE were pursuing visa revocation or that the revocation

had occurred. After her arrest, Ms. Öztürk eventually learned that the government

had revoked her student visa and begun removal proceedings against her.

Commenting on her case, Secretary of State Marco Rubio told reporters

Ms. Öztürk's visa was revoked because of her criticism of Israel's response to the

October 7th attacks[2] and that "I think it's stupid for any country in the world to

---

[2] Nik DeCosta-Klipa, *Why was Tufts Student Rumeysa Ozturk Detained by ICE? Here's What We Know*, WBUR (Mar. 28, 2025), https://www.wbur.org/news/2025/03/28/rumeysa-ozturk-marco-rubio-ice-detainment-israel-hamas-tufts-newsletter.

welcome people into their country that are going to go to your universities as visitors, and say 'I'm going to your universities to start a riot.'"[3]

Despite this hyperbolic rhetoric, the government's only actual evidence that it has cited purporting to justify the revocation of Ms. Öztürk's student visa is an op-ed piece that she co-authored in *The Tufts Daily* newspaper on March 26, 2024, one year prior to her arrest. That op-ed did nothing but voice a political opinion. It urged the University "to meaningfully engage with and actualize" three resolutions passed by the Tufts Community Union Senate,[4] which is described on its website as the main governing body for Tufts undergraduate students. *See* Senate, TUFTS COMMUNITY UNION, https://tcu.tufts.edu/senate (last visited Aug. 18, 2025). Those resolutions, passed in response to events in the Mideast, called on the University "to acknowledge the Palestinian genocide," disclose its investments, and divest from companies tied to Israel.[5]

The political views expressed first by the Senate resolutions and then by Ms. Öztürk and her co-authors may be controversial, but they are undoubtedly

---

[3] Ali Bianco, *Rubio Says State Department Has Revoked 300 Student Visas*, POLITICO (Mar. 27, 2025), https://www.politico.com/news/2025/03/27/marco-rubio-student-visas-palestine-00005141.

[4] Rümeysa Öztürk et al., *Try Again President Kumar: Renewing Calls for Tufts to Adopt March 4 TCU Senate Resolutions*, THE TUFTS DAILY (Mar. 26, 2024), https://www.tuftsdaily.com/article/2024/03/4ftk27sm6jkj.

[5] *Id.*

protected by the First Amendment. As the Supreme Court recognized decades ago, and has reaffirmed many times since:

> [A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purposes when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.

*Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). "Speech is often provocative and challenging," but that fact does not give the government license to censor the speech or punish the speaker. *Id*. at 4. To the contrary, "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (collecting cases). Indeed, just the opposite is true. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . ." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

In its public statements, the government has suggested that Ms. Öztürk's presence in the United States is a privilege that can be revoked without regard to the First Amendment. The Supreme Court long ago rejected the idea that the First Amendment applies only to U.S. citizens. *See Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded to aliens residing in this country."). The reasons for that go to the very core of who we are as a nation.

8

"Because we are a nation founded by immigrants . . . [i]t is especially appropriate that the First Amendment tolerance for different voices restrain our decision to expel a participant in that community from our midst." *Am-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1064 (9th Cir. 1995).

Ms. Öztürk has persuasively shown that the government's actions in this case violate the First Amendment on multiple grounds. *Amici* will not repeat those arguments here. Suffice to say that as punishment for writing an op-ed piece in her university newspaper – an expressive activity that surely lies at the core of the First Amendment – Ms. Öztürk was subject to an abduction-style arrest, transferred without notice to her lawyers in the middle of the night, and detained in a remote facility far from family and legal counsel while the government seeks her removal from the United States and the consequent disruption of her academic career. On this record, the district court was amply justified in concluding that Ms. Öztürk has at the very least, "presented evidence" – which the government has so far failed to refute – that the ordeal she has suffered was caused by the government's retaliatory motive, and that the First Amendment claims she has raised are "serious and worthy of further exploration." *Ozturk*, 779 F. Supp. 3d, at 491-92 (citing *Nieves v. Bartlett*, 587 U.S. 391 (2019)).[6]

---

[6] While citing *Nieves*, the district court left open the question of whether its "but for" standard applies on the facts of this case. *Id.*

9

Viewpoint discrimination is "an egregious form of content discrimination" and not permitted under the First Amendment. *Rosenberger v. Rectors & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992); *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). Likewise, "[o]fficial reprisal for protected speech offends the Constitution [because] it threatens to inhibit exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (quoting *Crawford-El v. Britton,* 523 U.S. 574, 588 n.10 (1998)). Thus, "the law is settled that as a general matter the First Amendment prohibits the government from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman*, 547 U.S. at 256. Yet, that is precisely what the government has done to Ms. Öztürk.

The ripple effects of the government's actions further highlight their unconstitutionality. In this case, the government's punitive response followed Ms. Öztürk's exercise of her First Amendment rights. As a result, others who reasonably fear that they may be subject to the same treatment have been inhibited from exercising their rights in the first place. *See* pp. 15-22. The government's approach to deterrence is thus exactly backwards. It is undeterred by the Constitution in pursuing its own immigration agenda while it seeks to deter the constitutionally protected speech of those, like Ms. Öztürk, whose immigration status can be threatened by the government.

10

Compounding the problem, the unwritten policy that forms the predicate for the government's effort to expel Ms. Öztürk from the United States is hopelessly vague. At various times, the government has indicated that its concern is focused on pro-terrorist speech, pro-Palestinian speech, or antisemitic speech. At other times, it has seemingly conflated all three. When dealing with First Amendment rights, where "[b]road prophylactic rules . . . are suspect" and "precision of regulation must be the touchstone," such vagueness is fatal. *NAACP v. Button*, 371 U.S. 415, 428 (1963). The Supreme Court has therefore been clear that the void-for-vagueness doctrine "demands a greater degree of specificity" when First Amendment rights are at stake than in other contexts. *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

The policy that lies at the heart of this case perfectly illustrates the twin evils that vagueness creates. *See, e.g.*, *Grayned v. Rockford*, 408 U.S. 104, 108-09 (1972). On the one hand, the policy provides virtually no guardrails for those charged with implementing the policy. Four veteran immigration agents recently testified that they could not remember ever being asked to make arrests like the ones they carried out in March and April of this year.[7] On the other hand, the

---

[7] Zach Montague, *Trump's Student Arrests, and the Lawsuit Fighting Them, Tread New Ground,* N.Y. TIMES (July 22, 2025), https://www.nytimes.com/2025/07/22/us/politics/trump-student-arrests-immigration-trial.html.

policy provides those targeted by the policy with virtually no guidance on how to steer clear of conduct that may get them in trouble with the authorities. Ms. Öztürk has been victimized by both of those vices.

In response to widespread criticism that it is engaging in an ideological purge, the Trump administration has claimed that each affected individual has been carefully vetted (albeit based on undisclosed criteria). The facts of Ms. Öztürk's case suggest otherwise. According to published reports, an investigation by the State Department uncovered no evidence linking Ms. Öztürk to antisemitism, despite public statements to the contrary by the Trump administration.[8] That finding did not deter the government from arresting and detaining Ms. Öztürk, or from publicly accusing her of engaging in activities "in support of Hamas."[9]

This pattern of behavior has had a direct, immediate, and foreseeable impact on the constitutional rights of *amici* and its members, particularly those who, like Ms. Öztürk, engage in teaching as part of their graduate school training. Moreover, that chilling effect is felt by citizens and non-citizens alike, as documented more fully in the personal accounts that follow. Most significantly, other student visa holders understandably fear that they will suffer the same fate as Ms. Öztürk unless

---

[8] John Hudson, *No Evidence Linking Tufts Student to Antisemitism or Terrorism*, WASH. POST (Apr. 13, 2025), https://www.washingtonpost.com/national-security/2025/04/13/tufts-student-rumeysa-ozturk-rubio-trump/.
[9] *Id.*

they refrain from publicly expressing political viewpoints, especially related to the ongoing Mideast conflict, that are inconsistent with the government's preferred orthodoxy. The resulting self-censorship is an objectively reasonable response to the government's actions and threats in Ms. Öztürk's case and elsewhere. Even when applying the more stringent test for Article III standing, the Supreme Court has recognized an injury-in-fact when "the threat of future enforcement . . . is substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014).

Such self-censorship is inconsistent with principles of academic freedom and undermines core free speech values in multiple ways. First, it violates the free speech rights of the students themselves. The government may not utilize threats to stifle constitutionally protected speech. *Bantam Books v. Sullivan*, 372 U.S. 58 (1963). Nor is there any need in this case to worry about defining when the line has been crossed into impermissible coercion. *Cf. Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024). The revocation of Ms. Öztürk's visa (along with many others visa revocations) as a prelude to removal from the United States is inherently coercive.

Second, classroom discussion is irreparably damaged if students do not feel free to fully express themselves. "The classroom is peculiarly the marketplace of ideas," *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) (internal quotation marks omitted). Interference with that marketplace violates the rights of everyone

in that classroom, whether speaker or listener, citizen or non-citizen. The First Amendment protects not only the right to express ideas but to receive them as well. *See e.g.*, *Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965); *Allende v Schultz*, 605 F. Supp. 1220 (D. Mass. 1985), *aff'd* 845 F.2d 1111 (1st Cir. 1988).

Union members who teach those classes are doubly affected. Education is an iterative process and educators, no less than students, suffer a First Amendment loss when classroom discussion is less robust than it would be otherwise because of the fear that the "wrong" comment can lead to life-altering consequences. In an effort to protect their students from the government's unconstitutional overreach, *amici's* members are refraining from teaching certain topics and initiating certain discussions rather than risk exposing their students to government scrutiny and potential adverse action, including arrest and detention. The Supreme Court has long held that the ability of the university to determine for itself what to teach and how to teach it are essential components of academic freedom. *See Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring).

Because a union is by definition a collective entity, each of the harms described above – the unconstitutional effort to revoke Ms. Öztürk's visa and expel her from the United States, the chilling affect that effort and the underlying policy it reflects creates for other non-citizen union members, and the intrusion upon an academic process in which *amici*'s members are personally involved – also impair

14

the First Amendment right of the *amici* themselves to engage in constitutionally protected organizing and advocacy for, by, and on behalf of all of their members, regardless of their citizenship status. *See Thomas v. Collins*, 323 U.S. 516, 532 (1945); *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940).

## II. THE GOVERNMENT'S ACTIONS IN THIS CASE HAVE RESULTED IN SIGNIFICANT AND FORESEEABLE HARMS TO THE CONSTITUIONALLY PROTECTED RIGHTS OF *AMICI* AND THEIR MEMBERS

### A. B.'s Story

B., an adjunct professor of economics at a university in Boston and a member of SEIU Local 509, has taught undergraduate students for more than 15 years. In B.'s experience, the arrest and detention of Local 509's member, Ms. Öztürk, "[w]ho was exercising her right to free speech by writing an op-ed in a campus newspaper, is already having far-reaching impact on the students and faculty in our campus community."

Based on B.'s work teaching international students he knows that many, "[a]re frightened by the prospect of losing the opportunity to complete their education in the U.S., and being arrested by masked and hooded ICE officers, all because they expressed an opinion that this administration disfavors. Why would any student want to run that risk when it's safer to self-censor oneself?" B. is aware that the University of Toronto has received a record number of inquiries regarding transfer applications from international students in the United States.

15

B. considers it essential that students feel free to ask questions and engage in robust classroom discussions in his economics courses. "[E]conomics is often understood in the context of good policy and if my students fear asking or examining economic policy issues learning is impeded. Students should be able to discuss trade and tariff policies in an economics classroom – and those discussions are at risk."

B. describes the concerns he and his fellow faculty members expressed during meetings of faculty. "[W]e are disturbed about Rümeysa and other international scholars. What is happening to academic freedom? Our faculty discussed the consequences of the heavy hand of the federal government mandating what can be taught and discussed in the classroom and in the academic community. Under federal government directives relayed by the university, I have already revised my summer term syllabus and deleted references that could be deemed to involve DEI."

B. reflects on the long-term effects on higher education if the government continues to suppress free speech. "People fear asserting their right to free speech now, what will happen to academic freedom of speech if these policies continue?"

**B.     S.'s Story**

S. is an adjunct professor in the Fine Arts department at a college in Boston and a member of SEIU Local 509. An adjunct professor for more than 25 years, S.

teaches drawing and painting and is an artist herself. S.'s early years were spent in a campus community where her parents were educators. "Having grown up and worked my entire professional life in an academic community I know a lot about the importance of freedom of speech and expression."

S. remembers that the arrest and detention of her fellow union member, Ms. Öztürk, was terrifying in a very personal way. She recounts that it caused her to reconsider whether free-flowing discussion in the classroom, the exchange of ideas, and the ability to offer students a safe place to learn and grow would be possible. S. fears that Ms. Öztürk's experience is a warning to us all, especially in academia, that the cherished right to dissent no longer exists. The image of Ms. Öztürk's arrest by masked and hooded men who "put you in a car and drive away" for no other reason than having co-authored an op-ed in a student newspaper is a defining one for her. "[T]hat happens in other countries but not in the U.S."

S. reflects on the symbolism of that image, "being taken to prison for your ideas, that's not the American way . . . but it's a message to all people in the U.S., Americans and non-citizens alike, be afraid, be afraid to express your opinions. Silence yourselves."

S. works with students whom she teaches to express themselves in their art. "I don't teach students to censor themselves. In fact, the opposite, I teach them to

17

reach into themselves and do not be afraid to express themselves." S. fears that academic freedom, her ability to encourage her students to freely express themselves in their art, and her students' willingness to do so is undermined by the suppression of free ideas that Ms. Öztürk's arrest, detention, and possible deportation represents.

### C.    L.'s Story

L., an adjunct faculty in the social sciences at a university in Boston, is a member of SEIU Local 509. For more than 15 years she has worked with graduate student teaching assistants and taught courses to undergraduate students. L. believes that the government's arrest and prosecution of Ms. Öztürk and other restrictions on academic freedom are a direct attack on "[t]he principles upon which this country was founded and on what makes this country great."

After viewing the video of Ms. Öztürk's arrest and seizure by government officers and knowing that it was a response to her op-ed in the student newspaper, L. is fearful for herself and her students. "[I] am anxious about bringing any ideas into the classroom that are contrary to those of the Trump administration. I don't want to bring undue attention to myself by having discussions with my students on a subject with which the current administration disagrees. No one knows, neither me nor my students, whether a simple writing assignment would end up resulting in being targeted by the government."

18

Approximately 25% of the student population in L.'s university are international students. To avoid placing students in a potentially dangerous situation, L. has altered assignments that require students to address issues that the current administration might find controversial. L. recounts a conversation with one of her brightest students, an international student, who described their fears, "[I] have nightmares that ICE is outside my door waiting to take me away."

L. is also concerned about the loss of her freedom of expression. "The distinction between what is an acceptable opinion and what will be censored is becoming more and more limited. It's arbitrary and subject to the whims of the current administration. It's not the America I know."

L. reflects that "around here we celebrate the 250th ride of Paul Revere and take our democracy pretty seriously. We believe that the government should not trample our freedom of speech or suppress our right to have an opinion."

### D.    R.C.'s Story

R.C. is a member of the National Education Association ("NEA") who held leadership positions in the union as a student. She lives and works as an educator in the Western United States. R.C. is not a U.S. citizen but is authorized to work in the United States through the Optional Practical Training (OPT) program that allows non-citizens to work for up to 12 months following graduation. Prior to this year, R.C. openly discussed her political opinions and values. She shared messages

on social media that concerned human rights and civil rights. She believed that in the United States every person had the right to peacefully express their opinions.

R.C. learned about the abduction and detention of Ms. Öztürk and other international students who spoke out about human rights issues through the news media in the spring of 2025. After hearing about these arrests, detentions and abductions, R.C. fears expressing her beliefs publicly. Although she is living and working in the United States legally, as a non-citizen she feels especially vulnerable and at risk. Now she refrains from engaging in any activities, including participating in protests or posting on social media, that could be considered anti-government or political. She is very worried that if she voices a political opinion, she will lose her ability to reside and work in the United States and be subject to arrest and detention.

R.C. is troubled about the loss of her freedom of expression. In the past she believed that the United States was a country where everyone was free to communicate their political opinions without fear of the government's reaction. She no longer believes that is true.

### E.    S.L.'s Story

S.L. is an adjunct professor of psychology at a university near Boston and a member of SEIU Local 509. A professor for more than ten years, S.L. believes that learning can only occur in a setting where students are encouraged to express their

ideas and concerns openly. S.L. reflects that "[m]ost educators understand that freedom of expression is essential in the classroom and I think this is particularly true in our psychology course classrooms."

S.L. has seen firsthand that the well-known and widely shared video of her fellow union member, Ms. Öztürk, who was whisked away by masked and hooded agents, frightened students and faculty and sent a clear message that freedom of expression is no longer permitted. She witnesses her students "[s]elf censoring their ideas and despairs that where there used to be robust classroom discussions, I now see fear and uncertainty dominating the classroom conversations. The intimidating impact of this arrest has been devastating for international and citizen students alike."

S.L. works with young adults who are exploring different points of view at a formative time of their lives. She notes that, "[i]n my classes, it's important for students to learn to engage in critical thinking, a skill which is only possible if alternate theories are analyzed and discussed. One of my classes, research and methodology, requires students to challenge presumptions and discuss different perspectives. That kind of learning is impossible if certain viewpoints are silenced because the students fear expressing ideas that are contrary to the current government orthodoxy."

21

S.L. believes that as a result of the government's actions against Ms. Öztürk and other international students, "[m]any international students will decide that they don't want to study in the United States any longer. That would be a loss for the international students, the academic community, and the free speech rights of us all."

As these experiences demonstrate, the transfer order by the district court is necessary and appropriate to vindicate Ms. Öztürk's First Amendment rights.

## CONCLUSION

The district court's transfer order should be affirmed.

Dated: August 22, 2025        Respectfully submitted,


/s/ Steven K. Ury
Steven K. Ury
Service Employees International Union
1800 Massachusetts Avenue, N.W.
Washington, D.C. 20036
(202) 730-7466

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 22, 2025, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Second Circuit by using the ACMS system. Counsel in this case are registered ACMS users and service will be accomplished by the ACMS system.

/s/ Steven K. Ury
Steven K. Ury

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 5,546 words and complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point.

/s/ Steven K. Ury
Steven K. Ury